# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Jeffrey J. Prosser and John P. Raynor,

                Plaintiffs,

v.

Federal Agricultural Mortgage Corporation; the
United States Department of Agriculture, and
National Rural Utilities Cooperative Finance
Corporation;

                Defendants

Case: 1:08-cv-00687
Assigned To : Robertson, James
Assign. Date : 4/22/2008
Description: Pro Se Gen. Civil

)
)
)
)
)
)
)
)

Declaratory Judgment
&
Request for An Injunction

Comes now Plaintiffs and for their Claims for Relief against the Defendants state:

## JURISDICTION AND VENUE

1.  This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201,
seeking injunctive relief pursuant to 28 U.S.C. § 2202. This Court has jurisdiction
pursuant to 28 U.S.C. § 1346 and 12 U.S.C.A. § 2279aa-14. Venue is proper under 28
U.S.C. § 1402.

## PARTIES TO THE ACTION

2.  Plaintiff Jeffrey J. Prosser ("Jeff Prosser") is a citizen and resident of the
United States Virgin Islands. Plaintiff Prosser is a citizen of a state other than the District
of Columbia.

3.  Plaintiff John P. Raynor ("Raynor") was the long-time confident of Jeff
Prosser had served as a director, consultant, and attorney to Innovative Communication
Corporation, a U. S. Virgin Islands corporation, a corporation that was beneficially

owned by Jeff Prosser and his wife. Plaintiff Raynor is a citizen of a state other than the District of Columbia.

4.      The Federal Agricultural Mortgage Corporation ("Farmer Mac") is a stockholder-owned, federally chartered instrumentality of the United States and is designated as an instrumentality of the United States by 12 U.S.C.A. § 2279aa-1(a)(1). Farmer Mac is located 1133 Twenty-First Street, N.W., Suite 600, Washington, D.C. 20036.

5.      The United States Department of Agriculture (the "USDA") is a Department of the United States Government. The USDA is headquartered at 1400 Independence Ave., S.W., Washington, DC 20250.

6.      Defendant National Rural Utilities Cooperative Finance Corporation ("CFC") is a tax-exempt (not-for-profit) financing cooperative formed pursuant to the laws of the District of Columbia and operates out of its offices at 2201 Cooperative Way, Herndon, VA 20171.

### STATEMENT OF THE CASE

7.      This case involves the unlawful bailout by the Federal Government of CFC, an unregulated, privately-owned, and corrupt cooperative association:

(intentionally left blank)

| | Farmer Mac | REDLG Program | Total |
|---|---|---|---|
| 29-Jul-05 | $ 500,000,000 | - | $ 500,000,000 |
| 22-Nov-05 | - | $ 500,000,000 | 500,000,000 |
| 22-Feb-06 | - | 500,000,000 | 500,000,000 |
| 9-May-06 | - | 1,000,000,000 | 1,000,000,000 |
| 15-May-07 | 365,600,000 | - | 365,600,000 |
| 1-Aug-07 | 40,000,000 | - | 40,000,000 |
| 7-Aug-07 | - | 500,000,000 | 500,000,000 |
| 2-Jan-08 | 34,000,000 | - | 34,000,000 |
| 28-Mar-08 | 400,000,000 | - | 400,000,000 |
| **Total** | $ 1,339,600,000 | $ 2,500,000,000 | $ 3,839,600,000 |

The money is not being invested in rural America; rather, the money is being invested to bail out CFC an organization imbue with fraudulent practices. In fact, CFC has contracted while receiving Government funding.

## GENERAL ALLEGATIONS

8.      Defendant USDA administers the Rural Economic Development Loan and Grant ("REDLG") program - a program that provides funding to rural projects through local utility organizations. At issue is the USDA approval and guarantee of $2.5 Billion in bonds issued by CFC and purchased by the Federal Financing Bank ("FFB") pursuant to the REDLG program.

9.      Defendant Farmer Mac was created by Congress in 1988 by the Agricultural Credit Act of 1987, which added a new Title VIII to the Farm Credit Act of 1971 (12 U.S.C. 2279aa et seq.) to establish a secondary market for mortgages secured by agricultural real estate (defined as land upon which crops are grown) and rural housing mortgage loans to increase the availability of long-term credit at stable interest rates to

American farmers, ranchers and rural homeowners. Farmer Mac has over $1.3 Billion in non-program investments issued by CFC.

10.     Defendant CFC is a tax-exempt (not-for-profit) financing cooperative ("coop" means cooperative association). CFC is controlled by (i) the Electric utilities that are members of the National Rural Electric Cooperative Association ("NRECA") and (ii) by the Board of NRECA. CFC lends money directly to rural electric utilities and lends money, indirectly, to rural telephone companies through Rural Telephone Finance Corporation ("RTFC"), a taxable cooperative, which is under the dominion and control of CFC.

11.     CFC is an unregulated, tax-exempt, private entity that exists due to the desire of Defendant, National Rural Electric Cooperative Association ("NRECA") and NRECA members to have a financing cooperative that is under their control.

12.     The Rural Telephone Finance Corporation ("RTFC") is a taxable cooperative legally domiciled in the District of Columbia, **created by CFC** in 1987 purportedly to serve the financial needs of the rural telecommunications industry. RTFC's Headquarters is co-located with CFC at 2201 Cooperative Way, Herndon, Virginia 20171.

13.     Since creating RTFC, CFC has controlled RTFC through unlawful means. **Attachment "A"** sets details the history of CFC unlawful control of RTFC. For example, CFC's Chief Executive Officer, CFC's Chief Financial Officer, and CFC's General Counsel also concurrently serve in the same capacities for RTFC. RTFC is a captive coop with no independent counsel, accountants, or advisors independent, separate and distinct from CFC's counsel, accountants, and advisors.

4

14.     Upon information and belief, RTFC is and always has been nothing more than a legal façade for CFC: a legal entity to record loans that CFC made to rural telephone companies.

15.     Upon information and belief, CFC's purpose for forming RTFC as a separate entity to make loans to rural telephone companies was to ensure that the rural telephone patrons had no legal control or influence over CFC (no input in the democratic control of CFC). RTFC was created and exists solely as a legal entity interposed between the rural telephone patrons and CFC (all RTFC funding is derived from CFC) so that rural telephone patrons had no direct access to or influence upon CFC's accounting and financial information of CFC. Further, the two-tier coop structure denied rural telephone patrons access to the standard published rates CFC was and is making available to rural electric companies.

16.     CFC used, and continues to use, this two-tier coop structure so that CFC could subsidize both loans made to and patronage dividends distributed to Electric utilities patrons at the expense of rural telephone patrons. Profits that legally belonged to rural telephone patrons were misappropriated for the benefit of rural electric patrons. The subsidization scheme is an unlawful plan, scheme, and design (the "Subsidization Scheme"). CFC discriminates against its rural telephone patrons for the benefit of rural electric patrons.

17.     The Subsidization Scheme was accomplished in two steps.

18.     The First Step of the Subsidization Scheme: CFC used the pricing of inter-coop loans (loans between CFC and RTFC) to sweep the vast majority of RTFC's profits into CFC. For instance, RTFC's results from operations for fiscal year 1998 and 2004

reveal that members' loans nearly tripled from $1.6 Billion to $4.6 Billion, RTFC's Gross

Revenue more than tripled from $91 Million to $306 Million, and yet, RTFC's operating

margin (income before allocations from CFC) **decreased** from $3.1 Million in 1998 to

$2.0 Million in 2004.

19.    The Second Step of the Subsidization Scheme: Thereafter, CFC distributes

and allocates RTFC's patronage income to CFC's the electric utility patrons.

Furthermore, relying upon the income stream produced by rural telephone patrons, CFC

made loans to electric patrons at little or no margin.

20.    The Subsidization Scheme is inconsistent with operating the financing

business "on a cooperative basis" and is not in accord with CFC's tax exempt status.

21.    There are three fundamental characteristics to coops, which are:

(i)    Subordination of capital;

(ii)    Democratic control of the Coop by the worker-members

themselves; and

(iii)    The vesting in and the allocation among the worker-members of all

fruits and increases arising from their cooperative endeavor in proportion to the

worker-members' active participation in the cooperative endeavor.

22.    The conduct of a Subsidization Scheme is inconsistent with the operating

principles of coops; especially (iii) above requiring the income of the coop to be allocated

to the patron whose business created the income.

23.    As part of the fraud CFC strongly advocates the very values the

Subsidization Scheme violates. **Attachment "B"** is CFC's published Web pages on coop

CFC, owned and controlled by its rural electric patrons, discriminates against its rural telephone patrons. The formation of RTFC and the interposition between RTFC between CFC and the rural telephone patrons is part and parcel to the discriminatory practices of CFC.

27.    RTFC, as a borrower and associate (non-voting) member, is a patron of CFC. RTFC is entitled to have its contribution to CFC's profits, net savings, allocated to RTFC's capital account "as if" the RTFC had made a cash contribution to CFC's capital.

28.    RTFC, as a coop, allocates its income among its members: the rural telephone patrons.   Consequently, misappropriation of RTFC's income is a misappropriation of income belonging to RTFC's members, the rural telephone patrons.

29.    Effectively, an electric member owned coop, CFC, used RTFC to abscond money that rightfully belonged to rural telephone companies and distribute the fruits of the Subsidization Scheme through

      (i)    Subsidized lending rates to Electric utilities; and

      (ii)   Distributions of RTFC's income to Electric utilities.

The subsidized lending rates to Electric utilities resulted CFC's Fair Value Financial Insolvency.

30.    CFC's management, serving concurrently as management of RTFC and standing in a fiduciary relationship to the rural telephone patrons, the RTFC members, used their offices and CFC's illegal control over RTFC to bring about the Subsidization Scheme. Each of these officers of RTFC has actual knowledge of the amount of money improperly diverted from RTFC to CFC through the Subsidization Scheme.

31.    Before May 31, 2005 CFC raised the majority of its funds through access to the public debt markets.  CFC is a reporting company within the meaning of the Securities and Exchange Act of 1934, section 12(g).

32.    Arthur Andersen LLP ("AA") was the auditor of CFC and RTFC for fiscal year 2001 (the year ending May 31, 2001) and for all earlier years of RTFC's existence.

33.    Until fiscal year 2004, CFC used the "Combined Financial Statements" of CFC and RTFC in its SEC filings.  For fiscal year 2004 and later years, CFC used the "Consolidated Financial Statements" of CFC and RTFC in its SEC filings.

34.    Upon information and belief, the only reason CFC files Combined or Consolidated Financial Information is to mask or conceal the Subsidization Scheme. Combined and Consolidated Financial Statements lessen the reporting requirements as to the CFC-RTFC relationship.  Additionally, CFC's disclosures in its SEC filings do not comply with FAS 57, *Related Party Disclosures*.

35.    Discovery of the Subsidization Scheme was dependent upon accurate footnotes to the Combined or Consolidated Financial Statements of CFC-RTFC.  In the footnotes to the financial statements, Generally Accepted Accounting Principles ("GAAP") require disclosure of the profit and loss that each business segment (line of business) contributed to the reporting entity's profits.  This disclosure is governed by FAS 131, *Disclosures about Segments of an Enterprise and Related Information*.  These are the Financial Statements CFC used to raise money from the public.

37.    CFC first began reporting Segment Information in fiscal year 1999.  FAS 131 was issued in 1997 was not applicable to CFC until fiscal year 1999.

38.    CFC's Financial Statements, audited by AA, reported two separate segments: electric loans and telephone loans. (FN 11 to the Financial Statements contained in the 10Ks for fiscal years 1999, 2000, and 2001)

39.    CFC did not properly implement FAS 131.  As later acknowledged by a subsequent auditor, the AA audited Financial Statements: "The amount reported for the electric systems represented the total earned on loans from CFC to its electric members and RTFC. The amount reported for the telecommunications systems represented the incremental amount earned [by RTFC] on its CFC loans that it re-lent to the telecommunications systems". (2002 10K, FN 13, p. 97)

39.    In essence, the SEC Form 10K (annual report) for 2002 acknowledged that the profits purloined from RTFC by CFC as the first step of the Subsidization Scheme (through inter-coop loans) was reported as CFC's profit and not as RTFC's profit during the period AA served as CFC's and RTFC's auditor.  AA's methodology made it impossible to discern the Subsidization Scheme and was not in accord with FAS 131.

40.    Upon information and belief, CFC's departure from GAAP with respect to reporting Segment Information was intentional to mask and conceal the Subsidization Scheme.  Upon information and belief, the CFC officers acted with scienter within the meaning of Securities and Exchange Acts.

41.    Ernst and Young LLP ("Ernst") first annual report (the 2002 10K) restated Segment Information for fiscal years 2000 and 2001 in accord with FAS 131.

42.    Based upon the Ernst segment information CFC misappropriated $51.8 Million: $23.3 Million for 2000 and $28.5 Million for 2001.  **Exhibit "2",** attached

hereto, provide a comparison of the AA Segment Information to the Ernst Segment Information as well as RTFC's audited results.

43.    Upon information and belief, AA based CFC's right to combine financial statements of CFC with RTFC upon CFC's voting control over RTFC.  RTFC was referred to as "a controlled affiliate of CFC" because "RTFC's bylaws require that the majority of RTFC's board of directors be elected from individuals designated by CFC". (2001 10K, p. 58)  This voting arrangement was illegal.

44.    Upon information and belief, Ernst would not tolerate blatantly illegal voting arrangement.  CFC opted to guarantee RTFC from all loan losses for a fee.  The 2007 10K states: "CFC has agreed to indemnify RTFC ... Therefore, there is no loan loss allowance required at RTFC...".  (2007 10K, p. 38)

45.    The Subsidization Scheme resulted in the defalcation of $262 Million from RTFC for fiscal years 2000 through 2004.  This is derived (deduced) from a comparison of the RTFC audited Financial Statements to the Segment Information prepared by Ernst.  Adjustments to the Segment Information for the applicable years to determine the $262 Million defalcation are made to reflect the guaranty arrangement.  In the Segment Information the guaranty fee is substituted for the loan loss adjustments. Point 7 at http://cooperativefinancecorporation.com/3101.htm sets forth all the calculations (linked to the source documents) for fiscal years 2000 through fiscal 2004 which are incorporated by reference.

46.    After discord with the Plaintiffs on behalf of Innovative Communication Corporation (ICC) and the Virgin Islands Telephone Corporation (Vitelco), an associate member and a member of RTFC, over the Subsidization Scheme, CFC replaced Ernst

with Deloitte Touché USA LLP ("Deloitte") for fiscal year 2005. Deloitte implemented

AA reporting methodology which is inconsistent with GAAP.

47.    Upon information and belief, the Deloitte partner, Randall B. Johnston,

was formerly a partner with AA and materially involved in AA's audits of CFC.

48.    Upon information and belief, because of Mr. Johnston's involvement,

Deloitte's audits of CFC violate the Sarbanes-Oxley Act of 2002 (SOX) § 208(b) as

implemented by 17 C.F.R. § 210.2-01, requiring a 5-year time-out period (after serving

for five years) for auditors, making the Deloitte audits illegal.

49.    For fiscal years 2005, 2006 and 2007, the Segment Information set forth in

the audited financial statements in CFC SEC form 10Ks (the annual reports) are:

(i)    Inconsistent with GAAP because the Segment Information does

not comport with FAS 107;

(ii)    Inconsistent with GAAP because CFC does not provide disclosures

with respect to CFC-RTFC required by FAS 57; and

(iii)    Inconsistent with Deloitte's representation in Footnote 1(b) that the

statements (and notes) are prepared *after elimination of all material

intercompany accounts and transactions.*"

The foregoing intentional departures from GAAP are intended to mask or conceal the

Subsidization Scheme from the RTFC members and the investing public.

50.    As a by-product of the Subsidization Scheme, CFC made loans to electric

members at uneconomical margins. This business decision deterred questions from

RTFC members that would arise had RTFC been allocated an insignificant portion of the

patronage income. Patronage income was kept low by making loans at uneconomical margins to electric utilities.

