# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JEFFREY J. PROSSER and JOHN P. RAYNOR,

          Plaintiffs,

v.

FEDERAL AGRICULTURAL MORTGAGE CORPORATION, UNITED STATES DEPARTMENT OF AGRICULTURE, and NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION,

          Defendants.

Civil Case No. **08-cv-687 (JR)**

## DEFENDANT NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION'S MOTION TO DISMISS

FULBRIGHT & JAWORSKI L.L.P.

_/s/ Ryan P. Hartman_
    Ryan P. Hartman (#974807 / TX0044)
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2623
Telephone:    (202) 662-0200
Facsimile:    (202) 662-4643
    Gerard G. Pecht (_pro hac vice_ pending)
1301 McKinney, Suite 5100
Houston, Texas 77010
Telephone:    (713) 651-5151
Facsimile:    (713) 651-5246
    Toby L. Gerber (_pro hac vice_ pending)
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone:    (214) 855-8000
Facsimile:    (214) 855-8200

COUNSEL FOR DEFENDANT NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION

60096537.9

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

STANDARD OF REVIEW ................................................................................................. 8

ARGUMENT AND AUTHORITIES ................................................................................ 11

I.       Plaintiffs Lack Article III Standing to Pursue Their Claims ................................ 11

    A.       Plaintiffs Have Not Personally Suffered a Concrete and
          Particularized, and Actual and Imminent Injury to a Legally-
          Protected Interest ...................................................................................... 12

          1.       Plaintiffs Have Not Alleged a Cognizable Injury in Fact to
                    Themselves ................................................................................... 12

          2.       Plaintiffs' Conclusory Claim of Future Harm Does Not
                    Confer Standing for the Injunctive and Declaratory Relief
                    Sought .......................................................................................... 14

          3.       Plaintiffs Lack Standing to Seek Redress for Alleged
                    Injuries to Third Parties .............................................................. 16

    B.       The Allegedly Unlawful Actions Challenged by Plaintiffs are not
          Fairly Traceable to Plaintiffs' Alleged Injury ......................................... 17

    C.       It is Not Likely, as Opposed to Merely Speculative, that Plaintiffs'
          Alleged Injury Will be Redressed by the Relief Which They Seek ........ 21

II.      Plaintiffs Lack Prudential Standing to Pursue Their Claims ............................... 23

III.     Plaintiffs Jeffrey Prosser and John Raynor, both Debtors in Chapter 7
      Bankruptcies with Trustees Appointed over Their Affairs, Lack Standing
      to Bring Claims Arising Before the Commencement of Their Bankruptcy
      Cases ..................................................................................................................... 26

IV.      Plaintiffs' Claims are not Ripe and Should be Dismissed ................................... 30

V.       Plaintiffs Have Failed to State a Claim for Which Relief Can Be Granted ......... 31

CONCLUSION AND PRAYER ....................................................................................... 32

Defendant National Rural Utilities Cooperative Finance Corporation ("National Rural") moves to dismiss the pro se[1] complaint of Plaintiffs Jeffrey J. Prosser ("Prosser") and John P. Raynor ("Raynor") against Defendants National Rural, the Federal Agricultural Mortgage Corporation ("Farmer Mac"), and the United States Department of Agriculture ("USDA") pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and would respectfully show as follows:

### INTRODUCTION

Plaintiffs have filed a largely indecipherable complaint, devoid of any causes of action, inexplicably claiming that they have been and will continue to be harmed by (i) transactions between a cooperative, National Rural, and one of its many members and close affiliate, Rural Telephone Finance Cooperative[2] ("RTFC"), with which Plaintiffs cannot and do not allege any relationship, and (ii) transactions, to which they are also strangers, between National Rural and the USDA and Farmer Mac involving loans to rural utilities, which Plaintiffs do not claim to be, under two statutes that grant Plaintiffs' no right of action. While their complaint is littered with jargon, meaningless in its context, like "security [sic] fraud" and "scienter," they do not even attempt to allege fundamental elements of the claims to which such terms relate. For the reasons set forth below, Plaintiffs' complaint should be dismissed because they simply cannot meet their

---

[1] While Plaintiffs have filed this lawsuit "pro se", the Court should note, as another federal court has in dismissing another lawsuit by Plaintiff Raynor, that although he "is proceeding pro se . . . he is a practicing attorney," and has even "signed his pleadings using his . . . business address," and accordingly, his pleadings should be held to the same standard as those of any attorney. Exh. A, Memo. & Order Granting Defs.' Mtn. to Dismiss in No. 4:06-cv-3244, *Raynor v. Titus, et al.*, in the U.S. District Court for the District of Nebraska, at 1; *see also* Exh. B1, *In re Emerging Commc'n. Sh. Litig.*, 2004 Del. Ch. LEXIS 70, *10, 138-42, 155 (Del Ch. 2004) (holding that Raynor, while acting as the personal attorney of Prosser, breached his fiduciary duties to the shareholders of Prosser's former companies).

[2] Plaintiffs mistakenly refer to this entity as "Rural Telephone Finance *Corporation*."

burdens to demonstrate standing and subject-matter jurisdiction, and to state a claim on which relief can be granted.

## BACKGROUND

National Rural is a private, not-for-profit cooperative association, the principal purpose of which is to provide its members with a source of financing to supplement the loan programs of the Rural Utilities Service ("RUS") of the United States Department of Agriculture. Exh. C, National Rural Form 10-K for the period ending May 31, 2007, at 1.[3] National Rural makes loans to its rural utility system members, which are located in almost every state and the District of Columbia, to enable them to acquire, construct and operate electric distribution, generation, transmission, and related facilities. *Id.* at 1-2. As of May 31, 2007, rural electric systems served 12% of all consumers of electricity in the U.S. and its territories, accounted for approximately 10% of total sales of electricity, and owned approximately 5% of energy generation and generating capacity. *Id.* at 12. As of that same date, National Rural, together with its affiliates, had over 1,500 members, nearly $18.2 billion in loans outstanding, almost $18.6 billion in assets, and A1/A+ rated senior secured debt. *Id.* at 2, 4, 16, 43, 80. National Rural is a not-for-profit member-owned finance cooperative; thus, its objective is not to maximize its net income, but to offer its members low-cost financial products and services consistent with sound financial management. *Id.* at 1.

RTFC, one of National Rural's many members, is also a private, not-for-profit cooperative association, the principal purpose of which is to provide and arrange financing for its

---

[3] As explained in more detail below, the Court may, in deciding National Rural's motion to dismiss under Rule 12(b)(6), consider information from National Rural's 10-K because Plaintiffs repeatedly reference and quote from that document in their complaint.

rural telecommunications members and their affiliates. *Id.* at 1-2. National Rural is the sole lender to and manages the lending and financial affairs of RTFC through a long-term management agreement, and under a guarantee agreement, RTFC pays National Rural a fee in exchange for which National Rural reimburses RTFC for loan losses. *Id.* at 1.

While Plaintiffs' complaint is difficult to follow, it appears to ultimately revolve around three allegations: (1) that RTFC, which is not a party to this lawsuit, was allegedly subsidizing National Rural unlawfully, (2) that the Federal Financing Bank ("FFB"), which is not a party to this lawsuit, was allegedly purchasing rural utility loans from National Rural that were improperly guaranteed by the USDA, and (3) that Farmer Mac, under the improvidently-granted authority of the Farm Credit Administration Office of Secondary Market Oversight ("FCA-OSMO"), also not a party to this action, was improperly purchasing rural utility loans from National Rural.

Plaintiffs, however, do not allege that they are shareholders or owners of National Rural or RTFC, or that they hold any interest at all in National Rural or RTFC. Nor are they claiming that they are parties to any of the loans about which they complain. In fact, the only allegation they make regarding their relationship to National Rural or RTFC is that Prosser and his wife, who is also not a party to this suit, *used to be* the "beneficial owners" of, and Raynor *used to be* a board member of Innovative Communication Corporation ("ICC"), which *used to be* an "associate member" of RTFC, and the Virgin Islands Telephone Corporation ("Vitelco"), which *used to be* a member of RTFC. Significantly, neither ICC nor Vitelco are plaintiffs in this lawsuit, nor do plaintiffs claim to bring this lawsuit on their behalf. That is likely because, in addition to the fact that Prosser and Raynor do not and cannot claim to have any ownership interest in or control over Vitelco and ICC, which are currently under the control of a bankruptcy

trustee, Vitelco and ICC (during the time that Prosser was allegedly their "beneficial owner" and Raynor sat on their board) previously alleged these same claims about a "subsidization scheme" against National Rural and RTFC and voluntarily dismissed them with prejudice in what was but a small part of Prosser, Raynor, ICC, and Vitelco's lengthy history of losses in litigation against National Rural and RTFC.

More specifically, Prosser *was* the owner of Innovative Communication Company, LLC ("ICC-LLC"), which is the parent of Emerging Communications, Inc. ("Emerging"), which is the parent of ICC, which is the parent of Vitelco. Exh. D, Memo. Op., Dec. 14, 2006, in Nos. 06-30007, *In re Emerging Commc'n., Inc.*, No. 06-30008, *In re Innovative Commc'n. Corp., L.L.C.,* & 06-30009, *In re Jeffrey J. Prosser*, in the Bankruptcy Court for the U.S. Virgin Islands, at 4-5 & n.3 (discussing structure of those companies). In 2004, the Delaware Chancery Court issued an opinion finding Plaintiffs Prosser and Raynor jointly and severally liable for breaching their fiduciary duties to the shareholders of Emerging in the transaction in which Prosser took Emerging private. Exh. B1, *In re Emerging Commc'n. Sh. Litig,* 2004 Del. Ch. LEXIS 70, *138-42, 155 (Del Ch. 2004). That opinion resulted in $130 million in judgments against them, after which Raynor, in 2004, declared bankruptcy, in which he remains today, with a trustee appointed over his estate. *See id.* at *155; Exh. B2, Final Orders & Judgments in Civil Case No. 16415, *In re Emerging Commc'n. Sh. Litig.*, in the Delaware Chancery Court for New Castle County; Exh. E, Voluntary Pet., Sep. 13, 2004, No. 04-83112, *In re John P. Raynor*, in the Bankruptcy Court for the District of Nebraska.[4] Also in 2004, RTFC sued ICC for defaulting on several hundred million dollars in loans from RTFC. *See generally* Exh. F, Compl. in No. 2004-154, *Rural Tel.*

---

[4] Plaintiff Raynor filed for bankruptcy between the time that the Chancery Court wrote its opinion and entered its judgments.

*Fin. Coop. v. Innovative Commc'n. Corp.*, in the District Court for the U.S. Virgin Islands.[5] ICC and Vitelco countersued both National Rural and RTFC, alleging the same misconduct regarding a "subsidization scheme," a supposedly "destroyed" loan document, and "retaliation" that Plaintiffs repeat in their complaint. *Compare, e.g.,* Exh. G, Am. Compl. in No. 2006-018, *Virgin Islands Tel. Corp. & Innovative Commc'n. Corp. v. Nat'l. Rural Util. Coop. Fin. Corp. & Rural Tel. Fin. Coop., et al.*, in the District Court of the U.S. Virgin Islands, at ¶¶ 6, 10, 20, 30, 43 (discussing National Rural's supposedly unlawful control over RTFC and the alleged destruction of the loan document between ICC and RTFC) & Exh. H, Am. Compl. in No. 2005-168, *Innovative Commc'n. Corp. v. Rural Tel. Fin. Coop. et al.*, in the District Court of the U.S. Virgin Islands, at ¶¶ 5, 8-13, & 33 (alleging National Rural's supposedly unlawful control over RTFC, RTFC's supposedly unlawful subsidization of National Rural, and National Rural's supposed retaliation against ICC and Prosser), *with* Compl. at ¶ 13 (alleging National Rural unlawfully controls RTFC), ¶¶ 15-60 (alleging that RTFC unlawfully subsidizes National Rural) & ¶¶ 101-102 (alleging destruction of the loan document between RTFC and ICC and retaliation). However, at the request of ICC and Vitelco (which, at that time, were ultimately owned by Prosser, and on whose boards Raynor was at that time sitting), the federal district court for the United States Virgin Islands dismissed ICC and Vitelco's claims with prejudice, and entered a judgment for $524 million against ICC in favor of RTFC, with Prosser liable for up to $100 million. Exh. I, Judgments and Dismissals.[6] Shortly thereafter, Prosser, as well as ICC and

---

[5] This case was originally filed in the United States District Court for the Eastern District of Virginia, but as the order included in Exhibit F indicates, was transferred to the District Court of the Virgin Islands.

[6] These judgments and dismissals include the (i) final judgment in favor of Rural Telephone Finance Cooperative against Innovative Communication Corporation and Jeffrey Prosser in Nos.

(continued)

Vitelco's parent companies – ICC-LLC and Emerging – filed for bankruptcy protection. Exh. J, Voluntary Pets. in Nos. 06-30007, *In re Emerging*, No. 06-30008, *In re ICC-LLC*, and 06-30009, *In re Prosser*, in the Bankruptcy Court for the U.S. Virgin Islands. At the request of the Department of Justice's Office of the United States Trustee, the bankruptcy court appointed trustees over ICC-LLC, Emerging, and Prosser, as well as ICC, which had by that time also gone into bankruptcy. *See* Exh. M, Voluntary Pet., No. 07-30012, *In re ICC*, in the District Court of the U.S. Virgin Islands; Exh. P, Order Appointing Stan Springel as Chapter 11 Trustee, in No. 06-30007, *In re Emerging Communications., Inc.*, No. 06-30008, *In re Innovative Communication Company, L.L.C.*, in the Bankruptcy Court for the United States Virgin Islands. Exh. Q, Order Requiring U.S. Trustee to Immediately Appoint Chapter 11 Trustee, No. 07-30012, *In re Innovative Communication Corporation*, in the Bankruptcy Court of the United States Virgin Islands.

Prosser and Raynor are now apparently attempting to resurrect and somehow personally pursue ICC and Vitelco's complaints, dismissed with prejudice, about the relationship between

---

2004-154, *Rural Telephone Finance Cooperative v. Innovative Communication Corporation*, and 2004-155, *Rural Telephone Finance Cooperative v. Jeffrey Prosser*, (ii) order dismissing with prejudice Innovative Communication Corporation's claims in No. 2004-155, *Rural Telephone Finance Cooperative v. Prosser*, (iii) order dismissing with prejudice Innovative Communication Corporation's claims in No. 2005-115, *Innovative Communication Corporation v. Rural Telephone Finance Cooperative*, (iv) order dismissing Emerging Communications, Inc. and Innovative Communication Company, LLC's claims in No. 2006-011, *Emerging Communications, Inc. & Innovative Communication Company, LLC v. Rural Telephone Finance Cooperative and National Rural Utilities Cooperative Finance Corporation*, (v) order dismissing Innovative Communication Corporation's claims in No. 2005-168, *Innovative Communication Corporation v. Rural Telephone Finance Cooperative, John J. List, and Steven Lilly*, and (vi) docket reflecting dismissal with prejudice of No. 2006-018, *Virgin Islands Telephone Corporation and Innovative Communication Corporation v. National Rural Utilities Cooperative Finance Corporation and Rural Telephone Finance Cooperative, et al.* in the District Court of the United States Virgin Islands, Division of St. Thomas and St. John.

two cooperatives, National Rural and RTFC, with which Prosser and Raynor have no relationship, though to what Plaintiffs engage in this pursuit, it is unclear.  While their lawsuit seeks declaratory and injunctive relief, it does not seek a declaration that the relationship between National Rural and RTFC is somehow improper, nor is it conceivable how Prosser and Raynor, who have no relevant connection to National Rural and RTFC, would enjoy a legally-cognizable benefit from such a ruling.  Instead, Plaintiffs seek a declaration that Farmer Mac's past purchases of National Rural's loans with the approval of the FCA-OSMO, which is not a party to this lawsuit, and the USDA's guarantee of bonds issued by National Rural and purchased by the FFB, also conspicuously absent from these proceedings, is illegal.  Compl. at ¶¶ 8, 79-80.  Plaintiffs also seek an injunction of unspecified terms against the USDA, Farmer Mac, and National Rural "to force compliance with the law," and a similarly-unspecified "preventative injunction" to "ensure no further violations of the law."  Compl. at p. 27.  However, they fail to articulate how they have Article III standing to request any of this relief, insofar as they have not and cannot allege any injury to them, fairly traceable to the conduct they are challenging – the loan transactions involving Farmer Mac, the USDA, and at least two non-parties, that would likely be redressed by a favorable decision from this Court.  Moreover, it is clear that they have no prudential standing to challenge the conduct alleged in this case, as they fall nowhere near the zones of interests of the statutes under which they allege National Rural's transactions with Farmer Mac, the USDA, and these non-parties are undertaken.  Additionally, since Raynor and Prosser are both debtors in Chapter 7 bankruptcies with trustees appointed over them, they have no standing to bring claims that arose prior to the dates of their respective bankruptcies, as the claims they assert here do on the face of Plaintiffs' complaint.  Moreover, even assuming that Plaintiffs had standing and alleged legally-cognizable claims, those claims

would fail because they are not ripe. Plaintiffs' complaint, which alleges no causes of action and fails to demonstrate that they have standing to bring the claims they are asserting, should be dismissed with prejudice.

## STANDARD OF REVIEW

This motion seeks dismissal of Plaintiffs' claims under Fed. R. Civ. P. 12(b)(1), for lack of standing, ripeness, and subject-matter jurisdiction, and Rule 12(b)(6), for failure to state a claim upon which relief can be granted.

The familiar standard for dismissal pursuant to Rule 12(b)(6) requires dismissal of a complaint if, taking all well-pleaded facts as true and construing them in the light most favorable to the plaintiff, they do not entitle the plaintiff to relief. *See, e.g., Wood v. United States Dep't. of Labor*, 275 F.3d 107, 108 n.2 (D.C. Cir. 2001).[7] However, "a court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations." *Hemphiill v. Kimberly-Clark Corp.*, 530 F.Supp.2d 108, 110 (D.D.C. 2008) (*citing Browning v. Clinton*, 292 F.3d 235, 242 (D.C.Cir. 2002)); *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("[W]e are not bound to accept as true a legal conclusion couched as a factual allegation"). Moreover, "Factual allegations must be enough to raise a right to relief above the speculative level," and a "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007).

In addition to considering the factual statements in Plaintiffs' pleadings, the Court, in deciding a motion to dismiss under Rule 12(b)(6), may also consider matters of which the Court

---

[7] Accordingly, National Rural's recital of facts from Plaintiffs' complaint and any attachments thereto should not be construed as an admission that those facts are true.

may take judicial notice. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997); *Koutny v. Martin*, 530 F.Supp.2d 84, 89 (D.D.C. 2007). Specifically, the court may take judicial notice of matters of public record, including court records. *See Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993); *Baker v. Henderson*, 150 F.Supp.2d 17, 19 n.1 (D.D.C. 2001).[8] Exhibits A through Q to this motion are all matters of public record of which the Court may take judicial notice.

Additionally, in deciding a motion to dismiss, a Court may also consider any exhibits attached to the *defendant's* motion which "'are referred to in the plaintiff[s'] complaint and are central to [the plaintiffs'] claim.'" *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (*quoting Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)); *see also Phillips v. LCI Intern., Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (a court can consider a document attached to the defendant's motion to dismiss, even if not attached to the complaint, where that document is "integral to and explicitly relied on in the complaint").[9] One such document that National Rural attaches is Exhibit C, its publicly-filed Form 10-K for the period ending May 31, 2007, that Plaintiffs reference and quote from throughout their complaint.

---

[8] Moreover, while "[r]es judicata is an affirmative defense that is generally pleaded in a defendant's answer," it "is also properly brought in a pre-answer Rule 12(b)(6) motion when 'all relevant facts are shown by the court's own records, of which the court takes notice,'" or "public records from other proceedings." *Hemphill v. Kimberly-Clark Corp.*, 530 F.Supp.2d 108, 111 (D.D.C. 2008) (citations omitted).

[9] *See also Harris v. IVAX Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999) ("a document central to the complaint that the defense appends to its motion to dismiss is also properly considered, provided that its contents are not in dispute"); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808-09 (2d Cir. 1996); *In re Dynegy Inc. Sec. Litig.*, 339 F.Supp.2d 804, 846-47 (S.D. Tex. 2004); *In re Sec. Litig. BMC Software*, 183 F.Supp.2d 860, 882 (S.D. Tex. 2001) ("The Court may also consider documents 'integral to and explicitly relied on in the complaint,' that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred to in the complaint").

*See, e.g.,* Compl. at ¶¶ 44 (quoting from the 10-K), 49 (discussing the content of the 10-K); 54(ii) (citing to the 10-K), 54(iii) (citing to the 10-K), & 77 (quoting from the 10-K).

The standard for dismissal under Rule 12(b)(1) depends on whether the attack is facial, i.e. challenging the sufficiency of the jurisdictional allegations on the face of the pleadings, or factual, i.e. challenging that the Court in fact lacks jurisdiction over the claims, no matter what facts the pleadings allege. Here, National Rural's Rule 12(b)(1) challenge is both.

Although facial challenges under Rule 12(b)(1), which are decided according to a standard similar to that for Rule 12(b)(6) motions, require the trial court to accept the complaint's allegations as true, *Turicentro, S.A. v. American Airlines, Inc.*, 303 F.3d 293, 300 n.4 (3d Cir. 2002), because a motion to dismiss under Rule 12(b)(1) implicates "the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim." *Nat'l Assoc. of Home Builders v. United States Army Corps of Engineers*, Civ. Act. No. 07-0972, 2008 U.S. Dist. LEXIS 23466, at *9 (D.D.C. Mar. 26, 2008); *see also Made in the USA Found. v. GMC*, Civ. Act. No. 04-0553, 2005 U.S. Dist. LEXIS 5689, at *3–4 (D.D.C. Apr. 6, 2005) (Robertson, J.) (declaring that a "court's scrutiny is less forgiving" under 12(b)(1) than under 12(b)(6)).

When considering a factual challenge under 12(b)(1), the court is not limited to the allegations contained in the complaint and may consider materials outside the pleadings. *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003); *see also Turicentro*, 303 F.3d at 300 n.4 (under a factual attack, a district court "accords plaintiff's allegations no presumption of truth" and may consider evidence outside the pleadings).

**ARGUMENT AND AUTHORITIES**

Plaintiffs' claims against Defendants should be dismissed because (i) Plaintiffs lack Article III standing, as they have failed to allege an injury in fact, fairly traceable to the conduct they are challenging, that would be remedied by the relief that they can seek, (ii) Plaintiffs lack prudential standing, as they have not alleged and cannot allege that the injuries they seek to vindicate are within the zone of interests protected or regulated by the statutes under which they appear to sue, (iii) Plaintiffs, both debtors in Chapter 7 bankruptcies, lack standing to pursue claims arising before the dates of their bankruptcy petitions, (iv) Plaintiffs' claims, even if legally-cognizable, are not ripe, and (v) Plaintiffs' complaint fails to state a claim upon which relief can be granted.

**I.    Plaintiffs Lack Article III Standing to Pursue Their Claims**

In order for the Court to have subject matter jurisdiction over Plaintiffs' claims, Plaintiffs must have standing under Article III of the United States Constitution to bring those claims. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiffs, as the parties invoking the Court's jurisdiction, bear the burden of proving their standing. *Lujan*, 504 U.S. at 561; *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) ("the party asserting federal jurisdiction when it is challenged has the burden of establishing it"). More specifically, "it is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers,'" and "[w]e presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *See Renne v. Geary*, 501 U.S. 312, 316 (1991) (internal quotes and citations omitted).

To demonstrate that they have standing, both Plaintiff Prosser and Plaintiff Raynor must plead and prove three familiar elements: (1) that each has personally suffered a concrete and

particularized, and actual and imminent injury to a legally-protected interest, (2) that their legally-cognizable injuries are fairly traceable to the allegedly unlawful action they are challenging, and (3) that it is likely, as opposed to merely speculative, that their injuries will be redressed by a favorable judicial decision. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006); *Lujan*, 504 U.S. at 560 (1992). Here, neither Plaintiff has met his burden to plead and prove any – much less all – of these elements, and the Court must therefore dismiss their complaint for lack of Article III standing.

**A.    Plaintiffs Have Not Personally Suffered a Concrete and Particularized, and Actual and Imminent Injury to a Legally-Protected Interest**

Despite the difficulty deciphering what claims Plaintiffs are asserting, it is clear that Plaintiffs lack standing to assert *any* claims because they have not demonstrated the primary requirement for standing: injury in fact.

**1.    Plaintiffs Have Not Alleged a Cognizable Injury in Fact to Themselves**

Injury in fact requires "an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted). The injury alleged must be "'distinct and palpable' . . . as opposed to merely '[a]bstract.'" *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (internal citations and quotation marks omitted). As the Supreme Court has explained, "the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1; *see also United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 688–89 (1973) (requiring plaintiffs to allege a "specific and perceptible harm"); *Nat'l Assoc. of Home Builders v. United States Army Corps of Engineers*, 2008 U.S. Dist. LEXIS 23466, at *13 (D.D.C. Mar. 26, 2008) (declaring that no standing exists if Plaintiffs' allegations are "purely speculative") (*quoting Tozzi v. HHS*, 271 F.3d 301, 307 (D.C. Cir. 2001) &

*Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980)).  The conclusory allegations of harm

in the Complaint do not come close to meeting this standard.[10]

Although Plaintiffs conclusorily state that they "have suffered harm to their business

interest and reputations linked to their discovery of [National Rural's] illegality and cozening,"

and "have suffered irreparable harm and will continue to suffer additional irreparable harm as

long as management of National Rural is retained because of the Farmer Mac and USDA

unlawful funding," Compl. at ¶¶ 103, 110, none of the allegations in the complaint provides a

factual basis for these bald assertions of injury.   Plaintiffs' mere speculation that there is

something improper about the relationships between National Rural, RTFC, the USDA, and

Farmer Mac is insufficient to confer standing, as litigants must "clearly and specifically set forth

facts sufficient to satisfy these Art. III standing requirements." *Whitmore v. Arkansas*, 495 U.S.

149, 155–56 (1990); *Ward v. Santa Fe Ind. Sch. Dist.*, 393 F.3d 599, 607 (5th Cir. 2004) (*citing*

*Public Citizen, Inc. v. Bomer*, 274 F.3d 212, 217 (5th Cir. 2001) for the proposition that

"dismissal for lack of standing [is] appropriate at [the] pleading stage when plaintiff *fails to set*

*forth specific facts demonstrating personal injury*") (emphasis added).

---

[10] To the extent Plaintiffs are simply claiming that the government's noncompliance with the law
was itself their injury, "[t]his Court has repeatedly held that an asserted right to have the
Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on
a federal court." *Allen v. Wright*, 468 U.S. 737, 738 (1984).  Moreover, to the extent Plaintiffs
argue they have standing as concerned citizens or taxpayers, such arguments have been soundly
rejected.  The Supreme Court has "consistently held that a plaintiff raising only a generally
available grievance about government—claiming only harm to his and every citizen's interest in
proper application of the Constitution and laws, and seeking relief that no more directly and
tangibly benefits him than it does the public at large" does not have standing. *Lujan*, 504 U.S. at
573–74.  Nor do taxpayers have standing to object to government spending and programs just
because they are taxpayers. *See, e.g., DaimlerChrysler Corp. v. Cuno*, 547 U.S. at 343 ("'the
interest of a taxpayer in the moneys of the federal treasury furnishes no basis' to argue that a
federal agency's loan practices are unconstitutional") (*citing Alabama Power Co. v. Ickes*, 302
U.S. 464, 478 (1938)).

"Pleadings must be something more than an ingenious academic exercise in the conceivable," *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 688–89 (1973), and Plaintiffs are required to explain how they have been injured and, more importantly, given the relief they are seeking, *will be* injured by Defendants' conduct. Since they have not, they have alleged no specific and perceptible harm, and have therefore failed to allege the injury in fact required by Article III. *See, e.g., Delorme v. United States*, 354 F.3d 810, 815–16 (8th Cir. 2004) (affirming dismissal at the pleading stage for lack of standing when the complaint did not "state the nature of any actual injury suffered").

### 2.    Plaintiffs' Conclusory Claim of Future Harm Does Not Confer Standing for the Injunctive and Declaratory Relief Sought

As explained above, Plaintiffs do not plead and cannot show that they have actually been harmed by the conduct of which they complain, nor do they plead or can they show that they will be harmed in the future. However, a substantial likelihood of future harm is a necessary component of standing to seek injunctive and declaratory relief, which are by their very nature forward-looking remedies. *City of Los Angeles v. Lyons*, 461 U.S. 95, 103–04 (1983) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.") (*quoting O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974); *see also Lujan*, 504 U.S. at 564. Moreover, "Where harm to reputation arises as a byproduct of government action, the reputational injury, without more, will not satisfy Article III standing *when that government action itself no longer presents an ongoing controversy*." *Foretich v. United States*, 351 F.3d 1198, 1212-13 (D.C. Cir. 2003) (emphasis in original).

In this regard, Plaintiffs' unexplained conclusion that they have, in the past, suffered harm to their business interests and reputations, and "will continue to suffer additional

irreparable harm as long as management of National Rural is retained because of the Farmer Mac and USDA unlawful funding," is particularly improper given the lack of supporting facts pled in their complaint. *See* Compl. at ¶¶ 103, 110. To the extent it is possible for anyone to suffer harm from Defendants' alleged actions, Plaintiffs certainly will not, as the companies with which Plaintiffs were *formerly* affiliated are *no longer members* of RTFC. Compl. at ¶ 96-99. As the Complaint states, Prosser and his wife, who is not a party to this suit, "*were*" the "beneficial owners," whatever that means, of Innovative Communication Corporation ("ICC") and the Virgin Islands Telephone Corporation ("Vitelco"), and Raynor admittedly was not even an owner of these companies, but "*was*" only a board member, which he no longer is. Compl. at ¶¶ 96, 99 (emphasis added).[11] Prosser does not claim to be a current shareholder or owner of Vitelco or ICC, nor does Raynor claim to be a member of either's board. Nor do Prosser and Raynor claim to be asserting this action on behalf of Vitelco or ICC, the latter of which is in bankruptcy, and both of which are therefore under the control of a bankruptcy trustee. *See* Exh. Q, Order Requiring U.S. Trustee to Immediately Appoint Chapter 11 Trustee, No. 07-30012, *In re Innovative Communication Corporation*, in the Bankruptcy Court of the United States Virgin Islands; Exh. D, Memo. Op., Dec. 14, 2006, at 4-5 & n.3 (discussing structure of those companies). Nor, even if they had the power to do so, could they, as such claims would clearly be barred by *res judicata* due the dismissal with prejudice of these claims in cases previously brought by ICC against National Rural and RTFC. *See* Exh. I, Judgments and Dismissals. Removing Prosser and Raynor one step further from National Rural and RTFC, the Complaint

---

[11] Indeed, Prosser never even had a direct ownership interest in ICC or Vitelco. He simply owned stock in ICC-LLC, which owned stock in Emerging, which owned stock in ICC, which owned stock in Vitelco. *See* Exh. D, Memo. Op., at 4-5.

goes on to state that Vitelco "*was*" a member of RTFC and that ICC "*was*" an associate member. *Id.* at ¶¶ 97, 98 (emphasis added). [12] Raynor and Prosser of course do not claim that they were or are shareholders of National Rural or RTFC, that they had or have any interest at all in National Rural or RTFC, that they are parties to any of the loan transactions of which they complain.

Accordingly, Plaintiffs' inability to plead and show any likelihood of future harm, much less a substantial likelihood of imminent harm, as required under the law, is fatal to Plaintiffs' request for injunctive and declaratory relief — the only relief requested in this lawsuit – and warrants dismissal of their complaint. *See Lyons*, 461 U.S. at 111; *Lujan*, 504 U.S. at 564.[13]

### 3.  Plaintiffs Lack Standing to Seek Redress for Alleged Injuries to Third Parties

The closest the complaint comes to conceivably alleging injury to anyone is its allegation of harm allegedly suffered by third parties, *not* by Plaintiffs.  *See* Complaint, at ¶ 28 ("[M]isappropriation of RTFC's income is a misappropriation of income belonging to RTFC's members, the rural telephone patrons."). Yet, it is fundamental that Plaintiffs "must assert [their] own legal rights and interests, and cannot rest [their] claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (same).  Even assuming for the sake of argument that Plaintiffs' false allegations are true

---

[12] Assuming that the Court concludes that Plaintiffs have standing and have otherwise alleged a justiciable controversy, then Plaintiffs' complaint should also be dismissed as moot because, among other reasons, Plaintiffs have pled that Plaintiff Prosser is no longer the "beneficial owner" of, and Plaintiff Raynor is no longer a board member of Vitelco and ICC, and which are no longer members and associate members, respectively, of RTFC.

[13] The inability to show future harm also relates to the redressability prong of the standing inquiry.  Here, the declarations and injunctive relief sought will not resolve any actual – as opposed to merely manufactured – controversy between Plaintiffs and Defendants.  *See Sierra Club v. Morton*, 405 U.S. 727, 740 (U.S. 1972) ("the decision as to whether review will be sought [should be placed] in the hands of those who have a direct stake in the outcome").

and that RTFC's members are harmed somehow by Defendants' conduct, Plaintiffs clearly do not have standing to assert claims on behalf of those third parties.

Because Plaintiffs have failed to plead and prove that they have personally suffered a concrete and particularized, and actual and imminent injury to a legally-protected interest, their complaint should be dismissed for lack of Article III standing.

**B.     The Allegedly Unlawful Actions Challenged by Plaintiffs are not Fairly Traceable to Plaintiffs' Alleged Injury**

In addition to the requirement of injury in fact, "[a] second prerequisite to standing . . . is a showing of a sufficient causal relationship between the challenged act and the alleged injury. A party must show that his injury reasonably can be said to have resulted from defendant's alleged statutory infraction." *Animal Welfare Institute v. Kreps*, 561 F.2d 1002, 1009 (D.C. Cir. 1977) (footnotes omitted). This is because, under the closely-related third test of Article III standing, a plaintiff must ultimately "show that 'there is a substantial probability' that, if the court affords the relief requested, his injury will be removed." *Id.* at 1009 (footnotes omitted). "Standing will be denied if the causal relationship is, in the court's view, 'purely speculative.'" *Id.* at 1009 (footnotes omitted); *see also* 13 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE 2D. § 3531.4 (2008) ("[A]n injury caused by other events is irrelevant to any purpose of standing doctrine. Causation in turn bears on remedial benefit, since a remedy addressed to actions that have not caused the injury will not alleviate the injury"). Put differently, "unadorned speculation will not suffice to invoke the federal judicial power," and a Court must deny standing where "*[s]peculative inferences are necessary to connect [plaintiffs'] injury to the challenged actions* . . . ." *See Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 44-45 (1976) (emphasis added). Because of this, "indirectness of injury, while not necessarily fatal to standing, 'may make it substantially more difficult to meet

the minimum requirement of Art. III: To establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm.'" *Simon*, 426 U.S. at 45-46 (*quoting Warth v. Seldin*, 422 U.S. 490, 505 (1975)); *see also New World Radio, Inc. v. F.C.C.*, 294 F.3d 164, 170 (D.C. Cir 2002) ("when the [party] is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish'") (citations omitted).

Courts "routinely refuse to permit . . . predictive assumptions to establish standing," and a Court must deny standing where "the individual links in the chain [of causation] alleged . . . depend on some allegation that cannot be easily described as true or false," or where a chain of causation rests on "the uncertainty of several individual links," or "[a] number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury," as "[t]he greater number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true." *See Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996).

As the Supreme Court in *Simon* explained by way of example, in a prior case the Court "held that low-income persons seeking the invalidation of a town's restrictive zoning ordinance," which they said drove up the cost of housing, "lacked standing because they had failed to show that the alleged injury, inability to obtain adequate housing within their means, was fairly attributable to the challenged ordinance instead of to other factors." *Simon*, 426 U.S. at 44 (*citing Warth*, 422 U.S. at 507)). That was because the plaintiffs in that case "relied 'on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had (defendants) acted otherwise, and might improve were the court to afford relief.'" *Id.* at 44 (*quoting Warth*, 422 U.S. at 507)). Similarly, the Supreme Court explained

that in another matter in which "the mother of an illegitimate child averred that state-court interpretation of a criminal child support statute as applying only to fathers of legitimate children violated the Equal Protection Clause of the Fourteenth Amendment," and "sought an injunction requiring the district attorney to enforce the statute against the father of her child," it "held that the mother lacked standing, because she had 'made no showing that her failure to secure support payments,'" the alleged injury in that case, "'results from the nonenforcement, as to her child's father, of (the statute),'" and "[t]he prospect that the requested prosecution in fact would result in the payment of child support instead of jailing the father was 'only speculative.'" *Simon*, 426 U.S. at 44 (*quoting Linda R.S. v. Richard D.*, 410 U.S. 618 (1973)).

Here, common sense demonstrates that Plaintiffs' chain of causation is patently speculative. Plaintiffs allege that, in fiscal years 2006, 2007, and 2008, Farmer Mac invested $500 million, $366 million, and $474 million, respectively, in National Rural, with the approval of the Farm Credit Administration Office of Secondary Market Oversight ("FCA-OSMO"), which is not a party to this litigation. Compl. at ¶ 66, 79-80. Plaintiffs further allege that these investments violate several provisions of the Code of Federal Regulations enacted under the Farm Credit Act. Compl. at ¶ 75; 12 C.F.R. § 652.35 (confirming enactment under the Farm Credit Act).[14]

At the same time, Plaintiffs allege that the USDA invested $500 million in National Rural in fiscal year 2008. Compl. at ¶ 66. They further allege that this investment is improper under

---

[14] One such provision is 12 C.F.R. § 652.35(c), which Plaintiffs claim states that Farmer Mac's investments in National Rural "must be able to be liquidate [sic] at price [sic] close to Farmer Mac's investment." Compl. at ¶ 75(iv). In fact, this provision simply states that "All eligible investments . . . must be readily marketable," meaning that "you can sell it promptly at a price that closely reflects its fair value in an active and universally recognized secondary market." 12 C.F.R. § 652.35(c).

several provisions of the Code of Federal Regulations enacted under the Rural Electrification Act. Compl. at ¶ 87; 7 C.F.R. 1720 (confirming enactment under the Rural Electrification Act).

Plaintiffs then speculate that "without [Farmer Mac and the USDA's] investments in [National Rural]," National Rural, at some undefined point, "*would have been* forced to seek bankruptcy protection," though, importantly, they allege nothing about the chain of causation between the supposedly illegal actions and the cessation of any *future* or *ongoing* harm they are suffering. Compl. at ¶ 66 (emphasis added). They then speculate that this conjectural bankruptcy would have somehow resulted in the replacement of National Rural's management. Compl. at ¶ 66, 106, 110. It is this management, they apparently claim without explanation, that is responsible for the fact that "Plaintiffs have suffered harm to their business interest and reputations linked to their discovery of [National Rural's] illegality and cozening," Compl. at ¶ 103; *see also* Compl. at ¶ 106, 108 & 110 ("Plaintiff's [sic] have suffered irreparable harm and will continue to suffer additional irreparable harm as long as management of [National Rural] is retained because of the Farmer Mac and USDA unlawful funding."). Plaintiffs then apparently presume that the incoming management of National Rural would somehow treat them differently, and further assume that this would alleviate the future harm that they failed to properly allege.

In short, Plaintiffs' chain of causation between the purportedly illegal actions of which they complain – funding by Farmer Mac and USDA – and the harm they allegedly suffered, and far more important in light of the relief requested, *are currently suffering and will continue to suffer*, is made up of links too uncertain, remote, and speculative to reasonably say that the injury resulted from defendants' alleged statutory infraction. *See Animal Welfare Institute v. Kreps*, 561

F.2d 1002, 1009 (D.C. Cir. 1977) (footnotes omitted).  Accordingly, the Court should dismiss Plaintiffs' complaint for this reason as well.

    **C.**    **It is Not Likely, as Opposed to Merely Speculative, that Plaintiffs' Alleged Injury Will be Redressed by the Relief Which They Seek**

    Finally, Plaintiffs' inability to demonstrate standing becomes even clearer when their alleged injury and its attenuated chain of causation is viewed through the lens of the third component of standing, redressability. Assuming, for the sake of argument, that Plaintiffs articulate a legally-cognizable injury caused by the conduct they challenge in this case, and that the Court could and did grant Plaintiffs' requested relief in full – that is, the Court (1) declared unlawful (a) Farmer Mac's investments in National Rural, and (b) the USDA's guarantee of bonds issued by National Rural to "the Federal Financing Bank Farmer," whatever that is, and (2) issued an injunction requiring National Rural, Farmer Mac, and USDA to "compl[y] with the law," it is apparent that none of that relief will fix what Plaintiffs vaguely describe as their injury. *See* Compl. at p. 27.[15]

    "The redressability inquiry poses a simple question: 'If plaintiffs secured the relief they sought, would it redress their injury?'" *Wilderness Soc. v. Norton*, 434 F.3d 584, 590 (D.C.Cir.2006) (*quoting Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1233 (D.C.Cir.1996)) (alterations omitted).  The mere "remote possibility, unsubstantiated by allegations of fact, that their situation . . . might improve were the court to afford relief'" is

_____

[15] Even if the Court concluded that Plaintiffs suffered an injury in fact caused by Defendants' violation of applicable statutes and regulations, "[C]ausation does not inevitably imply redressability," and "[t]here might be some circumstances in which governmental action is a substantial contributing factor in bringing about a specific harm, but the undoing of the governmental action will not undo the harm, because the new status quo is held in place by other forces. *Renal Physicians Ass'n v. U.S. Dept. of Health and Human Services*, 489 F.3d 1267, 1278 (D.C. Cir. 2007).

insufficient for Plaintiffs to demonstrate standing. *Simon*, 426 U.S. at 28. Moreover, "the Supreme Court has made clear that a plaintiff's standing fails" for lack of redressability "where it is purely speculative that a requested change in government policy will alter the behavior of regulated third parties that are [allegedly] the direct cause of the plaintiff's injuries." *Nat'l. Wrestling Coaches Ass'n. v. Dept. of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004).

For instance, in a case in which "organizations representing the interests of low-income persons challenged an IRS Revenue Ruling that allowed favorable tax treatment to nonprofit hospitals that offered only emergency-room services to indigents," the Supreme Court, in dismissing the plaintiffs' complaint for lack of standing, "held that the plaintiffs lacked standing because their alleged injury - denial of access to certain hospital services - was caused by the regulated hospitals," rather than by the IRS, and importantly, "even accepting the plaintiffs' averment that the IRS's policy encouraged hospitals to provide fewer services to indigents," the Court found it "'speculative whether the desired exercise of the court's remedial powers . . . would result in the availability to [the plaintiffs] of such services,'" as "it [was] just as plausible that the hospitals to which [the plaintiffs] may apply for service would elect to forego favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services.'" *Nat'l. Wrestling Coaches Ass'n.*, 366 F.3d at 938 (*quoting Simon*, 426 U.S. at 43-45).

While National Rural of course vigorously disputes that it has caused Plaintiffs any cognizable injury, Plaintiffs' complaint, if taken as true, and the relief it seeks must rest on the assumption that a judicial declaration that Farmer Mac should not purchase loans from National Rural under certain circumstances will result in Farmer Mac no longer purchasing loans from National Rural at all, and that a judicial declaration that the USDA should not guarantee National

Rural's loans under certain circumstances will result in the USDA not guaranteeing National Rural's loans in the future, which will result in the Federal Financing Bank, which is not a party to this suit, supposedly declining to purchase National Rural's loans in the future. Assuming all of that takes place, then Plaintiffs would have to surmise that the fact that Farmer Mac and the Federal Financing Bank are no longer purchasing National Rural's loans will result in National Rural having no one in the world to sell loans to. They would then have to speculate that National Rural has the desire or need to sell loans in the future, and that this need is so great that, if they did not sell loans, then National Rural, a cooperative with, as of May 31, 2007, over 1,500 combined members, nearly $18.2 billion in loans outstanding, almost $18.6 billion in assets, and A1/A+ rated senior secured debt, would have to declare bankruptcy. *See* Exh. C, National Rural Form 10-K for the period ending May 31, 2007, at 2, 4, 16, 43, 80. The bankruptcy of National Rural, they speculate, will result in the change of National Rural's management. This, they believe, will result in new management, which they further speculate will treat them differently, which will result in an ending of unidentified harm to plaintiffs' undefined interests. Under this casual scenario, there can be no question that it is not likely, as opposed to merely speculative, that the requested relief will redress Plaintiffs' alleged injury. For this reason as well, Plaintiffs' complaint should be dismissed for failure to plead and prove Article III standing.

## II.    Plaintiffs Lack Prudential Standing to Pursue Their Claims

In addition to demonstrating standing under Article III of the U.S. Constitution, Plaintiffs are required to demonstrate that they have prudential standing.

"The Supreme Court has enunciated two principal forms of standing: 'Article III (case or controversy)' and 'prudential. . . .'" *Am. Fed. Of Gov't. Employees, AFL-CIO v. Rumsfeld*, 321 F.3d 139, 142 (D.C. Cir. 2003). "[I]n this circuit we treat prudential standing as akin to jurisdiction, an issue we may raise on our own, in part because the doctrine serves the

'institutional obligations of the federal courts.' *American Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1357-58 (D.C. Cir. 2000).

"Prudential standing, unlike Article III standing, is 'based not on the Constitution, but instead on prudent judicial administration.'" *Am. Fed. Of Gov't. Employees, AFL-CIO*, 321 F.3d at 157 (D.C. Cir. 2003) (*quoting* Erwin Chemerinsky, FEDERAL JURISDICTION 60 (3d ed. 1999). Prudential standing reflects "'judicially self-imposed limits on the exercise of federal jurisdiction' [that] are 'founded in concern about the proper-and properly limited-role of the courts in a democratic society.'" *Id.* at 143 (*quoting Bennett v. Spear*, 520 U.S. 154, 162 (1997)). "Numbered among these prudential requirements is the doctrine . . . that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Id.* at 143.

The crux of this requirement is that, "Even if a plaintiff has Article III standing, the court must identify what interest the litigant seeks to vindicate and then decide if that interest is 'arguably within the zone of interests to be protected or regulated by the statute.'" *PDK Laboratories, Inc. v. U.S. D.E.A.*, 362 F.3d 786, (D.C. Cir. 2004). The burden is on the plaintiffs claiming jurisdiction to "'show that [their] asserted interest is among the group of claims that is envisioned by the relevant statute.'" *Am. Fed. Of Gov't. Employees, AFL-CIO*, 321 F.3d at 144 (*quoting Mudd v. White*, 309 F.3d 819, 824 (D.C. Cir. 2002)). A plaintiff "fails this test if his interests are so marginally related to or inconsistent with the implicit purposes in the statute 'that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Mudd*, 309 F.3d at 824 (*quoting Clarke v. Sec. Indus. Ass'n.*, 479 U.S. 388, 399 (1987)).[16]

---

[16] Moreover, "prudential standing requires the existence of a further link between the injury and the legal right asserted by the plaintiff. For if the alleged wrongfulness of the injurious action

(continued)

Plaintiffs appear to complain that their alleged harm was caused by loans made and purchased pursuant to the Rural Electrification Act, the Farm Credit Act, and regulations promulgated thereunder – specifically, Farmer Mac and the USDA's purchase of loans made by National Rural. *See* Complaint at ¶¶ 73–75 (alleging that Farmer Mac violated 12 C.F.R. 652.35, a regulation promulgated under the Farm Credit Act); ¶ 85–89 (implying that USDA violated the Rural Electrification Act, codified at 7 U.S.C. § 901 *et seq.*, and 7 C.F.R. 1720.5, 1720.6, and 1720.7 – regulations promulgated thereunder). However, case law makes it clear that, even if they had been able to plead Article III standing, Plaintiffs would still not have prudential standing to challenge actions taken pursuant to these two acts.

Federal courts have soundly rejected the ability of litigants not party to a loan transaction under the Rural Electrification Act to challenge its legality:

> From the entire history of the Rural Electrification Act and its administration we are totally convinced that Congress has never enacted or intended that loans by this Agency should be reviewable in the courts. The Act itself makes no provision for judicial loan review. . . . Regardless of how outrageous or unfair the making of this loan may seem, the remedy is not in the courts but in the Congress.

*Rural Electrification Admin. v. Central La. Elec. Co., Inc.*, 354 F.2d 859, 865 (5th Cir. 1966); *see also Sibley v. Rural Electrification Admin.*, 419 F.2d 384, 385 (5th Cir. 1969) (holding that courts are without jurisdiction to review loans made under the Rural Electrification Act regardless of whether the challenge is brought by a competitor or a member of an affected cooperative). Similarly, "no implied right of action exists under the [Farm Credit] Act."

---

challenged, that is, the asserted violation of a legal right, was not causally related to the injury suffered–if, in other words, it was not the illegal aspect of the action challenged that harmed the plaintiff–then the suit in question would not be one to vindicate that plaintiff's own rights. One cannot vindicate what has never been threatened." *Steffan v. Perry*, 41 F.3d 677, 698 (D.C. Cir. 1994).

*Williams v. Federal Land Bank*, 729 F. Supp. 1387, 1389 (D.D.C. 1990) (*citing Bowling v. Block*, 785 F.2d 556, 557 (6th Cir. 1986); *Smith v. Russellville PCA*, 777 F.2d 1544, 1546-48 (11th Cir. 1985); and *Kolb v. Naylor*, 658 F. Supp. 520, 525 (N.D.Iowa 1987)).

Accordingly, apart from Plaintiffs' lack of Article III standing, this Court is without subject matter jurisdiction to review the conduct of which Plaintiffs complain, as the statutes they claim were violated demonstrate that Plaintiffs' purported interests are not within those to be protected or regulated by these statutes, and that they are not entitled to a private right of action under them. *See, e.g., American Federation of Government Employees, AFL-CIO*, 321 F.3d at 158 (finding lack of prudential standing where OSHA does not create private right of action); *Mudd*, 309 F.3d at 824 (finding lack of prudential standing because plaintiff had no private right of action under statute in question). The Court should therefore dismiss Plaintiffs' complaint for lack of prudential standing.

**III.     Plaintiffs Jeffrey Prosser and John Raynor, both Debtors in Chapter 7 Bankruptcies with Trustees Appointed over Their Affairs, Lack Standing to Bring Claims Arising Before the Commencement of Their Bankruptcy Cases**

Plaintiff Prosser has been a debtor in bankruptcy since July 31, 2006. Exh. L, Voluntary Pet. of Jeffrey J. Prosser, No. 06-30009, *In re Jeffrey J. Prosser*, in the Bankruptcy Court for the U.S. Virgin Islands. On October 3, 2007, his case was converted to a Chapter 7 liquidation, and a trustee appointed over his estate. Exh. N, Order Converting Case to Chapter 7 in No. 06-30009, *In re Prosser*, at 6. Plaintiff Raynor has been a debtor in bankruptcy since September 13, 2004. Exh. E, Voluntary Pet. of John P. Raynor, No. 04-83112, *In re John P. Raynor*, in the United States Bankruptcy Court for the District of Nebraska. His case was also converted to a Chapter 7 liquidation, and a trustee appointed over his estate. Exh O, Order for Relief Under

Chapter 7 & Trustee's Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines, No. 04-83112, *In re Raynor*.[17]

Under applicable bankruptcy law, because Prosser and Raynor's claims arise before the filing of their respective bankruptcy cases on July 31, 2006, and September 13, 2004, Plaintiffs' respective trustees, rather than Plaintiffs, are the parties with standing to bring them, and Plaintiffs' complaint must be dismissed for that reason as well.

Section 541 of the Bankruptcy Code defines what property belongs to the bankruptcy estate, and specifically provides in relevant part that:

> The commencement of a [bankruptcy] case . . . creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held: (1) Except as provided in subsections (b) and (c)(2) of this section, *all legal or equitable interests of the debtor in property as of the commencement of the case.*

11 U.S.C. § 541(a)(1) (emphasis added). A debtor's interest in causes of action that accrue prior to the filing of the bankruptcy case or which relate to prepetition activities, therefore, no longer belong to any individual debtor but instead belong to the bankruptcy estate and shall be administered, if at all, for the benefit of all creditors. *See In re Ozark Rest. Equip. Co.*, 816 F.2d 1222, 1225 (8th Cir. 1987), *cert denied*, 484 U.S. 848 (1987) ("it is clear that causes of action belonging to the debtor at the commencement of the case are included within the definition of property of the estate") (emphasis in original); Lawrence P. King, COLLIER ON BANKRUPTCY ¶

---

[17] Incidentally, ICC – the company over which Prosser claims to have been a "beneficial owner" – is in bankruptcy with a trustee appointed over its estate, and ICC-LLC and Emerging, ICC's parent companies, are also in bankruptcy with a trustee over their estates. Exh. P, Order Appointing Stan Springel as Chapter 11 Trustee, in No. 06-30007, *In re Emerging Communications., Inc.*, No. 06-30008, *In re Innovative Communication Company, L.L.C.*, in the Bankruptcy Court for the United States Virgin Islands; Exh. Q, Order Requiring U.S. Trustee to Immediately Appoint Chapter 11 Trustee, No. 07-30012, *In re Innovative Communication Corporation*, in the Bankruptcy Court of the United States Virgin Islands.

541.08 (15th ed. Rev. 2008) ("The estate created pursuant to section 541(a) includes causes of action belonging to the debtor at the time the case is commenced. The debtor's interests in any such causes of action are included within the broad scope of the provision of section 541(a)(1) that the estate includes 'all legal or equitable interests of the debtor in property'") (citations omitted).

A Chapter 7 trustee has sole possession of, and rights to, property of the estate. *Lambert v Fuller Co.*, 122 B.R. 243, 245 (E.D. Pa. 1990) ("Upon the filing of, or conversion to, a Chapter 7 bankruptcy petition, an interim trustee is appointed, 11 U.S.C. § 701, to administer, *inter alia*, the property of the estate, including the exclusive right to prosecute causes of action that are the property of the bankruptcy estate. *See* 11 U.S.C. § 323 (a) & (b)."). And, pursuant to section 704 of the Bankruptcy Code, the trustee has the right and responsibility to assert causes of action whenever necessary for collection or preservation of the estate. 11 U.S.C. § 704.[18]

Thus, even if Plaintiffs' Complaint was not rapt with other problems, it must be dismissed because Plaintiffs also do not have standing under applicable bankruptcy law to bring this action. As provided above, Prosser and Raynor are debtors in a Chapter 7 bankruptcy cases with trustees appointed over their estates.[19] Therefore, only their respective Chapter 7 trustees

---

[18] Likewise, once appointed, a Chapter 11 trustee, like the kind currently over ICC, assumes the rights of a debtor-in-possession and maintains exclusive control over estate property, including causes of action. *See In re RNI Wind Down Corp.*, 348 B.R. 286, 293 (Bankr. D. Del. 2006). A Chapter 11 trustee has the same rights and duties as a Chapter 7 trustee to pursue causes of action for the benefit of the estate. 11 U.S.C. § 1106(a) (incorporating the duties of a Chapter 7 trustee set forth in section 704 of the Bankruptcy Code).

[19] It is of no consequence that Prosser was originally a debtor under Chapter 11 of the Bankruptcy Code. The Chapter 7 Trustee now owns all causes of action for all relevant time periods. *See Lambert*, 122 B.R. at 245-46; *In re Griseuk*, 165 B.R. 956, 959 (Bankr. M.D. Fla. 1994) (finding tort action arising after debtor's filing for Chapter 11 protection but before conversion of his case to Chapter 7 was property of the estate).

have ownership of any potential cause of action arising from alleged prepetition harms to Prosser

and Raynor, and thus have exclusive standing to file this suit. *See, e.g., Anderson v. Acme Mkts.*,

287 B.R. 624, 628-31 (E.D. Pa. 2002) (dismissing Chapter 7 debtor's Title VII complaint for

lack of standing); *Lambert*, 122 B.R. at 246 (finding that plaintiff, Chapter 7 debtor, did not have

standing to bring breach of contract and fraud causes of action because such claims belonged to

the Chapter 7 trustee).

It is clear that the conduct of which Plaintiffs complain began well before July 31, 2006,

the date of Prosser's bankruptcy petition, and/or September 13, 2004, the date of Raynor's

petition. For instance, Plaintiffs allege that:

- "The Rural Telephone Finance Corporation ("RTFC") . . . [was] created by [National Rural] in 1987 . . . . Since creating RTFC, [National Rural] has controlled RTFC through unlawful means. . . . Upon information and belief, RTFC is *and always has been* nothing more than a legal façade for [National Rural] . . . ." (Compl. at ¶ 12-13)[20]

- "The Subsidization Scheme result[ed] in the defalcation of $262 Million from RTFC for fiscal years 2000 through 2004." (Compl. at ¶ 45)

- "The civil RICO complaint includes, but is not limited to allegations [that] . . . on or about August 27, 2001, Vaughan . . . corruptly altered . . . the Authentic 2001 Loan Agreement . . . ." (Compl. at ¶ 101)

- "[A]fter discord with the Plaintiffs on behalf of . . . ICC and . . . Vitelco, [National Rural] replaced Ernest with Deloitte Touch USA LLP . . . for fiscal year 2005. (Compl. at ¶ 46)

- Farmer Mac's "initial investment" occurred "in July of 2005," and "the USDA's initial investment in November of 2005." (Compl. at ¶ 102).

---

[20] To the extent Plaintiffs allege harm from actions dating back to 1987, their claims are barred on their face by any conceivable limitations period, and should be dismissed on that ground as well for failure to state a claim. *See, e.g. Sheppard v. Texas Dept. of Transp.*, 158 F.R.D. 592, 595 (E.D. Tex. 1994) ("[W]here a complaint shows on its face that it is barred by an affirmative defense, a court may dismiss the action for failing to state a claim").

Thus, based on the allegations made in the Complaint, it appears that the causes of actions in Plaintiffs' complaint are owned by Prosser's estate. Therefore, because the bankruptcy trustee has the exclusive authority to bring the action alleged in the Complaint, Plaintiff Prosser has no standing, and his Complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

## IV.    Plaintiffs' Claims are not Ripe and Should be Dismissed

For this Court to have subject matter jurisdiction, Plaintiffs' claims must be ripe. *See Devia v. Nuclear Regulatory Com'n*, 492 F.3d 421, 424 (D.C. Cir. 2007); *Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands*, 385 F.3d 801, 806 (3d Cir. 2004) (dismissing action for declaratory and injunctive relief for lack of ripeness); *Philadelphia Fed. of Teachers*, 150 F.3d 319, 322-23 (3d Cir. 1998) ("'The existence of a case and controversy is a prerequisite to all federal actions, including those for declaratory or injunctive relief'"). In determining whether a dispute is ripe, a court should consider: (1) the fitness of the issues for judicial decision; and (2) the hardship to the parties of withholding court consideration. *Devia*, 492 F.3d at 424; *Philadelphia Fed. of Teachers*, 150 F.3d at 323.

Under the "'fitness for review' inquiry, a court considers whether the issues presented are purely legal, as opposed to factual, and the degree to which the challenged action is final." *Philadelphia Fed. of Teachers*, 150 F.3d at 323; *see also Devia* 492 F.3d at 424. Factors that a court may consider include: "whether the claim involves uncertain and contingent events that may not occur as anticipated or at all; the extent to which a claim is bound up in the facts; and whether the parties to the action are sufficiently adverse." *Philadelphia Fed. of Teachers*, 150 F.3d at 323. "A dispute is not ripe for judicial determination 'if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all. . . . 'Claims based merely upon assumed potential invasions of rights are not enough to warrant judicial intervention.'" *Wyatt, Virgin Islands, Inc.*, 385 F.3d at 806 (quoting *Ashwander v. Tennessee*

*Valley Auth.*, 297 U.S. 288, 325 (1936)); *see also Devia*, 492 F.3d at 425.  Under the "hardship to the parties inquiry," a court focuses on the hardship that may be entailed in denying judicial review, and such determination "turns on whether the challenged action creates a 'direct and immediate' dilemma for the parties, such that the lack of pre-enforcement review will put the plaintiffs to costly choices." *Philadelphia Fed. of Teachers*, 150 F.3d at 323 (citations omitted).

Plaintiffs' claims, which seek declaratory and injunctive relief, are not ripe because they have not pled or proven that National Rural, Farmer Mac, or the USDA intend in the future to violate the law or engage in any of the supposedly unlawful actions of which Plaintiffs complain. Therefore, Plaintiffs' claims are not ripe because they involve uncertain and "contingent future events that may not occur as anticipated or indeed may not occur at all" and are "based merely upon 'assumed potential invasions of rights.'" *Wyatt, Virgin Islands, Inc.*, 385 F.3d at 806. Accordingly, Plaintiffs' complaint should be dismissed on this ground as well.

## V.    <u>Plaintiffs Have Failed to State a Claim for Which Relief Can Be Granted</u>

In addition to their failure to plead and prove standing, Plaintiffs have also failed to state a claim for which relief can be granted, entitling Defendants to dismissal of Plaintiffs' complaint. Plaintiffs' complaint is virtually indecipherable, but even taking all well-pled factual allegations as true, Plaintiffs have asserted no claims that would entitle them to relief.  Tellingly, although the Complaint contains a litany of conclusory allegations about National Rural's alleged "cozening" and the USDA and Farmer Mac's "unlawful bailout" of National Rural, the Complaint fails to assert even a single cause of action. Accordingly, this lawsuit should also be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).  *See Podiatrist Ass'n v. La Cruz Azul de P.R.,*

*Inc.*, 332 F.3d 6, 19 (1st Cir. 2003) ("The threshold for stating a claim may be low, but it is real.") (citation omitted).[21]

## CONCLUSION AND PRAYER

For the foregoing reasons, defendant National Rural Utilities Cooperative Finance Corporation requests that the Court dismiss with prejudice Plaintiffs' complaint, award costs in favor of Defendants, and grant Defendants all other relief to which they may be justly entitled.

Dated: May 12, 2008                    Respectfully submitted,

                                       FULBRIGHT & JAWORSKI L.L.P.

                                       */s/ Ryan P. Hartman*
                                           Ryan P. Hartman
                                           D.C. Bar 974807 / Dist. Ct. Bar TX0044
                                       801 Pennsylvania Avenue, N.W.
                                       Washington, D.C. 20004-2623
                                       Telephone:    (202) 662-0200
                                       Facsimile:    (202) 662-4643
                                       Email:        rhartman@fulbright.com

                                           Gerard G. Pecht (*pro hac vice* pending)
                                       1301 McKinney, Suite 5100
                                       Houston, Texas 77010
                                       Telephone:    (713) 651-5151
                                       Facsimile:    (713) 651-5246

                                           Toby L. Gerber (*pro hac vice* pending)
                                       2200 Ross Avenue, Suite 2800
                                       Dallas, Texas 75201
                                       Telephone:    (214) 855-8000
                                       Facsimile:    (214) 855-8200

---

[21] Moreover, to the extent the Complaint can be read to assert causes of action against Farmer Mac and the USDA for violating the Farm Credit Act, the Rural Electrification Act, or any regulations thereunder, such claims, as explained above, are not subject to judicial review. Plaintiffs' accusation that any defendant has violated 18 U.S.C. § 657, a criminal statute, is similarly flawed, as it does not create a private cause of action. Plaintiffs cannot obtain any relief under any of these statutes or regulations, and their claims must be dismissed for this additional reason.

COUNSEL FOR DEFENDANT NATIONAL
RURAL UTILITIES COOPERATIVE
FINANCE CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2008, I caused a true and correct copy of the above-referenced filing and any attachments thereto to be served on all parties by serving the following by the means indicated below:

Mr. Adam P. Strochak
Mr. Alexander O. Levine
Weil, Gotshal & Manges L.L.P.
1300 Eye Street, NW, Suite 900
Washington, DC. 20005
*By ECF*

Mr. Jeffrey J. Prosser
P.O. Box 5227
St. Croix, V.I. 80823
*By Certified Mail, Return Receipt Requested*

Mr. John P. Raynor
Raynor, Rensch & Pfeiffer
10110 Nicholas Street, Suite 102
Omaha, NE. 68114
*By Certified Mail, Return Receipt Requested*

Civil Process Clerk
United States Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530
*By Certified Mail, Return Receipt Requested*

United States Department of Agriculture
1400 Independence Avenue, S.W.
Washington, D.C. 20250
*By Certified Mail, Return Receipt Requested*

The Honorable Michael B. Mukasey
United States Attorney General
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

*By Certified Mail, Return Receipt Requested*

/s/ Ryan P. Hartman
Ryan P. Hartman

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JEFFREY J. PROSSER** and **JOHN P. RAYNOR,** | ) ) ) |
| Plaintiffs, | ) ) |
| **v.** | ) ) |
| **FEDERAL AGRICULTURAL MORTGAGE CORPORATION, UNITED STATES DEPARTMENT OF AGRICULTURE,** and **NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION,** | ) Civil Case No. **08-687 (JR)** ) ) ) ) ) ) |
| Defendants. | ) ) |

**ORDER DISMISSING PLAINTIFFS' COMPLAINT**

Upon consideration of Defendant National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss, it is hereby ORDERED that this case should be, and hereby is DISMISSED WITH PREJUDICE. Costs shall be taxed against plaintiffs.

SO ORDERED this _____ day of _____, 2008.

_____
HONORABLE JAMES ROBERTSON

60096537.9

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JEFFREY J. PROSSER** and **JOHN P. RAYNOR,** )<br><br>Plaintiffs, )<br><br>**v.** )<br><br>**FEDERAL AGRICULTURAL MORTGAGE CORPORATION, UNITED STATES DEPARTMENT OF AGRICULTURE,** and **NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION,** )<br><br>Defendants. ) | Civil Case No. **08-cv-687 (JR)** |

**DECLARATION OF RYAN P. HARTMAN IN SUPPORT OF DEFENDANT NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION'S MOTION TO DISMISS**

My name is Ryan P. Hartman. I am an attorney of record for Defendant National Rural Utilities Cooperative Finance Corporation ("National Rural") in the above-referenced action, and submit this declaration in support of National Rural's Motion to Dismiss and the following attachments to that motion:

1. Attached as Exhibit A to Defendant National Rural's Motion to Dismiss is a true and correct copy of the Memorandum and Order dismissing No. 4:06-cv-03244-JFB-PRSE, *Raynor v. Titus, et al.*, in the United States District Court for the District of Nebraska.

2. Attached as Exhibit B1 to Defendant National Rural's Motion to Dismiss is a true and correct copy of the opinion in Consolidated Civil Action No. 16415 NC, *In re Emerging*

- 1 -

*Communications, Inc. Shareholders Litigation*, 2004 Del. Ch. LEXIS 70 (Del. Ch. 2004), in the Court of Chancery of the State of Delaware in and for New Castle County.

3.    Attached as Exhibit B2 to Defendant National Rural's Motion to Dismiss is a true and correct copy of the judgments entered in Consolidated Civil Action No. 16415 NC, *In re Emerging Communications, Inc. Shareholders Litigation*, 2004 Del. Ch. LEXIS 70 (Del. Ch. 2004), in the Court of Chancery of the State of Delaware in and for New Castle County.

4.    Attached as Exhibit C to Defendant National Rural's Motion to Dismiss is a true and correct copy of National Rural's Form 10-K for the period ending May 31, 2007, filed with the United States Securities and Exchange Commission.

5.    Attached as Exhibit D to Defendant National Rural's Motion to Dismiss is a true and correct copy of the Memorandum and Opinion of December 14, 2006, in Nos. 06-30007, *In re Emerging Communications., Inc.*, No. 06-30008, *In re Innovative Communication Company, L.L.C.,* & 06-30009, *In re Jeffrey J. Prosser*, in the Bankruptcy Court for the United States Virgin Islands.

6.    Attached as Exhibit E to Defendant National Rural's Motion to Dismiss is a true and correct copy of John P. Raynor's Voluntary Petition filed September 13, 2004 in No. 04-83112, *In re John P. Raynor*, in the Bankruptcy Court for the District of Nebraska.

7.    Attached as Exhibit F to Defendant National Rural's Motion to Dismiss is a true and correct copy of Rural Telephone Finance Cooperative's Complaint in No. 1:04-cv-633, *Rural Telephone Finance Cooperative v. Innovative Communication Corporation*, in the United States District Court for the Eastern District of Virginia, Alexandria Division, which was

transferred by the accompanying transfer order to No. 2004-154, *Rural Telephone Finance Cooperative v. Innovative Communication Corporation*, in the District Court of the United States Virgin Islands, Division of St. Thomas & St. John.

8.      Attached as Exhibit G to Defendant National Rural's Motion to Dismiss is a true and correct copy of the Virgin Islands Telephone Corporation and Innovative Communication Corporation's Amended Complaint in No. 2006-018, *Virgin Islands Telephone Corporation and Innovative Communication Corporation v. National Rural Utilities Cooperative Finance Corporation and Rural Telephone Finance Cooperative, et al.*, in the District Court of the United States Virgin Islands, Division of St. Thomas and St. John.

9.      Attached as Exhibit H to Defendant National Rural's Motion to Dismiss is a true and correct copy of Innovative Communication Corporation's Amended Complaint in No. 2005-168, *Innovative Communication Corporation v. Rural Telephone Finance Cooperative*, in the District Court of the United States Virgin Islands, Division of St. Thomas and St. John.

10.     Attached as Exhibit I to Defendant National Rural's Motion to Dismiss is a true and correct copy of the (i) final judgment in favor of Rural Telephone Finance Cooperative against Innovative Communication Corporation and Jeffrey Prosser in Nos. 2004-154, *Rural Telephone Finance Cooperative v. Innovative Communication Corporation*, and 2004-155, *Rural Telephone Finance Cooperative v. Jeffrey Prosser*, (ii) order dismissing with prejudice Innovative Communication Corporation's claims in No. 2004-155, *Rural Telephone Finance Cooperative v. Prosser*, (iii) order dismissing with prejudice Innovative Communication Corporation's claims in No. 2005-115, *Innovative Communication Corporation v. Rural Telephone Finance Cooperative*, (iv) order dismissing Emerging Communications, Inc. and

Innovative Communication Company, LLC's claims in No. 2006-011, *Emerging Communications, Inc. & Innovative Communication Company, LLC v. Rural Telephone Finance Cooperative and National Rural Utilities Cooperative Finance Corporation*, (v) order dismissing Innovative Communication Corporation's claims in No. 2005-168, *Innovative Communication Corporation v. Rural Telephone Finance Cooperative, John J. List, and Steven Lilly*, and (vi) docket reflecting dismissal with prejudice of No. 2006-018, *Virgin Islands Telephone Corporation and Innovative Communication Corporation v. National Rural Utilities Cooperative Finance Corporation and Rural Telephone Finance Cooperative*, *et al.* in the District Court of the United States Virgin Islands, Division of St. Thomas and St. John.

11.     Attached as Exhibit J to Defendant National Rural's Motion to Dismiss is a true and correct copy of the Voluntary Petition of Emerging Communications, Inc. in No. 06-30007, *In re Emerging Communications, Inc.*, in the Bankruptcy Court of the United States Virgin Islands.

12.     Attached as Exhibit K to Defendant National Rural's Motion to Dismiss is a true and correct copy of the Voluntary Petition of Innovative Communication Company, LLC in No. 06-30008, *In re Innovative Communication Company, LLC.*, in the Bankruptcy Court of the United States Virgin Islands.

13.     Attached as Exhibit L to Defendant National Rural's Motion to Dismiss is a true and correct copy of the Voluntary Petition of Jeffrey Prosser. in No. 06-30009, *In re Jeffrey J. Prosser*, in the Bankruptcy Court of the United States Virgin Islands.

14.     Attached as Exhibit M to Defendant National Rural's Motion to Dismiss is a true and correct copy of the Involuntary Petition of Innovative Communication Corporation in No.

07-30012, *In re Innovative Communication Corporation*, in the Bankruptcy Court of the United States Virgin Islands.

15.     Attached as Exhibit N to Defendant National Rural's Motion to Dismiss is a true and correct copy of the Order Converting Case to Chapter 7 entered in No. 06-30009, *In re Jeffrey J. Prosser*, in the Bankruptcy Court of the United States Virgin Islands.

16.     Attached as Exhibit O to Defendant National Rural's Motion to Dismiss is a true and correct copy of the Order for Relief Under Chapter 7 entered, and Trustee's Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines filed in No. 04-83112, *In re John P. Raynor*, in the Bankruptcy Court for the District of Nebraska.

17.     Attached as Exhibit P to Defendant National Rural's Motion to Dismiss is a true and correct copy of the Order Appointing Stan Springel as Chapter 11 Trustee, in No. 06-30007, *In re Emerging Communications., Inc.*, No. 06-30008, *In re Innovative Communication Company, L.L.C.,* & 06-30009, *In re Jeffrey J. Prosser*, in the Bankruptcy Court for the United States Virgin Islands.

18.     Attached as Exhibit Q to Defendant National Rural's Motion to Dismiss is a true and correct copy of the Order Requiring U.S. Trustee to Immediately Appoint Chapter 11 Trustee, No. 07-30012, *In re Innovative Communication Corporation*, in the Bankruptcy Court of the United States Virgin Islands.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 12, 2008.

**/s/ Ryan P. Hartman**
Ryan P. Hartman

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia

# Exhibit A

to

## National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JOHN P. RAYNOR, | ) | 4:06CV3244 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| JIM R. TITUS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the Magistrate Judge's Report and Recommendation that Defendants' Motion to Dismiss be granted. (Filing No. 50.) After a de novo review pursuant to Federal Rule of Civil Procedure 72 and NECivR 72.3, the Magistrate Judge's Report and Recommendation is adopted in part and modified in part.

Defendants filed a Motion to Dismiss on July 27, 2007 arguing that this court lacks personal jurisdiction over Defendants because Plaintiff failed to serve Defendants properly within 120 days of the filing of the Amended Complaint. (Filing No. 41.) Plaintiff here is proceeding pro se. However, he is a practicing attorney and has signed his pleadings using his attorney registration number and business address. (*See* Filing No. at CM/ECF pp. 5, 11.) Defendants informed Plaintiff on at least two separate occasions that service was improper. (Filing No. 46, Attach. 1, at CM/ECF p. 1.) Defendants also detailed the requirements for service and suggested that Plaintiff remedy the service defects and re-serve Defendants. (*Id.*) In spite of that notice and suggestion, Plaintiff failed to take action to correct the improper service until *after* Defendants filed their Motion to Dismiss, did not respond to Defendants' Motion to Dismiss, and did not prosecute this matter with "reasonable diligence" until Magistrate Judge Gossett requested that he do so. (Filing No. 40.)

The Report and Recommendation recommends that this court grant Defendants' Motion to Dismiss and dismiss this action with prejudice. (Filing No. 50 at CM/ECF p. 5.) Plaintiff filed an Objection to the Report and Recommendation, arguing that his repeated failures to serve Defendants properly are "technicalities" and requesting that, if the court dismisses this matter, that the dismissal be without prejudice. (Filing No. 55 at CM/ECF p. 3.) Where service of process is defective, the court has wide latitude under Federal Rule of Civil Procedure Rule 4 to either dismiss the action without prejudice or extend the time in which service may be made where "good cause" is shown for the failure. Fed. R. Civ. P. 4(m).

After a careful review of the record, the court finds that Plaintiff has not shown good (or any) cause for his failure to properly serve Defendants within 120 days of the filing of the Amended Complaint.[1] *See Adams v. Allied Signal Gen. Aviation Avionics*, 74 F.3d 882, 885-85 (8th Cir. 1996) ("When counsel has ample notice of a defect in service, does not attempt an obvious correction, and chooses to defend the validity of the service attempted, there is no good cause for the resulting delay if that method of service fails.") Therefore, the court adopts the Magistrate Judge's Report and Recommendation and this case is dismissed for the reasons articulated by Magistrate Judge Gossett. However, the Report and Recommendation is modified to the extent that Plaintiff's Amended Complaint is dismissed without prejudice pursuant to Federal Rule of Civil Procedure 12(b)(4) and (5).

IT IS THEREFORE ORDERED that:

1.      The Magistrate Judge's Report and Recommendation (filing no. 50) is adopted in part and modified in part.

---

[1]Although the court makes no finding regarding the issue, a brief review of the record indicates that Plaintiff alleges ongoing violations and that he may be able to re-file his action without violating the applicable statute of limitations.

2.     Plaintiff's Amended Complaint is dismissed without prejudice pursuant to Federal Rule of Civil Procedure 12(b)(4) and (5).

3.     Defendants' Motion to Dismiss (filing no. 41) is granted.

4.     Plaintiff's Objection to Report and Recommendation (filing no. 55) is granted in part in accordance with this Memorandum and Order.

5.     All other pending motions are denied as moot.

6.     A separate judgment will be entered in accordance with this Memorandum and Order.

February 19, 2008.                     BY THE COURT:


                                       s/ Joseph F. Bataillon
                                       Chief United States District Judge

3

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, **Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia**

# Exhibit B1

to

**National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss**

3 of 3 DOCUMENTS

**IN RE EMERGING COMMUNICATIONS, INC. SHAREHOLDERS LITIGATION**

**Consolidated Civil Action No. 16415**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2004 Del. Ch. LEXIS 70*

**August 30, 2003, Submitted**
**May 3, 2004, Decided**

**NOTICE:**

[*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**SUBSEQUENT HISTORY:** As Revised June 4, 2004. Judgment entered by *In re Emerging Communs., Inc. S'holders Litig., 2006 Del. Ch. LEXIS 25 (Del. Ch., Jan. 9, 2006)*

**DISPOSITION:** Appraisal action, Innovative is liable to Greenlight in the amount of $ 38.05 per share for each of the 750,300 shares that are subject to the appraisal, plus interest at the rate of 6.27%, compounded monthly, from the date of the merger to the date of the judgment. In fiduciary duty action, Innovative, ICC, Prosser, Raynor and Muoio are jointly and severally liable to the plaintiff class and to Greenlight (in its capacity as holder of litigation rights assigned by former ECM shareholders) in an amount equal to $ 27.80 per share.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Consolidated statutory appraisal and class actions for breach of fiduciary duty, which arose out of a two-step "going private" acquisition of publicly owned shares of a corporation by its majority stockholder, were brought on behalf of plaintiff former public shareholders against defendants, the corporation and its board. A trial on the merits was held and the parties submitted post-trial briefs and other memoranda for the court's consideration.

**OVERVIEW:** The two-step "privatization" process included a tender offer and then a cash-out merger. A special committee negotiated a price of $ 10 per share and the privatization was recommended and carried out. The court found that a fair value per share was $ 38, based on use of later projections for a discounted cash flow valuation, a cost of debt input of 6.3 percent, a cost of equity figure that included premiums for hurricane risk and small firm/small stock, but not a super small firm premium, and which did not rely on stock market price or a corporate opportunity claim. Interest was to be at the rate of 6.27 percent, compounded monthly, from the date of merger to the date of judgment. A fair dealing analysis was required, plaintiffs' fiduciary duty claims were not barred, and defendants failed to carry their burden of showing that they engaged in fair dealing. The committee and corporate minority shareholders who voted to approve the merger was not fully informed due to nondisclosures, the minority shareholders were not adequately represented, and various directors and officers were found to have violated their duty of care, loyalty, and/or good faith, rendering them liable.

**OUTCOME:** Plaintiff minority shareholders were awarded to $ 38 per share, together with interest, from the surviving corporation. The surviving corporation and several of the officers and directors were jointly and severally liable to the class and the minority shareholders for $ 27 per share.

**LexisNexis(R) Headnotes**

*Business & Corporate Law > Corporations >*

*Shareholders > Shareholder Duties & Liabilities > Controlling Shareholders > Causes of Action*
*Business & Corporate Law > Corporations > Shareholders > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Responsibilities*
*Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Shareholders*

[HN1] In a class action seeking to invalidate a "going private" acquisition of a corporation's minority stock by its majority stockholder, the standard under which a court reviews the validity of the transaction and the liability of the fiduciaries charged with breach of duty is entire fairness. That standard of review has two aspects: fair dealing and fair price.

*Business & Corporate Law > Corporations > Shareholders > Appraisal & Dissent Rights > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > Mergers > Rights of Dissenting Shareholders*

[HN2] A discounted cash flow valuation, for purposes of an appraisal proceeding, is based upon three inputs: (a) the projections of free cash flow for a specified number of years, (b) the estimated terminal value of the firm at the end of the "projection period," and (c) the discount rate.

*Business & Corporate Law > Corporations > Shareholders > Appraisal & Dissent Rights > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > Mergers > Rights of Dissenting Shareholders*

[HN3] As a general proposition, an appraiser should rely on a company's most recent contemporaneous management forecasts unless there are compelling reasons to the contrary.

*Business & Corporate Law > Corporations > Shareholders > Appraisal & Dissent Rights > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > Mergers > Rights of Dissenting Shareholders*
*Evidence > Procedural Considerations > Burdens of Proof > General Overview*

[HN4] It stands to reason that when a public company goes private, cost savings in some amount will often be achieved. But, in an appraisal proceeding, each party must bear the burden of establishing its own position.

*Business & Corporate Law > Corporations > Shareholders > Appraisal & Dissent Rights > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > Mergers > Rights of Dissenting Shareholders*

[HN5] Within the context of an appraisal proceeding, courts prefer valuations based on management projections available as of the date of the merger and hold a healthy skepticism for post-merger adjustments to management projections or the creation of new projections entirely. Contemporary pre-merger management projections are particularly useful in the appraisal context because management projections, by definition, are not tainted by post-merger hindsight and are usually created by an impartial body. In stark contrast, post hoc litigation-driven forecasts have an "untenably high" probability of containing "hindsight bias and other cognitive distortions." When management projections are made in the ordinary course of business, they are generally deemed reliable. Experts who then vary from management forecasts should proffer legitimate reasons for such variance.

*Business & Corporate Law > Corporations > Shareholders > Appraisal & Dissent Rights > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > Mergers > Rights of Dissenting Shareholders*

[HN6] In an appraisal proceeding, under the weighted average cost of capital (WACC) formula, the discount rate is calculated based upon a subject company's cost of capital. WACC is the sum of: (1) the percentage of the company's capital structure that is financed with equity, multiplied by the company's cost of equity capital, plus (2) the percentage of the company's capital structure that is financed with debt, multiplied by its after-tax cost of debt.

*Business & Corporate Law > Corporations > Shareholders > Appraisal & Dissent Rights > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > Mergers > Rights of Dissenting Shareholders*

[HN7] In an appraisal proceeding, one element of the weighted average cost of capital formula -- the "cost of equity capital" -- is determined by the capital asset pricing model (CAPM). Under CAPM, the cost of equity capital is the risk-free rate of return plus the subject company's risk. The subject company's risk is determined

2004 Del. Ch. LEXIS 70, *1

by multiplying the equity risk premium for the market by the company's beta. "Beta" is the measure of a given company's nondiversifiable risk relative to the market, specifically, the tendency of the returns on a company's security to correlate with swings in the broad market. A beta of one, for example, means that the security's price will rise and fall with the market; a beta greater than one signifies that the security's price will be more volatile than the market; and a beta less than one indicates that it will be less volatile than the market.

***Business & Corporate Law > Corporations > Shareholders > Appraisal & Dissent Rights > General Overview***
***Business & Corporate Law > Mergers & Acquisitions > Mergers > Rights of Dissenting Shareholders***

[HN8] In an appraisal proceeding, the appropriate weights to use to define a firm's capital structure in calculating the weighted average cost of capital (WACC) are the firm's long run target weights stated in terms of market value. One simple and popular procedure for estimating the target weights is to assume that they equal the company's current market value weights. This assumption involves a circularity. Often, a company is appraised because the market value of its securities is unknown, and, therefore, cannot be used to calculate the weights. The circularity can be overcome in the case of debt and preferred stock by directly establishing the value of these securities. However, common stock is still a problem. The estimated value of the equity depends on the WACC, which, in turn, depends on the value of the equity. In light of the circularity, an iterative procedure must be employed to solve simultaneously for the value of the equity and for the WACC. The iterative process begins with the selection of an initial estimate for the market value of the equity; the book value of the equity is a reasonable choice. Based on this initial estimate, the WACC is calculated. Subtracting the value of the debt and preferred stock produces a revised estimate of the equity and a revised equity weight. This revised estimate is then used to calculate a new initial estimate of the equity weight.

***Business & Corporate Law > Corporations > Shareholders > Appraisal & Dissent Rights > General Overview***
***Business & Corporate Law > Mergers & Acquisitions > Mergers > Rights of Dissenting Shareholders***
***Evidence > Procedural Considerations > Burdens of***

***Proof > General Overview***

[HN9] In an appraisal proceeding, the party seeking to add a premiums has the burden to establish that they are appropriate.

***Business & Corporate Law > Corporations > Shareholders > Appraisal & Dissent Rights > General Overview***
***Business & Corporate Law > Mergers & Acquisitions > Mergers > Rights of Dissenting Shareholders***

[HN10] Delaware law recognizes that, although market price should be considered in an appraisal, the market price of shares is not always indicative of fair value. The appraisal cases so confirm.

***Business & Corporate Law > Corporations > Shareholders > Appraisal & Dissent Rights > General Overview***
***Business & Corporate Law > Mergers & Acquisitions > Mergers > Rights of Dissenting Shareholders***
***Civil Procedure > Remedies > Judgment Interest > General Overview***

[HN11] Once the fair value of dissenting shareholders' shares is ascertained, *Del. Code Ann. tit. 8, § 262(h)*, the appraisal statute, requires a court to determine "the fair rate of interest, if any" after considering "all relevant factors." The interest may be simple or compound, and the court has broad discretion to determine whether interest should be simple or compound, but the court must explain its choice. *§ 262(i)*.

***Business & Corporate Law > Corporations > Shareholders > Appraisal & Dissent Rights > General Overview***
***Business & Corporate Law > Mergers & Acquisitions > Mergers > Rights of Dissenting Shareholders***
***Civil Procedure > Remedies > Judgment Interest > General Overview***

[HN12] The decision in Gonsalves v. Straight Arrow Publishers, Inc. is an accepted method for determining the rate of interest in appraisal actions. Gonsalves rests on the principle that an interest award should serve two purposes. First, it should disgorge a respondent of any benefit it received from the use of the petitioner's funds. Second, the interest award should compensate the petitioner for the loss of the use of its money. The second purpose, however, is countenanced with the understanding that the election to reject the merger and to

pursue appraisal does not shift to the corporation all responsibility for losses the petitioner may incur as a result of its inability to use the funds retained by the corporation and that the petitioner can mitigate its losses and obtain perfect compensation for the loss of the use of their funds by borrowing the fair value of their shares. Gonsalves, and several other decisions, have found that these twin purposes are served by awarding interest by weighing equally the respondent's actual costs of borrowing and based upon an objective prudent investor standard, the petitioner's opportunity cost.

*Business & Corporate Law > Corporations > Shareholders > Appraisal & Dissent Rights > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > Mergers > Rights of Dissenting Shareholders*
*Civil Procedure > Remedies > Judgment Interest > General Overview*
[HN13] The Delaware cases require that the interest rate in an appraisal proceeding be determined by weighting the cost of borrowing and the prudent investor rate of return equally.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Directors & Officers*
[HN14] An entire fairness analysis normally requires a court to decide, in addition to whether the price paid in an interested merger was "fair," whether the merger was the product of "fair dealing."

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Directors & Officers*
*Criminal Law & Procedure > Eyewitness Identification > Fair Identification Requirement*
[HN15] The Delaware Supreme Court has decided that where an interested merger is found to be unfair and the corporation's charter has a *Del. Code Ann. tit. 8, § 102(b)(7)* exculpatory provision, a court must then proceed to identify the breach or breaches of fiduciary duty upon which liability for damages will be predicated in the ratio decidendi of its determination that entire

fairness has not been established. That is, when entire fairness is the applicable standard of judicial review, a determination that the director defendants are exculpated from paying monetary damages can be made only after the basis for their liability has been decided.

*Contracts Law > Types of Contracts > Choses in Action*
*Governments > Fiduciary Responsibilities*
*Torts > Intentional Torts > Breach of Fiduciary Duty > Elements*
[HN16] It is established Delaware law that choses in action that survive the death of the victim are validly assignable. Choses in action such as breach of fiduciary duty and fraud claims survive to (or against) a personal representative under *Del. Code Ann. tit. 10, § 3701*. For purposes of determining which claims are assignable and which are not, Delaware law does not distinguish between claims that are liquidated and those that are unliquidated.

*Contracts Law > Types of Contracts > Choses in Action*
*Estate, Gift & Trust Law > Probate > Personal Representatives > General Overview*
[HN17] See *Del. Code Ann. tit. 10, § 3701*.

*Contracts Law > Contract Interpretation > Fiduciary Responsibilities*
*Contracts Law > Performance > Assignment > General Overview*
*Governments > Fiduciary Responsibilities*
[HN18] Champerty requires an agreement between the owner of a claim and a volunteer that the latter may take the claim and collect it, dividing the proceeds with the owner, if they prevail; the champertor to carry on the suit at his own expense. Champerty cannot be charged against one with an interest in the matter in controversy.

*Contracts Law > Performance > Assignment > General Overview*
[HN19] A failed assignment of claims does not constitute a waiver of those claims.

*Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Directors & Officers*
[HN20] Where a privatization is a self-dealing transaction of which the majority stockholder stands on both sides, entire fairness is the standard of review ab

2004 Del. Ch. LEXIS 70, *1

initio.

***Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Directors & Officers***
[HN21] In an entire fairness context, where the predicate for a burden-shifting argument is that a merger was negotiated by a special committee, the defendants must establish to the satisfaction of a carefully scrutinizing court, that the special committee was "fully informed."

***Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Shareholders***
***Business & Corporate Law > Mergers & Acquisitions > Takeovers & Tender Offers > Duties & Liabilities of Shareholders***
[HN22] No Delaware case has held that burden-shifting in a fairness inquiry can be accomplished by a tender of shares rather than by an actual vote. Nor should a tender be treated as the equivalent of an informed vote. Shareholders cannot be deemed to have ratified board action unless they are afforded the opportunity to express their approval of the precise conduct being challenged. Stockholders have materially different interests at stake when tendering, as opposed to voting their shares. In considering whether to tender, stockholders must evaluate the risk of being left worse off, i.e., left vulnerable to being frozen out at an even lower price, if the other stockholders were to tender into an inadequate offer. Indeed, many commentators would argue that the tender offer form is more coercive than a merger vote. In a merger vote, stockholders can vote no and still receive the transactional consideration if the merger prevails. In a tender offer, however, a non-tendering shareholder faces an uncertain fate. That stockholder could be one of the few who holds out, leaving herself in an even more thinly traded stock with little hope of liquidity and subject to a *Del. Code Ann. tit. 8, § 253* merger at a lower price or at the same price or at a later (and, given the time value of money, a less valuable) time.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview***
***Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Directors & Officers***
[HN23] A fair dealing analysis requires a court to address issues of when a transaction was timed, how it was initiated, structured, negotiated, and disclosed to the board, and how director and shareholder approval was obtained.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview***
***Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Directors & Officers***
[HN24] Delaware courts have recognized that a freeze-out merger of the minority proposed by the majority stockholder is inherently coercive. Where the freeze-out merger is initiated by the majority stockholder, that fact, even though dispositive, is evidence of unfair dealing.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview***
***Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Directors & Officers***
[HN25] A circumstance that evidences the absence of fair dealing is where a transaction is timed in a manner that is financially disadvantageous to the stockholders and that enables the majority stockholder to gain correspondingly.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview***
***Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Directors & Officers***
[HN26] A critical aspect of any fair dealing analysis is the adequacy of the representation of the minority stockholders' interests. Directors who, through personal or other relationships are beholden to the controlling person, lack independence from that person.

***Business & Corporate Law > Corporations > Shareholders > Appraisal & Dissent Rights > General Overview***
***Business & Corporate Law > Mergers & Acquisitions > Mergers > Rights of Dissenting Shareholders***
[HN27] The price at which a leveraged buy-out of a corporation is financially feasible is not determinative of a corporation's fair value.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities >***

*General Overview*
*Business & Corporate Law > Mergers & Acquisitions >*
*Mergers > Duties & Liabilities of Directors & Officers*
*Governments > Fiduciary Responsibilities*
[HN28] One of the requirements for "aiding and abetting" liability is a third party's "knowing participation" in the directors' breach of fiduciary duty.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Directors & Officers*
*Criminal Law & Procedure > Discovery & Inspection > Brady Materials*
[HN29] To establish a director's exculpation from liability under *Del. Code Ann. tit. 8, § 102(b)(7)*, the burden falls upon the director to show that his failure to withstand an entire fairness analysis is exclusively attributable to a violation of the duty of care.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Directors & Officers*
[HN30] Negligent or even gross negligent conduct, however misguided, does not automatically equate to disloyalty or bad faith.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*
*Criminal Law & Procedure > Discovery & Inspection > Brady Materials*
*Governments > Fiduciary Responsibilities*
[HN31] Although the Delaware Supreme Court has yet to define the precise conduct that would actionably violate the duty to act in good faith, the Court of Chancery of Delaware, New Castle has recently held that directors can be found to have violated their duty of good faith if they consciously and intentionally disregard their responsibilities, adopting a "we don't care about the risks" attitude concerning a material corporate decision.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities >*

*Fiduciary Responsibilities > Duty of Good Faith*
*Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Directors & Officers*
[HN32] Directors actionably violate their duty of good faith if they knew that they were making material decisions without adequate information and without adequate deliberation, and they simply did not care if the decisions caused the corporations and its stockholders to suffer injury or loss.

**COUNSEL:** Thomas J. Allingham II, Leonard P. Stark, Rosemary S. Goodier, Douglas E. McCann, and James A. Whitney, Esquires, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Attorneys for Greenlight Capital Qualified L.P., Greenlight Capital L.P. and Greenlight Capital Offshore, Ltd.

Norman M. Monhait, Esquire, of ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; OF COUNSEL: Shane T. Rowley, Esquire, of Faruqi & Faruqi, LLP, New York, New York; Attorneys for Brickell Partners and the Class.

Thomas A. Beck, Raymond J. DiCamillo, Catherine G. Dearlove and Kelly C. Ashby, Esquires, of RICHARDS, LAYTON & FINGER, Wilmington, Delaware; OF COUNSEL: P. Kevin Castel and Jonathan R. Donnellan, Esquires, of CAHILL GORDON & REINDEL, New York, New York; Attorneys for Emerging Defendants Communications, Inc., Jeffrey J. Prosser, Innovative Communication Corporation and Innovative Communication Company, LLC.

David C. McBride and Bruce L. Silverstein, Esquires, of YOUNG CONAWAY STARGATT & TAYLOR, Wilmington, Delaware; [*2] Attorneys for the Board Defendants; OF COUNSEL: Kevin C. Logue, and Ryan K. Roth Gallo, Esquires, of PAUL, HASTINGS, JANOFSKY & WALKER LLP, New York, New York; Attorneys for Defendants Richard N. Goodwin, John G. Vondras, Salvatore Muoio, Terrence A. Todman, Sir Shridath Ramphal; and Paul J. Ruskin, Esquire, of THE LAW OFFICES OF PAUL J. RUSKIN, Douglaston, New York; Attorney for Defendant John P. Raynor.

**JUDGES:** JACOBS, JUSTICE. *.

    *    Sitting by designation as Vice Chancellor under DEL. CONST., art. IV, § 13(2).

**OPINION BY:** JACOBS

**OPINION**

JACOBS, JUSTICE *

* Sitting by designation as vice Chancellor under *DEL. CONST., art. IV, § 13(2).*

Addressed in this Opinion are the merits of consolidated statutory appraisal and class actions for breach of fiduciary duty. These actions all arise out of the two-step "going private" acquisition of the publicly owned shares of Emerging Communications, Inc. ("ECM"), by Innovative Communications Corporation, L.L.C. ("Innovative"), ECM's majority stockholder. The first step tender offer was commenced on August 18, 1998 by Innovative for 29% of ECM's outstanding shares at a price of $ 10.25 per share. The balance of ECM's publicly held [*3] shares were acquired in a second-step cash-out merger of ECM into an Innovative subsidiary, at the same price, on October 19, 1998.

At the time of this two-step transaction (the "Privatization"), 52% of the outstanding shares of ECM, and 100% of the outstanding shares of Innovative, were owned by Innovative Communication Company, LLC ("ICC"). ICC, in turn, was wholly owned by ECM's Chairman and Chief Executive Officer, Jeffrey J. Prosser ("Prosser"). Thus, Prosser had voting control of both of the parties to the Privatization transaction.

In June 1998, shortly after the Privatization proposal was announced, a fiduciary duty class action was brought on behalf of the former public shareholders of ECM by Brickell Partners, an ECM shareholder. On February 10, 1999, four months after the Privatization was consummated, an appraisal action was filed by Greenlight Capital, L.P. and certain of its affiliates (collectively, "Greenlight"). A settlement of the Brickell Partners class action was thereafter proposed and later withdrawn. Greenlight, which had objected to the proposed settlement, filed a separate fiduciary duty action on behalf of both its 750,300 "appraisal shares" and 2,026,685 [*4] ECM minority shares to which Greenlight had been assigned the litigation rights. Thereafter, the Brickell fiduciary duty action and the Greenlight appraisal and fiduciary duty actions were consolidated, and were tried on the merits between September 17, 2001 and November 6, 2001. Post-trial briefing and the submission of other memoranda were completed on August 30, 2003.

This is the decision of the Court, after trial, on the merits of the consolidated fiduciary and appraisal actions.

I. THE FACTS

Next recited are the material facts, many of which are undisputed. Where there are disputes, the facts are as found below. Although the recited facts set forth the basic storyline, they are not intended to be comprehensive. To avoid unduly diverting the reader from the essential plotline, other facts that are relevant to discrete issues are discussed elsewhere in this Opinion in the context where those issues are addressed.

A. The Parties

1. The Plaintiffs

The plaintiffs, as noted are Brickell Partners, which represents a class of persons who owned shares in ECM between May 29, 1998 and October 19, 1998; and Greenlight, which comprises three investment funds that focus on special [*5] situation value investments. At the time of the tender offer, Greenlight owned *750,300* shares of ECM, and it was also the assignee of the litigation rights (which Greenlight had previously acquired) to 2,026,685 ECM minority shares. Greenlight brings its appraisal action on behalf of the 750,300 shares that it owns outright. Greenlight brings its class action on behalf of those shares, and also on behalf of the 2,026,685 ECM shares as to which Greenlight holds the litigation rights.

2. The Defendants

There are two groups of defendants: (1) the "ECM defendants," which consist of ECM, ICC, and Innovative; and (2) the "Board defendants," who were ECM's directors at the time of the Privatization. In addition to Jeffrey Prosser, who was also ECM's Chairman and Chief Executive Officer, ECM's directors were Richard Goodwin; John Raynor; Sir Shridath Ramphal; Salvatore Muoio; John Vondras; and Terrence Todman. Each of the board defendants served as an ECM director at Prosser's request.

(a) *The ECM Defendants*

ECM, a Delaware corporation that was headquartered in the U.S. Virgin Islands ("USVI"), was formed in 1997 to receive the Virgin Islands operations

of ECM's corporate predecessor, [*6] Atlantic Tele-Network, Inc. ("ATN"), in connection with a division of ATN's business. At the time of the October 1998 Privatization, ECM's principal business was the Virgin Islands Telephone Co. ("Vitelco"), which was the exclusive provider of local wired telephone services in the USVI. Vitelco represented the largest portion of ECM's business and accounted for approximately 88% of its revenues. ECM's other businesses included Vitelcom, an indirect subsidiary engaged in selling and leasing telecommunications equipment; and Vitelcom Cellular ("VitelCellular"), which provided cellular service in the USVI. ECM also owned SMB Holdings, which provided cellular service to the island of St. Maarten/St. Martin.

Innovative, a Virgin Islands corporation that was 100% owned by ICC, is a Delaware limited liability company with its principal place of business in the USVI. As earlier noted, at the time of the Privatization, Prosser owned the entire (100%) membership interest in ICC, which in turn owned 52% of ECM's common stock, and 100% of the stock of Innovative.

(b) *The Board Defendants*

The Board Defendants, and their respective backgrounds, are described at this point.

Richard N. Goodwin

[*7] Richard Goodwin, a member of the Massachusetts Bar, is a noted author of books on American history, government, and politics. In 1959, Mr. Goodwin served as a law clerk to United States Supreme Court Justice Felix Frankfurter, and during the 1960's, he served as Assistant Special Counsel to President John F. Kennedy. After President Kennedy's assassination, Goodwin served as Deputy Assistant Secretary of State for Inter-American Affairs and as Special Assistant to President Lyndon B. Johnson. In the late 1960's Mr. Goodwin served as campaign advisor to Senator Robert F. Kennedy. During the 1980's and part of the 1990's, Mr. Goodwin also served as a consultant to the government of the USVI.

Shridath S. Ramphal

Sir Shridath S. Ramphal ("Ramphal"), a native of Guyana, is a Barrister at. Law who has held numerous prestigious government and academic positions. Between 1965 and 1993, Ramphal served successively (from 1965 to 1975) as Solicitor General of British Guyana, Assistant Attorney General of the West Indies, Attorney General of Guyana, and Guyana's Minister of Foreign Affairs of Justice. From 1975 to 1990, Ramphal served as Secretary General of the British Commonwealth, a [*8] group of 58 nations headquartered in London, England. Ramphal also served as Vice President of the United Nations General Assembly (from 1968 to 1973), Chairman of the United Nations Committee on Development Planning (from 1984 to 1987), Special Advisor to the United Nations Conference on Environment and Development (1992), Chairman of the West Indian Commission (1990 to 1992), and as President of the World Conservation Union (from 1990 to 1993). Finally, Ramphal served as chancellor of the University of Guyana from 1988 to 1992, and as chancellor of the University of Warwick in the United Kingdom and chancellor of the University of the West Indies, since 1989.

Apart from these positions, Ramphal served as a director of, and a paid consultant to, ATN (ECM's corporate predecessor) in 1992, 1993, 1994, and 1995, during which years he was paid (respectively), $ 20,000, $ 140,000, $ 140,000, and $ 120,000.

John G. Vondras

John G. Vondras ("Vondras") is a professional engineer, with over 25 years of independent experience in the telecommunications industry. Vondras has served and continues to serve as a director (and as President Director) of PT ARIAWEST International, a joint venture [*9] company that operates a partnership with PT TELKOM, which provides wireless and land based telephone services in Indonesia. In 1986, Vondras spent two weeks in the USVI assisting Prosser on technical due diligence in Prosser's purchase of Vitelco. Vondras also served as a director of ATN.

Salvatore Muoio

Salvatore Muoio ("Muoio") is a principal and general partner of S. Muoio and Co., LLC, an investment advising firm, with significant experience in finance and the telecommunications industry. Mr. Muoio's background includes employment as a securities analyst and vice president at Lazard Freres & Co., from 1995 to 1996 in the telecommunications and media sector, and then for Gabelli & Co., Inc., from 1985 to 1995, serving both as a generalist and in the communications sector. During his career, Mr. Muoio has been quoted in many

well-regarded financial newspapers and periodicals.

Terrence A. Todman

Terrence Todman, ("Todman"), a USVI native, is a former United States ambassador to Argentina, Denmark, Spain, Costa Rica, Guinea, and Chad, and has served as special advisor to the Governor of the USVI. Todman, who is now retired, serves on the boards of directors of several other [*10] companies, including Areolineas Argentinas and the Exxel Group.

John P. Raynor

John P. Raynor, ("Raynor"), a practicing attorney, was a partner of an Omaha, Nebraska law firm, and served as Prosser's personal attorney as well as ECM's counsel. Raynor was also a business associate of Mr. Prosser, had been a director of ATN, and acted as Prosser's advisor in formulating the terms of the Privatization transaction.

B. Background Leading To The Formation of ECM

ECM's corporate predecessor, Atlantic TeleNetwork, Inc. ("ATN"), was a company that Prosser and a partner, Cornelius Prior, formed in 1987 to acquire the Virgin Islands Telephone Corporation ("Vitelco").

Vitelco, which was ATN's (and later ECM's) principal subsidiary, was (and still is) the exclusive provider of local wired telephone service in the USVI, where Vitelco operates a modern, fully digital telecommunications network. Vitelco was an extremely valuable asset, for several reasons. At the time of the Privatization, Vitelco faced no competition in the foreseeable future, and was guaranteed an 11.5% rate of return on the rate base for local telephone service by the Virgin Islands Public Service Commission. Vitelco's [*11] business, which is essentially non-cyclical and not materially affected by recession or inflation, was enhanced by its membership in the Rural Telephone Finance Cooperative ("RTFC"), a non-profit lending cooperative that provided Vitelco with capital at below-market interest rates. Prosser and his entities had access to RTFC financing only because of their affiliation with Vitelco.

Moreover, Vitelco had been essentially free from taxation. In May 1997, Vitelco was granted by the USVI Industrial Development Commission ("IDC") a five year tax abatement from 90% of income taxes and 100% of gross receipts, property and excise taxes (running from October 1998 through October 2003). The tax abatement was granted to help Vitelco recover from uninsured damage caused by Hurricane Marilyn in 1995. The tax abatement lasted for almost the entire period from the time ATN acquired Vitelco, until the Privatization.

In January 1991, ATN acquired an 80% interest in a second telephone company: Guyana Telephone & Telegraph Company Limited ("GT&T"). Eleven months later, ATN completed an initial public offering of over 5 million shares of its common stock at $ 19 per share. As a result, Prosser and Prior [*12] together owned about 65% of ATN's stock.

By 1993, Prosser and Prior had a falling out. That led to a management deadlock, which effectively precluded Prosser from pursuing his acquisition strategy. With the co-CEOs at loggerheads and the ATN board deadlocked, Prosser and Prior sued each other in June 1995. In February 1996, Prior and Prosser entered into a global settlement of their disputes, in which they terminated all litigation and released all claims.

As part of the settlement, Prosser and Prior attempted to sell ATN, and engaged two investment banks—Prudential and PaineWebber—to assist in that endeavor. Both banks concluded that a buyer should be willing to pay $ 25 to $ 30 per share for ATN, which represented a 150% to 200% premium over ATN's market price. But, potential acquirors expressed interest only in acquiring ATN's Virgin Islands operations, primarily Vitelco.

Because ATN could not be sold as an entirety, and because selling only the USVI business would not resolve the management deadlock, Prosser and Prior decided to split ATN into two new companies (the "Split Off"). One of those companies, to be controlled by Prosser, would consist of ATN's Virgin Islands Group. [*13] That company was ECM. The other company, which would be controlled by Prior, was New ATN, to which GT&T would be transferred. The Split Off was approved by ATN's board of directors and shareholders, and was consummated on December 30, 1997. Although ATN had no controlling stockholder before the Split Off (Prosser and Prior owned a large but not majority position), as a result of the Split Off Prosser ended up owning 52% of ECM's 10,959,131 shares, and ECM's public shareholders were relegated to the position of minority stockholders. [1]

1    Knowing that he would control ECM and Vitelco after the Split Off, Prosser began acquiring telecommunication and other media companies. On December 30, 1997, the same date as the Split Off closed, ICC (wholly owned by Prosser) closed its acquisition of three Caribbean Cable Companies (BVI Cable TV; St. Croix Cable TV, Inc.; and St. Maarten Cable TV) and the Daily News. ICC closed on its agreement to purchase St. Thomas Cable (executed in September 1997) on April 3, 1998. The plaintiffs contend that these acquisitions were all corporate opportunities of ATN and ECM.

[*14]  On December 31, 1997, ECM began trading as a public company on the American Stock Exchange. Shortly after Prosser obtained control of ECM, he appointed his long-time ATN directors, Raynor and Ramphal, to the ECM board. Prosser also appointed Messrs. Goodwin, Muoio and Vondras to the ECM board.

C. The Proposed, But Later Aborted, Merger of Innovative Into ECM

ECM's life as a public company was short - only ten and one half months. That was not accidental: before the Split Off had been completed, Prosser indicated that he intended to merge Innovative into ECM, and he began exploring a combination of the two companies in January 1998. On January 20, 1998, ECM hired Prudential to advise it on the fairness of a potential merger of Innovative into ECM's subsidiary ATNCo (the "Proposed Merger"). During the next month, Prosser formulated the terms of the Proposed Merger, assisted by Prudential, the law firm of Cahill, Gordon and Reindel, ECM's legal advisors ("Cahill Gordon"), and director John Raynor.

On February 27, 1998, Prosser sent to each ECM director an outline of the terms of the Proposed Merger, a draft merger agreement, and proposed resolutions creating a special board committee [*15] that would consist of Messrs. Raynor, Goodwin, and Ramphal. At the March 9, 1998 meeting of the ECM board, Prosser formally presented the Proposed Merger, whereby Innovative would merge into ATNCo (the wholly-owned ECM subsidiary that held Vitelco) in exchange for the issuance of $ 35 million of ATNCo convertible preferred stock to ICC (Innovative's parent). No privatization of ECM was contemplated as part of this transaction. At the March 9, 1998 board meeting, the ECM board also

constituted a special committee, consisting of Messrs. Goodwin, Raynor, and Ramphal (the "First Special Committee"), to consider Prosser's Proposed Merger. Those persons were appointed at the suggestion of Prosser. 2  At that time, Raynor, who was an ECM director and a Prosser business associate, was on retainer as ECM's attorney and had helped Prosser formulate the terms of the Proposed Merger.

2   Trial. Tr. Vol. 10 (Prosser) 1785).

The law firm retained to serve as counsel to the First Special Committee was Cahill Gordon. The [*16]  firm that was retained as the financial advisor to ECM and the First Special Committee in connection with the Proposed Merger was Prudential. From April 3, 1998 through May 20, 1998, Prudential engaged in discussions with ICC about the Proposed Merger terms.

Whether or not the First Special Committee actively considered the Proposed Merger is a heavily disputed issue. Goodwin testified that that Committee never met, that it had no financial or legal advisor, and that the Proposed Merger was "dropped within the month." 3 The other Committee members also testified that the First Special Committee never met and that it had no advisors. 4

3   Trial Tr. Vol. 4 (Goodwin) 829-35, 845-46, 853.
4   See Trial Tr. Vol. 7 (Ramphal) 1423-1425; Raynor Dep. 118-119.

The record, however, shows that Prudential and Cahill Gordon were retained by, and performed work for, the First Special Committee. 5 The scenario in which the Proposed Merger supposedly "languished" shortly after it first surfaced, is inconsistent [*17]  with JX 218, which is Prudential's extensive documentary presentation of the Proposed Merger to the Special Committee. Joint exhibit 218 was sent to the Committee members on May 22, 1998 in preparation for the Committee's meeting scheduled for May 27, 1998. In that document Prudential valued ATN -- the wholly owned ECM subsidiary into which Innovative would be merged -- at $ 25 to $ 30 per share. 6 It is difficult to square Prudential having sent this document -- which evidenced that that firm had done significant work -- to the First Special Committee as late as May 22, if in fact the Proposed Merger had languished or if the Special Committee had been disbanded after a week or two, as Goodwin testified.

5    *See, e.g.,* JX35 (Prudential retainer letter); JX96 (draft fairness opinion); JX 265 (Prudential presentation to Cahill Gordon and First Committee); JX218 (Prudential Presentation to Special Committee containing its evaluation of the Proposed Merger); Trial Tr. Vol. 8 (Heying) (stating Prudential and Cahill Gordon were retained; Trial Tr. Vol. 10 (Prosser) 1796-98 (same).

6    JX 218, Appendix, EC 020890-893. The Proposed Merger, if consummated, would have benefited ECM and its minority shareholders by combining all the media holdings Prosser had assembled (telephone, cellular and cable), using Vitelco's cash flow and capital, under the single corporate umbrella of ECM. Those benefits were not made available to ECM's minority stockholders in the Privatization. By definition, only Prosser received those benefits.

[*18]    D. Prosser Abandons the Merger In Favor Of The Privatization

During the third week of May 1998, Prosser began having significant reservations about the Proposed Merger, because the low market interest in ECM's common stock had caused that stock to be undervalued. [7] On May 21, 1998, Prosser, together with Raynor, met with representatives of Prudential and Cahill Gordon to discuss the feasibility of Innovative acquiring all of the outstanding stock of ECM. By that point, Prosser had decided (in Raynor's words) to "flip the transaction." [8] Having concluded that the market was not recognizing ECM's intrinsic value, Prosser switched from being a seller of ECM stock to becoming a buyer of that stock. Although Prosser had placed a value of $ 13.25 per share on ECM for purposes of the Split Off that had occurred only 5 months before, as a buyer of that same stock he was now proposing to pay only $ 9.125 per share.

7    Prosser Dep. June 7, 2000, at 67-69. On the first day ECM stock was traded, its high and low sales prices were $ 8.25 and $ 7.875, respectively. During the second calendar quarter of 1997 (April 1-June 30), ECM shares traded at prices ranging from a high of $ 8.9375 to a low of $ 6.25 per share. On the last trading day before the public announcement of the Privatization, the reported closing price was $ 7.00 per share. JX 155 at SC4133. Prosser informed the ECM board that

the ECM stock price had failed to reach the desired appreciation as a result of the small public float and the fact that the stock was not followed by Wall Street analysts. JX 155 at SC 4111.

[*19]

8    Raynor Dep. 173.

Between May 22 and May 28, Prosser, Prudential and Cahill formulated the terms of a Privatization proposal to be presented to ECM's board. On May 28, Raynor, Prosser and Thomas Minnich, ECM's Chief Operating Officer, informed the RTFC that they had decided to abandon the Proposed Merger and to take ECM private. The next day, Prosser delivered to the ECM board a letter withdrawing the Proposed Merger and proposing instead that Innovative acquire all the ECM shares it did not already own. The proposed Privatization was structured as a first-step cash tender offer for ECM's publicly traded shares at $ 9.125 per share, to be followed by a second-step cash-out merger at the same price. [9]

9    JX 150.

Prosser's May 29th letter was the first occasion that the ECM board and the First Special Committee (other than Raynor) learned of the abandonment of the Proposed Merger in favor of the Privatization. [*20] Those directors were never told of the roles played by Prudential, Cahill and Raynor -- all supposedly retained to represent the interest of the ECM minority stockholders -- in formulating the terms of the newly-substituted going private transaction. [10]

10    The $ 9.125 per share merger price was arrived at by Prosser in consultation with Prudential, and no one else had a significant role in that decision. Prosser Dep. June 7, 2000 at 73-74. The First Special Committee members (other than Raynor) were not told of the ongoing plans to change the transaction until May 29, 1998. Goodwin Dep. August 11, 2000 at 48-52, 62.

On the same day that Prosser proposed the Privatization, he told ECM's board that he (Prosser) had retained ECM's former advisors, Prudential and Cahill Gordon, to represent Innovative as the buyer in that transaction. Prudential was an especially valuable advisor to ECM, because it understood ECM's business and properties and had been ECM's only advisor during its

brief life as a stand-alone [*21] company. Thus, the advisors that initially were retained to work for the interests of ECM and its minority stockholders would now be working to serve the interests of Innovative, the party now bargaining *against* ECM. There is no evidence that the ECM board objected either to Prosser's co-opting these valuable advisors, or to the timing of the proposed Privatization. [11]

> 11  At that time (May 1998), Prosser knew that ECM's stock price was artificially depressed, because the market was not viewing ECM as a U.S. telephone company, but, rather, as a developing nation/third world phone company. That perception, Prosser knew, was unfair, because ECM had all the characteristics of a U.S. telephone company--a stable government, dollar economy, English language, American courts and legal system--and none of the characteristics of a third world company. Trial Tr., Vol. 10 (Prosser) at 1728-29; 1801-02, 1807. Rather than educate the market or afford it time to understand ECM's true characteristics, Prosser exploited the market unfairness by proposing the Privatization at a price that reflected a "premium" over ECM's then-current depressed market price level.

[*22]  E. The Formation Of The Second Special Committee And The Negotiation Of The Transaction Terms

At the May 29 ECM directors' meeting, the board formed another special committee (the "Second Special Committee") to review the fairness of the proposed Privatization. The directors selected to serve as members of this Second Special Committee were Messrs. Richard Goodwin, John Vondras, and Shridath Ramphal. [12]

> 12  In their briefs the parties dispute whether Mr. Muoio had also been appointed to the Second Special Committee. Plaintiffs argue that he was, pointing to the minutes of the May 29 meeting (JX 97), which recite that Muoio was appointed. The defendants argue that those minutes were incorrect, and point to testimony that Muoio was never on the Committee. The materiality of this fact dispute is, to say the least, obscure. Because even the plaintiffs concede that Muoio "did not serve" (Pl. Op. Trial Br. 27), the Court concludes that it is more probable than not that Muoio was never appointed.

There [*23] were several obstacles to the ability of these three directors to operate as a fully functioning Special Committee. Located on different continents and separated by a time difference of 14 hours, the three Committee members were never able to meet in person. Instead, they had to conduct their business by telephone and fax. Even teleconferences were difficult to arrange and as a result, the Second Special Committee never met collectively - even by telephone - to consider the $ 10.25 final negotiated offer whose approval it ultimately recommended.

Because one of the Second Special Committee members lived in Indonesia and the other lived in England, practicality dictated that Goodwin would be the Committee chair. In that capacity, Goodwin was designated to -- and did -- take the lead role in negotiating with Prosser and in selecting the Committee's legal and financial advisors. Mr. Goodwin interviewed William Schwitter of Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings"), as a potential legal advisor to the Second Special Committee, and on June 5, 1998, the Committee retained the Paul Hastings firm as its legal counsel. Later, after meeting with representatives of J.P. Morgan and [*24] Houlihan Lokey Howard & Zukin ("Houlihan") at his home in Massachusetts, Goodwin recommended that the Committee retain Houlihan as its financial advisor, and in mid-July, 1998, the Second Special Committee retained Houlihan in that capacity. [13]

> 13  Plaintiffs challenge the independence of both Mr. Schwitter and Houlihan, pointing out that Schwitter had been recommended by Cahill Gordon, counsel for Innovative, and that Houlihan (as well as all other potential financial advisors) "were first vetted by Prudential, which was now working solely for Prosser." Moreover (plaintiffs assert), Houlihan was ultimately recommended by Mr. Goodwin, because Goodwin felt that Houlihan (unlike Morgan Stanley) would not "[push] Prosser too hard," which might cause Prosser to back off and result in a lower stock price. Morgan Stanley, on the other hand, was "more aggressive" in pursuit of the retention, and was insisting on a fee arrangement that was linked to any increase above Prosser's initial $ 9.125 offer that Morgan could obtain.
>
>   These arguments are strained at best. Although at one time Schwitter was an attorney at

Cahill, at the time that Cahill recommended Schwitter (among other attorneys), he was a partner at a competitor firm and there is no evidence that Schwitter was beholden to Cahill or that he acted other than loyally as counsel to the Special Committee. Nor is there evidence that the retention of Houlihan prejudiced the Second Special Committee. The weakness was in the bargaining position of the Special Committee in relation to that of Prosser, who was not prepared to support or accept any alternative business transaction other than the Privatization. That is, the Committee's only options were to make a deal with Prosser on whatever terms he was willing to accept, or no deal at all (in which case the stock price might fall, to the minority stockholders' detriment). The defendants' response is that the Special Committee had ample bargaining power to negotiate a fair price, because it had the power to 'lust say no," *i.e.,* to veto the Privatization proposal, and that the Committee would approve the Privatization only if it was the best available transaction and represented fair value for the stock. Although the Court ultimately concludes that the Special Committee was ineffectual, it is not for the reason that. Paul Hastings and Houlihan had been retained as the Second Special Committee's advisors.

[*25]  As part of its pre-financial analysis investigation of ECM, Houlihan conducted (among other things) a review of ECM's financial information. That information included financial projections for ECM, dated March 25, 1998 (the "March projections"), that had been prepared by James Heying, ECM's then-Chief Financial Officer and Executive Vice President of Acquisitions. [14] What Houlihan was *not* provided, however, were financial projections dated June 22, 1998 (the "June projections") [15] that Prosser had caused Heying to prepare as part of Prosser's and ICC's application to the RTFC to finance the acquisition of ECM's minority shares.

14  JX 13, 14.
15  JX 38.

The June projections forecasted substantially higher growth than did the March projections. Based on the June projections, as modified by the RFTC, the RFTC concluded in July 1998 that ECM was worth (for loan

approval purposes) approximately $ 28 per share. [16] Recognizing that the Privatization gave Prosser "the opportunity to retain [*26] control at a price below the true market value of the company," [17] the RTFC approved financing that would enable Prosser to offer up to $ 11.40 per share. [18] That suggests, and Prosser later confirmed, that he always planned (and gave himself sufficient elbow room) to increase his initial offer by some amount. [19] Moreover, the $ 60 million RTFC loan represented the amount Prosser had asked for, not the limit of what the RTFC would have allowed him to borrow. [20]

16  JX 167 at RTFC 698, 707, 720. The RTFC made certain downward modifications to the June projections so that its valuation would be on the conservative side. Using a 12% medium risk discount in its DCF analysis, the RTFC valued ECM at $ 27.84 per share. *Id.*

17  JX 167 at RTFC 710; Reed Dep. 113-15.

18  *See* JX 167 at RTFC 710. ("The initial offer price will be $ 9.25. The loan amount includes an additional $ 11.4 million to accommodate a $ 2.15 increase to the initial offer price.")

19  *See* Prosser June 8, 2000 Dep. 270-71 ("I am quite certain that we had requested enough room to go up so that we would have the ability to fund at a higher price obviously than nine and a quarter . . . .").

[*27]

20  Trial Tr. Vol. 10 (Prosser) 1813-14.

Although Prosser made the June projections available to his legal advisor (Cahill), his financial advisor (Prudential), and his lender (the RTFC), the June projections were never provided to the Second Special Committee, Houlihan, or the ECM board. Instead, Prosser directed Heying to send Houlihan the March projections, even though the June projections were available by that point. As a result, the Committee and its advisors believed -- mistakenly -- that the March projections were the most recent projections available. [21]

21  Trial Tr. Vol. 7 (Vondras) 1351-52.

On August 4, 1998, the Committee met with Houlihan to discuss Houlihan's preliminary analysis, which had been furnished to the Committee members in the form of a draft presentation booklet. After explaining in detail his firm's assumptions and methodologies, Houlihan's representative informed the Committee [*28]

that it was not prepared to opine that $ 9.125 was a price that was fair to the minority stockholders. After further discussion, the Second Special Committee agreed that $ 9.125 would not provide adequate compensation to the ECM minority.

Before beginning its negotiations with Prosser, the Committee members discussed different strategies for obtaining the highest possible price for the minority shareholders. The Committee was not ready to reject Prosser's offer outright without at least attempting first to negotiate a higher price. One strategy the Committee discussed was to present Prosser with a "final price" they believed was fair and acceptable. They concluded, however, that the approach best calculated to achieve the highest price was not to demand a specific price from Prosser, but, rather, to negotiate with Prosser for the highest price he would pay for the shares and then determine whether that price represented fair value for the minority stockholders. [22]

> 22    There is evidence that sometime after the August 4th meeting, Houlihan told Goodwin that a one point increase above the original $ 9.125 offer, *i.e.,* an increase to $ 10.125, would enable Houlihan to furnish a fairness opinion. *See* JX 219, at SC 04099 (the so-called "Goodwin Diary"), where in his entry for August 7, Goodwin recites that he told Prosser that Houlihan had concluded that the initial offer was too low, and that "after much back and forth [Prosser] said that he could go up another point *(which was price Houlihan had told me privately would be acceptable.)"* Although Goodwin claimed at trial that Houlihan never told him that [Trial Tr. Vol. 5 (Goodwin) 911], Goodwin did not denigrate any other parts of what he wrote in the Goodwin Diary *(see, e.g., id* at 915-18, 923). The defendants suggest no reason why this particular diary entry should be viewed as inaccurate when the other entries were not.

[*29]   Between August 5 and August 10, 1998, in a series of telephone conversations, [23] Messrs. Goodwin and Prosser negotiated the buyout price for ECM's publicly held shares. During the first conversation, which took place on August 7, Goodwin told Prosser that his initial offer of $ 9.125 was inadequate. According to an entry that Goodwin made in his "diary":

> After much back and forth [Prosser] said that he could go up another point (which was price Houlihan had told me privately would be acceptable). If this failed [Prosser] was considering making a private tender which he calculated would give him around 90% of all the stock. If he could not get it at what he considered a fair price [he] might withdraw his offer and let the stock go to market level. [24]

> 23    Goodwin testified that in negotiating by telephone, rather than traveling to the Virgin Islands, he could much more "maintain the necessary detachment and impassivity" than he could in Prosser's presence. Trial Tr. Vol. 4 (Goodwin) 771.
> 24   JX 219 at SC 04099.

[*30]   Eventually, Prosser told Goodwin that he would consider the matter and call Goodwin back. Shortly thereafter, Prosser raised his offer by one eighth of a point, to $ 9.25 per share. Goodwin reported that offer to the Second Special Committee, which rejected it as inadequate. Goodwin then called Prosser and told Prosser that he would have to improve his offer. In a later negotiation, Prosser raised his offer to $ 10 per share. Again, Goodwin reported that offer to his fellow Committee members and to Houlihan. The Committee rejected that revised offer, and thereafter, Prosser raised his offer to $ 10.125 per share. The Second Special Committee rejected that offer as well.

In response, Prosser raised his offer to $ 10.25 per share, but told Goodwin that $ 10.25 was his final offer. Because the price had been going up in roughly quarter point increments, Goodwin countered by asking for $ 10.50 per share. Prosser rejected that request, pointing out that $ 10.25 was already "straining the limits of [his] financing" for the transaction. [25] At that point, Goodwin made a judgment that the Committee "had reached the limits of how far we could push . . .," [26] and informed the other Committee [*31] members -- Ramphal and Vondras -- of his conclusion. Ramphal and Vondras agreed to stop the negotiations at that point. [27]

> 25    Trial Tr. Vol. 4 (Goodwin) 778; JX 142. The record shows that, in fact, Prosser's financing would have enabled him to increase his offer to $

11.40 per share, and that the implied equity value of ECM was $ 305 million, or $ 28 per share. JX 167 at RFTC 698, 720; Reed Dep. 162-163; Prosser 6/7/00 Dep. 93-96. Goodwin testified that Prosser's representation about the limits of his financing, truthful or not, had no impact except to signal to him (Goodwin) that the negotiations had to end.

26   Trial Tr. Vol. 4 (Goodwin) 779.

27   The plaintiffs contend that the negotiations between Prosser and Goodwin were not arm's length, and that, in fact, the Special Committee's entire process was "bankrupt." To prove that point, the plaintiffs rely heavily upon the fact that Goodwin's regular practice was to send faxes to Special Committee members (or their counsel) through Prosser's secretary, Eling Joseph, and ask her to fax it to the others. Although Goodwin told Ms. Joseph that the Committee materials were confidential, this practice did create the potential of giving Prosser access to almost every document that circulated among the Special Committee, including Houlihan's financial analysis. Goodwin did not deny having routed his communications through Ms. Joseph, and defended that practice on the basis of convenience, not necessity. The defendants respond that there is no evidence that Prosser or his advisors saw these faxes. Prosser testified that Ms. Joseph never disclosed any of those materials to him, including Houlihan's valuation materials. The record discloses, however, that at least on one occasion the confidentiality of the faxed Committee materials was breached. Even if that had not occurred, this practice cannot help but undermine confidence in the integrity of the bargaining process. It is manifest that Goodwin's decision to route those materials through the secretary who shared the same office as Prosser--Goodwin's bargaining adversary--rather than route them through the office of the Committee's counsel, Mr. Schwitter, created a serious risk of compromising the Committee's process and its effectiveness in negotiating the highest available value.

[*32]  Thereafter, Goodwin asked Houlihan if it could furnish a fairness opinion at $ 10.25 per share. Houlihan responded that it could, because that price was within the valuation ranges resulting from its market multiple analysis and its discounted cash flow (DCF) analysis.

The Committee having obtained what they believed was the highest available price, the question then became whether that price was fair. On August 12, 1998, Goodwin and Vondras had a telephonic meeting with Houlihan and Paul Hastings to review Prosser's $ 10.25 offer. Having updated its financial analysis, Houlihan concluded that the revised offer price of $ 10.25 was fair to ECM's public shareholders from a financial point of view. Goodwin and Vondras thereafter voted to recommend that the full ECM board approve the Privatization. 28

28   Ramphal did not attend the Committee's August 12 meeting, even by telephone. Shortly after the meeting, Goodwin contacted Ramphal and gave him a detailed account of what had occurred.

F. ECM's Directors [*33] and Shareholders Approve The Proposed Privatization

A telephonic meeting of the ECM board to consider Prosser's revised offer to buy all of ECM's publicly held stock for $ 10.25 per share, was held on August 13, 1998, the following day. Present at that meeting were Mr. Schwitter and Houlihan representatives. Not attending were Messrs. Prosser (at the request of the Board) and Todman (due to a scheduling conflict). The Board members who had not served on the Special Committee had received copies of Houlihan's fairness analysis before the meeting. 29

29   Because the copies were sent after the Committee had acted on August 12, the non-Committee member directors had less than a day to review the Houlihan materials.

At the meeting, the Special Committee members described the process they had employed. Houlihan then explained its financial analysis and confirmed that in its opinion, the $ 10.25 per share price was fair to the minority stockholders from a financial point of view. After discussion, the board [*34] determined to approve the Privatization, but only if a majority of the shares held by the minority stockholders were tendered in the first-step tender offer. The meeting was then adjourned to August 17, 1998, at which time the board was told that Prosser would agree to this non-waivable minimum

tender condition. The full board, acting upon the unanimous recommendation of the Second Special Committee, then voted to approve the Privatization.

On August 18, 1998, ECM publicly announced the execution of a definitive merger agreement that provided for the Tender Offer and Merger at $ 10.25 per share, and that the Tender Offer was subject to the minimum tender condition. The Tender Offer commenced on August 24, 1998. At the time of the Tender Offer, there were 10,959,131 outstanding ECM shares, of which 5,606,873 shares were owned by Prosser through ICC, and the remaining 5,352,258 were held by the public. As of September 25, 1998, 3,206,844 of those shares (*i.e.,* a majority of the minority shares) had been tendered. On October 19, 1998, a special meeting of ECM shareholders took place, at which the Merger was approved by a vote of 5,760,660 FOR, and 4,466 AGAINST, out of 10,959,131 [*35] shares entitled to vote. The Merger was consummated that same day.

These appraisal and fiduciary duty class actions followed.

## II. THE PARTIES' CONTENTIONS AND THE ISSUES PRESENTED

As earlier noted, the plaintiffs have brought and litigated two separate actions--a statutory appraisal action and a class action asserting claims that the Privatization was not entirely fair to ECM's minority shareholders. In a statutory appraisal action, the Court must determine the "fair value" of the corporation whose stock is being appraised. [30] Plaintiff Greenlight claims that the statutory fair value of ECM at the time of the merger was $ 41.16 per share, plus the value of certain corporate opportunities that Prosser is claimed to have usurped (valued at $ 3.79 per share), for a total fair value of $ 44.95 per share.

  30  *8 Del. C. § 262(a).*

[HN1] In a class action seeking to invalidate a "going private" acquisition of a corporation's minority stock by its majority stockholder, the standard under [*36] which this Court reviews the validity of the transaction and the liability of the fiduciaries charged with breach of duty, is entire fairness. [31] That standard of review has two aspects: fair dealing and fair price. [32] In this case, the plaintiffs claim that the Privatization was the product of unfair dealing that, in turn, resulted in an

unfair transaction price. The transaction (it is claimed) resulted from violations of the defendants' fiduciary duties of loyalty and good faith, for which the defendants are liable and must respond in damages.

  31  *Emerald Partners v. Berlin, 787 A.2d 85 (Del. 2001).*
  32  *Weinberger v. UOP, Inc., 457 A.2d 701 (Del. 1983).*

The plaintiffs' claims, both fiduciary and statutory, and the defenses to those claims, involve a plethora of contentions that are too numerous to catalogue in detail at this point without overburdening an unavoidably lengthy Opinion. The reason, in great part, is that the case was over-litigated and over-briefed, [*37] a state of affairs for which the Court (by allowing the parties to file briefs in excess of the page limit) is responsible. The post-trial briefs and other submissions alone total almost 400 pages, [33] and the trial record, not surprisingly, is correspondingly voluminous. To save the reader from losing the forest in the trees, what follows is a "broad brush" sketch of the parties' contentions. A more detailed picture of those contentions - and the specific issues which flow therefrom - is set forth in the sections of this Opinion that follow.

  33  The opening post-trial brief is 143 pages, the answering brief is 150 pages, and the reply brief is 72 pages.

In the fiduciary duty class action, the basic issues are whether the defendants dealt fairly with the ECM minority and whether the $ 10.25 per share transaction price was fair. Because the plaintiffs' class action damages claim is identical (dollar-wise) to their statutory appraisal claim, the fiduciary "fair price," and statutory "fair value," contentions [*38] converge and are addressed in connection with the statutory appraisal claim. Accordingly, at this point the Court summarizes the "fair dealing" contentions. Thereafter, it summarizes the fair price/fair value claims.

With respect to fair dealing, the threshold procedural issue is which side has the burden of proof. Because the defendants stood on both sides of the transaction, normally the burden would fall upon them. If, however, the defendants can satisfy the Court that the transaction was approved by a fully functioning independent committee of independent directors or by an informed majority of minority stockholders, the burden shifts to the

plaintiff to prove that the transaction was unfair. [34] Here, the plaintiffs contend that the Second Special Committee was neither independent of Prosser nor fully functional, for which reason the burden of proving entire fairness falls upon the defendants. The defendants contend the opposite, and assert that the burden of proof must shift to the plaintiffs.

> 34    *Weinberger v. UOP, Inc., supra, Kahn v. Lynch Communication Sys., Inc.,* 638 A.2d 1110, 1117 (Del. 1994).

[*39] Turning first to the substantive fair dealing issues, the plaintiffs claim that the Privatization was not the result of fair dealing because: (1) the entire ECM board was "unfairly stacked" in favor of *(i.e.,* beholden to) Prosser, (2) the timing of the transaction and Prosser's co-opting of ECM's advisors were unfair, (3) the Special Committee was neither independent nor properly functioning, and (4) the defendants violated, in various respects, their "duty of candor" to the minority shareholders in both the tender offer disclosure document and in the proxy statement issued in connection with the second step merger.

Not surprisingly, the defendants vigorously resist these claims, and contend that in their dealings with ECM's minority stockholders they acted fairly in all respects. The defendants also raise three affirmative defenses: (1) Greenlight lacks standing to assert any claims based on its acquired "litigation rights," and (2) no former stockholders of ECM can recover the value of any shares that they tendered into the tender offer or voted in favor of the merger; and (3) even if the Privatization was not entirely fair, the defendants are exculpated from damages liability [*40] under Article Seventh of ECM's certificate of incorporation.

The parties' briefs are largely devoted to the "fair price" and appraisal issues, which in this case (as noted), are one and the same. Typical in litigation of this kind, the overriding question -- what ECM was intrinsically worth on the merger date -- involves a proverbial "battle of the experts." In this case, the valuation experts were University of Chicago Business School Professor Mark Zmijewski, the plaintiffs' expert who valued ECM at over $ 41 per share; and Daniel Bayston, a consultant at Duff and Phelps and the defendants' primary valuation expert, [35] who valued ECM at $ 10.38 per share.

> 35    The defendants called two additional

valuation experts: Princeton University Professor Burton Malkiel, who testified about issues relating to ECM's market value, and Gilbert Matthews, an investment banker and former managing partner of Bear Stearns & Co., who testified as the defendants' rebuttal witness.

These widely differing valuations of the [*41] same company result from quite different financial assumptions that each sponsoring side exhorts this Court to accept. To evaluate the parties' competing approaches requires the Court to resolve a multitude of DCF-related valuation issues, some of which are factual and others of which are conceptual.

The first set of issues involve which set of management projections is appropriate to use in a discounted cash flow (DCF) valuation of ECM -- the March projections that were furnished to the Special Committee, or the June projections that were created closer in time to the merger date but were furnished only to Prosser, his advisors, and the RTFC, and not the Special Committee or its advisors. Professor Zmijewski used the June projections without modification. Mr. Bayston, on the other hand, used the March projections and modified them in ways that the plaintiffs hotly dispute.

A second set of issues concerns the appropriate discount rate. In this regard, both Prof. Zmijewski and Mr. Bayston determined a discount rate using standard weighted average cost of capital ("WACC") and Capital Asset Pricing Model ("CAPM") formulas. Professor Zmijewski used the WACC formula without any modifications. [*42] Mr. Bayston modified the WACC formulas and inputs, by adding various "small firm" and "weather risk" premiums, substituting new costs of debt, and using a debt-to-value capital structure that (together with Bayston's other modifications) has also generated ardent disputes.

The third and fourth sets of issues center on the questions of what weight should be accorded to ECM's stock market price in determining its fair value; and whether the appraisal (or damages) award should include the value of certain businesses that plaintiffs claim are corporate opportunities of ECM.

The analysis that next follows addresses these fair value and fair price issues. In Part III of this Opinion the Court treats the valuation issues raised by the parties, and

concludes that (1) the $ 10.25 merger price was not fair, and (2) ECM's fair value (and fair price) on the date of the merger was $ 38.05 per share. In Part IV, the Court turns to the fair dealing issues, and concludes that the burden of establishing fair dealing remains with the defendants, who failed to carry that burden. Finally, in Part V, the Court determines what fiduciary duties were violated and which defendants are monetarily liable [*43] as a consequence.

### III. THE FAIR PRICE AND FAIR VALUE OF ECM

Although each side's experts valued ECM using both the comparable company and DCF approaches, in their briefs the parties focus almost exclusively upon DCF valuation issues. This Court views the parties' virtual non-treatment of the comparable company valuation as a tacit concession that that alternative valuation is a "throwaway" of no material significance. Accordingly, this Opinion addresses only the valuation issues presented by the parties' competing DCF approaches. [36]

> 36   The basic flaw in the comparable company approach is that ECM had no true comparables, as Mr. Bayston conceded. Trial Tr. Vol. 3 (Bayston) at 584-585. The DCF methodology, on the other hand, is more appropriate because ECM had available contemporaneous management forecasts, predictable earnings and cash flow.

Both sides agree, and our case law recognizes, that [HN2] a DCF valuation is based upon three inputs: (a) the projections of free cash flow for a specified number of [*44] years, (b) the estimated terminal value of the firm at the end of the "projection period," and (c) the discount rate. [37] Although the parties raise a plethora of DCF-related issues, those disputes center around four pivotal questions: (1) which projections (March or June) provide the more reliable free cash flow input to the DCF model; (2) what is the appropriate discount rate for ECM; (3) how much weight (if any) should the market value of ECM's stock be given in the valuation; and (4) should the value resulting from the DCF method be increased by the value of the businesses that are claimed to be corporate opportunities of ECM? The issues that fall within these four groupings are addressed in this Part of the Opinion.

> 37   *Cede & Co. and Cinerama v. Technicolor, Inc.*, 2003 Del. Ch. LEXIS 146, C.A. No. 7129, 2003 WL 23104613, (Del. Ch. Dec. 31, 2003)

("Cinerama") (citing *Taylor v. American Specialty Retailing Group, Inc.*, 2003 Del. Ch. LEXIS 75, 2003 WL 21753752 at * 3 (Del. Ch. July 25, 2003)).

A. Which Set [*45] Of ECM's Projections - March Or June - Is More Reliable For Purposes Of A DCF Valuation On The Merger Date?

Critical to any DCF valuation are the projected revenues, expenses, reserves, and other charges of the firm being valued. On this threshold issue the parties divide, because at Prosser's direction, Heying prepared two sets of management projections, contemporaneously and in the normal course of business. The first set was prepared on March 25, 1998; the second, on June 22, 1998. Plaintiffs' expert, Prof. Zmijewski, used the June projections to derive his projected cash flow inputs, whereas defendants' expert, Duff & Phelps (Bayston) used the March projections, but modified them in significant respects. The issue is what set of projections is the more reliable for purposes of appraising ECM as of the merger date. For the reasons next discussed, the Court determines that the unmodified June projections are the more appropriate and reliable source of inputs for a DCF valuation of ECM.

*First,* [HN3] as a general proposition (with which defendants' expert, Gilbert Matthews, agreed), "an appraiser should rely on a company's most recent contemporaneous management forecasts unless there [*46] are compelling reasons to the contrary." [38] Here, the facts compellingly point to reliance on the June projections, which, unlike the March projections, incorporated ECM's first quarter of actual results as a stand-alone company. The June projections also incorporated significant post-March events that were not included in the March projections, namely, the acquisition of St. Maarten Cellular, a corporate jet, and a headquarters building. All those events were "facts on the ground" that would have to be considered in any valuation of ECM on the merger date. If only the March projections were used, those facts could not be considered.

> 38   Trial Tr. Vol. 5 (Matthews) 1035.

Prosser conceded that the June projections reflected management's interpretation of the first quarter results in the context of the future performance of ECM, and that they were not unreasonably aggressive. [39] Also telling is

that the June projections were provided to Prosser's legal and financial advisors in the Privatization (Cahill [*47] and Prudential) -- but not to the Second Special Committee or its advisors. At Prosser's direction, those projections were also provided to the RTFC, which used them to value ECM as collateral for the Privatization financing. If contemporaneous reliance upon the June projections by Prosser, his lender and his financial and legal advisors was appropriate, then logic and common sense dictate that reliance on those same projections by Prof. Zmijewski in performing his valuation was no less appropriate.

> 39   Trial Tr. Vol. 10 (Prosser) 1020-1022. This testimony flatly conflicts with the defendants' contention that the St. Maarten Cellular forecast in the June projections was "unreasonably aggressive."

*Second,* the defendants' denigrations of Prof. Zmijewski's reliance on the June projections are unpersuasive. Defendants argue that the June projections are inappropriate for use in an appraisal because they incorporated two projected annual cost savings that (defendants say) are synergistic, *i.e.,* merger-related: [*48] $ 2.5 million in savings from the consolidation of ECM and ICC's operations, and $ 2 million in claimed "going private" savings from the elimination of costs of ECM remaining a public company. Even if those arguments were valid, the proper treatment would be to adjust the June projections for those merger-related cost savings, rather than discard those projections altogether. But more fundamentally, the record shows that (i) the consolidation cost savings were not merger-dependent and (ii) the claimed going private cost savings are not supported by any credible evidence of record.

The cost savings attributed to the consolidation were properly includable in the June projections, because they were contemplated well before the going private merger and could have been achieved without it. Prosser had identified potential consolidation savings before the Privatization occurred. Because Prosser controlled both ECM and ICC, he had the power to accomplish those savings without a business combination, such as by intercompany contractual arrangements. 40 To put it differently, the value achieved by Prosser's existing pre-merger ability to effect those cost savings was an asset of ECM at the [*49] time of the Privatization merger. It therefore was a benefit in which all ECM

stockholders, not just Prosser, were entitled to share. 41 That entitlement cannot be defeated by Prosser's unilateral decision not to achieve those savings except as part of a going private merger that would leave him as the sole owner of the enterprise.

> 40   JX 41 at RTFC 1507; Raynor Dep. 156. Although Prosser claimed at trial that ECM had analyzed and discussed the potential of savings through intercompany agreements and determined that regulatory and union issues precluded it, that testimony is uncorroborated by any document, pre-trial testimony or any other testimony. Heying, who was ECM's Chief Financial Officer, testified that he never discussed the subject of intercompany agreements with Prosser. It is implausible that ECM's CFO and two of its paid litigation consultants (Bayston and Matthews) would be unaware of that analysis if it had actually been performed, or would be unaware of any discussions about that analysis had any such discussions been held.
>
> 41   *Cede & Co. v. Technicolor, Inc.,* 684 A.2d 289 (Del. 1996).

[*50] As for the "going private" savings, the only evidence that those savings are reflected in the June projections is the self-interested testimony of Messrs. Prosser and Heying. No document of record identifies or itemizes those savings. Nowhere are those savings reflected or identified in the June projections or in Joint Exhibit 1, a document Heying prepared during this litigation to summarize the differences between the March and the June projections. Unlike the consolidation savings (which are explicitly identified in a separate line item on both the June projections and the Heying memorandum), there is no separate line item for these alleged savings on either of these documents. That is significant, because at the time he prepared the June projections, Heying prepared a cover memorandum to reflect the most significant changes between the March and the June projections. 42 The purported going private savings -- representing an alleged $ 2 million change -- is conspicuously absent from Heying's memorandum.

> 42   JX 168; Trial Tr. Vol. 8 (Heying) 1537-1539; Heying June 6, 2000 Dep. 183-84.

[*51] The defendants claim that the going private savings include reductions in legal fees and professional fees paid to Deloitte Touche and investment relations

companies, but defendants introduced no evidence of the magnitude of those fees, even though they possessed all the relevant data. The defendants could not even reach a consensus among themselves about the magnitude of those undocumented claimed savings. Heying testified at various times that it could be $ 2.2 to $ 2.5 million, or $ 2 million, or $ 1.8 to $ 2.2 million. [43] Bayston (whose source was Heying) testified that the savings were $ 2 to $ 2.5 million annually. [44] Matthews' report quantified those alleged savings exactly at $ 1,644,000 for 1999--a figure for which Matthews was unable to identify any source during his trial testimony. [45]

> 43   Heying June 6, 2000 Dep. 196-97; Trial Tr. Vol. 8 (Heying) 1473-74, 1541.
> 44   Tr. Vol. 3 (Bayston) 536-537.
> 45   Trial Tr. Vol. 6 (Matthews) 1211-14; JX 301, Ex. E.

[HN4] It stands to reason [*52] that when a public company goes private, cost savings in some amount will often be achieved. But, in an appraisal proceeding, each party must bear the burden of establishing its own position. [46] It was the defendants' burden to establish both the existence and the amount of any cost savings from going private. In this case, the defendants nowhere documented the existence, or the amount, of such cost savings, and the testimony of their witnesses on that subject is hopelessly inconsistent. In these circumstances, the defendants have not carried their burden of persuading the Court that the June projections included a significant cost savings of $ 2.5 million attributable to eliminating ECM as a public company. Accordingly, those savings are not a valid basis for the defendants to disregard, or to denigrate an appraiser's reliance upon, the June projections for purposes of performing a DCF valuation of ECM.

> 46   *M.G. Bancorporation, Inc. v. LeBeau*, 737 A.2d 513, 520 (Del. 1999).

*Third,* [*53] the March projections are inappropriate for the additional reason that the defendants' expert, Mr. Bayston, initially relied on those projections, but then modified them by making large adjustments to critical inputs. The effect of those inputs was to depress the cash flows that management had contemporaneously projected. The defendants argue that Bayston's adjustments must also be made to the June projections if this Court finds those projections to be the appropriate starting point in a DCF valuation. The Court

disagrees. It concludes that the June projections, without any modifications, are the most reliable source of inputs to project ECM's future net cash flows.

This Court has consistently expressed a preference for the most recently prepared management projections available as of the merger date. The Court has also been skeptical of *ex post* adjustments to such projections. As Chancellor Chandler observed in *Cede & Co. v. JRC Acquisition Corp.*:

> [HN5] This Court prefers valuations based on management projections available as of the date of the merger and holds a healthy skepticism for post-merger adjustments to management projections or the creation of new projections [*54] entirely. [47]

The Chancellor echoed that observation in his most recent appraisal opinion in *Cinerama*:

> Contemporary pre-merger management projections are particularly useful in the appraisal context because management projections, by definition, are not tainted by post-merger hindsight and are usually created by an impartial body. In stark contrast, *post hoc* litigation-driven forecasts have an "untenably high" probability of containing "hindsight bias and other cognitive distortions." [48]
>
> * * * *
>
> When management projections are made in the ordinary course of business, they are generally deemed reliable. Experts who then vary from management forecasts should proffer legitimate reasons for such variance. [49]

> 47   *Cede & Co. v. JRC Acquisition Corp.*, 2004 Del. Ch. LEXIS 12, No. 18648, 2004 WL 286963, at * 2 (Del. Ch. Feb. 10, 2004).
> 48   *Cinerama*, at * 7 (quoting *Agranoff v. Miller*, 791 A.2d 880, 892 (Del. Ch. 2001)).
> 49   *Id.*, (internal citation omitted) (citing *Gray v. Cytokine Pharmasciences, Inc.*, 2002 Del. Ch. LEXIS 48, 2002 WL 853549, at * 8 (Del. Ch. Apr.

*25, 2002*)) (rejecting valuation because it inexplicably ignored and altered management forecasts in favor of litigation-driven projections) and *Kleinwort Benson Ltd. v. Silgan Corp.*, *1995 Del. Ch. LEXIS 75, 1995 WL 376911, at * 5 (Del. Ch. June 15, 1995)* (observing that variations from management projections merit "close inspection" and may impeach the credibility of an expert witness). In the *Cinerama* opinion, the Chancellor concluded that the respondent company's expert's "repeated discarding or modification of contemporaneous . . . management forecasts . . . cast serious doubt upon the integrity and reliability of his expert report" (*Cinerama, supra at 6*), and that "management was in the best position to project the short-term prospects of the company, as they created projections *ex ante*, based upon information gleaned from their particular customers." *Id. at 8*.

[*55] The question presented here is whether the defendants have offered "legitimate reasons" for Bayston's modifications to the March projections. The Court concludes that they have not.

The primary modification [50] that Bayston made to the March (and, by inference, the June) projections was to increase projected capital expenditures (CapEx). Both the March and the June projections forecasted CapEx of approximately $ 9 million annually throughout the projection period. Prosser explained that these forecasted capital expenditures were lower than historical levels and were reasonable over the short term, because Vitelco had recently replaced and rebuilt its equipment, thereby reducing the need for short term capital expenditures. [51] Heying [52] and Matthews [53] agreed that the forecasted CapEx were management's best contemporaneous estimates.

> 50    Bayston's other modifications were to eliminate the "consolidation savings" and $ 2.5 million of "going private savings" from the projected revenues. For the reasons already discussed, those modifications have been rejected.
> 51    Trial Tr. Vol. 10 (Prosser) 1742-43.

[*56]

> 52    Trial Tr. Vol. 2 (Bayston) 326 (confirming that Heying told him that management's June CapEx forecasts were their best contemporaneous estimates).

> 53    Tr. Vol. 5 (Matthews) 1057-60 (no reason to change management CapEx forecast for 1998 through 2002).

Nonetheless, in his cash flow projection Bayston unilaterally increased forecasted CapEx by $ 3.7 million to $ 5.7 million per year, because (he claimed) managements "typically" underestimate capital expenditures. Bayston could not cite any scholarly research confirming that view. Nor could he quantify the average amount of any such underestimations, and he never performed an analysis of whether ECM's management had regularly underestimated CapEx. [54] Bayston's CapEx adjustment decreased free cash flow for each of the forecast years by the amount of the adjusted increase, and for the terminal year decreased cash flow by almost 20 percent. The result was a *negative growth* in free cash flow for years 2005 to 2007, resulting in a consequential decrease in Bayston's overall valuation. [55]

> 54    Trial Tr. Vol. 3 (Bayston) 569-72.

[*57]

> 55    *Id.*, Vol. 2 (Bayston) 330-332; Trial Tr. Vol. 1 (Zmijewski) 162-63.

That adjustment amounts essentially to Bayston substituting his personal judgment of what CapEx should be for the non-litigation business judgment of ECM's management. Bayston's judgment rests solely upon his opinion that "managements" in general underestimate CapEx. The defendants have nowhere demonstrated that that view is generally accepted within the financial valuation community or that *this* management habitually underestimated CapEx for ECM. Bayston's valuation approach evokes a reaction akin to that expressed by the Chancellor in *Cinerama*. There, the petitioner's expert had rejected a management forecast on unsubstantiated grounds, and the Court observed: "[The expert's] attempts to arrive at more 'realistic' results with a hindsight valuation that . . . completely ignores the closest insiders' projections, and results in a strikingly [low] number. This is simply inexcusable." [56]

> 56    *Cinerama*, at * 26. Nor is there merit to the defendants' criticism (articulated through Mr. Matthews) that in Prof. Zmijewski's terminal year (2002), depreciation exceeds CapEx, a state of affairs that cannot go on forever. Trial Tr. Vol. 5 (Matthews) 999-1001; Vol. 6 (Matthews) 1236-37. The flaw in this criticism is that Zmijewski projected cash flows only; he did not

forecast the individual components of free cash flow, including CapEx or depreciation. Accordingly, there is no basis to conclude that Prof. Zmijewski forecasts perpetual divergent depreciation and CapEx. Trial Tr., Vol. 1 (Zmijewski) 120-123.

[*58] For these reasons, the Court accepts Prof. Zmijewski's adoption of the June projections, and rejects Mr. Bayston's adoption of (and his modifications to) the March projections, as the basis for the cash flow inputs to the DCF valuation of ECM.

B. What Is The Appropriate Discount Rate?

The second major group of issues concerns the appropriate rate for discounting the projected free cash flows. Both Prof. Zmijewski and Mr. Bayston determined their discount rate(s) using the Weighted Average Cost of Capital ("WACC") and the Capital Asset Pricing Model ("CAPM") formulas. Professor Zmijewski used the WACC formula, without adjustment, to calculate a discount rate of 8.8% during the 1998-2002 period when ECM's tax abatement would be in effect, and 8.5% thereafter, assuming that ECM's tax abatement would not be renewed. Mr. Bayston also used the WACC model, but modified the formula and the inputs to that formula by adding various premiums, substituting new debt costs, and using a different debt-to-equity weighting, to arrive at a discount rate of 11.5%.

To understand the significance of the disputes that arise under this heading, it is useful to explain how the discount rate is determined [*59] under the WACC model. [HN6] Under WACC, the discount rate is calculated based upon the subject company's cost of capital. WACC is the sum of: (1) the percentage of the company's capital structure that is financed with equity, multiplied by the company's cost of equity capital, plus (2) the percentage of the company's capital structure that is financed with debt, multiplied by its after-tax cost of debt. [57]

57   See Cinerama, supra, at * 40; JX 352, p. 11. In formulaic terms, WACC has been expressed thusly (JX 298, at F-1):

WACC = (Leveraged Cost of Equity x Equity % of Capital) + (Cost of Long Term Debt x (1-tax rate) x Debt % of Capital).

[HN7] One element of the WACC formula -- the "cost of equity capital" -- is determined by the CAPM model. Under CAPM, the cost of equity capital is the risk-free rate of return plus the subject company's risk. The subject company's risk is determined by multiplying the equity risk premium for the market by the company's beta. "Beta" is the measure of a given company's [*60] nondiversifiable risk relative to the market, specifically, the tendency of the returns on a company's security to correlate with swings in the broad market. A beta of 1, for example, means that the security's price will rise and fall with the market; a beta greater than 1 signifies that the security's price will be more volatile than the market; and a beta less than 1 indicates that it will be less volatile than the market. [58]

58   Cinerama, supra, at 41 and n. 315.

The approximately 3% discrepancy between the two experts' discount rates (8.8% / 8.5% for Zmijewski vs. 11.5% for Bayston) is attributable primarily to their different determinations of the (1) cost of debt, (2) capital structure, and (3) cost of equity. The issues generated by each of these input differences are now discussed.

1. Cost of Debt

Professor Zmijewski calculated the weighted average cost of long term debt for ECM at 6.3%, which was ECM's actual observed cost of debt. He used that figure because of ECM's historical [*61] ability to borrow from the RTFC at below-market rates. Mr. Bayston, on the other hand, determined that ECM's weighted average cost of debt on the merger date was 6.59%, but he assigned ECM a cost of long term debt of 8%. Bayston's judgment was that ECM would not be able to borrow indefinitely from the RTFC at below-market rates and, therefore, ECM would have to borrow from another lender at rates closer to 8%. [59] The issue is which of these two long-term debt cost figures is more reasonable. The evidence of record persuades this Court that the more reasonable long-term debt cost assumption is 6.3%. [60]

59   Trial Tr. Vol. 2 (Bayston) 286.

60   The reason for the discrepancy between the two experts' calculation of ECM's actual weighted cost of debt appears to be that Zmijewski's 6.3% cost figure was as of October 10, 1998 (JX 352 at 22), whereas Bayston's calculation was as of September 30, 1998 (JX 298 at J-1). Because Zmijewski's figure represented ECM's long term

debt cost as of a time closer to the merger date than Bayston's, the Court adopts 6.3% as the relevant actual cost of long term debt for ECM.

[*62] The defendants admit that there is nothing of record which shows that on the merger date, ECM would not have been able to borrow from the RTFC at the weighted average cost of its existing debt. [61] As of the merger date, ECM had never borrowed at a rate even as high as 8%. Lending at below-market rates was the RTFC's mission, and as of the merger date management expected it could continue to borrow from the RTFC at favorable interest rates. [62] Management never told Mr. Bayston anything to the contrary, [63] and the defendants have cited nothing of record that supports Bayston's contrary assumption.

    61  Def's Consol. Post-Trial Br. at 110.
    62    See Reed Dep. 29-30; Trial Tr. Vol. 10 (Prosser) 1791; JX 209 at G331-32.
    63  Trial Tr. Vol. 3 (Bayston) 502.

For these reasons, the Court accepts Prof. Zmijewski's 6.3% cost of debt input, and rejects Mr. Bayston's 8% cost-of-debt assumption, the effect of which was to increase Bayston's calculated WACC from 10.9% to 11.16%. [64]

    64  Ex. H to Pls.' Op. Post-Trial Br.

[*63] 2. ECM's Debt/Equity Capital Structure

Another important element of the WACC formula is the percentage of the capital structure represented by equity and by long term debt. This factor has proved to be problematic for both sides, and for the Court as well.

At first glance the difference between the experts on this variable appears trivial. Professor Zmijewski arrived at a 28.2% debt-to-enterprise value capital structure, whereas the debt-to-value capital structure used by Mr. Bayston was 30%. Mr. Bayston's 30% figure, however, was a "target," rather than the actual, percentage of ECM's debt to its total enterprise value as of the merger date. It is undisputed that on September 30, 1998 (shortly before the merger date), ECM's actual long term debt was $ 190.4 million. What is disputed is ECM's total enterprise value. Bayston calculated enterprise value by (i) multiplying ECM's total outstanding shares (10,959,131) by the merger price ($ 10.38 per share), thus deriving a value of $ 113.7 million represented by

"equity," and then (ii) adding to that value the $ 190.4 million of long term debt, to arrive at a total enterprise value of $ 304.1 million. On that basis, Bayston calculated [*64] ECM's actual debt-to-value ratio at approximately 63%.

Bayston did not use the actual 63% debt-to-value ratio, however, because in his judgment ECM could not viably sustain such a highly-leveraged capital structure over the long term. Accordingly, Bayston used a 30% "target" figure, which assumed that management would reduce the debt level from 63% to 30%. [65]

    65  Trial. Tr. Vol. 3 (Bayston) 499-500.

Professor Zmijewski, unlike Mr. Bayston, based his 28.2% debt-to-value capital structure upon ECM's actual debt level, as opposed to a "target" debt level. But, to arrive at his 28.2% figure, Prof. Zmijewski assumed an enterprise value of $ 41.16 per share, [66] which also was the ultimate fair value that he had determined for ECM.

    66  Professor Zmijewski's original debt-to-value ratio was 27.2%, based upon a value of $ 42.94 per share. JX 234 at 46. He later adjusted the ratio to 28.2%, based upon a fair value of $ 41.16. JX 235 at Ex. S-1.

[*65] The finance literature supports elements, but not the entirety, of each side's approach. One treatise instructs that [HN8] "the appropriate weights to use [to define the firm's capital structure in calculating the WACC] . . . are the firm's *long run target weights stated in terms of market value.*" [67] Moreover:

> One simple and popular procedure for estimating the target weights is to assume that they equal the company's current market value weights. Unfortunately, this assumption involves a circularity. In most cases, a company is being appraised because the market value of its securities is unknown, and, therefore, cannot be used to calculate the weights . . . . The circularity can be overcome in the case of debt and preferred stock by directly establishing the value of these securities . . . . However, common stock is still a problem. The estimated value of the equity depends on the WACC, which, in turn, depends on the value of the equity.

In light of the circularity, an iterative procedure must be employed to solve simultaneously for the value of the equity and for the WACC. The iterative process begins with the selection of an initial estimate for the market value [*66] of the equity; the book value of the equity is a reasonable choice. Based on this initial estimate, the WACC is calculated . . . Subtracting the value of the debt and preferred stock produces a revised estimate of the equity and a revised equity weight. This revised estimate is then used to calculate a new initial estimate of the equity weight. [68]

67    Bradford Cornell, *CORPORATE VALUATION Tools for Effective Appraisal and Decision Making,* 224 (McGraw-Hill 1993) (italics in original) (hereinafter "Cornell").
68   Cornell, *supra* at 225.

The quoted excerpt does not support the entirety of either side's approach, however. Rather, the quoted treatise appears to support (in some circumstances) Bayston's use of a "target" long term debt weight, but it also supports Zmijewski's employment of an iterative process to solve the circularity problem inherent in the WACC formula. [69] Even so, this Court must decide which (if any) of the two competing enterprise values it should accept in determining [*67] the percentage of the capital structure represented by debt and the percentage represented by equity.

69   Trial Tr. Vol. 1 (Zmijewski) at 164-165; Zmijewski Dep. at 128-130.

The difficulty is both that Mr. Bayston's assumed $ 10.38 per share "enterprise value" and Prof. Zmijewski's assumed $ 41.16 per share "enterprise value" are identical to the ultimate "fair value" that each expert determined for ECM. Those values exemplify the ultimate circularity inherent in WACC. In this case that circularity is of particular concern, because each expert's ultimate valuation is hotly disputed. Additionally, Mr. Bayston's 30% debt-to-value "target" figure assumes that management would pay down approximately 50% of ECM's debt at some indeterminate future time. That assumption finds no support in the record. For these

reasons, the Court is unable to adopt the "enterprise value" assumed by either expert with any degree of confidence. Yet, the Court must still arrive independently at an enterprise value, and neither side [*68] has suggested a neutral or middle ground in their briefs.

Because the purpose of this calculation is to determine WACC based upon a reliable "value of the equity," the only sensible way (in the Court's view) to avoid the circularity in this case is to use an enterprise valuation of ECM that is not litigation-driven. On this record, the only such valuation is the $ 27.84 per share value, based on a 12% discount rate, that the RTFC determined and actually used for purposes of financing the Privatization. [70] Having no better or more reliable information, the Court adopts that value for purposes of determining the percentage of ECM's capital structure represented by long term debt and by equity on the merger date.

70    JX 167 at RTFC 698, 700, 707, 720. Prudential's estimate that ATNI could be sold for $ 25-30 per share in the Split Off, was for a company that included (but was larger than) ECM. Efforts to sell ATNI at that price were unavailing, because no purchaser was interested in acquiring ATNI in its entirety.

[*69] As for the percentage represented by long term debt, the only data credibly anchored to the record is the RTFC determination of ECM (ATN)'s net-debt-to-value ratio at 38.8%. Because that ratio was conservatively determined and was calculated as of July 29, 1998, three months before the merger, [71] the actual debt-to-value percentage as of the merger date is unknown and can only be estimated. The Court concludes that a debt-to-value ratio of 38% would have been a reasonable estimate and input for purposes of determining a discount rate as of the merger date. From that conclusion it also follows that the percentage of ECM's capital structure represented by equity would have been 62% (*i.e.,* 100%-38%).

71   *Id.*

### 3. Cost of Equity

Both Prof. Zmijewski and Mr. Bayston used the CAPM formula to calculate ECM's cost of equity. Using that standard approach, Zmijewski derived a cost of equity of 10.4% (for the years when the tax abatement

would be in effect), and 10.3% (when the current tax abatement [*70] expires). Bayston's initial cost of equity was somewhat lower -- 9.9% -- but Bayston then increased it to 14% by adding "premiums" totaling 4.1%. 72 More specifically, Bayston added a "small stock premium" of 1.7% and a "company-specific premium" of 2.4%, the latter consisting of a 1 to 1.5% "super-small stock premium" and a .9 to 1.4% hurricane risk premium." 73 Those "premiums" account for most of the difference between these two experts' cost of equity inputs. Accordingly, the issue becomes whether either of these premiums is appropriate in these circumstances. [HN9] The party seeking to add the premium (here, the defendants) has the burden to establish that they are appropriate. 74

72   JX 298 at Ex. F-2; JX 352 at 31.

73   Trial Tr. Vol. 2 (Bayston) 261, 168; Def. Consol. Post-Trial. Br. 87.

74   *ONTI, Inc. v. Integra Bank, 751 A.2d 904, 920 (Del. Ch. 1999).*

(a) *The 1.7% "Small Firm/Small Stock" Premium*

Although plaintiffs contend that there is no basis in the [*71] finance literature or theory for adding a "small firm/small stock" premium to the cost of equity, that is not entirely accurate. There is finance literature supporting the position that stocks of smaller companies are riskier than securities of large ones and, therefore, command a higher expected rate of return in the market. 75 Our case law also recognizes the propriety of a small firm/small stock premium in appropriate circumstances. 76 The issue, therefore, is not whether a small firm/small stock premium is permissible theoretically, but whether the defendants have shown that a premium of 1.7% is appropriate in this particular case. The Court concludes that the defendants have made that showing.

75   *See* treatises cited in *Onti, supra, 751 A.2d 920* at n. 71; *see also,* Jay Fishman, et. al, *Guide to Business Valuation,* Vol. 1 at 502.15 (Practitioners Publishing Co., 13th ed., 2003).

76   *ONTI, supra, Cede & Co. v. JRC Acquisition, C.A. No. 18648, 2004 WL 286963, at * 8 (Del. Ch., Feb. 10, 2004).*

[*72] Mr. Bayston computed a 1.7% small premium by a two step process. First, he determined qualitatively that such a premium was warranted by the size and business of ECM. Second, after reviewing data

from the Ibbotson Associates publication, *Stocks, Bonds, Bills and Inflation 1998 Yearbook* ("Ibbotson"), Bayston quantified that premium by subtracting the 11% geometric mean return for large company stocks from the 12.7% mean return for small company stocks. 77

77   JX 315; Trial Tr. Vol. 2 (Bayston) 263-264.

Plaintiffs do not attack the amount of the premium. Rather, they argue that no small stock/small company premium should have been added at all. They contend that Bayston mechanically and non-qualitatively applied a premium solely because of ECM's size, even though ECM did not fit the typical profile of a "small company." Moreover, plaintiffs argue, recent research data show that contrary to the empirical assumption that implicitly underlies the small stock/small firm premium, small firms have [*73] in fact under performed large firms.

The answer to the plaintiffs' second argument is that although large-cap companies may have outperformed small-cap companies for discrete, short periods of time, over the last 10 (indeed, the last 75) years, the mean returns for small companies have exceeded the returns for large-cap companies. 78 The short answer to the plaintiffs' first argument is that although the favorable characteristics of ECM 79 are reasons not to apply the second ("supersmall firm") premium that Bayston layered atop the 1.7% small stock/small company premium, those characteristics do not justify ignoring the incremental risk, not fully captured by beta, that typically accompanies a small sized firm.

78   Trial Tr. Vol. 2 (Bayston) 395; JX 315.

79   Plaintiffs point out that ECM's returns are not volatile, because its principal subsidiary is well-established, lacks competition, has protection against unforeseen events through regulatory relief, and has access to low-cost capital through the RTFC.

[*74] Accordingly, the Court accepts the 1.7% small stock/small firm premium that Mr. Bayston added to his 9.9% cost of equity, and arrives at a total cost of equity for ECM of 11.6%.

(b) *The 2.4% "Supersmall Firm" And "Hurricane Risk "Premium*

Far more controversial, and less grounded in finance theory and legal precedent, is the additional 2.4%

premium added by Bayston to account for what he determined was the incremental risk of ECM being both a "supersmall" firm and also subject to unusually hazardous weather risk, specifically, hurricanes.

Bayston's justification for adding an incremental premium of 1%-1.5% to ECM due to its "supersmall" size occupies less than one page of defendants' 150 page brief. That justification boils down to an assertion that the 1.7% small firm premium reflected only Ibbotson's average premium for small firms, but that Ibbotson contains "more particularized data which permits an assessment of the appropriate premium for a company, such as [ECM] 'which is much smaller . . . than the average companies within the Ibbotson data.'" [80] Other than to assert that that additional adjustment of the discount rate "reflects the reality of investment returns [*75] in such micro-cap companies" [81] the defendants offer no analysis, discussion of specific data, reference to any finance text, or other rationale for their "supersmall" firm premium.

> 80   Def's Answering Post-Trial Br. at 87 (citing Trial Tr. Vol. 2 (Bayston) at 271).
> 81   *Id.*

Defendants' support for an incremental premium that if accepted would further increase ECM's cost of capital, falls woefully short of the showing that is required. The defendants offer nothing to persuade the Court that ECM's risk profile fits what they contend is the "reality" of investment returns for micro-cap companies. ECM may be small, but it is also a utility that was unusually protected from the hazards of the marketplace. ECM was well established, it had no competition, it was able to borrow at below-market rates, and it was cushioned by regulators from extraordinary hazards (for example, by tax abatements). Implicit in the defendants' position, but nowhere straightforwardly argued, is the assumption that these [*76] advantages, however extraordinary, were not enough to offset the added risk created by ECM's "supersmall" size. It is the defendant's burden to support that assumption, and they have not done that.

By adding a second incremental premium to ECM's cost of equity to account for the risk of size, Bayston appears to have performed a mechanical exercise, rather than make a nuanced, textured judgment. Accordingly, the Court determines that the defendants have not established a credible justification for their incremental

"supersmall" firm premium, and declines to add that premium to the cost-of-equity.

Apart from the "supersmall firm" premium, Bayston also added a company-specific incremental premium for hurricane risk. The effect was to increase the cost of equity by 1-1.5%, to increase the discount rate by a range of .7% to 1.05%, and to decrease enterprise value by $ 18 to $ 24 million (*i.e.*, by $ 1.64 to $ 2.19 per share). Bayston's justification for this incremental premium was that (1) as a result of Hurricane Hugo in 1989 and Hurricane Marilyn in 1995, Vitelco (ATN) suffered losses, not reimbursed by insurance or Universal Service Fund revenues, of approximately $ 80 million; [*77] and (2) ECM's management believed that hurricanes would pose a significant risk to ECM's business in the future, in that future storm losses would not be reimbursable by insurance because (management was informed) coverage would no longer be available.

This analysis is faulty on factual and conceptual grounds. First, it overstates the amount of unreimbursed hurricane damage. That amount, Mr. Heying testified, totaled about $ 55 million for the entire 70 years preceding the merger. [82] Second, defendants' claim that management knew as of the merger date that its hurricane insurance would not continue, relies entirely on Prosser's trial testimony, [83] which is not corroborated by any contemporaneous document and is inconsistent with ECM's SEC filings and RTFC loan documents, none of which indicate any impending loss of hurricane loss coverage. [84] Third, assuming that the risk of future storm losses should be accounted for in some way, the defendants have not supported their argument that the appropriate way to do that is by increasing the cost of equity. Defendants cite no finance literature supporting that approach, nor have they supported their argument empirically, such as by (for [*78] example) comparing ECM's company-specific weather-related risk (net of mitigation factors) to the "average" or "mean" weather-related risk for all companies, or even for all "small" companies.

> 82   Trial Tr. Vol. 8 (Heying) at 1513.
> 83   *Id.,* Vol. 10 (Prosser) at 1758-59; Defs' Consol. Post-Trial Br. at 93.
> 84   *See* JX 155 at SC4189 (1997 10K); JX 165 at RTFC 2426 (covenanting to maintain storm insurance for two years).

The absence of theoretical and evidentiary support

leaves this Court unpersuaded that the risk of unrecoverable hurricane damage loss is so embedded in ECM's business as to require a structural increase in ECM's cost of equity. Absent theoretical and empirical guidance, a more rational approach would be to factor that risk into ECM's cash flow projections such as (for example) by dividing the net hurricane-related loss by a statistically representative number of years to arrive at a loss deduction from projected cash flow for each forecast year. Unfortunately, [*79] neither side performed such a calculation.

The only rational approach that is supported by the record is the plaintiffs' proposal that if the Court finds that the weather-related risk was not appropriately accounted for in Zmijewski's cash flow projections, the Court should reduce Zmijewski's enterprise value calculation by the dollar amount of the estimated effect of the hurricane risk, *i.e.,* by $ 18 to $ 24 million. That suggested approach supplies the frame of reference for the analysis that follows.

The plaintiffs' proposed approach to the weather risk issue raises two questions. The first is whether that risk has already been fully accounted for in Prof. Zmijewski's cash flow projections; if not, the second issue becomes what should be the amount of the resulting deduction from enterprise value. The record shows that the projections were based on historical results, and that they included the insurance premiums. [85] Because (as defense expert Gilbert Matthews conceded) it would not be appropriate to include the cost of insurance coverage in a forecast without taking into the account the benefit of the protection provided by that insurance, [86] the only loss that should be [*80] accounted for is the hurricane-related loss that was not reimbursed by insurance. Although the plaintiffs argue that that loss was implicitly included in Prof. Zmijewski's forecast, the Court has found no evidence to support that assertion. The Court is, therefore, unable to conclude that Professor Zmijewski factored those unreimbursed losses into his cash flow forecast.

85  Trial Tr. Vol. 8 (Heying) at 1460-62.

86  *Id.,* Vol. 6 (Matthews) at 1073.

Accordingly, it is appropriate (as plaintiffs concede) to deduct the dollar value effect of those losses from enterprise value. The question becomes: what amount should be deducted? The possibilities range from $ 18 to $ 24 million. Because the defendants overstated the

magnitude of the unreimbursed losses caused by hurricane damage, the Court finds that an appropriately conservative deduction would be at the low end of the range, *i.e.,* $ 18 million or $ 1.64 per share.

To summarize, the Court determines that the correct cost of equity for [*81] ECM at the merger date was 11.6% (Bayston's initial 9.9% plus a 1.7% small firm/small stock premium). That cost of equity figure does not include a premium for hurricane damage risk. That risk shall be accounted for by deducting $ 18 million ($ 1.64 per share) from the enterprise value calculated (independent of that risk) with the DCF inputs as determined in this Opinion. The result will be to reduce the enterprise value by that $ 18 million ($ 1.64 per share) amount.

* * * *

For the reasons previously discussed, the Court cannot accept in its entirety the DCF valuation of either side's expert. Although the Court accepts the plaintiffs' position that the projected cash flows and terminal value should be derived from the June projections, it has determined independently the disputed elements of the WACC and CAPM formulas from which the discount rate is computed. Based upon the Court's findings, the appropriate discount rate is determined to be 8.69%, and the fair value of ECM as of the merger date is determined to be $ 38.05 per share. [87]

87    The $ 38.05 fair value represents the difference between the value of $ 39.69 per share and the $ 1.64 per share hurricane loss adjustment. The $ 39.69 per share value, as well as the 8.69% discount rate, were computed by all counsel at the request of the Court. (*See* letter dated March 17, 2004 from the Court to all counsel.) In its letter the Court asked counsel to compute the discount rate and the resulting fair value, based upon the DCF inputs determined in this Opinion. On April 2, 2004, Mr. Allingham responded to the Court on behalf of all counsel, setting forth the manner in which the $ 39.69 per share value was arrived at. (Letter dated Apr. 2, 2004 from Thomas J. Allingham, II, Esquire, to the Court). In that letter, counsel identified one additional variable that the Court would be required to determine: ECM's assumed growth rate. As disclosed in counsel's April 2, 2004 letter, the parties' different growth rate assumptions

yielded a matrix of values ranging from $ 39.69 to $ 40.88 per share. Deciding to err on the side of conservatism, the Court selected the lowest value within that range -- $ 39.69 per share -- from which $ 1.64 per share was deducted to arrive at the ultimate adjudicated fair value for ECM of $ 38.05 per share.

 [*82]  C. What Weight Should Be Accorded To ECM's Market Price As Evidence Of Fair Value?

To support their claim that the fair value of ECM on the merger date was no more than $ 10.38 per share, the defendants urge that "where, as here, the market for a publicly traded security is an active and efficient one, the market price [of ECM's common stock] is, at the least, important corroborative evidence of value . . ." [88] For that argument, the defendants rely upon the expert testimony of Professor Burton Malkiel of Princeton University. Professor Malkiel opined that ECM's stock "was trade[d] in an efficient market with enough volume and a low enough bid-asked spread, and that it reflected news without delay; and these . . . indicators led [Prof. Malkiel] to conclude that ECM was traded in an efficient market and that the [$ 7.00 per share] market price of ECM common stock prior to the buyout . . . was a reasonable reflection of its value." [89] Intending no disrespect to Professor Malkiel, the Court is unable to accept his conclusion in this specific case. However sound Professor Malkiel's market price-based theory may be in other circumstances, that theory is inapplicable to these [*83] facts because its premise is not supported by either the trial record or Delaware law.

88   Defs. Consol. Ans. Post-Trial Br. at 105.
89   Trial Tr. Vol. 9 (Malkiel) at 1597-1598.

[HN10] Delaware law recognizes that, although market price should be considered in an appraisal, the market price of shares is not always indicative of fair value. [90] Our appraisal cases so confirm. [91]

90   *Cede & Co. v. Technicolor, Inc., 684 A.2d 289, 301 (Del. 1996)* (the "market price of shares may not be representative of true value.").
91   *See, e.g., Harris v. Rapid-American Corp.,* C.A. No. 6462, 1992 WL 69614, at * 1, * 4. (Del. Ch. Apr. 6, 1992) ($ 28 merger price, representing a 28% premium over unaffected trading price, was barely one-third of adjudicated fair value of $ 73.29); *In re Shell Oil Co., 1990 Del. Ch. LEXIS*

*199, C.A. No. 8080, 1990 WL 201390, at * 14-15, * 38 (Del. Ch. Dec. 11, 1990),* aff'd, *607 A.2d 1213 (Del. 1992)* (market price $ 44, adjudicated fair value $ 71.20).

 [*84]  Moreover, the record undermines any assertion that ECM's common stock was traded in an efficient market. Indeed, it was precisely because ECM's stock market price did not reflect ECM's underlying values that Prosser decided to abandon the proposed merger and instead acquire the ECM minority interest in the Privatization. Prosser himself told his fellow ECM directors that the ECM stock price had failed to reach the desired appreciation as a result of the small public float and the fact that the stock was not being followed by Wall Street analysts. [92] Moreover, because Prosser always owned the majority interest, the market price of ECM stock always reflected a minority discount. [93]

92   *See* note 7, *supra.*
93   Trial Tr. Vol. 1 (Zmijewski) at 95-96; Finger Dep. (Jan. 11, 2000) at 143-144.

Professor Malkiel admitted that markets occasionally make errors, that the market could have been wrong about ECM, and that it is possible for a stock that trades even in an efficient market to be mispriced, [*85] especially in the short run. [94] Professor Malkiel also conceded that the market may be inefficient if material information is withheld from it. [95] In the case of ECM, while the stock was trading freely, *(i.e.,* before Prosser announced the Privatization), the market never had the benefit of any disclosed earnings or projections of future results, including the June Projections. [96]

94   Trial Tr. Vol. 9 (Malkiel) at 1651-52, 1665-66, 1676-79. In this case, ECM stock traded publicly for only five months.
95   *Id.* at 1633.
96   Trial Tr. Vol. 1 (Zmijewski) at 93-94, 158-159.

For these reasons, the Court rejects the defendants' argument that the market price of ECM stock corroborates the $ 10.25 price as the fair or intrinsic value of ECM on the date of the merger. In this case, ECM's unaffected stock market price merits little or no weight.

D. The Corporate Opportunity Claims

The plaintiffs contend that to the value of ECM as

determined by the DCF method, there should be [*86] added an additional $ 3.79 per share, representing the combined value of the Caribbean Cable Companies [97] and the Daily News. Those companies, which ICC (wholly owned by Prosser) acquired on December 30, 1997, are claimed to have been corporate opportunities of ECM that Prosser wrongfully usurped. The plaintiffs urge that Prosser had a fiduciary duty to make those opportunities available to ECM, and that consequently, ECM's minority shareholders were entitled to share in the value of those opportunities on the merger date.

> [97] The Caribbean Cable Companies were BVI Cable TV, St. Croix Cable TV, Inc., St. Thomas-St. John Cable TV and St. Maarten Cable TV.

The Court cannot agree, because ECM did not come into existence until December 30, 1997, long after Prosser had had signed definitive purchase agreements on June 9, 1997 to acquire personally three of the Cable Companies, and an agreement to acquire the fourth Cable Company on September 8, 1997. [98] Because ECM did not exist, and therefore had no public [*87] shareholders at the time Prosser signed those agreements, Prosser was not a fiduciary, and could not have owed any fiduciary duties to ECM. [99]

> [98] Pretrial Order, Ps 81, 95.
> [99] *See Anadarko Pet. Corp. v. Panhandle East. Corp., 521 A.2d 624, 628 (Del. Ch. 1987)* (holding that a parent corporation owes no fiduciary duty to its wholly-owned subsidiary, and that no fiduciary duty arose until the subsidiary had outside stockholders).

If the Cable Companies and the Daily News were corporate opportunities, they were opportunities of ATN, which owned all the assets later allocated to Messrs. Prior and Prosser in the Split Off. In an Indemnity Agreement entered into among Prosser, Prior, and ATN as part of the Split Off, ATN and Prior relinquished any rights they had to such a claim. In that Agreement, ATN and Prior covenanted "not to bring any action suit or proceeding against Prosser or ECI with respect to any of the matters . . . relating to the business, operations or management [*88] of [ATN] or any of its Subsidiaries prior to and including the Closing." [100]

> [100] JX 22 at ECI 0857, § 3.01 (b). The Indemnity Agreement was one of the terms of the

Split Off that was disclosed to, and approved by, ATN stockholders. JX 22.

In short, ECM had no corporate opportunity claim because ECM did not exist at the time the opportunities arose and were taken. If a corporate opportunity claim existed, it belonged to ATN, which relinquished that claim in connection with the Split Off. Accordingly, the corporate opportunity claims cannot form any part of ECM's fair value as of the merger date.

### E. The Fair Value Of ECM And The Unfairness Of The Merger Price

As a consequence of the foregoing determinations, the fair value of ECM on the merger date is found to be $ 416,996,000, or $ 38.05 per share. [101] Under *8 Del. C. § 262*, Greenlight, as the single appraisal claimant, is entitled to recover that per share amount, multiplied by the 750,300 shares for which it [*89] seeks appraisal, plus interest as determined in Part III F, *infra*, of this Opinion.

> [101] The fair value of $ 416,996,000 ($ 38.05 per share) is equal to the discounted cash flow valuation of ECM that results from the DFC inputs determined in this Opinion ($ 434,996,000, or $ 39.69 per share) less $ 18 million ($ 1.64 per share), which represents the hurricane losses not reimbursed by insurance. *See* Apr. 2, 2004 Letter from Thomas J. Allingham, II, Esquire, to the Court, discussed in note 87, *supra.*

From that fair value finding it further follows that the $ 10.25 per share merger price was not a "fair price" within the meaning of the Delaware fiduciary duty case law beginning with *Weinberger v. UOP, Inc.* [102] Although that, without more, is dispositive, the unfairness of the merger price rests upon more than that one bit of simple deductive logic. The overwhelming weight of the credible evidence of record also compels that conclusion.

> [102] *457 A.2d 701 (Del. 1983).*

[*90] The only competent evidence that the merger price was fair was the fairness opinion that Houlihan furnished to the Second Special Committee, and the testimony of Mr. Bayston in support of the fairness opinion rendered by his firm, Duff & Phelps. But whatever evidentiary force Houlihan's opinion might

have had was totally undermined by the fact that (i) Houlihan never had the benefit of the June projections, and (ii) the defendants never called Houlihan, upon whose valuation the Special Committee and the board relied, to testify at trial in support of its valuation conclusion. The defendants have never explained their failure to do that. For these reasons, and because it was within the defendant's power to call Houlihan as a witness, [103] the only logical inference - and the inference this Court has drawn -- is that Houlihan's testimony would have been unfavorable to the defendant's position. [104] The RTFC's approximately $ 28 per share valuation of ECM -- which is credible because the RTFC relied on it in deciding to extend to Prosser a multimillion dollar loan to finance the Privatization -- was almost thrice the magnitude of the $ 10.25 per share value that Houlihan was willing [*91] to pronounce as fair. And even Duff & Phelps, the defendants' trial valuation expert, was apparently unable to opine that $ 10.25 per share was fair: that firm valued ECM at not less than $ 10.38 per share.

> 103     The defendants do not contend that Houlihan was unavailable to testify.
> 104     *Demby v. State, 744 A.2d 976, 978-979 (Del. 2000)* (citing *Wheatley v. State, 465 A.2d 1110 (Del. 1983)*).

The several infirmities that led the Court to reject the Duff & Phelps valuation have been discussed and need not be repeated here. One additional infirmity merits discussion, however, and that is Mr. Bayston's use of impermissible post-merger data in arriving at some of his conclusions. In his deposition Mr. Bayston conceded that he had relied on post-merger evidence in preparing his projections, including his CapEx assumptions:

> Q. So that in making your assessment about the best estimate of the costs of the company going forward, you examined and took into account [*92] the company's cost experience in the period between the appraisal date and the date of the preparation of your report?

> A. That's correct. [105]

> ****

> Q. Now, in formulating your more

aggressive assumption for capital expenditures, did you take into account the company's capital expenditures experienced between the appraisal date and the date when you prepared your report?

> A. I believe we looked at that issue. [106]

> 105   Bayston Dep. 286-87.
> 106   *Id. at 293.*

Although at trial Bayston claimed that he misspoke on his deposition, [107] that recantation is not credible because if in fact Bayston misspoke, he did so repeatedly over the course of many deposition pages. Moreover, Bayston had extensive litigation-related contact with ECM's management, [108] which would have made it extremely difficult to avoid incorporating post-merger evidence in his valuation.

> 107     Trial Tr. Vol. 1 (Bayston) 209, Vol. 2 (Bayston) 320, 323, 329.

[*93]

> 108     Trial. Tr. Vol. 2 (Bayston) 252-253, 328-329 (discussions about capital expenditures); 333-334 (discussing extensive conversations with ECM management.)

Striving to portray Mr. Bayston's contacts with management as a strength, the defendants criticize Prof. Zmijewski for "not even attempt[ing] to talk to [ECM] management in connection with his analysis." [109] But Prof. Zmijewski cannot fairly be faulted for doing what litigation experts in the valuation area customarily do: conducting careful due diligence using the sworn testimony and contemporaneous discovery record. What Zmijewski did not do in valuing ECM was to rely upon unsworn, post-merger conversations with management. Nor did Prof. Zmijewski rely upon post-merger data to determine the inputs on which his DCF analysis depended.

> 109   Def. Consol. Ans. Post-trial Br. at 52.

F. Interest

[HN11] Once the fair value of the dissenting shareholders' [*94] shares is ascertained, our appraisal

statute requires the Court to determine "the fair rate of interest, if any" after considering "all relevant factors." [110] The interest may be simple or compound, and this Court has broad discretion to determine whether interest should be simple or compound, but the Court must explain its choice. [111] As the Chancellor recently stated in *Cede & Co. v. JRC Acquisition:*

> [HN12] This Court's decision in *Gonsalves v. Straight Arrow Publishers, Inc.* is an accepted method for determining the rate of interest in appraisal actions. *Gonsalves* rests on the principle that an interest award should serve two purposes. First, it should disgorge the respondent of any benefit it received from the use of the petitioner's funds. Second, the interest award should compensate the petitioner for the loss of the use of its money. The second purpose, however, is countenanced with the understanding that the election to 'reject the merger and to pursue appraisal does not shift to the corporation all responsibility for losses [the petitioner] may incur as a result of [its] inability to use the funds retained by the corporation' and that the petitioner can [*95] mitigate its losses and obtain perfect 'compensation for the loss of the use of their funds by borrowing the fair value of their shares.' *Gonsalves,* and several other decisions, have found that these twin purposes are served by awarding interest by weighing equally the respondent's actual costs of borrowing and based upon an objective prudent investor standard, the petitioner's opportunity cost." [112]

Greenlight claims that it is entitled to an interest award of 22%, compounded daily, from the merger date. To further the [*96] compensatory purpose of the interest award, Greenlight argues, the Court should use Greenlight's actual rate of return on its invested capital -- 37% -- for the period beginning October 1, 1998. Because 37% is what Greenlight claims it would have earned on its appraisal award had that award been paid on the merger date, only that rate would restore Greenlight to the financial position it would have had if the merger price were entirely fair. To further the restitutionary purpose of an interest award, Greenlight urges the Court to use the interest rate that ECM pays to short term, unsecured creditors (a category that includes Greenlight in this appraisal). Since the date of the merger, that rate has been 7%. Weighting both rates equally, Greenlight arrives at a rate of 22% which, Greenlight urges, should be compounded daily.

The defendants insist that Greenlight is entitled to simple interest at 5.24%, or at most, interest at that rate compounded no more frequently than monthly. Although the defendants agree that the "restitutionary purpose of awarding interest is typically addressed by basing one half of the interest award on the corporation's cost of borrowing," [113] they contend [*97] that as of September 30, 1998, ECM's weighted average interest rate on its $ 190.4 million of debt was 6.59%.

> [113]    Defs' Consol. Post-Trial Br. at 110. *See Gilbert v. M.P.M Enters., Inc., 709 A.2d 663, 674 (Del. Ch., 1997); aff'd., 731 A.2d 790 (Del. 1999)* and *Chang's Holdings, S.A. v. Universal Chems. And Coatings, Inc., 1994 Del. Ch. LEXIS 222, No. 16856, 1994 WL 681091, at * 2 (Del. Ch. Nov. 22, 1994).*

As for the compensatory purpose of an interest award, the defendants claim that because this Court has historically applied an objective "prudent investor" standard, *(viz.,* what a prudent investor would have achieved if it had invested the proceeds at the date of the merger) Greenlight's subjective claimed 37% return on its investments is irrelevant as a matter of law. In this case, the prudent investor rate, as determined by Mr. Bayston who relied on the mix of investments specified by Delaware case law, implied an interest rate of 5.54% as of the date of the Duff & Phelps [*98] report, and 3.88% as of the date of trial. Because both sides agree that borrowing costs and compensatory measures should be

---

[110]   *8 Del. C. § 262(h).*

[111]    *8 Del. C. § 262(i)*; *M.G. Bancorporation, Inc. v. Le Beau, 737 A.2d at 527. Gonsalves v. Straight Arrow Publishers, Inc., 1999 Del. LEXIS 7, 725 A.2d 442 (Table), 1999 WL 87280* at * 4 (Del., Feb. 25, 1999).

[112]   *Cede & Co. v. JRC Acquisition, Corp., No. 18648, 2004 WL 286963, at * 12 (Del. Ch. Feb. 10, 2004)* (internal citations omitted).

weighed equally, the appropriate rate of interest is 5.24% [(6.59% + 3.88%) / 2]. Finally, defendants argue, Greenlight cites no authority for its request that interest be compounded daily. Defendants urge that the interest award should be either simple interest or, if interest is compounded, the compounding should be no more frequent than monthly, consistent with the case law. [114]

> [114] *See ONTI, Inc. v. Integra Bank,* 751 A.2d at 927-29 (interest compounded monthly); *Hintmann v. Fred Weber, Inc.,* 1998 Del. Ch. LEXIS 26, 1998 WL 83052 (Del. Ch. Feb. 17, 1998) (same); *Grimes v. Vitalink Communications Corp.,* 1997 Del. Ch. LEXIS 124, No. 12334, 1997 WL 538676, at * 13 (Del. Ch. Aug. 28, 1997).

These colliding contentions generate four issues: (1) what was ECM's cost of borrowing, (2) what was Greenlight's opportunity cost, (3) based on those inputs, what is the appropriate rate [*99] of interest, and (4) should the form of the award be simple or compound interest, and if interest is compounded, over what interval? These issues are now addressed.

Although defendants argue that 6.59% was ECM's cost of borrowing, as Greenlight points out, that represents ECM's average, not its marginal, cost of short term unsecured debt, which was 7%. [115] According the Court finds that ECM's cost of borrowing was 7%.

> [115] JX 235 at 26, Ex. 2B.

As for Greenlight's opportunity cost, *JRC Acquisition* and *Gonsalves* establish that that cost is to be determined on the basis of an objective "prudent investor" standard, not Greenlight's subjective claimed 37% investment return. The defendants argue that the prudent investor rate of return was 5.54% as of the date Duff & Phelps submitted its report and 3.88% at the time of the trial. Greenlight does not propose any alternative "prudent investor" rate of return. To err on the conservative side, the Court adopts 5.54% as the prudent investor rate of return.

[*100] [HN13] The Delaware cases require that the interest rate be determined by weighting the cost of borrowing and the prudent investor rate of return equally. On that basis, the appropriate rate of interest on the appraisal award is determined to be 6.27%, running from the date of the Privatization merger." [116]

> [116] Computed as follows: 7.00% + 5.54% / 2 = 6.27%.

The final issue relating to interest is whether the interest should be simple or compound and if compounded, over what interval. Greenlight cites no authority or evidence that daily compounding is appropriate in this case. But, Greenlight, which is in the business of investing money, has nonetheless satisfied the Court that it would have been able to earn interest on its appraisal award on a compound basis. Moreover, the Court finds, as did the Chancellor in *JRC Acquisition,* that "the dual purpose of compensation and restitution may only be served by a compounding interval at least as frequent as one month." [117]

> [117] *JRC Acquisition, supra, at * 15* (quoting *Grimes v. Vitalink Communications Corp., supra.,* 1997 WL 538676 at * 11). The defendants also concede that if interest is to be compounded, that the compounding be at one month intervals.

[*101] Accordingly, interest on Greenlight's appraisal award shall be at the rate of 6.27%, compounded monthly, from the date of the merger to the date of judgment.

## IV. WAS THE TRANSACTION THE PRODUCT OF FAIR DEALING?

### A. Threshold Issues

[HN14] An entire fairness analysis normally requires the Court to decide, in addition to whether the price paid in an interested merger was "fair," whether the merger was the product of "fair dealing." This case, however, raises three issues that must be confronted at the threshold. The first is whether this Court's determination that the merger price was not fair makes it unnecessary to engage in a "fair dealing" analysis. The Court concludes that a fair dealing analysis is required. The second issue is whether the plaintiffs are barred from asserting their fiduciary duty claims. The Court finds that they are not. The third issue is which side has the burden of proof. The Court determines that the burden falls upon the defendants. What follows is the basis for the Court's rulings on these threshold issues.

### 1. Is A Fair Dealing Analysis Required?

In this case, this Court's determination of ECM's

"fair value" disposes of both Greenlight's appraisal action [*102] and the "fair price" aspect of the plaintiffs' fiduciary duty claim. The determination that price is not fair raises a preliminary, threshold question of whether in this case any "fair dealing" analysis need be undertaken at all. It is arguable that where (as here) the merger price is found to be unfair, it would be difficult, if not impossible, for the merger to be found "entirely fair" even if the process leading up to the merger involved fair dealing. [118] That supposition, if correct, would lead to the result that where the merger price is found not to be fair, that finding establishes, *ipso facto*, the unfairness of the merger, thereby obviating the need for any analysis of the process oriented issues. The Supreme Court has not yet addressed that question, however.

> 118   *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1140 (Del. Ch. 1994), aff'd, 663 A.2d 1156 (Del. 1995) ("Plainly in a cash-out merger, price is a dominant concern, most especially where the buyer already has voting control of the enterprise, such as a parent-sub merger.").

   [*103]   What [HN15] the Supreme Court has decided is that where an interested merger is found to be unfair and the corporation's charter has a *Section 102(b)(7)* exculpatory provision, this Court must then proceed to "identify the breach or breaches of fiduciary duty upon which liability [for damages] will be predicated in the *ratio decidendi* of its determination that entire fairness has not been established." [119] That is, "when entire fairness is the applicable standard of judicial review, a determination that the director defendants are exculpated from paying monetary damages can be made only *after the basis* for their liability has been decided." [120]

> 119   *Emerald Partners v. Berlin*, 787 A.2d at 94 (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1165 & n.16 (Del. 1995)).
>
> 120   *Id.* (emphasis in original).

   That mandate, I find, is applicable here. In this case the defendants have raised a *§ 102(b)(7)* exculpatory defense. In determining that [*104] the merger price was not fair, this Court did not address whether the unfairness was the product of a breach of fiduciary duty or if so, the nature or character of that duty. Accordingly, a "fair dealing" analysis is required in this case, if only to enable the Court to determine the "basis for the [defendants'] liability" for *§ 102(b)(7)* exculpation purposes.

## 2. The "No Standing" Affirmative Defense

   The defendants have interposed the affirmative defense that the plaintiffs lack standing to assert any fiduciary duty claims. That defense comes in two parts. First, the defendants concede that Greenlight has standing to assert fiduciary claims on behalf of the 750,300 ECM shares that it owns outright. The defendants argue, however, that Greenlight lacks standing to assert any claims on behalf of the former holders of 2,026,685 shares that sold to Greenlight their "litigation rights" to assert the fiduciary claims associated with those shares. [121] Second, the defendants claim that no former shareholders of ECM can recover anything in respect of any shares that they tendered into the tender offer or voted in favor of the merger. Neither argument, in this Court's view, withstands [*105] scrutiny.

> 121   The assignments of litigation rights to Greenlight are found in the record at JX9.

### (a) *The Litigation Rights Validity Issue*

   The plaintiffs contend that Greenlight lacks standing to assert any claims based upon the assigned "litigation rights," because: (1) unliquidated fiduciary claims are not assignable as a matter of Delaware law and public policy, and (2) Greenlight purchased the litigation rights in violation of the parties' Confidentiality Stipulation in the appraisal action. Moreover (argue defendants), (3) if the assignments were invalidated, the litigation rights would not revert back to the assignors, *i.e.*, to the plaintiff class, because by selling these claims those stockholders waived their right to assert their fiduciary claims and must therefore be excluded from the class.

   Assuming without deciding that the defendants can be heard to challenge the validity of the assignments, [122] [HN16] it is established Delaware law that choses in action that survive the death of the [*106] victim are validly assignable. [123] In this case, the choses in action are breach of fiduciary duty and fraud claims. Those claims survive to (or against) a personal representative under *10 Del. C. § 3701*. [124] For purposes of determining which claims are assignable and which are not, Delaware law does not distinguish between claims that are liquidated and those that are unliquidated.

> 122   There is authority holding that only a party to the assignment can contest its validity *See Wagner v. United States*, 573 F.2d 447 (7th Cir.

*1978*); *Gamble v. Stevenson, 305 S.C. 104, 406 S.E.2d 350, 353 (S.C. 1991)*; 6A C.J.S. *Assignments* § 71 (1975).

123  *Industrial Trust Co. v. Stidham, 42 Del. 339, 3 Terry 339, 33 A.2d 159, 160-61 (Del. 1942)*; *Garford Motor Truck Co. v. Buckson, 34 Del. 103, 4 W.W. Harr. 103, 143 A. 410, 411 (Del. Super. Ct. 1927)*.

124  *Section 3701* provides:

[HN17] All causes of action, except actions for defamation, malicious prosecution, or upon penal statutes, shall survive to and against the executors or administrators of the person to, or against whom, the cause of action accrued. . . . All actions, so surviving, may be instituted or prosecuted by or against the executors or administrators of the person to or against whom the cause of action accrued.

[*107] Nor is there any basis for the defendants to argue that the assignments must be deemed invalid on public policy grounds because they are champertous. The short answer is that they are not champertous. [HN18] Champerty requires "an agreement between the owner of a claim and a volunteer that the latter may take the claim and collect it, dividing the proceeds with the owner, if they prevail; the champertor to carry on the suit at his own expense." [125] Greenlight's purchase of the litigation rights was not champertous, because Greenlight has always been involved in the litigation. Greenlight was a shareholder when the Privatization was announced; Greenlight was a member of the shareholder class and always had the right--and standing--to pursue an individual fiduciary duty remedy simultaneously with its appraisal action. Champerty cannot be charged against one with an interest in the matter in controversy. [126]

125  *Gibson v. Gillespie, 152 A. 589, 593 (Del. Super. Ct. 1928)*; *see also Compaq Computer Corp. v. Horton, 631 A.2d 1, 5, n.1 (Del. 1993)*.
126  *Cede & Co. v. Technicolor, Inc., 542 A.2d 1182 (Del. 1988)*.

[*108] The defendants next urge that Greenlight

should be denied standing to sue because it purchased the litigation rights in violation of Paragraph 2 of the Confidentiality Stipulation, which provides that:

Discovery Material shall be used solely for purposes of this litigation, and shall not be used for any other purpose, including, without limitation, any business or commercial purpose, provided, however, that Discovery Material may be used in connection with any litigation among the parties relating to the merger between [ECM] and [ICC] . . . effective as of October 19, 1998. [127]

127  D.I. 19 in Appraisal Action, Par. 2.

Specifically, the defendants contend that Greenlight "used" confidential Discovery Material to purchase the litigation rights in violation of the quoted paragraph. Although Greenlight did possess confidential information, the defendants have not shown that Greenlight used that information in acquiring the litigation rights. Even if Greenlight did use Discovery Material, [*109] the defendants have not established that such use was prohibited by the Confidentiality Stipulation, which permitted Discovery Material to be used in both the Appraisal Action ("this litigation") and in "any litigation relating to the Merger" *(i.e.,* the fiduciary duty action challenging that Merger). Nor have the defendants shown that Greenlight disclosed confidential Discovery Material publicly in the marketplace, or otherwise failed to abide by the Confidentiality Stipulation terms.

Finally, the defendants have suffered no prejudice as a result of the assignment of the litigation rights, because those rights belonged to the members of the class. Absent an assignment, the defendants would have had to defend against those claims asserted on behalf of the class in any event. Thus, the defendants can hardly claim cognizable prejudice as a result of the assignment of those same claims to one member of the class that elected to sue individually. [128]

128  Stated another way, if the Court granted defendants the relief they seek, the assignments would be void and the right to recover would revert to the class. [HN19] A failed assignment of

claims does not (as defendants assert without support), *constitute a waiver* of those claims. The defendants would still pay the same amount in damages; there would simply be a different name on the check. Not allowing the class member-assignors to recover would give the defendants a windfall for no valid factual or legal reason.

[*110]  (b) *The Waiver Issue*

The defendants next urge that members of the ECM shareholder class who tendered into the first step tender offer, or who voted for the Privatization merger, waived their right to challenge the fairness of that transaction. This argument is flawed, because it presupposes that the shareholders who tendered or voted made a fully informed decision based on full disclosure. As found elsewhere in this Opinion, that is not the case, because the defendants violated their duty of disclosure to the stockholders of ECM in several respects. On that basis alone the defendants' argument must be rejected. [129]

> [129]  *Bershad v. Curtiss-Wright Corp., 535 A.2d 840 (Del. 1987)* (acquiescence requires an informed act). For that same reason, the Court rejects the defendants' argument that the Class members who accepted the benefits of the merger must be deemed to have acquiesced in the merger. As Vice Chancellor Strine held in *Clements v. Rogers, 790 A.2d 1222 (Del. Ch. 2001)*, a plaintiff who accepts the merger consideration could not have acquiesced where she knew some, but not all of the material facts. The predicament in which Class of former ECM shareholders found themselves was indistinguishable from *Clements*.

[*111]  (c) *The Burden of Proof Issue*

The final threshold issue is which side has the burden of proof. Both sides agree that [HN20] because the Privatization is a self-dealing transaction of which the majority stockholder stands on both sides, entire fairness is the standard of review *ab initio.* [130] The only question is whether the burden of proof, which normally falls upon the defendants, has shifted to the plaintiffs in this particular case.

> [130]  *Emerald Partners v. Berlin, supra, 787 A.2d at 92, 97.*

The defendants argue that the burden of establishing that the merger was not entirely fair has shifted to the plaintiffs, because the merger was approved by both an informed independent committee of disinterested directors and an informed majority of minority stockholders. [131] The short answer is that the merger was not approved by a committee of independent directors who were properly informed or independent of Prosser, nor was it approved by an informed vote of a majority of ECM's minority [*112] stockholders.

> [131]  *Kahn v. Lynch Communications Sys., Inc., 638 A.2d 1110, 1117 (Del. 1994).*

[HN21] In an entire fairness context, where the predicate for a burden-shifting argument is that the merger was negotiated by a special committee, the defendants must establish to the satisfaction of a carefully scrutinizing court, that the special committee was "fully informed." [132] As discussed more fully elsewhere in this Opinion, the Special Committee and a majority of ECM's minority shareholders voted to approve the merger, but their votes were not fully informed. A highly material fact was not disclosed either to the Special Committee or to the minority stockholders, namely, that the most recent projections -- the June projections -- had been provided to Prosser and his financial advisor (Prudential) and his lender (RTFC) but not to the Special Committee. Members of the Special Committee testified that they and Houlihan should have been provided with the June Projections. [133] Moreover, the June [*113] Projections were not disclosed in the proxy statement, and the proxy disclosures relating to that issue falsely and misleadingly suggested that the shareholders were being provided with all of the projections to which Prosser and his advisers had been privy. The portion of the proxy statement that contained the March projections (identified therein only as Company projections) stated:

> Although the Company does not as a matter of course publicly disclose projections as to future revenues or earnings, because they were received by Mr. Prosser and the parent [ICC, LCC], the purchaser [ICC] is making these projections available to all stockholders. [134]

> [132]  *Id. at 1120.*

133    Trial Tr. Vol. 7 (Vondras) 1296, 1351-52; Vol. 4 (Goodwin) 751; Vol. 5 (Goodwin) 929-30. Mr. Vondras testified that the Special Committee "was deprived of information that [he] would have considered important in [his] assessment of . . . Prosser's offer" and that the Committee and Houlihan "...should have had the most current data, and it would have used that in their analysis. Would it change the...numbers? May or may not have. I don't know, but they should have had that data." Trial Tr. Vol. 7 (Vondras) 1351-52.

[*114]

134    JX 155 at SC4128.

As more fully discussed *infra,* the proxy statement and the tender offer documents omitted to disclose other material facts as well. The material omission relating to the June Projections, however, is sufficient, in and of itself, to undermine the informed character of the Special Committee approval that is a predicate to shifting the burden of proof in an entire fairness case.

The defendants argue that the burden must shift, nonetheless, because the minimum tender condition, *i.e.,* the condition that a majority of the minority shareholders tender into the offer, was the functional equivalent of a shareholder ratification of the transaction. But [HN22] no Delaware case has held that burden-shifting can be accomplished by a tender of shares rather than by an actual vote. Nor should a tender be treated as the equivalent of an informed vote. Shareholders cannot be deemed to have ratified board action unless they are afforded the opportunity to express their approval of the precise conduct being challenged. [135] Stockholders have materially different interests at stake [*115] when tendering, as opposed to voting their shares. In considering whether to tender, stockholders must evaluate the risk of being left worse off, *i.e.,* left vulnerable to being frozen out at an even lower price, if the other stockholders were to tender into an inadequate offer. As Vice Chancellor Strine incisively observed in *In re Pure Resources S'holders Litig:*

Indeed, many commentators would argue that the tender offer form is more coercive than a merger vote. In a merger vote, stockholders can vote no and still receive the transactional consideration if the merger prevails. In a tender offer, however, a non-tendering shareholder

faces an uncertain fate. That stockholder could be one of the few who holds out, leaving herself in an even more thinly traded stock with little hope of liquidity and subject to a § 253 merger at a lower price or at the same price or...at a later (and, given the time value of money, a less valuable) time. [136]

135    *In re Santa Fe Pac. S'holders Litig., 669 A.2d 59, 69 (Del. 1995); see also, In re Cencom Cable Income Partners, L.P., 2000 Del. Ch. LEXIS 90, No. 14634, 2000 WL 640676, at * 5 (Del. Ch. May 5, 2000)* ("Ratification can effectively occur only where the specific transaction is clearly delineated to the investor whose approval is sought and that approval has been put to a vote.").

[*116]

136    *808 A.2d 421, 442-43 (Del. Ch. 2002), appeal refused, 2002 Del. LEXIS 630 (Del. 2002)* (footnotes omitted).

Accordingly, the burden of proving fair dealing remains with the defendants.

The preliminary issues having been decided, the Court turns next to the substantive fair dealing questions.

B. Fair Dealing Analyzed

[HN23] A fair dealing analysis requires the Court to address "issues of when the transaction was timed, how it was initiated, structured, negotiated, and disclosed to the board, and how director and shareholder approval was obtained." [137]

137    *Rosenblatt v. Getty Oil Co., 493 A.2d 929, 937 (Del. 1985).*

1. Timing, Initiation and Structure

[HN24] Our courts have recognized that a freeze-out merger of the minority proposed by the majority stockholder is inherently coercive. [138] Where, as here, the freeze-out merger is initiated by the majority stockholder, that [*117] fact, even though not dispositive, is evidence of unfair dealing.

138    *See In re Pure Resources, Inc. S'holders*

*Litig, supra,* 808 A.2d at 436; *Kahn v. Lynch Communication Systems, Inc., supra,* 638 A.2d at 1116.

[HN25] Another circumstance that evidences the absence of fair dealing is where the transaction is timed in a manner that is financially disadvantageous to the stockholders and that enables the majority stockholder to gain correspondingly. [139] This case is the diametric opposite of *Jedwab v. MGM Grand Hotels, Inc.,* where this Court found that the timing of a merger was not unfair because there was no "persuasive indication . . . that from the minority's point of view this [was] a particularly poor time to liquidate their investment." [140] Here, the evidence of unfair timing could not be more persuasive. Prosser's initial proposal was to merge Innovative into a wholly owned subsidiary of ECM. That would have benefited ECM stockholders and enabled them to remain as investors [*118] in a larger merged company. Because ECM's stock price was depressed, Prosser abandoned that proposal at the eleventh hour and "flipped" the deal for his sole personal benefit to take advantage of the temporarily and artificially depressed stock price. That stock price then became the "floor" for the equally depressed and unfair Privatization price, and benefited Prosser to the same extent that it disadvantaged the minority stockholders who were now being squeezed out of the enterprise.

139  *509 A.2d 584 (Del. Ch. 1986).*
140  *Id. at 598.*

In addition to, and apart, from the unfairness of its initiation and timing, the transaction was also unfairly structured, in that Prudential and Cahill, the firms that had been retained as advisors to ECM in the initially Proposed (but later abandoned) Merger, were co-opted by Prosser to serve as his advisors. That switch was unfair to ECM, because during ECM's entire existence, Prudential and Cahill had been its advisers and they possessed [*119] material nonpublic information about ECM's values, business and prospects. As such, Prudential and Cahill were in the best position to represent the interests of the ECM minority. Those same advisers were now switching sides to represent interests that were adverse to that same minority.

At a minimum, ECM's board (including Prosser) or the Special Committee should have insisted that Prudential and Cahill remain as advisors to ECM, and that Prosser retain other financial and legal advisors.

Failing that, the board - or at the very least the Special Committee - should have insisted that Prudential and Cahill recuse themselves from the negotiations. By doing neither, ECM was deprived of the advantage of knowledgeable advisors. That advantage was conferred upon ECM's controlling stockholder and to-be-adversary in the transaction - Prosser. There is no evidence that either the full board or the Special Committee ever considered that issue.

2. The Adequacy of the Minority Shareholders' Representation

(a) *The Independence Of The Board And Of The Special Committee*

[HN26] A critical aspect of any fair dealing analysis is the adequacy of the representation of the minority stockholders' [*120] interests. In this case, that issue is particularly critical, because a majority of the ECM board members were not independent of Prosser, making it necessary to appoint a Special Committee to negotiate on the minority stockholders' behalf. Unfortunately, a majority of the Special Committee members also lacked independence, and the one Committee member who arguably was independent did not function effectively as a champion of the minority's interests.

Besides Prosser, the ECM board had six members, all of whom Prosser had directly appointed: Raynor, Ramphal, Muoio, Goodwin, Vondras, and Todman. It is undisputed that Prosser, whose wholly-owned entity was the acquirer of ECM's minority interest, was conflicted. But, most of the remaining directors also had disabling conflicts because they were economically beholden to Prosser. Directors who "through personal or other relationships are beholden to the controlling person[]" lack independence from that person. [141]

141  *Aronson v. Lewis,* 473 A.2d 805, 815 (Del. 1984); *see Beam v. Stewart,* 845 A.2d 1040, No. 501, 2003, Slip. Op. at 12 (Del. Mar. 31, 2004).

[*121] Raynor, who was Prosser's long time lawyer, was clearly conflicted. In 1996, 1997, and 1998, virtually one hundred percent of the legal fees that Raynor generated for his law firm were attributable to work he performed for Prosser and Prosser-owned entities. Before 1996, the percentage of total fees represented by work Raynor performed for Prosser was always greater than fifty percent. From 1987 through

1998, ATNI and its affiliates, and thereafter ECM and its affiliates, were the largest single client of Raynor's firm. [142] In 1998, the year of the Privatization, Raynor became "of counsel" at his firm and was put on a retainer arrangement wherein ATNCo paid compensation of $ 25,000 per month to Raynor, and $ 5,000 per month to his firm, to cover Raynor's office rental cost. That amount represented all of Raynor's compensation for 1998. [143] Raynor also served as a Prosser nominee to the ATNI board, and as a director of Innovative, ECM, ATNCo and Vitelco. [144] As a highly paid consultant to, and later full-time employee of, Prosser and his companies, Raynor was clearly beholden to Prosser and, thus, not independent. [145]

> [142]   Raynor Dep. (June 12, 2001) at 25-28. In 1997, Raynor's law firm, Raynor, Rensch & Pfeiffer, was paid $ 479,000 for legal services provided to ECM and its predecessor. JX1S5 at SC4176. In 1996, the firm was paid $ 533,000 for its legal services. JX254 at G893.

[*122]

> [143]   *Id.* at 30-32.
> [144]   *Id.* at 21, 29.
> [145]   *See In re Maxxam, Inc., 659 A.2d 760, 773-74 (Del. Ch. 1995).*

If further evidence of non-independence were needed, in July 1998 -during ECM's consideration of the Privatization proposal -- Prosser agreed to pay Raynor $ 2.4 million over a five year period as compensation for his past services. There was no negotiation over that fee -- Raynor requested $ 2.4 million and Prosser agreed to it. Nor was the $ 2.4 million compensation arrangement ever disclosed to the ECM board, Compensation Committee or the Special Committee, yet Raynor voted as an ECM director to approve the Privatization. [146] That disclosure omission was highly material. Goodwin testified that the $ 2.4 million payment arrangement should have been disclosed to the board. [147] For Raynor to have participated in the board's Privatization deliberations and vote as an ECM director without disclosing this contemporaneously negotiated compensation arrangement, was misleading to Raynor's fellow directors and a breach of his fiduciary duty [*123] owed to them and to ECM.

> [146]   JX 159; Raynor Dep. at 38-39, 61; Trial Tr. Vol. 10 (Prosser) 1834-36; Vol. *5* (Goodwin) *966;* Vol. 7 (Vondras) 1732; Vol. 7 (Ramphal)

1444-45.
> [147]   Trial Tr. Vol. 5 (Goodwin) 966-67.

Ramphal was similarly beholden to Prosser. Ramphal was originally introduced to Prosser by his son-in-law, Sir Ronald Sanders, who had a consulting arrangement with Prosser at that time. Like Sanders, Ramphal also fell into a lucrative consultancy with Prosser. In 1993 and 1994, Ramphal was paid consulting fees of $ 140,000 in both years, and in 1995 he was paid $ 120,000. On average, those amounts represented 22.5% of Ramphal's total income for that period. [148] Those amounts were in addition to the $ 30,000 directors' fee that Ramphal received annually. [149] Moreover, in 1998, Ramphal received $ 115,000 for his service on the ECM Board and special committees. [150]

> [148]   Trial Tr. Vol. 7 (Ramphal) 1386-87; Ramphal Dep. 33-34.

[*124]

> [149]   Ramphal Dep. at 34.
> [150]   Trial Tr. Vol. 7 (Ramphal) 1390.

Given these undisputed facts, the defendants have not shown that Ramphal was independent of, *i.e.,* not beholden to, Prosser, and the Court affirmatively finds that he was not. [151] That finding is strengthened by the fact that the consulting arrangement of Ramphal's son-in-law, Sanders, with Prosser would be put at risk if Ramphal, as a Special Committee member, took a position overly adversarial to Prosser. [152] Finally, both Sanders and Ramphal were appointed as directors of Innovative after the Privatization had been completed. [153]

> [151]   *See Kahn v. Tremont Corp., 694 A.2d 422, 430 (Del. 1997)* (purportedly "independent" director found beholden to majority stockholder where, three years previously, company had retained his consulting services for $ 10,000 per month and more than $ 325,000 in bonuses); *Kahn v. Dairy Mart Convenience Stores, Inc., 1996 Del. Ch. LEXIS 38, No. 12489, 1996 WL 159628, at *6 (Del. Ch. Mar 29, 1996)* (holding that consulting agreement may render independent director too beholden to management to remain independent).

[*125]

> [152]   *See Harbor Fin. Partners v. Huizenga, 751 A.2d 879, 889 (Del. Ch. 1999)* (a director has a disabling conflict where the director's decision could advance economic or career opportunities

of a family member).

153    Trial Tr. Vol. 7 (Ramphal) 1422; Ramphal Dep. 17, 35-36, 58.

Muoio was also a consultant to a Prosser entity and beholden to Prosser. As of mid-1997, Muoio was on an annual $ 200,000 retainer for providing banking/financial advisory services, [154] and he viewed Prosser as a source of additional future lucrative consulting fees. In March 1998, Muoio sought up to an additional $ 2 million for serving as financial adviser on a potential acquisition by ECM of CoreComm Inc. That effort was unsuccessful only because the acquisition ultimately never took place. [155]

154    JX 144 at EC22472.
155    Muoio Dep. at 16-17.

Lastly, Goodwin, Vondras and Todman received annual [*126] directors' fees of $ 100,000, a generous amount given that ECM's board met only three or four times in 1998. [156] Goodwin and Vondras each also received $ 50,000 and $ 15,000 for their service on the Special Committee. [157] The $ 115,000 Vondras received in 1998 for serving on ECM's board and Special Committee represented approximately 10% of his income for that year. [158]

156    Trial Tr. Vol. 7 (Ramphal) at 1390; Muoio Dep. 18.
157    JX 140 at EC5950.
158    Trial Tr. Vol. 7 (Vondras) 1288-89, 1376.

Although the directors' fees received by Goodwin, Vondras and Todman would not, without more, necessarily constitute a disabling financial interest, [159] the record shows that all three of these directors - indeed, all the board defendants - expected to continue as directors of Prosser entities and benefit from the substantial compensation which accompanied that status. In fact, all of ECM's directors except Muoio were appointed to the Innovative board after the Privatization. That expectation, [*127] coupled with the fact that his director and committee fees represented a sizeable portion of his income, was sufficient to vitiate Vondras' independence for purposes of considering objectively whether the Privatization was fair to the minority stockholders.

159    *Grobow v. Perot, 526 A.2d 914, 923, n.12 (Del. Ch. 1987), aff'd, 539 A.2d 180 (Del. 1988).*

The director defendants claim that they did not know they would be invited to join the Innovative board after the Privatization closed in October 1998. The evidence shows otherwise. During the negotiations over the Privatization, the ECM directors were told that they would continue on with the company "in its new incarnation." [160] The Merger Agreement generated by the board's counsel in connection with the Privatization disclosed that the board defendants would remain directors of the surviving corporation. The Special Committee, through its counsel, received drafts of that Merger Agreement as early as July 17, 1998, before [*128] they voted to approve the transaction. [161]

160    Goodwin Dep. Oct. 19, 2001 at 5.
161    JX155 at SC4236; SC4111.

In summary, the Court finds that a majority of the full board of ECM (Prosser, Raynor, Ramphal, Vondras, and Muoio) were beholden to Prosser and, thus, were not independent of him. The Court further finds that a majority of the Special Committee (Ramphal and Vondras) were beholden to, and therefore not independent of, Prosser, leaving Goodwin as the only arguably independent Committee member and Todman as the only arguably independent non-Committee director. As previously found, Goodwin, as Committee chair, did almost all of the Committee's work himself. Unfortunately, the work that Goodwin performed in that role, including his negotiations with Prosser, were fatally compromised and, consequently, inadequate to represent the interests of ECM's minority shareholders effectively. [162]

162    As former Justice (then Vice Chancellor) Hartnett appropriately observed in *Lewis v. Fuqua, 502 A.2d 962, 967 (Del. Ch. 1985)*, in addressing the independence of a special litigation committee appointed to review a derivative action, "if a single member committee is to be used, the member should, like Caesar's wife, be above reproach." Here, as in *Fuqua,* Goodwin's "past and present associations raise a question of fact as to his independence" (*502 A.2d at 967*), which, given the burden of proof, would ordinarily be resolved against Goodwin's independence. The Court assumes, without deciding, however, that Goodwin was independent, but nonetheless concludes on other grounds that the Special Committee was not an

effective representative of the minority stockholders' interests.

[*129] (b) *The Committee's Ineffectiveness As The Minority's Representative*

There are several reasons why Mr. Goodwin's efforts as the Special Committee's chairman, and as its sole functioning member, were doomed to failure.

The first is that Prosser withheld the June projections, and knowledge of their existence, from the Committee and its advisors, Houlihan and Paul Hastings. As a consequence, Goodwin and Houlihan were deprived of information that was essential to an informed assessment of the fair value of ECM and of the gross inadequacy of merger price Prosser was offering. Thus disabled, Goodwin was not in a position to negotiate vigorously for a substantial increase in Prosser's opening offer ($ 9.125 per share) or, alternatively, to make a considered judgment to shut down the negotiations, thereby preventing the Privatization from going forward at all. That nondisclosure, without more, was enough to render the Special Committee ineffective as a bargaining agent for the minority stockholders.

Second, Prosser misled Goodwin by falsely representing that $ 10.25 per share was already straining the limits of the financing available to him. In fact, Prosser's financing would have [*130] enabled him to increase his offer to $ 11.40 per share, and the record evidence indicates that the RTFC was willing to lend him more, based on its implied valuation of ECM as conservatively worth about $ 28 per share. [163] There is no evidence that Goodwin knew of Prosser's financing arrangements or the RTFC's valuation (for merger financing purposes) of ECM.

> 163    *See* Reed Dep. Mar. 16, 2000 at 162-53, 171; Prosser Dep. June 7, 2000 at 93-96; JX 167 at RTFC 698, 720. That is not to suggest that the level at which the deal could be financed is a measure of ECM's fair value. Any such suggestion would be contrary to Delaware law and to the fair value determinations in this case. *See Smith v. Van Gorkom, 488 A.2d 858, 890-891 (Del. 1985)* (holding that [HN27] price at which a leveraged buy-out of a corporation was financially feasible was not determinative of the corporation's fair value). The import of this nondisclosure is that it evidences Prosser's intent to deprive the

Special Committee of any real utility as a bargaining agent for the ECM minority.

[*131] Third, and finally, Goodwin was careless, if not reckless, by routing all of his communications with the other Special Committee members through Eling Joseph, Prosser's secretary. The result was to give Prosser access to the Committee's confidential deliberations and strategy. That inexplicable method of channeling communications to Goodwin's fellow Committee members further confirms the severe information imbalance that existed between the two "bargaining" sides. In fact, there was no effective bargaining, because Prosser held all the cards and misled Goodwin into believing that he (Goodwin) and the Committee's financial advisor (Houlihan), possessed all the information that was material to negotiating a fair price. Nothing could have been further from the truth.

3. The Adequacy of the Board And Shareholder Approvals

The fourth and final aspect of fair dealing concerns the adequacy of the board and shareholder approvals of the challenged transaction. In this case, those approvals were uninformed and, accordingly, of no legal consequence.

It is undisputed that the Privatization was approved by a unanimous vote of all ECM directors, with Prosser abstaining, at a board of directors' [*132] meeting held on August 17, 1998. [164] The board's approval was not informed, however, because the voting board members were ignorant of the existence of the June Projections and of the inadequacy of the Houlihan valuation that was based upon the March projections.

> 164   JX 33.

Moreover, Raynor, who was conflicted, voted in favor of the Privatization but did not disclose to the other voting board members, the $ 2.4 million compensation payout arrangement that he had recently negotiated with Prosser. As previously found, that nondisclosure was material.

By not disclosing these facts, Prosser and Raynor violated the fiduciary duty of disclosure they owed to their fellow directors of ECM. [165]

> 165   *Weinberger v. UOP, Inc., supra, 457 A.2d*

701.

The approval of the transaction by a majority of the minority shareholders [*133] was also legally ineffective, because the misdisclosures and omissions in the disclosure documents sent to shareholders in connection with the Privatization rendered that vote uninformed. Those misdisclosures and omissions also violated the fiduciary duty of disclosure owed by ECM's majority stockholder and by the ECM directors who were responsible for the accuracy of those documents. [166] The plaintiffs claim several disclosure violations, but the Court need address only three of them.

> 166   *Id., see also Lynch v. Vickers Energy Corp., 383 A.2d 278 (Del. 1977).*

First, the Proxy Statement omitted to disclose to the minority shareholders the existence of the June projections and the fact that those projections had been furnished to Prudential and the RTFC, but were withheld from the Special Committee and its advisors. That omission was materially misleading, not only in its own right but also because the proxy statement contained affirmative representations that the public was being provided [*134] with the same projections to which Prosser was privy. The section of the proxy statement containing the March projections (identified there only as "Company projections") disclosed that "[a]lthough the company does not as a matter of course publicly disclose projections as to future revenues or earnings, because they were received by Mr. Prosser and the parent [ICC, LLC], the purchaser [ICC] is making these projections available to all stockholders." [167] Those misdisclosures were highly material because knowledge of the June projections would have enabled the shareholders to understand ECM's intrinsic worth and the extent of the market's undervaluation of their company.

> 167   JX 155 at SC4128.

Second, the disclosure documents misled minority stockholders about the Special Committee's and the board's independence from Prosser. The Schedule 14D-9, which was disseminated in connection with the first-step tender offer, disclosed the members of the Special Committee and their compensation, but not their [*135] consulting relationships or retainer agreements with other Prosser entities. [168] Specifically, there was no disclosure of Raynor's or Ramphal's long-standing financial relationships with Prosser, including Raynor's $ 2.4

million payout arrangement for past services and Ramphal's significant consulting arrangements or his conflict concerning the economic and career prospects of his son-in-law. Nor was there disclosure of Muoio's consulting fee arrangement that had resulted in payments to him of hundreds of thousands of dollars. Also, because of their role as negotiators on behalf of the minority stockholders, the prior consulting relationships of Ramphal should have been disclosed. [169] The disclosure documents misleadingly suggested that the Special Committee, and perhaps a majority of the entire board, were independent. In fact, that was not true.

> 168   JX 251 at SC 4288-89; *see also JX155* at SC4108-09.
> 169   *See Clements v. Rogers, 790 A.2d 1222, 1242-43 (Del. Ch. 2001).*

[*136]   Third, that disclosure violation was compounded by the false disclosure that a majority of the board that approved the Privatization were members of the Special Committee. [170] In fact, only six of the board's seven members voted to approve the transaction, [171] and only three of those six were members of the Special Committee. Three is not a majority of seven. Also not disclosed was the related fact that ECM's and the Committee's original advisors who had been retained to represent the interests of all shareholders in the initially Proposed (but later abandoned) Merger, had been co-opted by Prosser and were now working against the minority stockholders whose interests that they were originally hired to further.

> 170   JX251 at SC4295.
> 171   JX33.

In short, the disclosure documents were crafted to reassure the minority stockholders that their interests had been effectively represented by a Special Committee of directors who were independent of Prosser and his entities on the other side of the [*137] transaction. That impression was materially false and misleading and was sufficient, without more, to render the approving vote of the stockholders uninformed. [172]

> 172   *See Clements v. Rogers, 790 A.2d 1222, 1242-43 (Del. Ch. 2001)* (accuracy of disclosures concerning the independence and effectiveness of a special negotiating committee are of particular importance were the transaction is with a controlling stockholder).

****

For all these reasons, the Court finds that the Privatization transaction, and the $ 10.25 per share merger price that has been adjudicated as unfair, were the product of unfair dealing. Accordingly, the Court concludes that the Privatization was not entirely fair to the minority stockholders of ECM. Having so found, the Court must now assess the liability consequences of that determination.

## V. THE DEFENDANTS' FIDUCIARY DUTY BREACHES AND LIABILITY THEREFOR

Having concluded that the Privatization was not entirely fair, the Court must next determine the nature [*138] of the fiduciary duty violation--whether of care, loyalty, or good faith-that resulted in the unfair transaction. [173] Under *Emerald Partners v. Berlin,* [174] that is necessary to enable the Court to adjudicate which (if any) of the director defendants is liable for money damages, because ECM's *§ 102(b)(7)* charter provision exculpates those directors found to have violated *solely* their duty of care from liability for money damages. Article Seventh of ECM's Certificate of Incorporation provides:

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit. [175]

173    That determination is required only for purposes of the fiduciary duty class action, not the appraisal. As the Court has found, the defendant that is solely liable in the appraisal proceeding is the surviving corporation in the merger, *i.e.,* Innovative. That entity is liable to Greenlight for $ 38.05, plus interest, for each ECM share for which appraisal was sought.

[*139]
174    *787 A.2d 85 (Del. 2001).*
175    Stipulation and Order, P164, at p.20.

By its terms, Article Seventh does not apply to fiduciaries other than directors. Thus, Article Seventh does not apply to Prosser in his capacity as ECM's controlling stockholder, or to ICC or Innovative, the entities that Prosser controlled and through which he effected the Privatization. Prosser, as majority stockholder, breached his duty of loyalty to Greenlight and the plaintiff shareholder class, by eliminating ECM's minority stockholders for an unfair price in an unfair transaction that afforded the minority no procedural protections. For that breach of duty Prosser is liable to Greenlight and the shareholder class. So also are the two Prosser-controlled entity defendants, Innovative and ICC, which were the mechanisms through which Prosser accomplished the Privatization. Those entities are liable for having aided and abetted Prosser's breach of fiduciary duty. [176]

176    *Weinberger v. Rio Grande Industries, Inc., 519 A.2d 116 (Del. Ch. 1986); Gilbert v. El Paso Co., 490 A.2d 1050, 1057 (Del. Ch. 1984).* [HN28] One of the requirements for "aiding and abetting" liability is the third party's "knowing participation" in the directors' breach of fiduciary duty. In that case, Prosser's knowledge must be attributed to the entities that he controlled and used to effectuate his breaches of duty.

[*140]    The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director.

Prosser is liable in his capacity as a director for breach of his duty of loyalty, conduct that is not exculpated under Article Seventh. Prosser is also liable on the basis that he "derived an improper personal benefit" from the Privatization transaction - which is another exception to the exculpatory coverage of Article Seventh.

Raynor also is liable for breaching his fiduciary duty of loyalty -- conduct that is excluded from the exculpatory shield of Article Seventh. Raynor did not personally and directly benefit from the unfair transaction (as did Prosser), but Raynor actively assisted Prosser in

carrying out the Privatization, and he acted to further Prosser's interests in that transaction, which were antithetical to the interests of ECM's minority stockholders.

Raynor acted in concert with Prosser, who was the source of Raynor's livelihood, to "flip" the transaction from a merger of Innovative into ATNCo, to a going private merger of ECM into Innovative. [177] [*141] Raynor also assisted Prosser and Innovative in obtaining RTFC financing for the Privatization [178] at the time when Raynor was still serving on the First Special Committee, ostensibly to safeguard the interests of ECM's minority stockholders. [179] After the Second Special Committee was formed, Raynor attended a meeting with Prosser and two ECM officers and the RTFC to discuss issues relating to the structuring of the revised deal. [180] Finally, on July 20, 1998, Opus Capital Partners ("Opus") sent a letter to Goodwin, complaining that the initial $ 9.125 price was too low and should be around $ 30. [181] This letter was somehow "leaked" to Cahill, Prudential, and Raynor, [182] and Raynor reported the contents of the Opus letter to the RTFC, editorializing that "Opus-biggest [shareholder with] dissenting opinion on buy back bought in @$ 6 or $ 7/share [but] believes should be valued @ $ 30 per share." [183]

177    JX155 at SC4110; Raynor Dep. 171-173.
178    JX184 at RTFC1474.
179    Trial Tr. Vol. 10 (Prosser) at 1796-97.
180    JX 187 at RTFC5145-46.
181    JX 32.

[*142]

182    JX 280; JX 106; JX 186 at RTFC5135.
183    JX 186 at RTFC5135; Reed Dep. 153.

Although Raynor did not benefit directly from the transactions, his loyalties ran solely to Prosser because Raynor's economic interests were tied solely to Prosser and he acted to further those economic interests. Accordingly, Raynor is liable to Greenlight and the shareholder class for breaching his fiduciary duty of loyalty and/or good faith. [184]

184    The Court employs the "and/or" phraseology because the Delaware Supreme Court has yet to articulate the precise differentiation between the duties of loyalty and of good faith. If a loyalty breach requires that the fiduciary have a self-dealing conflict of interest in the transaction itself, as at least one commentator has suggested,

then only Prosser is liable on that basis. Raynor would be liable for violating his duty of good faith for consciously disregarding his duty to the minority stockholders. *See* Hillary A. Sale, *Delaware's Good Faith, 89 Cornell L. Rev. 456 (2004).* On the other hand, if a loyalty breach, does not require a self-dealing conflict of interest or receipt of an improper benefit, then Raynor would be liable for breaching his duties of loyalty *and* good faith. *See Strassburger v. Earley, 752 A.2d 557 (Del. Ch. 2000)* (director whose conduct in a transaction evidences loyalty solely to employer whose interests were adverse to the corporation held to have violated his duty of loyalty). The Court need not decide that definitional issue, because under either definition, Raynor's conduct amounted to a non-exculpated breach of fiduciary duty.

[*143] The Court also concludes, albeit with reluctance, that Muoio is similarly liable, even though Muoio's conduct was less egregious than that of Prosser and Raynor. Unlike Raynor, Muoio did nothing affirmatively to assist Prosser in breaching his fiduciary duties of loyalty and good faith. Like his fellow directors, Muoio was also not independent of Prosser.

Muoio is culpable because he voted to approve the transaction even though he knew, or at the very least had strong reasons to believe, that the $ 10.25 per share merger price was unfair. Muoio was in a unique position to know that. He was a principal and general partner of an investment advising firm, with significant experience in finance and the telecommunications sector. From 1995 to 1996, Muoio had been a securities analyst for, and a vice president of, Lazard Freres & Co. in the telecommunications and media sector. From 1985 to 1995, he was a securities analyst for Gabelli & Co., Inc., in the communications sector, and from 1993 to 1995, he was a portfolio manager for Gabelli Global Communications Fund, Inc. [185]

185    Pretrial Stip. and Order, P's 40-42.

[*144] Hence, Muoio possessed a specialized financial expertise, and an ability to understand ECM's intrinsic value, that was unique to the ECM board members (other than, perhaps, Prosser). Informed by his specialized expertise and knowledge, Muoio conceded that the $ 10.25 price was 'at the low end of any kind of fair value you would put," [186] and expressed to Goodwin

his view that the Special Committee might be able to get up to $ 20 per share from Prosser. [187] In these circumstances, it was incumbent upon Muoio, as a fiduciary, to advocate that the board reject the $ 10.25 price that the Special Committee was recommending. As a fiduciary knowledgeable of ECM's intrinsic value, Muoio should also have gone on record as voting against the proposed transaction at the $ 10.25 per share merger price. Muoio did neither. Instead he joined the other directors in voting, without objection, to approve the transaction.

186  Muoio Dep. at 175.
187  Goodwin Dep. Sept. 6, 2001 at 47.

ECM's directors other [*145] than Prosser and Raynor could plausibly argue that they voted for the transaction in reliance on Houlihan's opinion that the merger term price was fair. In Muoio's case, however, that argument would be implausible. Muoio's expertise in this industry was equivalent, if not superior, to that of Houlihan, the Special Committee's financial advisor. That expertise gave Muoio far less reason to defer to Houlihan's valuation. Knowing (or at least having very strong reasons to suspect) that the price was unfair, why, then, would Muoio vote to approve this deal? The only explanation that makes sense is that Muoio, who was seeking future business opportunities from Prosser, decided that it would disserve his interests to oppose Prosser and become the minority's advocate.

Admittedly, divining the operations of a person's mind is an inherently elusive endeavor. Concededly, the possibility exists that Muoio's decision was driven not by his overriding loyalty to Prosser, but by a sincere belief that the $ 10.25 price was minimally fair, even if not the fairest or highest price attainable. But in this case that possibility is not sufficient to carry the day, because [HN29] to establish a director's exculpation [*146] from liability under 8 Del. C. § 102(b)(7), the burden falls upon the director to show that "[his] failure to withstand an entire fairness analysis is *exclusively* attributable to a violation of the duty of care." [188] Muoio has not carried that burden.

188  Emerald Partners v. Berlin, 787 A.2d at 98 (italics added).

The credible evidence persuades the Court that Muoio's conduct is explainable in terms of only one of two possible mindsets. The first is that Muoio made a

deliberate judgment that to further his personal business interests, it was of paramount importance for him to exhibit his primary loyalty to Prosser. The second was that Muoio, for whatever reason, "consciously and intentionally disregarded" his responsibility to safeguard the minority stockholders from the risk, of which he had unique knowledge, that the transaction was unfair. [189] If motivated by either of those mindsets, Muoio's conduct would have amounted to a violation of his duty [*147] of loyalty and/or good faith. [190] Because Muoio has not established to the satisfaction of the Court, after careful scrutiny of the record, that his motivation was of a benign character, he is not exculpated from liability to Greenlight and the shareholder class.

189  *See In re Walt Disney Co. Derivative Litig., 825 A.2d 275, 289 (Del. Ch. 2003).*
190  *See* note 184, *supra.*

That leaves the four remaining directors -- Goodwin, Ramphal, Todman, and Vondras -- whose conduct, while also highly troublesome, is far more problematic from a liability standpoint than that of Prosser, Raynor, and Muoio. Like Raynor and Muoio, those directors (except possibly Goodwin) were not independent of Prosser, they all voted for the Privatization, and none had a personal conflicting financial interest in, or derived a personal benefit from, that transaction to the exclusion of the minority stockholders.

The conduct of these four directors differs from that of Raynor and Muoio, in that there [*148] is no evidence that any of those directors affirmatively colluded with Prosser to effectuate the Privatization, or that they otherwise deliberately engaged in conduct disloyal to the minority stockholders' interests. Nor have the plaintiffs shown that any of those directors knew or had reason to believe, that the merger price was unfair.

This is not intended to suggest that these directors covered themselves in glory, or merit commendation, for the manner in which they discharged their responsibility as fiduciaries. But it is to say, and this Court after considerable reflection finds, that there is no persuasive evidence that the fiduciary violations of the ECM directors other than Prosser, Raynor, and Muoio implicated conduct more egregious than breaches of their duty of care.

A logical starting point in the analysis is first to consider the conduct of the members of the Second

Special Committee: Goodwin, Ramphal and Vondras. Because Ramphal was located in London and Vondras in Indonesia, they never met in person with each other or with Goodwin, who became the Committee's sole working member. Put differently, all Committee initiatives and decisions were made initially by Goodwin, subject [*149] to concurrence by Ramphal and Vondras, who on all relevant issues willingly deferred to Goodwin and relied upon his recommendations, both as to the Committee's process and the transaction price.

Although Goodwin negotiated a merger price ($ 10.25 per share) that this Court has found to be unfair, there is no persuasive evidence that Goodwin knew or should have known that this was the case. Primarily, that is because critical information was withheld from Goodwin, from the other Committee members, from and their financial advisor, Houlihan. Based upon information that in material respects was incomplete, Houlihan opined that the negotiated price was fair, and there is no evidence that Goodwin, who had negotiated the price with Prosser, had reason to believe otherwise.

This is not to say that Goodwin carried out this process with the care that would be expected of someone of his distinguished background and accomplishments. No justification has been shown for Goodwin communicating with the other Committee members through Ms. Joseph, the secretary of the minority stockholders' negotiating adversary, Prosser. That misstep constituted a violation of Goodwin's duty of care and resulted [*150] in critical information being leaked to the other side. But, that fiduciary breach was of no actionable consequence, because Goodwin had all along been deprived of material information that both he and Houlihan needed to negotiate a fair price. Consequently, even if Goodwin had maintained adequate security arrangements, there is no basis to conclude that the result would have been any different.

The plaintiffs insist, however, that Goodwin's fiduciary violations were of a character far more egregious than duty of care violations. Plaintiffs urge that: (1) Goodwin (as well as Ramphal and Vondras) were financially not independent of Prosser and were motivated to do whatever was needed to remain in Prosser's good graces, (2) Goodwin willingly acceded to retaining the Special Committee's legal and financial advisors from among candidates that had been selected by Prosser or his advisors, (3) Goodwin's "negotiations"

with Prosser were nothing more than a scripted minuet wherein Goodwin, on behalf of the Committee, would bargain for a negligible price increase, (4) that bargaining, coupled with the gilt-edged credentials of all three Committee members, would create a credible record of [*151] "arm's length" negotiations sufficient to survive entire fairness review. Goodwin's decision to route his communications through Ms. Joseph was, plaintiffs argue, further dramatic evidence that his true loyalties were to serve Prosser and his interests. This conduct, plaintiffs insist, violated Prosser's (and Ramphal's and Vondras's) fiduciary duties of loyalty and/or good faith -- conduct that is not exculpated under Article Seventh.

It is correct (and this Court has found) that with the possible exception of Goodwin, none of the Committee members was independent of Prosser, that viewed with perfect hindsight the magnitude of the negotiated price increase was negligible, and that Goodwin permitted his communications with Ramphal and Vondras to be routed through Prosser's secretary. In quite different circumstances that might establish a violation of the duties of good faith and/or loyalty, especially since the burden of establishing exculpation falls upon the directors seeking exculpation. But here that procedural burden does not help the plaintiffs, because the evidence, viewed as a whole, fails to establish a *prima facie* case of bad faith or disloyalty that these directors [*152] would be called upon to negate or disprove.

More specifically, although Goodwin, Ramphal and Vondras, because of their relationship to Prosser, might have been motivated to aid Prosser in his scheme to force out ECM's minority at an unfair price, there is no evidence that they actually engaged in such improperly motivated conduct, or otherwise acted with disloyal intent. To be sure, Goodwin's conduct may fairly be described as having violated his duty of care. And, given the non-independence of Ramphal and Vondras, their wholesale abdications to Goodwin of their responsibility as Committee members to take an active and direct role in the process, also bespeaks a failure to observe the requisite due care. [191] But [HN30] negligent or even gross negligent conduct, however misguided, does not automatically equate to disloyalty or bad faith. There is no evidence that Goodwin, Ramphal and Vondras intentionally conspired with Prosser to engage in a process that would create the illusion, but avoid the reality, of arm's length bargaining to obscure the true

purpose of benefiting Prosser at the expense of the minority stockholders.

> 191  *See Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 368 (Del. 1993)* ("We have stated that a director's duty of care requires a director to take an active and direct role in the context of a sale of a company from beginning to end.")

[*153] Nor, in these circumstances, did those directors' conduct amount to a breach of their fiduciary duty to act in good faith. [HN31] Although the Supreme Court has yet to define the precise conduct that would actionably violate that duty, this Court has recently held that directors can be found to have violated their duty of good faith if they *"consciously and intentionally disregard[] their responsibilities,* adopting a 'we don't care about the risks' attitude concerning a material corporate decision." [192] Here, there is no evidence that Goodwin, Ramphal, or Vondras acted with conscious and intentional disregard of their responsibilities, or made decisions with knowledge that they lacked material information. Because the conduct of those director defendants was, solely and at most, a violation of their duty of care, they are exculpated from liability under Article Seventh.

> 192  *In re Walt Disney, 825 A.2d at 289* (italics in original). Elaborating on that formulation, the Chancellor observed that [HN32] directors actionably violate their duty of good faith if they *"knew* that they were making material decisions without adequate information and without adequate deliberation, and . . . they simply did not care if the decisions caused the corporations and its stockholders to suffer injury or loss." *Id.*

[*154] The foregoing analysis and conclusion are equally applicable to the seventh director, Todman. The circumstance that differentiates Todman from Goodwin, Ramphal and Vondras is that Todman played no role in the negotiation of the merger terms, his sole involvement being to cast his vote as a director in favor of the Privatization. Because (unlike Muoio) there is no

evidence that Todman knew or had reason to suspect that the price was unfair, it may fairly be concluded that he voted for the transaction in reliance upon the pronouncements by Houlihan and the Special Committee that the merger price was fair. Accordingly, it serves no purpose for the Court to determine whether or not Todman's conduct amounted to a breach of his duty of care, because in either case the record evidence compels the finding that Todman committed no violation of his duty of loyalty or his duty of good faith. Accordingly, Todman is not liable, either because he has not been shown culpable in any respect, or because at most his conduct would have amounted to a breach of his duty of care, for which Todman would be exculpated under Article Seventh.

## VI. CONCLUSION

For the reasons set forth above:

(1) In [*155] the appraisal action, Innovative, as the surviving corporation, is liable to Greenlight in the amount of $ 38.05 per share for each of the 750,300 shares that are subject to the appraisal, plus interest at the rate of 6.27%, compounded monthly, from the date of the merger to the date of the judgment.

(2) In the fiduciary duty action, defendants Innovative, ICC, Prosser, Raynor and Muoio are jointly and severally liable to the plaintiff class and to Greenlight (in its capacity as holder of litigation rights assigned by former ECM shareholders) in an amount equal to $ 27.80 per share. [193]

> 193  $ 27.80 per share is equal to the difference between the fair value of ECM on the merger date ($ 38.05 per share) and the merger price paid to the ECM minority shareholders ($ 10.25 per share).

Counsel shall confer and submit an agreed form of Final Order and Judgment implementing the rulings made in this Opinion.

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, **Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia**

# Exhibit B2

to

# National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

**IN AND FOR NEW CASTLE COUNTY**

```
--------------------------------------------------------- x
IN RE EMERGING COMMUNICATIONS,        :      Consolidated
INC. SHAREHOLDERS LITIGATION          :      Civil Action No. 16415 NC
--------------------------------------------------------- x
```

### FINAL ORDER AND JUDGMENT

AND NOW, this 9ᵀᴴ day of January, 2006, the foregoing matter having been heard and considered after a full trial on the merits;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    Final judgment in C.A. No. 18816 is hereby entered on behalf of Plaintiffs Greenlight Capital Qualified L.P., Greenlight Capital L.P., and Greenlight Capital Offshore, Ltd. (collectively, "Greenlight"), as holders of 2,026,685 litigation rights assigned to Greenlight by former shareholders of Emerging, against Innovative Communication Company, LLC (a Delaware limited liability company), Innovative Communication Corporation (a dissolved Virgin Islands corporation), and Jeffrey J. Prosser, jointly and severally, in the principal amount of $56,341,843, together with interest thereon at the rate of 6.27%, compounded monthly from October 19, 1998 to the date of entry of this Order and Judgment.

2.    Post-judgment interest at the rate of 6.27% shall accrue on the amount of the judgment until the date of payment.

3.      Ordinary court costs, exclusive of attorneys' fees and expert witness costs, shall be borne by Emerging Communications, Inc., Innovative Communication Corporation, Innovative Communication Company, LLC, and Jeffrey J. Prosser, jointly and severally.

_____
Justice Jack B. Jacobs

Dated:       January 1, 2006

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

```
--------------------------------------------- x
IN RE EMERGING COMMUNICATIONS,               :    Consolidated
INC. SHAREHOLDERS LITIGATION                 :    Civil Action No. 16415 NC
--------------------------------------------- x
```

## FINAL ORDER AND JUDGMENT

AND NOW, this 9ᵗᵘ day of January, 2006, the foregoing matter having been heard and considered after a full trial on the merits;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    The fair value of a share of Emerging Communications, Inc. ("Emerging") as of October 19, 1998 is determined to be $38.05.

2.    Final judgment in C.A. No. 16943 is hereby entered on behalf of Petitioners Greenlight Capital Qualified L.P., Greenlight Capital L.P., and Greenlight Capital Offshore, Ltd. (collectively, "Greenlight"), against Emerging Communications, Inc. in the principal amount of $28,548,915.00, together with interest thereon at the rate of 6.27%, compounded monthly from October 19, 1998 to the date of entry of this Final Order and Judgment.

3.    Post-judgment interest at the rate of 6.27% shall accrue on the amount of the judgment until the date of payment.

4.    Ordinary court costs, exclusive of attorneys' fees and expert witness costs, shall be borne by Emerging Communications, Inc., Innovative Communications Corporation, Innovative Communication Company, LLC, and Jeffrey J. Prosser, jointly and severally.

_____
Justice Jack B. Jacobs

Dated:    January    9, 2006

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia

# Exhibit C

to

## National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss

# View Document

---

## NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORP /DC/
**10-K - MAY 31, 2007 10K filed 08/27/07**

**View** | **Email** | **Print** | **Save** ☐ Review Settings    **Add to Worklist**    **Compare Wizard**

**REQUIRED ITEMS** View Filing | Filing Values    Filed under the **The Securities Exchange Act of 1934**

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF

THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended May 31, 2007

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from                    to

Commission File Number 1-7102

## NATIONAL RURAL UTILITIES COOPERATIVE
## FINANCE CORPORATION

(Exact name of registrant as specified in its charter)

DISTRICT OF COLUMBIA
(State or other jurisdiction of incorporation or organization)

52-0891669
(I.R.S. Employer Identification Number)

2201 COOPERATIVE WAY, HERNDON, VA 20171
(Address of principal executive offices)
(Registrant's telecommunications number, including area code, is 703-709-6700)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which listed | Title of each class | Name of each exchange on which listed |
|---|---|---|---|
| 6.20% Collateral Trust Bonds, due 2008 | NYSE | 7.35% Collateral Trust Bonds, due 2026 | NYSE |
| 5.75% Collateral Trust Bonds, due 2008 | NYSE | 6.75% Subordinated Notes, due 2043 | NYSE |

| | | | |
|---|---|---|---|
| 5.70% Collateral Trust Bonds, due 2010 | NYSE | 6.10% Subordinated Notes, due 2044 | NYSE |
| 7.20% Collateral Trust Bonds, due 2015 | NYSE | 5.95% Subordinated Notes, due 2045 | NYSE |
| 6.55% Collateral Trust Bonds, due 2018 | NYSE | | |

Indicated by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained to the best of the registrant's knowledge in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.[ ☒ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer.  See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☐          Non-accelerated filer ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐  No ☒.

The Registrant is a cooperative and consequently, does not issue any equity capital stock.

**TABLE OF CONTENTS**

| Part No. | Item No. | | Page |
|---|---|---|---|
| I. | 1. | Business | 1 |
| | | General | 1 |
| | | Members | 2 |
| | | Distribution Systems | 3 |
| | | Power Supply Systems | 3 |
| | | Service Organizations and Associate Systems | 3 |
| | | Telecommunications Systems | 3 |
| | | Loan Programs | 4 |
| | | Interest Rates on Loans | 5 |
| | | CFC Loan Programs | 5 |
| | | RTFC Loan Programs | 5 |
| | | NCSC Loan Programs | 6 |
| | | RUS Guaranteed Loans for Rural Electric Systems | 6 |
| | | Conversion of Loans | 6 |
| | | Prepayment of Loans | 6 |
| | | Loan Security | 6 |
| | | Guarantee Programs | 7 |
| | | Guarantees of Long-Term Tax-Exempt Bonds | 7 |
| | | Guarantees of Tax Benefit Transfers | 8 |
| | | Letters of Credit | 8 |
| | | Other Guarantees | 8 |
| | | Disaster Recovery | 9 |
| | | Tax Status | 9 |
| | | Investment Policy | 9 |
| | | Employees | 9 |
| | | CFC Lending Competition | 9 |
| | | Member Regulation and Competition | 10 |
| | | The RUS Program | 12 |
| | 1A. | Risk Factors | 13 |
| | 1B. | Unresolved Staff Comments | 14 |
| | 2. | Properties | 15 |
| | 3. | Legal Proceedings | 15 |
| | 4. | Submission of Matters to a Vote of Security Holders | 15 |
| II. | 5. | Market for the Registrant's Common Equity and Related Stockholder Matters | 16 |
| | 6. | Selected Financial Data | 16 |
| | 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 17 |
| | | Restatement | 17 |
| | | Business Overview | 17 |
| | | Critical Accounting Estimates | 20 |
| | | New Accounting Pronouncements | 23 |
| | | Results of Operations | 24 |
| | | Ratio of Earnings to Fixed Charges | 32 |
| | | Financial Condition | 33 |
| | | Off-Balance Sheet Obligations | 41 |
| | | Liquidity and Capital Resources | 43 |
| | | Market Risk | 46 |
| | | Non-GAAP Financial Measures | 51 |
| | 7A. | Quantitative and Qualitative Disclosures About Market Risk | 55 |
| | 8. | Financial Statements and Supplementary Data | 55 |
| | 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 55 |
| | 9A. | Controls and Procedures | 55 |
| | 9B. | Other Information | 56 |
| III. | 10. | Directors and Executive Officers of the Registrant | 57 |
| | 11. | Executive Compensation | 63 |
| | 12. | Security Ownership of Certain Beneficial Owners and Management | 72 |
| | 13. | Certain Relationships and Related Transactions | 72 |
| | 14. | Principal Accountant Fees and Services | 73 |
| IV. | 15. | Exhibits and Financial Statement Schedules | 75 |
| | | Signatures | 77 |

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Form 10-K contains forward-looking statements within the meaning of the Securities Act of 1933, as amended, and the Exchange Act of 1934, as amended. Forward-looking statements, which are based on certain assumptions and describe our future plans, strategies and expectations, are generally identified by our use of words such as "intend," "plan," "may," "should," "will," "project," "estimate," "anticipate," "believe," "expect," "continue," "potential," "opportunity," and similar expressions, whether in the negative or affirmative. All statements that address expectations or projections about the future, including statements about loan growth, the adequacy of the loan loss allowance, net income growth, leverage and debt to equity ratios, and borrower financial performance are forward-looking statements. Although we believe that the expectations reflected in our forward-looking statements are based on reasonable assumptions, actual results and performance could differ materially from those set forth in the forward-looking statements. Factors that could cause future results to vary from current expectations include, but are not limited to, general economic conditions, legislative changes, governmental monetary and fiscal policies, changes in tax policies, changes in interest rates, the interest expense, demand for our loan products, changes in the quality or composition of our loan and investment portfolios, changes in accounting principles, policies or guidelines, and other economic and governmental factors affecting our operations. Some of these and other factors are discussed in our annual and quarterly reports previously filed with the Securities and Exchange Commission ("SEC"). Except as required by law, we undertake no obligation to update or publicly release any revisions to forward-looking statements to reflect events, circumstances or changes in expectations after the date on which the statement is made.

The information contained in this section should be read in conjunction with our consolidated financial statements and related notes and the information contained elsewhere in this Form 10-K, including that set forth under Item 1A, *Risk Factors*.

## PART I

### Item 1.            Business.

#### General

National Rural Utilities Cooperative Finance Corporation ("CFC" or "the Company") is a private, not-for-profit cooperative association incorporated under the laws of the District of Columbia in April 1969. The principal purpose of CFC is to provide its members with a source of financing to supplement the loan programs of the Rural Utilities Service ("RUS") of the United States Department of Agriculture. CFC makes loans to its rural utility system members ("utility members") to enable them to acquire, construct and operate electric distribution, generation, transmission and related facilities. CFC also provides its members with credit enhancements in the form of letters of credit and guarantees of debt obligations. CFC is exempt from payment of federal income taxes under the provisions of Section 501(c)(4) of the Internal Revenue Code. CFC is a not-for-profit member-owned finance cooperative, thus its objective is not to maximize its net income, but to offer its members low cost financial products and services consistent with sound financial management. CFC's internet address is www.nrucfc.coop, where under "Investors," copies can be found of this annual report on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, and amendments thereto, all of which CFC makes available as soon as reasonably practicable after the report is filed with the SEC. Information posted on CFC's website is not incorporated by reference into this Form 10-K.

For financial statement purposes, the results of operations and financial condition of CFC are consolidated with and include Rural Telephone Finance Cooperative ("RTFC") and National Cooperative Services Corporation ("NCSC"). Unless stated otherwise, references to the Company relate to the consolidation of CFC, RTFC, NCSC and certain entities controlled by CFC and created to hold foreclosed assets and effect loan securitization transactions. CFC also reports the operations for each of CFC, RTFC and NCSC as separate segments.

RTFC is a private not-for-profit cooperative association incorporated under the laws of the District of Columbia. The principal purpose of RTFC is to provide and arrange financing for its rural telecommunications members and their affiliates. CFC is the sole lender to and manages the lending and financial affairs of RTFC through a long-term management agreement. Under a guarantee agreement, RTFC pays CFC a fee in exchange for which CFC reimburses RTFC for loan losses. RTFC is headquartered with CFC in Herndon, Virginia. RTFC is a taxable cooperative that pays income tax based on its net income, excluding net income allocated to its members, as allowed by law under Subchapter T of the Internal Revenue Code.

NCSC was incorporated in 1981 in the District of Columbia as a private non-profit cooperative association. The principal purpose of NCSC is to provide financing to the for-profit and non-profit entities that are owned, operated or controlled by, or provide substantial benefit to, members of CFC. NCSC also markets, through its cooperative members, a consumer loan program for home improvements and an affinity credit card program. NCSC's membership consists of CFC and distribution systems that are members of CFC or are eligible for such membership. CFC is the primary source of funding to and manages the lending and financial affairs of NCSC through a management agreement which is automatically renewable on an annual basis unless terminated by either party. Under a guarantee agreement, NCSC pays CFC a fee in exchange for which CFC reimburses NCSC for loan losses, excluding losses in the consumer loan program. NCSC is headquartered with CFC in Herndon, Virginia. NCSC is a taxable corporation.

1

*Members*

The Company's consolidated membership was 1,544 as of May 31, 2007 including 899 utility members, the majority of which are consumer-owned electric cooperatives, 513 telecommunications members, 66 service members and 66 associates in 49 states, the District of Columbia and two U.S. territories. The utility members included 830 distribution systems and 69 generation and transmission ("power supply") systems. Memberships between CFC, RTFC and NCSC have been eliminated in consolidation.

CFC currently has four classes of electric members:
- Class A - cooperative or not-for-profit distribution systems;
- Class B - cooperative or not-for-profit power supply systems;
- Class C - statewide and regional associations wholly-owned or controlled by Class A or Class B members; and
- Class D - national associations of cooperatives.

The associates are not-for-profit entities organized on a cooperative basis which are owned, controlled or operated by Class A, B or C members and which provide non-electric services primarily for the benefit of ultimate consumers. Associates are not entitled to vote at any meeting of the members and are not eligible to be represented on CFC's board of directors. All references to members within this document include members and associates.

Membership in RTFC is limited to commercial (for-profit) or cooperative (not-for-profit) telecommunications systems that receive or are eligible to receive loans or other assistance from RUS, and that are engaged (or plan to be engaged) in providing telecommunications services to ultimate users.

Membership in NCSC is limited to CFC and organizations that are Class A members of CFC or are eligible to be Class A members of CFC.

In many cases, the residential and commercial customers of CFC's electric members are also the customers of RTFC's telecommunications members, as the service territories of the electric and telecommunications members overlap in many of the rural areas of the United States.

Set forth below is a table showing by state or U.S. territory the total number of CFC, RTFC and NCSC members, the percentage of total loans and the percentage of total loans and guarantees outstanding at May 31, 2007.

| State/Territory | Number of Members | Loan % | Loan and Guarantee % | State/Territory | Number of Members | Loan % | Loan and Guarantee % |
|---|---|---|---|---|---|---|---|
| Alabama | 30 | 1.92% | 2.19% | Missouri | 65 | 3.48% | 3.73% |
| Alaska | 30 | 1.85% | 1.76% | Montana | 40 | 0.73% | 0.74% |
| American Samoa | 1 | - | - | Nebraska | 40 | 0.09% | 0.09% |
| Arizona | 27 | 0.99% | 1.13% | Nevada | 7 | 0.81% | 0.80% |
| Arkansas | 30 | 2.86% | 2.76% | New Hampshire | 4 | 0.83% | 0.96% |
| California | 11 | 0.15% | 0.15% | New Jersey | 1 | 0.10% | 0.09% |
| Colorado | 40 | 5.09% | 5.09% | New Mexico | 25 | 0.18% | 0.17% |
| Connecticut | 1 | 1.10% | 1.04% | New York | 21 | 0.11% | 0.10% |
| Delaware | 1 | 0.22% | 0.21% | North Carolina | 44 | 2.86% | 3.23% |
| District of Columbia | 4 | 0.05% | 0.16% | North Dakota | 34 | 0.43% | 0.44% |
| Florida | 19 | 3.40% | 3.24% | Ohio | 42 | 2.15% | 2.06% |
| Georgia | 68 | 8.64% | 8.29% | Oklahoma | 49 | 2.65% | 2.52% |
| Guam | 1 | - | - | Oregon | 40 | 1.69% | 1.74% |
| Hawaii | 1 | 0.04% | 0.04% | Pennsylvania | 25 | 2.07% | 2.05% |
| Idaho | 17 | 0.93% | 0.89% | South Carolina | 38 | 2.63% | 2.52% |
| Illinois | 52 | 3.00% | 2.83% | South Dakota | 46 | 0.89% | 0.84% |
| Indiana | 53 | 2.65% | 2.51% | Tennessee | 29 | 0.53% | 0.50% |
| Iowa | 118 | 2.66% | 2.55% | Texas | 109 | 14.44% | 14.43% |
| Kansas | 49 | 4.69% | 4.71% | Utah | 11 | 3.12% | 3.04% |
| Kentucky | 33 | 1.96% | 2.50% | Vermont | 7 | 0.42% | 0.41% |
| Louisiana | 17 | 1.77% | 1.69% | Virgin Islands | 0 | 2.72% | 2.57% |
| Maine | 6 | 0.05% | 0.05% | Virginia | 27 | 1.02% | 0.98% |
| Maryland | 2 | 1.14% | 1.21% | Washington | 19 | 0.61% | 0.70% |
| Massachusetts | 1 | - | - | West Virginia | 4 | 0.03% | 0.03% |
| Michigan | 27 | 1.50% | 1.42% | Wisconsin | 62 | 2.04% | 1.92% |
| Minnesota | 75 | 4.04% | 3.87% | Wyoming | 15 | 0.65% | 0.68% |
| Mississippi | 26 | 2.02% | 2.37% | Total | 1,544 | 100.00% | 100.00% |

2

### Distribution Systems

Distribution systems are utilities engaged in retail sales of electricity to consumers in their service areas. Most distribution systems have all-requirements power purchase contracts with their power supply systems, which are owned and controlled by the member distribution systems. Wholesale power for resale also comes from other sources, including power supply system contracts with government agencies, investor-owned utilities and other entities, and in rare cases, the distribution system's own generating facilities.

Wholesale power supply contracts ordinarily guarantee neither an uninterrupted supply nor a constant cost of power. Contracts with RUS-financed power supply systems (which generally require the distribution system to purchase all its power requirements from the power supply system) provide for rate increases to pass along increases in sellers' costs. The wholesale power contracts permit the power supply system, subject to approval by RUS and, in certain circumstances, regulatory agencies, to establish rates to its members so as to produce revenues sufficient, with revenues from all other sources, to meet the costs of operation and maintenance (including replacements, insurance, taxes and administrative and general overhead expenses) of all generating, transmission and related facilities, to pay the cost of any power and energy purchased for resale, to pay the costs of generation and transmission, to make all payments on account of all indebtedness and lease obligations of the power supply system and to provide for the establishment and maintenance of reasonable reserves. The board of directors of the power supply system may review the rates under the wholesale power contracts at least annually.

Power contracts with investor-owned utilities and power supply systems which do not borrow from RUS generally have rates subject to regulation by the Federal Energy Regulatory Commission ("FERC"). Contracts with federal agencies generally permit rate changes by the selling agency (subject, in some cases, to federal regulatory approval).

### Power Supply Systems

Power supply systems are utilities that purchase or generate electric power and provide it on a wholesale basis to distribution systems for delivery to the ultimate retail consumer. Of the 61 operating power supply systems financed in whole or in part by RUS or CFC at December 31, 2005 (the most recent year for which data is available), 60 were cooperatives owned directly or indirectly by groups of distribution systems and one was government owned. Of this number, 34 had generating capacity of at least 100 megawatts, 12 had less than 100 megawatts of generating capacity and 14 had no generating capacity. The systems with no generating capacity generally operated transmission lines to supply certain distribution systems. Certain other power supply systems have been formed but do not yet own generating or transmission facilities.

### Service Organizations and Associate Systems

Service organizations include the National Rural Electric Cooperative Association ("NRECA"), statewide and regional cooperative associations. NRECA represents cooperatives nationally.

Associates include organizations that are owned, controlled or operated by Class A, B or C members and that provide non-electric services primarily for the benefit of ultimate consumers.

### Telecommunications Systems

Telecommunications systems include not-for-profit cooperative organizations and for-profit commercial organizations that primarily provide local exchange and access telecommunications services to rural areas.

Independent rural telecommunications companies provide service throughout many of the rural areas of the United States. These companies, which number approximately 1,300, are called independent because they are not affiliated with Verizon, AT&T or Qwest. Included in the 1,300 total are approximately 250 not-for-profit cooperative telecommunications companies. The majority of these independent rural telecommunications companies are family-owned or privately-held commercial companies. Approximately 20 of these commercial companies are publicly traded or issue bonds publicly.

Rural telecommunications companies (including all local exchange carriers ("LECs") other than Verizon, AT&T, Qwest, Cincinnati Bell and Embarq (formerly Sprint's local exchange properties)) comprise a relatively small sector (less than 15%) of a local exchange telecommunications industry that provides service to over 172 million access lines. These rural companies range in size from fewer than 100 customers to more than one million. Rural telecommunications companies' annual operating revenues range from less than $100,000 to over $2 billion. In addition to basic local exchange and access telecommunications service, most independents offer other communications services including wireless telephone, cable television and internet access. Most rural telecommunications companies' networks incorporate digital switching, fiber optics, internet protocol telephony and other advanced technologies.

3

**Loan Programs**

Set forth below is a table showing the weighted average loans outstanding to borrowers and the weighted average interest rates thereon by loan program and by segment during fiscal years ended May 31:

| | 2007 | | 2006 | |
| --- | --- | --- | --- | --- |
| | Weighted average loans outstanding | Weighted average interest rate | Weighted average loans outstanding | Weighted average interest rate |
| (Dollar amounts in thousands) | | | | |
| Total by loan type: (1) | | | | |
| Long-term fixed rate loans | $   14,323,272 | 5.87% | $   13,672,251 | 5.64% |
| Long-term variable rate loans | 1,433,484 | 7.58% | 2,351,131 | 6.43% |
| Loans guaranteed by RUS | 258,407 | 5.59% | 262,852 | 5.34% |
| Short-term loans | 1,028,585 | 7.06% | 948,774 | 6.07% |
| Non-performing loans | 534,733 | 0.02% | 570,196 | 0.01% |
| Restructured loans | 614,580 | 0.61% | 599,779 | 0.08% |
| Total loans | $   18,193,061 | 5.79% | $   18,404,983 | 5.48% |
| | | | | |
| Total by segment: | | | | |
| CFC | $   15,803,285 | 5.80% | $   15,604,657 | 5.43% |
| RTFC | 1,993,672 | 5.30% | 2,356,449 | 5.50% |
| NCSC | 396,104 | 8.00% | 443,877 | 7.08% |
| Total | $   18,193,061 | 5.79% | $   18,404,983 | 5.48% |

(1) Loans are classified as long-term or short-term based on their original maturity.

Total loans outstanding by state or U.S. territory based on the location of the system's headquarters are summarized below at May 31:

(in thousands)

| State/Territory | 2007 | 2006 | 2005 | State/Territory | 2007 | 2006 | 2005 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Alabama | $   347,723 | $   355,420 | $   362,305 | Montana | $   132,603 | $   147,731 | $   164,715 |
| Alaska | 335,352 | 333,716 | 330,827 | Nebraska | 16,447 | 14,149 | 15,635 |
| American Samoa | 769 | 1,604 | 2,765 | Nevada | 147,401 | 137,701 | 141,571 |
| Arizona | 178,659 | 169,754 | 165,664 | New Hampshire | 149,496 | 164,651 | 178,740 |
| Arkansas | 518,273 | 549,552 | 555,055 | New Jersey | 18,217 | 18,211 | 19,438 |
| California | 27,233 | 24,362 | 20,894 | New Mexico | 32,344 | 36,528 | 34,223 |
| Colorado | 922,558 | 876,100 | 873,413 | New York | 19,844 | 21,782 | 19,621 |
| Connecticut | 200,000 | 200,000 | 200,000 | North Carolina | 519,214 | 522,194 | 1,024,134 |
| Delaware | 39,582 | 23,842 | 19,809 | North Dakota | 77,072 | 77,002 | 81,977 |
| District of Columbia | 9,717 | 9,908 | 25,526 | Ohio | 390,350 | 410,346 | 415,227 |
| Florida | 617,010 | 659,416 | 636,792 | Oklahoma | 480,536 | 490,351 | 492,462 |
| Georgia | 1,566,308 | 1,557,675 | 1,573,770 | Oregon | 305,506 | 305,961 | 314,137 |
| Hawaii | 7,157 | 7,500 | 7,834 | Pennsylvania | 376,193 | 438,914 | 265,930 |
| Idaho | 168,253 | 165,035 | 170,820 | South Carolina | 476,139 | 501,990 | 525,285 |
| Illinois | 543,389 | 509,391 | 543,196 | South Dakota | 161,247 | 169,335 | 173,074 |
| Indiana | 481,243 | 432,953 | 373,185 | Tennessee | 96,073 | 111,043 | 125,688 |
| Iowa | 482,513 | 468,236 | 492,095 | Texas | 2,618,010 | 2,877,586 | 2,904,185 |
| Kansas | 849,864 | 593,670 | 539,392 | Utah | 565,768 | 580,472 | 547,288 |
| Kentucky | 355,503 | 335,551 | 454,976 | Vermont | 75,905 | 81,761 | 87,595 |
| Louisiana | 320,765 | 382,505 | 337,741 | Virgin Islands | 492,795 | 488,392 | 479,196 |
| Maine | 9,884 | 11,737 | 12,954 | Virginia | 184,986 | 209,153 | 218,801 |
| Maryland | 206,491 | 176,797 | 169,581 | Washington | 110,907 | 102,128 | 99,562 |
| Michigan | 271,541 | 294,162 | 301,822 | West Virginia | 5,355 | 7,700 | 8,171 |
| Minnesota | 731,883 | 744,941 | 895,976 | Wisconsin | 369,427 | 348,351 | 339,207 |
| Mississippi | 366,989 | 426,634 | 426,895 | Wyoming | 117,374 | 117,098 | 139,618 |
| Missouri | 630,289 | 669,914 | 663,301 | Total | $   18,128,207 | $   18,360,905 | $   18,972,068 |

4

The Company's loan portfolio is widely dispersed throughout the United States and its territories, including 48 states, the District of Columbia, American Samoa and the U.S. Virgin Islands. At May 31, 2007, 2006 and 2005, loans outstanding to borrowers located in any one state or territory did not exceed 15%, 16% and 16%, respectively, of total loans outstanding.

### Interest Rates on Loans

CFC's goal as a not-for-profit cooperatively-owned finance company is to set rates at levels that will provide its members with the lowest cost financing while maintaining sound financial results as required to obtain high credit ratings on its debt instruments. CFC sets its interest rates primarily based on its cost of funding, as well as general and administrative expenses, the loan loss provision and a reasonable level of earnings. Various discounts, which reduce the stated interest rates, are available to borrowers meeting certain criteria related to business type, performance, volume and whether CFC is their sole mortgage holder.

### CFC Loan Programs

#### Long-Term Loans

Long-term loans are generally for terms of up to 35 years and can be either amortizing or bullet loans with serial payment structures. These loans finance electric plant and equipment which typically have a useful life equal to or in excess of the loan maturity. A borrower can select a fixed interest rate for periods of one to 35 years or a variable rate. Upon the expiration of the selected fixed interest rate term, the borrower may select another fixed rate term or the variable rate. CFC sets long-term fixed rates daily and the long-term variable rate is set on the first business day of each month. The fixed rate on a loan is determined on the day the loan is advanced or repriced based on the rate term selected. A borrower may divide its loan into various tranches. The borrower then has the option of selecting a fixed or variable interest rate for each tranche.

In addition to CFC's customary loan standards, to be eligible for long-term loan advances, distribution systems generally must maintain an average modified debt service coverage ratio ("MDSC"), as defined in the loan agreement, of 1.35 or greater. Similarly, power supply systems generally must maintain an average times interest earned ratio ("TIER") and MDSC, as defined in the loan agreement, of 1.0 or greater. These are general guidelines only and CFC has in the past and may in the future make long-term loans to distribution and power supply systems that do not meet these criteria.

#### Short-Term Loans

CFC's short-term loans are line of credit loans and generally are advanced only at a variable interest rate. The line of credit variable interest rate is set on the first business day of each month. The principal amount of line of credit loans with maturities of greater than one year generally must be paid down to a zero outstanding principal balance for five consecutive days during each 12-month period.

Interim financing line of credit loans are also made available to CFC members that have a loan application pending with RUS and have received approval from RUS to obtain interim financing. Advances under these interim facilities are made with the agreement that they will be repaid with advances from RUS long-term loans.

### RTFC Loan Programs

The RTFC loan portfolio is concentrated in the core rural local exchange carrier ("RLEC") segment of the telecommunications market. RLECs are characterized by the low population density of their service territories. Services are generally delivered over networks that include fiber optic cable and digital switching. There is generally a significant barrier to competitive entry.

The businesses to which the remaining RTFC loans have been made are generally supporting the operations of the RLECs and are owned, operated or controlled by RLECs. Many such loans are supported by payment guarantees from the sponsoring RLECs.

#### Long-Term Loans

RTFC makes long-term loans to rural telecommunications companies and their affiliates for the acquisition, construction or upgrade of wireline telecommunications systems, wireless telecommunications systems, fiber optic networks, cable television systems and other corporate purposes. Long-term loans are generally for periods of up to 15 years. Loans may be advanced at a fixed or variable interest rate. Fixed rates are generally available for periods from one year to 15 years. Upon the expiration of the selected fixed interest rate term, the borrower may select another fixed rate term or a variable rate. Long-term fixed rates for telecommunications loans are set daily and the long-term variable rate is set on the first business day of each month. The fixed rate on a loan is determined on the day the loan is advanced or converted to a fixed rate based on the term selected. A borrower may divide its loan into various tranches. The borrower then has the option of selecting a fixed or variable interest rate for each tranche.

5

To borrow from RTFC, a wireline telecommunications system generally must be able to demonstrate the ability to achieve and maintain an annual debt service coverage ratio ("DSC") and an annual TIER of 1.25 and 1.50, respectively.  To borrow from RTFC, a cable television system, fiber optic network or wireless telecommunications system generally must be able to demonstrate the ability to achieve and maintain an annual DSC of 1.25.  Loans made to start-up ventures using emerging technologies are evaluated based on the quality of the business plan, experience of the management team and the level and quality of credit support from established companies.  Based on the business plan, specific covenants are developed for each transaction which require performance at levels deemed sufficient to repay the RTFC obligations under the approved terms.

### Short-Term Loans

RTFC provides line of credit loans to telecommunications systems for periods of up to five years.  These line of credit loans are typically in the form of a revolving line of credit, which generally requires the borrower to pay off the principal balance for five consecutive business days at least once during each 12-month period.  These line of credit loans may be provided on a secured or unsecured basis and are designed primarily to assist borrowers with liquidity and cash management.

Interim financing line of credit loans are also made available to RTFC members that have a loan application pending with RUS and have received approval from RUS to obtain interim financing.  These loans are for terms up to 24 months and the borrower must repay the RTFC loan with advances from the RUS long-term loans.

### NCSC Loan Programs

NCSC makes long-term and short-term loans to rural utility members and organizations affiliated with its members.  Loans may be secured or unsecured.  The loans to the affiliated organizations may have a guarantee of repayment to NCSC from the CFC member cooperative with which it is affiliated.

### Lease and General Loan Program

NCSC provided financing for the purchase of utility plant and/or related equipment, in some cases by a third party in a sale/leaseback transaction.  Collateral for these loans consists of a mortgage on the leased asset, utility plant and/or related equipment.  NCSC is not a party to these lease agreements.  NCSC no longer provides new financing of this type.

### Associate Member Loan Program

NCSC provides financing to for-profit or not-for-profit affiliated entities of member cooperatives for economic and community development purposes.  Collateral for these loans generally consists of a first mortgage lien on the assets of the associate member and/or project. These loans are also generally guaranteed by the sponsoring cooperative.

### RUS Guaranteed Loans for Rural Electric Systems

CFC may participate as an eligible lender in the RUS loan guarantee program under the terms and conditions of a master loan guarantee and servicing agreement between RUS and CFC.  Under this agreement, CFC may make long-term secured loans to eligible members for periods of up to 35 years, at fixed or variable rates established by CFC.  RUS guarantees the principal and interest payments on the notes evidencing such loans.  At May 31, 2007, CFC had $219 million of loans outstanding under this program.  In addition, at May 31, 2007, CFC was holding certificates totaling $37 million representing interests in trusts holding RUS guaranteed loans.

### Conversion of Loans

A borrower may convert a long-term loan from a variable interest rate to a fixed interest rate at any time without a fee.  Such conversion will be effective on the first day of the following month.  Generally, a borrower may convert from a fixed rate to another fixed rate or to a variable rate at any time, subject to a fee in most instances.  The fee on the conversion of a fixed interest rate to a variable interest rate is 25 basis points plus a make-whole premium, if applicable, per current loan policies.

### Prepayment of Loans

Generally, borrowers may prepay long-term loans at any time, subject to the payment of a prepayment fee of 33 to 50 basis points and a make-whole premium, if applicable.  Line of credit loans may be repaid at any time without a premium.

### Loan Security

Except when providing short-term loans, the Company typically lends to its members on a senior secured basis.  Long-term loans are typically secured on a parity with other secured lenders (primarily RUS), if any, by all assets and revenues of the borrower with exceptions typical in utility mortgages.  Short-term loans are generally unsecured lines of credit.

6

The following tables summarize the Company's secured and unsecured loans outstanding by loan program and by segment at May 31:

| (Dollar amounts in thousands) | 2007 | | | | | 2006 | | | |
|---|---|---|---|---|---|---|---|---|---|
| Total by loan program: | Secured | % | Unsecured | % | | Secured | % | Unsecured | % |
| Long-term fixed rate loans | $ 14,180,956 | 97% | $ 482,384 | 3% | | $ 13,984,404 | 96% | $ 562,446 | 4% |
| Long-term variable rate loans | 1,865,821 | 94% | 127,713 | 6% | | 2,414,737 | 96% | 109,985 | 4% |
| Loans guaranteed by RUS | 255,903 | 100% | - | - | | 261,330 | 100% | - | - |
| Short-term loans | 191,231 | 16% | 1,024,199 | 84% | | 146,835 | 14% | 881,168 | 86% |
| Total loans | $ 16,493,911 | 91% | $ 1,634,296 | 9% | | $ 16,807,306 | 92% | $ 1,553,599 | 8% |
| | | | | | | | | | |
| CFC | $ 14,462,448 | 92% | $ 1,342,842 | 8% | | $ 14,575,691 | 92% | $ 1,218,681 | 8% |
| RTFC | 1,630,079 | 88% | 230,300 | 12% | | 1,921,635 | 89% | 240,829 | 11% |
| NCSC | 401,384 | 87% | 61,154 | 13% | | 309,980 | 77% | 94,089 | 23% |
| Total loans | $ 16,493,911 | 91% | $ 1,634,296 | 9% | | $ 16,807,306 | 92% | $ 1,553,599 | 8% |

**Guarantee Programs**

The Company uses the same credit policies and monitoring procedures in providing guarantees as it does for loans and commitments. The following chart provides a breakout of guarantees outstanding by type at May 31:

| (in thousands) | 2007 | 2006 |
|---|---|---|
| Long-term tax-exempt bonds | $ 526,185 | $ 607,655 |
| Indemnifications of tax benefit transfers | 107,741 | 123,544 |
| Letters of credit | 365,766 | 272,450 |
| Other guarantees | 74,682 | 75,331 |
| Total | $ 1,074,374 | $ 1,078,980 |

Members' interest expense for the years ended May 31, 2007 and 2006 on debt obligations guaranteed by the Company was approximately $20 million for each year.

*Guarantees of Long-Term Tax-Exempt Bonds*
The Company has guaranteed debt issued in connection with the construction or acquisition by its members of pollution control, solid waste disposal, industrial development and electric distribution facilities. Governmental authorities issue such debt and the interest thereon is exempt from federal taxation. The proceeds of the offering are made available to the member system, which in turn is obligated to pay the governmental authority amounts sufficient to service the debt. The debt, which is guaranteed by the Company, may include short- and long-term obligations.

In the event of a default by a system for non-payment of debt service, the Company is obligated to pay, after available debt service reserve funds have been exhausted, scheduled debt service under its guarantee. The bond issue may not be accelerated due to such non-payment by the system so long as the Company performs under its guarantee. The system is required to repay, on demand, any amount advanced by the Company pursuant to its guarantee. This repayment obligation is secured on a pari passu basis with other lenders (including, in most cases, RUS), by a lien on substantially all of the system's assets. If the security instrument is a common mortgage with RUS, then in general, the Company may not exercise remedies thereunder for up to two years following default. However, if the debt is accelerated under the common mortgage because of a determination that the interest thereon is not tax-exempt, the system's obligation to reimburse the Company for any guarantee payments will be treated as a long-term loan. The system is required to pay to the Company initial and/or on-going guarantee fees in connection with these transactions.

Certain guaranteed long-term debt bears interest at variable rates which are adjusted at intervals of one to 270 days, weekly, each five weeks or semi-annually to a level expected to permit their resale or auction at par. At the option of the member on whose behalf it is issued, and provided funding sources are available, rates on such debt may be fixed until maturity. Holders have the right to tender the debt for purchase at par at the time rates are reset when the debt bears interest at a variable rate and the Company has committed to purchase debt so tendered if it cannot otherwise be remarketed. If the Company held the securities, the cooperative would pay interest to the Company at its short-term rate. Since the inception of the program in the mid-1980s, all bonds have been successfully remarketed and thus, the Company has not been required to purchase any bonds.

7

### Guarantees of Tax Benefit Transfers

The Company also has guaranteed members' obligations to indemnify against loss of tax benefits in certain tax benefit transfers that occurred in 1981 and 1982. A member's obligation to reimburse the Company for any guarantee payments would be treated as a long-term loan, secured on a pari passu basis with RUS by a first lien on substantially all the member's property to the extent of any cash received by the member at the outset of the transaction. The remainder would be treated as a short-term loan secured by a subordinated mortgage on substantially all of the member's property. Due to changes in federal tax law, no guarantees of this nature have been put in place since 1982. The maturities for this type of guarantee run through 2015.

### Letters of Credit

The Company issues irrevocable letters of credit to support members' obligations to energy marketers, other third parties and to the Rural Business and Cooperative Development Service. Letters of credit are generally issued on an unsecured basis and with such issuance fees as may be determined from time to time. Each letter of credit issued by CFC is supported by a reimbursement agreement with the member on whose behalf the letter of credit was issued. In the event a beneficiary draws on a letter of credit, the agreement generally requires the member to reimburse the Company within one year from the date of the draw, with interest accruing from such date at the Company's short-term variable rate of interest.

### Other Guarantees

The Company may provide other guarantees as requested by its members. Such guarantees may be made on a secured or unsecured basis with guarantee fees set to cover the Company's general and administrative expenses, a provision for losses and a reasonable margin.

The following chart summarizes total guarantees by segment at May 31:

| (Dollar amounts in thousands) | 2007 | | 2006 | |
|---|---|---|---|---|
| CFC: | | | | |
| Distribution | $ 211,320 | 20% | $ 70,166 | 7% |
| Power supply | 797,009 | 74% | 921,930 | 85% |
| Statewide and associate | 25,359 | 2% | 32,873 | 3% |
| CFC Total | 1,033,688 | 96% | 1,024,969 | 95% |
| NCSC | 40,686 | 4% | 54,011 | 5% |
| Total | $ 1,074,374 | 100% | $ 1,078,980 | 100% |

Total guarantees outstanding, by state and territory based on the location of the system's headquarters, are summarized as follows at May 31:

| (in thousands) | 2007 | 2006 | 2005 | | 2007 | 2006 | 2005 |
|---|---|---|---|---|---|---|---|
| Alabama | $ 72,348 | $ 22,250 | $ 22,450 | Montana | $ 9,029 | $ 145 | $ - |
| Alaska | 1,900 | 1,800 | 3,320 | Nebraska | 6 | - | - |
| Arizona | 38,301 | 43,699 | 45,869 | Nevada | 5,400 | - | - |
| Arkansas | 12,027 | 15,921 | 19,776 | New Hampshire | 34,550 | 9,550 | 10,500 |
| California | 1,010 | - | - | New Mexico | 1,020 | 1,016 | 1,000 |
| Colorado | 54,236 | 55,131 | 55,744 | North Carolina | 100,630 | 107,817 | 100,854 |
| District of Columbia | 20,998 | 21,428 | 30,248 | North Dakota | 7,115 | - | - |
| Florida | 4,623 | 100,038 | 108,385 | Ohio | 5,500 | 2,000 | 1,000 |
| Georgia | 26,027 | 35,283 | - | Oklahoma | 3,056 | 4,358 | 4,930 |
| Idaho | 3,173 | - | - | Oregon | 29,439 | 24,922 | 24,880 |
| Illinois | 219 | 225 | 633 | Pennsylvania | 17,519 | 18,307 | 21,021 |
| Indiana | 7 | 911 | 95,900 | South Carolina | 7,819 | 50 | - |
| Iowa | 8,240 | 8,517 | 5,708 | South Dakota | 6 | - | - |
| Kansas | 55,472 | 42,561 | 35,632 | Tennessee | 296 | 295 | 295 |
| Kentucky | 124,013 | 121,864 | 132,115 | Texas | 152,307 | 167,881 | 143,682 |
| Louisiana | 4,733 | 4,778 | 4,728 | Utah | 17,193 | 20,594 | 41,126 |
| Maine | 1 | - | - | Vermont | 3,500 | 1,250 | 1,250 |
| Maryland | 25,266 | 24,800 | - | Virginia | 3,935 | 4,133 | 3,603 |
| Michigan | 2,123 | 1,163 | 1,207 | Washington | 23,171 | 250 | - |
| Minnesota | 10,585 | 76,010 | 86,372 | Wisconsin | 32 | 322 | 274 |
| Mississippi | 88,312 | 37,267 | 41,437 | Wyoming | 13,969 | 9,370 | 9,595 |
| Missouri | 85,268 | 93,074 | 104,218 | Total | $ 1,074,374 | $ 1,078,980 | $ 1,157,752 |

8

Case 1:08-cv-00687-JR     Document 9-7     Filed 05/12/2008     Page 14 of 176



**Disaster Recovery**

CFC has had a comprehensive disaster recovery and business continuity plan in place since May of 2001.  The plan includes a duplication of CFC's production information systems at an off-site facility coupled with an extensive business recovery plan to utilize those remote systems.  CFC's production data is replicated in real time to the recovery site 24 hours a day, 7 days a week.  The plan also includes steps for each of CFC's operating groups to conduct business with a view to minimizing disruption for customers.  CFC contracts with an external vendor for the facilities to house the CFC owned backup systems as well as office space and related office equipment.

**Tax Status**

In 1969, CFC obtained a ruling from the Internal Revenue Service recognizing CFC's exemption from the payment of federal income taxes under Section 501(c)(4) of the Internal Revenue Code.  Such exempt status could be revoked as a result of changes in legislation or in administrative policy or as a result of changes in CFC's business.  CFC believes that its operations have not changed materially from those described to the Internal Revenue Service in its exemption filing.  RTFC is a taxable cooperative under Subchapter T of the Internal Revenue Code.  As long as RTFC continues to qualify under Subchapter T of the Internal Revenue Code, it is allowed a deduction from taxable income for the amount of net income allocated to its members.  RTFC pays income tax based on its net income, excluding net income allocated to its members.  NCSC is a taxable corporation. NCSC pays income tax annually based on its net income for the period.

**Investment Policy**

Surplus funds are invested pursuant to policies adopted by CFC's board of directors.  Under present policy, surplus funds may be invested in direct obligations of, or guaranteed by, the United States or agencies thereof or other highly liquid investment grade paper.  Current investments may include highly-rated securities such as commercial paper, obligations of foreign governments, Eurodollar deposits, bankers' acceptances, bank letters of credit, certificates of deposit or working capital acceptances.  The policy also permits investments in certain types of repurchase agreements with highly rated financial institutions, whereby the assets consist of eligible securities of a type listed above set aside in a segregated account.

**Employees**

At May 31, 2007, CFC had 218 employees, including financial and legal personnel, management specialists, credit analysts, accountants and support staff.  CFC believes that its relations with its employees are good.

**CFC Lending Competition**

CFC competes with other lenders on price, the variety of financing options offered and additional services provided to its member/owners.  CFC is primarily in competition with other banks for the business of its members.  The primary bank competitor is CoBank, ACB ("CoBank"), a government sponsored enterprise and member of the Farm Credit System whose status as such gives it the ability to offer lower interest rates in select situations.  In addition, there are some members that are large enough to obtain a credit rating and access the capital markets for funding.  In these cases, CFC is competing with the pricing and funding options the member is able to obtain in the capital markets.  CFC attempts to minimize the impact of competition by offering a variety of loan options and complimentary services and by leveraging the working relationship that it has with the majority of the members for over 35 years.

RUS is generally the members' first financing option as it is able to offer members interest rates that are generally lower than the rates CFC and the other banks are able to offer.  However, CFC and other banks do compete for bridge loans in anticipation of long-term funding from RUS, the portion of a loan that RUS is not able to provide, loans to members that cannot borrow from RUS and loans to members that have elected not to borrow from RUS.

According to December 31, 2005 financial data (the latest full calendar year for which this data is available as of the date of filing this Form 10-K) provided to CFC by its 812 reporting electric cooperative distribution and 60 reporting power supply systems, those entities had a total of $51 billion in long-term debt outstanding at December 31, 2005.  RUS is the dominant lender to the electric cooperative industry with $29 billion or 57% of the total outstanding debt for the 872 systems reporting 2005 results to CFC.  At December 31, 2005, CFC had a total of $16 billion of long-term exposure to its distribution and power supply member systems, including $15 billion of long-term loans and $1 billion of guarantees.  CFC's $16 billion long-term exposure represented 31% of the total long-term debt to these electric systems.  The remaining $6 billion or 12% was borrowed from other sources.

At December 31, 2006, CFC had a total of $16 billion of long-term exposure to its distribution and power supply member systems, including $15 billion of long-term loans and $1 billion of guarantees.

9

The competitive market for providing credit to the rural telecommunications industry is difficult to quantify, since many rural telecommunications companies are not RUS borrowers.  At December 31, 2006, RUS had a total of approximately $3.7 billion outstanding to telecommunications borrowers.  The Rural Telephone Bank ("RTB") is expected to be fully liquidated by November 2007 resulting in the transfer of the RTB loan portfolio to RUS.  RTFC is not in direct competition with RUS, but rather competes with other lenders for supplemental lending and for the full lending requirement of the rural telecommunications companies that have decided not to borrow from RUS or for projects not eligible for RUS financing.  RTFC's competition includes commercial banks, CoBank and insurance companies.  At December 31, 2006, RTFC had a total of $1.9 billion in long-term loans outstanding to telecommunications borrowers.

## Member Regulation and Competition

*Electric Systems*
The movement toward retail electric competition has faltered.  The electric utility industry has settled into a "hybrid" model in which there are significant differences in the regulatory approaches followed in different states and regions.  At October 31, 2005 (the latest comprehensive, and we believe still accurate, information available), customer choice has been implemented in 17 states.  Those states were Arizona, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, Ohio, Oregon, Pennsylvania, Rhode Island, Texas and Virginia (although Virginia passed legislation in 2007 to re-regulate the distribution and sale of electricity).  Of the remaining states, customer choice was not under consideration in 26 states, delayed in four states (Montana, Nevada, Oklahoma, and West Virginia), repealed in two states (Arkansas and New Mexico), and suspended in one state (California).  However, several of the states that had implemented customer choice are currently reconsidering their move to customer choice.

In the 17 states where customer choice has been implemented, the Company had a total of 240 electric members (185 distribution, 22 power supply and 33 statewide and associates) and $5,082 million of loans to electric systems at May 31, 2007.  In New York, where the Company has five electric members and $8 million of loans to electric systems, cooperatives are not required to file competition plans with the state utility commission.  In Michigan, where the Company has 13 electric members and $243 million in loans, the starting date for customer choice has been delayed.  The Company continues to believe that the distribution systems, which comprise the majority of its membership and loan exposure, will not be materially impacted by customer choice.  In general, even in those states where customers have a choice of alternative energy suppliers, very few customers have switched from the traditional supplier.

In addition, in five of the 17 states where customer choice has been implemented, cooperatives may decide whether to "opt in" to competition or retain a monopoly position with respect to energy sales.  Those states are Illinois, New Jersey, Ohio, Oregon and Texas.  As of May 31, 2007, CFC had loans outstanding in the amount of $3,747 million in those states.  Even if customers choose to purchase energy from an alternative supplier, the distribution systems own the lines to the customer and it would not be feasible for a competitor to build a second line to serve the same customers in almost all situations.  Therefore, the distribution systems will still be charging a fee or access tariff for the service of delivering power regardless of who supplies the power.  The impact of customer choice on power supply systems cannot be determined until final rules have been approved in each state and on the federal level.

Even in states where customer choice laws have been passed, there are many factors that may delay or influence the choices that customers have available to them and the timing of competition for cooperatives.  One such factor will be the level of fees that systems will be allowed to charge other utilities for use of their transmission and distribution system.  Other issues that may further delay competition include, but are not limited to, the following:
* Ability of cooperatives to "opt out" of the provisions of the customer choice laws in some states;
* Utilities in many states may still be regulated regarding rates on non-competitive services, such as distribution;
* Many states will still regulate the securities issued by utilities, including cooperatives;
* FERC regulation of rates as well as terms and conditions of transmission service;
* Reconciling the differences between state laws, such that out-of-state utilities can compete with in-state utilities; and
* The fact that few competitors have much interest in serving residential or rural customers.

In addition to customer choice laws, some state agencies regulate electric cooperatives with regard to rates and borrowing.  There are 16 states that regulate the rates electric systems charge; of these states, two states have partial oversight authority over the cooperatives' rates, but not the specific authority to set rates.  Nine states allow cooperatives the right to opt in or out of state regulation.  There are 20 states that regulate electric systems regarding the issuance of long-term debt and one of these states regulates both the issuance of short-term and long-term debt.  FERC also has jurisdiction to regulate wholesale rates, terms and conditions of service and the issuance of securities by public utilities within its jurisdiction, which presently includes only a few cooperatives.

10

With the enactment of the Energy Policy Act of 2005 in August 2005, the definition of a public utility has been modified to exclude cooperatives currently financed by RUS and non-RUS financed cooperatives provided that the non-RUS financed cooperatives have total annual sales less than four million Mwh. The Energy Policy Act of 2005 effectively provides a statutory exemption from FERC regulation as public utilities for essentially all distribution cooperatives, although such cooperatives may be subject to other aspects of FERC regulation in certain circumstances.

*Telecommunications Systems*

RTFC member telecommunications systems generally are regulated at the state and federal levels. Most state regulatory bodies regulate local service rates, intrastate access rates and telecommunications company borrowing. The Federal Communications Commission ("FCC") regulates interstate access rates and the issuance of licenses required to operate certain types of telecom operations. Some member telecommunications systems have affiliated companies that are not regulated.

The Telecommunications Act of 1996 (the "Telecom Act") created a framework for competition and deregulation in the local telecommunications market. The Telecom Act had four basic goals: competition, universal service, deregulation and fostering advanced telecommunications and information technologies. To achieve competition, the Act required all carriers to interconnect with all others and LECs to provide competitors with access to elements of their networks. Congress included provisions in the Telecom Act granting RLECs an exemption from the above requirement to provide competitors with access to their networks, absent a determination that it would be in the public interest.

Competition continues to be a significant factor in the telecommunications industry. A January 2007 FCC report on competition states that as of June 2006, competitive local exchange carriers ("CLECs") provided service to 30 million access lines - 17.4 % of the nation's 172 million end-user switched access lines. Wireless carriers are providing service to 217.4 million mobile telephone service subscriptions - more than incumbent LEC ("ILECs") and CLECs combined. Non facilities-based CLECs took advantage of pro-competitive FCC rules that allowed CLECs to obtain all elements of the ILECs' networks necessary to conduct business at favorable rates. This is known as the unbundled network element platform ("UNE-P") and consisted of a combination of an unbundled loop, unbundled local circuit switching and shared transport.

A March 2004 court order forced the FCC to revisit its rules on UNE-P. In a decision favorable to the regional Bell companies, in December 2004, the FCC ruled that ILECs no longer had any obligation to provide CLECs with mass market local circuit switching and gave CLECs 12 months to transition existing customers off of unbundled local circuit switching. This ruling caused the UNE-P CLEC business model to collapse and created extreme hardship for many such CLECs. Over 50% of total CLEC lines as of June 2004 were provided through UNE-P. AT&T and MCI subsequently exited the residential CLEC market. Combined with the failure of the stand-alone long distance provider business model, AT&T and MCI sought merger partners. AT&T was merged into SBC and is now known as AT&T. MCI merged into Verizon.

RLECs generally were not subject to UNE-P based competition, since RLECs enjoyed an exemption contained in the Telecom Act; however, rural telecommunications companies are experiencing competition. For the most part, local exchange competition has benefited RLECs by enabling them to enter nearby towns and cities as competitive LECs, leveraging their existing infrastructure and reputation for providing quality, modern telecommunications service.

In addition to competition, the Telecom Act also mandated a universal telecommunications service support mechanism and required that it be: (1) sufficient to ensure that rural customers receive reasonably comparable rates and services when compared to urban customers; and (2) portable, that is available to all eligible providers. Congress stated its intent that implicit subsidies presently contained in the access charges local telecommunications companies levy on long distance carriers be eliminated and be made explicit in the new universal service support mechanism. Rules adopted by the FCC in 2000 have provided adequate levels of universal service support. This has been essential for RLECs, as other FCC rulings have reduced access charges which are a key revenue source. Numerous wireless carriers have entered rural markets as competitors to the RLECs. By obtaining competitive eligible telecommunications carrier status from state regulators (as provided for in the Telecom Act), these wireless carriers are able to receive universal service funds ("USF") based on the incumbent LEC's costs. This has led to growth of the fund and great concern for its sustainability. USF's current funding base of interstate telecommunications revenues is shrinking as long distance minutes-of-use go down due to wireless, email and voice over internet protocol substitution. Uncontrolled demand for USF funding has resulted in the rate assessed on all participants in the nationwide network becoming unsustainably high. The second quarter 2007 assessment rate is 11.7%. All industry segments agree that changes need to be made regarding eligibility and the funding mechanism for USF. However, they are not all in agreement on what those changes should be. The Federal-State Joint Board has recently recommended limiting payments to wireless carriers at the 2006 levels on an interim basis to help stabilize the fund until Congress and the FCC can develop a long-term solution. Wireline carriers support this approach. Wireless carriers are opposed.

11

The FCC also has a proceeding open on intercarrier compensation – the most important components of which are access fees LECs charge to interexchange carriers that originate or terminate long distance traffic on LEC networks.  While the large LECs (most of which now own long distance companies) would like to see these fees transition to zero, RLECs depend heavily on access charges and are active participants in the FCC proceeding.  RLECs have come together with a unified proposal that would preserve some access fees and are promoting it with the FCC.

While uncertainty exists regarding USF and access, the Company does not anticipate that any potential revenue losses resulting from these changes will result in material losses on loans outstanding to rural telecommunications companies.

Most RLECs are expanding their service offerings to customers.  Without cable as a competitor in most rural areas, RLECs are introducing digital video, high-speed data, and local and long distance voice service.  Where they can leverage their infrastructure, they are competing with Verizon, Qwest, AT&T, Embarq and cable companies in neighboring towns.  RLECs have generally been very successful competitors in these situations.

Deregulation has not had much effect on LECs thus far.  The FCC has promulgated a series of rules to implement the Telecom Act, and eliminated very few existing regulatory requirements.  States continue to regulate RLECs extensively.  A revised or totally rewritten Telecom Act would start a whole new round of regulatory proceedings.

Another aspect of the Telecom Act dealt with advanced telecommunications and information technologies.  In the late 1990s there was the concern that there was a growing "digital divide" between various groups and areas within the country.  Legislators sought to provide broadband connectivity to all Americans through programs which provide funding to connect schools and libraries to the internet.  RUS has issued rules liberalizing its lending criteria to facilitate provision of advanced telecommunications and information services in rural areas.  Congress also created an RUS broadband loan program in 2002. To date, RUS has made 70 broadband loans totaling $1.22 billion.  Congress authorized $500 million in fiscal year 2007 lending authority.  For fiscal year 2008, the Administration is proposing an additional $300 million.

Given the increased availability of government financing for rural broadband, it is unlikely that the Company will be participating in this financing to any significant degree outside of incremental lending to existing RLEC borrowers to provide broadband services to their customers.

**The RUS Program**

Since the enactment of the Rural Electrification Act in 1936 (the "RE Act"), RUS has financed the construction of electric generating plants, transmission facilities and distribution systems in order to provide electricity to rural areas.  Principally through the organization of systems under the RUS loan program in 47 states and one U.S. territory, the percentage of farms and residences in rural areas of the United States receiving central station electric service increased from 11% in 1934 to almost 100% currently.  Rural electric systems serve 12% of all consumers of electricity in the United States and its territories and account for approximately 10% of total sales of electricity and own about 5% of energy generation and generating capacity.

In 1949, the RE Act was amended to allow RUS to lend for the purpose of furnishing and improving rural telecommunications service.  For fiscal year 2007, RUS has $690 million in lending authority for rural telephone systems and an additional $558 million for other telecommunications programs, including distance learning and broadband.

The RE Act provides for RUS to make insured loans and to provide other forms of financial assistance to electric borrowers.  RUS is authorized to make direct loans, at below market rates, to systems that qualify for the hardship program (5% interest rate) or the municipal rate program (based on a municipal government obligation index).  RUS is also authorized to guarantee loans that are used mainly to provide financing for construction of power supply projects.  Guaranteed loans bear interest at a rate agreed upon by the borrower and the lender (which generally has been the Federal Financing Bank ("FFB")).  RUS also provides financing at the Treasury rate.  The RUS exercises financial and technical supervision over borrowers' operations.  Its loans and guarantees are generally secured by a mortgage on substantially all of the system's property and revenues.

For the fiscal year ending September 30, 2008, the President's budget requests $100 million for hardship loans and $4 billion for loan guarantees with no requested budget for both municipal rate loans and treasury rate loans.  Neither the House of Representatives or the Senate have passed an Appropriations measure settling the fiscal year 2008 RUS Electric loan program levels.  Electric funding levels for fiscal year 2007 were as follows:  municipal rate loans of $100 million, hardship loans of $99 million, treasury rate loans of $1 billion, and loan guarantees of $2.7 billion.

12

**Item 1A.**                **Risk Factors.**

The Company's financial condition and results of operations are subject to various risks inherent in its business. The material risks and uncertainties that management believes affect CFC are described below.  The risks and uncertainties described below are not the only ones facing CFC.  Additional risks and uncertainties that management is not aware of, or that it currently deems immaterial, may also impair business operations. If any of the events or circumstances described in the following risks actually occur, our business, financial condition or results of operations could suffer.  You should consider all of the following risks together with all of the other information in this Annual Report on Form 10-K.

**The Company's ability to maintain and grow our business depends on access to external financing.**
The Company depends on access to the capital markets to refinance its long-term and short-term debt, fund new loan advances and if necessary, to fulfill its obligations under its guarantee and repurchase agreements.  At May 31, 2007, the Company had $2,884 million of commercial paper, daily liquidity fund and bank bid notes and $1,543 million of medium-term notes, collateral trust bonds, subordinated deferrable debt and long-term notes payable scheduled to mature during the next twelve months.  There can be no assurance that the Company will be able to access the markets in the future at all or on terms that are acceptable to the Company.  Downgrades to the Company's long-term debt ratings and/or commercial paper ratings or other events that may deny or limit the Company's access to the capital markets could negatively impact its operations.  The Company has no control over certain items that are considered by the credit rating agencies as part of their analysis for the Company, such as the overall outlook for the electric and telecommunications industries.

**Fluctuating interest rates could adversely affect our income, margin and cash flow.**
The Company is exposed to interest rate risk in its core lending and borrowing activities.  If the Company does not set interest rates on its loans at a level to cover its cost of funding, there would be an adverse affect on net interest income and net income.

The Company provides its members with many options on its loans with regard to interest rates, the term for which the selected interest rate is in effect and the ability to prepay the loan.  As a result there is a possibility of significant changes in the composition of the loan portfolio.  If the Company is not able to adjust its outstanding debt portfolio to match the changes in the loan portfolio, there could be an adverse impact on net interest income and net income.

In addition, the Company's calculated impairment on non-performing and restructured loans will increase as the Company's long-term variable and short-term interest rates increase.  Currently, an increase of 25 basis points to the Company's variable interest rates would result in an increase of $7 million to the calculated impairment.

**Competition from other lenders could impair the Company's financial results.**
The majority of the Company's members are eligible to borrow from RUS.  The rates offered by RUS are generally lower than the rates that the Company and other lenders can offer.  Thus the members' first financing option generally is to borrow funds under the RUS program.  The RUS funding level is determined by the U.S. Congress each year.  Increases to the amount of RUS funding could limit the amount of loan growth experienced by the Company.

The Company competes with other lenders for the portion of the loan commitment that RUS will not lend, for the loans to members that cannot borrow from RUS or for loans to members that have elected not to borrow from RUS.  If other lenders are more successful than the Company in the competition for this loan volume, it could have an adverse impact on the Company's financial results.

**We may not recover the value of amounts that we lend.**
CFC's allowance for loan losses is established through a provision charged to expense that represents management's best estimate of probable losses that have been incurred within the existing portfolio for loans.  The level of the allowance reflects management's continuing evaluation of: industry concentrations; specific credit risks; loan loss experience; current loan portfolio quality; present economic, political and regulatory conditions and unidentified losses and risks inherent in the current loan portfolio.  The determination of the appropriate level of the allowance for loan losses involves a high degree of subjectivity and requires CFC to make significant estimates of current credit risks and future trends, all of which may undergo material changes.  Changes in economic conditions affecting borrowers, new information regarding existing loans, identification of additional problem loans and other factors, both within and outside of CFC's control, may require an increase in the allowance for loan losses.  In addition, if actual losses incurred exceed current estimates of probable losses currently included in the allowance for loan losses, CFC will need additional provisions to increase the allowance for loan losses.  Any increases in the allowance for loan losses will result in a decrease in net income, and may have a material adverse effect on CFC's financial results and credit ratings.

13

The Company has been and may in the future be in litigation with borrowers related to enforcement or collection actions pursuant to loan documents. In such cases, the borrower or others may assert counterclaims against the Company or initiate actions against the Company related to the loan documents. Unfavorable rulings in these cases which result in loan losses that exceed the related allowance could have a material adverse effect on our financial results and credit ratings.

**Our ability to access the capital markets depends on our ability to maintain adjusted leverage and debt to equity ratios within a reasonable range of the current levels.**

Maintenance of adjusted leverage and debt to equity ratios within a reasonable range of the current levels is important in relation to the Company's ability to access the capital markets. A significant increase in the adjusted leverage or debt to equity ratios could impair the Company's ability to access the capital markets, its ability to access the Company's revolving lines of credit and its ability to maintain preferred credit ratings. See "Non-GAAP Financial Measures" for further explanation and a reconciliation of adjusted ratios.

**A decline in our credit rating could trigger payments under our derivative agreements.**

If the Company's credit rating falls to the level specified in certain of its derivative agreements, the other counterparty may terminate the agreement. If the counterparty terminates the agreement, a net payment may be due from one counterparty to the other based on the fair value of the underlying derivative instrument. Based on the fair market value of its interest rate exchange agreements subject to rating triggers at May 31, 2007, the Company may be required to make a payment of up to $5 million if its senior unsecured ratings declined to Baa1 or BBB+, and up to $47 million if its senior unsecured ratings declined below Baa1 or BBB+. In calculating the required payments, the Company only considered agreements in which it would have been required to make a payment upon termination. In the event the Company is required to make a payment as a result of a rating trigger, it could have a material adverse impact on its financial results.

**Our ability to comply with covenants related to our revolving credit agreements and debt indentures may affect our ability to obtain financing and maintain preferred rating levels on our debt.**

The Company must maintain compliance with all covenants related to its revolving credit agreements, including the adjusted TIER, adjusted leverage and amount of loans pledged in order to have access to the funds available under the revolving lines of credit. See "Non-GAAP Financial Measures" for further explanation and a reconciliation of adjusted ratios. A restriction on access to the revolving lines of credit would impair the Company's ability to issue short-term debt, as it is required to maintain backup-liquidity to maintain preferred rating levels on its short-term debt.

If the Company does not maintain compliance with covenants on its collateral trust bond, medium-term note and subordinated deferrable debt indentures, the holders of such debt could declare an event of default and accelerate the repayment of the full amount of the outstanding debt principal prior to the stated maturity of such debt. Additionally, the Company could not issue new debt under such indentures. Such an event would require the Company to obtain new funding to repay the accelerated debt as a result of the covenant default and could have a material adverse impact on its financial results and credit ratings.

**Our concentration of loans to borrowers within rural electric and telephone industries could impair our revenues if either or both of those industries were to experience economic difficulties.**

Credit concentration is one of the risk factors considered by the rating agencies in the evaluation of the Company's credit rating. Substantially all of the Company's credit exposure is to the rural electric and telephone industries and is subject to risks associated with those industries.

The Company's credit concentration to its ten largest borrowers could increase from the current 18% of total loans and guarantees outstanding, if:

- it were to extend additional loans and/or guarantees to the current ten largest borrowers,
- its total loans and/or guarantees outstanding were to decrease, with a disproportionately large share of the decrease to borrowers not in the current ten largest, or
- it were to advance large new loans and/or guarantees to one of the borrowers below the ten largest.

**We could jeopardize our federal tax exemption if we fail to conduct our business in accordance with our exemption from the Internal Revenue Service.**

Legislation that removes or imposes new conditions on the federal tax exemption for 501(c)(4) social welfare organizations could have a negative impact on the Company's net income. CFC's continued exemption depends on it conducting its business in accordance with its 501(c)(4) status.

**Item 1B.          Unresolved Staff Comments.**

None.

14

**Item 2.**    **Properties.**

CFC leases office space that serves as its headquarters in Fairfax County, Virginia.  In October 2005, CFC entered into a three-year lease with the building owner for approximately 107,228 square feet of the facility's office, meeting and storage space.  CFC has the option to extend the lease for two additional one-year periods with terms similar to the initial three-year lease.

**Item 3.**    **Legal Proceedings.**

None.

**Item 4.**    **Submission of Matters to a Vote of Security Holders.**

None.

15

PART II

**Item 5.**          **Market for Registrant's Common Equity and Related Stockholder Matters.**

Inapplicable.

**Item 6.**          **Selected Financial Data.**

The following is a summary of selected financial data for the years ended May 31:

| (Dollar amounts in thousands) | 2007 | 2006 (As restated) (11) | 2005 (As restated) (11) | 2004 (As restated) (11) | 2003 (As restated) (11) |
|---|---|---|---|---|---|
| **For the year ended May 31:** | | | | | |
| Interest income | $ 1,054,224 | $ 1,007,912 | $ 1,030,853 | $ 1,009,856 | $ 1,075,310 |
| Net interest income | 57,494 | 31,976 | 88,820 | 68,365 | 123,682 |
| Derivative cash settlements (1) | 86,442 | 80,883 | 78,287 | 123,363 | 130,686 |
| Derivative forward value (1) | (79,281) | 28,805 | 25,849 | (228,840) | 754,727 |
| Foreign currency adjustments (2) | (14,554) | (22,594) | (22,893) | (65,310) | (243,220) |
| Income (loss) prior to income taxes, minority interest and cumulative effect of change in accounting principle (3) | 16,541 | 105,762 | 126,561 | (194,292) | 649,485 |
| Cumulative effect of change in accounting principle (4) | - | - | - | 22,369 | - |
| Net income (loss) | $ 11,701 | $ 95,497 | $ 122,503 | $ (177,729) | $ 649,485 |
| Fixed charge coverage ratio (TIER) (5)(6) | 1.01 | 1.10 | 1.13 | - | 1.68 |
| Adjusted fixed charge coverage ratio (Adjusted TIER) (7) | 1.12 | 1.11 | 1.14 | 1.12 | 1.17 |
| **As of May 31:** | | | | | |
| Loans to members | $ 18,128,207 | $ 18,360,905 | $ 18,972,068 | $ 20,488,523 | $ 19,484,341 |
| Allowance for loan losses | (561,663) | (611,443) | (589,749) | (573,939) | (511,463) |
| Assets | 18,575,181 | 19,179,621 | 20,060,314 | 21,455,443 | 21,139,282 |
| Short-term debt (8) | 4,427,123 | 5,343,824 | 7,952,579 | 5,990,039 | 5,046,978 |
| Long-term debt (9) | 11,295,219 | 10,642,028 | 8,701,955 | 12,009,182 | 12,050,119 |
| Subordinated deferrable debt (10) | 311,440 | 486,440 | 685,000 | 550,000 | 650,000 |
| Members' subordinated certificates | 1,381,447 | 1,427,960 | 1,490,750 | 1,665,158 | 1,708,297 |
| Members' equity (1) | 566,286 | 545,351 | 523,583 | 483,126 | 454,376 |
| Total equity | 710,041 | 784,408 | 764,934 | 692,453 | 927,453 |
| Guarantees | $ 1,074,374 | $ 1,078,980 | $ 1,157,752 | $ 1,331,299 | $ 1,903,556 |
| Leverage ratio (6) | 26.64 | 24.80 | 26.71 | 31.88 | 23.85 |
| Adjusted leverage ratio (7) | 6.81 | 6.38 | 6.50 | 7.07 | 6.69 |
| Debt to equity ratio (6) | 25.13 | 23.42 | 25.20 | 29.95 | 21.79 |
| Adjusted debt to equity ratio (7) | 6.37 | 5.97 | 6.07 | 6.58 | 6.01 |

(1)  Derivative cash settlements represent the net settlements received/paid on interest rate and cross currency exchange agreements that do not qualify for hedge accounting for the years ended May 31, 2007, 2006, 2005, 2004 and 2003.  The derivative forward value represents the change in fair value on exchange agreements that do not qualify for hedge accounting, as well as amortization related to the long-term debt valuation allowance and related to the transition adjustment recorded as an other comprehensive loss on June 1, 2001.  Members' equity represents total equity excluding foreign currency adjustments, derivative forward value and accumulated other comprehensive income (see "Non-GAAP Financial Measures" in Management's Discussion and Analysis for further explanation of members' equity and a reconciliation to total equity).

(2)  Foreign currency adjustments represent the change on foreign denominated debt that is not related to a qualifying hedge under SFAS 133 during the period.  The foreign denominated debt is revalued at each reporting date based on the current exchange rate.  To the extent that the current exchange rate is different than the exchange rate at the time of issuance, there will be a change in the value of the foreign denominated debt.  CFC enters into foreign currency exchange agreements at the time of each foreign denominated debt issuance to lock in the exchange rate for all principal and interest payments required through maturity.

(3)  Includes $43 million gain on sale of building and land at May 31, 2006.

(4)  The cumulative effect of change in accounting principle in 2004 represents the impact of implementing Financial Accounting Standards Board Interpretation No. 46 (R), Consolidation of Variable Interest Entities, an interpretation of Accounting Research Bulletin No. 51, effective June 1, 2003.

(5)  The fixed charge coverage ratio is the same calculation as CFC's Times Interest Earned Ratio ("TIER").  For the year ended May 31, 2004, CFC's earnings were insufficient to cover fixed charges by $200 million.

(6)  See "Non-GAAP Financial Measures" in Management's Discussion and Analysis for the GAAP calculations of these ratios.

(7)  Adjusted ratios include non-GAAP adjustments that CFC makes to financial measures in assessing its financial performance.  See "Non-GAAP Financial Measures" in Management's Discussion and Analysis for further explanation of these calculations and a reconciliation of the adjustments.

(8)  Includes the current portion of long-term debt of $245 million, $40 million and $150 million at May 31, 2006, 2005 and 2003, respectively.

(9)  Excludes $1,368 million, $1,839 million, $3,591 million, $2,365 million, and $ 2,911 million in long-term debt that comes due, matures and/or will be redeemed during fiscal years 2008, 2007, 2006, 2005 and 2004, respectively (see Note 5 to the consolidated financial statements).  Includes the long-term debt



Case 1:08-cv-00687-JR     Document 9-7     Filed 05/12/2008     Page 23 of 176

valuation allowance of $(1) million and $2 million at May 31, 2003 and 2002, respectively, and the foreign currency valuation account of $221 million, $234 million and $176 million at May 31, 2005, 2004 and 2003, respectively.

(10)  Excludes $175 million called in June 2007 and $150 million called in June 2006 at May 31, 2007 and 2006, respectively, reported in short-term debt.

(11)  See Note 1 (w) to the consolidated financial statements for further explanation of the restatement of the consolidated statement of operations data for fiscal years 2006 and 2005 and the consolidated balance sheet data as of May 31, 2006.  Prior year periods have been revised to reflect the adjustments related to the restatement described in Note 1(w).

16

**Item 7.**                    **Management's Discussion and Analysis of Financial Condition and Results of Operations.**

Unless stated otherwise, references to the Company relate to the consolidation of National Rural Utilities Cooperative Finance Corporation ("CFC" or "the Company"), Rural Telephone Finance Cooperative ("RTFC"), National Cooperative Services Corporation ("NCSC") and certain entities controlled by CFC and created to hold foreclosed assets and effect loan securitization transactions.  The following discussion and analysis is designed to provide a better understanding of the Company's consolidated financial condition and results of operations and as such should be read in conjunction with the consolidated financial statements, including the notes thereto.  CFC refers to its financial measures that are not in accordance with generally accepted accounting principles ("GAAP") as "adjusted" throughout this document.  See "Non-GAAP Financial Measures" for further explanation of why the Non-GAAP measures are useful and for a reconciliation to GAAP amounts.

**Restatement**

Subsequent to the issuance of the May 31, 2006 consolidated financial statements, the Company's management identified an error in the recording of interest expense on foreign denominated debt and the cash settlement income from foreign currency exchange agreements, as well as the related accrued interest payable and accrued interest receivable.  The Company was using the agreed upon foreign exchange rate from the foreign currency exchange agreement rather than the average spot foreign currency exchange rate during the income statement period to convert the interest expense on the foreign denominated debt and foreign exchange agreement income to U.S. dollars.  The Company was also using the agreed upon foreign exchange rate from the foreign currency exchange agreement rather than the spot foreign currency exchange rate at the end of the balance sheet period to convert the accrued interest payable and accrued interest receivable to U.S. dollars.  The interest expense on the foreign denominated debt and the cash settlement income from the foreign currency exchange agreement are equal and offsetting amounts, as the Company uses the amount received under the exchange agreement to pay the interest expense on the foreign denominated debt.  The amounts for the accrued interest payable and accrued interest receivable are also offsetting.  As a result of this error, interest expense and cash settlement income were understated by $13 million and $15 million for the years ended May 31, 2006 and 2005, respectively.  The Company subtracts the net accrual from the last settlement date on its derivatives at each period end in the calculation of the related fair value, so the error in the calculation of the income receivable on the foreign exchange agreements also impacted the fair value of the derivatives recorded as a derivative asset.  Thus this correction also impacts the change in the fair value of the derivatives reported in the derivative forward value line on the consolidated statement of operations.  The derivative forward value line and net income were overstated by $0.2 million and $0.5 million for the years ended May 31, 2006 and 2005, respectively.  There is no impact on cash flows from operating activities or the total change in cash in the consolidated statements of cash flows.  There was no change to the reported times interest earned ("TIER") calculation for either year.  The amounts reported on the consolidated balance sheet for accrued interest payable and accrued interest and other receivables at May 31, 2006 were understated by $4 million and the amounts reported for the derivative asset and retained equity at May 31, 2006 were overstated by $4 million.

The Company has revised the Management's Discussion and Analysis for the effects of this restatement.

**Business Overview**

CFC was formed in 1969 by rural electric cooperatives to provide a source of financing to supplement the loan programs of the Rural Utilities Service ("RUS").  CFC is organized as a cooperative in which each member (other than associates) is entitled to one vote.  Under CFC's bylaws, the board of directors is composed of 23 individuals, 20 of whom must be either general managers or directors of member systems, two of whom are designated by the National Rural Electric Cooperative Association and one at-large position who must satisfy the requirements of an audit committee financial expert as defined by Section 407 of the Sarbanes-Oxley Act of 2002 and must be a trustee, director, manager, Chief Executive Officer or Chief Financial Officer of a member.  In November 2006, the CFC Board elected an at-large director that qualifies as a financial expert who will serve on the audit committee.  The director took his seat on the board following the CFC annual meeting in March 2007.  CFC is a tax-exempt entity under Section 501(c)(4) of the Internal Revenue Code.

RTFC is a not-for-profit private cooperative association created for the purpose of providing and/or arranging financing for its rural telecommunications members and their affiliates.  NCSC also is a private non-profit cooperative association.  The principal purpose of NCSC is to provide financing to the for-profit or non-profit entities that are owned, operated or controlled by or provide substantial benefit to, members of CFC.

17

The Company's primary objective as a cooperative is to provide its members with low loan and guarantee rates while maintaining sound financial results required to attain high credit ratings on its debt instruments. As a not-for-profit, membership owned financial institution, the Company's goal is not to maximize its profit on loans to members, but rather to find a balance between charging its members low rates on loans and maintaining the financial performance required to access the capital markets on behalf of its members. Thus, the Company marks up its funding costs only to the extent necessary to cover its operating expenses, a provision for loan losses and to provide earnings sufficient to preserve interest coverage in light of the Company's financing objectives.

At May 31, 2007, the Company's consolidated membership was 1,544 including 899 utility members, the majority of which are consumer-owned electric cooperatives, 513 telecommunications members, 66 service members and 66 associates in 49 states, the District of Columbia and two U.S. territories. The utility members included 830 distribution systems and 69 generation and transmission ("power supply") systems.

CFC obtains its funding from the capital markets, private placement of debt and its membership. CFC enters the capital markets, based on the combined strength of its members, to borrow the funds required to fulfill the financing requirements of its members. On a regular basis, CFC obtains debt financing in the capital markets by issuing fixed rate or variable rate secured collateral trust bonds, fixed rate subordinated deferrable debt, fixed rate or variable rate unsecured medium-term notes, commercial paper and enters into bank bid note agreements. In addition, CFC obtains debt financing from private funding sources through the issuance of fixed rate notes. CFC also obtains debt financing from its membership and other qualified investors through the direct sale of its commercial paper, daily liquidity fund and unsecured medium-term notes.

Rural electric cooperatives that join CFC are generally required to purchase membership subordinated certificates from CFC as a condition of membership. In connection with any long-term loan or guarantee made by CFC on behalf of one of its members, CFC may require that the member make an additional investment in CFC by purchasing loan or guarantee subordinated certificates. The membership subordinated certificates and the loan and guarantee subordinated certificates are unsecured and subordinate to other senior debt of CFC.

CFC is required by law to have a mechanism to allocate its net income to its members. CFC allocates its net income excluding the non-cash effects of Statement of Financial Accounting Standards ("SFAS") 133, Accounting for Derivative Instruments and Hedging Activities, as amended and SFAS 52, Foreign Currency Translation annually to an education fund, a members' capital reserve and to members based on each member's patronage of the loan programs during the year. RTFC annually allocates its net income to its members based on each member's patronage of the loan programs during the year. NCSC does not allocate its net income to its members.

The Company's performance is closely tied to the performance of its member rural electric and telecommunications systems due to the near 100% concentration of its loan and guarantee portfolio in those industries.

### Financial Overview
*Results of Operations*
The Company uses TIER instead of the dollar amount of net interest income or net income as its primary performance indicator, since its net income in dollar terms is subject to fluctuation as interest rates change. TIER is a measure of the Company's ability to cover the interest expense on its debt obligations. TIER is calculated by dividing the sum of interest expense and the net income prior to the cumulative effect of change in accounting principle by the interest expense.

For the year ended May 31, 2007, the Company reported net income of $12 million and TIER of 1.01, compared to a net income of $96 million and TIER of 1.10 for the prior year. For the year ended May 31, 2007, the Company reported an adjusted net income of $108 million and adjusted TIER of 1.12, compared to an adjusted net income of $97 million and adjusted TIER of 1.11 for the prior year. See "Non-GAAP Financial Measures" for more information on the adjustments the Company makes to its financial results for the purposes of its own analysis and covenant compliance.

During the year ended May 31, 2007, the Company's earnings were impacted by the level of loans on non-accrual status. Holding loans on non-accrual status resulted in a reduction of $81 million to reported interest income for the year ended May 31, 2007. During fiscal year 2008, the Company expects the outstanding balance on the current loans on non-accrual status to decrease due to anticipated loan write-offs and principal repayments. The Company anticipates writing off approximately $17 million related to VarTec Telecom, Inc. ("VarTec") during the first quarter of fiscal year 2008. This write-off will reduce the exposure to the amount of the expected recovery on the debtor-in-possession loan. In addition, it is expected that Denton County Electric Cooperative, Inc. d/b/a CoServ Electric ("CoServ") will make scheduled quarterly payments totaling $25 million, which will all be applied as a reduction to principal in fiscal year 2008.

The reduction to the amount of loans on non-accrual status should result in an increase to the adjusted net interest income yield during fiscal year 2008. Changes to the Company's variable interest rates should mirror changes to the federal funds

18

rate.  The calculated impairment on the Company's loans increases or decreases with the increases and decreases to the Company's variable interest rates.  Based on the current balance of impaired loans at May 31, 2007, an increase or decrease of 25 basis points to the Company's variable interest rates results in an increase or decrease of approximately $7 million, respectively, to the calculated impairment on loans irrespective of a change in the credit fundamentals of the impaired borrower.

*Financial Condition*
During the year ended May 31, 2007, the Company's total loans outstanding decreased by $233 million or 1% from May 31, 2006.  At May 31, 2007, RTFC loans outstanding decreased by $302 million, CFC loans outstanding increased by $10 million and NCSC loans outstanding increased by $59 million compared to May 31, 2006.  CFC loan advances were offset by the sale of $366 million of CFC distribution loans at par in a loan securitization transaction in February 2007.  CFC expects to continue such loan sales.  See further discussion in "Results of Operations".

The Company expects that the balance of the loan portfolio will remain relatively stable during fiscal year 2008.  Loans from the Federal Financing Bank ("FFB"), a division of the U.S. Treasury Department, with an RUS guarantee, represent a lower cost option for rural electric utilities compared to the Company.  The Company anticipates that the majority of its electric loan growth will come from distribution system borrowers that have fully prepaid their RUS loans and choose not to return to the government loan program, from distribution system borrowers that do not want to wait the 12 to 24 months it may take RUS to process and fund the loan and from power supply systems.  The Company anticipates that the RTFC loan balance will continue to decline due to long-term loan amortization and lower levels of capital expenditure requirements and asset acquisitions in the rural telecommunications marketplace.

During the year ended May 31, 2007, short-term debt decreased by $917 million and long-term debt increased by $653 million.  Short-term debt decreased due to the maturity of medium-term notes and because CFC further reduced its reliance on the dealer commercial paper markets.

At May 31, 2007, the Company reported total equity of $710 million, a decrease of $74 million from $784 million reported at May 31, 2006.  Under GAAP, the Company's reported equity balance fluctuates based on the impact of future expected changes to interest rates on the fair value of its interest rate exchange agreements.  As a result, it is difficult to predict the future changes in the Company's reported GAAP equity due to the uncertainty of the movement in future interest rates.  In its internal analysis and for purposes of covenant compliance under its credit agreements, the Company adjusts equity to exclude the non-cash impacts of SFAS 133 and 52.

*Liquidity*
At May 31, 2007, the Company had $2,884 million of commercial paper, daily liquidity fund and bank bid notes and $1,543 million of medium-term notes, collateral trust bonds, subordinated deferrable debt and long-term notes payable scheduled to mature during the next twelve months.  Members held commercial paper (including the daily liquidity fund) totaling $1,634 million or approximately 59% of the total commercial paper outstanding at May 31, 2007.  Commercial paper issued through dealers and bank bid notes totaled $1,118 million and represented 6% of total debt outstanding at May 31, 2007.  The Company intends to maintain the balance of dealer commercial paper and bank bid notes at 15% or less of total debt outstanding during fiscal year 2008.  During the next twelve months, the Company plans to refinance the $1,543 million of medium-term notes, collateral trust bonds, subordinated deferrable debt and long-term notes payable and fund new loan growth by issuing a combination of commercial paper, medium-term notes, collateral trust bonds and other debt.

CFC uses member loan repayments, capital market debt issuance, private debt issuance, member investments, and net income to fund its operations.  In addition, the Company maintains both short-term and long-term bank lines in the form of revolving credit agreements with its bank group.  Members pay a small membership fee and are typically required to purchase subordinated certificates as a condition to receiving a long-term loan advance and as a condition of membership.  CFC has a need for funding to make loan advances to its members, to make interest payments on its public and private debt and to make payments of principal on its maturing debt.  To facilitate open access to the capital markets, CFC is a regular issuer of debt in the capital markets, maintains strong credit ratings and has shelf registrations on file with the Securities and Exchange Commission ("SEC").  The Company plans to file a registration statement as a well-known seasoned issuer that will authorize the Company to issue an unlimited amount of debt under each of its public debt instruments for a three-year period.  CFC also has access to foreign debt markets with Euro medium-term note and commercial paper programs and an Australian medium-term note program.

The Company can borrow amounts from the FFB with a guarantee of repayment by the RUS as part of the funding mechanism for the Rural Economic Development Loan and Grant ("REDLG") program.  As a result of the RUS guarantee, these funds may represent a lower cost compared to the Company's other forms of debt securities.  Subsequent to our fiscal year-end, on August 1, 2007, CFC submitted an application to borrow the remaining $500 million available under FFB loan facilities.  These funds were received by CFC on August 7, 2007.

19

Subsequent to our fiscal year-end, on June 1, 2007, the Company redeemed the 7.40% subordinated deferrable debt securities due 2050 totaling $175 million.  The Company redeemed these securities at par and recorded a charge of $6 million in interest expense during the first quarter of fiscal year 2008 for the unamortized issuance costs.

**Critical Accounting Estimates**

*Allowance for Loan Losses*
At May 31, 2007 and 2006, the Company had a loan loss allowance that totaled $562 million and $611 million, representing 3.10% and 3.33% of total loans outstanding, respectively.  GAAP requires loans receivable to be reported on the consolidated balance sheets at net realizable value.  The net realizable value is the total principal amount of loans outstanding less an estimate of the probable losses inherent in the portfolio.  The Company calculates its loss allowance on a quarterly basis.  The loan loss allowance is calculated by segmenting the portfolio into three categories of loans: impaired, high risk and general portfolio.  There are significant subjective assumptions and estimates used in calculating the amount of the loss allowance required by each of the three categories.  Different assumptions and estimates could also be reasonable.  Changes in these assumptions and estimates could have a material impact on the Company's financial statements.

*Impaired Exposure*
The Company calculates impairment on certain loans in accordance with SFAS 114, Accounting by Creditors for Impairment of a Loan - an Amendment of SFAS 5 and SFAS 15, as amended.  SFAS 114 states that a loan is impaired when a creditor does not expect to collect all principal and interest due under the original terms of the loan.  The Company reviews its portfolio to identify impairments at least on a quarterly basis.  Factors considered in determining an impairment include, but are not limited to: the review of the borrower's audited financial statements and interim financial statements if available, the borrower's payment history, communication with the borrower, economic conditions in the borrower's service territory, pending legal action involving the borrower, restructure agreements between the borrower and the Company, and estimates of the value of the borrower's assets that have been pledged as collateral to secure the Company's loans.  The Company calculates the impairment by comparing the future estimated cash flow, discounted at the original loan interest rate, against its current investment in the receivable.  If the current investment in the receivable is greater than the net present value of the future payments discounted at the original contractual interest rate, the impairment is equal to that difference.  If it is not possible to estimate the future cash flow associated with a loan, then the impairment calculation is based on the value of the collateral pledged as security for the loan.  At May 31, 2007 and 2006, the Company had a total of $397 million and $447 million reserved specifically against impaired exposure totaling $1,099 million and $1,201 million, respectively, representing 36% and 37%, respectively, of the total impaired loan exposure.  The $397 million and $447 million specific reserves represented 71% and 73% of the total loan loss allowance at May 31, 2007 and 2006, respectively.  The calculated impairment at May 31, 2007 was lower than at May 31, 2006 due to a settlement agreement with one borrower resulting in a loan write-off of $44 million and payments received on impaired loans offset by higher interest rates on variable rate loans.  See further discussion under "Financial Condition".  The original contract rate on a portion of the impaired loans at May 31, 2007 will vary with the changes in the Company's variable interest rates.  Based on the current balance of impaired loans at May 31, 2007, a 25 basis point increase or decrease to the Company's variable interest rates would result in an increase or decrease, respectively, of approximately $7 million to the calculated impairment irrespective of a change in the credit fundamentals of the impaired borrower.

In calculating the impairment on a loan, the estimates of the expected future cash flow or collateral value are the key estimates made by management.  Changes in the estimated future cash flow or collateral value would impact the amount of the calculated impairment.  The change in cash flow required to make the change in the calculated impairment material would be different for each borrower and depend on the period covered, the original contract interest rate and the amount of the loan outstanding.  Estimates are not used to determine the Company's investment in the receivables or the discount rate since, in all cases, they are the loan balance outstanding at the reporting date and the original loan interest rate.

*High Risk Exposure*
Loan exposures considered to be high risk represent exposure in which the borrower has had a history of late payments, the borrower's financial results do not satisfy loan financial covenants, the borrower has contacted the Company to discuss pending financial difficulties or for some other reason, the Company believes that the borrower's financial results could deteriorate resulting in an elevated potential for loss.  The Company's corporate credit committee is responsible for determining which loans should be classified as high risk and the level of reserve required for each borrower.  The committee meets at least quarterly to review all loan facilities with an internal risk rating above a certain level.  Once it is determined that exposure to a borrower should be classified as high risk, the committee sets the required reserve level based on the facts and circumstances for each borrower, such as the borrower's financial condition, payment history, the Company's estimate of the collateral value, pending litigation, if any, and other factors.  This is an objective and subjective exercise in which the committee uses the available information to make its best estimate as to the level of loss allowance required.  At any reporting date, the reserve required could vary significantly depending on the facts and circumstances, which could include, but are not limited to: changes in collateral value, deterioration in financial condition, the borrower declaring bankruptcy, payment

20

default on the Company's loans and other factors. The borrowers in the high risk category will generally either move to the impaired category or back to the general portfolio within a period of 12 to 24 months. At May 31, 2007 and 2006, the Company had reserved $3 million and $2 million against the $6 million and $12 million of exposure classified as high risk, representing coverage of 50% and 17%, respectively. The $3 million and $2 million reserved for loans in the high risk category represented less than 1% of the total loan loss allowance at May 31, 2007 and 2006.

*General Portfolio*
The Company's methodology used to determine the required loan loss allowance for the general portfolio includes the use of an internal risk rating system, historical default data on corporate bonds and Company specific loss recovery data. The Company uses the following factors, in no particular order, to determine the level of the loan loss allowance for the general portfolio category:

- Internal risk ratings - the Company maintains risk ratings for each credit facility outstanding to its borrowers. The ratings are updated at least annually and are based on the following:
  - General financial condition of the borrower.
  - The Company's internal estimated value of the collateral securing its loans.
  - The Company's internal evaluation of the borrower's management.
  - The Company's internal evaluation of the borrower's competitive position within its service territory.
  - The Company's estimate of potential impact of proposed regulation and litigation.
  - Other factors specific to individual borrowers or classes of borrowers.
- Standard corporate default table - The table provides expected default rates based on rating level and the remaining maturity of the bond. The Company uses the standard default table for all corporate bonds published by Standard and Poor's Corporation to assist in estimating its reserve levels.
- Recovery rates - Estimated recovery rates based on historical experience of loan balance at the time of default compared to the total loss on the loan to date.

The Company aggregates the loans in the general portfolio by borrower type (distribution, generation, telecommunications, associate and other member) and by internal risk rating within borrower type. The Company correlates its internal risk ratings to the ratings used in the standard default table based on a comparison of its rating on borrowers that have a rating from one or more of the recognized credit rating agencies and based on a standard matching used by banks.

In addition to the general portfolio reserve requirement as calculated above, the Company maintains an additional reserve for borrowers with a total exposure in excess of 1.5% of its total loans and guarantees outstanding. The additional reserve is based on the amount of exposure in excess of 1.5% of the Company's total exposure and the borrower's internal risk rating. At May 31, 2007 and 2006, the Company had a reserve of $3 million based on the additional risk related to large exposures.

At May 31, 2007 and 2006, the Company had a total of $16,768 million and $16,886 million of loans, respectively, in the general portfolio. This total does not include $256 million and $261 million of loans at May 31, 2007 and 2006, respectively, that have a U.S. Government guarantee of all principal and interest payments. The Company does not maintain a loan loss allowance on loans that are guaranteed by the U.S. Government. At May 31, 2007 and 2006, the Company reserved a total of $162 million (including the $3 million described above for additional risk related to large exposures) for loans in the general portfolio representing coverage of 0.97% and 0.96%, respectively, of the total loans for the general portfolio.

In fiscal years 2007, 2006 and 2005, CFC recorded a recovery to the loan loss reserve totaling $7 million, provision of $23 million and provision of $16 million, respectively.

Senior management reviews the estimates and assumptions used in the calculations of the loan loss allowance for impaired loans, high risk loans and loans covered by the general portfolio, including large exposures related to single obligors, on a quarterly basis. Senior management discusses estimates with the board of directors and audit committee and reviews all loan loss related disclosures included in the Company's Form 10-Qs and Form 10-Ks filed with the SEC.

Management makes recommendations regarding loans to be written off to the CFC board of directors. In making its recommendation to write off all or a portion of a loan balance, management considers various factors including cash flow analysis and collateral securing the borrower's loans.

***Derivative Financial Instruments***
In June 1998, the FASB issued SFAS 133. SFAS 133, as amended, establishes accounting and reporting standards requiring that derivative instruments (including certain derivative instruments embedded in other contracts) be recorded in the consolidated balance sheets as either an asset or liability measured at fair value. The statement requires that changes in the derivative instrument's fair value be recognized currently in earnings unless specific hedge accounting criteria are met. Special accounting for qualifying hedges allows a derivative instrument's gains and losses to offset related results on the

21

hedged item in the consolidated statements of operations or to be recorded as other comprehensive income, to the extent effective, and requires that a company formally document, designate, and assess the effectiveness of transactions that receive hedge accounting. The Company is neither a dealer nor trader in derivative financial instruments. The Company uses interest rate, cross currency and cross currency interest rate exchange agreements to manage its interest rate and foreign currency risk.

Generally, the Company's derivatives do not qualify for hedge accounting. To qualify for hedge accounting, there must be a high correlation between the pay leg of the interest rate exchange agreement and the asset being hedged or between the receive leg of the interest rate exchange agreement and the liability being hedged. A large portion of the Company's interest rate exchange agreements use a 30-day composite commercial paper index as the receive leg, which would have to be highly correlated to the Company's own commercial paper rates to qualify for hedge accounting. The Company sells commercial paper to its members as well as to investors in the capital markets. The Company sets its commercial paper rates daily based on its cash requirements. The correlation between the Company's commercial paper rates and the 30-day composite commercial paper index has not been consistently high enough to qualify for hedge accounting. At May 31, 2007 and 2006, the Company did not have any interest rate exchange agreements that were accounted for using hedge accounting.

The Company does not plan to adjust its practice of using the 30-day composite commercial paper or a LIBOR index as the receive portion of its interest rate exchange agreements. The Company sets the variable interest rates on its loans based on the cost of its short-term debt, which is comprised of long-term debt due within one year and commercial paper. The Company believes that it is economically hedging its net interest income on loans by using the 30-day composite commercial paper or LIBOR index, which are the rates that are most closely related to the rates it pays on its own commercial paper. During certain periods, the correlation between the LIBOR rates or the 30-day composite commercial paper rate and the Company's 90-day and 30-day commercial paper rate has been higher than the required 90% to qualify for hedge accounting. However, the correlation is not consistently above the 90% threshold, therefore the interest rate exchange agreements that use the three-month LIBOR rate or 30-day composite commercial paper rate do not qualify for hedge accounting. For the purposes of its own analysis, the Company believes that the correlation is sufficiently high to consider these agreements effective economic hedges.

As a result of applying SFAS 133, the Company has recorded derivative assets of $223 million and $576 million and derivative liabilities of $72 million and $85 million at May 31, 2007 and 2006, respectively. From inception to date, accumulated other comprehensive income related to derivatives was $12 million and $13 million as of May 31, 2007 and 2006, respectively.

The impact of derivatives on the Company's consolidated statements of operations for the years ended May 31, 2007, 2006 and 2005 was a gain of $7 million, $107 million and $98 million, respectively. For the year ended May 31, 2007, the derivative forward value includes a charge of $31 million related to the termination of two interest rate exchange agreements. This amount was offset by a $31 million payment received as a result of the early termination and recorded as income in cash settlements. The change in the fair value of derivatives for the years ended May 31, 2007, 2006 and 2005 was a loss of $79 million, a gain of $29 million and a gain of $26 million, respectively, recorded in the Company's derivative forward value. For the years ended May 31, 2007, 2006 and 2005, the derivative forward value includes $0.8 million, $0.4 million and $16 million, respectively, related to the transition adjustment recorded as an other comprehensive loss on June 1, 2001, the date the Company implemented SFAS 133. In addition, income totaling $86 million, $79 million and $72 million was recorded for total net cash settlements received by the Company during the years ended May 31, 2007, 2006 and 2005, respectively, of which $86 million, $81 million and $78 million, respectively, relate to interest rate and cross currency interest rate exchange agreements that do not qualify for hedge accounting under SFAS 133 and were recorded in derivative cash settlements. The remaining expense of $2 million and $6 million for the years ended May 31, 2006 and 2005, respectively, relate to interest rate and cross currency interest rate exchange agreements that qualify for hedge accounting under SFAS 133 and were recorded in interest expense.

The Company is required to determine the fair value of its derivative instruments. Because there is not an active secondary market for the types of derivative instruments it uses, the Company obtains market quotes from its dealer counterparties. The market quotes are based on the expected future cash flow and estimated yield curves. The Company performs its own analysis to confirm the values obtained from the counterparties. The Company records the change in the fair value of its derivatives for each reporting period in the derivative forward value line on the consolidated statements of operations for the majority of its derivatives or in the other comprehensive income account on the consolidated balance sheets for the derivatives that qualify for hedge accounting. The counterparties are estimating future interest rates as part of the quotes they provide to the Company. The Company adjusts all derivatives to fair value on a quarterly basis. The fair value recorded by the Company will change as estimates of future interest rates change. To estimate the impact of changes to interest rates on the forward value of derivatives, the Company would need to estimate all changes to interest rates through the maturity of its outstanding derivatives. The Company has derivatives in the current portfolio that do not mature until 2045. In addition, the Company excludes the changes to the fair value of derivatives from its internal analysis since they represent the net present value of all future estimated cash settlements. Thus, the Company does not estimate the impact of changes in future interest

22

rates to the fair value of its derivatives.  The Company does not believe that volatility in the derivative forward value line on the consolidated statements of operations is material as it represents an estimated future value and not a cash impact for the current period.

Cash settlements that the Company pays and receives for derivative instruments that do not qualify for hedge accounting are recorded in the cash settlements line in the consolidated statements of operations.  Each 25 basis point increase or decrease to the 30-day composite commercial paper index, the three-month LIBOR rate and the six-month LIBOR rate would result in a $5 million increase or decrease in the Company's total cash settlements due to the composition of the portfolio at May 31, 2007.  The Company's interest rate exchange agreements at May 31, 2007 include $7,277 million notional amount, or 58% of the total interest rate exchange agreements in which the Company pays a fixed interest rate and receives a variable interest rate.  For the remaining $5,256 million notional amount, or 42% of the total interest rate exchange agreements at May 31, 2007, the Company pays a variable interest rate and receives a fixed interest rate. Based on the interest rate exchange agreements in place at May 31, 2007, an increase to variable interest rates results in an increase to cash settlements due to CFC.

**New Accounting Pronouncements**

In February 2006, the FASB issued SFAS 155, Accounting for Certain Hybrid Financial Instruments – an amendment of SFAS 133 and 140. SFAS 155 permits fair value measurement of any hybrid financial instrument that contains an embedded derivative that otherwise would require bifurcation. SFAS 155 also clarifies which interest-only strips and principal-only strips are not subject to the requirements of Statement 133. It establishes a requirement to evaluate interests in securitized financial assets to identify interests that are freestanding derivatives or that are hybrid financial instruments that contain an embedded derivative requiring bifurcation. SFAS 155 also clarifies that concentrations of credit risk in the form of subordination are not embedded derivatives. SFAS 155 is effective for all financial instruments acquired or issued after the beginning of an entity's first fiscal year that begins after September 15, 2006.  The Company's adoption of SFAS 155 as of June 1, 2007 is not expected to have a material impact on the Company's financial position or results of operations.

In March 2006, the FASB issued SFAS 156, Accounting for Servicing of Financial Assets.  SFAS 156 requires the initial measurement of all separately recognized servicing assets and liabilities at fair value and permits, but does not require, the subsequent measurement of servicing assets and liabilities at fair value. SFAS 156 is effective as of the beginning of the first fiscal year that begins after September 15, 2006.  The Company's adoption of SFAS 156 as of June 1, 2007 is not expected to have a material impact on the Company's financial position or results of operations.

In June 2006, the FASB issued FIN No. 48, Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109.  FIN 48 clarifies the accounting for income taxes by prescribing a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition.  FIN 48 is effective for fiscal years beginning after December 15, 2006.  The Company's adoption of FIN 48 as of June 1, 2007 is not expected to have a material impact on the Company's financial position or results of operations.

In September 2006, the FASB issued SFAS 157, Fair Value Measurements. SFAS 157 clarifies the principle that fair value should be based on the assumptions market participants would use when pricing an asset or liability and establishes a fair value hierarchy that prioritizes the information used to develop those assumptions. Under the standard, fair value measurements would be separately disclosed by level within the fair value hierarchy. SFAS 157 is effective as of the beginning of the first fiscal year that begins after November 15, 2007. The Company's adoption of SFAS 157 as of June 1, 2008 is not expected to have a material impact on the Company's financial position or results of operations.

In February 2007, the FASB issued SFAS 159, The Fair Value Option for Financial Assets and Financial Liabilities. The fair value option established by SFAS 159 permits entities to choose to measure eligible financial instruments at fair value. The unrealized gains and losses on items for which the fair value option has been elected should be reported in earnings. The decision to elect the fair value option is determined on an instrument by instrument basis and is irrevocable. Assets and liabilities measured at fair value pursuant to the fair value option should be reported separately in the balance sheet from those instruments measured using other measurement attributes. SFAS 159 is effective as of the beginning of the first fiscal year that begins after November 15, 2007.  As part of the Company's adoption of SFAS 159 as of June 1, 2008, it does not plan to choose the option to measure eligible financial instruments at fair value and therefore the adoption of SFAS 159 is not expected to have a material impact on the Company's financial position or results of operations.

23

**Results of Operations**

*Fiscal Year 2007 versus 2006 Results*
The following chart presents the results for the year ended May 31, 2007 versus May 31, 2006.

| (Dollar amounts in millions) | For the year ended May 31, | | Increase/ |
|---|---|---|---|
| | 2007 | 2006 | (Decrease) |
| Interest income | $ 1,054 | $ 1,008 | $ 46 |
| Interest expense | (997) | (976) | (21) |
| Net interest income | 57 | 32 | 25 |
| Recovery of (provision for) loan losses | 7 | (23) | 30 |
| Net interest income after recovery of (provision for) loan losses | 64 | 9 | 55 |
| | | | |
| Non-interest income: | | | |
| Rental and other income | 2 | 2 | - |
| Derivative cash settlements | 86 | 81 | 5 |
| Results of operations of foreclosed assets | 10 | 16 | (6) |
| Gain on sale of building and land | - | 43 | (43) |
| Total non-interest income | 98 | 142 | (44) |
| | | | |
| Non-interest expense: | | | |
| Salaries and employee benefits | (34) | (31) | (3) |
| Other general and administrative expenses | (18) | (21) | 3 |
| Recovery of guarantee liability | 2 | 1 | 1 |
| Derivative forward value | (79) | 29 | (108) |
| Foreign currency adjustments | (15) | (23) | 8 |
| Loss on sale of loans | (2) | - | (2) |
| Total non-interest expense | (146) | (45) | (101) |
| | | | |
| Income prior to income taxes and minority interest | 16 | 106 | (90) |
| | | | |
| Income taxes | (2) | (3) | 1 |
| Minority interest, net of income taxes | (2) | (7) | 5 |
| Net income | $ 12 | $ 96 | $ (84) |
| | | | |
| TIER | 1.01 | 1.10 | |
| Adjusted TIER (1) | 1.12 | 1.11 | |

(1) Adjusted to exclude the impact of the derivative forward value, foreign currency adjustments and minority interest from net income and to include all derivative cash settlements in the interest income. See "Non-GAAP Financial Measures" for further explanation and a reconciliation of these adjustments.

CFC's net interest income will increase or decrease due to changes in loan volume and the rate that it receives on its loans and pays on its sources of funding, respectively. CFC's loan volume substantially determines its funding needs. The following Volume Rate Variance Table provides a breakout of the change to interest income, interest expense and net interest income due to changes in loan volume versus changes to interest rates. The analysis is consistent with the May 31, 2007 and 2006 consolidated statements of operations. For comparability purposes, average daily loan volume is used as the denominator in calculating interest income yield, interest expense rates and net interest income spread.

Management calculates an adjusted net interest income, which includes all derivative cash settlements in interest expense. The following table also includes a breakout of the change to derivative cash settlements due to changes in the average notional amount of its derivative portfolio versus changes to the net difference between the average rate paid and the average rate received. See "Non-GAAP Financial Measures" for further explanation of the adjustment the Company makes in its financial analysis to include all derivative cash settlements in its interest expense.

24

Volume Rate Variance Table
(Dollar amounts in millions)

| | For the year ended May 31, | | | | | | Change due to | | |
| | 2007 | | | 2006 | | | | | |
| | Average Loan Balance | Income/ (Cost) | Rate | Average Loan Balance | Income/ (Cost) | Rate | Volume (1) | Rate (2) | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Interest income** | | | | | | | | | |
| CFC | $15,803 | $ 917 | 5.80% | $15,605 | $ 847 | 5.43% | $ 11 | $ 59 | $ 70 |
| RTFC | 1,994 | 106 | 5.30% | 2,356 | 130 | 5.50% | (20) | (4) | (24) |
| NCSC | 396 | 31 | 8.00% | 444 | 31 | 7.08% | (4) | 4 | - |
| Total | $18,193 | $ 1,054 | 5.79% | $18,405 | $ 1,008 | 5.48% | $ (13) | $ 59 | $ 46 |
| **Interest expense** | | | | | | | | | |
| CFC | $15,803 | $ (870) | (5.51)% | $15,605 | $ (827) | (5.30)% | $ (10) | $ (33) | $(43) |
| RTFC | 1,994 | (100) | (4.98)% | 2,356 | (123) | (5.21)% | 18 | 5 | 23 |
| NCSC | 396 | (27) | (6.90)% | 444 | (26) | (5.92)% | 3 | (4) | (1) |
| Total | $18,193 | $ (997) | (5.48)% | $18,405 | $ (976) | (5.30)% | $ 11 | $ (32) | $(21) |
| **Net interest income** | | | | | | | | | |
| CFC | $15,803 | $ 47 | 0.29% | $15,605 | $ 20 | 0.13% | $ 1 | $ 26 | $ 27 |
| RTFC | 1,994 | 6 | 0.32% | 2,356 | 7 | 0.29% | (2) | 1 | (1) |
| NCSC | 396 | 4 | 1.10% | 444 | 5 | 1.16% | (1) | - | (1) |
| Total | $18,193 | $ 57 | 0.31% | $18,405 | $ 32 | 0.18% | $ (2) | $ 27 | $ 25 |
| **Derivative cash settlements (3)** | | | | | | | | | |
| CFC | $12,508 | $ 86 | 0.69% | $15,030 | $ 82 | 0.54% | $ (14) | $ 18 | $ 4 |
| NCSC | 124 | 1 | 0.33% | 110 | (1) | (0.84)% | - | 2 | 2 |
| Total | $12,632 | $ 87 | 0.68% | $15,140 | $ 81 | 0.53% | $ (14) | $ 20 | $ 6 |
| **Adjusted interest expense (4)** | | | | | | | | | |
| Total | $18,193 | $ (910) | (5.00)% | $18,405 | $ (895) | (4.86)% | $ (3) | $ (12) | $(15) |

(1) Variance due to volume is calculated using the following formula: ((current average balance – prior year average balance) x prior year rate).

(2) Variance due to rate is calculated using the following formula: ((current rate – prior year rate) x current average balance).

(3) For derivative cash settlements, average loan balance represents the average notional amount of derivative contracts outstanding and the rate represents the net difference between the average rate paid and the average rate received for cash settlements during the period.

(4) See "Non-GAAP Financial Measures" for further explanation of the adjustment the Company makes in its financial analysis to include all derivative cash settlements in its interest expense.

*Interest Income*

Total interest income reported on the consolidated statements of operations and shown in the chart above includes the following and the weighted average interest rate thereon:

| | For the year ended May 31, | | | | |
| | 2007 | | 2006 | | |
| (Dollar amounts in millions) | Amount | Rate | Amount | Rate | Increase/ (Decrease) |
|---|---|---|---|---|---|
| Interest on long-term fixed rate loans (1) | $ 833 | | $ 759 | | $ 74 |
| Interest on long-term variable rate loans (1) | 115 | | 154 | | (39) |
| Interest on short-term loans (1) | 73 | | 58 | | 15 |
| Total interest income on loans | 1,021 | 5.61 % | 971 | 5.28% | 50 |
| Interest on investments (2) | 9 | 0.05 % | 10 | 0.05% | (1) |
| Conversion fees (3) | 9 | 0.05 % | 14 | 0.08% | (5) |
| Make-whole and prepayment fees (4) | 5 | 0.03 % | 5 | 0.03% | - |
| Commitment and guarantee fees (5) | 9 | 0.05 % | 7 | 0.04% | 2 |
| Other fees | 1 | - | 1 | - | - |
| Total interest income | $ 1,054 | 5.79 % | $ 1,008 | 5.48% | $ 46 |

(1) Represents interest income on loans to members.

(2) Represents interest income on the investment of excess cash.

(3) Conversion fees are deferred and recognized using the interest method over the remaining original loan interest rate pricing term, except for a small portion of the total fee charged to cover administrative costs related to the conversion, which is recognized immediately.

(4) Make-whole and prepayment fees are charged for the early repayment of principal in full and recognized when collected.

(5) Commitment fees for RTFC loan commitments are, in most cases, refundable on a prorata basis according to the amount of the loan commitment that is advanced. Such refundable fees are deferred and then recognized on a prorata basis based on the portion of the loan that is not advanced prior to the expiration of the commitment. Commitment fees on CFC loan commitments are not refundable and are billed and recognized based on the unused portion of committed lines of credit. Guarantee fees are charged based on the amount, type and term of the guarantee. Guarantee fees are deferred and amortized using the straight-line method into interest income over the life of the guarantee.

25

The $46 million or 5% increase to the total interest income for the year ended May 31, 2007 as compared to the prior year period was due to the increase to CFC loan interest rates in the markets offset by lower loan volume. During the year ended May 31, 2007, the Company raised variable interest rates by approximately 15 basis points, while fixed interest rates remained relatively stable. For the year ended May 31, 2007, the Company had a reduction to interest income of $81 million due to non-accrual loans compared to a reduction of $79 million for the prior year period. The decrease in loan volume is due to the prepayment of RTFC loans during the year ended May 31, 2007. The $4 million decrease in fee and investment income earned during the year ended May 31, 2007 was due to lower conversion fees recognized as compared to the prior year period.

The $70 million increase in CFC interest income during the year ended May 31, 2007 as compared to the prior year was due to the increase in interest rates and loan volume partly offset by the impact of non-accrual loans. The impact on CFC interest income of non-accrual loans was a reduction of $39 million for the year ended May 31, 2007 as compared to $36 million for the prior year period. The impact of non-accrual loans on interest income is included in the rate variance in the chart above. The $24 million decrease in RTFC interest income during the year ended May 31, 2007 as compared to the prior year was due to the reduction in the balance of RTFC loans outstanding. The impact on RTFC interest income of non-accrual loans was a reduction of $42 million for the year ended May 31, 2007 as compared to $43 million for the prior year period.

*Interest Expense*
Total interest expense reported on the consolidated statements of operations and shown in the chart above includes the following and the weighted average interest rate thereon:

| | | For the year ended May 31, | | | |
| | 2007 | | 2006 | | |
| (Dollar amounts in millions) | Amount | Rate | Amount | Rate | Increase/ (Decrease) |
|---|---|---|---|---|---|
| Interest expense - commercial paper and bid notes (1) | $    179 | | $    133 | | $    46 |
| Interest expense - medium-term notes (1) | 364 | | 409 | | (45) |
| Interest expense - collateral trust bonds (1) | 218 | | 272 | | (54) |
| Interest expense - subordinated deferrable debt (1) | 33 | | 46 | | (13) |
| Interest expense - subordinated certificates (1) | 48 | | 47 | | 1 |
| Interest expense - long-term private debt (1) | 119 | | 46 | | 73 |
| Total interest expense on debt | 961 | 5.28% | 953 | 5.18% | 8 |
| Debt issuance costs (2) | 12 | 0.07% | 10 | 0.05% | 2 |
| Derivative cash settlements, net (3) | - | - | 2 | 0.01% | (2) |
| Commitment and guarantee fees (4) | 16 | 0.09% | 11 | 0.06% | 5 |
| Loss (gain) on extinguishment of debt (5) | 5 | 0.03% | (2) | (0.01)% | 7 |
| Other fees | 3 | 0.01% | 2 | 0.01% | 1 |
| Total interest expense | $    997 | 5.48% | $    976 | 5.30% | $    21 |

(1) Represents interest expense and the amortization of discounts on debt.

(2) Includes amortization of all deferred charges related to debt issuance, principally underwriter's fees, legal fees, printing costs and comfort letter fees. Amortization is calculated on the effective interest method. Also includes issuance costs related to dealer commercial paper.

(3) Represents the net cost related to swaps that qualify for hedge treatment plus the accrual from the date of the last settlement to the current period end.

(4) Includes various fees related to funding activities, including fees paid to banks participating in the Company's revolving credit agreements and fees paid under bond guarantee agreements with RUS as part of the REDLG program. Fees are recognized as incurred or amortized on a straight-line basis over the life of the respective agreement.

(5) Represents the gain or loss on the early retirement of debt including the write-off of unamortized discount, premium and issuance costs.

The $21 million increase to the total interest expense for the year ended May 31, 2007 as compared to the prior year period was due to the increase to interest rates in the markets and an increase in guarantee fees expensed due to the increase in REDLG debt outstanding. Additionally, there was a $5 million loss on the extinguishment of debt for the year ended May 31, 2007 due to the write-off of unamortized debt issuance costs associated with the early redemption of subordinated deferrable debt. Debt issuance costs increased due to the issuance of $1.6 billion of extendible term debt with an initial maturity, and therefore amortization period, of 13 months.

The adjusted interest expense, which includes all derivative cash settlements for the year ended May 31, 2007, increased by $15 million compared to the prior year period due to the increase to interest expense noted above and the increase to derivative cash settlements described below. See "Non-GAAP Financial Measures" for further explanation of the adjustment the Company makes in its financial analysis to include all derivative cash settlements in its interest expense.

26

### Net Interest Income

The change in the line items described above resulted in an increase in net interest income of $25 million for the year ended May 31, 2007 compared to the prior year period. The net adjusted interest income, which includes all derivative cash settlements, for the year ended May 31, 2007 was $144 million, an increase of $31 million from the prior year period. See "Non-GAAP Financial Measures" for further explanation of the adjustment the Company makes in its financial analysis to include all derivative cash settlements in its interest expense, and therefore net interest income.

### Recovery of/Provision for Loan Losses

A recovery from the allowance for loan losses of $7 million was recorded during the year ended May 31, 2007 due primarily to payments received on impaired loans. The provision for loan losses of $23 million recorded during the year ended May 31, 2006 was primarily due to an increase in the calculated loan impairments during the year.

### Derivative Cash Settlements

The $6 million increase in cash settlements for the year ended May 31, 2007 compared to the prior year period is due to a $31 million payment received as a result of the termination of two interest rate exchange agreements offset by both a decrease to the net rate earned by the Company on exchange agreements and the reduction in the average notional amount of derivatives outstanding as compared to the prior year period.

### Results of Operations of Foreclosed Assets

The Company recorded net income of $10 million and $16 million from the operation of foreclosed assets for the years ended May 31, 2007 and 2006. The results of operations of foreclosed assets for the year ended May 31, 2006 includes a gain of $4 million related to the sale of real estate assets in August 2005. At May 31, 2007, the remaining balance of foreclosed assets is comprised of notes receivable which the Company continues to service.

### Gain on Sale of Building and Land

On October 18, 2005, CFC closed on the sale of its headquarters facility in Fairfax County, Virginia to an affiliate of Prentiss Properties Acquisition Partners, L.P. resulting in a gain of $43 million for the year ended May 31, 2006.

### Recovery of Guarantee Liability

There was a recovery of $2 million from the guarantee liability for the year ended May 31, 2007 compared to a recovery of $1 million in the prior year period. For the year ended May 31, 2007 and 2006, substantially all guarantees were issued by CFC.

### Derivative Forward Value

The $108 million decrease in the derivative forward value during the year ended May 31, 2007 compared to the prior year period is due to a charge of $31 million related to the termination of two interest rate exchange agreements, changes in the estimate of future interest rates over the remaining life of the derivative contracts and a 17% reduction in the average notional amount of derivatives outstanding.

### Foreign Currency Adjustment

The Company's foreign currency adjustment for the year ended May 31, 2007 increased by $8 million compared to the year ended May 31, 2006. Changes in the exchange rate between the U.S. dollar and Euro and the U.S. dollar and Australian dollar may cause the value of foreign denominated debt outstanding to fluctuate. An increase in the value of the Euro or the Australian dollar versus the value of the U.S. dollar results in an increase in the recorded U.S. dollar value of foreign denominated debt and therefore a charge to expense on the consolidated statements of operations, while a decrease in exchange rates results in a reduction in the recorded U.S. dollar value of foreign denominated debt and income. The Company has entered into foreign currency exchange agreements to cover all of the cash flows associated with its foreign denominated debt. Changes in the value of the foreign currency exchange agreement are approximately offset by changes in the value of the outstanding foreign denominated debt. There were no foreign currency exchange agreements outstanding at May 31, 2007.

### Loss on Sale of Loans

On February 15, 2007, the Company sold distribution loans with outstanding principal balances totaling $366 million in a loan securitization transaction. The Company received $366 million of cash in exchange for the loans, which represents the full principal amount of the loans sold. The Company incurred $0.7 million of costs associated with the transaction and had $0.9 million of unamortized deferred loan origination costs for the loans sold and accordingly, the Company recorded a loss on sale of loans totaling $1.6 million during the year ended May 31, 2007. The Company has no retained interest in the securitized loans. The Company services the loans in return for a market fee of 30 basis points and thus does not record a servicing asset or liability.

### Net Income

The change in the line items described above resulted in a decrease in net income of $84 million for the year ended May 31, 2007 from the prior year period. The adjusted net income, which excludes the impact of the derivative forward value and foreign currency adjustments and adds back minority interest, was $108 million, compared to $97 million for the prior year period. The

27

adjusted net income for the year ended May 31, 2006 included a $43 million gain on the sale of building and land.  Adjusted net income for the year ended May 31, 2006 was $54 million excluding the $43 million gain on the sale of the building and land.  See "Non-GAAP Financial Measures" for further explanation of the adjustments the Company makes in its financial analysis to net income.

*Fiscal Year 2006 versus 2005 Results*
The following chart presents the results for the year ended May 31, 2006 versus 2005.

| (Dollar amounts in millions) | For the year ended May 31, | | Increase/ (Decrease) |
|---|---|---|---|
| | 2006 | 2005 | |
| Interest income | $ 1,008 | $ 1,031 | $ (23) |
| Interest expense | (976) | (942) | (34) |
| Net interest income | 32 | 89 | (57) |
| Provision for loan losses | (23) | (16) | (7) |
| Net interest income after provision for loan losses | 9 | 73 | (64) |
| | | | |
| Non-interest income: | | | |
| Rental and other income | 2 | 6 | (4) |
| Derivative cash settlements | 81 | 78 | 3 |
| Results of operations of foreclosed assets | 16 | 13 | 3 |
| Gain on sale of building and land | 43 | - | 43 |
| Total non-interest income | 142 | 97 | 45 |
| | | | |
| Non-interest expense: | | | |
| Salaries and employee benefits | (31) | (29) | (2) |
| Other general and administrative expenses | (21) | (20) | (1) |
| Recovery of guarantee liability | 1 | 3 | (2) |
| Derivative forward value | 29 | 26 | 3 |
| Foreign currency adjustments | (23) | (23) | - |
| Total non-interest expense | (45) | (43) | (2) |
| | | | |
| Income prior to income taxes and minority interest | 106 | 127 | (21) |
| | | | |
| Income taxes | (3) | (2) | (1) |
| Minority interest, net of income taxes | (7) | (2) | (5) |
| Net income | $ 96 | $ 123 | $ (27) |
| | | | |
| TIER | 1.10 | 1.13 | |
| Adjusted TIER (1) | 1.11 | 1.14 | |

(1) Adjusted to exclude the impact of the derivative forward value and foreign currency adjustments from net income, to include minority interest in net income and to include all derivative cash settlements in the interest expense.  See "Non-GAAP Financial Measures" for further explanation and a reconciliation of these adjustments.

CFC's net interest income will increase or decrease due to changes in loan volume and the rate that it receives on its loans and pays on its sources of funding, respectively. CFC's loan volume substantially determines its funding needs. The following Volume Rate Variance Table provides a breakout of the change to interest income, interest expense and net interest income due to changes in loan volume versus changes to interest rates. The analysis is consistent with the May 31, 2006 and 2005 consolidated statements of operations.  For comparability purposes, average daily loan volume is used as the denominator in calculating interest income yield, interest expense rates and net interest income spread.

Management calculates an adjusted net interest income, which includes all derivative cash settlements in its interest expense. The following table also includes a breakout of the change to derivative cash settlements due to changes in the average notional amount of its derivative portfolio versus changes to the net difference between the average rate paid and the average rate received. See "Non-GAAP Financial Measures" for further explanation of the adjustment the Company makes in its financial analysis to include all derivative cash settlements in its interest expense.

28

**Volume Rate Variance Table**
(Dollar amounts in millions)

| | For the year ended May 31, | | | | | | Change due to | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2006 | | | 2005 | | | | | |
| | Average Loan Balance | Income/ (Cost) | Rate | Average Loan Balance | Income/ (Cost) | Rate | Volume (1) | Rate (2) | Total |
| Interest income | | | | | | | | | |
| CFC | $15,605 | $ 847 | 5.43% | $15,494 | $ 737 | 4.76% | $ 5 | $ 105 | $ 110 |
| RTFC | 2,356 | 130 | 5.50% | 3,863 | 266 | 6.88% | (104) | (32) | (136) |
| NCSC | 444 | 31 | 7.08% | 481 | 28 | 5.77% | (2) | 5 | 3 |
| Total | $18,405 | $1,008 | 5.48% | $19,838 | $1,031 | 5.19% | $(101) | $ 78 | $(23) |
| | | | | | | | | | |
| Interest expense | | | | | | | | | |
| CFC | $15,605 | $ (827) | (5.30)% | $15,494 | $ (662) | (4.28)% | $ (5) | $ (160) | $(165) |
| RTFC | 2,356 | (123) | (5.21)% | 3,863 | (261) | (6.75)% | 102 | 36 | 138 |
| NCSC | 444 | (26) | (5.92)% | 481 | (19) | (3.90)% | 2 | (9) | (7) |
| Total | $18,405 | $ (976) | (5.30)% | $19,838 | $ (942) | (4.74)% | $ 99 | $ (133) | $ (34) |
| | | | | | | | | | |
| Net interest income | | | | | | | | | |
| CFC | $15,605 | $ 20 | 0.13% | $15,494 | $ 75 | 0.48% | $ - | $ (55) | $ (55) |
| RTFC | 2,356 | 7 | 0.29% | 3,863 | 5 | 0.13% | (2) | 4 | 2 |
| NCSC | 444 | 5 | 1.16% | 481 | 9 | 1.87% | - | (4) | (4) |
| Total | $18,405 | $ 32 | 0.18% | $19,838 | $ 89 | 0.45% | $ (2) | $ (55) | $ (57) |
| | | | | | | | | | |
| Derivative cash settlements (3) | | | | | | | | | |
| CFC | $15,030 | $ 82 | 0.54% | $15,103 | $ 80 | 0.53% | $ - | $ 2 | $ 2 |
| NCSC | 110 | (1) | (0.84)% | 71 | (2) | (3.11)% | (1) | 2 | 1 |
| Total | $15,140 | $ 81 | 0.53% | $15,174 | $ 78 | 0.52% | $ (1) | $ 4 | $ 3 |
| | | | | | | | | | |
| Adjusted interest expense (4) | | | | | | | | | |
| Total | $18,405 | $ (895) | (4.86)% | $19,838 | $ (864) | (4.35)% | $ 98 | $ (129) | $ (31) |

(1) Variance due to volume is calculated using the following formula: ((current average balance – prior year average balance) x prior year rate).

(2) Variance due to rate is calculated using the following formula: ((current rate – prior year rate) x current average balance).

(3) For derivative cash settlements, average loan balance represents the average notional amount of derivative contracts outstanding and the rate represents the net difference between the average rate paid and the average rate received for cash settlements during the period.

(4) See "Non-GAAP Financial Measures" for further explanation of the adjustment the Company makes in its financial analysis to include all derivative cash settlements in its interest expense.

*Interest Income*

Total interest income reported on the consolidated statements of operations and shown in the chart above includes the following and the weighted average interest rate thereon:

| | For the year ended May 31, | | | | |
|---|---|---|---|---|---|
| | 2006 | | 2005 | | Increase/ (Decrease) |
| (Dollar amounts in millions) | Amount | Rate | Amount | Rate | |
| Interest on long-term fixed rate loans (1) | $ 759 | | $ 723 | | $ 36 |
| Interest on long-term variable rate loans (1) | 154 | | 206 | | (52) |
| Interest on short-term loans (1) | 58 | | 39 | | 19 |
| Total interest income on loans | 971 | 5.28 % | 968 | 4.88% | 3 |
| Interest on investments (2) | 10 | 0.05 % | 3 | 0.01% | 7 |
| Conversion fees (3) | 14 | 0.08 % | 18 | 0.09% | (4) |
| Make-whole and prepayment fees (4) | 5 | 0.03 % | 36 | 0.18% | (31) |
| Commitment and guarantee fees (5) | 7 | 0.04 % | 6 | 0.03% | 1 |
| Other fees | 1 | - | - | - | 1 |
| Total interest income | $ 1,008 | 5.48 % | $ 1,031 | 5.19% | $ (23) |

(1) Represents interest income on loans to members.
(2) Represents interest income on the investment of excess cash.

(3) Conversion fees are deferred and recognized using the interest method over the remaining original loan interest rate pricing term, except for a small portion of the total fee charged to cover administrative costs related to the conversion, which is recognized immediately.

(4) Make-whole and prepayment fees are charged for the early repayment of principal in full and recognized when collected.

(5) Commitment fees for RTFC loan commitments are, in most cases, refundable on a prorata basis according to the amount of the loan commitment that is advanced.  Such refundable fees are deferred and then recognized on a prorata basis based on the portion of the loan that is not advanced prior to the expiration of the commitment.  Commitment fees on CFC loan commitments are not refundable and are billed and recognized based on the unused portion of committed lines of credit.  Guarantee fees are charged based on the amount, type and term of the guarantee.  Guarantee fees are deferred and amortized using the straight-line method into interest income over the life of the guarantee.

29

Total interest income for the year ended May 31, 2006 represented a decrease of $23 million or 2% from the prior year primarily due to the decrease in fee income. There were offsetting changes to interest income due to the increase to interest rates in the markets and to a lower loan volume. During the year ended May 31, 2006, the Company raised variable interest rates by between approximately 180 basis points and 190 basis points depending on the loan program, while fixed interest rates remained relatively stable. The increase to income as a result of higher variable interest rates was also offset by a reduction to interest income as a result of an increase to loans on non-accrual status. For the year ended May 31, 2006, the Company had a reduction to interest income of $79 million due to non-accrual loans, compared to a reduction of $51 million for the prior year period. The decrease in loan volume is due to the prepayment of RTFC loans during the year ended May 31, 2006.

Total fee and investment income earned during the year ended May 31, 2006 decreased $26 million from the prior year. The decrease to fee and investment income for the year ended May 31, 2006 was due to a reduction of $31 million in prepayment and make-whole fees, offset slightly by an increase of $7 million to investment income. During the year ended May 31, 2005, there were significant loan prepayments that generated a large amount of prepayment and make-whole fees. The large loan prepayments that occurred during fiscal year 2005 do not represent normal business activity and are not anticipated to occur in the future. The Company does not have a goal of maintaining an investment portfolio as part of the business plan to generate income, but rather the Company will invest excess cash on a short-term basis. Excess cash investments are typically the result of the Company pre-funding debt maturities and due to commercial paper and medium-term note investments made late in the day by its members.

The $110 million increase in CFC interest income was due to the increase in interest rates partly offset by the impact of non-accrual loans. CFC interest income decreased $36 million for the year ended May 31, 2006 due to holding loans on non-accrual, compared to $27 million for the prior year period. The impact of non-accrual loans on interest income is included in the rate variance in the chart above. The $136 million decrease in RTFC interest income was due to loan prepayments and the impact of non-accrual loans. RTFC interest income decreased $43 million for the year ended May 31, 2006 due to holding loans on non-accrual, compared to $24 million in the prior year period.

*Interest Expense*
Total interest expense reported on the consolidated statements of operations and shown in the chart above includes the following and the weighted average interest rate thereon:

| (Dollar amounts in millions) | For the year ended May 31, | | | | Increase/ |
| | 2006 | | 2005 | | (Decrease) |
| | Amount | Rate | Amount | Rate | |
|---|---|---|---|---|---|
| Interest expense - commercial paper and bid notes (1) | $ 133 | | $ 89 | | $ 44 |
| Interest expense - medium-term notes (1) | 409 | | 418 | | (9) |
| Interest expense - collateral trust bonds (1) | 272 | | 315 | | (43) |
| Interest expense - subordinated deferrable debt (1) | 46 | | 41 | | 5 |
| Interest expense - subordinated certificates (1) | 47 | | 47 | | - |
| Interest expense - long-term private debt (1) | 46 | | 2 | | 44 |
| Total interest expense on debt | 953 | 5.18% | 912 | 4.60% | 41 |
| Debt issuance costs (2) | 10 | 0.05% | 12 | 0.06% | (2) |
| Derivative cash settlements, net (3) | 2 | 0.01% | 6 | 0.03% | (4) |
| Commitment and guarantee fees (4) | 11 | 0.06% | 9 | 0.04% | 2 |
| Gain on extinguishment of debt (5) | (2) | (0.01)% | - | - | (2) |
| Other fees | 2 | 0.01% | 3 | 0.01 % | (1) |
| Total interest expense | $ 976 | 5.30% | $ 942 | 4.74% | $ 34 |

(1) Represents interest expense and the amortization of discounts on debt.

(2) Includes amortization of all deferred charges related to debt issuance, principally underwriter's fees, legal fees, printing costs and comfort letter fees. Amortization is calculated on the effective interest method. Also includes issuance costs related to dealer commercial paper.

(3) Represents the net cost related to swaps that qualify for hedge treatment plus the accrual from the date of the last settlement to the current period end.

(4) Includes various fees related to funding activities, including fees paid to banks participating in the Company's revolving credit agreements and fees paid under bond guarantee agreements with RUS as part of the REDLG program. Fees are recognized as incurred or amortized on a straight-line basis over the life of the respective agreement.

(5) Represents the gain on the early retirement of debt including the write-off of unamortized discount, premium and issuance costs.

The $34 million increase to the total interest expense for the year ended May 31, 2006 was due to the increase to interest rates in the markets partly offset by lower loan volume for the year ended May 31, 2006 as compared to the prior year.

The adjusted interest expense, which includes all derivative cash settlements for the year ended May 31, 2006 increased by $31 million compared to the prior year period due to the increase to interest expense noted above partially offset by lower fees for swap terminations. See "Non-GAAP Financial Measures" for further explanation of the adjustment the Company makes in its financial analysis to include all derivative cash settlements in its interest expense. Derivative cash settlements for the year ended May 31, 2006 includes $80 million received for derivative cash settlements from the Company's derivative counterparties and $1 million received from counterparties for the termination of interest rate exchange agreements used as funding for the loans that were prepaid during the period. The derivative cash settlements for the year ended May 31, 2005 includes $100 million of derivative cash settlements received by CFC offset by $22 million of fees paid by CFC for the termination of exchange agreements.

*Net Interest Income*

The change in the line items described above resulted in a decrease in net interest income of $57 million for the year ended May 31, 2006 compared to the prior year period. The adjusted net interest income, which includes all derivative cash settlements, for the year ended May 31, 2006 was $113 million, a decrease of $54 million from the prior year period. See "Non-GAAP Financial Measures" for further explanation of the adjustment the Company makes in its financial analysis to include all derivative cash settlements in its interest expense, and therefore net interest income.

*Derivative Cash Settlements*

The increase in cash settlements for the year ended May 31, 2006 is primarily due to $1 million of termination fees received during the year ended May 31, 2006 compared to $22 million of termination fees paid during the year ended May 31, 2005 to unwind interest rate exchange agreements that were used as part of the funding for loans that were prepaid during the period. CFC is currently collecting more on its derivative contracts than it is paying.

*Results of Operations of Foreclosed Assets*

The Company recorded net income of $16 million and $13 million from the operation of foreclosed assets for the year ended May 31, 2006 and 2005. The results of operations of foreclosed assets for the year ended May 31, 2006 includes a gain of $4 million related to the sale of real estate assets in August 2005. At May 31, 2006, the remaining balance of foreclosed assets is comprised of notes receivable which the Company continues to service.

*Gain on Sale of Building and Land*

On October 18, 2005, CFC sold its headquarters facility in Fairfax County, Virginia to an affiliate of Prentiss Properties Acquisition Partners, L.P. for $85 million. The assets had a net book value of $40 million, thus generating a total gain of $43 million during the year ended May 31, 2006, net of $2 million in closing and other related costs.

*Recovery of Guarantee Liability*

There was a recovery of $1 million from the guarantee liability in the year ended May 31, 2006 compared to $3 million in the prior year period. For the year ended May 31, 2006 and 2005, substantially all guarantees were issued by CFC.

*Derivative Forward Value*

During the year ended May 31, 2006, the derivative forward value represented an increase of $3 million compared to the prior year period. The increase in the derivative forward value is due to changes in the estimate of future interest rates over the remaining life of the derivative contracts. The derivative forward value for the year ended May 31, 2006 and 2005 also includes amortization of $0.4 million and $16 million, respectively, related to the transition adjustment recorded as an other comprehensive loss on June 1, 2001, the date the Company implemented SFAS 133. This adjustment will be amortized into earnings over the remaining life of the related derivative contracts.

*Foreign Currency Adjustment*

The Company's foreign currency adjustment for the year ended May 31, 2006 did not fluctuate compared to the year ended May 31, 2005. Changes in the exchange rate between the U.S. dollar and Euro and the U.S. dollar and Australian dollar may cause the value of foreign denominated debt outstanding to fluctuate. An increase in the value of the Euro or the Australian dollar versus the value of the U.S. dollar results in an increase in the recorded U.S. dollar value of foreign denominated debt and therefore a charge to expense on the consolidated statements of operations, while a decrease in exchange rates results in a reduction in the recorded U.S. dollar value of foreign denominated debt and income. The Company has entered into foreign currency exchange agreements to cover all of the cash flows associated with its foreign denominated debt. Changes in the value of the foreign currency exchange agreement will be approximately offset by changes in the value of the outstanding foreign denominated debt.

*Net Income*

The change in the line items described above resulted in a decrease in net income of $27 million for the year ended May 31, 2006 from the prior year period. The adjusted net income, which excludes the impact of the derivative forward value and foreign currency adjustments and adds back minority interest, was $97 million, compared to $122 million for the prior year period. See "Non-GAAP Financial Measures" for further explanation of the adjustments the Company makes in its financial analysis to net

31

income.  Adjusted net income excluding the $43 million gain on the sale of the building and land for the year ended May 31, 2006 was $54 million, a decrease of $68 million from the prior year.

*Operating Results as a Percentage of Average Loans Outstanding*
The Company's operating results as a percentage of average loans outstanding is summarized as follows:

|  | For the year ended May 31, | | |
| --- | --- | --- | --- |
|  | 2007 | 2006 | 2005 |
| Interest income | 5.79% | 5.48 % | 5.19 % |
| Interest expense | (5.48)% | (5.30)% | (4.74)% |
|     Net interest income | 0.31% | 0.18 % | 0.45 % |
| Recovery of (provision for) loan losses | 0.04% | (0.13)% | (0.08)% |
| Net interest income after recovery of (provision for) loan losses | 0.35% | 0.05 % | 0.37 % |
| Non-interest income: | | | |
|     Rental and other income | 0.01% | 0.01 % | 0.03 % |
|     Derivative cash settlements | 0.48% | 0.44 % | 0.39 % |
|     Results of operations of foreclosed assets | 0.05% | 0.08 % | 0.07 % |
|     Gain on sale of building and land | - | 0.23 % | - |
|         Total non-interest income | 0.54% | 0.76 % | 0.49 % |
| Non-interest expense: | | | |
|     Salaries and employee benefits | (0.19)% | (0.17)% | (0.15 )% |
|     Other general and administrative expenses | (0.10)% | (0.11)% | (0.10)% |
|     Recovery for guarantee liability | 0.01% | 0.01 % | 0.02 % |
|     Derivative forward value | (0.43)% | 0.16 % | 0.13% |
|     Foreign currency adjustments | (0.08)% | (0.13)% | (0.12)% |
|     Loss on sale of loans | (0.01)% | - | - |
|         Total non-interest expense | (0.80)% | (0.24)% | (0.22)% |
| Income prior to income taxes and minority interest | 0.09% | 0.57 % | 0.64 % |
| Income taxes | (0.01)% | (0.01)% | (0.01)% |
| Minority interest, net of income taxes | (0.01)% | (0.04)% | (0.01)% |
|     Net income | 0.07% | 0.52 % | 0.62 % |
| Adjusted net interest income (1) | 0.79% | 0.62 % | 0.84 % |
| Adjusted income prior to income taxes and minority interest (2) | 0.60% | 0.54% | 0.63% |

(1) Adjusted to include derivative cash settlements in the interest expense.  See "Non-GAAP Financial Measures" for further explanation and a reconciliation of these adjustments.
(2) Adjusted to exclude derivative forward value and foreign currency adjustments.  See "Non-GAAP Financial Measures" for further explanation and a reconciliation of these adjustments.

**Ratio of Earnings to Fixed Charges**
The following chart provides the calculation of the ratio of earnings to fixed charges.  The ratio of earnings to fixed charges is the same calculation as TIER.  See "Results of Operations" for discussion on TIER and adjustments that the Company makes to the TIER calculation.

|  | For the year ended May 31, | | |
| --- | --- | --- | --- |
| (Dollar amounts in millions) | 2007 | 2006 | 2005 |
| Income prior to cumulative effect of change in accounting principle | $ 12 | $ 96 | $ 123 |
|     Add: fixed charges | 997 | 976 | 942 |
| Earnings available for fixed charges | $ 1,009 | $ 1,072 | $ 1,065 |
| Total fixed charges: | | | |
| Interest on all debt (including amortization of discount and issuance costs) | $ 997 | $ 976 | $ 942 |

| | | | |
|---|---|---|---|
| Ratio of earnings to fixed charges | 1.01 | 1.10 | 1.13 |

**Financial Condition**

***Loan and Guarantee Portfolio Assessment***
*Loan Programs*
Loans to members bear interest at rates determined from time to time by the Company after considering its interest expense, operating expenses, provision for loan losses and the maintenance of reasonable earnings levels.  In keeping with its not-for-profit, cooperative charter, the Company's policy is to set interest rates at the lowest levels it considers to be consistent with sound financial management.

The following chart summarizes loans by type and by segment at May 31:

| (Dollar amounts in millions) | Loans by Type | | | | Increase/ (Decrease) |
| --- | --- | --- | --- | --- | --- |
| | 2007 | | 2006 | | |
| Long-term loans (1): | | | | | |
| Long-term fixed rate loans | $ 14,881 | 82% | $ 14,763 | 80% | $ 118 |
| Long-term variable rate loans | 2,032 | 11% | 2,570 | 14% | (538) |
| Total long-term loans | 16,913 | 93% | 17,333 | 94% | (420) |
| Short-term loans (2) | 1,215 | 7% | 1,028 | 6% | 187 |
| Total loans | $ 18,128 | 100% | $ 18,361 | 100% | $ (233) |

| (Dollar amounts in millions) | Loans by Segment | | | | Increase/ (Decrease) |
| --- | --- | --- | --- | --- | --- |
| | 2007 | | 2006 | | |
| CFC: | | | | | |
| Distribution | $ 12,828 | 71% | $ 12,859 | 70% | $ (31) |
| Power supply | 2,858 | 16% | 2,811 | 15% | 47 |
| Statewide and associate | 119 | 1% | 125 | 1% | (6) |
| CFC Total | 15,805 | 88% | 15,795 | 86% | 10 |
| RTFC | 1,860 | 10% | 2,162 | 12% | (302) |
| NCSC | 463 | 2% | 404 | 2% | 59 |
| Total | $ 18,128 | 100% | $ 18,361 | 100% | $ (233) |

(1) Includes loans classified as restructured and non-performing and RUS guaranteed loans.
(2) Consists of secured and unsecured short-term loans that are subject to interest rate adjustment monthly or semi-monthly.

The Company's loans outstanding decreased $233 million or 1% during the year ended May 31, 2007 reflecting in large part loan prepayments by RTFC borrowers.  CFC loan advances were substantially offset by the sale of $366 million of CFC distribution loans in a loan securitization transaction in February 2007. Long-term fixed rate loans at May 31, 2007 and 2006 represented 88% and 85%, respectively, of total long-term loans.  Loans converting from a variable rate to a fixed rate for the year ended May 31, 2007 totaled $372 million, which was offset by $190 million of loans that converted from a fixed rate to a variable rate.  This resulted in a net conversion of $182 million from a variable rate to a fixed rate for the year ended May 31, 2007.  For the year ended May 31, 2006, loans converting from a variable rate to a fixed rate totaled $1,754 million, which was offset by $77 million of loans that converted from a fixed rate to a variable rate.  This resulted in a net conversion of $1,677 million from a variable rate to a fixed rate for the year ended May 31, 2006.

The following chart summarizes loans and guarantees outstanding by segment at May 31:

| (Dollar amounts in millions) | 2007 | | 2006 | | 2005 | |
| --- | --- | --- | --- | --- | --- | --- |
| CFC: | | | | | | |
| Distribution | $ 13,039 | 68% | $ 12,929 | 67% | $ 12,771 | 64% |
| Power supply | 3,655 | 19% | 3,733 | 19% | 3,707 | 18% |
| Statewide and associate | 145 | 1% | 158 | 1% | 177 | 1% |
| CFC Total | 16,839 | 88% | 16,820 | 87% | 16,655 | 83% |
| RTFC | 1,860 | 10% | 2,162 | 11% | 2,992 | 15% |
| NCSC | 503 | 2% | 458 | 2% | 483 | 2% |
| Total | $ 19,202 | 100% | $ 19,440 | 100% | $ 20,130 | 100% |

33

The following table summarizes the RTFC segment loans and guarantees outstanding as of May 31:

| (Dollar amounts in millions) | 2007 | | 2006 | | 2005 | |
|---|---|---|---|---|---|---|
| Rural local exchange carriers | $ 1,630 | 88% | $ 1,815 | 84% | $ 2,358 | 79% |
| Cable television providers | 155 | 8% | 179 | 8% | 169 | 6% |
| Long distance carriers | 9 | 1% | 89 | 5% | 135 | 5% |
| Fiber optic network providers | 37 | 2% | 41 | 2% | 67 | 2% |
| Competitive local exchange carriers | 21 | 1% | 28 | 1% | 45 | 1% |
| Wireless providers | 4 | - | 5 | - | 211 | 7% |
| Other | 4 | - | 5 | - | 7 | - |
| Total | $ 1,860 | 100% | $ 2,162 | 100% | $ 2,992 | 100% |

The Company's members are widely dispersed throughout the United States and its territories, including 49 states, the District of Columbia and two U.S. territories.  At May 31, 2007, 2006 and 2005, loans and guarantees outstanding to members in any one state or territory did not exceed 15%, 16% and 16%, respectively, of total loans and guarantees outstanding.

*Credit Concentration*
CFC, RTFC and NCSC each have policies that limit the amount of credit that can be extended to individual borrowers or a controlled group of borrowers.  The credit limitation policies set the limit on the total exposure and unsecured exposure to the borrower based on an assessment of the borrower's risk profile and the Company's internal risk rating system.  As a member owned cooperative, the Company makes best efforts to balance meeting the needs of its member/owners and mitigating the risk associated with concentrations of credit exposure.  The respective boards of directors must approve new credit requests from a borrower with a total exposure or unsecured exposure in excess of the limits in the policy.  Management of credit concentrations may include the use of syndicated credit agreements.

Total exposure, as defined by the policy, includes the following:
- loans outstanding, excluding loans guaranteed by RUS,
- the Company's guarantees of the borrower's obligations,
- unadvanced loan commitments, and
- borrower guarantees to the Company of another borrower's debt.

At May 31, 2007 and 2006, the total exposure outstanding to any one borrower or controlled group did not exceed 3% of total loans and guarantees outstanding.  At May 31, 2007, the ten largest borrowers included six distribution systems, two power supply systems and two telecommunications systems. At May 31, 2006, the ten largest borrowers included four distribution systems, five power supply systems and one telecommunications systems.  The following chart shows the exposure to the ten largest borrowers as a percentage of total exposure by type and by segment at May 31:

| (Dollar amounts in millions) | 2007 | | 2006 | |
|---|---|---|---|---|
| | Amount | % of Total | Amount | % of Total |
| Total by type: | | | | |
| Loans | $ 3,307 | | $ 3,140 | |
| Guarantees | 77 | | 267 | |
| Total credit exposure to ten largest borrowers | $ 3,384 | 18% | $ 3,407 | 18% |
| | | | | |
| Total by segment: | | | | |
| CFC | $ 2,691 | | $ 2,856 | |
| RTFC | 693 | | 488 | |
| NCSC | - | | 63 | |
| Total credit exposure to ten largest borrowers | $ 3,384 | 18% | $ 3,407 | 18% |

*Security Provisions*
Except when providing short-term loans, the Company typically lends to its members on a senior secured basis.  Long-term loans are typically secured on a parity with other secured lenders (primarily RUS), if any, by all assets and revenues of the borrower with exceptions typical in utility mortgages.  Short-term loans are generally unsecured lines of credit.  Guarantee reimbursement obligations are typically secured on a parity with other secured creditors by all assets and revenues of the borrower or by the underlying financed asset.  In addition to the collateral received, borrowers are also required to set rates designed to achieve certain financial ratios.

34

The following table summarizes the Company's unsecured credit exposure as a percentage of total exposure by type and by segment at May 31:

| (Dollar amounts in millions) | 2007 | | 2006 | |
| | Amount | % of Total | Amount | % of Total |
|---|---|---|---|---|
| Total by type: | | | | |
| Loans | $      1,634 | | $      1,554 | |
| Guarantees | 221 | | 144 | |
| Total unsecured credit exposure | $      1,855 | 10% | $      1,698 | 9% |
| | | | | |
| Total by segment: | | | | |
| CFC | $      1,559 | | $      1,358 | |
| RTFC | 230 | | 241 | |
| NCSC | 66 | | 99 | |
| Total unsecured credit exposure | $      1,855 | 10% | $      1,698 | 9% |

*Non-performing Loans*

A borrower is classified as non-performing when any one of the following criteria are met:

- principal or interest payments on any loan to the borrower are past due 90 days or more,
- as a result of court proceedings, repayment on the original terms is not anticipated, or
- for some other reason, management does not expect the timely repayment of principal and interest.

Once a borrower is classified as non-performing, CFC typically places the loan on non-accrual status and reverses all accrued and unpaid interest back to the date of the last payment. The Company generally applies all cash received during the non-accrual period to the reduction of principal, thereby foregoing interest income recognition. At May 31, 2007 and 2006, the Company had non-performing loans outstanding in the amount of $502 million and $578 million, respectively. All loans classified as non-performing were on a non-accrual status with respect to the recognition of interest income.

At May 31, 2007 and 2006, non-performing loans include $493 million and $488 million, respectively, to Innovative Communication Corporation ("ICC"). All loans to ICC have been on non-accrual status since February 1, 2005. ICC has not made debt service payments to the Company since June 2005. RTFC is the primary secured lender to ICC.

As part of a settlement agreement, RTFC obtained entry of judgments against ICC for approximately $525 million and ICC's indirect majority shareholder and chairman, Jeffrey Prosser ("Prosser") for approximately $100 million. RTFC also obtained dismissals with prejudice of all counterclaims, affirmative defenses and other lawsuits alleging wrongful acts by RTFC, certain of its officers, and CFC. Various parties also reached agreement for ICC to satisfy the RTFC judgments in the third quarter of calendar year 2006, subject to certain terms and conditions, however, on July 31, 2006, certain of the parties obligated to satisfy the RTFC judgments under the agreement filed voluntary bankruptcy proceedings, as described below, in order to obtain additional time to satisfy the judgments.

On July 31, 2006, ICC's immediate parent, Emerging Communication, Inc., a Delaware corporation ("Emcom"), Emcom's parent, Innovative Communication Company LLC, a Delaware limited liability company ("ICC-LLC") and Prosser, individually, each filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code, now pending in the United States District Court for the Virgin Islands, Division of St. Thomas and St. John, Bankruptcy Division  Each of the debtors is obligated to RTFC, for certain obligations of ICC, including court judgments. On February 13, 2007, the Bankruptcy Court ordered the appointment of a trustee for the ICC-LLC and Emcom bankruptcy estates and an examiner for Prosser's bankruptcy estate.

Subsequent to our fiscal year-end, on August 2, 2007, the Bankruptcy Court entered an order declaring that the debtors could not satisfy the RTFC judgments at a discount. Prosser, individually, has filed a notice of appeal of the order but has not sought a stay of its effect; none of the other debtors has sought review of the order.

On July 6, 2007, an involuntary petition under Chapter 11 of the United States Bankruptcy Code was filed in the United States District Court for the Virgin Islands, Bankruptcy Division, against ICC by Emcom shareholders ("the Greenlight Entities"). ICC has contested the petition and a hearing has been scheduled for September 6, 2007 regarding whether an order for relief in bankruptcy will be entered.

The debtors continue to seek a sale or refinancing of their assets in an effort to satisfy their debts to RTFC. Any transfer of control of a regulated telecommunications or cable television business, or sale or assignment of such business's regulated assets, may require the prior consent of regulatory authorities, including the Federal Communications Commission, the U.S. Virgin Islands Public Services Commission, and foreign governments.

35

For a more detailed description of the contingencies related to the non-performing loans outstanding to ICC, see Note 15 to the consolidated financial statements. Based on its analysis, the Company believes that it is adequately reserved for its exposure to ICC at May 31, 2007.

Non-performing loans at May 31, 2007 and 2006 include a total of $9 million and $90 million, respectively, to VarTec. VarTec is a telecommunications company and RTFC borrower located in Dallas, Texas. RTFC is VarTec's principal senior secured creditor. At May 31, 2007 and 2006, all loans to VarTec were on non-accrual status, resulting in the application of all payments received against principal.

VarTec and 16 of its U.S.-based affiliates, which were guarantors of VarTec's debt to RTFC, filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code on November 1, 2004 in Dallas, Texas. On July 29, 2005, the court approved a sale of VarTec's remaining operating assets (the "Domestic Assets Sale"). Final proceeds from the closing of the Domestic Assets Sale were received in June 2006 totaling $40 million. Pursuant to a court order, all net proceeds of asset sales, including the Domestic Assets Sale, have been provisionally applied to RTFC's secured debt. On June 19, 2006, the Chapter 11 proceedings were converted to Chapter 7 proceedings and a Chapter 7 trustee was appointed for each of the estates.

On June 10, 2005, the Official Committee of Unsecured Creditors (the "UCC") initiated an adversary proceeding against RTFC in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. As a result of the conversion of the proceedings to Chapter 7, the UCC was dissolved and the Chapter 7 trustee became the plaintiff in the adversary proceedings. On May 15, 2007, the Chapter 7 trustee and RTFC entered into a settlement agreement under which (a) all claims against RTFC were dismissed with prejudice and fully released, (b) a portion of the proceeds from the Domestic Asset Sale that had been provisionally applied to RTFC's secured debt will be reallocated to the claimants, including RTFC, of the VarTec bankruptcy estates, and (c) the administrative debtor-in-possession financing facility owed by the VarTec bankruptcy estates to RTFC was partially reduced. The Bankruptcy Court approved the settlement agreement on May 24, 2007, which approval became final and non-appealable on June 4, 2007. As a result of the settlement of the Unsecured Creditor litigation, the Company wrote off $44 million of pre-petition debt during the fourth quarter of fiscal year 2007 and expects to write off approximately $17 million in the first quarter of fiscal year 2008.

Based on its analysis, the Company believes that it is adequately reserved for its exposure to VarTec at May 31, 2007.

*Restructured Loans*
Loans classified as restructured are loans for which agreements have been executed that changed the original terms of the loan, generally a change to the originally scheduled cash flows. The Company will make a determination on each restructured loan with regard to the accrual of interest income on the loan. The initial decision is based on the terms of the restructure agreement and the anticipated performance of the borrower over the term of the agreement. The Company will periodically review the decision to accrue or not to accrue interest income on restructured loans based on the borrower's past performance and current financial condition.

At May 31, 2007 and 2006, restructured loans totaled $603 million and $630 million, respectively. A total of $545 million and $569 million of restructured loans were on non-accrual status with respect to the recognition of interest income at May 31, 2007 and 2006, respectively.

At May 31, 2007 and 2006, the Company had $545 million and $569 million, respectively, of loans outstanding to CoServ. All CoServ loans have been on non-accrual status since January 1, 2001. Total loans to CoServ at May 31, 2007 and 2006 represented 2.9% of the Company's total loans and guarantees outstanding.

Under the terms of a bankruptcy settlement, CFC restructured its loans to CoServ. CoServ is scheduled to make quarterly payments to CFC through December 2037. As part of the restructuring, CFC may be obligated to provide up to $204 million of senior secured capital expenditure loans to CoServ for electric distribution infrastructure through December 2012. When CoServ requests capital expenditure loans from CFC, these loans are provided at the standard terms offered to all borrowers and require debt service payments in addition to the quarterly payments that CoServ is required to make to CFC. As of May 31, 2007, $20 million was advanced to CoServ under this loan facility. To date, CoServ has made all payments required under the restructure agreement and capital expenditure loan facility. Under the terms of the restructure agreement, CoServ has the option to prepay the loan for $415 million plus an interest payment true up on or after December 13, 2007, and for $405 million plus an interest payment true up on or after December 13, 2008.

CoServ and CFC have no claims related to any of the legal actions asserted prior to or during the bankruptcy proceedings. CFC's legal claim against CoServ is limited to CoServ's performance under the terms of the bankruptcy settlement.

Based on its analysis, the Company believes that it is adequately reserved for its exposure to CoServ at May 31, 2007.

36

Pioneer Electric Cooperative, Inc. ("Pioneer") is an electric distribution cooperative located in Greenville, Alabama. Pioneer had also invested in a propane gas operation, which it has sold. Pioneer had experienced deterioration in its financial condition as a result of losses in the gas operation. At May 31, 2007 and 2006, CFC had a total of $52 million and $54 million, respectively, in loans outstanding to Pioneer. Pioneer was current with respect to all debt service payments at May 31, 2007. CFC is the principal creditor to Pioneer.

On March 9, 2006, CFC and Pioneer agreed on the terms of a debt modification that resulted in the loans being classified as restructured. Under the amended agreement, CFC extended the maturity of the outstanding loans and granted a two-year deferral of principal payments. In addition, CFC agreed to make available a line of credit for general corporate purposes. The restructured loans are secured by first liens on substantially all of the assets and revenues of Pioneer. At this time, CFC plans to maintain the loans to Pioneer on accrual status.

Based on its analysis, the Company believes that it is adequately reserved for its exposure to Pioneer at May 31, 2007.

*Loan Impairment*
On a quarterly basis, the Company reviews all non-performing and restructured borrowers, as well as certain additional borrowers selected based on known facts and circumstances at the time of the review, to determine if the loans to the borrower are impaired and/or to update the impairment calculation. The Company calculates an impairment for a borrower based on the expected future cash flow or the fair value of any collateral held by the Company as security for loans to the borrower. In some cases, to estimate future cash flow, certain assumptions are required regarding, but not limited to, the following:

- interest rates,
- court rulings,
- changes in collateral values,
- changes in economic conditions in the area in which the cooperative operates, and
- changes to the industry in which the cooperative operates.

As events related to the borrower take place and economic conditions and the Company's assumptions change, the impairment calculations will change. The loan loss allowance specifically reserved to cover the calculated impairments is adjusted on a quarterly basis based on the most current information available. At May 31, 2007 and 2006, CFC had impaired loans totaling $1,099 million and $1,201 million, respectively. At May 31, 2007 and 2006, CFC had specifically reserved a total of $397 million and $447 million, respectively, to cover impaired loans.

The following chart presents a summary of non-performing and restructured loans as a percentage of total loans and total loans and guarantees outstanding:

### NON-PERFORMING AND RESTRUCTURED LOANS

| (Dollar amounts in millions) | May 31, 2007 | May 31, 2006 | May 31, 2005 |
|---|---|---|---|
| Non-performing loans | $ 502 | $ 578 | $ 617 |
| Percent of loans outstanding | 2.77% | 3.15% | 3.25% |
| Percent of loans and guarantees outstanding | 2.61% | 2.97% | 3.06% |
| Restructured loans | $ 603 | $ 630 | $ 601 |
| Percent of loans outstanding | 3.33% | 3.43% | 3.17% |
| Percent of loans and guarantees outstanding | 3.14% | 3.24% | 2.99% |
| Total non-performing and restructured loans | $ 1,105 | $ 1,208 | $ 1,218 |
| Percent of loans outstanding | 6.10% | 6.58% | 6.42% |
| Percent of loans and guarantees outstanding | 5.75% | 6.21% | 6.05% |

*Allowance for Loan Losses*
The Company maintains an allowance for loan losses at a level estimated by management to provide adequately for probable losses inherent in the loan portfolio, which are estimated based upon a review of the loan portfolio, past loss experience, specific problem loans, economic conditions and other pertinent factors which, in management's judgment, deserve current recognition in estimating loan losses. The Company reviews and adjusts the allowance on a quarterly basis to maintain it at a level to cover estimated probable losses in the portfolio.

Management makes recommendations to the board of directors of CFC regarding write-offs of loan balances. In making its recommendation to write off all or a portion of a loan balance, management considers various factors including cash flow analysis and the collateral securing the borrower's loans. Since inception in 1969, write-offs totaled $195 million and recoveries totaled $35 million for a net loss amount of $160 million. In the past five fiscal years, write-offs totaled $62 million and recoveries totaled $8 million for a

net loan loss of $54 million.

37

Management believes that the allowance for loan losses is adequate to cover estimated probable portfolio losses.

Activity in the allowance for loan losses is summarized below for the years ended May 31:

| (Dollar amounts in millions) | For the year ended May 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| Beginning balance | $ 611 | $ 590 | $ 574 |
| (Recovery of) provision for loan losses | (7) | 23 | 16 |
| Net write-offs | (42) | (2) | - |
| Ending balance | $ 562 | $ 611 | $ 590 |
| | | | |
| Loan loss allowance by segment: | | | |
| CFC | $ 561 | $ 610 | $ 589 |
| NCSC | 1 | 1 | 1 |
| Total | $ 562 | $ 611 | $ 590 |
| | | | |
| As a percentage of total loans outstanding | 3.10% | 3.33% | 3.11% |
| As a percentage of total non-performing loans outstanding | 111.95% | 105.71% | 95.62% |
| As a percentage of total restructured loans outstanding | 93.20% | 96.98% | 98.17% |

CFC has agreed to indemnify RTFC and NCSC for loan losses, with the exception of the NCSC consumer loans that are covered by the NCSC loan loss allowance. Therefore, there is no loan loss allowance required at RTFC and only a small loan loss allowance is required at NCSC to cover the exposure to consumer loans.

The Company's loan loss allowance decreased $49 million from May 31, 2006 to May 31, 2007. Within CFC's loan loss allowance at May 31, 2007 as compared to the prior year end, there was a decrease in the calculated impairments of $50 million and an increase of $1 million to the allowance for all other loans. The decrease to the calculated impairments was primarily due to a settlement agreement with VarTec resulting in a loan write-off of $44 million and payments received on impaired loans offset by higher variable interest rates at May 31, 2007 as compared to May 31, 2006.

### Liabilities, Minority Interest and Equity

#### Outstanding Debt
The following chart provides a breakout of debt outstanding at May 31:

| (Dollar amounts in millions) | 2007 | 2006 | Increase/ (Decrease) |
|---|---|---|---|
| Short-term debt: | | | |
| Commercial paper (1) | $ 2,784 | $ 3,255 | $ (471) |
| Bank bid notes | 100 | 100 | - |
| Long-term debt with remaining maturities less than one year | 1,368 | 1,594 | (226) |
| Foreign currency valuation account | - | 245 | (245) |
| Subordinated deferrable debt with remaining maturities less than one year | 175 | 150 | 25 |
| Total short-term debt | 4,427 | 5,344 | (917) |
| Long-term debt: | | | |
| Collateral trust bonds | 4,017 | 3,847 | 170 |
| Notes payable | 2,533 | 2,575 | (42) |
| Medium-term notes | 4,745 | 4,220 | 525 |
| Total long-term debt | 11,295 | 10,642 | 653 |
| Subordinated deferrable debt | 311 | 486 | (175) |
| Members' subordinated certificates: | | | |
| Membership certificates | 649 | 651 | (2) |
| Loan certificates | 625 | 641 | (16) |
| Guarantee certificates | 107 | 136 | (29) |
| Total members' subordinated certificates | 1,381 | 1,428 | (47) |
| | | | |
| Total debt outstanding | $ 17,414 | $ 17,900 | $ (486) |
| | | | |
| Percentage of fixed rate debt (2) | 83% | 83% | |
| Percentage of variable rate debt (3) | 17% | 17% | |
| Percentage of long-term debt | 75% | 70% | |
| Percentage of short-term debt | 25% | 30% | |

(1)  Includes $250 million and $267 million related to the daily liquidity fund at May 31, 2007 and 2006, respectively.

(2)  Includes variable rate debt that has been swapped to a fixed rate less any fixed rate debt that has been swapped to a variable rate.

(3)  The rate on commercial paper notes does not change once the note has been issued.  However, the rates on new commercial paper notes change daily and commercial paper notes generally have maturities of less than 90 days.  Therefore, commercial paper notes are considered to be variable rate debt.  Also includes fixed rate debt that has been swapped to a variable rate less any variable rate debt that has been swapped to a fixed rate.

Other information with regard to short-term debt at May 31 is as follows:

| (Dollar amounts in thousands) | | 2007 | | 2006 | | 2005 |
|---|---|---|---|---|---|---|
| Weighted average maturity outstanding at year-end: | | | | | | |
|    Short-term debt (1) | | 25 days | | 26 days | | 22 days |
|    Long-term debt maturing within one year | | 192 days | | 203 days | | 294 days |
|    Total | | 83 days | | 92 days | | 145 days |
| Average amount outstanding during the year: | | | | | | |
|    Short-term debt (1) | $ | 3,372,639 | $ | 3,204,852 | $ | 4,355,579 |
|    Long-term debt maturing within one year | | 1,692,083 | | 3,502,026 | | 1,834,883 |
|    Total | | 5,064,722 | | 6,706,878 | | 6,190,462 |
| Maximum amount outstanding at any month-end during the year: | | | | | | |
|    Short-term debt (1) | | 3,847,814 | | 4,208,796 | | 4,816,367 |
|    Long-term debt maturing within one year | | 2,549,356 | | 4,031,102 | | 3,591,374 |

(1) Includes the daily liquidity fund and bank bid notes and does not include long-term debt due in less than one year.

Total debt outstanding at May 31, 2007 decreased as compared to May 31, 2006 due primarily to the decrease of $233 million to loans outstanding. The decrease to loan volume reduces the amount of debt required to fund loans. Short-term debt decreased due to the redemption and maturity of long-term debt, offset by an increase in commercial paper at May 31, 2007.

During fiscal year 2007, the Company redeemed the 7.625% subordinated deferrable debt securities due 2050 totaling $150 million. The Company redeemed these securities at par and recorded a charge of $5 million in interest expense for the unamortized issuance costs. Subsequent to the end of the year on June 1, 2007, the Company redeemed the 7.40% subordinated deferrable debt securities due 2050 totaling $175 million. The Company redeemed these securities at par and recorded a charge of $6 million in interest expense for the unamortized issuance costs in the first quarter of fiscal year 2008.

In December 2006, the Company issued $600 million of floating rate extendible collateral trust bonds. The bonds mature in 2008 unless extended by the holders, but no later than 2012. In April 2007, the Company issued $570 million of 5.45% collateral trust bonds due April 2017, $250 million of floating rate extendible medium-term notes with an initial maturity date of May 2008 which may be extended at the option of the holders to May 2014 and $300 million of floating rate extendible medium-term notes with an initial maturity date of April 2009 which may be extended at the option of the holders to April 2014.

At May 31, 2007, there was no foreign denominated debt outstanding. At May 31, 2006, the Company had a total of $960 million of foreign denominated debt. As a result of issuing debt in foreign currencies, the Company must adjust the value of the debt reported on the consolidated balance sheets for changes in foreign currency exchange rates since the date of issuance. To the extent that the current exchange rate is different than the exchange rate at the time of issuance, there will be a change in the value of the foreign denominated debt. The adjustment to the value of the debt for the current period is reported on the consolidated statements of operations as foreign currency adjustments. At the time of issuance of all foreign denominated debt, the Company enters into a cross currency or cross currency interest rate exchange agreement to fix the exchange rate on all principal and interest payments through maturity. At May 31, 2006, the reported amount of foreign denominated debt includes a valuation adjustment of $245 million due to changes in the value of the Euro and Australian dollar versus the U.S. dollar since the time the debt was issued.

The decrease to members' subordinated certificates of $47 million for the year ended May 31, 2007 is primarily due to $87 million related to amounts applied toward loan prepayments, normal amortization and maturities offset by the purchase of $42 million of new subordinated loan certificates.

*Minority Interest*
Minority interest on the consolidated balance sheets was $22 million at May 31, 2007 and 2006. During the years ended May 31, 2007, 2006 and 2005 the balance of minority interest has been adjusted by minority interest net income less the offset of unretired RTFC patronage capital against loans outstanding to certain impaired and high risk borrowers and the retirement of patronage capital to RTFC members in January of each fiscal year.

*Equity*
The following chart provides a breakout of the equity balances at May 31:

| (in millions) | 2007 | 2006 | Increase/ (Decrease) |
|---|---|---|---|
| Membership fees | $ 1 | $ 1 | $ - |
| Education fund | 1 | 1 | - |
| Members' capital reserve | 158 | 157 | 1 |
| Allocated net income | 406 | 386 | 20 |
| Total members' equity | 566 | 545 | 21 |
| Prior years cumulative derivative forward value and foreign currency adjustments | 226 | 226 | - |
| Current period derivative forward value (1) | (79) | 22 | (101) |
| Current period foreign currency adjustments | (15) | (22) | 7 |
| Total retained equity | 698 | 771 | (73) |
| Accumulated other comprehensive income | 12 | 13 | (1) |
| Total equity | $ 710 | $ 784 | $ (74) |

(1) Represents the derivative forward value (gain) loss recorded by CFC for the period.

Applicants are required to pay a one-time fee to become a member. The fee varies from two hundred dollars to one thousand dollars depending on the membership class. CFC is required by the District of Columbia cooperative law to have a methodology to allocate its net earnings to its members. CFC maintains the current year net earnings as unallocated through the end of its fiscal year. At that time, CFC's board of directors allocates its net earnings to its members in the form of patronage capital and to board approved reserves. Currently, CFC has two such board approved reserves, the education fund and the members' capital reserve. CFC adjusts the net earnings it allocates to its members and board approved reserves to exclude the non-cash impacts of SFAS 133 and 52. CFC allocates a small portion, less than 1%, of adjusted net earnings annually to the education fund as required by cooperative law. Funds from the education fund are disbursed annually to the statewide cooperative organizations to fund the teaching of cooperative principles in the service territories of the cooperatives in each state. The board of directors determines the amount of adjusted net earnings that is allocated to the members' capital reserve, if any. The members' capital reserve represents earnings that are held by CFC to increase equity retention. The earnings held in the members' capital reserve have not been specifically allocated to any member, but may be allocated to individual members in the future as patronage capital if authorized by CFC's board of directors. All remaining adjusted net earnings is allocated to CFC's members in the form of patronage capital. CFC bases the amount of adjusted net earnings allocated to each member on the members' patronage of the CFC lending programs in the year that the adjusted net earnings was earned. There is no impact on CFC's total equity as a result of allocating earnings to members in the form of patronage capital or to board approved reserves. CFC annually retires a portion of the patronage capital allocated to members in prior years. CFC's total equity is reduced by the amount of patronage capital retired to its members and by amounts disbursed from board approved reserves.

At May 31, 2007, total equity decreased by $74 million from May 31, 2006. During the year ended May 31, 2007, CFC retired $84 million of patronage capital to its members and accumulated other comprehensive income related to derivatives decreased $1 million which was offset by net income of $12 million.

*Contractual Obligations*

The following table summarizes the long-term contractual obligations at May 31, 2007 and the scheduled reductions by fiscal year.

| (in millions) Instrument | 2008 | 2009 | 2010 | 2011 | 2012 | More than 5 Years | Total |
|---|---|---|---|---|---|---|---|
| Long-term debt due in less than one year | $ 1,543 | $ - | $ - | $ - | $ - | $ - | $ 1,543 |
| Long-term debt | - | 2,685 | 1,481 | 522 | 1,516 | 5,091 | 11,295 |
| Subordinated deferrable debt | - | - | - | - | - | 311 | 311 |
| Members' subordinated certificates (1) | 19 | 10 | 6 | 20 | 5 | 1,048 | 1,108 |
| Operating leases (2) | 3 | 1 | - | - | - | - | 4 |
| Contractual interest on long-term debt (3) | 712 | 536 | 444 | 403 | 368 | 4,004 | 6,467 |
| Total contractual obligations | $ 2,277 | $ 3,232 | $ 1,931 | $ 945 | $ 1,889 | $ 10,454 | $ 20,728 |

(1) Excludes loan subordinated certificates totaling $273 million that amortize annually based on the outstanding balance of the related loan. There are many items that impact the amortization of a loan, such as loan conversions, loan repricing at the end of an interest rate term, prepayments, etc, thus an amortization schedule cannot be maintained for these certificates. Over the past three years, annual amortization on these certificates has averaged $28 million. In fiscal year 2007, amortization represented 12% of amortizing loan subordinated certificates outstanding.
(2) Represents the payment obligation related to the Company's three-year lease of office space for its headquarters facility. Assuming the Company exercises the option to extend the lease for an additional one-year period in fiscal year 2009, the future minimum lease payments for fiscal years 2009 and 2010 would increase to $3 million and $1 million, respectively. Assuming the Company exercises the option to extend the lease for an additional one-year period in fiscal year 2010, the future minimum lease payments for fiscal years 2009, 2010 and 2011 would increase to $3 million, $4 million and $1 million, respectively.
(3) Represents the interest obligation on the Company's debt based on terms and conditions at May 31, 2007.

## Off-Balance Sheet Obligations
*Guarantees*

The following chart provides a breakout of guarantees outstanding by type and by segment at May 31:

| (in millions) | 2007 | 2006 | Increase/ (Decrease) |
|---|---|---|---|
| Total by type: | | | |
| Long-term tax-exempt bonds | $ 526 | $ 608 | $ (82) |
| Indemnifications of tax benefit transfers | 108 | 124 | (16) |
| Letters of credit | 366 | 272 | 94 |
| Other guarantees | 74 | 75 | (1) |
| Total | $ 1,074 | $ 1,079 | $ (5) |
| | | | |
| Total by segment: | | | |
| CFC | $ 1,034 | $ 1,025 | $ 9 |
| NCSC | 40 | 54 | (14) |
| Total | $ 1,074 | $ 1,079 | $ (5) |

The decrease in total guarantees outstanding at May 31, 2007 compared to the prior year period is due to the $184 million of long-term tax-exempt bonds guarantees to two members which were refinanced or cancelled and the normal amortization on long-term tax-exempt bonds and tax benefit transfers offset by the $105 million in new long-term tax-exempt bonds and the $94 million increase to letters of credit. The increase to letters of credit is due to increases of $106 million in letters of credit to distribution systems and $8 million to power supply systems offset by decreases of $7 million in letters of credit to statewide and trade associations and $13 million to NCSC borrowers.

At May 31, 2007 and 2006, the Company had recorded a guarantee liability totaling $19 million and $17 million, respectively, which represents the contingent and non-contingent exposure related to guarantees of members' debt obligations.

The following table summarizes the off-balance sheet obligations at May 31, 2007 and the related principal amortization and maturities by fiscal year.

| (in millions) | Outstanding Balance | Principal Amortization and Maturities | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2008 | 2009 | 2010 | 2011 | 2012 | Remaining Years |
| Guarantees (1) | $ 1,074 | $ 194 | $ 130 | $ 149 | $ 118 | $ 95 | $ 388 |

(1) On a total of $396 million of tax-exempt bonds, CFC has unconditionally agreed to purchase bonds tendered or called for redemption at any time if the remarketing agents have not sold such bonds to other purchasers.

41

*Contingent Off-Balance Sheet Obligations*
*Unadvanced Loan Commitments*
At May 31, 2007, the Company had unadvanced loan commitments totaling $12,904 million, an increase of $124 million compared to the balance of $12,780 million at May 31, 2006. Unadvanced commitments are loans for which loan contracts have been approved and executed, but funds have not been advanced. The majority of the short-term unadvanced commitments provide backup liquidity to the Company's borrowers; therefore, it does not anticipate funding most of these commitments. Approximately 56% of the outstanding commitments at May 31, 2007 and 2006 were for short-term or line of credit loans. Substantially all above mentioned credit commitments contain material adverse change clauses, thus for a borrower to qualify for the advance of funds, the Company must be satisfied that there has been no material change since the loan was approved.

Unadvanced loan commitments do not represent off-balance sheet liabilities and have not been included in the chart summarizing off-balance sheet obligations above. The Company has no obligation to advance amounts to a borrower that does not meet the minimum conditions as determined by CFC's credit underwriting policy in effect at the time the loan was approved. If there has been a material adverse change in the borrower's financial condition or the borrower has not satisfied other terms in the agreement, the Company is not required to advance funds. Therefore, unadvanced commitments are classified as contingent liabilities.

## Ratio Analysis
*Leverage Ratio*
The leverage ratio is calculated by dividing the sum of total liabilities and guarantees outstanding by total equity. Based on this formula, the leverage ratio at May 31, 2007 was 26.64, an increase from 24.80 at May 31, 2006. The increase in the leverage ratio is due to a decrease of $74 million in total equity offset by a decrease of $530 million to total liabilities and a decrease of $5 million in guarantees as discussed under the Liabilities, Minority Interest and Equity section and the Off-Balance Sheet Obligations section of "Financial Condition".

For the purpose of covenant compliance on its revolving credit agreements and for internal management purposes, the leverage ratio calculation is adjusted to exclude derivative liabilities, debt used to fund RUS guaranteed loans, the foreign currency valuation account, subordinated deferrable debt and subordinated certificates from liabilities, uses members' equity rather than total equity and adds subordinated deferrable debt, subordinated certificates and minority interest to arrive at adjusted equity. At May 31, 2007 and 2006, the adjusted leverage ratio was 6.81 and 6.38, respectively. See "Non-GAAP Financial Measures" for further explanation and a reconciliation of the adjustments the Company makes in its leverage ratio calculation.

The increase in the adjusted leverage ratio is due to a decrease of $175 million in adjusted equity offset by the decrease in adjusted liabilities of $70 million and a decrease of $5 million in guarantees. The decrease to adjusted equity is primarily due to the decreases of $150 million in subordinated deferrable debt, the $84 million retirement of allocated earnings and $47 million in members subordinated certificates offset by adjusted net income totaling $108 million. The decrease in adjusted liabilities is primarily due to net decreases of $44 million in short-term and long-term debt excluding the foreign currency valuation account and subordinated deferrable debt included in short-term debt, $22 million to accrued interest payable and $12 million to deferred income. In addition to the adjustments made to the leverage ratio in the "Non-GAAP Financial Measures" section, guarantees to member systems that have an investment grade rating from Moody's Investors Service and Standard & Poor's Corporation are excluded from the calculation of the leverage ratio under the terms of the revolving credit agreements.

*Debt to Equity Ratio*
The debt to equity ratio is calculated by dividing the sum of total liabilities outstanding by total equity. The debt to equity ratio, based on this formula at May 31, 2007 was 25.13, an increase from 23.42 at May 31, 2006. The increase in the debt to equity ratio is due to the decrease of $74 million to total equity offset by the decrease of $530 million to total liabilities as discussed under the Liabilities, Minority Interest and Equity section of "Financial Condition".

For internal management purposes, the debt to equity ratio calculation is adjusted to exclude derivative liabilities, debt used to fund RUS guaranteed loans, the foreign currency valuation account, subordinated deferrable debt and subordinated certificates from liabilities, uses members' equity rather than total equity and adds subordinated deferrable debt, subordinated certificates and minority interest to arrive at adjusted equity. At May 31, 2007 and 2006, the adjusted debt to equity ratio was 6.37 and 5.97, respectively. See "Non-GAAP Financial Measures" for further explanation and a reconciliation of the adjustments made to the debt to equity ratio calculation. The increase in the adjusted debt to equity ratio is due to the decrease of $175 million in adjusted equity offset by the decrease of $70 million in adjusted liabilities.

*Credit Ratings*

The Company's long- and short-term debt and guarantees are rated by three of the major credit rating agencies, Moody's Investors Service, Standard & Poor's Corporation and Fitch Ratings.  The following table presents the Company's credit ratings at May 31, 2007.

| | Moody's Investors Service | Standard & Poor's Corporation | Fitch Ratings |
|---|---|---|---|
| **Direct:** | | | |
| Senior secured debt | A1 | A+ | A+ |
| Senior unsecured debt | A2 | A | A |
| Subordinated deferrable debt | A3 | BBB+ | A- |
| Commercial paper | P-1 | A-1 | F-1 |
| | | | |
| **Guarantees:** | | | |
| Pooled bonds | A1 | A | A |
| Other bonds | A2 | A | A |
| Short-term | P-1 | A-1 | F-1 |

The ratings listed above have the meaning as defined by each of the respective rating agencies, are not recommendations to buy, sell or hold securities and are subject to revision or withdrawal at any time by the rating organizations.

As of the date of the filing of this Form 10-K, Standard & Poor's Corporation and Moody's Investors Service have the Company's ratings on stable outlook and Fitch Ratings has the Company's ratings on positive outlook.

**Liquidity and Capital Resources**

The following section will discuss the Company's sources and uses of liquidity.  The Company's primary sources of liquidity include capital market debt issuance, private debt issuance, member loan principal repayments, member loan interest payments, a revolving bank line facility and member investments.  The Company's primary uses of liquidity include loan advances, interest payments on debt, principal repayments on debt and patronage capital retirements.  The Company feels that its sources of liquidity are adequate to cover the uses of liquidity.

*Sources of Liquidity*

*Capital Market Debt Issuance*

At May 31, 2007, the Company had effective registration statements for the issuance of $3,044 million of medium-term notes and $165 million of subordinated deferrable debt.  The Company plans to file a registration statement as a well-known seasoned issuer that will allow the Company to issue an unlimited amount of debt under each of these programs for a three-year period.  The Company has Board authorization to issue up to $1 billion of commercial paper and $4 billion of medium-term notes in the European market.  The Company also has Board authorization to issue $1.7 billion of medium-term notes in the Australian market.  At May 31, 2007, the Company has not utilized any of the European or Australian market authorizations.  In addition, the Company has a commercial paper program under which it sells commercial paper to investors in the capital markets.  The amount of commercial paper that can be sold is limited to the amount of backup liquidity available under the Company's revolving credit agreement.   The Company also obtains short-term funding from the sale of floating rate demand notes under its daily liquidity fund program. The registration statement for the daily liquidity fund program is effective for a three-year period for a total of $20 billion with a limitation on the aggregate principal amount outstanding at one time of $3 billion.

*Private Debt Issuance*

Beginning in fiscal year 2006, the Company made use of two sources of private debt issuance.  In July 2005, the Company issued $500 million of notes to Farmer Mac due in 2008 and secured such issuance with the pledge of loans to distribution systems as collateral.  The Company is also authorized to borrow up to $2.5 billion under FFB loan facilities with bond guarantee agreements with RUS as part of the funding mechanism for the REDLG program.  At May 31, 2007, the Company had a total of $2 billion of funding outstanding as part of the REDLG program.  On August 1, 2007, CFC submitted an application to borrow the remaining $500 million available under FFB loan facilities.  These funds were received by CFC on August 7, 2007.  CFC is required to place on deposit mortgage notes in an amount at least equal to the principal balance of the notes outstanding.

43

*Member Loan Repayments*
There has been significant prepayment activity over the past three fiscal years in the telecommunications loan programs. It is not anticipated that there will be significant loan prepayments over the next few years. Amortization of long-term loans in each of the five fiscal years following May 31, 2007 and thereafter are as follows:

| (in millions) | | Amortization (1) |
|---|---|---|
| 2008 | $ | 831 |
| 2009 | | 785 |
| 2010 | | 1,279 |
| 2011 | | 806 |
| 2012 | | 1,052 |
| Thereafter | | 12,160 |

(1) Represents scheduled amortization based on current rates without consideration for loans that reprice.

*Member Loan Interest Payments*
During the year ended May 31, 2007, interest income on the loan portfolio was $1,021 million, representing an average yield of 5.61% as compared to 5.28% and 4.88% for the years ended May 31, 2006 and 2005, respectively. At May 31, 2007, 82% of the total loans outstanding had a fixed rate of interest and 18% of loans outstanding had a variable rate of interest. At May 31, 2007, a total of 6% of loans outstanding were on a non-accrual basis with respect to the recognition of interest income.

*Bank Revolving Credit Facility*
The following is a summary of the Company's revolving credit agreements at May 31:

| (Dollar amounts in millions) | 2007 | 2006 | Termination Date | Facility fee per annum (1) |
|---|---|---|---|---|
| 364-day agreement (2) | $ 1,125 | $ - | March 14, 2008 | 0.05 of 1% |
| Five-year agreement | 1,125 | - | March 16, 2012 | 0.06 of 1% |
| Five-year agreement | 1,025 | 1,025 | March 22, 2011 | 0.06 of 1% |
| 364-day agreement | - | 1,025 | March 21, 2007 | 0.05 of 1% |
| Five-year agreement | - | 1,975 | March 23, 2010 | 0.09 of 1% |
| Total | $ 3,275 | $ 4,025 | | |

(1) Facility fee determined by CFC's senior unsecured credit ratings based on the pricing schedules put in place at the initiation of the related agreement.

(2) Any amount outstanding under these agreements may be converted to a one-year term loan at the end of the revolving credit periods. If converted to a term loan, the fee on the outstanding principal amount of the term loan is 0.10 of 1% per annum.

Up-front fees of between 0.03 and 0.05 of 1% were paid to the banks based on their commitment level to the five-year agreements in place at May 31, 2007, totaling in aggregate $1 million, which will be amortized on a straight-line basis over the life of the agreements. No upfront fees were paid to the banks for their commitment to the 364-day facility. Each agreement contains a provision under which if borrowings exceed 50% of total commitments, a utilization fee must be paid on the outstanding balance. The utilization fees are 0.05 of 1% for all three agreements in place at May 31, 2007.

Effective May 31, 2007 and 2006, the Company was in compliance with all covenants and conditions under its revolving credit agreements in place at that time and there were no borrowings outstanding under such agreements.

For the purpose of calculating the required financial covenants contained in its revolving credit agreements, the Company adjusts net income, senior debt and total equity to exclude the non-cash adjustments related to SFAS 133 and 52. The adjusted TIER, as defined by the agreements, represents the interest expense adjusted to include the derivative cash settlements, plus net income prior to the cumulative effect of change in accounting principle, plus minority interest net income and dividing that total by the interest expense adjusted to include the derivative cash settlements. In addition to the non-cash adjustments related to SFAS 133 and 52, senior debt also excludes RUS guaranteed loans, subordinated deferrable debt, members' subordinated certificates and minority interest. Total equity is adjusted to include subordinated deferrable debt, members' subordinated certificates and minority interest. Senior debt includes guarantees; however, it excludes:
- guarantees for members where the long-term unsecured debt of the member is rated at least BBB+ by Standard & Poor's Corporation or Baa1 by Moody's Investors Service; and
- the payment of principal and interest by the member on the guaranteed indebtedness if covered by insurance or reinsurance provided by an insurer having an insurance financial strength rating of AAA by Standard & Poor's Corporation or a financial strength rating of Aaa by Moody's Investors Service.

44

The following represents the Company's required and actual financial ratios under the revolving credit agreements at or for the year ended May 31:

| | Requirement | Actual 2007 | Actual 2006 |
|---|---|---|---|
| Minimum average adjusted TIER over the six most recent fiscal quarters | 1.025 | 1.09 | 1.11 |
| Minimum adjusted TIER at fiscal year end (1) | 1.05 | 1.12 | 1.11 |
| Maximum ratio of senior debt to total equity | 10.00 | 6.65 | 6.26 |

(1) The Company must meet this requirement in order to retire patronage capital.

The revolving credit agreements do not contain a material adverse change clause or ratings triggers that limit the banks' obligations to fund under the terms of the agreements, but CFC must be in compliance with their other requirements, including financial ratios, in order to draw down on the facilities.

*Member Investments*
At May 31, 2007 and 2006, members funded 20.9% and 19.2%, respectively, of total assets as follows:

| (Dollar amounts in millions) | 2007 Amount | 2007 % of Total (1) | 2006 Amount | 2006 % of Total (1) | Increase/ (Decrease) |
|---|---|---|---|---|---|
| Commercial paper (2) | $ 1,634 | 59% | $ 1,451 | 45% | $ 183 |
| Medium-term notes | 308 | 6% | 255 | 4% | 53 |
| Members' subordinated certificates | 1,381 | 100% | 1,428 | 100% | (47) |
| Members' equity (3) | 566 | 100% | 545 | 100% | 21 |
| Total | $ 3,889 | | $ 3,679 | | $ 210 |
| Percentage of total assets | 20.9% | | 19.2% | | |
| Percentage of total assets less derivative assets (3) | 21.2% | | 19.8% | | |

(1) Represents the percentage of each line item outstanding to CFC members.
(2) Includes $250 million and $267 million related to the daily liquidity fund at May 31, 2007 and 2006, respectively.
(3) See "Non-GAAP Financial Measures" for further explanation and a reconciliation of the adjustments made to total capitalization and a breakout of members' equity.

### Uses of Liquidity
*Loan Advances*
Loan advances are the result of new loans approved to members and from the unadvanced portion of loans that were approved prior to May 31, 2007. At May 31, 2007, the Company had unadvanced loan commitments totaling $12,904 million. The Company does not expect to advance the full amount of the unadvanced commitments at May 31, 2007. Unadvanced commitments generally expire within five years of the first advance on a loan and the majority of short-term unadvanced commitments are used as backup liquidity for member operations. Approximately 56% of the outstanding commitments at May 31, 2007 were for short-term or line of credit loans. The Company anticipates that over the next twelve months, loan advances will be approximately equal to the scheduled loan repayments.

*Interest Expense on Debt*
For the year ended May 31, 2007, interest expense on debt was $961 million, representing 5.28% of the average loan volume for which the debt was used as funding. The interest expense on debt represented 5.18% and 4.60% of the average loan volume for which the debt was used as funding for the years ended May 31, 2006 and 2005, respectively. At May 31, 2007, a total of 83% of outstanding debt had a fixed interest rate and 17% of outstanding debt had a variable interest rate.

*Principal Repayments on Long-term Debt*
The principal amount of medium-term notes, collateral trust bonds, long-term notes payable, subordinated deferrable debt and membership subordinated certificates maturing in each of the five fiscal years following May 31, 2007 and thereafter is as follows:

| (Dollar amounts in millions) | Amount Maturing (1) | Weighted Average Interest Rate |
|---|---|---|
| 2008 | $ 1,562 | 4.93% |
| 2009 | 2,695 | 5.24% |
| 2010 | 1,487 | 5.71% |
| 2011 | 542 | 4.44% |
| 2012 | 1,521 | 7.21% |
| Thereafter | 6,450 | 5.64% |
| Total | $ 14,257 | 5.61% |

(1) Excludes loan subordinated certificates totaling $273 million that amortize annually based on the outstanding balance of the related loan. There are many items that impact the amortization of a loan, such as loan conversions, loan repricing at the end of an interest rate term, prepayments, etc, thus an amortization schedule cannot be maintained for these certificates. Over the past three years, annual amortization on these certificates has averaged $28 million. In fiscal year 2007, amortization represented 12% of amortizing loan subordinated certificates outstanding.

*Patronage Capital Retirements*
The Company has made annual retirements of its allocated patronage capital in 27 of the last 28 years. In July 2007, the CFC board of directors approved the allocation of a total of $104 million from fiscal year 2007 net earnings to the CFC members. CFC is scheduled to make a cash payment of $86 million to its members as retirement of 70% of the amount allocated for fiscal year 2007 and 1/9th of the amount allocated for fiscal years 1991, 1992 and 1993.

## Market Risk

The Company's primary market risks are interest rate risk and liquidity risk. The Company is also exposed to counterparty risk as a result of entering into interest rate exchange agreements.

*Interest Rate Risk*
The interest rate risk exposure is related to the funding of the fixed rate loan portfolio. The Company does not match fund the majority of its fixed rate loans with a specific debt issuance at the time the loans are advanced. The Company aggregates fixed rate loans until the volume reaches a level that will allow an economically efficient issuance of debt. The Company uses fixed rate collateral trust bonds, medium-term notes, subordinated deferrable debt, members' subordinated certificates, members' equity and variable rate debt to fund fixed rate loans. The Company allows borrowers flexibility in the selection of the period for which a fixed interest rate will be in effect. Long-term loans typically have maturities of up to 35 years. Borrowers may select fixed interest rates for periods of one year through the life of the loan. To mitigate interest rate risk in the funding of fixed rate loans, the Company performs a monthly gap analysis, a comparison of fixed rate assets repricing or maturing by year to fixed rate liabilities and members' equity maturing by year (see chart on page 47). The interest rate risk is deemed minimal on variable rate loans, since the loans may be repriced either monthly or semi-monthly to reflect the cost of the debt used to fund the loans. At May 31, 2007 and 2006, 18% and 20%, respectively, of loans carried variable interest rates.

*Matched Funding Policy*
To monitor interest rate risk in the funding of fixed rate loans, the Company performs a monthly gap analysis (see chart on page 47). It is the Company's funding objective to manage the matched funding of asset and liability repricing terms within a range of 3% of total assets excluding derivative assets. At May 31, 2007, the Company had $14,672 million of fixed rate assets amortizing or repricing, funded by $12,683 million of fixed rate liabilities maturing during the next 30 years and $1,915 million of members' equity and members' subordinated certificates, a portion of which does not have a scheduled maturity. The difference of $74 million, or less than 1% of total assets and total assets excluding derivative assets, represents the fixed rate assets maturing during the next 30 years in excess of the fixed rate debt and equity. Fixed rate loans are funded with fixed rate collateral trust bonds, medium-term notes, long-term notes payable, subordinated deferrable debt, members' subordinated certificates and members' equity. With the exception of members' subordinated certificates, which are generally issued at rates below the Company's long-term cost of funding and with extended maturities, and commercial paper, the Company's liabilities have average maturities that closely match the repricing terms (but not the maturities) of its fixed interest rate loans. The Company also uses commercial paper supported by interest rate exchange agreements to fund its portfolio of fixed rate loans. Variable rate assets which reprice monthly or semi-monthly are funded with short-term liabilities, primarily commercial paper, collateral trust bonds, long-term notes payable and medium-term notes issued with a fixed rate and swapped to a variable rate, medium-term notes issued at a variable rate, subordinated certificates, members' equity and bank bid notes. The schedule allows the Company to analyze the impact on the overall adjusted TIER of issuing a certain amount of debt at a fixed rate for various maturities, prior to issuance of the debt. See "Non-GAAP Financial Measures" for further explanation and a reconciliation of the adjustments to TIER.

Certain of the Company's collateral trust bonds, subordinated deferrable debt and medium-term notes were issued with early redemption provisions.  To the extent borrowers are allowed to convert their fixed rate loans to a variable interest rate and to the extent it is beneficial, the Company takes advantage of these early redemption provisions.  However, because conversions and prepayments can take place at different intervals from early redemptions, the Company charges conversion fees designed to compensate for any additional interest rate risk it assumes.

The following chart shows the scheduled amortization and repricing of fixed rate assets and liabilities outstanding at May 31, 2007.

### INTEREST RATE GAP ANALYSIS
(Fixed Rate Assets/Liabilities)
As of May 31, 2007

| (Dollar amounts in millions) | May 31, 2008 or prior | June 1, 2008 to May 31, 2010 | June 1, 2010 to May 31, 2012 | June 1, 2012 to May 31, 2017 | June 1, 2017 to May 31, 2027 | Beyond June 1, 2027 | Total |
|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | |
| Amortization and repricing | $ 1,789 | $ 3,143 | $  2,624 | $ 3,541 | $ 2,519 | $ 1,056 | $14,672 |
| Total assets | $ 1,789 | $ 3,143 | $  2,624 | $ 3,541 | $ 2,519 | $ 1,056 | $14,672 |
| | | | | | | | |
| **Liabilities and members' equity:** | | | | | | | |
| Long-term debt | $ 1,273 | $ 3,061 | $  3,597 | $ 3,437 | $  895 | $  420 | $12,683 |
| Subordinated certificates | 42 | 56 | 90 | 84 | 718 | 290 | 1,280 |
| Members' equity (1) | 13 | 26 | 28 | 121 | 101 | 346 | 635 |
| Total liabilities and members' equity | $ 1,328 | $ 3,143 | $  3,715 | $ 3,642 | $ 1,714 | $ 1,056 | $14,598 |
| | | | | | | | |
| **Gap** (2) | $  461 | $     - | $ (1,091) | $  (101) | $  805 | $     - | $    74 |
| Cumulative gap | $  461 | $  461 | $  (630) | $  (731) | $   74 | $   74 | |
| Cumulative gap as a % of total assets | 2.48% | 2.48% | (3.39)% | (3.94)% | 0.40% | 0.40% | |
| Cumulative gap as a % of adjusted total assets (3) | 2.51% | 2.51% | (3.43)% | (3.98)% | 0.40% | 0.40% | |

---

(1)  Includes the portion of the loan loss allowance and subordinated deferrable debt allocated to fund fixed rate assets.  See "Non-GAAP Financial Measures" for further explanation of why CFC uses members' equity in its analysis of the funding of its loan portfolio.
(2)  Assets less liabilities and members' equity.
(3)  Adjusted total assets represents total assets in the consolidated balance sheet less derivative assets.

*Use of Derivatives*
At May 31, 2007 and 2006, the Company was a party to interest rate exchange agreements with a total notional amount of $12,533 million and $12,536 million, respectively.  The Company uses interest rate exchange agreements as part of its overall interest rate matching strategy.  Interest rate exchange agreements are used when they provide a lower cost of funding or minimize interest rate risk.  The Company will enter into interest rate exchange agreements only with highly rated financial institutions.  CFC used interest rate exchange agreements to synthetically change the interest rate from a variable rate to a fixed rate on $7,277 million as of May 31, 2007 and $7,350 million as of May 31, 2006 of debt used to fund long-term fixed rate loans.  Interest rate exchange agreements were used to synthetically change the interest rates from fixed to variable on $5,256 million and $5,186 million of long-term debt as of May 31, 2007 and 2006, respectively.  The Company has not invested in derivative financial instruments for trading purposes in the past and does not anticipate doing so in the future.

In December 2006, the Company terminated two $500 million pay variable and receive fixed interest rate exchange agreements.  The Company terminated these interest rate exchange agreements in an effort to reduce the total number of swap positions and total notional size of the swap portfolio, reduce the number of swaps using the 30-day composite commercial paper index floating leg, reduce exposure to certain counterparties and reduce the number of offsetting positions in the swap portfolio.  As a result of terminating these swaps, CFC recorded a charge of $31 million representing the fair value of the $1 billion of terminated interest rate exchange agreements.  This amount was offset by a $31 million payment received from the counterparties representing the fair value of the agreements on the date of termination and recorded as income in derivative cash settlements.  Therefore, there was no significant impact on net income for the year.

At May 31, 2007, there were no foreign currency exchange agreements outstanding.  At May 31, 2006, the Company was a party to cross currency interest rate exchange agreements with a total notional amount of $716 million related to medium-term notes denominated in foreign currencies.  Cross currency interest rate exchange agreements with a total notional amount of $434 million at May 31, 2006 in which the Company receives Euros and pays U.S. dollars, and $282 million at May 31, 2006 in which the Company receives Australian dollars and pays U.S. dollars, were used to synthetically change the foreign denominated debt to U.S. dollar denominated debt.  In addition, the $716 million of cross currency interest rate exchange agreements at May 31, 2006 synthetically changed the interest rate from the fixed rate on the foreign denominated debt to variable rate U.S. denominated debt or from a variable rate on the foreign denominated debt to a U.S. denominated variable rate.

The Company enters into an exchange agreement to sell the amount of foreign currency received from the investor for U.S. dollars on the issuance date and to buy the amount of foreign currency required to repay the investor principal and interest due through or on the maturity date.  By locking in the exchange rates at the time of issuance, the Company has eliminated the possibility of any currency gain or loss (except in the case of the Company or a counterparty default or unwind of the transaction) which might otherwise have been produced by the foreign currency borrowing.

*Counterparty Risk*
The Company is exposed to counterparty risk related to the performance of the parties with which it has entered into interest rate exchange agreements.  To mitigate this risk, the Company only enters into these agreements with financial institutions with investment grade ratings.  At May 31, 2007 and 2006, the Company was a party to interest rate exchange agreements with notional amounts totaling $12,533 million and $12,536 million and cross currency interest rate exchange agreements with notional amounts totaling $716 million at May 31, 2006.  To date, the Company has not experienced a failure of a counterparty to perform as required under any of these agreements.  At the time counterparties are selected to participate in the Company's exchange agreements, the counterparty must be a participant in one of its revolving credit agreements.  At May 31, 2007, the Company's interest rate exchange agreement counterparties had credit ratings ranging from AAA to A- as assigned by Standard & Poor's Corporation.

The Company currently uses two types of interest rate exchange agreements:  (1) the Company pays a fixed rate and receives a variable rate and (2) the Company pays a variable rate and receives a fixed rate.  The following chart provides a breakout of the interest rate exchange agreements at May 31, 2007 by type of agreement.

| (Dollar amounts in millions) | Notional Amount | Average Rate Paid | Average Rate Received |
|---|---|---|---|
| Pay fixed / receive variable | $    7,277 | 4.52% | 5.35% |
| Pay variable / receive fixed | 5,256 | 6.53% | 6.10% |
| Total | $   12,533 | 5.36% | 5.66% |

*Foreign Currency Risk*
The Company may issue commercial paper, medium-term notes or bonds denominated in foreign currencies.  At May 31, 2007, there were no foreign currency exchange agreements outstanding.  At May 31, 2006, CFC had $434 million and $282 million of medium-term notes denominated in Euros and Australian dollars, respectively.  The Company's foreign currency valuation account, which represents the change in the foreign exchange rate from the date of issuance to the reporting date, increased the debt balance by $245 million at May 31, 2006.  The change in the value of the foreign denominated debt is reported in the consolidated statements of operations as foreign currency adjustments.

*Rating Triggers*
The Company has certain interest rate exchange agreements that contain a condition that will allow one counterparty to terminate the agreement if the credit rating of the other counterparty drops to a certain level.   This condition is commonly called a rating trigger.  Under the rating trigger, if the credit rating for either counterparty falls to the level specified in the agreement, the other counterparty may, but is not obligated to, terminate the agreement.  If either counterparty terminates the agreement, a net payment may be due from one counterparty to the other based on the fair value of the underlying derivative instrument.  Rating triggers are not separate financial instruments and are not separate derivatives under SFAS 133.  The Company's rating triggers are based on its senior unsecured credit rating from Standard & Poor's Corporation and Moody's Investors Service.  At May 31, 2007, there are rating triggers associated with $8,727 million notional amount of interest rate exchange agreements.  If the Company's rating from Moody's Investors Service falls to Baa1 or the Company's rating from Standard & Poor's Corporation falls to BBB+, the counterparties may terminate agreements with a total notional amount of $1,466 million.  If the Company's rating from Moody's Investors Service falls below Baa1 or the Company's rating from Standard & Poor's Corporation falls below BBB+, the counterparties may terminate the agreements on the remaining total notional amount of $7,261 million.

At May 31, 2007, the Company's exchange agreements subject to rating triggers had a derivative fair value of $33 million, comprised of $38 million that would be due to the Company and $5 million that the Company would have to pay if all interest rate exchange agreements with a rating trigger at the level of BBB+ or Baa1 and above were to be terminated, and a derivative fair value of $93 million, comprised of $140 million that would be due to the Company and $47 million that the Company would have to pay if all interest rate exchange agreements with a rating trigger below the level of BBB+ or Baa1 were to be terminated.  See chart on page 43 for CFC's senior unsecured credit ratings as of May 31, 2007.

*Liquidity Risk*
The Company faces liquidity risk in the funding of its loan portfolio and refinancing its maturing obligations.  The Company offers long-term loans with maturities of up to 35 years and line of credit loans that are generally required to be paid down annually.  On long-term loans, the Company offers a variety of interest rate options including the ability to fix the interest rate for terms of one year through maturity.  At May 31, 2007, the Company has a total of $1,543 million of long-term debt maturing during the next twelve months.  The Company funds the loan portfolio with a variety of debt instruments and its members' equity.  The Company typically does not match fund each of its loans with a debt instrument of similar final maturity.  Debt instruments such as subordinated certificates have maturities that vary from the term of the associated loan or guarantee to 100 years and subordinated deferrable debt has been issued with maturities of up to 49 years.

The Company may issue collateral trust bonds and medium-term notes for periods of up to 30 years, but typically issues such debt instruments with maturities of 2, 3, 5, 7 and 10 years.  Debt instruments such as commercial paper and bank bid notes typically have maturities of 90 days or less. Therefore, the Company is at risk if it is not able to issue new debt instruments to replace debt that matures prior to the maturity of the loans for which they are used as funding.  Factors that mitigate liquidity risk include the Company maintenance of back-up liquidity through revolving credit agreements with domestic and foreign banks and a large volume of scheduled principal repayments received on an annual basis.  At May 31, 2007 and 2006, the Company had a total of $3,275 million and $4,025 million in revolving credit agreements and bank lines of credit. In addition, the Company limits the amount of dealer commercial paper and bank bid notes used in the funding of loans.  The Company's objective is to maintain the amount of dealer commercial paper and bank bid notes used to 15% or less of total debt outstanding.  At May 31, 2007 and 2006, there was a total of $1,118 million and $1,758 million, respectively, of dealer commercial paper and bank bid notes outstanding, representing 6% and 10%, respectively, of the Company's total debt outstanding.

For additional information of risks related to the Company's business, see Item 1A "Risk Factors".

49

*Financial Instruments and Derivatives*

All financial instruments to which the Company was a party at May 31, 2007 were entered into or contracted for purposes other than trading. The following table provides the significant balances and contract terms related to the financial instruments at May 31, 2007.

| (Dollar amounts in millions)<br>Instrument | Outstanding Balance | Fair Value | Principal Amortization and Maturities | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 2008 | 2009 | 2010 | 2011 | 2012 | Remaining Years |
| Investments | $ 2 | $ 2 | $ 2 | $ - | $ - | $ - | $ - | $ - |
| Average rate | 5.30 % | | 5.30% | | | | | |
| Long-term fixed rate loans (1) | 14,610 | 13,068 | 712 | 699 | 701 | 697 | 967 | 10,834 |
| Average rate | 6.13 % | | 5.87% | 5.88% | 5.97% | 6.03% | 6.13% | 6.18% |
| Long-term variable rate loans (2) | 1,189 | 1,189 | 99 | 71 | 98 | 93 | 68 | 760 |
| Average rate (3) | 7.48 % | | - | - | - | - | - | - |
| Short-term loans (4) | 1,188 | 1,188 | 1,188 | - | - | - | - | - |
| Average rate (3) | 6.73 % | | 6.73% | - | - | - | - | - |
| RUS Guaranteed FFB Refinance | 37 | 37 | 2 | 2 | 2 | 3 | 3 | 25 |
| Average rate (3) | 5.67 % | | - | - | - | - | - | - |
| Non-performing loans (5) | 502 | 312 | 9 | - | 493 | - | - | - |
| Average rate (5) | - | | - | - | - | - | - | - |
| Restructured loans (5) | 603 | 322 | 9 | 12 | 13 | 13 | 14 | 542 |
| Average rate (5) | 0.58 % | | - | - | - | - | - | - |
| Liabilities and equity: | | | | | | | | |
| Short-term debt (6) | 4,427 | 4,405 | 4,427 | - | - | - | - | - |
| Average rate | 5.16 % | | 5.16% | - | - | - | - | - |
| Medium-term notes | 4,745 | 5,036 | - | 357 | 1,279 | 19 | 1,513 | 1,577 |
| Average rate | 6.62 % | | - | 5.48% | 5.72% | 4.81% | 7.22% | 7.05% |
| Collateral trust bonds | 4,017 | 3,969 | - | 1,825 | 200 | 500 | - | 1,492 |
| Average rate | 5.30 % | | - | 5.36% | 5.70% | 4.39% | - | 5.48% |
| Long-term notes payable | 2,533 | 2,488 | - | 503 | 3 | 3 | 3 | 2,021 |
| Average rate | 5.14 % | | - | 4.68% | 8.11% | 8.11% | 8.11% | 5.25% |
| Subordinated deferrable debt | 311 | 300 | - | - | - | - | - | 311 |
| Average rate | 6.31 % | | - | - | - | - | - | 6.31% |
| Membership sub certificates (7) | 1,108 | N/A | 19 | 10 | 6 | 20 | 5 | 1,048 |
| Average rate | 4.28 % | | 5.77% | 2.26% | 1.21% | 4.91% | 3.03% | 4.28% |

---

(1) The principal amount of fixed rate loans is the total of scheduled principal amortizations without consideration for loans that reprice. Includes $218 million of loans guaranteed by RUS.

(2) Long-term variable rate loans include $1 million of loans guaranteed by RUS.

(3) Variable rates are set the first day of each month.

(4) The principal amount of line of credit loans are generally required to be paid down for a period of five consecutive days each year. These loans do not have a principal amortization schedule.

(5) Amortization based on expected repayment schedule. Average rate represents current accrual rate. Interest accrual rate cannot be estimated for future periods.

(6) Short-term debt includes commercial paper, bank bid notes and long-term debt due in less than one year.

(7) Fair value has not been included as it is impracticable to develop a discount rate that measures fair value (see Note 14 to the consolidated financial statements). Excludes loan subordinated certificates totaling $273 million that amortize annually based on the outstanding balance of the related loan, therefore there is no scheduled amortization. Over the past three years, annual amortization on these certificates has averaged $28 million. In fiscal year 2007, amortization represented 12% of amortizing loan subordinated certificates outstanding.

The following table provides the notional amount, average rate paid, average rate received and maturity dates for the interest rate exchange agreements to which the Company was a party at May 31, 2007.

| (Dollar amounts in millions)<br>Instruments | Notional Principal Amount | Fair Value | Notional Amortization and Maturities | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 2008 | 2009 | 2010 | 2011 | 2012 | Remaining Years |
| Interest rate exchange agreements | $ 12,533 | $ 151 | $ 1,084 | $ 1,045 | $ 2,192 | $ 350 | $ 2,910 | $ 4,952 |
| Average rate paid | 5.36 % | | | | | | | |
| Average rate received | 5.66 % | | | | | | | |

There were no cross currency or cross currency interest rate exchange agreements to which the Company was a party at May 31, 2007.

50

**Non-GAAP Financial Measures**

The Company makes certain adjustments to financial measures in assessing its financial performance that are not in accordance with GAAP. These non-GAAP adjustments fall primarily into two categories: (1) adjustments related to the calculation of the TIER ratio, and (2) adjustments related to the calculation of leverage and debt to equity ratios. These adjustments reflect management's perspective on the Company's operations, and in several cases adjustments used to measure covenant compliance under its revolving credit agreements, and thus the Company believes these are useful financial measures for investors. The Company refers to its non-GAAP financial measures as "adjusted" throughout this document.

*Adjustments to the Calculation of the TIER Ratio*
The Company's primary performance measure is TIER. TIER is calculated by adding the interest expense to net income prior to the cumulative effect of change in accounting principle and dividing that total by the interest expense. The TIER is a measure of the Company's ability to cover interest expense requirements on its debt. The Company adjusts the TIER calculation to add the derivative cash settlements to the interest expense, to add minority interest net income back to total net income and to remove the derivative forward value and foreign currency adjustments from total net income. Adding the cash settlements back to the interest expense also has a corresponding effect on the Company's adjusted net interest income and adjusted income prior to income taxes and minority interest. The Company makes these adjustments to its TIER calculation for the purpose of covenant compliance on its revolving credit agreements. The revolving credit agreements require the Company to achieve an average adjusted TIER ratio over the six most recent fiscal quarters of at least 1.025 and prohibit the retirement of patronage capital unless the Company has achieved an adjusted TIER ratio of at least 1.05 for the preceding fiscal year.

The Company uses derivatives to manage interest rate and foreign currency exchange risk on its funding of the loan portfolio. The derivative cash settlements represent the amount that the Company receives from or pays to its counterparties based on the interest rate indexes in its derivatives that do not qualify for hedge accounting. The Company adjusts the reported cost of funding to include the derivative cash settlements. The Company uses the adjusted cost of funding to set interest rates on loans to its members and believes that the interest expense adjusted to include derivative cash settlements represents its total cost of funding for the period. For the purpose of computing compliance with its revolving credit agreement covenants, the Company is required to adjust its interest expense to include the derivative cash settlements. TIER calculated by adding the derivative cash settlements to the interest expense reflects management's perspective on its operations and thus, the Company believes that it represents a useful financial measure for investors.

The derivative forward value and foreign currency adjustments do not represent cash inflows or outflows to the Company during the current period. The derivative forward value represents a present value estimate of the future cash inflows or outflows that will be recognized as net cash settlements for all periods through the maturity of its derivatives that do not qualify for hedge accounting. Foreign currency adjustments represent the change in value of foreign denominated debt resulting from the change in foreign currency exchange rates during the current period. The derivative forward value and foreign currency adjustments do not represent cash inflows or outflows that affect the Company's current ability to cover its debt service obligations. The forward value calculation is based on future interest rate expectations that may change daily creating volatility in the estimated forward value. The change in foreign currency exchange rates adjusts the debt balance to the amount that would be due at the reporting date. At the issuance date, the Company enters into a foreign currency exchange agreement for all foreign denominated debt that effectively fixes the exchange rate for all interest and principal payments. For the purpose of making operating decisions, the Company subtracts the derivative forward value and foreign currency adjustments from its net income when calculating TIER and for other net income presentation purposes. The covenants in the Company's revolving credit agreements also exclude the effects of derivative forward value and foreign currency adjustments. In addition, since the derivative forward value and foreign currency adjustments do not represent current period cash flows, the Company does not allocate such funds to its members and thus excludes the derivative forward value and foreign currency adjustments from net income when making certain presentations to its members and in calculating the amount of net income to be allocated to its members. TIER calculated by excluding the derivative forward value and foreign currency adjustments from net income reflects management's perspective on its operations and thus, the Company believes that it represents a useful financial measure for investors.

The implementation of SFAS 133 and foreign currency adjustments have also impacted the Company's total equity. The derivative forward value and foreign currency adjustments flow through the consolidated statements of operations as income or expense, increasing or decreasing the total net income for the period. The total net income or net loss for the period represents an increase or decrease, respectively, to total equity. As a result of implementing SFAS 133, the Company's total equity includes other comprehensive income, which represents unrecognized gains and losses on derivatives. The other comprehensive income component of equity related to derivatives that qualify for hedge accounting does not flow through the consolidated statements of operations. As stated above, the derivative forward value and foreign currency adjustments do not represent current cash inflow or outflow. The other comprehensive income is also an estimate of future gains and losses and

51

as such does not represent earnings that the Company can use to fund its loan portfolio. Financial measures calculated with members' equity, which is total equity excluding the impact of SFAS 133 and foreign currency adjustments, reflect management's perspective on its operations and thus, the Company believes that they represent a useful measure of its financial condition.

The following chart provides a reconciliation between interest expense, net interest income, income prior to income taxes and minority interest and net income and these financial measures adjusted to exclude the impact of SFAS 133 and foreign currency adjustments and to include minority interest in net income for the years ended May 31, 2007, 2006, 2005, 2004 and 2003.

| | For the year ended May 31, | | | | |
|---|---|---|---|---|---|
| (in thousands) | **2007** | **2006** | **2005** | **2004** | **2003** |
| Interest expense | $ (996,730) | $ (975,936) | $ (942,033) | $ (941,491) | $ (951,628) |
| Adjusted to include: Derivative cash settlements | 86,442 | 80,883 | 78,287 | 123,363 | 130,686 |
| Adjusted interest expense | $ (910,288) | $ (895,053) | $ (863,746) | $ (818,128) | $ (820,942) |
| | | | | | |
| Net interest income | $ 57,494 | $ 31,976 | $ 88,820 | $ 68,365 | $ 123,682 |
| Adjusted to include: Derivative cash settlements | 86,442 | 80,883 | 78,287 | 123,363 | 130,686 |
| Adjusted net interest income | $ 143,936 | $ 112,859 | $ 167,107 | $ 191,728 | $ 254,368 |
| | | | | | |
| Income (loss) prior to income taxes and minority interest | $ 16,541 | $ 105,762 | $ 126,561 | $ (194,292) | $ 649,485 |
| Adjusted to exclude: Derivative forward value | 79,281 | (28,805) | (25,849) | 228,840 | (754,727) |
| Foreign currency adjustments | 14,554 | 22,594 | 22,893 | 65,310 | 243,220 |
| Adjusted income prior to income taxes and minority interest | $ 110,376 | $ 99,551 | $ 123,605 | $ 99,858 | $ 137,978 |
| | | | | | |
| Net income (loss) prior to cumulative effect of change in accounting principle | $ 11,701 | $ 95,497 | $ 122,503 | $ (200,098) | $ 649,485 |
| Adjusted to include: Minority interest net income | 2,444 | 7,089 | 2,540 | 1,989 | - |
| Adjusted to exclude: Derivative forward value | 79,281 | (28,805) | (25,849) | 228,840 | (754,727) |
| Foreign currency adjustments | 14,554 | 22,594 | 22,893 | 65,310 | 243,220 |
| Adjusted net income | $ 107,980 | $ 96,375 | $ 122,087 | $ 96,041 | $ 137,978 |

TIER using GAAP financial measures is calculated as follows:

$$\text{TIER} = \frac{\text{Interest expense + net income prior to cumulative effect of change in accounting principle}}{\text{Interest expense}}$$

Adjusted TIER is calculated as follows:

$$\text{Adjusted TIER} = \frac{\text{Adjusted interest expense + adjusted net income}}{\text{Adjusted interest expense}}$$

The following chart provides the TIER and adjusted TIER for the years ended May 31, 2007, 2006, 2005, 2004 and 2003.

| | For the year ended May 31, | | | | |
|---|---|---|---|---|---|
| | **2007** | **2006** | **2005** | **2004 (1)** | **2003** |
| TIER (1) | 1.01 | 1.10 | 1.13 | - | 1.68 |
| Adjusted TIER | 1.12 | 1.11 | 1.14 | 1.12 | 1.17 |

(1) For the year ended May 31, 2004, CFC reported a net loss prior to the cumulative effect of change in accounting principle of $200 million, thus the TIER calculation results in a value below 1.00.

52

*Adjustments to the Calculation of Leverage and Debt to Equity*

The Company calculates the leverage ratio by adding total liabilities to total guarantees and dividing by total equity. The Company calculates the debt to equity ratio by dividing total liabilities by total equity. The Company adjusts these ratios to (i) subtract debt used to fund loans that are guaranteed by RUS from total debt, (ii) subtract from total debt, and add to total equity, debt with equity characteristics issued to its members and in the capital markets, (iii) include minority interest as equity and (iv) to exclude the impact of non-cash SFAS 133 and foreign currency adjustments from its total liabilities and total equity. For the purpose of computing compliance with its revolving credit agreement covenants, the Company is required to make these adjustments to its leverage ratio calculation. The revolving credit agreements prohibit the Company from incurring senior debt in an amount in excess of ten times the sum of equity, members' subordinated certificates, minority interest and subordinated deferrable debt, as defined by the agreements. The Company makes these same adjustments to its debt to equity ratio as the only difference between the leverage ratio and the debt to equity ratio is the addition of guarantees to liabilities in the leverage ratio. In addition to the adjustments the Company makes to calculate the adjusted leverage ratio, guarantees to the Company member systems that have an investment grade rating from Moody's Investors Service and Standard & Poor's Corporation are excluded from the calculation of the leverage ratio under the terms of the revolving credit agreements.

The Company is an eligible lender under the RUS loan guarantee program. Loans issued under this program carry the U.S. Government's guarantee of all interest and principal payments. Thus, the Company has little or no risk associated with the collection of principal and interest payments on these loans. Therefore, the Company believes that there is little or no risk related to the repayment of the liabilities used to fund RUS guaranteed loans and subtracts such liabilities from total liabilities for the purpose of calculating its leverage and debt to equity ratios. For the purpose of computing compliance with its revolving credit agreement covenants, the Company is required to adjust its leverage ratio by subtracting liabilities used to fund RUS guaranteed loans from total liabilities. The leverage and debt to equity ratios adjusted to subtract debt used to fund RUS guaranteed loans from total liabilities reflect management's perspective on its operations and thus, the Company believes that these are useful financial measures for investors.

The Company requires that its members purchase subordinated certificates as a condition of membership and as a condition to obtaining a loan or guarantee. The subordinated certificates are accounted for as debt under GAAP. The subordinated certificates have long-dated maturities and pay no interest or pay interest that is below market and under certain conditions the Company is prohibited from making interest payments to members on the subordinated certificates. For the purpose of computing compliance with its revolving credit agreement covenants, the Company is required to adjust its leverage ratio by subtracting members' subordinated certificates from total liabilities and adding members' subordinated certificates to total equity. The leverage and debt to equity ratios adjusted to treat members' subordinated certificates as equity rather than debt reflect management's perspective on its operations and thus, the Company believes that these are useful financial measures for investors.

The Company also sells subordinated deferrable debt in the capital markets with maturities of up to 49 years and the option to defer interest payments. The characteristics of subordination, deferrable interest and long-dated maturity are all equity characteristics. For the purpose of computing compliance with its revolving credit agreement covenants, the Company is required to adjust its leverage ratio by subtracting subordinated deferrable debt from total liabilities and adding it to total equity. The leverage and debt to equity ratios adjusted to treat subordinated deferrable debt as equity rather than debt reflect management's perspective on its operations and thus, the Company believes that these are useful financial measures for investors.

As a result of implementing SFAS 133, the Company's consolidated balance sheets include the fair value of its derivative instruments. As noted above, the amounts recorded are estimates of the future gains and losses that CFC may incur related to its derivatives. The amounts do not represent current cash flows and are not available to fund current operations. For the purpose of computing compliance with its revolving credit agreement covenants, the Company is required to adjust its leverage ratio by excluding the impact of implementing SFAS 133 from liabilities and equity. The leverage and debt to equity ratios adjusted to exclude the impact of SFAS 133 from liabilities and equity reflect management's perspective on its operations and thus, the Company believes that these are useful financial measures for investors.

53

As a result of issuing foreign denominated debt and the implementation of SFAS 133 which discontinued the practice of recording the foreign denominated debt and the related currency exchange agreement as one transaction, the Company must adjust the value of such debt reported on the consolidated balance sheet for changes in foreign currency exchange rates since the date of issuance in accordance with SFAS 52. At the time of issuance of all foreign denominated debt, the Company enters into a foreign currency exchange agreement to fix the exchange rate on all principal and interest payments through maturity. The adjustments to the value of the debt on the consolidated balance sheets are reported on the consolidated statements of operations as foreign currency adjustments. The adjusted debt value at the reporting date does not represent the amount that the Company will ultimately pay to retire the debt, unless the current exchange rate is equal to the exchange rate in the related foreign currency exchange agreement or the counterparty fails to honor its obligations under the agreement. For the purpose of computing compliance with its revolving credit agreement covenants, the Company is required to adjust its leverage ratio by excluding the impact of foreign currency valuation adjustments from liabilities and equity. The leverage and debt to equity ratios adjusted to exclude the impact of SFAS 52 reflect management's perspective on its operations and thus, the Company believes that these are useful financial measures for investors.

FIN 46(R) requires the Company to consolidate the results of operations and financial condition of RTFC and NCSC even though the Company has no financial interest or voting control over either company. In consolidation, the amount of the subsidiary equity that is owned or due to investors other than the parent company is shown as minority interest. Prior to consolidation, the RTFC members' equity was combined with the Company's equity and therefore included in total equity. For the purpose of computing compliance with its revolving credit agreement covenants, the Company is required to adjust total equity to include minority interest. The leverage and debt to equity ratio adjusted to treat minority interest as equity reflect management's perspective on its operations and thus, the Company believes that these are useful financial measures for investors.

The following chart provides a reconciliation between the liabilities and equity used to calculate the leverage and debt to equity ratios and these financial measures reflecting the adjustments noted above, as of the five years ended May 31, 2007.

| | May 31, | | | | |
|---|---|---|---|---|---|
| (in thousands) | 2007 | 2006 | 2005 | 2004 | 2003 |
| Liabilities | $ 17,843,151 | $ 18,373,319 | $ 19,276,728 | $ 20,741,825 | $ 20,211,829 |
| Less: | | | | | |
| Derivative liabilities | (71,934) | (85,198) | (78,471) | (129,915) | (353,840) |
| Foreign currency valuation account | - | (244,955) | (260,978) | (233,990) | (325,810) |
| Debt used to fund loans guaranteed by RUS | (255,903) | (261,330) | (258,493) | (263,392) | (266,857) |
| Subordinated deferrable debt (2) | (486,440) | (636,440) | (685,000) | (550,000) | (650,000) |
| Subordinated certificates | (1,381,447) | (1,427,960) | (1,490,750) | (1,665,158) | (1,708,297) |
| Adjusted liabilities | $ 15,647,427 | $ 15,717,436 | $ 16,503,036 | $ 17,899,370 | $ 16,907,025 |
| | | | | | |
| Total equity | $ 710,041 | $ 784,408 | $ 764,934 | $ 692,453 | $ 927,453 |
| Less: | | | | | |
| Prior year cumulative derivative forward value and foreign currency adjustments | (225,849) | (225,730) | (221,868) | (520,083) | (8,576) |
| Current period derivative forward value (1) | 79,744 | (22,713) | (26,755) | 232,905 | (754,727) |
| Current period foreign currency adjustments | 14,554 | 22,594 | 22,893 | 65,310 | 243,220 |
| Accumulated other comprehensive (income) loss | (12,204) | (13,208) | (15,621) | 12,541 | 47,006 |
| Subtotal members' equity | 566,286 | 545,351 | 523,583 | 483,126 | 454,376 |
| Plus: | | | | | |
| Subordinated certificates | 1,381,447 | 1,427,960 | 1,490,750 | 1,665,158 | 1,708,297 |
| Subordinated deferrable debt (2) | 486,440 | 636,440 | 685,000 | 550,000 | 650,000 |
| Minority interest (3) | 21,989 | 21,894 | 18,652 | 21,165 | - |
| Adjusted equity | $ 2,456,162 | $ 2,631,645 | $ 2,717,985 | $ 2,719,449 | $ 2,812,673 |
| | | | | | |
| Guarantees | $ 1,074,374 | $ 1,078,980 | $ 1,157,752 | $ 1,331,299 | $ 1,903,556 |

(1) Represents the derivative forward value (gain) loss recorded by CFC for the period.
(2) At May 31, 2007 and 2006, includes $175 million and $150 million, respectively, of subordinated deferrable debt classified in short-term debt.
(3) No adjustments required for minority interest prior to the implementation of FIN 46(R) in fiscal year 2004.

The leverage and debt to equity ratios using GAAP financial measures are calculated as follows:

$$\text{Leverage ratio} = \frac{\text{Liabilities} + \text{guarantees outstanding}}{\text{Total equity}}$$

$$\text{Debt to equity ratio} = \frac{\text{Liabilities}}{\text{Total equity}}$$

54

The adjusted leverage and debt to equity ratios are calculated as follows:

$$\text{Adjusted leverage ratio} = \frac{\text{Adjusted liabilities} + \text{guarantees outstanding}}{\text{Adjusted equity}}$$

$$\text{Adjusted debt to equity ratio} = \frac{\text{Adjusted liabilities}}{\text{Adjusted equity}}$$

The following chart provides the leverage and debt to equity ratios, as well as the adjusted ratios, as of the five years ended May 31, 2007.  The adjusted leverage ratio and the adjusted debt to equity ratio are the same calculation except for the addition of guarantees to adjusted liabilities in the adjusted leverage ratio.

|  | May 31, | | | | |
|  | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| Leverage ratio | 26.64 | 24.80 | 26.71 | 31.88 | 23.85 |
| Adjusted leverage ratio | 6.81 | 6.38 | 6.50 | 7.07 | 6.69 |
| Debt to equity ratio | 25.13 | 23.42 | 25.20 | 29.95 | 21.79 |
| Adjusted debt to equity ratio | 6.37 | 5.97 | 6.07 | 6.58 | 6.01 |

**Item 7A.        Quantitative and Qualitative Disclosures About Market Risk.**

See Market Risk discussion beginning on page 46.

**Item 8.        Financial Statements and Supplementary Data.**

The consolidated financial statements, auditors' reports and quarterly financial results are included on pages 79 through 122 (see Note 18 to consolidated financial statements for a summary of the quarterly results of CFC's operations).

**Item 9.        Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

**Item 9A.        Controls and Procedures.**

*Evaluation of Disclosure Controls and Procedures*
Senior management, including the Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934 ("the Exchange Act").  At the end of the period covered by this report, based on this evaluation process, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective due to the material weakness in our internal control over financial reporting described below.  See "Remediation Steps to Address the Material Weakness" below for detail on the changes made to controls and procedures.

*Management's Report on Internal Control Over Financial Reporting*
The management of National Rural Utilities Cooperative Finance Corporation ("the Company") is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934. The Company's internal control system over financial reporting is designed under the supervision of management, including the Chief Executive Officer and Chief Financial Officer, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Company's internal control over financial reporting includes those policies and procedures that:

(i.) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets;

(ii.) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

55

provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or dispositions of the assets of the Company;

Any system of internal control, no matter how well designed, has inherent limitations, including but not limited to the possibility that a control can be circumvented or overridden and misstatements due to error or fraud may occur and not be detected. Also, because of changes in conditions, internal control effectiveness may vary over time. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

A material weakness is a significant deficiency (as defined in PCAOB Auditing Standard No. 2), or combination of significant deficiencies, that results in there being more than a remote likelihood that a material misstatement in financial statements will not be prevented or detected.

The Company's management assessed the effectiveness of its internal controls over financial reporting as of May 31, 2007. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control-Integrated Framework.

In performing the assessment, management identified one material weakness in internal control over financial reporting existing as of May 31, 2007 and 2006. The error was detected and corrected prior to the release to the public of the Company's consolidated financial statements for the year ended May 31, 2007. Subsequent to May 31, 2007, it was determined that the Company had incorrectly translated interest expense on foreign denominated debt and income received under foreign currency exchange agreements. The Company was incorrectly using the agreed upon exchange rate from the foreign currency exchange agreement to translate the foreign currency amounts to US dollars rather than the market spot rate as required by the provisions of Statement of Financial Accounting Standards No. 52, Foreign Currency Translation. The error resulted in the restatement of the Company's consolidated financial statements for the years ended May 31, 2006 and 2005.

As evidenced by the material weakness described above, management has concluded that as of May 31, 2007, the Company did not maintain effective internal control over financial reporting.

*Remediation Steps to Address the Material Weakness*
We have implemented improvements to our internal controls and procedures over the accounting for transactions involving foreign currency. We have revised procedures for foreign denominated transactions to require the use of the market spot rate for the translation to US dollars.

**Changes in Internal Controls over Financial Reporting**
There were no changes in the Company's internal control over financial reporting that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Subsequent to May 31, 2007, management identified the material weakness described above and implemented the changes to controls and procedures described above.

By:  /s/ SHELDON C. PETERSEN
    Sheldon C. Petersen
    Governor and Chief Executive Officer
    August 27, 2007

By:  /s/ STEVEN L. LILLY
    Steven L. Lilly
    Senior Vice President and Chief Financial Officer
    August 27, 2007

By:  /s/ STEVEN L. SLEPIAN
    Steven L. Slepian
    Vice President and Controller
    August 27, 2007

**Item 9B.**            **Other Information.**

None.

## PART III

**Item 10.**          **Directors and Executive Officers of the Registrant.**

(a) Directors

| Name | Age | Director since | Date present term expires |
|------|-----|----------------|---------------------------|
| Terryl Jacobs (President of CFC) | 48 | 2002 | 2008 |
| Roger Arthur (Vice President of CFC) | 60 | 2003 | 2009 |
| Darryl Schriver (Secretary-Treasurer of CFC) | 42 | 2004 | 2010 |
| Roger A. Ball | 62 | 2003 | 2009 |
| Raphael A. Brumbeloe | 66 | 2007 | 2010 |
| Delbert Cranford | 63 | 2007 | 2010 |
| Jimmy Ewing, Jr. | 59 | 2007 | 2010 |
| Harold Foley | 73 | 2004 | 2010 |
| Steven J. Haaven | 56 | 2003 | 2009 |
| Gary Harrison | 45 | 2005 | 2009 |
| Craig A. Harting | 49 | 2002 | 2008 |
| Jim Herron | 50 | 2005 | 2008 |
| Martin Hillert, Jr. | 52 | 2004 | 2010 |
| Tom Kirby | 52 | 2002 | 2008 |
| William A. Kopacz | 60 | 2006 | 2009 |
| Reuben McBride | 60 | 2005 | 2008 |
| Gale Rettkowski | 61 | 2001 | 2009 |
| Ronald P. Salyer | 42 | 2003 | 2009 |
| R. Wayne Stratton | 59 | 2007 | 2010 |
| J. David Wasson, Jr. | 61 | 2006 | 2009 |
| Charles Wayne Whitaker | 57 | 2003 | 2009 |
| Jack F. Wolfe, Jr. | 63 | 2006 | 2008 |
| F. E. Wolski | 56 | 2007 | 2010 |

(b) Executive Officers

| Title | Name | Age | Held present office since |
|-------|------|-----|---------------------------|
| President and Director | Terryl Jacobs | 48 | 2007 |
| Vice President and Director | Roger Arthur | 60 | 2007 |
| Secretary-Treasurer and Director | Darryl Schriver | 42 | 2007 |
| Governor and Chief Executive Officer | Sheldon C. Petersen | 54 | 1995 |
| Senior Vice President of Member Services and General Counsel | John J. List | 60 | 1997 |
| Senior Vice President and Chief Financial Officer | Steven L. Lilly | 57 | 1994 |
| Senior Vice President of Operations | John T. Evans | 57 | 1997 |
| Senior Vice President of Corporate Relations | Richard E. Larochelle | 54 | 1998 |
| Senior Vice President of RTFC | Lawrence Zawalick | 49 | 2000 |
| Senior Vice President of Credit Risk Management | John M. Borak | 62 | 2002 |

The President, Vice-President and Secretary-Treasurer are elected annually by the board of directors at its first organizational meeting immediately following CFC's annual membership meeting, each to serve a term of one year; the Governor and Chief Executive Officer serves at the pleasure of the board of directors; and the other Executive Officers serve at the pleasure of the Governor and Chief Executive Officer.

(c) Identification of Certain Significant Employees.

Inapplicable.

(d) Family Relationships.

No family relationship exists between any director or executive officer and any other director or executive officer of the registrant.

(e) (1) and (2) Business Experience and Directorships.

57

In accordance with Article IV of CFC's Bylaws, each candidate for election to the board of directors must be a trustee, director or manager of a member of CFC with the exception of the at-large position for the audit committee financial expert who may also be a chief financial officer or has a comparable position of a member of CFC.

Ms. Jacobs has served as board secretary of Slope Electric Cooperative, Inc. in New England, ND since June 1999, and has been a director of the cooperative since 1996. She is a former member of the Resolutions Committee for Midwest Electric Consumers Association where she previously served as vice-chairperson. Ms. Jacobs has been an insurance agent since 1986 and has worked for Commercial Insurance Agency, Inc. since 2000.

Mr. Arthur has been a board member of Allamakee-Clayton Electric Cooperative in Postville, IA since 1992 and has served as president since 1993. Mr. Arthur is a director and former president of the Iowa Association of Electric Cooperatives and chairs the Regulatory Affairs Committee. He is a board member and secretary of the Cooperative Development Services of Iowa, Wisconsin and Minnesota and a director of the Fayette County Economic Development Commission. Since 1972, Mr. Arthur has been owner and operator of Arthur's Country Place Inc., a family farm corporation.

Mr. Schriver has been General Manager and CEO of Taylor Electric Cooperative, Inc. in Merkel, TX since 2002. Prior to 2002, he held staff positions at the Texas House of Representatives, Texas Legislative Council and Texas Senate. He serves as a director on the Golden Spread Electric Cooperative Board, the Golden Spread Electric Generating Cooperative Board, the Oklaunion Electric Generating Cooperative Board, the Yoakum Electric Generating Cooperative Board, the Mid-Tex Cooperative Board and the Texas Agricultural Cooperative Council. Mr. Schriver is a Group 4 member of the Governmental Relations Committee of Texas Electric Cooperatives. Mr. Schriver formerly served as director of Government Affairs of Brazos Electric Power Cooperative from 1996 to 1998 and of Governmental Relations of Texas Electric Cooperative from 1998 to 2002.

Mr. Ball has been a board member of Powell Valley Electric Cooperative in New Tazewell, TN since 1988 and has served as president since 1995. Mr. Ball serves as vice chairman of the Claiborne County Industrial Development Board and is a member of the Claiborne County Planning Commission. He served as president of the Workforce Investment Board for Service Delivery Area 2 of Tennessee. Since 1976, Mr. Ball has been owner/ broker of Ball Realty & Auction, Inc., specializing in development and management of commercial property.

Mr. Brumbeloe has served as a board director of Upson Electric Membership Corporation in Thomaston, GA since 1978 and has been board president since 1998. Mr. Brumbeloe has served as a board member of Georgia Electric Membership Corporation since 1983 and served as chairman from 1988 to 1989. He is also a member representative of Oglethorpe Power Corporation. He is currently the owner of the Red Rock Armory. Mr. Brumbeloe is retired from the Georgia State Patrol.

Mr. Cranford has served as a board director of Randolph Electric Membership Corporation in Asheboro, NC since 1989 and was president from 1995 to 2002 and vice president from 1994 to 1995. He is a director and former president of the North Carolina Association of Electric Cooperatives, Inc. and also served on the North Carolina Electrical Cooperative Board. Mr. Cranford also serves as a director of First Bank Corp, a member of the North Carolina Pharmaceutical Association and a board member and former president of the Farmer Volunteer Fire Department. Mr. Cranford is currently a retail pharmacist and an owner of retail pharmacies.

Mr. Ewing has served as a board director of Point Coupee Electric Membership Corporation in New Roads, LA since 1989 and has been board president since 1995. He served as secretary/treasurer from 1990 to 1995. Mr. Ewing also serves as a board member of the Association of Louisiana Electric Cooperatives, Inc. and has been secretary/treasurer since 2006. He is a member of the Action Committee for Rural Electrification, a board member of the Louisiana Landowners Association and a former board member of Cajun Electric Power Cooperative. Mr. Ewing is currently a restaurant owner and farm manager.

Mr. Foley has served as a director of Brown-Atchison Electric Cooperative Association, Inc. in Horton, KS since 1984. He has been board president of Brown-Atchison Electric Cooperative Association since 1991 and held the position of board vice president in 1990. He is a former alternate trustee representative to Kansas Electric Power Cooperative, Inc. (KEPCo) and former vice president of the KEPCo Services, Inc., Board of Directors. He was a real estate broker with Jepson & Associates in Valley Falls, KS from 1991 until his retirement in June 2003.

Mr. Haaven has been president and Chief Executive Officer ("CEO") of Wild Rice Electric Cooperative Inc. in Mahnomen, MN since 1987 and serves on the Minnkota Power Cooperative Manager Advisory Committee. He is also a member of the Karian/Peterson Powerline Contracting Board and president of Carr's Tree Service Board. He previously served as CEO, under a shared management agreement, of Wild Rice Electric Cooperative/Red River Valley Cooperative in Halstad, MN. Mr. Haaven is a former member of the Rural Electric Political Action Committee Board at Minnesota Rural Electric Association.

Mr. Harrison has served as CEO and General Manager of Dixie Electric Cooperative in Union Springs, AL since 1997. Mr. Harrison serves as chairman of the Alabama Rural Electric Association since April 2005. He has served as a board member of Alabama Electric Cooperative since April 1997 and as secretary-treasurer of the board since May 2007. Since January 2001, Mr. Harrison has served as CEO and president of Cooperative Utility Services, LLC.

Mr. Harting has been Chief Executive Officer of Sullivan County Rural Electric Cooperative in Forksville, PA since September 1989. He has been a member of the board of United Utility Supply, Inc., in Louisville, KY since June 1995. Mr. Harting is a member of the Sullivan County Industrial Development Authority, Northern Tier Regional Planning and Development Commission, and Workforce Investment Board of Towanda, PA. Mr. Harting also serves as treasurer of the Sullivan County Chamber of Commerce and serves on the board of the Five Rivers Council of the Boy Scouts of America.

Mr. Herron has served as General Manager of Mountain View Electric Association, Inc. in Limon, CO since 1996. Prior to that position, Mr. Herron was General Manager at Farmers' Electric Cooperative in Clovis, NM from 1993 to 1996. Mr. Herron currently serves on the Colorado Electric Education Institute. Previously, he served as chair of the Colorado Rural Electric Managers Association and as board member of the New Mexico Rural Electric Association.

Mr. Hillert has been CEO and General Manager of Adams-Columbia Electric Cooperative in Friendship, WI since 1996. In addition, he serves on the board of Badger Energy Services in Oconto Falls, WI, board vice president of Network 2010 in Oxford, WI and as a board member of Badger Unified Cooperative Services in Fall Creek, WI since 2001. Mr. Hillert also serves as treasurer of Wisconsin Cooperative Managers Association and is a board member of the Electric Coalition of Wisconsin. Mr. Hillert serves as chairman of Adams County Economic Development and is a member of Advisory Board of Directors for the University of Wisconsin Center for Cooperatives.

Mr. Kirby has been a board member of Central Indiana Power in Greenfield, IN, since 1991 and is a past chairman of that board. He served as director of the Indiana Statewide Association of RECs, Inc. from 1999 to 2004. Mr. Kirby has been director of Diagnostic Imaging at Hamilton Heart, Inc., a cardiology practice in Noblesville, IN since April 2004. From April 2003 to April 2004, Mr. Kirby was director of Diagnostic Imaging at St. Vincent's Women's Hospital of Indianapolis, IN. Mr. Kirby was Chief Technologist at Digirad Imaging Solutions, Inc. from June 2001 to April 2003. He was employed as a nuclear medicine technologist at Saint John's Health Corporation from 1980 to 2001.

Mr. Kopacz has been the General Manager of Midstate Electric Cooperative, Inc. in La Pine, OR since 1990. He is currently a board director of Northwest Requirement Utilities, Northwest Irrigation Utilities and Economic Development for Central Oregon. He is also a former board president of Economic Development for Central Oregon. He is a former director of Ruralite Services, a northwest electric cooperative publication, and former president of the Oregon Rural Electric Cooperative Association.

Mr. McBride has been a director of Graham County Electric Cooperative in Pima, AZ since 1991 and vice president since 1993. Mr. McBride is owner/operator of Reuben McBride Farms in Pima, AZ since 1980. Mr. McBride currently serves on the board of Arizona Electric Power Co-op., Inc. and served as board president and chairman of the Executive Committee from May 2002 to May 2005. In addition, Mr. McBride is a member of both the National and Arizona Action Committees for Rural Electrification.

Mr. Rettkowski has served as a director of Inland Power and Light Company in Spokane, WA since March 2000 and was president of the board through March 2003. He has served as board secretary-treasurer for Northwest Irrigation Utilities since August 1992. Mr. Rettkowski has been the president of Citizens for Irrigation for the state of Washington since September 1991. He is a former trustee of Lincoln Electric and Graingrowers Warehouse Co-op. Mr. Rettkowski has also been president of Rettkowski Brothers, Inc., a farming corporation in Wilbur, WA, since 1998.

Mr. Salyer has served as the president and CEO of Pioneer Rural Electric Cooperative in Piqua, OH since 2001 and served as executive vice president from 1999 to 2000. In addition, he is a member of the Ohio Rural Electric Cooperatives (OREC) Facilities Attachment Committee, chairman of the OREC Communications Systems Task Force and a trustee of Buckeye Power, Inc. In addition, he is also a director of Rural Electric Supply Cooperative of Ohio.

Mr. Stratton has been a director of East Kentucky Power Cooperative in Winchester, KY since 1990 and currently serves as Chairman of the Board. He has served as a director of Shelby Energy Cooperative since 1987, ACES Power Marketing since 2004, Shelbyville Municipal Water & Sewer Commission since 2000 and Republic Bancorp since 1995. Mr. Stratton is an at- large director that serves as the Audit Committee Financial Expert as defined by the Securities and Exchange Commission. He is a certified public accountant in Kentucky, accredited in Business Valuation by the AICPA, a Certified Forensic Accountant, Certified Fraud Examiner and a Credentialed Cooperative Director through National Rural Electric Cooperative Association ("NRECA"). Mr. Stratton has been a member/owner of Jones, Nale & Mattingly PLC, a full-service accounting and auditing practice since 1970. He currently serves as the Audit Committee Chairman and Audit Committee Financial Expert of

Republic Bancorp, a $2.8 billion bank traded on NASDAQ. He is the former Audit Committee Chairman of East Kentucky Power Cooperative, former team captain for AICPA peer reviews of other accounting firms and former Board Member of Kentucky Higher Education Assistance Authority (1985 to 2001) where as Chairman for eight years, he participated in various finance transactions. He served on the AICPA Uniform Accountancy Act Committee and is the past president of the Kentucky Society of CPAs.

Mr. Wasson has been the president and CEO of Laurens Electric Cooperative, Inc. in Laurens, SC since 1973. He has served on the board of directors of New Horizon Electric Cooperative since 1997 and has served as chairman since 2005. Mr. Wasson has been a board member of the South Carolina Electric Cooperative Association since 1975 and served as chairman from December 1983 to December 1985. He also serves as a director of The Palmetto Bank.

Mr. Whitaker has served as the president and General Manager of Southwest Arkansas Electric Cooperative in Texarkana, AR since 1986. In addition, Mr. Whitaker has been director and former chairman of Arkansas Electric Cooperative Corporation, Arkansas Electric Cooperative, Inc., and the Arkansas Rural Electric Self-Insurance Trust since 1986. He is also a former director of the National Information Solutions Cooperative.

Mr. Wolfe has been the president and CEO of Mid-Carolina Electric Cooperative, Inc. in Lexington, SC since 1975. He has also represented South Carolina's electric cooperatives on the NRECA Board of Directors since 1999, serving as secretary treasurer in 2005, vice president from 2005 to 2006 and currently serving as president. Mr. Wolfe serves as a director of The Electric Cooperatives of South Carolina, Inc. and the Central Electric Power Cooperative and has chaired a variety of statewide committees.

Mr. Wolski has been director of Wyrulec Company in Lingle, WY since 1986. Mr. Wolski has represented Wyoming's cooperative electric utilities on the NRECA Board of Directors since 1999 and was recently elected as NRECA vice president. Prior to his election to vice president, Mr. Wolski served as secretary-treasurer of the NRECA board. He has served as a director of Tri-State Generation & Transmission since 2001. He served on the board of the Wyoming Rural Electric Association for nine years, including three years as president. Mr. Wolski is also a former board member of the Wyoming Rural Telecommunication Cooperative. Mr. Wolski is the owner/manager of a family farm with a commercial hunting operation and is the owner/agent of an insurance business.

Mr. Petersen joined CFC in August 1983 as an area representative. He became the director of Policy Development and Internal Audit in January 1990, director of Credit Analysis in November 1990 and Corporate Secretary on June 1, 1992. He became Assistant to the Governor on May 1, 1993. He became Assistant to the Governor and Acting Administrative Officer on June 1, 1994. He became Governor and CEO on March 1, 1995. Mr. Petersen began his career in the rural electrification program in 1976 as staff assistant for Nishnabotna Rural Electric Cooperative in Harlan, IA. He later served as General Manager of Rock County Electric Cooperative Association in Janesville, WI.

Mr. List joined CFC as a staff attorney in February 1972. He served as Corporate Counsel from June 1980 to 1991. He became Senior Vice President and General Counsel on June 1, 1992, and became Senior Vice President, Member Services and General Counsel on February 1, 1997.

Mr. Lilly joined CFC as a Senior Financial Consultant in October 1983. He became director of Special Finance in June 1985 and director of Corporate Finance in June 1986. He became Treasurer and Principal Finance Officer on June 1, 1993, and became Senior Vice President and Chief Financial Officer on January 1, 1994.

Mr. Evans joined CFC as Senior Vice President of Operations in November 1997. He was Senior Vice President and Chief Operating Officer of Suburban Hospital Healthcare System, Bethesda, MD from 1994 to 1997. He was Senior Vice President and Chief Operating Officer for Geisinger Medical Center, Danville, PA from 1991 to 1994.

Mr. Larochelle joined CFC as director of Corporate Relations in May 1996. He became Senior Vice President of Corporate Relations in August 1998. Prior to joining CFC, he was the Legislative director at NRECA where he worked for 12 years. He also worked at the U.S. Department of Agriculture in the Rural Electrification Administration and the Farmers Home Administration.

Mr. Zawalick joined CFC in 1980. Throughout his career with CFC, Mr. Zawalick has held various positions. In April 1995, he was appointed Vice President of Business Development for CFC and Administrative Coordinator of RTFC. In February 2000, Mr. Zawalick was named CFC's Senior Vice President of RTFC.

Mr. Borak joined CFC in June 2002 as Senior Vice President, Credit Risk Management.  Previously, he was with Fleet National Bank, Boston, MA from 1992 to 2001 where he was a Senior Credit Officer with risk management and loan approval responsibility for several industry banking portfolios including investor owned utilities.  Prior assignments at Fleet in Hartford, CT included Manager of Credit Review and Manager of Loan Workout in the Connecticut bank.

(f) Involvement in Certain Legal Proceedings.

None to the knowledge of the Company.

(g) Promoters and Control Persons.

Inapplicable.

(h) Code of Ethics

The Company has adopted a Code of Ethics within the meaning of Item 406(b) of Regulation S-K. This Code of Ethics applies to our principal executive officer, our principal financial officer and principal accounting officer. This Code of Ethics is publicly available on our website at http://www.nrucfc.coop/aboutcfc/pdfs/ethicsPolicyCEO-SFO.pdf.

(i) Audit Committee

Our Audit Committee currently consists of eleven directors: Mr. McBride (Chairperson), Mr. Stratton (Vice-Chairperson), Mr. Ewing, Mr. Harting, Mr. Wasson, Mr. Schriver, Mr. Salyer, Mr. Arthur, Ms. Jacobs, Mr. Hillert and Mr. Cranford.  Mr. Stratton was designated by the Board as the "audit committee financial expert" as defined by Section 407 of the Sarbanes-Oxley Act of 2002 ("SOX"). The members of the Audit Committee are "independent" as that term is defined in Rule 10A-3 under the Securities Exchange Act.  Among other things, the Audit Committee reviews the Company's financial statements and the disclosure under Management's Discussion and Analysis in our Annual Report on Form 10-K. The Committee meets with our independent registered public accounting firm, internal auditors, Chief Executive Officer and financial management executives to review the scope and results of audits and recommendations made by those persons with respect to internal and external accounting controls and specific accounting and financial reporting issues and to assess corporate risk. The Board has adopted a written charter for the Audit Committee.

The Audit Committee completed its review and discussions with management regarding the Company's audited financial statements for the year ended May 31, 2007. The Audit Committee has discussed with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 61, as amended, and received from the independent accountants written disclosures and the letter regarding their independence required by Independence Standards Board Standard No. 1, and discussed with the independent accountants their independence.

Based on the review and discussions noted above, the Audit Committee recommended to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the year ended May 31, 2007 for filing with the Securities and Exchange Commission.

(j) Compensation Committee

### Role of the Compensation Committee

The Executive Committee of the Board of Directors has historically served as the compensation committee, making recommendations on the CEO's compensation, and recommending the overall compensation and benefits package for all executive officers and other employees to the full Board of Directors.  On May 25, 2007, the Board of Directors established a Compensation Committee to review and make appropriate recommendations to the full Board of Directors on CFC's total compensation philosophy and pay components, including, but not limited to, base and incentive pay programs.  The Committee is responsible for reviewing and making recommendations to the full Board of Directors on CFC's total compensation philosophy and pay components, including base and incentive pay programs.  The Committee is also responsible for approving the compensation, employment agreements and perquisites for the CEO. The Committee annually reviews all approved corporate goals and objectives relevant to compensation, evaluates performance in light of those goals and approves the CEO's compensation based on this evaluation, all of which is then approved by the full Board of Directors. The Committee has delegated authority to the CEO for evaluating the performance and approving compensation for all of the other named executive officers.  Other than the CEO, no other named executive officers make decisions regarding executive compensation.

The Compensation Committee reports to the Board of Directors on its actions and recommendations following Committee meetings and meets in executive session without members of management present when making specific compensation decisions.  Although the Board has delegated authority to the Committee with respect to CFC's executive and general

employee compensation programs and practices, the full Board of Directors also reviews CFC's compensation and benefits programs each year.

The Compensation Committee's charter can be found on CFC's website, www.nrucfc.coop.

### The Compensation Committee's Processes

The Compensation Committee has established a process to assist it in ensuring that CFC's executive compensation program is achieving its objectives. The Committee uses company performance measures in two ways. First, performance measures are used in establishing the specific company performance targets that determine how short-term incentive and long-term incentive pay will be earned. Prior to the start of each fiscal year, the Committee recommends performance measures for the corporate balanced scorecard and the specific goal and metrics for the long-term incentive plan to the full Board of Directors. Additionally, the Committee considers various measures of company performance in deciding on base pay for the CEO. The Committee considers financial metrics, customer satisfaction and market share, and industry leadership, but does not apply a formula or assign specific performance measures; instead, it makes a subjective determination on the CEO's base pay after considering such corporate performance measures collectively, along with benchmarking data analysis provided by the compensation consultant.

### Role of Compensation Consultant

CFC's management and Board of Directors have worked with Mercer Human Resource Consulting ("Mercer") for many years for compensation and benefit plan design consultation. In 2007, Mercer was hired by the board to advise on the CEO's total compensation. Mercer advised the Executive Committee through an assessment of compensation data using both a one year compensation analysis – which assesses CFC's CEO compensation and the compensation of peer CEOs for the most recent fiscal year, and three year compensation analysis – which assesses average peer CEO pay for the last three fiscal years. Compensation analyses include base pay, annual incentives, total cash compensation, long-term incentives and total direct compensation.

In addition, management has historically hired Mercer to advise CFC on the structure and design of the existing total compensation package for all employees, including named executive officers. Mercer assisted in the development of both the short- and long-term incentive plans and provides data to assist in establishing the appropriate incentive opportunities for all levels of employees. Mercer has also periodically evaluated the ongoing competitiveness of the existing compensation package for all employees, including named executive officers. No work was performed in 2006, other than the work directly for the committee on CEO pay.

### Role of Executive Officers

The Executive Committee has delegated the authority for making annual base pay decisions for named executive officers to the CEO. The CEO exercises his judgment to set annual base pay rates, based on market data, overall performance and leadership accomplishments. Other than the CEO, no other named executives are involved in making executive compensation decisions.

(k)  Director Independence

### Independence Determinations

The Board of Directors has determined the independence of each Director based on a review by the full Board. Our Audit Committee is subject to the independence requirements of Rule 10A-3 under the Securities Exchange Act. To evaluate the independence of our directors, the Board has voluntarily adopted categorical independence standards consistent with the New York Stock Exchange ("NYSE") standards. However, because we only list debt securities on the NYSE, we are not subject to most of the corporate governance listing standards of the NYSE, including the independence requirements.

No Director is considered independent unless the Board has determined that he or she has no material relationship with CFC, either directly or as a partner, shareholder, or officer of an organization that has a material relationship with CFC. Material relationships can include banking, legal, accounting, charitable, and familial relationships, among others. A Director is not considered independent if any of the following relationships existed within the previous three years:

     (i)     the director is, or has been within the last three years, an employee of CFC, or an immediate family member is, or has been within the last three years, an executive officer of CFC;

     (ii)    the director has received, or has an immediate family member who has received, during any twelve-month period within the last three years, more than $100,000 in direct compensation from CFC, other than director and committee fees and pension or other forms of deferred compensation for prior service (provided that such compensation is not contingent in any way on continued service);

(iii)   (a) the director or an immediate family member is a current partner of a firm that is CFC's external auditor; (b) the director is a current employee of such a firm; (c) the director has an immediate family member who is a current employee of such a firm and who participates in the firm's audit, assurance or tax compliance (but not tax planning) practice for CFC; or (d) the director or an immediate family member was within the last three years (but is no longer) a partner or employee of such a firm and personally worked on CFC's audit within that time;

(iv)    the director or an immediate family member is, or has been within the last three years, employed as an executive officer of another company where any of CFC's present executive officers at the same time serves or served on that company's compensation committee;

(v)     the director is a current employee, or an immediate family member is a current executive officer, of a company that has made payments to, or received payments from, CFC for property or services in an amount which, in any of the last three fiscal years, exceeds the greater of $1 million, or 2% of such other company's consolidated gross revenues.

The Board of Directors also reviewed directors' responses to a questionnaire asking about their relationships with CFC and its affiliates (and those of their immediate family members) and other potential conflicts of interest.

In reaching a determination that the directors are independent, the Board considered that in addition to the categories or type of transactions described above, loans and guarantees were made to member systems of which directors of CFC are members, employees or directors in the ordinary course of CFC business on the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with other members and did not involve more than normal risk of uncollectibility or present other unfavorable features. It is anticipated that, consistent with its loan and guarantee policies in effect from time to time, additional loans and guarantees will be made by CFC to member systems and trade and service organizations of which directors of CFC are members, employees, officers or directors.  As a cooperative, CFC was established for the very purpose of extending financing to its members (from whose ranks its directors must be drawn).  CFC has adopted a policy whereby substantially all extensions of credit to entities related to directors or their immediate family members are approved only by the disinterested directors.

Based on the criteria above, the Board of Directors has determined that the directors listed below are independent. The Board determined that none of the directors listed below has had during the last three years any of the relationships listed in (i) - (v) above or any other material relationship that would compromise his or her independence.

## Independent Directors

| | | |
|---|---|---|
| Terryl Jacobs | Harold Foley | Reuben McBride |
| Roger Arthur | Steven J. Haaven | Gale Rettkowski |
| Roger A. Ball | Gary Harrison | R. Wayne Stratton |
| Raphael A. Brumbeloe | Craig A. Harting | J. David Wasson, Jr. |
| Delbert Cranford | Tom Kirby | Jack F. Wolfe, Jr. |
| Jimmy Ewing, Jr. | William A. Kopacz | F. E. Wolski |

## Item 11.          Executive Compensation.

### Compensation Discussion and Analysis
#### Executive Compensation Philosophy and Objectives
The goal of our executive compensation program is to attract, motivate and retain highly talented executives who are dedicated to helping CFC achieve its objectives and committed to CFC's core values of service, integrity and excellence.  Our executive compensation programs are based on the same objectives that guide CFC in establishing all its compensation programs – rewarding employees for individual and corporate performance and retaining quality employees.  To this end, we offer a mix of base pay and pay for performance designed to align the interests of the executives with the needs of our members.

The components of our compensation package for named executive officers (consisting of Messrs. Petersen, Lilly, List, Evans and Zawalick) are consistent with those offered to all employees and consist of base pay that is market competitive, short-term incentive which is tied to the achievement of annual corporate goals and long-term incentive which is tied to the achievement of strategic objectives, plus retirement and other benefits.  The executive compensation program is designed to reward individual performance and contribution through the base pay component, and recognize corporate performance through the short and long term incentive programs.  We believe that all four elements of compensation work together to provide a competitive compensation package that drives performance and supports executive retention.

Performance–Named executive officers receive base pay that is both market competitive and reflective of the strategic management they provide to CFC. Other components of compensation – short-term (one year) incentive bonus and long-term (three year) incentive bonus – reflect the performance of the organization and the success in achieving performance metrics established by the Board of Directors.

Retention – The relationship between CFC and its members makes the retention of employees, including the named executive officers, vital to our business and long-term success. The compensation package, particularly the long-term incentive plan and the retirement benefits, assist in the retention of a highly qualified management team.

*Benchmarking*
For 2007, Mercer Human Resource Consulting ("Mercer") was engaged by the Board of Directors to conduct a benchmarking survey for the Chief Executive Officer position using peer organizations identified by the Executive Committee. The Executive Committee believes that CFC's most direct competitors for executive talent include a broad range of financial institutions. As a result, the Executive Committee included companies in the compensation comparison group that were similar to CFC in asset size and industry and business description. The group included financial institutions that are premier private market, commercial and/or mission driven lenders, offering full service financing, investment and related services. The companies targeted as peer companies ranged between 50% and 200% of CFC's December 2005 total assets of $19.2 billion. Comparators included financial services organizations such as Hudson City Bancorp, Inc., New York Community Bancorp, Inc., Student Loan Corp., Astoria Financial Corp, Nelnet, Inc., Indymac Bancorp, Webster Financial Corp., and Flagstar Bancorp, as well as five Farm Credit System peers.

Mercer led the Executive Committee through an assessment of compensation data using both a one year compensation analysis – which assesses CFC and peer CEOs for the most recent fiscal year, and three year compensation analysis – which assesses average peer CEO pay for the last three fiscal years. Compensation data analyzed included base pay, annual incentives, total cash compensation, long-term incentives and total direct compensation.

CFC benchmarks the compensation of the other named executive officer positions against similar positions in national, credible compensation surveys for financial services organizations of similar asset size. The survey data is used primarily to ensure that the base pay component of executive compensation is competitive, meaning generally within the fiftieth percentile of comparative pay for similar positions.

*Elements of Compensation*
CFC's executive compensation program provides a balanced mix of compensation that incorporates the following key components:
- An annual base pay salary
- An annual incentive cash bonus which is based on the achievement of short-term (one year) corporate goals
- A three-year incentive cash bonus which is based on the achievement of longer term corporate goals
- Retirement, health and welfare and other benefit programs provided generally to all CFC employees

While all elements of executive compensation work together to provide a competitive compensation package, each element of compensation is determined independently of the other elements.

Base Pay– CFC's philosophy is to provide annual base pay that reflects the value of the job in the marketplace. To attract and retain a highly skilled work force, we must remain competitive with the pay of other employers who compete with us for talent. Base pay for each of the named executive officers is benchmarked against similar positions in other organizations, as described under "Benchmarking".

CFC's compensation philosophy is to target total compensation – base pay, short-term incentive, long-term incentive and benefits – at the 75th percentile of market for the general employee population. However, due to the cooperative nature of this organization, CFC cannot match the compensation levels of named executive officers of other financial services organizations at the 75th percentile since we do not offer stock or equity shares. It is important to CFC, however, to pay the named executive officers of CFC competitively in base pay to retain key talent. For this reason, the Executive Committee, in consultation with Mercer, with respect to Mr. Petersen, CEO, assessed the competitiveness of Mr. Petersen's total cash compensation opportunity, including base pay, short-term incentive and long-term incentive, against the base pay only of the peer group CEOs.

Individual performance has an impact on the compensation of all employees, including the CEO and other named executive officers. With respect to the CEO, the Committee meets with the CEO in executive session annually to conduct a performance review based on his individual achievements, contribution to CFC's performance and other leadership accomplishments. In determining Mr. Petersen's base pay, the Executive Committee considered factors including financial metrics, portfolio management, customer satisfaction and market share, and industry leadership, but did not apply a formula

or assign specific performance measures. Instead, it made a subjective determination on the CEO's base pay after considering such corporate performance measures collectively, along with the peer group analysis discussed above.

The Executive Committee has delegated the authority for making annual base pay decisions for named executive officers to the CEO. The CEO exercises his judgment to set annual base pay rates, based on market data, overall performance and leadership accomplishments. In 2007, Mr. Petersen focused on the comparable market pay for similar positions, at the fiftieth percentile of market base pay, and general market increases of approximately 4%, to set base pay for the other named executive officers.

<u>Short-Term Incentive</u>– CFC's short-term cash incentive program is a one-year bonus that is tied to the annual performance of the organization as a whole. CFC believes that by paying a short-term incentive tied to the achievement of annual operating goals, all employees, including named executive officers, will focus their efforts on the most important strategic objectives which help CFC to fulfill its mission to its members. Additionally, the short-term incentive pay enhances CFC's ability to provide competitive compensation while at the same time tying actual incentive compensation paid to the achievement of corporate goals. All employees are eligible to participate in the short-term incentive program.

Mercer worked with CFC in the design of the short-term incentive plan. The Board of Directors considered analysis from Mercer regarding the competitiveness of CFC's compensation package, along with the cooperative nature of CFC, in determining the appropriate incentive opportunities for all employees. The short-term incentive plan provides annual cash bonus opportunities based upon the level of the position within CFC's compensation structure, ranging from 15% - 25% of base pay. Named executive officers are eligible to receive short-term bonus compensation up to 25% of their base pay, but otherwise participate in the annual incentive program on an equal basis with our other employees.

Corporate performance is measured using a balanced scorecard approved by the Board of Directors prior to the start of the fiscal year. The balanced scorecard is a performance management tool that articulates the corporate strategy of CFC into specific, quantifiable, measurable goals. By focusing goals in four quadrants, the scorecard ensures that proper attention is paid to all crucial areas of business performance. The scorecard provides balanced management indicators of business success and a focus for all employees as to the target results and measures that must be achieved if CFC is to succeed at the strategic plan. The intent is to align organizational, departmental and individual initiatives to achieve a common goal.

Corporate goals for 2007, which were the basis for the short-term incentive payment, were Customer Satisfaction, Financial Ratios, Internal Process and Operations, and Learning, Growth & Innovation. The Board of Directors establishes corporate goals and measures that they believe are challenging but achievable. For 2007, the estimated achievement of the goals equated to 93.75% of the total opportunity. Payments under the short-term incentive plan are subject to approval by the Board of Directors at a date subsequent to the filing of this Form 10-K.

<u>Long-Term Incentive</u>– the long term incentive plan is a three-year plan that is tied to CFC's long-term strategic objectives. The long-term incentive plan was implemented to create dynamic tension between short-term objectives and long-term goals. It is also an effective retention tool, helping the organization to keep key employees, and supports CFC's efforts to pay at market competitive levels. All employees on staff on the first day of the fiscal year, June 1, are eligible to participate in the plan cycle and will receive performance units that are calculated at 15% - 25% of base pay.

Performance units are issued at the start of each fiscal year for a three-year cycle. Performance units for named executive officers are calculated by dividing 25% of base pay on June 1 by the rating level of the AA- goal – currently $100 per performance unit. The performance units issued will have a value at the end of a three year period as described below. The measure for all active long-term incentive plans is the achievement of bond rating targets for our collateral trust bonds by three rating agencies: Standard & Poors, Fitch, and Moody's. The value of the performance units will range from $0 to $150 per performance unit according to the level of CFC's secured debt ratings by the three rating agencies. To achieve the highest value of $150, which exceeds the targeted value, all three agencies would have to raise CFC's long-term secured debt rating to AA stable. If this rating level is achieved, the incentive pay for named executive officers is 37.5% of the base pay of the year in which the units were issued. The collateral trust bond rating was selected as the measure for the long-term incentive plan because, as a financial services company, CFC is dependent on the capital markets and the stronger ratings lead to lower interest cost and more reliable access to the capital markets.

The long-term incentive is paid out in one lump sum after the end of the performance period and performance units cannot be rolled over for future value. Payments made to named executive officers in fiscal year 2007 were for performance units issued in June 2004 and the May 31, 2007 secured debt rating average of A+, stable outlook, which has a value of $40 per performance unit. There are three active long-term incentive plans in which named executive officers are participants. Performance units issued to named executive officers on June 1, 2005 will have a value based on bond ratings in place on May 31, 2008; performance units issued to named executive officers on June 1, 2006 will have a value based on bond ratings in place on May 31, 2009; and performance units issued to named executive officers on June 1, 2007 will have a value based

on bond ratings in place on May 31, 2010. The methodology for determining the number of performance units issued to named executive officers for all active long-term incentive plans is consistent with the process described above.

*Authorization and Payment of Incentive Compensation; Use of Discretion*
The Board of Directors reviews corporate performance and authorizes the payment of both short- and long-term incentive compensation based on that performance. Payment is at the discretion of the Board of Directors. If the Board of Directors authorizes short-term incentive payment, the amount of such payment is determined solely upon corporate performance measures established at the start of the fiscal year. Board of Directors authorization of long-term incentive payment is made based upon the bond ratings in place at the end of the third fiscal year, the value of the performance units as established at the start of the three-year plan cycle and based upon the formula outlined in the plan. Board of Directors authorization of the short-term incentive payment is made after audited financial statements are issued to ensure financial objectives have been accurately measured.

*Benefits*
CFC maintains a health and welfare program in which the named executive officers participate that is available to all employees of CFC. This includes medical, dental and vision insurance, flexible spending accounts, short- and long-term disability, life insurance, 401(k) program, pension plan (discussed below) and other voluntary insurance programs. CFC's goals are to provide benefit programs that are market competitive and that promote the attraction and retention of qualified employees, including executives.

The 401(k) Pension Plan is a company matching defined contribution plan available to all employees. CFC will match up to 3% of base salary with a minimum 2% employee contribution. Named executive officers' contributions to the 401(k) Pension Plan are limited by Internal Revenue Service ("IRS") regulations, capped at $15,500 for 2007 (plus an additional $5,000 catch up contribution for named executive officers over 50 years of age).

An important retention tool is CFC's defined benefit pension plan, the Retirement Security Plan. CFC participates in a multiple employer pension plan managed by National Rural Electric Cooperative Association ("NRECA"). We balance the effectiveness of this plan as a compensation and retention tool with the cost of providing the benefit. The pension plan is a qualified plan in which all employees are eligible to participate upon one year of service, and allows employees to retire with unreduced benefits at age 62. The value of the pension benefit is determined by base pay only and does not include other cash compensation. For more information on the NRECA Retirement Security Plan, see the Pension Benefits Table and accompanying narrative below.

CFC also offers as a component of the pension plan, through NRECA, a Pension Restoration Plan to a select group of management, including the named executive officers, to increase their retirement benefits above amounts available under the Retirement Security Pension Plan, which is restricted by IRS limitations on annual pay levels. The Pension Restoration Plan restores the value of the Retirement Security Plan for named executive officers to the level it would be if the IRS limits on annual pay were not in place. Unlike the pension plan, the Pension Restoration Plan is an unfunded, unsecured obligation of CFC and is not qualified for tax purposes.

The Pension Restoration Plan was previously composed of both a severance pay plan and a deferred compensation plan. In accordance with IRS regulation 409(a), the severance pay plan was frozen as of December 31, 2005. All pension restoration earned as of January 1, 2006 is earned under the pension restoration deferred compensation plan, subject to risk of forfeiture. For more information on the Pension Restoration Plan, see the Pension Benefits Table and accompanying narrative below.

As an additional retention tool designed to assist named executive officers in deferring compensation for use in retirement, each named executive officer is also eligible to participate in the Company's non-qualified 457(b) Deferred Compensation savings plan. Contributions to the plan are limited by the IRS. The 2007 cap for contributions is $15,500. There is no CFC contribution to the deferred compensation plan.

*Other Compensation*
We provide our named executive officers with other benefits, as reflected in the All Other Compensation column in the Summary Compensation Table below, that we believe are reasonable and consistent with CFC's compensation philosophy. These benefits contribute to CFC's ability to provide named executives a competitive total compensation package. CFC does not provide significant perquisites or personal benefits to the named executive officers. All named executive officers may receive an annual executive physical at their discretion.

The Executive Committee considers perquisites for the CEO in connection with its annual review of the CEO's total compensation package described above. The perquisites authorized are limited to Mr. Petersen, our Chief Executive Officer, receiving an annual vehicle allowance as well as an annual spousal air travel allowance. Prior to 2007, Mr. Petersen received reimbursement for spousal air travel and had the use of a company owned and maintained vehicle. To provide these

perquisites in a more efficient fashion, in 2007, the Board of Directors decided to provide these perquisites through annual allowances rather than through reimbursement or use of company owned vehicle. The amount of the vehicle and spousal air travel perquisites will be authorized annually by the Board of Directors. Amounts are determined based on the estimated cost for operation and maintenance of a vehicle and the anticipated cost of air travel by the CEO's spouse.

*Employment Agreements*

CFC's Chief Executive Officer, Mr. Petersen, has an employment agreement in place, dated March 1, 2004 in which CFC agrees to employ Mr. Petersen as Chief Executive Officer through February 28, 2009 (with automatic one year extensions unless either party objects).

Pursuant to a separate independent contractor agreement effective as of July 22, 2004, Mr. Petersen has agreed to provide service to RTFC for a period coterminous to the CFC agreement that is automatically extended at each March 1 after 2009, for an additional year unless RTFC or Mr. Petersen does not wish to extend the term of the contractor agreement with RTFC.

For details of the employment agreements for Mr. Petersen see "Employment Contracts" below.

Other named executive officers do not have employment, severance or change of control agreements, with the exception of a severance agreement for Mr. John Evans, CFC's Senior Vice President, Operations. As part of Mr. Evans' offer of employment in 1997, and in order to retain his services, CFC agreed that in the event of involuntary termination of employment, excepting an act of malfeasance or fraud, CFC shall pay Mr. Evans severance at the latest base compensation level for a period of nine months, including earned incentive pay and benefits. See "Termination of Employment and Change-in-Control Agreements" below.

**Compensation Committee Report**

The Compensation Committee of the Board of Directors oversees CFC's compensation program on behalf of the Board. In fulfilling its oversight responsibilities, the Compensation Committee reviewed and discussed with management the Compensation Discussion and Analysis set forth in this Form 10-K. Based upon this review and discussion, the Compensation Committee recommended to the Board of Directors that the Compensation Discussion and Analysis be included in this Form 10-K.

> Submitted by the Compensation Committee
> Terryl Jacobs
> Roger Arthur
> Darryl Schriver
> Steven J. Haaven
> Jim Herron
> Reuben McBride
> J. David Wasson, Jr.

67

*Summary Compensation Table*

The summary compensation table below sets forth the aggregate compensation for the year ended May 31, 2007 earned by the named executive officers and two additional executive officers of the Company that meet the definition of related persons pursuant to SEC disclosure requirements.

| Name and Principal Position | Year | Salary | Non-Equity Incentive Plan Compensation (1) | Change in Pension Value and Non-qualified Deferred Compensation Earnings (2) | All Other Compensation (3) | Total |
|---|---|---|---|---|---|---|
| Sheldon C. Petersen<br>Governor & CEO | 2007 | $ 643,125 | $    204,212 | $    428,799 | $    132,577 | $    1,408,713 |
| Steven L. Lilly<br>Senior Vice President &<br>Chief Financial Officer | 2007 | 364,000 | 117,513 | 266,788 | 50,938 | 799,239 |
| John J. List<br>Senior Vice President of<br>Member Services and<br>General Counsel | 2007 | 364,000 | 113,233 | 477,364 | 51,830 | 1,006,427 |
| John T. Evans<br>Senior Vice President of<br>Operations | 2007 | 364,000 | 113,233 | 146,285 | 16,833 | 640,351 |
| Lawrence Zawalick<br>Senior Vice President of<br>RTFC | 2007 | 265,500 | 85,507 | 147,479 | 46,494 | 544,980 |
| Richard E. Larochelle (4)<br>Senior Vice President of<br>Corporate Relations | 2007 | 265,500 | 85,507 | 161,864 | 18,582 | 531,452 |
| John. M. Borak (4)<br>Senior Vice President of<br>Credit Risk Management | 2007 | 233,500 | 75,927 | - | 10,860 | 320,287 |

(1) Includes amounts earned during fiscal year 2007 under the long-term and short-term incentive plans. Payments under the short-term incentive plan are subject to approval by the Board of Directors at a date subsequent to the filing of this Form 10-K.

(2) Represents the change in the net present value of the accumulated pension benefit under the Company's multi-employer defined benefit pension plan during the year. For Mr. Borak, change in pension value was a reduction of $122,189 as a result of a distribution of $228,679 during fiscal year 2007.

(3) For Mr. Petersen, includes $18,595 of perquisites comprised of $9,674 for personal use of vehicle and $8,921 for spousal travel. Both amounts are calculated based on a combination of incremental aggregate costs to the Company incurred prior to January 1, 2007, after which Mr. Petersen starting receiving an annual perquisite allowance for these costs. Additionally, for Mr. Petersen, includes $60,415 related to RTFC contributions to the RTFC deferred compensation plan. All other compensation also includes $38,055, $37,163, $38,055, $3,058, $34,657, and $6,745 related to the termination of a retirement benefit plan for Mr. Petersen, Mr. Lilly, Mr. List, Mr. Evans, Mr. Zawalick and Mr. Larochelle, respectively. The remaining amounts included in this column represent sick leave incentive bonuses and Company contributions to its 401(k) defined contribution plan.

(4) These executives are "related persons" as defined by the SEC's disclosure requirements and are included in the summary compensation table as we generally treat all of our executive officers equally.

*Grants of Plan-Based Awards*

The Company has a long-term and a short-term incentive plan for all employees under which executive officers may receive a bonus of up to 37.5% and 25% of salary, respectively. The incentive payouts are based on the executive officer's salary at the date the program becomes effective. See the "Compensation Discussion and Analysis" above for further information on these incentive plans.

The following table contains the estimated possible payouts under the Company's short-term incentive plan and possible future payouts for grants under the Company's long-term incentive plan during the year ended May 31, 2007.

| | | Estimated Future Payouts Under Non-Equity Incentive Plan Awards | | |
| | Grant date | Threshold | Target | Max |
|---|---|---|---|---|
| Petersen | | | | |
| Long-term Incentive Plan (1) | 6/1/06 | $    - | $  63,240 | $237,150 |
| Short-term Incentive Plan (2) (3) | 6/1/06 | - | 150,732 | 160,781 |
| Lilly | | | | |
| Long-term Incentive Plan (1) | 6/1/06 | - | 36,400 | 136,500 |
| Short-term Incentive Plan (2) (3) | 6/1/06 | - | 85,313 | 91,000 |
| List | | | | |
| Long-term Incentive Plan (1) | 6/1/06 | - | 36,400 | 136,500 |
| Short-term Incentive Plan (2) (3) | 6/1/06 | - | 85,313 | 91,000 |
| Evans | | | | |
| Long-term Incentive Plan (1) | 6/1/06 | - | 36,400 | 136,500 |
| Short-term Incentive Plan (2) (3) | 6/1/06 | - | 85,313 | 91,000 |
| Zawalick | | | | |
| Long-term Incentive Plan (1) | 6/1/06 | - | 26,560 | 99,600 |
| Short-term Incentive Plan (2) (3) | 6/1/06 | - | 62,227 | 66,375 |
| Larochelle | | | | |
| Long-term Incentive Plan (1) | 6/1/06 | - | 26,560 | 99,600 |
| Short-term Incentive Plan (2) (3) | 6/1/06 | - | 62,227 | 66,375 |
| Borak | | | | |
| Long-term Incentive Plan (1) | 6/1/06 | - | 23,360 | 87,600 |
| Short-term Incentive Plan (2) (3) | 6/1/06 | - | 54,727 | 58,375 |

(1) Target payouts were calculated using unit values of $40 based on CFC's projected average long-term secured credit rating of A+/stable at May 31, 2009.
(2) No units are granted by the short-term incentive plan, however the program was established on June 1, 2006 and was paid out based on performance at May 31, 2007.
(3) Target represents 23.4% of May 31, 2007 base salary based on the estimated achievement of 93.75% of performance targets established at the beginning of the fiscal year and evaluated at May 31, 2007 as shown in the "Summary Compensation Table" above.

The Board of Directors has approved a new long-term incentive plan with terms similar to the plan in effect during fiscal year 2007.  As a result, the executives included in the chart above received grants on June 1, 2007 with a payout to be determined on May 31, 2010.

**Employment Contracts**

Pursuant to an employment agreement effective as of March 1, 2004, CFC has agreed to employ Mr. Petersen as Chief Executive Officer through February 28, 2009 (with automatic one-year extensions unless either party objects) at no less than his base salary at the time, or $675,000 per annum, plus such incentive payments (if any) as may be awarded him.  Certain payments have been agreed to in the event of Mr. Petersen's termination other than for cause; for example, Mr. Petersen leaving for good reason, disability or termination of his employment due to death.  See "Termination of Employment and Change-In-Control Arrangements" below for information on these amounts.

Pursuant to a separate independent contractor agreement effective as of July 22, 2004, Mr. Petersen has agreed to provide service to RTFC for a period coterminous to the CFC agreement that is automatically extended at each March 1, after 2009, for an additional year unless RTFC or Mr. Petersen does not wish to extend or further extend the term of the contractor agreement with RTFC.  As compensation, RTFC must credit $30,000 to a deferred compensation account on January 1 of each year of the term.  See the "Nonqualified Deferred Compensation Table" and accompanying narrative below.

69

*Pension Benefits Table*

The Company is a participant in a multi-employer defined benefit pension plan that is administered by NRECA. Under the plan, the Company's employees are entitled to receive annually, under a 50% joint and surviving spouse annuity, 1.90% of the average of their five highest base salaries during their last ten years of employment, multiplied by the number of years of participation in the plan. The normal retirement age under the plan is 62. The following table contains the years of service and the present value of the accumulated benefit for the Company's executive officers at May 31, 2007.

| Name | Plan Name | Number of Years Credited Service (2) | Present Value of Accumulated Benefit | Payments During Last Fiscal Year |
|------|-----------|-------------------------------------|--------------------------------------|----------------------------------|
| Petersen | NRECA Retirement Security Plan (1) | 23.75 | $2,685,490 | $ - |
| Lilly | NRECA Retirement Security Plan (1) | 22.58 | 1,798,937 | - |
| List | NRECA Retirement Security Plan (1) | 34.42 | 2,952,668 | - |
| Evans | NRECA Retirement Security Plan (1) | 8.50 | 625,898 | - |
| Zawalick | NRECA Retirement Security Plan (1) | 26.67 | 1,046,068 | - |
| Larochelle | NRECA Retirement Security Plan (1) | 23.00 | 1,018,688 | - |
| Borak (2) | NRECA Retirement Security Plan (1) | 0.92 | 57,554 | 228,679 |

(1) CFC is a participant in a multiple employer pension plan. Credited years of service, therefore, included not only years of service with CFC, but also years of service with another cooperative participant in the multiple employer pension plan. Mr. Larochelle has 12 credited years of service with another cooperative in addition to CFC. All other named executive have credited years of service only with CFC.

(2) At May 31, 2007, Mr. Borak is the only listed executive that is eligible for retirement based on the required age of 62. Mr. Borak received distributions of $226,796 as part of a quasi-retirement and $1,884 as a result of no longer being at risk of forfeiture during the year ended May 31, 2007. Mr. Borak earned an additional $1,534 during the year ended May 31, 2007 as a result of no longer being at risk of forfeiture which had not yet been paid at May 31, 2007.

*Nonqualified Deferred Compensation*
*CFC Deferred Compensation Plan*

The CFC deferred compensation plan is a "nonqualified" deferred compensation savings program for the senior executive group and other selected management or highly compensated employees designated by CFC. Participants may elect to defer up to the lesser of 100% of their compensation for the year or the applicable IRS statutory dollar limit in effect for that year. Compensation for the purposes of this plan is defined as the total amount of compensation, including incentive pay, if any paid by CFC.

The accounts are credited with "earnings" based on the participants' selection of available investment options (currently, eight options) within the Homestead Funds. When a participant ceases to be an employee for any reason, distribution of the account will generally be made in 15 substantially equal annual payments beginning approximately 60 days after termination (unless an election is made to change the form and timing of the payment). The participant may elect either a single lump sum or substantially equal annual installments paid over no less than two and no more than 14 years. The amount paid is based on the accumulated value of the account.

*RTFC Deferred Compensation Plan*

RTFC contributes a sum of $30,000 annually to a deferred compensation account for Mr. Petersen on January 1 of each year that Mr. Petersen is contracted by RTFC. Interest will be credited to the account on December 31 of each such year at a rate equal to CFC's 20-year medium-term note rate on that date. On December 31, 2006, the applicable interest rate was 5.84%. The RTFC Board of Directors has approved that Mr. Petersen, at his option, may request that the deferred component of his compensation be directed into alternative investment vehicles that could offer the opportunity to earn a return that is greater than the CFC 20-year MTN rate. Mr. Petersen has not yet chosen to exercise that option. If Mr. Petersen's service to RTFC is terminated by RTFC other than for cause, or by Mr. Petersen for any reason, or by his death or disability, the account will be deemed continued for the remainder of the term of the contractor agreement with RTFC (but in no event less than six months nor more than a year), interest will be credited on a proportional basis for the calendar year during which the continuation ends and the balance in the account will be paid to Mr. Petersen or his beneficiaries in a lump sum.

The following table summarizes information related to the nonqualified deferred compensation plans in which the named executive officers were eligible to participate during the year ended May 31, 2007.

| Name | Executive Contributions in Last FY (1) | Registrant Contributions in Last FY | Aggregate Earnings in Last FY | Aggregate Withdrawals/ Distributions | Aggregate Balance at Last FYE |
|------|------|------|------|------|------|
| Petersen | | | | | |
| CFC Deferred Compensation | $15,208 | $      - | $    53,207 | $- | $286,045 |
| RTFC Deferred Compensation (2) | - | 60,415 | - | - | 581,233 |
| | | | | | |
| Lilly | | | | | |
| CFC Deferred Compensation | 15,208 | - | 31,569 | - | 181,402 |
| | | | | | |
| List | | | | | |
| CFC Deferred Compensation | 8,208 | - | 8,862 | - | 53,881 |
| | | | | | |
| Evans | | | | | |
| CFC Deferred Compensation | 12,250 | - | 19,017 | - | 120,084 |
| | | | | | |
| Zawalick | | | | | |
| CFC Deferred Compensation | 7,683 | - | 17,594 | - | 97,495 |
| | | | | | |
| Larochelle | | | | | |
| CFC Deferred Compensation | 15,208 | - | 7,679 | - | 201,100 |
| | | | | | |
| Borak | | | | | |
| CFC Deferred Compensation | 25,731 | - | 1,290 | - | 39,718 |

(1) Executive contributions are also included in salary in the summary compensation table on page 68.
(2) If Mr. Petersen's employment were terminated at May 31, 2007 without cause or due to death or disability, interest would accrue under the RTFC deferred compensation plan through May 31, 2008 at the CFC 20-year medium-term note rate on December 31, 2006. On December 31, 2006, the applicable interest rate was 5.84% which would result in additional Registrant contributions of $79,643 through May 31, 2008. Company contributions and earnings for fiscal year 2007 are included in all other compensation in the summary compensation table on page 68.

### Director Compensation Table
Directors receive a fixed sum of $4,000 for each of the scheduled board meetings attended and $150 for each conference call attended. Additionally, the directors receive reimbursement for reasonable travel expenses. The fixed amounts are paid following the conclusion of each board meeting or conference call attended. The following chart summarizes the total fees earned by CFC directors during the year ended May 31, 2007.

| Name | Fees Earned | Total |
|------|------|------|
| Terryl Jacobs | $    33,950 | $    33,950 |
| Roger Arthur | 40,550 | 40,550 |
| Darryl Schriver | 39,050 | 39,050 |
| Roger A. Ball | 33,200 | 33,200 |
| Ronald Bergh | 20,450 | 20,450 |
| Raphael A. Brumbeloe | 8,150 | 8,150 |
| Darlene H. Carpenter | 28,900 | 28,900 |
| Cletus Carter | 34,300 | 34,300 |
| Delbert Cranford | 8,150 | 8,150 |
| Jimmy Ewing Jr. | 8,150 | 8,150 |
| Harold Foley | 33,050 | 33,050 |
| Steven J. Haaven | 34,250 | 34,250 |
| Gary Harrison | 32,600 | 32,600 |
| Craig A. Harting | 32,900 | 32,900 |
| Jim Herron | 32,600 | 32,600 |
| Martin Hillert, Jr. | 33,200 | 33,200 |
| Tom Kirby | 32,900 | 32,900 |
| William A. Kopacz | 32,900 | 32,900 |
| Reuben McBride | 33,950 | 33,950 |
| Gale Rettkowski | 33,050 | 33,050 |
| Ronald P. Salyer | 35,900 | 35,900 |
| R. Wayne Stratton | 8,300 | 8,300 |

| | | |
|---|---|---|
| J. David Wasson, Jr. | 33,050 | 33,050 |
| Charles Wayne Whitaker | 32,750 | 32,750 |
| Bobby W. Williams | 28,600 | 28,600 |
| Jack F. Wolfe, Jr. | 24,600 | 24,600 |
| F. E.  Wolski | 4,150 | 4,150 |

*Termination of Employment and Change-In-Control Arrangements*

Sheldon Petersen, CEO, and John Evans, SVP, Operations, each have an executive agreement with CFC under which Mr. Petersen and Mr. Evans may continue to receive base salary and benefits in certain circumstances after resignation or termination of employment. No other named executive officers have termination or change-in-control agreements.

Under the executive agreement with Mr. Petersen, if CFC terminates his employment without cause, or Mr. Petersen terminates his employment for good reason, CFC is obligated to pay him a lump sum payment equal to the product of three times his annual base salary at the rate in effect at the time of termination, and his short-term incentive award, if any, for the previous year (or an amount equal to the annual bonus for 2003). Definitions of "cause" and "good reason" can be found in the agreement on file. The compensation payable to Mr. Petersen for termination without cause, assuming a termination date of May 31, 2007 is $2,380,782. The actual payments due on a termination without cause on different dates could materially differ from this estimate.

Under the executive agreement for Mr. Petersen with RTFC, if RTFC terminates his employment without cause, or if Mr. Petersen terminates his service to RTFC, or by his death or disability, RTFC will pay a lump sum payment equivalent to the amount in his deferred compensation account. However, the account will be deemed to be continued in effect for the lesser of (i) a period of 12 months or (ii) the remaining period of the Term of Service of the executive agreement prior to such termination, but in no case less than six months (the "Extended Period") and all credits (payment and interest) outlined in the agreement shall continue to be made. If the Extended Period ends other than on a December 31st, when normal interest calculations are made and added to the account, RTFC shall further credit the account with simple interest for the period from January 1 to the end of the Extended Period at the same rate that was used to credit interest on the prior December 31st. Payment is due to Mr. Petersen within 15 days of the end of the Extended Period. For details on the value of this compensation see the "Nonqualified Deferred Compensation Table".

Under the executive agreement for Mr. Petersen with RTFC, if RTFC terminates the service of the executive for cause, the term of service shall terminate immediately thereafter, and Mr. Petersen shall not be entitled to any payment with respect to the account.

Under the executive agreement with Mr. Evans, if CFC terminates his employment without cause, Mr. Evans would receive a continuation for nine months of his annual base salary in effect at the time of termination, incentive compensation for the additional nine month period, and nine months payment of all health and welfare and retirement plans. The compensation payable to Mr. Evans for termination without cause, assuming a termination date of May 31, 2007 is $385,219. The actual payments due on a termination without cause on different dates could materially differ from this estimate.

The estimates do not include amounts to which the named executive officers would be entitled to upon termination, such as base salary to date, unpaid bonuses earned, unreimbursed expenses, paid vacation time and any earned benefits under company plans.

*Compensation Committee Interlocks and Insider Participation*

During the year ended May 31, 2007, there were no compensation committee interlocks or insider participation related to executive compensation.

**Item 12.          Security Ownership of Certain Beneficial Owners and Management.**

Inapplicable.

**Item 13.          Certain Relationships and Related Transactions.**

*Review and Approval of Transactions with Related Persons*

The Board of Directors has adopted a policy for review and approval in writing and monitoring of transactions involving CFC and "related persons" (directors and executive officers or their immediate family members). The policy covers any related person transaction that meets the minimum threshold for disclosure under SEC disclosure requirements (generally, transactions involving amounts exceeding $120,000 in which a related person has a direct or indirect material interest).

*Policy and Procedures*

- Each director and executive officer is required to promptly notify the General Counsel in writing of any material interest that such person or an immediate family member of such person had, has or will have in a related person transaction.

- The General Counsel of CFC is responsible for the review, approval or ratification of any related person transaction, unless the General Counsel refers any related person transaction to the Board of Directors for its review, approval or ratification. If such related person transaction involves a director, the director may not participate in the deliberations or vote with respect to such approval or ratification.

- The General Counsel will notify the Board of Directors at each regularly scheduled Board meeting of any action taken by the General Counsel with respect to a related person transaction since the last regularly scheduled meeting of the Board of Directors.

- In the event the General Counsel becomes aware of a related person transaction that has not been approved under the Board policy prior to its consummation, the General Counsel will notify the Board of Directors. The Board of Directors will consider all of the relevant facts and circumstances with respect to such transaction, and will evaluate all options available to CFC, including ratification, revision or termination of such transaction, and shall take such course of action as the Board of Directors deems appropriate under the circumstances.

- The General Counsel will determine whether a related person has a material interest in a transaction on the basis of the significance of the information to investors in CFC securities in light of all the circumstances. Factors to be considered in determining whether a related person's interest in a transaction is material may include the importance of the interest to the related person (financially or otherwise), the relationship of the related person to the transaction and of related persons with each other, and the dollar amount involved in the transaction.

- The General Counsel, and where applicable, the Board of Directors, will not approve or ratify a related person transaction unless the General Counsel, or the Board, as the case may be, reasonably determines, based on a review of the available information, that the transaction is fair and reasonable to CFC and consistent with the best interests of CFC.

- Factors to be taken into account in making the determination may include (i) the business purpose of the transaction, (ii) whether the transaction is entered into on an arms-length basis on terms fair to CFC, and (iii) whether such a transaction would violate other CFC policies.

### *Related Person Transactions*

See the Summary Compensation Table in Item 11 for a description of compensation paid to Rich Larochelle and John Borak, CFC's executive officers who are not named executive officers, but meet the definition of a "related person" as described above.

### Item 14.    Principal Accountant Fees and Services.

The following table summarizes the aggregate professional fees for the audit of the financial statements for the years ended May 31, 2007 and 2006 and fees for other services during that period by Deloitte & Touche, LLP.

|  | 2007 | 2006 |
|---|---|---|
| Audit fees (1) | $ 1,636,815 | $ 1,550,989 |
| Audit-related fees (2) | - | 36,468 |
| Tax fees (3) | 29,650 | 18,559 |
| All other fees (4) | 33,000 | 7,000 |
| Total | $ 1,699,465 | $ 1,613,016 |

(1) Audit fees in 2007 and 2006 consist of fees for the audit of the consolidated financial statements of CFC, including RTFC and NCSC in accordance with FIN 46(R), totaling $1,205,928 and $586,835, respectively, fees for the preparation of the stand-alone financial statements for RTFC and NCSC totaling $242,408 and $91,000, respectively, and fees for the audit of management's assessment of the effectiveness of CFC's internal control over financial reporting in compliance with Section 404 of the Sarbanes-Oxley Act of 2002 totaling $24,900 and $773,154, respectively. Additionally, audit fees in 2007 and 2006 include comfort letter fees and for 2007, consents related to debt issuances and compliance work required by the independent auditors.
(2) Audit-related fees in 2006 consist of initial consultation on compliance with Section 404 of the Sarbanes-Oxley Act of 2002.
(3) Tax fees consist of assistance with matters related to tax compliance and consulting.
(4) These fees relate to the audit of a trust serviced by CFC.

CFC's Audit Committee is solely responsible for the nomination, approval, compensation, evaluation and discharge of the independent public accountants. The independent registered public accountants report directly to the Audit Committee and the Audit Committee is responsible for the resolution of disagreements between management and the independent registered public accountants. Consistent with Securities and Exchange Commission requirements, the Audit Committee has adopted a policy to pre-approve all audit and permissible non-audit services provided by the independent registered public accountants. Under the policy, the Audit Committee's pre-approval for permissible non-audit services is not required if all such services 1) do not aggregate to more than five percent of total revenue paid to the independent registered public accountants in the fiscal year when services are provided, 2) were not recognized as non-audit services at the time of the engagement and 3) are promptly brought to the attention of the Audit Committee and approved by the Audit Committee prior to the completion of the audit. This policy was followed during the years ended May 31, 2007 and 2006. CFC's independent registered public accountants for the current fiscal year have been appointed by the Audit Committee.

74

## PART IV

**Item 15.**                    **Exhibits and Financial Statement Schedules.**

(a)    **Documents filed as a part of this report.**

1.    **Consolidated financial statements**                                                    Page

Report of Independent Registered Public Accounting Firm                              79
Consolidated Balance Sheets                                                          80
Consolidated Statements of Operations                                               82
Consolidated Statements of Changes in Equity                                        83
Consolidated Statements of Cash Flows                                               84
Notes to Consolidated Financial Statements                                          86

2.    **Financial statement schedules**

All schedules are omitted because they are not required, are inapplicable or the information is included in the financial statements or notes thereto.

3.    **Exhibits**

3.1  -  Articles of Incorporation.  Incorporated by reference to Exhibit 3.1 to Registration Statement No. 2-46018, filed October 12, 1972.

3.2  -  Amended Bylaws as approved by CFC's board of directors and members on March 1, 2005.  Incorporated by reference to Exhibit 3.2 to CFC's Form 10-Q filed on April 14, 2005.

4.1  -  Form of Capital Term Certificate.  Incorporated by reference to Exhibit 4.3 to Registration Statement No. 2-46018 filed October 12, 1972.

4.2  -  Indenture dated as of February 15, 1994, between the Registrant and U.S. Bank National Association, successor trustee.  Incorporated by reference to Exhibit 4.3 from the report on Form 8-K filed by CFC on June 14, 1994.

4.3  -  Revolving Credit Agreement dated as of March 22, 2006 for $1,000,000,000 maturing on March 22, 2011.  Incorporated by reference to Exhibit 4.3 to CFC's Form 10-Q filed on April 14, 2006.

4.4  -  Revolving Credit Agreement dated as of March 16, 2007 for $1,125,000,000 maturing on March 16, 2012.  Incorporated by reference to Exhibit 4.4 to CFC's Form 10-Q filed on April 12, 2007.

4.5  -  Revolving Credit Agreement dated as of March 16, 2007 for $1,125,000,000 maturing on March 14, 2008.  Incorporated by reference to Exhibit 4.5 to CFC's Form 10-Q filed on April 12, 2007.

4.6  -  Indenture between CFC and Mellon Bank, N.A., as Trustee. Incorporated by reference to Exhibit 4.6 to Registration Statement on Form S-3 filed on October 15, 1996 (Registration No. 33-64231).

4.7  -  Indenture between CFC and Chemical Bank, as Trustee.  Incorporated by reference to Exhibit 4.7 to Amendment No. 1 to Registration Statement on Form S-3 filed on December 15, 1987 (Registration No. 33-34927).

4.8  -  First Supplemental Indenture between CFC and Chemical Bank, as Trustee.  Incorporated by reference to Exhibit 4.8 to Registration Statement on Form S-3 filed on October 1, 1990 (Registration No. 33-58445).

4.9  -  Bond Purchase Agreement between the Registrant, Federal Financing Bank and Rural Utilities Service dated as of April 28, 2006 for up to $1,500,000,000.

4.10 -  Series B Bond Guarantee Agreement between the Registrant and the Rural Utilities Service dated as of April 28, 2006 for up to $1,500,000,000.

4.11 -  Pledge Agreement dated as of April 28, 2006, between the Registrant, the Rural Utilities Service and U.S. Bank Trust National Association.

4.12 -  Series B Future Advance Bond from the Registrant to the Federal Financing Bank dated as of April 28, 2006 for up to $1,500,000,000 maturing on July 15, 2029.

4.13 -  Bond Purchase Agreement between the Registrant, Federal Financing Bank and Rural Utilities Service dated as of June 14, 2005 for up to $1,000,000,000.  Incorporated by reference to Exhibit 4.12 to CFC's Form 10-K filed on August 24, 2005.

4.14 -  Series A Bond Guarantee Agreement between the Registrant and the Rural Utilities Service dated as of June 14, 2005 for up to $1,000,000,000.  Incorporated by reference to Exhibit 4.13 to CFC's Form 10-K filed on August 24, 2005.

4.15 -  Pledge Agreement dated as of June 14, 2005, between the Registrant, the Rural Utilities Service and U.S. Bank Trust National Association.  Incorporated by reference to Exhibit 4.14 to CFC's Form 10-K filed on August 24, 2005.

4.16 -  Series A Future Advance Bond from the Registrant to the Federal Financing Bank dated as of June 14, 2005 for up to $1,000,000,000 maturing on July 15, 2028.  Incorporated by reference to Exhibit 4.15 to CFC's Form 10-K filed on August 24, 2005.

| 4.17 | - | Note Purchase Agreement dated as of July 28, 2005 for $500,000,000 between the Registrant and Federal Agricultural Mortgage Corporation.  Incorporated by reference to Exhibit 4.16 to CFC's Form 10-K filed on August 24, 2005. |
|---|---|---|
| 4.18 | - | Pledge Agreement dated as of July 28, 2005, between the Registrant, Federal Agricultural Mortgage Corporation and U.S. Bank Trust National Association.  Incorporated by reference to Exhibit 4.17 to CFC's Form 10-K filed on August 24, 2005. |
| 4.19 | - | Registration Rights Agreement dated as of July 28, 2005 between the Registrant and Federal Agricultural Mortgage Corporation.  Incorporated by reference to Exhibit 4.18 to CFC's Form 10-K filed on August 24, 2005. |
| 4.20 | - | 4.656% Senior Notes due 2008 dated as of July 29, 2005 from the Registrant to Federal Agricultural Mortgage Corporation.  Incorporated by reference to Exhibit 4.19 to CFC's Form 10-K filed on August 24, 2005. |
|  | - | Registrant agrees to furnish to the Commission a copy of all other instruments defining the rights of holders of its long-term debt upon request. |
| 10.1 | - | Plan Document for CFC's Deferred Compensation Program amended and restated as of July 1, 2003.  Incorporated by reference to Exhibit 10.1 to CFC's Form 10-K filed on August 24, 2005. |
| 10.2 | - | Employment Contract between CFC and Sheldon C. Petersen, dated as of March 1, 2004.  Incorporated by reference to Exhibit 10.2 to CFC's Form 10-K filed on August 20, 2004. |
| 10.3 | - | Supplemental Benefit Agreement between RTFC and Sheldon C. Petersen, dated as of July 22, 2004.  Incorporated by reference to Exhibit 10.3 to CFC's Form 10-K filed on August 20, 2004. |
| 10.4 | - | Employment Contract between CFC and John T. Evans, dated as of September 17, 1997 including termination of employment arrangement. |
| 12 | - | Computations of ratio of margins to fixed charges. |
| 14.1 | - | Ethics Policy for CEO and Senior Financial Officers.  Incorporated by reference to Exhibit 14.1 to CFC's Form 10-Q filed on October 14, 2004. |
| 23 | - | Consent of Deloitte & Touche LLP. |
| 31.1 | - | Certification of the Chief Executive Officer required by Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | - | Certification of the Chief Financial Officer required by Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | - | Certification of the Chief Executive Officer required by Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | - | Certification of the Chief Financial Officer required by Section 906 of the Sarbanes-Oxley Act of 2002. |

76

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in the County of Fairfax, Commonwealth of Virginia, on the 27th day of August 2007.

NATIONAL RURAL UTILITIES COOPERATIVE
FINANCE CORPORATION

By:    /s/  SHELDON C. PETERSEN
Sheldon C. Petersen
*Governor and Chief Executive Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the date indicated.

| Signature | Title | Date |
|---|---|---|
| /s/  SHELDON C. PETERSEN<br>**Sheldon C. Petersen** | Governor and Chief Executive Officer | |
| /s/  STEVEN L. LILLY<br>**Steven L. Lilly** | Senior Vice President and Chief Financial Officer | |
| /s/  STEVEN L. SLEPIAN<br>**Steven L. Slepian** | Vice President and Controller (Principal Accounting Officer) | |
| /s/  TERRYL JACOBS<br>**Terryl Jacobs** | President and Director | |
| /s/  ROGER ARTHUR<br>**Roger Arthur** | Vice President and Director | |
| /s/  DARRYL SCHRIVER<br>**Darryl Schriver** | Secretary-Treasurer and Director | August 27, 2007 |
| /s/  ROGER A. BALL<br>**Roger A. Ball** | Director | |
| /s/  RAPHAEL A. BRUMBELOE<br>**Raphael A. Brumbeloe** | Director | |
| /s/  DELBERT CRANFORD<br>**Delbert Cranford** | Director | |
| /s/  JIMMY EWING, JR.<br>**Jimmy Ewing, Jr.** | Director | |
| /s/  HAROLD FOLEY<br>**Harold Foley** | Director | |
| /s/  STEVEN J. HAAVEN<br>**Steven J. Haaven** | Director | |
| /s/  GARY HARRISON<br>**Gary Harrison** | Director | |
| /s/  CRAIG A. HARTING<br>**Craig A. Harting** | Director | |

77

| Signature | Title | Date |
|---|---|---|
| /s/  JIM HERRON<br>Jim Herron | Director | |
| /s/  MARTIN HILLERT, JR.<br>Martin Hillert, Jr. | Director | |
| /s/  TOM KIRBY<br>Tom Kirby | Director | |
| /s/  WILLIAM A. KOPACZ<br>William A. Kopacz | Director | |
| /s/  REUBEN MCBRIDE<br>Reuben McBride | Director | |
| /s/  GALE RETTKOWSKI<br>Gale Rettkowski | Director | August 27, 2007 |
| /s/  RONALD P. SALYER<br>Ronald P. Salyer | Director | |
| /s/  R. WAYNE STRATTON<br>R. Wayne Stratton | Director | |
| /s/  J. DAVID WASSON, JR.<br>J. David Wasson, Jr. | Director | |
| /s/  CHARLES WAYNE WHITAKER<br>Charles Wayne Whitaker | Director | |
| /s/  JACK F. WOLFE, JR.<br>Jack F. Wolfe, Jr. | Director | |
| /s/  F. E. WOLSKI<br>F. E. Wolski | Director | |

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Members of
National Rural Utilities Cooperative Finance Corporation
Herndon, Virginia

We have audited the accompanying consolidated balance sheets of National Rural Utilities Cooperative Finance Corporation and subsidiaries (the "Company") as of May 31, 2007 and 2006, and the related consolidated statements of operations, changes in equity, and cash flows for each of the three years in the period ended May 31, 2007.  These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting.  Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting.  Accordingly, we express no such opinion.  An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of National Rural Utilities Cooperative Finance Corporation and subsidiaries as of May 31, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended May 31, 2007, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1(w), the accompanying 2006 and 2005 consolidated financial statements have been restated.

/s/ DELOITTE & TOUCHE LLP

McLean, Virginia
August 27, 2007

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**CONSOLIDATED BALANCE SHEETS**

**May 31, 2007 and 2006**

**(in thousands)**

**A S S E T S**

| | 2007 | 2006 (As restated)* |
|---|---|---|
| Cash and cash equivalents | $ 304,107 | $ 260,338 |
| Loans to members | 18,128,207 | 18,360,905 |
| Less:  Allowance for loan losses | (561,663) | (611,443) |
| Loans to members, net | 17,566,544 | 17,749,462 |
| Accrued interest and other receivables | 291,637 | 317,364 |
| Fixed assets, net | 4,555 | 6,146 |
| Debt service reserve funds | 54,993 | 80,159 |
| Bond issuance costs, net | 45,611 | 51,064 |
| Foreclosed assets | 66,329 | 120,889 |
| Derivative assets | 222,774 | 575,669 |
| Other assets | 18,631 | 18,530 |
| | $ 18,575,181 | $ 19,179,621 |

See accompanying notes.
*See Note 1 (w)

NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION

CONSOLIDATED BALANCE SHEETS

May 31, 2007 and 2006

(in thousands)

LIABILITIES AND EQUITY

| | 2007 | 2006 (As restated)* |
|---|---|---|
| Short-term debt | $ 4,427,123 | $ 5,343,824 |
| Accrued interest payable | 281,458 | 302,959 |
| Long-term debt | 11,295,219 | 10,642,028 |
| Deferred income | 27,990 | 40,086 |
| Guarantee liability | 18,929 | 16,750 |
| Other liabilities | 27,611 | 28,074 |
| Derivative liabilities | 71,934 | 85,198 |
| Subordinated deferrable debt | 311,440 | 486,440 |
| Members' subordinated certificates: | | |
| Membership subordinated certificates | 649,424 | 650,799 |
| Loan and guarantee subordinated certificates | 732,023 | 777,161 |
| Total members' subordinated certificates | 1,381,447 | 1,427,960 |
| Commitments and contingencies | | |
| Minority interest | 21,989 | 21,894 |
| Equity: | | |
| Retained equity | 697,837 | 771,200 |
| Accumulated other comprehensive income | 12,204 | 13,208 |
| Total equity | 710,041 | 784,408 |
| | $ 18,575,181 | $ 19,179,621 |

See accompanying notes.
*See Note 1 (w)

81

## NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION

## CONSOLIDATED STATEMENTS OF OPERATIONS

### (in thousands)

### For the Years Ended May 31, 2007, 2006 and 2005

| | 2007 | 2006 (As restated)* | 2005 (As restated)* |
|---|---|---|---|
| Interest income | $ 1,054,224 | $ 1,007,912 | $ 1,030,853 |
| Interest expense | (996,730) | (975,936) | (942,033) |
| Net interest income | 57,494 | 31,976 | 88,820 |
| Recovery of (provision for) loan losses | 6,922 | (23,240) | (16,402) |
| Net interest income after recovery of (provision for) loan losses | 64,416 | 8,736 | 72,418 |
| Non-interest income: | | | |
| Rental and other income | 1,533 | 2,398 | 5,645 |
| Derivative cash settlements | 86,442 | 80,883 | 78,287 |
| Results of operations of foreclosed assets | 9,758 | 15,492 | 13,024 |
| Gain on sale of building and land | - | 43,431 | - |
| Total non-interest income | 97,733 | 142,204 | 96,956 |
| Non-interest expense: | | | |
| Salaries and employee benefits | (33,817) | (31,494) | (29,417) |
| Other general and administrative expenses | (18,072) | (20,595) | (19,459) |
| Recovery of guarantee liability | 1,700 | 700 | 3,107 |
| Derivative forward value | (79,281) | 28,805 | 25,849 |
| Foreign currency adjustments | (14,554) | (22,594) | (22,893) |
| Loss on sale of loans | (1,584) | - | - |
| Total non-interest expense | (145,608) | (45,178) | (42,813) |
| Income prior to income taxes and minority interest | 16,541 | 105,762 | 126,561 |
| Income taxes | (2,396) | (3,176) | (1,518) |
| Income prior to minority interest | 14,145 | 102,586 | 125,043 |
| Minority interest, net of income taxes | (2,444) | (7,089) | (2,540) |
| Net income | $ 11,701 | $ 95,497 | $ 122,503 |

See accompanying notes.
*See Note 1 (w)

# NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION

## CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY

### (in thousands)

### For the Years Ended May 31, 2007, 2006 and 2005

| | Total | Accumulated Other Comprehensive (Loss) Income | Subtotal Retained Equity | Membership Fees | Unallocated Net Income | Education Fund | Members' Capital Reserve | Patronage Capital Allocated General Reserve Fund | Other |
|---|---|---|---|---|---|---|---|---|---|
| Balance as of May 31, 2004 (As restated) * | $ 692,453 | $ (12,541) | $ 704,994 | $ 993 | $ 219,762 | $ 1,322 | $ 131,296 | $ 497 | $ 351,124 |
| Patronage capital retirement | (77,755) | - | (77,755) | - | - | - | - | - | (77,755) |
| Income prior to income taxes and minority interest (As restated) * | 126,561 | - | 126,561 | - | 10,026 | 778 | 32,771 | - | 82,986 |
| Other comprehensive income (As restated)* | 28,162 | 28,162 | - | - | - | - | - | - | - |
| Income taxes | (1,518) | - | (1,518) | - | (1,518) | - | - | - | - |
| Minority interest | (2,540) | - | (2,540) | - | (2,540) | - | - | - | - |
| Other | (429) | - | (429) | - | - | (900) | - | - | 471 |
| Balance as of May 31, 2005 (As restated) * | $ 764,934 | $ 15,621 | $ 749,313 | $ 993 | $ 225,730 | $ 1,200 | $ 164,067 | $ 497 | $ 356,826 |
| Patronage capital retirement | (72,912) | - | (72,912) | - | - | - | - | - | (72,912) |
| Income prior to income taxes and minority interest (As restated) * | 105,762 | - | 105,762 | - | 10,384 | 780 | - | - | 94,598 |
| Other comprehensive loss (As restated)* | (2,413) | (2,413) | - | - | - | - | - | - | - |
| Income taxes | (3,176) | - | (3,176) | - | (3,176) | - | - | - | - |
| Minority interest | (7,089) | - | (7,089) | - | (7,089) | - | - | - | - |
| Other | (698) | - | (698) | 1 | - | (699) | (7,223) | - | 7,223 |
| Balance as of May 31, 2006 (As restated) * | $ 784,408 | $ 13,208 | $ 771,200 | $ 994 | $ 225,849 | $ 1,281 | $ 156,844 | $ 497 | $ 385,735 |
| Patronage capital retirement | (84,247) | - | (84,247) | - | - | - | - | - | (84,247) |
| Income prior to income taxes and minority interest | 16,541 | - | 16,541 | - | (89,481) | 945 | 1,464 | 1 | 103,612 |
| Other comprehensive loss | (1,004) | (1,004) | - | - | - | - | - | - | - |
| Income taxes | (2,396) | - | (2,396) | - | (2,396) | - | - | - | - |
| Minority interest | (2,444) | - | (2,444) | - | (2,444) | - | - | - | - |
| Other | (817) | - | (817) | 3 | - | (820) | - | - | - |
| Balance as of May 31, 2007 | $ 710,041 | $ 12,204 | $ 697,837 | $ 997 | $ 131,528 | $ 1,406 | $ 158,308 | $ 498 | $ 405,100 |

See accompanying notes.
*See Note 1 (w)

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

**(in thousands)**

**For the Years Ended May 31, 2007, 2006 and 2005**

| | 2007 | 2006 (As restated)* | 2005 (As restated)* |
|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net income | $ 11,701 | $ 95,497 | $ 122,503 |
| Add (deduct): | | | |
| Amortization of deferred income | (12,248) | (14,444) | (17,597) |
| Amortization of bond issuance costs and deferred charges | 17,406 | 12,124 | 14,255 |
| Depreciation | 2,182 | 2,154 | 3,559 |
| (Recovery of) provision for loan losses | (6,922) | 23,240 | 16,402 |
| Recovery of guarantee liability | (1,700) | (700) | (3,107) |
| Results of operations of foreclosed assets | (9,758) | (15,492) | (13,024) |
| Derivative forward value | 79,281 | (28,805) | (25,849) |
| Foreign currency adjustments | 14,554 | 22,594 | 22,893 |
| Gain on sale of building and land | - | (43,431) | - |
| Loss on sale of loans | 1,584 | - | - |
| Changes in operating assets and liabilities: | | | |
| Accrued interest and other receivables | 27,203 | (12,626) | 56,001 |
| Accrued interest payable | (21,501) | 28,895 | (17,387) |
| Other | (702) | 4,902 | (6,517) |
| Net cash provided by operating activities | 101,080 | 73,908 | 152,132 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Advances made on loans | (7,228,143) | (6,162,154) | (6,466,367) |
| Principal collected on loans | 7,052,334 | 6,768,252 | 7,883,988 |
| Net investment in fixed assets | (591) | (4,665) | (3,367) |
| Net cash provided by foreclosed assets | 63,831 | 6,401 | 116,134 |
| Net proceeds from sale of foreclosed assets | 487 | 29,152 | 3,600 |
| Net proceeds from sale of building and land | - | 83,428 | - |
| Net proceeds from sale of loans | 364,100 | - | - |
| Net cash provided by investing activities | 252,018 | 720,414 | 1,533,988 |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| (Repayments of) proceeds from issuances of short-term debt, net | (470,591) | (1,005,995) | 736,466 |
| Proceeds from issuance of long-term debt, net | 2,066,332 | 3,792,566 | 289,757 |
| Payments for retirement of long-term debt | (1,645,848) | (3,580,731) | (2,394,391) |
| Proceeds from issuance of subordinated deferrable debt, net | - | - | 131,246 |
| Payments for retirement of subordinated deferrable debt | (150,000) | (48,560) | - |
| Proceeds from issuance of members' subordinated certificates | 45,605 | 77,081 | 97,016 |
| Payments for retirement of members' subordinated certificates | (68,319) | (113,819) | (199,844) |
| Payments for retirement of CFC patronage capital | (74,094) | (57,328) | (51,356) |
| Payments for retirement of RTFC patronage capital | (12,414) | (15,712) | (16,807) |
| Net cash used in financing activities | (309,329) | (952,498) | (1,407,913) |
| **NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS** | 43,769 | (158,176) | 278,207 |
| BEGINNING CASH AND CASH EQUIVALENTS | 260,338 | 418,514 | 140,307 |
| ENDING CASH AND CASH EQUIVALENTS | $ 304,107 | $ 260,338 | $ 418,514 |

See accompanying notes.
*See Note 1 (w)

84

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

**(in thousands)**

**For the Years Ended May 31, 2007, 2006 and 2005**

| | 2007 | 2006 (As restated) * | 2005 (As restated)* |
|---|---|---|---|
| **SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION:** | | | |
| Cash paid during year for interest | $ 1,000,826 | $ 945,303 | $ 943,652 |
| | | | |
| Non-cash financing and investing activities: | | | |
| Subordinated certificates applied against loan balances | $ - | $ - | $ 84,228 |
| Patronage capital applied against loan balances | - | 1,829 | 8,486 |
| Minority interest patronage capital applied against loan balances | - | 1,689 | 5,528 |
| Net (decrease) increase in debt service reserve funds/debt service reserve certificates | (25,166) | (13,023) | 8,946 |

See accompanying notes.
*See Note 1 (w)

85

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

**(1)    General Information and Accounting Policies**

*(a)    General Information*

National Rural Utilities Cooperative Finance Corporation ("CFC" or "the Company") is a private, not-for-profit cooperative association incorporated under the laws of the District of Columbia in April 1969. The principal purpose of CFC is to provide its members with a source of financing to supplement the loan programs of the Rural Utilities Service ("RUS") of the United States Department of Agriculture. CFC makes loans to its rural utility system members ("utility members") to enable them to acquire, construct and operate electric distribution, generation, transmission and related facilities. CFC also provides its members with credit enhancements in the form of letters of credit and guarantees of debt obligations. CFC is exempt from payment of federal income taxes under the provisions of Section 501(c)(4) of the Internal Revenue Code. CFC is a not-for-profit member-owned finance cooperative, thus its objective is not to maximize its net income, but to offer its members the lowest cost financial products and services consistent with sound financial management.

Rural Telephone Finance Cooperative ("RTFC") was incorporated as a private not-for-profit cooperative association in the state of South Dakota in September 1987. In February 2005, RTFC reincorporated as a not-for-profit cooperative association in the District of Columbia. The principal purpose of RTFC is to provide and arrange financing for its rural telecommunications members and their affiliates. RTFC's results of operations and financial condition are consolidated with those of CFC in the accompanying financial statements. RTFC is headquartered with CFC in Herndon, Virginia. RTFC is a taxable cooperative that pays income tax based on its net income, excluding net income allocated to its members, as allowed by law under Subchapter T of the Internal Revenue Code.

National Cooperative Services Corporation ("NCSC") was incorporated in 1981 in the District of Columbia as a private non-profit cooperative association. The principal purpose of NCSC is to provide financing to the for-profit or non-profit entities that are owned, operated or controlled by or provide substantial benefit to, members of CFC. NCSC also markets, through its cooperative members, a consumer loan program for home improvements and an affinity credit card program. NCSC's membership consists of CFC and distribution systems that are members of CFC or are eligible for such membership. NCSC's results of operations and financial condition are consolidated with those of CFC in the accompanying financial statements. NCSC is headquartered with CFC in Herndon, Virginia. NCSC is a taxable corporation.

The Company's consolidated membership was 1,544 as of May 31, 2007 including 899 utility members, the majority of which are consumer-owned electric cooperatives, 513 telecommunications members, 66 service members and 66 associates in 49 states, the District of Columbia and two U.S. territories. The utility members included 830 distribution systems and 69 generation and transmission ("power supply") systems. Memberships among CFC, RTFC and NCSC have been eliminated in consolidation.

*(b)    Principles of Consolidation*

The accompanying financial statements include the consolidated accounts of CFC, RTFC and NCSC and certain entities controlled by CFC created to hold foreclosed assets and effect loan securitization transactions, after elimination of all material intercompany accounts and transactions. Financial Accounting Standards Board ("FASB") Interpretation No. ("FIN") 46(R), Consolidation of Variable Interest Entities, an interpretation of Accounting Research Bulletin No. 51, requires CFC to consolidate the financial results of RTFC and NCSC. CFC is the primary beneficiary of variable interests in RTFC and NCSC due to its exposure to absorbing the majority of expected losses.

CFC is the sole lender to and manages the lending and financial affairs of RTFC through a management agreement in effect through December 1, 2016. Under a guarantee agreement, RTFC pays CFC a fee in exchange for which CFC reimburses RTFC for loan losses. All loans that require RTFC board approval also require CFC board approval. CFC is not a member of RTFC and does not elect directors to the RTFC board. RTFC is an associate member of CFC.

CFC is the primary source of funding to and manages the lending and financial affairs of NCSC through a management agreement which is automatically renewable on an annual basis unless terminated by either party. NCSC funds its programs either through loans from CFC or commercial paper and long-term notes issued by NCSC and guaranteed by CFC. In connection with these guarantees, NCSC must pay a guarantee fee and purchase from CFC interest-bearing subordinated term certificates in proportion to the related guarantee. Under a guarantee agreement, NCSC pays CFC a fee in exchange for which CFC reimburses NCSC for loan losses, excluding losses in the consumer loan program. Effective January 1, 2007, all loans that require NCSC board approval also require CFC board approval. CFC does not control the election of directors to the NCSC board. NCSC is a service organization member of CFC.

86

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

RTFC and NCSC creditors have no recourse against CFC in the event of a default by RTFC and NCSC, unless there is a guarantee agreement under which CFC has guaranteed NCSC and RTFC debt obligations to a third party. At May 31, 2007, CFC had guaranteed $321 million of NCSC debt, derivative instruments and guarantees with third parties. Guarantees related to debt and derivative instruments are not included in Note 13 at May 31, 2007 as they are reported on the consolidated balance sheet. At May 31, 2007, CFC had no guarantees of RTFC debt to third party creditors. All CFC loans to RTFC and NCSC are secured by all assets and revenues of RTFC and NCSC. At May 31, 2007, RTFC had total assets of $2,050 million including loans outstanding to members of $1,860 million and NCSC had total assets of $513 million including loans outstanding of $463 million. At May 31, 2007, CFC had committed to lend RTFC up to $4 billion, of which $2 billion was outstanding. Effective December 1, 2006, CFC's commitment to RTFC was reduced to $4 billion compared to $10 billion prior to that date. At May 31, 2007, CFC had committed to provide credit to NCSC of up to $1 billion. At May 31, 2007, CFC had provided a total of $526 million of credit to NCSC, representing $205 million of outstanding loans and $321 million of credit enhancements.

CFC established limited liability corporations and partnerships to hold foreclosed assets and effect loan securitization transactions. CFC has full ownership and control of all such companies and thus consolidates their financial results. CFC presents the companies formed to hold foreclosed assets in one line on the consolidated balance sheets and the consolidated statements of operations. A full consolidation is presented for the companies formed to effect loan securitization transactions.

Unless stated otherwise, references to the Company relate to the consolidation of CFC, RTFC, NCSC and certain entities controlled by CFC and created to hold foreclosed assets and effect loan securitization transactions.

(c)    *Cash and Cash Equivalents*

CFC includes cash, certificates of deposit and other investments with remaining maturities of less than 90 days as cash and cash equivalents.

(d)    *Allowance for Loan Losses*

The Company maintains an allowance for loan losses at a level estimated by management to adequately provide for probable losses inherent in the loan portfolio, which are estimated based upon a review of the loan portfolio, past loss experience, specific problem loans, economic conditions and other pertinent factors which, in management's judgment, deserve current recognition in estimating loan losses. On a quarterly basis, the Company prepares an analysis of the adequacy of the loan loss allowance and makes adjustments to the allowance as necessary. The allowance is based on estimates and, accordingly, actual loan losses may differ from the allowance amount.

Management makes recommendations of loans to be written off to the board of directors of CFC. In making its recommendation to write off all or a portion of a loan balance, management considers various factors including cash flow analysis and collateral securing the borrower's loans.

Activity in the loan loss allowance account is summarized below for the years ended May 31:

| (in thousands) | 2007 | 2006 | 2005 |
|---|---|---|---|
| Balance at beginning of year | $  611,443 | $  589,749 | $  573,939 |
| (Recovery of) provision for loan losses | (6,922) | 23,240 | 16,402 |
| Write-offs | (44,668) | (2,197) | (1,354) |
| Recoveries | 1,810 | 651 | 762 |
| Balance at end of year | $  561,663 | $  611,443 | $  589,749 |

(e)    *Non-performing Loans*

CFC classifies a borrower as non-performing when any one of the following criteria are met:
- principal or interest payments on any loan to the borrower are past due 90 days or more,
- as a result of court proceedings, repayment on the original terms is not anticipated, or
- for some other reason, management does not expect the timely repayment of principal and interest.

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

Once a borrower is classified as non-performing, CFC typically places the loan on non-accrual status and reverses all accrued and unpaid interest. CFC generally applies all cash received during the non-accrual period to the reduction of principal, thereby foregoing interest income recognition. The decision to return a loan to accrual status is determined on a case by case basis.

*(f)      Impairment of Loans*

CFC calculates impairment of loans receivable by comparing the present value of the estimated future cash flows associated with the loan discounted at the original loan interest rate(s) and/or the estimated fair value of the collateral securing the loan to the recorded investment in the loan in accordance with the provisions of Statement of Financial Accounting Standards ("SFAS") 114, Accounting by Creditors for Impairment of a Loan - an Amendment of SFAS 5 and SFAS 15, as amended. Loss reserves are specifically recorded based on the calculated impairment.

*(g)      Fixed Assets*

Buildings, furniture and fixtures and related equipment are stated at cost less accumulated depreciation and amortization of $10 million and $8 million as of May 31, 2007 and 2006, respectively. Depreciation expense ($2 million, $2 million and $4 million in fiscal years 2007, 2006 and 2005, respectively) is computed primarily on the straight-line method over estimated useful lives ranging from 2 to 40 years.

*(h)      Foreclosed Assets*

CFC records foreclosed assets received in satisfaction of loan receivables at fair value or fair value less costs to sell and maintains these assets on the consolidated balance sheets as foreclosed assets. It is CFC's intent to sell the foreclosed assets, but the assets do not currently meet conditions to qualify for assets held for sale under SFAS 144, Accounting for the Impairment or Disposal of Long-Lived Assets. Accordingly, CFC records depreciation of foreclosed assets. Foreclosed assets are assessed for impairment on a periodic basis. The results of operations from foreclosed assets are shown separately on the consolidated statements of operations.

*(i)      Derivative Financial Instruments*

CFC is neither a dealer nor a trader in derivative financial instruments. CFC uses interest rate, cross currency and cross currency interest rate exchange agreements to manage its interest rate and foreign currency exchange risk.

In accordance with SFAS 133, Accounting for Derivative Instruments and Hedging Activities, and SFAS 138, Accounting for Certain Derivative Instruments and Certain Hedging Activities, an amendment of SFAS 133, CFC records derivative instruments on the consolidated balance sheets as either an asset or liability measured at fair value. Changes in the fair value of derivative instruments are recognized in the derivative forward value line of the consolidated statements of operations unless specific hedge accounting criteria are met. The change to the fair value is recorded to other comprehensive income if cash flow hedge accounting criteria are met. In the case of certain foreign currency exchange agreements that meet hedge accounting criteria, the change in fair value is recorded to other comprehensive income and then reclassified to offset the related change in the dollar value of foreign denominated debt in the consolidated statements of operations. CFC formally documents, designates, and assesses the effectiveness of transactions that receive hedge accounting.

Net settlements for derivative instruments that qualify for hedge accounting are recorded in interest expense. CFC records net settlements related to derivative instruments that do not qualify for hedge accounting in derivative cash settlements. Prior to the implementation of SFAS 133, the net settlements for all interest rate exchange agreements were included in interest expense.

*(j)      Guarantee Liability*

CFC guarantees certain contractual obligations of its members so that they may obtain various forms of financing. With the exception of letters of credit, the underlying obligations may not be accelerated so long as CFC performs under its guarantee. CFC records a guarantee liability which represents CFC's contingent and non-contingent exposure related to its guarantees of its members' debt obligations. CFC's contingent guarantee liability is based on management's estimate of CFC exposure to losses within the guarantee portfolio. CFC uses factors such as borrower risk rating, maturity bonds, corporate bond default probabilities and historical recovery rates in estimating its contingent exposure. Adjustments to the contingent guarantee liability are recorded in CFC's provision for guarantee losses. CFC has recorded a non-contingent guarantee liability for all

88

## NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)

new or modified guarantees since January 1, 2003 in accordance with FIN No. 45, Guarantor's Accounting and Disclosure Requirement for Guarantees, Including Indirect Guarantees of Indebtedness of Others (an interpretation of FASB Statements No. 5, 57, and 107 and rescission of FASB Interpretation No. 34). CFC's non-contingent guarantee liability represents CFC's obligation to stand ready to perform pursuant to the terms of its guarantees that it has entered into since January 1, 2003. CFC's non-contingent obligation is estimated based on guarantee fees charged for guarantees issued, which represents management's estimate of the fair value of its obligation to stand ready to perform. The fees are deferred and amortized using the straight-line method into interest income over the term of the guarantee.

    *(k)    Amortization of Bond Discounts and Bond Issuance Costs*

Bond discounts and bond issuance costs are deferred and amortized as interest expense using the effective interest method or a method approximating the effective interest method over the initial legal maturity of each bond issue.

    *(l)    Membership Fees*

Members are charged a one-time membership fee based on member class. CFC distribution system members, power supply system members and national associations of cooperatives pay a $1,000 membership fee. CFC service organization members pay a $200 membership fee. CFC associates pay a $1,000 fee. RTFC voting members pay a $1,000 membership fee. RTFC associates pay a $100 fee. NCSC members pay a $100 membership fee. Membership fees are accounted for as members' equity.

    *(m)    Financial Instruments with Off-Balance Sheet Risk*

In the normal course of business, CFC is a party to financial instruments with off-balance sheet risk to meet the financing needs of its member borrowers. These financial instruments include commitments to extend credit, standby letters of credit and guarantees of members' obligations. The expected inherent loss related to CFC's off-balance sheet financial instruments is covered in CFC's guarantee liability.

    *(n)    Interest Income*

Interest income includes the following for the years ended May 31:

| (in thousands) | 2007 | 2006 | 2005 |
|---|---|---|---|
| Interest on long-term fixed rate loans (1) | $ 833,247 | $ 759,618 | $ 722,648 |
| Interest on long-term variable rate loans (1) | 114,786 | 153,613 | 206,343 |
| Interest on short-term loans (1) | 72,632 | 57,636 | 38,688 |
| Interest on investments (2) | 9,662 | 10,391 | 3,214 |
| Conversion fees (3) | 9,162 | 14,444 | 17,597 |
| Make-whole and prepayment fees (4) | 4,748 | 5,409 | 36,448 |
| Commitment and guarantee fees (5) | 9,161 | 6,488 | 5,740 |
| Other fees | 826 | 313 | 175 |
| Total interest income | $ 1,054,224 | $ 1,007,912 | $ 1,030,853 |

---

(1) Represents interest income on loans to members.
(2) Represents interest income on the investment of cash.
(3) Conversion fees are deferred and recognized using the interest method over the remaining original loan interest rate pricing term, except for a small portion of the total fee charged to cover administrative costs related to the conversion, which is recognized immediately.
(4) Make-whole and prepayment fees are charged for the early repayment of principal in full and recognized when collected.
(5) Commitment fees for RTFC loan commitments are, in most cases, refundable on a prorata basis according to the amount of the loan commitment that is advanced. Such refundable fees are deferred and then recognized on a prorata basis based on the portion of the loan that is not advanced prior to the expiration of the commitment. Commitment fees on CFC loan commitments are not refundable and are billed and recognized based on the unused portion of committed lines of credit. Guarantee fees are charged based on the amount, type and term of the guarantee. Guarantee fees are deferred and amortized using the straight-line method into interest income over the life of the guarantee.

Deferred income on the consolidated balance sheets is comprised primarily of deferred conversion fees totaling $25 million and $37 million at May 31, 2007 and 2006, respectively.

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

    *(o)*    *Interest Expense*

Interest expense includes the following for the years ended May 31:

| (in thousands) | 2007 | 2006 | 2005 |
|---|---|---|---|
| Interest expense - commercial paper and bid notes (1) | $    178,687 | $    133,035 | $    88,419 |
| Interest expense - medium-term notes (1) | 363,760 | 409,454 | 418,080 |
| Interest expense - collateral trust bonds (1) | 218,523 | 271,980 | 314,873 |
| Interest expense - subordinated deferrable debt (1) | 33,089 | 45,349 | 41,268 |
| Interest expense - subordinated certificates (1) | 47,852 | 47,017 | 46,930 |
| Interest expense - long-term private debt (1) | 118,722 | 46,201 | 2,119 |
| Debt issuance costs (2) | 12,328 | 9,662 | 12,456 |
| Derivative cash settlements, net (3) | - | 2,278 | 5,782 |
| Commitment and guarantee fees (4) | 16,023 | 10,595 | 9,137 |
| Loss (gain) on extinguishment of debt (5) | 4,806 | (1,907) | - |
| Other fees | 2,940 | 2,272 | 2,969 |
| Total interest expense | $    996,730 | $    975,936 | $    942,033 |

(1) Represents interest expense and the amortization of discounts on debt.
(2) Includes amortization of all deferred charges related to debt issuance, principally underwriter's fees, legal fees, printing costs and comfort letter costs. Amortization is calculated on the effective interest method.  Also includes issuance costs related to dealer commercial paper.
(3) Represents the net cost related to swaps that qualify for hedge accounting treatment plus the accrual from the date of the last settlement to the current period end.
(4) Includes various fees related to funding activities, including fees paid to banks participating in the Company's revolving credit agreements and fees paid under bond guarantee agreements with RUS as part of the Rural Economic Development Loan and Grant ("REDLG") program. Fees are recognized as incurred or amortized on a straight-line basis over the life of the respective agreement.
(5) Represents the gain or loss on the early retirement of debt including the write-off of unamortized discount, premium and issuance costs.

The Company does not include indirect costs, if any, related to funding activities in interest expense.

    *(p)*    *Income Taxes*

While CFC is exempt under Section 501(c)(4) of the Internal Revenue Code, it is subject to tax on its unrelated business taxable income.  RTFC takes a deduction for the amount of the net income that it allocates to its members.  Approximately 99% of the RTFC net income is allocated to its members annually.  NCSC pays tax on the full amount of its net income.

The income tax expense recorded in the consolidated statement of operations for the years ended May 31, 2007, 2006 and 2005 represents the income tax expense for RTFC and NCSC at the combined federal and state of Virginia income tax rate of approximately 38%.  During the year ended May 31, 2005, NCSC used the remainder of its prior year loss carryforwards and is currently paying Virginia state and federal income taxes.

    *(q)*    *Allocation of Net Income*

CFC is required by the District of Columbia cooperative law to have a methodology to allocate its net income to its members.  Annually, CFC's board of directors allocates its net income, excluding certain non-cash adjustments, to its members in the form of patronage capital and to board approved reserves.  Currently, CFC has two such board approved reserves, the education fund and the members' capital reserve.  CFC allocates a small portion, less than 1%, of net income annually to the education fund to further the teaching of cooperative principles as required by cooperative law.  Funds from the education fund are disbursed annually to the statewide cooperative organizations to fund the teaching of cooperative principles in the service territories of the cooperatives in each state.  The board of directors will determine the amount of income that is allocated to the members' capital reserve, if any.  The members' capital reserve represents income that is held by CFC to increase equity retention.

The income held in the members' capital reserve has not been specifically allocated to any member, but may be allocated to individual members in the future as patronage capital if authorized by CFC's board of directors.  All remaining income is annually allocated to CFC's members in the form of patronage capital.  CFC bases the amount of income allocated to each member on the members' patronage of the CFC lending programs in the year that the income was earned.  There is no impact on CFC's total equity as a result of allocating income to members in the form of patronage capital or to board approved reserves.  CFC's board of directors has annually voted to retire a portion of the patronage capital allocated to members in prior years.  CFC's total equity is reduced by the amount of patronage capital retired to its members and by disbursements from the education fund.

90

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

(r)    *Comprehensive Income*

Comprehensive income includes the Company's net income, as well as other comprehensive income related to derivatives.  Comprehensive income for the years ended May 31, 2007, 2006 and 2005 is calculated as follows:

| (in thousands) | 2007 | 2006 | 2005 |
|---|---|---|---|
| Net income | $   11,701 | $   95,497 | $   122,503 |
| Other comprehensive income: | | | |
| Unrealized (loss) gain on derivatives | - | (2,639) | 11,921 |
| Reclassification adjustment for realized (gains) losses on derivatives | (1,004) | 226 | 16,241 |
| Comprehensive income | $   10,697 | $   93,084 | $   150,665 |

(s)    *Operating Lease Obligations*

On October 18, 2005, the Company entered into an agreement to lease 107,228 square feet of office, meeting and storage space in two office buildings located in Herndon, Virginia.  The lease is for three years, terminating on October 17, 2008.  The Company has the option to extend the lease for two additional one-year periods with terms similar to the initial three-year lease.  The Company had previously owned these two buildings which were sold at the commencement of the agreement (see Note 16).

The following represents the future minimum lease payments related to the Company's three-year lease of office space for the years ended May 31:

| (in thousands) | 2008 | 2009 |
|---|---|---|
| Lease Payments (1) | $3,130 | $1,198 |

(1) Assuming the Company exercises the option to extend the lease for an additional one-year period, the future minimum lease payments for fiscal years 2009 and 2010 would increase to $3,301 thousand and $1,284 thousand, respectively.  Assuming the Company exercises the option to extend the lease for two additional one-year periods, the future minimum lease payments for fiscal years 2009, 2010 and 2011 would increase to $3,301 thousand, $3,503 thousand and $1,355 thousand, respectively.

Contingent rental payments may be due if the building operating expenses exceed the base year amount included in the lease agreement.  The Company would be required to pay contingent rental payments based on the amount of space leased in the building divided by total rentable space in the building times the amount that operating expenses exceeded the base year amount in the lease agreement.  To date, the Company has not been required to make contingent rental payments.

The Company recognizes rental expense on a straight-line basis, which requires taking the total scheduled payments and dividing by the number of months in the lease term.  During the years ended May 31, 2007 and 2006, the Company recognized rental expense of $3 million and $2 million, respectively.

(t)    *Use of Estimates*

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the assets and liabilities and the revenue and expenses reported in the financial statements, as well as amounts included in the notes thereto, including discussion and disclosure of contingent liabilities.  While CFC uses its best estimates and judgments based on the known facts at the date of the financial statements, actual results could differ from these estimates as future events occur.

CFC does not believe it is vulnerable to the risk of a near-term severe impact as a result of any concentrations of its activities.

(u)    *Reclassifications*

Certain reclassifications of prior year amounts have been made to conform to the current reporting format.

(v)    *New Accounting Pronouncements*

In February 2006, the FASB issued SFAS 155, Accounting for Certain Hybrid Financial Instruments – an amendment of SFAS 133 and 140. SFAS 155 permits fair value measurement of any hybrid financial instrument that contains an embedded derivative that otherwise

would require bifurcation. SFAS 155 also clarifies which interest-only strips and principal-only strips are not subject to the requirements of Statement 133. It establishes a requirement to evaluate interests in securitized

91

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

financial assets to identify interests that are freestanding derivatives or that are hybrid financial instruments that contain an embedded derivative requiring bifurcation. SFAS 155 also clarifies that concentrations of credit risk in the form of subordination are not embedded derivatives. SFAS 155 is effective for all financial instruments acquired or issued after the beginning of an entity's first fiscal year that begins after September 15, 2006. The Company's adoption of SFAS 155 as of June 1, 2007 is not expected to have a material impact on the Company's financial position or results of operations.

In March 2006, the FASB issued SFAS 156, Accounting for Servicing of Financial Assets. SFAS 156 requires the initial measurement of all separately recognized servicing assets and liabilities at fair value and permits, but does not require, the subsequent measurement of servicing assets and liabilities at fair value. SFAS 156 is effective as of the beginning of the first fiscal year that begins after September 15, 2006. The Company's adoption of SFAS 156 as of June 1, 2007 is not expected to have a material impact on the Company's financial position or results of operations.

In June 2006, the FASB issued FIN No. 48, Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109. FIN 48 clarifies the accounting for income taxes by prescribing a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. FIN 48 is effective for fiscal years beginning after December 15, 2006. The Company's adoption of FIN 48 as of June 1, 2007 is not expected to have a material impact on the Company's financial position or results of operations.

In September 2006, the FASB issued SFAS 157, Fair Value Measurements. SFAS 157 clarifies the principle that fair value should be based on the assumptions market participants would use when pricing an asset or liability and establishes a fair value hierarchy that prioritizes the information used to develop those assumptions. Under the standard, fair value measurements would be separately disclosed by level within the fair value hierarchy. SFAS 157 is effective as of the beginning of the first fiscal year that begins after November 15, 2007. The Company's adoption of SFAS 157 as of June 1, 2008 is not expected to have a material impact on the Company's financial position or results of operations.

In February 2007, the FASB issued SFAS 159, The Fair Value Option for Financial Assets and Financial Liabilities. The fair value option established by SFAS 159 permits entities to choose to measure eligible financial instruments at fair value. The unrealized gains and losses on items for which the fair value option has been elected should be reported in earnings. The decision to elect the fair value option is determined on an instrument by instrument basis and is irrevocable. Assets and liabilities measured at fair value pursuant to the fair value option should be reported separately in the balance sheet from those instruments measured using other measurement attributes. SFAS 159 is effective as of the beginning of the first fiscal year that begins after November 15, 2007. As part of the Company's adoption of SFAS 159 as of June 1, 2008, it does not plan to choose the option to measure eligible financial instruments at fair value and therefore the adoption of SFAS 159 is not expected to have a material impact on the Company's financial position or results of operations.

*(w)        Restatement*

Subsequent to the issuance of the May 31, 2006 consolidated financial statements, the Company's management identified an error in the recording of interest expense on foreign denominated debt and the cash settlement income from foreign currency exchange agreements, as well as the related accrued interest payable and accrued interest receivable. The Company was using the agreed upon foreign exchange rate from the foreign currency exchange agreement rather than the average spot foreign currency exchange rate during the income statement period to convert the interest expense on the foreign denominated debt and foreign exchange agreement income to U.S. dollars. The Company was also using the agreed upon foreign exchange rate from the foreign currency exchange agreement rather than the spot foreign currency exchange rate at the end of the balance sheet period to convert the accrued interest payable and accrued interest receivable to U.S. dollars. The interest expense on the foreign denominated debt and the cash settlement income from the foreign currency exchange agreement are equal and offsetting amounts, as the Company uses the amount received under the exchange agreement to pay the interest expense on the foreign denominated debt. The amounts for the accrued interest payable and accrued interest receivable are also offsetting. As a result of this error, interest expense and cash settlement income were understated by $13 million and $15 million for the years ended May 31, 2006 and 2005, respectively. The Company subtracts the net accrual from the last settlement date on its derivatives at each period end in the calculation of the related fair value, so the error in the calculation of the income receivable on the foreign exchange agreements also impacted the fair value of the derivatives recorded as a derivative asset. Thus this correction also impacts the change in the fair value of the derivatives reported in the derivative forward value line on the consolidated statement of operations. The derivative forward value line and net income were overstated by $0.2 million and $0.5 million for the years ended May 31, 2006 and 2005, respectively. There is no impact on cash flows from operating activities or the total change in cash in the consolidated statements of cash flows. The amounts
92

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

reported on the consolidated balance sheet for accrued interest payable and accrued interest and other receivables at May 31, 2006 were understated by $4 million and the amounts reported for the derivative asset and retained equity at May 31, 2006 were overstated by $4 million.

A summary of the significant effects of the restatement on the May 31, 2006 consolidated balance sheet and consolidated statement of operations is as follows:

|  | As previously reported | Adjustment | As restated |
|---|---|---|---|
| Accrued interest and other receivables | $ 313,796 | $ 3,568 | $ 317,364 |
| Derivative assets | 579,237 | (3,568) | 575,669 |
| Accrued interest payable | 299,391 | 3,568 | 302,959 |
| Retained equity | 774,768 | (3,568) | 771,200 |
| Total equity | 787,976 | (3,568) | 784,408 |

|  | As previously reported | Adjustment | As restated |
|---|---|---|---|
| Interest expense | $ (962,656) | $ (13,280) | $ (975,936) |
| Net interest income | 45,256 | (13,280) | 31,976 |
| Net interest income after provision for loan losses | 22,016 | (13,280) | 8,736 |
| Derivative cash settlements | 67,603 | 13,280 | 80,883 |
| Total non-interest income | 128,924 | 13,280 | 142,204 |
| Derivative forward value | 29,054 | (249) | 28,805 |
| Total non-interest expense | (44,929) | (249) | (45,178) |
| Income prior to income taxes and minority interest | 106,011 | (249) | 105,762 |
| Income prior to minority interest | 102,835 | (249) | 102,586 |
| Net income | 95,746 | (249) | 95,497 |

A summary of the significant effects of the restatement on the May 31, 2005 consolidated statement of operations is as follows:

|  | As previously reported | Adjustment | As restated |
|---|---|---|---|
| Interest expense | $ (926,790) | $ (15,243) | $ (942,033) |
| Net interest income | 104,063 | (15,243) | 88,820 |
| Net interest income after provision for loan losses | 87,661 | (15,243) | 72,418 |
| Derivative cash settlements | 63,044 | 15,243 | 78,287 |
| Total non-interest income | 81,713 | 15,243 | 96,956 |
| Derivative forward value | 26,320 | (471) | 25,849 |
| Total non-interest expense | (42,342) | (471) | (42,813) |
| Income prior to income taxes and minority interest | 127,032 | (471) | 126,561 |
| Income prior to minority interest | 125,514 | (471) | 125,043 |
| Net income | 122,974 | (471) | 122,503 |

The quarterly results for all impacted interim periods in fiscal year 2007 and 2006 have also been restated to correct the error. See Note 18 Selected Quarterly Financial Data for an explanation of the changes and a reconciliation from the amounts previously filed with the SEC and the restated amounts shown in this May 31, 2007 Form 10-K.

93

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

**(2)    Loans and Commitments**

Loans to members bear interest at rates determined from time to time by the Company after considering its interest expense, operating expenses, provision for loan losses and the maintenance of reasonable earnings levels. In keeping with its not-for-profit, cooperative charter, the Company's policy is to set interest rates at the lowest levels it considers to be consistent with sound financial management.

Loans outstanding to members and unadvanced commitments by loan type and by segment are summarized as follows at May 31:

| | 2007 | | 2006 | |
| | Loans Outstanding | Unadvanced Commitments (1) | Loans Outstanding | Unadvanced Commitments (1) |
|---|---|---|---|---|
| (in thousands) | | | | |
| Total by loan type: (2) | | | | |
| Long-term fixed rate loans | $ 14,663,340 | $ - | $ 14,546,850 | $ - |
| Long-term variable rate loans | 1,993,534 | 5,703,313 | 2,524,722 | 6,146,618 |
| Loans guaranteed by RUS | 255,903 | 491 | 261,330 | 591 |
| Short-term loans | 1,215,430 | 7,200,156 | 1,028,003 | 6,632,704 |
| Total loans | 18,128,207 | 12,903,960 | 18,360,905 | 12,779,913 |
| Less: Allowance for loan losses | (561,663) | - | (611,443) | - |
| Net loans | $ 17,566,544 | $ 12,903,960 | $ 17,749,462 | $ 12,779,913 |
| | | | | |
| Total by segment: | | | | |
| CFC: | | | | |
| Distribution | $ 12,827,772 | $ 9,176,686 | $ 12,859,076 | $ 8,905,434 |
| Power supply | 2,858,040 | 2,798,124 | 2,810,663 | 2,635,502 |
| Statewide and associate | 119,478 | 139,156 | 124,633 | 110,839 |
| CFC Total | 15,805,290 | 12,113,966 | 15,794,372 | 11,651,775 |
| RTFC | 1,860,379 | 473,762 | 2,162,464 | 550,990 |
| NCSC | 462,538 | 316,232 | 404,069 | 577,148 |
| Total loans | $ 18,128,207 | $ 12,903,960 | $ 18,360,905 | $ 12,779,913 |

(1) Unadvanced loan commitments are loans for which loan contracts have been approved and executed, but funds have not been advanced. Additional information may be required to assure that all conditions for advance of funds have been fully met and that there has been no material change in the member's condition as represented in the supporting documents. Since commitments may expire without being fully drawn upon and a significant amount of the commitments are for standby liquidity purposes, the total unadvanced loan commitments do not necessarily represent future cash requirements. Collateral and security requirements for advances on commitments are identical to those on initial loan approval. As the interest rate on unadvanced commitments is not set, long-term unadvanced commitments have been classified in this chart as variable rate unadvanced commitments. However, at the time of the advance, the borrower may select a fixed or variable rate.
(2) Loans are classified as long-term or short-term based on their original maturity.

94

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

The following table summarizes non-performing and restructured loans outstanding and unadvanced commitments to those borrowers by segment and by loan program at May 31:

| | 2007 | | 2006 | |
|---|---|---|---|---|
| (in thousands) | Loans Outstanding | Unadvanced Commitments (1) | Loans Outstanding | Unadvanced Commitments (1) |
| Non-performing loans: | | | | |
| RTFC: | | | | |
| Long-term fixed rate loans (2) | $ 212,984 | $ - | $ 212,984 | $ - |
| Long-term variable rate loans (2) | 261,081 | - | 314,987 | - |
| Short-term loans (2) | 27,799 | 418 | 49,817 | 296 |
| Total RTFC loans | 501,864 | 418 | 577,788 | 296 |
| | | | | |
| NCSC: | | | | |
| Long-term fixed rate loans (2) | - | - | 81 | - |
| Total non-performing loans | $ 501,864 | $ 418 | $ 577,869 | $ 296 |
| | | | | |
| Restructured loans: | | | | |
| CFC: | | | | |
| Long-term fixed rate loans (2) | $ 52,420 | $ - | $ 51,670 | $ - |
| Long-term variable rate loans (2) | 544,697 | 186,673 | 571,640 | 203,000 |
| Short-term loans (2) | - | 12,500 | 258 | 12,242 |
| Total CFC loans | 597,117 | 199,173 | 623,568 | 215,242 |
| | | | | |
| RTFC: | | | | |
| Long-term fixed rate loans (2) | 6,188 | - | 6,786 | - |
| Total restructured loans | $ 603,305 | $ 199,173 | $ 630,354 | $ 215,242 |

(1) Unadvanced loan commitments are loans for which loan contracts have been approved and executed, but funds have not been advanced. Additional information may be required to assure that all conditions for advance of funds have been fully met and that there has been no material change in the member's condition as represented in the supporting documents. Since commitments may expire without being fully drawn upon and a significant amount of the commitments are for standby liquidity purposes, the total unadvanced loan commitments do not necessarily represent future cash requirements. Collateral and security requirements for advances on commitments are identical to those on initial loan approval. As the interest rate on unadvanced commitments is not set, long-term unadvanced commitments have been classified in this chart as variable rate unadvanced commitments. However, at the time of the advance, the borrower may select a fixed or variable rate.
(2) Loans are classified as long-term or short-term based on their original maturity.

Loan origination costs are deferred and amortized using the straight-line method, which approximates the interest method, over the life of the loan as a reduction to interest income. At May 31, 2007 and 2006, the balance for deferred loan origination costs related to loans outstanding totaled $4 million and $3 million, respectively.

*Credit Concentration*
The Company's loan portfolio is widely dispersed throughout the United States and its territories, including 48 states, the District of Columbia, American Samoa and the U.S. Virgin Islands. At May 31, 2007 and 2006, loans outstanding to borrowers in any state or territory did not exceed 15% and 16%, respectively, of total loans outstanding. In addition to the geographic diversity of the portfolio, the Company limits its exposure to any one borrower. At May 31, 2007 and 2006, the total exposure outstanding to any one borrower or controlled group did not exceed 3% of total loans and guarantees outstanding. At May 31, 2007, the ten largest borrowers included six distribution systems, two power supply systems and two telecommunications systems. At May 31, 2006, the ten largest borrowers included four distribution systems, five power supply systems and one telecommunications system. The following chart shows the exposure to the ten largest borrowers as a percentage of total exposure by type and by segment at May 31:

| | 2007 | | | 2006 | |
|---|---|---|---|---|---|
| (Dollar amounts in thousands) | Amount | % of Total | | Amount | % of Total |
| Total by type: | | | | | |
| Loans | $ 3,306,986 | | | $ 3,140,666 | |
| Guarantees | 76,867 | | | 266,479 | |
| Total credit exposure | $ 3,383,853 | 18% | | $ 3,407,145 | 18% |
| | | | | | |
| Total by segment: | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| CFC | $ 2,691,060 | | $ | 2,855,874 | |
| RTFC | 692,793 | | | 488,391 | |
| NCSC | - | | | 62,880 | |
| Total credit exposure | $ 3,383,853 | 18% | $ | 3,407,145 | 18% |

95

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

*Interest Rates*

Set forth below is the weighted average interest rate earned on all loans outstanding during the fiscal years ended May 31:

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Long-term fixed rate | 5.87% | 5.64% | 5.62% |
| Long-term variable rate | 7.58% | 6.43% | 4.50% |
| Loans guaranteed by RUS | 5.59% | 5.34% | 4.90% |
| Short-term | 7.06% | 6.07% | 3.97% |
| Non-performing | 0.02% | 0.01% | 0.00% |
| Restructured | 0.61% | 0.08% | 0.05% |
| Total | 5.79% | 5.48% | 5.19% |
| Total by segment: | | | |
| CFC | 5.80% | 5.43% | 4.76% |
| RTFC | 5.30% | 5.50% | 6.88% |
| NCSC | 8.00% | 7.08% | 5.77% |
| Total | 5.79% | 5.48% | 5.19% |

In general, a borrower can select a fixed interest rate on long-term loans for periods of one to 35 years or the variable rate. Upon expiration of the selected fixed interest rate term, the borrower must select the variable rate or select another fixed rate term for a period that does not exceed the remaining loan maturity. The Company sets long-term fixed rates daily and variable rates monthly. On notification to borrowers, the Company may adjust the variable interest rate semi-monthly. Under the policies in effect for each company, the maximum interest rate which may be charged on short-term loans for CFC is the prevailing bank prime rate plus 1% per annum; for RTFC, it is the prevailing bank prime rate plus 1½% per annum; and for NCSC, it is the prevailing bank prime rate plus 1% per annum.

*Loan Repricing*

Long-term fixed rate loans outstanding at May 31, 2007, which will be subject to the repricing of their interest rates during the next five fiscal years, are summarized as follows (due to principal repayments, amounts subject to interest rate repricing may be lower at the actual time of interest rate repricing):

| (Dollar amounts in thousands) | Weighted Average Interest Rate | Amount Repricing |
|---|---|---|
| 2008 | 5.37% | $ 1,151,391 |
| 2009 | 5.50% | 1,068,606 |
| 2010 | 5.79% | 954,506 |
| 2011 | 5.88% | 799,805 |
| 2012 | 6.32% | 919,866 |
| Thereafter | 6.27% | 2,737,153 |

During the year ended May 31, 2007, long-term fixed rate loans totaling $989 million had their interest rates repriced.

*Loan Amortization*

On most long-term loans, level quarterly payments are required with respect to principal and interest in amounts sufficient to repay the loan principal, generally over periods of up to 35 years from the date of the secured promissory note.

Amortization of long-term loans in each of the five fiscal years following May 31, 2007 and thereafter are as follows:

| (in thousands) | Amortization [1] |
|---|---|
| 2008 | $ 831,181 |
| 2009 | 784,621 |
| 2010 | 1,279,012 |
| 2011 | 805,703 |

| | |
|---|---|
| 2012 | 1,051,788 |
| Thereafter | 12,160,472 |

(1) Represents scheduled amortization based on current rates without consideration for loans that reprice.

96

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

*Loan Security*

The Company evaluates each borrower's creditworthiness on a case-by-case basis. It is generally the Company's policy to require collateral for long-term loans. Such collateral usually consists of a first mortgage lien on the borrower's total system, including plant and equipment, and a pledge of future revenues. The loan and security documents also contain various provisions with respect to the mortgaging of the borrower's property and debt service coverage ratios, maintenance of adequate insurance coverage as well as certain other restrictive covenants.

The following tables summarize the Company's secured and unsecured loans outstanding by loan program and by segment at May 31:

| (Dollar amounts in thousands) | 2007 | | | | 2006 | | | |
|---|---|---|---|---|---|---|---|---|
| Total by loan program: | Secured | % | Unsecured | % | Secured | % | Unsecured | % |
| Long-term fixed rate loans | $ 14,180,956 | 97% | $ 482,384 | 3% | $ 13,984,404 | 96% | $ 562,446 | 4% |
| Long-term variable rate loans | 1,865,821 | 94% | 127,713 | 6% | 2,414,737 | 96% | 109,985 | 4% |
| Loans guaranteed by RUS | 255,903 | 100% | - | - | 261,330 | 100% | - | - |
| Short-term loans | 191,231 | 16% | 1,024,199 | 84% | 146,835 | 14% | 881,168 | 86% |
| Total loans | $ 16,493,911 | 91% | $ 1,634,296 | 9% | $ 16,807,306 | 92% | $ 1,553,599 | 8% |
| | | | | | | | | |
| CFC | $ 14,462,448 | 92% | $ 1,342,842 | 8% | $ 14,575,691 | 92% | $ 1,218,681 | 8% |
| RTFC | 1,630,079 | 88% | 230,300 | 12% | 1,921,635 | 89% | 240,829 | 11% |
| NCSC | 401,384 | 87% | 61,154 | 13% | 309,980 | 77% | 94,089 | 23% |
| Total loans | $ 16,493,911 | 91% | $ 1,634,296 | 9% | $ 16,807,306 | 92% | $ 1,553,599 | 8% |

*Concurrent Loans*

CFC makes loans to borrowers both as the sole lender of the loan commitment and on a concurrent basis with RUS. Under default provisions of common mortgages securing long-term CFC loans to distribution system members that also borrow from RUS, RUS has the sole right to act within 30 days or, if RUS is not legally entitled to act on behalf of all noteholders, CFC may exercise remedies. Under common default provisions of mortgages securing long-term CFC loans to, or guarantee reimbursement obligations of, power supply members, RUS retains substantial control over the exercise of mortgage remedies. As of May 31, 2007 and 2006, CFC had $2,302 million and $2,563 million outstanding, respectively, of loans issued on a concurrent basis with RUS.

*Pledging of Loans*

As of May 31, 2007 and 2006, distribution system mortgage notes related to outstanding long-term loans totaling $5,797 million and $5,472 million, respectively, and RUS guaranteed loans qualifying as permitted investments totaling $219 million and $223 million, respectively, were pledged as collateral to secure CFC's collateral trust bonds under the 1994 indenture. In addition, $2 million of cash was pledged under the 1972 indenture at May 31, 2007 and 2006.

As of May 31, 2007 and 2006, distribution system mortgage notes related to outstanding long-term loans totaling $592 million and $574 million, respectively, were pledged as collateral to secure CFC's notes to Federal Agricultural Mortgage Corporation ("Farmer Mac") issued in July 2005 and due in 2008.

In addition to the loans pledged as collateral at May 31, 2007 and May 31, 2006, CFC had $2,765 million and $2,302 million, respectively, of mortgage notes on deposit with the trustee for the $2 billion of notes payable to the Federal Financing Bank ("FFB") of the United States Treasury (see Note 6). There are certain rating triggers related to the $2 billion of notes payable to the FFB that would result in the mortgage notes being pledged as collateral rather than held on deposit.

The $2 billion of notes payable to the FFB contain a rating trigger related to the Company's senior secured credit ratings from Standard & Poor's Corporation, Moody's Investors Service and Fitch Ratings. A rating trigger event exists if the Company's senior secured debt does not have at least two of the following ratings: (i) A- or higher from Standard & Poor's Corporation, (ii) A3 or higher from Moody's Investors Service, (iii) A- or higher from Fitch Ratings and (iv) an equivalent rating from a successor rating agency to any of the above rating agencies. If the Company's senior secured credit ratings fall below the levels listed above, the total $2,765 million of mortgage notes would be pledged as collateral rather than held on deposit.

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

A total of $1 billion of notes payable to the FFB has a second rating trigger related to a financial expert to the Company's board of directors. A rating trigger event will exist if the financial expert position (as defined by Section 407 of the Sarbanes-Oxley Act of 2002) remains vacant for more than 90 consecutive days. In November 2006, the CFC Board elected an at-large director who qualifies as a financial expert who will serve on the audit committee. The director took his seat on the board following the CFC annual meeting in March 2007. If the Company does not satisfy the financial expert rating trigger, $1,394 million of mortgage notes would be pledged as collateral rather than held on deposit.

*RUS Guaranteed Loans*
At May 31, 2007 and 2006, CFC had a total of $256 million and $261 million, respectively, of loans outstanding on which RUS had guaranteed the repayment of principal and interest. There are two programs under which these loans were advanced. At May 31, 2007 and 2006, CFC had a total of $37 million and $38 million, respectively, under a program in which RUS previously allowed certain qualifying cooperatives to repay loans held by the FFB early and allowed the transfer of the guarantee to the new lender. At May 31, 2007 and 2006, CFC had a total of $219 million and $223 million, respectively, under a program in which RUS approved CFC, in February 1999, as a lender under its current loan guarantee program.

**(3)    Loan Securitizations**

The Company accounts for the sale of loans in securitization transactions according to the provisions of SFAS 140, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities. The Company derecognizes financial assets when control has been surrendered. The Company has no retained interest in securitized loans and therefore is not required to record such retained interests at fair value. The Company services the loans in return for a market fee and thus does not record a servicing asset or liability. The Company recognizes the service fee on an accrual basis over the period for which servicing activity is provided. Deferred transactions costs and unamortized deferred loan origination costs related to the loans sold are expensed as part of the calculation of the gain or loss on the sale.

On February 15, 2007, the Company sold CFC distribution loans with outstanding principal balances totaling $366 million in a loan securitization transaction. The transaction qualified for sale treatment under SFAS 140. The Company received $366 million of cash in exchange for the loans, which represents the full principal amount of the loans sold. The Company incurred $0.7 million of costs associated with the transaction and had $0.9 million of unamortized deferred loan origination costs for the loans sold and accordingly, the Company recorded a loss on sale of loans totaling $1.6 million.

The Company does not hold any continuing interest in the loans sold and has no obligation to repurchase loans from the purchaser. The holders of the certificates of beneficial interest issued by the purchaser have no claim against the Company nor any of the Company's assets in the event of a default on the loans held by the purchaser.

The Company services the loans for the purchaser in exchange for a fee of 30 basis points of the outstanding loan principal. The fee the Company earns for servicing does not include late fees, other administrative fees or income from the investment of funds. The Company considers the 30 basis point fee to be a market fee based on market quotes from other providers. As a result the Company has not recorded a servicing asset or liability. The servicing fee has a payment priority over any other disbursement made by the purchaser. During fiscal year 2007, the Company recognized $0.3 million in servicing fees.

**(4)    Foreclosed Assets**

Net assets received in satisfaction of loan receivables are recorded at the lower of cost or market and classified on the consolidated balance sheets as foreclosed assets. At May 31, 2007 and 2006, the balance of foreclosed assets included real estate developer notes receivable and limited partnership interests in certain real estate developments.

The activity for foreclosed assets is summarized below for the years ended May 31:

| (in thousands) | | 2007 | | 2006 | | 2005 |
|---|---|---|---|---|---|---|
| Beginning balance | $ | 120,889 | $ | 140,950 | $ | 247,660 |
| Results of operations | | 9,758 | | 15,492 | | 13,079 |
| Net cash provided by foreclosed assets | | (63,831) | | (6,401) | | (116,134) |
| Impairment to fair value write down | | - | | - | | (55) |
| Sale of foreclosed assets | | (487) | | (29,152) | | (3,600) |

Ending balance of foreclosed assets    $    66,329    $    120,889    $    140,950

98

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

Net cash provided by foreclosed assets increased significantly during the year ended May 31, 2007 due to full and partial paydowns of notes primarily by two limited partnership interests in certain real estate developments.  At May 31, 2005, the balance of foreclosed assets also included partnership interests in real estate properties.  CFC operated the real estate properties before selling such properties in August 2005 for $30 million.  A gain of $4 million was included in the results of operations of foreclosed assets during the year ended May 31, 2006.

**(5)** **Short-Term Debt and Credit Arrangements**

The following is a summary of short-term debt and the weighted average interest rates thereon at May 31:

| | | 2007 | | 2006 | |
|---|---|---|---|---|---|
| (Dollar amounts in thousands) | | Debt Outstanding | Weighted Average Interest Rate | Debt Outstanding | Weighted Average Interest Rate |
| Short-term debt: | | | | | |
| Commercial paper sold through dealers, net of discounts | $ | 1,017,879 | 5.30% | $ 1,658,222 | 5.05% |
| Commercial paper sold directly to members, at par | | 1,383,090 | 5.28% | 1,184,030 | 5.06% |
| Commercial paper sold directly to non-members, at par | | 133,087 | 5.29% | 146,294 | 5.01% |
| Total commercial paper | | 2,534,056 | 5.29% | 2,988,546 | 5.05% |
| Daily liquidity fund | | 250,563 | 5.23% | 266,664 | 5.05% |
| Bank bid notes | | 100,000 | 5.36% | 100,000 | 5.13% |
| Subtotal short-term debt | | 2,884,619 | 5.29% | 3,355,210 | 5.05% |
| | | | | | |
| Long-term debt maturing within one year: | | | | | |
| Medium-term notes sold through dealers (1) | | 133,801 | 4.32% | 1,278,142 | 6.18% |
| Medium-term notes sold through members | | 231,158 | 5.35% | 199,626 | 4.74% |
| Foreign currency valuation account (1) | | - | - | 244,955 | - |
| Secured collateral trust bonds | | 999,560 | 4.45% | 99,991 | 7.30% |
| Subordinated deferrable debt (2) | | 175,000 | 7.40% | 150,000 | 7.63% |
| Unsecured notes payable | | 2,985 | 8.52% | 15,900 | 4.23% |
| Total long-term debt maturing within one year | | 1,542,504 | 4.91% | 1,988,614 | 6.19% |
| | | | | | |
| Total short-term debt | $ | 4,427,123 | 5.16% | $ 5,343,824 | 5.48% |

(1) At May 31, 2006, medium-term notes includes $434 million of medium-term notes denominated in Euros and $282 million of medium-term notes denominated in Australian dollars. The foreign currency valuation account represents the change in the dollar value of foreign denominated debt due to changes in currency exchange rates from the date the debt was issued to the reporting date as required under SFAS 52, Foreign Currency Translation.
(2) Redeemed in June 2007 and 2006, respectively.

CFC issues commercial paper for periods of one to 270 days.  CFC also enters into short-term bank bid note agreements, which are unsecured obligations of CFC and do not require backup bank lines for liquidity purposes.  Bank bid note facilities are uncommitted lines of credit for which CFC does not pay a fee.  The commitments are generally subject to termination at the discretion of the individual banks.

*Foreign Denominated Short-Term Debt*
At May 31, 2007, there was no foreign denominated debt outstanding.  Included in short-term debt at May 31, 2006 are $716 million of medium-term notes due within one year that are denominated in a foreign currency.  At the time of issuance of short-term debt denominated in a foreign currency, CFC enters into a cross currency or cross currency interest rate exchange agreement to fix the exchange rate on all principal and interest payments through maturity.  The foreign denominated short-term debt is revalued at each reporting date based on the current exchange rate.  To the extent that the current exchange rate is different than the exchange rate at the time of issuance, there will be a change in the reported value of the foreign denominated short-term debt. The adjustment to the reported value of the short-term debt on the consolidated balance sheets is also reported on the consolidated statements of operations as foreign currency adjustments.  As a result of entering cross currency and cross currency interest rate exchange agreements, the adjusted short-term debt value at the reporting date does not represent the amount that CFC will ultimately pay to retire the short-term debt, unless the counterparty to the exchange agreement does not perform as required under the agreement.

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

*Revolving Credit Agreements*
The following is a summary of the Company's revolving credit agreements at May 31:

| (Dollar amounts in thousands) | 2007 | | 2006 | | Termination Date | Facility fee per annum (1) |
|---|---|---|---|---|---|---|
| 364-day agreement (2) | $ | 1,125,000 | $ | - | March 14, 2008 | 0.05 of 1% |
| Five-year agreement | | 1,125,000 | | - | March 16, 2012 | 0.06 of 1% |
| Five-year agreement | | 1,025,000 | | 1,025,000 | March 22, 2011 | 0.06 of 1% |
| 364-day agreement | | - | | 1,025,000 | March 21, 2007 | 0.05 of 1% |
| Five-year agreement | | - | | 1,975,000 | March 23, 2010 | 0.09 of 1% |
| Total | $ | 3,275,000 | $ | 4,025,000 | | |

(1) Facility fee determined by CFC's senior unsecured credit ratings based on the pricing schedules put in place at the initiation of the related agreement.

(2) Any amount outstanding under these agreements may be converted to a one-year term loan at the end of the revolving credit periods. If converted to a term loan, the fee on the outstanding principal amount of the term loan is 0.10 of 1% per annum.

Up-front fees of between 0.03 and 0.05 of 1% were paid to the banks based on their commitment level to the five-year agreements in place at May 31, 2007, totaling in aggregate $1 million, which will be amortized on a straight-line basis over the life of the agreements. No upfront fees were paid to the banks for their commitment to the 364-day facility. Each agreement contains a provision under which if borrowings exceed 50% of total commitments, a utilization fee must be paid on the outstanding balance. The utilization fees are 0.05 of 1% for all three agreements in place at May 31, 2007.

Effective May 31, 2007 and 2006, the Company was in compliance with all covenants and conditions under its revolving credit agreements in place at that time and there were no borrowings outstanding under such agreements.

For the purpose of calculating the required financial covenants contained in its revolving credit agreements, the Company adjusts net income, senior debt and total equity to exclude the non-cash adjustments related to SFAS 133 and 52. The adjusted TIER, as defined by the agreements, represents the interest expense adjusted to include the derivative cash settlements, plus minority interest net income, plus net income prior to the cumulative effect of change in accounting principle and dividing that total by the interest expense adjusted to include the derivative cash settlements. In addition to the non-cash adjustments related to SFAS 133 and 52, senior debt also excludes RUS guaranteed loans, subordinated deferrable debt, members' subordinated certificates and minority interest. Total equity is adjusted to include subordinated deferrable debt, members' subordinated certificates and minority interest. Senior debt includes guarantees; however, it excludes:
- guarantees for members where the long-term unsecured debt of the member is rated at least BBB+ by Standard & Poor's Corporation or Baa1 by Moody's Investors Service; and
- the payment of principal and interest by the member on the guaranteed indebtedness if covered by insurance or reinsurance provided by an insurer having an insurance financial strength rating of AAA by Standard & Poor's Corporation or a financial strength rating of Aaa by Moody's Investors Service.

The following represents the Company's required and actual financial ratios under the revolving credit agreements at or for the year ended May 31:

| | | Actual | |
|---|---|---|---|
| | Requirement | 2007 | 2006 |
| Minimum average adjusted TIER over the six most recent fiscal quarters | 1.025 | 1.09 | 1.11 |
| Minimum adjusted TIER at fiscal year end (1) | 1.05 | 1.12 | 1.11 |
| Maximum ratio of senior debt to total equity | 10.00 | 6.65 | 6.26 |

(1) The Company must meet this requirement in order to retire patronage capital.

The revolving credit agreements do not contain a material adverse change clause or ratings triggers that limit the banks' obligations to fund under the terms of the agreements, but CFC must be in compliance with their other requirements, including financial ratios, in

order to draw down on the facilities.

100

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

**(6)    Long-Term Debt**

The following is a summary of long-term debt and the weighted average interest rates thereon at May 31:

| (Dollar amounts in thousands) | 2007 Debt Outstanding | 2007 Weighted Average Interest Rate | 2006 Debt Outstanding | 2006 Weighted Average Interest Rate |
|---|---|---|---|---|
| Unsecured long-term debt: | | | | |
| Medium-term notes, sold through dealers (1) | $ 4,676,176 | | $ 4,174,200 | |
| Medium-term notes, sold directly to members (2) | 76,464 | | 55,052 | |
| Subtotal | 4,752,640 | | 4,229,252 | |
| Unamortized discount | (7,408) | | (9,203) | |
| Total unsecured medium-term notes | 4,745,232 | 6.62% | 4,220,049 | 6.73% |
| Unsecured notes payable | 2,032,630 | 5.26% | 2,074,565 | 5.30% |
| Total unsecured long-term debt | 6,777,862 | 6.21% | 6,294,614 | 6.26% |
| | | | | |
| Secured long-term debt: | | | | |
| Collateral trust bonds: | | | | |
| 3.25%, Bonds, due 2007 (3) | - | | 200,000 | |
| 6.20%, Bonds, due 2008 (3) | - | | 300,000 | |
| 3.875%, Bonds, due 2008 (3) | - | | 500,000 | |
| Floating Rate Bonds, due 2008 | 1,000,000 | | 1,000,000 | |
| Floating Rate Bonds, due 2008 | 600,000 | | - | |
| 5.75%, Bonds, due 2008 | 225,000 | | 225,000 | |
| Floating Rate Bonds, Series E-2, due 2010 | 1,953 | | 1,981 | |
| 5.70%, Bonds, due 2010 | 200,000 | | 200,000 | |
| 4.375%, Bonds, due 2010 | 500,000 | | 500,000 | |
| 4.75%, Bonds, due 2014 | 600,000 | | 600,000 | |
| 7.20%, Bonds, due 2015 | 50,000 | | 50,000 | |
| 5.45%, Bonds, due 2017 | 570,000 | | - | |
| 6.55%, Bonds, due 2018 | 175,000 | | 175,000 | |
| 7.35%, Bonds, due 2026 | 100,000 | | 100,000 | |
| Subtotal | 4,021,953 | | 3,851,981 | |
| Unamortized discount | (4,596) | | (4,567) | |
| Total secured collateral trust bonds | 4,017,357 | 5.30% | 3,847,414 | 5.00% |
| Secured notes payable | 500,000 | 4.66% | 500,000 | 4.66% |
| Total secured long-term debt | 4,517,357 | 5.23% | 4,347,414 | 4.96% |
| Total long-term debt | $ 11,295,219 | 5.82% | $ 10,642,028 | 5.73% |

(1) Medium-term notes sold through dealers mature through 2032 as of May 31, 2007 and 2006.  Does not include $134 million and $1,523 million of medium-term notes sold through dealers that were reclassified as short-term debt at May 31, 2007 and 2006, respectively.

(2) Medium-term notes sold directly to members mature through 2023 as of May 31, 2007 and 2006.  Does not include $231 million and $200 million of medium-term notes sold to members that were reclassified as short-term debt at May 31, 2007 and 2006, respectively.

(3) Amounts outstanding at May 31, 2007 are included as short-term debt.

The principal amount of medium-term notes, collateral trust bonds and long-term notes payable maturing in each of the five fiscal years following May 31, 2007 and thereafter is as follows:

| (Dollar amounts in thousands) | Amount Maturing | Weighted Average Interest Rate |
|---|---|---|
| 2008 (1) | $ - | - |
| 2009 | 2,684,912 | 5.25% |
| 2010 | 1,481,404 | 5.72% |
| 2011 | 521,910 | 4.42% |
| 2012 | 1,516,059 | 7.22% |
| Thereafter | 5,090,934 | 5.87% |
| Total | $ 11,295,219 | 5.82% |

_____

(1) The amount scheduled to mature in fiscal year 2008 has been presented as long-term debt due in one year under short-term debt.

Collateral trust bonds are secured by the pledge of mortgage notes or eligible securities in an amount at least equal to the principal balance of the bonds outstanding.  See Note 2 for additional information on the collateral pledged to secure the Company's collateral trust bonds.  Medium-term notes are unsecured obligations of CFC.

101

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

*Unsecured Notes Payable*
At May 31, 2007 and 2006, CFC had a total of $2 billion under a bond purchase agreement with the FFB and a bond guarantee agreement with RUS as part of the funding mechanism for the Rural Economic Development Loan and Grant ("REDLG") program. As part of the REDLG program, CFC is eligible to borrow up to the amount of the outstanding loans that it has issued concurrent with RUS loans. At May 31, 2007 and 2006, CFC had a total of $2.3 billion and $2.6 billion, respectively, outstanding on loans issued concurrently with RUS. As part of the REDLG program, CFC will pay to RUS a fee of 30 basis points per annum on the total amount borrowed. At May 31, 2007 and 2006, the $2 billion of unsecured notes payable issued as part of the REDLG program require CFC to place on deposit mortgage notes in an amount at least equal to the principal balance of the notes outstanding. See Note 2 for additional information on the mortgage notes held on deposit.

*Secured Notes Payable*
At May 31, 2007 and 2006, the Company had outstanding a total of $500 million of 4.656% notes to Farmer Mac due in 2008. The $500 million of notes payable sold to Farmer Mac are secured by the pledge of mortgage notes in an amount at least equal to the principal balance of the notes outstanding. See Note 2 for additional information on the collateral pledged to secure the Company's notes payable.

**(7)    Subordinated Deferrable Debt**

Subordinated deferrable debt represents quarterly income capital securities and subordinated notes that are long-term obligations subordinated to CFC's outstanding debt and senior to subordinated certificates held by CFC's members. CFC's subordinated deferrable debt is issued for terms of up to 49 years, pays interest quarterly, may be called at par after five years and allows CFC to defer the payment of interest for up to 20 consecutive quarters. To date, CFC has not exercised its right to defer interest payments. The following table is a summary of subordinated deferrable debt outstanding at May 31:

| (Dollar amounts in thousands) | 2007 | | 2006 | |
| --- | --- | --- | --- | --- |
| | Amounts Outstanding | Weighted Average Interest Rate | Amounts Outstanding | Weighted Average Interest Rate |
| 6.75% due 2043 | $   125,000 | | $   125,000 | |
| 6.10% due 2044 | 88,201 | | 88,201 | |
| 5.95% due 2045 | 98,239 | | 98,239 | |
| 7.40% due 2050 (1) | - | | 175,000 | |
| Total | $   311,440 | 6.31% | $   486,440 | 6.70% |

(1) Amount outstanding at May 31, 2007 was called in June 2007 and reported in short-term debt.

**(8)    Derivative Financial Instruments**

The Company is neither a dealer nor a trader in derivative financial instruments. The Company uses interest rate, cross currency and cross currency interest rate exchange agreements to manage its interest rate risk and foreign currency exchange risk.

Consistent with SFAS 133, as amended, the Company records derivative instruments on the consolidated balance sheet as either an asset or liability measured at fair value. Changes in the fair value of derivative instruments are recognized in the derivative forward value line item of the consolidated statement of operations unless specific hedge accounting criteria are met. Net settlements paid and received for derivative instruments that qualify for hedge accounting are recorded in interest expense. Net settlements related to derivative instruments that do not qualify for hedge accounting are recorded as derivative cash settlements in the consolidated statement of operations. The Company formally documents, designates, and assesses the effectiveness of transactions that receive hedge accounting.

*Interest Rate Exchange Agreements*
Generally, the Company's interest rate exchange agreements do not qualify for hedge accounting under SFAS 133. The majority of the Company's interest rate exchange agreements use a 30-day composite commercial paper index as either the pay or receive leg. The 30-day composite commercial paper index is the best match for the commercial paper that is the underlying debt used as the cost basis in setting the Company's variable interest rates. However, the correlation between movement in the 30-day composite commercial paper index and movement in the Company's commercial paper rates is not consistently high enough to qualify for hedge accounting. The Company's commercial paper rates are not indexed to the 30-day composite commercial paper index and the Company does not solely issue its commercial paper with maturities of 30 days. At May 31, 2007 and 2006, the Company did not have any interest rate exchange

agreements that were accounted for using hedge accounting.

102

## NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)

The Company was a party to the following interest rate exchange agreements at May 31:

|  | Notional Amounts Outstanding | |
| --- | --- | --- |
| (in thousands) | 2007 | 2006 |
| Pay fixed and receive variable | $ 7,276,473 | $ 7,349,584 |
| Pay variable and receive fixed | 5,256,440 | 5,186,440 |
| Total interest rate exchange agreements | $ 12,532,913 | $ 12,536,024 |

The Company has classified cash activity associated with derivatives as an operating activity in the consolidated statements of cash flows.

Interest rate exchange agreements had the following impact on the Company for the years ended May 31:

| (in thousands) | 2007 | 2006 | 2005 |
| --- | --- | --- | --- |
| **Statement of Operations Impact** | | | |
| Agreements that qualify for hedge accounting: | | | |
| Interest expense | $ - | $ 2,688 | $ 207 |
| Agreements that do not qualify for hedge accounting: | | | |
| Derivative cash settlements | 77,342 | 61,690 | 43,137 |
| Derivative forward value | (83,322) | 28,744 | 3,433 |
| Total (loss) gain on interest rate exchange agreements | $ (5,980) | $ 93,122 | $ 46,777 |
| **Comprehensive Income Impact** | | | |
| Agreements that qualify for hedge accounting: | | | |
| Unrealized (loss) gain on derivatives | $ - | $ (2,322) | $ (53) |
| Amortization of transition adjustment | (1,004) | 226 | 16,241 |
| Total comprehensive (loss) income | $ (1,004) | $ (2,096) | $ 16,188 |

Cash settlements includes periodic amounts that were paid and received related to its interest rate exchange agreements. In December 2006, the Company terminated two $500 million pay variable and receive fixed interest rate exchange agreements prior to the maturity dates. The early termination resulted in the Company receiving a payment of $31 million, the fair value of the agreements on that date. At termination, the Company also recorded a charge to the derivative fair value line to reduce the derivative asset by $31 million, the fair value of the agreements on that date. The payment received and the reduction to the recorded derivative asset are offsetting, thus there was no impact to reported net income as a result of this transaction. During the year ended May 31, 2006, cash settlements includes a payment of $1 million received from counterparties representing the fair value of interest rate exchange agreements terminated by the Company. These agreements were terminated due to the prepayment of RTFC loans during the year ended May 31, 2006, the proceeds of which were used to pay down the underlying debt for the terminated interest rate exchange agreements.

For the years ended May 31, 2007 and 2006, the derivative forward value also includes amortization of $0.8 million and $0.4 million, respectively, related to a total transition adjustment of $62 million recorded as an other comprehensive loss on June 1, 2001, the date the Company implemented SFAS 133. The transition adjustment will be amortized into earnings over the remaining life of the related interest rate exchange agreements. Approximately $0.8 million is expected to be amortized over the next twelve months related to the transition adjustment and will continue through April 2029.

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

*Cross Currency Interest Rate Exchange Agreements*

There were no cross currency or cross currency interest rate exchange agreements outstanding at May 31, 2007. At May 31, 2006, the Company was a party to the following cross currency interest rate exchange agreements, none of which were accounted for using hedge accounting.

| (Currency amounts in thousands) | | Notional Principal Amount | | | | |
|---|---|---|---|---|---|---|
| | Original | U.S. Dollars (5) | | Foreign Currency | | |
| Maturity Date | Exchange Rate | May 31, 2007 | May 31, 2006 | May 31, 2007 | May 31, 2006 | |
| July 7, 2006 | 1.506 | $ - | $ 166,000 (3) | - | 250,000 | AUD (2) |
| July 7, 2006 | 1.506 | - | 116,200 (4) | - | 175,000 | AUD (2) |
| March 14, 2007 | 1.153 | - | 433,500 (4) | - | 500,000 | EU (1) |
| Total | | $ - | $ 715,700 | - | 925,000 | |

(1) EU – Euros
(2) AUD Australian dollars
(3) These agreements also change the interest rate from a foreign denominated variable rate to a U.S. dollar denominated variable rate.
(4) These agreements also change the interest rate from a foreign denominated fixed rate to a U.S. dollar denominated variable rate.
(5) Amounts in the chart represent the U.S. dollar value at the initiation of the exchange agreement. At May 31, 2006, one U.S. dollar was the equivalent of 0.780 Euros and 1.329 Australian dollars, respectively.

Cross currency interest rate exchange agreements had the following impact on the Company for the years ended May 31:

| (in thousands) | 2007 | 2006 | 2005 |
|---|---|---|---|
| **Statement of Operations Impact** | | | |
| Agreements that qualify for hedge accounting: | | | |
| Interest expense | $ - | $ (4,966) | $ (5,989) |
| | | | |
| Agreements that do not qualify for hedge accounting: | | | |
| Derivative cash settlements | 9,100 | 19,193 | 35,150 |
| Derivative forward value | 4,041 | 61 | 22,416 |
| Total gain on cross currency exchange agreements | $ 13,141 | $ 14,288 | $ 51,577 |
| | | | |
| **Comprehensive Income Impact** | | | |
| Agreements that qualify for hedge accounting: | | | |
| Unrealized (loss) gain on derivatives | $ - | $ (317) | $ 11,974 |

*Rating Triggers*

The Company has certain interest rate exchange agreements that contain a provision called a rating trigger. Under a rating trigger, if the credit rating for either counterparty falls to the level specified in the agreement, the other counterparty may, but is not obligated to, terminate the agreement. If either counterparty terminates the agreement, a net payment may be due from one counterparty to the other based on the fair value of the underlying derivative instrument. Rating triggers are not separate financial instruments and are not separate derivatives under SFAS 133. The rating triggers contained in certain of the Company's derivative contracts are based on its senior unsecured credit rating from Standard & Poor's Corporation and Moody's Investors Service.

At May 31, 2007, the Company has the following notional amount and fair values associated with exchange agreements that contain rating triggers. For the purpose of the presentation, the Company has grouped the rating triggers into two categories, (1) ratings from Moody's Investors Service falls to Baa1 or from Standard & Poor's Corporation falls to BBB+ and (2) ratings from Moody's Investors Service falls below Baa1 or from Standard & Poor's Corporation falls below BBB+.

| (in thousands) | | Required Company | Amount Company | |
| Rating Level: | Notional Amount | Payment | Would Collect | Net Total |
|---|---|---|---|---|
| Fall to Baa1/BBB+ | $ 1,466,017 | $ (4,946) | $ 37,572 | $ 32,626 |
| Fall below Baa1/BBB+ | 7,261,386 | (47,263) | 140,604 | 93,341 |
| Total | $ 8,727,403 | $ (52,209) | $ 178,176 | $ 125,967 |

**(9)    Members' Subordinated Certificates**

*Membership Subordinated Certificates*
To join CFC and to establish eligibility to borrow, CFC members (other than service organizations and associates) are required to execute agreements to subscribe to membership subordinated certificates. Such certificates are interest-bearing, unsecured, subordinated debt of CFC. CFC is authorized to issue membership subordinated certificates without limitation as to the total principal amount.

104

## NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)

Generally, membership subordinated certificates mature in the years 2020 through 2095 and bear interest at 5% per annum. The maturity dates and interest rates payable on such certificates vary in accordance with applicable CFC policy.

*Loan and Guarantee Subordinated Certificates*

Members obtaining long-term loans, certain short-term loans or guarantees are generally required to purchase additional loan or guarantee subordinated certificates with each such loan or guarantee based on the members' CFC debt to equity ratio. These certificates are unsecured, subordinated debt of the Company.

Certificates currently purchased in conjunction with long-term loans are generally non-interest bearing. CFC's policy regarding the purchase of loan subordinated certificates requires members with a CFC debt to equity ratio in excess of the limit in the policy to purchase a non-amortizing/non-interest bearing subordinated certificate in the amount of 2% of the long-term loan for distribution systems and 7% of the long-term loan for power supply systems. CFC associates and RTFC members are required to purchase loan subordinated certificates of 10% of each long-term loan advance. For non-standard credit facilities, the borrower is required to purchase interest bearing certificates in amounts determined appropriate by CFC based on the circumstances of the transaction.

The maturity dates and the interest rates payable on guarantee subordinated certificates purchased in conjunction with CFC's guarantee program vary in accordance with applicable CFC policy. Members may be required to purchase non-interest bearing debt service reserve subordinated certificates in connection with CFC's guarantee of long-term tax-exempt bonds (see Note 13). CFC pledges proceeds from the sale of such certificates to the debt service reserve fund established in connection with the bond issue and any earnings from the investments of the fund inure solely to the benefit of the members for whom the bonds are issued. These certificates have varying maturities not exceeding the longest maturity of the guaranteed obligation.

Information with respect to members' subordinated certificates at May 31, is as follows:

| | 2007 | | 2006 | |
|---|---|---|---|---|
| (Dollar amounts in thousands) | Amounts Outstanding | Weighted Average Interest Rate | Amounts Outstanding | Weighted Average Interest Rate |
| Number of subscribing members | 899 | | 898 | |
| | | | | |
| Membership subordinated certificates: | | | | |
| Certificates maturing 2020 through 2095 | $ 627,875 | | $ 628,914 | |
| Subscribed and unissued | 21,549 | | 21,885 | |
| Total membership subordinated certificates | 649,424 | 4.88% | 650,799 | 4.88% |
| | | | | |
| Loan and guarantee subordinated certificates: | | | | |
| 3% certificates maturing through 2040 | 113,501 | | 115,662 | |
| 2% to 12% certificates maturing through 2042 | 200,779 | | 201,174 | |
| Non-interest bearing certificates maturing through 2042 | 369,037 | | 414,435 | |
| Subscribed and unissued | 48,706 | | 45,890 | |
| Total loan and guarantee subordinated certificates | 732,023 | 2.07% | 777,161 | 1.94% |
| | | | | |
| Total members' subordinated certificates | $ 1,381,447 | 3.39% | $ 1,427,960 | 3.28% |

Membership subordinated certificates generally mature in 100 years from issuance. The weighted average maturity for membership subordinated certificates outstanding at May 31, 2007 and 2006 was 69 years and 70 years, respectively. Loan and guarantee subordinated certificates have the same maturity as the related long-term loan. Some certificates may also amortize annually based on the outstanding loan balance.

The subscribed and unissued subordinated certificates represent subordinated certificates that members are required to purchase, but are not yet paid for. Upon collection of the full amount of the subordinated certificate, the amount of the certificate will be reclassified from subscribed and unissued to outstanding.

### (10)    Minority Interest

At May 31, 2007 and 2006, the Company reported minority interests of $22 million on the consolidated balance sheets. Minority interest represents the 100% interest that RTFC and NCSC members have in their respective organizations. The members of RTFC and

NCSC own or control 100% of the interest in the respective company.

During the year ended May 31, 2007, the balance of minority interest increased by $2 million of minority interest net income for the year ended May 31, 2007 offset by the retirement of $2 million of patronage capital to RTFC members in January 2007.

105

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

**(11)    Equity**

CFC is required by the District of Columbia cooperative law to have a methodology to allocate its net earnings to its members.  CFC maintains the current year net earnings as unallocated through the end of its fiscal year.  At that time, CFC's board of directors allocates its net earnings to members in the form of patronage capital and to board approved reserves.  Currently, CFC has two such board approved reserves, the education fund and the members' capital reserve.  CFC allocates a small portion, less than 1%, of net earnings annually to the education fund.  The allocation to the education fund must be at least 0.25% of net earnings as required by CFC's bylaws.  Funds from the education fund are disbursed annually to fund cooperative education among employees and directors of cooperatives in the service territories of each state.  The board of directors determines the amount of net earnings that is allocated to the members' capital reserve, if any.  The members' capital reserve represents earnings that are held by CFC to increase equity retention.  The net earnings held in the members' capital reserve have not been allocated to any member, but may be allocated to individual members in the future as patronage capital if authorized by CFC's board of directors.  All remaining net earnings are allocated to CFC's members in the form of patronage capital.  CFC bases the amount of net earnings allocated to each member on the members' patronage of the CFC lending programs in the year that the net earnings were earned.  There is no impact on CFC's total equity as a result of allocating net earnings to members in the form of patronage capital or to board approved reserves.  CFC's board of directors has annually voted to retire a portion of the patronage capital allocated to members in prior years.  CFC's total equity is reduced by the amount of patronage capital retired to members and by amounts disbursed from board approved reserves.  CFC adjusts the net earnings it allocates to members and board approved reserves to exclude the non-cash impacts of SFAS 133 and 52.

CFC's board of directors authorized the retirement of $84 million of allocated net earnings in July 2006, representing 70% of the allocated net earnings for fiscal year 2006 and one-ninth of the allocated net earnings for fiscal years 1991, 1992 and 1993.  This amount was retired in August 2006. Under current policy, the remaining 30% of the fiscal year 2006 allocated net earnings will be retained by CFC and used to fund operations for 15 years and then may be retired.  The retirement of allocated net earnings for fiscal years 1991, 1992 and 1993 is done as part of the transition to the current retirement cycle adopted in 1994 and will last through fiscal year 2008.  After that time and under current policy, retirements will be comprised of the 70% of allocated net earnings from the prior year as approved by the board of directors and the remaining portion of allocated net earnings retained by CFC from prior years (50% for 1994 and 30% for all years thereafter).

In July 2007, CFC's board of directors authorized the allocation of the fiscal year 2007 adjusted net earnings as follows: $1 million to the education fund and $104 million to members in the form of patronage capital.  The board of directors also authorized the allocation of $1 million to the members' capital reserve.  In July 2007, CFC's board of directors authorized the retirement of allocated net earnings totaling $86 million, representing 70% of the fiscal year 2007 allocation and one-ninth of the fiscal years 1991, 1992 and 1993 allocated net earnings.  This amount will be returned to members in cash at the end of August 2007.  Future allocations and retirements of net earnings will be made annually as determined by CFC's board of directors with due regard for CFC's financial condition.  The board of directors for CFC has the authority to change the policy for allocating and retiring net earnings at any time, subject to applicable cooperative law.

At May 31, 2007 and 2006, equity included the following components:

| (in thousands) | 2007 | 2006 |
|---|---|---|
| Membership fees | $          997 | $          994 |
| Education fund | 1,406 | 1,281 |
| Members' capital reserve | 158,308 | 156,844 |
| Allocated net income | 405,598 | 386,232 |
| Unallocated net income | (23) | - |
| Total members' equity | 566,286 | 545,351 |
| Prior years cumulative derivative forward value and foreign currency adjustments | 225,849 | 225,730 |
| Current period derivative forward value (1) | (79,744) | 22,713 |
| Current period foreign currency adjustments | (14,554) | (22,594) |
| Total retained equity | 697,837 | 771,200 |
| Accumulated other comprehensive income | 12,204 | 13,208 |
| Total equity | $     710,041 | $     784,408 |

(1) Represents the derivative forward value gain recorded by CFC for the period.

106

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

**(12)    Employee Benefits**

CFC is a participant in the National Rural Electric Cooperative Association ("NRECA") Retirement Security Plan. This plan is available to all qualified CFC employees. Under the plan, participating employees are entitled to receive annually, under a 50% joint and surviving spouse annuity, 1.90% of the average of their five highest base salaries during their last ten years of employment, multiplied by the number of years of participation in the plan. CFC contributed $3.3 million, $3.0 million and $2.8 million to the Retirement Security Plan during fiscal years 2007, 2006 and 2005, respectively. Funding requirements that are billed are charged to general and administrative expenses on a monthly basis. This is a multi-employer plan, available to all member cooperatives of NRECA, and therefore the projected benefit obligation and plan assets are not determined or allocated separately by individual employer.

The Economic Growth and Tax Relief Act of 2001 set a limit of $225,000 for calendar year 2007 on the compensation to be used in the calculation of pension benefits. In order to restore potential lost benefits, CFC has adopted a Pension Restoration Plan administered by NRECA. Under the plan, the amount that NRECA invoices CFC for the Retirement Security Plan will continue to be based on the full compensation paid to each employee. Upon the retirement of a covered employee, NRECA will calculate the retirement and security benefit to be paid with consideration of the compensation limits and will pay the maximum benefit thereunder. NRECA will also calculate the retirement and security benefit that would have been available without consideration of the compensation limits and CFC will pay the difference. NRECA will then give CFC a credit against future retirement and security contribution liabilities in the amount paid by CFC to the covered employee.

CFC has paid such additional benefits to the covered employee through two components of the Pension Restoration Plan, a Severance Pay Plan and a Deferred Compensation Plan. Under the Severance Pay Plan, the employee was paid an amount equal to the lost pension benefits but not exceeding twice the employee's annual compensation for the prior year. The benefit was paid within 24 months of termination of employment. To the extent that the Severance Pay Plan could not pay all of the lost pension benefits, the remainder was paid under a Deferred Compensation Plan in a lump sum or in installments of up to 60 months.

The Severance Pay Plan component of the Pension Restoration Plan has been eliminated effective January 1, 2005. Any benefit earned prior to December 31, 2004 will be held for the employee and will be paid out as outlined above. Benefits earned as of January 1, 2005, however, will be paid solely under the Deferred Compensation component of the Pension Restoration Plan, which carries a substantial risk of forfeiture.

As of December 31, 2006, the NRECA Retirement Security Plan meets the ERISA standards for a funded plan and CFC was current with regard to its obligations to NRECA, the plan provider.

CFC offers a 401(k) defined contribution savings program, the 401(k) Pension Plan, to all employees that have completed a minimum of 1,000 hours of service in either the first 12 consecutive months or first full calendar year of employment. CFC contributes an amount up to 3% of an employee's salary each year for all employees participating in the program with a minimum 2% employee contribution. During the years ended May 31, 2007, 2006 and 2005, CFC contributed $0.5 million each year under the program.

**(13)    Guarantees**

The Company guarantees certain contractual obligations of its members so that they may obtain various forms of financing. With the exception of letters of credit, the underlying obligations may not be accelerated so long as the Company performs under its guarantee. At May 31, 2007 and 2006, the Company had recorded a guarantee liability totaling $19 million and $17 million, respectively, which represents the contingent and non-contingent exposure related to guarantees of members' debt obligations. The contingent guarantee liability at May 31, 2007 and 2006 totaled $13 million and $15 million, respectively, based on management's estimate of exposure to losses within the guarantee portfolio. The Company uses factors such as internal risk rating, remaining term of guarantee, corporate bond default probabilities and estimated recovery rates in estimating its contingent exposure. The remaining balance of the total guarantee liability of $6 million and $2 million at May 31, 2007 and 2006, respectively, relates to the Company's non-contingent obligation to stand ready to perform over the term of its guarantees that it has entered into or modified since January 1, 2003 in accordance with FIN 45. The non-contingent obligation is estimated based on guarantee fees received. The fees are deferred and amortized on the straight-line method into

## NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)

interest income over the term of the guarantees. The Company deferred fees of $6 million, $2 million and $0.6 million for the years ended May 31, 2007, 2006 and 2005, respectively, related to new guarantees issued during the periods. Activity in the guarantee liability account is summarized below for the years ended May 31:

| (Dollar amounts in thousands) | 2007 | 2006 | 2005 |
|---|---|---|---|
| Beginning balance | $ 16,750 | $ 16,094 | $ 19,184 |
| Net change in non-contingent liability | 3,879 | 1,356 | 17 |
| Recovery of contingent guarantee losses | (1,700) | (700) | (3,107) |
| Ending balance | $ 18,929 | $ 16,750 | $ 16,094 |
| | | | |
| Liability as percentage of total guarantees | 1.76% | 1.55% | 1.39% |

The following chart summarizes total guarantees by type and segment at May 31:

| (in thousands) | 2007 | 2006 |
|---|---|---|
| Total by type: | | |
| Long-term tax exempt bonds (1) | $ 526,185 | $ 607,655 |
| Indemnifications of tax benefit transfers (2) | 107,741 | 123,544 |
| Letters of credit (3) | 365,766 | 272,450 |
| Other guarantees (4) | 74,682 | 75,331 |
| Total | $ 1,074,374 | $ 1,078,980 |
| | | |
| Total by segment: | | |
| CFC: | | |
| Distribution | $ 211,320 | $ 70,166 |
| Power supply | 797,009 | 921,930 |
| Statewide and associate | 25,359 | 32,873 |
| CFC total | 1,033,688 | 1,024,969 |
| NCSC | 40,686 | 54,011 |
| Total | $ 1,074,374 | $ 1,078,980 |

---

(1)  The maturities for this type of guarantee run through 2037. CFC has guaranteed debt issued in connection with the construction or acquisition of pollution control, solid waste disposal, industrial development and electric distribution facilities. CFC has unconditionally guaranteed to the holders or to trustees for the benefit of holders of these bonds the full principal, premium, if any, and interest on each bond when due. In addition, CFC has agreed to make up, at certain times, deficiencies in the debt service reserve funds for certain of these issues of bonds. In the event of default by a system for non-payment of debt service, CFC is obligated to pay any required amounts under its guarantees, which will prevent the acceleration of the bond issue. The system is required to repay, on demand, any amount advanced by CFC and interest thereon pursuant to the documents evidencing the system's reimbursement obligation.

Of the amounts shown above, $396 million and $572 million as of May 31, 2007 and 2006, respectively, are adjustable or floating/fixed rate bonds. The floating interest rate on such bonds may be converted to a fixed rate as specified in the indenture for each bond offering. During the variable rate period (including at the time of conversion to a fixed rate), CFC has unconditionally agreed to purchase bonds tendered or put for redemption if the remarketing agents have not previously sold such bonds to other purchasers. CFC's maximum potential exposure includes guaranteed principal and interest related to the bonds. CFC is unable to determine the maximum amount of interest that it could be required to pay related to the floating rate bonds. As of May 31, 2007, CFC's maximum potential exposure for the $25 million of fixed rate tax-exempt bonds is $33 million. Many of these bonds have a call provision that in the event of a default would allow CFC to trigger the call provision. This would limit CFC's exposure to future interest payments on these bonds. CFC's maximum potential exposure is secured by a mortgage lien on substantially all of the system's assets and future revenues. However, if the debt is accelerated because of a determination that the interest thereon is not tax-exempt, then in nearly all cases, the system's obligation to reimburse CFC for any guarantee payments will be treated as a long-term loan.

(2)  The maturities for this type of guarantee run through 2015. CFC has unconditionally guaranteed to lessors certain indemnity payments, which may be required to be made by the lessees in connection with tax benefit transfers. In the event of default by a system for non-payment of indemnity payments, CFC is obligated to pay any required amounts under its guarantees, which will prevent the acceleration of the indemnity payments. The member is required to repay any amount advanced by CFC and interest thereon pursuant to the documents evidencing the system's reimbursement obligation. The amounts shown represent CFC's maximum potential exposure for guaranteed indemnity payments. A member's obligation to reimburse CFC for any guarantee payments would be treated as a long-term loan to the extent of any cash received by the member at the outset of the transaction. This amount is secured by a mortgage lien on substantially all of the system's assets and future revenues. The remainder would be treated as a short-term loan secured by a subordinated mortgage on substantially all of the member's property. Due to changes in federal tax law, no further guarantees of this nature are anticipated.

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

(3)   The maturities for this type of guarantee run through 2017.  Additionally, letters of credit totaling $9 million at May 31, 2007 have a term of one year and automatically extend for a period of one year unless the Company cancels the agreement within 120 days of maturity (in which case, the beneficiary may draw on the letter of credit).  The Company issues irrevocable letters of credit to support members' obligations to energy marketers and other third parties and to the Rural Business and Cooperative Development Service with issuance fees as may be determined from time to time.  Each letter of credit issued is supported by a reimbursement agreement with the member on whose behalf the letter of credit was issued.  In the event a beneficiary draws on a letter of credit, the agreement generally requires the member to reimburse the Company within one year from the date of the draw.  Interest would accrue from the date of the draw at the line of credit variable rate of interest in effect on such date.  The agreement also requires the member to pay, as applicable, a late payment charge and all costs of collection, including reasonable attorneys' fees.  As of May 31, 2007, the Company's maximum potential exposure is $366 million, of which $217 million is secured.  When taking into consideration reimbursement obligation agreements that CFC has in place with other lenders, CFC's maximum potential exposure related to $24 million of letters of credit would be reduced to $9 million in the event of default.  Security provisions include a mortgage lien on substantially all of the system's assets, future revenues, and the system's commercial paper invested at the Company.  In addition to the letters of credit listed in the table, under master letter of credit facilities, the Company may be required to issue up to an additional $339 million in letters of credit to third parties for the benefit of its members at May 31, 2007.  At May 31, 2006, this amount was $217 million.

(4)   The maturities for this type of guarantee run through 2025.  CFC provides other guarantees for its members.  In the event of default by a system for non-payment of the obligation, CFC must pay any required amounts under its guarantees, which will prevent the acceleration of the obligation.  Such guarantees may be made on a secured or unsecured basis with guarantee fees set to cover CFC's general and administrative expenses, a provision for losses and a reasonable margin.  The member is required to repay any amount advanced by CFC and interest thereon pursuant to the documents evidencing the system's reimbursement obligation.  Of CFC's maximum potential exposure for guaranteed principal and interest totaling $75 million at May 31, 2007, $3 million is secured by a mortgage lien on substantially all of the system's assets and future revenues and the remaining $72 million is unsecured.

CFC uses the same credit policies and monitoring procedures in providing guarantees as it does for loans and commitments.

The following table details the scheduled reductions of CFC's outstanding guarantees in each of the fiscal years following May 31, 2007:

| (in thousands) | Amount |
|---|---|
| 2008 | $ 194,433 |
| 2009 | 129,502 |
| 2010 | 149,335 |
| 2011 | 118,368 |
| 2012 | 95,250 |
| Thereafter | 387,486 |
| Total | $ 1,074,374 |

At May 31, 2007 and 2006, CFC had a total of $221 million and $144 million of guarantees, representing 21% and 13% of total guarantees, respectively, under which its right of recovery from its members was not secured.

**(14)      Fair Value of Financial Instruments**

The following disclosure of the estimated fair value of financial instruments is made in accordance with SFAS 107, Disclosure about Fair Value of Financial Instruments.  Whenever possible, the estimated fair value amounts have been determined using quoted market information as of May 31, 2007 and 2006.  The estimated fair value information presented is not necessarily indicative of amounts the Company could realize currently in a market sale since it may be unable to sell such instruments due to contractual restrictions or to the lack of an established market.  The estimated market values have not been updated since May 31, 2007; therefore, current estimates of fair value may differ significantly from the amounts presented.  With the exception of redeeming collateral trust bonds and subordinated deferrable debt under early redemption provisions, terminating derivative instruments under early termination provisions and allowing borrowers to prepay their loans, the Company has held and intends to hold all financial instruments to maturity.  Below is a summary of significant methodologies used in estimating fair value amounts and a schedule of fair values at May 31, 2007 and 2006.

*Cash and Cash Equivalents*
Includes cash and certificates of deposit with remaining maturities of less than 90 days, which are valued at the carrying value.

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

*Loans to Members*
Fair values are estimated by discounting the future cash flows using the current rates at which similar loans would be made to borrowers with similar credit ratings and for the same remaining maturities.  Loans with different risk characteristics, specifically non-performing and restructured loans, are valued using a discount rate commensurate with the risk involved.  Loans with interest rate repricing scheduled within 90 days of year end are valued at carrying value, which approximates fair value.  Variable rate loans are valued at cost, which approximates fair value since the Company has the option to reset rates every 30 days.

*Debt Service Reserve Funds*
The Company considers the carrying value of debt service reserve funds to be equal to fair value.  Debt service reserve funds represent cash or short-term investments on deposit with the trustee of collateral trust bonds and thus carrying value is considered to be equal to fair value.

*Short-Term Debt*
Short-term debt consists of commercial paper, bank bid notes and other debt due within one year.  The fair value of short-term debt with maturities greater than 90 days is estimated based on quoted market rates for debt with similar maturities.  The fair value of short-term debt with maturities less than or equal to 90 days is carrying value, which is a reasonable estimate of fair value.

*Long-Term Debt*
Long-term debt consists of collateral trust bonds, medium-term notes and long-term notes payable.  The fair value of long-term debt is estimated based on published bid prices or dealer quotes or is estimated using quoted market prices for similar securities when no market quote is available and based on current exchange rates for long-term debt denominated in a foreign currency.

Long-term debt with a variable interest rate is valued at carrying value, which approximates fair value since rates may be adjusted every 30 days.

*Subordinated Deferrable Debt*
The fair value of subordinated deferrable debt is estimated based on published market prices.

*Members' Subordinated Certificates*
As it is impracticable to develop a discount rate that measures fair value, subordinated certificates have not been valued.  Members' subordinated certificates are extended long-term obligations of the Company; many have original maturities of 70 to 100 years.  These certificates are issued to the Company's members as a condition of membership or as a condition of obtaining loan funds or guarantees and are non-transferable.  As these certificates were not issued primarily for their future payment stream but mainly as a condition of membership and to receiving future loan funds, there is no ready market from which to obtain fair value quotes.

*Interest Rate and Cross Currency Interest Rate Exchange Agreements*
Derivative instruments are recorded in the consolidated balance sheets at fair value.  The fair value of the interest rate and cross currency interest rate exchange agreements is estimated taking into account the expected future market rate of interest and the current creditworthiness of the exchange counterparties.  The fair value of cross currency interest rate exchange agreements additionally takes into account the expected future currency exchange rate. The fair value of the cross currency exchange agreements is estimated taking into account the expected future currency exchange rate and the current creditworthiness of the exchange counterparties.

*Commitments*
The fair value is estimated as the carrying value, or zero.  Extensions of credit under these commitments, if exercised, would result in loans priced at market rates.

*Guarantees*
It is impracticable to supply fair value information related to guarantees based on market comparisons as there is no other company that provides guarantees to rural electric utility companies from which to obtain market rate information.  The fair value of CFC's guarantees shown is based on the amount recorded as a guarantee liability which represents CFC's contingent and non-contingent exposure related to its guarantees.

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

Carrying and fair values as of May 31, 2007 and 2006 are presented as follows:

| (in thousands) | 2007 | | 2006 | |
| --- | --- | --- | --- | --- |
| | Carrying Value | Fair Value | Carrying Value | Fair Value |
| **Assets:** | | | | |
| Cash and cash equivalents | $ 304,107 | $ 304,107 | $ 260,338 | $ 260,338 |
| Loans to members, net | 17,566,544 | 15,743,632 | 17,749,462 | 15,055,729 |
| Debt service reserve funds | 54,993 | 54,993 | 80,159 | 80,159 |
| Cash flow interest rate exchange agreements | 212,143 | 212,143 | 320,201 | 320,201 |
| Cash flow cross currency interest rate exchange agreements | - | - | 22,226 | 22,226 |
| Fair value interest rate exchange agreements | 10,631 | 10,631 | - | - |
| Fair value cross currency interest rate exchange agreements | - | - | 233,242 | 233,242 |
| **Liabilities:** | | | | |
| Short-term debt | 4,427,123 | 4,404,590 | 5,343,824 | 5,339,759 |
| Long-term debt | 11,295,219 | 11,492,645 | 10,642,028 | 10,725,849 |
| Guarantee liability (1) | 18,929 | 18,929 | 16,750 | 16,750 |
| Cash flow interest rate exchange agreement | 12,869 | 12,869 | 6,844 | 6,844 |
| Fair value interest rate exchange agreement | 59,065 | 59,065 | 78,354 | 78,354 |
| Subordinated deferrable debt | 311,440 | 299,964 | 486,440 | 462,741 |
| **Off-balance sheet instruments:** | | | | |
| Commitments | - | - | - | - |

(1) The carrying value represents CFC's exposure related to its guarantees and therefore will not equal total guarantees shown in Note 13.

**(15)    Contingencies**

The Company had the following loans classified as non-performing and restructured at May 31:

| (in thousands) | 2007 | 2006 |
| --- | --- | --- |
| Non-performing loans | $ 501,864 | $ 577,869 |
| Restructured loans | 603,305 | 630,354 |
| Total | $ 1,105,169 | $ 1,208,223 |

(a) At May 31, 2007 and 2006, all loans classified as non-performing were on a non-accrual status with respect to the recognition of interest income.  At May 31, 2007 and 2006, $545 million and $569 million, respectively, of restructured loans were on non-accrual status with respect to the recognition of interest income.  A total of $4 million and $1 million of interest income was accrued on restructured loans during the year ended May 31, 2007 and 2006.

Interest income was reduced as follows as a result of holding loans on non-accrual status for the years ended May 31:

| | | Reduction to interest income | | |
|---|---|---|---|---|
| (in thousands) | 2007 | 2006 | 2005 |
| Non-performing loans | $ 41,448 | $ 42,725 | $ 24,424 |
| Restructured loans | 39,177 | 35,947 | 26,969 |
| Total | $ 80,625 | $ 78,672 | $ 51,393 |

(b) The Company classified $1,099 million and $1,201 million of loans as impaired pursuant to the provisions of SFAS 114 at May 31, 2007 and 2006, respectively.  The Company reserved $397 million and $447 million of the loan loss allowance for such impaired loans at May 31, 2007 and 2006, respectively.  The amount included in the loan loss allowance for such loans was based on a comparison of the present value of the expected future cash flow associated with the loan discounted at the

111

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

original contract interest rate and/or the estimated fair value of the collateral securing the loan to the recorded investment in the loan. Impaired loans may be on accrual or non-accrual status with respect to the recognition of interest income based on a review of the terms of the restructure agreement and borrower performance. The Company accrued a total of $3 million and $1 million of interest income on impaired loans for the years ended May 31, 2007 and 2006, respectively. The Company did not accrue interest income on loans classified as impaired during the year ended May 31, 2005. The average recorded investment in impaired loans for the year ended May 31, 2007 and 2006 was $1,144 million and $1,162 million, respectively.

The Company updates impairment calculations on a quarterly basis. Since a borrower's original contract rate may include a variable rate component, calculated impairment could vary with changes to the Company's variable rate, independent of a borrower's underlying financial performance or condition. In addition, the calculated impairment for a borrower will fluctuate based on changes to certain assumptions. Changes to assumptions include, but are not limited to the following:

- court rulings,
- changes to collateral values, and
- changes to expected future cash flows both as to timing and amount.

(c) At May 31, 2007 and 2006, CFC had a total of $545 million and $569 million, respectively, of loans outstanding to Denton County Electric Cooperative, d/b/a CoServ Electric ("CoServ"), a large electric distribution cooperative located in Denton County, Texas, that provides retail electric service to residential and business customers. All loans have been on non-accrual status since January 1, 2001. Total loans to CoServ at May 31, 2007 and 2006 represented 2.9% of the Company's total loans and guarantees outstanding.

Under the terms of a bankruptcy settlement, CFC restructured its loans to CoServ. CoServ is scheduled to make quarterly payments to CFC through December 2037. As part of the restructuring, CFC may be obligated to provide up to $204 million of senior secured capital expenditure loans to CoServ for electric distribution infrastructure through December 2012. When CoServ requests capital expenditure loans from CFC, these loans are provided at the standard terms offered to all borrowers and require debt service payments in addition to the quarterly payments that CoServ is required to make to CFC. As of May 31, 2007, $20 million was advanced to CoServ under this loan facility. To date, CoServ has made all payments required under the restructure agreement and capital expenditure loan facility. Under the terms of the restructure agreement, CoServ has the option to prepay the loan for $415 million plus an interest payment true up on or after December 13, 2007 and for $405 million plus an interest payment true up on or after December 13, 2008.

CoServ and CFC have no claims related to any of the legal actions asserted prior to or during the bankruptcy proceedings. CFC's legal claim against CoServ is limited to CoServ's performance under the terms of the bankruptcy settlement.

Based on its analysis, the Company believes that it is adequately reserved for its exposure to CoServ at May 31, 2007.

(d) VarTec Telecom, Inc. ("VarTec") is a telecommunications company and RTFC borrower located in Dallas, Texas. RTFC is VarTec's principal senior secured creditor. At May 31, 2007 and 2006 RTFC had a total of $9 million and $90 million, respectively, of loans outstanding to VarTec. At May 31, 2007 and 2006, all loans to VarTec were on non-accrual status, resulting in the application of all payments received against principal.

VarTec and 16 of its U.S.-based affiliates, which were guarantors of VarTec's debt to RTFC, filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code on November 1, 2004 in Dallas, Texas. On July 29, 2005, the court approved a sale of VarTec's remaining operating assets (the "Domestic Assets Sale"). Final proceeds from the closing of the Domestic Assets Sale were received in June 2006 totaling $40 million. Pursuant to a court order, all net proceeds of asset sales, including the Domestic Assets Sale, have been provisionally applied to RTFC's secured debt. On June 19, 2006, the Chapter 11 proceedings were converted to Chapter 7 proceedings and a Chapter 7 trustee was appointed for each of the estates.

On June 10, 2005, the Official Committee of Unsecured Creditors (the "UCC") initiated an adversary proceeding against RTFC in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. As a result of the conversion of the proceedings to Chapter 7, the UCC was dissolved and the Chapter 7 trustee became the plaintiff in the adversary proceedings. On May 15, 2007, the Chapter 7 trustee and RTFC entered into a settlement agreement under which (a) all claims against RTFC were dismissed with prejudice and fully released, (b) a portion of the proceeds from the Domestic Asset Sale that had been provisionally applied to RTFC's secured debt will be reallocated to the claimants, including RTFC, of the VarTec bankruptcy estates, and (c) the administrative debtor-in-possession financing facility owed by the VarTec bankruptcy estates to RTFC was partially reduced. The Bankruptcy Court approved the settlement agreement on May 24, 2007, which approval became final and non-appealable on June 4, 2007. As a result of the settlement of the Unsecured Creditor litigation,

112

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

the Company wrote off $44 million of pre-petition debt during the fourth quarter of fiscal year 2007 and expects to write off approximately $17 million in the first quarter of fiscal year 2008.

Based on its analysis, the Company believes that it is adequately reserved for its exposure to VarTec at May 31, 2007.

(e) Innovative Communication Corporation ("ICC") is a diversified telecommunications company and RTFC borrower headquartered in St. Croix, United States Virgin Islands ("USVI"). In the USVI, through its subsidiary Virgin Islands Telephone Corporation d/b/a Innovative Telephone ("Vitelco"), ICC provides wire line local and long-distance telephone services and well as other communications and media services in the eastern and southern Caribbean and mainland France.

As of May 31, 2007 and 2006, RTFC had $493 million and $488 million, respectively, in loans outstanding to ICC. All loans to ICC have been on non-accrual status since February 1, 2005. ICC has not made debt service payments to the Company since June 2005.

RTFC is the primary secured lender to ICC. RTFC's collateral for the loans includes (i) a series of mortgages, security agreements, financing statements, pledges and guaranties creating liens in favor of RTFC on substantially all of the assets and voting stock of ICC, (ii) a direct pledge of 100% of the voting stock of ICC's USVI local exchange carrier subsidiary, Vitelco, (iii) secured guaranties, mortgages and direct and indirect stock pledges encumbering the assets and ownership interests in substantially all of ICC's other operating subsidiaries and certain of its parent entities, including ICC's immediate parent, Emerging Communication, Inc., a Delaware corporation ("Emcom") and Emcom's parent, Innovative Communication Company LLC, a Delaware limited liability company ("ICC-LLC"), and (iv) a personal guaranty of the loans from ICC's indirect majority shareholder and chairman, Jeffrey Prosser ("Prosser").

Beginning on June 1, 2004, RTFC filed a series of lawsuits against ICC, Prosser and others for failure to comply with the terms of ICC's loan agreement with RTFC dated August 27, 2001 as amended on April 4, 2003 (hereinafter, the "RTFC Lawsuits"). In response to the RTFC Lawsuits, ICC, Vitelco and Prosser denied liability and asserted claims, by way of counterclaim and by filing its own lawsuits against RTFC, CFC and certain of RTFC's officers, seeking various remedies, including reformation of the loan agreement, injunctive relief, and damages. The remedies were based on various theories including a claim that RTFC breached an alleged funding obligation for the settlement of litigation brought by Emcom shareholders (the "Greenlight Entities") against ICC-LLC, ICC and some of ICC's directors, and a claim that Emcom and ICC-LLC were entitled to contribution from RTFC and CFC in connection with judgments that the Greenlight Entities had been awarded (the "ICC Claims," together with the RTFC Lawsuits, the "Loan Litigation"). Venue of the Loan Litigation ultimately was fixed in the United States District Court for the District of the Virgin Islands.

On February 10, 2006, Greenlight filed petitions for involuntary bankruptcy against Prosser, Emcom and ICC-LLC in the United States Bankruptcy Court for the District of Delaware, later transferred to the United States District Court for the Virgin Islands, Bankruptcy Division. RTFC appeared in the proceedings as a party-in-interest in accordance with the provisions of the United States Bankruptcy Code.

On April 26, 2006, RTFC reached a settlement of the Loan Litigation with ICC, Vitelco, ICC-LLC, Emcom, their directors and Prosser, individually. Under the settlement, RTFC obtained entry of judgments in the District Court for the District of the Virgin Islands against ICC for approximately $525 million and Prosser for approximately $100 million. RTFC also obtained dismissals with prejudice of all counterclaims, affirmative defenses and other lawsuits alleging wrongful acts by RTFC, certain of its officers, and CFC. Various parties also reached agreement for ICC to satisfy the RTFC judgments in the third quarter of calendar year 2006, subject to certain terms and conditions, however, on July 31, 2006, certain of the parties obligated to satisfy the RTFC judgments under the agreement filed voluntary bankruptcy proceedings, as described below, in order to obtain additional time to satisfy the judgments.

On July 31, 2006, ICC-LLC, Emcom and Prosser, individually, each filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code, now pending in the United States District Court for the Virgin Islands, Division of St. Thomas and St. John, Bankruptcy Division Each of the debtors is obligated to RTFC, for certain obligations of ICC, including court judgments. On February 13, 2007, the Bankruptcy Court ordered the appointment of a trustee for the ICC-LLC and Emcom bankruptcy estates and an examiner for Prosser's bankruptcy estate.

Subsequent to the Company's fiscal year end, on August 2, 2007, the Bankruptcy Court entered an order declaring that the debtors could not satisfy the RTFC judgments at a discount. Prosser, individually, has filed a notice of appeal of the order but has not sought a stay of its effect; none of the other debtors has sought review of the order.

## NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)

On July 6, 2007, an involuntary petition under Chapter 11 of the United States Bankruptcy Code was filed in the United States District Court for the Virgin Islands, Bankruptcy Division, against ICC by the Greenlight Entities. ICC has contested the petition and a hearing has been scheduled for September 6, 2007 regarding whether an order for relief in bankruptcy will be entered.

The debtors continue to seek a sale or refinancing of their assets in an effort to satisfy their debts to RTFC. Any transfer of control of a regulated telecommunications or cable television business, or sale or assignment of such business's regulated assets, may require the prior consent of regulatory authorities, including the Federal Communications Commission, the U.S. Virgin Islands Public Services Commission, and foreign governments.

Based on its analysis, the Company believes that it is adequately reserved for its exposure to ICC at May 31, 2007.

(f) Pioneer Electric Cooperative, Inc. ("Pioneer") is an electric distribution cooperative located in Greenville, Alabama. Pioneer had also invested in a propane gas operation, which it has sold. Pioneer had experienced deterioration in its financial condition as a result of losses in the gas operation. At May 31, 2007 and 2006, CFC had a total of $52 million and $54 million, respectively, in loans outstanding to Pioneer. Pioneer was current with respect to all debt service payments at May 31, 2007. All loans to Pioneer remain on accrual status with respect to the recognition of interest income. CFC is the principal creditor to Pioneer.

On March 9, 2006, CFC and Pioneer agreed on the terms of a debt modification that resulted in the loans being classified as restructured. Under the amended agreement, CFC extended the maturity of the outstanding loans and granted a two-year deferral of principal payments. In addition, CFC agreed to make available a line of credit for general corporate purposes. The restructured loans are secured by first liens on substantially all of the assets and revenues of Pioneer.

Based on its analysis, the Company believes that it is adequately reserved for its exposure to Pioneer at May 31, 2007.

### (16)    Gain on Sale of Building and Land

On October 18, 2005, CFC sold its headquarters facility in Fairfax County, Virginia to an affiliate of Prentiss Properties Acquisition Partners, L.P. for $85 million. The assets had a net book value of $40 million, thus generating a total gain of $43 million during the year ended May 31, 2006, net of $2 million in closing and other related costs. The headquarters facility consists of two six-story buildings and adjacent parking garages situated on ten acres of land and two acres of unimproved land adjacent to the office buildings. On the sale date, CFC entered into a three-year lease with the new building owner for approximately one-third of the office space. CFC has the option to extend the lease for two additional one-year terms.

### (17)    Segment Information

The Company's consolidated financial statements include the financial results of CFC, RTFC and NCSC. Full financial statements are produced for each of the three companies and are the primary reports that management reviews in evaluating performance. The CFC segment includes the consolidation of entities controlled by CFC and created to hold foreclosed assets and effect loan securitization transactions and intercompany transaction elimination entries. The segment presentation for the years ended May 31, 2007, 2006 and 2005 reflect the operating results of each of the three companies as a separate segment.

As stated elsewhere in the consolidated financial statements, CFC is the sole lender to RTFC and the primary source of funding for NCSC. NCSC also obtains funding from third parties with a CFC guarantee. Thus, CFC takes all of the risk related to the funding of the loans to RTFC and NCSC, and in return, CFC earns a net interest income on the loans to RTFC and NCSC.

Pursuant to guarantee agreements, CFC has agreed to indemnify RTFC and NCSC for loan losses, with the exception of the NCSC consumer loan program. Thus, CFC maintains the majority of the total consolidated loan loss allowance. A small loan loss allowance is maintained by NCSC to cover its consumer loan exposure.

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

The following chart contains consolidated statements of operations for the years ended May 31, 2007, 2006 and 2005 and consolidated balance sheets as of May 31, 2007 and 2006.

|  | For the year ended May 31, 2007 | | | |
|---|---|---|---|---|
| (in thousands) | CFC | RTFC | NCSC | Consolidated |
| Statement of Operations: | | | | |
| Interest income | $ 916,913 | $ 105,614 | $ 31,697 | $ 1,054,224 |
| Interest expense | (870,186) | (99,224) | (27,320) | (996,730) |
| Net interest income | 46,727 | 6,390 | 4,377 | 57,494 |
| Recovery of loan losses | 5,499 | - | 1,423 | 6,922 |
| Net interest income after recovery of loan losses | 52,226 | 6,390 | 5,800 | 64,416 |
| Non-interest income: | | | | |
| Rental and other income | 888 | - | 645 | 1,533 |
| Derivative cash settlements | 86,040 | - | 402 | 86,442 |
| Results of operations of foreclosed assets | 9,758 | - | - | 9,758 |
| Total non-interest income | 96,686 | - | 1,047 | 97,733 |
| Non-interest expense: | | | | |
| General and administrative expenses | (43,029) | (5,373) | (3,487) | (51,889) |
| Recovery of guarantee liability | 1,700 | - | - | 1,700 |
| Derivative forward value | (79,744) | - | 463 | (79,281) |
| Foreign currency adjustments | (14,554) | - | - | (14,554) |
| Loss on sale of loans | (1,584) | - | - | (1,584) |
| Total non-interest expense | (137,211) | (5,373) | (3,024) | (145,608) |
| Income prior to income taxes and minority interest | 11,701 | 1,017 | 3,823 | 16,541 |
| Income taxes | - | (945) | (1,451) | (2,396) |
| Income per segment reporting | $ 11,701 | $ 72 | $ 2,372 | $ 14,145 |
| Reconciliation of net income: | | | | |
| Net income per segment reporting | | | | $ 14,145 |
| Minority interest, net of income taxes | | | | (2,444) |
| Net income per consolidated statement of operations | | | | $ 11,701 |
| Assets: | | | | |
| Loans to members | $ 15,805,290 | $ 1,860,379 | $ 462,538 | $ 18,128,207 |
| Less:  Allowance for loan losses | (561,113) | - | (550) | (561,663) |
| Loans to members, net | 15,244,177 | 1,860,379 | 461,988 | 17,566,544 |
| Other assets | 768,194 | 189,716 | 50,727 | 1,008,637 |
| Total assets | $ 16,012,371 | $ 2,050,095 | $ 512,715 | $ 18,575,181 |

115

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

|  | For the year ended May 31, 2006 | | | |
|---|---|---|---|---|
| (in thousands) | CFC | RTFC | NCSC | Consolidated |
| Statement of Operations: | | | | |
| Interest income | $    846,806 | $    129,665 | $    31,441 | $    1,007,912 |
| Interest expense | (826,836) | (122,824) | (26,276) | (975,936) |
| Net interest income | 19,970 | 6,841 | 5,165 | 31,976 |
| (Provision for) recovery of loan losses | (23,452) | - | 212 | (23,240) |
| Net interest (loss) income after (provision for) recovery of loan losses | (3,482) | 6,841 | 5,377 | 8,736 |
| Non-interest income: | | | | |
| Rental and other income | 2,017 | - | 381 | 2,398 |
| Derivative cash settlements | 81,809 | - | (926) | 80,883 |
| Results of operations of foreclosed assets | 15,492 | - | - | 15,492 |
| Gain on sale of building and land | 43,431 | - | - | 43,431 |
| Total non-interest income | 142,749 | - | (545) | 142,204 |
| Non-interest expense: | | | | |
| General and administrative expenses | (44,589) | (4,849) | (2,651) | (52,089) |
| Recovery of guarantee liability | 700 | - | - | 700 |
| Derivative forward value | 22,713 | - | 6,092 | 28,805 |
| Foreign currency adjustments | (22,594) | - | - | (22,594) |
| Total non-interest expense | (43,770) | (4,849) | 3,441 | (45,178) |
| Income prior to income taxes and minority interest | 95,497 | 1,992 | 8,273 | 105,762 |
| Income taxes | - | (36) | (3,140) | (3,176) |
| Income per segment reporting | $    95,497 | $    1,956 | $    5,133 | $    102,586 |
| Reconciliation of net income: | | | | |
| Net income per segment reporting | | | | $    102,586 |
| Minority interest, net of income taxes | | | | (7,089) |
| Net income per consolidated statement of operations | | | | $    95,497 |
| Assets: | | | | |
| Loans to members | $ 15,794,372 | $ 2,162,464 | $ 404,069 | $ 18,360,905 |
| Less:  Allowance for loan losses | (610,617) | - | (826) | (611,443) |
| Loans to members, net | 15,183,755 | 2,162,464 | 403,243 | 17,749,462 |
| Other assets | 1,179,059 | 209,868 | 41,232 | 1,430,159 |
| Total assets | $ 16,362,814 | $ 2,372,332 | $ 444,475 | $ 19,179,621 |

116

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

|  | For the year ended May 31, 2005 | | | |
|---|---|---|---|---|
| (in thousands) | CFC | RTFC | NCSC | Consolidated |
| Statement of Operations: | | | | |
| Interest income | $ 737,267 | $ 265,811 | $ 27,775 | $ 1,030,853 |
| Interest expense | (662,719) | (260,537) | (18,777) | (942,033) |
| Net interest income | 74,548 | 5,274 | 8,998 | 88,820 |
| Provision for loan losses | (16,402) | - | - | (16,402) |
| Net interest income after provision for loan losses | 58,146 | 5,274 | 8,998 | 72,418 |
| Non-interest income: | | | | |
| Rental and other income | 5,645 | - | - | 5,645 |
| Derivative cash settlements | 80,476 | - | (2,189) | 78,287 |
| Results of operations of foreclosed assets | 13,024 | - | - | 13,024 |
| Total non-interest income | 99,145 | - | (2,189) | 96,956 |
| Non-interest expense: | | | | |
| General and administrative expenses | (43,863) | (2,959) | (2,054) | (48,876) |
| Recovery of guarantee liability | 3,107 | - | - | 3,107 |
| Derivative forward value | 26,755 | - | (906) | 25,849 |
| Foreign currency adjustments | (22,893) | - | - | (22,893) |
| Total non-interest expense | (36,894) | (2,959) | (2,960) | (42,813) |
| Income prior to income taxes and minority interest | 120,397 | 2,315 | 3,849 | 126,561 |
| Income taxes | - | (57) | (1,461) | (1,518) |
| Income per segment reporting | $ 120,397 | $ 2,258 | $ 2,388 | $ 125,043 |
| Reconciliation of net income: | | | | |
| Net income per segment reporting | | | | $ 125,043 |
| Minority interest, net of income taxes | | | | (2,540) |
| Net income per consolidated statement of operations | | | | $ 122,503 |

117

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

**(18)    Selected Quarterly Financial Data (Unaudited)**

The Company has restated its consolidated financial statements to correct an error in the amount of interest expense recorded on foreign denominated debt and cash settlement income recorded from foreign currency exchange agreements (see further discussion in Note 1 (w) to the consolidated financial statements).

As a result, the following tables summarizing the quarterly consolidated statements of operating data for the four quarters of fiscal years 2007 and 2006 give effect to the restatements described in Note 1(w).

| (in thousands) | August 31, | November 30, | February 28, | May 31, | Total Year |
|---|---|---|---|---|---|
| Interest income | $  264,689 | $  260,244 | $  264,873 | $  264,418 | $  1,054,224 |
| Interest expense | (256,004) | (248,591) | (247,441) | (244,694) | (996,730) |
| Net interest income | 8,685 | 11,653 | 17,432 | 19,724 | 57,494 |
| Recovery of loan losses | - | - | - | 6,922 | 6,922 |
| Net interest income after recovery of loan losses | 8,685 | 11,653 | 17,432 | 26,646 | 64,416 |
| Non-interest income: | | | | | |
| Derivative cash settlements | 15,255 | 16,493 | 44,442 | 10,252 | 86,442 |
| Other non-interest income | 3,319 | 3,297 | 2,313 | 2,362 | 11,291 |
| Total non-interest income | 18,574 | 19,790 | 46,755 | 12,614 | 97,733 |
| Non-interest expense: | | | | | |
| Derivative forward value | (63,351) | (53,239) | (4,189) | 41,498 | (79,281) |
| Foreign currency adjustments | 3,321 | (20,620) | 1,886 | 859 | (14,554) |
| Other non-interest expense | (11,328) | (14,577) | (13,188) | (12,680) | (51,773) |
| Total non-interest expense | (71,358) | (88,436) | (15,491) | 29,677 | (145,608) |
| (Loss) income prior to income taxes and minority interest | (44,099) | (56,993) | 48,696 | 68,937 | 16,541 |
| Income taxes | 714 | 486 | (627) | (2,969) | (2,396) |
| Minority interest, net of income taxes | 366 | 312 | 566 | (3,688) | (2,444) |
| Net (loss) income | $  (43,019) | $  (56,195) | $  48,635 | $  62,280 | $  11,701 |

*Header: Fiscal Year 2007 Quarters Ended*

118

NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)

|  | | Fiscal Year 2006 Quarters Ended | | | |
|---|---|---|---|---|---|
| (in thousands) | August 31, | November 30, | February 28, | May 31, | Total Year |
| Interest income | $ 249,877 | $ 243,326 | $ 253,659 | $ 261,050 | $ 1,007,912 |
| Interest expense | (238,767) | (239,346) | (243,176) | (254,647) | (975,936) |
| Net interest income | 11,110 | 3,980 | 10,483 | 6,403 | 31,976 |
| (Provision for) recovery of loan losses | - | (3,886) | (19,566) | 212 | (23,240) |
| Net interest income (loss) after (provision for) recovery of loan losses | 11,110 | 94 | (9,083) | 6,615 | 8,736 |
| Non-interest income: | | | | | |
| Derivative cash settlements | 23,690 | 20,069 | 17,884 | 19,240 | 80,883 |
| Other non-interest income (1) | 6,154 | 41,631 | 9,474 | 4,062 | 61,321 |
| Total non-interest income | 29,844 | 61,700 | 27,358 | 23,302 | 142,204 |
| Non-interest expense: | | | | | |
| Derivative forward value | (37,427) | (17,505) | (16,892) | 100,629 | 28,805 |
| Foreign currency adjustments | (1,260) | 35,739 | (8,122) | (48,951) | (22,594) |
| Other non-interest expense | (8,817) | (13,451) | (16,545) | (12,576) | (51,389) |
| Total non-interest expense | (47,504) | 4,783 | (41,559) | 39,102 | (45,178) |
| (Loss) income prior to income taxes and minority interest | (6,550) | 66,577 | (23,284) | 69,019 | 105,762 |
| Income taxes | (199) | (1,530) | (319) | (1,128) | (3,176) |
| Minority interest, net of income taxes | (1,106) | (3,107) | (864) | (2,012) | (7,089) |
| Net (loss) income | $ (7,855) | $ 61,940 | $ (24,467) | $ 65,879 | $ 95,497 |

(1) Includes $38 million and $6 million gain on sale of building and land for the quarters ended November 30 and February 28, respectively.

The following is a reconciliation of the amounts previously reported as filed with the SEC and the restated amounts as reported in this May 31, 2007 10-K.

|  | August 31, 2006 | | |
|---|---|---|---|
| (in thousands) | As previously reported | Adjustment | As restated |
| Interest expense | $ (252,455) | $ (3,549) | $ (256,004) |
| Net interest income | 12,234 | (3,549) | 8,685 |
| Net interest income after provision for loan losses | 12,234 | (3,549) | 8,685 |
| Derivative cash settlements | 11,706 | 3,549 | 15,255 |
| Total non-interest income | 15,025 | 3,549 | 18,574 |
| Derivative forward value | (60,454) | (2,897) | (63,351) |
| Total non-interest expense | (68,461) | (2,897) | (71,358) |
| Loss prior to income taxes and minority interest | (41,202) | (2,897) | (44,099) |
| Net loss | (40,122) | (2,897) | (43,019) |

119

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

|  | November 30, 2006 | | |
|---|---|---|---|
| (in thousands) | As previously reported | Adjustment | As restated |
| Interest expense | $    (245,261) | $    (3,330) | $    (248,591) |
| Net interest income | 14,983 | (3,330) | 11,653 |
| Net interest income after provision for loan losses | 14,983 | (3,330) | 11,653 |
| Derivative cash settlements | 13,163 | 3,330 | 16,493 |
| Total non-interest income | 16,460 | 3,330 | 19,790 |
| Derivative forward value | (49,080) | (4,159) | (53,239) |
| Total non-interest expense | (84,277) | (4,159) | (88,436) |
| Loss prior to income taxes and minority interest | (52,834) | (4,159) | (56,993) |
| Net loss | (52,036) | (4,159) | (56,195) |

|  | February 28, 2007 | | |
|---|---|---|---|
| (in thousands) | As previously reported | Adjustment | As restated |
| Interest expense | $    (243,969) | $    (3,472) | $    (247,441) |
| Net interest income | 20,904 | (3,472) | 17,432 |
| Net interest income after provision for loan losses | 20,904 | (3,472) | 17,432 |
| Derivative cash settlements | 40,970 | 3,472 | 44,442 |
| Total non-interest income | 43,283 | 3,472 | 46,755 |
| Derivative forward value | (583) | (3,606) | (4,189) |
| Total non-interest expense | (11,885) | (3,606) | (15,491) |
| Income prior to income taxes and minority interest | 52,302 | (3,606) | 48,696 |
| Net income | 52,241 | (3,606) | 48,635 |

|  | August 31, 2005 | | |
|---|---|---|---|
| (in thousands) | As previously reported | Adjustment | As restated |
| Interest expense | $    (235,277) | $    (3,490) | $    (238,767) |
| Net interest income | 14,600 | (3,490) | 11,110 |
| Net interest income after provision for loan losses | 14,600 | (3,490) | 11,110 |
| Derivative cash settlements | 20,200 | 3,490 | 23,690 |
| Total non-interest income | 26,354 | 3,490 | 29,844 |
| Derivative forward value | (34,889) | (2,538) | (37,427) |
| Total non-interest expense | (44,966) | (2,538) | (47,504) |
| Loss prior to income taxes and minority interest | (4,012) | (2,538) | (6,550) |
| Net loss | (5,317) | (2,538) | (7,855) |

120

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

|  | November 30, 2005 | | |
|---|---|---|---|
| (in thousands) | As previously reported | Adjustment | As restated |
| Interest expense | $           (236,093) | $           (3,253) | $           (239,346) |
| Net interest income | 7,233 | (3,253) | 3,980 |
| Net interest income after provision for loan losses | 3,347 | (3,253) | 94 |
| Derivative cash settlements | 16,816 | 3,253 | 20,069 |
| Total non-interest income | 58,447 | 3,253 | 61,700 |
| Derivative forward value | (15,716) | (1,789) | (17,505) |
| Total non-interest expense | 6,572 | (1,789) | 4,783 |
| Income prior to income taxes and minority interest | 68,366 | (1,789) | 66,577 |
| Net income | 63,729 | (1,789) | 61,940 |

|  | February 28, 2006 | | |
|---|---|---|---|
| (in thousands) | As previously reported | Adjustment | As restated |
| Interest expense | $           (240,198) | $           (2,978) | $           (243,176) |
| Net interest income | 13,461 | (2,978) | 10,483 |
| Net interest income after provision for loan losses | (6,105) | (2,978) | (9,083) |
| Derivative cash settlements | 14,906 | 2,978 | 17,884 |
| Total non-interest income | 24,380 | 2,978 | 27,358 |
| Derivative forward value | (14,344) | (2,548) | (16,892) |
| Total non-interest expense | (39,011) | (2,548) | (41,559) |
| Loss prior to income taxes and minority interest | (20,736) | (2,548) | (23,284) |
| Net loss | (21,919) | (2,548) | (24,467) |

|  | May 31, 2006 | | |
|---|---|---|---|
| (in thousands) | As previously reported | Adjustment | As restated |
| Interest expense | $           (251,088) | $           (3,559) | $           (254,647) |
| Net interest income | 9,962 | (3,559) | 6,403 |
| Net interest income after recovery of loan losses | 10,174 | (3,559) | 6,615 |
| Derivative cash settlements | 15,681 | 3,559 | 19,240 |
| Total non-interest income | 19,743 | 3,559 | 23,302 |
| Derivative forward value | 94,003 | 6,626 | 100,629 |
| Total non-interest expense | 32,476 | 6,626 | 39,102 |
| Income prior to income taxes and minority interest | 62,393 | 6,626 | 69,019 |
| Net income | 59,253 | 6,626 | 65,879 |

**(19)    Subsequent Events**

On June 1, 2007, the Company redeemed the 7.40% subordinated deferrable debt securities due 2050 totaling $175 million.  The Company redeemed these securities at par and recorded a charge of $6 million in interest expense during the first quarter of fiscal year 2008 for the unamortized issuance costs.

**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

On August 1, 2007, CFC submitted an application to borrow an additional $500 million under FFB loan facilities with bond guarantee agreements with RUS as part of the funding mechanism for the REDLG program (see Note 6). These funds were received by CFC on August 7, 2007.

On August 10, 2007, the Company entered into an agreement to sell $74 million of distribution mortgage loans to Farmer Mac for $74 million. The distribution mortgage loans were sold at 100% of the outstanding principal balance on August 10, 2007. A total of $40 million of the distribution mortgage loans were transferred on August 10, 2007 and the remaining $34 million will be transferred on January 2, 2008. The transaction qualifies for sale treatment under SFAS 140. An immaterial loss associated with transaction costs and the write-off of unamortized deferred loan origination costs will be recognized on the sale. The Company does not hold any continuing interest in the loans sold and had no obligation to repurchase loans from the purchaser. The Company will service the loans for the purchaser in exchange for a fee of 30 basis points of the outstanding loan principal.

122





# NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORP /DC/

(NRC)

WOODLAND PARK
2201 COOPERATIVE WAY
HERNDON, VA 20171−3025
703. 709.6700

# EX−10.4

**EXECUTIVETERMINATION AGREEMENT**
**10−K Filed on 08/27/2007 − Period: 05/31/2007**
File Number 001−07102



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

September 17, 1997

Mr. John Evans
14913 Kelley Farm Dr.
Darnestown, MD 20874

Dear John:

On behalf of National Rural Utilities Cooperative Finance Corporation, I am pleased to offer you the position of Senior Vice President, Operations.  In this capacity, you will be an essential member of the senior management team and will report directly to me.

As an executive of the organization, your annual salary will be $190,000, which equates to a bi−monthly salary of $7,916.67.  In addition, this year's maximum bonus target is 5% payable after the close of CFC's fiscal year.  Future targeted bonuses will be based upon your ability to define and establish a new performance management and compensation system for the organization, and CFC's overall performance.

You will be entitled to participate in CFC's standard employee benefits program as previously discussed and outlined.  Special modifications have been made to this plan with regard to your annual leave.  You will accrue annual leave at a rate of 6.75 hours per semi−monthly pay period.  In addition, upon the first day of employment, 160 hours will be placed in your annual leave account.

In the event of involuntary termination of employment, excepting an act constituting malfeasance of fraud, CFC shall provide severance at the latest compensation level for a period of 9 months.

Your first day of employment will be determined upon acceptance of this offer.  You will be required to complete documents for employment eligibility verification (Form I−9) on your first day of employment.  Please indicate your acceptance of this offer by signing and returning the original Offer Letter.  Please retain a copy for your records.

I am very pleased to offer this position to you.  It is clear that your personality, drive and ambition will make you a valuable addition to CFC's senior management team.  I believe you recognize the tremendous potential of the organization.  I expect that you will equally enjoy the environment and I am certain you will find CFC to be a dynamic, challenging place to work.  We believe that
you will add great value and contribute to CFC's future development and success.  If there are any matters which need clarification, please do not hesitate to contact me through my office at (703) 709−6800, or at my home this weekend at _____.

This offer is tendered for your consideration and is valid through September 25, 1997.  This offer is contingent upon the successful completion of reference checks.

I look forward to having you join us and to a mutually beneficial association.

With best personal regards,

/s/ SHELDON C. PETERSEN
Sheldon C. Petersen
Governor & Chief Executive Officer


Enclosures


/s/ JOHN T. EVANS
Employee Signature

SEPTEMBER 23, 1997
Date Accepted

NOVEMBER 10, 1997
Start Date



# NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORP /DC/

(NRC)

WOODLAND PARK
2201 COOPERATIVE WAY
HERNDON, VA 20171−3025
703. 709.6700

## EX−23.1

**CONSENT OF INDEPENDENT PUBLIC ACCOUTING FIRM**
**10−K Filed on 08/27/2007 − Period: 05/31/2007**
File Number 001−07102



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

*Exhibit 23.1*

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in Registration Statements No. 333−109365, 333−115248, 333−142230 and 333−109310 on Form S−3 of our reports dated August 27, 2007 relating to the consolidated financial statements of National Rural Utilities Cooperative Finance Corporation and subsidiaries and management's report on the effectiveness of internal control over financial reporting, appearing in this Annual Report on Form 10−K of National Rural Utilities Cooperative Finance Corporation and subsidiaries for the year ended May 31, 2007.

/s/ DELOITTE & TOUCHE LLP

McLean, Virginia
August 27, 2007



# NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORP /DC/

(NRC)

WOODLAND PARK
2201 COOPERATIVE WAY
HERNDON, VA 20171−3025
703. 709.6700

# EX−31.1

**SECTION 302 CERFIFICATION − CEO**
**10−K Filed on 08/27/2007 − Period: 05/31/2007**
File Number 001−07102



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

*Exhibit 31.1*

**National Rural Utilities Cooperative Finance Corporation**
**Certification Pursuant to Section 302 of the Sarbanes−Oxley Act of 2002**
**(18 U.S.C. Section 1350)**

I, Sheldon C. Petersen, certify that:

1. I have reviewed this report on Form 10−K of National Rural Utilities Cooperative Finance Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e), and internal control over financial reporting (as defined in Exchange Act Rules 13a−15(f) and 15d−15(f)) for the registrant and we have:

    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors:

    a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: August 27, 2007

/s/ SHELDON C. PETERSEN
Sheldon C. Petersen
Chief Executive Officer

A signed original of this written statement required by Section 302 has been provided to National Rural Utilities Cooperative Finance Corporation and will be retained by National Rural Utilities Cooperative Finance Corporation and furnished to the Securities and Exchange Commission or its staff upon request.



# NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORP /DC/

(NRC)

WOODLAND PARK
2201 COOPERATIVE WAY
HERNDON, VA 20171−3025
703. 709.6700

# EX−31.2

**SECTION 302 CERTIFICATION − CFO**
**10−K Filed on 08/27/2007 − Period: 05/31/2007**
File Number 001−07102



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

*Exhibit 31.2*

**National Rural Utilities Cooperative Finance Corporation**
**Certification Pursuant to Section 302 of the Sarbanes−Oxley Act of 2002**
**(18 U.S.C. Section 1350)**

I, Steven L. Lilly, certify that:

1. I have reviewed this report on Form 10−K of National Rural Utilities Cooperative Finance Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e), and internal control over financial reporting (as defined in Exchange Act Rules 13a−15(f) and 15d−15(f)) for the registrant and we have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors:

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

   Date: August 27, 2007

/s/ STEVEN L. LILLY
Steven L. Lilly
Chief Financial Officer

A signed original of this written statement required by Section 302 has been provided to National Rural Utilities Cooperative Finance Corporation and will be retained by National Rural Utilities Cooperative Finance Corporation and furnished to the Securities and Exchange Commission or its staff upon request.



# NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORP /DC/

(NRC)

WOODLAND PARK
2201 COOPERATIVE WAY
HERNDON, VA 20171−3025
703. 709.6700

# EX−32.1

**SECTION 906 CERTIFICATION − CEO**
**10−K Filed on 08/27/2007 − Period: 05/31/2007**
File Number 001−07102



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

*Exhibit 32.1*

***National Rural Utilities Cooperative Finance Corporation***
***Certification Pursuant to Section 906 of the Sarbanes−Oxley Act of 2002***
***(18 U.S.C. Section 1350)***

Pursuant to the requirements of Section 906 of the Sarbanes−Oxley Act of 2002 (18 U.S.C. Sections 1350(a) and (b)), the undersigned hereby certifies as follows:

1. I am the Chief Executive Officer of National Rural Utilities Cooperative Finance Corporation ("CFC").

2. To the best of my knowledge:

    (A) CFC's Form 10−K for the period ended May 31, 2007 filed with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    (B) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of CFC.

August 27, 2007

By:    /s/ SHELDON C. PETERSEN
Sheldon C. Petersen
Chief Executive Officer

A signed original of this written statement required by Section 906 has been provided to National Rural Utilities Cooperative Finance Corporation and will be retained by National Rural Utilities Cooperative Finance Corporation and furnished to the Securities and Exchange Commission or its staff upon request.



# NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORP /DC/

(NRC)

WOODLAND PARK
2201 COOPERATIVE WAY
HERNDON, VA 20171−3025
703. 709.6700

# EX−32.2

**SECTION 906 CERTIFICATION − CFO**
**10−K Filed on 08/27/2007 − Period: 05/31/2007**
File Number 001−07102



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

*Exhibit 32.2*

***National Rural Utilities Cooperative Finance Corporation***
***Certification Pursuant to Section 906 of the Sarbanes−Oxley Act of 2002***
***(18 U.S.C. Section 1350)***

Pursuant to the requirements of Section 906 of the Sarbanes−Oxley Act of 2002 (18 U.S.C. Sections 1350(a) and (b)), the undersigned hereby certifies as follows:

1. I am the Chief Financial Officer of National Rural Utilities Cooperative Finance Corporation ("CFC").

2. To the best of my knowledge:

   (A) CFC's Form 10−K for the period ended May 31, 2007 filed with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

   (B) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of CFC.

August 27, 2007

By:    /s/ STEVEN L. LILLY
Steven L. Lilly
Chief Financial Officer

A signed original of this written statement required by Section 906 has been provided to National Rural Utilities Cooperative Finance Corporation and will be retained by National Rural Utilities Cooperative Finance Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, **Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia**

# Exhibit D

to

**National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR DISTRICT OF DELAWARE**

IN RE:

Innovative Communication
Company, LLC                          Bankruptcy No. 06-10133-JKF
     Involuntary Debtor            Chapter 11

                                       **Related to Dkt. No. 6, Motion to Transfer
Venue to the U.S. District Court for the
Virgin Islands filed by Alleged Debtor;**

                                       **Dkt. No. 154, Motion to Approve Petitioning
Creditors' Order to Determine Proper Venue
of Debtors' Voluntary Chapter 11 Cases
Pursuant to Debtors' Venue Motions and
Bankruptcy Rule 1014(b) filed by the
Greenlight Entities[1]**

Emerging Communications, Inc.         Bankruptcy No. 06-10134-JKF
     Involuntary Debtor            Chapter 11

                                         **Related to Dkt. No. 9, Motion to Transfer
Venue to the U.S. District Court for the
Virgin Islands Pursuant to 28 U.S.C. §1412
filed by Alleged Debtor;**

                                       **Dkt. No. 152, Motion to Approve Order
Determining Proper Venue of Debtors'
Voluntary Chapter 11 Cases Pursuant to
Debtors' Venue Motions and Bankruptcy
Rule 1014(b) filed by the Greenlight Entities**

---

[1]The Greenlight Entities are defined as Greenlight Capital L.P., Greenlight Capital
Offshore, Ltd., Greenlight Capital Qualified L.P. In the motion to transfer venue filed in the
Delaware involuntaries these entities are referred to as the Greenlight Hedge Funds.

1

Jeffrey J. Prosser
    Involuntary Debtor

Bankruptcy No. 06-10135-JKF
Chapter 11

**Related to Dkt. No. 6, Emergency Motion to Transfer Venue to the United States District Court for the Virgin Islands Pursuant to 28 U.S.C. §1412 filed by Alleged Debtor;**

**Dkt. No. 111, Motion to Approve Motion of Petitioning Creditors for Order to Determine Proper Venue of Debtors' Voluntary Chapter 11 Cases Pursuant to Debtors' Venue Motions and Bankruptcy Rule 1014(b) filed by the Greenlight Entities**

---

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF THE VIRGIN ISLANDS – BANKRUPTCY DIVISION

IN RE:

Innovative Communication
Company, LLC
    Debtor

Bankruptcy No. 06-30008-JKF
Chapter 11

**Related to Dkt. No. 4, Motion of Petitioning Creditors for Order to Determine Proper Venue of Debtors Voluntary Chapter 11 Cases Pursuant to Debtors' Venue Motions and Bankruptcy Rule 1014(b) filed by the Greenlight Entities**

Emerging Communications, Inc.
    Debtor

Bankruptcy No. 06-30007-JKF
Chapter 11

**Related to Dkt. No. 4, Motion of Petitioning Creditors for Order to Determine Proper Venue of Debtors Voluntary Chapter 11 Cases Pursuant to Debtors' Venue Motions and Bankruptcy Rule 1014(b) filed by the Greenlight Entities**

2

Jeffrey J. Prosser          Bankruptcy No. 06-30009-JKF
     Debtor                 Chapter 11

                              **Related to Dkt. No. 8, Motion of Petitioning**
                              **Creditors for Order to Determine Proper**
                              **Venue of Debtors Voluntary Chapter 11**
                              **Cases Pursuant to Debtors' Venue Motions**
                              **and Bankruptcy Rule 1014(b) filed by the**
                              **Greenlight Entities**

Appearances:

**For the District of Delaware:**

     **Innovative Communication Company, LLC** – Carol A. Rich, Esquire, Douglas P. Bartner, Esquire, and Robert E. Nies, Esquire, for Alleged Debtor; Gregg M. Galardi, Esquire, for the Greenlight Entities; Toby L. Gerber, Esquire, for Rural Telephone Finance Cooperative; Robert F. Craig, Esquire, for Jeffrey J. Prosser;

     **Emerging Communications, Inc.** – Daniel J. DeFranceschi, Esquire, and Douglas P. Bartner, Esquire, for Alleged Debtor; Gregg M. Galardi, Esquire, and William R. Greendyke, Esquire, for the Greenlight Entities; Toby L. Gerber, Esquire, and William R. Greendyke, Esquire, for Rural Telephone Finance Cooperative; Lisa C. McLaughlin, Esquire, and Robert F. Craig, Esquire, for Jeffrey J. Prosser;

     **Jeffrey J. Prosser** – Jenna B. Taub, Esquire, Lisa C. McLaughlin, Esquire, Robert F. Craig, Esquire, and Michael J. Lichtenstein, Esquire, for the Alleged Debtor; Gregg M. Galardi, Esquire, for the Greenlight Entities; Toby L. Gerber, Esquire, for Rural Telephone Finance Cooperative

**For the District of the Virgin Islands** – same counsel

**MEMORANDUM OPINION**[2]

     Before the court are various motions to determine whether venue of these cases should

be in the Bankruptcy Court for the District of Delaware or in the District Court for the Virgin

---

     [2]The court's jurisdiction was not at issue. This Memorandum Opinion constitutes our findings of fact and conclusions of law.

Islands, Bankruptcy Division ("USVI"). Involuntary chapter 11 cases were filed against

Innovative, Emerging and Prosser[3] in Delaware on February 10, 2006. Thereafter, on July 31,

2006, Innovative, Emerging and Prosser filed voluntary chapter 11 cases in the USVI. In the

Delaware involuntaries, Debtors filed motions to transfer venue to the USVI. The petitioning

creditors and the Rural Telephone Finance Cooperative ("RTFC"), a secured creditor, oppose

a transfer[4] and assert that venue is appropriate in Delaware.

Background

The procedural history and relationships of these cases is complex but relevant to the

venue motion. The Virgin Islands Telephone Corporation ("Vitelco"), a nondebtor, is an

indirect subsidiary of Debtor Innovative Communication Company, LLC ("ICC-LLC") and is

indirectly owned by Emerging. ICC-LLC is a holding company that owns approximately 51

------

[3]Prosser is the chairman of the board, CEO and president of ICC-LLC. It is alleged by the RTFC that he is also the chairman, CEO and president of most if not all of ICC-LLC's direct and indirect subsidiaries.

[4]RTFC asserts that a motion to transfer venue cannot be brought in an involuntary case until the putative debtor is adjudicated. That issue is moot inasmuch as Debtors filed voluntary petitions in the USVI and the venue motions and related pleadings have been filed in those cases as well. Furthermore, the Greenlight Entities filed their own motion in the Delaware involuntary cases seeking a determination of the proper venue.
The Greenlight Entities argue that venue should remain in Delaware because Debtors, RTFC, National Rural Utilities Cooperative Corporation, and the Greenlight Entities entered into Terms and Conditions of Settlement among themselves and that document requires that litigation with respect to the settlement be either in the Bankruptcy Court for the District of Delaware or the U.S. District Court for the District of Delaware. Following a hearing on November 7, 2006, this court denied the motion to assume the Terms and Conditions Settlement. The order is at Dkt. No. 99 in the USVI Emerging case, 06-30007, Dkt. No. 98 in the USVI Innovative case, 06-30008, and at Dkt. No. 90 in the USVI Prosser case, 06-30009. We note that the Terms and Conditions were executed after the involuntary cases were filed in Delaware and before the voluntary cases were filed in the USVI. Thus, even if venue concerning the terms of the settlement is in Delaware, that fact does not conclusively determine that venue for all purposes should also be in Delaware.

percent[5] of Debtor Emerging, itself a holding company. Emerging's direct, wholly owned, subsidiary is Innovative Communication Corporation ("ICC Corp."). ICC Corp. has various operating subsidiaries. The subsidiaries are cable companies in the USVI which own and operate the cable television system in St. Thomas, St. Croix, and St. John.[6] Vitelcom Cellular, Inc., a nondebtor, operates a cellular wireless company in the USVI. Daily Publishing Co., Inc., another nondebtor, owns and operates the largest daily newspaper in the USVI. These entities (the "ICC Operating Companies"), along with several other operating companies in the USVI and elsewhere, are all subsidiaries of ICC Corp. The ICC Operating Companies (except Daily Publishing) are, or function as, public utilities, the disruption of whose operations will have a major impact on citizens of the USVI and other Caribbean countries. Each of these entities, as well as ICC-LLC and Emerging, guaranteed loans made by the RTFC to ICC-LLC.

ICC-LLC is a Delaware limited liability company with its principal place of business in the USVI. ICC-LLC is wholly owned by Jeffery Prosser.[7] Emerging is also a Delaware corporation with its principal place of business in the USVI. ICC Corp. owns Vitelco and the ICC Operating Companies. ICC Corp., Vitelco and the USVI ICC Operating Companies are formed under USVI law and have their principal places of business in the USVI. Vitelco's annual revenues exceed $65 million and it, with the ICC Operating Companies, is the single

---

[5]ICSC-LLC, a USVI nondebtor limited liability company, owns the other 49 percent.

[6]These companies are St. Croix Cable TV, Inc., and Caribbean Communications Corporation.

[7]There is some question as to whether Prosser's wife is also an owner through the entireties but that is not material to the pending matters.

largest employer in the USVI. Vitelco operates under a franchise granted by the USVI government. Ownership and control of Vitelco and its operations are regulated by the USVI Public Service Commission.

The Greenlight Entities' principal place of business is in New York. Their claim against ICC-LLC derives from a judgment for $56,341,843 (plus interest) entered in the Delaware Chancery Court against ICC-LLC, Innovative Communications Corporation ("Old ICC") (a dissolved USVI company)[8] and Prosser. The Greenlight Entities have a separate judgment against Emerging in the amount of $28,548,915 (plus interest) and both judgments[9] arise from the privatization of Emerging.[10] These judgments are now final.[11] The Greenlight Entities domesticated the Delaware judgments in the USVI and therefore submitted to

---

[8]Old ICC's assets and liabilities were transferred to Innovative Communication Corporation ("New ICC"). New ICC assumed Old ICC's liabilities to RTFC. It is this debt that is the basis for the guarantees of Prosser, Emerging, and ICC-LLC to RTFC. New ICC, a nondebtor, is a wholly owned subsidiary of Emerging.

[9]The judgments were entered in Delaware on January 9, 2006, although the opinion upon which they were based was finalized on June 4, 2004.

[10]Numerous appeals and motions for new trial and lawsuits that were pending in state and federal courts when the involuntaries were filed have all been dismissed, withdrawn, or otherwise terminated as the result of certain terms and conditions incident to a settlement agreement the parties had negotiated but which has not been approved by the court. Thus, the only litigation between the parties is in the bankruptcy courts.

[11]Debtors contended that the Greenlight Entities could not be petitioning creditors in Delaware because they sold their claims, characterized by Debtors as contingent, disputed and unliquidated, to RTFC. Debtors allege that RTFC could not file an involuntary against them because it is oversecured and/or its claims were disputed, contingent and unliquidated. RTFC was in litigation over the extent and validity of its alleged lien in the USVI District Court. However, all appeals have been dismissed by Debtors pursuant to a Stipulation of Liability and Allowance of Claims filed with the Bankruptcy Court in Delaware, and through which the parties agreed that RTFC was owed $524,910,065 through various loan agreements with New ICC. Thus, although Debtors disputed the liabilities on the day the involuntaries were filed, they have since conceded liability. All judgments recited in the text are now final.

6

jurisdiction there. *See, e.g., Covington Industries, Inc. v. Resintex, A.G.*, 629 F.2d 730, 738

(2d Cir. 1980)("by attempting to register the judgment pursuant to 28 U.S.C. §1963 in New

York, the plaintiff had waived any question as to the personal jurisdiction of the New York

Court").[12]

RTFC is a Virginia based cooperative lender which provides financing to

telecommunication companies.  It is a controlled entity of the National Rural Utilities

Cooperative Corporation ("CFC") which is also RTFC's sole source of funds.[13]  Since 1987,

RTFC has acted as ICC Corp.'s principal lender.

---

[12]Section 1963 of title 28, U.S.C., provides:

> A judgment in an action for the recovery of money or property
> entered in any court of appeals, district court, bankruptcy court,
> or in the Court of International Trade may be registered by
> filing a certified copy of the judgment in any other district or,
> with respect to the Court of International Trade, in any judicial
> district, when the judgment has become final by appeal or
> expiration of the time for appeal or when ordered by the court
> that entered the judgment for good cause shown. Such a
> judgment entered in favor of the United States may be so
> registered any time after judgment is entered. A judgment so
> registered shall have the same effect as a judgment of the
> district court of the district where registered and may be
> enforced in like manner.

> A certified copy of the satisfaction of any judgment in whole or
> in part may be registered in like manner in any district in which
> the judgment is a lien.

> The procedure prescribed under this section is in addition to
> other procedures provided by law for the enforcement of
> judgments.

[13]CFC and RTFC share management, counsel and auditors.  CFC, a public company, is
a cooperative lender, primarily to public power utilities.

The lending relationship between RTFC and ICC Corp., a nondebtor, was the subject of litigation in the USVI District Court (a foreclosure action alleging non-monetary defaults). A company called "New ICC," *see* note 8, *supra*, is the primary borrower of RTFC and it is this debt that is the basis of the guarantees of Prosser, Emerging and ICC-LLC. Two of the actions in the USVI had been commenced by RTFC in Virginia and were transferred to the USVI by order of the Virginia court. Motions to retransfer to Virginia were denied. RTFC sought recusal of the USVI judge to whom the case was transferred. That motion was denied and the Court of Appeals denied RTFC's appeal.

After the Delaware Chancery Court issued its opinion, *see* note 9 and accompanying text, *supra*, RTFC and the Greenlight Entities entered into a joint venture under an intercreditor agreement. Debtors assert that the agreement constitutes a purchase of the judgments by RTFC from the Greenlight Entities and that the purpose of the agreement was to obtain the Greenlight Entities' consent to act as RTFC's "proxy" to file the involuntary petitions. Debtors assert that if RTFC's liens were found to be valid, or the Chancery Court's judgments reversed on appeal, the Greenlight Entities would not have recovered from the sale of ICC-LLC's assets but would recover through RTFC's claims. Debtors also contend that RTFC would benefit as well because on its own it could not have filed the involuntary petitions inasmuch as its judgments were under contest in the USVI.[14]  However, the

---

[14]There was, on the date the involuntaries were filed, a Rule 60 motion pending in the Virgin Islands District Court, a motion to stay pending appeal filed in the Delaware Chancery Court, and other appeals in the Supreme Court of Delaware. *See, e.g.,* Case No. 06-10133 (DE), Dkt. No. 6, at 9, n.4.

8

judgments are now final and unappealable. The issue is also moot for venue purposes by virtue of Debtors' own voluntary filings in the USVI.

The Debtors conclude that the filing of the involuntary petitions by the Greenlight Entities is simply a litigation tactic by RTFC to liquidate ICC Corp., Vitelco, and the ICC Operating Companies. RTFC was in litigation in the USVI with ICC Corp., but that case, too, has been terminated. In light of the foregoing, the Debtors seek venue in the USVI where, they assert, there is a logical, legal and regulatory nexus inasmuch as the ICC-LLC's most valuable assets (Emerging, ICC Corp., Vitelco, and the ICC Operating Companies) operate and will be affected. Debtors also assert that the Greenlight Entities are not prejudiced as they have voluntarily submitted to jurisdiction in the USVI by domesticating the judgments there.

Analysis

The parties contend that venue is governed by 28 U.S.C. §1412. However, this court must also look to 28 U.S.C. §1408. Federal Rule of Bankruptcy Procedure 1014 also comes into play. Section 1412 provides:

> A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

This standard is "broad and flexible." *In re Manville Forest Products Corp.*, 896 F.2d 1384, 1391 (2d Cir. 1990).

Title 28 of the United States Code at §1408 provides:

> Except as provided in section 1410 of this title, a case under title 11 may be commenced in the district court for the district--

9

(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

Federal Rule of Bankruptcy Procedure 1014(a) provides, in pertinent part:

(1) Cases filed in proper district. If a petition is filed in a proper district, . . . the case may be transferred to any other district if the court determines that the transfer is in the interest of justice or for the convenience of the parties.

(2) Cases filed in improper district. If a petition is filed in an improper district, . . . the case may be dismissed or transferred to any other district if the court determines that transfer is in the interest of justice or for the convenience of the parties.

The parties cite only §1412 with the exception of the RTFC which mentions §1408 in its "Preliminary Response."[15] The petitioning creditors argue that by definition (11 U.S.C. §101(2)) Prosser is an "affiliate" of the corporate Debtors and, because venue is proper in Delaware with respect to the corporate Debtors inasmuch as they are incorporated there (28 U.S.C. §1408(1)), it is also proper in Delaware with respect to Prosser. *See* 28 U.S.C. §1408(2). The Bankruptcy Code defines "affiliate" in part as an

---

[15]The Preliminary Response was filed in the Delaware involuntary cases: Case No. 06-10133 (DE) at Dkt. No. 53; Case No. 06-10134 (DE) at Dkt. No. 54; Case No. 06-10135 (DE) at Dkt. No. 34.

10

> (A) entity that directly or indirectly owns, controls, or holds
> with power to vote, 20 percent or more of the outstanding
> voting securities of the debtor . . . .[16]

11 U.S.C. §101(2)(A).

Venue is appropriate in the state of incorporation, 28 U.S.C. §1408(1), so venue is

proper in Delaware with respect to the corporate Debtors. However, the corporate Debtors

and the other entities related to the corporate Debtors, such as direct and indirect subsidiaries,

have operations in the USVI. The operations of these entities and those of their subsidiaries

are intimately and inextricably tied to the USVI. In addition, Vitelco and other ICC

companies which have their operations in the Virgin Islands are formed under USVI law.

Venue of Prosser's case in Delaware is not so easily determined. In his motion to

transfer venue, Delaware Case No. 06-10135, Dkt. No. 6, Prosser states that he is a resident of

the USVI, that his business activities and those of the companies he owns and operates are in

the USVI and other Caribbean locations, as are the regulatory agencies with which he must be

in contact and the employees whose jobs will be affected. The assets subject to the

involuntary case filed against him are in the USVI as well. Prosser is the chief executive

officer of the many related companies. Thus, even though venue of Prosser's case can lie in

Delaware because of his "affiliate" status, we find that the factors to be considered weigh

heavily in favor of venue in the USVI. The petitioning creditors argue that although Prosser

might not reside or be domiciled in Delaware, he is not a resident or domiciliary of the USVI

---

[16]Section 101(2)(B) also defines "affiliate" as a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . ."

either.  Prosser's voluntary petition lists property, including real estate, in the USVI and his

address on the voluntary petition is a USVI address.  In addressing the concept of "residence,"

the court, in *In re Handel*, stated:

> Four independent bases are provided for venue under §1408(1):
> domicile, residence, place of business and location of assets.
> By definition, domicile can be in only one place. . . .  As for
> venue based on place of business or location of assets, §1408(1)
> limits venue based on those factors by preceding each with the
> word "principal."  However, no such limitation is employed
> with respect to the fourth factor "residence."  And, it is
> undeniable that one may have more than one residence
> simultaneously.

*In re Handel*, 242 B.R. 789, 792 (Bankr.D.Mass. 1999)(citation omitted).  On this authority,

Prosser has a residence in the USVI.  There has not even been an allegation that Prosser has a

residence in or any connections with Delaware except his affiliate status.  Thus, Prosser's ties

to the USVI are significant and his ties to Delaware are not.

   In support of the motion to transfer venue, counsel for ICC-LLC cites *Matter of*

*Commonwealth Oil Refining Co., Inc.*, 596 F.2d 1239 (5th Cir. 1979), *cert. denied* 444 U.S.

1045 (1980), with respect to factors used by courts to determine proper venue.  The court

listed the following factors to help determine convenience to the parties, a relevant factor

under Rule 1014:

> (1)  proximity of creditors of every kind to the court;
> (2)  proximity of the debtor;
> (3)  proximity of witnesses who are necessary to the
> administration of the estate;
> (4)  the location of the debtor's assets;
> (5)  the economic administration of the estate; and
> (6)  the necessity for ancillary administration in the event of
> liquidation.

12

596 F.2d at 1247.  *Commonwealth Oil Refining* was decided under the Bankruptcy Act of

1898 when the test for determination of venue "applied significantly heightened legal

standards than called for under current law."  *In re Shorts Auto Parts of Warren, Inc.*, 136

B.R. 30, 38 (Bankr.N.D.N.Y. 1991).  *See also In re Newport Creamery, Inc.*, 265 B.R. 614,

618 (Bankr.M.D.Fla. 2001)(standards for transfer of case when venue is improper and when it

is proper are the same - the interest of justice or convenience of the parties).  *Cf. In re Capital

Hotel Group, Inc.*, 206 B.R. 190, 193 (Bankr.E.D.Mo. 1997)(court would not retain

improperly venued case for the convenience of secured creditors and debtor's counsel or the

interest of justice where reorganization was likely to include questions of valuation of estate

assets which were almost all located, with debtor's business operations, in a different district;

parties to the case were located in at least three different federal judicial districts).

 The Court of Appeals for the Third Circuit has identified factors to determine whether

"on balance the litigation would more conveniently proceed and the interests of justice be

better served by transfer to a different forum."  *Jumara v. State Farm Insurance Co.*, 55 F.3d

873, 879 (3d Cir. 1995).  Although the Court of Appeals identified factors a court must weigh

when faced with a decision concerning venue in the context of 28 U.S.C. §1404(a), which

provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, the

district court may transfer any civil action to any other district or division where it might have

been brought."  The factors are relevant here.  The court said:

> In ruling on §1404(a) motions, courts have not limited their
> consideration to the three enumerated factors in §1404(a)
> (convenience of parties, convenience of witnesses, or interests
> of justice), and, indeed, commentators have called on the courts
> to "consider all relevant factors to determine whether on
> balance the litigation would more conveniently proceed and the

13

interests of justice be better served by transfer to a different forum." 15 Wright, Miller & Cooper §3847. While there is no definitive formula or list of the factors to consider, *see* 1A Pt. 2 Moore's ¶0.345[5], at 4363, courts have considered many variants of the private and public interests protected by the language of §1404(a).

The private interests have included: plaintiff's forum preference as manifested in the original choice, 1A Pt. 2 Moore's ¶ 0.345[5], at 4363; the defendant's preference, 15 Wright, Miller & Cooper §3848, at 385; whether the claim arose elsewhere, *id.* §3848; the convenience of the parties as indicated by their relative physical and financial condition, *id.* §3849, at 408; the convenience of the witnesses - but only to the extent that the witnesses may actually be unavailable for trial in one of the fora, *id.* §3851, at 420-22; and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum), *id.* § 3853.

The public interests have included: the enforceability of the judgment, 1A Pt. 2 Moore's ¶0.345[5], at 4367; practical considerations that could make the trial easy, expeditious, or inexpensive, *id.*; the relative administrative difficulty in the two fora resulting from court congestion, *id.*, at 4373; 15 Wright, Miller & Cooper §3854; the local interest in deciding local controversies at home, 1A Pt. 2 Moore's ¶0.345[5], at 4374; the public policies of the fora, *see* 15 Wright, Miller & Cooper §3854; and the familiarity of the trial judge with the applicable state law in diversity cases, *id.*

*Jumara v. State Farm Insurance. Co.*, 55 F.3d at 879-80.

Here, we are faced with Prosser's residence in the USVI, ICC-LLC and Emerging having been incorporated in Delaware, the Greenlight Entities' principal places of business in New York and RTFC'S base of operations in Virginia. There are very few creditors in any of these three cases. However, the public interest in the USVI as well as other factors point to the USVI. On these facts, coupled with Prosser's significant contacts with the USVI, we find that venue is proper and best satisfies the interests of justice in the USVI. In making the loans

14

to companies that operate in the USVI, RTFC clearly was aware of the nexus of Prosser and his companies to the USVI. The corporate Debtors, ICC-LLC and Emerging, have creditors, regulators, employees, shareholders and operating subsidiaries that are public utilities (or function as such) with customers in the USVI. ICC-LLC's principal place of business, employees and assets are in the USVI. Its principal asset is Emerging stock and Emerging is the parent company of ICC Corp., a USVI corporation that controls, *inter alia*, Vitelco, the USVI telephone company, the ownership, control and operations of which are regulated by the USVI Public Service Commission. The judgments of the petitioning creditors were domesticated there. The public interest in the USVI is great, even though the companies that function as the telephone, newspaper, and other public communication vehicles are not the Debtors but are owned by the Debtor(s). Under these circumstances, the place of incorporation is not the controlling factor and venue in the USVI for the corporate Debtors is strongly indicated.

Moreover, none of the books and records or witnesses are in Delaware. Neither the Delaware nor the USVI courts are so congested that prompt resolution of these cases would be adversely affected and the financial condition of the petitioning creditors and the Debtors is such that venue in either jurisdiction would not prohibit their participation in the case (and, in fact, video conferencing and teleconferencing have been utilized effectively to limit travel to either court location to date). The petitioning creditors prefer Delaware. The voluntary Debtors prefer USVI. The Debtors' assets, public interest, local interest, the convenience to witnesses (most of whom, it is alleged by Debtors, will come from Florida, the USVI, and possibly other Caribbean countries) work together to establish the USVI as the proper venue

15

of the corporate cases.[17]   Thus, the predominant factors (1, 2, 4 and 5) listed in

*Commonwealth Oil Refining, supra*, 596 F.2d at 1247, favor venue in the USVI.

Venue in the USVI for Jeffrey Prosser, an individual, cannot lie in Delaware except

insofar as his technical status under the Bankruptcy Code is as an affiliate of the corporate

Debtors.  The Greenlight Entities assert that venue with respect to Prosser is appropriate in

Delaware not only because of his affiliate status, but because he filed a voluntary case in the

USVI thereby conceding that his case is linked to the chapter 11 cases of ICC-LLC and

Emerging.  This is not persuasive with respect to the propriety of venue of Prosser's case in

Delaware.  Although there apparently is some dispute as to where Prosser's domicile is, it is

incontrovertible that he has a residence in the USVI, that neither his domicile nor his

residence is in Delaware, and that his interests are inextricably intertwined with those of the

corporate Debtors.  The USVI has a paramount interest in what happens to the corporate

Debtors, given their direct connection to public utility services in the USVI.  The Greenlight

Entities assert that Prosser "and his businesses" have filed an application with the Federal

Communications Commission ("FCC") listing Florida addresses for himself and the corporate

Debtors.  *See, e.g.,* Second Supplemental Response of Petitioning Creditors to Debtors'

Motions to Transfer Venue, Case No. 06-10133, at Dkt. No. 165, at 14-15.  Even if Prosser is

---

[17]Factors 3 and 6, set forth in *Commonwealth Oil Refining, supra,* 596 F.2d at 1247, (the proximity of witnesses necessary to administration of the estate and the necessity for ancillary administration in the event of liquidation) are not implicated at this time.  However, we note that in the event that liquidation should occur, the USVI has the paramount interest in the corporate Debtors' assets.

a resident[18] or domiciliary of Florida and even if the corporate Debtors have business offices in Florida, those facts alone do not establish that venue is proper in Delaware or improper in the USVI. In his voluntary chapter 11 filed in the USVI Prosser states a personal residence address in St. Croix, USVI.[19] The schedule of real property filed in conjunction with the voluntary petition, Schedule A, lists two parcels in St. Croix, USVI, one in Palm Beach, Florida, and one in Lake Placid, New York. Schedule B, Personal Property, lists bank accounts, household goods, clothing, and other personal items located in Florida and in St. Croix.

There is nothing in the record before this court that indicates that venue is best situated in Delaware with respect to Prosser. Because the three cases are so closely related and because the factors to consider weigh most heavily in favor of the USVI with respect to venue of the corporate Debtors, we conclude all three cases are best venued in the USVI.

An order will be entered transferring the involuntary cases to the USVI where they will be related to the voluntary cases now filed in the USVI. Because the orders for relief have been entered in the voluntary cases in the USVI, it appears that, after the involuntaries are transferred, no further action will be needed in the involuntary cases and they can be closed. However, the Debtors, the U.S. Trustee, and all creditors and interest holders shall have thirty days to file appropriate motions or requests for relief if some further action is needed in the involuntary cases. If no motion is filed within that time, the three involuntary

---

[18]*See In re Handel*, 242 B.R. 789, 792 (Bankr. D.Mass. 1999) (person may have more than one residence simultaneously).

[19]Prosser's case was filed in the St. Croix Division and transferred to the St. Thomas and St. John Division where the corporate voluntaries were filed.

cases will be closed. Further, the §341 first meetings of creditors will now be scheduled in the USVI.

In addition, the Clerks for the Bankruptcy Court for the District of Delaware and for the District Court for the District of the Virgin Islands, Bankruptcy Division, shall cause a copy of this Memorandum Opinion and accompanying Order to be distributed to all counsel of record, all creditors, and all parties in interest.

An appropriate order will be entered.

DATE: December 14, 2006

*Judith K. Fitzgerald*

jmd

Judith K. Fitzgerald
United States Bankruptcy Judge

18

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, **Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia**

# Exhibit E

to

**National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss**

| **FORM B1** (12/03) | UNITED STATES BANKRUPTCY COURT DISTRICT OF NEBRASKA | **Voluntary Petition** |
| --- | --- | --- |

| Name of debtor (if individual, enter Last, First, Middle): Raynor, John Patrick | Name of Joint Debtor (Spouse)(Last, First, Middle) |
| --- | --- |
| All Other Names used by the Debtor in the last 6 years (include married, maiden, and trade names): None | All Other Names used by the Joint Debtor in the last 6 years (include married, maiden, and trade names): |
| Last four digits of Soc. Sec./Complete EIN or other Tax ID No. (if more than one, state all): 5851 | Last four digits of Soc. Sec./Complete EIN or other Tax ID No.. (if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State, & Zip Code) 10110 Nicholas Street, Suite 102, Omaha, Nebraska 68114 | Street Address of Joint Debtor (No. & St., City, State & Zip Code) |
| County of Residence or of the Principal Place of Business: Douglas County | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |

| Location of Principal Assets of Business Debtor (if different from street address above): |
| --- |

## Information Regarding the Debtor (Check the Applicable Boxes)

**Venue:** (Check any applicable box)

☒ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

| **Type of Debtor** (Check all boxes that apply) | **Chapter or Section of Bankruptcy Code Under Which the Petition is filed** (Check one box) |
| --- | --- |
| ☒ Individual(s)  ☐ Railroad ☐ Corporation  ☐ Stockbroker ☐ Partnership  ☐ Commodity Broker ☐ Other _____  ☐ Clearing Bank | ☐ Chapter 7   ☒ Chapter 11   ☐ Chapter 13 ☐ Chapter 9   ☐ Chapter 12 ☐ Sec. 304- Case ancillary to foreign proceeding |
| **Nature of Debts** (Check one box) ☐ Consumer/Non-Business  ☒ Business | **Filing Fee** (Check one box) ☒ Full Filing Fee attached ☐ Filing Fee to be paid in installments (Applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(e). See Official Form No. 3. |
| **Chapter 11 Small Business** (Check all boxes that apply) ☐ Debtor is a small business as defined in 11 U.S.C. ' 101 ☐ Debtor is and elects to be considered a small business under 11 U.S.C. ' 1121(e)(Optional) | |

| Statistical/Administrative Information (estimates only) ☒ Debtor estimates that funds will be available for distribution to unsecured creditors. ☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors. | THIS SPACE IS FOR COURT USE ONLY |
| --- | --- |

Estimated Number of Creditors

| 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
| --- | --- | --- | --- | --- | --- |
| ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |

Estimated Assets

| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | More than $100 million |
| --- | --- | --- | --- | --- | --- | --- | --- |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

Estimated Debts

| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | More than $100 million |
| --- | --- | --- | --- | --- | --- | --- | --- |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

Form Published by: Law Disks, 734 Franklin Avenue, Garden City, NY 11530    www.lawdisks.com

| **Voluntary Petition** | Name of Debtor(s): | **FORM B1, Page 2** |
|---|---|---|
| (This page must be completed and filed in every case.) | Raynor , John Patrick | |

| **Prior Bankruptcy Case Filed Within the last 6 Years** (If more than one, attach additional sheet.) | | |
|---|---|---|
| Location | Case Number: | Date Filed: |
| Where filed: | | |

| **Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor** (If more than one, attach additional sheet) | | |
|---|---|---|
| Name of Debtor: | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

## Signatures

**Signature(s) of Debtor(s) (Individual/Joint)**

I declare under penalty of perjury that the information provided in this petition is true and correct. [If the petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7 .

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
John P. Raynor , Debtor

X _____
, Joint Debtor

Telephone Number (If not represented by attorney)
9 | 11 | 2004
Date

**Signature of Attorney**

X _____
Signature of Attorney for Debtor(s)

Print below: Attorney Name, Code, Firm, Address, Telephone No:
Bar Number/Code:

Robert F. Craig (NE #10819)
Shawn M. Grimsley (NE #22770)
Robert F. Craig, P.C.
1321 Jones Street
Omaha, NE 68102

9-13-04
Date

**Signature of Debtor (Corporation/Partnership)**

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Authorized Individual

_____
Printed Name of Authorized Individual

**Exhibit A**

(To be completed if the Debtor is required to file periodic reports (e.g., forms 10K and 10Q with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)

☐ Exhibit A is attached and made a part of this petition.

**Exhibit B**

(To be completed if Debtor is an individual whose debts are primarily consumer debts.)

I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter.

X _____
, Attorney for Debtor(s)          Date

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐ Yes, and Exhibit C is attached and made part of this petition.
☐ No

**Signature of Non-Attorney Petition Preparer**

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____
Printed Name of Bankruptcy Petition Preparer

_____
Social Security Number (required by 11 U.S.C. § 110(c))

_____
Address

Name and Social Security Numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X _____
Signature of Bankruptcy Petition Preparer     Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. '110; 18 U.S.C. '156.

[Publisher's Note: This form is NOT intended to be used by nonattorney bankruptcy-petition preparers: Schedules do not contain all disclosures required for use by nonattorney bankruptcy-petition preparers.]

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, **Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia**

# Exhibit F

to

## National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss

FILED

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| RURAL TELEPHONE FINANCE COOPERATIVE, | ) |
| 2201 Cooperative Way | ) |
| Herndon, Virginia 20171-3025 | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civ. Action No. _1:04CV633_ |
| vs. | ) _(CMH/BRF_ |
| | ) |
| INNOVATIVE COMMUNICATION | ) |
| CORPORATION, | ) |
| Bjerget House | ) |
| 55-58 Hill Street | ) |
| St. Croix, U.S. Virgin Islands | ) |
| | ) |
| Defendant. | |

## COMPLAINT

Plaintiff Rural Telephone Finance Cooperative ("RTFC" or "Lender"), by its counsel, hereby states its Complaint against defendant Innovative Communication Corporation ("ICC" or "Borrower") to recover sums due and owing under loan agreements and related documents and for declaratory relief pursuant to 28 U.S.C. § 2201-02 as follows:

## THE PARTIES

1.    Plaintiff RTFC is a cooperative, nonprofit, membership corporation organized under the laws of the State of South Dakota with its principal place of business in Herndon, Virginia.

2.    Defendant ("ICC") is a corporation organized under the laws of the United States Virgin Islands with its principal place of business in Sunny Isle, St. Croix, United States Virgin Islands.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as RTFC

and ICC are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive

of interest and costs, and pursuant to 28 U.S.C. § 2201 as the relief sought is, in part, a

declaratory judgment declaring the rights of the parties.

4.      In the contract at issue here, ICC, as the Borrower, agreed as follows:

> Borrower submits to the nonexclusive jurisdiction of the United
> States courts located in Virginia . . . for purpose of all legal
> proceedings arising out of or relating to this Agreement or the
> transactions contemplated hereby. Borrower irrevocably waives,
> to the fullest extent permitted by applicable law, any objection that
> it may now or hereafter have to the establishing of venue of any
> such proceeding brought in such a court and any claim that any
> such proceeding has been brought in an inconvenient forum.

5.      Accordingly, this Court has personal jurisdiction over ICC because ICC

contractually agreed to submit to jurisdiction in this judicial district. In addition, this Court has

personal jurisdiction over ICC because the claims arise from ICC's transaction of business in this

Commonwealth, Va. Code Ann. § 8.01-328.1 (A)(1); and the claims arise from ICC's

contracting in this Commonwealth, Va. Code Ann. § 8.01-328.1 (A)(2).

6.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(a)(2) and because

the ICC has expressly agreed to venue in this Court. Venue is appropriate in this Division

pursuant to Local Rule 3(c).

## FACTUAL BACKGROUND

7.      RTFC was incorporated as a cooperative, nonprofit, membership corporation in

1987 and is in the business of providing, securing and arranging financing for its rural

2

telecommunications cooperative members and their affiliates. RTFC has over 500 rural

telecommunications cooperative members.

8.    ICC conducts business primarily to acquire, construct, erect, improve, maintain

and operate the facilities for, and to engage in the business of furnishing telephone and other

communication services and facilities in and around the Caribbean, including in the United

States Virgin Islands.

9.    ICC is the parent company of Virgin Islands Telephone Corporation ("Vitelco"), a

corporation organized under the laws of the United States Virgin Islands with its principal place

of business in Charlotte Amalie, St. Thomas, United States Virgin Islands.

10.    Vitelco is the incumbent local exchange carrier in the United States Virgin Islands

and provides local fixed wireline telephone services there. Under the 1996 Telecommunications

Act, Vitelco qualifies as a rural telephone carrier.

11.    Vitelco, as a member of the RTFC, and ICC, as Vitelco's parent, are eligible to

borrow money from RTFC and, since 1987, have borrowed money from RTFC.

12.    Between 1987 and 2000, RTFC made 15 separate loans to ICC totaling in excess

of $500 million.

13.    On August 27, 2001, RTFC and ICC signed a loan agreement (the "Loan

Agreement"), a promissory note (the "Secured Promissory Note") and other related documents to

document a loan (the "Loan") from RTFC to ICC in the amount of $169,291,578. A copy of the

Loan Agreement is attached hereto as Exhibit A. At the time the Loan was made, ICC had 15

prior, outstanding loans with RTFC in the amount of approximately $507,417,573 (the "Prior

Loans"). ICC's outstanding indebtedness to RTFC exceeds $550 million.

3

14.    As security for the Prior Loans and as security under the Loan Agreement, RTFC required, among other things, that ICC pledge all of the common stock and preferred stock of ICC and its subsidiaries, including all of the common stock of Vitelco.

15.    The Loan Agreement includes a number of agreements and covenants by ICC for the economic protection of RTFC and its secured interest in ICC's assets, including the Vitelco common stock. This action arises as a result of ICC's failure to make a mandatory prepayment pursuant to Section 2.4.2.1 of the Loan Agreement and as a result of a dispute between RTFC and ICC as to whether ICC has breached the negative covenants contained in Sections 7.2.5 and 7.2.6 of the Loan Agreement.

16.    RTFC seeks in this action a judgment against ICC in the amount of the mandatory prepayment required by Section 2.4.2.1 in the amount of $81,859,500, together with interest, costs and attorneys' fees. RTFC also seeks a declaration (a) that ICC has breached its contractual obligations pursuant to Sections 7.2.5, and/or 7.2.6; (b) that those provisions are valid and enforceable; (c) that those breaches are Events of Default under the Loan Agreement and (d) that RTFC, as a result of the Events of Default, is entitled to exercise its rights and remedies under the Loan Agreement and related documents, if the breaches are not cured by ICC within thirty days of notice of the Event of Default

## CAUSES OF ACTION

### Count 1 – RTFC's Claim for Payment Pursuant to
### Section 2.4.2.1 of the Loan Agreement

17.    Paragraphs 1 through 16 are incorporated herein by reference as if restated here in full.

4

18.     Section 2.4.2 of the Loan Agreement requires ICC, as the Borrower, to make

mandatory prepayments of the loan when ICC or its subsidiaries receives funds from certain

financing activities, specifically:

> 2.4.    Prepayment.  Borrower may make voluntary prepayment
> and must make mandatory prepayments according to the terms and
> conditions set forth herein.
>
>       \*   \*   \*
>
> 2.4.2.  Mandatory Prepayments.
> 2.4.2.1.      In the event that, and on each occasion on
> which, any Net Cash Proceeds are received by or on behalf
> of the Borrower or any Subsidiary, the Borrower shall,
> within three Business Days after such Net Cash Proceeds
> are received, prepay the Loans in an aggregate amount
> equal to such Net Cash Proceeds.

19.     Section 1 of the Loan Agreement, "Construction and Definitions of Terms,"

defines "Net Cash Proceeds" as follows:

> "Net Cash Proceeds" means, as applicable... (b) with respect to
> any offering of capital stock or issuance of debt, the gross cash
> proceeds received by the Borrower, or any of its Subsidiaries,
> therefrom less all reasonable legal, underwriting and other fees and
> expenses actually incurred in connection therewith.

20.     Vitelco is a "Subsidiary" of ICC under the construction and definitions of terms in

the Loan Agreement.

21.     During February 2004, Vitelco sold 85,000 shares of preferred stock (the

"Preferred Stock"), with a par value of $1,000, for net proceeds of $81,859,500.  The allegations

contained in the Complaint concerning Vitelco's sale of Preferred Stock are pleaded upon

information and belief based upon the disclosures in the audited Consolidated Financial

Statements for the years ended December 31, 2003 and 2002 of Innovative Communication

Corporation and Subsidiaries (the "ICC 2003 Financial Statements").

22.    RTFC first learned of the Preferred Stock sale by Vitelco in late April 2004 when it received a copy of the ICC 2003 Financial Statements.

23.    Pursuant to Section 1 of the Loan Agreement, the sum of $81,859,500 constitutes "Net Cash Proceeds."

24.    Pursuant to Section 2.4.2.1, ICC was obligated to make a mandatory prepayment to RTFC within three business days of the completion of the offering of Preferred Stock by Vitelco in an amount equal to the aggregate amount of the Net Proceeds received by Vitelco, namely, $81,859,500. The offering was completed more than three months ago, but ICC, despite demand, has not made the mandatory prepayment required by Section 2.4.2.1 of the Loan Agreement.

25.    Section 9.3 of the Loan Agreement provides as follows:

> 9.3    <u>Costs and Expenses</u>.  Borrower agrees to pay and to be liable for any and all reasonable expenses, including attorneys' fees and court costs, incurred by the Lender in exercising or enforcing any of its rights hereunder or under the Other Agreements, together with interest thereon at the rate and determined in the manner provided in the Mortgage. . . .

26.    Accordingly, RTFC seeks a judgment against ICC for $81,859,500, plus interest thereon and RTFC's attorneys' fees, costs and expenses pursuant to Section 9.3 of the Loan Agreement.

## Count 2 – RTFC's Claim for a Declaratory Judgment Concerning Sections 7.2.5 and 7.2.6 of the Loan Agreement

27.    Paragraphs 1 through 26 are incorporated herein by reference as if restated here in full.

6

28.     Section 7.2 of the Loan Agreement contains certain negative covenants imposed

upon ICC, specifically:

> 7.     NEGATIVE COVENANTS
>
>     *   *   *
>
> 7.2.     Consent. Borrower covenants and agrees with the Lender
> that Borrower, and its Subsidiaries, will not, directly or indirectly,
> without the prior written consent of the Lender do any of the
> following. . . .
>
>     *   *   *
>
> > 7.2.5.  Declare or pay any dividends or make any other
> > distribution to its members with respect to its ownership or
> > membership interests; (ii) purchase or redeem or retire any
> > of its ownership or membership interests. . . .
> >
> > 7.2.6.  Permit any Subsidiary to enter into any agreement
> > that would impair said Subsidiary's ability to pay dividends
> > or distributions to Borrower.

29.     The Loan Agreement defines certain events as "Event[s] of Default." Section 8.3

of the Loan Agreement provides that a breach by ICC of any of its covenants in the Loan

Agreement is an Event of Default, specifically:

> 8.     EVENT OF DEFAULT.  The occurrence of any one or
> more of the following events shall constitute an "Event of
> Default".
>
>     *   *   *
>
> > 8.3.     Other Covenants.  Failure of Borrower to observe or
> > perform any warranty, covenant or condition to be
> > observed or performed by Borrower under this Agreement
> > or any of the Other Agreements. . . .

30.     Upon the occurrence of an Event of Default, the Loan Agreement and the related

documents, including but not limited to Section 9 of the Loan Agreement, provide RTFC certain

rights and remedies.  Those rights and remedies include, but are not limited to, declaring that all

unpaid principal, all accrued and unpaid interest thereon and any other obligations under the

7

Loan and the Prior Loans are immediately due and payable, refusing to advance further funds to ICC and exercising its rights and remedies with respect to the collateral.

31.    With respect to Events of Default under Section 8.3, RTFC's exercise of its rights and remedies is subject to "thirty (30) days prior written notice to the Borrower during which time the Borrower shall have the opportunity to cure said Event of Default. . . ."

32.    Upon information and belief based on the ICC 2003 Financial Statements, Vitelco's Preferred Stock receive an annual dividend (cumulative) of 10 percent computed based upon the par value (which is $1,000 per share), payable quarterly in arrears.

33.    To the extent that ICC, without RTFC's consent, permits its Subsidiary, Vitelco, to declare or pay any dividends with respect to the Preferred Stock, ICC has breached the negative covenant contained in Section 7.2.5. If not cured within thirty days of notice of the breach, that breach will be an Event of Default under Section 8.3.

34.    Even if Vitelco does not declare or pay dividends with respect to the Preferred Stock, the issuance of the Preferred Stock still violates Section 7.2.6 of the Loan Agreement.

35.    Upon information and belief based upon the ICC 2003 Financial Statements, Vitelco may not pay dividends on its common shares (which are pledged as collateral by ICC to RTFC) if the dividends to the Preferred Stock are in arrears (not declared and paid quarterly) unless holders of more than two-thirds of the Preferred Stock approve such payments with respect to the common stock. Thus, the holders of Vitelco's Preferred Stock have the right to prevent the payment of dividends to ICC on Vitelco's common stock (if dividends on the Preferred Stock have not been paid). Those common stock dividends are in turn an important source of funds for ICC's payments of its obligations to RTFC.

36.    RTFC did not consent to ICC or its subsidiaries incurring dividend obligations to other parties, did not consent to ICC or its subsidiaries impairing Vitelco's ability to pay dividends to ICC with respect to the pledged common stock, and did not consent to ICC's breach of the negative covenants contained in Sections 7.2.5 and 7.2.6.

37.    An actual controversy exists between RTFC and ICC relating to ICC's obligations under Sections 7.2.5 and 7.2.6. RTFC contends that Sections 7.2.5 and 7.2.6 are valid and enforceable, that ICC has breached its obligations under one or both of those sections; that ICC's breach of the negative covenants in Section 7.2 is an Event of Default under Section 8.3; and that RTFC is therefore entitled to exercise its rights and remedies under the Loan Agreement and related documents, including, but not limited to, that RTFC may declare all unpaid principal, all accrued and unpaid interest thereon and any other obligations under the Loan and the Prior Loans to be immediately due and payable, may refuse to advance further funds to ICC and may exercise its rights and remedies with respect to the collateral, if the breaches are not cured by ICC within thirty days of notice of the Event of Default. Counsel for ICC has informed counsel for RTFC that it contends that there has been no Event of Default.

38.    Accordingly, RTFC seeks judgment declaring (a) that Sections 7.2.5 and 7.2.6 are valid and enforceable; (b) that ICC has breached its negative covenants under either or both of Sections 7.2.5 and 7.2.6; (c) that ICC's breach of one or both of these sections is an Event of Default under Section 8.3; and (d) that RTFC is entitled to exercise its rights and remedies under the Loan Agreement and related documents, including, but not limited to, that RTFC may declare all unpaid principal, all accrued and unpaid interest thereon and any other obligations under the Loan and the Prior Loans to be immediately due and payable, may refuse to advance

further funds to ICC and may exercise its rights and remedies with respect to the collateral, if the

breaches are not cured by ICC within thirty days of notice of the Event of Default.

39.    RTFC further seeks judgment against ICC for its attorneys' fees, costs and

expenses pursuant to Section 9.3 of the Loan Agreement.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(1)    **On the First Count of this Complaint,** for judgment against ICC for $81,859,500, plus interest thereon pursuant to Section 9.3 of the Loan Agreement;

(2)    **On the Second Count of this Complaint,** for judgment declaring (a) that Sections 7.2.5 and 7.2.6 are valid and enforceable; (b) that ICC has breached its negative covenants under either or both of Sections 7.2.5 and 7.2.6; (c) that ICC's breach of one or both of these sections is an Event of Default under Section 8.3; and (d) that RTFC is entitled to exercise its rights and remedies under the Loan Agreement and related documents, including, but not limited to, that RTFC may declare all unpaid principal, all accrued and unpaid interest thereon and any other obligations under the Loan and the Prior Loans to be immediately due and payable, may refuse to advance further funds to ICC and may exercise its rights and remedies with respect to the collateral, if the breaches are not cured by ICC within thirty days of notice of the Event of Default.

(3) For judgment against ICC for reasonable costs, expenses and attorney's fees pursuant to Section 9.3 of the Loan Agreement in an amount to be determined at trial.

Respectfully submitted,

**Rural Telephone Finance Cooperative**

By Counsel

Gerald Zingone (VSB #396604)
Thelen Reid & Priest LLP
701 Pennsylvania Avenue, N.W.
8th Floor
Washington, D.C. 20004-2608
(202) 508-4332

Of Counsel:

Michael Evan Jaffe
Thelen Reid & Priest LLP
701 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 508-4215

and

Jonathan D. Siegfried
Jonathan E. Polonsky
Noel Garcia
Thelen Reid & Priest LLP
875 Third Avenue
New York, NY 10022
(212) 603-2000

11

— OFFICE COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |
|---|---|
| RURAL TELEPHONE FINANCE COOPERATIVE, )<br><br>Plaintiff, )<br><br>v. )<br><br>INNOVATIVE TELEPHONE FINANCE COOPERATIVE, )<br><br>Defendant. ) | Civil Action 1:04CV633 |
| RURAL TELEPHONE FINANCE COOPERATIVE, )<br><br>Plaintiff, )<br><br>v. )<br><br>JEFFERY PROSSER, )<br><br>Defendant. ) | Civil Action 1:04CV1106 |

FILED
OCT 1 8 2004
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## ORDER

This case is before the Court on Defendant's Motion to Transfer these cases to the District of the Virgin Islands.

In considering a Motion to Transfer, the Court must consider the Plaintiff's choice of a forum. The Plaintiff filed these cases here and also filed a related matter in the Virgin Islands. The majority of the witnesses reside in the Virgin Islands, making it easier to compel live testimony and reduce the cost of obtaining that testimony. The Virgin Islands is the more

DOCKETED BY MANAGING CLERK
DATE 10/26/04 BY

53

convenient forum as one of the parties and the majority of the witnesses reside there. The nexus to the forum favors the Virgin Islands. The only nexus to Virginia is the residence of the Plaintiff. A related action is pending in the Virgin Islands that involves the issues in these cases. The loan agreement and Prosser guarantee do not contain a mandatory forum selection clause, they do provide for the choice of Virginia law. The courts in the Virgin Islands can easily deal with the interpretation of Virginia law, and it is hereby

ORDERED that Civil Action No. 1:04 CV 633 and Civil Action No. 1:04 CV 1106 are transferred to the United States District Court for the District of the Virgin Islands.

CHIEF UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
October 19, 2004

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia

# Exhibit G

to

## National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss

## THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| VIRGIN ISLANDS TELEPHONE CORPORATION and INNOVATIVE COMMUNICATION CORPORATION,<br>Plaintiff,<br><br>v.<br><br>NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION, RURAL TELEPHONE FINANCE COOPERATIVE, GREENLIGHT CAPITAL QUALIFIED, L.P., GREENLIGHT CAPITAL, L.P., AND GREENLIGHT CAPITAL OFFSHORE, LTD.,<br><br>Defendants. | ) CIVIL NO. 2006/18<br>)<br>)<br>) ACTION FOR<br>) DECLARATORY RELIEF,<br>) INJUNCTIVE RELIEF<br>) AND DAMAGES<br>)<br>)<br>)<br>)<br>) **JURY TRIAL DEMAND**<br>)<br>)<br>)<br>)<br>) |

## AMENDED COMPLAINT

Come now the plaintiffs, the Virgin Islands Telephone Corporation ("Vitelco") and Innovative Communication Corporation, ("ICC"), by counsel, and hereby allege as the basis of their complaint against the defendants as follows:

1.     This Court has jurisdiction over the subject matter herein pursuant to 4 V.I.C. §32(a) and 28 U.S.C. §1332, as well as 28 U.S.C. 2201 *et.*

Amended Complaint
Page 2

*seq.*, 5 V.I.C. §4901 *et. seq.* and 5 V.I.C. §1261 *et. seq.*

2.    The amount in controversy exceeds the sum or value of $75,000.00 exclusive of interest and costs.

3.    This action is between citizens of different states.

4.    The plaintiff, Virgin Islands Telephone Corporation ("Vitelco"), is a Virgin Islands corporation that operates the telephone system in the Virgin Islands. It is a wholly owned subsidiary of the co-plaintiff, Innovative Communication Corporation ("ICC"), and is also a Virgin Islands corporation.

5.    The defendant, Rural Telephone Finance Cooperative ("RTFC") is a cooperative organized under the laws of the District of Columbia, which is headquartered in Virginia.

6.    National Rural Utilities Cooperative Finance Corporation ("CFC") is a cooperative organized pursuant to the laws of the District of Columbia, having its principle office in Virginia. The RTFC is a member of the CFC cooperative. CFC manages and controls the day to day operations of the RTFC -- describing RTFC as a 'Controlled Affiliate of CFC. RTFC has only one employee of its own -- in a ministerial position. Therefore CFC's

**Amended Complaint**
**Page** 3

managers and personnel have conducted all of the business of, and transacted all of RTFC's affairs in the United States Virgin Islands.

7.    The defendants, Greenlight Capital Qualified, L.P., Greenlight Capital, L.P., and Greenlight Capital Offshore, Ltd. (hereinafter referred to collectively as "Greenlight") are hedge fund companies organized under the laws of jurisdictions other than the USVI where they are citizens thereof. The Greenlight defendants have corporate headquarters in New York.

8.    The RTFC and Greenlight have entered into a joint venture to take over ICC and Vitelco pursuant to an agreement as more fully described herein.

9.    The CFC and the RTFC have been trying to obtain control and ownership of ICC and Vitelco since June 1, 2004 by having the RTFC file a foreclosure action against Vitelco's parent company, ICC, through litigation that is currently pending before this Court. This Court has dismissed 20 of the 31 alleged claims asserted by the RTFC and has denied cross motions for summary judgment as to the remaining 10 alleged claims. These adverse rulings have thwarted the CFC's and the RTFC's attempt to

Amended Complaint
Page 4

seize control of Vitelco and ICC as the RTFC, at CFC's direction, has stated to the PSC and media that it would accomplish through this litigation. ICC has counterclaimed against the RTFC contending that ICC was not in default, the litigation was commenced in bad faith, and that RTFC intentionally acted outside the scope of legitimate proceedings to take over ICC -- having engaged in tortious conduct in furtherance of RTFC's attempted unlawful takeover of ICC and Vitelco.

10.    Further, the RTFC has (1) admitted to substituting pages in the Loan Agreement by and between ICC and the RTFC, (2) admitted to destroying the originals after doing so, and (3) acknowledged that it cannot produce a Loan Agreement executed by all parties. As a result, the District Court has found that there is a question regarding the validity of the RTFC's loan agreement. The spectre of an invalid loan agreement also stands in the way of the RTFC in trying to seize control of ICC and Vitelco at the current time for this reason.

11.    Even if the RTFC's remaining claims had any merit, the counterclaims of ICC and Vitelco eliminate, or at the very least, significantly reduce any amount owed to the RTFC.

**Amended Complaint**
**Page** 5

12.    Because the CFC and the RTFC have been unable to lawfully obtain control of ICC and Vitelco through the RTFC's foreclosure action against ICC, they decided to frustrate efforts by ICC's parent companies to defend the Greenlight litigation by refusing to provide a corrective affidavit of critical false testimony given by one of CFC's employees, Robin Reed, in that case.  The CFC then had the RTFC negotiate with Greenlight and enter into an agreement with Greenlight (the "Takeover Agreement"), the purpose of which is to gain control of ICC and Vitelco outside of the litigation pending in this Court.

13.    At the time the RTFC entered into the Takeover Agreement with Greenlight, Greenlight had an unsecured claim against Vitelco's indirect parent companies, Innovative Communication Company LLC ("ICC-LLC") and Emerging Communications, Inc. ("Emcom") as well as one of their beneficial owners, Jeffrey Prosser ("Prosser") and a dissolved company.  Greenlight secured this judgment with the help of testimony from a CFC employee, Robin Reed, that RTFC has since admitted was false.  This false testimony was cited some 22 times in the decision providing Greenlight with its judgment.  For more than a year after the Delaware

**Amended Complaint**
**Page** 6

decision, Greenlight delayed reducing its unsecured claim to a judgment because its claim was completely subordinate to the secured liens of the RTFC against Vitelco's stock, during which time the defendants in the Greenlight case had been trying to get a corrective affidavit on Reed's testimony. That affidavit was supplied so that it would arrive immediately after the judgment was entered.

14.    As neither party had the ability to seize control of ICC and Vitelco by themselves, the RTFC and Greenlight critically needed the Takeover Agreement to act in concert with one another in a joint venture to seize control of ICC and Vitelco.

15.    Under the Takeover Agreement, Greenlight was required to reduce its unsecured claims against ICC's parents to judgment and to thereafter commence involuntary bankruptcy proceedings within 45 days after obtaining the judgment, all of which was and is intended for the sole purpose of allowing the joint venture between the RTFC and Greenlight to seize control of ICC and Vitelco.

16.    The conduct of the CFC and the RTFC is particularly egregious since in essence it contractually requires another creditor which could not

**Amended Complaint**
**Page** 7

otherwise do so to force ICC's parent, Emerging Communications, Inc.

("Emcom"), into bankruptcy, an event which could trigger a default under

the RTFC's various loans to ICC in order to accomplish a result that the

CFC and the RTFC could not lawfully attain on their own, *i.e.*, control of

ICC's and Vitelco's stock through the RTFC's current foreclosure action.

17.    Pursuant to the Takeover Agreement, on or about January 9,

2006, the Greenlight defendants reduced the decision to a judgment for an

appraisal against Emcom and another judgment for breach of fiduciary

duty against Innovative Communication Company, LLC ("ICC-LLC"), a

Delaware limited liability company, a dissolved USVI corporation ("ICC-

Old") and Jeffrey Prosser in the Delaware Chancery Court.  While there are

pending challenges to the propriety of the court's decision, which

judgment is still subject to the appellate process as well, the Greenlight

defendants have an executable judgment.  Greenlight began recording its

judgments in various locations, including the states of New York and

Florida as well as in the U.S. Virgin Islands under the UEFJA.  However,

Greenlight recorded its judgment against the present ICC  at its present

address (a completely different company than the dissolved ICC-Old

**Amended Complaint**
**Page** 8

against which judgment was given – which was never at the address

stateed) when in fact it has no judgment against the existing ICC.  Despite

being requested to release the judgment as to ICC, to date Greenlight has

not done so.

18.    RTFC was ICC's lender.  In that capacity it fully participated in

the design of, and completely funded the 'going private' transaction that is

the basis of Greenlight's Delaware judgment.  Soon thereafter, RTFC gave

damaging testimony regarding ICC's financial value which was completely

erroneous as recently admitted by the RTFC in an affidavit.  The RTFC had

met with Greenlight's counsel before the deposition to discuss Reed's

testimony, but it had refused to even meet or confer with the attorneys

from Prosser's companies before the deposition. The testimony worked to

the full benefit of Greenlight -- a group of hedge funds located in New

York-- which, with an investment of less that $8 million is seeking to take

over ICC.  With the direct assistance of the RTFC's erroneous testimony,

judgments were obtained by Greenlight in Delaware in excess of $130

million based on extraordinarily high valuations of ICC (a high valuation

which served the interests of the RTFC by erroneously inflating the asset

**Amended Complaint**
**Page** 9

value securing RTFC loans in reports required to be provided to the SEC, credit agencies, and bond holders) -- predicated to a great extent on the erroneous testimony of RTFC, as the judge cites the testimony in more than 20 places and states in two places that it is the only or sole testimony he is considering on those points.  Greenlight and the RTFC, who both knew about this erroneous testimony, failed to bring it to the attention of the Delaware court after the May, 2004 decision, until the RTFC sent a letter by mail to the Delaware court which it knew would be received by that court too late to prevent the judgments from being entered. Now, the lender, RTFC, which gave the erroneous testimony and the $8 million investor that obtained a Delaware judgment based on that testimony (which is now on appeal) seek to take over ICC's phone, cable and wireless companies -- all requiring PSC approval, and subject to the Virgin Island's Government's option to not renew these franchises - via a secret agreement not initially shared with this Government or the PSC.  Moreover, the actions of the two parties are designed to prevent an appeal in Delaware or an examination of the bad faith of RTFC before the company is taken over and the alleged claims covered up.

Amended Complaint
Page 10

19.    The RTFC is a member of CFC.

20.    The RTFC is a shell managed by CFC which has no facilities or operations other than those of CFC -- and which has only one employee. RTFC's managers are all CFC employees.  CFC created RTFC.  RTFC's in-house lawyers are all CFC's lawyers.  CFC has to approve all loans by RTFC.  CFC does all collections for RTFC -- and frequently internal CFC memos refer to loans made by RTFC as "CFC Loans".  As such, employees of the CFC make all decisions for the RTFC and do all acts required to be done by the RTFC.

21.    In August of 2001, CFC was in the process of completing its annual 10-K report to be filed with the Securities and Exchange Commission ("SEC") as required by law.

22.    CFC recognized that the RTFC's loan to ICC was in default and could cause problems with CFC's audit due to the size of the ICC's loan, which constituted a significant portion of the total loan portfolio that was the subject of the 10-K report.

23.    As such, CFC instructed the RTFC to restructure ICC's loan so that it would be a performing loan which was current.  On August 14, 2001,

Amended Complaint
Page 11

the RTFC sent ICC a term sheet to accomplish this purpose, arranging additional funds to restructure ICC's outstanding debt of $169,291,578, which CFC characterized as additional financing -- although it was used to pay principal on other RTFC loans--and new funds were not actually advanced.

24.    Before the loan was closed, CFC's auditor Arthur Anderson, raised specific questions about ICC's loan actually being a restructuring which if answered truthfully would create a problem for CFC's 10-K statement.  As such, a CFC officer instructed a CFC loan officer, Robin Reed, to address this issue with Arthur Anderson to avoid a problem on CFC's 10-K report that disclosing the truth would create.  *See* **Exhibit A.**

25.    In response to this directive, CFC's loan officer sent an email to the Arthur Anderson auditor deliberately mischaracterizing the loan as a "new loan" when in fact it was a restructuring.  More importantly, the analysis placed a value on ICC that justified the loan which value relied heavily on the value of ICC's subsidiary, Vitelco, which had its own loans with the RTFC secured by Vitelco's collateral.  *See* **Exhibit B.**  It was this sort of questionable internal valuations within RTFC for its own purposes

**Amended Complaint**
**Page** 12

which led to false testimony and inflated estimates in the Greenlight litigation.

26.    As a result of this erroneous report, Arthur Anderson's auditor did not include any language in CFC's 10-K report regarding restructuring or any concerns about ICC's loan with the RTFC.

27.    CFC's officers further instructed its staff to quickly close this $169,291,578 RTFC/ICC loan expeditiously so that it could inform the bond rating agencies that there were no major loan problems on August 27, 2001, when it met with those rating agencies. *See* **Exhibit C**. CFC's 10-K was issued on this date as well. *See* excerpts attached as **Exhibit D**.

28.    As such, CFC worked expeditiously to close this $169,291,578 loan within two weeks of the term sheet being issued.

29.    In the rush to accomplish this task, loan documents were sent for delivery to ICC for execution on Friday, August 24, 2001 with instructions that they be promptly returned by Monday, August 27, 2001.

30.    While those original loan documents were signed and returned, CFC personnel decided to add additional terms to the loan documents, which they did by creating new loan documents, signature pages off of the

Amended Complaint
Page 13

documents signed by ICC, and attaching the signature pages to the new document -- without disclosing this fact to ICC. RTFC then destroyed the original loan documents and any indication that this had been done.

31.    This RTFC/ICC loan took care of CFC's immediate concerns over the issuance of its 10-K report to the SEC on August 27, 2001.

32.    In late 2003, Vitelco sought and obtained financing from another source, the Rural Utilities Service ("RUS"), so that it could pay off all of its RTFC loans even though its parent, ICC, would still have substantial loans outstanding with the RTFC.

33.    In December of 2003, the CFC instructed its employee not to cooperate in the RUS refinancing of Vitelco, as this refinancing would pay off the Vitelco loans to the RTFC, resulting in the RTFC losing its lien against Vitelco's collateral as well as losing control over Vitelco's financing which control it obtained through the Vitelco loan agreements.

34.    When it became clear that Vitelco's assets had to be released from the RTFC's loan security because of the RUS funding, CFC reluctantly authorized the release of these loans in January of 2004 after a confrontation with ICC and Vitelco. However, CFC became determined to

**Amended Complaint**
**Page** 14

regain control over Vitelco's collateral as soon as practicable since this collateral was the most valuable asset of ICC.

35.    On May 3, 2004, the Delaware Chancery Court issued an opinion against ICC's parent companies based in part on RTFC's erroneous testimony that assessed liability against these companies in excess of $200 million dollars.

36.    During this time period, CFC officers recognized (and admitted) that ICC could pay its loan in the normal course of business. *See* **Exhibit E.** Moreover, CFC knew the RTFC had a lien against all of ICC's assets so that the Greenlight decision posed no risk to its collateral.

37.    Notwithstanding this fact, CFC recognized the vulnerability of ICC as a result of the Greenlight opinion, which provided CFC with an opportunity to try to regain control over Vitelco and its collateral.

38.    As such, even though RTFC has admitted in documents filed with the SEC that ICC was current on its monthly payments (*see* Exhibit E), CFC caused RTFC to file a foreclosure action against ICC on June 1, 2004. The complaint alleged three defaults, two of which required 30 days notice -- which notice was not given.

Amended Complaint
Page 15

39.    CFC subsequently realized that three alleged defaults were not sufficient to achieve CFC's goal of overwhelming ICC and getting control of Vitelco.  As such, CFC instructed its staff to assert every fabricated default it could conceive of against ICC -- regardless of the existence of an actual factual basis for the alleged defaults.

40.    In response, CFC employees provided a list of 31 alleged defaults which were included in an amended complaint, 20 of which required 30 days advance notice with a right to cure -- which notice was again not given as required. In fact, CFC's employees knew there was absolutely no factual basis for many of the defaults subsequently alleged in the amended complaint.

41.    After filing the amended complaint, CFC instructed its employees to make certain a media campaign was instituted against ICC touting these 31 alleged defaults, which was done.

42.    During this time period, CFC instructed its employees and attorneys to make certain that contact was made with Vitelco's regulatory agency, the Public Service Commission ("PSC"), to disclose these alleged defaults and to tell the PSC that the RTFC intended to take control of

Vitelco, which was done in public and private meetings.

43.    During this time period, CFC employees, including in-house counsel, caused the RTFC to assert that ICC had violated the terms of the 2001 Loan Agreement even though these same officials knew the document they were asserting as being the loan document had in fact been changed by CFC employees without ICC's knowledge after being executed by ICC. These same CFC officials also knew that the original loan agreement signed by ICC had not been retained in the files of either CFC or RTFC.

44.    During this same time period, CFC instructed the RTFC not to do anything to help any Prosser related companies to correct or modify the May 3, 2004 opinion of the Delaware Chancery Court, as CFC wanted this liability against the Greenlight defendants to remain in place in order to help it coerce ICC into giving it control of ICC and Vitelco. Consistent with this instruction, the RTFC refused to correct the erroneous testimony of Robin Reed relied upon by the Delaware Chancery Court. Similarly, CFC instructed the RTFC to not do anything to assist in settlement of the Greenlight litigation. Consistent with this instruction, the RTFC announced it would not provide previously agreed upon funding for any

Amended Complaint
Page 17

such settlement.

45.    CFC engaged in the foregoing conduct in an effort to seize control of ICC and its most valuable subsidiary, Vitelco.

## COUNT I
## DECLARATORY AND INJUNCTIVE RELIEF

46.    All preceding paragraphs are realleged and incorporated herein by reference.

47.    Vitelco is a Virgin Islands public utility that is regulated by the Virgin Islands Public Services Commission ("PSC"). It is owned 100% by ICC, which is owned 100% by Emcom. Emcom is owned 100% directly and through a USVI LLC subsidiary by ICC-LLC. Prosser is an owner of ICC-LLC and as such is the beneficial owner of Vitelco through the corporate structure set forth herein.

48.    To insure that the PSC approves any owner of Vitelco, the Virgin Islands Legislature adopted 30 V.I.C. §43a in 1987 which provides in subsection (a) as follows:

§ 43a. Acquisition or control of public utility: approval of Commission

(a) No person or corporation, whether or not organized under

Amended Complaint
Page 18

the laws of the Territory, shall sell, acquire or transfer control, **either directly, or indirectly** of any public utility organized and doing business in this Territory, without first securing authorization from the Commission. Any such acquisition or control without prior authorization shall be void and of no effect. (emphasis added)

49.    As such, no entity can own or control Vitelco either directly by the legal or equitable ownership of its voting stock or indirectly by the legal or equitable ownership of the voting stock of its parent or indirect parent company or shareholder, which includes ICC-LLC, Emcom, ICC or Prosser.

50.    The defendants have taken steps to seize the legal and/or equitable ownership of Vitelco through the filing of an involuntary bankruptcy proceeding as part of the execution of Greenlight's judgment against ICC-LLC, Emcom and Prosser. This will result in the control of Vitelco's stock through the control of the stock of its parents, and therefore violate the express provisions of 30 V.I.C. §43a.

51.    As such, Vitelco seeks relief from this Court declaring that the defendants cannot take any action that would affect the control of the majority of the stock of any of Vitelco's parents, as this will result in a change of control of Vitelco without prior approval of the PSC.  The PSC

Amended Complaint
**Page** 19

has stated in a letter to the RTFC and Vitelco that such a matter must be brought before the PSC before any action is taken elsewhere. *See* **Exhibit F.**

52.    Additionally, the appointment of a trustee or receiver, or the creation of a 'debtor-in-possession in this or any other jurisdiction will cause irreparable harm to Vitelco as well as violate the public policy of this jurisdiction as declared by the V.I. Legislature, Vitelco seeks relief against the defendants prohibiting them from taking any action to seize any such control or ownership of the stock of Vitelco or its parents, without the express consent and prior approval of the PSC. Such approval has been mandated before such a sale or transfer of stock in a 1988 decision and order on this specific point by the Third Circuit in an action by the PSC against Vitelco. Violation of that decision and that Court's order may also result in further liability for Vitelco.

## COUNT II
## DECLARATORY RELIEF

53.    All preceding paragraphs are realleged and incorporated herein by reference.

54.    On or about October 24, 2005, the RTFC (at the direction of the

Amended Complaint
Page 20

CFC) and Greenlight secretly entered into the Takeover Agreement without ICC's or Vitelco's knowledge.

55.    The Takeover Agreement requires Greenlight to reduce certain unsecured claims to judgment and to thereafter file bankruptcy proceedings against Vitelco's parents in exchange for Greenlight receiving 10% of all funds obtained by the RTFC in taking over the operations of Vitelco.

56.    The actions of the RTFC are designed to circumvent the pending dispute regarding its foreclosure action against Vitelco's parent in an effort to avoid the jurisdiction of the District Court of the Virgin Islands, which it has repeatedly attempted to do in the past.

57.    The actions of the RTFC are unlawful and violate public policy as the RTFC is attempting to take over Vitelco through bankruptcy or through extra judicial proceedings against its parent companies when in fact the RTFC has no direct legal right to pursue such remedies in its own name, since it does not have a liquidated claim and, therefore, lacks the standing to file an involuntary bankruptcy and cannot proceed as a judgment creditor.

Amended Complaint
Page 21

58.    Indeed, a contract between a lender and a creditor of its borrower, the sole purpose of which is to create an acceleration of the debtor's obligation is an impermissible form of predatory lending so that said contract is unenforceable as contrary to public policy.

59.    Significantly, the Takeover Agreement between the RTFC and Greenlight is specifically designed to take control of Vitelco by circumventing this Court's jurisdiction as well as PSC approval, as mandated by 30 V.I.C. §43a.  As such, it is a contract that is void as being against the public policy of this jurisdiction.

60.    Likewise, Greenlight's Takeover Agreement with the RTFC tortiously interferes with the performance of the RTFC's loan with ICC, so that the agreement is unenforceable on the grounds of public policy.

61.    As such, Vitelco is entitled to declaratory relief finding that the Takeover Agreement between the RTFC and Greenlight is unenforceable as being against the public policy of this jurisdiction and to enjoin any action by these defendants to take control of Vitelco without prior PSC approval.

**Amended Complaint**
**Page** 22

## COUNT III
## VIOLATION OF *RESTATMENT SECOND OF TORTS, §870*

62.    All preceding paragraphs are realleged and incorporated herein by reference.

63.    Both CFC and the RTFC have intentionally caused injury to ICC and Vitelco by engaging in conduct causing said injury which is generally culpable and not justifiable under the circumstances pursuant to §870 of the *Restatement Second of Torts*.

64.    Said conduct on the part of the RTFC is set forth in the counterclaims asserted by ICC and Vitelco against the RTFC in the Fourth Cause of Action of ICC's amended counterclaim and in the Third Cause of Action of Vitelco's amended counterclaim in Civil No. 2004/132 pending before this Court, copies of which are attached as **Exhibits G and H** to this amended complaint, which are incorporated herein by reference. Additionally, ICC has filed a motion to amend its amended complaint in Civil No. 2004/154 to include this claim in the foreclosure action.

65.    Said improper conduct on the part of the RTFC was done at the express insistence of the CFC, as alleged herein, which includes but is not

**Amended Complaint**
**Page** 23

limited to, causing its employees acting within the scope of their employment (1) to have the RTFC assert unwarranted and frivolous defaults against ICC, (2) to do so without providing the required notice, (3) to assert the validity of a loan agreement that CFC employees knew had been altered without ICC's knowledge or consent and (4) having these alleged 31 defaults being touted throughout the media and before the PSC to put pressure on ICC to give the CFC control over ICC and Vitelco by using the RTFC to accomplish this purpose.

66.    Indeed, all of the acts of the RTFC as alleged in Exhibits G and H attached hereto and incorporated by reference, were done by CFC officers and employees or at their express instruction acting within the scope of their employment.

67.    Said conduct on the part of the CFC has caused damages to both ICC and Vitelco, which Vitelco and ICC are entitled to recover from the CFC in an amount to be determined by the trier of fact.

68.    Said conduct on the part of the CFC is willful and wanton, warranting the imposition of punitive damages as well.

Amended Complaint
Page 24

## COUNT IV
## VIOLATION OF *RESTATEMENT OF TORTS, §876(b)*

69.    All preceding paragraphs are realleged and incorporated herein by reference.

70.    Upon information and belief, Greenlight is well aware of the conduct of CFC and the RTFC as alleged herein and in the counterclaims, attached hereto as Exhibits G and H, which constitutes a breach of the duty set forth in §870 of the *Restatement Second of Torts* that the RTFC owes to ICC and Vitelco.

71.    Notwithstanding this knowledge, Greenlight elected to give substantial assistance to CFC and the RTFC in inflicting said harm on ICC and Vitelco by filing an involuntary bankruptcy petition against their parent companies so that the CFC and the RTFC would then be in a better position to complete their improper efforts to take over ICC and its subsidiaries, including Vitelco.  By taking said action, Greenlight is now entitled to fixed payments from the RTFC pursuant to the Takeover Agreement even if its judgments are subsequently reversed on appeal.

72.    As such, pursuant to §876(b) of the *Restatement of Torts Second,*

Amended Complaint
Page 25

Greenlight is liable to ICC and Vitelco for acting in concert with CFC and the RTFC by giving substantial assistance to the tortious conduct of the CFC and the RTFC, which has aided and abetted CFC and RTFC in their improper efforts to take over ICC and Vitelco.

73.    As a direct and proximate result of said action, Greenlight is liable to ICC and Vitelco for damages as determined by the trier of fact, including but not limited to all direct and consequential damages resulting to ICC and/or Vitelco as a result of the bankruptcy filings against ICC's parent companies, which damages were and are reasonably foreseeable as noted in the March 11, 2002 letter from Greenlight to the RTFC attached hereto as Exhibit I.

74.    Greenlight's conduct is wanton and intentional, particularly since it knows that said conduct may cause significant damage to ICC and Vitelco, so that an award of punitive damages is in order.

75.    Moreover, Greenlight demanded $4.4 million dollars for the defendants in the Greenlight litigation before it would even continue further settlement negotiations to resolve its differences with these companies, when in fact it never intended to conduct any such negotiations

**Amended Complaint**
**Page** 26

and in fact did not conduct any such negotiations, as it instead promptly

pursued an agreement with the RTFC to jointly take control of ICC and

Vitelco, which conduct was willful and outrageous likewise warranting the

imposition of punitive damages.

**COUNT V**
**SLANDER OF TITLE**

76.    All preceding paragraphs are realleged and incorporated herein

by reference.

77.    Greenlight has recorded judgments against the assets of ICC

even though it has no judgments against ICC.

78.    Despite the request that it remove this judgment against ICC's

assets, it has failed to do so.

79.    As such, the actions of Greenlight constitute slander of title

against ICC, warranting the imposition of damages as determined by the

trier of fact.

80.    The conduct of Greenlight in refusing to release recorded

judgments against ICC is wanton, willful and malicious, warranting an

imposition of an award of punitive damages in favor of ICC in an amount

**Amended Complaint**
**Page** 27

to be determined by the trier of fact.

## COUNT VII
## CIVIL CONSPIRACY

81.    All preceding paragraphs are realleged and incorporated herein by reference.

82.    The Greenlight judgment in Delaware is a result of a 1988 going private transaction (the "Privatization" transaction) by ICC's parent, Emcom.

83.    The defendants in the Greenlight litigation were Emcom, one of its parent companies, ICC-LLC, and an owner of ICC-LCC, Jeffrey Prosser, as well as a dissolved  USVI company (hereinafter collectively referred to a the "Greenlight defendants").

84.    Unbeknown to the Greenlight defendants, CFC's employee Robin Reed had done a valuation of the Privatization transaction that it knew would be damaging to the Greenlight defendants.  Rather than allow the Greenlight defendants an opportunity to evaluate this evidence before Reed's deposition, the CFC directed the RTFC to not cooperate with ICC or its parents (the other Greenlight defendants), and instead to cooperate with

Amended Complaint
Page 28

the Greenlight plaintiffs prior to Reed's deposition.

85.    Reed's testimony contained false calculations which the Delaware Chancery Court found critical to its findings against the Greenlight defendants - - mentioning them some 22 times and referring to them as the sole evidence on some points.

86.    Subsequent to the issuance of the Delaware Chancery Court's decision on May 3, 2004, repeated requests were made to the RTFC to correct this testimony, which the CFC refused to cause the RTFC to do.

87.    Instead of helping the Greenlight defendants correct the record so they could seek relief from the court's opinion which relied so heavily on Reed's testimony, CFC and the RTFC decided to take advantage of this situation by instituting foreclosure proceedings on the falsified loan documents CFC/RTFC had created, against the primary asset of the Greenlight defendants, ICC, in order to gain control of ICC and Vitelco.

88.    The CFC  and the RTFC thereafter conspired to take over ICC and Vitelco by having the RTFC engage in multiple improper acts as follows:

**Amended Complaint**
Page 29

- Hiring ICC's and Vitelco's former counsel in the initial RTFC loan transaction to represent its interest against ICC and Vitelco;

- Telling the PSC and newspapers that RTFC had nothing to do with the Greenlight Litigation, when, in fact it provided testimony and facilitated the transactions that led to the adverse decision;

- Initiating two *ex parte* meetings with members of the PSC and counsel to the PSC, where statements hostile to the interests of ICC were made, as well as misstatements of fact including promises that RTFC would be taking over ownership of Vitelco as a result of the Virginia Litigation, resulting in a change of management, with the clear implication that would be better for the ratepayers and employees of Vitelco;

- Making false and disparaging statements to various media and other third parties, suggesting ICC and Vitelco are insolvent and their management is untrustworthy in an effort to force these companies into bankruptcy.

- Making public statements at PSC meetings that were materially false including that Vitelco's parent company, ICC, owed approximately $30 million to the Belize government by the end of August -- a matter which was also of absolutely no relevance to the allegations of default contained in RTFC's Virginia Litigation;

- Causing the PSC, as a result of false statements regarding ICC's owing approximately $30 million to the Belize government by the end of August 2004 which Vitelco would fund, to issue an order barring Vitelco to expend any "proceeds" from the preferred stock offering;

**Amended Complaint**
**Page** 30

- Approaching Vitelco's employees prior to, during and after various PSC meetings, and promising that under RTFC's takeover their jobs would not be in danger and that "we've done this before," referring to the prospect of RTFC taking over Vitelco;

- Approaching the head of Vitelco's labor union and making an appointment to speak with him and making the same statements regarding prospects for an RTFC takeover and change of management as were made to the PSC and Vitelco employees;

- Stating publicly at PSC meetings that RTFC would not honor a previous written, contractual commitment in the amended 2003 ICC-RTFC loan agreements to provide a loan to ICC of up to $13,333,333 to help fund the settlement by ICC of the Greenlight Litigation, which was done to force Greenlight to ultimately have to reach an agreement with the RTFC rather than ICC;

- Conjuring up a litany of defaults by ICC, which it knew had no factual basis and asserting said defaults without even offering ICC a chance to cure any such alleged defaults;

- Improperly withholding dividends from ICC;

- Telling ICC's director that they hoped to cause ICC to financially collapse by preventing it from having access to other lenders.

- Refusing to provide a corrective affidavit from Reed until it was too late to prevent the Chancery Court from entering its judgments against the Greenlight defendants.

**Amended Complaint**
**Page** 31

89.    Notwithstanding this fact, Greenlight willingly and knowingly joined this civil conspiracy between CFC and the RTFC by entering into an agreement to sell its claims to RTFC to put ICC's parent companies into bankruptcy so that the CFC and the RTFC could complete their conspiracy to take over ICC and Vitelco through these multiple wrongful acts.

90.    As a result of said civil conspiracy, the plaintiffs have suffered damages for which the defendants are liable in an amount to be determined by the trier of fact.

91.    Likewise, because the acts of the defendants are willful and wanton, the plaintiffs are also entitled to an award of damages in an amount to be determined by the trier of fact.

WHEREFORE, Vitelco and ICC seek the following relief from this Court:

a.    Declaratory relief as set forth herein;

b.    Injunctive relief against the defendants;

c.    Compensatory and punitive damages as determined by the trier of fact against all defendants.

**Amended Complaint**
**Page** 32

     d.     Any and all other relief this Court deems appropriate;

     e.     Attorney's fees and costs incurred herein.

### A TRIAL BY JURY IS DEMANDED AS TO ALL ISSUES

Dated:       February 23, 2006

Joel H. Holt
2132 Company Street
Christiansted, St. Croix
00820
(340) 773-8709

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, **Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia**

# Exhibit H

to

**National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss**

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

INNOVATIVE COMMUNICATION )
CORPORATION, )
          )
    Plaintiff, )
          )
vs. )
          )
RURAL TELEPHONE FINANCE )
COOPERATIVE, JOHN J. LIST, )
AND STEVEN LILLY, )
          )
    Defendants. )
)

Civ. Action No. 2005/ *168*

**ACTION FOR WRONGFUL USE**

**OF CIVIL PROCEEDINGS**

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT

Comes now the plaintiff, by counsel, and hereby alleges as the basis of its complaint against the defendants upon information and belief as follows:

## I.    INTRODUCTION

1. This is an action for wrongful use of civil proceedings pursuant to the *Restatement Second of Torts §674, et. seq.* It an extraordinary case in which a lender filed knowingly frivolous claims against one of its most lucrative borrowers in order to ruin that borrower by their mere filing and public dissemination. The lender's motivation was simple: fear that the borrower would disclose the lender's own misconduct. For this reason, Innovative Communication Corporation ("ICC") seeks compensatory and punitive damages in an amount sufficient to deter the Rural Telephone Finance Cooperative (the "RTFC") from engaging in such further conduct.

2.  Almost three years ago, ICC informed the RTFC that it had uncovered not only the RTFC's mismanagement and improper diversion of its members' profits, but possibly outright fraud. After giving lip-service to reforming its practices as part of a 2003 settlement with ICC, the RTFC and certain of its officers created new mechanisms to perpetuate their mismanagement, and concocted a vengeful, retaliatory scheme to punish ICC and its Chairman, Jeffrey Prosser. That scheme culminated in a malicious prosecution of baseless claims, for which this action seeks relief.

## II.    BACKGROUND HISTORY BETWEEN ICC AND THE RTFC

### A.    CFC's Control of the RTFC

3.  The RTFC is itself a member of another cooperative, the National Rural Utilities Cooperative Finance Corporation ("CFC"). CFC was formed to make loans at favorable rates to its electric utility system members to enable them to acquire, construct and operate electric distribution, generation, transmission and related facilities.

4.  The RTFC was originally incorporated by the CFC in the state of South Dakota in 1987. The RTFC purportedly was created by the CFC for the purpose of providing and arranging financing for its rural telecommunications members and their affiliates. RTFC is headquartered and co-located with CFC in Herndon, Virginia. Despite its propensity to refer to itself as a "non-profit" entity, the RTFC is a taxable entity and takes tax deductions for allocations of net margins as allowed by law under Subchapter T of the Internal Revenue Code. In 2005, the RTFC reorganized under the cooperative laws of the District of Columbia because of more favorable director indemnification laws.

5. CFC totally controls and manipulates the RTFC, as the following indisputable

facts demonstrate:

- When the CFC formed the RTFC in 1987, CFC described the RTFC as a "controlled affiliate" on CFC's 1988 Form 10-K at 4.

- Until 2001, CFC appointed a majority of the RTFC's Board of Directors. Subsequently, six members of the CFC's board were appointed to serve as a lender "advisory" council to the RTFC board. All loans that require the RTFC's board approval also require the approval of the CFC lender "advisory" council, effectively maintaining CFC's control of RTFC.

- CFC is the RTFC's sole lender, and manages the RTFC through a long-term management agreement.

- The RTFC has no material employees of its own. CFC's officers and its legal and loan staff operate the RTFC. In fact, in its 2004 Form 10-Q filing to the Securities and Exchange Commission, CFC stated that it lent money to ICC -- "through" the RTFC.

- CFC and the RTFC share the same senior officers and managers, most of which have been with CFC and the RTFC since the RTFC's inception in 1987.

  - Sheldon Peterson is Chief Executive Officer of both CFC and the RTFC, and has been with CFC since 1983.

  - Steven L. Lilly is the Senior Vice President and Chief Financial Officer of CFC and the RTFC, and has been at CFC since 1983.

  - John J. List is the Senior Vice President of Member Services and General Counsel for CFC and is the Senior Vice President and General Counsel for RTFC, and has been at CFC since 1972.

  - Thus, the three most senior officers presently at CFC and RTFC are the same persons. Indeed, factoring in another RTFC Senior Vice President, the RTFC's four most senior officers were with CFC in 1987-1989 when it formed the RTFC.

6. In 2004, CFC (including the RTFC) had outstanding loans of just over 20 billion

dollars. In 1988, CFC had outstanding loans of over approximately 3.5 billion dollars.

By 1996, the outstanding loans had grown to only 7.2 billion dollars and then jumped to

nearly 20 billion dollars in 2001, where it has remained nearly the same since. To a

large extent, CFC's costs are dependent upon the ratings by the credit rating agencies:

the lower the rating, the higher the interest paid by CFC on the financial markets. After

the rapid growth and dramatic increase in loans through 2001, CFC's portfolio drew the

attention of these rating agencies and, on January 12, 2002, this growth and loan

concentration risk led to a downgrading by Moody's Investor Services of the CFC debt

ratings.

      B.    <u>ICC Discovers the RTFC's Misconduct</u>

    7.  ICC has been a member of RTFC for over 15 years, and has consistently been one

of its largest and most lucrative borrowers. ICC and its wholly-owned subsidiary, the

Virgin Islands Telephone Corporation (Vitelco), began borrowing from the RTFC in

1987, and continued borrowing additional funds through 2004.

    8.  In late 2002, when certain payments due from RTFC to ICC were "short", ICC's

investigation revealed that the RTFC and its management were misappropriating funds

that should have been distributed to its members by allocating and distributing those

funds to the CFC to lower the interest rates for CFC's members and to otherwise

subsidize CFC's operations - all at the expense of RTFC's telecommunications members

and to the windfall of CFC's electric utility members.

    9.  At Mr. Prosser's direction, ICC informed the RTFC that it had uncovered not

only the RTFC's mismanagement and improper diversion of its RTFC's members'

profits to CFC, but possibly outright fraud. The RTFC's officers and directors, including

Sheldon Petersen, Steven Lilly and John List, could not objectively or realistically

respond in any appropriate or even actual fiduciary manner, as each of the key

individuals served as the same officers of both CFC and the RTFC.   Indeed, they

themselves were responsible for the mismanagement and possible fraud.

ICC's allegations against the RTFC and its management included:

a.   Use of profits that should accrue to RTFC members to reduce the lending rates to electric utility members of CFC and to fund distributions to CFC's electric utility members -- in effect, transferring the profits that should be disbursed to RTFC's members (17% of which is ICC) to CFC's members;

b.   The pledging of RTFC's assets alongside CFC's assets as part of Combined Financial Statements, while reducing the RTFC Board to figureheads -- thus disenfranchising RTFC members from any control while sheltering meaningful operations of RTFC from the scrutiny of members;

c.   The failure to file the CFC-RTFC management and guarantee contracts with the SEC,  the refusal to disclose those contracts, and the use of those contracts to remove funds from RTFC, for CFC's benefit;

d.   Refusal to supply significant and material documents relating to the control and use of RTFC by CFC; and

e.   Use of an illegal arrangement regarding the election of RTFC board members.

A simple comparison of the yield, set forth in **Exhibit A**, provided on loans by the CFC

to its electric utility members in contrast to loans by the RTFC to its members

demonstrates yield differential.  Further, a simple comparison set forth in **Exhibit B** of

RTFC's Audited Financial Statements to the segment information contained in CFC's

Audited Financial Statements demonstrates that for fiscal years ended May 31, 2000

through 2004, CFC retained (and distributed to CFC's electric utility members) over $37

million and as much as $275 million of earnings (depending upon whether CFC's loan

guarantee to RTFC is given effect) which rightfully belong to RTFC. ICC has a substantial interest in RTFC.

### C.    RTFC Initial Retaliating Scheme

10. As a result of these serious allegations against the RTFC, the RTFC and its officers and directors, including Sheldon Petersen, Steven Lilly and John J. List, decided that the RTFC needed to discredit ICC and Mr. Prosser and eliminate him and his respective companies, ICC and Vitelco, as members of the RTFC, to avoid the information being circulated by ICC and Prosser to other RTFC members as well as to CFC's rating agencies.

11. Consequently, in response to ICC's and Mr. Prosser's complaints about the RTFC and its management misappropriating its assets for CFC's benefit, and in response to ICC's efforts to pressure the RTFC to come to terms on these matters, the RTFC and certain officers decided to retaliate through litigation, filing a complaint on March 13, 2003 alleging that ICC and Vitelco had defaulted on their loan obligations.

12. The suit was withdrawn and the parties entered into a settlement and release of all claims up to that date. The point of the settlement and release was that RTFC provided certain relief that ICC sought and it was anticipated that RTFC would correct the accounting irregularities and improper treatment of RTFC members, and in return ICC would renew its normal participation.

### D.    The RTFC's Continued Misconduct

13. RTFC did make changes in the summer of 2003. However, notwithstanding these changes and their promises, the RTFC's and the CFC's only changes were

cosmetic. Beneath the surface, the RTFC and its management continued to operate in the same fashion as before without any substantive corrections. For example, ICC uncovered the following continuing misconduct:

- RTFC paid unjustified fees to CFC pursuant to the Management Agreement and the Guaranty Agreement – fees that were *not* negotiated at arm's length, but rather between CFC and RTFC's then CFC-controlled board;

- RTFC's members were subjected to unjustifiably and significantly higher interest rates on loans to them than on those to CFC members;

- RTFC allocated to its members a disproportionately high percentage of CFC's losses from derivatives and foreign currency transactions; and

- CFC and RTFC manipulated their financial statements for the benefit of CFC, including the consolidation of CFC's and RTFC's financial statements to mask the fact that CFC operated at a loss while RTFC operated at a substantial and increasing profit. In remarkably brazen fashion, in its first quarterly SEC filing after receipt of a letter from ICC's subsidiary, Vitelco, CFC unjustifiably and improperly changed its segment reporting without sufficient explanation, falsely creating the appearance that it was CFC, and not the RTFC, that operated profitably. For example:

  - In its Form 10-K for the year ended May 31, 2004, CFC reported that RTFC's contribution to CFC's overall gross margin was about 75%, while CFC's contribution was 21%;

  - In its Form 10-Q for the period ended August 31, 2004, CFC reported that RTFC's contribution to CFC's overall gross margin was 101% while CFC's contribution was *negative* (8.5%); and

  - Yet, in CFC's Form 10-Q for the quarter ended the November 30, 2004, under a suddenly implemented new method of reporting, RTFC's contribution to CFC's overall gross margin cratered to 4%, while CFC's contribution miraculously jumped to 90% - a dramatic change the RTFC would have us believe is reflective of a change in performance occurring in just a three month period.

14. Moreover, aside from only giving lip-service to making amends as part of the 2003 settlement with ICC, RTFC continued its retaliatory scheme to punish ICC and its

Chairman for raising these issues, even though ICC continued to be one of the RTFC's largest borrowers, having paid the RTFC interest in excess of $150,000,000 since it began borrowing funds from the RTFC in 1987. That scheme culminated in a malicious prosecution of baseless claims filed in 2004, for which this action seeks relief.

15. Specifically, the RTFC filed a complaint alleging 31 defaults. *See* **Exhibit C** The RTFC then maliciously publicized the fact that it had now alleged 31 defaults against ICC to both the news media and various trade magazines as well as to Vitelco's public regulator, the PSC. *See* **Exhibit D.**

16. In executing its smear campaign, the RTFC failed to note that many of these new counts were added only for publicity sake and were otherwise baseless. The most recent evidence of this is the RTFC's *voluntary* dismissal of most of those added defaults alleged in its amended complaint. Those 16 claimed defaults are the subject of this lawsuit.

17. ICC will prove that the RTFC maliciously filed those 16 claimed defaults, knowing fully well that they were baseless, and organized and deployed a concerted campaign of issuing false statements to the PSC and to industry media and local newspapers to ruin ICC and to wrest control of ICC from Mr. Prosser.

## III.    THE PARTIES

18. The plaintiff, ICC, is a corporation organized under the laws of the United States Virgin Islands. ICC has its principal place of business in Sunny Isle, St. Croix, United States Virgin Islands.

19. The defendant, Rural Telephone Finance Cooperative ("RTFC"), is a cooperative association organized under the laws of the District of Columbia, with its principal place of business in Herndon, Virginia.

20. Steven Lilly ("Lilly"), upon information and belief, is a resident of Virginia. Lilly is and has been the Senior Vice President and Chief Financial Officer of the RTFC at all times relative hereto. Lilly is being sued in his personal capacity and in his official capacity as Senior Vice President and Chief Financial Officer of the RTFC.

21. John J. List ("List"), upon information and belief, is a resident of Virginia. List is and has been the Senior Vice President of Member Services for the RTFC at all times relative hereto. List is being sued in his personal capacity and in his official capacity as Senior Vice President of the RTFC.

## IV.    JURISDICTION AND VENUE

22. ICC and all of the defendants are of diverse citizenship, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. The Court therefore has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

23. Pursuant to 5 V.I.C. §4901 *et. seq.,* this Court has jurisdiction over defendants because defendants are engaged in various activities within this District, including transacting business and committing tortious acts in this District. The consequences of defendants' actions produce effects in and directly implicate this forum. Indeed, the RTFC is presently prosecuting other litigation in this jurisdiction against ICC and both Lilly and List have personally appeared in this jurisdiction in furtherance of the activities giving rise to this litigation.

## IV.    THE JUNE 1, 2004 LIITGATION

24. On June 1, 2004, Lilly, List and Petersen caused the RTFC to file an action for acceleration of ICC's debt based on three alleged defaults even though ICC was current on all of its monthly payments of interest and principal.

25. Two of the alleged defaults required 30 days notice, with ICC having the right to cure the same, which notice was not given by the RTFC before filing suit.

26. The parties then met to try to negotiate a settlement.

27. The RTFC made it clear that any such settlement would require Prosser to remove himself from any management of ICC, and that key members of present management be terminated.

28. ICC made it clear that the three alleged defaults were all barred by the same 1989 Settlement Agreement entered into between the RTFC, ICC and the Virgin Islands Public Service Commission ("PSC") that had been discussed in detail between the parties in relation to the RUS refinancing just months earlier.

29. In response, recognizing the validity of ICC's position, the RTFC filed an amended complaint alleging 31 defaults.

30. Twenty of theses new allegations of default required a 30-day grace period, during which RTFC could not file suit without notice and a right to cure, which the RTFC simply ignored.

31. RTFC's entire position in the Amended Complaint, in statements to the PSC describing the Amended Complaint and in various articles and interviews, was about how present management had created a company that could not be operated at a profit,

and ICC could not possibly pay its loans. Thus, as was explained repeatedly by the RTFC, the RTFC declared the additional defaults in order to replace ICC's management despite the RTFC's own admission in its own 2004 10-K SEC filings and RTFC's 2004 Annual Report that ICC was current on all principal and interest.

32. As an internal August 18, 2004 RTFC/CFC memo makes clear, RTFC was emphatic that it wanted to replace management but still told its auditors (which in turn told CFC's rating agencies) that not only was ICC a viable business, but that "the company has the ability to pay debt service." *See* **Exhibit E**

33. During this time period, ICC discovered that the RTFC and its management continued the disproportionate distribution of profits to CFC members, continued to control the RTFC for CFC's benefit despite promised changes, continued to hide accounting information, and continued to deal with the RTFC as if it were a shell -- and the RTFC's members as captives without rights.

34. Because of ICC's persistence, its 'pushing this edge', the defendants, as well as Sheldon Petersen, decided to use multiple alleged defaults for which they knew there was no factual basis in an amended complaint and thereafter to promote the same to discredit ICC in a carefully orchestrated scheme before ICC's regulator, in business magazines, and in the local press.

35. The assertion of "31 defaults" was initially made three times by RTFC's counsel to the PSC at its Board Meeting of September 10, 2004, which were then repeated numerous times to the media (including *Forbes Magazine*), trade journals (including *Telephony*), the PSC and in court pleadings. This was a methodical use of a large

number of completely fabricated claims to smear an opponent and improperly force capitulation, as noted in the attached articles. *See* Exhibit C.

36. Notwithstanding its aggressive insistence that ICC committed all of these new defaults, which RTFC's counsel described to the PSC on September 10, 2004 as "31 separate violations" of the loan agreements, on October 14, 2005, the RTFC dismissed 16 of the 31 alleged defaults with prejudice.

37. The RTFC did not have probable cause for any of the sixteen alleged defaults that it dropped, as noted by the relevant evidence found in the RTFC's own files, which establishes that RTFC's purpose in filing these claims was other than to secure a proper adjudication of the claims. This evidence includes but is not limited to the following alleged defaults in the July 20, 2004 Amended Complaint:

    a. Asserting in paragraphs 72-78 of the Amended Complaint that ICC had not disclosed the existence of a preferred stock issuance by ICC in 1998, when in fact the RTFC was involved in the transaction resulting in the issuance of the stock as reflected by the RTFC's own internal records in 1998 and 1999 discussing whether to take the stock as collateral. *See, e.g.* **Exhibit F**

    b. Asserting in paragraphs 79-87 of the Amended Complaint that ICC had Virgin Islands tax liens dating back to 1992 when the RTFC had made multiple loans between 1992 and 2004 without raising these alleged liens, which liens in fact <u>had been paid and released of record well before</u> the RTFC asserted them as constituting a default in 2004 under the loan agreement. *See, e.g.* **Exhibit G**

    c. Asserting in paragraphs 88-98 of the Amended Complaint that ICC had formed a subsidiary Communication Systems & Services, Inc. ("CS&S") and failed to disclose it to the RTFC or pledge its assets to secure ICC's lien, when the RTFC's own internal records dated August, 2001, show the disclosure of this "sister" corporation by ICC, whose assets would not be collateral for ICC's debt. *See, e.g.* **Exhibit H**

    d.  Asserting in paragraphs 88-98 of the Amended Complaint that ICC had formed a subsidiary Executive Security Services, Inc. ("ESS") and failed to disclose it to the RTFC or pledge its assets to secure ICC's lien, when the RTFC's own internal records dated August, 2001, show the disclosure of this subsidiary by ICC. Further, the RTFC's own internal records show it made a decision in August of 2001 to not take ESS as collateral for ICC's loan. *See, e.g.* **Exhibit I**

    e.  Asserting in paragraphs 105-108 of the Amended Complaint that ICC had allowed a subsidiary named "Pinacle Ltd." to be dissolved, when the public records clearly show that this corporation was never dissolved and was always in good standing. *See, e.g.* **Exhibit J**

    f.  Asserting in paragraphs 99-104 of the Amended Complaint that ICC had failed to record certain renewals of the RTFC's UCC filings when ICC had no obligation to do so and in fact the RTFC had the right and ability to do so; the RTFC in fact did record these renewals, even though it had never disclosed this fact, and instead continued to insist this alleged default still existed. *See* **Exhibit J**

    g.  Asserting that ICC had violated various loan provisions prior to April 1, 2003, even though the RTFC signed a Release on April 2, 2003 discharging all such prior defaults. *See, e.g.* **Exhibit K**

    h.  Asserting multiple defaults in its complaint even though many of the alleged defaults were subject to notice and the right to cure within 30 days, which the RTFC simply ignored, instead asserting these multiple defaults without waiting to see if these defaults actually existed and/or could be cured.

38. Indeed, the defendants were aware that these alleged defaults had no factual basis, yet they allowed the underlying litigation to continue for over fourteen months, touting these alleged defaults as being viable, before dismissing them with prejudice. *See* **Exhibit L**

39. Defendant List and Lilly took an active part in the initiation, continuation, or procurement of the sixteen alleged defaults and did not act primarily for the purpose of aiding the RTFC in obtaining a proper adjudication of the claims.

40. In short, the RTFC maliciously filed many of those claimed defaults, knowing as it did so that they were baseless, but seeking to use them in a shock campaign to ruin ICC and to wrest control of ICC from its Chairman and founder, Jeffrey Prosser. Defendants List and Lilly personally took an active part in the initiation, continuation or procurement of the claims, acting without probable cause and for an improper purpose. While the RTFC has thus far failed to take over ICC, the RTFC, List and Lilly have succeeded in interfering with ICC's business relationships, harming ICC's goodwill, and injuring ICC's reputation and profits.

## COUNT I

41. All preceding paragraphs are realleged and incorporated herein by reference.

42. The defendants, individually and collectively, took an active part in the initiation, continuation or procurement of asserting that ICC had breached §1(a) to Schedule A of the Emerging Pledge Agreement with the RTFC because it had allegedly failed to disclose to the RTFC the existence of ICC's Preferred Stock, and concealing the same from the RTFC. As a result of this alleged default, the RTFC sought to accelerate ICC's $550,000 outstanding debt with the RTFC.

43. Said proceedings were maliciously commenced without probable cause and were made for a purpose other than that of securing the proper adjudication of the claim, as said actions were pursued as an attempt to sever and remove ICC's current management, including Prosser, from running the company. Said proceedings were in retaliation for plaintiff's whistle blowing efforts and its exposing the fact that the RTFC is being used by CFC to subsidize its operations to the detriment of the RTFC members.

Complaint *ICC v. RTFC, List & Lilly*
Page 15

44. Said proceeding regarding the allegation that ICC breached its loan agreement with the RTFC because it had allegedly failed to disclose the existence of ICC's Preferred Stock has now been conclusively terminated in favor of ICC.

45. As such, the defendants are jointly and severally liable to ICC for wrongful use of civil proceedings.

46. As a direct and proximate result of said outrageous intentional and wrongful conduct, ICC is entitled to an award of compensatory damages as determined by the trier of fact, including but not limited to compensation for the following:

1. The loss of goodwill and interference with business relationships;

2. Damage to its reputation;

3. Out of pocket expenses resulting from defendants' baseless allegations; and

4. Lost business profits both past and future.

47. The conduct of the defendants in asserting the alleged sixteen defaults for which there was no factual basis and for which there was an ulterior motive warrants the imposition of punitive damages in an amount to be determined by the trier of fact.

## COUNT II

48. All preceding paragraphs are realleged and incorporated herein by reference.

49. The defendants, individually and collectively, took an active part in the initiation, continuation or procurement of asserting that ICC had breached §4.7 of its loan agreement with the RTFC because it had allegedly failed to pay certain Virgin Islands tax liens filed in June and July of 1992 and to obtain a discharge thereof. As a

result of this alleged default, the RTFC sought to accelerate ICC's $550,000 outstanding debt with the RTFC.

50. Said proceedings were maliciously commenced without probable cause and were made for a purpose other than that of securing the proper adjudication of the claim, as said actions were pursued as an attempt to sever and remove ICC's current management, including Jeffrey Prosser, from running the company. Said proceedings were in retaliation for plaintiff's whistle blowing efforts by exposing the fact that the RTFC is being used by CFC to subsidize its operations to the detriment of the RTFC members.

51. Said proceeding regarding the allegation that ICC breached its loan agreement with the RTFC because it had allegedly failed to pay certain Virgin Islands tax liens filed in June and July of 1992 and to obtain a discharge thereof has now been conclusively terminated in favor of ICC.

52. As such, the defendants are jointly and severally liable to ICC for wrongful use of civil proceedings.

53. As a direct and proximate result of said outrageous intentional and wrongful conduct, ICC is entitled to an award of compensatory damages as determined by the trier of fact, including but not limited to compensation for the following:

1. Loss of goodwill and interference with business relationships;

2. Damage to its reputation;

3. Out of pocket expenses resulting from these allegations; and

4. Lost business profits both past and future.

54. The conduct of the defendants in asserting this alleged breach for which there was no factual basis and for which there was an ulterior motive in asserting this false accusation warrants the imposition of punitive damages in an amount to be determined by the trier of fact.

## COUNT III

55. All preceding paragraphs are realleged and incorporated herein by reference.

56. The defendants, individually and collectively, took an active part in the initiation, continuation or procurement of asserting that ICC had breached §4.8 of its loan agreement with the RTFC because it had allegedly failed to pay certain Virgin Islands tax liens filed in June and July of 1992 and to obtain a discharge thereof. As a result of this alleged default, the RTFC sought to accelerate ICC's $550,000 outstanding debt with the RTFC.

57. Said proceedings were maliciously commenced without probable cause and were made for a purpose other than that of securing the proper adjudication of the claim, as said actions were pursued as an attempt to sever and remove ICC's current management, including Prosser, from running the company. Said proceedings were in retaliation for plaintiff's whistle blowing efforts and its exposing the fact that the RTFC is being used by CFC to subsidize its operations to the detriment of the RTFC members.

58. Said proceeding regarding the allegation that ICC breached its loan agreement with the RTFC because it had allegedly failed to pay certain Virgin Islands tax liens filed in June and July of 1992 and to obtain a discharge thereof has now been conclusively terminated in favor of ICC.

59. As such, the defendants are jointly and severally liable to ICC for wrongful use of civil proceedings.

60. As a direct and proximate result of said outrageous intentional and wrongful conduct, ICC is entitled to an award of compensatory damages as determined by the trier of fact, including but not limited to compensation for the following:

1.  The loss of goodwill and interference with business relationships;

2.  Damage to its reputation;

3.  Out of pocket expenses resulting from defendants' baseless allegations; and

4.  Lost business profits both past and future.

61. The conduct of the defendants in asserting the alleged sixteen defaults for which there was no factual basis and for which there was an ulterior motive warrants the imposition of punitive damages in an amount to be determined by the trier of fact.

## COUNT IV

62. All preceding paragraphs are realleged and incorporated herein by reference.

63. The defendants, individually and collectively, took an active part in the initiation, continuation or procurement of asserting that ICC had breached §4.10 of its loan agreement with the RTFC because it had allegedly failed to disclose the existence of a subsidiary, Communications Systems and Services ("CS&S"). As a result of this alleged default, the RTFC sought to accelerate ICC's $550,000 outstanding debt with the RTFC.

64. Said proceedings were maliciously commenced without probable cause and were made for a purpose other than that of securing the proper adjudication of the claim, as

said actions were pursued as an attempt to sever and remove ICC's current management, including Prosser, from running the company. Said proceedings were in retaliation for plaintiff's whistle blowing efforts and its exposing the fact that the RTFC is being used by CFC to subsidize its operations to the detriment of the RTFC members.

65. Said proceeding regarding the allegation that ICC breached its loan agreement with the RTFC because it had allegedly failed to disclose the existence of a subsidiary, CS&S, has now been conclusively terminated in favor of ICC.

66. As such, the defendants are jointly and severally liable to ICC for wrongful use of civil proceedings.

67. As a direct and proximate result of said outrageous intentional and wrongful conduct, ICC is entitled to an award of compensatory damages as determined by the trier of fact, including but not limited to the following: compensation for the following:

1. The loss of goodwill and interference with business relationships;

2. Damage to its reputation;

3. Out of pocket expenses resulting from defendants' baseless allegations; and

4. Lost business profits both past and future.

68. The conduct of the defendants in asserting the alleged sixteen defaults for which there was no factual basis and for which there was an ulterior motive warrants the imposition of punitive damages in an amount to be determined by the trier of fact.

## COUNT V

69. All preceding paragraphs are realleged and incorporated herein by reference.

70. The defendants, individually and collectively, took an active part in the initiation, continuation or procurement of asserting that ICC had breached §4.10 of its loan agreement with the RTFC because it had allegedly failed to disclose the existence of a subsidiary, Executive Security Services, Inc. ("ESS"). As a result of this alleged default, the RTFC sought to accelerate ICC's $550,000 outstanding debt with the RTFC.

71. Said proceedings were maliciously commenced without probable cause and were made for a purpose other than that of securing the proper adjudication of the claim, as said actions were pursued as an attempt to sever and remove ICC's current management, including Prosser, from running the company. Said proceedings were in retaliation for plaintiff's whistle blowing efforts and its exposing the fact that the RTFC is being used by CFC to subsidize its operations to the detriment of the RTFC members.

72. Said proceeding regarding the allegation that ICC breached its loan agreement with the RTFC because it had allegedly failed to disclose the existence of ESS has now been conclusively terminated in favor of ICC.

73. As such, the defendants are jointly and severally liable to ICC for wrongful use of civil proceedings.

74. As a direct and proximate result of said outrageous intentional and wrongful conduct, ICC is entitled to an award of compensatory damages as determined by the trier of fact, including but not limited to compensation for the following:

1.   The loss of goodwill and interference with business relationships;

2.   Damage to its reputation;

3.   Out of pocket expenses resulting from defendants' baseless allegations; and

4. Lost business profits both past and future.

75. The conduct of the defendants in asserting this alleged breach for which there was no factual basis and for which there was an ulterior motive in asserting this false accusation warrants the imposition of punitive damages in an amount to be determined by the trier of fact.

## COUNT VI

76. All preceding paragraphs are realleged and incorporated herein by reference.

77. The defendants, individually and collectively, took an active part in the initiation, continuation or procurement of asserting that ICC had breached §1.01 of the ICC Mortgage with the RTFC because it had allegedly failed to disclose the existence of two subsidiaries, ESS and CS&S. As a result of this alleged default, the RTFC sought to accelerate ICC's $550,000 outstanding debt with the RTFC.

78. Said proceedings were maliciously commenced without probable cause and were made for a purpose other than that of securing the proper adjudication of the claim, as said actions were pursued as an attempt to sever and remove ICC's current management, including Prosser, from running the company. Said proceedings were in retaliation for plaintiff's whistle blowing efforts and its exposing the fact that the RTFC is being used by CFC to subsidize its operations to the detriment of the RTFC members.

79. Said proceeding regarding the allegation that ICC breached its loan agreement with the RTFC because it had allegedly failed to disclose the existence of ESS and CS&S has now been conclusively terminated in favor of ICC.

80. As such, the defendants are jointly and severally liable to ICC for wrongful use of civil proceedings.

81. As a direct and proximate result of said outrageous intentional and wrongful conduct, ICC is entitled to an award of compensatory damages as determined by the trier of fact, including but not limited to compensation for the following:

1.   The loss of goodwill and interference with business relationships;

2.   Damage to its reputation;

3.   Out of pocket expenses resulting from defendants' baseless allegations; and

4.   Lost business profits both past and future.

82. The conduct of the defendants in asserting this alleged breach for which there was no factual basis and for which there was an ulterior motive in asserting this false accusation warrants the imposition of punitive damages in an amount to be determined by the trier of fact.

## COUNT VII

83. All preceding paragraphs are realleged and incorporated herein by reference.

84. The defendants, individually and collectively, took an active part in the initiation, continuation or procurement of asserting that ICC had breached §3.02 of the ICC Mortgage with the RTFC because it had allegedly failed to disclose the existence of two subsidiaries, CS&S and ESS.  As a result of this alleged default, the RTFC sought to accelerate ICC's $550,000 outstanding debt with the RTFC.

85. Said proceedings were maliciously commenced without probable cause and were made for a purpose other than that of securing the proper adjudication of the claim, as

said actions were pursued as an attempt to sever and remove ICC's current management, including Prosser, from running the company. Said proceedings were in retaliation for plaintiff's whistle blowing efforts and its exposing the fact that the RTFC is being used by CFC to subsidize its operations to the detriment of the RTFC members.

86. Said proceeding regarding the allegation that ICC breached its loan agreement with the RTFC because it had allegedly failed to disclose the existence of CS&S and ESS has now been conclusively terminated in favor of ICC.

87. As such, the defendants are jointly and severally liable to ICC for wrongful use of civil proceedings.

88. As a direct and proximate result of said outrageous intentional and wrongful conduct, ICC is entitled to an award of compensatory damages as determined by the trier of fact, including but not limited to compensation for the following:

1.    The loss of goodwill and interference with business relationships;

2.    Damage to its reputation;

3.    Out of pocket expenses resulting from defendants' baseless allegations; and

4.    Lost business profits both past and future.

89. The conduct of the defendants in asserting this alleged breach for which there was no factual basis and for which there was an ulterior motive in asserting this false accusation warrants the imposition of punitive damages in an amount to be determined by the trier of fact.

## COUNT VIII

90. All preceding paragraphs are realleged and incorporated herein by reference.

91. The defendants, individually and collectively, took an active part in the initiation, continuation or procurement of asserting that ICC had breached §7.2.2 of its loan agreement with the RTFC because it had allegedly formed or acquired a subsidiary, CS&S, without informing the RTFC. As a result of this alleged default, the RTFC sought to accelerate ICC's $550,000 outstanding debt with the RTFC.

92. Said proceedings were maliciously commenced without probable cause and were made for a purpose other than that of securing the proper adjudication of the claim, as said actions were pursued as an attempt to sever and remove ICC's current management, including Prosser, from running the company. Said proceedings were in retaliation for plaintiff's whistle blowing efforts and its exposing the fact that the RTFC is being used by CFC to subsidize its operations to the detriment of the RTFC members.

93. Said proceeding regarding the allegation that ICC breached its loan agreement with the RTFC because it had allegedly formed or acquired a subsidiary, CS&S, without the RTFC's permission has now been conclusively terminated in favor of ICC.

94. As such, the defendants are jointly and severally liable to ICC for wrongful use of civil proceedings.

95. As a direct and proximate result of said outrageous intentional and wrongful conduct, ICC is entitled to an award of compensatory damages as determined by the trier of fact, including but not limited to compensation for the following:

1.    The loss of goodwill and interference with business relationships;

2.    Damage to its reputation;

3.    Out of pocket expenses resulting from defendants' baseless allegations; and

4.    Lost business profits both past and future.

96. The conduct of the defendants in asserting this alleged breach for which there was no factual basis and for which there was an ulterior motive in asserting this false accusation warrants the imposition of punitive damages in an amount to be determined by the trier of fact.

### COUNT IX

97. All preceding paragraphs are realleged and incorporated herein by reference.

98. The defendants, individually and collectively, took an active part in the initiation and continuation of asserting that ICC had breached §7.2.2 of its loan agreement with the RTFC because it had allegedly formed or acquired a subsidiary, ESS, without informing the RTFC.  As a result of this alleged default, the RTFC sought to accelerate ICC's $550,000 outstanding debt with the RTFC.

99. Said proceedings were maliciously commenced without probable cause and were made for a purpose other than that of securing the proper adjudication of the claim, as said actions were pursued as an attempt to sever and remove ICC's current management, including Prosser, from running the company.  Said proceedings were in retaliation for plaintiff's whistle blowing efforts and its exposing the fact that the RTFC is being used by CFC to subsidize its operations to the detriment of the RTFC members.

100.    Said proceeding regarding the allegation that ICC breached its loan agreement with the RTFC because it had allegedly formed or acquired a subsidiary, ESS, without the RTFC's permission has now been conclusively terminated in favor of ICC.

101.     As such, the defendants are jointly and severally liable to ICC for wrongful use of civil proceedings.

102.     As a direct and proximate result of said outrageous intentional and wrongful conduct, ICC is entitled to an award of compensatory damages as determined by the trier of fact, including but not limited to compensation for the following:

1.     The loss of goodwill and interference with business relationships;

2.     Damage to its reputation;

3.     Out of pocket expenses resulting from defendants' baseless allegations; and

4.     Lost business profits both past and future.

103.     The conduct of the defendants in asserting this alleged breach for which there was no factual basis and for which there was an ulterior motive in asserting this false accusation warrants the imposition of punitive damages in an amount to be determined by the trier of fact.

## COUNT X

104.     All preceding paragraphs are realleged and incorporated herein by reference.

105.     The defendants, individually and collectively, took an active part in the initiation and continuation of asserting that ICC had breached §8.7(i) of its loan agreement with the RTFC because it had allegedly dissolved a subsidiary, "Pinnacle, Ltd.". As a result of this alleged default, the RTFC sought to accelerate ICC's $550,000 outstanding debt with the RTFC.

106.     Said proceedings were maliciously commenced without probable cause and were made for a purpose other than that of securing the proper adjudication of the claim, as said actions were pursued as an attempt to sever and remove ICC's current management, including Prosser, from running the company. Said proceedings were in retaliation for plaintiff's whistle blowing efforts and its exposing the fact that the RTFC is being used by CFC to subsidize its operations to the detriment of the RTFC members.

107.     Said proceeding regarding the allegation that ICC breached its loan agreement with the RTFC because it had allegedly dissolved a subsidiary, "Pinnacle, Ltd." has now been conclusively terminated in favor of ICC.

108.     As such, the defendants are jointly and severally liable to ICC for wrongful use of civil proceedings.

109.     As a direct and proximate result of said outrageous intentional and wrongful conduct, ICC is entitled to an award of compensatory damages as determined by the trier of fact, including but not limited to compensation for the following:

1.  The loss of goodwill and interference with business relationships;

2.  Damage to its reputation;

3.  Out of pocket expenses resulting from defendants' baseless allegations; and

4.  Lost business profits both past and future.

110.     The conduct of the defendants in asserting this alleged breach for which there was no factual basis and for which there was an ulterior motive in asserting this false accusation warrants the imposition of punitive damages in an amount to be determined by the trier of fact.

## COUNT XI

111.     All preceding paragraphs are realleged and incorporated herein by reference.

112.     The defendants, individually and collectively, took an active part in the initiation, continuation or procurement of asserting that ICC had breached §8.4 of its loan agreement with the RTFC because it had allegedly dissolved a subsidiary, "Pinnacle, Ltd.". As a result of this alleged default, the RTFC sought to accelerate ICC's $550,000 outstanding debt with the RTFC.

113.     Said proceedings were maliciously commenced without probable cause and were made for a purpose other than that of securing the proper adjudication of the claim, as said actions were pursued as an attempt to sever and remove ICC's current management, including Prosser, from running the company. Said proceedings were in retaliation for plaintiff's whistle blowing efforts and its exposing the fact that the RTFC is being used by CFC to subsidize its operations to the detriment of the RTFC members.

114.     Said proceeding regarding the allegation that ICC breached its loan agreement with the RTFC because it had allegedly dissolved a subsidiary, "Pinnacle, Ltd." has now been conclusively terminated in favor of ICC.

115.     As such, the defendants are jointly and severally liable to ICC for wrongful use of civil proceedings.

116.     As a direct and proximate result of said outrageous intentional and wrongful conduct, ICC is entitled to an award of compensatory damages as determined by the trier of fact, including but not limited to compensation for the following:

1.  The loss of goodwill and interference with business relationships;

2.  Damage to its reputation;

3.  Out of pocket expenses resulting from defendants' baseless allegations; and

4.  Lost business profits both past and future.

117.    The conduct of the defendants in asserting this alleged breach for which there was no factual basis and for which there was an ulterior motive in asserting this false accusation warrants the imposition of punitive damages in an amount to be determined by the trier of fact.

## COUNT XII

118.    All preceding paragraphs are realleged and incorporated herein by reference.

119.    The defendants, individually and collectively, took an active part in the initiation, continuation or procurement of asserting that ICC had breached §3.02 of the ICC Mortgage with the RTFC because it had allegedly failed to maintain certain liens on pledged collateral.  As a result of this alleged default, the RTFC sought to accelerate ICC's $550,000 outstanding debt with the RTFC.

120.    Said proceedings were maliciously commenced without probable cause and were made for a purpose other than that of securing the proper adjudication of the claim, as said actions were pursued as an attempt to sever and remove ICC's current management, including Prosser, from running the company.  Said proceedings were in retaliation for plaintiff's whistle blowing efforts and its exposing the fact that the RTFC is being used by CFC to subsidize its operations to the detriment of the RTFC members.

121.    Said proceeding regarding the allegation that ICC breached its loan agreement with the RTFC because it had allegedly failed to maintain certain liens on pledged collateral has now been conclusively terminated in favor of ICC.

122.    As such, the defendants are jointly and severally liable to ICC for wrongful use of civil proceedings.

123.    As a direct and proximate result of said outrageous intentional and wrongful conduct, ICC is entitled to an award of compensatory damages as determined by the trier of fact, including but not limited to compensation for the following:

    1.    The loss of goodwill and interference with business relationships;

    2.    Damage to its reputation;

    3.    Out of pocket expenses resulting from defendants' baseless allegations; and

    4.    Lost business profits both past and future.

124.    The conduct of the defendants in asserting this alleged breach for which there was no factual basis and for which there was an ulterior motive in asserting this false accusation warrants the imposition of punitive damages in an amount to be determined by the trier of fact.

## COUNT XIII

125.    All preceding paragraphs are realleged and incorporated herein by reference.

126.    The defendants, individually and collectively, took an active part in the initiation, continuation or procurement of asserting that ICC had breached §3.01 of the Master A Pledge Agreement with the RTFC because it had allegedly failed to maintain

certain liens on pledged collateral.  As a result of this alleged default, the RTFC sought

to accelerate ICC's $550,000 outstanding debt with the RTFC.

127.    Said proceedings were maliciously commenced without probable cause

and were made for a purpose other than that of securing the proper adjudication of the

claim, as said actions were pursued as an attempt to sever and remove ICC's current

management, including Prosser, from running the company.  Said proceedings were in

retaliation for plaintiff's whistle blowing efforts and its exposing the fact that the RTFC

is being used by CFC to subsidize its operations to the detriment of the RTFC members.

128.    Said proceeding regarding the allegation that ICC breached its loan

agreement with the RTFC because it had allegedly failed to maintain certain liens on

pledged collateral has now been conclusively terminated in favor of ICC.

129.    As such, the defendants are jointly and severally liable to ICC for

wrongful use of civil proceedings.

130.    As a direct and proximate result of said outrageous intentional and

wrongful conduct, ICC is entitled to an award of compensatory damages as determined

by the trier of fact, including but not limited to compensation for the following:

1.    The loss of goodwill and interference with business relationships;

2.    Damage to its reputation;

3.    Out of pocket expenses resulting from defendants' baseless allegations; and

4.    Lost business profits both past and future.

131.    The conduct of the defendants in asserting this alleged breach for which

there was no factual basis and for which there was an ulterior motive in asserting this

false accusation warrants the imposition of punitive damages in an amount to be determined by the trier of fact.

## COUNT XIV

132.    All preceding paragraphs are realleged and incorporated herein by reference.

133.    The defendants, individually and collectively, took an active part in the initiation, continuation or procurement of asserting that ICC had breached §8.6(ii) of its loan agreement with the RTFC because it had allegedly instituted a voluntary case of bankruptcy in violations of the loan agreement involving a subsidiary, Martinique Cable Multimedia, SARL ("MCM"). As a result of this alleged default, the RTFC sought to accelerate ICC's $550,000 outstanding debt with the RTFC.

134.    Said proceedings were maliciously commenced without probable cause and were made for a purpose other than that of securing the proper adjudication of the claim, as said actions were pursued as an attempt to sever and remove ICC's current management, including Prosser, from running the company. Said proceedings were in retaliation for plaintiff's whistle blowing efforts and its by exposing the fact that the RTFC is being used by CFC to subsidize its operations to the detriment of the RTFC members.

135.    Said proceeding regarding the allegation that ICC breached its loan agreement with the RTFC because it had allegedly instituted a voluntary case of bankruptcy in violations of the loan agreement involving a subsidiary, Martinique

Complaint *ICC v. RTFC, List & Lilly*
Page 33

Cable Multimedia, SARL ("MCM")has now been conclusively terminated in favor of ICC.

136.    As such, the defendants are jointly and severally liable to ICC for wrongful use of civil proceedings.

137.    As a direct and proximate result of said outrageous intentional and wrongful conduct, ICC is entitled to an award of compensatory damages as determined by the trier of fact, including but not limited to compensation for the following:

1.    The loss of goodwill and interference with business relationships;

2.    Damage to its reputation;

3.    Out of pocket expenses resulting from defendants' baseless allegations; and

4.    Lost business profits both past and future.

138.    The conduct of the defendants in asserting this alleged breach for which there was no factual basis and for which there was an ulterior motive in asserting this false accusation warrants the imposition of punitive damages in an amount to be determined by the trier of fact.

## COUNT XV

139.    All preceding paragraphs are realleged and incorporated herein by reference.

140.    The defendants, individually and collectively, took an active part in the initiation and continuation of asserting that ICC had breached §7.2.3 of its loan agreement with the RTFC because it had allegedly allowed a subsidiary, SMB Boatphone Holdings, Ltd. ("SMB") to borrow funds in violation so the loan agreement.

DOCSDC1:235238.1

As a result of this alleged default, the RTFC sought to accelerate ICC's $550,000 outstanding debt with the RTFC.

141.    Said proceedings were maliciously commenced without probable cause and were made for a purpose other than that of securing the proper adjudication of the claim, as said actions were pursued as an attempt to sever and remove ICC's current management, including Prosser, from running the company. Said proceedings were in retaliation for plaintiff's whistle blowing efforts and its exposing the fact that the RTFC is being used by CFC to subsidize its operations to the detriment of the RTFC members.

142.    Said proceeding regarding the allegation that ICC breached its loan agreement with the RTFC because it had allegedly allowed a subsidiary, SMB Boatphone Holdings, Ltd. ("SMB") to borrow funds in violation so the loan agreement has now been conclusively terminated in favor of ICC.

143.    As such, the defendants are jointly and severally liable to ICC for wrongful use of civil proceedings.

144.    As a direct and proximate result of said outrageous intentional and wrongful conduct, ICC is entitled to an award of compensatory damages as determined by the trier of fact, including but not limited to compensation for the following:

1.    The loss of goodwill and interference with business relationships;

2.    Damage to its reputation;

3.    Out of pocket expenses resulting from defendants' baseless allegations; and

4.    Lost business profits both past and future.

145.    The conduct of the defendants in asserting this alleged breach for which there was no factual basis and for which there was an ulterior motive in asserting this false accusation warrants the imposition of punitive damages in an amount to be determined by the trier of fact.

### COUNT XVI

146.    All preceding paragraphs are realleged and incorporated herein by reference.

147.    The defendants, individually and collectively, took an active part in the initiation, continuation or procurement of asserting that ICC had breached §7.2.7 of its loan agreement with the RTFC because it had allegedly allowed a subsidiary, SMB Boatphone Holdings, Ltd. ("SMB") to borrow funds in violation so the loan agreement. As a result of this alleged default, the RTFC sought to accelerate ICC's $550,000 outstanding debt with the RTFC.

148.    Said proceedings were maliciously commenced without probable cause and were made for a purpose other than that of securing the proper adjudication of the claim, as said actions were pursued as an attempt to sever and remove ICC's current management, including Prosser, from running the company. Said proceedings were in retaliation for plaintiff's whistle blowing efforts and its exposing the fact that the RTFC is being used by CFC to subsidize its operations to the detriment of the RTFC members.

149.    Said proceeding regarding the allegation that ICC breached its loan agreement with the RTFC because it had allegedly allowed a subsidiary, SMB

Boatphone Holdings, Ltd. ("SMB") to borrow funds in violation so the loan agreement has now been conclusively terminated in favor of ICC.

150.    As such, the defendants are jointly and severally liable to ICC for wrongful use of civil proceedings.

151.    As a direct and proximate result of said outrageous intentional and wrongful conduct, ICC is entitled to an award of compensatory damages as determined by the trier of fact, including but not limited to compensation for the following:

1.    The loss of goodwill and interference with business relationships;

2.    Damage to its reputation;

3.    Out of pocket expenses resulting from defendants' baseless allegations; and

4.    Lost business profits both past and future.

152.    The conduct of the defendants in asserting this alleged breach for which there was no factual basis and for which there was an ulterior motive in asserting this false accusation warrants the imposition of punitive damages in an amount to be determined by the trier of fact.

**WHEREFORE,** ICC prays for judgment against the defendants, jointly and severally, as follows:

1.    For all non-economic compensatory damages as permitted by law;

2.    For all economic compensatory and special damages, including consequential damages as set forth in Counts I through XVI of the complaint, in an amount not less than $100,000,000;

**Complaint** *ICC v. RTFC, List & Lilly*
Page 37

3.  For punitive damages as set forth in Counts I through XVI of the complaint in an

    amount not less than $100,000,000;

4.  For attorney's fees and costs of suit incurred herein; and

5.  For such other further relief as the Court may deem just and proper.

**A TRIAL BY JURY IS DEMANDED**

Dated:

Joel H. Holt
2132 Company Street
Christiansted, St. Croix 00820
Tele: (340) 773-8709
Fax:  (340) 773-8677

**OF COUNSEL:**

Lanny J. Davis, Esq.
Raymond G. Mullady, Jr., Esq.
Orrick, Herrington & Sutcliffe LLP
Washington Harbour
3050 K Street, N.W.
Washington, DC 20007-5135
Tele:  (202) 339-8400
Fax:   (202) 339-8500

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia

# Exhibit I

to

**National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss**

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| RURAL TELEPHONE FINANCE, COOPERATIVE, | ) )  ) | |
| Plaintiff, | ) ) | NO. 2004-CV-154 |
| v. | ) ) | LOAN DEFAULT ACTION |
| INNOVATIVE COMMUNICATION CORPORATION, | ) ) ) | |
| Defendant-Counterclaimant | ) ) ) | |
| RURAL TELEPHONE FINANCE, COOPERATIVE, | ) ) ) | |
| Plaintiff, | ) ) | NO. 2004-CV-155 |
| v. | ) ) | GUARANTEE ACTION |
| JEFFREY PROSSER, | ) ) | |
| Defendant. | ) ) | |

### FINAL JUDGMENT

This Court, finding no just reason for delay, hereby orders, adjudges, and decrees that Final Judgment be entered on behalf of Rural Telephone Finance Cooperative, against Innovative Communication Corporation ("ICC"), and Jeffrey J. Prosser ("Prosser"), jointly and severally, in the principal amount of five-hundred twenty-four million nine-hundred ten-thousand sixty-five dollars

31097968.1C

- 1 -

($52 1,910,065.00), with interest thereon at a rate, pursuant to 28 U.S.C. § 1961, of

5.01 %, compounded annually from the judgment entry date, until paid; provided,

that Prosser's liability shall not exceed more than one-hundred million dollars

($10 ,000,000.00) of the principal amount.

All liens asserted by RTFC in securing its claims are valid, enforceable, and

non-avoidable.

This Court directs the Clerk to promptly enter a record of this Final

Judgment pursuant to Fed. R. Civ. P. 79(a).

ENTERED on this 8ᵗʰ day of ＪＵＮＥ , 2006.

Curtis V. Gomez
Honorable District Judge

ATTEST:

WILFREDO F. MORALES
Clerk of the Court

By: _____
Deputy Clerk

COPIES TO:
Mr. Joel H. Holt, Esq.
Mr. J. Daryl Dodson, Esq.
Mr. Thomas Alkon, Esq.
Richard Hunter, Esq.
Magistrate Barnard
Caryl Jackson, Chief Deputy
Olga Schneider
Kendra Nielson     - 2 -

31097968.1

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

RURAL TELEPHONE FINANCE,  )
COOPERATIVE,       )
            )
    Plaintiff,     )
            )  NO. 2004-CV-154
v.           )
            )  LOAN DEFAULT ACTION
INNOVATIVE COMMUNICATION )
CORPORATION,      )
            )
    Defendant-    )
    Counterclaimant  )

## FINAL JUDGMENT ON ICC'S CLAIMS

Pursuant to the stipulation of Plaintiff Rural Telephone Finance Cooperative ("RTFC") and Defendant Innovative Communication Corporation ("ICC"), this Court finding no just reason for delay, hereby orders, adjudges, and decrees that Final Judgment be entered under Fed. R. Civ. P. 54(b) dismissing **with prejudice** all claims and causes of action of ICC against RTFC, including but not limited to ICC's counterclaims and supplemental claims and all claims which could have been asserted and which relate to or arise out of any of the matters alleged in ICC's counterclaims or supplemental claims. Each party shall bear its own costs and legal fees. **This Final Judgment as to ICC's claims shall not affect RTFC's claims in this matter, all of which shall remain pending.**

This Court directs the Clerk to promptly enter a record of this Final Judgment pursuant to Fed. R. Civ. P. 79(a).

ENTERED on this 8th day of ___JUNE___, 2006.

_____
Curtis V. Gomez
Honorable District Judge

ATTEST:

WILFREDO F. MORALES
Clerk of the Court

By: _____
Deputy Clerk

COPIES TO:
Mr. Joel H. Holt, Esq.
Mr. J. Daryl Dodson, Esq.
Richard Hunter, Esq.
Hon Greoffrey Barnard
Carol Jackson, Chief Deputy
Olga Schneider
Kendra Nielsam

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

INNOVATIVE COMMUNICATION )
CORPORATION )
         )
         Plaintiff, )
         )    NO. 2005-CV-115
v. )
         )    DECLARATORY ACTION
RURAL TELEPHONE FINANCE )
COOPERATIVE, )
         )
         Defendant- )
         Counterclaimant. )

## FINAL JUDGMENT ON ICC'S CLAIMS

Pursuant to the stipulation of Plaintiff Innovative Communication Corporation ("ICC") and Defendant Rural Telephone Finance Cooperative ("RTFC"), this Court, finding no just reason for delay, hereby orders, adjudges, and decrees that Final Judgment be entered under Fed. R. Civ. P. 54(b) dismissing **with prejudice** ICC's Complaint and Amended Complaint and all claims or causes of action which could have been asserted by ICC against RTFC and which related to or arise out of any of the matters alleged in ICC's Complaint or Amended Complaint. Each party shall bear its own costs and legal fees.

This Court directs the Clerk to promptly enter a record of this Final Judgment pursuant to Fed. R. Civ. P. 79(a).

31098496.6                - 1 -

ENTERED on this ⁸ᵗʰ day of JUNE , 2006.

_____
Curtis V. Gomez
Honorable District Judge

ATTEST:

WILFREDO F. MORALES
Clerk of the Court

By: _____
Deputy Clerk

COPIES TO:
Mr. Joel H. Holt, Esq.
Mr. J. Daryl Dodson, Esq.
Richard Hunter, Esq.
Thomas Alkon, Esq.
Henry Smock, Esq.
Geoffrey Barnard - Magistrate
Carol Jackson, Chief Deputy
Olga Schneider
Kendra Nielsom, Esq

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

EMERGING COMMUNICATIONS, INC. )
and INNOVATIVE COMMUNICATION )
COMPANY, LLC, )
                    )
         Plaintiffs, )
                    )      NO. 2006-CV-011
v.                    )
                    )      ACTION FOR
RURAL TELEPHONE FINANCE )      CONTRIBUTION,
COOPERATIVE, and NATIONAL )      DECLARATORY, AND
RURAL UTILITIES COOPERATIVE )      INJUNCTIVE RELIEF
FINANCE CORPORATION, )
                    )
         Defendants. )

## FINAL JUDGMENT

Pursuant to the stipulation of Plaintiffs Emerging Communications, Inc. and Innovative Communication Company, LLC, and Defendants Rural Telephone Finance Cooperative and National Rural Utilities Cooperative Finance Corporation, this Court, finding no just reason for delay, hereby orders, adjudges, and decrees that Final Judgment be entered dismissing **with prejudice** all claims or causes of action of each and both Plaintiffs against either or both Defendants and which relate to or arise out of any of the matters alleged in any of the pleadings herein  Each party shall bear its own costs and legal fees.

This Court directs the Clerk to promptly enter a record of this Final Judgment pursuant to Fed. R. Civ. P. 79(a).

31098528.3                          - 1 -

ENTERED on this ___ day of _____, 2006.

Curtis V. Gomez
Honorable District Judge

ATTEST:

WILFREDO F. MORALES
Clerk of the Court

By: _____
Deputy Clerk

COPIES TO:
Mr. Joel H. Holt, Esq.
Mr. Daryl Dodson, Esq.

*Richard Hunter, Esq.*
*Geoffrey Barnard - Magistrate Judge*
*Olga A Schneider*
*Carol Jackson, Chief-Deputy*
*Kendra Nielsam, Esq.*

*7/9/06*
*GAD*

3109852 3                                    - 2 -

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

INNOVATIVE COMMUNICATION )
CORPORATION )
)
      Plaintiff, )
)    NO. 2005-CV-168
v. )
)    ACTION FOR
RURAL TELEPHONE FINANCE )    WRONGFUL USE OF
COOPERATIVE, JOHN J. LIST, & )    CIVIL PROCEEDINGS
STEVEN LILLY )
)
      Defendants. )
_____ )

### FINAL JUDGMENT

Pursuant to the stipulation of Plaintiff Innovative Communication Corporation ("ICC") and Defendants Rural Telephone Finance Cooperative ("RTFC"), John J. List, and Steven Lilly, this Court, finding no just reason for delay, hereby orders, adjudges, and decrees that Final Judgment be entered dismissing **with prejudice** ICC's Complaint and Amended Complaint and all claims or causes of action of ICC against any of the Defendants which relate to or arise out of any of the matters alleged in the Complaint or Amended Complaint. Each party shall bear its own costs and legal fees.

This Court directs the Clerk to promptly enter a record of this Final Judgment pursuant to Fed. R. Civ. P. 79(a).

3109851-3               - 1 -

ENTERED on this 8th day of June, 2006.

_____
Curtis V. Gomez
Honorable District Judge

ATTEST:

WILFREDO F. MORALES
Clerk of the Court

By: _____
Deputy Clerk

COPIES TO:
Mr. Joel H. Holt, Esq.
Mr. Richard H. Hunter, Esq.
Geoffrey Barnard, Magistrate Judge
6/9/06  Cari Jackson, Chief Deputy
(rn)   Olga Schneider
Tejisvi Srimoohnamy, Esq.

**3:06-cv-00018-CVG** Virgin Islands Telephone Corporation v. Rural Telephone Finance
Cooperative
Curtis V Gomez, presiding
**Date filed:** 01/19/2006
**Date terminated:** 06/09/2006
**Date of last filing:** 06/09/2006

# History

| Doc. No. | Dates | | Description |
|---|---|---|---|
| 60 | *Filed & Entered:* | 06/09/2006 | Judgment |
| | *Docket Text:* JUDGMENT That final judgment be entered dismissing with prejudice all claims or causes of action of each Pltf against any or all of the Defendants, including all actions anc claims which could have been asserted against any or all of the Defendants and which relate to or arise out of any the matters alleged in any of the pleading filed herein. | | |
| 59 | *Filed & Entered:* | 06/08/2006 | Stipulation of Dismissal |
| | *Docket Text:* STIPLUATION OF DISMISSAL by Parties | | |
| 58 | *Filed & Entered:* | 05/09/2006 | Pretrial Order |
| | *Docket Text:* ORDER (GWB)5/8/06 That the stipulation for an extension of time is GRANTED. | | |
| 57 | *Filed & Entered:* | 05/03/2006 | Answer to Complaint |
| | *Docket Text:* ANSWER by Defts Greenlight Capital Qualified , L.P. Greenlight Capital L.P. and Greenlight Capital Offshore Ltd. | | |
| 56 | *Filed & Entered:* | 05/02/2006 | Stipulation |
| | *Docket Text:* STIPULATION for extension of time for Pltf to respond to RTFC's motion to dismiss amended complaint by Parties | | |
| 54 | *Filed & Entered:* | 04/06/2006 | Answer to Complaint |
| | *Docket Text:* ANSWER (ORIGINAL ) of Deft. National Rural Utilities Cooperative Finance Corporation to Pltfs amended Complaint by Deft. | | |
| 55 | *Filed & Entered:* | 04/06/2006 | Jams docket entry |
| | *Docket Text:* NOTICE of service of Deft Rural Telephone Finance Cooperative's motion to dismiss amended complaint by Deft | | |
| 51 | *Filed & Entered:* | 04/03/2006 | Jams docket entry |
| | *Docket Text:* RETURN of service executed on Greenlight Capital Qualified L.P. on 3/1/06 | | |
| 52 | *Filed & Entered:* | 04/03/2006 | Jams docket entry |
| | *Docket Text:* RETURN of service executed on Greenlight Capital L.P. on 3/1/06 | | |
| 53 | *Filed & Entered:* | 04/03/2006 | Jams docket entry |
| | *Docket Text:* RETURN of service executed on Greenlight Capital Offshore LTD on 3/1/06 | | |
| 49 | *Filed & Entered:* | 03/31/2006 | Stipulation |
| | *Docket Text:* STIPULATION that all defts. shall have through 4/6/26 to plead move or | | |

| | | | |
|---|---|---|---|
| | otherwise respond to the Amended Complt | | |
| 50 | *Filed & Entered:* | 03/31/2006 | Jams docket entry |
| | *Docket Text:* SO APPROVED (GWB) RE: Stipulation (Docket #49) | | |
| 48 | *Filed & Entered:* | 03/21/2006 | Pretrial Order |
| | *Docket Text:* ORDER (GWB)That Defts shall have through March 30, 2006 to plead , move or otherwise respond to the amended complaint . | | |
| 45 | *Filed & Entered:* | 03/13/2006 | Jams docket entry |
| | *Docket Text:* STIPULATION that the defts. shall have through March 30, 2006, to respond to the amended complaint filed by pltfs. | | |
| 46 | *Filed & Entered:* | 03/13/2006 | Jams docket entry |
| | *Docket Text:* RETURN of summons issued to National Rual Utilities Cooperative Finance Corp. c/o Steven Lilly executed on 2/28/06 | | |
| 47 | *Filed & Entered:* | 03/13/2006 | Jams docket entry |
| | *Docket Text:* RETURN of service issued to National Registered Agents, Inc. executed on 2/28/06 | | |
| 41 | *Filed & Entered:* | 02/28/2006 | Transcript |
| | *Docket Text:* TRANSCRIPT on motion hearing on 12/31/06 by C.Kean | | |
| 42 | *Filed & Entered:* | 02/28/2006 | Transcript |
| | *Docket Text:* TRANSCRIPT on motion hearing on 02/01/06 by C.Kean | | |
| 43 | *Filed & Entered:* | 02/28/2006 | Transcript |
| | *Docket Text:* TRANSCRIPT on motion hearing on 01/20/06 by C.Kean | | |
| 44 | *Filed & Entered:* | 02/28/2006 | Transcript |
| | *Docket Text:* TRANSCRIPT on in chambers teleconference hearing on 02/10/06 by C.Kean | | |
| 40 | *Filed & Entered:* | 02/27/2006 | Jams docket entry |
| | *Docket Text:* NOTICE of filing by Pltfs | | |
| 37 | *Filed & Entered:* | 02/23/2006 | Jams docket entry |
| | *Docket Text:* NOTICE of service of motion to dismiss by Deft | | |
| 38 | *Filed & Entered:* | 02/23/2006 | Amended Complaint |
| | *Docket Text:* AMENDED COMPLAINT by J. Holt Esq. | | |
| 39 | *Filed & Entered:* | 02/23/2006 | Summons Issued |
| | *Docket Text:* SUMMONS issued to National Rural Utilities Cooperative Finance Corporation | | |
| 36 | *Filed & Entered:* | 02/13/2006 | Jams docket entry |
| | *Docket Text:* NOTICE of submission of transcript by Defts. | | |
| 31 | *Filed & Entered:* | 02/10/2006 | Memorandum Opinion |
| | *Docket Text:* MEMORANDUM OPINION by Judge Gomez | | |
| 32 | *Filed & Entered:* | 02/10/2006 | Pretrial Order |
| | *Docket Text:* ORDER (CVG)Pltf's motion for a temporary restraining is DENIED | | |
| 33 | *Filed & Entered:* | 02/10/2006 | *Description not available* |
| | *Docket Text:* CTRM. MIN. Status conf; before Judge Gomez ; CR C. Kean | | |
| 34 | *Filed & Entered:* | 02/10/2006 | Jams docket entry |
| | *Docket Text:* NOTICE of filing letter agreement regarding intercreditor agreement by Deft | | |

| 35 | *Filed & Entered:* | 02/10/2006 | Jams docket entry |
|----|----|----|----|
| | *Docket Text:* Supplemental filing by Atty J. Holt | | |
| 30 | *Filed & Entered:* | 02/09/2006 | *Description not available* |
| | *Docket Text:* CTRM. MIN. Telphone Conf.;before Judge Gomez ; CR C.Kean | | |
| 26 | *Filed & Entered:* | 02/08/2006 | Jams docket entry |
| | *Docket Text:* BRIEF (Supplemental) on Vitelco's emergency motion for temporary restraining order and preliminary injunctive relief by Deft. | | |
| 27 | *Filed & Entered:* | 02/08/2006 | Jams docket entry |
| | *Docket Text:* DECLARATION of J. Daryl Dodson Esq. | | |
| 28 | *Filed & Entered:* | 02/08/2006 | *Description not available* |
| | *Docket Text:* CTRM. MIN. Telphone conf. ; before Judge Gomez; CR. Chandra Kean | | |
| 29 | *Filed & Entered:* | 02/08/2006 | Jams docket entry |
| | *Docket Text:* MEMORANDUM Re issues raised by Court at Feb. 7, 2006 conf. by Vitelco's | | |
| 25 | *Filed & Entered:* | 02/06/2006 | Jams docket entry |
| | *Docket Text:* REPLY to RTFC's supplemental declaration by Pltf | | |
| 24 | *Filed & Entered:* | 02/03/2006 | Jams docket entry |
| | *Docket Text:* Supplemental exhibit and declaration of Gerard G. Pecht in opposition to emerrgency motion for Temporarty Restraining Order and Request for preliminary injunctive relief by Deft. | | |
| 23 | *Filed & Entered:* | 02/02/2006 | *Description not available* |
| | *Docket Text:* CTRM. MIN. on Status Conf. Ct.Reporter: None | | |
| 20 | *Filed & Entered:* | 02/01/2006 | *Description not available* |
| | *Docket Text:* CTRM. MIN. cont of hearing on mot for injunction on 1/31/06 Court Reporter: C.Kean | | |
| 21 | *Filed & Entered:* | 02/01/2006 | Jams docket entry |
| | *Docket Text:* BRIEF OF VITELCO RE: Issues raised by court | | |
| 22 | *Filed & Entered:* | 02/01/2006 | Jams docket entry |
| | *Docket Text:* SUPPLEMENTAL BRIEF ON Vitelco's emergency mot. for TRO and Prel. Inj. relief by Rural Telephone Finance | | |
| 14 | *Filed & Entered:* | 01/31/2006 | Pretrial Order |
| | *Docket Text:* ORDER (CVG)That Deft's motion is GRANTED and it is further ORDERED that Thomas J. Allingham II be admitted pro hac vice this Court for the purpose of participating in the above-captioned case. | | |
| 15 | *Filed & Entered:* | 01/31/2006 | Jams docket entry |
| | *Docket Text:* OATH OF ADMISSION by Thomas J. Allingham Esq. | | |
| 16 | *Filed & Entered:* | 01/31/2006 | *Description not available* |
| | *Docket Text:* CTRM. MIN. hearing on motion pro hac vic ; before Judge Gomez Ct Reporter C. Kean. | | |
| 17 | *Filed & Entered:*<br>*Terminated:* | 01/31/2006<br>06/09/2006 | Motion for Miscellaneous Relief |
| | *Docket Text:* MOTION for admission of Thomas J. Allingham, Esq. pro hac vice by Defts | | |
| 18 | *Filed & Entered:* | 01/31/2006 | Jams docket entry |
| | *Docket Text:* REPLY to Deft's response to request for TRO | | |

| 19 | *Filed & Entered:* | 01/31/2006 | Motion for Miscellaneous Relief |
| | *Terminated:* | 02/10/2006 | |
| | *Docket Text:* MOTION for leave to file amended response to emergency motion for temporary restraining Order and preliminary injunctive relief by Deft. | | |
| 13 | *Filed & Entered:* | 01/30/2006 | Pretrial Order |
| | *Docket Text:* ORDER (CVG)That a hearing will be held on the pending Emergency Motion for Temporary Restraining Order on Jan. 31, 2006 at 3:30 pm | | |
| 9 | *Filed & Entered:* | 01/20/2006 | *Description not available* |
| | *Docket Text:* CTRM. MIN. on hearing motion TRO and Motion for admission Pro Hac Vice before Judge Gomez ; CR C. Kean | | |
| 10 | *Filed & Entered:* | 01/20/2006 | Jams docket entry |
| | *Docket Text:* ENTRY of appearance by Richard Dollison Esq. | | |
| 11 | *Filed & Entered:* | 01/20/2006 | Response to Motion |
| | *Docket Text:* RESPONSE of telephone finance cooperative to emergency motion for temporary retraining order and preliminary injunctive relief by RTFC | | |
| 12 | *Filed & Entered:* | 01/20/2006 | Jams docket entry |
| | *Docket Text:* REPLY to Deft's motion to enter briefing schedule by Pltf | | |
| 1 | *Filed & Entered:* | 01/19/2006 | Complaint |
| | *Docket Text:* COMPLAINT | | |
| 2 | *Filed & Entered:* | 01/19/2006 | Summons Issued |
| | *Docket Text:* SUMMONS issued to National Registered Agents Inc. | | |
| 3 | *Filed & Entered:* | 01/19/2006 | Summons Issued |
| | *Docket Text:* SUMMONS issued to Greenlight Capital Qualified L.P. | | |
| 4 | *Filed & Entered:* | 01/19/2006 | Summons Issued |
| | *Docket Text:* SUMMONS issued to Capital L.P. | | |
| 5 | *Filed & Entered:* | 01/19/2006 | Summons Issued |
| | *Docket Text:* SUMMONS issued to Greenlight Capital Offshore LTD. | | |
| 6 | *Filed & Entered:* | 01/19/2006 | Motion for Miscellaneous Relief |
| | *Terminated:* | 01/19/2006 | |
| | *Docket Text:* MOTION (EMERGENCY) for Temporary Restraining Order and Preliminary injunctive Relief by Pltf | | |
| 7 | *Filed & Entered:* | 01/19/2006 | Jams docket entry |
| | *Docket Text:* MEMORANDUM in support of EMERGENCY Motion for Temporary Restraining Order and Preliminary injunctive Relief by Pltf | | |
| 8 | *Filed & Entered:* | 01/19/2006 | Motion for Miscellaneous Relief |
| | *Terminated:* | 06/09/2006 | |
| | *Docket Text:* MOTION to enter briefing shcedule by Deft | | |

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia

# Exhibit J

to

## National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss

(Official Form 1) (10/05)                                                                                    FORM B1, Page 1

| District Court of the Virgin Islands<br>Division of St. Thomas and St. John, Bankruptcy Division | Voluntary Petition |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Emerging Communications, Inc.** | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. No./Complete EIN or other Tax I.D. No. (if more than one, state all):<br>66-0547028 | Last four digits of Soc. Sec. No./Complete EIN or other Tax I.D. No. (if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State):<br><br>**48A Kronprindsens Gade<br>P.O. Box 6100<br>St. Thomas, VI**    ZIP CODE  **00801** | Street Address of Joint Debtor (No. & Street, City, State): |
| County of Residence or of the Principal Place of Business:<br>**Division of St. Thomas** | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |
| Location of Principal Assets of Business Debtor (if different from street address above): | |

| Type of Debtor (Form of Organization)<br>(Check one box) | Nature of Business<br>(Check all applicable boxes.) | Chapter of Bankruptcy Code Under Which the Petition is Filed (Check one box) |
|---|---|---|
| ☐ Individual (includes Joint Debtors)<br>☑ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities, check this box and provide the information requested below)<br><br>State type of entity:_____ | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined in 11 U.S.C. § 101 (51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☐ Nonprofit Organization qualified under 15 U.S.C. § 501(c)(3) | ☐ Chapter 7    ☑ Chapter 11    ☐ Chapter 15 Petition for<br>☐ Chapter 9    ☐ Chapter 12        Recognition of a Foreign<br>                                              Main Proceeding<br><br>☐ Chapter 13                          ☐ Chapter 15 Petition for<br>                                              Recognition of a Foreign<br>                                              Nonmain Proceeding |

Below continues with Nature of Debts spanning the right under the above:

| | | Nature of Debts (Check one box)<br>☐ Consumer/Non-Business    ☑ Business |
|---|---|---|

| Filing Fee (Check one box) | Chapter 11 Debtors |
|---|---|
| ☑ Full Filing Fee attached<br>☐ Filing Fee to be paid in installments (Applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form No. 3A.<br>☐ Filing Fee waiver requested *Applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B. | Check one box:<br><br>☐ Debtor is a small business as defined in 11 U.S.C. § 101(51D)<br><br>☑ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>Check if:<br><br>☐ Debtor's aggregate noncontingent liquidated debts owed to non-insiders or affiliates are less than $2 million. |

| Statistical/Administrative Information | |
|---|---|
| ☒ Debtor estimates that funds will be available for distribution to unsecured creditors.<br><br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors. | |

THIS SPACE IS FOR COURT USE ONLY

Estimated Number of Creditors[1]

| 1-<br>49 | 50-<br>99 | 100-<br>199 | 200-<br>999 | 1,000-<br>5,000 | 5,001-<br>10,000 | 10,001-<br>25,000 | 25,001<br>50,000 | 50,001-<br>100,000 | OVER<br>100,000 |
|---|---|---|---|---|---|---|---|---|---|
| ☑ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

Estimated Assets

| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | 1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

Estimated Debts

| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | 1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

---

[1] The statistical information set forth herein is based on the consolidated financial information of Debtor and its affiliates identified on Exhibit 1 hereto.

RLF1-3040980-2

(Official Form 1) (10/05)                                                                                                    FORM B1, Page 2

| Voluntary Petition<br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>**Emerging Communications, Inc.** | |
|---|---|---|
| **Prior Bankruptcy Case Filed Within Last 8 Years** (If more than one, attach additional sheet) | | |
| Where Filed: United States Bankruptcy Court for the District of Delaware | Case Number: 06-10134 (JKF)<br>(Involuntary) | Date Filed: February 10, 2006 |
| **Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor** (If more than one, attach additional sheet) | | |
| Name of Debtor:<br>SEE ATTACHED - <u>EXHIBIT 1</u> | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

| Exhibit A | Exhibit B |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐   Exhibit A is attached and made a part of this petition. | (To be completed if debtor is an individual<br>whose debts are primarily consumer debts)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I delivered to the debtor the notice required by § 342(b) of the Bankruptcy Code.<br><br>X _____<br>Signature of Attorney for Debtor(s)              Date |

| Exhibit C | Certification Concerning Debt Counseling<br>by Individual/Joint Debtor(s) |
|---|---|
| Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?<br><br>☐   Yes, and Exhibit C is attached and made a part of this petition.<br><br>☑   No | ☐   I/we have received approved budget and credit counseling during the 180-day period preceding the filing of this petition.<br><br>☐   I/we request a waiver of the requirement to obtain budget and credit counseling prior to filing based on exigent circumstances. (Must attach certification describing.) |

| Information Regarding the Debtor (Check the Applicable Boxes)<br>Venue (Check any applicable box) |
|---|
| ☐   Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District. |
| ☑   There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District. |
| ☐   Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District. |

| Statement by a Debtor Who Resides as a Tenant of Residential Property<br>*Check all applicable boxes.* |
|---|
| ☐   Landlord has a judgment against the debtor for possession of debtor's resident. (If box checked, complete the following.)<br><br>_____<br>(Name of landlord that obtained judgment)<br><br><br>_____<br>(Address of landlord) |
| ☐   Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and |
| ☐   Debtor has included in this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition. |

RLF1-3040980-2

(Official Form 1) (10/05)

FORM B1, Page 3

| Voluntary Petition<br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>Emerging Communications, Inc. |
|---|---|

<strong>Signatures</strong>

| Signature(s) of Debtor(s) (Individual/Joint) | Signature of a Foreign Representative |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct.<br>[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.<br>[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by § 342(b) of the Bankruptcy Code.<br>I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _____<br>　Signature of Debtor<br>X _____<br>　Signature of Joint Debtor<br><br>　Telephone Number (if not represented by attorney)<br><br>　Date | I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.<br>(Check only one box.)<br><br>☐　I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by § 1515 of title 11 are attached.<br>☐　Pursuant to § 1515 of title 11, United States Code, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.<br><br>X _____<br>　(Signature of Foreign Representative)<br><br>　(Printed Name of Foreign Representative)<br><br>　Date |
| **Signature of Attorney**<br>X _____<br>　Signature of Attorney for Debtor(s)<br>　Carol Ann Rich<br>　Printed Name of Attorney for Debtor(s)<br>　Dudley Clark & Chan, LLP<br>　Firm Name<br>　9720 Estate Thomas, Havensight<br>　Address<br>　St. Thomas, Virgin Islands 00802<br>　(340) 776-7474<br>　Telephone Number<br>　July 31, 2006<br>　Date | **Signature of Non-Attorney Bankruptcy Petition Preparer**<br>I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19B is attached.<br><br>_____<br>Printed Name and title, if any, of Bankruptcy Petition Preparer |
| **Signature of Debtor (Corporation/Partnership)**<br>I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.<br>The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _____<br>　Signature of Authorized Individual<br>　Eling S. Joseph<br>　Printed Name of Authorized Individual<br>　Corporate Secretary<br>　Title of Authorized Individual<br>　July 31, 2006<br>　Date | Social Security Number (If the bankruptcy petition preparer is not an individual, state the Social Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)<br><br>Address<br><br>X _____<br>Date<br>Signature of Bankruptcy Petition Preparer or officer, principal, responsible person, or partner whose social security number is provided above.<br>Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual:<br><br>If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.<br><br>*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. § 110; 18 U.S.C. § 156.* |

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EMERGING COMMUNICATIONS, | ) | Case No. 06-_____ (    ) |
| INC., a Delaware corporation, | ) | |
| | ) | |
| Debtor. | ) | |

## LIST OF CREDITORS HOLDING LARGEST UNSECURED CLAIM

      The debtor in this chapter 11 case (the "Debtor") filed a voluntary petition in this Court on July 31, 2006 for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532. The following is a list of the Debtor's largest unsecured creditors (the "Top Creditor List"), based on the Debtor's books and records as of approximately July 31, 2006. The Top Creditor List was prepared in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure for filing in the Debtor's chapter 11 case. The Top Creditor List does not include: (1) persons who come within the definition of an "insider" set forth in 11 U.S.C. § 101(31); nor (2) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the largest unsecured claims. The information presented in the Top Creditor List shall not constitute an admission by, nor is it binding on, the Debtor. The failure of the Debtor to list a claim as contingent, unliquidated or disputed does not constitute a waiver of the Debtor's right to contest the validity, priority, and/or amount of any such claim.

| Name, Address, Phone and Fax No. of Creditor | Nature of Claim | Contingent, unliquidated, disputed or subject to setoff | Approximate Amount of Claim |
|---|---|---|---|
| Greenlight<br>140 East 45th Street<br>New York, NY 10017 | Secured Judgment Deficiency | Disputed | Unliquidated |
| Banco Popular CC<br>Sugar Estate<br>St. Thomas, VI 00801<br>Tel: 340-693-2823<br>Fax: 340-693-2888 | Company Credit Card Unsecured Debt | | $406,067.33 |
| Orrick, Herrington & Sutcliffe LLP<br>Washington Harbour<br>3050 K Street, NW<br>Washington, DC 20007-5135<br>Tel: 202-339-8400<br>Fax: 202-339-8500 | Professional Fees | | $300,000.00 |
| Postmaster<br>585 Roosevelt Avenue<br>San Juan, PR 00936-9998<br>Tel: 787-641-4811<br>Fax: | Services | | $1,481.03 |

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **EMERGING COMMUNICATIONS,** | ) | **Case No. 06-_____ (   )** |
| **INC., a Delaware corporation,** | ) | |
| | ) | |
| Debtor. | ) | |

## DECLARATION UNDER PENALTY OF PERJURY

I, Eling S. Joseph, Corporate Secretary of Emerging Communications, Inc., the company named as debtor in this case, declare under penalty of perjury under the laws of the United States of America that I have reviewed the List of Creditors Holding Largest Unsecured Claims submitted herewith and that it is true and correct to the best of my information and belief.

Date: July 31, 2006

_____
Eling S. Joseph
Corporate Secretary
Emerging Communications, Inc.

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **EMERGING COMMUNICATIONS,** | ) | **Case No. 06-_____ (   )** |
| **INC., a Delaware corporation,** | ) | |
| | ) | |
| Debtor. | ) | |

### LIST OF CREDITORS

A list of the above-captioned debtor's (the "Debtor") creditors in accordance with Federal Rule of Bankruptcy Procedure 1007(a) is filed by attachment hereto.

The list has been prepared on a consolidated basis from the books and records of the Debtor and the Debtor's affiliates listed on Exhibit 1. The list contains only those creditors whose names and addresses were maintained in the databases of the Debtor and its affiliates or were otherwise readily ascertainable by the Debtor prior to the commencement of this case. The schedules of liabilities to be subsequently filed should be consulted for a list of the Debtor's creditors that is comprehensive and current as of the date of the commencement of this case.

Certain of the creditors listed may not hold outstanding claims against the Debtor as of the date hereof and, therefore, may not be creditors for purposes of this case. By filing the attached list, the Debtor in no way waives or prejudices its right to object to the extent, validity or enforceability of the claims, if any, held by the parties identified therein.

RLF1-3040980-2

## CREDITOR LIST

1.  ICC-Corp.
    56-58 Hill Street
    P.O. Box 1730
    Christiansted
    St. Croix, U.S. Virgin Islands 00821

2.  The Virgin Islands Telephone Corporation d/b/a Innovative Telephone
    Innovative Business Center
    4611 Tuto Place
    St. Thomas, U.S. Virgin Islands 00802

3.  The Government of the Virgin Islands of the United States
    1131 King Street
    Christiansted
    St. Croix, U.S. Virgin Islands 00820

4.  The Internal Revenue Service
    31 Hopkins Plaza, Room 1150
    Baltimore, Maryland 21201

5.  AT&T 800 Readyline
    P.O. Box 9001309
    Louisville, Kentucky 40290-1309

6.  Buccaneer Bay Landowners Association, Inc.
    P.O. Box 26443
    Christiansted
    U.S. Virgin Islands 00824-6443

7.  Bell Telecommunications West Indies, Ltd
    Box 7
    The Valley
    Anguilla, British West Indies

8.  RTFC
    2201 Cooperative Way
    Herndon, Virginia 20171

9.  Greenlight
    140 East 45th Street
    New York, New York 10017

10.    Banco Popular
       Attn: Ana Apoute, Branch Manager
       Hibiscus Branch
       P.O. Box 8580
       St. Thomas, Virgin Islands 00801

11.    Master-Risk, Inc.
       P.O. Box 24840
       Christiansted
       St. Croix, U.S. Virgin Islands 00824

12.    ICC Long Distance, Inc. d/b/a Innovative Long Distance
       4006 Estate Diamond
       Christiansted
       U.S. Virgin Islands 00820-4436

13.    The Sampson Firm, P.C.
       9202 West Dodge Road, Suite 307
       Omaha, Nebraska 68114

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EMERGING COMMUNICATIONS, | ) | Case No. 06-_____ (    ) |
| INC., a Delaware corporation, | ) | |
| | ) | |
| Debtor. | ) | |

## DECLARATION REGARDING CREDITOR LIST

I, Eling S. Joseph, Corporate Secretary of Emerging Communications, Inc., the company named as debtor in this case, declare under penalty of perjury under the laws of the United States of America that I have reviewed the List of Creditors submitted herewith and that it is true and correct to the best of my information and belief.

Date: July 31, 2006

_____
Eling S. Joseph
Corporate Secretary
Emerging Communications, Inc.

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | |
|---|---|
| In re: | )     Chapter 11 |
| | ) |
| EMERGING COMMUNICATIONS, | )     Case No. 06-_____ (  ) |
| INC., a Delaware corporation, | ) |
| | ) |
|           Debtor. | ) |

## LIST OF EQUITY SECURITY HOLDERS

Following is the list of the Debtor's equity security holders which is prepared in accordance with Rule 1007(a)(3) for filing in this chapter 11 case.

| | NAME AND LAST KNOWN ADDRESS OR PLACE OF BUSINESS OF HOLDER | SECURITY CLASS | NUMBER OF SECURITIES | EQUITY INTEREST |
|---|---|---|---|---|
| 1. | Innovative Communication Company, LLC<br>48A Kronprindsens Gade<br>P.O. Box 6100<br>St. Thomas, VI 00801 | Common Stock | | 52% |
| 2. | Innovative Communication Subsidiary Company, LLC<br>48A Kronprindsens Gade<br>P.O. Box 6100<br>St. Thomas, VI 00801 | Common Stock | | 48% |

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **EMERGING COMMUNICATIONS,** | ) | **Case No. 06-_____ (   )** |
| **INC., a Delaware corporation,** | ) | |
| | ) | |
| Debtor. | ) | |

### DECLARATION REGARDING LIST OF EQUITY SECURITY HOLDERS

I, Eling S. Joseph, Corporate Secretary of Emerging Communications, Inc., the company named as debtor in this case, declare under penalty of perjury under the laws of the United States of America that I have reviewed the List of Equity Security Holders submitted herewith and that it is true and correct to the best of my information and belief.

Date: July 31, 2006

Eling S. Joseph
Corporate Secretary
Emerging Communications, Inc.

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **EMERGING COMMUNICATIONS,** | ) | **Case No. 06-_____ (   )** |
| **INC., a Delaware corporation,** | ) | |
| | ) | |
| Debtor. | ) | |

## CORPORATE OWNERSHIP STATEMENT

Pursuant to Federal Rules of Bankruptcy Procedure 1007(a)(1) and 7007.1, Emerging Communications, Inc. ("Emerging") advises the Court that Innovative Communication Company, LLC directly owns 52% of Emerging's equity interests and indirectly owns 48% of Emerging's equity interests. Additionally, Innovative Communication Subsidiary Company, LLC[1] directly owns 48% of Emerging's equity interests.

---

[1] Innovative Communication Subsidiary Company, LLC's equity interests are 100% owned by Innovative Communication Company, LLC.

RLF1-3040980-2

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **EMERGING COMMUNICATIONS,** | ) | **Case No. 06-_____ (   )** |
| **INC., a Delaware corporation,** | ) | |
| | ) | |
| **Debtor.** | ) | |

## DECLARATION REGARDING CORPORATE OWNERSHIP STATEMENT

I, Eling S. Joseph, Corporate Secretary of Emerging Communications, Inc., the company named as debtor in this case, declare under penalty of perjury under the laws of the United States of America that I have reviewed the Corporate Ownership Statement submitted herewith and that it is true and correct to the best of my information and belief.

Date: July 31, 2006

Eling S. Joseph
Corporate Secretary
Emerging Communications, Inc.

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **EMERGING COMMUNICATIONS,** | ) | **Case No. 06-_____ (   )** |
| **INC., a Delaware Corporation** | ) | |
| | ) | |
| **Debtor.** | ) | |

## CERTIFICATION OF RESOLUTIONS

The undersigned, being the Corporate Secretary of Emerging Communications, Inc., a Delaware corporation (the "Company"), (a) does hereby certify that on July 26, 2006, pursuant to the Amended and Restated By Laws of Emerging Communications, Inc. and the laws of the State of Delaware, at a duly noticed special meeting of the Directors of the Company, the following resolutions (the "Resolutions") were duly adopted. The Resolutions have not been modified or rescinded and they are still in full force and effect as of the date hereof:

**RESOLVED,** that in the judgment of the Directors, it is in the best interests of the Company, its creditors, employees and other interested parties that a petition be filed by the Company seeking relief under the provisions of chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532, (the "Bankruptcy Code"); and

**FURTHER RESOLVED:** that each of the officers and acting officers of the Company (each an "Authorized Officer," and together the "Authorized Officers"), and any of them, be and hereby is, authorized and directed on behalf of the Company to (a) execute and verify a petition to commence a case under chapter 11 of the Bankruptcy Code, as well as all other ancillary documents, and to cause the same to be filed in the District Court of the Virgin Islands, Division of St Thomas and St. John, Bankruptcy Division; or such other court as the appropriate officer or officers of the Corporation shall determine to be appropriate, (b) perform any and all such acts as are reasonable, advisable, expedient, convenient, proper or necessary to effect any of the foregoing; and, make or cause to be made prior to execution thereof any modifications to the Petition or ancillary documents as any such Authorized Officer, in such officer's discretion, deems necessary or desirable to carry out the intent and accomplish the purposes of these resolutions (such approval to be conclusively established by the execution thereof by such Authorized Officer); (c) execute, verify and file or cause to be filed all petitions, schedules, lists, motions, applications and other papers or documents (including cash collateral agreements) necessary or desirable in connection with the foregoing; and (d) execute and verify any and all other documents necessary or appropriate (the "Chapter 11 Papers") in connection with the chapter 11 case in such form or forms as any such Authorized Officer may approve;

**FURTHER RESOLVED,** that the Authorized Officers of the Company shall be, and each of them hereby is, authorized, directed and empowered to retain, on behalf of the Company: (a) Richards, Layton & Finger, P.A. as bankruptcy counsel for the Company for the purpose of, among other things, representing the Company in its chapter 11 case; (b) Dudley Clark & Chan, L.L.P. as local bankruptcy co-counsel for the Company for the purpose of, among other things,

representing the Company in its chapter 11 case and (c) such additional professionals, including attorneys, accountants, financial advisors, investment bankers, consultants or brokers, in each case as in such officer's or officers' judgment may be necessary in connection with the Company's chapter 11 case and other related matters, on such terms as such officer or officers shall approve;

FURTHER RESOLVED, that the law firms of Richards, Layton & Finger, P.A., Dudley Clark & Chan, L.L.P. and any additional special counsel selected by the Authorized Officers, if any, shall be, and hereby are, authorized, empowered and directed to represent the Company, as debtor and debtor in possession, in connection with any chapter 11 case commenced by or against it under the Bankruptcy Code;

FURTHER RESOLVED, that in addition to the specific authorizations heretofore conferred upon the Authorized Officers of the Company, each of the officers of the Company or their designees shall be, and each of them, acting alone, hereby is, authorized, directed and empowered, in the name of and on behalf of the Company, to take or cause to be taken any and all such further actions, to execute and deliver any and all such agreements, certificates, instruments and other documents and to pay all expenses, including filing fees, in each case as in such officer's or officers' judgment shall be necessary or desirable in order to fully carry out the intent and accomplish the purposes of the resolutions adopted herein;

FURTHER RESOLVED, that all acts lawfully done or actions lawfully taken or to be taken by any officer or officers of the Company in connection with the implementation of these resolutions are hereby in all respects ratified, confirmed and approved; and

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of July, 2006.

Date: July 26, 2006

Eling S. Joseph
Corporate Secretary
Emerging Communications, Inc.

**Exhibit 1**

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION
CONTINUATION STATEMENT OF RELATED OR COMPANION CASES**

Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor

| Name of Debtor | Case Number | Date Filed | District | Relationship | Judge |
|---|---|---|---|---|---|
| Jeffrey J. Prosser | N/A | Date hereof | U.S. Virgin Islands | Affiliate | N/A |
| Innovative Communication Company, LLC | N/A | Date hereof | U.S. Virgin Islands | Affiliate | N/A |

(Official Form 1) (10/05)                                                                                                    **FORM B1, Page 1**

| District Court of the Virgin Islands<br>Division of St. Thomas and St. John, Bankruptcy Division | Voluntary Petition |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Innovative Communication Company, LLC** | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|

| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
|---|---|

| Last four digits of Soc. Sec. No./Complete EIN or other Tax I.D. No. (if more than one, state all):<br>66-0552021 | Last four digits of Soc. Sec. No./Complete EIN or other Tax I.D. No. (if more than one, state all): |
|---|---|

| Street Address of Debtor (No. & Street, City, State):<br><br>**48A Kronprindsens Gade**    ZIP CODE **00801**<br>**P.O. Box 6100**<br>**St. Thomas, VI** | Street Address of Joint Debtor (No. & Street, City, State): |
|---|---|

| County of Residence or of the Principal Place of Business:<br>**Division of St. Thomas** | County of Residence or of the Principal Place of Business: |
|---|---|

| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |
|---|---|

Location of Principal Assets of Business Debtor (if different from street address above):

---

**Type of Debtor (Form of Organization)**
(Check one box)

☐ Individual (includes Joint Debtors)
☑ Corporation (includes LLC and LLP)
☐ Partnership
☐ Other (If debtor is not one of the above entities, check this box and provide the information requested below)

State type of entity:_____
_____

**Nature of Business**
(Check all applicable boxes.)

☐ Health Care Business
☐ Single Asset Real Estate as defined in 11 U.S.C. § 101 (51B)
☐ Railroad
☐ Stockbroker
☐ Commodity Broker
☐ Clearing Bank
☐ Nonprofit Organization qualified under 15 U.S.C. § 501(c)(3)

**Chapter of Bankruptcy Code Under Which the Petition is Filed (Check one box)**

☐ Chapter 7         ☑ Chapter 11         ☐ Chapter 15 Petition for Recognition of a Foreign Main Proceeding
☐ Chapter 9         ☐ Chapter 12

☐ Chapter 13         ☐ Chapter 15 Petition for Recognition of a Foreign Nonmain Proceeding

**Nature of Debts (Check one box)**
☐ Consumer/Non-Business         ☑ Business

---

**Filing Fee (Check one box)**

☑ Full Filing Fee attached
☐ Filing Fee to be paid in installments (Applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form No. 3A
☐ Filing Fee waiver requested *Applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B.

**Statistical/Administrative Information**

☒ Debtor estimates that funds will be available for distribution to unsecured creditors.

☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

**Chapter 11 Debtors**

Check one box:

☐ Debtor is a small business as defined in 11 U.S.C. § 101(51D)

☑ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Check if:

☐ Debtor's aggregate noncontingent liquidated debts owed to non-insiders or affiliates are less than $2 million.

---

**Estimated Number of Creditors[1]**

| 1-49 | 50-99 | 100-199 | 200-999 | 1,000-5,000 | 5,001-10,000 | 10,001-25,000 | 25,001-50,000 | 50,001-100,000 | OVER 100,000 | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|---|---|---|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | |

**Estimated Assets**

| $0 to $50,000 | $50,001 to $100,000 | 100,001 to $500,000 | 500,001 to $1 million | 1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

**Estimated Debts**

| $0 to $50,000 | $50,001 to $100,000 | 100,001 to $500,000 | 500,001 to $1 million | 1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

---

[1] The statistical information set forth herein is based on the consolidated financial information of Debtor and its affiliates identified on Exhibit 1 hereto.

RLF1-3040962-2

(Official Form 1) (10/05)                                                                                                    FORM B1, Page 2

| Voluntary Petition<br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>**Innovative Communication Company, LLC** | |
|---|---|---|
| **Prior Bankruptcy Case Filed Within Last 8 Years** (If more than one, attach additional sheet) | | |
| Where Filed: United States Bankruptcy Court for the District of Delaware | Case Number: 06-10133 (JKF)<br>(Involuntary) | Date Filed: February 10, 2006 |
| **Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor** (If more than one, attach additional sheet) | | |
| Name of Debtor:<br>SEE ATTACHED - <u>EXHIBIT 1</u> | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

| Exhibit A | Exhibit B |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐   Exhibit A is attached and made a part of this petition. | (To be completed if debtor is an individual<br>whose debts are primarily consumer debts)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I delivered to the debtor the notice required by § 342(b) of the Bankruptcy Code.<br><br>X _____<br>    Signature of Attorney for Debtor(s)              Date |

| Exhibit C | Certification Concerning Debt Counseling<br>by Individual/Joint Debtor(s) |
|---|---|
| Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?<br><br>☐   Yes, and Exhibit C is attached and made a part of this petition.<br><br>☑   No | ☐  I/we have received approved budget and credit counseling during the 180-day period preceding the filing of this petition.<br><br>☐  I/we request a waiver of the requirement to obtain budget and credit counseling prior to filing based on exigent circumstances. (Must attach certification describing.) |

**Information Regarding the Debtor (Check the Applicable Boxes)**
**Venue (Check any applicable box)**

☐  Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☑  There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐  Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Statement by a Debtor Who Resides as a Tenant of Residential Property**
*Check all applicable boxes.*

☐  Landlord has a judgment against the debtor for possession of debtor's resident. (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐  Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐  Debtor has included in this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

(Official Form 1) (10/05)    **FORM B1, Page 3**

| Voluntary Petition *(This page must be completed and filed in every case)* | Name of Debtor(s): Innovative Communication Company, LLC |
|---|---|

| Signatures | |
|---|---|

| **Signature(s) of Debtor(s) (Individual/Joint)** | **Signature of a Foreign Representative** |
|---|---|

**Signature(s) of Debtor(s) (Individual/Joint)**

I declare under penalty of perjury that the information provided in this petition is true and correct.
[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.
[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by § 342(b) of the Bankruptcy Code.
I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Debtor

X _____
Signature of Joint Debtor

_____
Telephone Number (if not represented by attorney)

_____
Date

**Signature of a Foreign Representative**

I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.
(Check only one box.)

☐  I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by § 1515 of title 11 are attached.

☐  Pursuant to § 1515 of title 11, United States Code, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.

X _____
(Signature of Foreign Representative)

_____
(Printed Name of Foreign Representative)

_____
Date

**Signature of Attorney**

X _____
Signature of Attorney for Debtor(s)
Carol Ann Rich
Printed Name of Attorney for Debtor(s)
Dudley Clark & Chan, LLP
Firm Name
9720 Estate Thomas, Havensight
Address
St. Thomas, Virgin Islands 00802
(340) 776-7474
Telephone Number
July 31, 2006
Date

**Signature of Non-Attorney Bankruptcy Petition Preparer**

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19B is attached.

_____
Printed Name and title, if any, of Bankruptcy Petition Preparer

_____
Social Security Number (If the bankruptcy petition preparer is not an individual, state the Social Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)

_____
Address

X _____

_____
Date

**Signature of Debtor (Corporation/Partnership)**

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.
The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Authorized Individual
Eling S. Joseph

_____
Printed Name of Authorized Individual
Secretary

_____
Title of Authorized Individual
July 31, 2006
Date

Signature of Bankruptcy Petition Preparer or officer, principal, responsible person, or partner whose social security number is provided above.
Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. § 110; 18 U.S.C. § 156.*

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INNOVATIVE COMMUNICATION CO., a Delaware LLC, | ) | Case No. 06-_____ (   ) |
| | ) | |
| Debtor. | ) | |

## LIST OF CREDITORS HOLDING LARGEST UNSECURED CLAIM

The debtor in this chapter 11 case (the "Debtor") filed a voluntary petition in this Court on July 31, 2006 for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532. The following is a list of the Debtor's largest unsecured creditors (the "Top Creditor List"), based on the Debtor's books and records as of approximately July 31, 2006. The Top Creditor List was prepared in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure for filing in the Debtor's chapter 11 case. The Top Creditor List does not include: (1) persons who come within the definition of an "insider" set forth in 11 U.S.C. § 101(31); nor (2) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the largest unsecured claims. The information presented in the Top Creditor List shall not constitute an admission by, nor is it binding on, the Debtor. The failure of the Debtor to list a claim as contingent, unliquidated or disputed does not constitute a waiver of the Debtor's right to contest the validity, priority, and/or amount of any such claim.

| Name, Address, Phone and Fax No. of Creditor | Nature of Claim | Contingent, unliquidated, disputed or subject to setoff | Approximate Amount of Claim |
|---|---|---|---|
| Greenlight<br>140 East 45th Street<br>New York, NY  10017 | Secured Judgment Deficiency | Disputed | Unliquidated |
| Orrick, Herrington & Sutcliffe LLP<br>Washington Harbour<br>3050 K Street, NW<br>Washington, DC  20007-5135<br>Tel: 202-339-8400<br>Fax: 202-339-8500 | Professional Services | | $300,000.00 |
| Sampson Firm<br>9202 West Dodge Road, Suite 307<br>Omaha, NE  68114<br>Tel: 402-934-7654 | Professional Services | | $30,150.00 |

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **INNOVATIVE COMMUNICATION** | ) | **Case No. 06-_____ (   )** |
| **CO., a Delaware LLC,** | ) | |
| | ) | |
| Debtor. | ) | |

### DECLARATION UNDER PENALTY OF PERJURY

I, Eling S. Joseph, Secretary of Innovative Communication Company, LLC, the company named as debtor in this case, declare under penalty of perjury under the laws of the United States of America that I have reviewed the List of Creditors Holding Largest Unsecured Claims submitted herewith and that it is true and correct to the best of my information and belief.

Date: July 31, 2006

Eling S. Joseph
Secretary
Innovative Communication Company, LLC

RLF1-3040962-2

### IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **INNOVATIVE COMMUNICATION** | ) | **Case No. 06-_____ (   )** |
| **CO., a Delaware LLC,** | ) | |
| | ) | |
| Debtor. | ) | |

### LIST OF CREDITORS

A list of the above-captioned debtor's (the "Debtor") creditors in accordance with Federal Rule of Bankruptcy Procedure 1007(a) is filed by attachment hereto.

The list has been prepared on a consolidated basis from the books and records of the Debtor and the Debtor's affiliates listed on Exhibit 1. The list contains only those creditors whose names and addresses were maintained in the databases of the Debtor and its affiliates or were otherwise readily ascertainable by the Debtor prior to the commencement of this case. The schedules of liabilities to be subsequently filed should be consulted for a list of the Debtor's creditors that is comprehensive and current as of the date of the commencement of this case.

Certain of the creditors listed may not hold outstanding claims against the Debtor as of the date hereof and, therefore, may not be creditors for purposes of this case. By filing the attached list, the Debtor in no way waives or prejudices its right to object to the extent, validity or enforceability of the claims, if any, held by the parties identified therein.

## CREDITOR LIST

1.  Greenlight
    140 East 45th Street
    New York, New York 10017

2.  Rural Telephone Finance Cooperative
    2201 Cooperative Way
    Herndon, Virginia 20171

3.  ICC-Corp.
    56-58 Hill Street
    P.O. Box 1730
    Christiansted
    St. Croix, U.S. Virgin Islands 00821

4.  Orrick, Herrington & Sutcliffe LLP
    Washington Harbour
    3050 K Street, N.W.
    Washington, D.C. 20007-5135

5.  Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
    Museum Tower
    150 West Flagler Street
    Miami, Florida 33130

6.  Atlantic Aircraft, Inc.
    56-58 Hill Streeet
    St Croix, U.S. Virgin Islands 00821

7.  Dallas County
    c/o Linebarger Goggan Blair & Sampson LLP
    2323 Bryan Street, Suite 1600
    Dallas, Texas 75201

8.  The Sampson Firm, P.C.
    9202 West Dodge Road, Suite 307
    Omaha, Nebraska 68114

RLF1-3040962-2

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INNOVATIVE COMMUNICATION | ) | Case No. 06-_____ (    ) |
| CO., a Delaware LLC, | ) | |
| | ) | |
| Debtor. | ) | |

## DECLARATION REGARDING CREDITOR LIST

    I, Eling S. Joseph, Secretary of Innovative Communication Company, LLC, the company named as debtor in this case, declare under penalty of perjury under the laws of the United States of America that I have reviewed the List of Creditors submitted herewith and that it is true and correct to the best of my information and belief.

Date: July 31, 2006

_____
Eling S. Joseph
Secretary
Innovative Communication Company, LLC

RLF1-3040962-2

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INNOVATIVE COMMUNICATION CO., a Delaware LLC, | ) | Case No. 06-_____ ( ) |
| | ) | |
| | ) | |
| Debtor. | ) | |

## LIST OF EQUITY SECURITY HOLDERS

Following is the list of the Debtor's equity security holders which is prepared in accordance with Rule 1007(a)(3) for filing in this chapter 11 case.

| | NAME AND LAST KNOWN ADDRESS OR PLACE OF BUSINESS OF HOLDER | SECURITY CLASS | NUMBER OF SECURITIES | EQUITY INTEREST |
|---|---|---|---|---|
| 1. | Jeffrey J. Prosser | Common Stock | | 100% |

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **INNOVATIVE COMMUNICATION** | ) | **Case No. 06-_____ (   )** |
| **CO., a Delaware LLC,** | ) | |
| | ) | |
| Debtor. | ) | |

## DECLARATION REGARDING LIST OF EQUITY SECURITY HOLDERS

I, Eling S. Joseph, Secretary of Innovative Communication Company, LLC, the company named as debtor in this case, declare under penalty of perjury under the laws of the United States of America that I have reviewed the List of Equity Security Holders submitted herewith and that it is true and correct to the best of my information and belief.


Date:  July 31, 2006                    _____
                                                         Eling S. Joseph
                                                         Secretary
                                                         Innovative Communication Company, LLC

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **INNOVATIVE COMMUNICATION** | ) | **Case No. 06-_____ (   )** |
| **CO., a Delaware LLC,** | ) | |
| | ) | |
| Debtor. | ) | |

## CORPORATE OWNERSHIP STATEMENT

Pursuant to Federal Rules of Bankruptcy Procedure 1007(a)(1) and 7007.1, Innovative Communications Company, LLC ("ICC-LLC") advises the Court that there are no corporation(s), that directly or indirectly own 10% or more of ICC-LLC's equity interests.

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **INNOVATIVE COMMUNICATION** | ) | **Case No. 06-_____ (   )** |
| **CO., a Delaware LLC,** | ) | |
| | ) | |
| Debtor. | ) | |

## DECLARATION REGARDING CORPORATE OWNERSHIP STATEMENT

I, Eling S. Joseph, Secretary of Innovative Communication Company, LLC, the company named as debtor in this case, declare under penalty of perjury under the laws of the United States of America that I have reviewed the Corporate Ownership Statement submitted herewith and that it is true and correct to the best of my information and belief.


Date: July 31, 2006

Eling S. Joseph
Secretary
Innovative Communication Company LLC

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **INNOVATIVE COMMUNICATION** | ) | **Case No. 06-_____ (   )** |
| **CO., a Delaware LLC** | ) | |
| | ) | |
| Debtor. | ) | |

## CERTIFICATION OF RESOLUTIONS

The undersigned, being the Secretary of Innovative Communication Company, LLC, a Delaware limited liability company (the "Company"), (a) does hereby certify that on July 26, 2006, pursuant to the Limited Liability Company Agreement and the laws of the State of Delaware, at a duly noticed special meeting of the Members of the Company, the following resolutions (the "Resolutions") were duly adopted. The Resolutions have not been modified or rescinded and they are still in full force and effect as of the date hereof:

**RESOLVED,** that in the judgment of the Members, it is in the best interests of the Company, its creditors, employees and other interested parties that a petition be filed by the Company seeking relief under the provisions of chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532, (the "Bankruptcy Code"); and

**FURTHER RESOLVED:** that each of the officers and acting officers of the Company (each an "Authorized Officer," and together the "Authorized Officers"), and any of them, be and hereby is, authorized and directed on behalf of the Company to (a) execute and verify a petition to commence a case under chapter 11 of the Bankruptcy Code, as well as all other ancillary documents, and to cause the same to be filed in the District Court of the Virgin Islands, Division of St Thomas and St. John, Bankruptcy Division; or such other court as the appropriate officer or officers of the Corporation shall determine to be appropriate, (b) perform any and all such acts as are reasonable, advisable, expedient, convenient, proper or necessary to effect any of the foregoing; and, make or cause to be made prior to execution thereof any modifications to the Petition or ancillary documents as any such Authorized Officer, in such officer's discretion, deems necessary or desirable to carry out the intent and accomplish the purposes of these resolutions (such approval to be conclusively established by the execution thereof by such Authorized Officer); (c) execute, verify and file or cause to be filed all petitions, schedules, lists, motions, applications and other papers or documents (including cash collateral agreements) necessary or desirable in connection with the foregoing; and (d) execute and verify any and all other documents necessary or appropriate (the "Chapter 11 Papers") in connection with the chapter 11 case in such form or forms as any such Authorized Officer may approve;

**FURTHER RESOLVED,** that the Authorized Officers of the Company shall be, and each of them hereby is, authorized, directed and empowered to retain, on behalf of the Company: (a) Richards, Layton & Finger, P.A. as bankruptcy counsel for the Company for the purpose of, among other things, representing the Company in its chapter 11 case; (b) Dudley Clark & Chan, L.L.P. as local bankruptcy co-counsel for the Company for the purpose of, among other things,

representing the Company in its chapter 11 case and (c) such additional professionals, including attorneys, accountants, financial advisors, investment bankers, consultants or brokers, in each case as in such officer's or officers' judgment may be necessary in connection with the Company's chapter 11 case and other related matters, on such terms as such officer or officers shall approve;

      **FURTHER RESOLVED**, that the law firms of Richards, Layton & Finger, P.A., Dudley Clark & Chan, L.L.P. and any additional special counsel selected by the Authorized Officers, if any, shall be, and hereby are, authorized, empowered and directed to represent the Company, as debtor and debtor in possession, in connection with any chapter 11 case commenced by or against it under the Bankruptcy Code;

      **FURTHER RESOLVED**, that in addition to the specific authorizations heretofore conferred upon the Authorized Officers of the Company, each of the officers of the Company or their designees shall be, and each of them, acting alone, hereby is, authorized, directed and empowered, in the name of and on behalf of the Company, to take or cause to be taken any and all such further actions, to execute and deliver any and all such agreements, certificates, instruments and other documents and to pay all expenses, including filing fees, in each case as in such officer's or officers' judgment shall be necessary or desirable in order to fully carry out the intent and accomplish the purposes of the resolutions adopted herein;

      **FURTHER RESOLVED**, that all acts lawfully done or actions lawfully taken or to be taken by any officer or officers of the Company in connection with the implementation of these resolutions are hereby in all respects ratified, confirmed and approved; and

      IN WITNESS WHEREOF, I have hereunto set my hand this   26th   day of July, 2006.

Date: July 26, 2006

                         Eling S. Joseph
                         Secretary
                         Innovative Communication Company LLC

# **Exhibit 1**

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION
CONTINUATION STATEMENT OF RELATED OR COMPANION CASES

Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor

| Name of Debtor | Case Number | Date Filed | District | Relationship | Judge |
|---|---|---|---|---|---|
| Jeffrey J. Prosser | N/A | Date hereof | U.S. Virgin Islands | Affiliate | N/A |
| Emerging Communications, Inc. | N/A | Date hereof | U.S. Virgin Islands | Affiliate | N/A |

| **FORM B1**<br>**(12/03)** | **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF VIRGIN ISLANDS** | **Voluntary Petition** |
|---|---|---|

| Name of debtor (if individual, enter Last, First, Middle):<br>Prosser, Jeffrey J. | Name of Joint Debtor (Spouse)(Last, First, Middle)<br>, |
|---|---|
| All Other Names used by the Debtor in the last 6 years<br>(include married, maiden, and trade names): None | All Other Names used by the Joint Debtor in the last 6 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec./Complete EIN or other Tax ID No. (if more than one, state all): 9304 | Last four digits of Soc. Sec./Complete EIN or other Tax ID No.. (if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State, & Zip Code)<br>4A & 10AA Estate Shoys , St Croix, Virgin Islands 00820 | Street Address of Joint Debtor (No. & St., City, State & Zip Code) |
| County of Residence or of the<br>Principal Place of Business: | County of Residence or of the<br>Principal Place of Business: |
| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |

Location of Principal Assets of Business Debtor
(if different from street address above):

### Information Regarding the Debtor (Check the Applicable Boxes)

**Venue:** (Check any applicable box)

☒ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

| **Type of Debtor** (Check all boxes that apply)<br>☒ Individual(s)  ☐ Railroad<br>☐ Corporation  ☐ Stockbroker<br>☐ Partnership  ☐ Commodity Broker<br>☐ Other _____  ☐ Clearing Bank | **Chapter or Section of Bankruptcy Code Under Which**<br>**the Petition is filed** (Check one box)<br>☐ Chapter 7  ☒ Chapter 11  ☐ Chapter 13<br>☐ Chapter 9  ☐ Chapter 12<br>☐ Sec. 304- Case ancillary to foreign proceeding |
|---|---|

| **Nature of Debts** (Check one box)<br>☐ Consumer/Non-Business ☒ Business<br><br>**Chapter 11 Small Business** (Check all boxes that apply)<br>☐ Debtor is a small business as defined in 11 U.S.C. ' 101<br>☐ Debtor is and elects to be considered a small business under<br>11 U.S.C. ' 1121(e)(Optional) | ☒ **Filing Fee** (Check one box)<br>☒ Full Filing Fee attached<br>☐ Filing Fee to be paid in installments (Applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments.<br>Rule 1006(e). See Official Form No. 3. |
|---|---|

**Statistical/Administrative Information** (estimates only)

☒ Debtor estimates that funds will be available for distribution to unsecured creditors.

☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

THIS SPACE IS FOR COURT USE ONLY

Estimated Number of Creditors

| 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

Estimated Assets

| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

Estimated Debts

| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

Form Published by: Law Disks, 734 Franklin Avenue, Garden City, NY 11530    www.lawdisks.com

| **Voluntary Petition** | Name of Debtor(s): | FORM B1, Page 2 |
|---|---|---|
| (This page must be completed and filed in every case.) | Prosser , Jeffrey J. | |

| Prior Bankruptcy Case Filed Within the last 6 Years (if more than one, attach additional sheet.) | | |
|---|---|---|
| Location | Case Number: | Date Filed: |
| Where filed: Delaware | 06-10135-Involuntary | 2/10/06 |

| Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor (if more than one, attach additional sheet) | | |
|---|---|---|
| Name of Debtor: See Attached List | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

## Signatures

**Signature(s) of Debtor(s) (Individual/Joint)**

I declare under penalty of perjury that the information provided in this petition is true and correct.  [If the petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter  7 .

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X /s/Jeffrey J. Prosser
  Jeffrey J. Prosser , Debtor

X
  , Joint Debtor

  Telephone Number (If not represented by attorney)

  July 31, 2006
  Date

**Exhibit A**

(To be completed if the Debtor is required to file periodic reports (e.g., forms 10K and 10Q with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)

☐     Exhibit A is attached and made a part of this petition.

**Exhibit B**

(To be completed if Debtor is an individual whose debts are primarily consumer debts.)

I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter.

X
  , Attorney for Debtor(s)          Date

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐  Yes, and Exhibit C is attached and made part of this petition.
☐  No

**Signature of Attorney**

X    /s/ Thomas Alkon
  Signature of Attorney for Debtor(s)
  Print below: Attorney Name, Code, Firm, Address, Telephone No:
  Bar Number/Code: 575

Thomas Alkon
Thomas Alkon, PC
2115 Queen Street
Christiansted, St. Croix 00820
340-773-3305

  July 31, 2006
  Date

**Signature of Debtor (Corporation/Partnership)**

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X
  Signature of Authorized Individual

  Printed Name of Authorized Individual

**Signature of Non-Attorney Petition Preparer**

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

  Printed Name of Bankruptcy Petition Preparer

  Social Security Number (required by 11 U.S.C. § 110(c))

  Address

Name and Social Security Numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X
  Signature of Bankruptcy Petition Preparer          Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. '110; 18 U.S.C. '156.

[Publisher's Note: This form is NOT intended to be used by nonattorney bankruptcy-petition preparers: Schedules do not contain all disclosures required for use by nonattorney bankruptcy-petition preparers.]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF VIRGIN ISLANDS

IN RE:                          )
                                )    Voluntary Chapter 11
    JEFFREY J. PROSSER      )
                                )    Case No. 06 –
        DEBTOR          )
_____ )

## AFFILIATED BANKRUPTICES

| DEBTOR | CASE NO./DATE FILED | JUDGE/DISTRICT | RELATIONSHIP |
|---|---|---|---|
| Innovative Communication Company, LLC | 06-10133/Involuntary/2-10-06 | Fitzgerald /Delaware | AFFILIATE |
| Emerging Communications, Inc. | 06-10134/Involuntary/2-10-06 | Fitzgerald Delaware | AFFILIATE |

_____

_____

_____

Dated this 31st day of July, 2006.

JEFFREY J. PROSSER, Debtor

By:  __/s/ Thomas Alkon_____
    Thomas Alkon (VI #575)
    Thomas Alkon, PC
    2115 Queen Street
    Christiansted, St. Croix 00820
    Phone:  (340) 773-3305

AND

BY:  __/s/ Robert F. Craig_____
    Robert F. Craig (NE #10819)
    Jenna Taub (NE # 22725)
    Robert F. Craig, PC
    1321 Jones Street
    Omaha, NE 68102
    Phone: (402) 408-6004
    Fax: (402) 408-6001

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF VIRGIN ISLANDS

IN RE:                                )
                                      )        Voluntary Chapter 11
    JEFFREY J. PROSSER      )
                                      )        Case No. 06 –
      DEBTOR          )
_____ )

## VERIFICATION OF CREDITOR MATRIX

    The undersigned hereby verifies that the attached list of creditors is true and correct to the best of his knowledge.

Dated this 31st day of July, 2006

                    JEFFREY J. PROSSER, Debtor


                    By:  __/s/ Jeffrey J. Prosser_____

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, **Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia**

# Exhibit K

to

**National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss**

(Official Form 1) (10/05)                                                                                          **FORM B1, Page 1**

| District Court of the Virgin Islands<br>Division of St. Thomas and St. John, Bankruptcy Division | Voluntary Petition |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Innovative Communication Company, LLC** | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. No./Complete EIN or other Tax I.D. No. (if more than one, state all):<br>**66-0552021** | Last four digits of Soc. Sec. No./Complete EIN or other Tax I.D. No. (if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State):<br><br>**48A Kronprindsens Gade**<br>**P.O. Box 6100**<br>**St. Thomas, VI**    ZIP CODE **00801** | Street Address of Joint Debtor (No. & Street, City, State): |
| County of Residence or of the Principal Place of Business:<br>**Division of St. Thomas** | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |
| Location of Principal Assets of Business Debtor (if different from street address above): | |

| Type of Debtor (Form of Organization)<br>(Check one box) | Nature of Business<br>(Check all applicable boxes.) | Chapter of Bankruptcy Code Under Which the Petition is Filed (Check one box) |
|---|---|---|
| ☐ Individual (includes Joint Debtors)<br>☒ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities, check this box and provide the information requested below)<br><br>State type of entity:_____<br>_____ | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined in 11 U.S.C. § 101 (51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☐ Nonprofit Organization qualified under 15 U.S.C. § 501(c)(3) | ☐ Chapter 7    ☒ Chapter 11    ☐ Chapter 15 Petition for<br>☐ Chapter 9    ☐ Chapter 12        Recognition of a Foreign<br>                                                Main Proceeding<br><br>        ☐ Chapter 13                ☐ Chapter 15 Petition for<br>                                                Recognition of a Foreign<br>                                                Nonmain Proceeding |

| | Nature of Debts (Check one box) |
|---|---|
| | ☐ Consumer/Non-Business        ☒ Business |

| Filing Fee (Check one box) | Chapter 11 Debtors |
|---|---|
| ☒ Full Filing Fee attached<br>☐ Filing Fee to be paid in installments (Applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form No. 3A<br>☐ Filing Fee waiver requested *Applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B. | Check one box:<br><br>☐ Debtor is a small business as defined in 11 U.S.C. § 101(51D)<br><br>☒ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>Check if: |
| **Statistical/Administrative Information**<br><br>☒ Debtor estimates that funds will be available for distribution to unsecured creditors.<br><br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors. | ☐ Debtor's aggregate noncontingent liquidated debts owed to non-insiders or affiliates are less than $2 million. |

| Estimated Number of Creditors[1] | | | | | | | | | | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|---|---|---|---|---|---|---|---|
| 1-<br>49 | 50-<br>99 | 100-<br>199 | 200-<br>999 | 1,000-<br>5,000 | 5,001-<br>10,000 | 10,001-<br>25,000 | 25,001<br>50,000 | 50,001-<br>100,000 | OVER<br>100,000 | |
| ☒ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | |

| Estimated Assets | | | | | | | |
|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | 100,001 to<br>$500,000 | 500,001 to<br>$1 million | 1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

| Estimated Debts | | | | | | | |
|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | 100,001 to<br>$500,000 | 500,001 to<br>$1 million | 1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

---

[1] The statistical information set forth herein is based on the consolidated financial information of Debtor and its affiliates identified on Exhibit 1 hereto.

RLF1-3040962-2

(Official Form 1) (10/05)                                                                                      FORM B1, Page 2

| Voluntary Petition<br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>**Innovative Communication Company, LLC** | |
|---|---|---|
| colspan="3" | **Prior Bankruptcy Case Filed Within Last 8 Years** (If more than one, attach additional sheet) |
| Where Filed: United States Bankruptcy Court for the District of Delaware | Case Number: 06-10133 (JKF)<br>(Involuntary) | Date Filed: February 10, 2006 |

| Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor (If more than one, attach additional sheet) | | |
|---|---|---|
| Name of Debtor:<br>SEE ATTACHED - UNDERLINE EXHIBIT 1 | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

| Exhibit A | Exhibit B |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐  Exhibit A is attached and made a part of this petition. | (To be completed if debtor is an individual<br>whose debts are primarily consumer debts)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I delivered to the debtor the notice required by § 342(b) of the Bankruptcy Code.<br><br>X _____<br>Signature of Attorney for Debtor(s)            Date |

| Exhibit C | Certification Concerning Debt Counseling<br>by Individual/Joint Debtor(s) |
|---|---|
| Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?<br><br>☐  Yes, and Exhibit C is attached and made a part of this petition.<br>☑  No | ☐  I/we have received approved budget and credit counseling during the 180-day period preceding the filing of this petition.<br><br>☐  I/we request a waiver of the requirement to obtain budget and credit counseling prior to filing based on exigent circumstances. (Must attach certification describing.) |

| Information Regarding the Debtor (Check the Applicable Boxes)<br>Venue (Check any applicable box) |
|---|
| ☐  Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District. |
| ☑  There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District. |
| ☐  Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District. |

| Statement by a Debtor Who Resides as a Tenant of Residential Property<br>*Check all applicable boxes.* |
|---|
| ☐  Landlord has a judgment against the debtor for possession of debtor's resident. (If box checked, complete the following.)<br><br>_____<br>(Name of landlord that obtained judgment)<br><br><br>_____<br>(Address of landlord) |
| ☐  Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and |
| ☐  Debtor has included in this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition. |

RLF1-3040962-2

(Official Form 1) (10/05)                                                                     FORM B1, Page 3

| Voluntary Petition<br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>Innovative Communication Company, LLC |
|---|---|

| Signatures | |
|---|---|

| **Signature(s) of Debtor(s) (Individual/Joint)**<br>I declare under penalty of perjury that the information provided in this petition is true and correct.<br>[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.<br>[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by § 342(b) of the Bankruptcy Code.<br>I request relief in accordance with the chapter of title 11, United States Code, specified in this petition. | **Signature of a Foreign Representative**<br>I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.<br>(Check only one box.)<br><br>☐ I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by § 1515 of title 11 are attached.<br>☐ Pursuant to § 1515 of title 11, United States Code, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached. |
|---|---|
| X _____<br>   Signature of Debtor<br>X _____<br>   Signature of Joint Debtor<br><br>_____<br>   Telephone Number (if not represented by attorney)<br><br>_____<br>   Date | X _____<br>   (Signature of Foreign Representative)<br><br>_____<br>   (Printed Name of Foreign Representative)<br><br>_____<br>   Date |

| X _____<br>   **Signature of Attorney**<br>   Signature of Attorney for Debtor(s)<br>   Carol Ann Rich<br>   Printed Name of Attorney for Debtor(s)<br>   Dudley Clark & Chan, LLP<br>   Firm Name<br>   9720 Estate Thomas, Havensight<br>   Address<br>   St. Thomas, Virgin Islands 00802<br>   (340) 776-7474<br>   Telephone Number<br>   July 31, 2006<br>   Date | **Signature of Non-Attorney Bankruptcy Petition Preparer**<br>I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19B is attached.<br><br>_____<br>Printed Name and title, if any, of Bankruptcy Petition Preparer |
|---|---|

| **Signature of Debtor (Corporation/Partnership)**<br>I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.<br>The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _____<br>   Signature of Authorized Individual<br>   Eling S. Joseph<br><br>   Printed Name of Authorized Individual<br>   Secretary<br><br>   Title of Authorized Individual<br>   July 31, 2006<br>   Date | Social Security Number (If the bankruptcy petition preparer is not an individual, state the Social Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)<br><br>_____<br>Address<br>_____<br>_____<br><br>X _____<br>_____<br>Date<br>Signature of Bankruptcy Petition Preparer or officer, principal, responsible person, or partner whose social security number is provided above.<br>Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual:<br><br>If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.<br><br>*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. § 110; 18 U.S.C. § 156.* |
|---|---|

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **INNOVATIVE COMMUNICATION** | ) | Case No. 06-_____ (   ) |
| **CO., a Delaware LLC,** | ) | |
| | ) | |
| Debtor. | ) | |

### LIST OF CREDITORS HOLDING LARGEST UNSECURED CLAIM

The debtor in this chapter 11 case (the "Debtor") filed a voluntary petition in this Court on July 31, 2006 for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532.  The following is a list of the Debtor's largest unsecured creditors (the "Top Creditor List"), based on the Debtor's books and records as of approximately July 31, 2006.  The Top Creditor List was prepared in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure for filing in the Debtor's chapter 11 case.  The Top Creditor List does not include:  (1) persons who come within the definition of an "insider" set forth in 11 U.S.C. § 101(31); nor (2) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the largest unsecured claims.  The information presented in the Top Creditor List shall not constitute an admission by, nor is it binding on, the Debtor.  The failure of the Debtor to list a claim as contingent, unliquidated or disputed does not constitute a waiver of the Debtor's right to contest the validity, priority, and/or amount of any such claim.

| Name, Address, Phone and Fax No. of Creditor | Nature of Claim | Contingent, unliquidated, disputed or subject to setoff | Approximate Amount of Claim |
|---|---|---|---|
| Greenlight<br>140 East 45th Street<br>New York, NY  10017 | Secured Judgment Deficiency | Disputed | Unliquidated |
| Orrick, Herrington & Sutcliffe LLP<br>Washington Harbour<br>3050 K Street, NW<br>Washington, DC  20007-5135<br>Tel: 202-339-8400<br>Fax: 202-339-8500 | Professional Services | | $300,000.00 |
| Sampson Firm<br>9202 West Dodge Road, Suite 307<br>Omaha, NE  68114<br>Tel: 402-934-7654 | Professional Services | | $30,150.00 |

# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **INNOVATIVE COMMUNICATION** | ) | **Case No. 06-_____ (    )** |
| **CO., a Delaware LLC,** | ) | |
| | ) | |
| Debtor. | ) | |

## DECLARATION UNDER PENALTY OF PERJURY

I, Eling S. Joseph, Secretary of Innovative Communication Company, LLC, the company named as debtor in this case, declare under penalty of perjury under the laws of the United States of America that I have reviewed the List of Creditors Holding Largest Unsecured Claims submitted herewith and that it is true and correct to the best of my information and belief.

Date: July 31, 2006

Eling S. Joseph
Secretary
Innovative Communication Company, LLC

RLF1-3040962-2

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **INNOVATIVE COMMUNICATION** | ) | **Case No. 06-_____ (   )** |
| **CO., a Delaware LLC,** | ) | |
| | ) | |
| Debtor. | ) | |

## LIST OF CREDITORS

A list of the above-captioned debtor's (the "Debtor") creditors in accordance with Federal Rule of Bankruptcy Procedure 1007(a) is filed by attachment hereto.

The list has been prepared on a consolidated basis from the books and records of the Debtor and the Debtor's affiliates listed on Exhibit 1. The list contains only those creditors whose names and addresses were maintained in the databases of the Debtor and its affiliates or were otherwise readily ascertainable by the Debtor prior to the commencement of this case. The schedules of liabilities to be subsequently filed should be consulted for a list of the Debtor's creditors that is comprehensive and current as of the date of the commencement of this case.

Certain of the creditors listed may not hold outstanding claims against the Debtor as of the date hereof and, therefore, may not be creditors for purposes of this case. By filing the attached list, the Debtor in no way waives or prejudices its right to object to the extent, validity or enforceability of the claims, if any, held by the parties identified therein.

**CREDITOR LIST**

1.  Greenlight
    140 East 45th Street
    New York, New York 10017

2.  Rural Telephone Finance Cooperative
    2201 Cooperative Way
    Herndon, Virginia 20171

3.  ICC-Corp.
    56-58 Hill Street
    P.O. Box 1730
    Christiansted
    St. Croix, U.S. Virgin Islands 00821

4.  Orrick, Herrington & Sutcliffe LLP
    Washington Harbour
    3050 K Street, N.W.
    Washington, D.C. 20007-5135

5.  Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
    Museum Tower
    150 West Flagler Street
    Miami, Florida 33130

6.  Atlantic Aircraft, Inc.
    56-58 Hill Streeet
    St Croix, U.S. Virgin Islands 00821

7.  Dallas County
    c/o Linebarger Goggan Blair & Sampson LLP
    2323 Bryan Street, Suite 1600
    Dallas, Texas 75201

8.  The Sampson Firm, P.C.
    9202 West Dodge Road, Suite 307
    Omaha, Nebraska 68114

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **INNOVATIVE COMMUNICATION** | ) | **Case No. 06-_____ (   )** |
| **CO., a Delaware LLC,** | ) | |
| | ) | |
| Debtor. | ) | |

**DECLARATION REGARDING CREDITOR LIST**

I, Eling S. Joseph, Secretary of Innovative Communication Company, LLC, the company named as debtor in this case, declare under penalty of perjury under the laws of the United States of America that I have reviewed the List of Creditors submitted herewith and that it is true and correct to the best of my information and belief.

Date: July 31, 2006

_____
Eling S. Joseph
Secretary
Innovative Communication Company, LLC

RLF1-3040962-2

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **INNOVATIVE COMMUNICATION** | ) | **Case No. 06-_____ (   )** |
| **CO., a Delaware LLC,** | ) | |
| | ) | |
| Debtor. | ) | |

## LIST OF EQUITY SECURITY HOLDERS

Following is the list of the Debtor's equity security holders which is prepared in accordance with Rule 1007(a)(3) for filing in this chapter 11 case.

| | NAME AND LAST KNOWN ADDRESS OR PLACE OF BUSINESS OF HOLDER | SECURITY CLASS | NUMBER OF SECURITIES | EQUITY INTEREST |
|---|---|---|---|---|
| 1. | Jeffrey J. Prosser | Common Stock | | 100% |

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INNOVATIVE COMMUNICATION | ) | Case No. 06-_____ (   ) |
| CO., a Delaware LLC, | ) | |
| | ) | |
| Debtor. | ) | |

## DECLARATION REGARDING LIST OF EQUITY SECURITY HOLDERS

    I, Eling S. Joseph, Secretary of Innovative Communication Company, LLC, the company named as debtor in this case, declare under penalty of perjury under the laws of the United States of America that I have reviewed the List of Equity Security Holders submitted herewith and that it is true and correct to the best of my information and belief.


Date:  July 31, 2006

_____
Eling S. Joseph
Secretary
Innovative Communication Company, LLC

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **INNOVATIVE COMMUNICATION** | ) | **Case No. 06-_____ (   )** |
| **CO., a Delaware LLC,** | ) | |
| | ) | |
| Debtor. | ) | |

### CORPORATE OWNERSHIP STATEMENT

Pursuant to Federal Rules of Bankruptcy Procedure 1007(a)(1) and 7007.1, Innovative

Communications Company, LLC ("ICC-LLC") advises the Court that there are no

corporation(s), that directly or indirectly own 10% or more of ICC-LLC's equity interests.

RLF1-3040962-2

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **INNOVATIVE COMMUNICATION** | ) | **Case No. 06-_____  (   )** |
| **CO., a Delaware LLC,** | ) | |
| | ) | |
| Debtor. | ) | |

### DECLARATION REGARDING CORPORATE OWNERSHIP STATEMENT

I, Eling S. Joseph, Secretary of Innovative Communication Company, LLC, the company named as debtor in this case, declare under penalty of perjury under the laws of the United States of America that I have reviewed the Corporate Ownership Statement submitted herewith and that it is true and correct to the best of my information and belief.

Date: July 31, 2006

_____
Eling S. Joseph
Secretary
Innovative Communication Company LLC

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **INNOVATIVE COMMUNICATION** | ) | **Case No. 06-_____ (   )** |
| **CO., a Delaware LLC** | ) | |
| | ) | |
| Debtor. | ) | |

## CERTIFICATION OF RESOLUTIONS

The undersigned, being the Secretary of Innovative Communication Company, LLC, a Delaware limited liability company (the "Company"), (a) does hereby certify that on July 26, 2006, pursuant to the Limited Liability Company Agreement and the laws of the State of Delaware, at a duly noticed special meeting of the Members of the Company, the following resolutions (the "Resolutions") were duly adopted. The Resolutions have not been modified or rescinded and they are still in full force and effect as of the date hereof:

**RESOLVED,** that in the judgment of the Members, it is in the best interests of the Company, its creditors, employees and other interested parties that a petition be filed by the Company seeking relief under the provisions of chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532, (the "Bankruptcy Code"); and

**FURTHER RESOLVED:** that each of the officers and acting officers of the Company (each an "Authorized Officer," and together the "Authorized Officers"), and any of them, be and hereby is, authorized and directed on behalf of the Company to (a) execute and verify a petition to commence a case under chapter 11 of the Bankruptcy Code, as well as all other ancillary documents, and to cause the same to be filed in the District Court of the Virgin Islands, Division of St Thomas and St. John, Bankruptcy Division; or such other court as the appropriate officer or officers of the Corporation shall determine to be appropriate, (b) perform any and all such acts as are reasonable, advisable, expedient, convenient, proper or necessary to effect any of the foregoing; and, make or cause to be made prior to execution thereof any modifications to the Petition or ancillary documents as any such Authorized Officer, in such officer's discretion, deems necessary or desirable to carry out the intent and accomplish the purposes of these resolutions (such approval to be conclusively established by the execution thereof by such Authorized Officer); (c) execute, verify and file or cause to be filed all petitions, schedules, lists, motions, applications and other papers or documents (including cash collateral agreements) necessary or desirable in connection with the foregoing; and (d) execute and verify any and all other documents necessary or appropriate (the "Chapter 11 Papers") in connection with the chapter 11 case in such form or forms as any such Authorized Officer may approve;

**FURTHER RESOLVED,** that the Authorized Officers of the Company shall be, and each of them hereby is, authorized, directed and empowered to retain, on behalf of the Company: (a) Richards, Layton & Finger, P.A. as bankruptcy counsel for the Company for the purpose of, among other things, representing the Company in its chapter 11 case; (b) Dudley Clark & Chan, L.L.P. as local bankruptcy co-counsel for the Company for the purpose of, among other things,

representing the Company in its chapter 11 case and (c) such additional professionals, including attorneys, accountants, financial advisors, investment bankers, consultants or brokers, in each case as in such officer's or officers' judgment may be necessary in connection with the Company's chapter 11 case and other related matters, on such terms as such officer or officers shall approve;

       **FURTHER RESOLVED**, that the law firms of Richards, Layton & Finger, P.A., Dudley Clark & Chan, L.L.P. and any additional special counsel selected by the Authorized Officers, if any, shall be, and hereby are, authorized, empowered and directed to represent the Company, as debtor and debtor in possession, in connection with any chapter 11 case commenced by or against it under the Bankruptcy Code;

       **FURTHER RESOLVED**, that in addition to the specific authorizations heretofore conferred upon the Authorized Officers of the Company, each of the officers of the Company or their designees shall be, and each of them, acting alone, hereby is, authorized, directed and empowered, in the name of and on behalf of the Company, to take or cause to be taken any and all such further actions, to execute and deliver any and all such agreements, certificates, instruments and other documents and to pay all expenses, including filing fees, in each case as in such officer's or officers' judgment shall be necessary or desirable in order to fully carry out the intent and accomplish the purposes of the resolutions adopted herein;

       **FURTHER RESOLVED**, that all acts lawfully done or actions lawfully taken or to be taken by any officer or officers of the Company in connection with the implementation of these resolutions are hereby in all respects ratified, confirmed and approved; and

       IN WITNESS WHEREOF, I have hereunto set my hand this ___26th___ day of July, 2006.

Date: July 26, 2006

                             Eling S. Joseph
                             Secretary
                             Innovative Communication Company LLC

RLF1-3041182-1

# **Exhibit 1**

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION
CONTINUATION STATEMENT OF RELATED OR COMPANION CASES

Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor

| Name of Debtor | Case Number | Date Filed | District | Relationship | Judge |
|---|---|---|---|---|---|
| Jeffrey J. Prosser | N/A | Date hereof | U.S. Virgin Islands | Affiliate | N/A |
| Emerging Communications, Inc. | N/A | Date hereof | U.S. Virgin Islands | Affiliate | N/A |

RLF1-3043202-1

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia

# Exhibit L

to

## National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss

| FORM B1 (12/03) | UNITED STATES BANKRUPTCY COURT DISTRICT OF VIRGIN ISLANDS | Voluntary Petition |
|---|---|---|

| Name of debtor (if individual, enter Last, First, Middle): Prosser, Jeffrey J. | Name of Joint Debtor (Spouse)(Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 6 years (include married, maiden, and trade names): None | All Other Names used by the Joint Debtor in the last 6 years (include married, maiden, and trade names): |
| Last four digits of Soc. Sec./Complete EIN or other Tax ID No. (if more than one, state all): 9304 | Last four digits of Soc. Sec./Complete EIN or other Tax ID No.. (if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State, & Zip Code) 4A & 10AA Estate Shoys , St Croix, Virgin Islands 00820 | Street Address of Joint Debtor (No. & St., City, State & Zip Code) |
| County of Residence or of the Principal Place of Business: | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |

| Location of Principal Assets of Business Debtor (if different from street address above): |
|---|

### Information Regarding the Debtor (Check the Applicable Boxes)

**Venue:** (Check any applicable box)

☒ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

| **Type of Debtor** (Check all boxes that apply) | **Chapter or Section of Bankruptcy Code Under Which the Petition is filed** (Check one box) |
|---|---|
| ☒ Individual(s)   ☐ Railroad | ☐ Chapter 7   ☒ Chapter 11   ☐ Chapter 13 |
| ☐ Corporation   ☐ Stockbroker | ☐ Chapter 9   ☐ Chapter 12 |
| ☐ Partnership   ☐ Commodity Broker | ☐ Sec. 304- Case ancillary to foreign proceeding |
| ☐ Other _____   ☐ Clearing Bank | |

| **Nature of Debts** (Check one box) | **Filing Fee** (Check one box) |
|---|---|
| ☐ Consumer/Non-Business  ☒ Business | ☒ Full Filing Fee attached |
| **Chapter 11 Small Business** (Check all boxes that apply) | ☐ Filing Fee to be paid in installments (Applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(e). See Official Form No. 3. |
| ☐ Debtor is a small business as defined in 11 U.S.C. ' 101 | |
| ☐ Debtor is and elects to be considered a small business under 11 U.S.C. ' 1121(e)(Optional) | |

| **Statistical/Administrative Information** (estimates only) | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| ☒ Debtor estimates that funds will be available for distribution to unsecured creditors. | |
| ☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors. | |

| Estimated Number of Creditors | 1-15 ☒ | 16-49 ☐ | 50-99 ☐ | 100-199 ☐ | 200-999 ☐ | 1000-over ☐ |
|---|---|---|---|---|---|---|

| Estimated Assets | $0 to $50,000 ☐ | $50,001 to $100,000 ☐ | $100,001 to $500,000 ☐ | $500,001 to $1 million ☐ | $1,000,001 to $10 million ☐ | $10,000,001 to $50 million ☐ | $50,000,001 to $100 million ☐ | More than $100 million ☒ |
|---|---|---|---|---|---|---|---|---|

| Estimated Debts | $0 to $50,000 ☐ | $50,001 to $100,000 ☐ | $100,001 to $500,000 ☐ | $500,001 to $1 million ☐ | $1,000,001 to $10 million ☐ | $10,000,001 to $50 million ☐ | $50,000,001 to $100 million ☐ | More than $100 million ☒ |
|---|---|---|---|---|---|---|---|---|

Form Published by: Law Disks, 734 Franklin Avenue, Garden City, NY 11530    www.lawdisks.com

| **Voluntary Petition** | Name of Debtor(s): | **FORM B1**, Page 2 |
| (This page must be completed and filed in every case.) | Prosser , Jeffrey J. | |

| **Prior Bankruptcy Case Filed Within the last 6 Years (If more than one, attach additional sheet.)** | | |
| Location | Case Number: | Date Filed: |
| Where filed: Delaware | 06-10135-Involuntary | 2/10/06 |

| **Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor (If more than one, attach additional sheet)** | | |
| Name of Debtor: | Case Number: | Date Filed: |
| See Attached List | | |
| District: | Relationship: | Judge: |

| **Signatures** | |
|---|---|
| **Signature(s) of Debtor(s) (Individual/Joint)** | **Exhibit A** |

**Signature(s) of Debtor(s) (Individual/Joint)**

I declare under penalty of perjury that the information provided in this petition is true and correct.  [If the petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter  7  .

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X /s/Jeffrey J. Prosser
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
   Jeffrey J. Prosser , Debtor

X
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
   , Joint Debtor

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
   Telephone Number (If not represented by attorney)

   July 31, 2006
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
   Date

**Exhibit A**

(To be completed if the Debtor is required to file periodic reports (e.g., forms 10K and 10Q with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)

☐    Exhibit A is attached and made a part of this petition.

**Exhibit B**

(To be completed if Debtor is an individual whose debts are primarily consumer debts.)

I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter.

X
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
   , Attorney for Debtor(s)        Date

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐  Yes, and Exhibit C is attached and made part of this petition.
☐  No

**Signature of Attorney**

X    /s/ Thomas Alkon
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
   Signature of Attorney for Debtor(s)
   Print below: Attorney Name, Code, Firm, Address, Telephone No:
      Bar Number/Code: 575

Thomas Alkon
Thomas Alkon, PC
2115 Queen Street
Christiansted, St. Croix 00820
340-773-3305

   July 31, 2006
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
   Date

**Signature of Non-Attorney Petition Preparer**

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
   Printed Name of Bankruptcy Petition Preparer

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
   Social Security Number (required by 11 U.S.C. § 110(c))

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
   Address

Name and Social Security Numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
   Signature of Bankruptcy Petition Preparer        Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. ' 110; 18 U.S.C. ' 156.

[Publisher's Note: This form is NOT intended to be used by nonattorney bankruptcy-petition preparers: Schedules do not contain all disclosures required for use by nonattorney bankruptcy-petition preparers.]

**Signature of Debtor (Corporation/Partnership)**

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
   Signature of Authorized Individual

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
   Printed Name of Authorized Individual

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF VIRGIN ISLANDS

IN RE:                                    )
                                          )        Voluntary Chapter 11
    JEFFREY J. PROSSER          )
                                          )        Case No. 06 –
        DEBTOR          )
_____)

### AFFILIATED BANKRUPTICES

| DEBTOR | CASE NO./DATE FILED | JUDGE/DISTRICT | RELATIONSHIP |
|---|---|---|---|
| Innovative Communication Company, LLC | 06-10133/Involuntary/2-10-06 | Fitzgerald /Delaware | AFFILIATE |
| Emerging Communications, Inc. | 06-10134/Involuntary/2-10-06 | Fitzgerald Delaware | AFFILIATE |

_____

_____

_____

Dated this 31st day of July, 2006.

JEFFREY J. PROSSER, Debtor

By:  __/s/ Thomas Alkon_____
      Thomas Alkon (VI #575)
      Thomas Alkon, PC
      2115 Queen Street
      Christiansted, St. Croix 00820
      Phone:  (340) 773-3305

AND

BY:  __/s/ Robert F. Craig_____
      Robert F. Craig (NE #10819)
      Jenna Taub (NE # 22725)
      Robert F. Craig, PC
      1321 Jones Street
      Omaha, NE 68102
      Phone: (402) 408-6004
      Fax: (402) 408-6001

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF VIRGIN ISLANDS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Voluntary Chapter 11 |
| JEFFREY J. PROSSER | ) | |
| | ) | Case No. 06 – |
| DEBTOR | ) | |
| | ) | |

**VERIFICATION OF CREDITOR MATRIX**

The undersigned hereby verifies that the attached list of creditors is true and correct to the best of his knowledge.

Dated this 31st day of July, 2006

JEFFREY J. PROSSER, Debtor

By: __/s/ Jeffrey J. Prosser_____

S:\ACTIVE CASES\Prosser\Virgin Island Bankruptcy\verification of matrix.7-31-06.doc

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, **Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia**

# Exhibit M

**to**

## National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss

Official Form 5 (10/06)

| U.S. District Court of the Virgin Islands<br>Division of St. Croix, Bankruptcy Division | INVOLUNTARY PETITION |
|---|---|

| IN RE (Name of Debtor - If Individual: Last, First, Middle)<br><br>Innovative Communication Corporation | ALL OTHER NAMES used by debtor in the last 8 years (Include married, maiden, and trade names.)<br><br>Atlantic Tele-Network Co. |
|---|---|

LAST FOUR DIGITS OF SOC. SEC. NO./Complete EIN or other TAX I.D. NO. (If more than one, state all.) 66-0445332

| STREET ADDRESS OF DEBTOR (No. and street, city, state, and zip code)<br>Bjerget House, 56-58 Hill Street<br>St. Croix, U.S. Virgin Islands  00821 | MAILING ADDRESS OF DEBTOR (If different from street address) |
|---|---|

| COUNTY OF RESIDENCE OR PRINCIPAL PLACE OF BUSINESS    St. Croix County | 00821<br>ZIP CODE | | ZIP CODE |
|---|---|---|---|

LOCATION OF PRINCIPAL ASSETS OF BUSINESS DEBTOR (If different from previously listed addresses)

CHAPTER OF BANKRUPTCY CODE UNDER WHICH PETITION IS FILED
☐ Chapter 7    ☒ Chapter 11

**INFORMATION REGARDING DEBTOR (Check applicable boxes)**

| Nature of Debts<br>(Check one box.)<br><br>Petitioners believe:<br><br>☐ Debts are primarily consumer debts<br>☒ Debts are primarily business debts | Type of Debtor<br>☐ Individual<br>☒ Corporation<br>☐ Partnership<br>☐ Other (if Debtor is not one of the above entities, check this box and state type of entity below.)<br><br>_____ | Nature of Business<br>(Check one box.)<br>☐ Health Care Business<br>☐ Single Asset Real Estate as defined in 11 U.S.C. § 101(51)(B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☒ Other  Telecommunication Services |
|---|---|---|

| VENUE | FILING FEE (Check one box) |
|---|---|
| ☒ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in the District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.<br><br>☒ A bankruptcy case concerning debtor's affiliate, general partner or partnership is pending in this District. | ☒ Full Filing Fee attached<br><br>☐ Petitioner is a child support creditor or its representative, and the form specified in § 304(g) of the Bankruptcy Reform Act of 1994 is attached.<br><br>*[If a child support creditor or its representative is a petitioner, and if the petitioner files the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.]* |

**PENDING BANKRUPTCY CASE FILED BY OR AGAINST ANY PARTNER OR AFFILIATE OF THIS DEBTOR** (Report information for any additional cases on attached sheets.)

| Name of Debtor<br><br>PLEASE SEE ATTACHED SCHEDULE A | Case Number | Date |
|---|---|---|
| Relationship | District | Judge |

| ALLEGATIONS<br>(Check applicable boxes) | COURT USE ONLY |
|---|---|
| 1.    ☒ Petitioner(s) are eligible to file this petition pursuant to 11 U.S.C. § 303(b).<br>2.    ☒ The debtor is a person against whom an order for relief may be entered under title 11 of the United States Code.<br>3.a.  ☒ The debtor is generally not paying such debtor's debts as they become due, unless such debts are the subject of a bona fide dispute as to liability or amount;<br>or<br>b.    ☐ Within 120 days preceding the filing of this petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession. | |

OFFICIAL FORM 5 (10/06) – Cont. -

Name of Debtor  Innovative Communication Corporation

Case No  _____

## TRANSFER OF CLAIM

☐ Check this box if there has been a transfer of any claim against the debtor by or to any petitioner. Attach all documents evidencing the transfer and any statements that are required under Bankruptcy Rule 1003(a). **See Exhibit 1 attached hereto**

## REQUEST FOR RELIEF

Petitioner(s) request that an order for relief be entered against the debtor under the chapter of title 11, United States Code, specified in this petition. If any petitioner is a foreign representative appointed in a foreign proceeding, a certified copy of the order of the court granting recognition is attached.

Petitioner(s) declare under penalty of perjury that the foregoing is true and correct according to the best of their knowledge, information, and belief.

| | |
|---|---|
| */s/ David Einhorn*<br>*Senior Managing Member of Greenlight Capital, LLC,*<br>X *General Partner of Greenlight Capital Qualified, L.P.*<br>Signature of Petitioner or Representative (State title) | */s/ Richard H. Dollison*<br>X */s/ Gregg M. Galardi*                    July 5, 2007<br>Signature of Attorney                    Date<br>Thomas J. Allingham II          Matthew J. Duensing, Esq.<br>Gregg M. Galardi               Richard H. Dollison, Esq.<br>Skadden, Arps, Slate, Meagher   Stryker, Duensing, Casner &<br>& Flom LLP                     Dollison |
| Greenlight Capital Qualified, L.P.          July 5, 2007<br>Name of Petitioner                    Date Signed | Name of Attorney Firm (If any)<br>One Rodney Square              5126 Drake's Passage, Ste 202<br>Wilmington, DE  19801          St. Thomas, VI  00804 |
| Name & Mailing          140 East 45th Street, 24th Floor<br>Address of Individual    New York, New York  10017<br>Signing in Representative   David Einhorn<br>Capacity | Address<br>(302) 651-3000                (340) 774-6011<br>Telephone No. |
| */s/ David Einhorn*<br>*Senior Managing Member of Greenlight Capital, LLC,*<br>X *General Partner of Greenlight Capital, L.P.*<br><br><br>Signature of Petitioner or Representative (State title) | */s/ Richard H. Dollison*<br>X */s/ Gregg M. Galardi*                    July 5, 2007<br><br><br>Signature of Attorney                    Date<br>Thomas J. Allingham II          Matthew J. Duensing, Esq.<br>Gregg M. Galardi               Richard H. Dollison, Esq.<br>Skadden, Arps, Slate, Meagher   Stryker, Duensing, Casner &<br>& Flom LLP                     Dollison |
| Greenlight Capital, L.P.                July 5, 2007<br>Name of Petitioner                    Date Signed | Name of Attorney Firm (If any)<br>One Rodney Square              5126 Drake's Passage, Ste 202<br>Wilmington, DE  19801          St. Thomas, VI  00804 |
| Name & Mailing          140 East 45th Street, 24th Floor<br>Address of Individual    New York, New York  10017<br>Signing in Representative   David Einhorn<br>Capacity | Address<br>(302) 651-3000                (340) 774-6011<br>Telephone No. |
| */s/ David Einhorn*<br>*President of Greenlight Capital, Inc., Investment Manager of*<br>X *Greenlight Capital Offshore, Ltd.*<br><br><br>Signature of Petitioner or Representative (State title) | */s/ Richard H. Dollison*<br>X */s/ Gregg M. Galardi*                    July 5, 2007<br><br><br>Signature of Attorney                    Date<br>Thomas J. Allingham II          Matthew J. Duensing, Esq.<br>Gregg M. Galardi               Richard H. Dollison, Esq.<br>Skadden, Arps, Slate, Meagher   Stryker, Duensing, Casner &<br>& Flom LLP                     Dollison |
| Greenlight Capital Offshore, Ltd.          July 5, 2007<br>Name of Petitioner                    Date Signed | Name of Attorney Firm (If any)<br>One Rodney Square              5126 Drake's Passage, Ste 202<br>Wilmington, DE  19801          St. Thomas, VI  00804 |
| Name & Mailing          140 East 45th Street, 24th Floor<br>Address of Individual    New York, New York  10017<br>Signing in Representative   David Einhorn<br>Capacity | Address<br>(302) 651-3000                (340) 774-6011<br>Telephone No. |

| PETITIONING CREDITORS | | |
|---|---|---|
| Name and Address of Petitioner<br><br>Greenlight Capital Qualified, L.P.<br>140 East 45th Street, 24th Floor<br>New York, New York 10017 | Nature of Claim<br><br>Claim for, among other things, amounts due under the Final Order and Judgment entered by the Court of Chancery of the State of Delaware on January 11, 2006 on behalf of the Petitioning Creditors against Innovative Communication Corporation, Innovative Communication Company, LLC, and Jeffrey J. Prosser (the "Delaware Judgment")<br><br>**See Exhibit 2 attached hereto** | Amount of Claim<br><br>Judgment not less than $20,132,287.40 plus interest, expert witness costs, attorney fees, ordinary court costs and other amounts which may become due in the future. |
| Name and Address of Petitioner<br><br>Greenlight Capital, L.P.<br>140 East 45th Street, 24th Floor<br>New York, New York 10017 | Nature of Claim<br><br>Claim for, among other things, amounts due under the Delaware Judgment<br><br>**See Exhibit 2 attached hereto** | Amount of Claim<br><br>Judgment not less than $17,038,453.20 plus interest, expert witness costs, attorney fees, ordinary court costs and other amounts which may become due in the future. |
| Name and Address of Petitioner<br><br>Greenlight Capital Offshore, Ltd.<br>140 East 45th Street, 24th Floor<br>New York, New York 10017 | Nature of Claim<br><br>Claim for, among other things, amounts due under the Delaware Judgment<br><br>**See Exhibit 2 attached hereto** | Amount of Claim<br><br>Judgment not less than $19,171,102.40 plus interest, expert witness costs, attorney fees, ordinary court costs and other amounts which may become due in the future. |
| Note:    If there are more than three petitioners, attach additional sheets with the statement under penalty of perjury, each petitioner's signature under the statement and the name of attorney and petitioning creditor information in the format above. | | Total Amount of Petitioners' Claims<br><br>Not less than $56,341,843 currently outstanding, plus interest, expert witness costs, attorney fees, ordinary court costs and other amounts which may become due in the future. |

_____0___ continuation sheets attached

## SCHEDULE A

Involuntary bankruptcy petitions were filed on February 10, 2006 in the United States Bankruptcy Court for the District of Delaware against the following affiliated companies by the Petitioning Creditors:

Innovative Communication Company, LLC (Case No. 06-10133)
Emerging Communications, Inc. (Case No. 06-10134)
Jeffrey J. Prosser (Case No. 06-10135)

Voluntary bankruptcy petitions were filed on July 31, 2006 in the United States District Court for the District of the Virgin Islands, Bankruptcy Division, for the following affiliated companies:

Innovative Communication Company, LLC (Case No. 06-30008-JKF)
Emerging Communications, Inc. (Case No. 06-30007-JKF)
Jeffrey J. Prosser (Case No. 06-30009-JKF)

Pursuant to Rule 1003-1 of the Local Bankruptcy Rules of the District Court of the Virgin Islands, Bankruptcy Division, Jeffrey J. Prosser, Bjerget House, 56-58 Hill Street, St. Croix, VI 00821, (340) 777-7700, and Bobby Lubana, 777 South Flagler Drive, West Palm Beach, FL 33401, (561) 514-0600, are designated as the individuals who are the principal operating officers of the alleged debtor.

On December 14, 2006, the United States Bankruptcy Court for the District of Delaware entered an order (the "Venue Order") in the involuntary bankruptcy cases transferring venue of such cases to the United States District Court for the District of the Virgin Islands, Bankruptcy Division.

**EXHIBIT 1**

As of the date of the filing of this involuntary petition, there has been no transfer of any claim against the debtor by or to any of Greenlight Capital, L.P., Greenlight Capital Offshore, Ltd., and Greenlight Capital Qualified, L.P. (collectively, the "Petitioning Creditors"). Attached hereto as Exhibit A is a copy of an Intercreditor Agreement dated as of October 24, 2005, by and among the Rural Telephone Finance Cooperative (the "RTFC") and the Petitioning Creditors (the Intercreditor Agreement"). The terms of the Intercreditor Agreement provide for, among other things, the transfer of certain claims against Innovative Communication Corporation, a U.S. Virgin Islands corporation (the "Involuntary Debtor") in exchange for the payment of $15,000,000.00 by the RTFC to the Petitioning Creditors upon the entry of an order for relief under section 303 of the Bankruptcy Code against the Involuntary Debtor. See Intercreditor Agreement ¶ 3.1.

The claims of the Petitioning Creditors against the Involuntary Debtor have not been transferred as of the date of the filing of this involuntary bankruptcy petition and were not transferred for the purpose of commencing this involuntary bankruptcy case.

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Dated: July 5, 2007                        Dated: July 5, 2007
    New York, New York                        New York, New York

By:    _/s/ David Einhorn_        By:    _/s/ David Einhorn_
Senior Managing Member of Greenlight    President of Greenlight Capital, Inc.,
Capital, LLC, General Partner of         Investment Manager of Greenlight
Greenlight Capital Qualified, L.P.       Capital Offshore, Ltd.

Dated: July 5, 2007
    New York, New York

By:    _/s/ David Einhorn_
Senior Managing Member of Greenlight
Capital, LLC, General Partner of
Greenlight Capital, L.P.

**EXHIBIT A TO EXHIBIT 1**

**INTERCREDITOR AGREEMENT**

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT ("Agreement"), dated as of October 24, 2005, is made and entered into by and among (1) RURAL TELEPHONE FINANCE COOPERATIVE, A COOPERATIVE ORGANIZED UNDER THE LAWS OF THE DISTRICT OF COLUMBIA ("RTFC"), (2) GREENLIGHT CAPITAL, L.P., A DELAWARE LIMITED PARTNERSHIP, (3) GREENLIGHT CAPITAL OFFSHORE, LTD., A BRITISH VIRGIN ISLANDS CORPORATION, AND (4) GREENLIGHT CAPITAL QUALIFIED, L.P., A DELAWARE LIMITED PARTNERSHIP.

### RECITALS:

A.    **WHEREAS**, pursuant to that certain Loan Agreement, made as of August 27, 2001, as amended, Innovative Corp. is indebted to RTFC in the aggregate principal amount of approximately $507,000,000[1]; which indebtedness is secured by a pledge of certain Collateral;

B.    **WHEREAS**, pursuant to the Delaware Ruling, the Emerging Entities and Prosser are liable to the Greenlight Entities in an aggregate amount in excess of $130,000,000;

C.    **WHEREAS**, RTFC and the Greenlight Entities believe that it is in their respective best interests to cooperate with each other in their efforts to collect on their respective claims against the Emerging Entities and certain other parties; and

D.    **WHEREAS**, RTFC desires to purchase from the Greenlight Entities, and the Greenlight Entities desire to sell, transfer and assign to RTFC, their respective claims against Innovative Corp., upon the occurrence of certain events, all upon the terms and subject to the conditions set forth herein; and

E.    **WHEREAS**, RTFC and the Greenlight Entities have reached additional agreement as to the enforcement and collection of the Parties' respective claims against the Prosser Assets and the Belize Assets; and

F.    **WHEREAS**, the Greenlight Entities represent to RTFC that they have resolved among themselves that, if Innovative Corp. has not voluntarily filed a Bankruptcy Proceeding upon the execution date of this Agreement, and if the statutory requisites set forth in section 303 of the Bankruptcy Code for the commencement of an involuntary Bankruptcy Proceeding are met, then the Greenlight Entities will jointly undertake the filing of involuntary Bankruptcy Proceedings under the Bankruptcy Code with respect to Innovative Corp. and, if necessary or desirable, some or all of the other Emerging Entities that have not voluntarily filed such a Bankruptcy Proceeding. The Greenlight Entities have further resolved among themselves, and hereby represent to RTFC, that any such involuntary Bankruptcy Proceeding(s) will be filed no later than 45 days following the entry of a judgment on the Delaware Ruling.

G.    **WHEREAS**, RTFC and the Greenlight Entities wish to cooperate with each other in connection with their efforts to collect on their respective claims against Innovative Corp. and

---

[1]    Further detail of RTFC Claim is attached to this Agreement as Schedule 1.

certain other parties, which collection efforts may include, among other things, involvement in any bankruptcy proceedings with respect to the Emerging Entities and their respective subsidiaries, and proposing and soliciting acceptances of one or more plans of reorganization in any such cases commenced under the Bankruptcy Code or, in the case of RTFC, seeking to foreclose or exercising other rights as a secured creditor with respect to the Collateral securing the RTFC Claim. In connection therewith, RTFC and the Greenlight Entities wish to enter into this Agreement to set forth the terms and conditions applicable to such cooperation and certain related matters.

## AGREEMENT:

NOW, THEREFORE, in consideration of the premises and for other good, fair and valuable consideration, the receipt, adequacy and reasonable equivalency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

1.  **DEFINITIONS.**

The following terms shall have the meanings assigned to them below:

| | |
|---|---|
| **Bankruptcy Code:** | Title 11 U.S.C. § 101, et seq. |
| **Bankruptcy Proceeding:** | A judicial proceeding commenced by the filing of a bankruptcy petition by or against Innovative Corp. and, if applicable, other Persons, seeking entry of an order for relief under the Bankruptcy Code. |
| **Belize:** | Belize Telcom Ltd., a Belizean limited liability company. |
| **Belize Assets:** | All assets of any kind or nature owned of record or beneficially by Belize or any direct or indirect subsidiary of Belize (whether or not wholly owned), including all property, plant and equipment and other assets listed as owned by Belize or such subsidiary in the books and records of Belize or such subsidiary, all cash, marketable securities and similar assets held by any such entity, all real property owned by such entity, all intellectual property and other intangible assets of such entity and all claims, causes of action, contract rights and other contingent assets of such entity; all equity interests in Belize or any direct or indirect subsidiary thereof (whether or not wholly owned); and all proceeds, income, earnings or amounts distributed in respect of any of the foregoing; provided, however, that the Belize Assets shall in no event include any Innovative Assets or Prosser Assets. For the avoidance of doubt, the Belize Assets shall include any assets so described in the immediately preceding sentence which are determined by a court of competent jurisdiction to have been transferred, sold, conveyed or assigned to another Person under circumstances constituting a fraudulent conveyance or other voidable transfer |

Page 2

under the Bankruptcy Code or other applicable transfer avoidance law.

**Business Day:**    Any day other than a Saturday, Sunday or other legal holiday for federal government employees in the continental United States.

**Collateral:**    All tangible and intangible property, both legal and equitable, that is encumbered, mortgaged and/or pledged to, or otherwise held by, RTFC to secure the repayment of the RTFC Claim.

**Creditor:**    A party holding a claim (as defined in the Bankruptcy Code) against one or more of the Emerging Entities, including RTFC and each of the three Greenlight Entities.

**Delaware Ruling:**    The opinion of the Court of Chancery of the State of Delaware in and for New Castle County, dated June 4, 2004, in the Shareholders Litigation (including the related Stipulation of Settlement entered into by the parties to the Shareholders Litigation in connection therewith and any Order of the Court of Chancery entered in connection therewith) in which the Court of Chancery determined that: (i) ECI (the surviving entity of the merger of ICC Merger Sub Corporation with and into ECI, which the Court of Chancery incorrectly identified as Innovative Corp.) is liable to the Greenlight Entities for damages in the aggregate amount of $28,548,915, plus interest at the rate of 6.27%, compounded monthly, accruing from October 19, 1998 to the date of judgment; and (ii) Innovative Corp., ICC, Prosser and certain other persons are jointly and severally liable to the Greenlight Entities for damages in the aggregate amount of $77,200,183, plus interest, such that, as of the date hereof, the Emerging Entities and Prosser are indebted to the Greenlight Entities in an aggregate amount in excess of $130,000,000.

**ECI:**    Emerging Communications, Inc., a Delaware corporation.

**Emerging Entities:**    Comprising the following entities:  **ECI, ICC** and **Innovative Corp.**

**Filing Entity:**    An entity against which an order for relief under either section 301 or section 303 of the Bankruptcy Code has been entered.

**Finality / Final Order:**    Finality is the procedural condition in which an order entered by a court may no longer be appealed to a higher court, nor be made the subject of a writ of certiorari, pursuant to applicable rules of court. Such an order is termed a "Final Order."

**Foreclosure Action**    An action, suit or proceeding, or series of related actions, suits or proceedings, commenced by, or on behalf of, RTFC seeking to

Page 3

exercise foreclosure remedies with respect to all or a substantial portion of the Collateral securing the RTFC Claim.

**Fractional Share:** A sum of money calculated by multiplying a given distribution amount by a certain fraction which is specifically established and stated in this Agreement.

**Greenlight Capital:** Greenlight Capital, L.P., a Delaware limited partnership.

**Greenlight Claim:** Those claims of the Greenlight Entities against Innovative Corp. and its direct and indirect subsidiaries (whether or not wholly owned) described and established in the Delaware Ruling in an aggregate amount currently in excess of $130,000,000 and all rights associated therewith. For the avoidance of doubt, the Greenlight Claim shall in no event be deemed to include any claims of the Greenlight Entities, whether arising under the Delaware Ruling or otherwise, against Prosser, ECI or ICC or any of their respective direct or indirect subsidiaries (whether or not wholly owned) other than Innovative Corp. and its direct or indirect subsidiaries (whether or not wholly owned).

**Greenlight Entities:** Comprising the following three entities: **Greenlight Capital, Greenlight Offshore** and **Greenlight Qualified**.

**Greenlight Offshore:** Greenlight Capital Offshore, Ltd., a British Virgin Islands corporation.

**Greenlight Qualified:** Greenlight Capital Qualified, L.P., a Delaware limited partnership.

**ICC:** Innovative Communications Company, LLC, a Delaware limited liability company.

**Including:** Means "including, without limitation."

**Innovative Assets:** All equity interests in Innovative Corp. and all assets of any kind or nature owned of record or beneficially by Innovative Corp. or any direct or indirect subsidiary of Innovative Corp. (whether or not wholly owned), including all property, plant and equipment and other assets listed as owned by Innovative Corp. or such subsidiary in the books and records of Innovative Corp. or such subsidiary, all cash, marketable securities and similar assets held by Innovative Corp. or such subsidiary, all real property owned by Innovative Corp. or such subsidiary, all intellectual property and other intangible assets of Innovative Corp. or such subsidiary and all claims, causes of action, contract rights and other contingent assets of Innovative Corp. or such subsidiary; all equity interests in Innovative Corp. or any direct or indirect

Page 4

subsidiary thereof (whether or not wholly owned); and all proceeds, income, earnings or amounts distributed in respect of any of the foregoing; provided, however, that the Innovative Assets shall in no event include any Prosser Assets or Belize Assets. For the avoidance of doubt, the Innovative Assets shall include any assets so described in the immediately preceding sentence which are determined by a court of competent jurisdiction to have been transferred, sold, conveyed or assigned to another Person under circumstances constituting a fraudulent conveyance or other voidable transfer under the Bankruptcy Code or other applicable transfer avoidance law.

**Innovative Corp:**             Innovative Communication Corporation, a U.S. Virgin Islands corporation.

**Obligor:**                     Any of the Emerging Entities and/or Prosser.

**Parties:**                     RTFC and each of the Greenlight Entities.

**Person:**                      Means any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated organization or government (or any agency, instrumentality or political subdivision thereof).

**Plan of Reorganization**       Any plan of reorganization for Innovative Corp. under the Bankruptcy Code which may or may not include other Persons as debtors.

**Pro Rata Share:**              A sum of money calculated by multiplying a distribution amount by a fraction, the numerator of which is the specified amount then owing to a given Creditor and the denominator of which is the aggregate amount owed to all Creditors.

**Prosser:**                     Jeffrey Prosser, a defendant in the Shareholders Litigation.

**Prosser Assets:**              All assets of any kind or nature owned of record or beneficially (whether or not wholly owned) by (1) ECI, or (2) ICC or (3) any of their respective direct or indirect subsidiaries, or by (4) Prosser, or (5) any entity owned or controlled by Prosser or in which Prosser has an equity interest, or (6) any direct or indirect subsidiary of any such entity, including all property, plant and equipment and other assets listed as owned by such entity in the books and records of such entity, all cash, marketable securities and similar assets held by any such entity, all real property owned by any such entity, all intellectual property and other intangible assets of such entity and all claims, causes of action, contract rights and other contingent assets of such entity; all equity interests in such entity or any direct or indirect subsidiary

thereof (whether or not wholly owned); and all proceeds, income, earnings or amounts distributed in respect of any of the foregoing; provided, however, that the Prosser Assets shall in no event include any Innovative Assets or Belize Assets. For the avoidance of doubt, the Prosser Assets shall include any assets so described in the immediately preceding sentence which are determined by a court of competent jurisdiction to have been transferred, sold, conveyed or assigned to another Person under circumstances constituting a fraudulent conveyance or other voidable transfer under the Bankruptcy Code or other applicable transfer avoidance law.

**Prosser Parties:**          Means Prosser and the Emerging Entities.

**RTFC Claim:**               The consolidated secured and unsecured claims held by RTFC against Innovative Corp. and based upon loan transactions totaling approximately $507,000,000, and all rights associated therewith.

**RTFC Liens:**               All security interests held by RTFC in the Collateral securing the repayment by any of the Emerging Entities of the RTFC Claim.

**Sale Transaction**          Any (i) sale of any or all of the assets of Innovative Corp. and/or its subsidiaries (other than pursuant to section 363 of the Bankruptcy Code); or (ii) any merger, consolidation, recapitalization, reclassification or similar transaction (including any sale or exchange of common stock or other equity securities) involving Innovative Corp. and/or its subsidiaries in which the common stock or other equity securities of Innovative Corp. or any of its subsidiaries is converted into or exchanged for cash, securities or other property and, as a result of which, any person or group (other than the equity holders of such entity or entities as of immediately prior to such transaction) (x) owns or controls more than 50% of the common stock or other equity securities of such entity or entities or (y) has the ability to elect a majority of the board of directors, board of managers or other governing body of such entity or entities, in each case, other than in connection with a Bankruptcy Proceeding.

**Shareholders Litigation:**  The action before the Court of Chancery of the State of Delaware in and for New Castle County captioned *In re Emerging Communications, Inc. Shareholders Litigation*, C.A. No. 16415.

**Vitelco:**                  Virgin Islands Telephone Corporation, a U.S. Virgin Islands corporation.

2.    JUDICIAL PROCEDURES.

2.1    **Bankruptcy Proceedings.**  In view of the determination of the Greenlight Parties to initiate involuntary bankruptcy proceedings (as represented in paragraph F above) against any of the Emerging Entities that have not filed voluntary bankruptcy petitions within 45 days following the entry of a judgment on the Delaware Ruling, the timing of certain provisions of this Agreement specifically relate to the timing of events which would normally be anticipated in any such voluntary or involuntary bankruptcy proceedings.

2.2    **Provisions for Fees and Costs.** The professional fees and other incidental costs of preparing, filing and prosecuting the involuntary Bankruptcy Proceeding referenced above shall be borne by the Party incurring same.

3.    CONSIDERATION

Upon the terms and subject to the conditions of this Agreement, in consideration of the purchase, sale, assignment and transfer to RTFC of the Greenlight Claim as provided herein, and the representations, covenants and agreements of the Greenlight Entities contained herein, RTFC shall pay to the Greenlight Entities, by wire transfer of immediately available funds to an account or accounts designated in writing by the Greenlight Entities, the following amounts as of the dates and upon the occurrence of the events set forth below:

3.1    **First Claim Purchase.**  On the first Business Day following either (i) the entry of an order for relief under the Bankruptcy Code against Innovative Corp. as a result of Innovative Corp. and/or the other Emerging Entities or their respective subsidiaries voluntarily commencing a Bankruptcy Proceeding in accordance with section 301 of the Bankruptcy Code; or (ii) the Bankruptcy Court entering an order for relief under section 303 of the Bankruptcy Code against Innovative Corp. as a result of (x) an involuntary petition not being controverted by Innovative Corp. and/or the other Emerging Entities or their respective subsidiaries, or (y) the Bankruptcy Court entering an order for relief after trial, which order for relief shall have become a Final Order, RTFC shall pay the Greenlight Entities the aggregate sum of **$15,000,000** and, upon such payment, the Greenlight Entities shall be deemed to have sold and assigned to RTFC **$60,000,000** of the Greenlight Claim; provided, however, that RTFC shall be entitled to deduct from the payment to the Greenlight Entities contemplated by this Section 3.1 any payments made by RTFC to the Greenlight Entities pursuant to Section 3.4 of this Agreement prior to the date on which such order for relief is entered.  The Parties agree to cooperate reasonably with each other in the execution and filing of any notices or other papers documenting such transaction to the extent reasonably deemed necessary or appropriate by RTFC.

3.2    **Second Claim Purchase.** On the first Business Day following either (a) the entry of a Final Order confirming a Plan of Reorganization or (b) the consummation of a court-approved transaction pursuant to section 363 of the Bankruptcy Code for the sale of all or substantially all of the assets of the bankruptcy estate of Innovative Corp. and, if applicable, the assets of Innovative Corp. subsidiaries (such court approval being in the form of a Final Order approved as to form by RTFC), RTFC shall pay the Greenlight Entities the aggregate sum of **$12,500,000**, and, upon such payment, the Greenlight Entities shall be deemed to have sold and assigned to RTFC the balance of the Greenlight Claim; provided, however, that RTFC shall be

entitled to deduct from the payment to the Greenlight Entities contemplated by this Section 3.2 any payments made by RTFC to the Greenlight Entities pursuant to Section 3.4 of this Agreement prior to the date on which such Final Order is entered or such sale transactions are consummated (provided such amounts have not previously been deducted from any amounts otherwise payable pursuant to Section 3.1 hereof). The Parties agree to cooperate reasonably in the execution and filing of any notices or other papers documenting such transaction to the extent reasonably deemed necessary or appropriate by RTFC.

3.3    **Additional Consideration**. As additional consideration for the sale of the Greenlight Claim to RTFC pursuant to Sections 3.1 and 3.2 above, from and after the date on which RTFC shall have received from the bankruptcy estate(s) of any of the Emerging Entities, including any of their respective subsidiaries, payments or distributions (other than any payments or distributions arising from, or relating to, Prosser Assets or Belize Assets, which are addressed in Sections 3.5 and 3.6 hereof, respectively), whether consisting of money, property or securities, in an amount equal to or in excess of the sum of (i) **$327,500,000**, plus (ii)(A) the amount of any debtor in possession financing provided by RTFC; plus (B) the amount of any post-confirmation loans provided by RTFC and any unpaid or forgone interest with respect thereto; plus (C) the amount of any capital contributions made by RTFC (such capital contributions to be treated for the purposes of this Section 3.3 as loans and to be repaid with interest calculated at the same rate and in the same manner as post-confirmation loans hereunder) (the amounts specified in clauses (A), (B) and (C) above being referred to herein as **"Financing Transactions"**), RTFC shall deliver to the Greenlight Entities, in the form received by RTFC (including, if appropriate, the granting of an undivided interest therein), 10% of the value of any such additional payment or distribution (*i.e.*, payments or distributions over and above the first $327,500,000 received plus the amount of all Financing Transactions effected by RTFC), whether consisting of money, property or securities, received by RTFC from the bankruptcy estate(s) of Innovative Corp. and/or any of the other Emerging Entities, including any of their respective subsidiaries, in respect of the RTFC Claim and/or the Greenlight Claim purchased by RTFC from the Greenlight Entities hereunder (other than any payments or distributions arising from, or relating to, Prosser Assets or Belize Assets, which are addressed in Section 3.5 and 3.6 hereof, respectively), such payments to the Greenlight Entities pursuant to this Section 3.3 being calculated after first deducting from the amounts received by RTFC the professional fees and other costs of collection incurred by RTFC after the date hereof in connection with its efforts to collect the payment or distribution RTFC receives, in an aggregate amount not to exceed $3,000,000, unless otherwise agreed to by the Parties.

3.4    **Non Bankruptcy Recoveries**. In the event that RTFC receives any payment or distribution, whether consisting of money, property or securities, from any of the Emerging Entities, including any of their respective subsidiaries, in respect of the RTFC Claim and/or the Greenlight Claim purchased by RTFC from the Greenlight Entities hereunder, or receives from any other party upon the sale or other disposition of the equity interests in Innovative Corp. or any property of Innovative Corp. or its subsidiaries, including the Collateral securing the RTFC Claim (and/or the value of the assets of entities to which RTFC acquires ownership through enforcement of the RTFC Liens against the Collateral), or in connection with a Sale Transaction (other than, in each case, (A) from the bankruptcy estates of Innovative Corp. or its subsidiaries, which payments and distributions are addressed in Sections 3.1 through 3.3 hereof, or (B) arising from, or relating to, Prosser Assets or Belize Assets, which payments and distributions are

Page 8

addressed in Sections 3.5 and 3.6 hereof, respectively), then RTFC shall deliver to the Greenlight Entities, in the form received by RTFC (including, if appropriate, the granting of an undivided interest therein), (x) 10% of the value of any such payment or distribution until the aggregate amount of all such payments and distributions is equal to or exceeds $300,000,000; and (y) from and after the date on which the aggregate amount of all such payments and distributions is equal to or exceeds $327,500,000, 10% of the value of any such additional payments or distributions (*i.e.*, payments or distributions over and above the first $327,500,000 received) (clauses (x) and (y) being collectively referred to herein as the **"Greenlight Share"**); provided that the Greenlight Share shall be calculated after first deducting (i) any payments made by RTFC to the Greenlight Entities pursuant to Sections 3.1 and 3.2 of this Agreement and (ii) the professional fees and other costs of collection incurred by RTFC after the date hereof in connection with its efforts to collect the payment or distribution RTFC receives, in an aggregate amount not to exceed $3,000,000, unless otherwise agreed to by the Parties. Upon payment by RTFC to the Greenlight Entities pursuant to this Section 3.4 of the aggregate sum of $15,000,000, the Greenlight Entities shall be deemed to have sold and assigned to RTFC $60,000,000 of the Greenlight Claim (to the extent not previously sold to RTFC pursuant to Section 3.1 hereof) and upon payment by RTFC to the Greenlight Entities pursuant to this Section 3.4 of the aggregate sum of $30,000,000, the Greenlight Entities shall be deemed to have sold and assigned to RTFC the balance of the Greenlight Claim (to the extent not previously sold to RTFC pursuant to Sections 3.1 and 3.2 hereof). The Parties hereto further acknowledge and agree that any payments or other distributions received by the Greenlight Entities arising out of, or relating to, the Innovative Assets (excluding any such payments received from RTFC) shall be, as between the Parties hereto, shared and distributed according to this Section 3.4. The Parties agree to cooperate reasonably with each other in the execution and filing of any notices or other papers documenting such transaction to the extent reasonably deemed necessary or appropriate by RTFC.

3.5    **Prosser Collections**.  The Parties shall mutually cooperate in the pursuit of their respective claims against the Prosser Assets, and RTFC agrees to subordinate its claims against the Prosser Assets to the first $35,000,000 of the Greenlight Entities' claims against the Prosser Assets. After collection by the Greenlight Entities of a sum equal to $35,000,000 with respect to the Prosser Assets, all additional collections by the Parties with respect to the Prosser Assets shall be divided by Fractional Shares of one-third to RTFC and two-thirds to the Greenlight Entities. In furtherance of the foregoing, (x) until such time as the Greenlight Entities shall have received payments or other distributions arising out of, or relating to, the Prosser Assets (including any such payments received from RTFC) in an aggregate amount equal to or in excess of $35,000,000, RTFC shall deliver to the Greenlight Entities, in the form received by RTFC, 100% of the value of any payment or distribution received by RTFC in respect of the Prosser Assets until the aggregate amount of all payments and distributions received by the Greenlight Entities in respect of the Prosser Assets is equal to or exceeds $35,000,000; and (y) from and after such time as the Greenlight Entities shall have received payments or other distributions arising out of, or relating to, the Prosser Assets (including any such payments received from RTFC) in an aggregate amount equal to or in excess of $35,000,000, (1) RTFC shall deliver to the Greenlight Entities, in the form received by RTFC, a Fractional Share equal to two-thirds of the value of any payment or distribution received by RTFC in respect of the Prosser Assets and (2) the Greenlight Entities shall deliver to RTFC, in the form received by the Greenlight Entities, a Fractional Share equal to one-third of the value of any payment or distribution received by the

Greenlight Entities in respect of the Prosser Assets. If and when the claims of the Greenlight Entities against the Prosser Assets are fully satisfied, all other and further collections with respect to the Prosser Assets shall be applied to RTFC's claims against the Prosser Assets. For purposes of this Section 3.5, any amounts collected by the Parties in respect of the Prosser Assets shall be calculated after first deducting the professional fees and other costs of collection incurred by either Party after the date hereof in connection therewith, in an aggregate amount not to exceed $3,000,000 for RTFC or $3,000,000 for the Greenlight Entities, unless otherwise agreed to by the Parties.

3.6    **Belize Collections.** The Parties shall mutually cooperate in the pursuit of their respective claims against the Belize Assets, and to divide any collections with respect thereto by the Fractional Shares of 50% to RTFC and 50% to the Greenlight Entities. In furtherance of the foregoing, from and after the date hereof, in the event that RTFC or any of the Greenlight Entities receives any payment or distribution, whether consisting of money, property or securities, in respect of the Belize Assets (1) RTFC shall deliver to the Greenlight Entities, in the form received by RTFC, a Fractional Share equal to 50% of the value of any such payment or distribution received by RTFC in respect of the Belize Assets and (2) the Greenlight Entities shall deliver to RTFC, in the form received by the Greenlight Entities, a Fractional Share equal to 50% of the value of any such payment or distribution received by the Greenlight Entities in respect of the Belize Assets. For purposes of this Section 3.6, any amounts collected by the Parties in respect of the Belize Assets shall be calculated after first deducting the professional fees and other costs of collection incurred by either Party after the date hereof in connection therewith, in an aggregate amount not to exceed $3,000,000 for RTFC or $3,000,000 for the Greenlight Entities, unless otherwise agreed to by the Parties.

3.7    **Certain Matters Regarding Payments.**

3.7.1    Prompt Payment. Any amounts payable pursuant to Sections 3.3 through 3.6 hereof shall be paid by RTFC to the Greenlight Entities, or by the Greenlight Entities to RTFC, as the case may be, as promptly as practicable after receipt of such amounts by RTFC or the Greenlight Entities, as applicable, but in no event later than thirty (30) days thereafter.

3.7.2    Payments Non-refundable. The Parties hereto acknowledge and agree that any amounts paid to the Greenlight Entities by RTFC, or by the Greenlight Entities to RTFC, in each case, pursuant to Sections 3.1 through 3.6 hereof shall be non-refundable notwithstanding any subsequent termination of this Agreement and irrespective of whether any involuntary Bankruptcy Proceeding filed by RTFC and the Greenlight Entities with respect to Innovative Corp. or any of the other Emerging Entities and/or their respective subsidiaries is dismissed, or whether a Plan of Reorganization is confirmed or consummated.

3.7.3    No Setoff. The Parties hereto further acknowledge and agree that any amounts payable by RTFC to the Greenlight Entities, or by the Greenlight Entities to RTFC, in each case, pursuant to Sections 3.5 and 3.6 hereof shall be in addition to the amounts payable pursuant to Sections 3.1 through 3.4 hereof and, for the avoidance of doubt, in the event that any bankruptcy case of Prosser or ECI, ICC, Belize or any of their respective subsidiaries shall be consolidated with the Bankruptcy Proceeding of Innovative Corp. and/or its subsidiaries and results in a recovery by RTFC or the Greenlight Entities with respect to the Prosser Assets or the

Belize Assets, then the provisions of Sections 3.5 and 3.6 shall apply with respect to such any recovery with respect to such Prosser Assets or Belize Assets, in addition to any amounts payable pursuant to Sections 3.1 through 3.4 hereof.

       3.7.4    <u>Notice of Distributions Received</u>. Each Party agrees that it shall notify the other Party or Parties in writing within five (5) Business Day after the receipt, or deemed receipt, of a distribution of proceeds (i) from Innovative Corp., ECI, ICC, Belize, or any of their respective subsidiaries, or from Prosser, (ii) from the bankruptcy estate of any of the foregoing persons or entities; or (iii) under any other circumstances requiring payment by such Party under Sections 3.1 through 3.6 hereof.

       3.7.5    <u>Application of Proceeds</u>. The Parties hereto acknowledge and agree that any amounts collected by RTFC from Innovative Corp. or any of the other Emerging Entities, or any of their respective direct or indirect subsidiaries (whether or not wholly owned), or from Prosser or any other Person shall, to the extent applicable, be applied: *first*, to the satisfaction of the RTFC Claim and *second*, to the satisfaction of the Greenlight Claim purchased by RTFC from the Greenlight Entities hereunder. In no event shall any payments made by RTFC to the Greenlight Entities pursuant to Sections 3.1 through 3.6 be deemed to reduce the amount of the Greenlight Claim or otherwise be in satisfaction of all or any portion thereof. The Parties hereto further acknowledge and agree that any distributions, collections or other payments received by the Parties from Prosser or the Emerging Entities, or their respective bankruptcy estates, if applicable, shall be, as between the Parties hereto, shared and distributed according to the governing terms of this Agreement.

       3.7.6    <u>Methods of Payment</u>. Any payments required to be made by RTFC to the Greenlight Entities pursuant to this Agreement shall be made by wire transfer of immediately available funds to an account or accounts designated in writing by an agent designated by the Greenlight Entities (the "<u>Greenlight Agent</u>") prior to such payment (it being understood that the Greenlight Agent may provide standing wire transfer instructions to be used by RTFC for purposes of all future payments hereunder, or the Greenlight Agent may choose to specify different wire transfer instructions from time to time as payments are required to be made under this Agreement). RTFC shall be fully protected in relying on the most current wire transfer instructions provided by the Greenlight Agent and any payment made by RTFC of an amount required to be paid pursuant to this Agreement shall, if paid pursuant to such current wire transfer instructions, be deemed to satisfy RTFC's obligations with respect thereto for all purposes under this Agreement. Any payments required to be made by the Greenlight Entities to RTFC pursuant to this Agreement shall be made by wire transfer of immediately available funds to an account or accounts designated in writing by RTFC prior to such payment (it being understood that RTFC may provide standing wire transfer instructions to be used by the Greenlight Entities for purposes of all future payments hereunder, or RTFC may choose to specify different wire transfer instructions from time to time as payments are required to be made under this Agreement). The Greenlight Entities shall be fully protected in relying on the most current wire transfer instructions provided by RTFC and any payment made by the Greenlight Entities of an amount required to be paid pursuant to this Agreement shall, if paid pursuant to such current wire transfer instructions, be deemed to satisfy the Greenlight Entities' obligations with respect thereto for all purposes under this Agreement.

4.    FURTHER AGREEMENTS AMONG THE PARTIES.

4.1    **Validity of Claims and Liens.**  From and after the date of this Agreement, RTFC agrees that it will not challenge the amount or validity of the Greenlight Claim, and the Greenlight Entities agree that they will not challenge (1) the amount or validity of the RTFC Claim, (2) the validity, effectiveness, perfection, priority and non-avoidability of the RTFC Liens, or (3) the value of any Collateral securing the RTFC Claim.

4.2    **Greenlight Covenants.**

4.2.1    Entry of Judgment.  The Greenlight Entities shall each use their respective commercially reasonable efforts to cause the Court of Chancery of the State of Delaware to enter, as soon as practicable after the date hereof, a judgment on the Delaware Ruling.  In the event the Greenlight Entities fail to achieve such entry of judgment on the Delaware Ruling, or fail to initiate, and use commercially reasonable efforts to pursue, involuntary Bankruptcy Proceedings with respect to Innovative Corp. and any Emerging Entity made the object of any judgment on the Delaware Ruling (to the extent that any such Emerging Entity has not voluntarily filed a Bankruptcy Proceeding) as represented in Recital F above, then RTFC shall have the option, at its discretion, to terminate this Agreement, upon written notice to the Greenlight Entities, whereupon all future obligations of the Parties hereunder shall terminate.

4.2.2    Waiver of Certain Claims.  During the term of this Agreement and subject to the terms set forth herein, the Greenlight Entities hereby waive any and all rights and claims arising out of, or with respect to, RTFC's enforcement of the RTFC Claim or enforcement of the Greenlight Claim purchased by RTFC from the Greenlight Entities hereunder including, without limitation, (i) the exercise by RTFC of any remedies, whether in bankruptcy or otherwise, in connection therewith, (ii) the foreclosure by RTFC of any liens, (iii) the credit bidding by RTFC of the RTFC Claim and/or the Greenlight Claim acquired from the Greenlight Entities hereunder, (iv) RTFC's reorganization of, investment in, or management and sale of the Emerging Entities, their assets and their businesses, (v) any Financing Transactions, or (vi) the incurrence of professional, fees in connection with the foregoing, with respect to all of which RTFC shall be entitled to exercise its sole discretion, including incurring such costs as it deems necessary.

4.2.3    Support of the Plan of Reorganization and Disclosure Statement.  If a Plan of Reorganization is filed or supported by RTFC and this Agreement has not been terminated, the Greenlight Entities agree that they will (i) not object to the Plan of Reorganization or otherwise commence any proceeding to oppose or alter any of the terms of the Plan of Reorganization or any other document filed by RTFC in connection with the confirmation of the Plan; (ii) not agree to, consent to, provide any support to, participate in the formulation of or any discussions or negotiations regarding, or vote for, any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring involving Innovative Corp. or any of its subsidiaries, other than the Plan of Reorganization and the transactions contemplated thereby; (iii) take all reasonable actions necessary or reasonably requested by RTFC to support the Plan of Reorganization and the transactions contemplated thereby, including voting the Greenlight Claim in favor of such Plan of Reorganization; and (iv) not take any actions inconsistent with, or that would prevent, delay or impede approval or confirmation of, the Plan of Reorganization, the Disclosure Statement to be prepared, filed and disseminated

in connection therewith or any related documents. In furtherance of the foregoing, subject to the terms and conditions hereof, the Greenlight Entities agree to execute and deliver, within seven (7) business days after solicitation materials are delivered to the Greenlight Entities, a ballot in a form reasonably acceptable to the Greenlight Entities and RTFC showing the Greenlight Entities' acceptance of the Plan of Reorganization. If the Greenlight Entities have received the payment required pursuant to Section 3.1 above, and this Agreement has not otherwise been terminated, the Greenlight Entities shall take all actions reasonably requested by RTFC in furtherance of the Plan of Reorganization, or as RTFC may otherwise reasonably determine are necessary, desirable or appropriate in connection with the preparation, filing, prosecution, confirmation and/or consummation of the Plan of Reorganization, including, without limitation, using all commercially reasonable efforts to: prosecute, or assist in the prosecution of, the Plan of Reorganization; secure the appointment of a trustee or receiver with respect to Innovative Corp. or any of the other Emerging Entities and/or their respective subsidiaries; terminate any period of exclusivity during which the Plan or Reorganization may not be filed by RTFC; assist in securing all consents and approvals necessary for the confirmation of the Plan of Reorganization, including the consent of any creditor or class of creditors of Innovative Corp. or any of the other Emerging Entities or their respective subsidiaries, and any similar matters.

4.2.4    Agreement to Forebear.  During the term of this Agreement and other than as contemplated by this Agreement or agreed to in writing by the Parties, the Greenlight Entities shall not: (i) exercise or seek to exercise any rights or exercise or seek to exercise any remedies with respect to the Greenlight Claim against Innovative Corp. or any of its subsidiaries or the assets thereof; (ii) institute any action or proceeding with respect to such rights or remedies, including without limitation, any action of foreclosure against Innovative Corp. or any of its subsidiaries or the assets thereof; or (iii) contest, protest or object to any Foreclosure Action brought by RTFC against Innovative Corp. or any of its subsidiaries or any other exercise by RTFC of any rights and remedies against one or more of the Emerging Entities and/or their respective subsidiaries in connection with the RTFC Claim; provided that nothing in this Agreement shall prevent the Greenlight Entities from seeking satisfaction of the Greenlight Claim through action against the Prosser Assets or the Belize Assets. Notwithstanding anything in this Agreement to the contrary, except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner, waive, limit, impair, or restrict the ability of the Greenlight Entities to (A) protect and preserve their rights, remedies, and interests, including, without limitation, those rights, remedies and interests associated with the Greenlight Claim or any other claim against the Innovative Assets, the Prosser Assets or the Belize Assets, nor (B) to support or pursue fraudulent conveyance or other transfer avoidance actions under the Bankruptcy Code or other applicable transfer avoidance law.

4.2.5    Capacity.  Each of the individuals executing this Agreement on behalf of the Greenlight Entities represents and warrants by his or her signature that he or she is authorized and empowered by all requisite consents to execute this Agreement on behalf of the Greenlight Entity indicated, duly acting on behalf of such limited partnership as its general partner or duly acting on behalf of the entity which serves as its general partner, and that such execution is duly authorized by the respective limited partnership agreements and is done in accordance with applicable state law governing actions by the respective limited partnerships. Each Greenlight Entity executing this Agreement further represents and warrants that it is one of the entities that

filed the February 10, 1999, appraisal action which lead to the Delaware Ruling, and is one of the parties referenced and identified collectively as "Greenlight" in the Delaware Ruling.

### 4.3    Certain Covenants of RTFC.

4.3.1    <u>Commercially Reasonable Efforts.</u>  From and after the date of this Agreement, unless this Agreement is earlier terminated, RTFC shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws to cause the Parties to receive the maximum recovery reasonably attainable with respect to the Innovative Assets, the Prosser Assets and the Belize Assets.

4.3.2    <u>Agreement to Forebear.</u>  During the term of this Agreement and other than as contemplated by this Agreement or agreed to in writing by the Parties, RTFC agrees that until the Greenlight Entities' claims against Prosser have been repaid in full, RTFC shall not (i) exercise or seek to exercise any rights or exercise or seek to exercise any remedies, in each case, against Prosser, with respect to the RTFC Claim or the Greenlight Claim purchased by RTFC from the Greenlight Entities hereunder; or (ii) institute any action or proceeding with respect to such rights or remedies, including without limitation, any action of foreclosure against any Prosser Assets held by Prosser.  Notwithstanding the foregoing or anything else in this Agreement to the contrary, except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner, waive, limit, impair, or restrict the ability of RTFC (A) to protect and preserve its rights, remedies, and interests, including, without limitation, those rights, remedies and interests associated with the RTFC Claim or any other claim against the Innovative Assets, the Prosser Assets or the Belize Assets, nor (B) to support or pursue fraudulent conveyance or other transfer avoidance actions under the Bankruptcy Code or other applicable transfer avoidance law.

4.3.3    <u>Exercise of RTFC Remedies.</u>  RTFC may at any time, in its sole discretion, enforce any rights, and exercise any remedies, in connection with the RTFC Claim and the Greenlight Claim purchased by RTFC from the Greenlight Entities hereunder, all in such order and in such manner as it may determine in the exercise of its sole business judgment; <u>provided</u> that the enforcement of such rights and exercise of such remedies is consistent with the terms of this Agreement.  Such exercise and enforcement may include, without limitation, the rights to foreclose on, and sell or otherwise dispose of, Collateral securing the RTFC Claim, to release guarantors, to incur expenses in connection with such sale or disposition and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code or any other applicable law of any applicable jurisdiction and the right to refrain from taking any action otherwise permitted in connection with the RTFC Claim, in each case, except as provided in section 4.3.2 hereof.

4.4    **Independent Actions by Parties.**  Nothing contained in this Agreement shall prohibit a Party from taking independent action not inconsistent with this Agreement to pursue enforcement and collection of its claims against an Obligor, including accelerating the maturity of obligations, demanding payment which it has a right to demand, or instituting legal action against an Obligor to obtain a judgment or other legal process in respect of such claim, or prohibit or limit RTFC from extending post-bankruptcy financing to any of the Obligors.  In

addition to the foregoing, RTFC and the Greenlight Entities shall cooperate to seek a mutually satisfactory restructuring of (1) the obligations of Vitelco to its creditors and (2) the terms and conditions of Vitelco's outstanding preferred shares.

4.5    **Relation of Parties.** This Agreement is entered into solely for the purposes set forth herein, and, except as otherwise provided herein, neither RTFC nor any of the Greenlight Entities assumes any responsibility to any other Party hereto to advise such other Party of information known to such Party regarding the financial condition of any Obligor or of any other circumstances bearing upon the risk of nonpayment of any portion of claims against an Obligor.

5.    MISCELLANEOUS PROVISIONS

5.1    **Benefits of Agreement.** Each Party specifically acknowledges and agrees that nothing contained in this Agreement is, or is intended to be, for the benefit of any Obligor or any other person, and no Person other than the Parties is responsible or liable for, entitled to rely upon, or entitled to raise as a defense -- in any manner whatsoever -- any of these Sections of this Agreement. Except as otherwise specifically provided, nothing contained herein shall limit or in any way modify any of the obligations of the Obligors to the Parties.

5.2    **Entire Agreement.** This Agreement represents the entire Agreement between and among the Parties with respect to the subject matter hereof and, except as otherwise provided, this Agreement may not be altered, amended, modified or terminated except in a writing executed by all the Parties to this Agreement.

5.3    **Notices.** Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed or sent by facsimile to the Parties hereto at the respective addresses or facsimile numbers, as applicable, set forth on the **Notices Addendum** hereof. All notices and other communications given to any Party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service, or on the Business Day following receipt of good transmission notification to the sender's facsimile machine if sent by facsimile, or on the date three Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in the Notices Addendum hereof.

5.4    **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective successors, transferees and assigns.

5.5    **Consents, Waivers.** All waivers or consents with respect to any provision of this Agreement shall be effective only if the same shall be in writing and signed by all of the Parties.

5.6    **Governing Law.** This Agreement shall be governed as to all matters by, and construed in accordance with, the substantive laws of the State of Delaware, excluding (to the greatest extent permissible by law) any rule of law that would cause the application of the laws of any jurisdiction other than the State of Delaware. To the greatest extent possible, all undefined terms used in this Agreement shall be construed to have the meaning ascribed to them under the laws of the State of Delaware. Subject to any applicable United States bankruptcy law and rules, the Parties hereto submit to the non-exclusive jurisdiction and venue of the federal and

state courts of the Commonwealth of Virginia and hereby waive any right to trial by jury for the resolution of disputes which may arise hereunder.

      5.7    **Counterparts.** This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one Agreement and any of the Parties hereto may execute this Agreement by signing any such counterpart.

      5.8    **Sale of Interest.** No Party will sell, transfer or otherwise dispose of any interest in this Agreement unless the purchaser or transferee agrees, in writing, to be bound by the terms of this Agreement pursuant to an appropriate Joinder Agreement executed and delivered to each other Party hereto.

      5.9    **Severability.** In case any one or more of the provisions contained in this Agreement shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

      5.10    **Effectiveness.** This Agreement shall not be effective until it shall have been executed and delivered by each Party.

      5.11    **Headings.** The headings of the sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

      5.12    **Effect of Bankruptcy or Insolvency.** This Agreement shall continue in effect notwithstanding the bankruptcy or insolvency of any party hereto or any Obligor.

      5.13    **Expenses.** Whether or not this Agreement becomes effective or the transactions contemplated hereby are consummated, each of the parties agrees to pay all of its own out-of-pocket expenses incurred in connection with the preparation, execution and delivery of this Agreement and any other documentation contemplated hereby.

      5.14    **Further Assurances.** Each of the Parties, at its own expense and at any time from time to time, upon the written request of the other Party or Parties hereto, will promptly and duly execute and deliver such further instruments and documents and take such further actions as the other Party or Parties reasonably may request for the purposes of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted.

      5.15    **Confidentiality.** The Parties recognize that, in connection with the performance of this Agreement, each party or their respective affiliates (in such capacity, the **"Disclosing Party"**) may disclose Confidential Information (as defined below) to the other party or parties or such party's or parties' affiliates (the **"Receiving Party"**). For purposes of this Agreement **"Confidential Information"** means (i) proprietary information (whether owned by the Disclosing Party or a third party to whom the Disclosing Party owes a non-disclosure obligation) regarding the Disclosing Party's business, (ii) information which is marked as confidential at the time of disclosure to the Receiving Party, or if in oral form, is identified as confidential at the time of oral disclosure and reduced in writing or other tangible (including electronic) form including a prominent confidentiality notice and delivered to the Receiving Party within thirty (30) days of disclosure; or (iii) information regarding this Agreement, the terms thereof or the

terms of the relationship among the parties created thereby. **"Confidential Information"** shall not include information which: (A) was known to the Receiving Party prior to the disclosure by the Disclosing Party; (B) becomes publicly known through no wrongful act of the Receiving Party; (C) has rightfully been received by the Receiving Party from a third party; or (D) has been independently developed by the Receiving Party. The Receiving Party agrees (x) not to use any such Confidential Information for any purpose other than in the performance of its obligations under this Agreement and (y) not to disclose any such Confidential Information, except (1) to its employees who are reasonably required to have the Confidential Information in connection herewith, (2) to its agents, representatives, lawyers and other advisers that have a need to know such Confidential Information and (3) pursuant to, and to the extent of, a request or order by a governmental authority. The Receiving Party agrees to take all reasonable measures to protect the secrecy and confidentiality of, and avoid disclosure or unauthorized use of, the Disclosing Party's Confidential Information.

5.16    **Survival.** The provisions of Sections 5.6, 5.13 and 5.15 and this Section 5.16 shall survive the termination of this Agreement.

5.17    **Termination.** In the event that any Party shall materially breach its covenants or agreements set forth in this Agreement, which breach shall remain uncured for a period of thirty (30) days from and after the date on which written notice thereof is given by the non-breaching Party, this Agreement shall be terminable at any time thereafter at the election of the non-breaching Party and, except as provided in Section 5.16 hereof, the obligations of the parties hereunder shall terminate.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their duly authorized officers, all as of the day and year first above written.

RURAL TELEPHONE FINANCE COOPERATIVE

By_____

Title and name:_____

GREENLIGHT CAPITAL OFFSHORE, LTD.

By_____

Title and name:_____

GREENLIGHT CAPITAL, L.P.

By_____

Title and name:_____

GREENLIGHT CAPITAL QUALIFIED, L.P.

By_____

Title and name:_____

## NOTICES ADDENDUM

**RURAL TELEPHONE FINANCE COOPERATIVE**

2201 Cooperative Way
Herndon, VA 20171-3025
Attn: Steven L. Lilly
Attn.: John J. List
Fax No.: 703-709-6780

**GREENLIGHT CAPITAL, L.P.**

**GREENLIGHT CAPITAL OFFSHORE, LTD.**

**GREENLIGHT CAPITAL QUALIFIED, L.P.**

140 East 45th Street
New York, New York 10017
Attn: David Einhorn
Fax No.: 212-973-9219

**ATTORNEYS:**

LeBoeuf, Lamb, Greene & MacRae, LLP
125 West 55th Street
New York, NY 10019-5389
Attn.: Eric W. Cowan
Attn.: Jonathan D. Siegfried
Fax No.: 212-424-8500

**ATTORNEYS:**

Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square, Seventh Floor
Wilmington, Delaware 19801
Attn: Thomas J. Allingham, II
Attn: Gregg M. Galardi
Fax No.: 302-651-3001

– and –

Fulbright & Jaworski L.L.P.
2200 Ross Ave., Suite 2800
Dallas, Texas 75201
Attn.: Toby L. Gerber
Attn.: Michael Anglin
Fax No.: 214-855-8200

Note: Any change of address or other contact
information must be served by certified mail
upon each other Party listed above.

# SCHEDULE 1

### RTFC Claim for ICC as of October 21, 2005

| | |
|---|---:|
| Principal Outstanding | 481,962,421.43 |
| Interest due through October 21st [1] | 15,924,284.30 |
| Legal Fees[2] | 8,972,216.70 |
| Travel Expenses | 18,642.06 |
| | |
| Total Claim as of 10/21/05[3] | 506,877,564.49 |

[1]Interest due does not include default interest, but does include interest for line of credit 3/20/05-10/21/05.

   Line of credit interest has not been included on invoices.

[2]Legal fees include $1,813,656.36 in fees billed by LeBoeuf, but not yet paid (or recorded)

[3]Total claim does not include late fees

432996.01-Wilmington Server 1A - MSW

OCT. 25. 2005  9:30AM    CFC. LSG. 703. 709. 6774                    NO. 241    P. 1

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their duly authorized officers, all as of the day and year first above written.

RURAL TELEPHONE FINANCE COOPERATIVE

By_____

Title and name: Steven Lilly, Senior Vice President and Chief Financial Officer

GREENLIGHT CAPITAL, L.P.

By_____

Title and name:_____

GREENLIGHT CAPITAL OFFSHORE, LTD.

By_____

Title and name:_____

GREENLIGHT CAPITAL QUALIFIED, L.P.

By_____

Title and name:_____

Page 18

INTERCREDITOR AGREEMENT

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their duly authorized officers, all as of the day and year first above written.

RURAL TELEPHONE FINANCE COOPERATIVE

By_____

Title and name:_____

GREENLIGHT CAPITAL OFFSHORE, LTD.

By *Greenlight Capital, Inc., its investment adviser*

Title and name: President, David Einhorn

GREENLIGHT CAPITAL, L.P.

By *Greenlight Capital, LLC its general partner*

Title and name: Senior Managing Member, David Einhorn

GREENLIGHT CAPITAL QUALIFIED, L.P.

By *Greenlight Capital, LLC, its general partner*

Title and name: Senior Managing Member, David Einhorn

Page 18

INTERCREDITOR AGREEMENT

## EXHIBIT 2

The Petitioning Creditors assert that they are unsecured creditors of the Involuntary Debtor based upon, among other things, the Involuntary Debtor's assumption of the liabilities of Innovative Communication Corporation, a dissolved U.S. Virgin Islands corporation ("Old Innovative") (including Old Innovative's liability on the Delaware Judgment) pursuant to section 1.2 of the Reorganization Agreement, dated December 23, 1998, by and between Old Innovative and Atlantic Tele-Network Co. (predecessor by name change to the Involuntary Debtor) (the "Reorganization Agreement"), a copy of which is attached hereto as Exhibit A, the Assumption attached to the Reorganization Agreement, or otherwise applicable law.

**EXHIBIT A TO EXHIBIT 2**

**REORGANIZATION AGREEMENT**

## REORGANIZATION AGREEMENT

REORGANIZATION AGREEMENT dated this 23rd day of December, 1998, by and between INNOVATIVE COMMUNICATION CORPORATION, a U.S. Virgin Islands corporation (the "Transferor"), and ATLANTIC TELE-NETWORK CO., a U.S. Virgin Islands corporation (the "Transferee").

WHEREAS, the Transferee desires to acquire all of the assets of the Transferor (including the shares of capital stock of the companies identified on ANNEX A hereto (the "Shares"), the $20,000,000 Promissory Note of Jeffrey J. Prosser dated October, 1997 (the "Prosser Note") and the $53,722,567 Promissory Note of Innovative Communication Subsidiary Company, LLC (the "LLC Note" and, together with the Prosser Note, the "Notes")) and assume all of the liabilities of the Transferor in a reorganization within the meaning of Section 368(a)(1)(C) of the Internal Revenue Code of 1986, as amended, upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and of the respective representations, warranties, covenants, agreements and conditions contained herein, the Transferor and the Transferee agree as follows:

### 1. Closing.

1.1 Time and Place of Closing. The closing of the transactions hereunder (the "Closing") shall take place at the offices of Cahill Gordon & Reindel, 80 Pine Street, New York, New York 10005 at the earliest practicable time after the conditions to Closing set forth in Section 2 hereof have been satisfied or waived.

1.2 Transactions at the Closing. At the Closing, the Transferor shall assign and deliver to the Transferee all of the assets of the Transferor, including the Notes and the certificates for the Shares, together with stock powers executed in blank, and the Transferee shall deliver to the Transferor 52,000 shares of its Senior Preferred Stock, Series A (the "Preferred Stock"), and assume all of the liabilities of the Transferor including indebtedness of the Transferor owing to the Rural Telephone Finance Cooperative (the "RTFC").

2.    Conditions to Closing.

2.1 Conditions Precedent to Obligations of the Transferee. The obligations of the Transferee to be discharged under this Agreement on or prior to the Closing are subject to satisfaction of the following conditions at or prior to the Closing (unless expressly waived in writing by the Transferee, at or prior to the Closing):

(a) Compliance by the Transferor. All of the terms, covenants and conditions of this Agreement to be complied with and performed by the Transferor at or prior to the Closing shall have been complied with and performed in all material respects, and the representations and warranties made by the Transferor in this Agreement shall be correct in all material respects at and as of the Closing, with the same force and effect as though such representations and warranties had been made at and as of the Closing, except for changes contemplated by this Agreement and except for representations and warranties that are made at a specific time, which shall be true and correct in all material respects only at such time.

(b) No Legal Action. No action, suit, investigation or other proceeding relating to the transactions contemplated hereby shall have been instituted before any court or instituted or threatened by any governmental body which presents a substantial risk of the restraint or prohibition of the transactions contemplated hereby or the obtaining of material damages or other material relief in connection therewith.

2.2 Conditions Precedent to Obligations of the Transferor. The obligations of the Transferor to be discharged under this Agreement on or prior to the Closing are subject to satisfaction of the following conditions at or prior to the Closing (unless expressly waived in writing by the Transferor at or prior to the Closing):

(a) Compliance by the Transferee. All of the terms, covenants and conditions of this Agreement to be complied with and performed by the Transferee at or prior to the Closing shall have been complied with and performed in all material respects, and the representations and warranties made by the Transferee in this Agreement shall be correct in all material respects at and as of the Closing, with the same force and effect as though such representations



and warranties had been made at the Closing, except for changes contemplated by this Agreement.

(b)  No Legal Action.  No action, suit, investigation or other proceeding relating to the transactions contemplated hereby shall have been instituted before any court or instituted or threatened by any governmental body which presents a substantial risk of the restraint or prohibition of the transactions contemplated hereby or the obtaining of material damages or other material relief in connection therewith.

3.  Representations of the Transferor.  The Transferor hereby represents and warrants to the Transferee as follows:

3.1  Organization, Good Standing, Power, Authority, etc.  The Transferor is a corporation duly organized, validly existing and in good standing under the laws of the Virgin Islands.  The Transferor has the full corporate power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.  The Transferor has taken all action required by law, the Transferor's Certificate of Incorporation, its By-laws or otherwise required to be taken by it to authorize the execution and delivery of this Agreement and the consummation of the sale contemplated hereby.  This Agreement is a valid and binding obligation of the Transferor, enforceable in accordance with its terms, except that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and general principles of equity.

3.2  No Conflicts; No Consents.  Neither the execution and delivery of this Agreement nor the consummation by the Transferor of the sale contemplated hereby will (a) conflict with, or result in breach of, any provision of the Certificate of Incorporation or By-laws of the Transferor, (b) violates any statute or law or any judgment, order, writ, injunction, decree, regulation or rule applicable to the Transferor, or (c) result in default, with or without the giving of notice (or give rise to any right of termination, cancellation or acceleration), under any of the terms, conditions or provisions of any note, bond, indenture, franchise, license, permit or agreement or other instrument or obligation to which the Transferor is a party or to which any of the assets of the Transferor are subject.  No consent, authorization or approval of, or declaration, filing or registration with, any governmen-

-4-

tal or regulatory authority is required in connection with the
execution and delivery of, and the performance by the Trans-
feror of its obligations under, this Agreement or the consumma-
tion by the Transferor of the sale contemplated hereby.

4.    Representations of the Transferee.  The Trans-
feree hereby represents and warrants to the Transferor that:

4.1  Organization, Good Standing, Power, Author-
ity, etc.  The Transferee is a corporation duly organized, val-
idly existing and in good standing under the laws of the Virgin
Islands.  The Transferee has the full corporate power and
authority to execute and deliver this Agreement, and to perform
its obligations under this Agreement.  The Transferee has taken
all action required by law, the Transferee's Certificate of
Formation or otherwise required to be taken by it to authorize
the execution and delivery of this Agreement and the consumma-
tion of the sale contemplated hereby.  This Agreement is a
valid and binding agreement of the Transferee, enforceable in
accordance with its terms, except that such enforcement may be
subject to bankruptcy, insolvency, reorganization, moratorium
or other similar laws now or hereafter in effect relating to
creditors' rights and general principles of equity.

4.2  No Conflicts; No Consents.  Neither the
execution and delivery of this Agreement nor the consummation
by the Transferee of the sale contemplated hereby will (a) con-
flict with, or result in a breach of, any provision of its Cer-
tificate of Incorporation or By-Laws or (b) violate any statute
or law or any judgment, order, writ, injunction, decree, rule
or regulation applicable to the Transferee and/or any of its
subsidiaries.  No consent, authorization or approval of, or
declaration, filing or registration with, or exemption by, any
governmental or regulatory authority is required in connection
with the execution and delivery of, and the performance by the
Transferee of its obligation under, this Agreement or the con-
summation by the Transferee of the sale contemplated hereby.

5.    Successors and Assigns.  All covenants and
agreements contained in this Agreement by or on behalf of each
of the parties hereto shall bind, and inure to the benefit of,
the respective successors and assigns of the parties hereto.

6.    Miscellaneous.

6.1  Governing Law.  This Agreement shall be
construed in accordance with and governed by the laws of the



-5-

State of New York, without giving effect to the principles of conflict of laws thereof.

6.2 Severability; Interpretation. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the Transferor and the Transferee direct that such court interpret and apply the remainder of this Agreement in the manner which it determines most closely effectuates their intent in entering into this Agreement, and in doing so particularly take into account the relative importance of the term, provision, covenant or restriction being held invalid, void or unenforceable.

6.3 Headings. The section headings herein are for convenience only and shall not affect the construction hereof.

6.4 Entire Agreement. This Agreement embodies the entire agreement between the parties relating to the subject matter hereof and any and all prior oral or written agreements, representations or warranties, contracts, understandings, correspondence, conversations, and memoranda, whether written or oral, between the Transferee, on the one hand, and the Transferor, on the other, or between or among any agents, representatives, parents, subsidiaries, affiliates, predecessors in interest or successors in interest, with respect to the subject matter hereof, are merged herein and replaced hereby.

6.5 Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.







**REORGANIZATION AGREEMENT**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement this 23rd day of December, 1998.



INNOVATIVE COMMUNICATION
CORPORATION.

By: _____
Name: Jeffrey J. Prosser
Title: President

ATLANTIC TELE-NETWORK CO.

By: _____
Name: Jeffrey J. Prosser
Title: President



ANNEX A

| COMPANY | SHARES |
|---|---|
| St. Croix Cable TV, Inc. | 208,758 (Common Stock) |
| Virgin Islands Cable TV | 48 (limited partnership units) |
| Todd International, Ltd. | 10,000 (Common Stock) |
| Caribbean Communications Corp. | 50,000 (Common Stock) |
| Timbro, Ltd. | 1 (Common Stock) |
| Finacle, Ltd. | 1 (Common Stock) |
| Com Sys International, Ltd. | 1 (Common Stock) |
| XI Management, Ltd. | 1 (Common Stock) |
| FC Management, Ltd. | 1 (Common Stock) |
| TKH Management, Ltd. | 1 (Common Stock) |
| BVI Cable TV, Ltd. | 10,000 (Common Stock) |
| Daily News Publishing, Corp. | 5,200 (Common Stock) |

## ASSUMPTION

1. Reference is made to the Reorganization Agreement dated December 23, 1998 (the "Reorganization Agreement") between Innovative Communication Corporation, a U.S. Virgin Islands corporation (the "Transferor"), and Atlantic Tele-Network Co., a U.S. Virgin Islands corporation (the "Transferee"). Capitalized terms used herein without definition have the respective meanings ascribed to those terms in the Reorganization Agreement.

Pursuant to Section 1.2 of the Reorganization Agreement, the Transferee hereby assumes all of the liabilities of the Transferor, including all indebtedness of the Transferor owing to the RTFC, as of this 23rd day of December 1998. Transferee shall take any and all actions reasonably deemed necessary by RTFC to perfect RTFC's security interest in all of Transferee's assets.

ATLANTIC TELE-NETWORK CO.

By: _____

Name: Jeffrey J. Prosser
Title: President

Acknowledged and Accepted:

RURAL TELEPHONE FINANCE COOPERATIVE

By: _____
    Name:
    Title:

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, **Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia**

# Exhibit N

to

## National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**BANKRUPTCY DIVISION**
**DIVISION OF ST. THOMAS AND ST. JOHN**

IN RE

Jeffrey J. Prosser          Bankruptcy No. 06-30009
    Debtor          Chapter 11

                    **Related to Doc No. 684, Motion of Greenlight**
                    **to . . . File Under Seal the Renewed Motion of**
                    **Greenlight for an Order . . . Converting Jeffrey**
                    **J. Prosser's Bankruptcy Case Under Chapter 11**
                    **of the Bankruptcy Code to a Case Under**
                    **Chapter 7 of the Bankruptcy Code**

                    **Related to Doc. No. 774, Motion to File Under**
                    **Seal RTFC'S Joinder in Renewed Motion of**
                    **Greenlight for an Order Converting Case to**
                    **Chapter 7**

**ORDER CONVERTING CASE TO CHAPTER 7**

        **AND NOW**, this **3**rd day of **October, 2007**,

        **WHEREAS** the Court has reviewed and considered the transcripts, the evidentiary

record, the parties' briefs and arguments, and the Examiner's Report(s) and finds that the moving

party has established cause to convert within the meaning of 11 U.S.C. §1112(b)(1);

        **WHEREAS** the record is replete with evidence of the acrimony between the creditors

(RTFC and Greenlight) and Debtor which has caused the reorganization process to come to a

halt;

        **WHEREAS** an abbreviated history of the case is as follows:

                (1)     For years prepetition Debtor and the RTFC and Greenlight disputed and
                litigated, in various fora, the amount owed by Debtor to the creditors.  The

1

financial history of the corporate debtors in which Debtor has an interest[1] is intermingled with Debtor's personal liability.

(2)    Eventually, in approximately April, 2006, Debtor, the RTFC and Greenlight entered into a global settlement by which Debtor would pay $402 million by a date certain which he failed to do. To date, Debtor has not paid any amount towards the $402 million, notwithstanding several extensions of time to pay ordered by this Court during the course of these bankruptcy proceedings. This Court ruled that the global settlement had expired by its terms. That Order has been appealed.

(3)    In June of 2007 Debtor obtained a financing commitment for $620 million but the terms of that agreement will preserve equity for Debtor and requires that the RTFC and Greenlight provide him a release which they refuse to do.

(4)    This Court appointed a Trustee in the cases of the jointly administered corporate debtors. *See* note 1, *supra*. Another corporation in which Debtor has an interest, Innovative Communication Corporation ("New ICC"), Bankr. No. 07-30012, has recently been adjudicated a debtor and was the source of Debtor's income. This Court entered an order in ICC's case, Bankr. No. 06-30008, on September 7, 2007, Doc. No. 870, which gave the Trustee in that case the authority to vote the shares of debtor Emerging Communications, Inc., Bankr. No. 06-30007, thereby effectively giving the Trustee control of New ICC, Bankr. No. 07-30012. The Court found, for reasons stated on the record on September 6 and 7, 2007, that Trustee control of New ICC was necessary to manage a fair and independent sale process. Inasmuch as, due to the corporate structure, Debtor's source of income was New ICC and the corporate structure is now subject to the Trustee's control, Debtor has no ability to control his income.

(5)    Furthermore, the Pension Benefit Guaranty Corporation represented to this Court at the hearing on September 6, 2007, that its claim is approximately $30 million to date, $10 million of which constitutes statutory liens. Transcript of September 6, 2007, Bankr. No. 07-30012, Doc. No. 52, at 126. Debtor's Schedules and Amended Schedules, Bankr. No. 06-30009, Doc. Nos. 26 and 359, respectively, indicate that his liabilities exceed his assets by at least $147 million. The amount stated on the Amended Schedules as owed to RTFC and Greenlight is represented on the Schedules to be only the principal amount of their claims.

(6)    All the evidence at all the hearings before this court establish that Debtor

---

[1]Emerging Communications, Inc., Bankr. No. 06-30007, Innovative Communication Company, LLC ("ICC"), Bankr. No. 06-30008, jointly administered at Bankr. No. 06-30008, and Innovative Communication Corporation ("New ICC"), 07-30012.

has no basis for a claim to equity in the corporations. Even if the agreement establishing the $402 million settlement amount is found by an appellate court to be viable, Debtor has no equity in assets. Moreover, Debtor's personal assets, net of exemptions, are worth less than the liabilities against them.

(7)    In June of 2007 Debtor obtained a financing commitment that he proposes to incorporate into a liquidating plan but the creditors have stated that they will not approve any such plan filed by Debtor inasmuch as, per the terms of Debtor's financing commitment, creditors would have to provide him a release which they refuse, and are not required, to do. Creditors have stated their intention to file their own liquidating plan.

**WHEREAS** based upon assets and liabilities, any plans will have to be liquidating plans due to the amount of debt compared with the value of assets;

**WHEREAS** the RTFC and Greenlight have stated repeatedly that under no circumstances will they support any plan Debtor might propose and will file their own plan;

**WHEREAS** the cost of litigation will be less in a Chapter 7 because, in light of the acrimony between the RTFC and Greenlight on the one hand and Debtor on the other, a Chapter 7 Trustee as an independent fiduciary will be better able to assess what is in the best interests of the estate;

**WHEREAS** Debtor's counsel admitted at the hearing on September 21, 2007, that it was necessary to have Debtor's nondebtor wife's agreement and cooperation in order to confirm a plan and sell assets but that has not yet been obtained, there is no testimony that such agreement of Debtor's wife will be obtained, and neither she nor anyone on her behalf has appeared in this case;

**WHEREAS** Debtor has substantial personal debts and contributes to the payment of his nondebtor wife's debts;

**WHEREAS** Debtor's major source of income has been from his employment with

3

Innovative Communication Corporation, Bankr. No. 07-30012, which employment has been

terminated and, although the corporate Trustee stated on the record that another arrangement

employing Debtor may be reached soon, any amount that would be paid to Debtor would be less

than what he has been receiving;

    **WHEREAS** Debtor's nominal income from dividends or distributions from his bank

stock is irregular;

    **WHEREAS**, according to the Examiner's investigation to date, Debtor's personal

liabilities exceed his income and/or the value of his non-exempt assets;

    **WHEREAS** the Bankruptcy Code requires debtors to list all claims, even contingent

claims;

    **WHEREAS** information was offered on the record, but not yet subject to proof, which

would indicate that the Internal Revenue Service ("IRS") may have a claim;

    **WHEREAS** the Examiner discovered that Debtor did not list the IRS as a creditor and

the docket reflects that the IRS did not get notice of the proof of claim bar date and, therefore,

the Chapter 7 Trustee will be required to ensure that the IRS gets proper notice of the Chapter 7

claims bar date in the event that the IRS has a claim;

    **WHEREAS** this Court entered an Order on August 3, 2007, Doc. No. 729, requiring

Debtor to give the Examiner in the instant case and the Trustee in the corporate case

> immediate, full, complete and unfettered access to any and all
> personnel, books, records, documents and accounts, including bank
> accounts, of (i) the Debtor, (ii) any entity or organization . . . in
> which the Debtor has any interest . . . or any entity or organization
> over which the Debtor either directly or indirectly, exercises any
> influence or any degree of control . . . and (iii) any entity or
> organization . . . which is owned or under the direction or control
> of any entity or organization in which the Debtor has any interest

4

or over which the Debtor, either directly or indirectly exercises any influence or control;

**WHEREAS** the Order of August 3, 2007, provided that, upon the filing by the Trustee or Examiner of an affidavit of Debtor's failure to comply with that Order, the Court "may" enter a conversion order;

**WHEREAS** such an affidavit was filed by the Trustee on September 19, 2007, at Doc. No. 832 and, notwithstanding the terms of the Order, the Court held a hearing with respect to conversion on September 21, 2007;

**WHEREAS** as of the hearing on September 21, 2007, Debtor still had not released to the Examiner his personal checking account statement and had not requested, or only recently requested, records from his bank and, although information was sought for a time period of 10 years, no effort was made by Debtor to provide recent information;

**WHEREAS** in January, 2007, Debtor filed a plan, Doc. 245, but without a disclosure statement and which the Court found was unconfirmable;

**WHEREAS** in light of Debtor's loss of income, the fact that liabilities exceed assets, that his nondebtor wife may have claims against assets he proposes to use to fund a liquidating plan, and that the financing Debtor received requires creditors to release all claims against Debtor and creditors refuse to do so,

**WHEREAS** Debtor has no equity in corporate debtors which, with Debtor, owe substantial sums (i.e., at least $402 million, by Debtor's account) to the RTFC and Greenlight and which the parties have been unable to resolve to date;

**WHEREAS** on September 7, 2007, this Court entered an Order in Bankr. No. 06-30008, at Doc. No. 870 permitting the corporate Trustee to vote the shares held by Emerging

5

Communications Corporation, Bankr. No. 06-30007, in New ICC, Bankr. No. 07-30012, thereby

removing Debtor's control of his major source of income;

**Now, therefore,** the Court finds, pursuant to 11 U.S.C. §1112(b) as follows:

(A) this bankruptcy case is now over 14 months old and there is no likelihood of a

reasonable prospect of rehabilitation of Debtor's financial affairs in a Chapter 11;

(B) whereas, notwithstanding orders of this Court extending deadlines to make payment

on a prepetition settlement which Debtor asserts he wishes to assume, Debtor has been unable,

and, therefore, has failed to do so;

(C) whereas, although Debtor filed a plan jointly with the corporate debtors on January 8,

2007, Bankr. No. 06-30009 at Doc. No. 245, Bankr. No. 06-30008 at Doc. No. 275, Bankr. No.

06-30007 at Doc. No. 294, no disclosure statement was filed and the Court found the plan to be

nonconfirmable as a matter of law and no amended plan or any disclosure statement has been

filed to date;

It is **ORDERED** as follows:

(1) the motion to convert to Chapter 7 is **GRANTED** and the above-captioned case is

hereby **converted to Chapter 7, effective immediately;**

(2) the U.S. Trustee shall **immediately** appoint a Chapter 7 Trustee;.

(3) Debtor shall forthwith turn over to the Chapter 7 Trustee all records and property of

the estate in Debtor's custody and control as required by Fed.R.Bankr.P. 1019(4);

(4) within 30 days of the date of this Order, Debtor shall file an accounting of all receipts

and distributions made during the Chapter 11;

(5) within 15 days of the date of this Order, Debtor shall file a schedule of all unpaid

6

debts incurred after the commencement of the Chapter 11 case, as required by Fed.R.Bankr.P. 1019(5), and a list of all postpetition claimants with their names and addresses. **The Clerk shall reject for filing any list of claimants which is not filed in matrix format**;

(6) within 15 days of the date of this Order, Debtor shall file a Financial Report (or reports) covering the period from the last filed financial report through the date of conversion;

(7) **it is the responsibility of Debtor's counsel to ensure that the above reports are timely filed and failure to do so may result in sanctions against counsel**;

(8) within15 days of the date of this Order, Debtor shall file the Statements and Schedules required by Fed.R.Bankr.P. 1019(1)(A) and 1007(b), if not already filed;

(9) the Clerk shall send the notice required by Fed.R.Bankr.P. 1019(6). If the report that Debtor is required to file pursuant to this Order is filed in time for the Clerk to include postpetition creditors in the §341 notice mailing, the Clerk shall so include the postpetition creditors in that mailing. If the report is not filed in time to include postpetition creditors in the §341 notice mailing, within ten (10) days of the filing of the report the Clerk shall send the notice required by Fed.R.Bankr.P. 1019(6) to those creditors;

(10) all Chapter 11 fee petitions by any professional shall be filed with the Clerk of the Bankruptcy Court within forty-five (45) days hereof. The fee petitions shall be captioned "Chapter 11 Fee Petition in Converted Case."

It is **FURTHER ORDERED** that counsel for Debtor shall immediately serve a copy of

7

this Order on any professional of record in this case and shall file a certificate of service with the

Clerk of the Bankruptcy court within ten (10) days hereof.

Judith K. Fitzgerald                    rmab
Judith K. Fitzgerald
United States Bankruptcy Judge

8

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, **Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia**

# Exhibit O

to

## National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss

Form J56 (02/98)
orlf.jsp

**UNITED STATES BANKRUPTCY COURT**
**District of Nebraska**
**111 South 18th Plaza**
**Suite 1125**
**Omaha, NE 68102**

---

In Re:

    John Patrick Raynor                        Bankruptcy Proceeding No.  04−83112

    Debtor(s)

---

### ORDER FOR RELIEF UNDER CHAPTER 7

On consideration of the petition filed on September 13, 2004 by (against) the above−named debtor, an order for relief under this chapter of the Bankruptcy Code (title 11 of the United States Code) is granted.

Dated:  6/2/05

                                   BY THE COURT:

                                   Timothy J. Mahoney
                                   Chief Judge

Copies mailed or electronically sent by the Court to:
U.S. Trustee
Debtor(s)
Debtor's Attorney
Trustee

FORM B9D (Chapter 7 Corporation/Partnership Asset Case) (9/97)                                           Case Number **04−83112**

## UNITED STATES BANKRUPTCY COURT
### District of Nebraska

### Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines

A bankruptcy case concerning the debtor Individual listed below was originally filed under chapter 11 on 9/13/04 and was converted to a case under chapter 7 on 6/2/05.

You may be a creditor of the debtor. **This notice lists important deadlines.** You may want to consult an attorney to protect your rights. All documents filed in the case may be inspected at the bankruptcy clerk's office at the address listed below. NOTE: The staff of the bankruptcy clerk's office cannot give legal advice.

### See Reverse Side For Important Explanations.

Debtor(s) (name(s) and address):
John Patrick Raynor
10110 Nicholas Street, Suite 102
Omaha, NE 68114

| Case Number: | Taxpayer ID Nos.: |
|---|---|
| 04−83112 | |

| Attorney for Debtor(s) (name and address): | Bankruptcy Trustee (name and address): |
|---|---|
| Jenna B. Taub | Richard D. Myers |
| Robert Craig PC | Chapter 7 Trustee |
| 1321 Jones Street | 11404 West Dodge Road |
| Omaha, NE 68102 | Suite 500 |
| Telephone number: (402) 408−6000 | Omaha, NE 68154 |

### Meeting of Creditors:

Date: **July 5, 2005**                    Time: **10:30 AM**

Location: **Roman L. Hruska Courthouse, 111 South 18th Plaza, US Trustee Meeting Room, Omaha, NE 68102**

### Deadlines:

Proof of Claim must be *received* by the bankruptcy clerk's office by the following deadline:

### Deadlines to File a Proof of Claim:

For all creditors (except a governmental unit):        For a governmental unit: 180 days from order for relief

### Creditors May Not Take Certain Actions:

The filing of the bankruptcy case automatically stays certain collection and other actions against the debtor and the debtor's property. If you attempt to collect a debt or take other action in violation of the Bankruptcy Code, you may be penalized.

### Please Do Not File a Proof of Claim Unless You Receive a Notice To Do So.

| **Address of the Bankruptcy Clerk's Office:** | **For the Court:** |
|---|---|
| U.S. Bankruptcy Court | Clerk of the Bankruptcy Court: |
| 111 South 18th Plaza | Diane Zech |
| Suite 1125 | |
| Omaha, NE 68102 | |

| Hours Open: Monday − Friday 8:00 AM − 4:30 PM | Date: 6/3/05 |
|---|---|

## EXPLANATIONS

FORM B9D (9/97)

| | |
|---|---|
| Filing of Chapter 7 Bankruptcy Case | A bankruptcy case under chapter 7 of the Bankruptcy Code (title 11, United States Code) has been filed in this court by or against the debtor(s) listed on the front side, and an order for relief has been entered. |
| Creditors May Not Take Certain Actions | Prohibited collection actions are listed in Bankruptcy Code § 362. Common examples of prohibited actions include contacting the debtor by telephone, mail or otherwise to demand repayment; taking actions to collect money or obtain property from the debtor; repossessing the debtor's property; and starting or continuing lawsuits or foreclosures. |
| Meeting of Creditors | A meeting of creditors is scheduled for the date, time and location listed on the front side. *The debtor's representative must be present at the meeting to be questioned under oath by the trustee and by creditors.* Creditors are welcome to attend, but are not required to do so. The meeting may be continued and concluded at a later date without further notice. |
| Claims | A Proof of Claim is a signed statement describing a creditor's claim. If a Proof of Claim form is not included with this notice, you can obtain one at any bankruptcy clerk's office. If you do not file a Proof of Claim by the "Deadline to File a Proof of Claim" listed on the front side, you might not be paid any money on your claim against the debtor in the bankruptcy case. To be paid you must file a Proof of Claim even if your claim is listed in the schedules filed by the debtor.<br><br>CREDITORS WHO MOVE PRIOR TO RECEIVING A FINAL DISTRIBUTION MUST NOTIFY THE CLERK OF THE COURT OF ANY CHANGE OF ADDRESS. |
| Liquidation of the Debtor's Property and Payment of Creditors' Claims | The bankruptcy trustee listed on the front of this notice will collect and sell the debtor's property. If the trustee can collect enough money, creditors may be paid some or all of the debts owed to them, in the order specified by the Bankruptcy Code. To make sure you receive any share of that money, you must file a Proof of Claim, as described above. |
| Bankruptcy Clerk's Office | Any paper that you file in this bankruptcy case should be filed at the bankruptcy clerk's office at the address listed on the front side. You may inspect all papers filed, including the list of the debtor's property and debts, at the bankruptcy clerk's office. |
| Legal Advice | The staff of the bankruptcy clerk's office cannot give legal advice. You may want to consult an attorney to protect your rights. |
| Abandonment of Assets | Within 21 days after the § 341(a) meeting is held, the trustee will file with the court a list of property to be abandoned. If no objection to the list is filed within 40 days after the § 341(a) meeting is held, the property will be deemed abandoned without further action by the court. (To determine the date the § 341(a) meeting is actually held, interested parties may contact the office of the U.S. Trustee at (402) 221–4300.) |
| Appointment of Trustee | The trustee named on the front side is the interim trustee appointed by the U.S. Trustee to serve under general blanket bond. |

### — Refer to Other Side for Important Deadlines and Notices —

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, **Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia**

# Exhibit P

to

## National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
BANKRUPTCY DIVISION
DIVISION OF ST. THOMAS AND ST. JOHN

In Re:

Emerging Communications, Inc.
    Debtor

Bankruptcy No. 06-30007
Chapter 11
**Related to Dkt. No. 484, U.S. Trustee
Application for Approval of Appointment of
Chapter 11 Trustee**

Innovative Communication
Company, LLC
    Debtor

Bankruptcy No. 06-30008
Chapter 11
**Related to Dkt. No. 464, U.S. Trustee
Application for Approval of Appointment of
Chapter 11 Trustee**

Jeffrey J. Prosser
    Debtor

Bankruptcy No. 06-30009

**ORDER APPOINTING STAN SPRINGEL AS CHAPTER 11 TRUSTEE**

    **AND NOW**, this **15**[th] day of **March, 2007**, **WHEREAS** this court held a hearing on the above matters;

    **WHEREAS** counsel for the Public Service Commission ("PSC") represented to the court that the chairperson  for the PSC sent, but did not file in any of these bankruptcy cases, a letter with respect to the PSC's position on appointment of a Chapter 11 Trustee;

    **WHEREAS** this court did not receive the letter;

    **WHEREAS** counsel for the PSC represented to the court that he would fax the letter to Chambers so that the court could review the letter before issuing this order;

    **WHEREAS** when the court did not receive the letter several hours after the hearing and placed a telephone call to counsel for the PSC with respect to same;

    **WHEREAS** over 24 hours have passed and counsel for the PSC has not faxed the letter

and the court has not been provided same from any other source;

It is **ORDERED**, for the reasons expressed on the record at the hearing on  March 14, 2007, that Stan Springel of Alvarez & Marsal, 100 Pine Street, Suite 2200, San Francisco, California, 94111, is appointed Chapter 11 Trustee in the above-captioned cases and shall embark upon his statutory duties immediately.

It is **FURTHER ORDERED** that Mr. Springel shall perform all duties under 11 U.S.C. §1106 and in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, applicable Local Rules, and orders of this court, including but not limited to the Case Management and Administrative Fee Orders, and that he shall take cognizance of and comply with the regulatory authority of the Public Services Commission of the Virgin Islands insofar as it is applicable to the nondebtor utility(ies).

It is **FURTHER ORDERED** that Debtors, including Debtor Jeffrey Prosser, Case No. 06-30009, shall cooperate with the Trustee and shall cause nondebtor entities whose influence in these cases is critical to the reorganization of these cases to cooperate with the Trustee as well.

It is **FURTHER ORDERED** that on or before **April 26, 2007**, the Trustee file a business plan, which, upon motion, may be filed under seal pursuant to the procedures in the Case Management Order in effect in these cases.  The Trustee must serve same on counsel for the following parties:  all Debtors, the Greenlight Entities, the RTFC, the U.S. Trustee, and the Public Services Commision of the Virgin Islands.

It is **FURTHER ORDERED** that if the Trustee files the business plan under seal, counsel for Debtors, the Greenlight Entities, the RTFC, the U.S. Trustee, and the Public Services Commision of the Virgin Islands and the entities themselves shall maintain strict confidentiality with respect to the contents of same.

It is **FURTHER ORDERED** that counsel for Debtors shall serve a copy of this Order on

all creditors and parties in interest who do not receive electronic notice of its entry.

Judith K. Fitzgerald
United States Bankruptcy Judge

*Jeffrey J. Prosser & John P. Raynor v. Federal Agricultural Mortgage Corporation, et al.*, Case No. 1:08-cv-00687-JR in the United States District Court for the District of Columbia

# Exhibit Q

to

## National Rural Utilities Cooperative Finance Corporation's Motion to Dismiss

**IN THE DISTRICT COURT FOR THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN, BANKRUPTCY DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| INNOVATIVE COMMUNICATION | : |
| CORP., | : Case No. 07-30012 (JKF) |
| | : |
| Debtor. | : |
| | : **Related Doc.: 67** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER REQUIRING U.S. TRUSTEE TO IMMEDIATELY APPOINT**
**~~ORDER APPOINTING~~ CHAPTER 11 TRUSTEE**

Came on for consideration Rural Telephone Finance Cooperative's motion for an order appointing an interim chapter 11 trustee (the "Trustee Motion") in the above-captioned Innovative Communication Corporation ("New ICC") bankruptcy case, as well as any joinder, response, and opposition thereto. For the reasons stated on the record at the October 2, 2007 hearing, taking notice of pleadings and other matters of record in certain related cases numbered 06-30008 (jointly administered) and 06-30009 also pending before this Court, having proper jurisdiction in accordance with 28 U.S.C. §§ 157 and 1334, finding that due notice was provided to all relevant parties, and after deliberation and sufficient cause appearing therefore, it is

**ORDERED** as follows:

1.  The United States Trustee shall appoint a chapter 11 trustee for New ICC immediately;

2.  Such chapter 11 trustee shall serve with full statutory powers;

3.  This Court hereby reserves jurisdiction to interpret and enforce this Order; and

4.  Notwithstanding any Bankruptcy Rule to the contrary, this Order shall take effect immediately upon its entry.

**ORDERED** in the U.S. Virgin Islands on __**October 3**__ , 2007.

_Judith K. Fitzgerald_

THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

Copy to Daryl Dodson, Esq.

(Daryl Dodson is directed to serve copies of this order upon all interested parties on the Master Service List and to file a certificate of service)