51.    By its loan pricing, CFC wagered the continuity of its business on the continuation of the Subsidization Scheme. The following exhibits illustrate this point:

(i)    **Exhibit "3"** proves that as CFC increased long-term loans to electric utilities by $4.8 Billion between 2001 and 2004, the rate differentials (difference in lending rates) between electric and telephone increased by 74 basis points;

(ii)    **Exhibit "4"** proves that the Electric loans were priced so that Electric loans produced little or no spread since fiscal year 2003. The "Net Spread" on Electric loans is calculated in two steps: first, funding costs (basically interest – "Rate on Funded Liabilities) is deducted from the gross income produced by Electric loans to determine the "Spread" (net interest income derived); and secondly, general and administrative expenses allocated to Electric loans are deducted from the Spread to determine the "Net Spread" (income before loan loss adjustments and other items of income and loss).

Exhibit "4" tracks the information from fiscal year 1998 through fiscal year 2007. The column "% TLP" represents the Electric loans percentage of CFC-RTFC total loan portfolio.

52.    Exhibit shows an absolute correlation to the increasing dependency on Electric loans and CFC's financial problems. As Electric loans increased in its share of the CFC's loan portfolio the "Reported Spread" decline because Electric loans were producing little or no spread.

53.     Exhibit "4" can be verified by an examination of the Segment Information for 2004: the last Ernst audit. A $15.5 Billion Electric loan portfolio produced $19.8 Million of Gross Income and a $15.4 Million dollar loss or deficit after deducting general and administrative expenses. (2004 10K, p. 134) CFC restated earnings in 2007. The restatement exacerbates increasing the loss or deficit to over $28.6 Million on a $15.5 Billion Electric loan portfolio.

54.     The loan pricing policies coupled with the increasing dependence upon the Electric loan portfolio (in Exhibit "4", Electric loans increase from a low of 72.95% of the total loan portfolio at the end of fiscal year 2001 to 87.19% of the total loan portfolio for fiscal year 2007) had another negative and harmful repercussion - the Subsidization Scheme caught up to CFC because CFC is insolvent of a Fair Value basis.

55.     CFC is bankrupt on a Fair Value basis. **Exhibit "5"** attached hereto using the Fair Value disclosures in the footnotes to the Financial Statements (CFC's information) and making the calculations that CFC's does not do, proves:

(i)      CFC had a **deficiency** in its Fair Value as of May 31, 2005 of nearly $700 Million. (2006 10K, FN 13, p. 100) CFC was then insolvent on a Fair Value basis.

(ii)     CFC had a **deficiency** in its Fair Value as of May 31, 2006 of nearly $2.0 Billion. (2007 10K, FN 14, p. 111) CFC was then insolvent on a Fair Value basis.

(iii)    CFC had a **deficiency** in its Fair Value as of May 31, 2007 of nearly $1.3 Billion. (2007 10K, FN 14, p. 111) CFC was then insolvent on a Fair Value basis.

CFC's failure to make the foregoing calculations and to frankly disclose and discuss the above is a material omission defrauding CFC's public investors.

56.     CFC's Fair Value reporting does not comport to GAAP, FAS 107, *Disclosures about Fair Value of Financial Instruments*. CFC's methodology overstates the Fair Value of members' loans. CFC's deficient in equity is must worse than its own numbers indicate.

57.     The departure from GAAP centers on the valuation of members' loans which constituted –

      (i)     91.70% of CFC's total assets as of May 31, 2005; and

      (ii)    94.57% CFC's total assets as of May 31, 2007. (Exhibit "5")

Members' loans constitute CFC's largest asset and the loans to Electric members dominate this asset category.

58.     FAS 105, paragraph 5, defines Fair Value as "the fair value of a financial instrument is the amount at which the instrument could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale". CFC uses its internal rates (an unobservable input) as of May 31st each year as the rate to determine Fair Value.

59.     This pricing methodology is subject to manipulation and does not represent market rates since CFC does not purport to charge market rate of interest.

60.     Upon information and belief, misreporting of Fair Value (overstating the value of CFC's largest asset) is intentional and made with scienter. CFC comments on Federal Reserve policy but purportedly can not determine the market rate of a 30-year, 3% mortgage.

61.    Egan-Jones Ratings Co., the only NRSRO that is independent, assigns CFC a junk bond rating to CFC because CFC's margins on loans are so razor-thin.

### Farmer Mac & USDA Steps into the Breach

62.    CFC is not a government sponsored entity and is not regulated by any government agency whatsoever.

63.    CFC is independent of the Farm Credit Administration (the "FCA"), a U.S. Government agency.

64.    CFC's Telephone loans decreased by nearly $2 Billion from May 31, 2003 to May 31, 2005.

65.    With Electric loans as of May 31, 2005 constituting nearly 82% of the CFC loan portfolio and the Electric loan portfolio providing little or no margin before loan losses, CFC was in dire financial straights as of May 31, 2005 because of CFC's financial reliance upon the Subsidization Scheme.

66.    Farmer Mac and the USDA stepped into the breach (Exhibit "4") as follows:

(i)    During fiscal year 2006, Farmer Mac invested $500 Million and the USDA invested $2 Billion in CFC;

(ii)    During fiscal year 2007, Farmer Mac invested $366 Million in CFC; and

(iii)    During fiscal year 2008 (which ends May 31, 2008), Farmer Mac invested $474 Million and the USDA invested $500 Million in CFC.

Without the foregoing investments CFC would have been forced to seek bankruptcy protection.

67.    These investments by the USDA and Farmer Mac are an unlawful bailout of CFC, an entity imbue with fraudulent business practices.

68.    None of the Government investments in CFC are benefiting rural electric and telephone utilities.  CFC's total assets have decreased by $1.5 Billion and CFC's total loan portfolio has decreased by $816 Million since May 31, 2005.  (Exhibit "4")

69.    The elimination of CFC would not eliminate the loans made to rural electric and telephone companies but would bring an end to CFC's continuing fraud! None of the Federal money is benefiting rural America.

70.    In 1987 Congress bailed out the Farm Credit System by authorizing the issuance of taxpayer-backed bonds (the "FCA Bailout").   That bailout required the issuance of $1.261 Billion in Bonds.

71.    To date, Farmer Mac and the USDA have invested over $3.8 Billion in CFC or nearly three times the FCA Bailout.  The $3.8 Billion is not enough.

### *Farmer Mac*

72.    Farmer Mac's investments in CFC are patently unlawful.

73.    12 C.F.R. §652.35, *Eligible non-program investments*, governs Farmer Mac's investments in CFC.

74.    Farmer Mac's investments in CFC constitute two types of investments:

(i)    The purchase of corporate noted issued by CFC (the "CFC Note"); and

(ii)    The purchase of mortgage-backed securities issued by CFC which are backed by the loans secured by Electric distribution schedules.

Farmer Mac has invested $900 Million in CFC Note(s) and $439.6 Million in CFC issued mortgage-backed securities: a sum larger that the FCA Bailout.

75.    These investments violate 12 C.F.R. §652.35 –

(i)    In that, 12 C.F.R. § 652.35(d)(1) restricts Farmer Mac investments in any single 'issuer' to 25% of Farmer Mac's "… regulatory capital in eligible investments issued by **any single entity, issuer or obligor**". This limitation based upon Farmer Mac's **regulatory capital of $230.3 Milli**on (FM 2007 10K, page 25) as of December 31, 2007 restricts Farmer Mac's investment in CFC to $58 Million.

(ii)    In that, 12 C.F.R. § 652.35(a)(6) explicitly requires mortgage-backed securities to be rated 'AAA' by an NRSRO. The mortgage-backed securities issued by CFC are unrated and thus not eligible for investment. (FM 2007 10K, page 70)

(iii)    In that, 12 C.F.R. § 652.35(c) requires that the CFC Note and the CFC mortgage-backed securities "…must be readily marketable. An eligible investment is marketable if you can sell it promptly at a price that closely reflects its fair value in an active and universally recognized secondary market". These investments, a product of private transactions, are not readily marketable and have no secondary market.

(iv)    In that, 12 C.F.R. § 652.35(c) also requires liquidity in that the CFC Note and the CFC issued mortgage-backed securities must be able to be liquidate at price close to Farmer Mac's investment. Upon information and belief, these investments can not be liquidated without substantial discounts.

Farmer Mac's total investment in CFC of over $1.3 Billion exceeds its regulatory capital by a multiple of 5 (5 times the restriction) and by the authorized investment by the sum of $1.1 Billion.

76.    Upon information and belief, Farmer Mac is complicit in CFC's security fraud.

77.    Farmer Mac paid "face value" for the loans backed by the mortgage-backed securities. (CFC's 2007 10K, page 98)  Farmer Mac transaction has contributed to false reliance upon CFC by public investors in that:

(i)    CFC sold loans at par that had a market value substantially below par; and

(iii)    CFC reported income from a transaction that should have produced a large loss (netting the cost of the transaction against the Fair Value and income recognized [1st qtr. 2008] for mortgage servicing rights).

78.    Upon information and belief, a market price sale of the loans backing the mortgage-backed securities sold to Farmer Mac would have produced a $40 Million to $50 Million loss on the sale of CFC's loans.  A $40 Million loss of the sale of loans would have been a 'red flag' for investors as to CFC's financial condition. Farmer Mac's unlawful actions help CFC advert disclosure of the harsh realities of CFC's financial condition to investors.

79.    The Farm Credit Administration Office of Secondary Market Oversight ("FCA-OSMO") purports to have approved Farmer Mac's investment pursuant to CFC 12 C.F.R. § 652.35(e), authority to approve investments on a case-by-case basis. (**Exhibit "6"**)

80.    Any exercise of the FCA-OSMO authority to approve the Farmer Mac investments with respect to CFC is unlawful and can not be relied upon by Farmer Mac.

81.    The primary objective of the regulations is to ensure the safety and soundness and continuity of Farmer Mac operations. FCA, Rules and Regulations, Action: Final Rule, July 14, 2005, 70 FR 40635, at 40635, 2005 WL 1637686. 12 C.F.R. § 652.1 set forth the purpose of the regulations:

> "The purpose of this subpart is to ensure safety and soundness, continuity of funding, and appropriate use of non-program investments considering Farmer Mac's special status as a Government-sponsored enterprise (GSE)."

These regulations bind the regulator (FCA-OSMO) as well as the regulated (Farmer Mac).

82.    There is no legitimate support or basis to forsake the safety and soundness of Farmer Mac by authorizing investments to ensure the safety and soundness of CFC, a private entity. Farmer Mac's investment in CFC exceeds FCA Bailout in 1987.

83.    The FCA's Office of Secondary Market Oversight exists to protect the Federal fisc, not to squander Federal money. Nor does the Office of Secondary Market Oversight have authority pursuant to 12 C.F.R. § 652.35(e) to rewrite Federal laws governing the activities of the FCA and Farmer Mac.

84.    The bailout of CFC, if there is to be one, is a Congressional decision and not one delegated to the FCA-OSMO. The Office of Secondary Market Oversight approval of Farmer Mac investments makes the CFC Bailout no less unlawful.

### *The USDA*

85.    CFC has been the recipient of $2.5 Billion from the Rural Economic Development Loan and Grant ("REDLG") program, 7 U.S.C. § 940c-1.

86.    In re-authorizing the REDLG program, the Conference Committee noted: "This section provides for a new source of private funding for the Rural Economic Development Loan and Grant (REDLG) program. Since enactment in 1987, the REDLG program has provided approximately $185 million in economic development **assistance to rural communities in the form of grants and zero-interest loans for rural development projects** such as water and waste, business incubator, schools, hospitals, emergency services, and general economic and community development." H.R. CONF. REP. 107-424, at p. 588, H.R. Conf. Rep. No. 424, 107TH Cong., 2ND Sess. 2002, 2002 U.S.C.C.A.N. 141, 2002 WL 848327 (Emphasis added)

87.    The implementing regulations of the REDLG program require a fiscally sound borrower for eligibility.  For example -

(i)    7 C.F.R. § 1720.7(b)(3) requires that "The applicant's demonstrated performance of **financially sound business practices**".  As demonstrated, CFC's business practices were unsound.

(ii)    7 C.F.R. § 1720.5(b)(2) requires that the "bonds to be issued by the guaranteed lender [CFC] must receive an underlying investment grade rating from a Rating Agency, **without regard to the guarantee [by the USDA]**".  Upon information and belief, but for CFC's illegality and cozening CFC would not have an investment grade rating.

(iii)    7 C.F.R. § 1720.6(a)(5) requires audited financial statements.  As noted above, upon information and belief the Deloitte audits were illegal because violation of SOX § 208(b) which requires time-out period of 5 years for Mr. Johnston; CFC's auditor at AA and Deloitte.

CFC is insolvent of a Fair Value and hence, is not fiscally sound.

88.    The employees of the USDA owe to the United States and the taxpayers the duty of exercising a reasonable degree of care, skill, and judgment in the performance and discharge of the administration of the REDLG program.

89.    Upon information and belief, USDA's duty to exercise reasonable care, skill, and judgment in approving was not exercised in approving the REDLG loans to CFC.

90.    Mr. James M. Andrew, the Administrator of USDA's Rural Utilities Services, had previously served 16 years on the National Rural Electric Cooperative Association's ("NRECA") board including six years as an officer, including two as the president of NRECA.    On November 10, 2005, Mr. Andrew stated: "As president of NRECA, I served on the board of the National Rural Electric Cooperative Finance Corporation (CFC), a supplemental finance cooperative owned by the members".

91.    Upon information and belief, cronies of NRECA (placed within the USDA's rural utilities services) such as Mr. Andrew were the final authority as to CFC's eligibility for REDLG program because the then Secretary of the Agriculture, Mike Johanns, declared a hands-off policy the Rural Utilities Services because his wife was employed by AllTel Communications, then a rural wireline and wireless rural telephone provider.

92.    None of the money advanced under the REDLG program resulted in investment in rural America.    The investment was made in a financially bankrupt organization – CFC.

*Farmer Mac & the USDA*.

93.     Upon information and belief, the $3.8 Billion Federal government investment in CFC is nothing more than a perverse act of exorbitant cronyism. In the case of Farmer Mac, the investment is so large that Farmer Mac's continuity is now tied to the continuity of CFC – upon information and belief a violation of 18 U.S.C.A. § 657.

94.     Upon information and belief, Mr. Glenn English, a former Congressman (served 20 years), a former member of CFC's board, and the CEO of NERCA orchestrated the CFC bailout. **Exhibit "6",** incorporated herein, credits Mr. English with a lobbying victory. Mr. English retired from CFC's Board on May 31, 2005, upon information and belief, because of his actual knowledge of CFC's precarious financial condition. With at least $2.5 Billion of the $3 Billion available under the REDLG program was absorbed to keep CFC afloat, the REDLG program failed in its goal to support Electric and Telephone projects.

95.     Upon information and belief, the $3.8 Bailout is not enough. CFC remains bankrupt and is seeking additional government funding.

### The Plaintiffs

96.     Plaintiff Jeff Prosser and his wife were the beneficial owners of Innovative Communication Corporation ("ICC"), a U.S. Virgin Islands corporation, and the Virgin Islands Telephone Corporation ("Vitelco"), the local telephone company in the U.S. Virgin Islands.

97.     ICC was an associate member of RTFC, CFC's façade to make loans to rural telephone companies and their affiliates.

98.     Vitelco was a member of RTFC.

99.     Plaintiff Raynor was a long-term board member of Vitelco and ICC as well as business attorney and consultant for Vitelco, ICC and the Prosser.

100.    Plaintiffs have filed, or are in the process of filing, a civil RICO suit naming as Defendants CFC; National Rural Electric Cooperative Association ("NRECA"); CFC's and RTFC's Chief Executive Officer, Sheldon C. Petersen ("Petersen"); CFC's and RTFC's Chief Financial Officer, Steven L. Lilly ("Lilly"); CFC's and RTFC's General Counsel, John J. List ("List"); and NRECA's Chief Executive Officer and a former (1994 thru May of 2005) CFC board member, Glenn L. English ("English").

101.    The civil RICO complaint includes, but is not limited to, allegations of the following predicate acts:

(i)     Numerous violations and a course of conduct in violation of 18 U.S.C. § 1513(e) (SOX § 1107, Retaliation Against Informants) by using RTFC's status as the ICC principal lender as a tool or instrument to threaten or create fear of economic harm to the Plaintiffs or in order to suppress the Plaintiffs and ICC's knowledge of, and rights to seek redress for, the underlying fraud, the Subsidization Scheme, itself an illegal scheme.

(ii)    Numerous acts and a course of conduct in violation of 18 U.S.C. § 1951(a) (the Hobbs Act)—to wit, multiple extortionist acts (a course of conduct) serving RTFC's extortion objective to cause ICC and the Prossers to consent to unlawful acts and consent to depart with valuable property or rights induced by wrongful use of actual or threatened force, violence, or fear.

(iii)   Violations of 18 U.S.C. § 1512(c) (destroying evidence with intent

to influence an official proceeding)- to wit, on or about August 27, 2001, Vaughan (an employee of CFC performing the functions of RTFC's assistant general counsel) corruptly altered, destroyed, and concealed a document, the **Authentic 2001 Loan Agreement** between ICC and RTFC and further did create the **False 2001 Loan Agreement**, with the intent to impair the object's integrity or availability for use in an official proceeding. RTFC proceeded to submit the False 2001 Loan Agreement in numerous legal actions against Plaintiffs.

102. Most of the retaliatory and extortionistic acts constituting the course of conduct in furtherance of suppressing the Plaintiffs knowledge of, and rights to seek redress for, the underlying fraud, the Subsidization Scheme, itself an illegal scheme, occurred after Farmer Mac's initial investment in July of 2005 and the USDA's initial investment in November of 2005.

103. Plaintiffs have suffered harm to their business interest and reputations linked to their discovery of CFC's illegality and cozening.

104. Upon information and belief, Mr. Andrews has actual knowledge of:

   (i)    CFC's Subsidization Scheme;

   (ii)   the gravamen of ICC and Vitelco dispute with RTFC and CFC;
and

   (iii)  CFC's fraudulent business practices.

105. Upon information and belief, Farmer Mac has actual knowledge or, in the exercise of due care, should have actual knowledge of:

   (i)    CFC's Subsidization Scheme;

   (ii)   the gravamen of ICC and Vitelco dispute with RTFC and CFC;

and

   (iii) CFC's fraudulent business practices.

The expenditure of over $1.3 Billion mandates an understanding of the circumstances that created CFC's need to access the Federal fisc.

  106. The Farmer Mac funding and the USDA loan guarantees have kept the corrupt and incompetent management of CFC in place knowingly allowing said management to maintain and conceal the Subsidization Scheme and to engage in the retaliatory and extortionistic course of conduct against Plaintiffs in order to suppress the Plaintiffs knowledge of, and rights to seek redress for, the underlying fraud, the Subsidization Scheme, itself an illegal scheme.

  107. CFC's CEO Mr. Petersen received total compensation of over $1.4 Million in fiscal year 2007, CFC's CFO, Mr. Lilly, received total compensation of over $0.799 Million in fiscal year 2007, and CFC's General Counsel Mr. List received total compensation of over $1.0 Million in fiscal year 2007.  The Federal fisc is being plundered to pay these exorbitant salaries.

  108. Farmer Mac's funding, and the funding received through the USDA's guarantees, of CFC constitute a cause (*causa sine qua non*) of Plaintiff's damages.

  109. Plaintiffs have no legal or equitable recourse or remedy against Farmer Mac and/or USDA other than to force compliance with the law.

  110. Plaintiff's have suffered irreparable harm and will continue to suffer additional irreparable harm as long as management of CFC is retained because of the Farmer Mac and USDA unlawful funding.

WHEREFORE, Plaintiffs request that the Court enter judgment and equitable orders against Defendants as follows:

1.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a judgment that the Federal Agriculture Mortgage Corporation's (Farmer Mac's) investments in the National Rural Utilities Cooperative Finance Corporation ("CFC") are unlawful;

2.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a judgment that USDA guarantees of Bonds issued by National Rural Utilities Cooperative Finance Corporation ("CFC") to the Federal Financing Bank Farmer are unlawful;

3.    Pursuant to 28 U.S.C. § 2202, Plaintiff seeks the issuance of an mandatory injunction to the National Rural Utilities Cooperative Finance Corporation ("CFC") and the Federal Agriculture Mortgage Corporation's (Farmer Mac's) to force compliance with the law;

4.    Pursuant to 28 U.S.C. § 2202, Plaintiff seeks the issuance of an mandatory injunction to the National Rural Utilities Cooperative Finance Corporation ("CFC") and the United States Department of Agriculture to force compliance with the law;

5.    Pursuant to 28 U.S.C. § 2202, Plaintiff seeks the issuance of a preventive injunction to ensure no further violations of the law; and

6.    Such other relief the Court deems just and proper.


Dated:  April 21, 2008.

Jeffrey J. Prosser, Plaintiff

Jeffrey J. Prosser, Pro Se
P.O. Box 5227
St. Croix, U.S.V.I. 80823

John P. Raynor, Plaintiff

John P. Raynor, Pro Se
Raynor, Rensch & Pfeiffer
10110 Nicholas Street, Suite 102
Omaha, Nebraska 68114
Telephone No.: (402) 498-4400
jraynor@rrplawyers.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

*Jeffrey J. Prosser et al v. Federal Agricultural Mortgage Corporation et al*

## Attachment "A"

### CFC's RELATIONSHIP TO RTFC: A LEGAL ANALYSIS

### VIOLATION OF LAWS – LEGAL STRUCTURE

CFC was organized in April of 1969 by[1] the National Rural Electric Cooperative Association ("NECA"), a cooperative representing the interests of rural cooperative electric utilities. As to the creation of RTFC, CFC states[2]: "RTFC is a controlled affiliate of CFC and was created [by CFC] for the purpose of providing and/or arranging financing for its rural telecommunications members and affiliates." RTFC was organized in 1987. Through fiscal year 2001, CFC referred[3] to RTFC in its publicly filed documents as "a controlled affiliate of CFC". Since fiscal year 2001, CFC simply describes[4] its control and domination over RTFC and RTFC's business.

The relationship by and between CFC and RTFC is replete with violations of the law. To comprehend the scope of the illegality one must first understand the financial relationship of RTFC and CFC.

### 1.    The Money Flow.

CFC raises money from the public markets using the combined or consolidated statements (referred to hereinafter as "consolidate statements") of CFC, RTFC, and since fiscal year 2004, National Cooperative Services Corporation ("NCSC"). The money flows as follows:

a.    Control over all money is assumed by CFC; and

b.    To the extent that CFC authorizes RTFC to make a loan to an RTFC member, CFC advances funds to RTFC.

As structure, CFC to marks up the cost of funds provided RTFC (the "CFC MARKUP"). BY adjusting the CFC MARKUP, CFC effectively controls the amount of money RTFC is permitted

---

[1] SEE CFC Business story at http://www.nrucfc.coop/aboutcfc/cfcHistory.htm.
[2] May 31, 2001 10K, page 58.
[3] May 31, 2001 10K, page 58.
[4] May 31, 2006 10K, page 77.

to earn. The CFC MARKUP sweeps most of the RTFC's earnings from loans to rural telephone companies to CFC and traps the money within CFC.

RTFC is a "patron" of CFC since RTFC derives all of its funds from CFC. As patron of CFC, RTFC is entitled to the allocation of the portion CFC's earnings contributed by RTFC.

In fiscal years 2000 and 2001, patronage allocations from CFC constituted 86.85% and 89.74%, respectively, of RTFC's net margin (net income). CFC operates RTFC so that patronage income allocations and other income allocations from CFC compose the bulk of RTFC's earnings.

Besides CFC exerting control over all funds, through various contracts CFC buttresses its control over RTFC with other requirements. For instance, the 10K for fiscal year 2006 provides:

> "CFC is the **sole lender** to and manages the lending and financial affairs of RTFC through a long-term management agreement. Under a guarantee agreement, RTFC pays CFC a fee in exchange for which CFC reimburses RTFC for loan losses. Six members of the CFC board serve as a lender advisory council to the RTFC board. **All loans that require RTFC board approval also require the approval of the CFC lender advisory council.** CFC is not a member of RTFC and does not elect directors to the RTFC board. RTFC is an associate member of CFC." (Bold added). (2006 10K, p. 77, Note 1(b))

The management contract insures that RTFC does not borrow money from any other source other than CFC. CFC nullifies or abrogates RTFC's ability to perform RTFC's purpose for existence without CFC's approval: that is, to lend money.

The import of the flow of money is as follows:

      a.     All material transactions occur within CFC;

      b.     RTFC does not even have authority[5] to make a loan to its members without CFC's approval;

      c.     The majority of the income generated from RTFC members' loans is trapped within CFC because of the CFC MARKUP; and

      d.     From a financial prospective, RTFC is dependent upon CFC's allocation of patronage income to RTFC for RTFC's patronage income to members because of the CFC MARKUP.

Financially, RTFC is completely dominated by CFC.

    2.    **Voting Control: Illegality from the Inception.**

---

[5] A lending cooperative that has no authority and no ability to perform its principle function – lending money.

From the inception of RTFC in 1987 until after May 31, 2001, CFC had a $1,000.00 investment in RTFC for a 'golden' membership interest. CFC's fashioned RTFC's bylaws so for CFC's investment of $1,000 entitled CFC to nominate a majority of the Board members of RTFC. The SEC 10Ks filed by CFC had the following statement[6] or words of similar import:

> "CFC has a $1,000 membership interest in RTFC. CFC exercises control over RTFC through majority representation on their Boards of Directors."

The auditor throughout this period was Arthur Andersen ("AA"). When Ernst and Young ("Ernst") became auditor the voting provision was eliminated. The first 10K filing with the SEC in which an Ernst audit was available stated:

> "In September 2001, the CFC and RTFC boards of directors approved changes in the governance of RTFC and on October 9, 2001, RTFC received consents from a majority of its members, making the changes effective. CFC is not a member of RTFC and does not elect directors to the RTFC board. In October 2001, RTFC refunded the $1,000 membership interest to CFC." (2002 10K, Note 1(b), page 72).

As discussed later, the golden membership interest was eliminated because such an arrangement was *illegal*. It took AA's demise due to the Enron debacle before an illegal voting arrangement was change.

Since fiscal year 2001, CFC relies upon a management contract to dominate and control RTFC. The Financial Statement included in the Annual Reports simply states[7]: "CFC ... manages the lending and financial affairs of RTFC through a long-term management agreement."

Since 2001 CFC has not a member of RTFC; however, RTFC is a member of CFC. RTFC has the status of an associate member of CFC. Associate members, pursuant to Section 2 of Article II of CFC's bylaws, have no voting authority. Because RTFC is a member of CFC, CFC's management and directors owed RTFC and arguably, RTFC members, a fiduciary duty.

As organized, RTFC members are not members of CFC. CFC does not own RTFC. In its SEC filings CFC states" The members of RTFC and NCSC own or control 100% of the interest in the respective company". (2006 10K, page 94)

Further, CFC members are not members of RTFC. You have two separate classes of owners.

Material facts summarizing the ownership relationship between CFC and RTFC are:

---

[6] SEE: 2001 10K, Note 1(b), page 77.
[7] SEE: 2006 10K, 1(b), page 77.

a.      Until September 2001 CFC had a golden membership interest in RTFC which allowed CFC to *illegally* nominate a majority of RTFC's directors;

b.      Since 2001 CFC has no ownership in RTFC;

c.      RTFC is an associate, non-voting, member of CFC;

d.      RTFC members are not members of CFC and can not borrow directly from CFC; and

e.      There is not the commonality of ownership that is usually a requisite for consolidated financial statements.

Contractually, CFC dominates RTFC.

### 3.    **Interlocking Management.**

There has been and still are interlocking management arrangements between CFC and RTFC. For instance the 2004 Annual Reports show the following interlocking management arrangements:

(i)      Sheldon C. Petersen, Governor and Chief Executive Officer of both RTFC and CFC;

(ii)      John J. List, Senior Vice President and General Counsel of both RTFC and CFC;

(iii)      Steven L. Lilly, Senior Vice President and Chief Financial Officer of both RTFC and CFC;

(iv)      John T. Evans, Senior Vice President of Operations of both RTFC and CFC;

(v)      Richard E. Larochelle, Senior Vice President of Corporate Relations of both RTFC and CFC; and

(vi)      John M. Borak, Senior Vice President of Credit Risk Management of both RTFC and CFC.

Of the six key officers listed in the RTFC 2004 Annual Report only one, Lawrence Zawalick, Senior Vice President of RTFC, was not an officer of CFC.

Besides management, RTFC has no independent professionals. RTFC's outside counsel and independent accountants are CFC's outside counsel and accountants.

### 4.    **The Present Illegality of the CFC-RTFC Relationship.**

RTFC was and is a façade for CFC, an artifice or device to allow CFC to plunder rural telephone utilities for the benefit of rural electric utilities. What follows are some observations as to the structure and relationship of CFC and RTFC.

| Structure Issue: | Allegation: |
|---|---|
| RTFC is nonvoting[8] member of CFC | - Stands in marked contrast to the core belief espoused by CFC that coops are subject to democratic control: the one member, one vote principle. |
| Interlocutory Management arrangement whereby CFC's management serves as RTFC's management. | - CFC controls the day-to-day affairs of RTFC by insuring RTFC does not have independent management. |
| CFC exercises control over all funds raised from the use of consolidated Financial statements of CFC/RTFC. | - RTFC has no control over funds raised based upon RTFC's financial condition. |
| CFC controls RTFC's income by the interest rate charge on loans to RTFC. | - Would not be relevant but for the fact it is done in furtherance of the PCMS. |
| CFC control exercised over all RTFC loans. | - RTFC has no authority on its own to make a loan: RTFC's fundamental reason for existence. |
| Dual (side by side) Coops. | - This arrangement renders meaningless RTFC members voting rights.  RTFC members vote to elect a board that has no authority to make loans. |
| Dual (side by side) Coops. | - This arrangement removes RTFC members from CFC where truly meaningful economic decisions are made. |

---

[8] The only other non-voting members of CFC were affiliates of voting members.

| Dual (side by side) Coops. | - There is no reason for this arrangement, but for, the PCMS. |
| CFC's long-term management contract with RTFC. | - To insure CFC's dominion and control of RTFC is complete. |
| Independent professionals for RTFC such as accountants, lawyers, etc. | - **Do not exist**!  As in the case of management, CFC's professionals are RTFC's professionals. |

It is not conjecture but a fact: RTFC voting privileges are meaningless and no different than giving RTFC members voting privileges a shell corporation.  The CFC-RTFC relationship violates District of Columbia laws, DC ST § 29-913(b).  The District of Columbia has been RTFC domicile since February 2005 and CFC's since its creation.  DC ST § 29-913(b) provides "No voting agreement or other device to evade the requirements of this section [one member one vote] shall be enforceable at law or in equity".  As organized, RTFC was formed as a basis to keep telephone members from the center of control, CFC, effectively neutering RTFC members' voting rights.  RTFC as it exists and functions is a "device" deployed by CFC to deprive RTFC members of their voting rights.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

*Jeffrey J. Prosser et al v. Federal Agricultural Mortgage Corporation et al*

**Attachment "B"**

# Principles and Values of Co-ops

Cooperatives worldwide generally operate using the same principles as adopted in 1995 by the International Cooperative Alliance. The principles are part of a cooperative statement of identity which also includes the definition of a cooperative and a list of cooperative values.

## Definition
A cooperative is an autonomous association of persons united voluntarily to meet their common economic, social and cultural needs and aspirations through a jointly-owned and democratically controlled enterprise.

## Values
Cooperatives are based on the values of self-help, self-responsibility, democracy, equality, equity and solidarity. In the tradition of their founders, cooperative members believe in the ethical values of honesty, openness, social responsibility and caring for others.

## Principles

1. Voluntary and Open Membership - Cooperatives are voluntary organizations, open to all persons able to use their services and willing to accept the responsibilities of membership, without gender, social, racial, political or religious discrimination.

2. Democratic Member Control - Cooperatives are democratic organizations controlled by their members, who actively participate in setting their policies and making decisions. Men and women serving as elected representatives are accountable to the membership. In primary cooperatives, members have equal voting rights (one member, one vote) and cooperatives at other levels are organized in a democratic manner.

3. Member Economic Participation - Members contribute equitably to, and democratically control, the capital of their cooperative. At least part of that capital is usually the common property of the cooperative. They usually receive limited compensation, if any, on capital subscribed as a condition of membership. Members allocate surpluses for any or all of the following purposes: developing the cooperative, possibly by setting up reserves, part of which at least would be indivisible; benefiting members in proportion to their transactions with the cooperative; and supporting other activities approved by the membership.

4. Autonomy and Independence - Cooperatives are autonomous, self-help organizations controlled by their members. If they enter into agreements with other organizations, including governments, or raise capital from external sources, they do so on terms that ensure democratic control by their members and maintain their cooperative autonomy.

5.  Education, Training and Information - Cooperatives provide education and training for their members, elected representatives, managers and employees so they can contribute effectively to the development of their cooperatives. They inform the general public - particularly young people and opinion leaders - about the nature and benefits of cooperation.

6.  Cooperation among Cooperatives - Cooperatives serve their members most effectively and strengthen the cooperative movement by working together through local, national, regional and international structures.

7.  Concern for Community - While focusing on member needs, cooperatives work for the sustainable development of their communities through policies accepted by their members.

More information on Cooperative Principles may be obtained from the website of one of our business partners, the National Cooperative Business Association (www.ncba.org).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

*Jeffrey J. Prosser et al v. Federal Agricultural Mortgage Corporation et al*

_____

**Exhibit "1"**

_____

**CFC's BYLAWS – Article XI: - Allocation and Distribution of Net Savings**

EX-3.2 8 bylaws.htm REVOLVING CREDIT AGREEMENT

## BYLAWS

NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION
(As amended March 25, 1970; February 29, 1972; February 27, 1973; February 1, 1983; February 3, 1987; February 9, 1988; February 11, 1992; February 28, 1995; March 21, 2000; February 17, 2004; and March 1, 2005)

### ARTICLE I - Purposes and Powers

Section 1. Purposes.

The purposes of National Rural Utilities Cooperative Finance Corporation (hereinafter called the Association) shall be as stated in its Articles of Incorporation.

Section 2. Powers.

(a)    For the accomplishment of its purposes, the powers of this Association shall be those conferred upon it by the District of Columbia Cooperative Association Act (hereinafter referred to as the Act).

(b)    The Association shall engage only in those activities directly related to carrying out its purposes as stated in its Articles of Incorporation, and shall at no time furnish services, other than financing services, provided to, or engage in activities, other than financing activities, conducted for its Class A, Class B, and Class C members by a Class D member.

### ARTICLE II-Members and Membership; Associates

Section 1 Eligibility for Membership.

The original subscribers to membership shall constitute the initial membership of the Association, and they are designated charter members without payment of membership fee.Charter memberships shall terminate when members have been admitted to membership from all eleven districts established in Article IV, Section 3 of these Bylaws.  Other than the charter members, membership in the Association shall be limited to the following classes:

Class A.

Cooperative or nonprofit corporations, public corporations, utility districts, and other public bodies, which have received or are eligible to receive a loan or commitment for a loan from the Rural Utilities Service or any successor agency, and which are engaged or planning to engage in the furnishing of utility services to their members and patrons for their use as ultimate consumers.

Class B.

Cooperative or nonprofit corporations which are federations of Class A members or of other Class B members, or both, or which are owned and controlled by Class A members or by other Class B members, or both, and which are engaged or planning to engage in the furnishing of utility services primarily to Class A members or other Class B members.

Class C.

Statewide and regional associations which are wholly-owned or controlled by Class A members or Class B members, or both, or which are wholly-owned subsidiaries of a CFC member, and which do not furnish utility services but which supply other forms of service to their members.

Class D.

National associations of cooperatives which are Class A, Class B, and Class C members, provided said national associations have, at the time of admission to membership in this Association, members domiciled in at least 80 percent of the states of the United States.

Section 2. Eligibility for Association.

An Associate relationship with the Association shall be limited to nonprofit groups or entities organized on a cooperative basis, which are owned, controlled, or operated by Class A, B, C or D members of the Association, and which are engaged in or plan to engage in the furnishing of non-electric services, including without limitation telecommunication services, primarily for the benefit of ultimate consumers.  No Associate shall be entitled to vote at any meeting of the members, whether district or annual, or to be counted for purposes of determining whether the requisite number of members is present to constitute a quorum at any meeting or has requested the call of a special meeting.  Trustees, directors, and managers of Associates shall not by virtue of any of these offices be eligible for election to the Board of Directors.

Section 3.  Method and Terms of Admission to Membership or Association.

(a)    An applicant for membership or association shall make application therefor on a form which shall be specified by the Board of Directors, and shall forward said application to the Secretary accompanied by payment of a fee which shall be $1,000.00 for organizations classified as Class A, Class B, and Class D in Article II, Section 1, and Associates in Article II, Section 2, and $200.00 for organizations classified as Class C in Article II, Section 1 of these Bylaws.

(b)    The Secretary shall present each application with the required accompanying documents and payment of membership fee to the Board of Directors for approval; and upon determination that the applicant has fully complied with the eligibility and other requirements of these Bylaws, the applicant may

be admitted to membership. A certificate of membership, in form as specified by the Board of Directors and complying with the requirements of the Act, shall be issued to the applicant upon admission to membership and, subject to Article II, Section 7, the applicant shall have all the rights, privileges, duties, and responsibilities of membership from and after the date of such issuance.

Section 4. Property Rights of Members; Non-Liability for Debts of the Association.

The property rights of all members shall be equal; they shall be entitled to the return of the par value of their membership certificates when and as provided by law, and in the Articles of Incorporation and these Bylaws. The property of the members of the Association shall be exempt from execution for the debts of the Association and no member shall be liable or responsible for any debts or liabilities of the Association.

Section 5. Transfer of Membership-Withdrawal

(a)   Membership in the Association and certificates representing such membership shall not be transferable, except that, in case of a merger or consolidation of a member with another corporation, membership may be vested in the successor corporation, provided the latter is eligible for membership.

(b)   Withdrawal from membership and retirement of membership certificates may be accomplished in the manner prescribed in the Act. For the purpose of sections of the Act referring to the par value of a member's holdings, the par value of membership certificates which constitute such holdings shall be the amount of the membership fee prescribed for the applicable class of membership in Article II, Section 3, Subsection (a) of these Bylaws.

Section 6. Effect of Termination of Membership.

Termination of membership in any manner shall operate as a release of all right, title, and interest of the member in the property and assets of the Association; provided, however, that such termination of membership shall not release the member from debts or liabilities of such member to the Association.

Section 7. Member Suspension.

(a)   The Board of Directors of the Association may suspend members as provided in this Bylaw, and as permitted by law. The Board of Directors may suspend a member upon an affirmative vote of two-thirds of the Board of Directors present and voting, for one or more of the following reasons ("Suspension Reasons"): (i) if required by applicable law; (ii) for failure by the member to timely pay any amounts due to the Association, which failure shall continue beyond any applicable grace period; (iii) failure by the member to comply with the Articles of Incorporation and the Bylaws of the Association; (iv) if the member legally dissolves or otherwise ceases to exist (except to the extent that such dissolution is covered by the terms of Section 5(a) of this Article II); or (v) if the member voluntarily requests that its membership be suspended.

(b)   Other than in the case of a voluntary membership suspension, the Association shall provide written notice, including the underlying Suspension Reason, to any member being considered for suspension, not less than thirty (30) days prior to the date when the Board of Directors shall vote on the proposed suspension. Such member shall have the opportunity to comment on the proposed suspension within fifteen (15) days of the date of such notice. The notice will inform the member of its right to comment on the proposed suspension.

(c)   A suspended member forfeits and relinquishes all rights provided in the Articles of Incorporation and the Bylaws of the Association, including, but not limited to, any voting rights, or privileges, provided, however, that such suspension of membership rights shall not release the member from debts or liabilities of such member to the Association or in any other way affect the debts and liabilities of such member to the Association and will not entitle the suspended member to the payment of any fees or other amounts due from the Association other than when due and payable in the ordinary course.

(d)   The Board of Directors may lift the suspension of a member upon an affirmative vote of two-thirds of the Board of Directors present and voting.

**ARTICLE III-Meetings of Members**

Section 1. Annual Meeting.

The annual meeting of the members shall be held within the first six months of each calendar year at such time and place as shall be designated by the Board of Directors in the notice of the meeting, for the purpose stated in the notice and for transacting such other business as may come before the meeting. In the event that the national welfare or the best interest or convenience of the Association shall, in the judgment of the Board of Directors, demand a postponement or advancement of the annual meeting, such annual meeting may be postponed for a period not exceeding 180 days, or advanced not more than 90 days, by the Board of Directors, and all members shall be notified of the postponement or advancement, and the date fixed for the postponed or advanced annual meeting, and such annual meeting when so held in accordance with such notice shall be and constitute the regular annual meeting of members in as full, complete, and ample a manner as though held on the date originally fixed for the meeting. Failure to hold the annual meeting at the designated time shall not work a forfeiture or dissolution of the Association.

Section 2. Special Meetings.

Special meetings of the members may be called by the President, by the Board of Directors, or upon a written request signed by at least ten per cent (10%) of all the members and it shall thereupon be the duty of the Secretary to cause notice of such meeting to be given as hereinafter provided. Special meetings of the members may be held at any place specified in the notice of the special meeting.

Section 3. Notice of Members' Meetings.

Written or printed notice stating the place, day, and hour of the meeting and the purpose or purposes for which the meeting is called, shall be delivered not less than forty-five (45) days nor more than sixty (60) days before the date of the meeting, either personally, by mail, or by any alternative method permitted by applicable law, by or at the direction of the Secretary, or by the persons calling the meeting, to each member. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, in a sealed envelope, addressed to the member at the member's address as it appears on the records of the Association, with postage thereon prepaid. The failure of any member to receive notice of an annual or special meeting of the members

shall not invalidate any action which may be taken by the members at any such meeting.

Section 4. Quorum.

Except as otherwise provided in Article IV, Section 5, the presence of representatives of at least ten percent (10%) of the total number of members of the Association shall constitute a quorum for the transaction of business at all meetings of the members. In the event that less than a quorum as herein provided shall be present at any regular or special meeting, a majority of those present may adjourn the meeting from time to time without further notice.

Section 5. Voting.

Each member shall be entitled to one vote and no more upon each matter submitted to a vote at all meetings of the members. In the event the representative of a member is absent, or is unable or refuses to act, an alternate designated by such member shall act as the representative of the member and shall cast the vote of such member. However, if both the representative and alternate of such member shall fail to act, then the President of such member may represent and cast the vote of such member as provided in Article III, Section 6 of these Bylaws. No individual may represent more than one member and proxy voting is prohibited in all meetings.

Section 6. Member Representatives and Alternates.

Each member admitted to membership pursuant to Article II, Section 3 of these Bylaws shall be entitled to select either by vote of its membership or its Board of Directors one of its members, directors, or employees to act as the representative, and one such person to act as the alternate, of such member at the meetings of the Association. Such representative or alternate when so selected shall continue to be the representative or alternate, respectively, of such member until the representative or alternate shall resign or the member shall have selected a successor representative or alternate and shall have so notified the Secretary of the Association in writing. In the event any member shall fail to select a representative or alternate as herein provided or the representative or alternate selected by such member shall be unable to serve or for any cause fail to so serve, the President of the member shall serve as its representative and cast its vote. To participate in any meeting of the Association, a member's representative or alternate shall first be certified to the Association in a manner determined by the Board of Directors of the Association.

Section 7. Order of Business.

The order of business at the annual meeting of the members, and so far as applicable and possible at all other meetings of the members, shall be essentially as follows:

1. Enrollment and determination of a quorum.

2. Reading of the notice of the meeting and proof of the mailing thereof, or of the waiver or waivers of notice of the meeting, as the case may be.

3. Reading of unapproved minutes of previous meetings of the members and the taking of necessary action thereon.

4. Presentation and consideration of reports of officers, directors, and committees.

5. Unfinished business.

6. New business.

7. Adjournment.

Section 8. Conduct at Member Meetings.

In addition to the application of Robert's Rules of Order provided for in Article XIII, Section 4, the presiding officer at any member meeting:

(a)    May remove, or provide for the removal of any person or persons from any member meeting for unruly, disruptive, or similar behavior; and

(b)    May use reasonable discretion necessary to conduct the member meeting in an efficient and effective manner.

**ARTICLE IV -Directors**

Section 1. Number and General Powers.

The business and affairs of the Association shall be managed by a Board of up to twenty-three Directors, which shall exercise all of the powers of the Association except such as are by law, the Articles of Incorporation, or these Bylaws conferred upon or reserved to the members.

Section 2. First Board of Directors.

(a)    The persons named in the Articles of Incorporation of the Association as members of the First Board of Directors shall compose the board until they are succeeded by a board elected by members of the Association other than its charter members, or until their successors shall have been otherwise elected and shall have qualified.

(b)    In the event that applicants for Class A, Class B, Class C, and Class D membership shall not have been admitted into membership in the Association by July 1, 1970, in lieu of the nominating and election procedures prescribed in this Article, the First Board of Directors shall make such provision as the board shall deem appropriate for the nomination and election of the first elected Board of Directors and the selection of nominating committees in each district, to be conducted at the first regular annual meeting of members, or at a special meeting of members duly called for such purposes, after members, other than charter members, shall have been admitted to membership in all eleven districts. Thereafter, the procedures

prescribed in this Article for the nomination and election of directors shall be followed.

Section 3. Districts.

(a)    There shall be eleven districts as follows:

No. 1:    Maine, Vermont, New Hampshire, Massachusetts, New York,
Connecticut, Rhode Island, New Jersey, Pennsylvania, Delaware,
Maryland, Virginia, and North Carolina.

No. 2:    South Carolina, Georgia, Florida, and all territories, possessions, and
commonwealths of the United States bordering upon or in the Atlantic Ocean.

No. 3:    Kentucky, Tennessee, Mississippi, and Alabama.

No. 4:    Michigan, Indiana, Ohio, and West Virginia.

No. 5:    Wisconsin, Iowa, and Illinois.

No. 6:    North Dakota, South Dakota, and Minnesota.

No. 7:    Wyoming, Nebraska, Colorado, and Kansas.

No. 8:    Oklahoma, Missouri, Arkansas, and Louisiana.

No. 9:    Washington, Montana, Idaho, Oregon, Nevada, California,
Utah, Alaska, Hawaii, and all territories, possessions, and
commonwealths of the United States bordering upon or in the
Pacific Ocean.

No. 10:    Arizona, New Mexico, and Texas.

No. 11:    Class D Member

(b)    Each district shall be represented by two board members.

(c)    In Districts Nos. 1 to 10, inclusive, one of the two positions on the Board of Directors in each district shall be designated "Position D" and the other "Position M." No person shall be eligible to become or remain a "Position D" director who is not a trustee or director of a member organization within the district; and no person shall be eligible to become or remain a "Position M" director who is not a manager of a member organization within the district. A person who is both a manager and a trustee or director of member organizations shall not be eligible to become or remain a "Position D" director.

(d)    At all stages of the nominating and election process prescribed in this Article IV, there shall be clearly stated in all notices and petitions and on all ballots the designation of the position to which a candidate is to be elected.

(e)    The two directors in each of Districts Nos. 1 to 10, inclusive, shall not represent members from the same state, except where only one state within the district has members.

(f)    Other than the Class D member, in the event a member conducts operations in more than one state or district, it shall be deemed to be a member within the state or district in which its principal headquarters is located: except that upon the request of such a member, the Board of Directors may designate that for purposes of this section the member is located in a state or district in which it conducts operations, other than the state or district in which its principal headquarters is located.

Section 4. At-Large Director Position.

(a)    In addition to the twenty-two (22) directors elected from the districts described in Article IV, Section 3 above, if the Board of Directors in its discretion so determines, then there may be one additional director (the "At-Large Director") elected to serve on the Board of Directors of the Association from time to time.

(b)    The At-Large Director shall be an at-large director elected by the members in the manner set forth in Article IV, Section 6(c) below.

(c)    The At-Large Director shall serve on the Audit Committee described in Article V.

Section 5. District Meetings.

The Board of Directors each year shall call a separate meeting of the members in each of Districts Nos. 1 to 10, inclusive, as established by Section 3 of this Article, for the purpose of electing a nominating committee, or electing directors or both, as the case may be. Such district meeting shall be held during the period July 1 to December 31 of each calendar year at such place within or without said district as shall be designated by the Board of Directors. Notice of such meeting shall be given in accordance with the provisions of Article III, Section 3 and shall specify the persons to act as chairman and secretary of the meeting and the business to come before the meeting, including the names of any director candidates to be voted upon and information about the director candidates. The Board of Directors shall designate one of the directors from such district to act as chairman and the other director from such district to act as secretary of the meeting, or in the absence of either, the members present shall elect a chairman or secretary, as

required.  The presence of representatives of at least ten percent (10%) of the total number of members of the Association in each district shall constitute a quorum for the transaction of business at each district meeting.

Section 6.  Nominations and Elections.

(a)    All candidates for election to the Board of Directors from Districts Nos. 1 to 10, inclusive, shall be nominated and elected in the following manner:

(i)    At the district meeting next before that at which candidates are to be elected to a position on the board from such district, a nominating committee shall be elected composed of one person from each state within the district, each of which persons must be a trustee, director, or manager of a member.

(ii)    The Board of Directors in its call for a district meeting, as provided in Section 5 of this Article, shall specify the method of electing the nominating committee.

(iii)    The nominating committee shall, at least 90 days before the district meeting at which candidates for the Board are to be elected, submit to the Secretary of this Association the names of two or more nominees for each position in the District for which an election is to be held, together with a statement as to each nominee's background, qualifications, availability, and eligibility to serve, if elected.

(iv)    In the event a nominating committee has not been elected, or fails to select at least two nominees for each position for which an election is to be held or otherwise fails to comply with the provisions of this Section 6, the Board of Directors shall, on behalf of the nominating committee, name the nominees or as many nominees as shall be necessary to complete a full slate, and said nominations made by the Board of Directors, together with nominations made by petition, if any, in accordance with subsection (a)(v) of this Section 6, shall be voted upon at the district meeting held pursuant to subsection (a)(vii) of this Section 6.

(v)    In addition to the nominees selected pursuant to Article IV, Sections 6(a) (iii) or (iv) above, other nominations of candidates for positions within the District may be made by petition of one-fourth of the members within the district and submitted to the Secretary of the Association at least 20 days prior to the district meeting together with a statement of the nominee's background, qualifications, availability, and eligibility to serve, if elected.

(vi)    No nominations from the floor shall be permitted at district meetings.

(vii)    At the district meeting next before the annual meeting at which the term of a director representing such district is due to expire, the members within the district shall elect a director to such position on the Board of Directors who shall fill such position immediately after the next ensuing annual meeting.  Voting shall be by written ballot and each member within the district shall be entitled to one vote.  The ballots shall be furnished by the Secretary of the Association and shall contain the names of all eligible nominees and the member which each  represents.  The nominee receiving the highest number of votes shall be elected.  In the event of a tie vote, another vote shall be taken immediately with only the names of those tied with the highest number of votes appearing on the ballot.

(b)    One candidate for each position in District No. 11, the term of which is due to expire, shall be elected by the members of District No. 11 and the Class D member shall determine the method of election.  The person elected shall fill the position immediately.

(c)    If the Board of Directors determines that the At-Large Director position should be filled, at least one candidate satisfying the requirements set forth in Article IV, Section 8 shall be nominated by the Board of Directors and no other nominations shall be permitted. The names of the candidates nominated by the Board of Directors to fill the At-Large Director position shall be included on the written ballots described in Article IV, Section (6)(a) (vii) above and each member shall have one vote.  The nominee for the At-Large Director position receiving the highest number of votes at the conclusion of all of the district meetings shall be elected and shall fill such position immediately after the next ensuing annual meeting. In the event of a tie vote, another vote shall be taken at the annual meeting of the members with only the names of those tied with the highest number of votes appearing on the written ballot.  All members present at the annual meeting shall have one vote and the nominee for the At-Large Director position receiving the highest number of votes at the annual meeting shall be elected.

Section 7.  Tenure of Office.

(a)    At the first meeting of the board elected at the annual meeting held in 1971, the directors shall be divided by lot into three classes, two consisting of seven directors each, the third of eight directors.  The directors of the first class shall hold office for a term of one year; the directors of the second class shall hold office for a term of two years; the directors of the third class shall hold office for a term of three years.

(b)    Upon the expiration of each of said terms, directors elected thereafter shall serve for terms of three years or until their successors shall have been elected and shall have qualified.  Notwithstanding the foregoing, the Board of Directors may at any time, in the exercise of its discretion upon an affirmative vote of two-thirds of the Board of Directors present and voting, end the term of the At-Large Director and the position shall remain vacant until the Board of Directors determines that it should be filled.

(c)    No director, other than the directors elected from District 11, shall be elected to serve more than two consecutive full three-year terms.

(d)    Except with respect to the At-Large Director position, when a vacancy occurs on the Board of Directors, the remaining directors may by a majority vote elect a successor director to fill the vacant position, to hold office until the next succeeding district  meeting.  At such next meeting, a successor director shall be elected by the members in the district to fill the vacant position, to hold office for the balance of the term for said position; and in connection with this election, the Board of Directors shall make such provision as the board shall deem appropriate for the nomination of the candidates to be voted on by the members in the district.  If the vacancy is in District No. 11 any successor director elected by the board or by the members in the district pursuant to this subsection (d) must be a person whose name is on a list of one or more nominees certified by the Class D member of District No. 11.  If a vacancy occurs in the At-Large Director position, the remaining directors may by a majority vote elect a successor director to fill the vacant position, to hold office until the next annual meeting at which time the At-Large Director position may be filled in the manner set forth in Article IV, Section 6(c) above. Any successor At-Large Director elected in the manner set forth in Article IV, Section 6(c) shall hold office for the balance of the term for said position.

Section 8.  Qualifications.

(a)     Except with respect to the At-Large Director, no person shall be eligible to become or remain a director of the Association who is not a director or trustee, or a manager, of a member that is not suspended pursuant to Article II, Section 7, or who, except with respect to directors representing District No. 11, is a member of the governing board, or a director of any other organization of members which has national membership consisting of organizations which hold Class A, Class B, or Class C memberships in this Association.

(b)     No person shall be eligible to become or remain the At-Large Director unless the person:

(i) is a trustee, director, manager, chief executive officer, or chief financial officer of a member of the Association or holds a comparable position of a member of the Association;

(ii) has such qualifications as may be required from time to time by the Securities and Exchange Commission ("SEC"), or other governmental agency or authority, or any national stock exchange on which the Association has listed any of its securities ("NSE") as a condition of serving on the Board of Directors as an Audit Committee Financial Expert (as defined by the SEC) or comparable position; and

(iii) is not an employee of the Association and is otherwise independent, as defined by the SEC or other governmental agency or authority, or a NSE.

The Board of Directors shall determine whether candidates for the At-Large Director position have all of the aforesaid qualifications and whether the At-Large Director continues to satisfy such requirements.

(c)     Upon establishment of the fact that a director is holding the office of director of this Association in violation of this section of the Bylaws, the term of such director shall be deemed to have automatically expired and such vacant position may be filled by the remaining directors pursuant to Article IV, Section 7(d) above.

(d)     Nothing contained in this section shall affect in any manner whatsoever the validity of any action taken at any meeting of the board.

Section 9. Meetings.

(a)     A regular meeting of the board shall be held within 30 days after the annual meeting of members.  Regular meetings of the board shall also be held at such times and places within or without the District of Columbia as designated by the board.  Such regular meetings may be held without notice other than in the resolution of the board fixing the time and place thereof.

(b)     Special meetings of the board may be called by the President or by any seven directors, and it shall thereupon be the duty of the Secretary to cause notice of such meeting to be given as hereinafter provided.  The President or directors calling the meeting shall fix the time and place for the holding of the meeting.

(c)     Written notice of the time, place, and purpose of any special meeting of the board shall be delivered to each director by mail or by any alternative method permitted by applicable law, or upon a default in duty by the Secretary, by the President, or the directors calling the meeting.  Such notice, if mailed, shall be deemed to be delivered when deposited in the United States mail addressed to the director at the director's address as it appears on the records of the Association, with postage prepaid, at least ten days before the date set for this meeting.

(d)     Any regular meeting or special meeting of the Board of Directors or a committee of the Board of Directors may be conducted with absent directors participating, and deemed present in person, through any means of communication by which all directors participating in the meeting may reasonably and verifiably identify themselves, and simultaneously and approximately instantaneously communicate with each other during the meeting.

(e)     Any action required or permitted to be taken at a meeting of the Board of Directors or a meeting of a committee of the Board of Directors may be taken without a meeting if a writing setting forth and approving the action taken shall be signed by all of the directors entitled to vote on such action.  In such case, such consent shall have the same force and effect as if a meeting had been held.

Section 10. Quorum.

A majority of the Board of Directors shall consitute a quorum for the transaction of business at any meeting; provided that if less than a majority are present at said meeting, a majority of those present may adjourn the meeting from time to time without further notice.  Notwithstanding the foregoing, the Board of Directors may set the number of directors necessary for a quorum during an emergency at the lowest level permissible by law.  An emergency exists for purposes of this Article IV if a quorum of the Association's directors cannot readily be assembled, either in person or as permitted in Article IV, Section 9(d), because of some catastrophic event (*e.g.* fire, flood, storm, acts of war or rebellion, acts of terrorism, acts of the public enemy, etc.).

Section 11. Manner of Acting.

The act of the majority, or such higher percentage if required for a particular action, of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

Section 12. Compensation.

Directors shall receive a fixed sum as established by the Board of Directors for their respective services for a designated period or periods of time defined by the Board of Directors with such sum to be prorated for any portion of those periods of time served.  As authorized by the board, directors may be reimbursed for expenses actually and necessarily incurred in attending meetings of the board and in carrying out board business, or granted a reasonable per diem allowance by the board in lieu of detailed accounting for expenses.

**ARTICLE V-Committees**

The Board of Directors, in addition to other powers and authorities granted to it by law and these Bylaws, shall appoint such committees as it may deem proper and define the duties and prescribe the authority which such committees may exercise, which may include, without limitation, an audit committee

(the "Audit Committee").

**ARTICLE VI-Officers**

Section 1. Number.

The officers of the Association shall be a President, Vice President, Secretary-Treasurer, and such other officers as may be determined from time to time by the Board of Directors.

Section 2. Election and Term of Office.

(a)    The officers shall be elected annually by the Board of Directors at the first meeting of the Board of Directors held after each annual meeting of the members, but no later than thirty days thereafter. The President, Vice President, and Secretary-Treasurer must be members of the Board of Directors.

(b)    Each officer shall hold office until the organization meeting of the Board of Directors held during or following the next succeeding annual meeting of the members, or until a successor shall have been duly elected and shall have qualified, subject to the provisions of these Bylaws with respect to the removal of officers.

(c)    The incumbent Board of Directors serving for the ensuing year shall determine whether the election of officers shall be during, or subsequent to the adjournment of, the next annual members meeting. In lieu of such determination, the President shall specify in the agenda the time that the election of officers shall be conducted by the Board.

Section 3. Removal.

Any officer or agent elected or appointed by the Board of Directors may be removed by a majority of the full Board of Directors whenever in its judgment the best interests of the Association would be served thereby.

Section 4. Vacancies.

Except as otherwise provided in these Bylaws, a vacancy in any office may be filled by the Board of Directors for the unexpired portion of the term.

Section 5. President.

The President shall:

(a)    except as provided for in Article IV, Section 5, preside at all meetings of the members and of the Board of Directors;

(b)    sign with the Secretary certificates of membership, the issuance of which shall have been authorized by resolution of the Board of Directors, and may sign any deeds, mortgages, deeds of trust, notes, bonds, contracts, certificates, or other instruments authorized by the Board of Directors to be executed, except in cases in which the signing and execution thereof shall be delegated by the Board of Directors or by these Bylaws to some other officer or agent of the Association, or shall be required by law to be otherwise signed or executed from time to time; and

(c)    in general perform all duties incident to the office of President and such other duties as may be prescribed by the Board of Directors from time to time.

Section 6. Vice President.

In the absence of the President or in the event of the President's inability or refusal to act, the Vice President shall perform the duties of the President, and, when so acting, shall have the powers of and be subject to all the restrictions upon the President and shall perform such other duties as from time to time may be assigned by the Board of Directors.

Section 7. Secretary-Treasurer.

The Secretary-Treasurer shall perform or cause to be performed the following duties:

(a)    keep the minutes of the meetings of the members and the meetings of the Board of Directors in one or more books provided for that purpose;

(b)    be custodian of the corporate records and of the seal of the Association and have general charge of the books of the Association;  and

(c)    in general perform all the duties incident to the office of the Secretary-Treasurer and such other duties as from time to time may be assigned by the Board of Directors.

Section 8. Governor and Chief Executive Officer ("CEO").

The Board of Directors shall appoint a Governor to serve as the chief executive officer of the Association. The Governor shall be responsible for carrying out the policies of the Association and, except as to matters specifically reserved to the Board of Directors and the officers in these Bylaws or by law, shall supervise the conduct of the day-to-day business of the Association. The Governor or the Governor's designee may sign or countersign any deeds, mortgages, deeds of trust, notes, bonds, contracts, certificates, or other instruments authorized by the Board of Directors to be executed except in cases in which such signing or countersigning shall be delegated by the Board of Directors or by these Bylaws to some other officer or agent of the Association or shall be required by law to be otherwise signed or countersigned.

Section 9. Bonds of Officers.

The Board of Directors shall require the Secretary-Treasurer or any other officer or employee of the Association charged with responsibility for the custody of any of its funds or property to give bond, the premium for which shall be paid by the Association, in such sum and with such surety as the Board of Directors shall determine.

Section 10.  Reports.

The officers of the Association shall submit at each annual meeting of the members reports covering the business of the Association for the previous fiscal year and showing the condition of the Association at the close of such fiscal year.

## ARTICLE VII-Removal of Directors and Officers

A director or officer may be removed with or without cause, by a vote of two-thirds of the members voting at a regular or special meeting.  The director or officer involved shall have an opportunity to be heard at said meeting.  A vacancy caused by any such removal shall be filled by the vote provided in the Bylaws for election of directors or officers, as the case may be.

## ARTICLE VIII-Contracts, Checks, and Deposits

Section 1.  Contracts.

Except as otherwise provided in these Bylaws, the Board of Directors may authorize any officer or officers, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Association, and such authority may be general or confined to specific instances.

Section 2.  Checks, Drafts, Etc.

All checks, drafts, or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Association shall be signed by such officer or officers, agent or agents, or employee or employees of the Association and in such manner as shall from time to time be determined by resolution of the Board of Directors.

Section 3.  Deposits.

All funds of the Association shall be deposited from time to time to the credit of the Association in such bank or banks as the Board of Directors may select.

## ARTICLE IX-Waiver of Notice

Any member, director, or officer may waive, in writing, before or after the meeting, any notice of meetings required to be given by these Bylaws.

## ARTICLE X-Irregularities in Notice

Irregularities in the giving of any notice or the holding of any meeting provided for in these Bylaws shall not invalidate any action taken at such meeting.

## ARTICLE XI-Allocation and Distribution of Net Savings

Section 1.  Nonprofit Operation.

The Association shall at all times be operated on a cooperative nonprofit basis for the primary and mutual benefit of its patrons.  No interest or dividends shall be paid or payable on its certificates of membership.

All net savings, representing the excess of revenues over operating costs and expenses, shall be received by the Association with the understanding that they are furnished by its patrons as capital and that the Association is obligated to pay by credits to a capital account and the reserve funds set up in Section 2 of this Article for each patron all such amounts in excess of operating costs and expenses, to patrons in proportion to their patronage.

Section 2.  Reserve Funds.

At the close of each fiscal year, not less than ten percent (10%) of the net savings of the Association as determined by the Board of Directors shall be placed in a reserve fund until such time as the fund shall equal at least fifty-percent (50%) of the capital paid-up.  The amounts so placed in the reserve fund may be used in the general conduct of the Association business and shall be allocated on the books of the Association to patrons in proportion to their patronage, or in lieu of such allocation, the books and records of the Association shall afford a means for doing so.  Such reserves against bad debts and losses, and other reserves, shall be established as in the judgment of the Board of Directors are sufficient to assure the solvency of the Association and the achievement of its purposes, and to meet its obligations as they mature.

Section 3.  Educational Fund.

At the close of each fiscal year at least 1/4 of 1 per centum of the net savings of the Association, or such higher per centum as may be set by the Board of Directors, shall be placed in an educational fund to be used in teaching patrons the principles of cooperation.

Section 4.  Patronage Capital Certificates.

(a)    The books and records of the Association shall be set-up and kept in such a manner that at the end of each fiscal year the amount of patronage capital, if any, in the form of net savings so furnished by each patron is clearly reflected and credited in an appropriate record to the capital account of each patron.  The Association may issue Patronage Capital Certificates, in form prescribed by the Board of Directors, which shall reflect the amount of patronage so credited to the patron's account.  No dividends or interest shall be payable on such certificates.  All such amounts credited to the capital

account of any patron shall have the same status as though they had been paid to the patron in cash in pursuance of a legal obligation to do so and the patron had then furnished the Association corresponding amounts for capital.

(b)    All other amounts received by the Association from its operations in excess of costs and expenses shall, insofar as permitted by law, be (a) used to offset any losses incurred during the current or any prior fiscal year, and (b) to the extent not needed for that purpose, allocated to its patrons on a patronage basis and any amount so allocated shall be included as a part of the capital credited to the accounts of patrons, as herein provided, or in lieu of such allocation, the books and records of the Association shall afford a means for doing so.

(c)    In the event of dissolution of the Association, outstanding Patronage Capital Certificates, if any, or the amounts of patronage capital reflected on the books and records of the Association shall be retired without priority on a pro rata basis in accordance with the provisions of Article IX of the Articles of Incorporation. If, at any time prior to dissolution, the Board of Directors shall determine that the financial condition of the Association will not be impaired thereby the capital then credited to patrons' accounts and the Patronage Capital Certificates evidencing same, if any, may be retired in full or in part. After February 11, 1992, the Board of Directors shall determine the method, basis, priority, and order of retirement, if any, for all amounts thereafter furnished as capital.

(d)    Capital credited to the account of each patron and Patronage Capital Certificates, if any, are not assignable or transferable except as the Board of Directors, acting under policies of general application, shall determine otherwise.

(e)    The patrons of the Association, by dealing with the Association, acknowledge that the terms and conditions of the Articles of Incorporation and Bylaws shall constitute and be a contract between the Association and each patron, and both the Association and the patron are bound by such contract as fully as though each patron had individually signed a separate instrument containing such terms and provisions.

### ARTICLE XII-Seal

The corporate seal of the Association shall be in the form of a circle and shall have inscribed theron the name of the Association and the words "Corporate Seal, District of Columbia."

### ARTICLE XIII-Miscellaneous

Section 1. Fiscal Year.

The dates when the fiscal year of the Association shall begin and end shall be fixed by the Board of Directors.

Section 2. Books; Auditing.

The Board of Directors shall cause to be established and maintained a complete accounting system. The board shall after the close of each fiscal year cause to be made by a Certified Public Accountant a full and complete audit of the accounts, books, and financial condition of the Association as of the end of such fiscal year. A written report of the audit, conforming with the requirements of the Act shall be submitted to the annual meeting of the members of the Association.

Section 3. Annual Report.

An annual report shall be prepared and filed as required by the Act and a copy thereof shall be kept on file at the principal office of the Association.

Section 4. Rules of Order.

The conduct of the meetings of this Association and its committees shall be governed by the latest available revision of Robert's Rules of Order except as such rules may be inconsistent with these Bylaws.

Section 5. Waiver of Notice of Meetings.

Whenever any notice is required to be given of any meeting by law or by the provisions of these Bylaws, a waiver thereof in writing signed by the person or persons or on behalf of the organization or organizations entitled to receive such notice, whether before or after the date and time stated therein, shall be equivalent and have the same effect as the giving of such notice. Presence without objection at a meeting of a person or on behalf of an organization entitled to notice of the meeting shall also constitute waiver of notice.

ARTICLE XIV -Indemnification and Insurance

Section 1. Right to Indemnification.    Each Indemnitee shall be indemnified and held harmless by the Association to the fullest extent authorized by law, as the same exists or may hereafter change (but, in the case of any such change, only to the extent that such amendment permits the Association to provide broader indemnification rights than said law permitted the Association to provide prior to such change), against all Loss reasonably incurred by an Indemnitee in connection with a Proceeding. Notwithstanding the foregoing, except as provided in Section 3 of this Article XIV with respect to Proceedings seeking to enforce rights to indemnification, the Association shall indemnify any such Indemnitee seeking indemnification in connection with a Proceeding (or part thereof) initiated by such Indemnitee only if such Proceeding (or part thereof) was authorized by the Board of Directors.

Section 2. Right to Advancement of Expenses.    The right to indemnification conferred in Section 1 of this Article XIV shall include the right of the Indemnitee to be paid by the Association for expenses (including reasonable attorneys' fees) incurred in defending any such Proceeding in advance of its final disposition. However, such an advancement of expenses incurred by an Indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such Indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Association of an undertaking, by or on behalf of such Indemnitee, to repay all amounts so advanced if it shall ultimately be determined by Final Adjudication that such Indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

Section 3. Right of Indemnitee to Bring Suit.

(a)    Right to bring suit. If a claim under Section 1 or Section 2 of this Article XIV is not paid in full by the Association within 30 days after a written claim has been received by the Association (except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days), the Indemnitee may at any time thereafter bring suit against the Association to recover the unpaid amount of the claim. If successful in whole or in part in any such suit, or in a suit brought by the Association to recover an advancement of expenses pursuant to the terms of an undertaking, the Indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.

(b)    Defense. In (i) any suit brought by the Indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the Indemnitee to enforce a right of an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Association to recover an advancement of expenses pursuant to the terms of an undertaking, the Association shall be entitled to recover such expenses upon a Final Adjudication that, the Indemnitee has not met the applicable standard for indemnification.

(c)    Presumptions. Neither the failure of the Association (including its Board of Directors, independent legal counsel or members) to have made a determination prior to the commencement of such action that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee has met the applicable standard of conduct, nor an actual determination by the Association (including its Board of Directors, independent legal counsel or members) that the Indemnitee has not met such applicable standard of conduct, shall create a presumption that the Indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the Indemnitee, be a defense to such suit. In any suit brought by the Indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Association to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this Article XIV or otherwise shall be on the Association.

Section 4. Non-Exclusivity of Rights.    The right to indemnification and the advancement of expenses conferred in this Article XIV shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Articles of Incorporation, provision of these Bylaws, agreement, vote of members or disinterested directors or otherwise.

Section 5. Insurance.    The Association may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Association or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Association would have the power to indemnify such person against such expense, liability or loss under applicable law.

Section 6. Indemnification of Employees and Agents of the Association.    The Association may, to the extent authorized from time to time by the Board of Directors, grant rights to indemnification, and rights to the advancement of expenses, to any employee or agent of the Association to the fullest extent of the provisions of this Article XIV with respect to the indemnification and advancement of expenses of directors and officers of the Association.

Section 7. Contract Rights.    The rights to indemnification and to the advancement of expenses conferred in Section 1 and Section 2 of this Article XIV shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the Indemnitee's heirs, executors and administrators.

Section 8. Definitions.  For purposes of this Article XIV:

"Final Adjudication" means a final judicial decision from which there is no further right to appeal.

"Indemnitee" means each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "Proceeding"), by reason of the fact that he or she or a person of whom he or she is the legal representative is or was a director or an officer of the Association or at the request of the Association is or was serving as a director, officer, employee or agent of or providing services under a management agreement to any other corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to any employee benefit plan, whether the basis of such Proceeding is alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, employee or agent.

"Loss" means expense, liability and loss (including, without limitation, reasonable attorneys' fees, judgments, fines, excise taxes or penalties under the Employee Retirement Income Security Act of 1974, as amended, and amounts paid or to be paid in settlement).

**ARTICLE XV-Amendments**

These Bylaws may be altered, amended, or repealed by the affirmative vote of not less than two-thirds (2/3) of the members present and voting at any regular or special meeting provided that at such regular or special meeting notice of such meeting shall have contained a copy of the proposed alteration, amendment, or repeal. After any alteration, amendment, or repeal of these Bylaws has been adopted, all members shall be notified of such action as soon as is conveniently possible.

It shall require the affirmative vote of two-thirds (2/3) or more of all members in each of the 11 districts to amend, alter, or repeal Section 2(b) of Article I or this sentence of these Bylaws.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

*Jeffrey J. Prosser et al v. Federal Agricultural Mortgage Corporation et al*

---

**Exhibit "2"**

---

**Segment Information: AA v Ernst 2000 & 2001**

**CFC/RTFC SEGMENT INFORMATION**
**Arthur Andersen v. Ernst & Young**
(In Thousands)

| | Electric | | | Telephone | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | AA | Ernst | Differences | AA | Ernst | Differences | AA | Ernst | Differences |
| **For fiscal year ended May 31, 2000:** | | | | | | | | | |
| Operating income | 780,809 | 780,809 | - | 240,189 | 240,189 | - | 1,020,998 | 1,020,998 | - |
| Cost of funds | 624,033 | 688,271 | (64,238) | 236,127 | 173,053 | 63,074 | 860,160 | 861,324 | (1,164) |
| Gross margin | 156,776 | 92538 | 64,238 | 4,062 | 67,136 | (63,074) | 160,838 | 159,674 | 1,164 |
| General and administrative expenses | 26,421 | 21,256 | 5,165 | 565 | 5,730 | (5,165) | 26,986 | 26,986 | - |
| Provision for loan losses | 17,355 | 6,155 | 11,200 | - | 11,200 | (11,200) | 17,355 | 17,355 | - |
| Net margin before extra-ordinary item | 113,000 | 65,127 | 47,873 | 3,497 | 50,206 | (46,709) | 116,497 | 115,333 | 1,164 |
| Extra-Ordinary Item | (1,164) | - | (1,164) | - | - | - | (1,164) | - | (1,164) |
| Net margin | 111,836 | 65,127 | 46,709 | 3,497 | 50,206 | (46,709) | 115,333 | 115,333 | - |
| **RTFC Reported Income for fiscal year ended May 31, 2000:** | | | | | | | | | |
| Operating Margin | | | | 3,497 | 3,497 | | | | |
| Net Margin | | | | 26,880 | 26,880 | | | | |
| Discrepancy | | | | (23,383) | 23,326 | | | | |
| **For fiscal year ended May 31, 2001:** | | | | | | | | | |
| Operating income | 968,771 | 968,771 | - | 419,524 | 419,524 | - | 1,388,295 | 1,388,295 | - |
| Cost of funds | 702,426 | 804,384 | (101,958) | 415,128 | 313,455 | 101,673 | 1,117,554 | 1,117,839 | (285) |
| Gross margin | 266,345 | 164,387 | 101,958 | 4,396 | 106,069 | (101,673) | 270,741 | 270,456 | 285 |
| General and administrative expenses | 31,907 | 23,790 | 8,117 | 579 | 8,696 | (8,117) | 32,486 | 32,486 | - |
| Provision for loan losses | 105,204 | 74,404 | 30,800 | - | 30,800 | (30,800) | 105,204 | 105,204 | - |
| Net margin before extra-ordinary item | 129,234 | 66,193 | 63,041 | 3,817 | 66,573 | (62,756) | 133,051 | 132,766 | (285) |
| Extra-Ordinary Item | (285) | - | (285) | - | - | - | (285) | - | 285 |
| Net margin | 128,949 | 66,193 | 62,756 | 3,817 | 66,573 | (62,756) | 132,766 | 132,766 | - |
| **RTFC Reported Income for fiscal year ended May 31, 2001:** | | | | | | | | | |
| Operating Margin | | | | 3,817 | 3,817 | | | | |
| Net Margin | | | | 38,098 | 38,098 | | | | |
| Discrepancy | | | | (34,281) | 28,475 | | | | |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

*Jeffrey J. Prosser et al v. Federal Agricultural Mortgage Corporation et al*

_____

**Exhibit "3"**

_____

**Loan Portfolio Restructuring – Rate Differentials of Electric v Telephone**

**National Rural Utilities Cooperative Finance Corporation**
**Extract from Note 2 - 2002 10K Contrasted to 2004 10K**
(in thousands)

| | 2001 | | 2004 | |
| --- | --- | --- | --- | --- |
| | Amount | Rate | Amount | Rate |
| Long-term Fixed Rate Loans: | | | | |
| Electric systems | 6,088,076 | 6.85% | 10,897,008 | 5.27% |
| Telecommunication systems | 2,453,158 | 8.17% | 2,695,205 | 7.33% |
| | | | | |
| *Rate Differential*: Telecommunications sys. | | | | |
| less Electric sys. | | **1.32%** | | **2.06%** |
| | | | | |
| Long- term Variable Rate Loans: | | | | |
| Electric systems | 5,096,467 | 7.05% | 2,904,399 | 2.63% |
| Telecommunication systems | 2,481,257 | 7.69% | 1,542,554 | 4.52% |
| | | | | |
| *Rate Differential*: Telecommunications sys. | | | | |
| less Electric sys. | | **0.64%** | | **1.89%** |
| | | | | |
| Intermediate-term unsecured loans: | | | | |
| Electric systems | 276,785 | 7.24% | 43,326 | 2.56% |
| Telecommunication systems | 13,838 | 7.50% | 7,064 | 4.75% |
| | | | | |
| *Rate Differential*: Telecommunications sys. | | | | |
| less Electric sys. | | **0.26%** | | **2.19%** |

Notes:
1. 2001 10K, page 62 provides the information for 2001.
2. 2004 10K, page 108 provides the information for 2004.

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)**

At the date of initial adoption, CFC recorded transition adjustments as a cumulative change in accounting principle, as required by SFAS No. 133. The impact of such adjustments is an increase of $25 million to net margin, a decrease of $182 million to other comprehensive income and the recognition of $157 million of liabilities on the balance sheet. CFC expects that the adoption of SFAS No. 133 will increase the volatility of the reported net margin and other comprehensive income. The amount of volatility will be based on amounts, positions and market conditions that exist during any period.

*(l) Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the assets and liabilities and the revenue and expenses reported in the financial statements, as well as amounts included in the notes thereto, including discussion and disclosure of contingent liabilities. While CFC uses its best estimates and judgments based on the known facts at the date of the financial statements, actual results could differ from these estimates as future events occur.

CFC does not believe it is vulnerable to the risk of a near-term severe impact as a result of any concentrations of its activities.

*(m) Membership Fees*

Members are charged a one-time membership fee based on member class. CFC distribution system members (class A), power supply system members (class B), national associations of cooperatives (class D) and associate members (class E) pay a $1,000 membership fee. CFC service organization members (class C) pay a $200 membership fee. RTFC voting members pay a $1,000 membership fee and non-voting members pay a $100 membership fee. Membership fees are accounted for as members' equity.

*(n) Reclassifications*

Certain reclassifications of prior year amounts have been made to conform to the fiscal year 2001 presentation.

**(2) Loans and Commitments**

Loans to members bear interest at rates determined from time to time by the board of directors after considering CFC's cost of funds, operating expenses, provision for loan losses and the maintenance of reasonable margin levels. In keeping with its not-for-profit, cooperative charter, CFC's policy is to set interest rates at the lowest levels it considers to be consistent with sound financial management. Loans outstanding to members, weighted average interest rates thereon and unadvanced commitments by loan type are summarized as follows as of May 31:

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)**

| | 2001 | | | 2000 | | |
|---|---|---|---|---|---|---|
| (Dollar amounts in thousands) | Loans Outstanding | Weighted Average Interest Rates | Unadvanced Commitments (A) | Loans Outstanding | Weighted Average Interest Rates | Unadvanced Commitments (A) |
| Long-term fixed rate secured loans (B): | | | | | | |
| Electric systems | $ 6,088,076 | 6.85% | $ — | $ 6,674,470 | 6.74% | $ — |
| Telecommunication systems | 2,453,158 | 8.17% | — | 1,540,928 | 7.36% | — |
| Total long-term fixed rate secured loans | 8,541,234 | 7.23% | — | 8,215,398 | 6.86% | — |
| Long-term variable rate secured loans (C): | | | | | | |
| Electric systems | 5,096,467 | 7.05% | 7,395,994 | 4,019,155 | 7.45% | 7,524,197 |
| Telecommunication systems | 2,481,257 | 7.69% | 311,654 | 1,816,826 | 8.02% | 589,696 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Total long-term variable rate secured loans | 7,577,724 | 7.26% | 7,707,648 | 5,835,981 | 7.62% | 8,113,893 |
| Loans guaranteed by RUS: | | | | | | |
| Electric systems | 182,134 | 6.31% | 103,685 | 89,153 | 6.53% | — |
| Intermediate-term secured loans: | | | | | | |
| Electric systems | 55,325 | 7.08% | 43,129 | 141,771 | 7.41% | 48,533 |
| Intermediate-term unsecured loans: | | | | | | |
| Electric systems | 276,785 | 7.24% | 309,692 | 200,706 | 7.35% | 408,644 |
| Telecommunication systems | 13,836 | 7.50% | 2,402 | 12,206 | 7.80% | 6,090 |
| Total intermediate-term unsecured loans | 290,621 | 7.25% | 312,094 | 212,912 | 7.37% | 414,734 |
| Line of credit loans (D): | | | | | | |
| Electric systems | 1,193,795 | 7.35% | 4,825,576 | 1,281,483 | 7.59% | 4,403,987 |
| Telecommunication systems | 377,148 | 8.12% | 834,813 | 329,768 | 8.32% | 717,700 |
| Total line of credit loans | 1,570,943 | 7.53% | 5,660,389 | 1,611,251 | 7.74% | 5,121,687 |
| Nonperforming loans: | | | | | | |
| Electric systems | 812 | — | — | — | — | — |
| Restructured loans (E): | | | | | | |
| Electric systems | 1,465,157 | 2.63% | — | 571,579 | 3.90% | — |
| Total loans | 19,683,950 | 6.91% | 13,826,945 | 16,678,045 | 7.12% | 13,698,847 |
| Less: Allowance for loan losses | (331,997) | | — | (228,292) | | — |
| Net loans | $19,351,953 | | $13,826,945 | $16,449,753 | | $13,698,847 |
| Total by member class: | | | | | | |
| Distribution | $11,444,999 | | $ 9,713,486 | $10,394,985 | | $ 9,644,058 |
| Power supply | 2,308,384 | | 2,307,259 | 2,037,108 | | 2,054,322 |
| Statewide and associate | 605,168 | | 657,331 | 546,224 | | 686,981 |
| Telecommunication systems | 5,325,399 | | 1,148,869 | 3,699,728 | | 1,313,486 |
| Total | $19,683,950 | | $13,826,945 | $16,678,045 | | $13,698,847 |

(A)  Unadvanced commitments include loans approved by CFC for which loan contracts have not yet been executed and for which loan contracts have been executed but funds have not been advanced. Since commitments may expire without being fully drawn upon, the total amounts reported as commitments do not necessarily represent future cash requirements. Collateral and security requirements for advances on commitments are identical to those on initial loan approval.

(B)  Generally, the terms of long-term fixed rate loans range from one to 35 years. Upon expiration of the interest rate term, the borrower may select another fixed rate term of one to 35 years (but not beyond maturity of the loan) or a variable rate. The borrower may also repay to CFC the principal then outstanding together with interest due thereon and other sums, if required. Includes $56 million and $102 million of unsecured loans at May 31, 2001 and 2000, respectively.

(C)  Includes $65 million and $49 million of unsecured loans at May 31, 2001 and 2000, respectively.

(D)  Includes $445 million and $342 million of secured loans at May 31, 2001 and 2000, respectively.

(E)  The rates on restructured loans represent the effective rate based on the scheduled minimum payments.

NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION

NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

Total loans outstanding, by state or U.S. territory, are summarized below:

| (Dollar amounts in thousands) | May 31, | | State/Territory | May 31, | |
|---|---|---|---|---|---|
| **State/Territory** | **2001** | **2000** | | **2001** | **2000** |
| Alabama | $ 364,974 | $ 431,922 | Montana | $ 220,234 | $ 233,613 |
| Alaska | 293,070 | 334,694 | Nebraska | 12,785 | 13,928 |
| Arizona | 101,770 | 90,680 | Nevada | 94,958 | 91,669 |
| Arkansas | 531,224 | 475,015 | New Hampshire | 243,973 | 282,913 |
| California | 86,783 | 85,577 | New Jersey | 8,724 | 7,385 |
| Colorado | 599,602 | 421,427 | New Mexico | 38,063 | 83,654 |

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS — (Continued)**

judgments based on the known facts at the date of the financial statements, actual results could differ from these estimates as future events occur.

CFC does not believe it is vulnerable to the risk of a near-term severe impact as a result of any concentrations of its activities.

*(s) Reclassifications*

Certain reclassifications of prior year amounts have been made to conform to the fiscal year 2004 presentation.

**(2)  Loans and Commitments**

Loans to members bear interest at rates determined from time to time by the board of directors after considering CFC's cost of funds, operating expenses, provision for loan losses and the maintenance of reasonable margin levels. In keeping with its not-for-profit, cooperative charter, CFC's policy is to set interest rates at the lowest levels it considers to be consistent with sound financial management.

NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION

NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS — (Continued)

Loans outstanding to members, weighted average interest rates thereon and unadvanced commitments by loan type are summarized as follows at May 31:

| (Dollar amounts in thousands) | 2004 | | | 2003 | | |
|---|---|---|---|---|---|---|
| | Loans Outstanding | Weighted Average Interest Rates | Unadvanced Commitments[A] | Loans Outstanding | Weighted Average Interest Rates | Unadvanced Commitments[A] |
| Long-term fixed rate secured loans[B]: | | | | | | |
| Electric systems | $10,897,008 | 5.27% | $ — | $ 9,484,490 | 5.64% | $ — |
| Telecommunication systems | 2,695,205 | 7.33% | — | 2,735,220 | 7.77% | — |
| Other | 46,945 | 8.45% | — | — | — | — |
| Total long-term fixed rate secured loans | 13,639,158 | 5.69% | — | 12,219,710 | 6.12% | — |
| Long-term variable rate secured loans[C]: | | | | | | |
| Electric systems | 2,904,399 | 2.63% | 5,483,912 | 3,211,434 | 3.35% | 5,650,836 |
| Telecommunication systems | 1,542,554 | 4.52% | 292,064 | 1,965,390 | 5.30% | 291,724 |
| Other | 224,134 | 3.30% | 50,252 | — | — | — |
| Total long-term variable rate secured loans | 4,671,087 | 3.28% | 5,826,228 | 5,176,824 | 4.09% | 5,942,560 |
| Loans guaranteed by RUS: | | | | | | |
| Electric systems | 263,392 | 4.60% | 8,491 | 266,857 | 4.71% | 30,388 |
| Intermediate-term secured loans: | | | | | | |
| Electric systems | 4,616 | 2.50% | 20,226 | 14,525 | 3.63% | 28,522 |
| Other | 399 | 3.99% | — | — | — | — |
| Total intermediate-term secured loans | 5,015 | 2.62% | 20,226 | 14,525 | 3.63% | 28,522 |
| Intermediate-term unsecured loans: | | | | | | |
| Electric systems | 43,326 | 2.56% | 60,621 | 50,843 | 3.65% | 72,559 |
| Telecommunication systems | 7,064 | 4.75% | 1,572 | 18,642 | 5.45% | 4,827 |
| Total intermediate-term unsecured loans | 50,390 | 2.87% | 62,193 | 69,485 | 4.13% | 77,386 |
| Line of credit loans[D]: | | | | | | |
| Electric systems | 792,580 | 2.50% | 5,249,793 | 884,146 | 3.57% | 5,233,146 |
| Telecommunication systems | 57,747 | 5.05% | 300,151 | 223,388 | 5.60% | 377,409 |
| Other | 50,119 | 3.30% | 109,456 | — | — | — |
| Total line of credit loans | 900,446 | 2.71% | 5,659,400 | 1,107,534 | 3.98% | 5,610,555 |
| Non-performing loans[E]: | | | | | | |
| Telecommunication systems | 340,438 | 4.54% | — | — | — | — |
| Other | 789 | — | — | — | — | — |
| Total non-performing loans | 341,227 | 4.53% | — | — | — | — |
| Restructured loans[E]: | | | | | | |
| Electric systems | 617,808 | — | — | 629,406 | — | — |
| Total loans | 20,488,523 | 4.80% | 11,576,538 | 19,484,341 | 5.23% | 11,689,411 |
| Less: Allowance for loan losses | (573,939) | | — | (511,463) | | — |
| Net loans | $19,914,584 | | $11,576,538 | $18,972,878 | | $ 11,689,411 |
| | | | | | | |
| Total by member class: | | | | | | |
| Distribution | $12,569,228 | | $ 8,532,978 | $11,410,592 | | $ 8,527,266 |
| Power supply | 2,819,224 | | 2,101,439 | 2,701,094 | | 2,321,125 |
| Statewide and associate | 134,677 | | 188,626 | 430,015 | | 167,059 |
| Subtotal electric systems | 15,523,129 | | 10,823,043 | 14,541,701 | | 11,015,450 |
| Telecommunication systems | 4,643,008 | | 593,787 | 4,942,640 | | 673,961 |
| Other | 322,386 | | 159,708 | — | | — |
| Total | $20,488,523 | | $11,576,538 | $19,484,341 | | $ 11,689,411 |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

*Jeffrey J. Prosser et al v. Federal Agricultural Mortgage Corporation et al*

_____

**Exhibit "4"**

_____

**Electric Loan Information & Pricing**

## National Rural Utilities Cooperative Finance Corporation ("CFC")
### Insolvency Analysis - the Numbers

| F/Y/E May 31, | 10K Source | Total Liab. & Equity | Total Equity | Adjustment Derivative Liabilities | Funded Liabilities | Rate On (a) Funded Liabilities | Total | Rate of Income | Average Funded Liabilities | Cost of Funds | Rate On (a) Funded Liabilities | Rep. Spread Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1997 | 1998 | 9,057,494 | 271,594 | - | 8,785,900 | 5.63% | 271,594 | 6.60% | 9,594,755 | 540,535 | 5.63% | 99 10K, p. 32 |
| 1998 | 1999 | 10,682,888 | 279,278 | - | 10,403,610 | 5.53% | 279,278 | 6.42% | 12,016,955 | 664,109 | 5.53% | 99 10K, p. 32 |
| 1999 | 1999 | 13,925,252 | 294,953 | - | 13,630,299 | 5.66% | 294,953 | 6.60% | 15,186,261 | 860,160 | 5.66% | 01 10K, p. 32 |
| 2000 | 2000 | 17,083,440 | 341,217 | - | 16,742,223 | 6.15% | 341,217 | 7.17% | 16,742,223 | 1,117,839 | 6.15% | 01 10K, p. 32 |
| 2001 | 2001 | 19,998,842 | 393,899 | - | 19,604,943 | 4.50% | 393,899 | 5.54% | 18,173,583 | 885,838 | 4.50% | 01 10K, p. 32 |
| 2002 | 2002 | 20,323,342 | 326,376 | 251,803 | 19,745,163 | 4.82% | 578,179 | 4.92% | 19,675,653 | 951,628 | 4.82% | 03 10K, p. 39 |
| 2003 | 2002 | 21,027,883 | 930,836 | 354,781 | 19,742,266 | 4.50% | 1,285,617 | 4.50% | 19,743,715 | 941,491 | 4.50% | 03 10K, p. 39 |
| **2004** | **2005** | **21,349,572** | **695,734** | **129,915** | **20,523,923** | **4.68%** | **825,649** | **5.01%** | **20,133,096** | **942,033** | **4.68%** | **05 10K, p. 31** |
| 2005 | 2005 | 20,060,314 | 768,761 | 78,471 | 19,213,082 | 4.74% | 847,232 | 5.41% | 19,868,603 | 975,936 | 4.74% | 05 10K, p. 31 |
| 2006 | 2007 | 19,179,621 | 784,408 | 85,198 | 18,310,015 | 5.20% | 869,606 | 5.41% | 18,761,549 | 975,936 | 5.20% | 07 10K, p. 32 |
| 2007 | 2007 | 18,575,181 | 710,041 | 71,934 | 17,793,206 | 5.52% | 781,975 | 5.80% | 18,051,611 | 996,730 | 5.52% | 07 10K, p. 32 |

### The Key Figures - The Electric Loan Portfolio

| F/Y/E May 31, | 10K Source | % of the Total Loan Portfolio (% TLP) | Gross Electric Loans | Aver. Gross Electric Loans | Gross Income | Rate of Income | Spread (b) | Reported Spread | G&A Exp. (3) | Net Spread | Patronage Distributions | Pat. Dis. On Total Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1997 | 1998 | 85.11% | 7,579,033 | 8,291,804 | 492,548 | 6.60% | 0.96% | 1.00% | (0.26%) | 0.70% | 57,601 | 20.62% |
| 1998 | 1999 | 80.22% | 9,004,575 | 9,998,819 | 546,910 | 6.42% | 0.89% | 1.04% | (0.25%) | 0.64% | 66,445 | 22.53% |
| 1999 | 1999 | 91.69% | 10,993,063 | 11,835,570 | 641,765 | 6.60% | 0.93% | 1.07% | (0.21%) | 0.72% | 77,439 | 22.69% |
| 2000 | 2000 | 72.95% | 12,678,076 | 13,518,314 | 780,809 | 7.17% | 1.02% | 1.44% | (0.22%) | 0.79% | 98,323 | 24.96% |
| 2001 | 2001 | 74.68% | 14,358,551 | 14,665,292 | 968,771 | 5.54% | 1.04% | 1.52% | (0.18%) | 0.86% | 74,622 | 22.86% |
| 2002 | 2002 | 74.63% | 14,972,033 | 14,756,867 | 812,768 | 4.92% | 0.10% | 0.71% | (0.20%) | 0.10% | 70,576 | 7.58% |
| 2003 | 2003 | 74.95% | 14,541,701 | 14,948,643 | 726,384 | 4.50% | (0.17%) | 0.40% | (0.23%) | (0.40%) | 77,755 | 11.18% |
| **2004** [1] | **2005** | **74.95%** | **15,355,584** | **15,430,375** | **673,078** | | **(0.17%)** | **0.40%** | **(0.23%)** | **(0.40%)** | **77,755** | **11.18%** |
| 2005 [2] | 2005 | 81.73% | 15,505,166 | 15,505,769 | 772,619 | 5.01% | 0.27% | 0.52% | (0.25%) | 0.02% | 72,912 | 9.48% |
| 2006 | 2007 | 86.02% | 15,794,372 | 15,649,769 | 846,806 | 5.41% | 0.21% | 0.18% | (0.28%) | (0.07%) | 84,247 | 10.74% |
| 2007 | 2007 | 87.19% | 15,805,290 | 15,799,831 | 916,913 | 5.80% | 0.28% | 0.31% | (0.27%) | 0.01% | 85,494 | 12.04% |

1  National Cooperative Services Corporation ("NCSC") is reported as a separate segment. It was previously combined in the Electric sytem.
2  Telco loans dropped during fiscal year 2005 by $1.65 B and by 5/31/2005 Telco loans were $1.95B less than as of 5/31/2003.
3  Does not include any provision for Loan Losses.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

*Jeffrey J. Prosser et al v. Federal Agricultural Mortgage Corporation et al*

---

**Exhibit "5"**

---

**Equity Restated pursuant to CFC's Fair Value Disclosures**

## National Rural Utilities Cooperative Finance Corporation (CFC)
### Total Equity: Carrying Value to Fair Value
(fiscal years 2005, 2006 & 2007)

| (in thousands) | 31-May-07 | | | 31-May-06 | | | 31-May-05 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Carrying Value | Fair Value | Diff. | Carrying Value | Fair Value | Diff. | Carrying Value | Fair Value | Diff. |
| **Total Equity as reported in Balance Sheet** | | | **710,041** | | | **784,408** | | | **768,761** |
| *Assets:* | | | | | | | | | |
| Cash and cash equivalents | 304,107 | 304,107 | - | 260,338 | 260,338 | - | 418,514 | 418,514 | - |
| Loans to members, net | 17,566,544 | 15,743,632 | (1,822,912) | 17,749,462 | 15,055,729 | (2,693,733) | 18,382,319 | 17,681,520 | (700,799) |
| Debt service reserve funds | 54,993 | 54,993 | - | 80,159 | 80,159 | - | 93,182 | 93,182 | - |
| Cash flow interest rate exchange agrs. | 212,143 | 212,143 | - | 320,201 | 320,201 | - | 61,671 | 61,671 | - |
| Cash flow cross-curr. int. rate exch. agrs. | - | - | | 22,226 | 22,226 | | 64,797 | 64,797 | |
| Fair value interest rate exch. agrs. | 10,631 | 10,631 | | 233,242 | 233,242 | | 224,992 | 224,992 | |
| cross currency int. rate exch. agrs. | - | - | | - | - | | 233,403 | 233,403 | |
| *Liabilities:* | | | | | | | | | |
| Short-term debt | 4,427,123 | 4,404,590 | 22,533 | 5,343,824 | 5,339,759 | 4,065 | 7,952,579 | 7,977,991 | (25,412) |
| Long-term debt | 11,295,219 | 11,492,645 | (197,426) | 10,642,028 | 10,725,849 | (83,821) | 8,701,955 | 9,439,911 | (737,956) |
| Guarantee liability | 18,929 | 18,929 | - | 16,750 | 16,750 | - | 16,094 | 16,094 | - |
| Cash flow interest rate exch. agrs. | 12,869 | 12,869 | | 6,844 | 6,844 | | 67,154 | 67,154 | |
| Interest rate exch. agrs. | 59,065 | 59,065 | | 78,354 | 78,354 | | 11,317 | 11,317 | |
| Subordinated deferrable debt | 311,440 | 299,964 | 11,476 | 486,440 | 462,741 | 23,699 | 685,000 | 689,288 | (4,288) |
| Off-balance sheet instr.: Commitments | - | - | | - | - | | - | - | |
| **Total Equity on a Fair Value Basis** | | | **(1,276,288)** | | | **(1,965,382)** | | | **(699,694)** |
| Source: (10K) (Footnote #) (page #) | 2007 10K | FN 14 | Page 111 | 2007 10K | FN 14 | Page 111 | 2006 10K | FN 13 | Page 100 |

### CFC's Asset Growth
(in Thousands)

| | Carrying Value Loans, Net | Other Assets | Total Assets |
|---|---|---|---|
| As of May 31,2004 per 2005 10k, page 72 | 19,914,584 | 1,526,654 | 21,441,238 |
| As of May 31, 2005 per 2005 10k, page 72 | 18,382,319 | 1,663,769 | 20,046,088 |
| As of May 31, 2006 per 2007 10k, page 80 | 17,749,462 | 1,430,159 | 19,179,621 |
| As of May 31, 2007 per 2007 10k, page 80 | 17,566,544 | 1,008,637 | 18,575,181 |

| | % of Curr. Year Total Assets | % of Curr. Year Total Assets | % of 2004 Total Assets |
|---|---|---|---|
| As of May 31,2004 | 92.88% | 7.12% | 100.00% |
| As of May 31, 2005 | 91.70% | 8.30% | 93.49% |
| As of May 31, 2006 | 92.54% | 7.46% | 89.45% |
| As of May 31, 2007 | 94.57% | 5.43% | 86.63% |

### Government Investment in re: CFC
(in Thousands)

| | Farmer Mac | REDLG Program | Total |
|---|---|---|---|
| 29-Jul-05 | $ 500,000 | | $ 500,000 |
| 22-Nov-05 | | $ 500,000 | 500,000 |
| 22-Feb-06 | | 500,000 | 500,000 |
| 9-May-06 | | 1,000,000 | 1,000,000 |
| 15-May-07 | 365,600 | | 365,600 |
| 1-Aug-07 | 40,000 | | 40,000 |
| 7-Aug-07 | | 500,000 | 500,000 |
| 2-Jan-08 | 34,000 | | 34,000 |
| 28-Mar-08 | 400,000 | | 400,000 |
| **Total** | $ 1,339,600 | $ 2,500,000 | $ 3,839,600 |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

*Jeffrey J. Prosser et al v. Federal Agricultural Mortgage Corporation et al*

_____

**Exhibit "6"**

_____

**Farm Credit Administration's Letter purporting to have authority to approve
investments on a case-by-case basis**

**Farm Credit Administration**

1501 Farm Credit Drive
McLean, Virginia 22102-5090
(703) 883-4000



April 8, 2008

Mr. John P. Raynor
10110 Nicholas Street, Suite 102
Omaha, NE 68114

Dear Mr. Raynor:

The Farm Credit Administration (FCA) received your letter of March 27, 2008, addressed to the Office of Secondary Market Oversight. Your letter raises various issues regarding the business relationships between the National Rural Utilities Cooperative Finance Corporation (CFC) and the Federal Agricultural Mortgage Corporation (Farmer Mac). It also raises several issues with regard to FCA.

To respond to your assertions regarding the authorities of the FCA in relation to Farmer Mac's investments in CFC, FCA has clear regulatory authority to approve investments on a case-by-case basis and to set terms and conditions for such investments as appropriate (12 C.F.R. § 652.35(e)). We will take the information you provided regarding the business relationship under advisement in the context of our ongoing oversight and supervision of Farmer Mac.

Sincerely,

Samuel R. Coleman, CFA
Director
Office of Secondary Market Oversight

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

*Jeffrey J. Prosser et al v. Federal Agricultural Mortgage Corporation et al*

—————————————————

**Exhibit "7"**

—————————————————

**Wall Street Journal Article Date December 27, 2004**

# Co-op Pleased With Loan Program

**Rural Electric Association
Is a Big Winner in Pact
From Bush Administration**
By JOHN J. FIALKA
Staff Reporter of THE WALL STREET JOURNAL
December 27, 2004

*(See Corrections & Amplifications item below.)*

WASHINGTON -- Glenn English is a former congressman who heads the National Rural Electric Cooperative Association. The Oklahoma Republican wasn't running for office this year, but he was still a big winner in the election.

Nobody was more pleased when, amid intense competition with John Kerry for Farm Belt votes, the Bush administration announced $3 billion in government-backed loans for rural development three days before the election.

The move got scant attention from the national media, but was widely trumpeted in the agricultural trade media and in the rural communities that stood to gain. A Minnesota business leader issued a statement thanking "President Bush for this important announcement that means millions of dollars ... throughout Minnesota." Iowa's Democratic Sen. Tom Harkin fumed that the decision was made "for political points on the eve of the election."

The last-minute announcement illustrates the Bush administration's willingness to bend its free-market principles for powerful farm groups. The White House move came despite longstanding criticism of the subsidized loans by the Government Accountability Office and other government watchdogs.

The decision also shows the clout of the group Mr. English leads, an obscure but effective lobbying organization in Washington whose scope long ago extended to issues far beyond electrifying the countryside.

As a lawmaker from 1975 to 1994, Mr. English led a campaign inside Congress for more rural loans during the 1990s, and has since maintained access to pivotal players on agriculture and appropriations committees that write farm legislation. Mr. English sets up lobbying trips by leaders of the association's members: 900 cooperatives that are nonprofit, consumer-owned organizations originally formed to bring electricity to rural areas.

The cooperatives' 37 million customers vote in almost every rural House district. Since 1989, the association's political action committee has pumped out almost $8 million in donations, according to the Center for Responsive Politics, putting it on a par with **Exxon Mobil** Corp.'s PAC.

Mr. English sees the association's recent victory in getting subsidized loans for rural electric and telecommunications projects as the first step in an ambitious political agenda. He hopes to

expand the PAC's fund raising -- currently limited to co-ops -- to include individual donations from co-op members, as it refers to customers of the rural utilities.

He views the looming debate over the energy bill as an opportunity to exert more political sway, particularly in decisions about overhauling the nation's electricity grid where co-ops will likely battle another muscular stakeholder: privately owned utilities. "We want to take it to a level where we've never been before," Mr. English says.

The rural-loan subsidy was originally authorized in the 2002 farm bill, but it took two years for the Bush administration to agree to create it. "While this has been a difficult experience," Mr. English said, "it has created a new level of trust among some key people in the Bush administration."

Trust among Republican administration officials is indeed a new development for co-op lobbying projects. The Agriculture Department's Rural Electrification Administration was created by Franklin D. Roosevelt by executive order in 1935 to make low-cost loans to groups bringing power lines and power plants to rural America, then still largely in the dark. Budget cutters in the Nixon, Reagan and first Bush administrations tried repeatedly to abolish the agency.

By 1990, rural America had been wired, and President Bush's father led the charge against the co-ops, asserting in a speech that congressional proposals to expand the loan programs "represented unwarranted increases in federal subsidies and risk," and created a portfolio of loans that was increasingly hard to manage. A report issued by his Agriculture Department noted that "nearly 100% of all farms and rural areas" had reliable electricity and telephone systems. It said that government-subsidized loans should be cut back and reserved for a few hardship cases.

Consequently, the co-ops decided to organize their own private bank, the National Rural Utilities Cooperative Finance Corp., or CFC, located in Herndon, Va. The Agriculture Department agency, which Congress ultimately retained and renamed the Rural Utilities Service, helped the CFC get started by giving co-ops even sweeter government-backed loans if they would promise to wean themselves from federal assistance and get future loans at the private bank.

The loans recently announced by the Bush administration would blur the distinction between private lenders, such as the CFC, and government ones, such as the Agriculture Department's Rural Utilities Service. It would for the first time allow the co-ops' private bank to issue government-backed loans. In return for the lower interest rates, the CFC will pay a fee into a new fund that is expected to generate $270 million. Local cooperatives could use the fund to help their communities raise money for projects, such as pitching in on buying a new fire engine.

Both the CFC and the Rural Utilities Service have drawn criticism for going beyond their official missions. A GAO report issued in June said that the lenders are having problems targeting their money in the rural areas they are supposed to serve. Because it has a "once a borrower, always a borrower" standard, the Agriculture Department's bank currently provides 29% of its loans to co-ops in counties now classified as being in metropolitan areas. Three co-ops provide electricity to

suburban Atlanta and another offers satellite-television service to viewers in Washington, D.C., according to the GAO and the Agriculture Department's inspector general.

Examiners also have suggested that both banks have wandered into overly risky areas. According to the GAO, the government bank had to write off more than $3.2 billion in losses to three borrowers from 1999 through 2003. Meanwhile the co-ops' private bank also got into trouble, lending more than $1 billion to a member in suburban Fort Worth, Texas. The Denton County Electric Cooperative formed a company called CoServ, which sprouted more than 30 subsidiaries selling telecommunications, real-estate developments, natural gas, home-security systems and cable television. Most of these businesses went bankrupt in 2002, leaving the co-ops' bank holding a suburban hotel and a golf course, among other properties.

Sheldon C. Peterson, chief executive of the CFC, said that his $20 billion company is in sound financial condition, and that the CoServ loan was "an experiment" -- a failed attempt to develop business opportunities for co-ops. He said he can't talk about two other pending bad loans because they're in negotiation.

Hilda Gay Legge, the administrator of the government lending program, said that while some of the loans go to areas that are partly urban, the agency's "focus continues to be on the rural." Only 3.6% of the borrowers in the agency's $50 billion loan portfolio missed payments last year, she said, adding that "they may be behind, but they're not bad loans."

**Write to** John J. Fialka at john.fialka@wsj.com

**Corrections & Amplifications:**

Glenn English, director of the National Rural Electric Cooperative Association, is a former Democratic congressman from Oklahoma. This article incorrectly identified him as a Republican

F
08-687
JR

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Jeffrey J. Prosser, Pro Se, and John P. Raynor, Pro Se | Federal Agricultural Mortgage Corporation; U. S. Depart. of Agriculture & National Rural Utilities Cooperative Finance Corporation |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___ D.C. ___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

N/a

Case: 1:08-cv-00687
Assigned To : Robertson, James
Assign. Date : 4/22/2008
Description: Pro Se Gen. Civil

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
⊙ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)  OR  ⊙ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

5

○ **G.** *Habeas Corpus/ 2255*

☐ 530 Habeas Corpus-General
☐ 510 Motion/Vacate Sentence

○ **H.** *Employment Discrimination*

☐ 442 Civil Rights-Employment
(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)

*(If pro se, select this deck)*

○ **I.** *FOIA/PRIVACY ACT*

☐ 895 Freedom of Information Act
☐ 890 Other Statutory Actions (if Privacy Act)

*(If pro se, select this deck)*

○ **J.** *Student Loan*

☐ 152 Recovery of Defaulted Student Loans (excluding veterans)

○ **K.** *Labor/ERISA (non-employment)*

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Labor Railway Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

○ **L.** *Other Civil Rights (non-employment)*

☐ 441 Voting (if not Voting Rights Act)
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights
☐ 445 American w/Disabilities-Employment
☐ 446 Americans w/Disabilities-Other

○ **M.** *Contract*

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholder's Suits
☐ 190 Other Contracts
☐ 195 Contract Product Liability
☐ 196 Franchise

○ **N.** *Three-Judge Court*

☐ 441 Civil Rights-Voting (if Voting Rights Act)

**V. ORIGIN**

◉ 1 Original Proceeding
○ 2 Removed from State Court
○ 3 Remanded from Appellate Court
○ 4 Reinstated or Reopened
○ 5 Transferred from another district (specify)
○ 6 Multi district Litigation
○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 U.S.C. § 2201 Declaratory Judgment and permanent injunction to stop unlawful expenditure of Federal funds

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $** _____   Check YES only if demanded in complaint
**JURY DEMAND:**   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 4/22/08    SIGNATURE OF ATTORNEY OF RECORD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.