## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Jeffrey J. Prosser, pro se, and John P. Raynor, pro se, <br><br> Plaintiffs, <br><br> v. <br><br> Federal Agricultural Mortgage Corporation; the United States Department of Agriculture, and National Rural Utilities Cooperative Finance Corporation; <br><br> Defendants | ) ) ) ) ) ) ) ) ) ) ) ) Civil No.: 1:08-cv-00687 (JR) <br><br> **Motion** |

## MOTION TO DISQUALIFY FULBRIGHT & JAWORSKI L.L.P.

COMES NOW, John P. Raynor, pro se Plaintiff (herein "Movant"), and files this motion to disqualify the firm of *Fulbright & Jaworski L.L.P.* In support thereof, Movant respectfully states as follows:

### Factual Background

1.     Fulbright & Jaworski L.L.P. ("Fulbright) presently 'purports' to represent (i) the Rural Telephone Finance Corporation ("RTFC"); (ii) the National Rural Utilities Cooperative Finance Corporation ("CFC"); (iii) the *audit committee* of the National Rural Utilities Cooperative Finance Corporation ("CFC's Audit Committee"); and (iv) by inference, the management of CFC (the "Management") which serves as the management of RTFC. These parties have conflicting interests.

2.     The foregoing statement regarding Fulbright's representation is based upon the following:

**RECEIVED**

JUN 2 - 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

a.      Fulbright presently represents RTFC, a cooperative association ("coop"), in the bankruptcy proceedings:

(i)      Case No. 06-30008, the voluntary bankruptcy petition of Innovative Communication Company, LLC ("ICC-LLC"), a limited liability company, which case was filed July 31, 2006 in the Bankruptcy Division of the U.S. Virgin Islands Federal District Court.

(ii)     Case No. 3:06-bk-30007, the voluntary bankruptcy petition of Emerging Communications, Inc. ("ECM"), which case was filed July 31, 2006 in the Bankruptcy Division of the U.S. Virgin Islands Federal District Court.

(iii)    Case No. 07-30012, the involuntary bankruptcy of Innovative Communication Corporation ("New ICC"), which was placed in involuntary bankruptcy on September 21, 2007 in the Bankruptcy Division of the U.S. Virgin Islands Federal District Court.

(iv)     Case No. 3:06-bk-30009, the voluntary bankruptcy petition of Jeffrey J. Prosser ("Prosser") the beneficial owner of ICC-LLC, ECM, and New ICC and pro se plaintiff herein, which case was filed July 31, 2006 in the Bankruptcy Division of the U.S. Virgin Islands Federal District Court.

**Exhibit "A"** is an extract from the docket sheet reflecting Fulbright as counsel for RTFC. ICC-LLC, ECM, and New ICC are hereinafter collectively referred to as "ICC".

b.      In this action, Fulbright purports to represent CFC, a coop.

c.      In a grievance filed by Fulbright, initiated and presently pending with the Nebraska Bar Association by and against John P. Raynor ("Raynor"), the Movant herein, Fulbright purports to represent (i) RTFC, (ii) CFC, and (iii) CFC's Audit Committee.   The grievance was filed in response to a letter (the "Financial Expert Letter") written by Raynor to

2

the newly appointed Financial Expert of the Audit Committee appointed in compliance with §

407(a) of the Sarbanes-Oxley Act of 2002 ("SOX").

      d.      Since CFC has 'no ownership' interest in RTFC; RTFC is controlled, in

part, by an interlocking management arrangement whereby CFC's management serves as

RTFC's management.  In actions in the United States Virgin Islands, Fulbright represented the

Management of CFC whom have served and continue to serve as the management of RTFC.

Attached, as **Exhibit "B"**, is the grievance filed by Fulbright and all filings pursuant to the

grievance to the extent such records are available to Raynor.

### The Relationship of CFC-RTFC

3.      Understanding the historical and present relationship by and between CFC and

RTFC is necessary to appreciate the scope of the conflict.

*Historical*

4.      The relationship from 1987 through 2001 was based upon a RTFC voting

arrangement implemented by CFC when CFC formed RTFC which was patently illegal.

5.      From RTFC's creation in 1987 by CFC through fiscal year ended May 31, 2004,

RTFC was domiciled and organized as a South Dakota coop.

6.      From RTFC's creation in 1987 through fiscal year 2001, CFC controlled RTFC

through an **illegal voting arrangement**; in that:

      a.      The laws of South Dakota codify the one-member, one-vote principle that

is one of the fundamental coop principles. For example, the 1999 version of South Dakota Laws

state:

"SDCL § 47-16-10   Votes at meeting.
At any member meeting of a cooperative composed of individual members and member cooperative corporations, each such individual member or corporate member shall be entitled to only one vote."

      b.     The foregoing South Dakota statute is and has been the South Dakota law implementing the one-member, one vote principle, or democratic control principle, essential to characterization of an association as a coop.

      c.     Through the fiscal year 2001, CFC referred to RTFC in SEC documents as: "RTFC is a controlled affiliate of CFC and was created [by CFC] for the purpose of providing and/or arranging financing for its rural telecommunications members and affiliates." (May 31, 2001 10K, page 58)

      d.     CFC stated in SEC documents that "CFC has a $1,000 membership interest in RTFC.  CFC exercises control over RTFC through majority representation on their Boards of Directors."  (2001 10K, Note 1(b), page 77).  CFC never disclosed that its means of control was unlawful.

      e.     When Ernst and Young, L.L.P. ("Ernst") became auditors the voting control CFC exercised over RTFC changed:

"In September 2001, the CFC and RTFC boards of directors approved changes in the governance of RTFC and on October 9, 2001, RTFC received consents from a majority of its members, making the changes effective. CFC is not a member of RTFC and does not elect directors to the RTFC board. In October 2001, **RTFC refunded the $1,000 membership interest to CFC.**" (2002 10K, Note 1(b), page 72) (Emphasis added)

CFC never disclosed in the SEC filings that CFC's voting control of RTFC was blatantly unlawful.

*FY 2002 thru the present: the CFC-RTFC relationship*

7.    from the redemption in October 2001 CFC's golden membership interest in RTFC through this day, CFC exercises inordinate control over RTFC in violation of:

a.    DC ST §§ 29-901(5)(c) and 29-931(4)(a) which require "proportionate amount of savings returns" be allocated to members by systematically and over a long-term basis using CFC's control over RTFC to defalcate patronage income belonging to RTFC and its members.

b.    DC ST § 29-903 that require (as does CFC Bylaws) that the association be operated for the primary and mutual[1] benefit of its patrons.

c.    DC ST § 29-913(b) which provides "No voting agreement or other device to evade the requirements of this section [one member one vote] shall be enforceable at law or in equity".

Presently and since February of 2005, RTFC has been legally domiciled in the District of Columbia.

8.    As organized, this two-tier coop arrangement is designed to keep telephone members from CFC, the center of control; effectively neutering RTFC members' voting rights. RTFC as it exists and functions is a "device" deployed by CFC to deprive RTFC members of their voting rights.  This two-tier coop structure was essential to accomplish the systematic defalcation of RTFC and thereby, the rural telephone companies which also entails the commission of numerous acts by CFC that violate security laws and other laws.

9.    Since fiscal year 2001, CFC does not own any interest in RTFC.   In the 2007 10K, CFC states: "The members of RTFC and NCSC own or control 100% of the interest in the respective company". (2007 10K, FN 10, p. 105)

---

[1] Predatory lending by CFC to rural telephone for the benefit of electric patrons does not satisfy this requirement.

10.    Since October 2001, CFC continues to exercise control over RTFC.  CFC's 2002

10K, Footnote ("FN") 1(b), page 72, stated:

> "CFC is the **sole lender** to and manages the affairs of RTFC through a **long-term
> management agreement**.  All amounts borrowed from CFC **may be accelerated** if
> RTFC obtains financing from another source.   Under a guarantee agreement, CFC
> maintains a loan loss reserve for RTFC.  Six members of the CFC board serve as a loan
> advisory committee to the RTFC board.  All loans that require RTFC board approval also
> **require the approval of the CFC loan advisory committee**." (Emphasis added)

11.    CFC and RTFC have interlocking management arrangements.  The 2004 RTFC

Annual Reports sets for the following management:

(a)    Sheldon C. Petersen, Governor and Chief Executive Officer of both RTFC

and CFC;

(b)    John J. List, Senior Vice President and General Counsel of both RTFC and

CFC;

(c)    Steven L. Lilly, Senior Vice President and Chief Financial Officer of both

RTFC and CFC;

(d)    John T. Evans, Senior Vice President of Operations of both RTFC and

CFC;

(e)    Richard E. Larochelle, Senior Vice President of Corporate Relations of

both RTFC and CFC; and

(f)    John M. Borak, Senior Vice President of Credit Risk Management of both

RTFC and CFC.

Of the six key officers listed in the RTFC 2004 Annual Report only one, Lawrence Zawalick,

Senior Vice President of RTFC, was not an officer of CFC.  **Exhibit "C"**, attached hereto,

consists of an extract from the CFC 2007 10K and an extract from the 2004 RTFC Annual

Report setting forth the key officer of each coop which verifies the foregoing statement.

12.    CFC's general counsel, outside counsel, and independent accountants serve as RTFC's outside counsel and accountants.   RTFC does not employ or engage independent professionals.

*Fulbright's Representation*.

13.    Fulbright's representation of RTFC, CFC, CFC's Audit Committee and the Management facilitates or enables CFC's illegal control exercised by CFC over RTFC.

### The Standing Issue Relationship to CFC's Defalcation of RTFC

14.    Movant seeks declaratory relief that the Federal Agriculture Mortgage Corporation ("Farmer Mac") and the United States Department of Agriculture ("USDA") funding provided CFC is unlawful and further, Movant requests injunctive relief.

15.    CFC has raised a standing issue.

16.    Movant has been notified by Farmer Mac's counsel that they intend to raise a standing issue.

17.    Movant acknowledges that taxpayer standing is insufficient unless there are fundamental constitutional issues.

18.    Movant's arguments supporting standing will revolve around the following:

    a.    Movant has discovered systematic defalcation of RTFC and RTFC members by CFC.

    b.    Farmer Mac and the USDA have a duty and obligation to fully understand CFC's financial condition before committing more than $3.8 Billion of the Federal Fisc to an unregulated, privately-owned entity.

    c.    Prior to any reasonable and thorough investigation into the affairs of CFC would result in knowledge of the RTFC-ICC dispute and the basis of the dispute.

d.    RTFC, acting under the dominion and control of CFC, has improperly instituted a foreclosure suit (the "RTFC Foreclosure Action") against ICC for the purpose to suppress knowledge of, and prevent ICC from seeking redress for, the underlying fraud, the defalcation of patronage income that lawfully belonged to RTFC and its members, itself an illegal scheme.

e.    The RTFC Foreclosure Action violates –

(i)    18 U.S.C. § 1512(c) because the action is based upon a loan document that RTFC's counsel admits is not[2] the loan document executed by ICC and that RTFC destroyed the original loan document.

(ii)    18 U.S.C. § 1513(e) as amended by SOX § 1107 because the action is retaliation for ICC's discovery of the defalcation of RTFC by CFC.

(iii)    18 U.S.C. § 1951(a) because RTFC sought to force ICC and Prosser to surrender valuable property rights through extortion.

f.    The USDA and Farmer Mac have been funding CFC since July of 2005.

g.    That said funding of CFC by the USDA and Farmer Mac is unlawful.

h.    While the USDA and Farmer Mac actions do not rise to the level of liability under 18 U.S.C. § 1962 (d); nevertheless, without the USDA's and Farmer Mac's financial support, CFC could not sustain its actions that have harmed and continue to harm the Movant.

i.    The USDA's and Farmer Mac's financial support of CFC is a *substantial factor in bringing about the harm* to the Movant establishing legal causation pursuant to Restatement (Second) of Torts § 431.

---

[2] RTFC could not authenticate the loan document because a CFC lawyer (acting on behalf of RTFC) admitted under oath that he altered and destroyed the original loan document. Thus, CFC was denied a summary judgment.

19.    Movant has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)

### Prayer

Representing CFC, RTFC, and CFC's Audit Committee, all of which have adverse interest to the others, as well as having represented CFC's Management whom serve as RTFC's Management, the Movant respectfully requests that the Court enter an Order disqualifying the firm of *Fulbright & Jaworski L.L.P.* from representing any of the foregoing parties in this proceeding.

Dated:   May 29, 2008.

<div style="margin-left:50%">

John P. Raynor, Pro Se Plaintiff, Movant

John P. Raynor, Pro Se
Raynor, Rensch & Pfeiffer
10110 Nicholas Street, Suite 102
Omaha, Nebraska 68114
Telephone No.: (402) 498-4400
jraynor@rrplawyers.com

</div>

## Notice of Service

I hereby certify that on May 29, 2008, electronic copies of the above and foregoing pleading were sent by regular United States mail, postage prepaid, to:

Ryan P. Hartman
Fulbright & Jaworski L.L.P.
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2623

Civil Process Clerk
United States Attorney's Office
  For the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

The Honorable Michael B. Mukasey
United States Attorney General
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

Adam P. Strochak
Alexander O. Levine
Weil, Gotshal & Manges L.L.P.
1300 Eye Street, N.W., Suite 900
Washington, D.C. 20005

United States Department of
  Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

Jeffrey J. Prosser
P.O. Box 5227
St. Croix
U.S. Virgin Islands 80823

John P. Raynor

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Jeffrey J. Prosser, pro se, and John P. Raynor, pro se,            )
                                                                  )
                                                                  )    Civil No.: 1:08-cv-00687  *JR*
                                    Plaintiffs,                    )
                                                                  )
    v.                                                            )          **MOL**
                                                                  )
Federal Agricultural Mortgage Corporation; the                    )
United States Department of Agriculture, and                      )
National Rural Utilities Cooperative Finance                      )
Corporation;                                                      )
                                                                  )
                            Defendants                            )

## MEMORANDUM OF LAW

## IN RE:

## MOTION TO DISQUALIFY FULBRIGHT & JAWORSKI L.L.P.

John P. Raynor, the Pro Se Plaintiff (herein "Movant"), respectfully submits this brief in support of his Motion to Disqualify the law firm of *Fulbright & Jaworski L.L.P.* in the above titled action.

### I.

### The Standing Issue

The issue of standing has already been raised by Fulbright. Further, Farmer Mac's counsel has informally stated that standing will be raised. This issue turns upon whether there is a case and controversy sufficient enough to allow Movant standing to seek the declaratory and injunctive relief for violations of Federal regulations that are in fact occurring.

The issue of standing requires a thorough venting of the relationship between the National Rural Utilities Cooperative Finance Corporation ("CFC") and Rural Telephone Finance Corporation ("RTFC") ("CFC-RTFC") which Movant alleges is replete with illegality and cozening including, but not limited to, (i) tax fraud; (ii) securities fraud; (iii) state law violations; and (iii) numerous predicated acts under RICO. Further, the ultimate issue of the requested relief against the USDA will turn upon what facts the USDA 'knew or should have known' when spending the Federal Fisc. The ultimate issue of the requested relief against Farmer Mac will turn upon what facts the USDA 'knew or should have known' when spending the Federal Fisc as well as the patently unlawful investment of $3.8 Billion by Farmer Mac in CFC: a sum nearly six (6) times Farmer Mac's total capital and exceeding the sum necessary for the taxpayer bailout of the Farm Credit Administration in 1987. All of the above requires an examination of the relationship of CFC and RTFC.

In these circumstances, given Fulbright's past and present representation, Fulbright is representing parties with adverse interest and can not represent CFC in this proceeding. This memorandum of law provides the factual basis which establishes the conflict.

## II.

## CFC and RTFC are Coops

Both CFC and RTFC are coops. CFC's 10K, in Part I, Item 1 "Business", continuously commences with the same expression as set forth in the 2007 10K, page 1, which is: "National Rural Utilities Cooperative Finance Corporation ("CFC" or "the Company") is a private, not-for-profit cooperative association incorporated under the laws of the District of Columbia in April 1969". CFC is owned by rural electric companies. In the same part, CFC's 2007 10K, describes the Rural Telephone Finance Corporation as follows: "RTFC is a private not-for-profit

cooperative association incorporated under the laws of the District of Columbia". RTFC is owned by rural telephone companies.

CFC and RTFC are financing coops which are unregulated, private lenders. CFC makes loans directly to rural electric companies and directly to RTFC. RTFC in turn makes loans to rural telephone companies. CFC is RTFC's sole source of funding.

The gravamen of the Movant's antagonistic relationship with CFC is centered upon the profit CFC makes from loans to RTFC, a patron of CFC. Movant's position is that all of RTFC's contribution to CFC's profit must be allocated to RTFC. CFC's position, deduced by CFC's accounting and past practices, is that CFC can use profits from loans to RTFC to subsidize loans made, as well as patronage distributions, to electric companies. Movant avers that CFC's conduct is unlawful; violating many laws including, but not limited to, tax laws, coop laws, and security laws. CFC is a reporting company with over $10 Billion in publicly issued debt outstanding.

This case and controversy involves the inter-workings of two **unaffiliated** coops: CFC and RTFC. Title 29, Chapter 9, of the District of Columbia statutes is devoted to the unique legal requirements of coops. Coops differ from corporations in that coops are to be operated "for the primary and mutual benefit of the **patrons** of the association (or their patrons, if any) as ultimate consumers". DC ST § 29-903. (Emphasis added) In contrast, corporations are operated for the primary benefit of their shareholders. The Internal Revenue Service, in a cogent explanation of the foregoing coop principle, states:

> "We believe the Service's characterization of patronage dividends as price rebates in the case of a purchasing cooperative and as part payment for produce furnished in the case of a marketing cooperative is merely an alternative means of stating that a nonexempt cooperative **must function as a conduit**." GCM 38061, 1979 WL 52855 (IRS General Counsel Memorandum), page 6. (Emphasis added)

In the case of financing coops, patronage dividends are deemed interest rebates. CFC rebates interest that belongs to, and should be rebated to, RTFC (and thus, telephone companies) to subsidize loans and patronage distributions (rebates) to electric companies. The IRS further states:

> "To conclude, as some representatives of the cooperative industry have concluded, that a multi-activity, exempt cooperative may divert earnings produced by one patronage activity to the patrons of another distinct activity, **we believe is plainly inconsistent with the characterization of the cooperative as an agent or conduit**." Id. at page 5. (Emphasis added)

A coop is an aggregation of patrons whom join together to achieve economics of scale. Under the conduit theory, the essence of coops, patrons make money together in contrast to one group of patrons (electric) making money off another group of patrons (telephone). RTFC is an associate member and a patron of CFC. CFC is **not** a member or patron of RTFC.

The *conduit theory* is embedded in CFC's bylaws. These provisions of CFC's bylaws are not gratuitous provisions but rather legal requirements in order to qualify as a coop under the laws of the District of Columbia and also, as a tax-exempt entity[1] under the Internal Revenue Code. Article XI of CFC's bylaws dealing with the "Allocation and Distribution of Net Savings", specifically incorporates the conduit principle. Section 4 of Article XI of CFC's bylaws discusses conduit principle in context of "Patronage Capital Certificates". It states:

> "(a) The books and records of the Association shall be set-up and kept in such a manner that at the end of each fiscal year the amount of patronage capital, if any, **in the form of net savings so furnished *by each patron* is clearly reflected and credited in an appropriate record to the capital account *of each patron*. ...** All such amounts credited to the capital account of any patron shall have the **same status as though they had been paid to the patron in cash in pursuance of a legal obligation to do so and the patron had then furnished the Association corresponding amounts for capital**." (Emphasis added)

---

[1] CFC is exempt under Internal Code Section 501(c)(4).

As a patron of CFC, RTFC is legally entitled to be allocated RTFC's contribution to the income of CFC pursuant to Article XI, Section 4, paragraph (a) of CFC's bylaws. As a conduit CFC is obligated to allocate to RTFC its contribution to CFC's profit. This section is emboldened by subsection (e) of Section 4 which provides "... the Articles of Incorporation and Bylaws [of CFC] shall constitute and be a contract between the Association and each patron...".

The other provisions of Article XI of CFC's bylaws clarify and illuminate the statement in Article XI, Section 1 that: "The Association shall at all times be operated on a cooperative nonprofit basis for the **primary and mutual benefit of its patrons**". (Emphasis added) Section 1 incorporates the provisions of DC ST § 29-903 - Purposes for incorporation.

## III.

## A Glimpse at CFC's Accounting

After the demise of Arthur Andersen LLP ("AA"), CFC engaged Ernst & Young LLP ("Ernst") to prepare the audit report for fiscal year ended May 31, 2002. CFC's Financial Statements for fiscal years 2000, 2001, and 2002 and SEC filings were based upon the "combined" financial statements of CFC and RTFC.

General Accepted Accounting Principles ("GAAP") require disclosure in a footnote to the financial statements of the relative contribution of different segments of an enterprise to the combined income reported in the Income Statement. In CFC's Financial Statements for fiscal year 2002 Ernst reported on two segments for fiscal years 2000, 2001, and 2002: Electric and Telecommunications ("Telephone"). In CFC's Financial Statements for fiscal year 2001 AA reported on two segments for fiscal years 1999, 2000, and 2001: Electric and Telecommunications ("Telephone"). AA and Ernst statements overlapped with both publishing information for the same two years: 2000 and 2001. This table is a comparison of the net margin

(net profit) reported by AA and Ernst as well as net margin reported in RTFC's audited income statement.

|  | (in thousands) | | |
|---|---|---|---|
|  | AA | Ernst | Difference |
| Net Margin per Segment Information: | | | |
| May 31, 2000: Electric | 111,836 | 65,127 | (46,709) |
| May 31, 2001: Electric | 128,949 | 66,193 | (62,756) |
| May 31, 2000: Telephone | 3,497 | 50,206 | 46,709 |
| May 31, 2001: Telephone | 3,817 | 66,573 | 62,756 |
| RTFC's Net Margin per RTFC audit | | | |
| May 31, 2000 | 26,880 | | 0 |
| May 31, 2001 | 38,098 | | 0 |

In the overlap years there are major differences in the segment contribution by each segment as presented by AA and Ernst though there was no change in the Combined Net Margin. Additionally, the income reported by RTFC (telephone) in RTFC's separate audited financial statements does not correspond to the segment information reported by either AA or Ernst in the Combined Financial Statements of CFC-RTFC.

Ernst discussed the change in reporting methodology in the 2002 10K, FN 13, page 97. As to the AA methodology Ernst stated:

"The amount reported for the electric systems represented the total earned on loans from CFC to its electric members **and RTFC**. The amount reported for the telecommunications systems represented the incremental amount earned on its CFC loans that it re-lent to the telecommunications systems." (Emphasis added)

Interpretation - AA methodology allocated earnings captured within CFC from loans CFC made to RTFC to the electric companies. On the other hand, RTFC earnings reflected only the small spread RTFC added to the cost of funds CFC charged RTFC.

In the same footnote, Ernst described the new reporting methodology as follows:

"The new presentation provides a breakout of the income statement between electric loans and telecommunications loans that reflects the full gross margin earned by each portfolio. The telecommunications system income statement now

represents the total earned on telecommunications loans at both the CFC and RTFC levels. The **electric system income statement is now only the amount earned on loans to electric member systems.**" (Emphasis added)

Clearly, the new reporting methodology adopted by Ernst (which is mandated by FAS 131, ¶ 27(b)) is consistent with the conduit or rebate theory that by law governs the allocation of coop earnings.

Since RTFC is a "patron" of CFC, RTFC must be allocated RTFC's contribution to the combined income of CFC-RTFC. This is required by (i) the IRS (CFC is tax exempt while RTFC is taxable); (ii) CFC's bylaws; and (iii) D.C. statutes. Obviously, as the table illustrates, there is a large discrepancy between RTFC's reported income and RTFC's contribution to the combined income of CFC-RTFC as reported by either AA or Ernst.

This litigation or motion is not intended to advocate proper resolution of this conflict. Nevertheless, once the misappropriation issue was raised, RTFC changed accounting firms and re-instituted the AA reporting methodology of segment information. Upon information and belief the present auditor of CFC-RTFC is Randall B. Johnston, the former AA auditor of CFC who had relocated to a new firm. Upon information and belief, Mr. Johnston's involvement as the CFC-RTFC auditor violates § 203 of the Sarbanes-Oxley Act of 2002 (SOX) as implemented by 17 C.F.R. § 210.2-01 making the Deloitte audits of CFC unlawful.

IV.

**Fulbright's Grievance**

A grievance filed against Movant with the Nebraska Bar Association establishes Fulbright's conflict in this proceeding.

Movant wrote about his concerns about the CFC-RTFC relationship to CFC's newly appointed Financial Expert, a member of CFC's audit committee charged with investigating

7

accounting fraud.  Fulbright responded by filing a grievance against Movant.  Attached hereto is Exhibit B which actually consists of three separate exhibits:

1.    Exhibit "B-1" which is the original grievance filed by Fulbright;

2.    Exhibit "B-2" which is Movant's response to the Bar Association; and

3.    Exhibit "B-3" which is the communication as the issue stands today.

Movant does not lightly waive the confidentiality surrounding the grievance; however, the grievance establishes Fulbright's conflict as well as their litigation tactics.

Exhibit "B-1" sets forth the original grievance filed in a letter dated August 29, 2008 (the "Grievance Letter").  Exhibit A to Exhibit "B-1" sets forth the April 30, 2007 letter which was sent to the Financial Expert of the Audit Committee of CFC whom had assumed office March 31, 2007.  This letter is referred to as the "Financial Expert Letter".

On page 1 of the Grievance Letter, Mr. Gerber of Fulbright states as part of the formal complaint that Fulbright represents both CFC and RTFC.  The Grievance alleges that the Movant violated Rule 4.2 of the Nebraska Rules of Professional Conduct, specifically, "Communication with Person Represented by Counsel".  That person is the Financial Expert of CFC's audit Committee.  Thus, Mr. Gerber's grievance is based upon Fulbright's representation of the Financial Expert.  The Financial Expert Letter was sent for the purpose of causing CFC's Audit Committee to initiate an investigation of the actions of CFC's management which serves as RTFC's management (the "Management") (refer to the Motion, Exhibit C).

In essence, the Grievance Letter is evidence that Fulbright represents clients which have adverse interests:

1.    CFC, which does not own any interest whatsoever in RTFC;

2.    RTFC, an entity owned by rural telephone companies;

8

3.    The Financial Expert whom was appointed to fulfill the requirements of SOX § 407 implemented by 17 C.F.R. § 229.407; and

4.    The Management.

No one firm can ethically represent all the foregoing parties in circumstances where the Financial Expert Letter raises issues as to the legality of the CFC-RTFC relationship and requests an investigation to determine whether "CFC has systematically defrauded RTFC" (from page 1 of the Financial Expert Letter).

The following are basic ethical principles:

*Corporate Counsel's Duty.* The March 31, 2003 Report of the American Bar Association Task Force on Corporate Responsibility in discussing then existing ethical considerations for representation of corporate clients stated:

> "Nevertheless, lawyers for the public corporation must bear in mind **that their responsibility is to the corporation**, and not to the corporate directors, officers or other corporate agents with whom they necessarily communicate in representing the corporation. This is the **bedrock principle** recognized in Rule 1.13(a) of the Model Rules. Outside lawyers retained by the corporation and lawyers employed by the corporation both must exercise professional judgment in the interests of the corporate client, independent of the personal interests of the corporation's officers and employees." Page 23 of the Report (Emphasis added)

Exhibit 2 to Exhibit B-2 (Movant's response to the Grievance) contains the full report of the Task Force on Corporate Responsibility.

Fulbright owes a duty to the entity and not to the entity's management. In this case, the conflict is self-evident. CFC and RTFC are unrelated entities (no common ownership) that have extensive and material financial dealings with each other. One counsel can not represent both entities. In fact, RTFC never employs independent counsel. Common counsel (General Counsel as well as outside counsel) is one of the instruments that CFC uses to assert control over RTFC.

9

Fulbright is representing two coops with no common ownership and that have interdependent financial dealings – a conflict per se.

*CFC's Audit Committee.*    There are two key sections of Exhibit B-2, Movant's response to the Nebraska Bar Association to the Grievance (hereinafter the "Response"):

1.    Section II titled "PUBLIC POLICY AS ENACTED IN SOX ENCOURAGES SUCH LETTERS"; and

2.    Section III titled "I SHOULD BE ABLE TO ASSUME THAT FULBRIGHT'S REPRESENTATION WILL BE LIMITED BY ETHICAL CONSIDERATIONS".

These sections of Movant's Response detail the responsibility of the Audit Committee as amended by SOX, the Sarbanes-Oxley Act of 2002.  The answer quotes liberally from the Corporate Governance Practices (the "Corporate Governance Practices") adopted on August 11-12, 2003 by the ABA's House of Delegates attached as Exhibit 3 to the Response and from a white paper of the ABA Corporate Governance Committee titled *THE INDEPENDENCE OF OUTSIDE COUNSEL,* prepared by Walter Demond, which is attached as Exhibit 4 to the Movant's Response to the Grievance.

Clearly, the intent of SOX is that the Audit Committee is to play an important and pivotal role in detecting and stopping corporate fraud.  The Senate Report accompanying SOX states:

> "Recent events have highlighted the failure of companies' internal audit committees to properly police their auditors and have raised awareness of the need for strong, competent audit committees with real authority. ... The Committee believes that the bill's approach to strengthening audit committees will help avoid future auditing breakdowns." S. REP. 107-205, page 23.

Changes, such as SOX § 301(5) which requires that Audit Committees be given authority and funding to hire independent counsel, were enacted for the purpose of allowing audit committees

to act independently.   Congress deemed Audit Committees as the first line of defense against corporate fraud.

Fulbright can not represent CFC and RTFC while at the same time representing the audit committee.  Nevertheless, Fulbright did just that by filing a grievance against Movant for writing a letter to the Financial Expert of the Audit Committee foolishly believing that the Financial Expert would in fact perform his duties.

*CFC's & RTFC's Management.*    In litigation that was pending in the U.S. Virgin Islands, Fulbright represented Management of RTFC and CFC whom were named as individual defendants in certain actions.   Under information and belief, if CFC had a functioning and independent Audit Committee as intended by SOX, the letter would have resulted in an investigation of CFC's Management and not a grievance.    It is suffice to say that under the circumstances, Fulbright can not ethically represent the Management and the coops, RTFC and CFC.

## V.

### Fulbright Should Be Disqualified

The Court must consider the conflict in light of the following facts:

1.    Since 2001, CFC has had no ownership in RTFC;

2.    Before 2001, CFC's unlawful[2] control of the RTFC Board of Directors was based upon a de minimis investment of $1,000  (2002 10K, FN 1(b), page 72);

3.    RTFC is a patron of CFC;

4.    RTFC is an associate (non-voting) member of CFC (2006 10K, FN 1(b), page 77);

---

[2] CFC CEO lectures on coop values.  CFC promotes on its web site coop values.  Yet, CFC knowingly and intentionally violated the law until, upon information and belief, new auditors required the termination of the unlawful arrangement.

5.      CFC is the sole lender to RTFC (2007 10K, FN 1(b), page 86);

6.      CFC manages the lending and financial affairs of RTFC through a management agreement in effect through December 1, 2016 (2007 10K, FN 1(b), page 86);

7.      CFC's management, including the General Counsel, serve as RTFC's management, including RTFC's General Counsel;

8.      CFC's auditor, Deloitte, serves as RTFC's auditor; and

9.      Upon information and belief, Randall B. Johnston, Deloitte's managing partner of the CFC account, tolerated the unlawful voting control CFC exercised over RTFC.

In this proceeding, Fulbright purports to represent CFC in current action while representing RTFC in the bankruptcy proceedings as well as CFC's Audit Committee in the Grievance proceedings notwithstanding the fact that the standing issue will entail a venting of the relationship by and between CFC and RTFC.

Fulbright, as counsel for CFC, will have to make arguments why CFC's ill-gotten income from RTFC loans belongs to CFC. As counsel for RTFC, Fulbright owes RTFC a duty to argue the diametrically opposing position: the conduit concept - all the earnings contributed by RTFC to CFC belong to RTFC, a reckoning that would bankrupt CFC.

The Court of Appeals for the District of Columbia Circuit, in a case in which Exxon acquired a corporation subject to a "hold separate order" while facing a possible divesture proceeding held:

> "For these reasons, we believe that the public interest is served by the prohibition preventing counsel for Exxon from representing the Drives Group during the course of the FTC litigation and related compliance proceedings. To ensure that divestiture remains as a meaningful potential remedy in the FTC proceeding, it is

essential that the Drives Group remains a healthy and strong entity. In the circumstances of this case, we believe that the prohibition against representation is a reasonable extension of the hold separate order imposed by the District Court as a condition for the acquisition of Reliance by Exxon." *F. T. C. v. Exxon Corp.*, 636 F.2d 1336, at 1347, 205 U.S.App.D.C. 208, at 219, C.A.D.C., 1980

The ruling was made after the Court found: "There is thus no conflict concerning the primary issue that will be litigated before the Federal Trade Commission". Thus a secondary conflict, the fact that Drives Group may be divested, was determinative that Exxon and Drives Group could not have joint representation. This motion is based upon CFC's continuing pattern of exercising dominion and control over RTFC by having CFC's general counsel and outside counsel serve as RTFC's general counsel and outside counsel. The conflict exists today (unlike Exxon) and Fulbright is bound by the same considerations any other law firm or lawyer would be.

In another case contending that the sale of a corporation would violate § 7 of Clayton Act, this Court has held that in-house counsel staff of the proposed buyer of company could have access to confidential information subject to individual liability and professional discipline if they disclosed information or participated in decisions in which there was significant risk of inadvertent disclosure. *U.S. v. Sungard Data Systems, Inc.,* 173 F.Supp.2d 20, D.D.C., 2001. This Court premised this relief on the following finding:

> "Having heard the testimony, I am first convinced that it would be extremely difficult, if not impossible, for the defendants' outside counsel to prepare this case for trial without the assistance of in-house counsel." *Id.* at p. 21

In investment banking firms such relief is referred to as a 'Chinese Wall'. Such relief is insufficient in the case at bar because Fulbright represents the following clients simultaneously and their interests are adverse:

1.    CFC, in which case Fulbright, must act in the best interest of CFC and not CFC's management;

13

2.    RTFC, whose interest is adverse to CFC and to the interest of CFC's management that also serves as RTFC's management;

3.    The CFC Audit Committee, which under SOX is vested with legal responsibility investigate (SOX § 301 & 17 C.F.R. § 240.10A-3(b)(3)) accounting matters which means that the Audit Committee must be independent of management and, in the case of combined or consolidated financial statements with an entity not commonly owned ("RTFC"), independent of the corporation; and

4.    Management of CFC that serves as management of RTFC (Exhibit C to the Motion) which have an interest regarding the ongoing defalcation of RTFC adverse to RTFC, CFC, and the CFC's Audit Committee.

Having represented and in most cases continuing to represent conflicted parties of RTFC, CFC, the Management, and CFC's Audit Committee, Fulbright can not ethically represent any party in the present proceeding.

Dated:  May 29, 2008.

John P. Raynor, Pro Se Plaintiff,
Movant

John P. Raynor, Pro Se
Raynor, Rensch & Pfeiffer
10110 Nicholas Street, Suite 102
Omaha, Nebraska 68114
Telephone No.: (402) 498-4400
jraynor@rrplawyers.com

14

## Notice of Service

I hereby certify that on May 29, 2008, electronic copies of the above and foregoing Memorandum of Law were sent by regular United States mail, postage prepaid, to:

Ryan P. Hartman
Fulbright & Jaworski L.L.P.
801 Pennsylvania Avenue, N.W.
Washington, D.C. 2004-2623

Civil Process Clerk
United States Attorney's Office
  For the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

The Honorable Michael B. Mukasey
United States Attorney General
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

Adam P. Strochak
Alexander O. Levine
Weil, Gotshal & Manges L.L.P.
1300 Eye Street, N.W., Suite 900
Washington, D.C. 20005

United States Department of
  Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

Jeffrey J. Prosser
P.O. Box 5227
St. Croix,
U.S. Virgin Islands 80823

John P. Raynor

Exhibit "A"

**List of Parties & Representation**
**In re Innovative Communication Company, LLC**

**3:06-bk-30008-JKF** Innovative Communication Company, LLC
**Case type:** bk **Chapter:** 11 **Asset:** Yes **Vol:** v **Judge:** Judith K. Fitzgerald
**Date filed:** 07/31/2006 **Date of last filing:** 05/29/2008

# Parties

**Alvarez & Marsal North America LLC**
*Added: 07/23/2007*
*(Accountant)*

represented by

**Micheala Christine Crocker**
Vinson & Elkins, L.L.P.
2001 Ross Avenue
Suite 3700
Dallas, TX 75201
214.220.7787
2 14.999.7787 (fax)
mcrocker@velaw.com
*Assigned: 12/21/07*

**Andrew Kamensky**
Hunton & Williams
1111 Brickell Avenue #2500
Miami, FL 33131
305-536-2690
305-810-2460 (fax)
akamensky@hunton.com
*Assigned: 09/17/07*

**Artisan Design Group, LLC**
8100B Roswell Rd
Atlanta, GA
770-477-3233
Tax ID / EIN: 58-222715
*Added: 11/20/2007*
*(Counter-Claimant)*

represented by

**Scot F. McChain**
Law Offices of Scot F. McChain PC
1142 King Street
Christiansted, VI 00820
340-773-9688
340-773-9711 (fax)
Scot@McChainlaw.com
*Assigned: 11/20/07*

**BANCO POPULAR DE PUERTO RICO**
*Added: 08/03/2006*
*(Creditor)*

represented by

**Gregory H. Hodges**
DUDLEY, TOPPER & FEUERZEIG
P.O. BOX 756
ST. THOMAS, VI 00804-0756
340-774-4405
340-715-4400 (fax)
ghodges@dtflaw.com
*Assigned: 08/03/06*

**BANK OF AMERICA, N.A.**
Dan Langelier
Banc of America Strategic Solutions, Inc
Mail Code: FII-400-07-02
101 East Kennedy Boulevard -7th Floor
Tampa, FL 33602
*Added: 07/24/2007*
*(Creditor)*

represented by

**Onika I. Gilliam**
Birch, deJongh & Hindels, PLLC
1330 Est Taanerberg
Poinsettia House @ Bluebeard's Castle
St. Thomas, VI 00802
340-774-1000 x9
340-774-73000 (fax)
ogilliam@viaccess.net
*Assigned: 07/24/07*

**James P. Carroll**
*Added: 03/31/2008*
*(Interested Party)*

represented by

**Yann Geron**
Fox Rothschild LLP
100 Park Avenue, 15th FL
New York, NY 10017
212-878-7901
212-692-0940 (fax)
ygeron@foxrothschild.com
*Assigned: 03/31/08*

**Fred Stevens**
Fox Rothschild LLP
100 Park Avenue, 15th FL
New York, NY 10017
212-878-7905
212-692-0940 (fax)
fstevens@foxrothschild.com
*Assigned: 04/03/08*

**Charlie's Stone Consulting, LLC**
P.O. Box 223208
Christiansted 00822
340-772-4285
SSN / ITIN: xxx-xx-3829
*Added: 11/20/2007*
*(Counter-Claimant)*

|  |  |  |
|---|---|---|
| | represented by | **Scot F. McChain**<br>Law Offices of Scot F. McChain PC<br>1142 King Street<br>Christiansted, VI 00820<br>340-773-9688<br>340-773-9711 (fax)<br>Scot@McChainlaw.com<br>*Assigned: 11/20/07* |

**Cardinal P. Connor**
6I-1 Estate Thomas
Suite 105 Biscott Hotel
St. Thomas, VI 00802
340-714-5500 x105
*Added: 01/17/2008*
*(Interested Party)*

**Michaela Crocker**
Vison & Elkins, LLP
2001 Ross Avenue
Suite 3700
Dallas, TX 75201
214.220.7787
214.999.7787 (fax)
mcrocker@velaw.com
*Added: 05/21/2007*
*(Attorney)*

**Jeffrey Cymbler**
Gazes LLC
32 Avenue of the Americas
27th Floor
New York, NY 10013
United States
(212) 765-9000
(212) 765-9675 (fax)
jcymbler@gazesllc.com
*Added: 11/21/2007*
*(Attorney)*

|  |  |  |
|---|---|---|
| | represented by | **Jeffrey K. Cymbler**<br>Gazes LLC<br>32 Avenue of the Americas 27th Floor<br>New York, NY 10013<br>212-765-9000<br>212-765-9675 (fax)<br>jcymbler@gazesllc.com<br>*Assigned: 11/27/07*<br>*LEAD ATTORNEY* |

**D.E. Shaw Laminar Lending, Inc.**
120 West 45th Street, 39th Floor
New York, NY 10036
*Added: 10/18/2007*
*(Interested Party)*

|  |  |  |
|---|---|---|
| | represented by | **Alfred Jennings Stone, III**<br>Tom Bolt & Associates, P.C.<br>Corporate Place<br>5600 Royal Dane Mall<br>St. Thomas, VI 00802<br>340-774-2944<br>340-776-1639 (fax)<br>ajstone@vilaw.com<br>*Assigned: 10/18/07* |

**DLJ Merchant Banking, Inc.**
pwolfson@sonnenschein.com
*Added: 01/16/2008*
*(Creditor)*

|  |  |  |
|---|---|---|
| | represented by | **Mark A. Fink**<br>Sonnenschein Nath & Rosenthal, LLP<br>1221 Avenue of the Americas<br>25th Floor<br>New York, NY 10020<br>mfink@sonnenschein.com<br>*Assigned: 01/16/08*<br>*LEAD ATTORNEY* |

**Dallas County**
C/o Linebarger Goggan Blair & Sampson LL
2323 Bryan Street, Ste. 1600
Dallas, TX 75201
*Added: 02/22/2007*
*(Creditor)*

|  |  |  |
|---|---|---|
| | represented by | **Elizabeth Weller**<br>Linebarger Goggan Blair & Sampson LLP<br>2323 Bryan Street Ste. 1600<br>Dallas, TX 75201<br>214-880-0089<br>469-221-5002 (fax)<br>dallas.bankruptcy@publicans.com<br>*Assigned: 02/22/07*<br>*LEAD ATTORNEY* |

**Department of Justice**
Attorney General
GERS Bldg. 2nd Floor
St. Thomas, VI 00820
*Added: 09/17/2007*
*(Interested Party)*

**Steven A. Felsenthal**
Stutzman, Bromberg, Esserman & Plifka
2323 Bryan Street, Ste. 2200, TX 75201-2689
*Added: 03/20/2008*
*(Examiner)*

represented
by

**Todd H. Newman**
Nichols Newman Logan & Grey, P.C.
1131 King Street
Christiansted, VI 00820
340-773-3200
340-773-3409 (fax)
tnewman@nnldlaw.com
*Assigned: 03/20/08*

**Fir Tree Recovery Master Fund, L.P.**
535 Fifth Avenue, 31st Floor
New York, NY 10017
*Added: 10/18/2007*
*(Interested Party)*

represented
by

**Alfred Jennings Stone, III**
Tom Bolt & Associates, P.C.
Corporate Place
5600 Royal Dane Mall
St. Thomas, VI 00802
340-774-2944
340-776-1639 (fax)
ajstone@vilaw.com
*Assigned: 10/18/07*

**Fir Tree Value Master Fund, L.P.**
535 Fifth Avenue, 31st Floor
New York, NY 10017
*Added: 10/18/2007*
*(Interested Party)*

represented
by

**Alfred Jennings Stone, III**
Tom Bolt & Associates, P.C.
Corporate Place
5600 Royal Dane Mall
St. Thomas, VI 00802
340-774-2944
340-776-1639 (fax)
ajstone@vilaw.com
*Assigned: 10/18/07*

**Justine Flashman**
Hodge & Francois
1340 Taarneberg
St. Thomas, VI 00802
340-774-6845
340-776-8900 (fax)
adam@hodgefrancois.com
*Added: 11/01/2006*
*(Intervenor)*

represented
by

**Adam G. Christian**
LAW OFFICE OF HODGE & FRANCOIS
1340 TAARENBERG
St. Thomas, VI 00802
340-774-6845
*Assigned: 11/01/06*

**Guy G. Gebhardt**
Office of the United States Trustee
75 Spring St. Ste 362 R. Russell Bldg.
Atlanta, GA 30303
404-331-4437
Guy.Gebhardt@usdoj.gov
SSN / ITIN: xxx-xx-0000
*Added: 07/31/2006*
*(U.S. Trustee)*

**Global Bank of Commerce, Ltd**
P.O. Box W1803
St. John's
Antigua
2684802240
2684621831 (fax)
dohertyn@candw.ag
*Added: 04/04/2008*
*(Respondent)*

represented
by

**Edward H. Jacobs**
Jacobs & Brady
7 Church Street
Christiansted, VI 00820
340 773-3322
edwardjacobs@yahoo.com
*Assigned: 04/04/08*

**Greenlight Capital Qualified, L.P., Greenlight Capital, L.P.,
Greenlight Capital Offshore, Ltd.**
c/o Stryker, Duensing, Casner & Dollison
P. O. Box 6785
5126 Drake's Passage
Suite #202, VI 00804
340-774-6011
340-776-8520 (fax)
mduensing@vilawyers.com
*Added: 08/01/2006*
*(Creditor)*

represented
by

**Richard H. Dollison**
Stryker, Duensing, Casner & Dollison
Upper Level Drake's Passage
PO Box 6785
St. Thomas, VI 00804-6785
340-774-6011
rdollison@vilawyers.com
*Assigned: 08/01/06*

**Gregg M. Galardi**
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
PO Box 636

Wilmington, DE 19889-0636
302-651-3000
302-651-3001 (fax)
ggalardi@skadden.com
*Assigned: 12/21/06*
*LEAD ATTORNEY*

**Matthew P. Ward**
Skadden Arps Slate Meagher & Flom LLP
One Rodney Square
PO Box 636
Wilmington, DE 19899-0636
302-651-3000
302-651-3001 (fax)
mpward@skadden.com
*Assigned: 01/18/07*

**Andre Hector**
5349 Contender Lane
Apt 1505
Forth Worth, TX 76132
*Added: 08/24/2007*
*(Creditor)*

represented
by

**Lee Rohn**
LEE J. ROHN, ESQ.
1101 KING STREET
SUITE 2
CHRISTIANSTED, VI 00820
340-778-8855
lee@rohnlaw.com
*Assigned: 08/24/07*

**Joel Holt**
2132 Company Street, VI 00820
340-773-8709
340-773-8677 (fax)
*Added: 05/10/2007*
*(Attorney)*

**Hunton & Williams**
*Added: 05/29/2007*
*(Attorney)*

represented
by

**Andrew Kamensky**
Hunton & Williams
1111 Brickell Avenue #2500
Miami, FL 33131
305-536-2690
305-810-2460 (fax)
akamensky@hunton.com
*Assigned: 07/13/07*

**Craig V. Rasile**
Hunton & Williams
1111 Brickell Avenue #2500
Miami, FL 33131
305-536-2579
305-810-2460 (fax)
craisle@hunton.com
*Assigned: 08/09/07*

**Craig V. Rasile**
Hunton & Williams
1111 Brickell Avenue #2500
Miami, FL 33131
305-536-2579
305-810-2460 (fax)
crasile@hunton.com
*Assigned: 08/23/07*

**Innovative Communication Company, LLC**
48A Kronprindsens Gade
P. O. Box 6100
St. Thomas, VI 00801
Tax ID / EIN: 66-0552021
*Added: 07/31/2006*
*(Debtor)*

represented
by

**Douglas P. Bartner**
Shearman & Sterling, LLP
599 Lexington Avenue,
New York, NY 10022
212-848-8190
646-848-8190 (fax)
dbartner@shearman.com
*Assigned: 01/04/07*
*LEAD ATTORNEY*

**Micheala Christine Crocker**
Vinson & Elkins, L.L.P.
2001 Ross Avenue
Suite 3700
Dallas, TX 75201

214.220.7787
2 14.999.7787 (fax)
mcrocker@velaw.com
*Assigned: 01/24/08*

**Gloria Lai Huang**
Shearman & Sterling, LLP
599 Lexington Avenue
New York, NY 10022
212-848-7132
646-848-7132 (fax)
gloria.huang@shearman.com
*Assigned: 01/04/07*
*LEAD ATTORNEY*

**Lynette C. Kelly**
Shearman & Sterling, LLP
599 Lexington Avenue
New York, NY 10022
212-848-8768
616-848-8768 (fax)
lkelly@shearman.com
*Assigned: 01/04/07*
*LEAD ATTORNEY*

**Scott C Shelley**
Sheaman & Sterling, LLP
599 Lexington Ave
New York, NY 10022
212-848-8955
646-848-8955 (fax)
sshelley@shearman.com
*Assigned: 01/04/07*
*LEAD ATTORNEY*

| | | |
|---|---|---|
| **Innovative Communication Corporation**<br>C/o Campbell & Levine, LLC<br>Douglas A. Campbell<br>David B. Salzman<br>1700 Grant Building<br>Pittsburgh, PA 15219-2399<br>Tax ID / EIN: 66-0552021<br>*Added: 05/21/2007*<br>*(Interested Party)* | represented<br>by | **David Bruce Salzman**<br>Campbell & Levine, LLC<br>1700 Grant Building<br>Pittsburgh, PA 15219<br>412-261-0310<br>412-261-5066 (fax)<br>dbs@camlev.com<br>*Assigned: 05/21/07* |
| **Bernard C. Pattie**<br>Law Offices of Bernard C. Pattie, PC<br>1244 Queen Cross Street<br>Suite 5<br>Christiansted, VI 00820<br>(340) 692-7717<br>(340) 692-7719 (fax)<br>boinie@compuserve.com<br>*Added: 12/28/2007*<br>*(Attorney)* | represented<br>by | **Bernard C. Pattie**<br>The Law Offices of Bernard C. Pattie, PC<br>1244 Queen Cross Street, Suite 5<br>Christiansted, VI 00820<br>340-692-7717<br>340-692-7719 (fax)<br>boinie@compuserve.com<br>*Assigned: 12/28/07* |
| **Pension Benefit Guaranty Corporation**<br>1200 K Street NW Ste. 340<br>Washington, DC 20005-4026<br>202-326-4020<br>*Added: 12/21/2006*<br>*(Creditor)* | represented<br>by | **Kimberly E. Neureiter**<br>Pension Benefit Guaranty Corporation<br>1200 K Street N.W.<br>Suite 340<br>Washington, DC 20005<br>202-326-4020 X3581<br>202-326-4112 (fax)<br>neureiter.kimberly@pbgc.gov<br>*Assigned: 09/24/07*<br>*LEAD ATTORNEY* |
| **Jeffrey J Prosser**<br>2115 Queen St<br>Christiansted, VI 00820<br>SSN / ITIN: xxx-xx-9304<br>*Added: 12/20/2006*<br>*(Interested Party)* | represented<br>by | **Robert F. Craig**<br>Robert F. Craig, P.C.<br>1321 Jones St.<br>Omaha, NE 68102<br>402-408-6000<br>402-408-6001 (fax)<br>robert@craiglaw.org<br>*Assigned: 12/20/06* |

**Michael J. Lichtenstein**
Shulman, Rogers, Gandal Prody & Ecker PA
11921 Rockville Pike Ste. 300
Rockville, MD 20852-2743
301-230-5231
mjl@srgpe.com
*Assigned: 05/10/07*

**Alex M. Moskowitz**
A.J. Weiss & Associates
6934 Vessup Lane
St. Thomas, VI 00802
340-777-3011
340-777-3019 (fax)
alex@weisslaw-vi.net
*Assigned: 05/05/08*

**Kevin A. Rames**
K. A. Rames, P.C.
2111 Company Street Suite 3
ST. CROIX, VI 00820
340 773-7284
kjajrames@viaccess.net
*Assigned: 09/10/07*

**A. Jeffrey Weiss**
A. J. Weiss & Associates
6934 Vessup Lane
St. Thomas, VI 00802
340-777-3011
340-777-3019 (fax)
jeffweiss@weisslaw-vi.net
*Assigned: 03/20/08*

| | | |
|---|---|---|
| **John Patrick Raynor**<br>10110 Nicholas Street, Suite 102<br>Omaha, NE 68114<br>United States<br>402-498-4400<br>402-498-0339 (fax)<br>jraynor@rrplawyers.com<br>SSN / ITIN: xxx-xx-5851<br>*Added: 11/21/2007*<br>*(Interested Party)* | represented<br>by | **John P. Raynor**<br>10110 Nicholas Street<br>Suite 102<br>Omaha, NE 681174<br>402-498-4400<br>402-498-0339 (fax)<br>jraynor@rrplawyers.com<br>*Assigned: 04/28/08* |
| **Redwood Domestic Fund, L.P.**<br>910 Sylvan Avenue<br>Englewood Cliffs, NJ 07362<br>*Added: 10/18/2007*<br>*(Interested Party)* | represented<br>by | **Alfred Jennings Stone, III**<br>Tom Bolt & Associates, P.C.<br>Corporate Place<br>5600 Royal Dane Mall<br>St. Thomas, VI 00802<br>340-774-2944<br>340-776-1639 (fax)<br>ajstone@vilaw.com<br>*Assigned: 10/18/07* |
| **Richards, Layton & Finger, P.A.**<br>*Added: 09/06/2006*<br>*(Attorney)* | represented<br>by | **Carol Rich**<br>Dudley, Clark & Chan<br>9720 Estate Thomas<br>St. Thomas, VI 00802<br>340-776-7474<br>340-776-8044 (fax)<br>crich@dudleylaw.com,crich@islands.vi,crichlaw@yahoo.com<br><br>*Assigned: 11/30/06* |
| **Rural Telephone Finance Cooperative**<br>C/o Moore, Dodson, & Russell PC<br>PO Box 310<br>St. Thomas, VI 00804-0310<br>*Added: 08/09/2006*<br>*(Creditor)* | represented<br>by | **J. Daryl Dodson**<br>MOORE, DODSON, & RUSSELL<br>P. O. Box 310<br>St. Thomas, VI 00804<br>340-777-5490<br>340-777-5498 (fax)<br>jddodson@surfvi.com<br>*Assigned: 08/09/06*<br>*LEAD ATTORNEY* |

**Toby L. Gerber**
Fulbright & Jaworski, L.L.P.
2200 Ross Avenue - Ste. 2800
Dallas, TX 75201
214-855-7171
214-855-8200 (fax)
tgerber@fulbright.com
*Assigned: 12/05/06*
*LEAD ATTORNEY*

**William Greendyke**
Fulbright & Jaworksi
1301 Mc Kinney, Ste. 4100
Houston, TX 77010-3095
713-651-5193
713-651-5246 (fax)
wgreendyke@fulbright.com
*Assigned: 12/05/06*
*LEAD ATTORNEY*

**Charles S. Russell, Jr.**
Moore Dodson & Russel, P. C.
P.O. Box 310
St. Thomas, VI 00804
stever@surfvi.com
*Assigned: 08/02/07*

**Shearman & Sterling LLP**
*Added: 01/31/2007*
*(Attorney)*

**Stan Springel**
Stan Springel of Alvarez & Marsal
100 Pine Street, Suite 2200
San Francisco, CA 94111
415-490-2300
415-837-1684 (fax)
sspringel@alvarezandmarsal.com
*Added: 03/23/2007*
*(Trustee)*

represented
by

**Micheala Christine Crocker**
Vinson & Elkins, L.L.P.
2001 Ross Avenue
Suite 3700
Dallas, TX 75201
214.220.7787
2 14.999.7787 (fax)
mcrocker@velaw.com
*Assigned: 05/29/07*

**Benjamin A. Currence**
BENJAMIN A. CURRENCE P. C.
P.O.Box 6143
St. Thomas, VI 00804-6143
340 775-3434
currence@surfvi.com
*Assigned: 03/28/07*

**Andrew Kamensky**
Hunton & Williams
1111 Brickell Avenue #2500
Miami, FL 33131
305-536-2690
305-810-2460 (fax)
akamensky@hunton.com
*Assigned: 04/24/07*

**James Jay Lee**
Vinson & Elkins L.L.P.
2001 Ross Avenue, Suite 3700
Dallas, TX 75201
214-220-7744
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 (fax)
jimlee@velaw.com
*Assigned: 10/24/07*

**Craig V. Rasile**
Hunton & Williams
1111 Brickell Avenue #2500
Miami, FL 33131
305-536-2579
305-810-2460 (fax)
craisle@hunton.com
*Assigned: 08/10/07*

Craig V. Rasile
Hunton & Williams
1111 Brickell Avenue #2500
Miami, FL 33131
305-536-2579
305-810-2460 (fax)
crasile@hunton.com
*Assigned: 08/29/07*

Daniel C. Stewart
Vinson & Elkins
2001 Ross Avenue, Suite 3700
Dallas, TX 75201
214-220-7700
214-220-7716 (fax)
dstewart@velaw.com
*Assigned: 08/10/07*

**The Public Services Commission of the Virgin Islands**
C/o Jeffrey Moorehead, Esq.
1132 King St. # 3
St. Croix, VI 00820-4953
*Added: 01/09/2007*
*(Interested Party)*

represented
by

Jeffrey B. C. Moorhead
Jeffrey B. C. Moorhead, P. C.
CRT Brow Building
1132 King Street Ste. # 3
St. Croix, VI 00820-4953
340-773-2539
340-773-8659 (fax)
jeffreymlaw@yahoo.com
*Assigned: 01/09/07*
*LEAD ATTORNEY*

George W. H. Phillips
Department of Justice
Attorney General Office
GERS Bldg. 2nd Fl
St. Thomas, VI 00802
340-774-5666
340-776-3494 (fax)
gphillips@doj.vi.gov
*Assigned: 09/24/07*

**Felicia S. Turner**
Office of the United States Trustee
75 Spring Street, S. W. Room 362
Atlanta, GA 30303
404-331-4437
404-331-4464 (fax)
SSN / ITIN: xxx-xx-0000
*Added: 01/04/2007*
*(U.S. Trustee)*

**United Steelworkers**
C/o The Law Offices of Micheal Sanford
2191 Church Street
St. Croix, VI 00820-4601
*Added: 08/07/2006*
*(Interested Party)*

represented
by

Jessica Gallivan
The Law Offices of Micheal Sanford
2191 Church Street
St. Croix, VI 00820-4601
340-773-3681
340-778-8104 (fax)
*Assigned: 08/07/06*
*LEAD ATTORNEY*

Michael J. Sanford
Law Offices of Michael Sanford
2191 Church Street
St. Croix, VI 00820-4601
340 773-3681
mike@saastx.vi
*Assigned: 10/24/07*

**Vinson & Elkins L.L.P.**
2001 Ross Avenue
Suite 3700
Dallas, TX 75209
214.220.7700
214.220.7716 (fax)
*Added: 06/01/2007*
*(Attorney)*

represented
by

Micheala Christine Crocker
Vinson & Elkins, L.L.P.
2001 Ross Avenue
Suite 3700
Dallas, TX 75201
214.220.7787
2 14.999.7787 (fax)
mcrocker@velaw.com
*Assigned: 06/01/07*

|  |  |  | Daniel C. Stewart<br>Vinson & Elkins<br>2001 Ross Avenue, Suite 3700<br>Dallas, TX 75201<br>214-220-7700<br>214-220-7716 (fax)<br>dstewart@velaw.com<br>*Assigned: 06/26/07* |
|---|---|---|---|
| **Virgin Islands Telephone Company**<br>C/o Campbell & Levine, LLC<br>Douglas A. Campbell<br>David B. Salzman<br>1700 Grant Building<br>Pittsburgh, PA 15219-2399<br>*Added: 05/21/2007*<br>*(Interested Party)* |  | represented<br>by | **David Bruce Salzman**<br>Campbell & Levine, LLC<br>1700 Grant Building<br>Pittsburgh, PA 15219<br>412-261-0310<br>412-261-5066 (fax)<br>dbs@camlev.com<br>*Assigned: 05/21/07* |
| **York Capital Management, L.P.**<br>767 Fifth Avenue, 17th Floor<br>New York, NY 10153<br>*Added: 10/18/2007*<br>*(Interested Party)* |  | represented<br>by | **Alfred Jennings Stone, III**<br>Tom Bolt & Associates, P.C.<br>Corporate Place<br>5600 Royal Dane Mall<br>St. Thomas, VI 00802<br>340-774-2944<br>340-776-1639 (fax)<br>ajstone@vilaw.com<br>*Assigned: 10/18/07* |
| **York Credit Opportunities Fund, L.P.**<br>767 Fifth Avenue, 17th Floor<br>New York, NY 10153<br>United States<br>*Added: 10/18/2007*<br>*(Interested Party)* |  | represented<br>by | **Alfred Jennings Stone, III**<br>Tom Bolt & Associates, P.C.<br>Corporate Place<br>5600 Royal Dane Mall<br>St. Thomas, VI 00802<br>340-774-2944<br>340-776-1639 (fax)<br>ajstone@vilaw.com<br>*Assigned: 10/18/07* |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 05/29/2008 12:10:08 | | |
| **PACER Login:** | jr1887 | **Client Code:** | |
| **Description:** | Party List | **Search Criteria:** | 3:06-bk-30008-JKF |
| **Billable Pages:** | 5 | **Cost:** | 0.40 |

**Exhibit "B - 1"**
**Letter Initiating the Grievance Proceedings**



**COUNSEL FOR DISCIPLINE OF THE**
**NEBRASKA SUPREME COURT**

Counsel for Discipline
**DENNIS G. CARLSON**

Assistant Counsel
For Discipline
**JOHN W. STEELE**
**KENT L. FROBISH**

3808 Normal Blvd.
Lincoln, NE 68506
**(402) 471-1040**
**FAX (402) 471-1014**

September 5, 2007

John P. Raynor
Attorney at Law
11301 Davenport St.
Omaha, NE 68154

RE: Grievance of Attorney Toby Gerber

Dear Mr. Raynor:

The Nebraska Supreme Court Revised Rules of Discipline provide that I am to notify a member in writing that he is under investigation or that he is the subject of a grievance and furnish him a copy thereof. Accordingly, I am enclosing a copy of a grievance filed with this office.

Pursuant to Rule 9 (E) of the Supreme Court Rules of Discipline, you are required to send to me an appropriate written response within the next fifteen (15) working days. If you fail to so respond, the Rules provide that this failure alone shall be grounds for discipline.

After reviewing your response, I can dismiss the grievance if it does not appear that your conduct was in violation of the Rules of Professional Conduct. If your conduct does appear to constitute a violation of the Rules, a further investigation will be instituted, as may be appropriate under the circumstances.

Sincerely,

Dennis G. Carlson
Counsel for Discipline

DGC:ck
Enc.



# FULBRIGHT & JAWORSKI L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
2200 ROSS AVENUE, SUITE 2800
DALLAS, TEXAS 75201-2784
WWW.FULBRIGHT.COM

TOBY L. GERBER
PARTNER
TGERBER@FULBRIGHT.COM

TELEPHONE:     (214) 855-8000
FACSIMILE:     (214) 855-8200
DIRECT DIAL:   (214) 855-7171

August 29, 2007

Mr. Dennis Carlson
Office of the Counsel for Discipline
Nebraska State Bar Association
3808 Normal Boulevard
Lincoln, Nebraska 68506

*By Certified Mail*
*Return Receipt Requested*

Re:    Grievance Against Nebraska Attorney John P. Raynor

Dear Mr. Carlson:

I am writing to file a grievance against John P. Raynor, an attorney licensed by the Nebraska State Bar Association, for violating Nebraska Rule of Professional Conduct and Model Rule of Professional Conduct (collectively "Rule") 4.2, which prohibits a lawyer from communicating about the subject matter of representation with a person the lawyer knows to be represented by counsel in that matter.

My firm represents the National Rural Utilities Cooperative Finance Corporation ("CFC") and its affiliate, the Rural Telephone Finance Cooperative ("RTFC"), and I write this letter on their behalf. Since 2004, CFC and RTFC have been in litigation with Mr. Raynor's client, Jeffrey Prosser, as well as several companies wholly owned by Mr. Prosser, including Emerging Communications, Inc. ("Emerging"), Emerging's subsidiary Innovative Communication Company, LLC ("ICC-LLC"), ICC-LLC's subsidiary Innovative Communication Corporation ("ICC"), and ICC's subsidiary the Virgin Islands Telephone Company ("Vitelco"), after Mr. Prosser and his companies defaulted on substantial loans that my clients made to them. Mr. Raynor, in addition to serving as the longtime counsel of Mr. Prosser, may also represent some of these companies, and he claims to hold positions on several of their boards.

Between 2004 and 2006, there have been as many as eight lawsuits simultaneously pending between CFC or RTFC and Mr. Prosser or his companies, including a derivative lawsuit in which Mr. Raynor was named as a party.[1] In 2006, Mr. Raynor's client and his companies

---

[1] This case was filed as Cause No. 2005-132, *Rural Tel. Fin. Coop., et al. v. Innovative Commc'n Corp., et al.*, in the District Court of the Virgin Islands, St. Thomas and St. John Division. Mr. Raynor did not answer this lawsuit and commenced voluntary bankruptcy proceedings shortly before it was filed. *See* Case No. 04-83112, *In re John Patrick Raynor*, in the United States Bankruptcy Court for the District of Nebraska (filed Oct. 13, 2004).

Mr. Dennis Carlson
Office of the Counsel for Discipline
Nebraska State Bar
August 29, 2007
Page 2

voluntarily dismissed with prejudice their claims against CFC and RTFC and consented to
having judgments for as much as $524 million entered against them as part of an agreement with
CFC and RTFC to settle this litigation. When a few months later they failed to exercise an
option to pay an amount provided under the settlement agreement with CFC and RTFC, Mr.
Prosser, Emerging, and ICC-LLC commenced voluntary bankruptcy proceedings before the
Bankruptcy Division of the District Court for the District of the Virgin Islands. At the request of
the Department of Justice, the bankruptcy court appointed a trustee over the affairs of Emerging
and ICC-LLC, and it also appointed an examiner over the affairs of Mr. Prosser. These
bankruptcy proceedings are ongoing, with CFC and RTFC seeking to recover from Mr. Prosser
and his companies amounts owed to them under these judgments.

Despite his knowledge that CFC and RTFC have long been represented by counsel
throughout this lengthy litigation and bankruptcies, on or about April 30, 2007, Mr. Raynor sent
the letter attached as Exhibit "A" (the "Raynor Letter") to Mr. R. Wayne Stratton, a member of
CFC's board of directors. Mr. Raynor's letter alleges that all of CFC and RTFC's litigation
against Mr. Prosser and his companies is baseless and in retaliation for Mr. Prosser supposedly
making accusations about accounting improprieties at CFC and RTFC and their efforts to
conceal purported financial problems. Raynor Letter, at 1, 14-15. Based on our understanding
that Mr. Raynor is an attorney representing Mr. Prosser and writing a member of CFC's board of
directors about a matter in which Mr. Raynor must know CFC is represented by counsel, we
believe his communication constitutes a violation of Rule 4.2.

## AUTHORITIES

Nebraska Rule of Professional Conduct 4.2, which adopts verbatim ABA Model Rule of
Professional Conduct Rule 4.2 and its official commentary, sets out the fundamental prohibition
that "In representing a client, a lawyer shall not communicate about the subject of the
representation with a person the lawyer knows to be represented by another lawyer in the matter,
unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court
order."[2] With respect to a corporation or other organization, the official comments to that rule
further explain that:

[T]his Rule prohibits communications with a constituent of the organization

---

[2] The Counsel for Discipline may or may not view Mr. Raynor's communications as "conduct in connection with a
matter pending before a tribunal." Neb. R. Prof'l. Conduct 8.5(b)(1). In the event the Counsel does, "the rules of
the jurisdiction in which the tribunal sits" would govern Mr. Raynor's conduct. *Id.* The Virgin Islands Bankruptcy
Court applies the rules of the District Court, which has adopted the ABA Rules of Professional Conduct as its
disciplinary rules. V.I. Bankr. Ct. Local Rule 9010-1(D) (applying V.I. Dist. Ct. Local Rule 83.2(a) to disciplinary
matters); V.I. Dist. Ct. Local Rule 83.2 (selecting ABA Rules as the rules of decision on disciplinary matters). ABA
Rule 4.2 is identical to Nebraska Rule of Professional Conduct 4.2.

Mr. Dennis Carlson
Office of the Counsel for Discipline
Nebraska State Bar
August 29, 2007
Page 3

[1] who supervises, directs or regularly consults with the organization's lawyer concerning the matter or

[2] [who] has authority to obligate the organization with respect to the matter or

[3] whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.

Neb. R. Prof'l Conduct 4.2, cmt. 7; ABA R. Prof'l Conduct 4.2, cmt. 7. The Nebraska State Bar Association has recognized that this rule prohibits *ex parte* communications "with persons having managerial responsibility on behalf of the organization, and with any other person whose . . . statement may constitute an admission on the part of the organization." Neb. Eth. Op. 91-3. The person or organization in question need not even be a named party to a live proceeding to be protected by Rule 4.2, as that rule applies to "'any person [or organization], whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question.'" ABA Formal Ethics Op. 95-396 (quoting former ABA Model R. Prof'l Conduct 4.2 cmt. 3).[3]

This no-contact rule, present in some form in every American jurisdiction, "contributes to the proper functioning of the legal system by protecting a person [or organization] who has chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter, interference by those lawyers with the client-lawyer relationship and the uncounseled disclosure of information relating to the representation." Neb. R. Prof'l Conduct 4.2 cmt. 1. It "prevents a lawyer from circumventing opposing counsel to obtain unwise statements from the adversary party," and "preserves the integrity of the attorney

---

[3] The broad reach of Rule 4.2 can be confirmed by examining its history. As ABA Formal Ethics Opinion 95-396 explains, former ABA Rule 4.2 referred to communications with a "party" who was known to be represented by counsel rather than a "person." While that ethics opinion and the commentary to former ABA Rule 4.2 made clear that the term "party" extended to any person or organization represented by counsel, whether or not a party to a formal proceeding, the substitution of the word "person" for "party" in the current version of Rule 4.2 was intended to remedy any question about its broad application. *See* ABA Formal Ethics Op. 95-396 n.16 ("In order to eliminate the ambiguity arising from use of the term 'party,' described in the accompanying text, the Committee has proposed that the Rule be amended to substitute the word 'person' for 'party' in the body of the Rule."); *see also id.* at n.17 (collecting the following cases and opinions); *United States v. Jamil*, 546 F. Supp. 646, 654 (E.D.N.Y. 1982), *rev'd on other grounds*, 707 F.2d 638, 654 (2d Cir. 1983) (stating that N.Y.D.R 7-104(A)(1), which is substantively identical to Rule 4.2, protects a person who is a potential litigant); Fla. State Bar Assoc. Comm. on Prof'l Ethics Op. 78-4 (1978) (holding that Fla. D.R. 7-104(A)(1), which is substantively identical to Rule 4.2, applies "whenever an attorney-client relationship has been established . . . regardless of whether or not litigation has commenced"); Miss. State Bar, Op. 141 (1988) (concluding, in interpreting that state's rule which is identical to Rule 4.2, that "[t]he actual filing of a lawsuit or intent to file a lawsuit is irrelevant to the question of whether the lawyer may communicate with the adverse party."); Tex. State Bar Prof'l Ethics Comm., Op. 492 (1994) (Texas anti-contact rule, which is substantively identical to Rule 4.2, applies "despite the fact that litigation is neither in progress nor contemplated.").

Mr. Dennis Carlson
Office of the Counsel for Discipline
Nebraska State Bar
August 29, 2007
Page 4

client relationship . . . [t]hat is, counsel is precluded from driving a wedge between the opposing attorney and that attorney's client." *Polycast Technology Corp. v. Uniroyal, Inc.*, 129 F.R.D. 621, 625 (S.D.N.Y. 1990) (interpreting N.Y.D.R. 7-104(A)(1), a rule substantively identical to Nebraska's Rule 4.2).[4]  Moreover, the rule protects parties from the inadvertent disclosure of privileged or damaging information. *See id.* at 625; Neb. R. Prof'l. Conduct 4.2 cmt. 1. Notably, in interpreting and applying Rule 4.2, courts have recognized that a lawyer's "ability to control access to his client" is "a fundamental element of the attorney-client relationship," and furthers "'the protection a represented person [or organization] has achieved by obtaining counsel.'" *Runsvold v. Idaho State Bar*, 925 P.2d 1118, 1120 (Idaho 1996) (quoting Hazard & W. Hodes, The Law of Lawyering, § 4.2:101 (2d ed. 1993) (emphasis omitted)).  Mr. Raynor's letter to my client's director discussing litigation between his client and CFC and RTFC plainly runs afoul of Rule 4.2.

## I.    Mr. Raynor's Communication is with a Party He Knows is Represented by Counsel

Rule 4.2 prohibits communications with a party a lawyer knows is represented by counsel. CFC and RTFC have been and continue to be represented by counsel throughout their litigation and dealings with Mr. Raynor's client, Mr. Prosser, and his companies.

Because CFC and RTFC are represented by counsel, Rule 4.2 prohibits communications with any constituent of CFC and RTFC, (1) "who supervises, directs or regularly consults with the organization's lawyer concerning the matter," (2) who "has authority to obligate the organization with respect to the matter," or (3) "whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability." Rule 4.2 cmt. 7.  A member of CFC's board is a person whose acts or omissions in connection with the matter may be imputed to CFC for purposes of liability, therefore placing him within the third protected category of persons with whom *ex parte* communications are prohibited. *See e.g.*, *In re Total Containment, Inc.*, 335 B.R. 589, 621 (Bankr. E.D. Pa. 2005) (wrongful conduct of director can be imputed to the corporation if committed in the scope of employment and for the benefit of the corporation).  The second protected group, which includes individuals who have authority to obligate CFC with respect to the matter in which CFC is represented, also includes a member of its board. *See, e.g.*, *In re North Babylon Estates*, 30 F.2d 372, 375 (2d Cir. 1929); *Dickheiser v. Pennsylvania R. Co.*, 5 F.R.D. 5, 9 (E.D. Pa. 1946) ("Directors acting in good faith have the power to compromise and settle disputed claims against the corporation.") (citing Fletcher on Corporations (1931 Ed.) Vol. 2, Sec. 528)).  CFC's director unquestionably falls

---

[4] N.Y.D.R. 7-104(A)(1) provides that "During the course of his representation of a client a lawyer shall not ... [c]ommunicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so."

Mr. Dennis Carlson
Office of the Counsel for Discipline
Nebraska State Bar
August 29, 2007
Page 5

within either standard as broadly articulated by the Nebraska State Bar Association to include a "person[] having managerial responsibility on behalf of the organization" or a "person whose . . . statement may constitute an admission on the part of the organization." *See* Neb. Eth. Op. 91-3. Because Mr. Stratton, as a director of CFC, falls within at least one of the protected categories under Rule 4.2, any communication with him is a communication with CFC as a party represented by counsel for purposes of that rule.[5]

Mr. Raynor knows that he is communicating with an organization represented by counsel and a director of that organization. A person's knowledge that a person or organization is represented by counsel "may be inferred from the circumstances," and one "cannot evade the requirement of obtaining the consent of counsel by closing his eyes to the obvious." Neb. R. Prof'l. Conduct 4.2 cmt. 8. Given the lengthy history of litigation between CFC and RTFC and Mr. Raynor's client and his companies, as well as Mr. Raynor's references to this litigation throughout his letter, Mr. Raynor's knowledge that CFC and RTFC are represented by counsel in this litigation may be inferred from a multitude of sources. Mr. Raynor was a named defendant in the derivative action brought by RTFC that resulted in the execution of a confidentiality and non-disparagement agreement, which Mr. Raynor himself executed, as well as the settlement agreement between the parties. ICC, the company for which Mr. Raynor purports to be a director, has long been involved in litigation with both CFC and RTFC in which they were represented by counsel.[6] Given Mr. Raynor's involvement as counsel for Mr. Prosser throughout these years of litigation, he cannot credibly claim that he was unaware that CFC and RTFC were proceeding through these matters with counsel, and of course, Mr. Raynor is certainly aware that Mr. Stratton is a director of CFC, as he addresses him as such in the first sentence of his letter.

## II.    Mr. Raynor Is Communicating about the Subject Matter of Representation

Similarly, there can be no doubt that Mr. Raynor is communicating about the subject matter of the litigation between CFC or RTFC and Mr. Prosser and his companies. The graveman of Mr. Raynor's letter is that CFC and RTFC's litigation claims against his client are

---

[5] While Mr. Stratton may also qualify as an individual "who supervises, directs, or regularly consults with the organization's lawyer concerning the matter," it is not necessary to examine the evidence placing him within this first criterion as either the second or third are sufficient.

[6] *See* Cause Nos. 2006-018, *Virgin Islands Tel. Corp. & Innovative Commc'n. Corp. v. Nat'l. Rural Util. Coop. Fin. Corp. & Rural Tel. Fin. Coop., et al.*, No. 2004-154 *Rural Tel. Fin. Coop. v. Innovative Commc'n. Corp.*, No. 2004-155, *Rural Tel. Fin Coop. v. Prosser*, No. 2005-115, *Innovative Commc'n. Corp v. Rural Tel. Fin Coop.*, and No. 2006-019, *Rural Tel. Fin. Coop. v. Innovative Commc'n. Corp.*, in the District Court of the Virgin Islands, St. Thomas and St. John Division. *See also* No. 2006-011, *Emerging Commc'n., Inc. & Innovative Commc'n. Co., LLC v. Rural Tel. Fin Coop. & Nat. Rural Util. Coop. Fin Corp.*, in the District Court of the Virgin Islands, St. Thomas and St. John Division.

Mr. Dennis Carlson
Office of the Counsel for Discipline
Nebraska State Bar
August 29, 2007
Page 6

baseless and asserted in retaliation for his client's alleged criticism of purported accounting issues and CFC and RTFC and supposed efforts to conceal their financial problems. Raynor Letter at 15 ("ICC can demonstrate that there was no basis for the foreclosure and the root cause is due solely to ICC questioning the allocations of patronage dividends which, as indicated above, had public reporting implications. If foreclosure is tied to the accounting issues discussed in this letter (which I believe it is), then, CFC/RTFC's behavior . . . has been criminalized . . . .").[7] Further, Mr. Raynor's letter expressly references the litigation between CFC and RTFC and Mr. Prosser and his companies that has spilled over into bankruptcy court, and the parties' positions in these proceedings:

> In internal memos RTFC admits that it started foreclosure against ICC to change management. Additionally, if you research the facts involving ICC you will find that RTFC had one fact based matter (the effect of the 1989 Settlement by and between the Virgin Islands, PSC, RTFC and Vitelco) if decided for the benefit of ICC, RTFC would have been in a potion to commence a foreclosure without cause[.] Note also RTFC could not authenticate its 2001 loan agreement with ICC. At that point (failing to authenticate the loan agreement) RTFC entered into the Inter-Creditor Agreement with Greenlight effecting paying Greenlight to obtain judgment and force ICC into bankruptcy to avoid RTFC's day of reckoning in Court. ICC can demonstrate that there was no basis for the foreclosure . . . .

Raynor Letter, at 14-15. Given the explicit discussions of this litigation and the argument of Mr. Raynor's letter that this litigation is nothing more than retaliation, there can be little doubt that Mr. Raynor is communicating with CFC regarding the subject matter of litigation between CFC and his client.

## III.    Mr. Raynor is Writing as a Lawyer Representing his Client

Finally, Mr. Raynor's letter is prohibited because he is writing it as a lawyer representing his client, and multiple sources confirm that Mr. Raynor has been and is presently an attorney for Mr. Prosser, and perhaps for Emerging as well, and demonstrate further that he was acting at the direction of Mr. Prosser in writing his letter to CFC's director.

As previously mentioned, the bankruptcy court, at the request of the United States Department of Justice, has placed a trustee in charge of the affairs of Mr. Prosser's two parent

---

[7] Mr. Raynor's allegations of financial improprieties at CFC and RTFC and a purported cover up were alleged in a lawsuit against RTFC and two of its officers for wrongful use of civil proceedings, which was dismissed with prejudice at the request of Mr. Prosser and his companies and are subject to a full and complete release. *See* Am. Compl., ¶¶ 7-17, in Case No. 2005-168, *Innovative Commc'n. Corp. v. Rural Tel. Fin. Coop., List, & Lilly*, in the District Court of the Virgin Islands, St. Thomas and St. John Division.

Mr. Dennis Carlson
Office of the Counsel for Discipline
Nebraska State Bar
August 29, 2007
Page 7

companies – Emerging and ICC-LLC. On May 16, 2007, counsel for the trustee acknowledged in open court that Mr. Raynor wrote his letter to Mr. Stratton at the direction of Mr. Prosser. Exh. C, Hrg. Tr., May 16, 2007, at 31 ("One thing that [Prosser] did not do, however, to help the process is . . . he had a director of New ICC, who is an occasional attorney for Mr. Prosser . . . write a 15-page letter to one of the Board members of the RTFC . . . ."). The examiner appointed by the bankruptcy court has also determined that Mr. Raynor is still acting as counsel to Mr. Prosser. Exh. D, Initial Report of Examiner, Apr. 26, 2007 ("Examiner's Report"), at 6 ("On April 19, 2007, the Examiner and his professionals met with John Raynor, counsel to Jeffrey Prosser and former director of Emerging and perhaps New ICC"); Exh. E, Examiner's Second Interim Report, Jun. 7, 2007, at 5 ("The accountants also met in Nebraska with John Raynor, the Debtor's attorney and former bank board member."). Indeed, Mr. Raynor has been the attorney for both Mr. Prosser and Emerging since at least the late 1990s. *See* Exh. B, *In re Emerging Commc'n. S'holder. Litig.*, 2004 WL 1305745, *3 (Del. Ch. 2004).

Moreover, this letter, which contains a number of legal conclusions and explicit references to the litigation between CFC and RTFC and Prosser and his companies, was not written on the letterhead of ICC, the company owned by Mr. Prosser of which Mr. Raynor claims to be a director, nor even on Mr. Raynor's personal letterhead, but rather is written on the letterhead of his law firm, the first page of which prominently reads:

<div align="center">

RAYNOR, RENSCH & PFEIFFER
**ATTORNEYS AT LAW**

</div>

and lists him as "Of Counsel." These facts are more than sufficient to support the conclusion that Raynor was representing his client when he sent his letter to CFC.[8]

## IV.    Additional Factors Justify Disciplinary Action Against Mr. Raynor

Mr. Raynor's conduct is like that of an attorney in *Matter of Herkenhoff*, 866 P.2d 350 (N.M. 1993), decided under New Mexico rule 16-402, which in relevant part is substantively

---

[8] The fact that Mr. Raynor might be both Mr. Prosser's lawyer and a director of one or more of Mr. Prosser's companies does not render his communication permissible, as the situations against which Rule 4.2 is intended to safeguard – the trained advocate's solicitation of uncounseled disclosures, the driving of a wedge between an attorney and his or her client, and the inadvertent disclosure of privileged information – obviously are not ameliorated by Mr. Raynor's choice to also serve as a lawyer for and director of his client's business. *See generally* D.C. Bar Assoc. Eth. Op. 258 (holding, as many jurisdictions do, that a lawyer proceeding *pro se* may not communicate directly with a party represented by counsel, despite the general rule that parties are free to communicate directly with one another, because that self-represented lawyer is no less capable of taking advantage of another litigant than a lawyer who is representing a client).

Mr. Dennis Carlson
Office of the Counsel for Discipline
Nebraska State Bar
August 29, 2007
Page 8

identical to Rule 4.2.[9]  In *Herkenhoff*, the attorney in question (Mr. Herkenhoff) was contacted by the president and CEO (Mr. Arend) of a bank adverse to his client.  After the two initially exchanged some correspondence, Mr. Herkenhoff wrote a three-page letter to Mr. Arend, with a copy to a national bank examiner, in which he accused Mr. Arend of "various acts of malice, misrepresentation, and bad faith," and requested that Mr. Arend stop his bank's collection actions against his client.  He also requested a meeting with Mr. Arend outside the presence of his bank's attorney (Mr. Roggow), and "suggested that he and his clients had a proposal for Arend's consideration."  *Id.* at 352-53.  The New Mexico Supreme Court, after recounting that "[s]eldom have we seen a more blatant violation of Rule 16-402 or a more blatant example of the types of abuses that the rule is designed to prevent," observed that

> Herkenhoff not only attempted to intimidate an opposing party but also made an obvious effort to undermine the attorney-client relationship existing between Roggow and the bank.  The letter went beyond a violation of Rule 16-402 and constitute as well a clear violation of Rule 16-404 in that it was clearly intended to create discord between Arend and his attorney and to cause problems for Arend and the Bank with the bank examiners.

*Id.* at 353.

Mr. Raynor's conduct in sending the director of an opposing party he knows is represented by counsel a harassing letter discussing longstanding litigation between his client and that director's company is no different than that of Mr. Herkenhoff.  Like Mr. Herkenhoff, Mr. Raynor alleges numerous bad acts on the part of CFC and RTFC, and in fact threatens criminal sanctions against CFC and RTFC.  Raynor Letter at 15 ("CFC/RTFC's behavior including the Inter-Creditor Agreement has been criminalized under 18 U.S.C. § 1513(e)).  Like Mr. Herkenhoff, Mr. Raynor invites CFC's director to engage in further *ex parte* communications with him.  *Id.* at 15 ("The above touches the surface[.]  I would be happy to discuss matters in further detail[.]).  Like Mr. Herkenhoff, Mr. Raynor copies a regulatory body

---

[9] If anything, N.M. Rule 16-402, when considered as a whole, would be more lenient on Raynor than the ABA's Rule 4.2, as New Mexico's rule provides that:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.  Except for persons having a managerial responsibility on behalf of the organization, an attorney is not prohibited from communicating directly with employees of a corporation, partnership or other entity about the subject matter of the representation even though the corporation, partnership or entity itself is represented by counsel.

N.M. Rule 16-402.

Mr. Dennis Carlson
Office of the Counsel for Discipline
Nebraska State Bar
August 29, 2007
Page 9

(the U.S. Securities and Exchange Commission) on his letter, with the unsubtle threat that distribution implies. *Id.* at 15. Like Mr. Herkenhoff, Mr. Raynor does not send a copy of his letter to his target's attorneys, and while doing so would not have excused this misconduct, *see Guy Chemical Co., Inc. v. Romaco AG*, 2007 WL 1276909, *4 (W.D. Pa., May 1, 2007) (slip op.), his failure to do so further suggests that he intended to conceal this communication from CFC and RTFC's counsel. Mr. Raynor's actions violate at least one cardinal ethical rule of your Bar.

I am also enclosing as Exhibit "B" to this letter a copy of the opinion of Delaware Supreme Court Justice Jack Jacobs (sitting in Chancery by designation) in *In re Emerging Communications Shareholders Litigation*, which I mentioned earlier. In addition to detailing some relevant proof of Mr. Raynor's longstanding role as Mr. Prosser's attorney and an attorney for Mr. Prosser's companies, Justice Jacobs chronicles a number of breaches of fiduciary duty by Mr. Raynor that may constitute conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of Nebraska Rule 8.4 (codified as DR 1-102 at the time of the acts complained of) that may be appropriate to take into account in determining the proper disciplinary sanction against Mr. Raynor for this instant breach of the Nebraska Rules of Professional Conduct.[10]

Please do not hesitate to contact me at (214) 855-7171 if I can provide any additional information.

Very truly yours,

Toby L. Gerber

Enclosures

cc:     Mr. William R. Greendyke *(firm)*
        Mr. Layne E. Kruse *(firm)*
        Mr. Gerard G. Pecht *(firm)*

---

[10] While Mr. Raynor's substantial judgment debt to the plaintiffs in this case might have been discharged in his subsequent, voluntary Chapter 7 bankruptcy, *see* No. 04-83112, *In re John P. Raynor*, in the United States Bankruptcy Court for the District of Nebraska, that discharge, if any, would not prevent the Nebraska Bar from considering the acts and omissions described in the *In re Emerging* opinion.

# Exhibit A

**RAYNOR, RENSCH & PFEIFFER**
ATTORNEYS AT LAW
10110 NICHOLAS STREET • SUITE 102
OMAHA, NEBRASKA 68114
(402) 498-4400
FAX (402) 498-0339

TERRY L HADDOCK
PATRICK M HENG
JOHN J KOHL
WILLIAM E PFEIFFER
RICHARD J RENSCH
KELLE J WESTLAND

OF COUNSEL
JOHN P RAYNOR
THOMAS G INCONTRO

COLUMBUS OFFICE
1470 25TH AVE
COLUMBUS, NE 68601
(402) 562-7759

April 30, 2007

Mr. R. Wayne Stratton
Jones, Nale & Mattingly PLC
Certified Public Accountants
642 South Fourth Avenue, Suite 300
Louisville, KY 40202-9975

RE:   National Rural Utilities Cooperative Finance Corporation ("CFC")

Dear Mr. R. Wayne Stratton:

I am writing an open letter to you because of your respective legal obligations as a board member who qualifies as an Audit Committee Financial Expert as defined by the Securities and Exchange Commission. I declare that I am interested in this transaction  I am at this time a director of Innovative Communication Corporation ("ICC") and the Virgin Islands Telephone Corporation ("Vitelco")  My history dates back to the days in which Atlantic Tele-Network, Inc., the predecessor of ICC, acquired Vitelco.  I have on many occasions negotiated and dealt personally with officers of CFC and its affiliate, Rural Telephone Finance Corporation ("RTFC"). My position is fully supportable by public documents

The highlights of this letter:

1.   CFC, on a fair market basis, is bankrupt;

2.   CFC has systematically defrauded RTFC and thus, RTFC's members;

3.   The Federal Government is placing billions of taxpayers' money at risk by refinancing CFC's indebtedness; and

4   CFC's activities are replete with violations of numerous laws.

CFC is an *unregulated* company imbued with fraudulent practices and staffed with incompetent management. Further, CFC is accessing funds of the public through public debt instruments and taxpayers' money.

It is not a simple explanation and is premised upon CFC/RTFC's financial reporting.

### CFC/RTFC Structure & Relationship

The facts involve two cooperative financing organizations serving rural utilities where one cooperative, RTFC, is under the complete domination and control of the other cooperative, CFC. CFC, the dominative cooperative, is a tax-exempt entity pursuant to IRC and the subservient cooperative, RTFC, is a taxable entity. CFC and RTFC are two separate organizations with completely separate and distinct membership. CFC was formed to provide financing to rural electric utilities. CFC formed RTFC for the stated purpose to provide financing to rural telephone companies. As organized by CFC the relationship between RTFC and CFC is as follows:

1. All of RTFC's critical positions are filled by CFC employees holding the identical positions for CFC. For instance, CFC's CFO serves as RTFC's CFO. RTFC is not represented by independent counsel.

2. Up through fiscal year ended May 31, 2001; CFC controlled the election[1] of RTFC's board through the investment of $1,000 in a special certificate that entitled CFC to nominate a majority of RTFC's governing Board. This is an illegal relationship violating the basic cooperative principle of one member, one vote.

3. RTFC is a non-voting member of CFC. As a member and patron of CFC, RTFC is entitled to distributions of CFC's allocated margins (profits) based upon RTFC's contribution to the consolidated or combined profits of CFC/RTFC.

4. Though the public markets are accessed based upon the combined or consolidated financial statements of CFC/RTFC; CFC assumes control over all the funds and all the lending activities of both CFC and RTFC. Thus, CFC is able to trap the majority in the markup on cost of funds at CFC leaving RTFC dependent upon patronage allocations from CFC.

As structured and operated, RTFC is a patron of CFC and is under the absolute control of CFC

---

[1] Page 58 of the 10K for fiscal year ended May 31, 2001 (the "2001 10K") states: "CFC has a $1,000 membership interest in RTFC. CFC exercises control over RTFC through majority representation on their Boards of Directors."

2

### CFC Is Bankrupt On A Fair Market Basis

At points in the following discussion CFC will be compared to CoBank, an instrumentality of the U.S. Government operating as a cooperative providing rural financing. CFC in its 2006 10K on page 10 states: "The primary bank competitor is CoBank, ACB ("CoBank"), a government sponsored entity and member of the Farm Credit System whose status as such gives it the ability to offer lower interest rates in select situations."

The statement (the heading to this section) as to CFC's credit worthiness is based upon CFC's own financial disclosures  Page 100 of the 2006 10K discloses the Fair Value of Members' loans are $2,693,733,000 less than the Carrying Value. This is on a net basis so it is after credit (or deducting) the $611,443,000 Loan Loss Reserve.

The sum overshadows CFC's financial structure  If the Member loans were sold for the Fair Value the write-off would exceed the Members' equity of $787,976,000 (as reported on page 72 of the 2006 10K), the total of Members' Subordinate Certificates of $1,427,960,000 (also reported on page 72 of the 2006 10K), and create a *deficit in equity* of $477,797,000

Note that CFA Institute advocates[2] "Fair Value" as the basis for reporting the carrying value of assets including loans. Further, the FASB 159 allows CFC to elect report loans to members on a fair market value basis. CFC exists only because CFC is able to account for loans at historical costs (unless it is a troubled loan or held for resale) rather then applying the standard of the lower of cost or market  As stated, recording loans at fair value would result in a substantial deficit in CFC's reported equity.

As far as the Members' Subordinate Certificates, please note that ICC never purchased a subordinate certificate that was not fully financed with the proceeds of a concurrent loan from RTFC  Thus, the equity that supports the loan in the case of ICC was funded by those very parties lending to CFC. The subordinate certificates in our circumstances were nothing more than a Ponzi scheme to create the appearance of subordinate indebtedness willingly participated and structured by CFC.

The following table sets forth the deficit between Carrying Value and Fair Value on a historical basis.

---

[2] See http://www.cfainstitute.org/centre/positions/reporting/fair_value_reporting.html

3

## CFC
## Members' Loans – Net of Loan Loss Reserve
## Book Value v. Fair Value

| Loans to members, net: May 31st: | Carrying Value | Fair Value | Difference | Percentage of Book Value |
|---|---|---|---|---|
| 1994 | 5,921,022 | 5,863,472 | 57,550 | 0.97% |
| 1995 | 6,747,124 | 6,810,007 | (62,883) | (0.93%) |
| 1996 | 7,728,271 | 7,661,739 | 66,532 | 0.86% |
| 1997 | 8,678,196 | 8,602,301 | 75,895 | 0.87% |
| 1998 | 10,329,345 | 10,391,615 | (62,270) | (0.60%) |
| 1999 | 13,491,199 | 12,648,316 | 842,883 | 6.25% |
| 2000 | 16,449,753 | 15,030,991 | 1,418,762 | 8.62% |
| 2001 | 19,351,953 | 18,173,976 | 1,177,977 | 6.09% |
| 2002 | 19,540,367 | 18,528,841 | 1,011,526 | 5.18% |
| 2003 | 18,972,878 | 18,590,420 | 382,458 | 2.02% |
| 2004 | 19,914,584 | 18,285,544 | 1,629,040 | 8.18% |
| 2005 | 18,382,319 | 17,681,520 | 700,799 | 3.81% |
| 2006 | 17,749,462 | 15,055,729 | 2,693,733 | 15.18% |

The historical presentation supports the conclusion that a $1,992,934,000 increase in the deficit in one year was not possible unless CFC was overstating the fair value in 2005 (understating the deficit) and earlier years   This is another material misrepresentation in CFC's public documents. It is no coincidence that things changed a few years after Steven Lilly became CFO in 1994 and Sheldon Peterson became CEO in 1995.

This paragraph compares CFC to CoBank.  On page 65 of CoBank's 2005 Annual Report, Note 12 discusses the Fair Value in contrast to the Carrying Value (Book Value) of CoBank's assets and liabilities.  CoBank's disclosure compared to CFC's disclosure on the value of loans on a net basis is as follows:

|  | CoBank | | CFC | |
|---|---|---|---|---|
|  | Carrying V. | Fair Value | Carrying V. | Fair Value |
| 2006 | 25,860 | 26,009 | 17,749,462 | 15,055,729 |
| 2005 | 23,520 | 23,759 | 18,382,319 | 17,681,520 |

CFC had a deficiency in the Fair Value of its loans of $2 7 Billion and $700 Million in 2006 and 2005, respectively, while CoBank's experience was just the opposite: CoBank had NO deficiency in the Fair Value of its loans.  There is no explaining away this number.

4

Note that the disclosure of the Fair Value in contrast to the Carrying Value involves all the material assets and liabilities of CFC. "Members' loans, net" are the only line item that demonstrates a material difference between the Fair Value and Carrying Value.

### CFC's Income Confirms It Is Technically Bankrupt

CFC is a financing cooperative. Its core business is financing. CFC makes little or no money from its core business. Regulated businesses such as banks would be closed (or there would be a forced change in management) if the banks were not deriving profits from their lending business. The fact CFC is unregulated is the only reason it can operate as it does.

If CFC formatted its financial statements to strike a subtotal reflecting the "Gross Margin" less "Total Operating Expense", the 2006 10K would show *losses* in 2004 and 2006 of $12,821,000 and $26,975,000, respectively. In 2005 CFC would have a profit of $47,537,000 but $36,440,000 of the income was attributable[3] to make whole fees earned at a time when telephone loans were decreased by over $1.6 Billion, a one-time event. The anomaly is 2005 not 2004 and 2006 for the reasons that become evident in the next section. Simply, CFC is locked into a financial position where the results of 2004 and 2006 will continue in the coming years.

This is further supported by an examination of Item 6, page 16 of the 2006 10K. This table sets forth some of the results for the period 2002 through 2006. CFC's Gross Margin in 2002 was $300,695,000 and in 2006 CFC's Gross margin was $45,256,000. Thus, CFC's Gross Margin in 2006 was 15.05% of CFC's Gross Margin in 2002. Part of the change can be explained by the fact that CFC has been shrinking since 2002 however; the Cost of Funds (a figure not reported on that table) in 2006 was actually 107.81% of the Cost of Funds in 2002. Thus, the 2002 Operating Income has decreased while the Cost of Funds has in fact increased. That can not be explained without considering that CFC is in fact distributing too much money in patronage dividends relying more on funding from indebtedness and less on equity funding.

Now, compare CFC's earnings to CoBank's earnings. CoBank reports its net interest margin while CFC combines certain other activities in computing CFC's Gross Margin. But Footnote 1(n) and 1(o) on pages 80-81 of CFC's 2006 10K provides the interest and investment income as well as interest expense for years ended 2004, 2005, and 2006. While CoBank reports on a calendar year basis CFC reports on a fiscal year basis with the year ending May 31st. The following compares the Net Interest Margin for December 31st 2003, 2004, and 2005 of CoBank to

---

[3] See page 82 of the 10K for 2005

CFC's Net Interest Margin for years ended May 31st 2004, 2005, and 2006  Also, in the next table the net interest margin is compared to Members loans and total assets of each organization.

| | CFC May 31st | | | CoBank December 31st | | |
|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2003 | 2004 | 2005 |
| Loans, Net | 19,914,584 | 18,382,319 | 17,79,462 | 24,358,019 | 23,520,371 | 25,860,144 |
| Total Assets | 21,455,457 | 20,060,314 | 19,179,621 | 30,880,786 | 30,855,882 | 33,834,917 |
| Interest Income | 976,894 | 970,983 | 981,260 | 1,129,598 | 1,144,746 | 1,527,772 |
| Interest Expense | (891,577) | (894,640) | (942,437) | (587,261) | (619,458) | (1,044,411) |
| Net Int. Income | 85,317 | 76,343 | 38,823 | 542,337 | 525,288 | 483,361 |

If the above table is not clear enough the following tables present a few calculations based upon the above information:

| | CFC | | | CoBank | | |
|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2003 | 2004 | 2005 |
| Net Int. Inc /Loans | 0.43% | 0.42% | 0.22% | 2.23% | 2.23% | 1.87% |
| Net Int. Inc./Assets | 0.40% | 0.38% | 0.22% | 1.76% | 1.70% | 1.43% |

CoBank's Net Interest Income reflected as a percentage of Net Members' Loans is over 519%, 537% and 854% of CFC's returns for the respective periods  CoBank's Net Interest Income reflected as a percentage of Total Assets is over 441%, 447% and 705% of CFC's returns for the respective periods.  CoBank's assets other then Members' loans reflect substantial liquidity: something that is absent from CFC's total assets  Simply, there is no comparison.

Something excluded from this letter is the footnotes that if examined will show that the bulk of CFC's loans are invested on a fixed rate basis (even variable rates are locked-in to an index) with little or negligible margin.  CFC pays some form of interest on nearly every dollar excepting only Members' equity and telephone subordinate capital certificates[4].

In summation, CFC does not make money from its lending activities and is not positioned to make money from its lending activities in the future.  The 2006 Income was derived solely from the one-time sale of CFC's office building and cash settlements from derivative transactions.  The

---

[4] That is another problem with decreasing Telephone loans.  Telephone subordinate certificates never had an interest rate attached.  It is evident by examining Note 8 to the 2006 10K on page 94 that most subordinate certificates on the electric side pay interest.

results of operations demonstrate that CFC does not make money in its core business. If CFC was a bank regulatory authorities would close it

### The Electric Utility Loan Portfolio

The Electric utility members' loans have not made a profit since May 31, 2003. The 2004 10K on page 134 discloses CFC's Gross Margin of $91,292, which is the total of $19,813 from Electric, $62,053 from Telephone, and $9,426 from Other. If the allocated general and administrative expenses ("G&A Expense") were deducted from Electric's Gross Margin, the Electric Members' Loans in 2004 produced an loss of over $15 million[5].

When it became apparent the Electric Members' Loans were not contributing to CFC's profits, CFC changed accountants and with the change in accountants changed the reporting of segment information. In the presentation of Segment Information CFC now reinserts the markup on the Cost of Funds from CFC's loans to RTFC and further, attributes those earnings to the Electric Members' Loans. Thus, the Gross Margin reported by Electric combined both (1) the actual gross margin earned on loans to Electric Members and (2) the Gross Margin earned on the loan made to RTFC. This resulted in nearly a $56 Million shift in the Gross Margin earned in 2004 from Telephone to Electric per page 106 of the 2005 10K. This is a material misrepresentation of the Gross margin earned on Electric loans.

Just using the 2004 Gross Margin when Deloitte restated 2004 Segment Information (as compared to Ernst's information) as a basis to estimate, then interpolating what the 2005 Segment Information would look like if reported by Ernst (coupled with changes disclosed in the 2005 10K) it is clear that Electric's Gross Margin did not exceed the allocated G&A Expense in 2005. There is no way that the Electric loans made a positive contribution in 2006 when the Income Statement for 2006 discloses that total G&A Expense exceeded CFC's total Gross Margin

Consider also the fact that of gross loans Electric members' loans constituted 74.68% in 2002 and now constitute 86.02% of the gross loan portfolio on a combined basis. Clearly, decreasing Telephone loans was not a good decision.

How could CFC work itself into such a position? I posit the following for your consideration

---

[5] This fact was disclosed if you examine the segment information but it is not discussed. The fact that approximately 75% of the combined loan portfolio does not earn enough to pay G&A Expenses deserves discussion because it is material

### CFC's Systematic Defalcation of RTFC

Cooperatives are supposed to allocate their net savings or earnings among patrons based upon the patron's relative contribution to earnings. These principles are captured in CFC's Bylaws in the following provisions:

Article XI – Allocation and Distribution of Net Savings.

The Association shall at all times be operated on a cooperative nonprofit basis for the primary and *mutual* benefit of its patrons. SEE Section 1. Nonprofit Operation; 1st paragraph.

... that the Association is obligated to pay by credits to a capital account ... for each patron all such amounts in excess of operating costs and expenses, to patrons *in proportion to their patronage*. SEE Section 1. Nonprofit Operation; 2nd paragraph.

... in the form of *net savings so furnished by each patron* is clearly reflected and credited in an appropriate record to the capital account of each patron. SEE Section 4. Patronage Capital Certificates; Paragraph (a).

RTFC is a patron of CFC because it receives all of its funding from CFC.

Further, these principles are embedded in the tax treatment of CFC and RTFC. A General Counsel Memorandum on "COOPERATIVE NETTING" dated August 22, 1979, GCM 38061, 1979 WL 52855, makes it unequivocal that:

"To conclude, as some representatives of the cooperative industry have concluded, that a multi-activity, exempt cooperative may divert earnings produced by one patronage activity to the patrons of another distinct activity, we believe is plainly inconsistent with the characterization of the cooperative as an agent or conduit."

"As already indicated, we do not believe the diversion by a cooperative of earnings from one patronage department to another department or from one function to another function is consistent with the essential nature of a cooperative as a mere agent or conduit."

Under the conduit theory and CFC's Bylaws, RTFC, a patron of CFC, is entitled to its contribution to the combined and consolidated earnings of CFC/RTFC.

When Ernst became CFC's auditor, for the first time, CFC disclosed accurate segment information in its public filings. Ernst restated the segment information for 2000 and 2001. What was readily apparent from a comparison of RTFC's income to the *restated*[6] Segment Information

---

[6] The first time the segment information was transparent.

was the fact that RTFC was not being allocated its contribution to the combined earnings of CFC/RTFC    A comparison of the telecom earnings as reported in the segment information reported for 2000 and 2001 by Arthur Andersen to Ernst for the same period is as follows:

|  | AA | Ernst |
|---|---|---|
| 2000 Net Margin (2001 10K page 78 contrasted to 2002 10K page 98) | $3,497 | $50,246 |
| 2001 Net Margin (2001 10K page 78 contrasted to 2002 10K page 98) | $3,817 | $80,165 |

The relevancy of the above would not be fully appreciated without comparing the "net margin" reported in the segment information of the 10K to the "Net Margin" reported on RTFC's individual audited financial statements. The RTFC's financial statements included the CFC patronage allocation to RTFC for the year. That calculation reveals that there has been a material and substantial misappropriation of patronage income. For instance, RTFC's income (after patronage dividends from CFC) in 2000 and 2001 was $26,880 and $38,098, respectively. The indicate that RTFC was shorted patronage income of $23,326 ($50,246 - $26,880) in 2000 and patronage income of $28,475 (80,165 - $38,098) in 2001. The figures $23 million and $28 million garnered our attention.

Ernst disclosed the following information in its reports of Segment Information for the period Ernst was CFC's auditor (for f/y/e May 31, 2002, 2003, and 2004):

### Telephone (RTFC)
### Segment Information (in Thousands)[7]

|  | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|
| Gross Margin |  |  |  |  |  |
| - 2002 10K page 98 | 67,136 | 106,069 | 116,578 |  |  |
| - 2004 10K page 134-5 |  |  |  | 66,635 | 62,053 |
| G&A expenses | (5,730) | (8,696) | (9,919) | (9,560) | (4,267) |
| Loan Losses | (11,200) | (30,800) | (55,000) | (37,159) | (145,861) |
| Derivative Cash Settlements | - | - | 9,927 | 36,663 | 26,118 |
| Net Margin | 50,206 | 66,573 | 61,586 | 56,579 | (61,957) |
| *Add back: Loan losses* | 11,200 | 30,800 | 55,000 | 37,159 | 145,861 |
| Adjusted Net Margin | 61,406 | 97,373 | 116,586 | 93,738 | 83,904 |

---

[7] Allocations in the changes in valuations of Derivative and Foreign Currency are ignored because CFC does not consider those items in determining its adjusted Net Margin: the basis of patronage allocations  Only derivative cash settlements are included to allocate patronage dividends.

The above table has two calculations: Net Margin and Adjusted Net Margin. The difference is the add-back of the loan loss provision which is explained after the next table. RTFC reported on its separate audited income statement the following information:

<div align="center">

**Telephone (RTFC)**
**Reported: Separate Income Statement**

</div>

|  | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|
| Gross Margin | 4,062,760 | 4,396,352 | 5,871,171 | 6,889,604 | 6,297,879 |
| G&A Expenses | (565,657) | (578,951) | (641,863) | (811,022) | (821,871) |
| Guaranty Fee to CFC | - | - | (374,253) | (773,504) | (1,018,980) |
| Management Fee to CFC | - | - | (1,675,340) | (2,507,552) | (2,414,831) |
| Operating Margin | 3,497,103 | 3,817,401 | 3,179,715 | 2,797,526 | 2,042,197 |
| Patronage allocation from CFC | 23,344,638 | 34,187,286 | 23,636,017 | 25,150,995 | 24,215,258 |
| Interest Income | 38,140 | 93,153 |  |  |  |
| Income Tax Expense | - | - | - | (35,100) | (52,500) |
| Net Margin | 26,879,881 | 38,097,840 | 26,815,732 | 27,913,421 | 26,204,955 |

In 2002 CFC charged RTFC a separate loan guarantee fee. The fee came into existence because CFC guaranteed[8] RTFC from any and all loan losses. The pertinent language as set forth in Note One to 2003 RTFC Financial Statements provides:

> Guaranty Agreement with CFC
>
> RTFC's loan agreements with CFC (see Note 5) require RTFC to maintain, or cause to be maintained, an adequate reserve for loan and guarantee losses. RTFC has entered into a guaranty agreement with CFC whereby CFC guarantees payment to RTFC of an amount equal to the portion of CFC's loan and guarantee loss reserve allocated to the RTFC loans on CFC's books as well as any amount by which such allowance is not sufficient to cover charge-offs by RTFC. …
>
> RTFC pays CFC an annual guaranty fee equal to fifty (50) basis points times the portion of CFC's loan loss reserve allocated to RTFC loans. This fee is calculated and paid at the beginning of each fiscal quarter.

To give effect to CFC's guaranty agreement (insuring RTFC against all loan losses), RTFC is entitled to patronage allocation on its contribution to "adjusted net margin" (the table at the bottom

---

[8] These changes were made when CFC's illegal investment to control RTFC board of $1,000.00 was eliminated presumably to continue to report on a combined basis.

of page 9 hereof) which is determined by adding back any loan loss charged and deducting all guarantee fees and other management fees

The following table sets forth RTFC's earnings as reported to its members (which includes CFC's allocation to RTFC), RTFC's contribution to the combined earnings based upon the segment information, and any deficiency in the allocation from CFC. For the fiscal years ended May 31, 2002, 2003, and 2004, RTFC's contribution to earnings are modified by removing the loan loss adjustment and substituting RTFC's guarantee fee paid to CFC to give effect to the guaranty agreement.

### RTFC's Deficiency In Patronage Allocations
#### (In Thousands)

|  | | Reported Earnings | Contribution To Combined Earnings | Deficiency |
|---|---|---|---|---|
| F/Y/E May 31, 2000 | | $26,880 | $50,206 | $23,326 |
| F/Y/E May 31, 2001 | | $38,098 | $66,573 | 28,475 |
| F/Y/E May 31, 2002 | | $26,816 | $116,212 | 89,396 |
| F/Y/E May 31, 2003 | | $27,913 | $94,512 | 66,599 |
| F/Y/E May 31, 2004 | | $26,512 | $93,430 | 67,268 |
| | Total | | | $275,074 |

The above is a bottom line approach: it ignores the disparity in interest rates between CFC Members and RTFC Members and concentrates only on the allocation of the combined net savings. There is no way to determine the accuracy of allocations from CFC to RTFC after May 31, 2004 or before May 31, 2000 since accurate and transparent Segment Information is not available.

In a recent discussion I learned this may not have been a recent event but goes to the very reason CFC established RTFC. CFC established RTFC for the purpose of earning money for electric members from loans to members of RTFC. This is inconsistent with CFC's Bylaws (RTFC is a patron of CFC), with the General Counsel Memorandum cited above and CFC's tax-exempt purpose (moving income from a taxable entity to a tax exempt entity). As reported in Note 1(b) to the Financial Statements in the 2002 10K, for a mere $1,000 CFC designated a majority of RTFC's directors. This illegal relationship had existed since the formation of RTFC in 1987. The General Counsel Memorandum cited above views such arrangements as inconsistent with the tax status as a cooperative. The fact CFC embedded an illegal method to control RTFC at its very formation further substantiates CFC's illegal purpose in establishing RTFC

### Setting Electric's Margins

CFC markups fund loans to RTFC and then RTFC makes an additional spread on the cost of funds when it lends to RTFC members. So it is unlikely the source of the nearly $2.7 Billion in the Fair Value of loans is attributable to loans to RTFC. This could be determined by examining RTFC's current financial statements which I do not have access thereto. But note that the 2004 RTFC Financial Statement reported in a footnote that RTFC had a deficiency of only $54 million when the deficiency reported in the footnotes to the CFC/RTFC Financial Statements in 2004 was over $1.6 Billion. The import of the fair value discrepancy is that CFC is lending to its Electric members at below market rates. By below market, I am referring to loans with margins over the cost of funds that are below reasonable business margin[9] to cover operating expenses, loan losses, and provide a reasonable return to members. This is further confirmed by the fact that Electric loan portfolio has not produced a Gross Margin in excess of G&A Expenses since fiscal year ending May 31, 2003[10].

A possible explanation and evidence of CFC's misleading disclosure is contained in the 2006 10K on page 24 under a table entitled "Volume Rate Variance Table". This table shows that with respect to electric loans in 2006 CFC earned 5.43%, had a cost of funds of 5.21%, and a gross margin of 0.21%. The 2005 information stated on electric loans that CFC earned 4.76%, had a cost of funds of 4.18%, and a gross margin of 0.58%. This information ties to the cost of funds reported in the segment information. CFC has changed its method of reporting segment information so that the markup on the cost of funds made on telephone loans (as well as loans to NSCS) is captured by Electric and thus decreases the cost of funds charged against electric loans (below actual cost of funds on the liability side of the balance sheet). In essence, if CFC earns $55 million from marking up loans to RTFC it decreases actual cost of funds (paid to CFC's creditors) in determining the cost of funds of electric members. Stated differently, the gross margin reported on page 24 for Electric is overstated because the cost of funds of Electric is unstated and the gross margin earned on telephone loans is understated.

---

[9] Note Co-Bank's margins
[10] The 2004 10K, Note 15, page 134 shows Electric Gross Margin of $19,813 and allocated G&A expense of $35,168. The segment information presentation was changed by Deloitte making it an inexact science to determine based upon the gross margin shift with respect to 2004 when it was restated, my estimates indicate a gross margin deficiency as compared to G&A Expenses in 2005 of over $20 Million

The above is best illustrated by examining the segment information prepared by Ernst for the May 31, 2004 10K (Note 15, Pages 133 through 136) against the May 31, 2005 10K prepared by Deloitte (Note 15, Pages 81 through 84). This table sets forth that comparison in millions:

**Report Cost of Funds: Telephone**

|  | 2004 | 2003 |
|---|---|---|
| As reported by Deloitte: 2005 10K (pages 106-7) | $ 300 | $ 338 |
| As reported by Ernst: 2004 10K (pages 134-5) | ($ 245) | ($ 278) |
| DIFFERENCE | $ 55 | $ 60 |

This difference as well as the difference in the third segment (NCSC- also treated like telephone companies) decreases the "Cost of Funds" reported by Electric companies. So the reporting methodology Deloitte and AA allowed CFC to use in reporting segment information overstates the Cost of Funds of Telephone and NCSC while understating the Cost of Funds of Electric members. This is misleading disclosure. It disguises the viability of the electric loan portfolio.

One feasible explanation for CFC's lack of earnings on its core business of lending is the possibility that CFC's management priced loans to electric members not on the actual cost of funds but based upon the methodology now actually used to report "Volume Rate Variance Table". First, Electric loans were priced not on the real cost of funds but on the subsidized cost of funds. Secondly, such loans were priced with too small of margins using the subsidized cost of funds as the basis to price loans. Thirdly, on top of all that CFC does not really match its funding to its loans.

Given that scenario, once RTFC loans were reduced bringing to an end a large portion of the subsidization and Electric loans had to start paying more (not all – there are still telephone loans) of the Electric's actual (real) cost of funds; CFC Gross Margin becomes squeezed. Add a rise in interest rates of the cost of funds side and you have our present situation. A Gross Margin in 2006 that is 15% of the Gross Margin in 2002  This explains why the Electric loan portfolio hasn't had a Gross Margin *in excess* of its allocated share of G&A Expenses since May 31, 2003.

The only thing that has helped cushion a financial structure otherwise set up to crash is the $2 Billion in funding provided under the Government's Rural Economic Development Loan and Grant ("REDLG") Program. While these loans help cushion some of the problems it is not enough to offset the impact of poor lending decisions based upon reliance that a systematic fraud occurring since 1987 will continue forever.

13

### Summation

In the opening of this letter I stated a number of items all of which have been developed at a high level except one statement: "CFC's activities are replete with violations of numerous laws". It really all starts with the systematic defalcation of RTFC[11] and continues with attempts to not disclose to the public the real impact on CFC's results of operations as Telephone loans decrease First, the shifting of income from RTFC, a taxable entity, to CFC, a tax-exempt entity, cannot be considered legal. Secondly, cooperative netting jeopardizes CFC's tax exemption if the IRS General Counsel is correct as to the cooperative principles embedded in tax law Further, look at the reporting of Segment Information as it changed from Arthur Andersen to Ernst and then with Deloitte ("no transparency" to "transparency" back to "no transparency"). What could be said about the reason for the change in Segment Reporting when it occurred right after the Electric's Gross Margin was exceeded for the first time by its G&A Expenses? How about a comparison of Income Statements over the period 2002 through 2006? As late as 2002 "Total Expenses" were subtracted from the "Gross Margin" for the "Operating Margin" *before* the results derivative and foreign currency transactions on the Income Statement. In 2003 that subtotal, Operating Margin was moved under an additional (new item) foreclosed assets but still was placed before the results derivative and foreign currency transactions. In 2004 the results derivative and foreign currency transactions were moved before any subtotal: thus there is Gross Margin and nothing is subtracted against Gross Margin until the subtotals of Operating Expenses, Foreclosed Assets and Derivative transactions are deducted If you strike a subtotal under both total operating expenses and also after results from foreclosed assets CFC produced losses in 2004 and 2006 What is curious of late is how CFC has completely reformatted the income statements on its 10Qs filed after May 31, 2006. Do you think this just happened by chance after CFC's 2006 10K Income Statement revealed a Gross Margin less than G&A Expenses? Could any of the preceding be construed as a violation of security laws? How about when CFC reports cost of funds for Electric loans reflecting the subsidization of Telephone loans? Why don't the 10K's disclose how Electric cost of funds are calculated so that investors understand the real cost of funds Electric members may some day have to cover?

In internal memos RTFC admits that it started foreclosure against ICC to change management. Additionally, if you really research the facts involving ICC you will find that RTFC

---

[11] This appears to be the apparent reason that CFC created RTFC

had one fact based matter (the effect of the 1989 Settlement by and between the Virgin Islands PSC, RTFC and Vitelco) if decided for the benefit of ICC, RTFC would have been in a position of commencing a foreclosure without cause[12]   Note also RTFC could not authenticate its 2001 loan agreement with ICC.  At that point (failing to authenticate the loan agreement) RTFC entered into the Inter-Creditor Agreement with Greenlight effecting paying Greenlight to obtain judgment and force ICC into bankruptcy to avoid RTFC's day of reckoning in Court.  ICC can demonstrate that there was no basis for the foreclosure and the root cause is due solely to ICC questioning the allocations of patronage dividends which, as indicated above, had public reporting implications.  If the foreclosure is tied to the accounting issues discussed in this letter (which I believe it is), then, CFC/RTFC's behavior including the Inter-Creditor Agreement has been criminalized under 18 USC § 1513(e).

The above touches the surface   I would be happy to discuss matters in further detail

Sincerely yours,

John Raynor

Cc:    Mr. Yuri B  Zehsky, Esquire Assistant Director, Division of Enforcement Securities and Exchange Commission 450 Fifth Street, N W., Mail Stop 08-01 Washington, D.C  20549

Attachments:
-   2000 through 2004 RTFC Income Statements with Note 1 of 2004 Financial Statements
-   All other information is in the public records.

---

[12] There was no payment default

15

RURAL TELEPHONE FINANCE COOPERATIVE

## Statements of Income, Expenses and Net Margins
*For the Years Ended May 31, 2001 and 2000*

| | 2001 | 2000 |
|---|---|---|
| **Operating Income – Interest on loans** | | 240,189,383 |
| Less – Cost of funds | | 236,126,623 |
| Gross operating margin | | 4,062,760 |
| **General and Administrative Expenses** | | 565,657 |
| Operating margin | | 3,497,103 |
| **Non-Operating Income** | | |
| Patronage capital allocation from CFC | | 23,344,638 |
| Interest income from Commercial Paper investment | | 38,140 |
| **Total Non-Operating Income** | | 23,382,778 |
| **Net Margin** | | 26,879,881 |

*The accompanying notes are an integral part of these financial statements*

15

NO.376   P.6/17

# RURAL TELEPHONE FINANCE COOPERATIVE
## STATEMENTS OF INCOME, EXPENSES AND NET MARGIN
### FOR THE YEARS ENDED MAY 31, 2002 AND 2001

|  | 2002 | 2001 |
|---|---|---|
| **OPERATING INCOME** - Interest on loans | $  373,765,221 | $  419,523,919 |
| Less - Cost of funds | 367,894,050 | 415,127,567 |
| Gross operating margin | 5,871,171 | 4,396,352 |
|  |  |  |
| GENERAL AND ADMINISTRATIVE EXPENSES | 641,863 | 578,951 |
| GUARANTY FEE EXPENSE TO CFC | 374,253 | - |
| MANAGEMENT FEE EXPENSE TO CFC | 1,675,340 | - |
| Operating margin | 3,179,715 | 3,817,401 |
|  |  |  |
| **NON-OPERATING INCOME** |  |  |
| Patronage capital allocation from CFC | 23,636,017 | 34,187,286 |
| Interest Income from Commercial Paper Investment | - | 93,153 |
| TOTAL NON-OPERATING INCOME | 23,636,017 | 34,280,439 |
|  |  |  |
| NET MARGIN | $  26,815,732 | $  38,097,840 |

The accompanying notes are an integral part of these financial statements.

3

RURAL TELEPHONE FINANCE COOPERATIVE
STATEMENTS OF INCOME, EXPENSES AND NET MARGIN
FOR THE YEARS ENDED MAY 31, 2004 AND 2003

|  | 2004 | 2003 |
|---|---|---|
| **OPERATING INCOME** | $ 306,579,369 | $ 344,491,756 |
| Less: Cost of funds | 300,281,490 | 337,602,152 |
| Gross operating margin | 6,297,879 | 6,889,604 |
| **GENERAL AND ADMINISTRATIVE EXPENSES** | 821,871 | 811,022 |
| **GUARANTY FEE EXPENSE TO CFC** | 1,018,980 | 773,504 |
| **MANAGEMENT FEE EXPENSE TO CFC** | 2,414,831 | 2,507,552 |
| Total Expenses | 4,255,682 | 4,092,078 |
| Operating margin | 2,042,197 | 2,797,526 |
| **NON-OPERATING INCOME** | | |
| Patronage capital allocation from CFC | 24,215,258 | 25,150,995 |
| TOTAL NON-OPERATING INCOME | 24,215,258 | 25,150,995 |
| **NET MARGIN BEFORE INCOME TAXES** | $ 26,257,455 | $ 27,948,521 |
| **INCOME TAX EXPENSE** | 52,500 | 35,100 |
| **NET MARGIN** | $ 26,204,955 | $ 27,913,421 |

See accompanying notes.

4

RURAL TELEPHONE FINANCE COOPERATIVE
NOTES TO FINANCIAL STATEMENTS
AS OF MAY 31, 2005 AND 2003

1.    **GENERAL INFORMATION AND ACCOUNTING POLICIES**

*Organization and Background*

Rural Telephone Finance Cooperative ("RTFC" or the "Company") is a private cooperative association, which provides financing for the benefit of its members and their affiliates. The Company was incorporated on September 8, 1987, under the South Dakota Cooperative Association Act and began business November 1, 1987 Membership is limited to cooperatives, public or private corporations, utility districts and other public bodies, as defined in RTFC's bylaws, which are engaged or plan to engage in providing telephone or telecommunications services to rural consumers. As of May 31, 2004, RTFC had 507 members. RTFC is affiliated with, and an associate member of, the National Rural Utilities Cooperative Finance Corporation ("CFC"), a private, not-for-profit cooperative association that provides its members with a source of financing to supplement the loan programs of the Rural Utilities Service ("RUS") of the United States Department of Agriculture. RTFC conducts its business from the national headquarters of CFC in Herndon, Virginia. The Company takes deductions for allocations of net margins to its patrons in accordance with Subchapter T of the Internal Revenue Code

*Operating Income*

The majority of RTFC's operating income relates to interest earned on loans to members that is recognized on an accrual basis, unless the collection of all principal and interest is not deemed probable Operating income also includes upfront fees, which were collected and are amortized using the straight-line method over the life of the loan. During the fiscal years ended May 31, 2004 and 2003, RTFC recognized $217,143 and $620,701, respectively, in upfront fees.

*Nonperforming Loans*

It is RTFC's policy to classify a loan as nonperforming when it meets any one of the following criteria:  (i) interest or principal payments are contractually past due 90 days or more, (ii) as a result of court proceedings, repayment in accordance with the original terms is not anticipated, or (iii) for other reasons, timely repayment is not expected Once a borrower is classified as nonperforming, interest on its loans is generally recognized on a cash basis. Alternatively, RTFC may choose to apply all cash received to the reduction of principal, thereby forgoing interest income recognition At May 31, 2004, there were three loans, to one borrower, in the amount of $340,437,915 classified as nonperforming  At May 31, 2003, there were no loans classified as nonperforming

*Management Agreement with CFC*

RTFC operates through a ten-year management contract with CFC, under which staffing and other resources necessary to supplement RTFC's daily operations are provided Beginning October 9, 2001, CFC recovers the cost of services performed under the management contract through a management fee paid by RTFC. The fee, which is calculated and paid monthly, is equal to an annualized rate of five (5) basis points times the weighted average principal amount of RTFC loans outstanding during each month. The management agreement expires in fiscal year 2009 and will automatically extend for additional one-year terms unless either party terminates the agreement.

7

*Guaranty Agreement with CFC*

RTFC has entered into a guaranty agreement with CFC whereby CFC guarantees payment to RTFC of an amount equal to the portion of CFC's loan and guarantee loss reserve allocated to the RTFC loans on CFC's books as well as any amount by which such allowance is not sufficient to cover charge-offs by RTFC. No loan or guarantee charge-offs were incurred during the year ended May 31, 2004. RTFC incurred loan charge-offs of $1,102,458 during the year ended May 31, 2003, which were reimbursed by CFC. Based on this guaranty agreement, RTFC does not record an allowance for loan and guarantee losses. As of May 31, 2004 and 2003, CFC recorded a loan loss allowance of $309,655,000 and $174,992,000, respectively, and recorded a provision of $134,673,000 and $37,294,000, respectively, related to the RTFC loans. As of May 31, 2004 and 2003, CFC recorded a guarantee loss allowance of $0 and $65,000, respectively, and recorded a recovery of $65,000 and $135,000, respectively, related to the RTFC guarantees

RTFC pays CFC an annual guaranty fee equal to fifty (50) basis points times the portion of CFC's loan loss reserve allocated to RTFC loans   This fee is calculated and paid at the beginning of each fiscal quarter

*Patronage Capital Earned*

As an associate member of CFC, RTFC is eligible to earn an annual patronage capital allocation from CFC   RTFC records the allocation as income in the year earned   The amount earned is based on CFC's allocated internal net margins as defined by CFC, which are allocated to members pro-rata based upon base-rate interest charged on borrowings with CFC.  CFC currently retires 70% of its allocated margins in the fiscal year immediately following the fiscal year in which the net margins were earned, with the remainder retired on a 15-year cycle at the discretion of its Board of Directors   The amounts not yet retired are recorded as an Investment in CFC (see Note 3)

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the assets and liabilities and the revenue and expenses reported in the financial statements, as well as amounts included in the notes thereto, including discussion and disclosure of contingent liabilities. While RTFC uses its best estimates and judgments based on the known facts at the date of the financial statements, actual results could differ from these estimates as future events occur.

*Reclassifications*

Certain reclassifications of prior year amounts have been made to conform to the fiscal year 2004 presentation.

8

# Exhibit B

Westlaw.

Not Reported in A.2d                                                    Page 1
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

▷
In re Emerging Communications, Inc. Shareholders Lit-
igation
Del.Ch.,2004.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.
Court of Chancery of Delaware.
In re EMERGING COMMUNICATIONS, INC.
SHAREHOLDERS LITIGATION
No. Civ.A. 16415.

Submitted Aug. 30, 2003.
Decided May 3, 2004.
Revised June 4, 2004.

Thomas J. Allingham II, Leonard P. Stark, Rosemary S.
Goodier, Douglas E. McCann, and James A. Whitney,
of Skadden, Arps, Slate, Meagher & Flom LLP, Wilm-
ington, Delaware; for Greenlight Capital Qualified L.P.,
Greenlight Capital L.P. and Greenlight Capital Off-
shore, Ltd.
Norman M. Monhait, of Rosenthal, Monhait, Gross &
Goddess, P.A., Wilmington, Delaware; Shane T. Row-
ley, of Faruqi & Faruqi, LLP, New York, New York;
for Brickell Partners and the Class, of counsel.
Thomas A. Beck, Raymond J. DiCamillo, Catherine G.
Dearlove and Kelly C. Ashby, of Richards, Layton &
Finger, Wilmington, Delaware; P. Kevin Castel and
Jonathan R. Donnellan, of Cahill Gordon & Reindel,
New York, New York; for Emerging Defendants Com-
munications, Inc., Jeffrey J. Prosser, Innovative Com-
munication Corporation and Innovative Communication
Company, LLC, of counsel.
David C. McBride and Bruce L. Silverstein, of Young
Conaway y Stargatt & Taylor, Wilmington, Delaware;
Attorneys for the Board Defendants; Kevin C. Logue,
and Ryan K. Roth Gallo, of Paul, Hastings, Janofsky &
Walker LLP, New York, New York; Attorneys for De-
fendants Richard N. Goodwin, John G. Vondras, Sal-
vatore Muoio, Terrence A. Todman, Sir Shridath
Ramphal; and Paul J. Ruskin, of the Law Offices of
Paul J. Ruskin, Douglaston, New York; Attorney for
Defendant John P. Raynor, of counsel.

OPINION
JACOBS, J.[FN*]

FN* Sitting by designation as Vice Chancellor
under Del. Const., art. IV, § 13(2).

*1 Addressed in this Opinion are the merits of consolid-
ated statutory appraisal and class actions for breach of
fiduciary duty. These actions all arise out of the two-
step "going private" acquisition of the publicly owned
shares of Emerging Communications, Inc. ("ECM"), by
Innovative Communications Corporation, L.L.C.
("Innovative"), ECM's majority stockholder. The first
step tender offer was commenced on August 18, 1998
by Innovative for 29% of ECM's outstanding shares at a
price of $10.25 per share. The balance of ECM's pub-
licly held shares were acquired in a second-step cash-
out merger of ECM into an Innovative subsidiary, at the
same price, on October 19, 1998.

At the time of this two-step transaction (the
"Privatization"), 52% of the outstanding shares of
ECM, and 100% of the outstanding shares of Innovat-
ive, were owned by Innovative Communication Com-
pany, LLC ("ICC"). ICC, in turn, was wholly owned by
ECM's Chairman and Chief Executive Officer, Jeffrey
J. Prosser ("Prosser"). Thus, Prosser had voting control
of both of the parties to the Privatization transaction.

In June 1998, shortly after the Privatization proposal
was announced, a fiduciary duty class action was
brought on behalf of the former public shareholders of
ECM by Brickell Partners, an ECM shareholder. On
February 10, 1999, four months after the Privatization
was consummated, an appraisal action was filed by
Greenlight Capital, L.P. and certain of its affiliates
(collectively, "Greenlight"). A settlement of the Brick-
ell Partners class action was thereafter proposed and
later withdrawn. Greenlight, which had objected to the
proposed settlement, filed a separate fiduciary duty ac-
tion on behalf of both its 750,300 "appraisal shares" and
2,026,685 ECM minority shares to which Greenlight
had been assigned the litigation rights. Thereafter, the
Brickell fiduciary duty action and the Greenlight ap-
praisal and fiduciary duty actions were consolidated,
and were tried on the merits between September 17,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 2

2001 and November 6, 2001. Post-trial briefing and the submission of other memoranda were completed on August 30, 2003.

This is the decision of the Court, after trial, on the merits of the consolidated fiduciary and appraisal actions.

## I. THE FACTS

Next recited are the material facts, many of which are undisputed. Where there are disputes, the facts are as found below. Although the recited facts set forth the basic storyline, they are not intended to be comprehensive. To avoid unduly diverting the reader from the essential plotline, other facts that are relevant to discrete issues are discussed elsewhere in this Opinion in the context where those issues are addressed.

### A. The Parties

#### 1. *The Plaintiffs*

The plaintiffs, as noted are Brickell Partners, which represents a class of persons who owned shares in ECM between May 29, 1998 and October 19, 1998; and Greenlight, which comprises three investment funds that focus on special situation value investments. At the time of the tender offer, Greenlight owned 750,300 shares of ECM, and it was also the assignee of the litigation rights (which Greenlight had previously acquired) to 2,026,685 ECM minority shares. Greenlight brings its appraisal action on behalf of the 750,300 shares that it owns outright. Greenlight brings its class action on behalf of those shares, and also on behalf of the 2,026,685 ECM shares as to which Greenlight holds the litigation rights.

#### 2. *The Defendants*

*2 There are two groups of defendants: (1) the "ECM defendants," which consist of ECM, ICC, and Innovative; and (2) the "Board defendants," who were ECM's directors at the time of the Privatization. In addition to Jeffrey Prosser, who was also ECM's Chairman and Chief Executive Officer, ECM's directors were Richard Goodwin; John Raynor; Sir Shridath Ramphal; Salvatore Muoio; John Vondras; and Terrence Todman. Each of the board defendants served as an ECM director

at Prosser's request.

#### (a) *The ECM Defendants*

ECM, a Delaware corporation that was headquartered in the U.S.Virgin Islands ("USVI"), was formed in 1997 to receive the Virgin Islands operations of ECM's corporate predecessor, Atlantic Tele-Network, Inc. ("ATN"), in connection with a division of ATN's business. At the time of the October 1998 Privatization, ECM's principal business was the Virgin Islands Telephone Co. ("Vitelco"), which was the exclusive provider of local wired telephone services in the USVI. Vitelco represented the largest portion of ECM's business and accounted for approximately 88% of its revenues. ECM's other businesses included Vitelcom, an indirect subsidiary engaged in selling and leasing telecommunications equipment; and Vitelcom Cellular ("VitelCellular"), which provided cellular service in the USVI. ECM also owned SMB Holdings, which provided cellular service to the island of St. Maarten/St. Martin.

Innovative, a Virgin Islands corporation that was 100% owned by ICC, is a Delaware limited liability company with its principal place of business in the USVI. As earlier noted, at the time of the Privatization, Prosser owned the entire (100%) membership interest in ICC, which in turn owned 52% of ECM's common stock, and 100% of the stock of Innovative.

#### (b) *The Board Defendants*

The Board Defendants, and their respective backgrounds, are described at this point.

#### *Richard N. Goodwin*

Richard Goodwin, a member of the Massachusetts Bar, is a noted author of books on American history, government, and politics. In 1959, Mr. Goodwin served as a law clerk to United States Supreme Court Justice Felix Frankfurter, and during the 1960's, he served as Assistant Special Counsel to President John F. Kennedy. After President Kennedy's assassination, Goodwin served as Deputy Assistant Secretary of State for Inter-American Affairs and as Special Assistant to President Lyndon B. Johnson. In the late 1960's Mr. Goodwin served as campaign advisor to Senator Robert F. Kennedy. During the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

1980's and part of the 1990's, Mr. Goodwin also served as a consultant to the government of the USVI.

### Shridath S. Ramphal

Sir Shridath S. Ramphal ("Ramphal"), a native of Guyana, is a Barrister at Law who has held numerous prestigious government and academic positions. Between 1965 and 1993, Ramphal served successively (from 1965 to 1975) as Solicitor General of British Guyana, Assistant Attorney General of the West Indies, Attorney General of Guyana, and Guyana's Minister of Foreign Affairs of Justice. From 1975 to 1990, Ramphal served as Secretary General of the British Commonwealth, a group of 58 nations headquartered in London, England. Ramphal also served as Vice President of the United Nations General Assembly (from 1968 to 1973), Chairman of the United Nations Committee on Development Planning (from 1984 to 1987), Special Advisor to the United Nations Conference on Environment and Development (1992), Chairman of the West Indian Commission (1990 to 1992), and as President of the World Conservation Union (from 1990 to 1993). Finally, Ramphal served as chancellor of the University of Guyana from 1988 to 1992, and as chancellor of the University of Warwick in the United Kingdom and chancellor of the University of the West Indies, since 1989.

*3 Apart from these positions, Ramphal served as a director of, and a paid consultant to, ATN (ECM's corporate predecessor) in 1992, 1993, 1994, and 1995, during which years he was paid (respectively), $20,000, $140,000, $140,000, and $120,000.

### John G. Vondras

John G. Vondras ("Vondras") is a professional engineer, with over 25 years of independent experience in the telecommunications industry. Vondras has served and continues to serve as a director (and as President Director) of PT ARIAWEST International, a joint venture company that operates a partnership with PT TELKOM, which provides wireless and land based telephone services in Indonesia. In 1986, Vondras spent two weeks in the USVI assisting Prosser on technical due diligence in Prosser's purchase of Vitelco. Vondras also served as a director of ATN.

### Salvatore Muoio

Salvatore Muoio ("Muoio") is a principal and general partner of S. Muoio and Co., LLC, an investment advising firm, with significant experience in finance and the telecommunications sector. Mr. Muoio's background includes employment as a securities analyst and vice president at Lazard Fréres & Co., from 1995 to 1996 in the telecommunications and media sector, and then for Gabelli & Co., Inc ., from 1985 to 1995, serving both as a generalist and in the communications sector. During his career, Mr. Muoio has been quoted in many well-regarded financial newspapers and periodicals.

### Terrence A. Todman

Terrence Todman, ("Todman"), a USVI native, is a former United States ambassador to Argentina, Denmark, Spain, Costa Rica, Guinea, and Chad, and has served as special advisor to the Governor of the USVI. Todman, who is now retired, serves on the boards of directors of several other companies, including Areolineas Argentinas and the Exxel Group.

### John P. Raynor

John P. Raynor, ("Raynor"), a practicing attorney, was a partner of an Omaha, Nebraska law firm, and served as Prosser's personal attorney as well as ECM's counsel. Raynor was also a business associate of Mr. Prosser, had been a director of ATN, and acted as Prosser's advisor in formulating the terms of the Privatization transaction.

### B. Background Leading To The Formation of ECM

ECM's corporate predecessor, Atlantic TeleNetwork, Inc. ("ATN"), was a company that Prosser and a partner, Cornelius Prior, formed in 1987 to acquire the Virgin Islands Telephone Corporation ("Vitelco").

Vitelco, which was ATN's (and later ECM's) principal subsidiary, was (and still is) the exclusive provider of local wired telephone service in the USVI, where Vitelco operates a modern, fully digital telecommunications network. Vitelco was an extremely valuable asset, for several reasons. At the time of the Privatization, Vitelco faced no competition in the foreseeable future, and

Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

was guaranteed an 11.5% rate of return on the rate base for local telephone service by the Virgin Islands Public Service Commission. Vitelco's business, which is essentially non-cyclical and not materially affected by recession or inflation, was enhanced by its membership in the Rural Telephone Finance Cooperative ("RTFC"), a non-profit lending cooperative that provided Vitelco with capital at below-market interest rates. Prosser and his entities had access to RTFC financing only because of their affiliation with Vitelco.

*4 Moreover, Vitelco had been essentially free from taxation. In May 1997, Vitelco was granted by the USVI Industrial Development Commission ("IDC") a five year tax abatement from 90% of income taxes and 100% of gross receipts, property and excise taxes (running from October 1998 through October 2003). The tax abatement was granted to help Vitelco recover from uninsured damage caused by Hurricane Marilyn in 1995. The tax abatement lasted for almost the entire period from the time ATN acquired Vitelco, until the Privatization.

In January 1991, ATN acquired an 80% interest in a second telephone company: Guyana Telephone & Telegraph Company Limited ("GT & T"). Eleven months later, ATN completed an initial public offering of over 5 million shares of its common stock at $19 per share. As a result, Prosser and Prior together owned about 65% of ATN's stock.

By 1993, Prosser and Prior had a falling out. That led to a management deadlock, which effectively precluded Prosser from pursuing his acquisition strategy. With the co-CEOs at loggerheads and the ATN board deadlocked, Prosser and Prior sued each other in June 1995. In February 1996, Prior and Prosser entered into a global settlement of their disputes, in which they terminated all litigation and released all claims.

As part of the settlement, Prosser and Prior attempted to sell ATN, and engaged two investment banks-Prudential and PaineWebber-to assist in that endeavor. Both banks concluded that a buyer should be willing to pay $25 to $30 per share for ATN, which represented a 150% to 200% premium over ATN's market price. But, potential acquirors expressed interest only in acquiring ATN's

Virgin Islands operations, primarily Vitelco.

Because ATN could not be sold as an entirety, and because selling only the USVI business would not resolve the management deadlock, Prosser and Prior decided to split ATN into two new companies (the "Split Off"). One of those companies, to be controlled by Prosser, would consist of ATN's Virgin Islands Group. That company was ECM. The other company, which would be controlled by Prior, was New ATN, to which GT & T would be transferred. The Split Off was approved by ATN's board of directors and shareholders, and was consummated on December 30, 1997. Although ATN had no controlling stockholder before the Split Off (Prosser and Prior owned a large but not majority position), as a result of the Split Off Prosser ended up owning 52% of ECM's 10,959,131 shares, and ECM's public shareholders were relegated to the position of minority stockholders. [FN1]

> FN1. Knowing that he would control ECM and Vitelco after the Split Off, Prosser began acquiring telecommunication and other media companies. On December 30, 1997, the same date as the Split Off closed, ICC (wholly owned by Prosser) closed its acquisition of three Caribbean Cable Companies (BVI Cable TV; St. Croix Cable TV, Inc.; and St. Maarten Cable TV) and the Daily News. ICC closed on its agreement to purchase St. Thomas Cable (executed in September 1997) on April 3, 1998. The plaintiffs contend that these acquisitions were all corporate opportunities of ATN and ECM.

On December 31, 1997, ECM began trading as a public company on the American Stock Exchange. Shortly after Prosser obtained control of ECM, he appointed his long-time ATN directors, Raynor and Ramphal, to the ECM board. Prosser also appointed Messrs. Goodwin, Muoio and Vondras to the ECM board.

### C. The Proposed, But Later Aborted, Merger of Innovative Into ECM

ECM's life as a public company was short-only ten and one half months. That was not accidental: before the Split Off had been completed, Prosser indicated that he

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 5

intended to merge Innovative into ECM, and he began exploring a combination of the two companies in January 1998. On January 20, 1998, ECM hired Prudential to advise it on the fairness of a potential merger of Innovative into ECM's subsidiary ATNCo (the "Proposed Merger"). During the next month, Prosser formulated the terms of the Proposed Merger, assisted by Prudential, the law firm of Cahill, Gordon and Reindel, ECM's legal advisors ("Cahill Gordon"), and director John Raynor.

*5 On February 27, 1998, Prosser sent to each ECM director an outline of the terms of the Proposed Merger, a draft merger agreement, and proposed resolutions creating a special board committee that would consist of Messrs. Raynor, Goodwin, and Ramphal. At the March 9, 1998 meeting of the ECM board, Prosser formally presented the Proposed Merger, whereby Innovative would merge into ATNCo (the wholly-owned ECM subsidiary that held Vitelco) in exchange for the issuance of $35 million of ATNCo convertible preferred stock to ICC (Innovative's parent). No privatization of ECM was contemplated as part of this transaction. At the March 9, 1998 board meeting, the ECM board also constituted a special committee, consisting of Messrs. Goodwin, Raynor, and Ramphal (the "First Special Committee"), to consider Prosser's Proposed Merger. Those persons were appointed at the suggestion of Prosser.[FN2] At that time, Raynor, who was an ECM director and a Prosser business associate, was on retainer as ECM's attorney and had helped Prosser formulate the terms of the Proposed Merger.

FN2. Trial. Tr. Vol. 10 (Prosser) 1785).

The law firm retained to serve as counsel to the First Special Committee was Cahill Gordon. The firm that was retained as the financial advisor to ECM and the First Special Committee in connection with the Proposed Merger was Prudential. From April 3, 1998 through May 20, 1998, Prudential engaged in discussions with ICC about the Proposed Merger terms.

Whether or not the First Special Committee actively considered the Proposed Merger is a heavily disputed issue. Goodwin testified that that Committee never met, that it had no financial or legal advisor, and that the

Proposed Merger was "dropped within the month ."[FN3] The other Committee members also testified that the First Special Committee never met and that it had no advisors.[FN4]

> FN3. Trial Tr. Vol. 4 (Goodwin) 829-35, 845-46, 853.

> FN4. See Trial Tr. Vol. 7 (Ramphal) 1423-1425; Raynor Dep. 118-119.

The record, however, shows that Prudential and Cahill Gordon were retained by, and performed work for, the First Special Committee.[FN5] The scenario in which the Proposed Merger supposedly "languished" shortly after it first surfaced, is inconsistent with JX 218, which is Prudential's extensive documentary presentation of the Proposed Merger to the Special Committee. Joint exhibit 218 was sent to the Committee members on May 22, 1998 in preparation for the Committee's meeting scheduled for May 27, 1998. In that document Prudential valued ATN-the wholly owned ECM subsidiary into which Innovative would be merged-at $25 to $30 per share.[FN6] It is difficult to square Prudential having sent this document-which evidenced that that firm had done significant work-to the First Special Committee as late as May 22, if in fact the Proposed Merger had languished or if the Special Committee had been disbanded after a week or two, as Goodwin testified.

> FN5. See, e.g., JX35 (Prudential retainer letter); JX96 (draft fairness opinion); JX 265 (Prudential presentation to Cahill Gordon and First Committee); JX218 (Prudential Presentation to Special Committee containing its evaluation of the Proposed Merger); Trial Tr. Vol. 8 (Heying) (stating Prudential and Cahill Gordon were retained; Trial Tr. Vol. 10 (Prosser) 1796-98 (same).

> FN6. JX 218, Appendix, EC 020890-893. The Proposed Merger, if consummated, would have benefited ECM and its minority shareholders by combining all the media holdings Prosser had assembled (telephone, cellular and cable), using Vitelco's cash flow and capital, under the single corporate umbrella of ECM. Those benefits were not made available to ECM's minority

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                            Page 6
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

stockholders in the Privatization. By definition, only Prosser received those benefits.

### D. Prosser Abandons the Merger In Favor Of The Privatization

During the third week of May 1998, Prosser began having significant reservations about the Proposed Merger, because the low market interest in ECM's common stock had caused that stock to be undervalued.[FN7] On May 21, 1998, Prosser, together with Raynor, met with representatives of Prudential and Cahill Gordon to discuss the feasibility of Innovative acquiring all of the outstanding stock of ECM. By that point, Prosser had decided (in Raynor's words) to "flip the transaction." [FN8] Having concluded that the market was not recognizing ECM's intrinsic value, Prosser switched from being a seller of ECM stock to becoming a buyer of that stock. Although Prosser had placed a value of $13.25 per share on ECM for purposes of the Split Off that had occurred only 5 months before, as a buyer of that same stock he was now proposing to pay only $9.125 per share.

> FN7. Prosser Dep. June 7, 2000, at 67-69. On the first day ECM stock was traded, its high and low sales prices were $8.25 and $7.875, respectively. During the second calendar quarter of 1997 (April 1-June 30), ECM shares traded at prices ranging from a high of $8.9375 to a low of $6.25 per share. On the last trading day before the public announcement of the Privatization, the reported closing price was $7.00 per share. JX 155 at SC4133. Prosser informed the ECM board that the ECM stock price had failed to reach the desired appreciation as a result of the small public float and the fact that the stock was not followed by Wall Street analysts. JX 155 at SC 4111.

> FN8. Raynor Dep. 173.

*6 Between May 22 and May 28, Prosser, Prudential and Cahill formulated the terms of a Privatization proposal to be presented to ECM's board. On May 28, Raynor, Prosser and Thomas Minnich, ECM's Chief Operating Officer, informed the RTFC that they had decided to abandon the Proposed Merger and to take ECM

private. The next day, Prosser delivered to the ECM board a letter withdrawing the Proposed Merger and proposing instead that Innovative acquire all the ECM shares it did not already own. The proposed Privatization was structured as a first-step cash tender offer for ECM's publicly traded shares at $9.125 per share, to be followed by a second-step cash-out merger at the same price.[FN9]

> FN9. JX 150.

Prosser's May 29th letter was the first occasion that the ECM board and the First Special Committee (other than Raynor) learned of the abandonment of the Proposed Merger in favor of the Privatization. Those directors were never told of the roles played by Prudential, Cahill and Raynor-all supposedly retained to represent the interest of the ECM minority stockholders-in formulating the terms of the newly-substituted going private transaction.[FN10]

> FN10. The $9.125 per share merger price was arrived at by Prosser in consultation with Prudential, and no one else had a significant role in that decision. Prosser Dep. June 7, 2000 at 73-74. The First Special Committee members (other than Raynor) were not told of the ongoing plans to change the transaction until May 29, 1998. Goodwin Dep. August 11, 2000 at 48-52, 62.

On the same day that Prosser proposed the Privatization, he told ECM's board that he (Prosser) had retained ECM's former advisors, Prudential and Cahill Gordon, to represent Innovative as the buyer in that transaction. Prudential was an especially valuable advisor to ECM, because it understood ECM's business and properties and had been ECM's only advisor during its brief life as a stand-alone company. Thus, the advisors that initially were retained to work *for* the interests of ECM and its minority stockholders would now be working to serve the interests of Innovative, the party now bargaining *against* ECM. There is no evidence that the ECM board objected either to Prosser's co-opting these valuable advisors, or to the timing of the proposed Privatization.[FN11]

> FN11. At that time (May 1998), Prosser knew

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

that ECM's stock price was artificially depressed, because the market was not viewing ECM as a U.S. telephone company, but, rather, as a developing nation/third world phone company. That perception, Prosser knew, was unfair, because ECM had all the characteristics of a U.S. telephone company-a stable government, dollar economy, English language, American courts and legal system-and none of the characteristics of a third world company. Trial Tr., Vol. 10 (Prosser) at 1728-29; 1801-02, 1807. Rather than educate the market or afford it time to understand ECM's true characteristics, Prosser exploited the market unfairness by proposing the Privatization at a price that reflected a "premium" over ECM's then-current depressed market price level.

E. The Formation Of The Second Special Committee And The Negotiation Of The Transaction Terms

At the May 29 ECM directors' meeting, the board formed another special committee (the "Second Special Committee") to review the fairness of the proposed Privatization. The directors selected to serve as members of this Second Special Committee were Messrs. Richard Goodwin, John Vondras, and Shridath Ramphal.[FN12]

> FN12. In their briefs the parties dispute whether Mr. Muoio had also been appointed to the Second Special Committee. Plaintiffs argue that he was, pointing to the minutes of the May 29 meeting (JX 97), which recite that Muoio was appointed. The defendants argue that those minutes were incorrect, and point to testimony that Muoio was never on the Committee. The materiality of this fact dispute is, to say the least, obscure. Because even the plaintiffs concede that Muoio "did not serve" (Pl. Op. Trial Br. 27), the Court concludes that it is more probable than not that Muoio was never appointed.

There were several obstacles to the ability of these three directors to operate as a fully functioning Special Committee. Located on different continents and separated by a time difference of 14 hours, the three Committee members were never able to meet in person. Instead, they had to conduct their business by telephone and fax. Even teleconferences were difficult to arrange and as a result, the Second Special Committee never met collectively-even by telephone-to consider the $10.25 final negotiated offer whose approval it ultimately recommended.

Because one of the Second Special Committee members lived in Indonesia and the other lived in England, practicality dictated that Goodwin would be the Committee chair. In that capacity, Goodwin was designated to-and did-take the lead role in negotiating with Prosser and in selecting the Committee's legal and financial advisors. Mr. Goodwin interviewed William Schwitter of Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings"), as a potential legal advisor to the Second Special Committee, and on June 5, 1998, the Committee retained the Paul Hastings firm as its legal counsel. Later, after meeting with representatives of J.P. Morgan and Houlihan Lokey Howard & Zukin ("Houlihan") at his home in Massachusetts, Goodwin recommended that the Committee retain Houlihan as its financial advisor, and in mid-July, 1998, the Second Special Committee retained Houlihan in that capacity.[FN13]

> FN13. Plaintiffs challenge the independence of both Mr. Schwitter and Houlihan, pointing out that Schwitter had been recommended by Cahill Gordon, counsel for Innovative, and that Houlihan (as well as all other potential financial advisors) "were first vetted by Prudential, which was now working solely for Prosser." Moreover (plaintiffs assert), Houlihan was ultimately recommended by Mr. Goodwin, because Goodwin felt that Houlihan (unlike Morgan Stanley) would not "[push] Prosser too hard," which might cause Prosser to back off and result in a lower stock price. Morgan Stanley, on the other hand, was "more aggressive" in pursuit of the retention, and was insisting on a fee arrangement that was linked to any increase above Prosser's initial $9.125 offer that Morgan could obtain.
>
> These arguments are strained at best. Although at one time Schwitter was an attorney at Cahill,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 8

at the time that Cahill recommended Schwitter (among other attorneys), he was a partner at a competitor firm and there is no evidence that Schwitter was beholden to Cahill or that he acted other than loyally as counsel to the Special Committee. Nor is there evidence that the retention of Houlihan prejudiced the Second Special Committee. The weakness was in the bargaining position of the Special Committee in relation to that of Prosser, who was not prepared to support or accept any alternative business transaction other than the Privatization. That is, the Committee's only options were to make a deal with Prosser on whatever terms he was willing to accept, or no deal at all (in which case the stock price might fall, to the minority stockholders' detriment). The defendants' response is that the Special Committee had ample bargaining power to negotiate a fair price, because it had the power to "just say no," *i.e.,* to veto the Privatization proposal, and that the Committee would approve the Privatization only if it was the best available transaction and represented fair value for the stock. Although the Court ultimately concludes that the Special Committee was ineffectual, it is not for the reason that Paul Hastings and Houlihan had been retained as the Second Special Committee's advisors.

**\*7** As part of its pre-financial analysis investigation of ECM, Houlihan conducted (among other things) a review of ECM's financial information. That information included financial projections for ECM, dated March 25, 1998 (the "March projections"), that had been prepared by James Heying, ECM's then-Chief Financial Officer and Executive Vice President of Acquisitions.[FN14] What Houlihan was *not* provided, however, were financial projections dated June 22, 1998 (the "June projections")[FN15] that Prosser had caused Heying to prepare as part of Prosser's and ICC's application to the RTFC to finance the acquisition of ECM's minority shares.

FN14. JX 13, 14.

FN15. JX 38.

The June projections forecasted substantially higher growth than did the March projections. Based on the June projections, as modified by the RFTC, the RFTC concluded in July 1998 that ECM was worth (for loan approval purposes) approximately $28 per share.[FN16] Recognizing that the Privatization gave Prosser "the opportunity to retain control at a price below the true market value of the company,"[FN17] the RTFC approved financing that would enable Prosser to offer up to $11.40 per share.[FN18] That suggests, and Prosser later confirmed, that he always planned (and gave himself sufficient elbow room) to increase his initial offer by some amount.[FN19] Moreover, the $60 million RTFC loan represented the amount Prosser had asked for, not the limit of what the RTFC would have allowed him to borrow.[FN20]

FN16. JX 167 at RTFC 698, 707, 720. The RTFC made certain downward modifications to the June projections so that its valuation would be on the conservative side. Using a 12% medium risk discount in its DCF analysis, the RTFC valued ECM at $27.84 per share. *Id.*

FN17. JX 167 at RTFC 710; Reed Dep. 113-15.

FN18. *See* JX 167 at RTFC 710. ("The initial offer price will be $9.25. The loan amount includes an additional $11.4 million to accommodate a $2.15 increase to the initial offer price.")

FN19. *See* Prosser June 8, 2000 Dep. 270-71 ("I am quite certain that we had requested enough room to go up so that we would have the ability to fund at a higher price obviously than nine and a quarter....").

FN20. Trial Tr. Vol. 10 (Prosser) 1813-14.

Although Prosser made the June projections available to his legal advisor (Cahill), his financial advisor (Prudential), and his lender (the RTFC), the June projections were never provided to the Second Special Committee, Houlihan, or the ECM board. Instead, Prosser directed Heying to send Houlihan the March projections, even though the June projections were

Not Reported in A.2d                                                      Page 9
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

available by that point. As a result, the Committee and its advisors believed-mistakenly-that the March projections were the most recent projections available.[FN21]

FN21. Trial Tr. Vol. 7 (Vondras) 1351-52.

On August 4, 1998, the Committee met with Houlihan to discuss Houlihan's preliminary analysis, which had been furnished to the Committee members in the form of a draft presentation booklet. After explaining in detail his firm's assumptions and methodologies, Houlihan's representative informed the Committee that it was not prepared to opine that $9.125 was a price that was fair to the minority stockholders. After further discussion, the Second Special Committee agreed that $9.125 would not provide adequate compensation to the ECM minority.

Before beginning its negotiations with Prosser, the Committee members discussed different strategies for obtaining the highest possible price for the minority shareholders. The Committee was not ready to reject Prosser's offer outright without at least attempting first to negotiate a higher price. One strategy the Committee discussed was to present Prosser with a "final price" they believed was fair and acceptable. They concluded, however, that the approach best calculated to achieve the highest price was not to demand a specific price from Prosser, but, rather, to negotiate with Prosser for the highest price he would pay for the shares and then determine whether that price represented fair value for the minority stockholders.[FN22]

FN22. There is evidence that sometime after the August 4th meeting, Houlihan told Goodwin that a one point increase above the original $9.125 offer, i.e., an increase to $10.125, would enable Houlihan to furnish a fairness opinion. See JX 219, at SC 04099 (the so-called "Goodwin Diary"), where in his entry for August 7, Goodwin recites that he told Prosser that Houlihan had concluded that the initial offer was too low, and that "[a]fter much back and forth [Prosser] said that he could go up another point (which was price Houlihan had told me privately would be acceptable.)" Although Goodwin claimed at trial that Houli-

han never told him that [Trial Tr. Vol. 5 (Goodwin) 911], Goodwin did not denigrate any other parts of what he wrote in the Goodwin Diary (see, e.g., id. at 915-18, 923). The defendants suggest no reason why this particular diary entry should be viewed as inaccurate when the other entries were not.

*8 Between August 5 and August 10, 1998, in a series of telephone conversations,[FN23] Messrs. Goodwin and Prosser negotiated the buyout price for ECM's publicly held shares. During the first conversation, which took place on August 7, Goodwin told Prosser that his initial offer of $9.125 was inadequate. According to an entry that Goodwin made in his "diary":

FN23. Goodwin testified that in negotiating by telephone, rather than traveling to the Virgin Islands, he could much more "maintain the necessary detachment and impassivity" than he could in Prosser's presence. Trial Tr. Vol. 4 (Goodwin) 771.

After much back and forth [Prosser] said that he could go up another point (which was price Houlihan had told me privately would be acceptable). If this failed [Prosser] was considering making a private tender which he calculated would give him around 90% of all the stock. If he could not get it at what he considered a fair price [he] might withdraw his offer and let the stock go to market level.[FN24]

FN24. JX 219 at SC 04099.

Eventually, Prosser told Goodwin that he would consider the matter and call Goodwin back. Shortly thereafter, Prosser raised his offer by one eighth of a point, to $9.25 per share. Goodwin reported that offer to the Second Special Committee, which rejected it as inadequate. Goodwin then called Prosser and told Prosser that he would have to improve his offer. In a later negotiation, Prosser raised his offer to $10 per share. Again, Goodwin reported that offer to his fellow Committee members and to Houlihan. The Committee rejected that revised offer, and thereafter, Prosser raised his offer to $10.125 per share. The Second Special Committee rejected that offer as well.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 10

In response, Prosser raised his offer to $10.25 per share, but told Goodwin that $10.25 was his final offer. Because the price had been going up in roughly quarter point increments, Goodwin countered by asking for $10.50 per share. Prosser rejected that request, pointing out that $10.25 was already "straining the limits of [his] financing" for the transaction.[FN25] At that point, Goodwin made a judgment that the Committee "had reached the limits of how far we could push ...,"[FN26] and informed the other Committee members-Ramphal and Vondras-of his conclusion. Ramphal and Vondras agreed to stop the negotiations at that point.[FN27]

> FN25. Trial Tr. Vol. 4 (Goodwin) 778; JX 142. The record shows that, in fact, Prosser's financing would have enabled him to increase his offer to $11.40 per share, and that the implied equity value of ECM was $305 million, or $28 per share. JX 167 at RFTC 698, 720; Reed Dep. 162-163; Prosser 6/7/00 Dep. 93-96. Goodwin testified that Prosser's representation about the limits of his financing, truthful or not, had no impact except to signal to him (Goodwin) that the negotiations had to end.

> FN26. Trial Tr. Vol. 4 (Goodwin) 779.

> FN27. The plaintiffs contend that the negotiations between Prosser and Goodwin were not arm's length, and that, in fact, the Special Committee's entire process was "bankrupt." To prove that point, the plaintiffs rely heavily upon the fact that Goodwin's regular practice was to send faxes to Special Committee members (or their counsel) through Prosser's secretary, Eling Joseph, and ask her to fax it to the others. Although Goodwin told Ms. Joseph that the Committee materials were confidential, this practice did create the potential of giving Prosser access to almost every document that circulated among the Special Committee, including Houlihan's financial analysis. Goodwin did not deny having routed his communications through Ms. Joseph, and defended that practice on the basis of convenience, not necessity. The defendants respond that there is no evidence that Prosser or his advisors saw these faxes.

Prosser testified that Ms. Joseph never disclosed any of those materials to him, including Houlihan's valuation materials. The record discloses, however, that at least on one occasion the confidentiality of the faxed Committee materials was breached. Even if that had not occurred, this practice cannot help but undermine confidence in the integrity of the bargaining process. It is manifest that Goodwin's decision to route those materials through the secretary who shared the same office as Prosser-Goodwin's bargaining adversary-rather than route them through the office of the Committee's counsel, Mr. Schwitter, created a serious risk of compromising the Committee's process and its effectiveness in negotiating the highest available value.

Thereafter, Goodwin asked Houlihan if it could furnish a fairness opinion at $10.25 per share. Houlihan responded that it could, because that price was within the valuation ranges resulting from its market multiple analysis and its discounted cash flow (DCF) analysis.

The Committee having obtained what they believed was the highest available price, the question then became whether that price was fair. On August 12, 1998, Goodwin and Vondras had a telephonic meeting with Houlihan and Paul Hastings to review Prosser's $10.25 offer. Having updated its financial analysis, Houlihan concluded that the revised offer price of $10.25 was fair to ECM's public shareholders from a financial point of view. Goodwin and Vondras thereafter voted to recommend that the full ECM board approve the Privatization.[FN28]

> FN28. Ramphal did not attend the Committee's August 12 meeting, even by telephone. Shortly after the meeting, Goodwin contacted Ramphal and gave him a detailed account of what had occurred.

## F. ECM's Directors and Shareholders Approve The Proposed Privatization

*9 A telephonic meeting of the ECM board to consider Prosser's revised offer to buy all of ECM's publicly held stock for $10.25 per share, was held on August 13,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 11

1998, the following day. Present at that meeting were Mr. Schwitter and Houlihan representatives. Not attending were Messrs. Prosser (at the request of the Board) and Todman (due to a scheduling conflict). The Board members who had not served on the Special Committee had received copies of Houlihan's fairness analysis before the meeting.[FN29]

> FN29. Because the copies were sent after the Committee had acted on August 12, the non-Committee member directors had less than a day to review the Houlihan materials.

At the meeting, the Special Committee members described the process they had employed. Houlihan then explained its financial analysis and confirmed that in its opinion, the $10.25 per share price was fair to the minority stockholders from a financial point of view. After discussion, the board determined to approve the Privatization, but only if a majority of the shares held by the minority stockholders were tendered in the first-step tender offer. The meeting was then adjourned to August 17, 1998, at which time the board was told that Prosser would agree to this non-waivable minimum tender condition. The full board, acting upon the unanimous recommendation of the Second Special Committee, then voted to approve the Privatization.

On August 18, 1998, ECM publicly announced the execution of a definitive merger agreement that provided for the Tender Offer and Merger at $10.25 per share, and that the Tender Offer was subject to the minimum tender condition. The Tender Offer commenced on August 24, 1998. At the time of the Tender Offer, there were 10,959,131 outstanding ECM shares, of which 5,606,873 shares were owned by Prosser through ICC, and the remaining 5,352,258 shares were held by the public. As of September 25, 1998, 3,206,844 of those shares (*i.e.*, a majority of the minority shares) had been tendered. On October 19, 1998, a special meeting of ECM shareholders took place, at which the Merger was approved by a vote of 5,760,660 FOR, and 4,466 AGAINST, out of 10,959,131 shares entitled to vote. The Merger was consummated that same day.

These appraisal and fiduciary duty class actions followed.

## II. THE PARTIES' CONTENTIONS AND THE IS-SUES PRESENTED

As earlier noted, the plaintiffs have brought and litigated two separate actions-a statutory appraisal action and a class action asserting claims that the Privatization was not entirely fair to ECM's minority shareholders. In a statutory appraisal action, the Court must determine the "fair value" of the corporation whose stock is being appraised.[FN30] Plaintiff Greenlight claims that the statutory fair value of ECM at the time of the merger was $41.16 per share, plus the value of certain corporate opportunities that Prosser is claimed to have usurped (valued at $3.79 per share), for a total fair value of $44.95 per share.

> FN30. 8 *Del. C.* § 262(a).

In a class action seeking to invalidate a "going private" acquisition of a corporation's minority stock by its majority stockholder, the standard under which this Court reviews the validity of the transaction and the liability of the fiduciaries charged with breach of duty, is entire fairness.[FN31] That standard of review has two aspects: fair dealing and fair price.[FN32] In this case, the plaintiffs claim that the Privatization was the product of unfair dealing that, in turn, resulted in an unfair transaction price. The transaction (it is claimed) resulted from violations of the defendants' fiduciary duties of loyalty and good faith, for which the defendants are liable and must respond in damages.

> FN31. *Emerald Partners v. Berlin,* 787 A.2d 85 (Del.2001).

> FN32. *Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del.1983).

*10 The plaintiffs' claims, both fiduciary and statutory, and the defenses to those claims, involve a plethora of contentions that are too numerous to catalogue in detail at this point without overburdening an unavoidably lengthy Opinion. The reason, in great part, is that the case was over-litigated and over-briefed, a state of affairs for which the Court (by allowing the parties to file briefs in excess of the page limit) is responsible. The post-trial briefs and other submissions alone total almost 400 pages,[FN33] and the trial record, not surpris-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 12

ingly, is correspondingly voluminous. To save the reader from losing the forest in the trees, what follows is a "broad brush" sketch of the parties' contentions. A more detailed picture of those contentions-and the specific issues which flow therefrom-is set forth in the sections of this Opinion that follow.

> FN33. The opening post-trial brief is 143 pages, the answering brief is 150 pages, and the reply brief is 72 pages.

In the fiduciary duty class action, the basic issues are whether the defendants dealt fairly with the ECM minority and whether the $10.25 per share transaction price was fair. Because the plaintiffs' class action damages claim is identical (dollar-wise) to their statutory appraisal claim, the fiduciary "fair price," and statutory "fair value," contentions converge and are addressed in connection with the statutory appraisal claim. Accordingly, at this point the Court summarizes the "fair dealing" contentions. Thereafter, it summarizes the fair price/fair value claims.

With respect to fair dealing, the threshold procedural issue is which side has the burden of proof. Because the defendants stood on both sides of the transaction, normally the burden would fall upon them. If, however, the defendants can satisfy the Court that the transaction was approved by a fully functioning independent committee of independent directors or by an informed majority of minority stockholders, the burden shifts to the plaintiff to prove that the transaction was unfair.[FN34] Here, the plaintiffs contend that the Second Special Committee was neither independent of Prosser nor fully functional, for which reason the burden of proving entire fairness falls upon the defendants. The defendants contend the opposite, and assert that the burden of proof must shift to the plaintiffs.

> FN34. *Weinberger v. UOP, Inc., supra; Kahn v. Lynch Communication Sys., Inc.,* 638 A.2d 1110, 1117 (Del.1994).

Turning first to the substantive fair dealing issues, the plaintiffs claim that the Privatization was not the result of fair dealing because: (1) the entire ECM board was "unfairly stacked" in favor of (*i.e.,* beholden to) Prosser, (2) the timing of the transaction and Prosser's co-opting

of ECM's advisors were unfair, (3) the Special Committee was neither independent nor properly functioning, and (4) the defendants violated, in various respects, their "duty of candor" to the minority shareholders in both the tender offer disclosure document and in the proxy statement issued in connection with the second step merger.

Not surprisingly, the defendants vigorously resist these claims, and contend that in their dealings with ECM's minority stockholders they acted fairly in all respects. The defendants also raise three affirmative defenses: (1) Greenlight lacks standing to assert any claims based on its acquired "litigation rights," and (2) no former stockholders of ECM can recover the value of any shares that they tendered into the tender offer or voted in favor of the merger; and (3) even if the Privatization was not entirely fair, the defendants are exculpated from damages liability under Article Seventh of ECM's certificate of incorporation.

*11 The parties' briefs are largely devoted to the "fair price" and appraisal issues, which in this case (as noted), are one and the same. Typical in litigation of this kind, the overriding question-what ECM was intrinsically worth on the merger date-involves a proverbial "battle of the experts." In this case, the valuation experts were University of Chicago Business School Professor Mark Zmijewski, the plaintiffs' expert who valued ECM at over $41 per share; and Daniel Bayston, a consultant at Duff & Phelps and the defendants' primary valuation expert,[FN35] who valued ECM at $10.38 per share.

> FN35. The defendants called two additional valuation experts: Princeton University Professor Burton Malkiel, who testified about issues relating to ECM's market value, and Gilbert Matthews, an investment banker and former managing partner of Bear Stearns & Co., who testified as the defendants' rebuttal witness.

These widely differing valuations of the same company result from quite different financial assumptions that each sponsoring side exhorts this Court to accept. To evaluate the parties' competing approaches requires the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 13
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Court to resolve a multitude of DCF-related valuation issues, some of which are factual and others of which are conceptual.

The first set of issues involve which set of management projections is appropriate to use in a discounted cash flow (DCF) valuation of ECM-the March projections that were furnished to the Special Committee, or the June projections that were created closer in time to the merger date but were furnished only to Prosser, his advisors, and the RTFC, and not the Special Committee or its advisors. Professor Zmijewski used the June projections without modification. Mr. Bayston, on the other hand, used the March projections and modified them in ways that the plaintiffs hotly dispute.

A second set of issues concerns the appropriate discount rate. In this regard, both Prof. Zmijewski and Mr. Bayston determined a discount rate using standard weighted average cost of capital ("WACC") and Capital Asset Pricing Model ("CAPM") formulas. Professor Zmijewski used the WACC formula without any modifications. Mr. Bayston modified the WACC formulas and inputs, by adding various "small firm" and "weather risk" premiums, substituting new costs of debt, and using a debt-to-value capital structure that (together with Bayston's other modifications) has also generated ardent disputes.

The third and fourth sets of issues center on the questions of what weight should be accorded to ECM's stock market price in determining its fair value; and whether the appraisal (or damages) award should include the value of certain businesses that plaintiffs claim were corporate opportunities of ECM.

The analysis that next follows addresses these fair value and fair price issues. In Part III of this Opinion the Court treats the valuation issues raised by the parties, and concludes that (1) the $10.25 merger price was not fair, and (2) ECM's fair value (and fair price) on the date of the merger was $38.05 per share. In Part IV, the Court turns to the fair dealing issues, and concludes that the burden of establishing fair dealing remains with the defendants, who failed to carry that burden. Finally, in Part V, the Court determines what fiduciary duties were violated and which defendants are monetarily liable as a

consequence.

### III. THE FAIR PRICE AND FAIR VALUE OF ECM

**\*12** Although each side's experts valued ECM using both the comparable company and DCF approaches, in their briefs the parties focus almost exclusively upon DCF valuation issues. This Court views the parties' virtual non-treatment of the comparable company valuation as a tacit concession that that alternative valuation is a "throwaway" of no material significance. Accordingly, this Opinion addresses only the valuation issues presented by the parties' competing DCF approaches.FN36

> FN36. The basic flaw in the comparable company approach is that ECM had no true comparables, as Mr. Bayston conceded. Trial Tr. Vol. 3 (Bayston) at 584-585. The DCF methodology, on the other hand, is more appropriate because ECM had available contemporaneous management forecasts, predictable earnings and cash flow.

Both sides agree, and our case law recognizes, that a DCF valuation is based upon three inputs: (a) the projections of free cash flow for a specified number of years, (b) the estimated terminal value of the firm at the end of the "projection period," and (c) the discount rate.FN37 Although the parties raise a plethora of DCF-related issues, those disputes center around four pivotal questions: (1) which projections (March or June) provide the more appropriate free cash flow input to the DCF model; (2) what is the appropriate discount rate for ECM; (3) how much weight (if any) should the market value of ECM's stock be given in the valuation; and (4) should the value resulting from the DCF method be increased by the value of the businesses that are claimed to be corporate opportunities of ECM? The issues that fall within these four groupings are addressed in this Part of the Opinion.

> FN37. *Cede & Co. and Cinerama v. Technicolor, Inc.,* C.A. No. 7129, 2003 WL 23104613, (Del.Ch. Dec.31, 2003) ("*Cinerama*") (citing *Taylor v. American Specialty Retailing Group, Inc.,* 2003 WL 21753752 at \*3 (Del.Ch. July 25, 2003)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### A. Which Set Of ECM's Projections-March Or June-Is More Reliable For Purposes Of A DCF Valuation On The Merger Date?

Critical to any DCF valuation are the projected revenues, expenses, reserves, and other charges of the firm being valued. On this threshold issue the parties divide, because at Prosser's direction, Heying prepared two sets of management projections, contemporaneously and in the normal course of business. The first set was prepared on March 25, 1998; the second, on June 22, 1998. Plaintiffs' expert, Prof. Zmijewski, used the June projections to derive his projected cash flow inputs, whereas defendants' expert, Duff & Phelps (Bayston) used the March projections, but modified them in significant respects. The issue is what set of projections is the more reliable for purposes of appraising ECM as of the merger date. For the reasons next discussed, the Court determines that the unmodified June projections are the more appropriate and reliable source of inputs for a DCF valuation of ECM.

*First,* as a general proposition (with which defendants' expert, Gilbert Matthews, agreed), "an appraiser should rely on a company's most recent contemporaneous management forecasts unless there are compelling reasons to the contrary." [FN38] Here, the facts compellingly point to reliance on the June projections, which, unlike the March projections, incorporated ECM's first quarter of actual results as a stand-alone company. The June projections also incorporated significant post-March events that were not included in the March projections, namely, the acquisition of St. Maarten Cellular, a corporate jet, and a headquarters building. All those events were "facts on the ground" that would have to be considered in any valuation of ECM on the merger date. If only the March projections were used, those facts could not be considered.

FN38. Trial Tr. Vol. 5 (Matthews) 1035.

*13 Prosser conceded that the June projections reflected management's interpretation of the first quarter results in the context of the future performance of ECM, and that they were not unreasonably aggressive.[FN39] Also telling is that the June projections were provided to Prosser's legal and financial advisors in the Privatiza-

tion (Cahill and Prudential)-but not to the Second Special Committee or its advisors. At Prosser's direction, those projections were also provided to the RTFC, which used them to value ECM as collateral for the Privatization financing. If contemporaneous reliance upon the June projections by Prosser, his lender and his financial and legal advisors was appropriate, then logic and common sense dictate that reliance on those same projections by Prof. Zmijewski in performing his valuation was no less appropriate.

> FN39. Trial Tr. Vol. 10 (Prosser) 1020-1022. This testimony flatly conflicts with the defendants' contention that the St. Maarten Cellular forecast in the June projections was "unreasonably aggressive."

*Second,* the defendants' denigrations of Prof. Zmijewski's reliance on the June projections are unpersuasive. Defendants argue that the June projections are inappropriate for use in an appraisal because they incorporated two projected annual cost savings that (defendants say) are synergistic, *i.e.,* merger-related: $2.5 million in savings from the consolidation of ECM and ICC's operations, and $2 million in claimed "going private" savings from the elimination of costs of ECM remaining a public company. Even if those arguments were valid, the proper treatment would be to adjust the June projections for those merger-related cost savings, rather than discard those projections altogether. But more fundamentally, the record shows that (i) the consolidation cost savings were not merger-dependent and (ii) the claimed going private cost savings are not supported by any credible evidence of record.

The cost savings attributed to the consolidation were properly includable in the June projections, because they were contemplated well before the going private merger and could have been achieved without it. Prosser had identified potential consolidation savings before the Privatization occurred. Because Prosser controlled both ECM and ICC, he had the power to accomplish those savings without a business combination, such as by intercompany contractual arrangements.[FN40] To put it differently, the value achieved by Prosser's existing pre-merger ability to effect those cost savings was an asset of ECM at the time of the Privatization merger. It

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 15
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

therefore was a benefit in which all ECM stockholders, not just Prosser, were entitled to share.[FN41] That entitlement cannot be defeated by Prosser's unilateral decision not to achieve those savings except as part of a going private merger that would leave him as the sole owner of the enterprise.

> FN40. JX 41 at RTFC 1507; Raynor Dep. 156. Although Prosser claimed at trial that ECM had analyzed and discussed the potential of savings through intercompany agreements and determined that regulatory and union issues precluded it, that testimony is uncorroborated by any document, pre-trial testimony or any other testimony. Heying, who was ECM's Chief Financial Officer, testified that he never discussed the subject of intercompany agreements with Prosser. It is implausible that ECM's CFO and two of its paid litigation consultants (Bayston and Matthews) would be unaware of that analysis if it had actually been performed, or would be unaware of any discussions about that analysis had any such discussions been held.

> FN41. *Cede & Co. v. Technicolor, Inc.,* 684 A.2d 289 (Del.1996).

As for the "going private" savings, the only evidence that those savings are reflected in the June projections is the self-interested testimony of Messrs. Prosser and Heying. No document of record identifies or itemizes those savings. Nowhere are those savings reflected or identified in the June projections or in Joint Exhibit 1, a document Heying prepared during this litigation to summarize the differences between the March and the June projections. Unlike the consolidation savings (which are explicitly identified in a separate line item on both the June projections and the Heying memorandum), there is no separate line item for these alleged savings on either of these documents. That is significant, because at the time he prepared the June projections, Heying prepared a cover memorandum to reflect the most significant changes between the March and the June projections.[FN42] The purported going private savings-representing an alleged $2 million change-is conspicuously absent from Heying's memorandum.

> FN42. JX 168; Trial Tr. Vol. 8 (Heying) 1537-1539; Heying June 6, 2000 Dep. 183-84.

*14 The defendants claim that the going private savings include reductions in legal fees and professional fees paid to Deloitte Touche and investment relations companies, but defendants introduced no evidence of the magnitude of those fees, even though they possessed all the relevant data. The defendants could not even reach a consensus among themselves about the magnitude of those undocumented claimed savings. Heying testified at various times that it could be $2.2 to $2.5 million, or $2 million, or $1.8 to $2.2 million.[FN43] Bayston (whose source was Heying) testified that the savings were $2 to $2.5 million annually.[FN44] Matthews' report quantified those alleged savings exactly at $1,644,000 for 1999-a figure for which Matthews was unable to identify any source during his trial testimony.[FN45]

> FN43. Heying June 6, 2000 Dep. 196-97; Trial Tr. Vol. 8 (Heying) 1473-74, 1541.

> FN44. Trial Tr. Vol. 3 (Bayston) 536-537.

> FN45. Trial Tr. Vol. 6 (Matthews) 1211-14; JX 301, Ex. E.

It stands to reason that when a public company goes private, cost savings in some amount will often be achieved. But, in an appraisal proceeding, each party must bear the burden of establishing its own position.[FN46] It was the defendants' burden to establish both the existence and the amount of any cost savings from going private. In this case, the defendants nowhere documented the existence, or the amount, of such cost savings, and the testimony of their witnesses on that subject is hopelessly inconsistent. In these circumstances, the defendants have not carried their burden of persuading the Court that the June projections included a significant cost savings of $2.5 million attributable to eliminating ECM as a public company. Accordingly, those savings are not a valid basis for the defendants to disregard, or to denigrate an appraiser's reliance upon, the June projections for purposes of performing a DCF valuation of ECM.

> FN46. *M.G. Bancorporation, Inc. v. LeBeau,* 737 A.2d 513, 520 (Del.1999).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 16

*Third,* the March projections are inappropriate for the additional reason that the defendants' expert, Mr. Bayston, initially relied on those projections, but then modified them by making large adjustments to critical inputs. The effect of those inputs was to depress the cash flows that management had contemporaneously projected. The defendants argue that Bayston's adjustments must also be made to the June projections if this Court finds those projections to be the appropriate starting point in a DCF valuation. The Court disagrees. It concludes that the June projections, without any modifications, are the most reliable source of inputs to project ECM's future net cash flows.

This Court has consistently expressed a preference for the most recently prepared management projections available as of the merger date. The Court has also been skeptical of *ex post* adjustments to such projections. As Chancellor Chandler observed in *Cede & Co. v. JRC Acquisition Corp.:*

[T]his Court prefers valuations based on management projections available as of the date of the merger and holds a healthy skepticism for post-merger adjustments to management projections or the creation of new projections entirely.[FN47]

> FN47. *Cede & Co. v. JRC Acquisition Corp.,* No. 18648, 2004 WL 286963, at *2 (Del.Ch. Feb.10, 2004).

*15 The Chancellor echoed that observation in his most recent appraisal opinion in *Cinerama:*

Contemporary pre-merger management projections are particularly useful in the appraisal context because management projections, by definition, are not tainted by post-merger hindsight and are usually created by an impartial body. In stark contrast, *post hoc* litigation-driven forecasts have an "untenably high" probability of containing "hindsight bias and other cognitive distortions." [FN48]

> FN48. *Cinerama,* at *7 (quoting *Agranoff v. Miller,* 791 A.2d 880, 892 (Del.Ch.2001)).

When management projections are made in the ordinary course of business, they are generally deemed reliable.

Experts who then vary from management forecasts should proffer legitimate reasons for such variance.[FN49]

> FN49. *Id.,* (internal citation omitted) (citing *Gray v. Cytokine Pharmasciences, Inc.,* 2002 WL 853549, at *8 (Del.Ch. Apr.25, 2002)) (rejecting valuation because it inexplicably ignored and altered management forecasts in favor of litigation-driven projections) and *Kleinwort Benson Ltd. v. Silgan Corp.,* 1995 WL 376911, at *5 (Del.Ch. June 15, 1995) (observing that variations from management projections merit "close inspection" and may impeach the credibility of an expert witness). In the *Cinerama* opinion, the Chancellor concluded that the respondent company's expert's "repeated discarding or modification of contemporaneous ... management forecasts ... cast serious doubt upon the integrity and reliability of his expert report" (*Cinerama, supra* at 6), and that "management was in the best position to project the short-term prospects of the company, as they created projections *ex ante,* based upon information gleaned from their particular customers." *Id.* at 8.

The question presented here is whether the defendants have offered "legitimate reasons" for Bayston's modifications to the March projections. The Court concludes that they have not.

The primary modification [FN50] that Bayston made to the March (and, by inference, the June) projections was to increase projected capital expenditures (CapEx). Both the March and the June projections forecasted CapEx of approximately $9 million annually throughout the projection period. Prosser explained that these forecasted capital expenditures were lower than historical levels and were reasonable over the short term, because Vitelco had recently replaced and rebuilt its equipment, thereby reducing the need for short term capital expenditures.[FN51] Heying [FN52] and Matthews [FN53] agreed that the forecasted CapEx were management's best contemporaneous estimates.

> FN50. Bayston's other modifications were to

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

eliminate the "consolidation savings" and $2.5 million of "going private savings" from the projected revenues. For the reasons already discussed, those modifications have been rejected.

FN51. Trial Tr. Vol. 10 (Prosser) 1742-43.

FN52. Trial Tr. Vol. 2 (Bayston) 326 (confirming that Heying told him that management's June CapEx forecasts were their best contemporaneous estimates).

FN53. Trial Tr. Vol. 5 (Matthews) 1057-60 (no reason to change management CapEx forecast for 1998 through 2002).

Nonetheless, in his cash flow projection Bayston unilaterally increased forecasted CapEx by $3.7 million to $5.7 million per year, because (he claimed) managements "typically" underestimate capital expenditures. Bayston could not cite any scholarly research confirming that view. Nor could he quantify the average amount of any such underestimations, and he never performed an analysis of whether ECM's management had regularly underestimated CapEx.[FN54] Bayston's CapEx adjustment decreased free cash flow for each of the forecast years by the amount of the adjusted increase, and for the terminal year decreased cash flow by almost 20 percent. The result was a *negative growth* in free cash flow for years 2005 to 2007, resulting in a consequential decrease in Bayston's overall valuation.[FN55]

FN54. Trial Tr. Vol. 3 (Bayston) 569-72.

FN55. *Id.,* Vol. 2 (Bayston) 330-332; Trial Tr. Vol. 1 (Zmijewski) 162-63.

That adjustment amounts essentially to Bayston substituting his personal judgment of what CapEx should be for the non-litigation business judgment of ECM's management. Bayston's judgment rests solely upon his opinion that "managements" in general underestimate CapEx. The defendants have nowhere demonstrated that that view is generally accepted within the financial valuation community or that *this* management habitually underestimated CapEx for ECM. Bayston's valuation approach evokes a reaction akin to that expressed by the Chancellor in *Cinerama*. There, the petitioner's

expert had rejected a management forecast on unsubstantiated grounds, and the Court observed: "[The expert's] attempts to arrive at more 'realistic' results with a hindsight valuation that ... completely ignores the closest insiders' projections, and results in a strikingly [low] number. This is simply inexcusable."[FN56]

FN56. *Cinerama,* at *26. Nor is there merit to the defendants' criticism (articulated through Mr. Matthews) that in Prof. Zmijewski's terminal year (2002), depreciation exceeds CapEx, a state of affairs that cannot go on forever. Trial Tr. Vol. 5 (Matthews) 999-1001; Vol. 6 (Matthews) 1236-37. The flaw in this criticism is that Zmijewski projected cash flows only; he did not forecast the individual components of free cash flow, including CapEx or depreciation. Accordingly, there is no basis to conclude that Prof. Zmijewski forecasts perpetual divergent depreciation and CapEx. Trial Tr., Vol. 1 (Zmijewski) 120-123.

*16 For these reasons, the Court accepts Prof. Zmijewski's adoption of the June projections, and rejects Mr. Bayston's adoption of (and his modifications to) the March projections, as the basis for the cash flow inputs to the DCF valuation of ECM.

### B. What Is The Appropriate Discount Rate?

The second major group of issues concerns the appropriate rate for discounting the projected free cash flows. Both Prof. Zmijewski and Mr. Bayston determined their discount rate(s) using the Weighted Average Cost of Capital ("WACC") and the Capital Asset Pricing Model ("CAPM") formulas. Professor Zmijewski used the WACC formula, without adjustment, to calculate a discount rate of 8.8% during the 1998-2002 period when ECM's tax abatement would be in effect, and 8.5% thereafter, assuming that ECM's tax abatement would not be renewed. Mr. Bayston also used the WACC model, but modified the formula and the inputs to that formula by adding various premiums, substituting new debt costs, and using a different debt-to-equity weighting, to arrive at a discount rate of 11.5%.

To understand the significance of the disputes that arise under this heading, it is useful to explain how the dis-

Not Reported in A.2d                                                                 Page 18
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

count rate is determined under the WACC model. Under WACC, the discount rate is calculated based upon the subject company's cost of capital. WACC is the sum of: (1) the percentage of the company's capital structure that is financed with equity, multiplied by the company's cost of equity capital, *plus* (2) the percentage of the company's capital structure that is financed with debt, multiplied by its after-tax cost of debt.[FN57]

> FN57. *See Cinerama, supra,* at *40; JX 352, p. 11. In formulaic terms, WACC has been expressed thusly (JX 298, at F-1):

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 19
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

WACC =    (Leveraged  +
          Cost of
          Equity x
          Equity % of
          Capital)

          (Cost of
          Long Term
          Debt x
          (1-tax rate)
          x Debt % of
          Capital).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                        Page 20
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

One element of the WACC formula-the "cost of equity capital"-is determined by the CAPM model. Under CAPM, the cost of equity capital is the risk-free rate of return plus the subject company's risk. The subject company's risk is determined by multiplying the equity risk premium for the market by the company's beta. "Beta" is the measure of a given company's nondiversifiable risk relative to the market, specifically, the tendency of the returns on a company's security to correlate with swings in the broad market. A beta of 1, for example, means that the security's price will rise and fall with the market; a beta greater than 1 signifies that the security's price will be more volatile than the market; and a beta less than 1 indicates that it will be less volatile than the market.[FN58]

FN58. *Cinerama, supra,* at 41 and n. 315.

The approximately 3% discrepancy between the two experts' discount rates (8.8% / 8.5% for Zmijewski vs. 11.5% for Bayston) is attributable primarily to their different determinations of the (1) cost of debt, (2) capital structure, and (3) cost of equity. The issues generated by each of these input differences are now discussed.

### 1. Cost of Debt

Professor Zmijewski calculated the weighted average cost of long term debt for ECM at 6.3 %, which was ECM's actual observed cost of debt. He used that figure because of ECM's historical ability to borrow from the RTFC at below-market rates. Mr. Bayston, on the other hand, determined that ECM's weighted average cost of debt on the merger date was 6.59 %, but he assigned ECM a cost of long term debt of 8 %. Bayston's judgment was that ECM would not be able to borrow indefinitely from the RTFC at below-market rates and, therefore, ECM would have to borrow from another lender at rates closer to 8 %.[FN59] The issue is which of these two long-term debt cost figures is more reasonable. The evidence of record persuades this Court that the more reasonable long-term debt cost assumption is 6.3%.[FN60]

FN59. Trial Tr. Vol. 2 (Bayston) 286.

FN60. The reason for the discrepancy between the two experts' calculation of ECM's actual weighted cost of debt appears to be that Zmijewski's 6.3% cost figure was as of October 10, 1998 (JX 352 at 22), whereas Bayston's calculation was as of September 30, 1998 (JX 298 at J-1). Because Zmijewski's figure represented ECM's long term debt cost as of a time closer to the merger date than Bayston's, the Court adopts 6.3 % as the relevant actual cost of long term debt for ECM.

*17 The defendants admit that there is nothing of record which shows that on the merger date, ECM would not have been able to borrow from the RTFC at the weighted average cost of its existing debt.[FN61] As of the merger date, ECM had never borrowed at a rate even as high as 8%. Lending at below-market rates was the RTFC's mission, and as of the merger date management expected it could continue to borrow from the RTFC at favorable interest rates.[FN62] Management never told Mr. Bayston anything to the contrary,[FN63] and the defendants have cited nothing of record that supports Bayston's contrary assumption.

FN61. Def's Consol. Post-Trial Br. at 110.

FN62. *See* Reed Dep. 29-30; Trial Tr. Vol. 10 (Prosser) 1791; JX 209 at G331-32.

FN63. Trial Tr. Vol. 3 (Bayston) 502.

For these reasons, the Court accepts Prof. Zmijewski's 6.3% cost of debt input, and rejects Mr. Bayston's 8% cost-of-debt assumption, the effect of which was to increase Bayston's calculated WACC from 10.9% to 11.16%.[FN64]

FN64. Ex. H to Pls.' Op. Post-Trial Br.

### 2. ECM's Debt/Equity Capital Structure

Another important element of the WACC formula is the percentage of the capital structure represented by equity and by long term debt. This factor has proved to be problematic for both sides, and for the Court as well.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

At first glance the difference between the experts on this variable appears trivial. Professor Zmijewski arrived at a 28.2% debt-to-enterprise capital structure, whereas the debt-to-value capital structure used by Mr. Bayston was 30%. Mr. Bayston's 30% figure, however, was a "target," rather than the actual, percentage of ECM's debt to its total enterprise value as of the merger date. It is undisputed that on September 30, 1998 (shortly before the merger date), ECM's actual long term debt was $190.4 million. What is disputed is ECM's total enterprise value. Bayston calculated enterprise value by (i) multiplying ECM's total outstanding shares (10,959,131) by the merger price ($10.38 per share), thus deriving a value of $113.7 million represented by "equity," and then (ii) adding to that value the $190.4 million of long term debt, to arrive at a total enterprise value of $304.1 million. On that basis, Bayston calculated ECM's actual debt-to-value ratio at approximately 63%.

Bayston did not use the actual 63% debt-to-value ratio, however, because in his judgment ECM could not viably sustain such a highly-leveraged capital structure over the long term. Accordingly, Bayston used a 30% "target" figure, which assumed that management would reduce the debt level from 63% to 30%.[FN65]

FN65. Trial. Tr. Vol. 3 (Bayston) 499-500.

Professor Zmijewski, unlike Mr. Bayston, based his 28.2% debt-to-value capital structure upon ECM's actual debt level, as opposed to a "target" debt level. But, to arrive at his 28.2% figure, Prof. Zmijewski assumed an enterprise value of $41.16 per share,[FN66] which also was the ultimate fair value that he had determined for ECM.

> FN66. Professor Zmijewski's original debt-to-value ratio was 27.2%, based upon a value of $42.94 per share. JX 234 at 46. He later adjusted the ratio to 28.2%, based upon a fair value of $41.16. JX 235 at Ex. S-1.

The finance literature supports elements, but not the entirety, of each side's approach. One treatise instructs that "the appropriate weights to use [to define the firm's capital structure in calculating the WACC] ... are the firm's *long run target weights stated in terms of market value.*"[FN67] Moreover:

> FN67. Bradford Cornell, *CORPORATE VALUATION Tools for Effective Appraisal and Decision Making*, 224 (McGraw-Hill 1993) (italics in original) (hereinafter "Cornell").

**\*18** One simple and popular procedure for estimating the target weights is to assume that they equal the company's current market value weights. Unfortunately, this assumption involves a circularity. In most cases, a company is being appraised because the market value of its securities is unknown, and, therefore, cannot be used to calculate the weights.... The circularity can be overcome, in the case of debt and preferred stock by directly establishing the value of these securities.... However, common stock is still a problem. The estimated value of the equity depends on the WACC, which, in turn, depends on the value of the equity.

In light of the circularity, an iterative procedure must be employed to solve simultaneously for the value of the equity and for the WACC. The iterative process begins with the selection of an initial estimate for the market value of the equity; the book value of the equity is a reasonable choice. Based on this initial estimate, the WACC is calculated ... Subtracting the value of the debt and preferred stock produces a revised estimate of the equity and a revised equity weight. This revised estimate is then used to calculate a new initial estimate of the equity weight.[FN68]

> FN68. Cornell, *supra* at 225.

The quoted excerpt does not support the entirety of either side's approach, however. Rather, the quoted treatise appears to support (in some circumstances) Bayston's use of a "target" long term debt weight, but it also supports Zmijewski's employment of an iterative process to solve the circularity problem inherent in the WACC formula.[FN69] Even so, this Court must decide which (if any) of the two competing enterprise values it should accept in determining the percentage of the capital structure represented by debt and the percentage represented by equity.

> FN69. Trial Tr. Vol. 1 (Zmijewski) at 164-165; Zmijewski Dep. at 128-130.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 22
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

The difficulty is both that Mr. Bayston's assumed $10.38 per share "enterprise value" and Prof. Zmijewski's assumed $41.16 per share "enterprise value" are identical to the ultimate "fair value" that each expert determined for ECM. Those values exemplify the ultimate circularity inherent in WACC. In this case that circularity is of particular concern, because each expert's ultimate valuation is hotly disputed. Additionally, Mr. Bayston's 30% debt-to-value "target" figure assumes that management would pay down approximately 50% of ECM's debt at some indeterminate future time. That assumption finds no support in the record. For these reasons, the Court is unable to adopt the "enterprise value" assumed by either expert with any degree of confidence. Yet, the Court must still arrive independently at an enterprise value, and neither side has suggested a neutral or middle ground in their briefs.

Because the purpose of this calculation is to determine WACC based upon a reliable "value of the equity," the only sensible way (in the Court's view) to avoid the circularity in this case is to use an enterprise valuation of ECM that is not litigation-driven. On this record, the only such valuation is the $27.84 per share value, based on a 12% discount rate, that the RTFC determined and actually used for purposes of financing the Privatization.[FN70] Having no better or more reliable information, the Court adopts that value for purposes of determining the percentage of ECM's capital structure represented by long term debt and by equity on the merger date.

> FN70. JX 167 at RTFC 698, 700, 707, 720. Prudential's estimate that ATNI could be sold for $25-30 per share in the Split Off, was for a company that included (but was larger than) ECM. Efforts to sell ATNI at that price were unavailing, because no purchaser was interested in acquiring ATNI in its entirety.

*19 As for the percentage represented by long term debt, the only data credibly anchored to the record is the RTFC determination of ECM (ATN)'s net-debt-to-value ratio at 38.8%. Because that ratio was conservatively determined and was calculated as of July 29, 1998, three months before the merger,[FN71] the actual debt-to-value percentage as of the merger date is unknown

and can only be estimated. The Court concludes that a debt-to-value ratio of 38% would have been a reasonable estimate and input for purposes of determining a discount rate as of the merger date. From that conclusion it also follows that the percentage of ECM's capital structure represented by equity would have been 62% (*i.e.,* 100%-38%).

> FN71. *Id.*

### 3. Cost of Equity

Both Prof. Zmijewski and Mr. Bayston used the CAPM formula to calculate ECM's cost of equity. Using that standard approach, Zmijewski derived a cost of equity of 10.4% (for the years when the tax abatement would be in effect), and 10.3% (when the current tax abatement expires). Bayston's initial cost of equity was somewhat lower-9.9%-but Bayston then increased it to 14% by adding "premiums" totaling 4.1%.[FN72] More specifically, Bayston added a "small stock premium" of 1.7% and a "company-specific premium" of 2.4%, the latter consisting of a 1 to 1.5% "super-small stock premium" and a .9 to 1.4% hurricane risk premium."[FN73] Those "premiums" account for most of the difference between these two experts' cost of equity inputs. Accordingly, the issue becomes whether either of these premiums is appropriate in these circumstances. The party seeking to add the premium (here, the defendants) has the burden to establish that they are appropriate.[FN74]

> FN72. JX 298 at Ex. F-2; JX 352 at 31.

> FN73. Trial Tr. Vol. 2 (Bayston) 261, 168; Def. Consol. Post-Trial. Br. 87.

> FN74. *ONTI, Inc. v. Integra Bank,* 751 A.2d 904, 920 (Del.Ch.1999).

### (a) The 1.7% "Small Firm/Small Stock" Premium

Although plaintiffs contend that there is no basis in the finance literature or theory for adding a "small firm/small stock" premium to the cost of equity, that is not entirely accurate. There is finance literature supporting the position that stocks of smaller companies are riskier than securities of large ones and, therefore, command a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)

(Cite as: Not Reported in A.2d)

Page 23

higher expected rate of return in the market.[FN75] Our case law also recognizes the propriety of a small firm/ small stock premium in appropriate circumstances.[FN76] The issue, therefore, is not whether a small firm/small stock premium is permissible theoretically, but whether the defendants have shown that a premium of 1.7% is appropriate in this particular case. The Court concludes that the defendants have made that showing.

> [FN75.] *See* treatises cited in *Onti, supra,* 751 A.2d 920 at n. 71; *see also,* Jay Fishman, et. al, *Guide to Business Valuation,* Vol. 1 at 502.15 (Practitioners Publishing Co., 13[th] ed., 2003).

> [FN76.] *ONTI, supra; Cede & Co. v. JRC Acquisition, C.A. No. 18648, 2004 WL 286963,* at *8 (Del. Ch., Feb. 10, 2004).

Mr. Bayston computed a 1.7% small stock premium by a two step process. First, he determined qualitatively that such a premium was warranted by the size and business of ECM. Second, after reviewing data from the Ibbotson Associates publication, *Stocks, Bonds, Bills and Inflation 1998 Yearbook* ("Ibbotson"), Bayston quantified that premium by subtracting the 11% geometric mean return for large company stocks from the 12.7% mean return for small company stocks.[FN77]

> [FN77.] JX 315; Trial Tr. Vol. 2 (Bayston) 263-264.

**\*20** Plaintiffs do not attack the amount of the premium. Rather, they argue that no small stock/small company premium should have been added at all. They contend that Bayston mechanically and non-qualitatively applied a premium solely because of ECM's size, even though ECM did not fit the typical profile of a "small company ." Moreover, plaintiffs argue, recent research data show that contrary to the empirical assumption that implicitly underlies the small stock/small firm premium, small firms have in fact under performed large firms.

The answer to the plaintiffs' second argument is that although large-cap companies may have outperformed small-cap companies for discrete, short periods of time, over the last 10 (indeed, the last 75) years, the mean returns for small companies have exceeded the returns for large-cap companies.[FN78] The short answer to the plaintiffs' first argument is that although the favorable characteristics of ECM[FN79] are reasons not to apply the second ("supersmall firm") premium that Bayston layered atop the 1.7% small stock/small company premium, those characteristics do not justify ignoring the incremental risk, not fully captured by beta, that typically accompanies a small sized firm.

> [FN78.] Trial Tr. Vol. 2 (Bayston) 395; JX 315.

> [FN79.] Plaintiffs point out that ECM's returns are not volatile, because its principal subsidiary is well-established, lacks competition, has protection against unforeseen events through regulatory relief, and has access to low-cost capital through the RTFC.

Accordingly, the Court accepts the 1.7% small stock/ small firm premium that Mr. Bayston added to his 9.9% cost of equity, and arrives at a total cost of equity for ECM of 11.6%.

#### (b) *The 2.4% "Supersmall Firm" And "Hurricane Risk" Premium*

Far more controversial, and less grounded in finance theory and legal precedent, is the additional 2.4% premium added by Bayston to account for what he determined was the incremental risk of ECM being both a "supersmall" firm and also subject to unusually hazardous weather risk, specifically, hurricanes.

Bayston's justification for adding an incremental premium of 1%-1 .5% to ECM due to its "supersmall" size occupies less than one page of defendants' 150 page brief. That justification boils down to an assertion that the 1.7% small firm premium reflected only Ibbotson's average premium for small firms, but that Ibbotson contains "more particularized data which permits an assessment of the appropriate premium for a company, such as [ECM] 'which is much smaller ... than the average companies within the Ibbotson data." '[FN80] Other than to assert that that additional adjustment of the discount rate "reflects the reality of investment returns in such micro-cap companies"[FN81] the defendants offer no analysis, discussion of specific data, reference to any finance text, or other rationale for their "supersmall"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 24
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

firm premium.

> FN80. Def's Answering Post-Trial Br. at 87
> (citing Trial Tr. Vol. 2 (Bayston) at 271).

> FN81. *Id.*

Defendants' support for an incremental premium that if accepted would further increase ECM's cost of capital, falls woefully short of the showing that is required. The defendants offer nothing to persuade the Court that ECM's risk profile fits what they contend is the "reality" of investment returns for micro-cap companies. ECM may be small, but it is also a utility that was unusually protected from the hazards of the marketplace. ECM was well established, it had no competition, it was able to borrow at below-market rates, and it was cushioned by regulators from extraordinary hazards (for example, by tax abatements). Implicit in the defendants' position, but nowhere straightforwardly argued, is the assumption that these advantages, however extraordinary, were not enough to offset the added risk created by ECM's "supersmall" size. It is the defendant's burden to support that assumption, and they have not done that.

*21 By adding a second incremental premium to ECM's cost of equity to account for the risk of size, Bayston appears to have performed a mechanical exercise, rather than make a nuanced, textured judgment. Accordingly, the Court determines that the defendants have not established a credible justification for their incremental "supersmall" firm premium, and declines to add that premium to the cost-of-equity.

Apart from the "supersmall firm" premium, Bayston also added a company-specific incremental premium for hurricane risk. The effect was to increase the cost of equity by 1-1.5%, to increase the discount rate by a range of .7% to 1.05%, and to decrease enterprise value by $18 to $24 million (*i.e.*, by $1.64 to $2.19 per share). Bayston's justification for this incremental premium was that (1) as a result of Hurricane Hugo in 1989 and Hurricane Marilyn in 1995, Vitelco (ATN) suffered losses, not reimbursed by insurance or Universal Service Fund revenues, of approximately $80 million; and (2) ECM's management believed that hurricanes would pose a significant risk to ECM's business in the future, in that future storm losses would not be reimbursable by

insurance because (management was informed) coverage would no longer be available.

This analysis is faulty on factual and conceptual grounds. First, it overstates the amount of unreimbursed hurricane damage. That amount, Mr. Heying testified, totaled about $55 million for the entire 70 years preceding the merger.[FN82] Second, defendants' claim that management knew as of the merger date that its hurricane insurance would not continue, relies entirely on Prosser's trial testimony,[FN83] which is not corroborated by any contemporaneous document and is inconsistent with ECM's SEC filings and RTFC loan documents, none of which indicate any impending loss of hurricane loss coverage.[FN84] Third, assuming that the risk of future storm losses should be accounted for in some way, the defendants have not supported their argument that the appropriate way to do that is by increasing the cost of equity. Defendants cite no finance literature supporting that approach, nor have they supported their argument empirically, such as (for example) by comparing ECM's company-specific weather-related risk (net of mitigation factors) to the "average" or "mean" weather-related risk for all companies, or even for all "small" companies.

> FN82. Trial Tr. Vol. 8 (Heying) at 1513.

> FN83. *Id.,* Vol. 10 (Prosser) at 1758-59; Defs' Consol. Post-Trial Br. at 93

> FN84. *See* JX 155 at SC4189 (1997 10K); JX 165 at RTFC 2426 (covenanting to maintain storm insurance for two years).

The absence of theoretical and evidentiary support leaves this Court unpersuaded that the risk of unrecoverable hurricane damage loss is so embedded in ECM's business as to require a structural increase in ECM's cost of equity. Absent theoretical and empirical guidance, a more rational approach would be to factor that risk into ECM's cash flow projections such as (for example) by dividing the net hurricane-related loss by a statistically representative number of years to arrive at a loss deduction from projected cash flow for each forecast year. Unfortunately, neither side performed such a calculation.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 25
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

*22 The only rational approach that is supported by the record is the plaintiffs' proposal that if the Court finds that the weather-related risk was not appropriately accounted for in Zmijewski's cash flow projections, the Court should reduce Zmijewski's enterprise value calculation by the dollar amount of the estimated effect of the hurricane risk, *i.e.*, by $18 to $24 million. That suggested approach supplies the frame of reference for the analysis that follows.

The plaintiffs' proposed approach to the weather risk issue raises two questions. The first is whether that risk has already been fully accounted for in Prof. Zmijewski's cash flow projections; if not, the second issue becomes what should be the amount of the resulting deduction from enterprise value. The record shows that the projections were based on historical results, and that they included the insurance premiums.[FN85] Because (as defense expert Gilbert Matthews conceded) it would not be appropriate to include the cost of insurance coverage in a forecast without taking into the account the benefit of the protection provided by that insurance,[FN86] the only loss that should be accounted for is the hurricane-related loss that was not reimbursed by insurance. Although the plaintiffs argue that that loss was implicitly included in Prof. Zmijewski's forecast, the Court has found no evidence to support that assertion. The Court is, therefore, unable to conclude that Professor Zmijewski factored those unreimbursed losses into his cash flow forecast.

> FN85. Trial Tr. Vol. 8 (Heying) at 1460-62.
>
> FN86. *Id.*, Vol. 6 (Matthews) at 1073.

Accordingly, it is appropriate (as plaintiffs concede) to deduct the dollar value effect of those losses from enterprise value. The question becomes: what amount should be deducted? The possibilities range from $18 to $24 million. Because the defendants overstated the magnitude of the unreimbursed losses caused by hurricane damage, the Court finds that an appropriately conservative deduction would be at the low end of the range, *i.e.*, $18 million or $1.64 per share.

To summarize, the Court determines that the correct cost of equity for ECM at the merger date was 11.6% (Bayston's initial 9.9% plus a 1.7% small firm/small

stock premium). That cost of equity figure does not include a premium for hurricane damage risk. That risk shall be accounted for by deducting $18 million ($1.64 per share) from the enterprise value calculated (independent of that risk) with the DCF inputs as determined in this Opinion. The result will be to reduce the enterprise value by that $18 million ($1.64 per share) amount.

For the reasons previously discussed, the Court cannot accept in its entirety the DCF valuation of either side's expert. Although the Court accepts the plaintiffs' position that the projected cash flows and terminal value should be derived from the June projections, it has determined independently the disputed elements of the WACC and CAPM formulas from which the discount rate is computed. Based upon the Court's findings, the appropriate discount rate is determined to be 8.69%, and the fair value of ECM as of the merger date is determined to be $38.05 per share.[FN87]

> FN87. The $38.05 fair value represents the difference between the value of $39.69 per share and the $1.64 per share hurricane loss adjustment. The $39.69 per share value, as well as the 8.69% discount rate, were computed by all counsel at the request of the Court. (*See* letter dated March 17, 2004 from the Court to all counsel.) In its letter the Court asked counsel to compute the discount rate and the resulting fair value, based upon the DCF inputs determined in this Opinion. On April 2, 2004, Mr. Allingham responded to the Court on behalf of all counsel, setting forth the manner in which the $39.69 per share value was arrived at. (Letter dated Apr. 2, 2004 from Thomas J. Allingham, II, Esquire, to the Court). In that letter, counsel identified one additional variable that the Court would be required to determine: ECM's assumed growth rate. As disclosed in counsel's April 2, 2004 letter, the parties' different growth rate assumptions yielded a matrix of values ranging from $39.69 to $40.88 per share. Deciding to err on the side of conservatism, the Court selected the lowest value within that range-$39.69 per share-from which $1.64

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

per share was deducted to arrive at the ultimate adjudicated fair value for ECM of $38.05 per share.

### C. What Weight Should Be Accorded To ECM's Market Price As Evidence Of Fair Value?

*23 To support their claim that the fair value of ECM on the merger date was no more than $10.38 per share, the defendants urge that "where, as here, the market for a publicly traded security is an active and efficient one, the market price [of ECM's common stock] is, at the least, important corroborative evidence of value ..." FN88 For that argument, the defendants rely upon the expert testimony of Professor Burton Malkiel of Princeton University. Professor Malkiel opined that ECM's stock "was trade[d] in an efficient market with enough volume and a low enough bid-asked spread, and that it reflected news without delay; and these ... indicators led [Prof. Malkiel] to conclude that ECM was traded in an efficient market and that the [$7.00 per share] market price of ECM common stock prior to the buyout ... was a reasonable reflection of its value." FN89 Intending no disrespect to Professor Malkiel, the Court is unable to accept his conclusion in this specific case. However sound Professor Malkiel's market price-based theory may be in other circumstances, that theory is inapplicable to these facts because its premise is not supported by either the trial record or Delaware law.

FN88. Defs. Consol. Ans. Post-Trial Br. at 105.

FN89. Trial Tr. Vol. 9 (Malkiel) at 1597-1598.

Delaware law recognizes that, although market price should be considered in an appraisal, the market price of shares is not always indicative of fair value. FN90 Our appraisal cases so confirm. FN91

FN90. *Cede & Co. v. Technicolor, Inc.,* 684 A.2d 289, 301 (Del.1996) (the "market price of shares may not be representative of true value.").

FN91. *See, e.g., Harris v. Rapid-American Corp.,* C.A. No. 6462, 1992 WL 69614, at *1, *4, (Del.Ch. Apr.6, 1992) ($28 merger price, representing a 28% premium over unaffected

trading price, was barely one-third of adjudicated fair value of $73.29); *In re Shell Oil Co.,* C.A. No. 8080, 1990 WL 201390, at *14-15, *38 (Del.Ch. Dec.11, 1990), *aff'd,* 607 A.2d 1213 (Del.1992) (market price $44, adjudicated fair value $71.20);

Moreover, the record undermines any assertion that ECM's common stock was traded in an efficient market. Indeed, it was precisely because ECM's stock market price did not reflect ECM's underlying values that Prosser decided to abandon the proposed merger and instead acquire the ECM minority interest in the Privatization. Prosser himself told his fellow ECM directors that the ECM stock price had failed to reach the desired appreciation as a result of the small public float and the fact that the stock was not being followed by Wall Street analysts. FN92 Moreover, because Prosser always owned the majority interest, the market price of ECM stock always reflected a minority discount. FN93

FN92. *See* note 7, *supra.*

FN93. Trial Tr. Vol. 1(Zmijewski) at 95-96; Finger Dep. (Jan. 11, 2000) at 143-144.

Professor Malkiel admitted that markets occasionally make errors, that the market could have been wrong about ECM, and that it is possible for a stock that trades even in an efficient market to be mispriced, especially in the short run. FN94 Professor Malkiel also conceded that the market may be inefficient if material information is withheld from it. FN95 In the case of ECM, while the stock was trading freely, (*i.e.,* before Prosser announced the Privatization), the market never had the benefit of any disclosed earnings or projections of future results, including the June Projections. FN96

FN94. Trial Tr. Vol. 9 (Malkiel) at 1651-52, 1665-66, 1676-79. In this case, ECM stock traded publicly for only five months.

FN95. *Id.* at 1633.

FN96. Trial Tr. Vol. 1 (Zmijewski) at 93-94, 158-159.

For these reasons, the Court rejects the defendants' ar-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                         Page 27
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

gument that the market price of ECM stock corroborates the $10.25 price as the fair or intrinsic value of ECM on the date of the merger. In this case, ECM's unaffected stock market price merits little or no weight.

### D. The Corporate Opportunity Claims

*24 The plaintiffs contend that to the value of ECM as determined by the DCF method, there should be added an additional $3.79 per share, representing the combined value of the Caribbean Cable Companies [FN97] and the Daily News. Those companies, which ICC (wholly owned by Prosser) acquired on December 30, 1997, are claimed to have been corporate opportunities of ECM that Prosser wrongfully usurped. The plaintiffs urge that Prosser had a fiduciary duty to make those opportunities available to ECM, and that consequently, ECM's minority shareholders were entitled to share in the value of those opportunities on the merger date.

> FN97. The Caribbean Cable Companies were BVI Cable TV, St. Croix Cable TV, Inc., St. Thomas-St. John Cable TV and St. Maarten Cable TV.

The Court cannot agree, because ECM did not come into existence until December 30, 1997, long after Prosser had had signed definitive purchase agreements on June 9, 1997 to acquire personally three of the Cable Companies, and an agreement to acquire the fourth Cable Company on September 8, 1997.[FN98] Because ECM did not exist, and therefore had no public shareholders at the time Prosser signed those agreements, Prosser was not a fiduciary, and could not have owed any fiduciary duties to ECM.[FN99]

> FN98. Pretrial Order, ¶ s 81, 95.

> FN99. See *Anadarko Pet. Corp. v. Panhandle East. Corp., 521 A.2d 624, 628 (Del.Ch.1987)* (holding that a parent corporation owes no fiduciary duty to its wholly-owned subsidiary, and that no fiduciary duty arose until the subsidiary had outside stockholders).

If the Cable Companies and the Daily News were corporate opportunities, they were opportunities of ATN, which owned all the assets later allocated to Messrs.

Prior and Prosser in the Split Off. In an Indemnity Agreement entered into among Prosser, Prior, and ATN as part of the Split Off, ATN and Prior relinquished any rights they had to such a claim. In that Agreement, ATN and Prior covenanted "not to bring any action suit or proceeding against Prosser or ECI with respect to any of the matters ... relating to the business, operations or management of [ATN] or any of its Subsidiaries prior to and including the Closing." [FN100]

> FN100. JX 22 at ECI 0857, § 3.01(b). The Indemnity Agreement was one of the terms of the Split Off that was disclosed to, and approved by, ATN stockholders. JX 22.

In short, ECM had no corporate opportunity claim because ECM did not exist at the time the opportunities arose and were taken. If a corporate opportunity claim existed, it belonged to ATN, which relinquished that claim in connection with the Split Off. Accordingly, the corporate opportunity claims cannot form any part of ECM's fair value as of the merger date.

### E. The Fair Value Of ECM And The Unfairness Of The Merger Price

As a consequence of the foregoing determinations, the fair value of ECM on the merger date is found to be $416,996,000, or $38.05 per share.[FN101] Under *8 Del. C. § 262*, Greenlight, as the single appraisal claimant, is entitled to recover that per share amount, multiplied by the 750,300 shares for which it seeks appraisal, plus interest as determined in Part III F, *infra*, of this Opinion.

> FN101. The fair value of $416,996,000 ($38.05 per share) is equal to the discounted cash flow valuation of ECM that results from the DFC inputs determined in this Opinion ($434,996,000, or $39.69 per share) less $18 million ($1.64 per share), which represents the hurricane losses not reimbursed by insurance. See Apr. 2, 2004 Letter from Thomas J. Allingham, II, Esquire, to the Court, discussed in note 87, *supra*.

From that fair value finding it further follows that the $10.25 per share merger price was not a "fair price" within the meaning of the Delaware fiduciary duty case law beginning with *Weinberger v. UOP, Inc.*[FN102] Al-

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 28

though that, without more, is dispositive, the unfairness of the merger price rests upon more than that one bit of simple deductive logic. The overwhelming weight of the credible evidence of record also compels that conclusion.

FN102. 457 A.2d 701 (Del.1983).

*25 The only competent evidence that the merger price was fair was the fairness opinion that Houlihan furnished to the Second Special Committee, and the testimony of Mr. Bayston in support of the fairness opinion rendered by his firm, Duff & Phelps. But whatever evidentiary force Houlihan's opinion might have had was totally undermined by the fact that (i) Houlihan never had the benefit of the June projections, and (ii) the defendants never called Houlihan, upon whose valuation the Special Committee and the board relied, to testify at trial in support of its valuation conclusion. The defendants have never explained their failure to do that. For these reasons, and because it was within the defendant's power to call Houlihan as a witness,[FN103] the only logical inference-and the inference this Court has drawn-is that Houlihan's testimony would have been unfavorable to the defendant's position.[FN104] The RTFC's approximately $28 per share valuation of ECM-which is credible because the RTFC relied on it in deciding to extend to Prosser a multimillion dollar loan to finance the Privatization-was almost thrice the magnitude of the $10.25 per share value that Houlihan was willing to pronounce as fair. And even Duff & Phelps, the defendants' trial valuation expert, was apparently unable to opine that $10.25 per share was fair: that firm valued ECM at not less than $10.38 per share.

FN103. The defendants do not contend that Houlihan was unavailable to testify.

FN104. Demby v. State, 744 A.2d 976, 978-979 (Del.2000) (citing Wheatley v. State, 465 A.2d 1110 (Del.1983)).

The several infirmities that led the Court to reject the Duff & Phelps valuation have been discussed and need not be repeated here. One additional infirmity merits discussion, however, and that is Mr. Bayston's use of impermissible post-merger data in arriving at some of his conclusions. In his deposition Mr. Bayston conceded

that he had relied on post-merger evidence in preparing his projections, including his CapEx assumptions:

Q. So that in making your assessment about the best estimate of the costs of the company going forward, you examined and took into account the company's cost experience in the period between the appraisal date and the date of the preparation of your report?
A. That's correct.[FN105]

FN105. Bayston Dep. 286-87.

Q. Now, in formulating your more aggressive assumption for capital expenditures, did you take into account the company's capital expenditures experienced between the appraisal date and the date when you prepared your report?
A. I believe we looked at that issue.[FN106]

FN106. Id. at 293.

Although at trial Bayston claimed that he misspoke on his deposition,[FN107] that recantation is not credible because if in fact Bayston misspoke, he did so repeatedly over the course of many deposition pages. Moreover, Bayston had extensive litigation-related contact with ECM's management,[FN108] which would have made it extremely difficult to avoid incorporating post-merger evidence in his valuation.

FN107. Trial Tr. Vol. 1 (Bayston) 209, Vol. 2 (Bayston) 320, 323, 329.

FN108. Trial. Tr. Vol. 2 (Bayston) 252-253, 328-329 (discussions about capital expenditures); 333 -334 (discussing extensive conversations with ECM management.)

Striving to portray Mr. Bayston's contacts with management as a strength, the defendants criticize Prof. Zmijewski for "not even attempt[ing] to talk to [ECM] management in connection with his analysis."[FN109] But Prof. Zmijewski cannot fairly be faulted for doing what litigation experts in the valuation area customarily do: conducting careful due diligence using the sworn testimony and contemporaneous discovery record. What Zmijewski did not do in valuing ECM was to rely upon unsworn, post-merger conversations with management.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 29

Nor did Prof. Zmijewski rely upon post-merger data to determine the inputs on which his DCF analysis depended.

> FN109. Def. Consol. Ans. Post-trial Br. at 52.

### F. Interest

\*26 Once the fair value of the dissenting shareholders' shares is ascertained, our appraisal statute requires the Court to determine "the fair rate of interest, if any" after considering "all relevant factors." [FN110] The interest may be simple or compound, and this Court has broad discretion to determine whether interest should be simple or compound, but the Court must explain its choice.[FN111] As the Chancellor recently stated in *Cede & Co. v. JRC Acquisition*:

> FN110. 8 *Del. C.* § 262(h).

> FN111. 8 *Del. C.* § 262(i); *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d at 527. *Gonsalves v. Straight Arrow Publishers, Inc.*, 725 A.2d 442 (Table), 1999 WL 87280 at \*4 (Del., Feb.25, 1999).

This Court's decision in *Gonsalves v. Straight Arrow Publishers, Inc.* is an accepted method for determining the rate of interest in appraisal actions. *Gonsalves* rests on the principle that an interest award should serve two purposes. First, it should disgorge the respondent of any benefit it received from the use of the petitioner's funds. Second, the interest award should compensate the petitioner for the loss of the use of its money. The second purpose, however, is countenanced with the understanding that the election to 'reject the merger and to pursue appraisal does not shift to the corporation all responsibility for losses [the petitioner] may incur as a result of [its] inability to use the funds retained by the corporation' and that the petitioner can mitigate its losses and obtain perfect 'compensation for the loss of the use of their funds by borrowing the fair value of their shares.' *Gonsalves*, and several other decisions, have found that these twin purposes are served by awarding interest by weighing equally the respondent's actual costs of borrowing and based upon an objective prudent investor standard, the petitioner's opportunity cost.[FN112]

> FN112. *Cede & Co. v. JRC Acquisition, Corp.*, No. 18648, 2004 WL 286963, at \*12 (Del.Ch. Feb.10, 2004) (internal citations omitted).

Greenlight claims that it is entitled to an interest award of 22%, compounded daily, from the merger date. To further the compensatory purpose of the interest award, Greenlight argues, the Court should use Greenlight's actual rate of return on its invested capital-37%-for the period beginning October 1, 1998. Because 37% is what Greenlight claims it would have earned on its appraisal award had that award been paid on the merger date, only that rate would restore Greenlight to the financial position it would have had if the merger price were entirely fair. To further the restitutionary purpose of an interest award, Greenlight urges the Court to use the interest rate that ECM pays to short term, unsecured creditors (a category that includes Greenlight in this appraisal). Since the date of the merger, that rate has been 7%. Weighting both rates equally, Greenlight arrives at a rate of 22% which, Greenlight urges, should be compounded daily.

The defendants insist that Greenlight is entitled to simple interest at 5.24%, or at most, interest at that rate compounded no more frequently than monthly. Although the defendants agree that the "restitutionary purpose of awarding interest is typically addressed by basing one half of the interest award on the corporation's cost of borrowing," [FN113] they contend that as of September 30, 1998, ECM's weighted average interest rate on its \$190.4 million of debt was 6.59%.

> FN113. Defs' Consol. Post-Trial Br. at 110. *See Gilbert v. M.P.M. Enters., Inc.*, 709 A.2d 663, 674 (Del.Ch., 1997); *aff'd*, 731 A.2d 790 (Del.1999) and *Chang's Holdings, S.A. v. Universal Chems. And Coatings, Inc.*, No. 16856, 1994 WL 681091, at \*2 (Del. Ch. Nov. 22, 1994).

\*27 As for the compensatory purpose of an interest award, the defendants claim that because this Court has historically applied an objective "prudent investor" standard, (*viz.*, what a prudent investor would have achieved if it had invested the proceeds at the date of the merger) Greenlight's subjective claimed 37% return

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

on its investments is irrelevant as a matter of law. In this case, the prudent investor rate, as determined by Mr. Bayston who relied on the mix of investments specified by Delaware case law, implied an interest rate of 5.54% as of the date of the Duff & Phelps report, and 3.88% as of the date of trial. Because both sides agree that borrowing costs and compensatory measures should be weighed equally, the appropriate rate of interest is 5.24% [ (6.59% + 3.88%) /2]. Finally, defendants argue, Greenlight cites no authority for its request that interest be compounded daily. Defendants urge that the interest award should be either simple interest or, if interest is compounded, the compounding should be no more frequent than monthly, consistent with the case law.[FN114]

> FN114. See *ONTI, Inc. v. Integra Bank, 751 A.2d at 927-29* (interest compounded monthly); *Hintmann v. Frede Weber, Inc.,* 1998 WL 83052 (Del.Ch. Feb.17, 1998)* (same); *Grimes v. Vitalink Communications Corp.,* No. 12334, 1997 WL 538676, at *13 (Del.Ch. Aug.28, 1997).

These colliding contentions generate four issues: (1) what was ECM's cost of borrowing, (2) what was Greenlight's opportunity cost, (3) based on those inputs, what is the appropriate rate of interest, and (4) should the form of the award be simple or compound interest, and if interest is compounded, over what interval? These issues are now addressed.

Although defendants argue that 6.59% was ECM's cost of borrowing, as Greenlight points out, that represents ECM's average, not its marginal cost of short term unsecured debt, which was 7%.[FN115] According the Court finds that ECM's cost of borrowing was 7%.

> FN115. JX 235 at 26, Ex. 2B.

As for Greenlight's opportunity cost, *JRC Acquisition* and *Gonsalves* establish that that cost is to be determined on the basis of an objective "prudent investor" standard, not Greenlight's subjective claimed 37% investment return. The defendants argue that the prudent investor rate of return was 5.54% as of the date Duff & Phelps submitted its report and 3.88% at the time of the trial. Greenlight does not propose any alternative "prudent investor" rate of return. To err on the conser-

vative side, the Court adopts 5.54% as the prudent investor rate of return.

The Delaware cases require that the interest rate be determined by weighting the cost of borrowing and the prudent investor rate of return equally. On that basis, the appropriate rate of interest on the appraisal award is determined to be 6.27%, running from the date of the Privatization merger.[FN116]

> FN116. Computed as follows: 7.00% + 5.54% / 2 = 6.27%.

The final issue relating to interest is whether the interest should be simple or compound and if compounded, over what interval. Greenlight cites no authority or evidence that daily compounding is appropriate in this case. But, Greenlight, which is in the business of investing money, has nonetheless satisfied the Court that it would have been able to earn interest on its appraisal award on a compound basis. Moreover, the Court finds, as did the Chancellor in *JRC Acquisition,* that "the dual purpose of compensation and restitution may only be served by a compounding interval at least as frequent as one month."[FN117]

> FN117. *JRC Acquisition, supra,* at *15 (quoting *Grimes v. Vitalink Communications Corp., supra.,* 1997 WL 538676 at *11). The defendants also concede that if interest is to be compounded, that the compounding be at one month intervals.

*28 Accordingly, interest on Greenlight's appraisal award shall be at the rate of 6.27%, compounded monthly, from the date of the merger to the date of judgment.

## IV. WAS THE TRANSACTION THE PRODUCT OF FAIR DEALING?

### A. Threshold Issues

An entire fairness analysis normally requires the Court to decide, in addition to whether the price paid in an interested merger was "fair," whether the merger was the product of "fair dealing." This case, however, raises three issues that must be confronted at the threshold.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

The first is whether this Court's determination that the merger price was not fair makes it unnecessary to engage in a "fair dealing" analysis. The Court concludes that a fair dealing analysis is required. The second issue is whether the plaintiffs are barred from asserting their fiduciary duty claims. The Court finds that they are not. The third issue is which side has the burden of proof. The Court determines that the burden falls upon the defendants. What follows is the basis for the Court's rulings on these threshold issues.

### 1. Is A Fair Dealing Analysis Required?

In this case, this Court's determination of ECM's "fair value" disposes of both Greenlight's appraisal action and the "fair price" aspect of the plaintiffs' fiduciary duty claim. The determination that price is not fair raises a preliminary, threshold question of whether in this case any "fair dealing" analysis need be undertaken at all. It is arguable that where (as here) the merger price is found to be unfair, it would be difficult, if not impossible, for the merger to be found "entirely fair" even if the process leading up to the merger involved fair dealing.[FN118] That supposition, if correct, would lead to the result that where the merger price is found not to be fair, that finding establishes, *ipso facto,* the unfairness of the merger, thereby obviating the need for any analysis of the process oriented issues. The Supreme Court has not yet addressed that question, however.

> FN118. *See Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1134, 1140 (Del.Ch.1994), *aff'd,* 663 A.2d 1156 (Del.1995)* ("Plainly in a cash-out merger, price is a dominant concern, most especially where the buyer already has voting control of the enterprise, such as a parent-sub merger.").

What the Supreme Court has decided is that where an interested merger is found to be unfair and the corporation's charter has a Section 102(b)(7) exculpatory provision, this Court must then proceed to "identify the breach or breaches of fiduciary duty upon which liability [for damages] will be predicated in the *ratio decidendi* of its determination that entire fairness has not been established."[FN119] That is, "when entire fairness

is the applicable standard of judicial review, a determination that the director defendants are exculpated from paying monetary damages can be made only *after the basis* for their liability has been decided."[FN120]

> FN119. *Emerald Partners v. Berlin,* 787 A.2d at 94 (quoting *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1165 & n. 16 (Del.1995)).

> FN120. *Id.* (emphasis in original).

That mandate, I find, is applicable here. In this case the defendants have raised a § 102(b)(7) exculpatory defense. In determining that the merger price was not fair, this Court did not address whether the unfairness was the product of a breach of fiduciary duty or if so, the nature or character of that duty. Accordingly, a "fair dealing" analysis is required in this case, if only to enable the Court to determine the "basis for the [defendants'] liability" for § 102(b)(7) exculpation purposes.

### 2. The "No Standing" Affirmative Defense

*29 The defendants have interposed the affirmative defense that the plaintiffs lack standing to assert any fiduciary duty claims. That defense comes in two parts. First, the defendants concede that Greenlight has standing to assert fiduciary claims on behalf of the 750,300 ECM shares that it owns outright. The defendants argue, however, that Greenlight lacks standing to assert any claims on behalf of the former holders of 2,026,685 shares that sold to Greenlight their "litigation rights" to assert the fiduciary claims associated with those shares.[FN121] Second, the defendants claim that no former shareholders of ECM can recover anything in respect of any shares that they tendered into the tender offer or voted in favor of the merger. Neither argument, in this Court's view, withstands scrutiny.

> FN121. The assignments of litigation rights to Greenlight are found in the record at JX9.

#### (a) The Litigation Rights Validity Issue

The plaintiffs contend that Greenlight lacks standing to assert any claims based upon the assigned "litigation rights," because: (1) unliquidated fiduciary claims are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

not assignable as a matter of Delaware law and public policy, and (2) Greenlight purchased the litigation rights in violation of the parties' Confidentiality Stipulation in the appraisal action. Moreover (argue defendants), (3) if the assignments were invalidated, the litigation rights would not revert back to the assignors, *i.e.,* to the plaintiff class, because by selling these claims those stockholders waived their right to assert their fiduciary claims and must therefore be excluded from the class.

Assuming without deciding that the defendants can be heard to challenge the validity of the assignments,[FN122] it is established Delaware law that choses in action that survive the death of the victim are validly assignable.[FN123] In this case, the choses in action are breach of fiduciary duty and fraud claims. Those claims survive to (or against) a personal representative under 10 *Del. C.* § 3701.[FN124] For purposes of determining which claims are assignable and which are not, Delaware law does not distinguish between claims that are liquidated and those that are unliquidated.

> FN122. There is authority holding that only a party to the assignment can contest its validity *See Wagner v. United States,* 573 F.2d 447 (7th Cir.1978); *Gamble v. Stevenson,* 305 S.C. 104, 406 S.E.2d 350, 353 (S.C.1991); 6A C.J.S. *Assignments* § 71 (1975).

> FN123. *Industrial Trust Co. v. Stidham,* 33 A.2d 159, 160-61 (Del.1942); *Garford Motor Truck Co. v. Buckson,* 143 A. 410, 411 (Del.Super.Ct.1927).

> FN124. Section 3701 provides:
> All causes of action, except actions for defamation, malicious prosecution, or upon penal statutes, shall survive to and against the executors or administrators of the person to, or against whom, the cause of action accrued....[A]ll actions, so surviving, may be instituted or prosecuted by or against the executors or administrators of the person to or against whom the cause of action accrued.

Nor is there any basis for the defendants to argue that the assignments must be deemed invalid on public policy grounds because they are champertous. The short

answer is that they are not champertous. Champerty requires "an agreement between the owner of a claim and a volunteer that the latter may take the claim and collect it, dividing the proceeds with the owner, if they prevail; the champertor to carry on the suit at his own expense." [FN125] Greenlight's purchase of the litigation rights was not champertous, because Greenlight has always been involved in the litigation. Greenlight was a shareholder when the Privatization was announced; Greenlight was a member of the shareholder class and always had the right-and standing-to pursue an individual fiduciary duty remedy simultaneously with its appraisal action. Champerty cannot be charged against one with an interest in the matter in controversy.[FN126]

> FN125. *Gibson v. Gillespie,* 152 A. 589, 593 (Del.Super.Ct.1928); *see also Compaq Computer Corp. v. Horton,* 631 A.2d 1, 5, n. 1 (Del.1993).

> FN126. *Cede & Co. v. Technicolor, Inc.,* 542 A.2d 1182 (Del.1988).

*30 The defendants next urge that Greenlight should be denied standing to sue because it purchased the litigation rights in violation of Paragraph 2 of the Confidentiality Stipulation, which provides that:
Discovery Material shall be used solely for purposes of this litigation, and shall not be used for any other purpose, including, without limitation, any business or commercial purpose, *provided,* however, that Discovery Material may be used in connection with any litigation among the parties relating to the merger between [ECM] and [ICC] ... effective as of October 19, 1998.[FN127]

> FN127. D.I. 19 in Appraisal Action, Par. 2.

Specifically, the defendants contend that Greenlight "used" confidential Discovery Material to purchase the litigation rights in violation of the quoted paragraph. Although Greenlight did possess confidential information, the defendants have not shown that Greenlight used that information in acquiring the litigation rights. Even if Greenlight did use Discovery Material, the defendants have not established that such use was prohibited by the Confidentiality Stipulation, which permitted

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 33
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Discovery Material to be used in both the Appraisal Action ("this litigation") and in "any litigation relating to the Merger" (*i.e.*, the fiduciary duty action challenging that Merger). Nor have the defendants shown that Greenlight disclosed confidential Discovery Material publicly in the marketplace, or otherwise failed to abide by the Confidentiality Stipulation terms.

Finally, the defendants have suffered no prejudice as a result of the assignment of the litigation rights, because those rights belonged to the members of the class. Absent an assignment, the defendants would have had to defend against those claims asserted on behalf of the class in any event. Thus, the defendants can hardly claim cognizable prejudice as a result of the assignment of those same claims to one member of the class that elected to sue individually.<u>FN128</u>

> <u>FN128.</u> Stated another way, if the Court granted defendants the relief they seek, the assignments would be void and the right to recover would revert to the class. A failed assignment of claims does not (as defendants assert without support), *constitute a waiver* of those claims. The defendants would still pay the same amount in damages; there would simply be a different name on the check. Not allowing the class member-assignors to recover would give the defendants a windfall for no valid factual or legal reason.

#### (b) The Waiver Issue

The defendants next urge that members of the ECM shareholder class who tendered into the first step tender offer, or who voted for the Privatization merger, waived their right to challenge the fairness of that transaction. This argument is flawed, because it presupposes that the shareholders who tendered or voted made a fully informed decision based on full disclosure. As found elsewhere in this Opinion, that is not the case, because the defendants violated their duty of disclosure to the stockholders of ECM in several respects. On that basis alone the defendants' argument must be rejected.<u>FN129</u>

> <u>FN129. Bershad v. Curtiss-Wright Corp.,</u> 535 A.2d 840 (Del.1987)(acquiescence requires an informed act). For that same reason, the Court

rejects the defendants' argument that the Class members who accepted the benefits of the merger must be deemed to have acquiesced in the merger. As Vice Chancellor Strine held in <u>Clements v. Rogers,</u> 790 A.2d 1222 (Del.Ch.2001), a plaintiff who accepts the merger consideration could not have acquiesced where she knew some, but not all of the material facts. The predicament in which Class of former ECM shareholders found themselves was indistinguishable from *Clements.*

#### (c) The Burden of Proof Issue

The final threshold issue is which side has the burden of proof. Both sides agree that because the Privatization is a self-dealing transaction of which the majority stockholder stands on both sides, entire fairness is the standard of review *ab initio.*<u>FN130</u> The only question is whether the burden of proof, which normally falls upon the defendants, has shifted to the plaintiffs in this particular case.

> <u>FN130. Emerald Partners v. Berlin, supra,</u> 787 A.2d at 92, 97.

*31 The defendants argue that the burden of establishing that the merger was not entirely fair has shifted to the plaintiffs, because the merger was approved by both an informed independent committee of disinterested directors and an informed majority of minority stockholders.<u>FN131</u> The short answer is that the merger was not approved by a committee of independent directors who were properly informed or independent of Prosser, nor was it approved by an informed vote of a majority of ECM's minority stockholders.

> <u>FN131. Kahn v. Lynch Communications Sys., Inc.,</u> 638 A.2d 1110, 1117 (Del.1994).

In an entire fairness context, where the predicate for a burden-shifting argument is that the merger was negotiated by a special committee, the defendants must establish to the satisfaction of a carefully scrutinizing court that the special committee was "fully informed."<u>FN132</u> As discussed more fully elsewhere in this Opinion, the Special Committee and a majority of ECM's minority shareholders voted to approve the merger, but their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

votes were not fully informed. A highly material fact was not disclosed either to the Special Committee or to the minority stockholders, namely, that the most recent projections-the June projections-had been provided to Prosser and his financial advisor (Prudential) and his lender (RTFC) but not to the Special Committee. Members of the Special Committee testified that they and Houlihan should have been provided with the June Projections.[FN133] Moreover, the June Projections were not disclosed in the proxy statement, and the proxy disclosures relating to that issue falsely and misleadingly suggested that the shareholders were being provided with all of the projections to which Prosser and his advisers had been privy. The portion of the proxy statement that contained the March projections (identified therein only as Company projections) stated:

> FN132. Id. at 1120.

> FN133. Trial Tr. Vol. 7 (Vondras) 1296, 1351-52; Vol. 4 (Goodwin) 751; Vol. 5 (Goodwin) 929-30. Mr. Vondras testified that the Special Committee "was deprived of information that [he] would have considered important in [his] assessment of ... Prosser's offer" and that the Committee and Houlihan "... should have had the most current data, and it would have used that in their analysis. Would it change the ... numbers? May or may not have. I don't know, but they should have had that data." Trial Tr. Vol. 7 (Vondras) 1351-52.

Although the Company does not as a matter of course publicly disclose projections as to future revenues or earnings, because they were received by Mr. Prosser and the parent [ICC, LCC], the purchaser [ICC] is making these projections available to all stockholders.[FN134]

> FN134. JX 155 at SC4128.

As more fully discussed infra, the proxy statement and the tender offer documents omitted to disclose other material facts as well. The material omission relating to the June Projections, however, is sufficient, in and of itself, to undermine the informed character of the Special Committee approval that is a predicate to shifting the burden of proof in an entire fairness case.

The defendants argue that the burden must shift, nonetheless, because the minimum tender condition, i.e., the condition that a majority of the minority shareholders tender into the offer, was the functional equivalent of a shareholder ratification of the transaction. But no Delaware case has held that burden-shifting can be accomplished by a tender of shares rather than by an actual vote. Nor should a tender be treated as the equivalent of an informed vote. Shareholders cannot be deemed to have ratified board action unless they are afforded the opportunity to express their approval of the precise conduct being challenged.[FN135] Stockholders have materially different interests at stake when tendering, as opposed to voting their shares. In considering whether to tender, stockholders must evaluate the risk of being left worse off, i.e., left vulnerable to being frozen out at an even lower price, if the other stockholders were to tender into an inadequate offer. As Vice Chancellor Strine incisively observed in In re Pure Resources S'holders Litig:

> FN135. In re Santa Fe Pac. S'holders Litig., 669 A.2d 59, 69 (Del.1995); see also, In re Cencom Cable Income Partners, L.P., No. 14634, 2000 WL 640676, at *5 (Del. Ch. May 5, 200) ("Ratification can effectively occur only where the specific transaction is clearly delineated to the investor whose approval is sought and that approval has been put to a vote.").

*32 Indeed, many commentators would argue that the tender offer form is more coercive than a merger vote. In a merger vote, stockholders can vote no and still receive the transactional consideration if the merger prevails. In a tender offer, however, a nontendering shareholder faces an uncertain fate. That stockholder could be one of the few who holds out, leaving herself in an even more thinly traded stock with little hope of liquidity and subject to a § 253 merger at a lower price or at the same price or ... at a later (and, given the time value of money, a less valuable) time.[FN136]

> FN136. 808 A.2d 421, 442-43 (Del.Ch.2002), appeal refused, 812 A.2d 224 (Del.2002) (footnotes omitted).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Accordingly, the burden of proving fair dealing remains with the defendants.

The preliminary issues having been decided, the Court turns next to the substantive fair dealing questions.

### B. Fair Dealing Analyzed

A fair dealing analysis requires the Court to address "issues of when the transaction was timed, how it was initiated, structured, negotiated, and disclosed to the board, and how director and shareholder approval was obtained." [FN137]

FN137. *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 937 (Del.1985).

#### 1. Timing, Initiation and Structure

Our courts have recognized that a freeze-out merger of the minority proposed by the majority stockholder is inherently coercive.[FN138] Where, as here, the freeze-out merger is initiated by the majority stockholder, that fact, even though not dispositive, is evidence of unfair dealing.

FN138. See *In re Pure Resources, Inc. S'holders Litig., supra,* 808 A.2d at 436; *Kahn v. Lynch Communication Systems, Inc., supra,* 638 A.2d at 1116.

Another circumstance that evidences the absence of fair dealing is where the transaction is timed in a manner that is financially disadvantageous to the stockholders and that enables the majority stockholder to gain correspondingly.[FN139] This case is the diametric opposite of *Jedwab v. MGM Grand Hotels, Inc.,* where this Court found that the timing of a merger was not unfair because there was no "persuasive indication ... that from the minority's point of view this [was] a particularly poor time to liquidate their investment." [FN140] Here, the evidence of unfair timing could not be more persuasive. Prosser's initial proposal was to merge Innovative into a wholly owned subsidiary of ECM. That would have benefited ECM stockholders and enabled them to remain as investors in a larger merged company. Because ECM's stock price was depressed, Prosser abandoned that proposal at the eleventh hour and "flipped"

the deal for his sole personal benefit to take advantage of the temporarily and artificially depressed stock price. That stock price then became the "floor" for the equally depressed and unfair Privatization price, and benefited Prosser to the same extent that it disadvantaged the minority stockholders who were now being squeezed out of the enterprise.

FN139. 509 A.2d 584 (Del.Ch.1986)

FN140. *Id.* at 598.

In addition to, and apart, from the unfairness of its initiation and timing, the transaction was also unfairly structured, in that Prudential and Cahill, the firms that had been retained as advisors to ECM in the initially Proposed (but later abandoned) Merger, were co-opted by Prosser to serve as his advisors. That switch was unfair to ECM, because during ECM's entire existence, Prudential and Cahill had been its advisers and they possessed material nonpublic information about ECM's values, business and prospects. As such, Prudential and Cahill were in the best position to represent the interests of the ECM minority. Those same advisers were now switching sides to represent interests that were adverse to that same minority.

*33 At a minimum, ECM's board (including Prosser) or the Special Committee should have insisted that Prudential and Cahill remain as advisors to ECM, and that Prosser retain other financial and legal advisors. Failing that, the board-or at the very least the Special Committee-should have insisted that Prudential and Cahill recuse themselves from the negotiations. By doing neither, ECM was deprived of the advantage of knowledgeable advisors. That advantage was conferred upon ECM's controlling stockholder and to-be-adversary in the transaction-Prosser. There is no evidence that either the full board or the Special Committee ever considered that issue.

#### 2. The Adequacy of the Minority Shareholders' Representation

(a) The Independence Of The Board And Of The Special Committee

A critical aspect of any fair dealing analysis is the ad-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 36
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

equacy of the representation of the minority stockhold-ers' interests. In this case, that issue is particularly crit-ical, because a majority of the ECM board members were not independent of Prosser, making it necessary to appoint a Special Committee to negotiate on the minor-ity stockholders' behalf. Unfortunately, a majority of the Special Committee members also lacked independence, and the one Committee member who arguably was inde-pendent did not function effectively as a champion of the minority's interests.

Besides Prosser, the ECM board had six members, all of whom Prosser had directly appointed: Raynor, Ramph-al, Muoio, Goodwin, Vondras, and Todman. It is undis-puted that Prosser, whose wholly-owned entity was the acquirer of ECM's minority interest, was conflicted. But, most of the remaining directors also had disabling conflicts because they were economically beholden to Prosser. Directors who "through personal or other rela-tionships are beholden to the controlling person[ ]" lack independence from that person.[FN141]

> FN141. _Aronson v. Lewis,_ 473 A.2d 805, 815 (Del.1984); _see Beam v. Stewart,_ --- A.2d ----, No. 501, 2003, Slip. Op. at 12 (Del. Mar. 31, 2004).

Raynor, who was Prosser's long time lawyer, was clearly conflicted. In 1996, 1997, and 1998, virtually one hundred percent of the legal fees that Raynor gener-ated for his law firm were attributable to work he per-formed for Prosser and Prosser-owned entities. Before 1996, the percentage of total fees represented by work Raynor performed for Prosser was always greater than fifty percent. From 1987 through 1998, ATNI and its af-filiates, and thereafter ECM and its affiliates, were the largest single client of Raynor's firm.[FN142] In 1998, the year of the Privatization, Raynor became "of coun-sel" at his firm and was put on a retainer arrangement wherein ATNCo paid compensation of $25,000 per month to Raynor, and $5,000 per month to his firm, to cover Raynor's office rental cost. That amount represen-ted all of Raynor's compensation for 1998.[FN143] Raynor also served as a Prosser nominee to the ATNI board, and as a director of Innovative, ECM, ATNCo and Vitelco.[FN144] As a highly paid consultant to, and later full-time employee of, Prosser and his companies,

Raynor was clearly beholden to Prosser and, thus, not independent.[FN145]

> FN142. Raynor Dep.(June 12, 2001) at 25-28. In 1997, Raynor's law firm, Raynor, Rensch & Pfeiffer, was paid $479,000 for legal services provided to ECM and its predecessor. JX155 at SC4176. In 1996, the firm was paid $533,000 for its legal services. JX254 at G893.

> FN143. _Id._ at 30-32.

> FN144. _Id._ at 21, 29.

> FN145. _See In re Maxxam, Inc.,_ 659 A.2d 760, 773-74 (Del.Ch.1995).

**\*34** If further evidence of non-independence were needed, in July 1998-during ECM's consideration of the Privatization proposal-Prosser agreed to pay Raynor $2.4 million over a five year period as compensation for his past services. There was no negotiation over that fee-Raynor requested $2.4 million and Prosser agreed to it. Nor was the $2.4 million compensation arrangement ever disclosed to the ECM board, Compensation Com-mittee or the Special Committee, yet Raynor voted as an ECM director to approve the Privatization.[FN146] That disclosure omission was highly material. Goodwin testi-fied that the $2.4 million payment arrangement should have been disclosed to the board.[FN147] For Raynor to have participated in the board's Privatization delibera-tions and vote as an ECM director without disclosing this contemporaneously negotiated compensation ar-rangement, was misleading to Raynor's fellow directors and a breach of his fiduciary duty owed to them and to ECM.

> FN146. JX 159; Raynor Dep. at 38-39, 61; Tri-al Tr. Vol. 10 (Prosser) 1834-36; Vol. 5 (Goodwin) 966; Vol. 7 (Vondras) 1732; Vol. 7 (Ramphal) 1444-45.

> FN147. Trial Tr. Vol. 5 (Goodwin) 966-67.

Ramphal was similarly beholden to Prosser. Ramphal was originally introduced to Prosser by his son-in-law, Sir Ronald Sanders, who had a consulting arrangement with Prosser at that time. Like Sanders, Ramphal also

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

fell into a lucrative consultancy with Prosser. In 1993 and 1994, Ramphal was paid consulting fees of $140,000 in both years, and in 1995 he was paid $120,000. On average, those amounts represented 22.5% of Ramphal's total income for that period.[FN148] Those amounts were in addition to the $30,000 directors' fee that Ramphal received annually.[FN149] Moreover, in 1998, Ramphal received $115,000 for his service on the ECM Board and special committees.[FN150]

> [FN148.] Trial Tr. Vol. 7 (Ramphal) 1386-87; Ramphal Dep. 33-34.

> [FN149.] Ramphal Dep. at 34.

> [FN150.] Trial Tr. Vol. 7 (Ramphal) 1390.

Given these undisputed facts, the defendants have not shown that Ramphal was independent of, *i.e.,* not beholden to, Prosser, and the Court affirmatively finds that he was not.[FN151] That finding is strengthened by the fact that the consulting arrangement of Ramphal's son-in-law, Sanders, with Prosser would be put at risk if Ramphal, as a Special Committee member, took a position overly adversarial to Prosser.[FN152] Finally, both Sanders and Ramphal were appointed as directors of Innovative after the Privatization had been completed.[FN153]

> [FN151.] *See Kahn v. Tremont Corp.,* 694 A.2d 422, 430 (Del.1997) (purportedly "independent" director found beholden to majority stockholder where, three years previously, company had retained his consulting services for $10,000 per month and more than $325,000 in bonuses); *Kahn v. Dairy Mart Convenience Stores, Inc.,* No. 12489, 1996 WL 159628, at *6 (Del. Ch. Mar 29, 1996) (holding that consulting agreement may render independent director too beholden to management to remain independent).

> [FN152.] *See Harbor Fin. Partners v. Huizenga,* 751 A.2d 879, 889 (Del.Ch.1999) (a director has a disabling conflict where the director's decision could advance economic or career opportunities of a family member).

> [FN153.] Trial Tr. Vol. 7 (Ramphal) 1422; Ramphal Dep. 17, 35-36, 58.

Muoio was also a consultant to a Prosser entity and beholden to Prosser. As of mid-1997, Muoio was on an annual $200,000 retainer for providing banking/financial advisory services,[FN154] and he viewed Prosser as a source of additional future lucrative consulting fees. In March 1998, Muoio sought up to an additional $2 million for serving as financial adviser on a potential acquisition by ECM of CoreComm Inc. That effort was unsuccessful only because the acquisition ultimately never took place.[FN155]

> [FN154.] JX 144 at EC22472

> [FN155.] Muoio Dep. at 16-17.

Lastly, Goodwin, Vondras and Todman received annual directors' fees of $100,000, a generous amount given that ECM's board met only three or four times in 1998.[FN156] Goodwin and Vondras each also received $50,000 and $15,000 for their service on the Special Committee.[FN157] The $115,000 Vondras received in 1998 for serving on ECM's board and Special Committee represented approximately 10% of his income for that year.[FN158]

> [FN156.] Trial Tr. Vol. 7 (Ramphal) at 1390; Muoio Dep. 18.

> [FN157.] JX 140 at EC5950.

> [FN158.] Trial Tr. Vol. 7 (Vondras) 1288-89, 1376.

*35 Although the directors' fees received by Goodwin, Vondras and Todman would not, without more, necessarily constitute a disabling financial interest,[FN159] the record shows that all three of these directors-indeed, all of the board defendants-expected to continue as directors of Prosser entities and benefit from the substantial compensation which accompanied that status. In fact, all of ECM's directors except Muoio were appointed to the Innovative board after the Privatization. That expectation, coupled with the fact that his director and committee fees represented a sizeable portion of his income, was sufficient to vitiate Vondras' independence

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

for purposes of considering objectively whether the Privatization was fair to the minority stockholders.

FN159. *Grobow v. Perot,* 526 A.2d 914, 923, n. 12 (Del.Ch.1987), *aff'd,* 539 A.2d 180 (Del.1988).

The director defendants claim that they did not know they would be invited to join the Innovative board after the Privatization closed in October 1998. The evidence shows otherwise. During the negotiations over the Privatization, the ECM directors were told that they would continue on with the company "in its new incarnation." FN160 The Merger Agreement generated by the board's counsel in connection with the Privatization disclosed that the board defendants would remain directors of the surviving corporation. The Special Committee, through its counsel, received drafts of that Merger Agreement as early as July 17, 1998, before they voted to approve the transaction.FN161

FN160. Goodwin Dep. Oct. 19, 2001 at 5.

FN161. JX155 at SC4236; SC4111.

In summary, the Court finds that a majority of the full board of ECM (Prosser, Raynor, Ramphal, Vondras, and Muoio) were beholden to Prosser and, thus, were not independent of him. The Court further finds that a majority of the Special Committee (Ramphal and Vondras) were beholden to, and therefore not independent of, Prosser, leaving Goodwin as the only arguably independent Committee member and Todman as the only arguably independent non-Committee director. As previously found, Goodwin, as Committee chair, did almost all of the Committee's work himself. Unfortunately, the work that Goodwin performed in that role, including his negotiations with Prosser, were fatally compromised and, consequently, inadequate to represent the interests of ECM's minority shareholders effectively.FN162

FN162. As former Justice (then Vice Chancellor) Hartnett appropriately observed in *Lewis v. Fuqua,* 502 A.2d 962, 967 (Del.Ch.1985), in addressing the independence of a special litigation committee appointed to review a derivative action, "[i]f a single member committee is to be used, the member should, like Caesar's

wife, be above reproach." Here, as in *Fuqua,* Goodwin's "past and present associations raise a question of fact as to his independence" (502 A.2d at 967), which, given the burden of proof, would ordinarily be resolved against Goodwin's independence. The Court assumes, without deciding, however, that Goodwin was independent, but nonetheless concludes on other grounds that the Special Committee was not an effective representative of the minority stockholders' interests.

*(b) The Committee's Ineffectiveness As The Minority's Representative*

There are several reasons why Mr. Goodwin's efforts as the Special Committee's chairman, and as its sole functioning member, were doomed to failure.

The first is that Prosser withheld the June projections, and knowledge of their existence, from the Committee and its advisors, Houlihan and Paul Hastings. As a consequence, Goodwin and Houlihan were deprived of information that was essential to an informed assessment of the fair value of ECM and of the gross inadequacy of merger price Prosser was offering. Thus disabled, Goodwin was not in a position to negotiate vigorously for a substantial increase in Prosser's opening offer ($9.125 per share) or, alternatively, to make a considered judgment to shut down the negotiations, thereby preventing the Privatization from going forward at all. That nondisclosure, without more, was enough to render the Special Committee ineffective as a bargaining agent for the minority stockholders.

*36 Second, Prosser misled Goodwin by falsely representing that $10.25 per share was already straining the limits of the financing available to him. In fact, Prosser's financing would have enabled him to increase his offer to $11.40 per share, and the record evidence indicates that the RTFC was willing to lend him more, based on its implied valuation of ECM as conservatively worth about $28 per share.FN163 There is no evidence that Goodwin knew of Prosser's financing arrangements or the RTFC's valuation (for merger financing purposes) of ECM.

FN163. *See* Reed Dep. Mar. 16, 2000 at

162-53, 171; Prosser Dep. June 7, 2000 at 93-96; JX 167 at RTFC 698, 720. That is not to suggest that the level at which the deal could be financed is a measure of ECM's fair value. Any such suggestion would be contrary to Delaware law and to the fair value determinations in this case. *See Smith v. Van Gorkom, 488 A.2d 858, 890-891 (Del.1985)* (holding that price at which a leveraged buy-out of a corporation was financially feasible was not determinative of the corporation's fair value). The import of this nondisclosure is that it evidences Prosser's intent to deprive the Special Committee of any real utility as a bargaining agent for the ECM minority.

Third, and finally, Goodwin was careless, if not reckless, by routing all of his communications with the other Special Committee members through Eling Joseph, Prosser's secretary. The result was to give Prosser access to the Committee's confidential deliberations and strategy. That inexplicable method of channeling communications to Goodwin's fellow Committee members further confirms the severe information imbalance that existed between the two "bargaining" sides. In fact, there was no effective bargaining, because Prosser held all the cards and misled Goodwin into believing that he (Goodwin) and the Committee's financial advisor (Houlihan), possessed all the information that was material to negotiating a fair price. Nothing could have been further from the truth.

### 3. The Adequacy of the Board And Shareholder Approvals

The fourth and final aspect of fair dealing concerns the adequacy of the board and shareholder approvals of the challenged transaction. In this case, those approvals were uninformed and, accordingly, of no legal consequence.

It is undisputed that the Privatization was approved by a unanimous vote of all ECM directors, with Prosser abstaining, at a board of directors' meeting held on August 17, 1998.[FN164] The board's approval was not informed, however, because the voting board members were ignorant of the existence of the June Projections

and of the inadequacy of the Houlihan valuation that was based upon the March projections.

FN164. JX 33.

Moreover, Raynor, who was conflicted, voted in favor of the Privatization but did not disclose to the other voting board members, the $2.4 million compensation payout arrangement that he had recently negotiated with Prosser. As previously found, that nondisclosure was material.

By not disclosing these facts, Prosser and Raynor violated the fiduciary duty of disclosure they owed to their fellow directors of ECM.[FN165]

FN165. *Weinberger v. UOP, Inc.,* supra, 457 A.2d 701.

The approval of the transaction by a majority of the minority shareholders was also legally ineffective, because the misdisclosures and omissions in the disclosure documents sent to shareholders in connection with the Privatization rendered that vote uninformed. Those misdisclosures and omissions also violated the fiduciary duty of disclosure owed by ECM's majority stockholder and by the ECM directors who were responsible for the accuracy of those documents.[FN166] The plaintiffs claim several disclosure violations, but the Court need address only three of them.

FN166. *Id.,* see also *Lynch v. Vickers Energy Corp.,* 383 A.2d 278 (Del.1977).

*37 First, the Proxy Statement omitted to disclose to the minority shareholders the existence of the June projections and the fact that those projections had been furnished to Prudential and the RTFC, but were withheld from the Special Committee and its advisors. That omission was materially misleading, not only in its own right but also because the proxy statement contained affirmative representations that the public was being provided with the same projections to which Prosser was privy. The section of the proxy statement containing the March projections (identified there only as "Company projections") disclosed that "[a]lthough the company does not as a matter of course publicly disclose projections as to future revenues or earnings, be-

cause they were received by Mr. Prosser and the parent [ICC, LLC], the purchaser [ICC] is making these projections available to all stockholders."[FN167] Those misdisclosures were highly material because knowledge of the June projections would have enabled the shareholders to understand ECM's intrinsic worth and the extent of the market's undervaluation of their company.

FN167. JX 155 at SC4128.

Second, the disclosure documents misled minority stockholders about the Special Committee's and the board's independence from Prosser. The Schedule 14D-9, which was disseminated in connection with the first-step tender offer, disclosed the members of the Special Committee and their compensation, but not their consulting relationships or retainer agreements with other Prosser entities.[FN168] Specifically, there was no disclosure of Raynor's or Ramphal's long-standing financial relationships with Prosser, including Raynor's $2.4 million payout arrangement for past services and Ramphal's significant consulting arrangements or his conflict concerning the economic and career prospects of his son-in-law. Nor was there disclosure of Muoio's consulting fee arrangement that had resulted in payments to him of hundreds of thousands of dollars. Also, because of their role as negotiators on behalf of the minority stockholders, the prior consulting relationships of Ramphal should have been disclosed.[FN169] The disclosure documents misleadingly suggested that the Special Committee, and perhaps a majority of the entire board, were independent. In fact, that was not true.

FN168. JX 251 at SC 4288-89; see also JX155 at SC4108-09.

FN169. See Clements v. Rogers, 790 A.2d 1222, 1242-43 (Del.Ch.2001).

Third, that disclosure violation was compounded by the false disclosure that a majority of the board that approved the Privatization were members of the Special Committee.[FN170] In fact, only six of the board's seven members voted to approve the transaction,[FN171] and only three of those six were members of the Special Committee. Three is not a majority of seven. Also not disclosed was the related fact that ECM's and the Committee's original advisors who had been retained to rep-

resent the interests of all shareholders in the initially Proposed (but later abandoned) Merger, had been co-opted by Prosser and were now working against the minority stockholders whose interests that they were originally hired to further.

FN170. JX251 at SC4295.

FN171. JX33.

*38 In short, the disclosure documents were crafted to reassure the minority stockholders that their interests had been effectively represented by a Special Committee of directors who were independent of Prosser and his entities on the other side of the transaction. That impression was materially false and misleading and was sufficient, without more, to render the approving vote of the stockholders uninformed.[FN172]

FN172. See Clements v. Rogers, 790 A.2d 1222, 1242-43 (Del.Ch.2001) (accuracy of disclosures concerning the independence and effectiveness of a special negotiating committee are of particular importance were the transaction is with a controlling stockholder).

For all these reasons, the Court finds that the Privatization transaction, and the $10.25 per share merger price that has been adjudicated as unfair, were the product of unfair dealing. Accordingly, the Court concludes that the Privatization was not entirely fair to the minority stockholders of ECM. Having so found, the Court must now assess the liability consequences of that determination.

## V. THE DEFENDANTS' FIDUCIARY DUTY BREACHES AND LIABILITY THEREFOR

Having concluded that the Privatization was not entirely fair, the Court must next determine the nature of the fiduciary duty violation-whether of care, loyalty, or good faith-that resulted in the unfair transaction.[FN173] Under Emerald Partners v. Berlin,[FN174] that is necessary to enable the Court to adjudicate which (if any) of the director defendants is liable for money damages, because ECM's § 102(b)(7) charter provision exculpates those directors found to have violated solely their duty of care from liability for money damages. Article Sev-

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 41

enth of ECM's Certificate of Incorporation provides:

> FN173. That determination is required only for purposes of the fiduciary duty class action, not the appraisal. As the Court has found, the defendant that is solely liable in the appraisal proceeding is the surviving corporation in the merger, *i.e.,* Innovative. That entity is liable to Greenlight for $38.05, plus interest, for each ECM share for which appraisal was sought.

> FN174. 787 A.2d 85 (Del.2001).

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit.[FN175]

> FN175. Pretrial Stipulation and Order, ¶ 164, at p.20.

By its terms, Article Seventh does not apply to fiduciaries other than directors. Thus, Article Seventh does not apply to Prosser in his capacity as ECM's controlling stockholder, or to ICC or Innovative, the entities that Prosser controlled and through which he effected the Privatization. Prosser, as majority stockholder, breached his duty of loyalty to Greenlight and the plaintiff shareholder class, by eliminating ECM's minority stockholders for an unfair price in an unfair transaction that afforded the minority no procedural protections. For that breach of duty Prosser is liable to Greenlight and the shareholder class. So also are the two Prosser-controlled entity defendants, Innovative and ICC, which were the mechanisms through which Prosser accomplished the Privatization. Those entities are liable for having aided and abetted Prosser's breach of fiduciary duty.[FN176]

> FN176. *Weinberger v. Rio Grande Industries, Inc.,* 519 A.2d 116 (Del.Ch.1986); *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del.Ch.1984). One of the requirements for "aiding and abet-

ting" liability is the third party's "knowing participation" in the directors' breach of fiduciary duty. In that case, Prosser's knowledge must be attributed to the entities that he controlled and used to effectuate his breaches of duty.

The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director.

*39 Prosser is liable in his capacity as a director for breach of his duty of loyalty, conduct that is not exculpated under Article Seventh. Prosser is also liable on the basis that he "derived an improper personal benefit" from the Privatization transaction-which is another exception to the exculpatory coverage of Article Seventh.

Raynor also is liable for breaching his fiduciary duty of loyalty-conduct that is excluded from the exculpatory shield of Article Seventh. Raynor did not personally and directly benefit from the unfair transaction (as did Prosser), but Raynor actively assisted Prosser in carrying out the Privatization, and he acted to further Prosser's interests in that transaction, which were antithetical to the interests of ECM's minority stockholders.

Raynor acted in concert with Prosser, who was the source of Raynor's livelihood, to "flip" the transaction from a merger of Innovative into ATNCo, to a going private merger of ECM into Innovative.[FN177] Raynor also assisted Prosser and Innovative in obtaining RTFC financing for the Privatization [FN178] at the time when Raynor was still serving on the First Special Committee, ostensibly to safeguard the interests of ECM's minority stockholders.[FN179] After the Second Special Committee was formed, Raynor attended a meeting with Prosser and two ECM officers and the RTFC to discuss issues relating to the structuring of the revised deal.[FN180] Finally, on July 20, 1998, Opus Capital Partners ("Opus") sent a letter to Goodwin, complaining that the initial $9 .125 price was too low and should be around $30.[FN181] This letter was somehow "leaked" to Cahill, Prudential, and Raynor,[FN182] and Raynor reported the contents of the Opus letter to the RTFC, editorializing that "Opus-biggest [shareholder with] dissenting opinion on buy back bought in @$6 or $7/share [but] be-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 42

lieves should be valued @ $30 per share." [FN183]

    FN177. JX155 at SC4110; Raynor Dep. 171-173.

    FN178. JX184 at RTFC1474.

    FN179. Trial Tr. Vol. 10 (Prosser) at 1796-97.

    FN180. JX 187 at RTFC5145-46.

    FN181. JX 32.

    FN182. JX 280; JX 106; JX 186 at RTFC5135.

    FN183. JX 186 at RTFC5135; Reed Dep. 153.

Although Raynor did not benefit directly from the transactions, his loyalties ran solely to Prosser because Raynor's economic interests were tied solely to Prosser and he acted to further those economic interests. Accordingly, Raynor is liable to Greenlight and the shareholder class for breaching his fiduciary duty of loyalty and/or good faith. [FN184]

    FN184. The Court employs the "and/or" phraseology because the Delaware Supreme Court has yet to articulate the precise differentiation between the duties of loyalty and of good faith. If a loyalty breach requires that the fiduciary have a self-dealing conflict of interest in the transaction itself, as at least one commentator has suggested, then only Prosser is liable on that basis. Raynor would be liable for violating his duty of good faith for consciously disregarding his duty to the minority stockholders. See Hillary A. Sale, *Delaware's Good Faith,* 89 Cornell L.Rev. 456 (2004). On the other hand, if a loyalty breach does not require a self-dealing conflict of interest or receipt of an improper benefit, then Raynor would be liable for breaching his duties of loyalty *and* good faith. See *Strassburger v. Earley,* 752 A.2d 557 (Del.Ch.2000) (director whose conduct in a transaction evidences loyalty solely to employer whose interests were adverse to the corporation held to have violated his duty of loyalty). The Court need not decide that definitional issue, because under either definition, Raynor's

conduct amounted to a non-exculpated breach of fiduciary duty.

The Court also concludes, albeit with reluctance, that Muoio is similarly liable, even though Muoio's conduct was less egregious than that of Prosser and Raynor. Unlike Raynor, Muoio did nothing affirmatively to assist Prosser in breaching his fiduciary duties of loyalty and good faith. Like his fellow directors, Muoio was also not independent of Prosser.

Muoio is culpable because he voted to approve the transaction even though he knew, or at the very least had strong reasons to believe, that the $10.25 per share merger price was unfair. Muoio was in a unique position to know that. He was a principal and general partner of an investment advising firm, with significant experience in finance and the telecommunications sector. From 1995 to 1996, Muoio had been a securities analyst for, and a vice president of, Lazard Freres & Co. in the telecommunications and media sector. From 1985 to 1995, he was a securities analyst for Gabelli & Co., Inc., in the communications sector, and from 1993 to 1995, he was a portfolio manager for Gabelli Global Communications Fund, Inc. [FN185]

    FN185. Pretrial Stip. and Order, ¶ 's 40-42.

\*40 Hence, Muoio possessed a specialized financial expertise, and an ability to understand ECM's intrinsic value, that was unique to the ECM board members (other than, perhaps, Prosser). Informed by his specialized expertise and knowledge, Muoio conceded that the $10.25 price was "at the low end of any kind of fair value you would put," [FN186] and expressed to Goodwin his view that the Special Committee might be able to get up to $20 per share from Prosser. [FN187] In these circumstances, it was incumbent upon Muoio, as a fiduciary, to advocate that the board reject the $10.25 price that the Special Committee was recommending. As a fiduciary knowledgeable of ECM's intrinsic value, Muoio should also have gone on record as voting against the proposed transaction at the $10.25 per share merger price. Muoio did neither. Instead he joined the other directors in voting, without objection, to approve the transaction.

    FN186. Muoio Dep. at 175.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN187. Goodwin Dep. Sept. 6, 2001 at 47.

ECM's directors other than Prosser and Raynor could plausibly argue that they voted for the transaction in reliance on Houlihan's opinion that the merger term price was fair. In Muoio's case, however, that argument would be implausible. Muoio's expertise in this industry was equivalent, if not superior, to that of Houlihan, the Special Committee's financial advisor. That expertise gave Muoio far less reason to defer to Houlihan's valuation. Knowing (or at least having very strong reasons to suspect) that the price was unfair, why, then, would Muoio vote to approve this deal? The only explanation that makes sense is that Muoio, who was seeking future business opportunities from Prosser, decided that it would disserve his interests to oppose Prosser and become the minority's advocate.

Admittedly, divining the operations of a person's mind is an inherently elusive endeavor. Concededly, the possibility exists that Muoio's decision was driven not by his overriding loyalty to Prosser, but by a sincere belief that the $10.25 price was minimally fair, even if not the fairest or highest price attainable. But in this case that possibility is not sufficient to carry the day, because to establish a director's exculpation from liability under 8 Del. C. § 102(b)(7), the burden falls upon the director to show that "[his] failure to withstand an entire fairness analysis is *exclusively* attributable to a violation of the duty of care."[FN188] Muoio has not carried that burden.

FN188. *Emerald Partners v. Berlin,* 787 A.2d at 98 (italics added).

The credible evidence persuades the Court that Muoio's conduct is explainable in terms of only one of two possible mindsets. The first is that Muoio made a deliberate judgment that to further his personal business interests, it was of paramount importance for him to exhibit his primary loyalty to Prosser. The second was that Muoio, for whatever reason, "consciously and intentionally disregarded" his responsibility to safeguard the minority stockholders from the risk, of which he had unique knowledge, that the transaction was unfair.[FN189] If motivated by either of those mindsets, Muoio's conduct would have amounted to a violation of his duty of loyalty and/or good faith.[FN190] Because Muoio has not

established to the satisfaction of the Court, after careful scrutiny of the record, that his motivation was of a benign character, he is not exculpated from liability to Greenlight and the shareholder class.

FN189. *See In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 289 (Del.Ch.2003).

FN190. *See* note 184, *supra.*

*41 That leaves the four remaining directors-Goodwin, Ramphal, Todman, and Vondras-whose conduct, while also highly troublesome, is far more problematic from a liability standpoint than that of Prosser, Raynor, and Muoio. Like Raynor and Muoio, those directors (except possibly Goodwin) were not independent of Prosser, they all voted for the Privatization, and none had a personal conflicting financial interest in, or derived a personal benefit from, that transaction to the exclusion of the minority stockholders.

The conduct of these four directors differs from that of Raynor and Muoio, in that there is no evidence that any of those four affirmatively colluded with Prosser to effectuate the Privatization, or that they otherwise deliberately engaged in conduct disloyal to the minority stockholders' interests. Nor have the plaintiffs shown that any of those directors knew or had reason to believe, that the merger price was unfair.

This is not intended to suggest that these directors covered themselves in glory, or merit commendation, for the manner in which they discharged their responsibility as fiduciaries. But it is to say, and this Court after considerable reflection finds, that there is no persuasive evidence that the fiduciary violations of the ECM directors other than Prosser, Raynor, and Muoio implicated conduct more egregious than breaches of their duty of care.

A logical starting point in the analysis is first to consider the conduct of the members of the Second Special Committee: Goodwin, Ramphal and Vondras. Because Ramphal was located in London and Vondras in Indonesia, they never met in person with each other or with Goodwin, who became the Committee's sole working member. Put differently, all Committee initiatives and decisions were made initially by Goodwin, subject to

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

concurrence by Ramphal and Vondras, who on all relevant issues willingly deferred to Goodwin and relied upon his recommendations, both as to the Committee's process and the transaction price.

Although Goodwin negotiated a merger price ($10.25 per share) that this Court has found to be unfair, there is no persuasive evidence that Goodwin knew or should have known that this was the case. Primarily, that is because critical information was withheld from Goodwin, from the other Committee members, from and their financial advisor, Houlihan. Based upon information that in material respects was incomplete, Houlihan opined that the negotiated price was fair, and there is no evidence that Goodwin, who had negotiated the price with Prosser, had reason to believe otherwise.

This is not to say that Goodwin carried out this process with the care that would be expected of someone of his distinguished background and accomplishments. No justification has been shown for Goodwin communicating with the other Committee members through Ms. Joseph, the secretary of the minority stockholders' negotiating adversary, Prosser. That misstep constituted a violation of Goodwin's duty of care and resulted in critical information being leaked to the other side. But, that fiduciary breach was of no actionable consequence, because Goodwin had all along been deprived of material information that both he and Houlihan needed to negotiate a fair price. Consequently, even if Goodwin had maintained adequate security arrangements, there is no basis to conclude that the result would have been any different.

*42 The plaintiffs insist, however, that Goodwin's fiduciary violations were of a character far more egregious than duty of care violations. Plaintiffs urge that: (1) Goodwin (as well as Ramphal and Vondras) were financially not independent of Prosser and were motivated to do whatever was needed to remain in Prosser's good graces, (2) Goodwin willingly acceded to retaining the Special Committee's legal and financial advisors from among candidates that had been selected by Prosser or his advisors, (3) Goodwin's "negotiations" with Prosser were nothing more than a scripted minuet wherein Goodwin, on behalf of the Committee, would bargain for a negligible price increase, (4) that bargaining,

coupled with the gilt-edged credentials of all three Committee members, would create a credible record of "arm's length" negotiations sufficient to survive entire fairness review. Goodwin's decision to route his communications through Ms. Joseph was, plaintiffs argue, further dramatic evidence that his true loyalties were to serve Prosser and his interests. This conduct, plaintiffs insist, violated Prosser's (and Ramphal's and Vondras's) fiduciary duties of loyalty and/or good faith-conduct that is not exculpated under Article Seventh.

It is correct (and this Court has found) that with the possible exception of Goodwin, none of the Committee members was independent of Prosser, that viewed with perfect hindsight the magnitude of the negotiated price increase was negligible, and that Goodwin permitted his communications with Ramphal and Vondras to be routed through Prosser's secretary. In quite different circumstances that might establish a violation of the duties of good faith and/or loyalty, especially since the burden of establishing exculpation falls upon the directors seeking exculpation. But here that procedural burden does not help the plaintiffs, because the evidence, viewed as a whole, fails to establish a *prima facie* case of bad faith or disloyalty that these directors would be called upon to negate or disprove.

More specifically, although Goodwin, Ramphal and Vondras, because of their relationship to Prosser, might have been motivated to aid Prosser in his scheme to force out ECM's minority at an unfair price, there is no evidence that they actually engaged in such improperly motivated conduct, or otherwise acted with disloyal intent. To be sure, Goodwin's conduct may fairly be described as having violated his duty of care. And, given the non-independence of Ramphal and Vondras, their wholesale abdications to Goodwin of their responsibility as Committee members to take an active and direct role in the process, also bespeaks a failure to observe the requisite due care.[FN191] But negligent or even gross negligent conduct, however misguided, does not automatically equate to disloyalty or bad faith. There is no evidence that Goodwin, Ramphal and Vondras intentionally conspired with Prosser to engage in a process that would create the illusion, but avoid the reality, of arm's length bargaining to obscure the true purpose of benefiting Prosser at the expense of the minority stock-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 45

holders.

> FN191. *See Cede & Co. v. Technicolor, Inc.,*
> *634 A.2d 345, 368 (Del.1993)* ("[W]e have
> stated that a director's duty of care requires a
> director to take an active and direct role in the
> context of a sale of a company from beginning
> to end.")

*43 Nor, in these circumstances, did those directors'
conduct amount to a breach of their fiduciary duty to act
in good faith. Although the Supreme Court has yet to
define the precise conduct that would actionably violate
that duty, this Court has recently held that directors can
be found to have violated their duty of good faith if they
*"consciously and intentionally disregard[ ] their re-*
*sponsibilities,* adopting a 'we don't care about the risks'
attitude concerning a material corporate decision."
FN192 Here, there is no evidence that Goodwin,
Ramphal, or Vondras acted with conscious and inten-
tional disregard of their responsibilities, or made de-
cisions with knowledge that they lacked material in-
formation. Because the conduct of those director de-
fendants was, solely and at most; a violation of their
duty of care, they are exculpated from liability under
Article Seventh.

> FN192. *In re Walt Disney, 825 A.2d at 289*
> (italics in original). Elaborating on that formu-
> lation, the Chancellor observed that directors
> actionably violate their duty of good faith if
> they *"knew* that they were making material de-
> cisions without adequate information and
> without adequate deliberation, and ... they
> simply did not care if the decisions caused the
> corporations and its stockholders to suffer in-
> jury or loss." *Id.*

The foregoing analysis and conclusion are equally ap-
plicable to the seventh director, Todman. The circum-
stance that differentiates Todman from Goodwin,
Ramphal and Vondras is that Todman played no role in
the negotiation of the merger terms, his sole involve-
ment being to cast his vote as a director in favor of the
Privatization. Because (unlike Muoio) there is no evid-
ence that Todman knew or had reason to suspect that
the price was unfair, it may fairly be concluded that he

voted for the transaction in reliance upon the pro-
nouncements by Houlihan and the Special Committee
that the merger price was fair. Accordingly, it serves no
purpose for the Court to determine whether or not Tod-
man's conduct amounted to a breach of his duty of care,
because in either case the record evidence compels the
finding that Todman committed no violation of his duty
of loyalty or his duty of good faith. Accordingly, Tod-
man is not liable, either because he has not been shown
culpable in any respect, or because at most his conduct
would have amounted to a breach of his duty of care,
for which Todman would be exculpated under Article
Seventh.

### VI. CONCLUSION

For the reasons set forth above:

(1) In the appraisal action, Innovative, as the surviving
corporation, is liable to Greenlight in the amount of
$38.05 per share for each of the 750,300 shares that are
subject to the appraisal, plus interest at the rate of
6.27%, compounded monthly, from the date of the mer-
ger to the date of the judgment.

(2) In the fiduciary duty action, defendants Innovative,
ICC, Prosser, Raynor and Muoio are jointly and sever-
ally liable to the plaintiff class and to Greenlight (in its
capacity as holder of litigation rights assigned by
former ECM shareholders) in an amount equal to
$27.80 per share.FN193

> FN193. $27.80 per share is equal to the differ-
> ence between the fair value of ECM on the
> merger date ($38.05 per share) and the merger
> price paid to the ECM minority shareholders
> ($10.25 per share).

Counsel shall confer and submit an agreed form of Final
Order and Judgment implementing the rulings made in
this Opinion.

Del.Ch.,2004.
In re Emerging Communications, Inc. Shareholders Lit-
igation
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit "B-2"**
**Raynor's Response to the Nebraska Bar Association in re the Grievance**

# RAYNOR, RENSCH & PFEIFFER

ATTORNEYS AT LAW
10110 NICHOLAS STREET • SUITE 102
OMAHA, NEBRASKA 68114
(402) 498-4400
FAX (402) 498-0339

TERRY L. HADDOCK
PATRICK M. HENG
JOHN J. KOHL
WILLIAM E. PFEIFFER
RICHARD J. RENSCH
KELLE J. WESTLAND
TODD FRAZIER
SEAN P. RENSCH

OF COUNSEL
JOHN P. RAYNOR

COLUMBUS OFFICE
1470 25TH AVE.
COLUMBUS, NE 68601
(402) 562-7759

October 26, 2007

Dennis G. Carlson, Esq.
Counsel for Discipline
3808 Normal Blvd.
Lincoln, NE 68506

RE: Grievance of Attorney Toby Gerber

Dear Mr. Carlson:

Mr. Gerber, in his grievance, charges me with a violation of Nebraska Rules of Professional Conduct, specifically, Rule 4.2. The Rule states:

"RULE 4.2 COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order."

My response to the complaint is being *limited* to the above cited rule. *If there is any further matter that you seek clarification on or that you are considering please notify me and I will be happy to respond.*

There are three reasons why this complaint should be dismissed. Each reason is addressed in a separate section of this letter. For purposes of this letter there are a few basic definitions and relationships that must be taken into consideration to understand the full import of this response.

Dennis G. Carlson, Esq.
October 26, 2007
Page 2 of 11

"RTFC" means the Rural Telephone Cooperative Finance Corporation, a cooperative originally formed under the laws of South Dakota and presently legally domiciled in the District of Columbia.

"CFC" means the National Rural Utilities Cooperative Finance Corporation, a cooperative formed under the laws of the District of Columbia.

"Letter" means the letter which is the subject of the grievance.

"SOX" means the Sarbanes-Oxley Act of 2002.

RTFC's patrons are rural telephone companies. RTFC patrons are NOT members of CFC nor are they patrons of CFC.

CFC's patrons are (i) rural electric companies and (ii) RTFC.

CFC dominates and controls RTFC. Attached hereto as Exhibit "1" is a memo outlining the CFC relationship to RTFC.

Fulbright refers to Fulbright & Jaworski L.L.P., a law firm.

Patronage Capital Misappropriation Scheme means CFC's use of its dominance and control over RTFC to trap RTFC's earnings within CFC and then, in contravention of CFC's own bylaws, allocate patronage capital rightfully belonging to RTFC to electric utility members of CFC.

With the above in mind, I now address the grievance.

## I
## I WAS NOT ACTING IN A REPRESENTATIVE CAPACITY

The Letter was addressed to the "Financial Expert" of CFC's Audit Committee in my capacity as a member of the Board Directors of Innovative Communication Corporation ("ICC"). I had not undertaken the representation in litigation of ICC or any director of ICC at the time the letter at issue was sent. Indeed, the letter was frank as to the reasons I was writing the letter when it stated in the first paragraph that:

> "I am writing an open letter to you because of your respective legal obligations as a board member who qualifies as an Audit Committee Financial Expert as defined by the Securities and Exchange Commission."

Dennis G. Carlson, Esq.
October 26, 2007
Page 3 of 11

      I was involved in the acquisition of the corporation, the Virgin Islands Telephone Corporation ("Vitelco") in 1987 in which the predecessor to ICC was formed. Since that date, I have been an outside consultant for ICC and Vitelco serving on the Board of ICC and its predecessor since 1987 until recently. The following is a list of positions that I held with ICC's telecommunications companies:

| | |
|---|---|
| Emerging Communications, Inc. (a Delaware corporation) | Director |
| Innovative Communication Corporation (a U.S. Virgin Islands corporation) | Director |
| Virgin Islands Telephone Corporation (a U.S. Virgin Islands corporation) | Director |
| Valvision SAS (a French corporation) | President and Director |
| St. Martin Mobile S.A. (a French corporation) | Director |
| World Satellite Guadeloupe S.A. (a French corporation) | President and Director |
| Martinique TV Cable S.A. (a French corporation) | President and Director |
| Cable Evasion 86 S.A. (a French corporation) | President and Director |
| ICC France S.A. (a French corporation) | Director |

From that date through the date of the Letter, I never represented ICC or any of its affiliates as an attorney in representative capacity in any litigation whatsoever. I have negotiated acquisition contracts, negotiated loans with the Rural Telephone Cooperative Finance Corporation ("RTFC") (a coop under the domination and control of CFC), served as a "special projects" coordinator for ICC, and as a resource (as management would serve) for attorneys acting in a representative capacity.

      Fulbright notes that my letterhead used for the Letter identifies me as an attorney. I ask you to consider the implications of writing such a letter and not identifying myself as an

Dennis G. Carlson, Esq.
October 26, 2007
Page 4 of 11

attorney. In my opinion, to do so would be deceptive. Further, use of my Credential is permitted under the First Amendment to the U.S. Constitution.

The Letter was written in good faith hoping that the advent of a Financial Expert finally assuming office on March 31, 2007 would result in an "independent" Audit Committee that would in fact perform their appointed task and investigate the underlying accounting problems. Never did I threaten to sue or otherwise hold the Financial Expert accountable.

## II
## PUBLIC POLICY AS ENACTED IN SOX
## ENCOURAGES SUCH LETTERS

CFC publicly invites such comments as to the subject matter set forth in the Letter. SOX § 301 adding 15 U.S.C. § 78f(m)(4) provides:

COMPLAINTS.--Each audit committee shall establish procedures for--

"(A) the **receipt, retention, and treatment of complaints** received by the issuer regarding accounting, internal accounting controls, or auditing matters; and

"(B) the confidential, anonymous submission by employees of the issuer of concerns regarding questionable accounting or auditing matters. (Emphasis Added).

SOX required public companies (such as CFC) to make numerous changes in corporate governance to prevent corporate fraud. As to the Audit Committees, SOX required a number of changes to assure that Audit Committees were in fact independent and further, established audit committees as the gatekeepers against corporate fraud. For instance, SOX requires:

    a.    Audit committees are directly responsible for the appointment and oversight of accounting firms (15 U.S.C. § 78f(m)(2));
    b.    Audit committees members to be independent (15 U.S.C. § 78f(m)(3));
    c.    Audit committees are to receive and investigate complaints related to accounting and auditing complaints (15 U.S.C. § 78f(m)(4));
    d.    Audit committees are to have authority to engaged independent advisors (15 U.S.C. § 78f(m)(5));
    e.    Audit committees are to be adequately funded (15 U.S.C. § 78f(m)(6)); and
    f.    The law directed the Commission to adopt rules mandating that each audit committee has at least one "Financial Expert" (SOX § 407 implemented by 17 C.F.R. § 229.407, Instructions to Item 407(c)(3), Paragraph (5)).

CFC's invitation to make comments on matters affecting the financial reporting superficially

Dennis G. Carlson, Esq.
October 26, 2007
Page 5 of 11

complies with one aspect of SOX. CFC's web site implements the foregoing requirements by having the following announcement:

> **"Contact Us**
>
> We have a number of ways for members, investors and the general public to share their concerns or complaints about accounting, internal accounting controls or auditing at CFC. Comments or concerns can be sent to the Board of Director's Audit Committee Chairman at CorporateCompliance@nrucfc.coop." SEE http://www.nrucfc.coop/aboutcfc/howWeOperate.htm

The web page goes further by setting forth the address to write to CFC's Audit Committee.

The general rule is that a contract is against public policy if it is injurious to the interests of the public, or contravenes some established interest of society or some public statute, or is against good morals, or tends to interfere with the public welfare. SEE *Canal Ins. Co. v. Ashmore*, 126 F.3d 1083, at 1087, C.A.8 (Ark.), 1997. Congress has determined that it is in the public interest (i) to have Audit Committees responsible to detect fraud and (ii) to encourage whistle blowing. The Second Circuit in speaking about SOX § 806 (18 USCA § 1514A) stated:

> "Congress enacted the Sarbanes-Oxley Act of 2002 ("Act") in response to an acute crisis: Revelations of mass corporate fraud, most vividly in connection with the Enron Corporation, threatened to destroy investors' faith in the American financial markets and, in so doing, to jeopardize those markets and the American economy. Congress recognized that the problem was an intractable one, and that a number of strong enforcement tools would be necessary-from new regulations and reporting requirements, to expanded oversight, to new criminal provisions. Congress also recognized that for *any* of these tools to work, the law had to protect whistleblowers from retaliation, because "often, in complex fraud prosecutions, ... insiders are the only firsthand witnesses to the fraud." S.Rep. No. 107-146, at 10 (2002). **Congress therefore made whistleblower protection central to the Act,** creating a procedure whereby wrongfully discharged employees can seek redress, including *immediate* preliminary reinstatement, first through the Department of Labor and then through the courts." *Bechtel v. Competitive Technologies, Inc.,* 448 F.3d 469, 484 (2d Cir.2006) (Straub, J. dissenting). (Emphasis Added).

There is no reason that SOX § 1007 (18 USCA § 1513(e)) expanding Whistleblower protections beyond employees should be treated as less central to SOX. Further, there is no reason why Public Policy should be bar to applying Nebraska Rules of Professional Conduct, Rule 4.2, when the letter was addressed to the Financial Expert of the Audit Committee and I was unaware of any counsel that represented the Audit Committee.

Dennis G. Carlson, Esq.
October 26, 2007
Page 6 of 11

The "contact me" culture is part and parcel to the corporate culture since SOX.  SOX established new Public Policy.    The Letter at issue was a communication contemplated and indeed encouraged by SOX.  Use of the Letter as a basis of a grievance against the party is a telltale sign that CFC is more interested in reprisals (itself a violation of SOX) then in rectifying the accounting errors.  Why?  CFC's continual existence is dependent upon not correcting the underlying accounting practices.

<div align="center">

**III**

**I SHOULD BE ABLE TO ASSUME THAT FULBRIGHT'S REPRESENTATION WILL BE LIMITED BY ETHICAL CONSIDERATIONS.**

</div>

Ethically, Fulbright & Jaworski L.L.P. ("Fulbright") should not represent the Audit Committee of National Rural Utilities Cooperate Finance Corporation ("CFC") because Fulbright represents RTFC and RTFC's management (whom also serve as CFC's management) and whose very actions were called into issue by the Letter.  The Sarbanes-Oxley Act of 2002 ("SOX") and the related ethical considerations for reporting companies under the Securities Exchange Act of 1934 ("Reporting Company") have resulted in an evolution in ethical considerations.  The ABA compiled a list of Corporate Governance Practices, specifically; Corporate Governance Practice No. 9 which provides:

> "Engagements of counsel by the board of directors, **or by a committee of the board,** for special investigations or independent advice should be structured **to assure independence** and direct reporting to the board of directors or the committee." (Emphasis Added).

The above Corporate Governance Practice is especially applicable to Audit Committees which under SOX are charged with investigating financial improprieties and assuring[1] the SEC reports are correct.  The Letter was sent only to the designated Financial Expert of CFC's audit committee.

The opening sentence of the Letter states:

> "I am writing an open letter to you because of your respective legal obligations as a board member who qualifies as an Audit Committee Financial Expert as defined by the Securities and Exchange Commission."

---

[1] Enforcement of the SEC laws relies heavily upon private enforcement.  The Securities Law handbook, Volume 2, 2001 Edition, page 2-17 states: "If one were to compare in quantitative terms actions based upon federal securities laws initiated by private persons with those initiated by the Commission, it would become apparent that the private action is an effective and indispensable supplement to the 'policing' of the federal securities laws".

Dennis G. Carlson, Esq.
October 26, 2007
Page 7 of 11

*The underpinning of the grievance is that I knew that Fulbright represented the audit*
*committee of CFC. I disagree.*

For further discussion in this section, I am attaching the following Exhibits:

a.     Exhibit "2" the "Report Of The American Bar Association Task Force On
       Corporate Responsibility" (the "Corporate Responsibility Report") dated May 31,
       2003;

b.     Exhibit "3" the Corporate Governance Practices (the "Corporate Governance
       Practices") adopted on August 11-12, 2003 by the ABA's House Of Delegates;
       and

c.     Exhibit "4" a white paper (the "Committee's White Paper") of the ABA
       Corporate Governance Committee titled *THE INDEPENDENCE OF OUTSIDE*
       *COUNSEL* prepared by Walter Demond.

The Exhibits are evidence of the dramatic effect Enron, Worldcom and other corporate fraud
cases had on issues of corporate governance.  For instance, the ABA Corporate Governance
Practices, Exhibit 3, beginning on page 4 states:

"The Governance Policy Resolution has not been developed in a static environment.
Since the Task Force was appointed, many reforms significantly affecting corporate
governance and responsibility have been effected or proposed:

·   The Sarbanes-Oxley Act of 20027 has brought about, among many other things,
extensive federal regulation of the accounting profession, including the creation of an
external regulatory organization (the Public Company Accounting Oversight Board),
detailed prescriptions governing the auditing work of the firms that certify the financial
statements of public corporations, and limits on the scope of non-auditing services that
such firms may supply.

·   The Sarbanes-Oxley Act of 2002 prescribed the adoption of substantive requirements
for the composition and responsibilities of the audit committees of public corporations
with shares listed with the public markets, and established a prohibition against personal
loans to directors and executive officers of public corporations.

·   In response to concern that existing rules of professional conduct did not sufficiently
direct the lawyer for the corporation to report illegal conduct to the corporation's board of
directors, Congress adopted Section 307 of the Sarbanes-Oxley Act of 2002, requiring
the Securities and Exchange Commission ("SEC") to promulgate rules of professional
conduct for lawyers appearing and practicing before the SEC.

Dennis G. Carlson, Esq.
October 26, 2007
Page 8 of 11

·   Major stock markets – notably the New York Stock Exchange ("NYSE") and the Nasdaq Stock Market ("Nasdaq") – have submitted to the SEC proposed listing standards for public corporations that will extensively reshape the responsibilities and operating processes of the board of directors, committees of the board, and senior corporate officers, and extend the authority of shareholders." (Citations Omitted).

SOX placed a great deal of emphasis on Audit Committees, as stated above "the adoption of substantive requirements for the composition and responsibilities of the audit committees". SOX § 301(5) requires that audit committees have "the authority to engage independent counsel".

While SOX does not *mandate* independent counsel; however, the thrust of SOX including the responsibility that rests upon the shoulders of the audit committee give a strong impetus to engage independent counsel when the issues are raised (as raised in the Letter) regarding management that may affect the integrity of the financial reporting. The Committee's White Paper more directly states:

On page 3:
"Although the SEC stops short of prescribing the criteria for an attorney to qualify as an independent counsel, a **central concern** in its release adopting the independent counsel requirement in 2001 is that the counsel not be compromised by a historical relationship with the fund's advisor." ("Emphasis Added")

On page 4:
"The independent counsel should also report directly to the committee seeking the independent advice rather than to the in-house counsel of the company." 

On page 5:
"In reviewing decisions made by special litigation or audit committees, **the importance of an independent investigation cannot be overemphasized.** When doubt exists as to the receipt of independent advice, courts have rejected settlements by the committee, as well as application of the business judgment rule to committee decisions. This relationship (between counsel performing the investigation and the company) is a major factor in determining the independence of a corporate investigation. Obviously, internal corporate investigations cannot be completely independent, as independent counsel is paid by the company it is investigating. However, the degree of independence may be enhanced by limiting the types of relationships independent counsel has with the company, including its officers and directors. **Ideally, independent counsel would have no connection to the company at all.**" ("Emphasis Added")

On page 5:
"Specifically, the committee **should not hire the law firm that traditionally handles the company's business.** As stated in *In re Enron Corp. Securities, Derivative & ERISA*

Dennis G. Carlson, Esq.
October 26, 2007
Page 9 of 11

> *Litigation v. Enron Corp.*, 'issues of serious conflict of interests' arise when the firm alleged to have participated in the wrongdoing investigates the same wrongdoing." ("Emphasis Added")

> On page 5-6:
> "Counsel intended to be independent should be free of any influences that might interfere with its ability to render unbiased legal advice to the special litigation or audit committee."

> On page 8:
> "Obviously care should be taken when the general or other outside counsel is implicated in, **or at least has knowledge of,** the events or circumstances underlying the need to determine whether to retain independent counsel in the first place. In such circumstances, general or other outside counsel's role should be limited to recommending that independent counsel be retained, and providing resources as requested by that independent counsel. Ideally, general or other outside counsel should be completely isolated from the investigation and play no role in it whatsoever. (Emphasis Added).

Citations were omitted in the above quotations.

> The Modern Rules of Professional Conduct in Rule 1.13(a) states:

> "A lawyer employed or retained by an organization [RTFC] represents the organization [RTFC] acting through its duly authorized constituents."

Page 23 of Exhibit "2", the Corporate Responsibility Report, states:

> "Nevertheless, lawyers for the public corporation must bear in mind that their responsibility is to the corporation, and not to the corporate directors, officers or other corporate agents with whom they necessarily communicate in representing the corporation. This is the bedrock principle recognized in Rule 1.13(a) of the Model Rules."

Fulbright represents RTFC.

> ICC's issues as they relate to the above ethical standards concern the following:

> a.    The Patronage Capital Misappropriation Scheme operated to the detriment of RTFC and to the benefit of CFC's electric utility members creating a conflict between CFC and RTFC in representation;
>
> b.    The Patronage Capital Misappropriation Scheme that is implemented by CFC's management serving in their capacity as officers of RTFC;

Dennis G. Carlson, Esq.
October 26, 2007
Page 10 of 11

     c.     CFC's own bylaws (as well as a memorandum from the IRS general Counsel) do
            NOT permit the Patronage Capital Misappropriation Scheme;

     d.     Further, RTFC members are NOT members of CFC; and

     e.     Fulbright represents RTFC NOT RTFC's management.

If Fulbright represents RTFC, Fulbright's representation of CFC is not in accord with, and
undermines, the above ethical principles. Even if Fulbright purports to represent both CFC and
RTFC, then, one can not presume that Fulbright would be so bold as to claim representation of
CFC's audit committee when the context of the Letter sent to the Financial Expert of the Audit
Committee calls into question acts of the management of the CFC and RTFC.

     Fulbright is not ignorant of the ethical ramifications of SOX.

     I received a letter threatening me about the Letter. It was from Fulbright and was dated
June 5, 2007. I responded thereto in a letter dated June 7, 2007, with surprise that Fulbright
claimed now to represent the audit committee of CFC. These letters are attached as Exhibit "5".
Fulbright's letter was from Gerald G. Pecht. Mr. Pecht represents himself to be an expert in
SOX. He lists his areas of concentration as:

- Securities Litigation and Enforcement
- Internal Investigations
- Audit Committee Investigations
- Corporate Compliance

His speeches include the following:

- "Explaining the Audit Committee's Role in IT Governance," KPMG Audit Committee
  Institute, Houston, Texas, June 2007.
- "How It All Fits Together - Communication and Coordination with the Board and Other
  Committees," KPMG Audit Committee Institute, November 2006.
- "Is Sarbanes-Oxley Working?," Inns of Court, January 10, 2006.
- "Enhancing Oversight of Internal Control Over Financial Reporting: Understanding
  Challenges, Exploring Value," KPMG Audit Committee Institute, May 10, 2005.
- "Exploring Expectations of Audit Committee Effectiveness," KPMG Audit Committee
  Institute, December 8, 2004.
- "A Litigator's Perspective on Sarbanes-Oxley," KPMG Audit Committee Institute, July
  16, 2003.
- "The Civil Litigation Impact of Sarbanes-Oxley," KPMG Audit Committee Institute,
  January 16, 2003

The link to his profile is:
http://www.fulbright.com/index.cfm?fuseaction=attorneys.detail&site_id=311&emp_id=554.

Dennis G. Carlson, Esq.
October 26, 2007
Page 11 of 11


Mr. Pecht's letter and my response are combined into one exhibit: Exhibit "5".

I submit to you the following issues:
   a.    Why does Mr. Pecht send a letter and threaten litigation but does not personally file the grievance?
   b.    Is Mr. Gerber charged with the SOX knowledge that Mr. Pecht seems to possess?
   c.    If so, how can Mr. Gerber in good faith allege that I should have known that Fulbright represents the Audit Committee?
   d.    Does Fulbright understand the conflict of representing CFC's audit committee, CFC's management, CFC, and RTFC?
   e.    Ultimately, can the Nebraska Bar Association give any credence to such a complaint under such circumstances?

Twice ICC raised accounting issues and twice RTFC accelerated ICC's loans without a default. In my opinion RTFC's acceleration and related actions (really the actions of CFC acting through RTFC) is retaliatory in violation with SOX § 1107 – 18 U.S.C. § 1513(e). Fulbright's grievance is retaliatory conduct directed to me.

Nebraska Rules of Professional Conduct, specifically, Rule 4.2, must be considered in light of the circumstances. In this case, it is unreasonable for me to presume that Fulbright would be representing the audit committee in contravention of professional ethic evolving as a result of SOX.

_____

I must reiterate that I stand ready to answer any further questions and account fully for my past conduct. I believe the above is responsive and if it is not responsive in any aspect, please notify me and I will address any deficiency.


Sincerely yours,

John P. Raynor

**Exhibit "1"**

Memo Outlining CFC's Relationship to RTFC

**CONFIDENTIAL MEMORANDUM**

**CFC's RELATIONSHIP TO RTFC
A LEGAL ANALYSIS**

### I. VIOLATION OF LAWS – LEGAL STRUCTURE

CFC was organized in April of 1969 by[1] the National Rural Electric Cooperative Association ("NECA"), a cooperative representing the interests of cooperative electric utilities and the consumers they serve. As to the creation of RTFC, CFC states[2]: "RTFC is a controlled affiliate of CFC and was created [by CFC] for the purpose of providing and/or arranging financing for its rural telecommunications members and affiliates." RTFC was organized in 1987. Through fiscal year 2001, CFC referred[3] to RTFC in its publicly filed documents as "a controlled affiliate of CFC". Since fiscal year 2001, CFC simply describes[4] its control and domination over RTFC and RTFC's business.

ICC maintains that CFC used RTFC as an artifice or device to systematically misappropriate funds from rural telephone members of RTFC. RTFC has approximately 500 members. The misappropriation of RTFC by CFC, which can be proven for fiscal years 2000 through 2004, was not a recent phenomenon but is systemic and is the very reason behind the formation of RTFC. It is nothing more than one segment of rural America preying upon another segment for ill-gotten gains. While CFC and NECA annunciate the rural cause, CFC is in fact a predator in the rural sector.

The relationship by and between CFC and RTFC is replete with violations of the law. To comprehend the scope of the illegality one must first understand the relationship between RTFC and CFC.

    **1.**    **The Money Flow.**

CFC raises money based upon the combined or consolidated statements (referred to hereinafter as "consolidate statements") of CFC, RTFC, and since fiscal year 2004, National Cooperative Services Corporation ("NCSC"). The flow of the money is as follows:

    a.    Control over all money is assumed by CFC; and

---

[1] SEE CFC Business story at http://www.nrucfc.coop/aboutcfc/cfcHistory.htm.
[2] May 31, 2001 10K, page 58.
[3] May 31, 2001 10K, page 58.
[4] May 31, 2006 10K, page 77.

b.    To the extent that CFC authorizes RTFC to make a loan to an RTFC member, CFC advances funds to RTFC.

The above structure allows CFC to mark up the cost of funds provided RTFC (the "CFC MARKUP") and effectively control the amount of money RTFC is permitted to earn.

Essentially, RTFC is a "patron" of CFC. As patron of CFC, especially since CFC is a tax exempt organization, RTFC is entitled to allocation (not necessarily distribution) of its contributions to CFC's earnings.

An example of the foregoing is illustrated by a comparison of the SEC Form 10K for fiscal year 2001 filed by CFC to RTFC's Annual Report for the same period.

*F/y/e May 31, 2000*.

- - CFC reported[5] that "Telecommunications" made $3.497 Million.

- - RTFC reported[6] an Operating Margin of $3.497 Million;

- - RTFC reported a Net Margin (net income) of $26.880 Million after inclusion of patronage dividends received from CFC of $23.345 Million and interest income of 0.038 Million to the Operating Margin.

*F/y/e May 31, 2001*.

- - CFC reported[7] that "Telecommunications" made $3.817 Million.

- - RTFC reported[8] an operating margin of $3.817 Million;

- - RTFC reported a Net Margin of $ 38.098 Million after inclusion of patronage dividends received from CFC of $34.280 Million and interest income of 0.093 Million to the Operating Margin.

In fiscal years 2000 and 2001, patronage allocations from CFC constituted 86.85% and 89.74%, respectively, of RTFC's net margin. Even using CFC's figures, RTFC is operated where the majority of RTFC's contribution to the earnings of CFC/RTFC is captured within CFC. If the correct amount of patronage income was paid to RTFC, over 93% of RTFC's contribution to CFC/RTFC earnings was captured within CFC for 2000 and 2001. Effectively, under the scheme, patronage dividends represent the *portion* of the CFC MARKUP that is shared with RTFC.

---

[5] SEE: May 31, 2001 10K, page 78.
[6] SEE: 2001 RTFC Annual Report, page 15.
[7] SEE: May 31, 2001 10K, page 78.
[8] SEE: 2001 RTFC Annual Report, page 15.

Besides CFC exerting control in fact over all funds, through contracts CFC buttresses its control over RTFC. For instance, the 10K for fiscal year 2006 provides:

"CFC is the **sole lender** to and manages the lending and financial affairs of RTFC through a long-term management agreement. Under a guarantee agreement, RTFC pays CFC a fee in exchange for which CFC reimburses RTFC for loan losses. Six members of the CFC board serve as a lender advisory council to the RTFC board. **All loans that require RTFC board approval also require the approval of the CFC lender advisory council.** CFC is not a member of RTFC and does not elect directors to the RTFC board. RTFC is an associate member of CFC." (Bold Added). SEE page 77, Note 1(b).

The management contract insures that RTFC does not borrow money from any other source other than CFC and nullifies or abrogates RTFC's ability to perform its purpose: to lend money. RTFC at best is an organization that may recommend loans to CFC.

### *Observations*
The import of the flow of money is as follows:

      a.     All material transactions occur within CFC;

      b.     RTFC does not even have authority[9] to make a loan to its members without CFC's approval;

      c.     The majority of the income generated from RTFC members' loans is trapped within CFC because of the CFC MARKUP; and

      d.     From a financial prospective, RTFC is dependent upon CFC's allocation of patronage income to RTFC for RTFC's patronage income to members because of the CFC MARKUP.

Financially, RTFC is financially dominated by CFC.

    **2.    Control: Illegality from the Inception.**

From the inception of RTFC in 1987 until Arthur Andersen ("AA") was no longer the auditor of RTFC (after May 31, 2001), CFC had a $1,000.00 investment in RTFC which was a golden membership interest. For its de minimis investment, CFC nominated a majority of the Board members of RTFC. The SEC 10Ks filed by CFC when AA was the auditor had the following statement[10] or words of similar import:

"CFC has a $1,000 membership interest in RTFC. CFC exercises control over RTFC through majority representation on their Boards of Directors."

---

[9] A lending cooperative that has no authority and no ability to perform its principle function – lending money.
[10] SEE: 2001 10K, Note 1(b), page 77.

When Ernst and Young ("Ernst") became auditor this provision was eliminated. The first SEC 10K in which an Ernst audit was available stated[11]:

> "In September 2001, the CFC and RTFC boards of directors approved changes in the governance of RTFC and on October 9, 2001, RTFC received consents from a majority of its members, making the changes effective. CFC is not a member of RTFC and does not elect directors to the RTFC board. In October 2001, RTFC refunded the $1,000 membership interest to CFC."

As discussed later, the golden membership interest was eliminated because such an arrangement was *illegal*. It took AA's demise because of Enron before this change in the governance of RTFC was made.

Since fiscal year 2001, CFC relies upon a management contract to dominate and control RTFC. The Financial Statement included in the Annual Reports simply states[12]: "CFC … manages the lending and financial affairs of RTFC through a long-term management agreement."

CFC is not a member of RTFC however, RTFC is a member of CFC; albeit, an associate member. Associate members, pursuant to Section 2 of Article II of CFC's bylaws, have no voting authority. It is and was completely irrelevant whether RTFC was a member since under cooperative law patronage dividends are payable to *patrons*, not just members. However, once RTFC became a member of CFC, CFC's management and directors owed RTFC and arguably, RTFC members, a fiduciary duty. Clearly, this fiduciary duty has been repeatedly breached.

As organized, RTFC members are not members of CFC. Further, CFC members are not members of RTFC. You have two separate classes of owners.

### Observations

Material to the understanding of the ownership relationship between CFC and RTFC is as follows:

a.  Until September 2001 CFC had a golden membership interest in RTFC which allowed CFC to *illegally* nominate a majority of RTFC's directors;

b.  Since 2001 CFC has no ownership in RTFC;

c.  RTFC is an associate, non-voting, member of CFC;

---

[11] 2002 10K, Note 1(b), page 72.
[12] SEE: 2006 10K, 1(b), page 77.

4

d.   RTFC members are not members of CFC and can not borrow directly from CFC; and

e.   There is not the commonality of ownership that is usually a requisite for consolidated financial statements.

Contractually, CFC dominates RTFC.

### 3.   **Interlocking Management**.

There has been and still are interlocking management arrangements between CFC and RTFC. For instance the 2004 Annual Reports show the following interlocking management arrangements:

(i)    Sheldon C. Petersen, Governor and Chief Executive Officer of both RTFC and CFC;

(ii)   John J. List, Senior Vice President and General Counsel of both RTFC and CFC;

(iii)  Steven L. Lilly, Senior Vice President and Chief Financial Officer of both RTFC and CFC;

(iv)   John T. Evans, Senior Vice President of Operations of both RTFC and CFC;

(v)    Richard E. Larochelle, Senior Vice President of Corporate Relations of both RTFC and CFC; and

(vi)   John M. Borak, Senior Vice President of Credit Risk Management of both RTFC and CFC.

The six key officers above are CFC's managers occupying the same position in RTFC. In addition to the above, pursuant to the RTFC 2004 Annual Report there is only one RTFC officer, Lawrence Zawalick, Senior Vice President, that was not an officer of CFC.

RTFC's outside counsel and independent accountants are CFC's outside counsel and accountants.

### *Observation*

In addition to the control exerted over all funds, a golden membership interest, and a long-term management contract, domination and control is further emboldened by interlocking management and lack of services rendered to RTFC by independent counsel and accountants.

### 4.   **RTFC's Legal Domicile.**

RTFC was incorporated as a private cooperative association in the state of South Dakota in September 1987. In June of 2004 ICC raised the prospect of a derivative suit against RTFC and

CFC. In February of 2005, RTFC moved[13] to the District of Columbia. CFC was originally incorporated in D.C.

**5.    Violation of laws.**

The substantive relationship of RTFC to CFC is as follows:

a.    RTFC members only have a voting interest in RTFC;

b.    RTFC has no authority and no means to conduct or fulfill its purpose[14] "...to provide and arrange financing for its rural telecommunications members and their affiliates";

c.    RTFC conducts no real business other than to function as a legal façade to document loans CFC authorizes to members of RTFC;

d.    CFC financially, contractually, and de facto completely dominates and controls RTFC; and

e.    RTFC is dependent upon CFC's allocation of the CFC MARKUP as a patronage dividend for virtually all of RTFC's income.

The above is further supported by violations of the law from the inception of the formation of RTFC.

ICC maintains the above did or still violates the following laws -

a.    SDCL § 47-16-10.  This statute incorporates the one member, one vote principle into South Dakota statutes.  CFC's golden membership interest that existed from the inception of RTFC until September of 2001 was illegal.  Of a significance to be explained later, this illegal relationship was repeatedly ignored by AA, CFC's auditor.

b.    DC ST § 29-913(b).  This statute provides "No voting agreement or other device to evade the requirements of this section [one member one vote] shall be enforceable at law or in equity".  As organized, RTFC was formed as a basis to keep telephone members from the center of control, CFC, effectively neutering RTFC members' voting

---

[13] SEE: February 28, 2005 10Q, Page 9.
[14] SEE: 2006 10K, page 77, Note 1(a).

rights. RTFC as it exists and functions is a "device" deployed by CFC to deprive RTFC members of their voting rights.

c.      Tax Law. The IRS has stated[15] that democratic control means one member – one vote and is required for cooperative treatment stating: "Prohibiting patronage voting as inconsistent with cooperative operation ensures that Subchapter T will not be so utilized." Based upon the preceding RTFC was not entitled to benefits of Subchapter T while the golden membership interest of CFC existed. The General Counsel Memorandum states at various points that its discussion is equally applicable to tax exempt cooperatives. A strict adherence to the law would conclude that the CFC/RTFC relationship eliminates CFC's entitlement to its tax exempt status.

The relationship of CFC to RTFC is illegal.

## II. VIOLATION OF LAWS – PATRONAGE ALLOCATIONS

This discussion is generally restricted to only fiscal years 2000 and 2001 because it is straight forward and easily explained. Note however, for the fiscal years 2000 through 2004, the only years in which transparent information is available, ICC estimates the defalcation to exceed $250 Million. LECG Corporation, an outside expert services firm had similar figures.

### 1.    Patronage Income Allocations.

In the last quarter of 2002, ICC was informed that its patronage dividend for the 2002 fiscal year was declining significantly. Aware that CFC had major problem loans in its electric utility loan portfolio, ICC decided to examine the publicly filed financial statements of CFC to determine the basis of patronage allocation. For fiscal year 2002, Ernst was the independent auditor replacing AA that had been the independent auditor for the fiscal years preceding 2002. Since the Consolidated Income Statement for fiscal year 2002 is presented for three years, segment information was restated by Ernst for fiscal years 2000 and 2001. The following table compares AA to Ernst segment information for fiscal years 2000 and 2001 as well as RTFC's reported income for fiscal years 2000 and 2001.

---

[15] SEE: General Counsel Memorandum on "COOPERATIVE NETTING", GCM 38061, 1979 WL 52855 (IRS GCM).

|  | Electric | Telephone | Total |
|---|---|---|---|
| Net Margin For fiscal year 2000 - | | | |
| Arthur Andersen[16] | 111,836 | 3,497 | 115,333 |
| Ernst[17] | 65,127 | 50,206 | 115,333 |
| *RTFC's Annual Report[18]* | | 26,880 | |
| Loans outstanding[19], net expressed as % | 77.86% | 22.14% | 100.00% |
| Net Margin For fiscal year 2001 - | | | |
| Arthur Andersen | 128,949 | 3,817 | 132,766 |
| Ernst | 66,193 | 66,573 | 132,766 |
| *RTFC's Annual Report* | | 38,098 | |
| Loans outstanding, net expressed as % | 72.93% | 27.07% | 100.00% |

What is not immaterial and should not be overlooked is that telephone loans, constituting approximately one quarter of the total loan portfolio, were contributing over 43% of the net margin in 2000 and over 50% of the net margin in 2001.

What is apparent from the above table is that RTFC was not getting the correct allocation of patronage income whether you examine the table from a basis of either AA or Ernst.

RTFC had patronage income from CFC of over $23 million in fiscal year 2000 and $34 million in fiscal year 2001. According to AA, RTFC was not entitled to any patronage dividend since RTFC's operating margin of $3.497 million in fiscal year 2000 and $3.817 million in fiscal year 2001 constituted RTFC's total economic contribution to CFC/RTFC. Consequently, based upon AA's segment information, there was no basis for taking the economic contribution of electric from electric and contributing to RTFC as a patronage dividend.

On the other hand, as Ernst reported RTFC's contribution to CFC/RTFC's net margin, RTFC was shorted over $23 million in 2000 and over $28 million in 2001. In that case, there was no basis for electric utilizing the CFC MARKUP to siphon funds from telephone by under allocating patronage income to RTFC.

---

[16] SEE: 2001 10K, page 78
[17] SEE: 2002 10K, page 98
[18] SEE: 2001 RTFC Ann. Rep., Page 15

[19] SEE: 2002 10K, page 98

8

Common sense, an examination of the interest rates charged telephone loans and the differences in the cost of funds as determined by AA and Ernst dictate that AA's analysis was flawed. ICC concluded that the Ernst numbers were right and further, that for fiscal years 2000 through 2004 CFC skimmed over $250 million from RTFC. LECG Corporation had similar numbers.

Additionally, there is nothing more telling about how CFC operated to trap RTFC's profits in CFC than comparing RTFC's growth in Operating (Gross) Revenue and Loans to RTFC's growth in Operating Margin (the profit RTFC before booking patronage allocations from CFC). The following table further demonstrates financially how RTFC's loans increased from 1998 through 2004 while RTFC's operating margin before allocations from CFC ultimately shrunk.

| Fiscal Year | Gross Loan Rec. | RTFC's | | | |
| | | Gross Revenue | Operating Margin ("O.M.") | O.M. as % of Loan Rec. | O.M. as % 1998 = 100% |
| --- | --- | --- | --- | --- | --- |
| 1998 | 1,574,899,929 | 90,662,803 | 3,134,749 | 0.20% | 100.00% |
| 1999 | 2,710,388,709 | 149,037,380 | 3,834,278 | 0.14% | 122.32% |
| 2000 | 3,699,728,339 | 240,189,383 | 3,497,103 | 0.09% | 111.56% |
| 2001 | 5,325,398,519 | 419,523,919 | 3,817,401 | 0.07% | 121.78% |
| 2002 | 5,075,075,959 | 373,765,221 | 3,179,715 | 0.06% | 101.43% |
| 2003 | 4,942,640,264 | 344,491,756 | 2,797,526 | 0.06% | 89.24% |
| 2004 | 4,643,008,529 | 306,579,369 | 2,042,197 | 0.04% | 65.15% |

There is no proportional relationship between RTFC's loans and RTFC's operating margin. The major factor between Gross Revenue and Operating Margin is the 'cost of funds' ("COF"). The COF is the interest paid by RTFC to CFC on funding provided by CFC. The same management acting on behalf of both CFC and RTFC made the decision of the charges RTFC for funding and on the other side, as RTFC, agreed to the charges. These decisions are made to trap RTFC earnings within CFC.

Faced with what appeared to be subsidization in excess of over $100 million for 2000, 2001 and 2002, ICC raised the matter with RTFC. RTFC refused to offer any explanation of the patronage allocation saying that it was a CFC matter and RTFC members were not entitled to such information. Note that parties proffering that explanation were officers of both CFC and RTFC and further, had a duty as officers of RTFC to know or ascertain such information if it wasn't actually known already. Additionally, CFC owes a fiduciary duty to RTFC and arguably, RTFC members are intended beneficiaries of that obligation. To this date, CFC has never offered an explanation.

2.    **Violation of CFC's ByLaws.**

CFC's Bylaws, in Article XI, provides:

> Section 1:    Nonprofit Operation. The Association shall at all times be operated ... for the primary and **mutual benefit** of its patrons. ... **All net savings**, representing the excess of revenues over operating costs and expenses, shall be received by the Association with the understanding that they **are furnished by its patrons as capital** and that the Association is obligated to pay by credits to a capital account ... for each patron ... **in proportion to their patronage.** (Emphasis Added)
>
> Section 4.    Patronage Capital Certificates. ... that at the end of each fiscal year the amount of patronage capital, if any, in the form of **net savings so furnished by** *each* **patron** is clearly reflected and credited in an appropriate record to the capital account **of each patron.** ... (Emphasis Added)

Note that the provisions allocating net savings is based upon patronage, thus membership in CFC is not even a consideration in the allocation patronage income. Pursuant to the Articles, RTFC is entitled to the allocation of net savings RTFC contributes. Clearly, CFC management was acting ultra virus or in contravention of CFC's articles.

3.    **Violation of Laws.**

CFC's misappropriation of RTFC patronage income puts CFC in violation of the following laws:

a.    DC ST §§ 29-901(5)(c) and 29-931(4)(a) which require "proportionate amount of savings returns" be allocated to members;

b.    DC ST § 29-903 that require (as does CFC Bylaws) that the association be operated for the primary and mutual[20] benefit of its *patrons*; and

c.    Cooperative netting has been determined by the IRS[21] to be inconsistent with tax treatment accorded to tax exempt and non-exempt cooperative treatment; and

d.    The organization and operation of RTFC by CFC, effectively uses RTFC as a device and artifice to shift taxable income that would be reportable by members of RTFC and launder such money through CFC, a tax exempt entity, to CFC's electric members violating numerous provisions of the tax law.

---

[20] Predatory lending by CFC to rural telephone for the benefit of electric patrons does not satisfy this requirement.
[21] SEE: General Counsel Memorandum on "COOPERATIVE NETTING", GCM 38061, 1979 WL 52855 (IRS GCM).

LECG Corporation concluded that the CFC relationship to RTFC in practice resulted in tax fraud.

### III. SOX VIOLATION – ILLEGAL AUDIT?

Facts as known to date:

a. One Randall B. Johnston signed a letter that was included in an 8K filed by CFC on April 22, 2002 when CFC migrated to Ernst from AA. Mr. Johnston signed the letter on behalf of AA. That functionality would be reserved to the lead or reviewing partner.

b. One Randall B. Johnston signed a letter addressed to me on April 25, 2006 in response to a letter sent to Deloitte raising various accounting issues.

c. Sarbanes-Oxley Act of 2002 ("SOX), § 203 required audit and reviewing partner rotation every 5 years.

d. It is unlawful to perform and audit in contravention of the provisions of SOX §203.

e. SOX § 208(b) gives the SEC authority to issue *legislative* regulations.

f. 17 C.F.R. § 210.2-01 requires a "time out" period of 5 years, and further counts audits performed before the effective date of SOX.

g. The regulations were issued[22] by the SEC in January 28, 2003 in SEC Release No. 33-8183.

Mr. Johnston's accounting expertise seems to be exempt organizations.

If Mr. Johnston was the lead or reviewing partner for AA assigned to CFC and the lead or reviewing partner for Deloitte, as it appears, the issue is one of simple counting. If Johnston served in the capacity of lead or reviewing partner for the fiscal years 1997 through 2001 and served in either capacity for the Deloitte audits for fiscal years 2005 and 2006 then the audits performed by Deloitte were illegal. If Johnston served in the capacity of lead or reviewing partner for the fiscal years 1998 through 2001 and served in either capacity for the Deloitte audit for fiscal year 2006 then such audit performed by Deloitte was illegal.

This is relevant and material to RTFC's claims against ICC. Note that these audits could not have been performed without complicity of CFC's management in the performance of the audit.

---

[22] The regulations were issued before Deloitte became CFC's auditor.

## IV. RULE 10B-5.

1. **The Regulation.**

<u>17 C.F.R. § 240.10b-5</u> provides:
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to **omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading**, or

(c) To engage in any act, practice, or **course of business** which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." (Emphasis added)

CFC is constantly selling securities, however, the "in connection with" doesn't require CFC itself to be selling securities but only CFC makes statements with the intent that it influences the market.

2. **Facts.**

There has been consequence to CFC's systematic defalcation of RTFC. The involuntary subsidization provided by RTFC was passed through to electric members in the form of below market interest rates. For instance, as demonstrated in the following table, using the Ernst segment information[23] it is apparent that telephone contributes an inordinate share of the CFC/RTFC Gross Margin.

| Fiscal year: | 2002 | 2003 | 2004 |
|---|---|---|---|
| RTFC's % of consolidated Gross Margin | 38.77% | 47.59% | 67.97% |
| RTFC's % of total loans | 25.23% | 25.13% | 21.76% |

While the Gross Margin is an indicator, another revealing comparison that illustrates the inordinate contribution of telephone is the gross margin less "General and administrative expenses" (GM-G&A).

| Fiscal year: | 2002 | 2003 | 2004 |
|---|---|---|---|
| RTFC's % of consolidated GM-G&A[24] | 40.53% | 56.03% | 113.53% |
| RTFC's % of total loans | 25.23% | 25.13% | 21.76% |

---

[23] SEE: 2004 10K, pages 134-136.
[24] SEE: 2004 10K, pages 134-136.

12

Clearly, RTFC contributed an inordinate amount of income of CFC/RTFC (over 100% in fiscal year 2004). Clearly, CFC has under priced its lending rates to electric members.

The disastrous consequences of CFC's pricing policies (providing below market loans to electric members) become indisputable when two factors are examined: the fair value of loans and the fact that Electric loans has not made a positive contribution to the combined income of CFC/RTFC since fiscal year 2003. The fair value of loans is analyzed first since it is a straight forward proposition.

| | |
|---|---:|
| Loans to members[25] | 18,360,905 |
| Less: Allowance for loan losses | (611,443) |
| Loans to members, net | 17,749,462 |
| | |
| Fair Value of Loans[26] | (15,055,729) |
| | |
| Overstatement in the Carrying Value of Loans (the "Fair Value Deficiency") | 2,693,733 |

If the Fair Value Deficiency was booked in fiscal year 2006 consolidated balance sheet would be adjusted as follows:

| | | |
|---|---:|---:|
| Liabilities & Equity[27] | | |
| Liabilities | | $ 16,941,791 |
| Total members' subordinated certificates | | 1,427,960 |
| Minority Interest | | 21,894 |
| Subtotal | | 18,391,645 |
| Total Equity | 787,976 | |
| Fair Value Adjustment to loans | (2,693,733) | |
| Adjusted Equity | | (1,905,757) |
| | | |
| Total Liabilities, Minority Interest & Equity | | $ 16,485,888 |

Effectively, CFC is technically bankrupt. Again, this is a result of CFC providing loans to electric members at below market rates.

Note that ICC believes the Fair Value Deficiency is understated. The determination of Fair Value is not in accord with FASB 107. FASB 107 requires the used of "market" rates. CFC

---

[25] SEE: 2006 10K, page 71

[26] SEE: 2006 10K, page 100

[27] SEE: 2006 10K, page 72.

computes Fair Value using its lending rates. CFC is an admitted below market lender so use of CFC's rates overstates Fair Value and understates the Fair Value Deficiency. Further, CFC fails to determine the Fair Value of long-term, variable rate loans that are repricing every ninety days *at rates below market.* While FASB 107 is not specific, I believe its is clear that FASB does not require Fair Value determination for loans that are repricing at market rates every ninety days.

The confirming calculation is a reference to the Gross margin less the total of 'general and administrative expenses' for fiscal year 2004.

|                                         | Electric | Telephone | Other | Total |
|-----------------------------------------|----------|-----------|-------|-------|
| Per Ernst[28]:                          |          |           |       |       |
| Gross Margin for 2004                   | 19,813   | 62,053    | 9,426 | 91,292 |
| Less: 2004 General & Admin. Expenses    | (35,168) | (4,267)   | (957) | (40,392) |
| Contribution to profits before LLR Adj. | (15,355) | 57,786    | 8,469 | 50,900 |

For fiscal year 2005, since Deloitte adopted the Ernst methodology of reporting segment information, a non-transparent approach, the figures must be derived by interpolation. For 2005 my figures[29] show that Electric's Gross Margin less the total of 'general and administrative expenses' produces a *loss* of $20 Million to $30 Million.

### 3.  The AA/Deloitte Methodology.

The AA/Deloitte Methodology was discussed above in section II, Subpart 1, where in fiscal year 2000 telephone earnings of $3,497,000 reported by AA suddenly became $50,206,000 of earnings pursuant to Ernst and in fiscal year 2001 telephone earnings of $3,817,000 reported by AA instantly became $66,573,000 of earnings pursuant to Ernst. This was a result of treating the CFC MARKUP (RTFC funds trapped in CFC) as Electric's earnings and then using those earnings to offset Electric's cost of funds.

To make the point clear, using the AA/Deloitte methodology *electric* earnings reported in the segment information (i) do not reflect the actual cost of funds but rather, (ii) the cost of funds LESS the CFC MARKUP. The common factor in this methodology is Randall B. Johnston; the audit partner that moved from AA to Deloitte (the "Johnston Factor").

---

[28] SEE: 2004 10K, page 134.
[29] I am happy to share my calculations with you and the trustee.

14

Is there any basis for presenting the segment information in accord with the Johnston Factor? The short answer is no. Notes 1(b) to the financial statements entitled "*Principles of Consolidation*" states:

> "The accompanying financial statements include the consolidated accounts of CFC, RTFC and NCSC and certain entities controlled by CFC created to hold foreclosed assets, **after elimination of all material intercompany accounts and transactions**." (Emphasis Added)

The Johnston Factor results in "material intercompany ... transactions", the CFC MARKUP, being reinserted within the presentation solely for the purpose of the presentation of segment information. The Johnston factor modifies the above statement by creating a singular exception rewriting the disclosure "... after elimination of all material intercompany accounts and transactions *excepting for the presentation of segment information in which CFC's earnings from loans to RTFC are presented as an offset to Electric loans cost of funds.*" Not only is the italicized statement not added but there is no disclosure that Electric's cost of funds is not, in reality, Electric's cost of funds.

The Johnston Factor is material and there is no way to ascertain the true contribution of Electric and Telephone loan portfolios to the combined earnings of CFC/RTFC. For instance, we know CFC had been systematically skimming from RTFC before fiscal year 2000 but there is no way of examining the publicly available information to ascertain the degree of such skimming – it is impossible. Material omissions include the failure to state:

a.    That the Electric loan portfolio, which constitutes 86% of CFC's total loan portfolio in fiscal year 2006, has not made a positive contribution to earnings since fiscal year 2003; and

b.    That on a fair value[30] basis CFC is bankrupt.

Also, you have to factor in the timing. CFC moved to Deloitte after the 2004 Segment Information reported a gross margin for $19,813,000 and total general and administrative expenses of $35,168,000. Deloitte comes into play and problem fixed – why a change in accounting methodology rather than a real fix to the problem? Also, one must consider timing in regard to section V of this letter.

---

[30] The CFA Institute is a strong advocate of fair value reporting  SEE:
http://www.cfainstitute.org/centre/positions/reporting/fair_value_reporting.html. I may be mistaken but isn't Byron Smyl a CFA.

The AA/Deloitte Methodology is not in accord with two principles of GAAP: FASB 131 and FASB 57. In paragraph 27, subparagraph (b), of FASB 131 the disclosure is required of "Revenues from transactions with other operating segments of the same enterprise". CFC does not disclose the income received from RTFC inflating RTFC's cost of funds over CFC's actual cost of funds. Additionally, FASB 57, Related Party Disclosures, require extensive disclosure on the transactions between CFC and RTFC. This standard disclosure is missing from the Financial Statements of CFC and RTFC filed with the SEC.

The nonconformity with GAAP may be a rather boring and unexciting but it is essential to the misappropriation of patronage capital from RTFC.

### 4.    Violation of Laws.

The reporting to the public by CFC violates Rule 10b-5 because of material omissions and a course of business which:

a.    Fails to adequately advise[31] the purchasers of securities that CFC is bankrupt on a fair market value basis;

b.    Fails to adequately advise purchasers of securities that the Electric loan portfolio has not made a positive contribution to earnings since fiscal year 2003; and

c.    Fails to adequately advise purchasers of securities of the defalcation of RTFC by CFC of literally hundreds of millions of dollars could cause the implosion of consolidated financial picture that forms the basis upon which investors make their decisions.

Note that CFC in response to criticism of its lending rates cites derivatives as an insurance policy of sort. However, they fail to mention that insurance policy is already recorded on the books of CFC *at fair value* and contributes a large portion of CFC's equity. If both derivatives and loans are reflected at fair value there would be a deficit in equity in 2006 of over $1.9 Billion after full recognition of derivatives; enough to overshadow "Total members' subordinated certificates" and "Total Equity" (with the fair value of derivates included therein) by over $450 Million. CFC's refuge is yet another misleading statement meant to deceive those that are not financially sophisticated.

---

[31] Unless you really think one line in a 116 page document is sufficient disclosure.

## V.   RETALIATION - SOX

### 1.    The Facts.

Twice ICC raised the propriety of CFC's patronage allocation to RTFC and twice RTFC responded by (i) providing no answers (no attempt has ever been made to explain the allocation) and (ii) instead responded by accelerating all of ICC's loans. Thus, the loans serve as leverage to keep RTFC members in their place.

When it became evident that (i) RTFC could not prove a default and (ii) that RTFC could not authenticate the loan document (because they had unilaterally altered the document), RTFC resorted to the Inter-Creditor Agreement. The Inter-Creditor Agreement was nothing more than a maneuver to ultimately prevent ICC from having its day in court by putting ICC (RTFC and Greenlight mistakenly believed that there would be a judgment against ICC) and its parents into bankruptcy. Why would a secure lender elevate an unsecured creditor to their status? In so doing, why would a secure lender pay an unsecured creditor? Why wasn't it Greenlight paying RTFC rather than RTFC paying Greenlight? The Inter-Creditor Agreement is an agreement between RTFC and Greenlight to take a *legal action for an illegal purpose* - retaliation.

### 2.    SOX and Retaliation!

The Second Circuit in *Bechtel v. Competitive Technologies, Inc.*, 448 F.3d 469, 484 (2d Cir.2006) stated:

> "Congress enacted the Sarbanes-Oxley Act of 2002 ("Act") in response to an acute crisis: Revelations of mass corporate fraud, most vividly in connection with the Enron Corporation, threatened to destroy investors' faith in the American financial markets and, in so doing, to jeopardize those markets and the American economy.  Congress recognized that the problem was an intractable one, and that a number of strong enforcement tools would be necessary-from new regulations and reporting requirements, to expanded oversight, to new criminal provisions.  Congress also recognized that for *any* of these tools to work, the law had to protect whistleblowers from retaliation, because "often, in complex fraud prosecutions, ... insiders are the only firsthand witnesses to the fraud." S.Rep. No. 107-146, at 10 (2002).  **Congress therefore made whistleblower protection central to the Act, ...**".   (Emphasis Added).

While the above quote addresses retaliation it applies with no less authority to ICC. SOX § 1107 added subsection (e) to 18 U.S.C.A. § 1513 which states:

> (e) Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any federal offense, shall be fined under this title or imprisoned

17

not more than 10 years, or both.

It has been held in the case of a companion statute, 18 USC §1512(b)(3), prohibiting and hindering communications does not require an official proceeding to be pending or imminent at the time of the offense, but, rather, a reasonable belief that a named witness will communicate information to a law enforcement officer is enough to create liability under the statute. SEE <u>U.S. v. Davis, 183 F.3d 231, 52 Fed. R. Evid. Serv. 732 (3d Cir. 1999)</u>, opinion amended on other grounds, <u>197 F.3d 662 (3d Cir. 1999)</u>.

The above section extended whistleblower protection to parties like ICC. ICC claims first raised directly with RTFC go to the heart of the veracity of CFC's public reporting which as indicated above, violate numerous laws. RTFC's retaliation is to foreclose the existence of whistleblower so that CFC can continue plundering RTFC and misleading investors in CFC's public filings.

### 3.    Violation of Laws.

RTFC's action by design is to eliminate the very existence of a RTFC member, ICC, for raising questions that exposes CFC's numerous violations of federal security laws. In effect, ICC is suffering the repercussions of retaliatory acts that I believe is a criminal violation of SOX § 1107.

### VI. The Façade

RTFC was and is a façade for CFC, an artifice or device to allow CFC to plunder rural telephone segment for the benefit of rural electric. Below are some observations as to the structure and relationship of CFC and RTFC.

| Structure Issue: | Raynor's Observation: |
|---|---|
| RTFC is nonvoting member of CFC | - Stands in marked contrast to the core belief espoused by CFC that coops are subject to democratic control: the one member, one vote principle |
| Before Ernst period, for $1,000 investment CFC elected a majority of RTFC's Board. | - This is an illegal arrangement and violates the one member, one vote principle |
| Interlocutory Management arrangement whereby CFC management serves as RTFC's management. | - CFC controls the day-to-day affairs of RTFC. |

18

| | |
|---|---|
| CFC exercises control over all funds raised from the combined or consolidation statements of CFC/RTFC. | - Statements used are combined or consolidated CFC/RTFC statements thus RTFC should have control over its fair share of funds raised. |
| CFC markups funds provided RTFC. | - Meaningless as long as patronage income was properly allocated. |
| CFC control exercised over all RTFC loans. | - RTFC has no authority to make a loan. 'Odd' for a cooperative that is organized to make loans. |
| Dual (side by side) Coops. | - Effect is to render meaningless members of RTFC voting rights. |
| Dual (side by side) Coops. | - Effect is to remove RTFC members from entity where truly meaningful decisions are made. |
| Dual (side by side) Coops. | - If RTFC can be a member of CFC why could not RTFC members be direct members of CFC? |
| CFC's long-term management contract with RTFC. | - To insure domination of RTFC is complete. |

It is not conjecture but a fact: RTFC voting privileges are meaningless and no different than giving RTFC members voting privileges a shell corporation. RTFC is so dominated by CFC that RTFC has no authority whatsoever, including, the authority to manage its own income. RTFC is an entity created with illegal voting control at its inception and was merely an artifice or device used by CFC to defraud rural telephone companies.

## SUMMATION

From the first inception of RTFC, CFC started and has continued unabated to trample various laws, all in support of its predatory lending practices to rural telephone. Throughout the history of the CFC/RTFC relationship, CFC has violated Coop principles, tax law, security law and many state laws. This is a fraud that pre-dates Enron and has continued unabated notwithstanding the passage of SOX.

Exhibit "2"

Report Of The American Bar Association Task Force On Corporate Responsibility

# REPORT OF
# THE AMERICAN BAR ASSOCIATION
# TASK FORCE ON CORPORATE RESPONSIBILITY*

March 31, 2003

James H. Cheek, III, Chair
Thomas A. Gottschalk
Nell Hennessy
R. William Ide III
Charles E. McCallum
Burley B. Mitchell, Jr.
Robert H. Mundheim
John F. Olson
Aulana L. Peters
Roberta Cooper Ramo
Dean Joel Seligman
Hon. Ben F. Tennille
Solomon B. Watson, IV


Prof. Lawrence A. Hamermesh, Reporter
Prof. Curtis R. Reitz, Special Reporter


Liaisons:
ABA Board of Governors:            Leslie W. Jacobs
Section of International Law:       John A. Kelley
Section of Litigation:             Brad D. Brian
Section of Taxation:               Stuart J. Offer

Special Advisers:
Section of Business Law Committee on Corporate Laws:
     Mary Ann Jorgenson
Section of Business Law Committee on Federal Regulation of Securities:
     Stanley Keller

**\*The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be considered as representing the policy of the American Bar Association.**

©2003 American Bar Association

## I.    BACKGROUND OF THE TASK FORCE

On March 28, 2002, Robert Hirshon, President of the American Bar

Association ("ABA"), appointed a task force with the following charge:

> The Task Force on Corporate Responsibility shall examine systemic
> issues relating to corporate responsibility arising out of the unexpected
> and traumatic bankruptcy of Enron and other Enron-like situations which
> have shaken confidence in the effectiveness of the governance and
> disclosure systems applicable to public companies in the United States.
> The Task Force will examine the framework of laws and regulations and
> ethical principles governing the roles of lawyers, executive officers,
> directors, and other key participants. The issues will be studied in the
> context of the system of checks and balances designed to enhance the
> public trust in corporate integrity and responsibility. The Task Force will
> allow the ABA to contribute its perspectives to the dialogue now occurring
> among regulators, legislators, major financial markets and other
> organizations focusing on legislative and regulatory reform to improve
> corporate responsibility.

On July 16, 2002, the Task Force submitted its Preliminary Report in response to

this charge.[1]  That Report preliminarily recommended reforms in two principal

areas:  internal corporate governance (relating to the composition, conduct and

responsibilities of the public corporation's board of directors and its committees)

and the professional conduct of lawyers.  During the months following release of

the Preliminary Report, the Task Force convened hearings on its preliminary

recommendations in Chicago, New York and Palo Alto, California.  Twenty-seven

witnesses submitted written and oral testimony at those hearings,[2] and the Task

Force received a variety of other written and oral comments on its Preliminary

Report.

---

[1]    The Preliminary Report of the Task Force is published at 58 BUS. LAW.
189 (2002), and is available at
http://www.abanet.org/buslaw/corporateresponsibility/home.html (the "Task Force
Web Site").

[2]    The written and oral testimony submitted at these hearings is available on
the Task Force Web Site.

After succeeding Robert Hirshon as President of the ABA, Alfred P. Carlton, Jr. reappointed the Task Force and, in his testimony to the Task Force in Chicago, encouraged the Task Force to draw "broad public policy conclusions which lead to policy recommendations for the ABA House of Delegates ... that go beyond the technical aspects of corporate securities law and the ABA's model rules of professional conduct."[3]  This Report responds to the Task Force's founding charge from Robert Hirshon and to President Carlton's call for broad policy conclusions.[4]

## II.    OVERVIEW OF THE REPORT

The policy conclusions expressed in this Report address the mechanisms of public corporation governance in the United States,[5] with particular emphasis on the role of lawyers.  Consistent with its charge to examine "systemic issues,"

---

[3]    Testimony of Alfred P. Carlton, Jr., at 91, available on the Task Force Web Site.

[4]    Not all members of the Task Force endorse each recommendation and every view expressed in this Report, but the Report taken as a whole reflects a consensus of the members of the Task Force.  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be considered as representing the policy of the American Bar Association.

[5]    As used in this Report, the term "public corporation" means generally a company that has a class of stock sufficiently widely held as to require registration under Section 12 of the Securities Exchange Act of 1934 ("Exchange Act") or the filing of reports pursuant to Section 15(d) of that Act.  The Task Force believes that many of its recommendations will be relevant to and constructive in the governance of other organizations and entities.  Nevertheless, this Report primarily addresses public corporations because:  the charge to the Task Force explicitly addresses "public companies;" the greatest risk to investors involves public companies; most large companies are publicly held; and the existing pattern of regulation of public corporations through federal securities law and securities trading markets facilitates prompt reform.

the Task Force has not attempted to determine the legal, ethical or moral responsibility of any individual person or organization associated with any particular failure of corporate responsibility.[6] The aim of the Task Force, rather, has been to examine public corporation governance mechanisms to determine how they might be modified in ways that would enhance corporate responsibility.

The term "corporate responsibility" is not self-defining. In framing its recommendations, the Task Force has understood that term to include, at the very least, behavior by the executive officers and directors of the corporation that conforms to law and results from the proper exercise of the fiduciary duties of care and loyalty to the corporation and its shareholders. In the Task Force's view, moreover, the term "corporate responsibility" also embraces ethical behavior beyond that demanded by minimum legal requirements.[7]

From that threshold perspective, the ABA is well positioned to draw public policy conclusions and to contribute to the ongoing debate on matters of public corporation governance that affect corporate responsibility. Particularly through its Section of Business Law, the ABA has long been an important source of

---

[6]    For examples of proceedings in which such determinations are being made, *see In re Enron Corp. Securities, Derivative & ERISA Litigation*, 235 F.Supp.2d 549 (S.D.Tex. 2002); Joint Committee on Taxation's Report of Investigation of Enron Corporation and Related Entities Regarding Federal Tax and Compensation Issues, and Policy Recommendations (Feb. 19, 2003), available at the Task Force Web Site; *SEC v. WorldCom, Inc.,* Litigation Release No. 17866 (Nov. 26, 2002), available at http://www.sec.gov/litigation/litreleases/lr17866.htm; *SEC v. HealthSouth Corporation and Richard M. Scrushy*, Litigation Release No. 18044 (March 20, 2003), available at http://www.sec.gov/litigation/litreleases/lr18044.htm.

[7]    The Task Force's Preliminary Report (at 4-6) articulated this definition of "corporate responsibility." No comments were submitted questioning that definition, and the Task Force adopts it for purposes of this Report.

4

guidance in the formulation of model laws and best practices of corporate governance.[8] The professional careers of its members have included intensive practical experience with and study of public corporations and the legal and ethical framework within which those businesses carry on their activities. Likewise, the ABA's Standing Committee on Ethics and Professional Responsibility, along with numerous other groups within the ABA, has worked for decades on refining and redefining the sensitive and critical role of legal counsel in the area of corporate governance.[9]

The Task Force has drawn upon this experience in responding to the turbulent events in corporate governance since the fall of 2001, and has distilled from those events governance policy recommendations relating to the role of the corporate lawyer (set forth in Part IV of this Report), recommended changes to the Model Rules of Professional Conduct (set forth in Part V of this Report), and

---

[8]     The ABA Section of Business Law, through its Committee on Corporate Laws, has prepared the Model Business Corporation Act, which has been widely followed by the states, and has also published the *Corporate Director's Guidebook* (3rd ed. 2001). That committee continually considers revisions to the Model Act; a fourth edition of the Guidebook, reflecting recent developments and making additional best practices recommendations, is currently in preparation and is expected to be published later this year. The Section of Business Law, through its Committee on Federal Regulation of Securities, has long been actively involved in addressing compliance with federal securities laws, particularly requirements for public corporations to provide full and accurate disclosure.

[9]     A recent example of such work is the ABA's extensive comment letter submitted to the SEC on the rules of attorney conduct proposed by the SEC in November 2002, available at http://www.sec.gov/rules/proposed/s74502/apcarlton1.htm.

5

recommended corporate governance practices (set forth in Part VI of this Report).

These recommendations have not been developed in a static environment. Since the Task Force was appointed, many reforms significantly affecting corporate responsibility have been effected or proposed:

- The Sarbanes-Oxley Act of 2002[10] has brought about, among many other things, extensive federal regulation of the accounting profession, including the creation of an external regulatory organization (the Public Company Accounting Oversight Board), detailed prescriptions governing the auditing work of the firms that certify the financial statements of public corporations, and limits on the scope of non-auditing services that such firms may supply.

- The Securities and Exchange Commission ("SEC"), as well as state regulators and the National Association of Securities Dealers, has also addressed perceived weaknesses in the integrity of securities analysts' assessments of companies' performance and prospects, by adopting regulations requiring such analysts to certify the independence of their reports and to disclose any compensation received from the issuer that is the subject of the reports.[11]

---

[10]    P.L. 107-204, 107th Cong., 2d sess. (July 30, 2002).

[11]    The SEC adopted Regulation AC, pursuant to Section 501 of the Sarbanes-Oxley Act of 2002, on February 20, 2003. The text of Regulation AC is available at http://www.sec.gov/rules/final/33-8193.htm .

- The SEC has also adopted, both on its own initiative and at the direction of the Sarbanes-Oxley Act of 2002, rules implementing enhanced and accelerated disclosure requirements.[12]

- The Sarbanes-Oxley Act of 2002 also prescribed the adoption of substantive requirements for the composition and responsibilities of the audit committees of public corporations with shares listed with the public markets,[13] and established a prohibition against personal loans to directors and executive officers of public corporations.[14]

- In response to concern that existing rules of professional conduct did not sufficiently direct the lawyer for the corporation to report illegal conduct to the corporation's board of directors,[15] Congress adopted Section 307 of the Sarbanes-Oxley Act of 2002,[16] requiring the SEC to promulgate rules

---

[12]    Sarbanes-Oxley Act of 2002, Section 409, adding new Section 13(l) of the Exchange Act; SEC Release No. 33-8128, Acceleration of Periodic Report Filing Dates and Disclosure Concerning Website Access to Reports, Sep. 5, 2002, available at http://www.sec.gov/rules/final/33-8128.htm.

[13]    Sarbanes-Oxley Act of 2002, Section 301.

[14]    *Id.*, Section 402(a), enacting Section 13(k) of the Exchange Act, 15 U.S.C. §78m(k).

[15]    *See, e.g.,* letter of Professors Richard W. Painter, *et al.*, to SEC Chairman Harvey Pitt, dated March 7, 2002, available at http://www.abanet.org/buslaw/corporateresponsibility/pitt.pdf.

[16]    Section 307 requires the SEC to issue rules:

setting forth minimum standards of professional conduct for attorneys appearing and practicing before the Commission in any way in the representation of issuers, including a rule

(1) requiring an attorney to report evidence of a material violation of securities law or breach of fiduciary duty or

of professional conduct for lawyers "appearing and practicing"[17] before the SEC.  In specified circumstances, those rules will require lawyers to report to the highest levels of corporate authority material violations of the securities laws and other failures of legal compliance.  The SEC adopted these rules (the "Part 205 Rules")[18] on January 29, 2003, and has proposed additional rules of conduct that in some circumstances would require a lawyer to withdraw as counsel and to have that withdrawal reported outside the company by the lawyer or, alternatively, by the company.[19]  In describing these proposed rules, the SEC noted with approval this Task Force's Preliminary Report, and its Chairman at the

---

similar violation by the company or any agent thereof, to the chief legal counsel or the chief executive officer of the company (or the equivalent thereof); and

(2)  if the counsel or officer does not appropriately respond to the evidence (adopting, as necessary, appropriate remedial measures or sanctions with respect to the violation), requiring the attorney to report the evidence to the audit committee of the board of directors of the issuer or to another committee of the board of directors comprised solely of directors not employed directly or indirectly by the issuer, or to the board of directors.

[17]    The term "appearing and practicing" before the SEC is defined for purposes of the SEC's new rules of professional conduct to include "providing advice in respect of the United States securities laws or the Commission's rules or regulations thereunder regarding any document that the attorney has notice will be filed with or submitted to" the SEC. 17 CFR §205.2(a).

[18]    17 CFR Part 205, effective Aug. 5, 2003.

[19]    Release Nos. 33-8186; 34-47282; IC-25920, available at http://www.sec.gov/rules/proposed/33-8186.htm .

same time indicated that further rulemaking would be influenced by action taken by the ABA.[20]

- Major stock markets – notably the New York Stock Exchange ("NYSE") and the Nasdaq Stock Market ("Nasdaq") – have submitted to the SEC proposed listing standards for public corporations that will extensively reshape the responsibilities and operating processes of the board of directors, committees of the board, and senior corporate officers, and extend the authority of shareholders.[21]

The Task Force generally endorses these initiatives and adds recommendations of its own – particularly those relating to the role and responsibilities of lawyers –that complement and supplement those initiatives. The Task Force believes that implementation of its recommendations would significantly enhance corporate responsibility through changes in practices and attitudes that address identified failures of corporate governance.  These recommendations acknowledge, however, that effective responses to concerns about public corporation behavior and corporate responsibility must draw upon and operate within the institutional and historical framework of public corporation

---

[20]     *Id.*; speech by former SEC Chairman Harvey Pitt, Jan. 29, 2003, available at http://www.sec.gov/news/speech/spch012903hlp.htm.

[21]     The corporate governance listing standards proposed by the NYSE on August 16, 2002, as modified on March 12, 2003, are available at http://www.nyse.com/abouthome.html?query=/about/report.html.  The listing standards proposed by Nasdaq on November 20, 2002, as modified on March 11, 2003, are available at http://www.nasdaq.com/about/ProposedRules.stm#boards . These listing standards proposals must be (and have not yet been) formally published for comment and ultimately approved by the SEC.

governance in the United States, taking into account the significant changes that have been made in that framework in the last year.  The Task Force also recognizes that recommendations that enhance processes and structural mechanisms will not operate with full effectiveness in the absence of attentive and dedicated service by committed and qualified corporate directors, officers and lawyers.

## III.    THE FRAMEWORK OF PUBLIC CORPORATION GOVERNANCE IN THE UNITED STATES

To most effectively communicate the content and significance of the recommendations in this Report, it is helpful to outline the foundational elements of public corporation governance in which the recommendations would operate.

### A.    The Participants in Public Corporation Governance

The laws governing the organization and governance of public as well as privately held companies in the United States universally establish that the business and affairs of the corporation are to be managed by or under the direction of its board of directors.[22]  At the same time, however, it is generally acknowledged that the board of directors of a public corporation has no practical ability to manage or directly supervise every aspect of the corporation's business and affairs.  Direct operational control of American public corporations is, and must remain, primarily in the hands of their senior executive officers.[23]

---

[22]    *See, e.g.,* 8 *Del. C.*§141(a); Model Business Corporation Act §8.01(b).

[23]    As used in this Report, the term "senior executive officer" means the chief executive officer, the chief operating officer, the chief financial officer, and those officers who perform the functions of one or more of those positions.  *Cf.*

10

This concentration of day to day managerial control in the senior executive officers may give rise to potential conflicts of interest and other motivational problems that present persistent challenges for effective corporate governance. First, senior executive officers of public companies may sometimes succumb to the temptation to serve personal interests by maximizing their own wealth or control through manipulation or misreporting of corporate information, at the expense of long-term corporate well-being.[24] Second, senior executive officers are often motivated to report good news, and are averse to reporting news of business setbacks, mistakes, or worse, out of selfish concern that such reports might adversely reflect on them.[25] Third, senior executive officers may also be motivated to report information and analysis incorrectly or incompletely to the board of directors out of concern that individual directors might pursue unproductive or even disruptive inquiries or initiatives of their own. And finally,

---

Securities Act Rule 405, 17 CFR §230.405; Exchange Act Rule 3b-7, 17 CFR §240.3b-7.

[24]    For example, it has been suggested that increased reliance on stock options in executive compensation packages during the 1990's encouraged senior executive officers to promote short term stock price performance through accounting maneuvers, at the expense of long term growth and stability. *See* The Conference Board Commission on Public Trust and Private Enterprise Findings and Recommendations, Part I: Executive Compensation (Sep.17, 2002) available at http://www.conference-board.org/knowledge/governCommission.cfm, at 4. It may be that executive compensation packages that are structured more carefully to reward long term performance would more closely align the interests of senior executive officers with corporate and investor interests. *See id.* at 5; Business Roundtable, Principles of Corporate Governance (May 2002), available at http://www.brtable.org/pdf/704.pdf, at 19.

[25]    *See, e.g.,* Donald C. Langevoort, *Organized Illusions: A Behavioral Theory Of Why Corporations Mislead Stock Market Investors (And Cause Other Social Harms)*, 146 U. PA. L. REV. 101, 130-146 (1997).

senior executive officers may be motivated to report information and analysis incorrectly or incompletely to the public out of a concern about harming shareholder interests by reporting news that may adversely affect the corporation's stock price. Unchecked, these various motivations on the part of senior executive officers can significantly harm the interests of the corporation and the investors, employees, customers and other constituencies affected by the corporation's business.

To check such potentially harmful motivations, and to focus the attention of senior executive officers on the interests of the corporation and its shareholders, our system of corporate governance has long relied upon the active oversight and advice of the key participants in the corporate governance process, including the directors, auditors and counsel.[26]  Corporate responsibility and sound corporate governance thus depend upon the active and informed participation of independent directors and advisers who act vigorously in the best interest of the corporation and are empowered to exercise their responsibilities effectively.

There are many participants in the governance of public companies who contribute to the oversight of corporate conduct with a view to enhancing corporate responsibility.  The private sector participants include:

---

[26]    *See* M. EISENBERG, THE STRUCTURE OF THE CORPORATION (1976); Noyes E. Leech & Robert H. Mundheim, *The Outside Director of the Publicly Held Corporation*, 31 BUS. LAW. 1799 (1976)

- Boards of directors, whose responsibilities include the duty to oversee management performance in the best interests of the corporation.[27] These governing bodies have increasingly included outside directors (directors not employed by the corporation), and the standards for evaluating their independence from the corporation's senior executive officers have evolved significantly in recent years.[28]

- Public accounting firms, which are required to opine that public corporation financial statements fairly present the financial position and results of operations of the enterprise in conformity with generally accepted accounting principles.[29] Because of their importance to the integrity of the capital markets, and because of concerns arising from

---

[27]    *See, e.g., In re Caremark Int'l Inc. Deriv. Lit.*, 698 A.2d 959 (Del. Ch. 1996); Business Roundtable May 2002 Principles of Corporate Governance at 1; Model Business Corporation Act Annotated §8.31 (2000/01/02 Supp. at 8-204, 8-216P; American Law Institute, Principles of Corporate Governance: Analysis and Recommendations (1994) §3.02(a); The Conference Board Commission on Public Trust and Private Enterprise, Findings and Recommendations Part 2 (Jan. 9, 2003), at 3, available at
http://www.conference-board.org/knowledge/governCommission.cfm.

[28]    *See, e.g.,* the NYSE and Nasdaq listing standard proposals identified in note 21, *supra.* The Task Force has not formulated a definition of director independence for purposes of its recommended corporate governance policies. Inevitably, the appropriate definition of that term will depend upon the nature of the corporation's business and ownership structure. The Task Force notes the significant progress made by the NYSE and the Nasdaq in developing definitions of director independence in their recent listing standard proposals, and acknowledges that, while trading marketplace arbitrage should be avoided, precise uniformity may be unwarranted. In all events the Task Force's initial concern in this regard (Preliminary Report at 14) has been substantially alleviated by the formulation of the pending NYSE and Nasdaq proposals.

[29]    *See* John C. Coffee, Jr., *Understanding Enron: "It's About the Gatekeepers, Stupid,"* 57 BUS. LAW. 1403, 1405 (2002).

13

Enron, WorldCom and other cases in which the reliability of audits of public corporation financial statements has been compromised, the auditing firms for public companies have been subjected in the last year to sweeping regulatory reforms, including the creation of a new national rulemaking and disciplinary commission, the Public Company Accounting Oversight Board, which is itself subject to the oversight and enforcement authority of the SEC.[30]

- Shareholders, particularly institutional investors, who exercise ultimate power to elect and remove directors, and who increasingly seek to influence corporate policy through governance proposals and nominations to the board of directors.[31] Institutional shareholders, of course, have internal limitations of their own: just as with senior executive officers, those who manage institutional investments have some degree of personal interest in reporting positive results of their investment decisions and actions, and may tend to look uncritically at such results, especially where investment success or related compensation are measured by short-term stock price performance.

- Legal counsel who provide advice to public corporations, through their directors, officers and employees, on compliance with the corporation's legal obligations. The competition to acquire and keep client business, or

---

[30]    *Id.;* Sarbanes-Oxley Act of 2002, §§101-110.

[31]    *See, e.g.,* The Conference Board Commission on Public Trust and Private Enterprise, Findings and Recommendations (January 9, 2003), at 15-20, 27.

the desire to advance within the corporate executive structure, may induce
lawyers to seek to please the corporate officials with whom they deal
rather than to focus on the long-term interest of their client, the
corporation.

Other private sector participants who do not have direct, formal governance
responsibility nonetheless perform important roles in promoting corporate
responsibility.

- Securities analysts evaluate corporate performance and prospects and
  communicate their findings to clients and the investor community.  There
  have recently been significant challenges, however, to the independence
  and quality of such evaluations, and suggestions that some analyst
  reports are significantly influenced by direct or indirect compensation paid
  to the analysts by the companies on which they report.[32]

- Credit rating agencies evaluate the financial performance and strength of
  issuers of debt securities and play an important role in alerting investors to
  significant changes in the financial condition of public companies.  In
  response to Congressional direction in Section 702 of the Sarbanes-Oxley
  Act of 2002, the SEC has released a study calling for further evaluation of
  a variety of issues raised by the role of credit rating agencies, including

---

[32]     See, e.g., Gretchen Morgenson, "Accord Highlights Wall Street Failures,"
New York Times, Dec. 20, 2002 at C1; SEC Release No. 33-8193 (Feb. 20,
2003) available at http://www.sec.gov/rules/final/33-8193.htm#P23_2296 .  Rules
recently adopted by the SEC, NYSE and Nasdaq impose more stringent
requirements for disclosure of potentially conflicting interests on the part of
analysts. See note 11, supra; SEC Release No. 34-45908 (May 10, 2002),
available at http://www.sec.gov/rules/sro/34-45908.htm

15

potential conflicts of interest, barriers to entry and the desirability of

enhanced regulatory oversight.[33]

Finally, these private sector participants operate in a framework of legal rules

established by other institutions that supply important regulatory support for

corporate responsibility.

- The courts interpret and enforce the fiduciary responsibilities of corporate

  directors and officers. Indeed, courts can be expected to identify and give

  effect to evolving expectations regarding oversight responsibility, conflicts

  of interest and director independence, and the Task Force believes that

  such common law development may improve the level of corporate

  responsibility. State courts also promulgate and supervise enforcement of

  rules of professional conduct applicable to lawyers in their representation

  of public corporations.

- State legislatures define basic rules of corporate governance and often

  supplement the common law by establishing or refining key duties of

  corporate directors and officers.[34] Recognizing that precise uniformity

  among state corporate statutes is neither a generally accepted goal nor

  easy to achieve, and that state corporate laws must accommodate the

  needs of both private and publicly held enterprises, the Task Force

---

[33]    Report on the Role and Function of Credit Rating Agencies in the
Operation of the Securities Markets, Jan. 24, 2003, available at
http://www.sec.gov/news/studies/credratingreport0103.pdf .

[34]    *See, e.g.,* Model Business Corporation Act §8.30 (standards of conduct for
directors), and §8.42 (standards of conduct for officers).

nonetheless expects that the states – and the drafters of the ABA-
sponsored Model Business Corporation Act – will continue to examine
legislative initiatives to complement other recent legal reforms to improve
corporate responsibility.

- The SEC promulgates rules implementing the federal securities laws
  adopted by Congress, including the extensive reforms effected by the
  Sarbanes-Oxley Act of 2002. By proscribing some conduct and
  prescribing and enforcing requirements for disclosure by public companies
  in areas including financial performance, executive compensation, codes
  of conduct and transactions between the corporation and its directors and
  officers, by ensuring effective exercise of the shareholder franchise, and in
  many other ways, the SEC performs a critical role in enhancing corporate
  responsibility.

- Stock exchanges (such as the NYSE) and other securities markets
  (particularly Nasdaq) establish, subject to review by the SEC, standards
  for admission of a public corporation's shares to trading. Such listing
  standards have established important governance requirements,[35] and in
  recent months both the NYSE and the Nasdaq, at the prompting of the

---

[35]    For an excellent description of the development of stock exchange
governance listing standards, *see* Special Study Group of the Committee on
Federal Regulation of Securities, Section of Business Law, *Special Study on
Market Structure, Listing Standards and Corporate Governance*, 57 BUS. LAW.
1487 (2002).

SEC, have proposed a broad array of new governance listing requirements.[36]

• Federal legislation has from time to time imposed substantive and procedural mandates that specifically affect corporate governance, such as: requiring accurate books and records and internal controls, and proscribing improper payments;[37] prohibiting extension of credit in the form of a personal loan to any director or executive officer;[38] and requiring that a public corporation's periodic financial reports be accompanied by a certification by the chief executive officer and the chief financial officer that the information they contain "fairly presents, in all material respects, the financial condition and results of operations of the issuer."[39]

## B. Identifying and Responding to Shortcomings in Outside Oversight of Public Corporation Governance

Despite the range of private sector participants who have been in a position to contribute to public corporation governance, the last several years have witnessed spectacular failures of corporate responsibility. Knowledgeable observers have asserted that through inaction, inattention, indifference or, in some cases, conflicting personal interests or loyalties, some of these participants bear significant responsibility for these failures, and lawyers have not been

---

[36]    See note 21, *supra.*

[37]    See 15 U.S.C. §§78m(b), Section 13(b) of the Exchange Act.

[38]    15 U.S.C. §78m(k), Section 13(k) of the Exchange Act, added by Section 402 of the Sarbanes-Oxley Act of 2002.

[39]    18 U.S.C. §1350, enacted by Section 906 of the Sarbanes-Oxley Act of 2002.

excluded from such assertions.[40] Inordinate self-interest on the part of corporate executives in short term corporate stock price levels, and instances in which that self-interest has led to aggressive accounting or assumption of extreme business risks, were not tempered by the checks and balances which the general corporate governance scheme expected from the directors or the professional firms engaged by the corporation to provide review and advice. Questionable treatment of financial information evaded audit scrutiny, and important disclosures were not made. Nothing in the record developed in the Task Force's public hearings has called into question the core conclusion, articulated in the Task Force's Preliminary Report, that *the exercise by independent participants of*

---

[40]    *See, e.g.,* Coffee, *supra* note 29; Joel Seligman, *No Man Can Serve Two Masters: Corporate and Securities Law After Enron,* 80 WASH. U. L.Q. 449 (2002); Leo E. Strine, Jr., *Derivative Impact? Some Early Reflections on the Corporation Law Implications of the Enron Debacle,* 57 BUS. LAW. 1371 (2002); William W. Bratton, *Enron and the Dark Side of Shareholder Value,* 76 TUL. L. REV. 1275 (2002). With respect to the conduct of lawyers, *see* Roger C. Cramton, *Enron and the Corporate Lawyer: A Primer on Legal and Ethical Issues,* 58 BUS. LAW. 143 (2002); Report of Investigation by the Special Investigative Committee of the Board of Directors of Enron Corp. by William C. Powers, Jr., Chair, dated February 1, 2002, available at http://news.findlaw.com/hdocs/docs/enron/sicreport/; *In re Enron Corp. Securities, Derivative & ERISA Lit.,* 235 F.Supp.2d 549, 704-05 (S.D.Tex. 2002) (denying motion to dismiss securities law claims against Vinson & Elkins arising out of its representation of Enron); Dennis K. Berman, "Global Crossing Board Report Rebukes Counsel," Wall Street Journal, Mar. 11, 2003, at B9; Mike France, "What About the Lawyers?," Business Week, Dec. 23, 2002 at 58-62; Matthew Brelis and Jeffrey Krasner, "Auditor Knew of Tyco Deals, Prosecutor Says PWC Says It Didn't Know Loans Hadn't Been OK'd," Boston Globe, Feb. 8, 2003, at E-1 (reviewing criminal charges against Mark Belnick, former general counsel of Tyco International, Ltd.).

*active and informed stewardship of the best interests of the corporation has in too many instances fallen short.*[41]

The events of the last two years compellingly call for significant reforms and "consciousness raising" in our system of corporate governance. As previously described, there have already been numerous such reform initiatives.[42] The Task Force believes, however, that important reforms remain to be developed or implemented in a number of areas. The policy principles recommended in this Report address two of these areas: the role of lawyers and the role of directors. These principles are intended to enhance the ability of corporate counsel and directors to discharge their corporate governance responsibilities more effectively. In the next two parts of this section, we review briefly some of the background premises that have led us to recommend the policies articulated in this Report.

## C. The Role of Lawyers for the Public Corporation

Lawyers are and should be important participants in corporate governance and important contributors to corporate responsibility. Lawyers employed by the corporation and outside lawyers retained by the corporation often serve as key advisers to senior management and usually participate in the negotiation, structuring and documentation of the corporation's significant business transactions. Additionally, lawyers often serve as counselors to the board to assist it in performing its oversight function. In such roles, lawyers obviously do

---

[41] Preliminary Report at 10.

[42] *See* Part II, *supra.*

20

and should play a critical role in helping the corporation recognize, understand and comply with applicable laws and regulations, as well as to identify and evaluate business risks associated with legal issues. The Task Force believes that a prudent corporate governance program should call upon lawyers – notably the corporation's general counsel[43] – to assist in the design and maintenance of the corporation's procedures for promoting legal compliance.

This conception of the lawyer as a promoter of corporate compliance with law emanates from the basic values of the legal profession. It follows naturally from the ABA's goal "to increase public understanding of and respect for the law, the legal process, and the role of the legal profession."[44]  It is also in keeping with the ABA's Model Rules of Professional Conduct,[45] which emphasize the lawyer's responsibility "[a]s advisor [to] provide[] a client with an informed understanding of the client's legal rights and obligations and explain[] their practical implications."[46]

The Model Rules reinforce this positive relationship between lawyers and their clients in a number of other ways. They require the lawyer to be competent

---

[43]     As used in this Report, the term "general counsel" refers to the lawyer having general supervisory responsibility for the legal affairs of the corporation. *See* n. 63, *infra*.

[44]     ABA Goals and mission statement, Goal IV, available at http://www.abanet.org/about/goals.html.

[45]     Referred to in this Report as "Model Rules" or "Rules."  These rules are the template used by most state authorities in formulating and promulgating the rules that bind the lawyers admitted to practice in those states.  The Model Rules are available at http://www.abanet.org/cpr/mrpc/mrpc_toc.html.

[46]     Model Rules Preamble ¶[2].

and diligent in rendering legal services;[47] to respect the client's right to decide on objectives;[48] to consult with the client about the means by which the client's objectives are to be accomplished;[49] to protect the client's information; and to avoid conflicts of interest. The obligations of confidentiality and loyalty, however, never permit the lawyer to "counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent."[50]  To the contrary, the lawyer is not permitted to "continue assisting a client in conduct that the lawyer originally supposed was legally proper but then discovers is criminal or fraudulent."[51]

The Task Force acknowledges that lawyers for the corporation – whether employed by the corporation or specially retained -- are not "gatekeepers" of corporate responsibility in the same fashion as public accounting firms. Accounting firms' responsibilities require them to express a formal public opinion, based upon an independent audit, that the corporation's financial statements fairly present the corporation's financial condition and results of operations in

---

[47]     Model Rules 1.1, 1.3.

[48]     Model Rule 1.2.

[49]     Model Rule 1.4(a)(2).

[50]     Model Rule 1.2(d).  One of the witnesses in the Task Force hearings usefully suggested that this aspect of Model Rule 1.2 deserved to be expressed in a separate rule.  Statement of Mark L. Tuft on behalf of the Bar Association of San Francisco, at 12, available on the Task Force Web Site.

[51]     Model Rule 1.2, Comment [10].

conformity with generally accepted accounting principles.[52]  The auditor is subject to standards designed to assure an arm's length perspective relative to the firms they audit.  In contrast, as several commentators pointed out in the public hearings on the Preliminary Report, corporate lawyers are first and foremost counselors to their clients.[53]  Except in clearly defined circumstances in which other considerations take precedence, an alternative view of the lawyer as an enforcer of law may tend to create an atmosphere of adversity, or at least arm's length dealing, between the lawyer and the corporate client's senior executive officers that is inimical to the lawyer's essential role as a counselor promoting the corporation's compliance with law.

Nevertheless, lawyers for the public corporation must bear in mind that their responsibility is to the corporation, and not to the corporate directors, officers or other corporate agents with whom they necessarily communicate in representing the corporation. This is the bedrock principle recognized in Rule 1.13(a) of the Model Rules.  Outside lawyers retained by the corporation and lawyers employed by the corporation both must exercise professional judgment in the interests of the corporate client, independent of the personal interests of the corporation's officers and employees.

---

[52]     *See, e.g.,* R. William Ide, *Post-Enron Corporate Governance Opportunities: Creating a Culture of Greater Board Collaboration and Oversight*, 54 MERC. L. REV. 829, 841-843 (2003); Coffee, *supra* note 29, at 1405 ("Characteristically, the gatekeeper essentially assesses or vouches for the corporate client's own statements about itself or a specific transaction"); *see* Regulation S-X Rule 2-02, 17 CFR §210.2-02.

[53]     *See* note 84, *infra.*

Lawyers who provide legal advice to corporate clients most effectively fulfill that duty of independent professional judgment by gaining a thorough understanding of the client's objectives, so that they can most readily identify means to achieve those objectives that comply with applicable law. Yet while that depth of understanding of the corporate client depends upon active and close involvement with the corporation's officers, lawyers must at the same time retain the professional detachment that allows them to recognize and point out issues of legal compliance, even at the risk of being perceived as unduly pessimistic or obstructive of the business plans sought by the corporation's executive officers. There are times, moreover, when the corporate lawyer must recognize that his or her own independence may be compromised by relationships with senior executive officers; at such times, the lawyer's responsibility may require him or her to assure that the corporate client retains other counsel who can exercise the requisite professional detachment.[54]

The recommendations in this Report relating to lawyers are intended to enhance the lawyer's ability to exercise and bring to bear independent professional judgment, and thereby enhance the lawyer's ability to promote

---

[54]    It has been suggested that such considerations warrant, as a matter of regular practice, the retention of counsel other than general corporate counsel to advise the board of directors or one or more of its committees. The Task Force believes that such a practice generally would not be desirable. Apart from the added cost of additional counsel, the division of management and the board of directors into two separately counseled factions may result in less open communication, less constructive collaboration between directors and senior executive officers, and, ultimately, less effective oversight by the board of directors. The Task Force recognizes, however, that there are situations in which separate counsel, for the board or one or more of its committees, may be necessary or desirable.

24

corporate responsibility without undermining the constructive and collaborative relationship that must exist with the client so that compliance with law can be most effectively promoted.

## D. The Role of Directors

The directors of a public corporation are expected to serve an important function in overseeing the conduct of senior executive officers.   The ability of outside directors to discharge that function effectively, however, has at times been compromised by the practical realities of the relationship between such directors and the senior executive officers – particularly the chief executive officer – of the corporation:

- Outside directors have at times been overly dependent upon and overly passive with respect to senior executive officers, particularly the chief executive officer; conversely, such officers too often have looked on outside directors as a sounding board but not as persons to be encouraged to press issues or independently raise troubling questions.

- Outside directors too often have relied almost exclusively upon senior executive officers, and advisers selected by such officers, for information and guidance about corporate affairs.

- Outside directors too often have failed to devote adequate time and attention to discharge their oversight responsibilities that demand a relatively detailed understanding of a number of aspects of the corporation's activities and its material transactions.

25

- Outside directors too often have deferred to the senior executive officers to set agendas for meetings of the board, select director nominees, initiate the analysis of and in effect determine executive compensation, select the key advisers to the board and its committees (*e.g.*, compensation consultants), and select the outside auditors for the company.

- Too often, even when an outside adviser is formally engaged by the board of directors or by a committee of the board, the adviser's view of the senior executive officers as the client has influenced the advice rendered.

The Task Force recognizes that it is not desirable for directors to try to manage the corporation directly and comprehensively, and that there are inherent limitations on the abilities of outside directors to assure corporate responsibility.[55] Directors cannot be expected to know all aspects of corporate activity, and they will necessarily rely to a significant extent upon information supplied by the corporation's senior executive officers and other corporate agents. Moreover, it is widely accepted that competent directors are not expected to serve in an environment in which they can be held personally liable for injury to the corporation arising from honest mistakes or omissions, as long as they act on a reasonably informed basis, in good faith and free of conflicting

---

[55]     At least one commentator has thoughtfully questioned the utility of listing standards that require more extensive reliance upon outside directors as a means to enhance corporate responsibility and performance. Stephen M. Bainbridge, *A Critique of the NYSE's Director Independence Listing Standards*, 30 SEC. REG. J. 370 (2002).

personal interests or loyalties.[56]  Thus, "[d]*irectors cannot guarantee corporate
compliance; they can only be expected to undertake and execute good faith
efforts to ensure that it occurs.*"[57]

It is the sense of the Task Force, however, that many corporate boards
have developed a culture of passivity with respect to senior executive officers, in
which those officers are not subject to meaningful director oversight.[58]  Direct
legislative action or the imposition of legal sanctions to change this culture may

---

[56]    The rationale for this relatively expansive legal deference to good faith
action of directors has several components.  First, it is widely agreed that director
liability for ordinary negligence would unduly discourage socially useful decisions
by directors to pursue risky but potentially rewarding business strategies.  *See
Gagliardi v. Tri-Foods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996); *Joy v.
North*, 692 F.2d 880, 884-86 (2d Cir. 1982).  Second, the complexity of business
decisions by directors creates a likelihood of undue hindsight bias in evaluating
unfavorable outcomes.  Hal R. Arkes and Cindy A. Schipani, *Medical Malpractice
v. The Business Judgment Rule: Differences in Hindsight Bias*, 73 OR. L. REV.
587, 588, 591-93 (1994).  Third, and in light of such complexity, director liability
for good faith conduct promotes excessively costly precautionary measures, has
a chilling effect on candid exchanges of information and criticism, and promotes
overextended adherence to failed business strategies in order to avoid
admissions of mistake.  *See* Donald C. Langevoort, *The Human Nature of
Corporate Boards: Law, Norms, and the Unintended Consequences of
Independence and Accountability*, 89 GEO. L. J. 797 (2001).

[57]    Strine, *supra*, 57 BUS. LAW. at 1393 (emphasis in original).

[58]    SEC Chairman William H. Donaldson recently articulated this same view:

Over the past decade or more, at too many companies, the chief
executive position has steadily increased in power and influence. In some
cases, the CEO had become more of a monarch than a manager. Many
boards have become gradually more deferential to the opinions,
judgments and decisions of the CEO and senior management team. This
deference has been an obstacle to directors' ability to satisfy the
responsibility that the owners -  the shareholders - have delegated and
entrusted to them.

Remarks at the 2003 Washington Economic Policy Conference, Mar. 24, 2003,
available at  http://www.sec.gov/news/speech/spch032403whd.htm.

27

produce a confrontational climate in the board room which would have undesirable consequences. The Task Force believes, rather, that desirable changes in attitude can most effectively be encouraged by a variety of structural and procedural reforms. The policies and practices recommended in this Report with respect to the role of the board of directors attempt to address issues of outside director attitude largely by suggesting means to enhance the independence and resources of the outside directors, and to increase the flow of material information and analysis to those directors. In this respect, the recommendations in this Report support the basic thrust of the new listing standards proposed by the NYSE and the Nasdaq, and the governance recommendations made by the Conference Board and the Business Roundtable and, in the United Kingdom, by the recent Higgs Report.[59] All of these authorities have urged the adoption, either through listing standards or best practices guidelines, of processes that augment the independence of outside directors from senior executive officers, afford such directors greater responsibilities in the selection of board nominees and in the oversight of financial reporting and legal compliance and encourage such directors to become generally more active and assertive in their supervisory roles.

Changes in structure and process alone, however, will never fully accomplish the enhancements in corporate responsibility contemplated by this

---

[59]    20 January 2003 Report of Derek Higgs to the Chancellor of the Exchequer and the Secretary of State for Trade and Industry, entitled *Review of the role and effectiveness of non-executive directors*, available at http://www.dti.gov.uk/cld/non_exec_review/pdfs/higgsreport.pdf .

28

Report. Even the most stringent prescriptions for involvement of outside

directors will not generate the backbone to *act* independently and objectively

which the Task Force believes is necessary to an effective system of corporate

governance.[60] The goal of the policies and practices recommended in this

Report will only be fully achieved if outside directors abandon the passive role

many have been content to play, and replace it with a new culture stressing

constructive skepticism[61] and an active, independent oversight role.

\*       \*       \*       \*       \*       \*       \*       \*       \*

The foregoing considerations form the backdrop to the Task Force's

recommendations set forth in the following sections of this Report.    The Task

Force recognizes that there are different ways of implementing these

recommendations, ranging from state law changes to trading market listing

standards to federal statutory or SEC regulatory prescriptions to institutionally

sponsored "best practices." The Task Force does not take a position on which

method is preferable in any particular case, but urges that the ABA and

---

[60]     Business Roundtable May 2002 Principles of Corporate Governance, at 2
("[e]ven the most thoughtful and well-drafted policies and procedures are
destined to fail if directors and management are not committed to enforcing them
in practice."); Donaldson, *supra* note 58 ("a 'check the box' approach to good
corporate governance will not inspire a true sense of ethical obligation. It could
merely lead to an array of inhibiting, 'politically correct' dictates. If this was the
case, ultimately corporations would not strive to meet higher standards, they
would only strain under new costs associated with fulfilling a mandated process
that could produce little of the desired effect. They would lose the freedom to
make innovative decisions that an ethically sound entrepreneurial culture
requires.").

[61]     *See* The Business Roundtable May 2002 Principles of Corporate
Governance at 3; Phyllis Plitch, "Ex-Sec Chief Advocates Openness," Ft.
Lauderdale Sun-Sentinel, Mar. 23, 2003 (quoting former SEC Chairman Arthur
Levitt).

appropriate entities within the ABA proceed promptly to evaluate and, where appropriate, develop specific ways in which to implement the Task Force's recommendations.

## IV.  RECOMMENDED POLICIES OF CORPORATE GOVERNANCE

To improve the governance of public corporations[62] and enhance

corporate responsibility, the Task Force recommends the corporate governance

practices set forth in Part VI and adoption of the following governance policies as

ABA policy:

1.  **The board of directors of a public corporation must engage in active, independent and informed oversight of the corporation's business and affairs, including its senior management.**

2.  **In order to improve the effectiveness of such oversight, the board of directors of a public corporation should adopt governance principles (more fully specified in Part VI of this Report) that (a) establish and preserve the independence and objectivity of directors by eliminating disabling conflicts of interest and undue influence or control by the senior management of the corporation and (b) provide the directors with timely and sufficient information and analysis necessary to the discharge of their oversight responsibilities.**

3.  **The directors should recognize and fulfill an obligation to disclose to the board of directors information and analysis known to them that is relevant to the board's decision making and oversight responsibilities.  Senior executive officers should recognize and fulfill an obligation to disclose, to a supervising officer, the general counsel, or the board of directors or committees of the board, information and analysis relevant to such persons' decision making and oversight responsibilities.**

4.  **Providing information and analysis necessary for the directors to discharge their oversight responsibilities, particularly as**

---

[62]    While these recommendations address public corporations, the Task Force believes that many nonpublic organizations and entities would benefit from many of these policies and recommends that all organizations and entities consider whether these policies would promote compliance with law and ethical standards.

31

they relate to legal compliance matters, requires the active involvement of general counsel for the public corporation.[63]

5.  A lawyer representing a public corporation shall serve the interests of the entity, independent of the personal interests of any particular director, officer, employee or shareholder.

6.  The general counsel of a public corporation should have primary responsibility for assuring the implementation of an effective legal compliance system under the oversight of the board of directors.

7.  Public corporations should adopt practices in which:

    a.  The selection, retention, and compensation of the corporation's general counsel are approved by the board of directors.

    b.  General counsel meets regularly and in executive session with a committee of independent directors to communicate concerns regarding legal compliance matters, including potential or ongoing material violations of law by, and breaches of fiduciary duty to, the corporation.

    c.  All reporting relationships of internal and outside lawyers for a public corporation establish at the outset a direct line of communication with general counsel through which these lawyers are to inform the general counsel of material potential or ongoing violations of law by, and breaches of fiduciary duty to, the corporation.

8.  The Model Business Corporation Act and the general corporation laws of the states, and the courts interpreting and applying the duties of directors, should more clearly delineate the oversight responsibility of directors generally, and the unique role that independent directors play in discharging that responsibility in public company settings.[64]

---

[63]     If a public corporation has no internal general counsel, it should identify and designate a lawyer or law firm to act as general counsel. The responsibility for implementing these recommended policies may necessarily be delegated to some extent by the general counsel to subordinate lawyers.

[64]     Among the specific oversight matters which should be considered in relation to the Model Business Corporation Act or its commentary and the state corporate laws as well as in relation to important guidance such as the *Corporate*

9.  Engagements of counsel by the board of directors, or by a committee of the board, for special investigations or independent advice should be structured to assure independence and direct reporting to the board of directors or the committee.

10. The SEC and state attorney disciplinary authorities should cooperate in sharing information in order to promote effective and appropriate enforcement of rules of conduct applicable to counsel to public corporations.

11. The courts, law schools and lawyer professional organizations such as the ABA should promote awareness of, and adherence to, the professional responsibilities of lawyers in their representation of public corporations.

12. Law firms and law departments should adopt procedures to facilitate and promote compliance with rules of professional conduct governing the representation of public corporations.[65]

---

*Director's Guidebook*, are at least the following: selecting, evaluating and compensating the chief executive officer and other members of senior management; reviewing, approving, and monitoring fundamental financial and business strategies and the performance of the company relative to those strategies; assessing major risks facing the company; and ensuring that reasonable processes are in place to maintain the integrity of the company and the corresponding accountability of senior management, including processes relating to integrity of financial reporting, compliance with law and corporate codes of legal and ethical conduct, and processes designed to prevent improper related party transactions. Federal law (particularly the securities laws, including the rules and regulations adopted by the SEC) also plays a significant role in affecting and promoting corporate responsibility.

[65]    In its Preliminary Report (at 43), the Task Force stated the intention to consider issues involving potential conflicts of interest arising out of lawyers' business and investment relationships with clients. The testimony submitted to the Task Force, however, did not significantly focus on such issues, and the Task Force therefore recommends that further review of the issues be undertaken by interested professional organizations, including the appropriate ABA entities.

## V.    RECOMMENDATIONS CONCERNING THE ROLE OF LAWYERS

In formulating recommendations relating to the role of lawyers, the primary goal of the Task Force has been to enhance the ability of lawyers to promote compliance with law. The recommendations relating to lawyers are found in the corporate governance policies set forth in Part IV and in the Model Rule changes discussed in this Part. These recommendations address two principal subjects: (1) the role of lawyers in facilitating the flow of information and analysis concerning legal compliance issues within the organizations they represent (including public corporations); and (2) the limitations on the ability of the lawyer to disclose to third parties information concerning criminal or fraudulent conduct by the client.

Many of the corporate governance policy recommendations set forth in Part IV address the development of prudent practices to facilitate communication between the lawyer and the corporate client in relation to legal compliance matters. The Task Force believes that the development of such practices, by encouraging early and regular attention to and communication about potential problems of legal compliance, will significantly diminish the occurrence of material violations of law.

The Task Force recognizes, however, that even where the recommended practices are applied, corporate officers and employees may take actions that involve the corporation in material violations of law. Such actions may occur where officers or employees reject legal advice, or where they fail to consult a lawyer. The Task Force believes that the Model Rules (particularly Rules 1.13

and 1.6) that address the professional responsibility of lawyers when such circumstances arise should be revised in order to promote legal compliance.[66]

## A. Facilitating the Flow of Information and Analysis Within Organizational Clients.

In their role of promoting their organizational clients' compliance with law, a key function of lawyers is to bring issues of legal compliance to the attention of appropriate authorities within the organization. The Task Force believes that there are two useful approaches to enhancing the efficacy of this role. The first (set forth in Section 1 below and in the policies set forth in Part IV) involves the adoption by public corporations of practices and procedures in which both employed (in-house) lawyers and outside lawyers for the corporation can more readily and effectively convey to appropriate organizational authorities information and analysis concerning issues of legal compliance. The second approach (set forth in Section 2 below) supplements the first approach by recommending that the Model Rules (especially Rule 1.13) be amended to address more effectively the relatively unusual situation in which action or threatened action by an organization's employee violates a law or legal obligation and is likely to cause substantial injury to the organization.

---

[66]    This Report continues the practice traditionally used in the Model Rules of speaking about the responsibilities of individual lawyers. However, in many cases involving representation of publicly held corporations, the corporate client is advised by a law firm. The interplay of lawyer obligations to the corporation and lawyer obligations to each other in the context of law firm practice are generally addressed in Model Rules 5.1 and 5.2. A direct, detailed analysis of the responsibilities of a law firm and the lawyers within the firm and the procedures that would facilitate discharge of their responsibilities would be a useful addition to the literature on professional responsibilities, and the Task Force recommends that an appropriate committee of the ABA undertake such an analysis.

1.   *Establishing Lines of Communication*

The Task Force recommends the adoption of corporate governance policies that would facilitate and encourage independent oversight of potential violations of law and breaches of duty to the corporation. Among the policies set forth in Part IV are two policies which the Task Force believes are of particular importance. First, the board of directors should establish a practice of regular, executive session meetings between the general counsel[67] and a committee of independent directors.[68] Second, each retention of outside counsel to the corporation should establish two things at the outset of the engagement: (1) a direct line of communication between outside counsel and the corporation's general counsel; and (2) the understanding that outside counsel are obliged to apprise the general counsel, through that direct line of communication, of material violations or potential violations of law by the corporation or of  material violations or potential violations of duties to the corporation. The reasons for these recommended practices are set forth below.

Communication Between General Counsel and Independent Directors

The general counsel of a corporation works day to day with senior management and typically reports to the CEO or another senior executive officer.

---

[67]   Reference to the general counsel includes, where appropriate, the general counsel's staff and, where no office of general counsel has been established to perform this function, outside counsel performing a similar role with respect to corporate governance, compliance or disclosure. *See* note 63, *supra*.

[68]   In recommending such meetings, the Task Force recognizes that their purposes may be fulfilled in many instances by meetings in which only the chair of the committee is present, especially if the chair is expected to report to the committee relevant information learned at such meetings. *See* Part IV, *supra*, recommendations 3 and 7b.

Although this interaction is necessarily with individual members of management, the general counsel's client is the corporation. This creates a tension whose positive resolution demands a number of practical steps.

Where the general counsel concludes that action or inaction of an officer or employee with whom counsel works is breaching or will breach a duty to the corporation, or is violating or will violate a law, such that substantial injury to the corporation is likely to ensue, counsel may have to confront the issue of communicating with a higher corporate authority on the subject.[69] If the relevant officer or employee is a senior executive officer or, most difficult, the CEO, general counsel must determine whether to go up the corporate ladder to a committee of independent directors or to the entire board. Knowing that doing so may destabilize the relationships among senior executive officers and directors, the general counsel may be reluctant to communicate with the board of directors or a committee of the board.

The Task Force believes, however, that such impediments to communication to higher corporate authorities can be minimized or eliminated if the board of directors adopts a practice in which the general counsel, as a matter of routine, periodically meets privately with a committee of independent directors. The value of such meetings will be maximized if the committee has instructed

---

[69]    Indeed, the Part 205 Rules may impose such an obligation as a matter of law. *See* 17 CFR §205.3(b)(2) ('Unless the chief legal officer … reasonably believes that no material violation has occurred, is ongoing, or is about to occur, he or she shall take all reasonable steps to cause the issuer to adopt an appropriate response, and … may refer a report of evidence of a material violation to a qualified legal compliance committee [of the board of directors]."); and §205.3(b)(1).

general counsel to use those occasions to report on material violations or potential violations of law, breaches of duty to the corporation and other substantial legal concerns, such as significant litigation and contingent liabilities, relating to the welfare of the corporation that have come to general counsel's attention. The committee should make clear to general counsel the expectation that such reports will reveal what investigation of facts has been made, what steps have been taken to deal with any violation or breach that has occurred, and the steps taken or recommended to make sure such violation or breach does not recur. Use of this procedure would establish an expectation by the board that the general counsel will report concerns about significant legal compliance issues, and would to some extent insulate such communications from being perceived by senior executive officers as disruptive. Indeed, the fact that the general counsel is expected to make such disclosure may persuade the CEO to take corrective action or personally report such issues directly to the committee.[70]

The Task Force therefore believes that a practice of having routine, periodic private meetings (designed to elicit specific information) between the general counsel and an appropriate committee of independent directors would significantly enhance the general counsel's ability to assure that critical issues,

---

[70]    The committee may respond to the general counsel by agreeing with the CEO's position that the corporation must, as a matter of business strategy, take the risk of engaging in the conduct questioned by the general counsel. At that point, general counsel would need to evaluate whether the Part 205 Rules and the applicable rules of professional conduct require or permit the lawyer to take any further action.

including all issues of material law and fiduciary duty violations, are reviewed by appropriate corporate authorities.

### Communication between Outside Counsel and General Counsel

The corporation is commonly served by a number of outside counsel who interact with specific corporate employees. Many outside counsel may not have regular contact with the corporation's senior executive officers (including the CEO), and they typically do not interact with the board of directors or its independent members. In the absence of such contact, outside counsel who knows of facts from which such counsel concludes that a duty to the corporation is being or has been breached or that the corporation may be violating or potentially violating the law is unlikely to have access to the corporation's resources that would permit an appropriate investigation to be made.

In such a circumstance, Model Rule 1.13 or the Part 205 Rules may require the outside counsel to communicate with higher corporate authorities, and such communication may be a desirable contribution to corporate governance even if the rules of professional conduct do not mandate it. There are frequently significant practical obstacles, however, to outside counsel bringing such misconduct to the attention of appropriate corporate authorities. In many situations operational personnel will hire (or be perceived as hiring) outside counsel and be responsible for future hires of counsel. Consequently, outside counsel may be discouraged from fulfilling the professional responsibility to the corporation out of concern over offending the personal desires or interests of the

employee or department which retains counsel. The outside counsel must
nevertheless comply with applicable rules of professional conduct.

Such compliance, as well as otherwise beneficial communication of
concerns about legal compliance, can be fostered by the adoption of a practice
under which the general counsel makes clear to outside counsel, at the outset of
the representation and in periodic communications thereafter, that when outside
counsel knows of facts from which such counsel concludes that an officer or
employee is engaged in conduct which has resulted or will result in material
violations of law or fiduciary duty to the company, outside counsel should
communicate those facts to the general counsel.[71] General counsel may have
additional information, typically has the resources to investigate further, and is
charged with responsibility to pursue such inquiries in appropriate situations.
General counsel's instruction that outside counsel make his or her concerns
known to the general counsel is designed to elicit important information and
analysis and direct it to a place in the corporate structure where appropriate
action can be taken.[72]

> *2. Reinforcing the Obligation to Communicate with Higher
> Corporate Authorities*

---

[71]   Certainly this is the practice contemplated in the Part 205 Rules; under
those rules, if a lawyer is required to report evidence of a material violation, that
duty may be satisfied by reporting to the corporation's chief legal officer. 17 CFR
§205.3(b)(1).

[72]   This procedure may not be effective where outside counsel knows or has
reason to believe that general counsel will not handle the problem properly either
because of a disabling conflict of interest or because of weakness or
incompetence. In those cases, the applicable rules of professional conduct
should guide the outside counsel in dealing with presenting concerns about
corporate misconduct to higher levels of authority within the corporation.

40

Like the practices recommended in the previous section, Model Rule 1.13 addresses internal communications among the organization's lawyers, officers, employees and ultimate governing body. The first provision of that Rule recognizes that, for purposes of a lawyer's professional responsibilities, the client is the organization itself. It provides:

> (a)    A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.[73]

Rule 1.13 next addresses the actions to be taken by the lawyer within the organizational client. The key provision, in current Rule 1.13(b), is that the lawyer must take appropriate action in the best interest of the client, namely the organization. While this obligation is a mandate, the Rule cannot and does not prescribe precisely what action is appropriate; the lawyer is obligated to exercise informed professional judgment in determining what steps are "reasonably necessary in the best interest of the organization." That can be determined, in specific detail, only in the context of the circumstances in which the problem arises. The current rule suggests, very generally, a few kinds of action open to the lawyer, but mandates none of them. The Task Force has concluded that these provisions confuse rather than clarify the mandatory nature of the lawyer's obligations under the rule, and accordingly recommends that they be deleted.[74]

---

[73]    The full text of existing Model Rule 1.13 and its Commentary is reproduced in Appendix A to this Report, along with a version marked to show the changes recommended by the Task Force. The Task Force is not recommending any change to Rule 1.13(a).

[74]    For similar reasons, the Task Force recommends that the Comments to the present Rule be modified so as to remove or revise statements that

41

In lieu of those open-ended provisions, the Task Force recommends two substantive revisions to Rule 1.13(b). The first is a refinement of the definition of the circumstances that trigger the lawyer's duty to take action within the organization. The second clarifies the circumstances in which the lawyer is required to communicate with a higher authority within the organization. Currently, Rule 1.13(b) requires a lawyer for an organizational client to act when the lawyer "knows"[75] that a person within the organization is violating or intends to violate the law and is likely to cause substantial injury to the organization. The Task Force recommends that this prerequisite be revised to differentiate between knowledge of facts and evaluation of legal consequences. As under the current rule, the starting point of the recommended rule is subjective: the obligation to take action would arise only on the basis of the facts known to the lawyer.[76] The

discourage the lawyer from taking a matter up to higher authority within the organizational client.

[75]     As defined in Model Rule 1.0(f), the terms "knowingly," "known," or "knows" refer to actual knowledge and do not include knowledge that could be imputed to the lawyer. Actual knowledge can, however, be inferred from circumstances. Furthermore, lawyers cannot close their eyes to the obvious, *i.e.* the lawyer may be deemed to "know" that which the lawyer consciously avoided knowing. *See* Comment [8] to Model Rule 4.2 and ABA *Formal Ethics Opinion* 346 (1982) (lawyers cannot "shut their eyes to what was plainly to be seen").

[76]     In its Preliminary Report, the Task Force considered whether the triggering standard should be "reasonably should know," a standard that under Rule 1.0(j) denotes that "a lawyer of reasonable prudence and competence would ascertain the matter in question." The proposal to incorporate that standard in the trigger to required action under Rule 1.13 drew substantial criticism from those who presented testimony or statements to the Task Force. *See, e.g.,* written testimony of Prof. Thomas D. Morgan dated Sep. 20, 2002, at 16-17; written testimony of the New York County Lawyers' Association dated Oct. 25, 2002, at 5-6; written statement of Prof. Stephen Gillers, dated Oct. 25, 2002, at 2; written testimony of Patricia Lee Refo on behalf of the ABA Section of Litigation, at 13-15; written submission of the American Corporate Counsel

proposed trigger for requiring action by the lawyer then proceeds to an objective test, namely, whether a reasonable lawyer who knows such facts would, in similar circumstances, conclude that the conduct in which a constituent is engaging or intends to engage constitutes a violation of law or duty to the organization that is likely to result in substantial injury to the organization. This standard recognizes that there is a range of reasonable conduct, and that a lawyer satisfies that standard by acting within that range. Moreover, it does not imply any duty on the lawyer's part to investigate or inquire further as to information provided by a client or the client's agent, or by a person to whom the lawyer has been referred by the client.[77]  Although the lawyer is under no duty to investigate or inquire, however, the lawyer may not simply accept such information at face value if to do so would be unreasonable in the circumstances.

The second substantive change to Rule 1.13(b) recommended by the Task Force addresses the lawyer's obligation to report wrongdoing to higher authority in the organizational client. Currently, that rule identifies "reporting up" as a potential course of action when the lawyer has discerned an actual or threatened violation of law or violation of legal obligation to the organization, but the Rule imposes no clear obligation to pursue that course of action. The Task

Association dated Nov. 11, 2002, at 6, all available on the Task Force Web Site. The concern of the critics was that this standard may impose a duty, of uncertain extent, to investigate that could only be evaluated after the fact with the benefit of hindsight. They noted also that the lawyer may not be able to insist that the client pay for, or even permit, the investigation that may, in the light of hindsight, prove to have been necessary.

[77]    This standard is thus similar to the standard used to trigger the "reporting up" obligations in the Part 205 Rules. *See* §§ 205.3(b)(2) and 205.2(e).

Force believes, however, that the Rule should more actively encourage such action, by requiring that the lawyer refer the matter to higher authority in the organization – including, if warranted, the organization's highest authority -- unless the lawyer reasonably believes that it is not necessary to do so.[78]

Thus, Rule 1.13(b) as recommended by the Task Force would provide:

(b)    If a lawyer for an organization knows facts from which a reasonable lawyer, under the circumstances, would conclude that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law which reasonably might be imputed to the organization, and that is likely to result in substantial injury to the organization, then the lawyer shall proceed as is reasonably necessary in the best interest of the organization. Unless the lawyer reasonably believes that it is not necessary in the best interest of the organization to do so, the lawyer shall refer the matter to higher authority in the organization, including, if warranted by the circumstances, the highest authority that can act on behalf of the organization as determined by applicable law.

It is important to emphasize that Rule 1.13 is *not* a guide to "best legal practices." It provides instruction in the extraordinary circumstance of a significant failure of governance that puts or threatens to put the interest of the organization into serious legal jeopardy, and the nature of the required response of the lawyer for the organization if this extraordinary circumstance should occur.  It does not limit the responsibility of the lawyer to act always in the best interest of the organization, and it certainly permits the lawyer to bring to the attention of the client, including its highest authority, matters not covered by the Rule, but which

---

[78]    Thus, unlike the relatively rigid reporting requirements in the Part 205 Rules, proposed Rule 1.13 would continue to allow the lawyer to exercise professional judgment in determining the appropriate way to proceed in the best interest of the organization.

the lawyer reasonably believes to be of sufficient importance that the client needs to be informed of them.

In its deliberations, the Task Force considered whether the lawyer's duties under the Rule should continue to be triggered only by matters that are "related to the representation." The Task Force's Preliminary Report recommended that the Rule require the lawyer to act with respect to any known violation, even if not related to the representation.[79] Others pointed out, however, that it would be unfair to hold responsible a lawyer working in one field of the law to understand that facts of which he was aware should have led to a conclusion of law violation in a field with which he was unfamiliar.[80] The Task Force is persuaded by this analysis and recommends that this qualification be retained in the Rule.[81]

The Task Force also recommends that Rule 1.13 be amended to include a new provision to assure that the organization's highest authority is made aware that a lawyer for the organization has withdrawn or is discharged in circumstances addressed by the Rule. In some instances, the actions of the

---

[79]    Preliminary Report at 29. Some commentators supported that preliminary recommendation. *See, e.g.,* letter of Prof. Myles V. Lynk dated Sep. 17, 2002, at 5.

[80]    *See, e.g.,* statement of Mark L. Tuft on behalf of the Bar Association of San Francisco, Nov. 11, 2002, at 15, available on the Task Force Web Site.

[81]    The Part 205 Rules are triggered if "an attorney, appearing and practicing before the Commission in the representation of an issuer, becomes aware" of a violation. This does not seem to require a nexus with the representation. The rule proposal read differently: "If, in appearing and practicing before the Commission in the representation of an issuer, an attorney becomes aware ... ." This wording seems to require that the knowledge be obtained in the course of the representation. The release promulgating the Part 205 Rules gave no explanation for the change.

lawyer within the organization, pursuant to Rule 1.13(b), may fail to prevent or avoid action that seriously threatens the interest of the organization. Current Rule 1.13(c) provides that a lawyer, in this circumstance, may choose to withdraw.[82] In that event, or if the organizational client discharges the lawyer because of the lawyer's actions under Rule 1.13(b) in reporting to higher authority, the lawyer's professional obligations to act in the best interest of the organization should require the lawyer to take reasonable steps to assure that the organization's highest authority is aware of the withdrawal or discharge, and the lawyer's understanding of the circumstances that brought it about. Therefore, the Task Force recommends the adoption of a new Rule 1.13(e) providing:

> (e)    A lawyer who reasonably believes that he or she has been discharged because of the lawyer's actions taken pursuant to Paragraphs (b) or (c), or who withdraws in circumstances that require or permit the lawyer to take action under either of those Paragraphs, shall proceed as the lawyer reasonably believes necessary to assure that the organization's highest authority is informed of the lawyer's discharge or withdrawal.

Finally, because the corporate failures that prompted the appointment of the Task Force were concerned exclusively with public corporations, the Task Force also explored the possibility of suggesting a new Model Rule, patterned on Model Rule 1.13, but limited to organizations with publicly traded securities. The Task Force concluded, however, that it was not appropriate to craft a special rule.[83] In any situation in which an organization has multiple owners or members

---

[82]    In the interest of clarity, the Task Force recommends that this choice be reflected in the Commentary to the Rule, through reference to Rule 1.16, rather than by reference in the text of the Rule itself.

[83]    The Part 205 Rules, of course, do establish obligations applicable only to lawyers representing public corporations.

46

(such as minority owners in a closely held business) other than the organization's managers, the lawyer's duty to the organizational client is an important safeguard. Thus, the modifications of the duties defined in Model Rule 1.13 recommended by the Task Force are likely to be of value to corporations without publicly traded securities, charitable organizations, other not-for-profit entities, and governmental organizations. Conversely, the Task Force has not identified any particular respect in which the recommended modifications to Rule 1.13 would be appropriate for public corporations but inappropriate for other organizational clients.

### B.    Confidentiality and its Limitations

#### 1.    Existing Law and Policy

As many of those commenting on the Task Force's Preliminary Report emphasized, the attorney-client relationship is one of trust and confidence, dependent upon strong recognition of the lawyer's general duty to maintain the confidence of client information.[84] It is a fundamental principle of the client-lawyer relationship that, except with the client's informed consent, the lawyer

---

[84]    See, e.g., testimony of Hon. Charles B. Renfrew on behalf of the American College of Trial Lawyers; Preliminary Statement of Attorneys' Liability Assurance Society, Inc., at 6-7; testimony of Patricia Lee Refo on behalf of the ABA Section of Litigation, at 11-12; letter of Oct. 30, 2002 on behalf of the Los Angeles County Bar Association; testimony of the State Bar of California Committee on Professional Responsibility, at 7-10. All of these submissions are available on the Task Force Web Site. See also Comment c to RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS §68 (2000) (discussing the rationale for the attorney-client privilege, including the view that "clients would be unwilling to disclose personal, embarrassing, or unpleasant facts unless they could be assured that neither they nor their lawyers could be called later to testify to the communication.").

must not reveal to third parties information relating to the representation.[85] This principle underlies the trust that should be the keystone of the client-lawyer relationship. A client must feel free to seek legal assistance and to communicate fully and frankly with the client's lawyer. Without such full and frank communication the lawyer will be unable to represent the client effectively. Many legal rules are complex and most are fact-specific in their application. Lawyers are better situated than non-lawyers to appreciate the effect of legal rules and to identify facts that determine whether a legal rule is applicable. Full disclosure by clients facilitates efficient presentation at trials and other proceedings and in a lawyer's advising functions.

In the view of the Task Force, however, some commentators who emphasized the importance of trust and confidence in the attorney-client relationship have ignored exceptions to confidentiality principles that have developed to serve other policy purposes. Such exceptions are already well established in the Model Rules and in the lawyer disciplinary rules of most states. For example:

- Where a lawyer's withdrawal from representation will not avoid continued assistance to a client's crime or fraud, the lawyer may be required under the existing Model Rules to "disaffirm an opinion, document or affirmation or the like" previously given by the lawyer.[86]

---

[85]    This paragraph paraphrases Comment [2] to Model Rule 1.6.

[86]    Model Rule 4.1(b), and Comment [3]. As that comment explains, Model Rule 4.1(b)'s duty to disclose is simply "a specific application of the principle set forth in Rule 1.2(d) and addresses the situation where a client's crime or fraud takes the form of a lie or misrepresentation."

- Where a lawyer representing a client in an adjudicative proceeding knows that the client has testified falsely, the lawyer may be required, not merely permitted, to disclose the falsity to the tribunal, even if the result is the client's loss of the case and a prosecution for perjury.[87]

- To the extent reasonably believed to be necessary, the lawyer is allowed to disclose information relating to the representation of a client in order to establish a claim or defense in a case against the client, including an action seeking recovery of legal fees.[88]

- The lawyer disciplinary rules of forty-one states permit a lawyer to disclose client information in order to prevent a client from perpetrating a fraud that constitutes a crime, and eighteen states permit such disclosure to rectify substantial loss resulting from client crime or fraud in which the client used the lawyer's services.[89]

---

[87]    Model Rule 3.3(b), and Comments [10] – [11].

[88]    Model Rule 1.6(b)(3), and Comment [9].

[89]    States that permit disclosure to prevent crime:  Alaska (Alaska Rules of Prof'l Conduct R. 1.6 (2001)); Arizona (Ariz. Rules of Prof'l Conduct ER 1.6 ( 2002)); Arkansas (Ark. Rules of Prof'l Conduct R. 1.6 (2002)); Colorado (Colo. Rules of Prof'l Conduct R 1.6 (2002)); Connecticut (Conn. Rules of Prof'l Conduct R. 1.6 (2002)); Florida (Fla. Rules of Prof'l Conduct R. 1.6(2002)); Georgia (Ga. State Bar R. 1.6 (2002)); Hawaii (Haw. Rules of Prof'l Conduct R.1.6 (2002)); Idaho (Idaho Rules of Prof'l Conduct. R. 1.6 (2002)); Illinois (Ill. Rules of Prof'l Conduct R.1.6 (2002)); Indiana (Ind. Rules of Prof'l Conduct R.1.6 (2002)); Iowa (Iowa Code or Prof'l Responsibility DR 4-101(2002)); Kansas (Kan. Sup. Ct. Rules R. 1.6 (2001)); Massachusetts (Mass. Rules of Prof'l Conduct R. 1.6 (2002)); Maryland (Md. Rules of Prof'l Conduct R. 1.6 (2002)); Maine (Me. R. Bar 3.6 (2002)); Michigan (Mich. Rules of Prof'l Conduct R 1.6 (2002)); Minnesota (Minn. Rules of Prof'l Conduct R. 1.6 (2001)); Mississippi (Miss. Rules of Prof'l Conduct R. 1.6 (2002)); Nebraska (Neb. Code of Prof'l Responsibility DR 4-101 (2002)): Nevada (Nev. Rules of Prof'l Conduct R. 156(2002)); New

All of these exceptions could be said to detract from the atmosphere of

confidentiality conducive to clients' disclosure of important information to their

---

Hampshire (N.H. Rules of Prof'l Conduct R. 1.6 (2002)); New Jersey (N.J. Rules of Prof'l Conduct R. 1.6 (2002)); New Mexico (N.M Rules of Prof'l Conduct R.16-106 (2002)); New York (N.Y. Code of Prof'l Responsibility DR 4-101(2002)); North Carolina (N.C. Rules of Prof'l Conduct R. 1.6 (2002)); North Dakota (N.D. Rules of Prof'l Conduct R. 1.6 (2002)); Ohio (Ohio Code of Responsibility DR4-101) (2002)); Oklahoma (Okla. Rules of Prof'l Conduct R.1.6 (2002)); Oregon (Or. Code of Prof'l Responsibility DR 4-101(2002)); Pennsylvania (Pa. Rules of Prof'l Conduct R.1.6 (2002)); South Carolina (S.C. Rules of Prof'l Conduct R. 1.6 (2001)); Tennessee (Tenn. Rules of Prof'l Conduct R. 1.6 (2003)); Texas (Tex. Rules of Prof'l Conduct R. 1.05(2002)), Utah (Utah Rules of Prof'l Conduct R. 1.6 (2002)); Vermont (Vt. Rules of Prof'l Conduct R. 1.6(2001)); Virginia (Va. Rules of Prof'l Conduct R. 1.6 (2002)); Washington (Wash. Rules of Prof'l Conduct R. 1.6 (2002)); Wisconsin(Wis. Rules of Prof'l Conduct R. 1.6 (2002)); West Virginia (W. Va Rules of Prof'l Conduct R. 1.6 (2002)); Wyoming (Wyo. Rules of Prof'l Conduct R. 1.6(2002)).

States that require such disclosure: Florida (Fla. Rules of Prof'l Conduct R. 1.6(2002)); New Jersey (N.J. Rules of Prof'l Conduct R. 1.6 (2002)); Virginia (Va. Rules of Prof'l Conduct R. 1.6(2002); Wisconsin (Wis. Rules of Prof'l Conduct R. 1.6(2002)).

States that permit disclosure to rectify substantial loss resulting from client crime or fraud using the lawyer's services: Connecticut (Conn. Rules of Prof'l Conduct R. 1.6 (2002)); Hawaii (Haw. Rules of Prof'l Conduct R.1.6 (2002)); Massachusetts (Mass. Rules of Prof'l Conduct R. 1.6 (2002)); Maryland (Md. Rules of Prof'l Conduct R. 1.6 (2002)); Michigan (Mich. Rules of Prof'l Conduct R. 1.6 (2002)); Minnesota (Minn. Rules of Prof'l Conduct R. 1.6 (2001)); Nevada (Nev. Rules of Prof'l Conduct R. 156 (2002)); New Jersey (N.J. Rules of Prof'l Conduct R 1.6 (2002)); North Carolina (N.C. Rules of Prof'l Conduct R. 1.6 (2002)); North Dakota (N.D. Rules of Prof'l Conduct R. 1.6 (2002)); Ohio (Ohio Code of Prof'l Responsibility DR 7-102(B)(1) (2002)); Oklahoma (Okla. Rules of Prof'l Conduct R. 1.6(2002)); Oklahoma (Okla. Rules of Prof'l Conduct R. 1.6 (2002)); Pennsylvania (Pa. Rules of Prof'l Conduct  R. 1.6(2002)); South Dakota (S.D. Rules or Prof'l Conduct R. 1.6 (2002); Texas (Tex. Rules of Prof'l Conduct R. 105 (2002)); Utah (Utah Rules of Prof'l  Conduct (2002)); Virginia (Va. Rules of Prof'l Conduct R. 1.6(2002)); Wisconsin (Wis. Rules of Prof'l Conduct R. 1.6 (2002)).

States that require such disclosure: Hawaii (Haw. Rules of Prof'l Conduct R. 1.6 (2002)); Ohio (Ohio Code of Prof'l Responsibility DR 4-101(2002)); Oklahoma (Okla. Rules of Prof'l Conduct R. 1.6 (2002)).

lawyers, yet these limitations exist and serve similarly important policy purposes, including the protection of the ultimate client or third parties, and the protection of the professional integrity of the lawyer. This balancing of competing policy interests represents a carefully developed system of lawyer regulation. The Task Force believes that the ABA and the legal profession must be mindful of these competing policies in reviewing the Model Rules as applicable to the lawyer for the organizational client as well as mindful of the potential for further regulatory intrusion into the critical domain of the attorney-client relationship.[90]

The Model Rules' treatment of the lawyer's obligation of confidentiality is significantly out of step with the policy balance reflected in the rules of professional conduct in most of the states, in Section 67 of the RESTATEMENT THIRD, THE LAW GOVERNING LAWYERS,[91] and in the recommendations of the ABA Commission on Evaluation of the Rules of Professional Conduct ("Ethics 2000 Commission").[92] The Task Force believes that this inconsistency has become

---

[90]    As noted above, the SEC has deferred action on a proposal to require the lawyer to report illegal conduct to the SEC in order to permit further public comment and consideration of a company reporting alternative. Commenting on that action, former SEC Chairman Arthur Levitt noted: "The Commission wisely delayed action requiring lawyers who uncover securities law violations to resign and notify the SEC if the company does not take appropriate action. This does not mean the issue should die. The legal community and the SEC have a duty to find a creative solution that doesn't pierce attorney-client confidentiality yet sends a strong message to investors that their ultimate ownership will be honored." Arthur Levitt, Jr., "The SEC's Repair Job," Wall Street Journal, Feb. 10, 2003.

[91]    The "RESTATEMENT."

[92]    Ethics 2000 Report with Recommendation to the House of Delegates (August 2001), available at http://www.abanet.org/cpr/e2k-report_home.html.

increasingly dissonant in the last year, as public opinion has demanded that

lawyers play a greater role in promoting corporate responsibility.[93]

> 2.    *Conforming Model Rule 1.6 to Existing Law and Policy*

The Task Force therefore recommends that Model Rule 1.6(b) be

amended, as proposed by the Ethics 2000 Commission, to provide that:

> (b) A lawyer may reveal information relating to the
> representation of a client to the extent the lawyer reasonably
> believes necessary: ...
>
>> (2) to prevent the client from committing a
>> crime or fraud that is reasonably certain to result in
>> substantial injury to the financial interests or property
>> of another and in furtherance of which the client has
>> used or is using the lawyer's services; [and]
>>
>> (3) to prevent, mitigate or rectify substantial
>> injury to the financial interests or property of another
>> that is reasonably certain to result or has resulted
>> from the client's commission of a crime or fraud in
>> furtherance of which the client has used the lawyer's
>> services; ... .

The Task Force believes that the interest of society, and the bar, in

assuring that a lawyer's services are not used by a client in the furtherance of a

crime or a fraud justifies an exception to the important principle of confidentiality,

as most states have recognized.  The importance of protecting both society and

the bar from the consequences of a client's misuse of the lawyer's services in the

---

[93]    *See* Lisa H. Nicholson, *A Hobson's Choice for Securities Lawyers in the
Post-Enron Environment: Striking a Balance Between the Obligation of Client
Loyalty and Market Gatekeeper,* 16 GEO. J. LEGAL ETHICS 91 (2002).

furtherance of a serious crime or fraud must be balanced against the importance

to the client-lawyer relationship of the principle of confidentiality.[94]

The Model Rules leave no room for doubt as to whether a lawyer may

permit his services to be used by a client for criminal or fraudulent activity. Model

---

[94]    The Task Force's Preliminary Report (at 32) proposed a balance in which the lawyer would be required, not just permitted, to disclose client information "in order to prevent client conduct known to the lawyer to involve a crime, including violations of federal securities laws and regulations, in furtherance of which the client has used or is using the lawyer's services, and which is reasonably certain to result in substantial injury to the financial interests or property of another." This proposal engendered strong criticism (see notes 76 and 84, supra), and the Task Force has determined to modify that recommendation. The ABA's comment letter to the SEC on the proposed Part 205 Rules (note 9, supra) explains the reasons for that modification in the following passage commenting on the proposal to require lawyers to report to the SEC:

We believe that the proposed Section 307 rules that mandate withdrawal from representation, notice to the SEC and disaffirmance risk destroying the trust and confidence many issuers have up to now placed in their legal counsel, creating divided loyalties and driving a wedge into the attorney-client relationship. Providing notice to the SEC that the attorney has withdrawn "for professional considerations" and disaffirming specific documents will have a similar effect as a violation of client confidences, and may itself be a violation of the attorney's duties to the client under state court rules, because it will promptly trigger an enforcement investigation and potentially civil lawsuits. As a consequence, some issuers might not even consult qualified attorneys regarding close issues of whether or not to disclose information in a filing or otherwise because the attorney might engage in a noisy withdrawal even though all that may have been involved was a matter of business judgment as to the materiality of certain information.

Moreover, mandating withdrawal and disaffirmance removes the flexibility that lawyers need in order to have time to counsel their corporate clients effectively. In some instances, premature withdrawal and disaffirmance of documents might seriously and unfairly harm the issuer and its shareholders or create disruption in the market for issuer's securities, when more time spent with managers or expert advisers might have avoided the need for the attorney to employ so extreme a measure. Such consultations also may prove the attorney to be wrong in believing any material violation will occur.

Rule 1.2(d) provides that a lawyer "shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent." And Model Rule 4.1 provides that, in the course of representing a client, a lawyer "shall not knowingly . . . make a false statement of material fact or law to a third person," and that a lawyer shall not knowingly "fail to disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client." But what if the client has misled the lawyer, leading the lawyer to believe that the client is pursuing a lawful and honest purpose while in fact using the lawyer's work product to perpetrate a crime or fraud? In such circumstances should the lawyer be prohibited from taking action to prevent or rectify such misuse of the lawyer's services?

The Ethics 2000 Commission believed, and the Task Force agrees, that the use of the lawyer's services for such improper ends constitutes an abuse by the client of the client-lawyer relationship, forfeiting the client's absolute entitlement to the protection of Model Rule 1.6. In such circumstances, the Task Force believes that the lawyer must be permitted, where the crime or fraud has resulted or is reasonably certain to result in substantial injury to the financial interests or property of third parties, to reveal information relating to the representation as reasonably believed necessary to prevent the commission of, or to prevent or rectify the consequences of, the crime or fraud.[95]

---

[95]    Comment f to RESTATEMENT §67 further explains:

Once use or disclosure of information has been made to prevent, rectify, or mitigate loss under Subsection (2), the lawyer is not further warranted in actively assisting the victim on an ongoing basis in pursuing a remedy

As noted earlier, there is a long-standing exception to Model Rule 1.6 that permits a lawyer to reveal information relating to a representation "to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client."  We believe that it is at least as important to society, and to the integrity of the profession, to permit disclosure in order to prevent the lawyer's services from being used in the commission of a crime or fraud as it is to permit disclosure in order to collect the lawyer's fee or to protect the lawyer from a client's unmeritorious civil claim.

In opposition to the proposal to amend Model Rule 1.6, it has been suggested that the disclosure to third parties permitted under the laws of most states is "rarely if ever employed," and there is therefore no need to amend Rule 1.6.[96]  The Task Force is not persuaded by this suggestion.  Even if the authorization to disclose afforded by most states' disciplinary rules is not often used, the existence of the such authority gives lawyers the opportunity to use that power to encourage the client to remediate or refrain from unlawful conduct.

3.    *Confidentiality for the Organizational Client*

---

against the lawyer's client or in any similar manner aiding the victim or harming the client.  Thus, a lawyer is not warranted under this Section in serving as legal counsel for a victim …, volunteering to serve as witness in a proceeding by the victim, or cooperating with an administrative agency in obtaining compensation for victims. The lawyer also may not use or disclose information for the purpose of voluntarily assisting a law-enforcement agency to apprehend and prosecute the client, unless the lawyer reasonably believes that such disclosure would be necessary to prevent, rectify, or mitigate the victim's loss.

[96]    Statement of Patricia Lee Refo on behalf of the ABA Section of Litigation, Nov. 11, 2002, at 11, available on the Task Force Web Site.

The balance of confidentiality considerations described above applies to both individual and organizational clients. The Task Force has focused, however, on two additional aspects of the duty of confidentiality that require further elaboration with respect to organizational clients. The first such aspect is the uncontroversial but perhaps not universally understood proposition that a lawyer does not violate Model Rule 1.6 by disclosing to an organizational constituent, acting as such, information relating to the representation that was imparted to the lawyer by another organizational constituent (*e.g.*, by sharing with a corporation's general counsel or its board of directors facts learned from a corporate officer). Organizational constituents thus cannot legitimately expect that the lawyer will not reveal to others within the organization information they have imparted to the lawyer.

The second aspect on which the Task Force has focused arises because, just as with individual clients, full and frank communication with the organization's lawyer is encouraged if organizational constituents expect that information they communicate to the organization's lawyer will not be revealed outside the organization (except as the organization may decide). That expectation is undoubtedly valuable to an organizational client as a general proposition. The organization may have a countervailing interest, however, when a lawyer's actions within the organization, including advice to the organization's highest authority, are unavailing to protect the organization against substantial injury arising from a constituent's violation of law. In such a circumstance, the organization's interest in having the lawyer proceed "as is reasonably necessary

in the best interest of the organization"[97] may outweigh the organization's general

interest in preserving confidentiality.[98]

The Task Force therefore recommends the adoption of the following new

provision in Rule 1.13 that permits, but does not require, the lawyer for the

organization to communicate with persons outside the organization in order to

prevent substantial injury to the organization:

> (c)    Except as provided in Paragraph (d), if
>
>> (1) despite the lawyer's efforts in accordance with
>> Paragraph (b), the highest authority that can act on
>> behalf of the organization insists upon or fails to
>> address in a timely and appropriate fashion action, or
>> a refusal to act, that is clearly a violation of law, and
>>
>> (2) the lawyer reasonably believes that the violation is
>> reasonably certain to result in substantial injury to the
>> organization,
>
> then the lawyer may reveal information relating to the
> representation whether or not Rule 1.6 permits such
> disclosure, but only if and to the extent the lawyer
> reasonably believes necessary to prevent substantial injury
> to the organization.

The Task Force agrees with the Reporter to the Restatement that Model

Rule 1.6 " ... should not be understood to preclude controlled disclosure beyond

the organization in the limited circumstances where the wrongdoing is clear, the

injury to the client organization is substantial, and disclosure would clearly be in

---

[97]    Model Rule 1.13(b).

[98]    Existing Model Rule 1.13 reflects this tension between the two ethical
policy considerations when it states that any measures taken by the lawyer
should "be designed to minimize . . . the risk of revealing information relating to
the representation to persons outside the organization."  In the Task Force's
recommended changes this proposition would become part of Comment [4] to
Rule 1.13.

the interest of the entity client."[99] The Task Force considers this especially
important in the circumstance in which the board of directors or other highest
authority of the organizational client is disabled from acting in the best interest of
the organization, e.g., because of self-interest or personal involvement in the
violation.[100]

Because such disclosure may reveal client information otherwise
protected under Rule 1.6(a), the proposed addition to Rule 1.13 contains strict
conditions that must exist before any "reporting out" is allowed. The lawyer must
have a heightened level of certainty as to the violation of law, and the actual or
threatened violation must be "clear." Moreover, there is no permission to "report
out" when the organizational governance failure involves a violation of legal duty
to the organization but is not otherwise a violation of law. As under Rule 1.6,
communication of client information outside the organization must be limited to
information reasonably believed to be necessary to prevent substantial injury to
the organization that is reasonably certain to occur. In most circumstances, this
limitation would permit communication only with persons outside the organization
who have authority and responsibility to take appropriate preventive action.

---

[99]    Comment f to RESTATEMENT § 96.

[100]    Model Rule 1.14, which deals with clients who are natural persons
suffering diminished capacity due to minority, mental impairment, or similar
reasons, while not entirely apposite, is analogous. In those circumstances the
lawyer for the disabled client is "impliedly authorized under Rule 1.6(a) to reveal
information about the client, but only to the extent reasonably necessary to
protect the client's interests." The Task Force's proposed Model Rule 1.13(c)
seeks to accomplish the same result for an organizational client where the
capacity of its governing board or other highest authority to act in the best
interest of the organization is diminished by its self-interest or personal
involvement in the violation.

The Task Force has also concluded that there are two circumstances in which a lawyer for an organizational client should not be permitted to reveal information relating to a representation, even where the governing authority is disabled from acting or unwilling to act in the organization's best interest. One such circumstance involves the lawyer who has been engaged by the organization to investigate whether an organizational constituent has committed a material violation of law or a breach of duty to the organization. The organization in such a circumstance has an especially compelling need for the ground rules of that investigation to promote open and frank communications between the investigating lawyer and organizational constituents. It is essential to minimize obstacles in the way of the investigating lawyer's testing the truth of the allegation.

In addition, a lawyer who has been engaged by an organization or a constituent to defend against a claim of a violation of law has an especially compelling need to obtain from organizational constituents all information that might support a meritorious defense to such a claim, without fear by the constituents that the lawyer may disclose the information to a third party. The importance of the advocate's role in our adversarial dispute resolution process justifies denying to a lawyer in this role the authority under Rule 1.13, as recommended by the Task Force, to reveal information relating to the representation outside the organization.[101]

---

[101]    The Task Force notes that the SEC made similar provision in §§205.3(b)(6) and (7) of the Part 205 Rules.

The Task Force therefore recommends the addition of the following paragraph (d) in Rule 1.13 as a limitation on the recommended addition of Rule 1.13(c):

> (d)    Paragraph (c) shall not apply with respect to information relating to a lawyer's engagement by an organization to investigate an alleged violation of law or to defend the organization or an officer, employee or other person associated with the organization against a claim arising out of an alleged violation of law.

The Task Force considered whether to recommend a similar provision for investigative and defense lawyers in its Model Rule 1.6 proposals. The Task Force concluded, however, that such a provision is unnecessary. The exceptions proposed to be added to Model Rule 1.6 apply only if the lawyer's services have been, are being, or will be used by the client in the furtherance of the crime or fraud. It is unlikely at best that in such a circumstance the lawyer would or even could agree to represent the organization or a constituent in investigating or defending a claim arising out of the crime or fraud in which the lawyer's services were used. To the contrary, the lawyer would have a personal interest in exposing and preventing or rectifying any crime or fraud, and the lawyer should not undertake the investigation or defense.[102] Therefore, investigating and defense counsel engaged with respect to alleged crime or fraud should never be in a position to reveal information relating to that representation pursuant to the Task Force's recommended changes in Model Rule 1.6.

*    *    *    *    *    *

---

[102]    *See* Model Rule 1.7(a)(2).

While the recommendations of the Task Force focus on ways that lawyers for a corporation can be more effective in their counseling role to encourage compliance with legal obligations, the Task Force believes that lawyers who represent a corporation have a duty, whenever the situation may present itself, to strongly advise senior executive officers that actions they may be contemplating which violate the law, including the perpetration of a fraud, should not be taken and are always contrary to the legitimate interests of the corporation. Moreover, lawyers representing a corporation are encouraged whenever appropriate to bring a "public" perspective into their counseling which takes into account not merely specific legal obligations or requirements, but likely reactions of persons outside the corporation such as government officials and even the public at large, especially when those reactions may create legislative, regulatory or litigation risks. Indeed, lawyers for a corporation, particularly in-house counsel, are frequently expected to provide an ethical, as well as a legal, perspective in their advice to senior executive officers. The Task Force endorses this expectation and urges boards of directors and senior executive officers to invite their counsel to provide such perspective as being in the best interest of the corporation and related to the goal of instilling a culture of legal compliance and corporate responsibility.

## VI.   RECOMMENDED CORPORATE GOVERNANCE PRACTICES

The Task Force recommends the governance practices set forth below as a means to improve the effectiveness of oversight by boards of directors of public corporations (with appropriate exceptions for corporations with controlling shareholders and for foreign private issuers).[103]  In most if not all instances, practices substantially similar to these recommendations either have been or will be imposed by legislation or stock market listing standards, or are recommended by significant authorities on corporate governance.  For each recommendation set forth below, such comparable law, listing standards and recommendations are briefly identified for purposes of comparison.

**1. A substantial majority of the members of the board of directors should be independent of the corporation's senior executive officers, both in fact and in appearance.[104]**

Among the other proponents of a similar requirement or guideline are:

- The NYSE, which has proposed such a principle as a standard (requiring a majority of independent directors) for listed companies other than companies with ownership of 50% or more of the corporation's voting stock.  Proposed Rule 303A(1).

---

[103]   Such exceptions are recognized in the listing standards currently proposed by the NYSE and Nasdaq.  Those exceptions rest on important legal and practical considerations (including the rights associated with majority share ownership and the legal obligations of corporations organized under the laws of countries other than the United States).  The Task Force recognizes that other legal or practical considerations may justify departure from some or all of the proposed practices, even for a public corporation, and the practice recommendations set forth here should be presumptively, but not invariably, applied.

[104]   In implementing this recommendation, public corporations that maintain an executive committee of the board of directors should not constitute the membership of the committee and confer authority upon it so as to evade the substance of this recommendation.

- Nasdaq (same).  Proposed Rule 4350(c)(1).

- The Business Roundtable, which has recommended that "a substantial majority of directors of the board of a publicly owned corporation should be independent of management, both in fact and appearance, as determined by the board."  May 2002 Principles of Corporate Governance, at 11.

- The Conference Board, which has recommended that "a substantial majority of the board should be composed of independent directors."  January 9, 2003 Findings and Recommendations Part 2, at 23.

- The Higgs Report, which recommends that, for UK public companies, "at least half of the members of the board, excluding the chairman, should be independent non-executive directors." January 2003 Higgs Report at 35.

## 2. The independent directors should meet regularly outside the presence of any senior executive officer.

Comparable recommendations include:

- NYSE Proposed Rule 303A(3), requiring non-management directors to meet at regularly scheduled executive sessions without management.

- Nasdaq Proposed Rule 4350(c)(2), requiring independent directors to have regularly scheduled meetings at which only independent directors are present.

- Business Roundtable May 2002 Principles of Corporate Governance at 25 ("Independent directors should have the opportunity to meet outside the presence of the CEO and any other management directors.").

- The Conference Board January 9, 2003 Findings and Recommendations Part 2 at 6 ("having frequent, regular meetings of the non-management directors is a key structural component for oversight of the CEO function.").

- Higgs Report at 34 ("the non-executive directors should meet at least once a year without the chairman or executives present").

## 3. The board of directors should establish a committee (described in these recommendations as the corporate governance committee)

63

**composed exclusively of independent directors with responsibility for the identification and nomination (or recommendation of nomination) of independent members of the board of directors, and for extending invitations to prospective independent board members.**

Comparable recommendations include:

- NYSE Proposed Rule 303A(4), requiring a "nominating/corporate governance committee" composed exclusively of independent directors, with responsibility to "identify individuals qualified to become board members, and to select, or to recommend that the board select, the director nominees for the next annual meeting of shareholders."

- Nasdaq Proposed Rule 4350(c)(4), requiring the director nominations be approved either by a majority of the independent directors or by a nominations committee comprised solely of independent directors.

- Business Roundtable May 2002 Principles of Corporate Governance at 20-21, recommending that a corporate governance committee "perform[ ] the core function of recommending nominees to the board," and that "while it is appropriate for the CEO to meet with potential director nominees, the final responsibility for selecting director nominees rests with the board."

- Conference Board January 9, 2003 Findings and Recommendations Part 2 at 24, recommending that the "nominating/governance committee" be composed exclusively of independent directors and "be responsible for nominating qualified candidates to stand for election to the board."

- Higgs Report at 40, recommending that the nomination committee consist of a majority of independent non-executive directors, "which should lead the process for board appointments and make recommendations to the board."

4. **The corporate governance committee should appoint (or recommend to the full board of directors the appointment of) the persons to serve on each of the other standing committees of the board.**

Comparable recommendations include:

- NYSE Proposed Rule 303A(4), commentary ("board committee nominations are among a board's most important functions. Placing this responsibility in the hands of an independent nominating/corporate governance committee can enhance the independence and quality of nominees.").

- Business Roundtable May 2002 Principles of Corporate Governance at 13 ("Decisions about committee membership should be made by the full board, based on recommendations from a committee responsible for corporate governance issues.").

- Conference Board January 9, 2003 Findings and Recommendations Part 2 at 24 ("the nominating/governance committee should recommend to the full board of directors ... an appropriate board organization, including committee assignments.").

5. **The board of directors should establish an audit committee, composed exclusively of independent directors.**

   a. **The audit committee should meet regularly outside the presence of any senior executive officer.**

   b. **The audit committee should be:**

      i. **authorized to engage and remove the corporation's outside auditor (or if legally permissible, to recommend such engagement or removal to the Board), and to determine the terms of the engagement of the outside auditor;**

      ii. **authorized and afforded resources sufficient to engage independent accounting and legal advisers when determined by the committee to be necessary or appropriate; and**

      iii. **responsible for recommending or establishing policies relating to non-audit services provided by the corporation's outside auditor to the corporation and other aspects of the corporation's relationship with the outside auditor that may adversely affect that firm's independence.**

   c. **The resolution of the board of directors creating the committee should specify whether the foregoing decisions are to be made exclusively by the audit committee, or**

**(where legally permissible) by the full board of directors (or by the independent directors) upon the recommendation of the committee.**

Section 301 of the Sarbanes-Oxley Act of 2002 requires the SEC to adopt rules requiring the national securities exchanges and national securities associations to adopt listing standards providing, among other things, that (i) each member of the audit committee be independent, (ii) the audit committee be "directly responsible for the appointment, compensation, and oversight of the work of any registered public accounting firm employed" by the company, and (iii) the audit committee have authority to engage independent counsel and other advisers. On January 8, 2003 the SEC proposed rules to implement these statutory requirements.[105] The Sarbanes-Oxley Act (§201, adding Section 10A(h) of the Exchange Act) also requires that public company auditing firms perform permitted non-audit services only upon advance approval by the audit committee.

The listing standards prescribed by Section 301 of the Sarbanes-Oxley Act of 2002 appear to require that the board of directors delegate to the audit committee direct and exclusive responsibility for the matters specified in the statute. The Task Force's recommendations differ in that they would allow the full board of directors (or all of the independent directors) to act on such matters, upon recommendation of the audit committee acting pursuant to the recommended procedures. The Task Force prefers this approach because of the potential benefits of information and insight that may be gained from other independent directors and even from directors who do not meet prevailing standards of independence.

6. **The board of directors should establish a compensation committee, composed exclusively of independent directors.**

   a. **The compensation committee should meet regularly outside the presence of any senior executive officer.**

   b. **The compensation committee should be responsible for determining, or making a recommendation with respect to, the compensation (including executive benefit plans) of the senior executive officers of the corporation.**

   c. **The compensation committee should be authorized and afforded resources sufficient to engage independent**

---

[105]    Proposed Exchange Act Rule 10A-3, available at http://www.sec.gov/rules/proposed/34-47137.htm .

executive compensation and legal advisers when determined by the committee to be necessary or appropriate.

d. In determining or recommending the amount, form and terms of compensation of senior executive officers, the compensation committee should (i) evaluate the performance of such officers, and (ii) be guided by, and seek to promote, the long term interests of the corporation and its shareholders.

e. The resolution of the board of directors creating the committee should specify whether the foregoing decisions are to be made exclusively by the compensation committee, or by the full board of directors (or by the independent directors) upon the recommendation of the committee.

f. In deliberating on the compensation of the chief executive officer, the compensation committee should meet outside the presence of any senior executive officer; the chief executive officer may, if the compensation committee chooses, participate in the deliberations on the compensation of any other officer.

Comparable recommendations include:

- NYSE Proposed Rule 303A(5), requiring a compensation committee, composed exclusively of independent directors, responsible for discharging "the board's responsibilities relating to compensation of the company's executives," including review of the CEO's performance and establishment of the CEO's compensation level.  The commentary to the proposed rule also provides that "the compensation committee charter should give that committee sole authority to retain and terminate [a compensation] consulting firm, including sole authority to approve the firm's fees and other retention terms."

- Nasdaq Proposed Rule 4350(c)(3), requiring that (i) CEO compensation be determined either by a majority of independent directors or a compensation committee comprised solely of independent directors, meeting in both cases in executive session, and (ii) other officer compensation be determined either by a majority of independent directors or a compensation committee comprised solely of independent directors, with the CEO entitled to be present but not to vote.

- Business Roundtable May 2002 Principles of Corporate Governance at 21-22, recommending "a committee comprised solely of independent directors that addresses compensation issues," including "the corporation's overall compensation programs, and setting CEO and senior management compensation." The Business Roundtable Principles also recommend that "[a]ll incentives should further the corporation's long-term strategic plan and should be consistent with the culture of the corporation and the overall goal of enhancing enduring stockholder value." (id.).

- Conference Board Commission on Public Trust and Private Enterprise Findings and Recommendations, Part I: Executive Compensation at 8, recommending that: "The Compensation Committee should retain any outside consultants who advise it, and the outside consultants should report solely to the Committee;" ... The Compensation Committee should be comprised solely of directors who are free of any relationships with the company (except for compensation received in their role as directors) and its management and who can act independently of management in carrying out their responsibilities; ... The Compensation Committee should vigorously exercise continuous oversight over all matters of executive compensation policy; ... The Compensation Committee should hold executive sessions as required (for example, to determine CEO pay and stock option grants) and the Committee should exercise its power to schedule meetings and set its own agenda." The Conference Board Commission also recommends that the compensation committee "establish, with the concurrence of the board, performance-based incentives that support and reinforce the corporation's long-term strategic goals set by the board ... , and whose award is linked to achievement of specific strategic goals." (Id. at 9).

- Higgs Report at 61, recommending that "all members of the remuneration committee should meet the test of independence," that "the committee should have delegated responsibility for setting remuneration for all executive directors and the chairman," and that "the committee should be responsible for appointing remuneration consultants."

For the reasons explained in connection with its recommendations relating to the audit committee, the Task Force's recommendations relating to the compensation committee allow for the possibility that senior executive compensation be set by action of the full board of directors or all

of the independent directors, upon recommendation of the compensation committee acting pursuant to the procedures recommended.

7. **The corporate governance committee (or another committee consisting exclusively of independent directors) should adopt (or recommend to the full board of directors) a corporate code of ethics and conduct that includes the establishment of one or more mechanisms through which information concerning violations of law by the corporation or its management personnel, or breaches of fiduciary duty to the corporation which could have a material effect on the corporation, not appropriately addressed by corporate officers, can be freely transmitted to more senior officers and, if necessary, to a committee consisting solely of independent directors.**

The Sarbanes-Oxley Act of 2002 in several ways addresses corporate codes of ethics and mechanisms for reporting violations of law or breaches of duty to the corporation. Section 406, as implemented by SEC rulemaking on January 20, 2003,[106] requires public companies to adopt (or disclose reasons for not adopting) codes of ethics for certain executive officers that include mechanisms for "the prompt internal reporting to an appropriate person or persons identified in the code of violations of the code." Section 301 of the Act also requires that a listed company's audit committee "establish procedures for … the confidential, anonymous submission by employees of the issuer of concerns regarding questionable accounting or auditing matters."

Recommendations comparable to the practices recommended here include:

- NYSE Proposed Rule 303A(10), requiring adoption of a code of business conduct and ethics that encourages "the reporting of any illegal or unethical behavior," with measures to "ensure that employees know that the company will not allow retaliation for reports made in good faith."

- Nasdaq Proposed Rule 4350(m), requiring "a code of conduct addressing, at a minimum, conflicts of interest and compliance with applicable laws, rules and regulations, with an appropriate compliance mechanism and disclosure of any waivers to executive officers and directors."

- Business Roundtable May 2002 Principles of Corporate Governance at 10, recommending that "a corporation should have a code of conduct

---

[106]    SEC Release 33-8177, available at http://www.sec.gov/rules/final/33-8177.htm .

with effective reporting and enforcement mechanisms. Employees should have a means of alerting management and the board to potential misconduct without fear of retribution, and violations of the code should be addressed promptly and effectively."

- Conference Board January 9, 2003 Findings and Recommendations Part 2 at 25, recommending that boards considering adopting "programs to ensure that employees understand, apply, and adhere to the company's code of ethics," and "processes that encourage and make it safe for employees to raise ethical issues and report possible ethical violations."

8. **In addition to approvals required by law, a committee composed exclusively of independent directors and appointed for the purpose by or on the recommendation of the independent directors or a committee composed exclusively of such directors, should review and approve any material transaction between the corporation and any director or senior executive officer of the corporation (and any person or entity controlling or controlled by such director or officer, or in which such director or officer has a direct or indirect material financial interest), including (where permitted by law) a loan or guarantee by the corporation. Such review and approval should include (i) an explanation of why the transaction is in the best interests of the corporation without regard to the interest or desire of the individual (or related person or entity); (ii) a documented rationale for engaging in the transaction with a related party rather than with a third party; (iii) a specific determination of the fairness of the transaction; and (iv) a review of the public disclosure that may be appropriate for the transaction.**

The Nasdaq has proposed adoption of a listing standard that would require that all "related party transactions" – defined as transactions required to be disclosed under Item 404 of SEC Regulation S-K – be approved by the corporation's audit committee or other body of independent directors.[107]

9. **The board of directors should charge a committee composed exclusively of independent directors (such as an audit committee or a legal compliance committee) with responsibility to obtain and evaluate regular reports from the corporate officers responsible for implementing the corporation's internal controls, codes of**

---

[107]    Proposed Rule 4350(h), available at http://www.nasdaq.com/about/SR-NASD-2002-80_Amendment_1.pdf .

**ethics and compliance policies, including general counsel, the chief financial officer, the chief internal auditor and the chief compliance officer, on legal and compliance affairs of the corporation as directed by such committee, including, at a minimum, information about violations or potential violations of law and breaches of fiduciary duty by an executive officer or director that could have a material adverse effect on the corporation.**

Comparable recommendations include:

- Conference Board January 9, 2003 Findings and Recommendations Part 2 at 33, recommending that "the internal auditor should have a direct line of communication and reporting responsibility to the audit committee, and he or she should attend all regularly scheduled audit committee meetings, report on the status of audits conducted by the internal audit group, report to the committee on other matters that the internal auditor, in his or her judgment, believes should be brought to the audit committee's attention, and meet with the audit committee in executive session."

- Business Roundtable May 2002 Principles of Corporate Governance at 18, recommending that "the audit committee should provide a channel of communication to the board for the outside auditor and internal auditors and may also meet with and receive reports from finance officers, compliance officers and the general counsel."

Section 404 of the Sarbanes-Oxley Act of 2002 required the SEC to prescribe rules requiring the annual report of a public corporation to include "an assessment … of the effectiveness of the internal control structure and procedures of the issuer for financial reporting."[108]

10. **The board of directors should consider and determine appropriate action on the following matters:**

   a. **Processes for setting agendas and distributing information;**

   b. **Policy concerning expected time commitments of directors, and the extent to which other directorships or other factors**

---

[108]    On October 22, 2002, the SEC proposed rules to implement the requirement of Section 404.  Release No. 33-8138, available at http://www.sec.gov/rules/proposed/33-8138.htm.  On January 27, 2003, however, the SEC deferred adoption of such rules.  Release No. 34-47262, available at http://www.sec.gov/rules/final/34-47262.htm.

71

(such as health) may impair a director's ability to satisfy such commitments;

c.  Policy concerning rotation of the chair and membership of the board of directors and its corporate governance, audit and compensation committees;

d.  Whether to appoint a "lead" independent director or an independent director to serve as chair of the board of directors or to preside at meetings of non-management directors;

e.  Establishment and maintenance of a training and education program for all directors, and particularly independent directors, in regard to (A) their legal and ethical responsibilities as directors, (B) the financial condition, the principal operating risks and the performance factors materially important to the business of the corporation and (C) the operation, significance and effects of compensation incentive programs and related party transactions; and

f.  Periodic evaluations by the directors of (A) the effectiveness and adequacy of meetings of the Board of Directors and its committees, (B) the adequacy and timeliness of the information provided by management to the Board of Directors, (C) the diversity of experience of individual directors and (D) the contributions of each director.

For recommendations relating to the foregoing subjects, see:

* Commentary to NYSE Proposed Rule 303A(3) (rotation of board committee chairs; identification of presiding director at meetings of independent directors); 303A(9) (director orientation and training; annual performance evaluation of the board and committees).

* Business Roundtable May 2002 Principles of Corporate Governance at 25 (board chair should "be responsive to individual directors' requests to add items to the agenda, and open to suggestions for improving the agenda"); 24 (evaluate whether acceptance of directorship "will compromise the ability to perform present responsibilities"); 13 (preferring CEO as board chair); 26 ("educational opportunities for directors on an ongoing basis"); 27-28 (evaluation of board, committees and individual directors); 21 (corporate governance committee to evaluate content and timeliness of information flow to the board).

- Conference Board January 9, 2003 Findings and Recommendations Part 2 at 22 (director involvement in setting agenda); 21 (consider separating Chair and CEO); 24 (director orientation and training); 24 (evaluation of board, committees, and individual directors); 23 (diversity in director qualifications).

- Higgs Report, at 50-51 (assessment and facilitation of information flow to directors); 54-55 (assessment of time commitments associated with service as director); 23 (separate roles of chairman and chief executive); 47-49 (director training); 49-50 (evaluation of board, committee and director performance).

## CONCLUSION

The issues addressed by the Task Force are complex and vitally important to an effective system of checks and balances supporting improved corporate responsibility. Public confidence in the present system has eroded in the wake of highly publicized recent corporate failures. Lawyers for the corporation should play an important role in corporate governance and the recommendations of the Task Force will enhance the opportunity for the lawyer to be a more effective contributor to a workable system of checks and balances.

The Task Force analyzed carefully the many thoughtful comments on its original recommendations. As a result, the original recommendations have been modified in some respects and reaffirmed and expanded in other respects. The Task Force believes that the recommendations in this Report appropriately balance competing public policy concerns and should have a positive impact in improving public confidence in corporate responsibility.

**APPENDIX A**

## CURRENT RULES 1.6 AND 1.13 OF THE MODEL RULES OF PROFESSIONAL RESPONSIBILITY

CONFIDENTIALITY OF INFORMATION

RULE 1.6 ABA MODEL RULES OF PROFESSIONAL CONDUCT

(a) A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b).

(b) A lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary:

(1) to prevent reasonably certain death or substantial bodily harm;

(2) to secure legal advice about the lawyer's compliance with these Rules;

(3) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client; or

(4) to comply with other law or a court order.

ORGANIZATION AS CLIENT

RULE 1.13 ABA MODEL RULES OF PROFESSIONAL CONDUCT

(a) A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.

(b) If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest of the organization. In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the

organization and the apparent motivation of the person involved, the policies of the organization concerning such matters and any other relevant considerations. Any measures taken shall be designed to minimize disruption of the organization and the risk of revealing information relating to the representation to persons outside the organization. Such measures may include among others:

(1) asking for reconsideration of the matter;

(2) advising that a separate legal opinion on the matter be sought for presentation to appropriate authority in the organization; and

(3) referring the matter to higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest authority that can act on behalf of the organization as determined by applicable law.

(c) If, despite the lawyer's efforts in accordance with paragraph (b), the highest authority that can act on behalf of the organization insists upon action, or a refusal to act, that is clearly a violation of law and is likely to result in substantial injury to the organization, the lawyer may resign in accordance with Rule 1.16.

(d) In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing.

(e) A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders.

### RECOMMENDED REVISIONS TO THE MODEL RULES OF PROFESSIONAL RESPONSIBILITY
(Marked to show proposed changes to existing Rules and Commentary)

### RULE 1.6: CONFIDENTIALITY OF INFORMATION

(a)    A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b).

(b)    A lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary:

> (1) to prevent reasonably certain death or substantial bodily harm;

> (2) to prevent the client from committing a crime or fraud that is reasonably certain to result in substantial injury to the financial interests or property of another and in furtherance of which the client has used or is using the lawyer's services;

> (3) to prevent, mitigate or rectify substantial injury to the financial interests or property of another that is reasonably certain to result or has resulted from the client's commission of a crime or fraud in furtherance of which the client has used the lawyer's services;

> (42) to secure legal advice about the lawyer's compliance with these Rules;

> (53) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client; or

> (64) to comply with other law or a court order.

**Commentary**

[1] This Rule governs the disclosure by a lawyer of information relating to the representation of a client during the lawyer's representation of the client. See

77

Rule 1.18 for the lawyer's duties with respect to information provided to the lawyer by a prospective client, Rule 1.9(c)(2) for the lawyer's duty not to reveal information relating to the lawyer's prior representation of a former client and Rules 1.8(b) and 1.9(c)(1) for the lawyer's duties with respect to the use of such information to the disadvantage of clients and former clients.

[2] A fundamental principle in the client-lawyer relationship is that, in the absence of the client's informed consent, the lawyer must not reveal information relating to the representation. See Rule 1.0(e) for the definition of informed consent. This contributes to the trust that is the hallmark of the client-lawyer relationship. The client is thereby encouraged to seek legal assistance and to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter. The lawyer needs this information to represent the client effectively and, if necessary, to advise the client to refrain from wrongful conduct. Almost without exception, clients come to lawyers in order to determine their rights and what is, in the complex of laws and regulations, deemed to be legal and correct. Based upon experience, lawyers know that almost all clients follow the advice given, and the law is upheld.

[3] The principle of client-lawyer confidentiality is given effect by related bodies of law: the attorney-client privilege, the work product doctrine and the rule of confidentiality established in professional ethics. The attorney-client privilege and work-product doctrine apply in judicial and other proceedings in which a lawyer may be called as a witness or otherwise required to produce evidence concerning a client. The rule of client-lawyer confidentiality applies in situations other than those where evidence is sought from the lawyer through compulsion of law. The confidentiality rule, for example, applies not only to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source. A lawyer may not disclose such information except as authorized or required by the Rules of Professional Conduct or other law. See also Scope.

[4] Paragraph (a) prohibits a lawyer from revealing information relating to the representation of a client. This prohibition also applies to disclosures by a lawyer that do not in themselves reveal protected information but could reasonably lead to the discovery of such information by a third person. A lawyer's use of a hypothetical to discuss issues relating to the representation is permissible so long as there is no reasonable likelihood that the listener will be able to ascertain the identity of the client or the situation involved.

**Authorized Disclosure**

[5] Except to the extent that the client's instructions or special circumstances limit that authority, a lawyer is impliedly authorized to make disclosures about a client when appropriate in carrying out the representation. In some situations, for example, a lawyer may be impliedly authorized to admit a

fact that cannot properly be disputed or to make a disclosure that facilitates a satisfactory conclusion to a matter. Lawyers in a firm may, in the course of the firm's practice, disclose to each other information relating to a client of the firm, unless the client has instructed that particular information be confined to specified lawyers.

### Disclosure Adverse to Client

[6] Although the public interest is usually best served by a strict rule requiring lawyers to preserve the confidentiality of information relating to the representation of their clients, the confidentiality rule is subject to limited exceptions. Paragraph (b)(1) recognizes the overriding value of life and physical integrity and permits disclosure reasonably necessary to prevent reasonably certain death or substantial bodily harm. Such harm is reasonably certain to occur if it will be suffered imminently or if there is a present and substantial threat that a person will suffer such harm at a later date if the lawyer fails to take action necessary to eliminate the threat. Thus, a lawyer who knows that a client has accidentally discharged toxic waste into a town's water supply may reveal this information to the authorities if there is a present and substantial risk that a person who drinks the water will contract a life-threatening or debilitating disease and the lawyer's disclosure is necessary to eliminate the threat or reduce the number of victims.

[7] Paragraph (b)(2) is a limited exception to the rule of confidentiality that permits the lawyer to reveal information to the extent necessary to enable affected persons or appropriate authorities to prevent the client from committing a crime or fraud, as defined in Rule 1.0(d), that is reasonably certain to result in substantial injury to the financial or property interests of another and in furtherance of which the client has used or is using the lawyer's services. Such a serious abuse of the client-lawyer relationship by the client forfeits the protection of this Rule. The client can, of course, prevent such disclosure by refraining from the wrongful conduct. Although paragraph (b)(2) does not require the lawyer to reveal the client's misconduct, the lawyer may not counsel or assist the client in conduct the lawyer knows is criminal or fraudulent. See Rule 1.2(d). See also Rule 1.16 with respect to the lawyer's obligation or right to withdraw from the representation of the client in such circumstances, and Rule 1.13(c) which permits the lawyer, where the client is an organization, to reveal information relating to the representation in limited circumstances.

[8] Paragraph (b)(3) addresses the situation in which the lawyer does not learn of the client's crime or fraud until after it has been consummated. Although the client no longer has the option of preventing disclosure by refraining from the wrongful conduct, there will be situations in which the loss suffered by the affected person can be prevented, rectified or mitigated. In such situations, the lawyer may disclose information relating to the representation to the extent necessary to enable the affected persons to prevent or mitigate reasonably

certain losses or to attempt to recoup their losses.  Paragraph (b)(3) does not apply when a person who has committed a crime or fraud thereafter employs a lawyer for representation concerning that offense.

[9~~7~~] A lawyer's confidentiality obligations do not preclude a lawyer from securing confidential legal advice about the lawyer's personal responsibility to comply with these Rules. In most situations, disclosing information to secure such advice will be impliedly authorized for the lawyer to carry out the representation. Even when the disclosure is not impliedly authorized, paragraph (b)(2) permits such disclosure because of the importance of a lawyer's compliance with the Rules of Professional Conduct.

[10~~8~~] Where a legal claim or disciplinary charge alleges complicity of the lawyer in a client's conduct or other misconduct of the lawyer involving representation of the client, the lawyer may respond to the extent the lawyer reasonably believes necessary to establish a defense. The same is true with respect to a claim involving the conduct or representation of a former client. Such a charge can arise in a civil, criminal, disciplinary or other proceeding and can be based on a wrong allegedly committed by the lawyer against the client or on a wrong alleged by a third person, for example, a person claiming to have been defrauded by the lawyer and client acting together. The lawyer's right to respond arises when an assertion of such complicity has been made. Paragraph (b)(5~~3~~) does not require the lawyer to await the commencement of an action or proceeding that charges such complicity, so that the defense may be established by responding directly to a third party who has made such an assertion. The right to defend also applies, of course, where a proceeding has been commenced.

[11~~9~~] A lawyer entitled to a fee is permitted by paragraph (b)(5~~3~~) to prove the services rendered in an action to collect it. This aspect of the rule expresses the principle that the beneficiary of a fiduciary relationship may not exploit it to the detriment of the fiduciary.

[12~~10~~] Other law may require that a lawyer disclose information about a client. Whether such a law supersedes Rule 1.6 is a question of law beyond the scope of these Rules. When disclosure of information relating to the representation appears to be required by other law, the lawyer must discuss the matter with the client to the extent required by Rule 1.4. If, however, the other law supersedes this Rule and requires disclosure, paragraph (b)(6~~4~~) permits the lawyer to make such disclosures as are necessary to comply with the law.

[13~~11~~] A lawyer may be ordered to reveal information relating to the representation of a client by a court or by another tribunal or governmental entity claiming authority pursuant to other law to compel the disclosure. Absent informed consent of the client to do otherwise, the lawyer should assert on behalf of the client all nonfrivolous claims that the order is not authorized by other law or that the information sought is protected against disclosure by the attorney-client

privilege or other applicable law. In the event of an adverse ruling, the lawyer must consult with the client about the possibility of appeal to the extent required by Rule 1.4. Unless review is sought, however, paragraph (b)(6̶4) permits the lawyer to comply with the court's order.

[14̶1̶2] Paragraph (b) permits disclosure only to the extent the lawyer reasonably believes the disclosure is necessary to accomplish one of the purposes specified. Where practicable, the lawyer should first seek to persuade the client to take suitable action to obviate the need for disclosure. In any case, a disclosure adverse to the client's interest should be no greater than the lawyer reasonably believes necessary to accomplish the purpose. If the disclosure will be made in connection with a judicial proceeding, the disclosure should be made in a manner that limits access to the information to the tribunal or other persons having a need to know it and appropriate protective orders or other arrangements should be sought by the lawyer to the fullest extent practicable.

[15̶1̶3] Paragraph (b) permits but does not require the disclosure of information relating to a client's representation to accomplish the purposes specified in paragraphs (b)(1) through (b)(6̶4). In exercising the discretion conferred by this Rule, the lawyer may consider such factors as the nature of the lawyer's relationship with the client and with those who might be injured by the client, the lawyer's own involvement in the transaction and factors that may extenuate the conduct in question. A lawyer's decision not to disclose as permitted by paragraph (b) does not violate this Rule. Disclosure may be required, however, by other Rules. Some Rules require disclosure only if such disclosure would be permitted by paragraph (b). See Rules 1.2(d), 4.1(b), 8.1 and 8.3. Rule 3.3, on the other hand, requires disclosure in some circumstances regardless of whether such disclosure is permitted by this Rule. See Rule 3.3(c).

## ~~Withdrawal~~

~~[14] If the lawyer's services will be used by the client in materially furthering a course of criminal or fraudulent conduct, the lawyer must withdraw, as stated in Rule 1.16(a)(1). After withdrawal the lawyer is required to refrain from making disclosure of the client's confidences, except as otherwise permitted by Rule 1.6. Neither this Rule nor Rule 1.8(b) nor Rule 1.16(d) prevents the lawyer from giving notice of the fact of withdrawal, and the lawyer may also withdraw or disaffirm any opinion, document, affirmation, or the like. Where the client is an organization, the lawyer may be in doubt whether contemplated conduct will actually be carried out by the organization. Where necessary to guide conduct in connection with this Rule, the lawyer may make inquiry within the organization as indicated in Rule 1.13(b).~~

## Acting Competently to Preserve Confidentiality

[16~~15~~] A lawyer must act competently to safeguard information relating to the representation of a client against inadvertent or unauthorized disclosure by the lawyer or other persons who are participating in the representation of the client or who are subject to the lawyer's supervision. See Rules 1.1, 5.1 and 5.3.

[17~~16~~] When transmitting a communication that includes information relating to the representation of a client, the lawyer must take reasonable precautions to prevent the information from coming into the hands of unintended recipients. This duty, however, does not require that the lawyer use special security measures if the method of communication affords a reasonable expectation of privacy. Special circumstances, however, may warrant special precautions. Factors to be considered in determining the reasonableness of the lawyer's expectation of confidentiality include the sensitivity of the information and the extent to which the privacy of the communication is protected by law or by a confidentiality agreement. A client may require the lawyer to implement special security measures not required by this Rule or may give informed consent to the use of a means of communication that would otherwise be prohibited by this Rule.

**Former Client**

[18~~17~~] The duty of confidentiality continues after the client-lawyer relationship has terminated. See Rule 1.9(c)(2). See Rule 1.9(c)(1) for the prohibition against using such information to the disadvantage of the former client.

\*       \*       \*

## RULE 1.13: ORGANIZATION AS CLIENT

(a)     A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.

(b)     If a lawyer for an organization knows <u>facts from which a reasonable lawyer, under the circumstances, would conclude</u> that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law which reasonably might be imputed to the organization, and that is likely to result in substantial injury to the organization, <u>then</u> the lawyer shall proceed as is reasonably necessary in the best interest of the organization. ~~In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the~~

82

~~organization and the apparent motivation of the person involved, the policies of the organization concerning such matters and any other relevant considerations. Any measures taken shall be designed to minimize disruption of the organization and the risk of revealing information relating to the representation to persons outside the organization. Such measures may include among others:~~

~~(1)    asking for reconsideration of the matter;~~

~~(2)    advising that a separate legal opinion on the matter be sought for presentation to appropriate authority in the organization; and~~

~~(3)    referring~~ Unless the lawyer reasonably believes that it is not necessary in the best interest of the organization to do so, the lawyer shall refer the matter to higher authority in the organization, including, if warranted by the circumstances, ~~seriousness of the matter, referral to~~ the highest authority that can act on behalf of the organization as determined by applicable law.

(c)    Except as provided in Paragraph (d), if~~,~~

(1) despite the lawyer's efforts in accordance with Paragraph (b)~~,~~ the highest authority that can act on behalf of the organization insists upon or fails to address in a timely and appropriate fashion action, or a refusal to act, that is clearly a violation of law ~~and is likely to result in substantial injury to the organization~~, and

(2)    the lawyer reasonably believes that the violation is reasonably certain to result in substantial injury to the organization,

then the lawyer may~~:    resign in accordance with Rule 1.16,~~ reveal information relating to the representation whether or not Rule 1.6 permits such disclosure, but only if and to the extent the lawyer reasonably believes necessary to prevent substantial injury to the organization.

(d)    Paragraph (c) shall not apply with respect to information relating to a lawyer's engagement by an organization to investigate an alleged violation of law, or to defend the organization or an officer, employee or other person associated with the organization against a claim arising out of an alleged violation of law.

(e) A lawyer who reasonably believes that he or she has been discharged because of the lawyer's actions taken pursuant to Paragraphs

<u>(b) or (c), or who withdraws in circumstances that require or permit the lawyer to take action under either of those Paragraphs, shall proceed as the lawyer reasonably believes necessary to assure that the organization's highest authority is informed of the lawyer's discharge or withdrawal.</u>

~~(d)~~ <u>(f)</u> In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing.

~~(e)~~ <u>(g)</u> A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders.

## Comment

### The Entity as the Client

[1]    An organizational client is a legal entity, but it cannot act except through its officers, directors, employees, shareholders and other constituents. Officers, directors, employees and shareholders are the constituents of the corporate organizational client. The duties defined in this Comment apply equally to unincorporated associations. "Other constituents" as used in this Comment means the positions equivalent to officers, directors, employees and shareholders held by persons acting for organizational clients that are not corporations.

[2]    When one of the constituents of an organizational client communicates with the organization's lawyer in that person's organizational capacity, the communication is protected by Rule 1.6. Thus, by way of example, if an organizational client requests its lawyer to investigate allegations of wrongdoing, interviews made in the course of that investigation between the lawyer and the client's employees or other constituents are covered by Rule 1.6. This does not mean, however, that constituents of an organizational client are the clients of the lawyer. The lawyer may not disclose to such constituents information relating to the representation except for disclosures explicitly or impliedly authorized by the organizational

client in order to carry out the representation or as otherwise permitted by Rule 1.6.

[3]    When constituents of the organization make decisions for it, the decisions ordinarily must be accepted by the lawyer even if their utility or prudence is doubtful. Decisions concerning policy and operations, including ones entailing serious risk, are not as such in the lawyer's province. ~~However, different considerations arise~~ Paragraph (b) makes clear, however, that when the lawyer knows facts that would lead a reasonable lawyer under the circumstances to conclude that the organization ~~may~~ is likely to be substantially injured by action of ~~a~~ an officer or other constituent that violates a legal obligation to the organization or is in violation of law ~~In such a circumstance, it may be reasonably necessary for the lawyer to ask the constituent to reconsider the matter. If that fails, or if the matter is of sufficient seriousness and importance to the organization, it may be reasonably necessary for the lawyer to take steps to have the matter reviewed by a higher authority in the organization. Clear justification should exist for seeking review over the head of the constituent normally responsible for it. The stated policy of the organization may define circumstances and prescribe channels for such review, and a lawyer should encourage the formulation of such a policy. Even in the absence of organization policy, however, the lawyer may have an obligation to refer a matter to higher authority, depending on the seriousness of the matter and whether the constituent in question has apparent motives to act at variance with the organization's interest. Review by the chief executive officer or by the board of directors may be required when the matter is of importance commensurate with their authority. At some point it may be useful or essential to obtain an independent legal opinion.~~ and might be imputed to the organization, the lawyer must proceed as is reasonably necessary in the best interest of the organization. As defined in Rule 1.0(f), knowledge can be inferred from circumstances, and a lawyer cannot ignore the obvious. The lawyer's obligation to proceed as is reasonably necessary in the best interest of the organization is determined by the conclusions that a reasonable lawyer would, under the circumstances, draw from the facts known. The terms "reasonable" and "reasonably" imply a range within which the lawyer's conduct will satisfy the requirements of Rule 1.13. In determining what is reasonable in the best interest of the organization the circumstances at the time of determination are relevant. Such circumstances may include, among others, the lawyer's area of expertise, the time constraints under which the lawyer is acting, and the lawyer's previous experience and familiarity with the client. For example, the facts suggesting a violation may be part of a large volume of information

that the lawyer has insufficient time fully to comprehend. Or the facts known to the lawyer may be sufficient to signal the likely existence of a violation to an expert in a particular field of law but not to a lawyer who works in another specialty. Under such circumstances the lawyer would not have an obligation to proceed under Paragraph (b).

[4]    In determining how to proceed under Paragraph (b), the lawyer should give due consideration to the seriousness of the violation and its consequences, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters, and any other relevant considerations.  Ordinarily, referral to a higher authority would be necessary.  In some circumstances, however, it may be  appropriate for the lawyer to ask the constituent to reconsider the matter; for example, if the circumstances involve a constituent's innocent misunderstanding of law and subsequent acceptance of the lawyer's advice, the lawyer may reasonably conclude that the best interest of the organization does not require that the matter be referred to higher authority.  If a constituent persists in conduct contrary to the lawyer's advice, it will be necessary for the lawyer to take steps to have the matter reviewed by a higher authority in the organization.  If the matter is of sufficient seriousness and importance or urgency to the organization, referral to higher authority in the organization may be necessary even if the lawyer has not communicated with the constituent.  Any measures taken should, to the extent practicable, minimize the risk of revealing information relating to the representation to persons outside the organization. Even in circumstances where a lawyer is not obligated to proceed by Rule 1.13, a lawyer may bring to the attention of an organizational client, including its highest authority, matters that the lawyer reasonably believes to be of sufficient importance to warrant doing so in the best interest of the organization.

[4][5]  Paragraph (b) also makes clear that when reasonably necessary to enable the organization to address the matter in a timely and appropriate fashion the lawyer must refer the matter to higher authority, including, if warranted by the circumstances, the highest authority that can act on behalf of the organization under applicable law. The organization's highest authority to whom a matter may be referred ordinarily will be the board of directors or similar governing body. However, applicable law may prescribe that under certain conditions the highest authority reposes elsewhere, for example, in the independent directors of a corporation.

86

**Relation to Other Rules**

[5][6] The authority and responsibility provided in this Rule are concurrent with the authority and responsibility provided in other Rules. In particular, this Rule does not limit or expand the lawyer's responsibility under Rule 1.6, 1.8, 1.16, 3.3 or 4.1. Paragraph (c) of this Rule supplements Rule 1.6(b) by providing an additional basis upn which the lawyer may reveal information relating to the representation, but does not modify, restrict, or limit the provisions of Rule 1.6(b)(1) – (6). Under Paragraph (c) the lawyer may reveal such information only when the organization's highest authority insists upon or fails to address threatened or ongoing action that is clearly a violation of law, and then only to the extent the lawyer reasonably believes necessary to prevent reasonably certain substantial injury to the organization. It is not necessary that the lawyer's services be used in furtherance of the violation, but it is required that the matter be related to the lawyer's representation of the organization.   If the lawyer's services are being used by an organization to further a crime or fraud by the organization, Rules 1.6(b)(2) and 1.6(b)(3) may permit the lawyer to disclose confidential information. In such circumstances Rule 1.2(d) can may also be applicable, in which event, withdrawal from the representation under Rule 1.16(a)(1) may be required.

[7]    Paragraph (d) makes clear that the authority of a lawyer to disclose information relating to a representation in circumstances described in Paragraph (c) does not apply with respect to information relating to a lawyer's engagement by an organization to investigate an alleged violation of law or to defend the organization or an officer, employee or other person associated with the organization against a claim arising out of an alleged violation of law. This is necessary in order to enable organizational clients to enjoy the full benefits of legal counsel in conducting an investigation or defending against a claim.

[8]    A lawyer who reasonably believes that he or she has been discharged because of the lawyer's actions taken pursuant to Paragraph (b) or (c), or who withdraws in circumstances that require or permit the lawyer to take action under either of these Paragraphs, must proceed as the lawyer reasonably believes necessary to assure that the organization's highest authority is informed of the lawyer's discharge or withdrawal, and what the lawyer reasonably believes to be the basis for his or her discharge or withdrawal.

## Government Agency

[6] [9] The duty defined in this Rule applies to governmental organizations. Defining precisely the identity of the client and prescribing the resulting obligations of such lawyers may be more difficult in the government context and is a matter beyond the scope of these Rules. See Scope [18]. Although in some circumstances the client may be a specific agency, it may also be a branch of government, such as the executive branch, or the government as a whole. For example, if the action or failure to act involves the head of a bureau, either the department of which the bureau is a part or the relevant branch of government may be the client for purposes of this Rule. Moreover, in a matter involving the conduct of government officials, a government lawyer may have authority under applicable law to question such conduct more extensively than that of a lawyer for a private organization in similar circumstances. Thus, when the client is a governmental organization, a different balance may be appropriate between maintaining confidentiality and assuring that the wrongful act is prevented or rectified, for public business is involved. In addition, duties of lawyers employed by the government or lawyers in military service may be defined by statutes and regulation. This Rule does not limit that authority. See Scope.

## Clarifying the Lawyer's Role

[7] [10]      There are times when the organization's interest may be or become adverse to those of one or more of its constituents. In such circumstances the lawyer should advise any constituent, whose interest the lawyer finds adverse to that of the organization of the conflict or potential conflict of interest, that the lawyer cannot represent such constituent, and that such person may wish to obtain independent representation. Care must be taken to assure that the individual understands that, when there is such adversity of interest, the lawyer for the organization cannot provide legal representation for that constituent individual, and that discussions between the lawyer for the organization and the individual may not be privileged.

[8] [11]      Whether such a warning should be given by the lawyer for the organization to any constituent individual may turn on the facts of each case.

## Dual Representation

[9] [12]    Paragraph (g) recognizes that a lawyer for an organization may also represent a principal officer or major shareholder.

## Derivative Actions

[10][13]  Under generally prevailing law, the shareholders or members of a corporation may bring suit to compel the directors to perform their legal obligations in the supervision of the organization. Members of unincorporated associations have essentially the same right. Such an action may be brought nominally by the organization, but usually is, in fact, a legal controversy over management of the organization.

[11] [14]The question can arise whether counsel for the organization may defend such an action. The proposition that the organization is the lawyer's client does not alone resolve the issue. Most derivative actions are a normal incident of an organization's affairs, to be defended by the organization's lawyer like any other suit. However, if the claim involves serious charges of wrongdoing by those in control of the organization, a conflict may arise between the lawyer's duty to the organization and the lawyer's relationship with the board. In those circumstances, Rule 1.7 governs who should represent the directors and the organization.

**Exhibit "3"**

**The ABA's Corporate Governance Practices**

**AMERICAN BAR ASSOCIATION**
**ADOPTED BY THE HOUSE OF DELEGATES**
**August 11-12, 2003**

RESOLVED, That the American Bar Association adopts and endorses the following corporate governance practices:

1.  The board of directors of a public corporation must engage in active, independent and informed oversight of the corporation's business and affairs, including its senior management.

2.  The board of directors of a public corporation should adopt governance principles that (a) establish and preserve the independence and objectivity of directors by eliminating disabling conflicts of interest and undue influence or control by the senior management of the corporation and (b) provide the directors with timely and sufficient information and analysis necessary to the discharge of their oversight responsibilities.

3.  The directors should recognize and fulfill an obligation to disclose to the board of directors information and analysis known to them that is relevant to the board's decision making and oversight responsibilities.  Senior executive officers should recognize and fulfill an obligation to disclose, to a supervising officer, the general counsel, or the board of directors or committees of the board, information and analysis relevant to such persons' decision making and oversight responsibilities.

4.  Providing information and analysis necessary for the directors to discharge their oversight responsibilities, particularly as they relate to legal compliance matters, requires the active involvement of general counsel for the public corporation.

5.  A lawyer representing a public corporation shall serve the interests of the entity, independent of the personal interests of any particular director, officer, employee or shareholder.

6.  The general counsel of a public corporation should have primary responsibility for assuring the implementation of an effective legal compliance system under the oversight of the board of directors.

7.  Public corporations should adopt practices in which:

    a.  The selection, retention, and compensation of the corporation's general counsel are approved by the board of directors.

b. General counsel meets regularly and in executive session with a committee of independent directors to communicate concerns regarding legal compliance matters, including potential or ongoing material violations of law by, and breaches of fiduciary duty to, the corporation.

c. All reporting relationships of internal and outside lawyers for a public corporation establish at the outset a direct line of communication with general counsel through which these lawyers are to inform the general counsel of material potential or ongoing violations of law by, and breaches of fiduciary duty to, the corporation.

8. The Model Business Corporation Act and the general corporation laws of the states, and the courts interpreting and applying the duties of directors, should more clearly delineate the oversight responsibility of directors generally, and the unique role that independent directors play in discharging that responsibility in public company settings.

9. Engagements of counsel by the board of directors, or by a committee of the board, for special investigations or independent advice should be structured to assure independence and direct reporting to the board of directors or the committee.

10. The SEC and state attorney disciplinary authorities should cooperate in sharing information in order to promote effective and appropriate enforcement of rules of conduct applicable to counsel to public corporations.

11. The courts, law schools and lawyer professional organizations such as the ABA should promote awareness of, and adherence to, the professional responsibilities of lawyers in their representation of public corporations.

12. Law firms and law departments should adopt procedures to facilitate and promote compliance with rules of professional conduct governing the representation of public corporations.

# REPORT

## I.    BACKGROUND OF THE RESOLUTION

The Task Force on Corporate Responsibility ("Task Force") respectfully submits the foregoing resolution (the "Governance Policy Resolution") in response to the following charge, presented to it by Robert Hirshon, then President of the American Bar Association, upon appointment of the Task Force on March 28, 2002:

> The Task Force on Corporate Responsibility shall examine systemic issues relating to corporate responsibility arising out of the unexpected and traumatic bankruptcy of Enron and other Enron-like situations which have shaken confidence in the effectiveness of the governance and disclosure systems applicable to public companies in the United States. The Task Force will examine the framework of laws and regulations and ethical principles governing the roles of lawyers, executive officers, directors, and other key participants. The issues will be studied in the context of the system of checks and balances designed to enhance the public trust in corporate integrity and responsibility. The Task Force will allow the ABA to contribute its perspectives to the dialogue now occurring among regulators, legislators, major financial markets and other organizations focusing on legislative and regulatory reform to improve corporate responsibility.

On July 16, 2002, the Task Force submitted its Preliminary Report in response to this charge. During the months following release of the Preliminary Report, the Task Force convened public hearings on its preliminary recommendations in Chicago, New York City and Palo Alto, California and received a variety of written and oral comments on its Preliminary Report.[1]

After succeeding Robert Hirshon as President of the ABA, Alfred P. Carlton, Jr. reappointed the Task Force and, in his testimony to the Task Force in Chicago, encouraged the Task Force to draw "broad public policy conclusions which lead to policy recommendations for the ABA House of Delegates ... that go beyond the technical aspects of corporate securities law and the ABA's model rules of professional conduct."[2] The Governance Policy Resolution responds to the Task Force's founding charge from Robert Hirshon and to President Carlton's call for broad policy conclusions.[3]

---

[1]    The Preliminary Report of the Task Force is published at 58 BUS. LAW. 189 (2002), and is available, along with the oral and written testimony submitted in the Task Force's public hearings, at http://www.abanet.org/buslaw/corporateresponsibility/home.html (the "Task Force Web Site").

[2]    Testimony of Alfred P. Carlton, Jr., at 91, available on the Task Force Web Site.

[3]    Not all members of the Task Force endorse each recommendation and every view expressed in the Report, but the Report taken as a whole reflects a consensus of the members of the Task Force. The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be considered as representing the policy of the American Bar Association.

## II.    CONTEXT OF THE GOVERNANCE POLICY RESOLUTION

The Governance Policy Resolution addresses the mechanisms of public corporation governance in the United States,[4] with particular emphasis on the role of lawyers. Rather than attempt to determine the legal, ethical or moral responsibility of any individual person or organization associated with any particular failure of corporate responsibility,[5] the Task Force has sought to examine public corporation governance mechanisms to determine how they might be modified in ways that would enhance corporate responsibility.

The term "corporate responsibility" is not self-defining. The Task Force has understood that term to include, at the very least, behavior by the executive officers and directors of the corporation that conforms to law and results from the proper exercise of the fiduciary duties of care and loyalty to the corporation and its shareholders. In the Task Force's view, moreover, the term "corporate responsibility" also embraces ethical behavior beyond that demanded by minimum legal requirements.[6]

The Governance Policy Resolution has not been developed in a static environment. Since the Task Force was appointed, many reforms significantly affecting corporate governance and responsibility have been effected or proposed:

- The Sarbanes-Oxley Act of 2002[7] has brought about, among many other things, extensive federal regulation of the accounting profession, including the creation of an external regulatory organization (the Public Company Accounting Oversight Board), detailed prescriptions governing the auditing work of the firms that certify the financial statements of public corporations, and limits on the scope of non-auditing services that such firms may supply.

---

[4]    As used in this recommendation and in the Task Force's Report, the term "public corporation" means generally a company that has a class of stock sufficiently widely held as to require registration under Section 12 of the Securities Exchange Act of 1934 ("Exchange Act") or the filing of reports pursuant to Section 15(d) of that Act. The Task Force believes that many of its recommendations will be relevant to and constructive in the governance of other organizations and entities.

[5]    For examples of proceedings in which such determinations are being made, see *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 235 F.Supp.2d 549 (S.D.Tex. 2002); Joint Committee on Taxation's Report of Investigation of Enron Corporation and Related Entities Regarding Federal Tax and Compensation Issues, and Policy Recommendations (Feb. 19, 2003), available at the Task Force Web Site; *SEC v. WorldCom, Inc.*, Litigation Release No. 17866 (Nov. 26, 2002), available at http://www.sec.gov/litigation/litreleases/lr17866.htm; *SEC v. HealthSouth Corporation and Richard M. Scrushy*, Litigation Release No. 18044 (March 20, 2003), available at http://www.sec.gov/litigation/litreleases/lr18044.htm.

[6]    The Task Force's Preliminary Report (at 4-6) articulated this definition of "corporate responsibility." No comments were submitted questioning that definition, and the Task Force adopts it for purposes of its Report.

[7]    P.L. 107-204, 107th Cong., 2d sess. (July 30, 2002).

- The Sarbanes-Oxley Act of 2002 prescribed the adoption of substantive requirements for the composition and responsibilities of the audit committees of public corporations with shares listed with the public markets,[8] and established a prohibition against personal loans to directors and executive officers of public corporations.[9]

- In response to concern that existing rules of professional conduct did not sufficiently direct the lawyer for the corporation to report illegal conduct to the corporation's board of directors,[10] Congress adopted Section 307 of the Sarbanes-Oxley Act of 2002, requiring the Securities and Exchange Commission ("SEC") to promulgate rules of professional conduct for lawyers appearing and practicing before the SEC.

- Major stock markets – notably the New York Stock Exchange ("NYSE") and the Nasdaq Stock Market ("Nasdaq") – have submitted to the SEC proposed listing standards for public corporations that will extensively reshape the responsibilities and operating processes of the board of directors, committees of the board, and senior corporate officers, and extend the authority of shareholders.[11]

## III.    THE FRAMEWORK OF PUBLIC CORPORATION GOVERNANCE IN THE UNITED STATES

The laws governing the organization and governance of public as well as privately held companies in the United States universally establish that the business and affairs of the corporation are to be managed by or under the direction of its board of directors.[12] At the same time, however, it is generally acknowledged that direct operational control of American public corporations is, and must remain, primarily in the hands of their senior executive officers.[13]

This concentration of day to day managerial control in the senior executive officers may give rise to potential conflicts of interest and other motivational problems that present persistent challenges for effective corporate governance. First, senior executive officers of public companies may sometimes succumb to the temptation to serve personal interests by maximizing their own wealth or control through manipulation or misreporting of corporate information, at the

---

[8]    Sarbanes-Oxley Act of 2002, Section 301.

[9]    *Id.*, Section 402(a), enacting Section 13(k) of the Exchange Act, 15 U.S.C. §78m(k).

[10]    *E.g.,* letter of Professors Richard W. Painter, *et al.,* to SEC Chairman Harvey Pitt, dated March 7, 2002, available at http://www.abanet.org/buslaw/corporateresponsibility/pitt.pdf .

[11]    The NYSE and Nasdaq proposed corporate governance listing standards are available at http://www.nyse.com/abouthome.html?query=/about/report.html and http://www.nasdaq.com/about/ProposedRules.stm#boards, respectively.

[12]    *See, e.g.,* 8 *Del. C.* §141(a); Model Business Corporation Act §8.01(b).

[13]    As used in this Supporting Statement, the term "senior executive officer" means the chief executive officer, the chief operating officer, the chief financial officer, and those officers who perform the functions of one or more of those positions.

expense of long-term corporate well-being.[14] Second, senior executive officers are often motivated to report good news, and are averse to reporting news of business setbacks, mistakes, or worse, out of selfish concern that such reports might adversely reflect on them.[15] Third, senior executive officers may also be motivated to report information and analysis incorrectly or incompletely to the board of directors out of concern that individual directors might pursue unproductive or even disruptive inquiries or initiatives of their own. And finally, senior executive officers may be motivated to report information and analysis incorrectly or incompletely to the public out of a concern about harming shareholder interests by reporting news that may adversely affect the corporation's stock price. Unchecked, these various motivations on the part of senior executive officers can significantly harm the interests of the corporation and the investors, employees, customers and other constituencies affected by the corporation's business.

To check such potentially harmful motivations, and to focus the attention of senior executive officers on the interests of the corporation and its shareholders, our system of corporate governance has long relied upon the active oversight and effective counseling of the key participants in the corporate governance process, including the directors, auditors and counsel.[16] Corporate responsibility and sound corporate governance thus depend upon the active and informed participation of independent directors and advisers who act vigorously in the best interest of the corporation and are empowered to exercise their responsibilities effectively.

There are many participants in the governance of public companies who contribute to the oversight of corporate conduct with a view to enhancing corporate responsibility. The private sector participants include:

- Boards of directors, whose responsibilities include the duty to oversee management performance in the best interests of the corporation.[17] These governing bodies have increasingly included outside directors (directors not employed by the corporation), and the standards for evaluating their independence from the corporation's senior executive officers have evolved significantly in recent years.[18]

---

[14]    *See* The Conference Board Commission on Public Trust and Private Enterprise Findings and Recommendations, Part I: Executive Compensation (Sep.17, 2002) available at http://www.conference-board.org/knowledge/governCommission.cfm, at 4.

[15]    *See, e.g.,* Donald C. Langevoort, *Organized Illusions: A Behavioral Theory Of Why Corporations Mislead Stock Market Investors (And Cause Other Social Harms)*, 146 U. PA. L. REV. 101, 130-146 (1997).

[16]    *See* M. EISENBERG, THE STRUCTURE OF THE CORPORATION (1976); Noyes E. Leech & Robert H. Mundheim, *The Outside Director of the Publicly Held Corporation*, 31 BUS. LAW. 1799 (1976).

[17]    *E.g., In re Caremark Int'l Inc. Deriv. Lit.*, 698 A.2d 959 (Del. Ch. 1996); Model Business Corporation Act Annotated §8.31 (2000/01/02 Supp. at 8-204, 8-216P).

[18]    *See, e.g.,* the NYSE and Nasdaq listing standard proposals identified in note 11, *supra.*

6

- Public accounting firms, which are required to opine that public corporation financial statements fairly present the financial position and results of operations of the enterprise in conformity with generally accepted accounting principles.[19]  Because of their importance to the integrity of the capital markets, and because of concerns arising from cases in which the reliability of public corporation audits has been compromised, the auditing firms for public companies have been subjected in the last year to sweeping regulatory reforms, including the creation of a new national rulemaking and disciplinary commission, the Public Company Accounting Oversight Board, which is itself subject to the oversight and enforcement authority of the SEC.[20]

- Shareholders, particularly institutional investors, who exercise ultimate power to elect and remove directors, and who increasingly seek to influence corporate policy through governance proposals and nominations to the board of directors.[21]

- Legal counsel who provide advice to public corporations, through their directors, officers and employees, on compliance with the corporation's legal obligations.  The competition to acquire and keep client business, or the desire to advance within the corporate executive structure, may induce lawyers to seek to please the corporate officials with whom they deal rather than to focus on the long-term interest of their client, the corporation.

Finally, these private sector participants operate in a framework of legal rules established by state legislatures and other institutions that supply important regulatory support for corporate responsibility.

- The courts interpret and enforce the fiduciary responsibilities of corporate directors and officers.  Indeed, courts can be expected to identify and give effect to evolving expectations regarding oversight responsibility, conflicts of interest and director independence, and the Task Force believes that such common law development may improve the level of corporate responsibility.  State courts also promulgate and supervise enforcement of rules of professional conduct applicable to lawyers in their representation of public corporations.

- State legislatures define basic rules of corporate governance and often supplement the common law by establishing or refining key duties of corporate directors and officers.[22]  Recognizing that precise uniformity among state corporate statutes is neither a generally

---

[19]    *See* John C. Coffee, Jr., *Understanding Enron: "It's About the Gatekeepers, Stupid,"* 57 BUS. LAW. 1403, 1405 (2002).

[20]    *Id.;* Sarbanes-Oxley Act of 2002, §§ 101-110.

[21]    *See, e.g.,* The Conference Board Commission on Public Trust and Private Enterprise, Findings and Recommendations (January 9, 2003), at 15-20, 27.

[22]    *See, e.g.,* Model Business Corporation Act §8.30 (standards of conduct for directors), and §8.42 (standards of conduct for officers).

accepted goal nor easy to achieve, and that state corporate laws must accommodate the needs of both private and publicly held enterprises, the Task Force nonetheless expects that the states – and the statutory language of the ABA-sponsored Model Business Corporation Act ("MBCA") – will more clearly delineate the oversight responsibility of directors generally, and the unique role that independent directors play in discharging that responsibility in public company settings.

- The SEC promulgates rules implementing the federal securities laws adopted by Congress, including the extensive reforms effected by the Sarbanes-Oxley Act of 2002. By proscribing some conduct and prescribing and enforcing requirements for disclosure by public companies in areas including financial performance, executive compensation, codes of conduct and transactions between the corporation and its directors and officers, by ensuring effective exercise of the shareholder franchise, and in many other ways, the SEC performs a critical role in enhancing corporate responsibility.

- Stock exchanges (such as the NYSE) and other securities markets (particularly Nasdaq) establish, subject to review by the SEC, standards for admission of a public corporation's shares to trading. Such listing standards have established important governance requirements,[23] and in recent months both the NYSE and the Nasdaq, at the prompting of the SEC, have proposed a broad array of new governance listing requirements.[24]

- Federal legislation has from time to time imposed substantive and procedural mandates that specifically affect corporate governance, such as: requiring accurate books and records and internal controls, and proscribing improper payments;[25] prohibiting extension of credit in the form of a personal loan to any director or executive officer;[26] and requiring that a public corporation's periodic financial reports be accompanied by a certification by the chief executive officer and the chief financial officer that the information they contain "fairly presents, in all material respects, the financial condition and results of operations of the issuer."[27]

Despite the range of private sector participants who have been in a position to contribute to public corporation governance, the last several years have witnessed spectacular failures of corporate responsibility. Knowledgeable observers have asserted that through inaction,

---

[23]    For an excellent description of the development of stock exchange governance listing standards, see Special Study Group of the Committee on Federal Regulation of Securities, Section of Business Law, *Special Study on Market Structure, Listing Standards and Corporate Governance*, 57 BUS. LAW. 1487 (2002).

[24]    *See* note 11, *supra.*

[25]    *See* 15 U.S.C. §§78m(b), Section 13(b) of the Exchange Act.

[26]    15 U.S.C. §78m(k), Section 13(k) of the Exchange Act, added by Section 402 of the Sarbanes-Oxley Act of 2002.

[27]    18 U.S.C. §1350, enacted by Section 906 of the Sarbanes-Oxley Act of 2002.

inattention, indifference or, in some cases, conflicting personal interests or loyalties, some of these participants bear significant responsibility for these failures, and lawyers have not been excluded from such assertions.[28]  Inordinate self-interest on the part of corporate executives in short term corporate stock price levels, and instances in which that self-interest has led to aggressive accounting or assumption of extreme business risks, were not tempered by the checks and balances which the general corporate governance scheme expected from the directors or the professional firms engaged by the corporation to provide review and advice.  Nothing in the record developed in the Task Force's public hearings has called into question the core conclusion, articulated in the Task Force's Preliminary Report, that *the exercise by independent participants of active and informed stewardship of the best interests of the corporation has in too many instances fallen short.*[29]

In addressing this problem, the Task Force focused in part upon the directors of the public corporation, who serve an important function in overseeing the conduct of senior executive officers.  The ability of outside directors to discharge that function effectively, however, has at times been compromised by the practical realities of the relationship between such directors and the senior executive officers – particularly the chief executive officer – of the corporation:

- Outside directors have at times been overly dependent upon and overly passive with respect to senior executive officers, particularly the chief executive officer; conversely, such officers too often have looked on outside directors as a sounding board but not as persons to be encouraged to press issues or independently raise troubling questions.

- Outside directors too often have relied almost exclusively upon senior executive officers, and advisers selected by such officers, for information and guidance about corporate affairs.

- Outside directors too often have failed to devote adequate time and attention to discharge their oversight responsibilities that demand a relatively detailed understanding of a number of aspects of the corporation's activities and its material transactions.

---

[28]    E.g., Coffee, *supra* note 19; Joel Seligman, *No Man Can Serve Two Masters: Corporate and Securities Law After Enron*, 80 WASH. U. L.Q. 449 (2002); Leo E. Strine, Jr., *Derivative Impact? Some Early Reflections on the Corporation Law Implications of the Enron Debacle*, 57 BUS. LAW. 1371 (2002); William W. Bratton, *Enron and the Dark Side of Shareholder Value*, 76 TUL. L. REV. 1275 (2002).  With respect to the conduct of lawyers, see Roger C. Cramton, *Enron and the Corporate Lawyer: A Primer on Legal and Ethical Issues*, 58 BUS. LAW. 143 (2002); Report of Investigation by the Special Investigative Committee of the Board of Directors of Enron Corp. by William C. Powers, Jr., Chair, dated February 1, 2002, available at http://news.findlaw.com/hdocs/docs/enron/sicreport/; Dennis K. Berman, "Global Crossing Board Report Rebukes Counsel," Wall Street Journal, Mar. 11, 2003, at B9; Mike France, "What About the Lawyers?," Business Week, Dec. 23, 2002 at 58-62.

[29]    Preliminary Report at 10.

- Outside directors too often have deferred to the senior executive officers to set agendas for meetings of the board, select director nominees, initiate the analysis of and in effect determine executive compensation, select the key advisers to the board and its committees (*e.g.*, compensation consultants), and select the outside auditors for the company.

- Too often, even when an outside adviser is formally engaged by the board of directors or by a committee of the board, the adviser's view of the senior executive officers as the client has influenced the advice rendered.

The Task Force recognizes that it is not desirable for directors to try to manage the corporation directly and comprehensively, and that there are inherent limitations on the abilities of outside directors to assure corporate responsibility.[30] Directors will necessarily rely to a significant extent upon information supplied by the corporation's senior executive officers and other corporate agents. Moreover, it is widely accepted that competent directors are not expected to serve in an environment in which they can be held personally liable for injury to the corporation arising from honest mistakes or omissions, as long as they act on a reasonably informed basis, in good faith and free of conflicting personal interests or loyalties.[31] Thus, "[d]*irectors cannot guarantee corporate compliance; they can only be expected to undertake and execute good faith efforts to ensure that it occurs.*"[32]

It is the sense of the Task Force, however, that many corporate boards have developed a culture of passivity with respect to senior executive officers, in which those officers are not subject to meaningful director oversight.[33] Direct legislative action or the imposition of legal sanctions to change this culture may produce a confrontational climate in the board room which

---

[30]     At least one commentator has thoughtfully questioned the utility of listing standards that require more extensive reliance upon outside directors as a means to enhance corporate responsibility and performance. Stephen M. Bainbridge, *A Critique of the NYSE's Director Independence Listing Standards*, 30 SEC. REG. J. 370 (2002).

[31]     Courts have observed that director liability for ordinary negligence would unduly discourage socially useful decisions by directors to pursue risky but potentially rewarding business strategies. *See Gagliardi v. Tri-Foods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996); *Joy v. North*, 692 F.2d 880, 884-86 (2d Cir. 1982).

[32]     Strine, *supra*, 57 BUS. LAW. at 1393 (emphasis in original).

[33]     SEC Chairman William H. Donaldson recently articulated this same view:

> Over the past decade or more, at too many companies, the chief executive position has steadily increased in power and influence. In some cases, the CEO had become more of a monarch than a manager. Many boards have become gradually more deferential to the opinions, judgments and decisions of the CEO and senior management team. This deference has been an obstacle to directors' ability to satisfy the responsibility that the owners - the shareholders - have delegated and entrusted to them.

Remarks at the 2003 Washington Economic Policy Conference, Mar. 24, 2003, available at http://www.sec.gov/news/speech/spch032403whd.htm.

would have undesirable consequences. The Task Force believes, rather, that desirable changes in attitude can most effectively be encouraged by a variety of structural and procedural reforms. The policies and practices recommended in this Report with respect to the role of the board of directors attempt to encourage such changes largely by augmenting the independence of outside directors from senior executive officers, affording such directors greater responsibilities in the selection of board nominees and in the oversight of financial reporting and legal compliance and encouraging such directors to become generally more active and assertive in their supervisory roles.

Changes in structure and process alone, however, will never fully accomplish the enhancements in corporate responsibility contemplated by this Report. Even the most stringent prescriptions for involvement of outside directors will not generate the backbone to *act* independently and objectively which the Task Force believes is necessary to an effective system of corporate governance.[34] The goal of the policies and practices recommended in this Report will only be fully achieved if outside directors abandon the passive role many have been content to play, and replace it with a new culture stressing constructive skepticism[35] and an active, independent oversight role.

The events of the last two years compellingly call for significant reforms and "consciousness raising" in our system of corporate governance. As previously described, there have already been numerous such reform initiatives.[36] The Task Force believes, however, that important reforms remain to be developed or implemented in a number of areas. The Governance Policy Resolution addresses two of these areas: the role of lawyers and the role of directors. The elements of that resolution are intended to enhance the ability of corporate counsel and directors to discharge their corporate governance responsibilities more effectively.

IV.    **ENHANCING THE CONTRIBUTION OF LAWYERS TO THE EFFECTIVE GOVERNANCE OF THE PUBLIC CORPORATION**

Lawyers are and should be important participants in corporate governance and important contributors to corporate responsibility. Lawyers employed by the corporation and outside lawyers retained by the corporation often serve as key advisers to senior management and usually participate in the negotiation, structuring and documentation of the corporation's significant business transactions. Additionally, lawyers often serve as counselors to the board to assist it in performing its oversight function. In such roles, lawyers obviously do and should play a critical role in helping the corporation recognize, understand and comply with applicable laws and regulations, as well as to identify and evaluate business risks associated with legal issues. The Task Force believes that a prudent corporate governance program should call upon lawyers

---

[34]    Business Roundtable May 2002 Principles of Corporate Governance, at 2 ("[e]ven the most thoughtful and well-drafted policies and procedures are destined to fail if directors and management are not committed to enforcing them in practice."); Donaldson, *supra* note 36.

[35]    *See* The Business Roundtable May 2002 Principles of Corporate Governance at 3.

[36]    *See* Part II, *supra.*

– notably the corporation's general counsel[37] – to assist in the design and maintenance of the corporation's procedures for promoting legal compliance.

In their role of promoting their organizational clients' compliance with law, a key function of lawyers is to bring issues of legal compliance to the attention of appropriate authorities within the organization. The Governance Policy Resolution includes two policies that the Task Force believes are of particular importance in this regard. First, the board of directors should establish a practice of regular, executive session meetings between the general counsel[38] and a committee of independent directors.[39] Second, each retention of outside counsel to the corporation should establish two things at the outset of the engagement: (1) a direct line of communication between outside counsel and the corporation's general counsel; and (2) the understanding that outside counsel are obliged to apprise the general counsel, through that direct line of communication, of material violations or potential violations of law by the corporation or of material violations or potential violations of duties to the corporation.

## Communication Between General Counsel and Independent Directors

The general counsel of a corporation works day to day with senior management and typically reports to the CEO or another senior executive officer. Although this interaction is necessarily with individual members of management, the general counsel's client is the corporation. This creates a tension whose positive resolution demands a number of practical steps.

Where the general counsel concludes that action or inaction of an officer or employee with whom counsel works is breaching or will breach a duty to the corporation, or is violating or will violate a law, such that substantial injury to the corporation is likely to ensue, counsel may have to confront the issue of communicating with a higher corporate authority on the subject.[40] If the relevant officer or employee is a senior executive officer or, most difficult, the CEO, general counsel must determine whether to go up the corporate ladder to a committee of independent directors or to the entire board. Knowing that doing so may destabilize the relationships among senior executive officers and directors, the general counsel may be reluctant to communicate with the board of directors or a committee of the board.

---

[37]    As used in the Report, the term "general counsel" refers to the lawyer having general supervisory responsibility for the legal affairs of the corporation. *See* Recommendation n. 1.

[38]    Reference to the general counsel includes, where appropriate, the general counsel's staff and, where no office of general counsel has been established to perform this function, outside counsel performing a similar role with respect to corporate governance, compliance or disclosure. *See* Recommendation n. 1.

[39]    In recommending such meetings, the Task Force recognizes that their purposes may be fulfilled in many instances by meetings in which only the chair of the committee is present, especially if the chair is expected to report to the committee relevant information learned at such meetings. *See* Governance Policy Resolution ¶¶3 and 7b.

[40]    Indeed, the regulations adopted by SEC pursuant to Section 307 of the Sarbanes-Oxley Act of 2002 (the "Part 205 Rules") may impose such an obligation as a matter of federal law. *See* 17 CFR §§205.3(b)(1) and (b)(2).

The Task Force believes, however, that such impediments to communication to higher corporate authorities can be minimized or eliminated if the board of directors adopts a practice in which the general counsel, as a matter of routine, periodically meets privately with a committee of independent directors. The value of such meetings will be maximized if the committee has instructed general counsel to use those occasions to report on material violations or potential violations of law, breaches of duty to the corporation and other substantial legal concerns, such as significant litigation and contingent liabilities, relating to the welfare of the corporation that have come to general counsel's attention. The committee should make clear to general counsel the expectation that such reports will reveal what investigation of facts has been made, what steps have been taken to deal with any violation or breach that has occurred, and the steps taken or recommended to make sure such violation or breach does not recur. Use of this procedure would establish an expectation by the board that the general counsel will report concerns about significant legal compliance issues, and would to some extent insulate such communications from being perceived by senior executive officers as disruptive. Indeed, the fact that the general counsel is expected to make such disclosure may persuade the CEO to take corrective action or personally report such issues directly to the committee.[41]

The Task Force therefore believes that a practice of having routine, periodic private meetings (designed to elicit specific information) between the general counsel and an appropriate committee of independent directors would significantly enhance the general counsel's ability to assure that critical issues, including all issues of material law and fiduciary duty violations, are reviewed by appropriate corporate authorities.

### Communication between Outside Counsel and General Counsel

The corporation is commonly served by a number of outside counsel who interact with specific corporate employees. Many outside counsel may not have regular contact with the corporation's senior executive officers (including the CEO), and they typically do not interact with the board of directors or its independent members. In the absence of such contact, outside counsel who knows of facts from which such counsel concludes that a duty to the corporation is being or has been breached or that the corporation may be violating or potentially violating the law is unlikely to have access to the corporation's resources that would permit an appropriate investigation to be made.

In such a circumstance, Model Rule 1.13 or the Part 205 Rules may require the outside counsel to communicate with higher corporate authorities, and such communication may be a desirable contribution to corporate governance even if the rules of professional conduct do not mandate it. There are frequently significant practical obstacles, however, to outside counsel bringing such misconduct to the attention of appropriate corporate authorities. In many situations operational personnel will hire (or be perceived as hiring) outside counsel and be responsible for future hires of counsel. Consequently, outside counsel may be discouraged from

---

[41]    The committee may respond to the general counsel by agreeing with the CEO's position that the corporation must, as a matter of business strategy, take the risk of engaging in the conduct questioned by the general counsel. At that point, general counsel would need to evaluate whether the Part 205 Rules and the applicable rules of professional conduct require or permit the lawyer to take any further action.

13

fulfilling the professional responsibility to the corporation out of concern over offending the personal desires or interests of the employee or department that retains counsel. The outside counsel must nevertheless comply with applicable rules of professional conduct.

Such compliance, as well as otherwise beneficial communication of concerns about legal compliance, can be fostered by the adoption of a practice under which the general counsel makes clear to outside counsel, at the outset of the representation and in periodic communications thereafter, that when outside counsel knows of facts from which such counsel concludes that an officer or employee is engaged in conduct which has resulted or will result in material violations of law or fiduciary duty to the company, outside counsel should communicate those facts to the general counsel. General counsel may have additional information, typically has the resources to investigate further, and is charged with responsibility to pursue such inquiries in appropriate situations. General counsel's instruction that outside counsel make his or her concerns known to the general counsel is designed to elicit important information and analysis and direct it to a place in the corporate structure where appropriate action can be taken.[42]

## V.    ENHANCING THE CONTRIBUTION OF DIRECTORS TO PUBLIC CORPORATION GOVERNANCE

The Task Force recommends the governance practices set forth in Part VI of its Report as a means to improve the effectiveness of oversight by boards of directors of public corporations (with appropriate exceptions for corporations with controlling shareholders and for foreign private issuers).[43] In most if not all instances, practices substantially similar to these recommendations either have been or will be imposed by legislation or stock market listing standards, or are recommended by significant authorities on corporate governance.[44]

The Task Force recognizes that there are different ways of implementing these governance practices, ranging from state law changes to trading market listing standards to federal statutory or SEC regulatory prescriptions to institutionally sponsored "best practices." In its Eighth Policy, the Task Force sets forth its conclusion that the statutory language of the

---

[42]    This procedure may not be effective where outside counsel knows or has reason to believe that general counsel will not handle the problem properly either because of a disabling conflict of interest or because of weakness or incompetence. In those cases, the applicable rules of professional conduct should guide the outside counsel in dealing with presenting concerns about corporate misconduct to higher levels of authority within the corporation.

[43]    Such exceptions are recognized in the listing standards currently proposed by the NYSE and Nasdaq. Those exceptions rest on important legal and practical considerations (including the rights associated with majority share ownership and the legal obligations of corporations organized under the laws of countries other than the United States). The Task Force recognizes that other legal or practical considerations may justify departure from some or all of the proposed practices, even for a public corporation, and the practice recommendations set forth here should be presumptively, but not invariably, applied.

[44]    Part VI of the Task Force's Report catalogues these various counterparts, which can be found in the proposed listing standards of the New York Stock Exchange and Nasdaq, certain provisions of the Sarbanes-Oxley Act of 2002 and SEC regulations implementing such provisions, and corporate governance policies of organizations like The Conference Board and The Business Roundtable.

14

MBCA, state legislatures and courts interpreting state law should more clearly delineate the oversight responsibility of directors generally, and the unique role that independent directors play in discharging that responsibility in public company settings.[45] In addition, the Task Force urges that the ABA and appropriate entities within the ABA proceed promptly to evaluate and, where appropriate, develop other specific ways in which to implement the Task Force's policy recommendations.

## CONCLUSION

The issues addressed by the Task Force are complex and vitally important to an effective system of checks and balances supporting improved corporate responsibility. Public confidence in the present system has eroded in the wake of highly publicized recent corporate failures. Lawyers for the corporation should play an important role in corporate governance and the governance policy recommendations of the Task Force will enhance the opportunity for the lawyer to be a more effective contributor to a workable system of checks and balances. For the foregoing reasons, the Task Force respectfully urges that the House of Delegates adopt the proposed governance policies.

Respectfully submitted,
The Task Force on Corporate Responsibility
James H. Cheek, III, Chair

---

[45] Among the specific oversight matters which should be considered in relation to the Model Business Corporation Act or its commentary and the state corporate laws as well as in relation to important guidance such as the *Corporate Director's Guidebook*, are at least the following: selecting, evaluating and compensating the chief executive officer and other members of senior management; reviewing, approving, and monitoring fundamental financial and business strategies and the performance of the company relative to those strategies; assessing major risks facing the company; and ensuring that reasonable processes are in place to maintain the integrity of the company and the corresponding accountability of senior management, including processes relating to integrity of financial reporting, compliance with law and corporate codes of legal and ethical conduct, and processes designed to prevent improper related party transactions. Federal law (particularly the securities laws, including the rules and regulations adopted by the SEC) also plays a significant role in affecting and promoting corporate responsibility.

# GENERAL INFORMATION FORM

Submitting Entity:    Task Force on Corporate Responsibility

Submitted By: James H. Cheek, III, Chair

1.    <u>Summary of Recommendation(s)</u>:  The recommendation is to adopt the corporate governance policies and related governance practices more fully set forth in Parts IV and VI of the Task Force's Report.  In general, these policies involve structural and procedural reforms designed to enhance the independence and resources of outside directors of public corporations, increase the flow of material information and analysis to those directors, and enhance the ability of the lawyers representing public corporations to exercise and bring to bear independent professional judgment and thereby promote corporate responsibility without undermining the constructive and collaborative relationship that must exist so that compliance with law can be most effectively promoted.

2.    <u>Approval by Submitting Entity</u>:  The recommendation as submitted was approved by the Task Force through its adoption of its Report dated March 31, 2003.

3.    <u>Has this or a similar recommendation been submitted to the House or Board previously?</u>

    No.

4.    <u>What existing Association policies are relevant to this recommendation and how would they be affected by its adoption?</u>

    The recommendation addresses core areas of concern about the governance of public corporations including the role of lawyers in the system of corporate governance.

5.    <u>What urgency exists which requires action at this meeting of the House?</u>

    The Task Force was directed by the President of the ABA in March 2002 to evaluate "systemic issues relating to corporate responsibility" in relation to, among other things, "the framework of laws and regulations and ethical principles governing the roles of lawyers."  The Task Force believes that its recommendations merit prompt attention by the House of Delegates in light of recent changes in applicable law, including new federal legislation and related rules and listing standards promulgated by the Securities and Exchange Commission and the major trading markets relating to corporate governance matters.

6.    <u>Status of legislation (if applicable)</u>:   Not applicable.

7.    <u>Cost to the Association (both direct and indirect costs)</u>:     None.

8.    <u>Disclosure of Interest (if applicable)</u>: None.

9.    <u>Referrals</u>:    The Task Force's Report is expected to be distributed to each of the Sections and Divisions and Standing Committees of the ABA.

10.    <u>Contact Person (prior to the meeting)</u>:    James H. Cheek, III, Chair, Task Force on Corporate Responsibility, Bass Berry Sims, PLC,  Suite 2700, 315 Deaderick St., Nashville, TN 37238-3001, business: (615) 742-6223, fax: (615) 742-6298, email jcheek@bassberry.com.

11.    <u>Contact Person (who will present the report to the House)</u>:    James H. Cheek, III, Chair, Task Force on Corporate Responsibility, Bass Berry Sims, PLC,  Suite 2700, 315 Deaderick St., Nashville, TN 37238-3001, business: (615) 742-6223, fax: (615) 742-6298, email jcheek@bassberry.com.

17

Exhibit "4"

The ABA's ABA Corporate Governance Committee White Paper
titled
*THE INDEPENDENCE OF OUTSIDE COUNSEL*

# THE INDEPENDENCE OF OUTSIDE COUNSEL – White Paper of the

# Corporate Governance Committee

### By Walter Demond*

Whether in the context of shareholder derivative suits, fairness inquiries into mergers, or the availability of safe harbors under the Investment Company Act, one of the most important elements in determining the independence of directors is the impartiality of those advising the directors—including independent counsel.  Despite the fact that independence is essential in defending against corporate wrongdoings, it has yet to be expressly defined.

The Sarbanes-Oxley Act ("Act"), the New York Stock Exchange ("NYSE") and NASDAQ listing standards, the Investment Company Act of 1940, and the American Bar Association ("ABA") Corporate Governance Practices each discuss the significance of independent directors as well as the independence of those who advise the directors. Because independence is still largely determined on a case-by-case basis, this paper will examine the above standards along with case law and commentary to determine who qualifies as independent counsel and when retaining independent counsel is advisable.

## The Sarbanes-Oxley Act

The Act restricts the public listing of businesses to those whose audit committees have "the authority to engage independent counsel."[1]  The Act also contains a provision

---

[1] Section 301(5) of the Sarbanes-Oxley Act, H.R. 3763, 107th Cong. (2d Sess. 2002); *See also* SEC Final Rule Release No. 33-8820, implementing section 10A(m)(1) of the Securities Exchange Act of 1934, effective April 25, 2003, (stating "As directed by the Sarbanes-Oxley Act of 2002, we are adopting a

requiring appropriate funding to be available to the audit committee for paying any advisors it decides to employ.[2]  Therefore, although the Act does not define "independent counsel," it does provide that independent counsel may be hired by the audit committee, as it determines is necessary to carry out its duties, and that the audit committee determine the amount of compensation.

## NYSE and NASDAQ Listing Standards

On November 4, 2003, the Securities and Exchange Commission ("SEC") issued an order approving corporate governance amendments to the NYSE and NASDAQ listing standards.[3]  Under the NASDAQ standards, the audit committee must now have the ability to hire and obtain funding for independent counsel and other advisors.[4]  Similarly, the NYSE standards require that the audit committee be empowered to obtain advice and assistance from outside legal advisors as it deems necessary to fulfill its duties.[5]  Moreover, the committee must be able to employ such outside legal advisors without board approval.[6]

## The Investment Company Act of 1940

The nexus between the independence of directors and the independence of their advisors is most apparent in the context of the Investment Company Act of 1940.[7]  The

---

new rule to direct the national securities exchanges and national securities associations to prohibit the listing of any security of an issuer that is not in compliance with the audit committee requirements mandated by the Sarbanes-Oxley Act of 2002.").

[2]  *Id.* at section 301(6) (the amount of appropriate funding is to be determined by the audit committee).

[3]  *See* NASD and NYSE Rulemaking: Relating to Corporate Governance, approved by the SEC November 4, 2003, available at http://www.sec.gov/rules/sro/34-48745.htm (last visited January 13, 2004).

[4]  *Id. See also* rule 10A-3 of the Securities Exchange Act of 1934, requiring each national securities exchange and national securities association to prohibit the listing of any security of an issuer that is not in compliance with the audit committee requirements mandated by the Sarbanes-Oxley Act of 2002.

[5]  *See* NYSE Section 303A(7)(b)(ii)(E).

[6]  *Id.*

[7]  15 U.S.C. 80a-1 (2000).

2

SEC has created numerous safe harbors for a variety of conflict-of-interest transactions; however, essential to each safe harbor is the need for approval of the conflict-of-interest situation by independent directors advised by independent counsel.[8] The policy behind requiring independent counsel to advise the independent directors is that "conflicts involved in the transactions and arrangements permitted by the exemptive rules make it critical that independent directors, when they seek legal counsel, be represented by persons who are free of significant conflicts of interests that might affect their legal advice."[9] Although the SEC stops short of prescribing the criteria for an attorney to qualify as an independent counsel, a central concern in its release adopting the independent counsel requirement in 2001 is that the counsel not be compromised by a historical relationship with the fund's advisor.[10] The release further states that the Commission does "not believe that . . . a lawyer whose firm simultaneously represents the fund's advisor and independent directors in connection with . . . areas of conflict between the fund and its advisor, is an 'independent legal counsel.'"[11]

**American Bar Association Corporate Governance Practices**

On March 28, 2002, the ABA Task Force on Corporate Responsibility was appointed to "examine systemic issues relating to corporate responsibility."[12] After conducting public hearings and receiving comments on its preliminary report, the Task

---

[8]  66 *Fed. Reg.* 3734 (Jan. 16, 2001) (codified at 17 C.F.R. parts 239, 240, 270, and 274).

[9]  *Id.* at 3737; *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 965, 982, 986 (S.D.N.Y. 1987), *aff'd* 835 F.2d 45 (2d Cir. 1987) (emphasizing that the board was represented by its own counsel throughout); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038, 1064 (S.D.N.Y. 1981) (noting board was represented by counsel independent from fund's advisor).

[10]  17 C.F.R. 270.0-1(a)(6)(i)(A) (2002).

[11]  66 *Fed. Reg.* at 3739.

[12]  *See* ABA Task Force on Corporate Responsibility: *Governance Policy Resolution*, issued April 29, 2003, available at http://www.abanet.org/buslaw/corporateresponsibility/final_report.pdf (last visited January 8, 2004).

3

Force finalized its Governance Policy Resolution, and, on August 11-12, 2003, the ABA House of Delegates adopted and endorsed the policies recommended by the Task Force.[13]

From these policies, the ABA compiled a list of Corporate Governance Practices. Specifically, Corporate Governance Practice No. 9 provides that "[e]ngagements of counsel by the board of directors, or by a committee of the board, for special investigations or independent advice should be structured to assure independence and direct reporting to the board of directors or the committee."[14] Therefore, although the ABA has not attempted to define "independent counsel," this principle reiterates the view that it is important for the independent counsel to report to the entity that hired it and not to the in-house counsel of the company.

### Who Controls Independent Counsel?

Typically, in-house counsel is responsible for the hiring of outside counsel, its compensation, and the scope of its employment. However, when it becomes necessary for the board, acting through a special litigation committee or the audit committee, to receive independent legal advice, the hiring and compensation of outside independent counsel ought to be done by the committee that hired it instead of the in-house counsel. The independent counsel should also report directly to the committee seeking the independent advice rather than to the in-house counsel of the company. As stated in a report issued by the Conference Board Commission on Public Trust and Private Enterprise:[15]

---

[13] *See* ABA House of Delegates: Resolution adopting corporate governance practices, August 11-12, 2003, available at http://www.abanet.org/leadership/2003/journal/119c.pdf (last visited January 8, 2004).

[14] *Id.*

[15] The Conference Board is a business network consisting of prominent leaders from business, finance, public service and academia. The Commission on Public Trust and Private Enterprise was created to address the causes of declining public and investor trust in companies and their leaders.

4

> Special counsel retained to conduct independent
> investigations with likelihood to implicate company
> executives should report directly to the board or an
> appropriate committee of the board and should not be an
> individual or firm that the company regularly uses as
> outside counsel or that derives a material amount of
> revenues from the company.[16]

## When is Independent Counsel Necessary?

In reviewing decisions made by special litigation or audit committees, the importance of an independent investigation cannot be overemphasized. When doubt exists as to the receipt of independent advice, courts have rejected settlements by the committee, as well as application of the business judgment rule to committee decisions.[17] This relationship (between counsel performing the investigation and the company) is a major factor in determining the independence of a corporate investigation. Obviously, internal corporate investigations cannot be completely independent, as independent counsel is paid by the company it is investigating. However, the degree of independence may be enhanced by limiting the types of relationships independent counsel has with the company, including its officers and directors. Ideally, independent counsel would have no connection to the company at all. However, in reality it may be difficult, if not impossible, to find counsel who is both competent in the company's area of business and has no relationship whatsoever with the company, its officers, or directors. Therefore, the committee conducting the investigation should identify any such relationships and determine which ones, if any, are sufficiently *de minimus* to be acceptable.

---

[16]  *See* "Findings and Recommendations" Report issued by the Conference Board Commission on Public Trust and Private Enterprise, January 9, 2003, available at http://www.conference-board.org/pdf_free/757.pdf

[17]  *In re Phar Pharmaceutical Inc.*, 750 F. Supp. 641, 647 (S.D.N.Y. 1990) (denying the application of the business judgment rule, because both New York and Delaware law contemplate that a special litigation committee be represented by independent counsel); *In re Oracle Securities Litigation*, 829 F. Supp.

**Protecting Independence**

Specifically, the committee should not hire the law firm that traditionally handles the company's business. As stated in *In re Enron Corp. Securities, Derivative & ERISA Litigation v. Enron Corp.*, "issues of serious conflict of interests" arise when the firm alleged to have participated in the wrongdoing investigates the same wrongdoing.[18] Even if the law firm has no direct involvement in the subject matter of the investigation, choosing a law firm that has also served as counsel for the company in the past may undermine the perceived independence of the special litigation or audit committee.[19]

The question of committee members' independence is directly linked to the relative independence of their counsel.[20] If counsel is currently working for or has previously done work for the company, the relative independence of that counsel will depend upon the amount of revenue the law firm derives from doing business with the company, as well as what percentage of the law firm's total business that company represents. The law firm's interest in retaining a lucrative client may influence (or be perceived to influence) its judgment when conducting an investigation as to the company's misconduct. However, counsel which has not previously represented the company might also have an interest in obtaining work in the future, therefore no firm will be completely free from the potential influence of future work. Counsel intended to

---

1176, 1189 (N.D. Cal. 1993) (rejecting settlement approved by the committee on the grounds that it did not receive independent advice).

[18]   *In re Enron Corp. Securities, Derivative & ERISA Litigation v. Enron Corp.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002).

[19]   *See Einhorn v. Culea*, 612 N.W.2d 78, 90 (Wis. 2000) (stating, "[c]ourts should be more likely to find a special litigation committee independent if the committee retains counsel who has not represented individual defendants or the corporation in the past.").

[20]   *See Drilling v. Berman*, 589 N.W.2d 503 (Minn. Ct. App. 1999) (linking committee's good faith and independence with absence of ties its counsel had to corporation and its experience in representing special litigation committees).

be independent should be free of any influences that might interfere with its ability to render unbiased legal advice to the special litigation or audit committee.[21]

## Role of General and Other Outside Counsel[22]

### A.    When to Retain Independent Counsel?

Directors and committees clearly have the right to hire and consult independent counsel in certain circumstances. It is not always clear, however, when those circumstances arise. In this area, general and other outside counsel typically play an important first step in the independent counsel process. For example, in some cases, the directors or committee may not be aware that circumstances call for retaining independent counsel, and it is up to the general and/or other outside counsel to recognize these situations, research the appropriate rules and laws, and advise the directors or committee accordingly.

In addition, there may be times when the directors or committee recognize that a situation may require independent counsel and will accordingly seek guidance from general or other outside counsel on the matter. Under these conditions, it is usually permissible for such counsel to prepare a memorandum that identifies the legal issues and provides analysis and alternatives for the directors or committee to consider in determining whether to retain independent counsel. For example, in a derivative suit, most states' laws contain special provisions that permit independent and disinterested directors to evaluate the merits of a shareholder's claims and determine whether the company should maintain a lawsuit against its directors. While the laws generally do not

---

[21] *General Electric Co. v. Rowe*, 1992 WL 277997 (E.D. Pa. Sept. 30, 1992).

[22] For purposes of this paper, the term "General Counsel" encompasses inside or outside lawyers performing an in-house counsel function for the company; "Other Outside Counsel" refers to any other lawyer-client relationship with the company, whether historical or ongoing.

require that the independent and disinterested directors retain independent counsel to assist with their investigation, it would be expected that general or other outside counsel would brief the board on the unique substantive and procedural aspects of a derivative suit, noting that independent counsel is typically retained and the benefits/risks thereof. Similar situations may be seen with regard to determining whether independent counsel is necessary for certain transactions, *i.e.*, the general or other outside counsel will perform the initial role of informing the appropriate committee of its obligations and options.

Obviously care should be taken when the general or other outside counsel is implicated in, or at least has knowledge of, the events or circumstances underlying the need to determine whether to retain independent counsel in the first place. In such circumstances, general or other outside counsel's role should be limited to recommending that independent counsel be retained, and providing resources as requested by that independent counsel. Ideally, general or other outside counsel should be completely isolated from the investigation and play no role in it whatsoever. In such circumstances, opposing parties and the court (or appropriate regulatory agency) will be expected to search for any evidence of attempts to control or manipulate the independent counsel process on the part of the general or other outside counsel. In practice, however, it may not be realistic or desirable to completely remove general counsel from the investigative process. For example, the independent directors may desire general counsel to handle administrative matters related to the independent counsel's activities.

B.      *Selecting Independent Counsel*

In addition to assisting directors or committee members in determining when it may be appropriate to hire independent counsel, general counsel will often assist in the

8

preliminary stages of selecting independent counsel.  For example, such counsel may assist in the preparation of questionnaires designed to determine whether prospective independent counsel is sufficiently "independent" to perform its role.  Typical questions include:

- Whether any member of the potential independent firm, or his or her immediate family, ever served as an officer or director of the company or any other entity in connection with the matter under investigation;
- Whether any member of the potential independent firm ever had an attorney-client relationship with an officer or director of the company or any other entity in connection with the matter under investigation;
- Whether any member of the potential independent firm ever represented the company or any other entity in connection with the matter under investigation;
- Whether any member of the potential independent firm ever represented an entity in connection with an allegation that the entity participated or bore responsibility for alleged wrongdoing by the company;
- Whether any member of the potential independent firm ever represented an entity in a situation adverse to the company;
- Whether any member of the potential independent firm, or his or her immediate family, has any business, financial, social, or family relationship with the company, or a current or former officer or director of the company, that would be reasonably likely to materially affect the independence of the independent counsel; and
- Whether any member of the potential independent firm has any equity interest in the company or any other entity in connection with the matter under investigation.

It should be generally acceptable for general or other outside counsel to prepare an initial non-exclusive list of prospective independent counsel for consideration. General or other outside counsel may also play a role in assisting directors or committees in identifying issues related to the specific underlying situation to help the appropriate persons determine whether a potential firm is qualified.  General or other outside counsel should refrain, however, from participating, other than administratively, in the evaluation process or advising on final selections.

C.    *Counsel's Role After Independent Counsel is Retained*

While the independent counsel, once it is retained, answers to the entity that hired it and not general counsel, general and other outside counsel may still play important roles in the process. For example, general and other outside counsel are typically valuable resources in obtaining information for the independent counsel about the company and the underlying circumstances. General counsel may provide advice on billing, though general counsel should avoid any appearance of controlling the independent counsel through payment of bills. General and other outside counsel may also be called upon by the independent committee to advise on general legal, procedural, and administrative matters related to the representation.

## Conclusion

While there is no clear path to passing the test of independence, by following certain practices companies may circumvent most problems in this area. Companies should avoid hiring outside counsel who has had any involvement in the subject matter of the investigation. Companies should also avoid hiring outside counsel with close ties— whether social or professional—to possible targets of the investigation. Ultimately, on the scale of independence, law firms with fewer connections to the company, its directors, and its officers will more likely be viewed as truly independent counsel.

*Walter Demond is a shareholder of Clark, Thomas & Winters, Professional Corporation, in Austin, Texas. The author gratefully acknowledges the assistance of Meitra Farhadi, an associate at Clark, Thomas & Winters, and meaningful input from Michael Madigan, a partner at Akin, Gump, Strauss, Hauer & Feld, L.L.P., and William Torgerson, Vice Chairman & General Counsel at Pepco Holdings, Inc.

**Exhibit "5"**

**Fulbright letter dated June 5, 2007**
**&**
**Raynor's Response**

# FULBRIGHT & JAWORSKI L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
FULBRIGHT TOWER
1301 McKINNEY, SUITE 5100
HOUSTON, TEXAS 77010-3095
WWW.FULBRIGHT.COM

GERARD G. PECHT
PARTNER
GPECHT@FULBRIGHT.COM

TELEPHONE:    (713) 651-5151
FACSIMILE:    (713) 651-5246
DIRECT DIAL:    (713) 651-5243

June 5, 2007

Mr. John P. Raynor
Raynor, Rensch & Pfeiffer
10110 Nicholas Street, Suite 102
Omaha, Nebraska 68114

*By Certified Mail*
*Return Receipt Requested*
*and by Facsimile*

Re:    Case Nos. 06-30007, *In re Emerging Communications, Inc.*, 06-30008 *In re Innovative Communication Company LLC*, & 06-30009, *In re Jeffrey J. Prosser*, in the District Court of the Virgin Islands, St. Thomas and St. John Division, Bankruptcy Division (collectively, the "Bankruptcy Proceeding")

Dear Mr. Raynor:

As you know, my firm represents Rural Telephone Finance Corporation ("RTFC") and the National Rural Utilities Cooperative Finance Corporation ("CFC"). It has come to our attention that you have sent correspondence replete with false commentary and defamatory remarks about RTFC and CFC to several recipients, including your letter of April 30, 2007, to Mr. R. Wayne Stratton (the "Stratton Letter"), a member of CFC's board of directors, and to the Securities and Exchange Commission Enforcement Division, and have also sent correspondence regarding CFC and RTFC to an ethics officer for Deloitte and Touche. You appear to represent and be acting on behalf of and for the benefit of Mr. Prosser and Innovative Communication Corporation ("New Innovative" or "ICC"), and perhaps Emerging Communications, Inc. ("Emerging") and Innovative Communication Company, LLC ("ICC-LLC"). Your communications not only violate the express terms of a binding non-disparagement agreement executed by you, but since you are an attorney for certain of these parties, your letter to Mr. Stratton also constitutes a prohibited *ex parte* communication in clear violation of your professional obligations as a member of the Nebraska State Bar and the legal profession.

Paragraph 6 of the Non-disparagement Agreement executed by you expressly provides that you are to *"refrain from making any remarks or statements, whether written or oral, the purpose of which is to disparage the reputation or business of the other parties"* to the agreement, which includes RTFC and CFC. Your allegations in the Stratton Letter are patently false, and even a cursory review of your letter reveals that your statements are not only specious, but are soaked with malicious intent. The letter violates the express terms of the non-disparagement agreement, not to mention various laws protecting parties from defamation.

31343704.3

Mr. John P. Raynor
Raynor, Rensch & Pfeiffer
June 5, 2007
Page 2

You are also reminded that you, Mr. Jeffrey Prosser, and his companies are all signatories to a broad and general release, by which you released CFC and RTFC from liability for the very allegations contained in your letter. This release further undermines your already specious claims, and my clients, which have already succeeded in enforcing this release against Jeffrey Prosser, Emerging Communications, Inc., and Innovative Communication Company LLC, will not hesitate to enforce it against you and seek all appropriate monetary and other relief.

Your objective in seeking to disrupt the Bankruptcy Proceeding is no less transparent. It is abundantly clear that your actions are designed to interfere with and frustrate the proper and efficient administration of the Bankruptcy Proceeding for benefit of Mr. Prosser, whom you appear to represent, and his companies, who are parties to the Bankruptcy Proceeding. Your letter reflects a calculated effort to impugn the character and reputation of CFC and RTFC with the obvious objective of collaterally attacking CFC and RTFC's efforts in the Bankruptcy Proceeding for the benefit of Mr. Prosser and his companies. RTFC and CFC will not sit idle and allow you, Mr. Prosser, and any of his companies to engage in a smear campaign against them and drag their name and good reputation through the mud. Nor will CFC allow you to engage in *ex parte* communications with its directors to advance Mr. Prosser's interests and those of his companies. As an attorney, you are well aware of the ethical rules barring *ex parte* communications with individuals and organizations you know to be represented by counsel on matters pertaining to the representation. Your letter to Mr. Stratton unquestionably violates this fundamental prohibition.

At this time, we demand that you and your law firm immediately cease and desist from further *ex parte* communications with CFC, RTFC, and any of its officers, directors, and employees, regarding the subject matter of any past or present litigation between CFC or RTFC and Mr. Prosser or any of the companies directly or indirectly owned by Mr. Prosser. We also insist that you comply with the terms of the non-disparagement agreement you executed and cease making false and disparaging statements about CFC and RTFC. We further demand that you cease all interference with the Bankruptcy proceeding. Both CFC and RTFC reserve the right to take all appropriate legal action.

Very truly yours,

Gerard G. Pecht

cc:    Mr. Toby L. Gerber (*firm*)
       Mr. William R. Greendyke (*firm*)

31343704.3

**John Raynor**
**Attorney At Law**
10110 Nicholas Street, Suite 102
Omaha, Nebraska 68114

June 7, 2007

Mr. Greg G. Pecht
Fulbright & Jaworski L.L.P.
Fulbright Tower
1301 McKinney, Suite 5100
Houston, Texas 77010-3095

      RE:    Your letter dated June 5, 2007

Dear Mr. Pecht:

      I am in receipt of your letter dated June 5, 2007.

      Before I respond thereto, I want to provide my understanding of your letter. The National Rural Utility Cooperative Finance Corporation ("CFC"), under the Sarbanes-Oxley Act, is encouraged to employ a "Financial Expert" as a Board Member and Audit Committee Member effective for fiscal years ending after July 15, 2003. CFC was dilatory in this regard and did not have a "Financial Expert" join the Board and Audit Committee of CFC until May 31, 2006. The letter at issue was written to Mr. Stratton within a month of him assuming his position and begins with the statement: "...letter to you because of your respective legal obligations as a board member who qualifies as an Audit Committee Financial Expert as defined by the Securities and Exchange Commission." In response to that letter to Mr. Stratton you instruct me to "cease and desist" and by your reservation "... to take all appropriate legal action" threaten me with further legal action.

      I assume you read the letter and understand the statements made therein are supported by references to CFC's public documents. In response to your letter, I would like to state as follows:

1.    **Gravamen of the Dispute.**    ICC twice raised issues regarding the allocations of CFC's patronage income to RTFC. On both occasions, CFC provided *no answers* and instead RTFC accelerated[1] the ICC loans. Upon RTFC's failure to authenticate the underlying loan agreement (because of admission that RTFC unilaterally altered the loan document) and with the clear prospect of having all of the claimed defaults thrown out of Court[2], RTFC entered the Inter-Creditor Agreement with Greenlight. The purpose and intent thereof was to frustrate justice.

---

[1] Thus, RTFC uses its position as a lender by accelerating loans to suppress a member's issues "questioning accounting or auditing matters" within the meaning of Sarbanes-Oxley Act § 301.

[2] All the defaults were dismissed or withdrawn except those defaults based upon RTFC's 1989 settlement with the Virgin Island's PSC. ICC was confident that the findings of fact would have shown RTFC to commence foreclosure with no valid reason.

1

RTFC[3] sought, through the Inter-Creditor Agreement, to deny ICC its day in Court by paying another, Greenlight, to seek judgment and force ICC into bankruptcy: a legal assassination. Availing itself of the economic coercion caused by the involuntary bankruptcy filings against Jeffrey J. Prosser, ICC LLC, and Emerging Communications, Inc., RTFC then entered into an illusory contract with ICC. The purported settlement only advanced RTFC's interest by dismissing the litigation RTFC commenced but was losing and making RTFC's unliquidated claims liquidated. ICC received a mere sixty (60) days to accomplish what RTFC knew was impossible to perform[4] – to refinance the company. Now you seek under the purported settlement agreement to suppress the questioner rather than address "accounting or auditing matters" raised consistent with and pursuant to § 301 of the Sarbanes-Oxley Act.

In my view, the whole of the action against ICC violates 18 USC §1513(e). I would encourage you to examine the issue of whether Fulbright & Jaworski L.L.P. can hide under the umbrella of representation without a thorough venting of the gravamen of the dispute.

Note that this matter can be quickly resolved if CFC would provide credible[5] answers to the questions first raised in 2003 which have further been illuminated in the letter to Mr. Stratton.

2.    **Disclosure & Explanation?**    I have been consistent in my position since it was first raised in early 2003 after a review of the May 31, 2002 10K filed by CFC. That 10K was the first time accurate segment information was reported[6]. Since the patronage allocation issues were first raised with RTFC (whom serve as officers of CFC), *no one has answered ICC's questions or issues*. In fact, there has not been even one attempt to provide an explanation. Instead, there has been a campaign of suppression and intimation.

I use the occasion of this letter to request that you provide an explanation in lieu of threatening me. Provide a credible explanation and there will be no more letters or comments.

3.    **Fulbright & Jaworski L.L.P. Representation?**    Who does your firm represent? Do you write the letter on behalf of -
  (i)    RTFC;
  (ii)    CFC;
  (iii)    Mr. Stratton and/or the Audit Committee which under Sarbanes-Oxley Act § 301 is to have the authority to employ *independent* counsel; or
  (iv)    All of the above.
The dispute between ICC and RTFC is premised upon ICC's questioning the propriety of patronage allocations from CFC to RTFC and subsequently to ICC as a member of RTFC. CFC refused to provide any information concerning CFC's patronage allocation policy because ICC was not a member of CFC. For this purpose, CFC asserted and relied upon the fact that CFC and RTFC are two separate entities even though in public filings through May 31, 2001, RTFC was referred to as a controlled affiliate of CFC.

---

[3] Presumably, upon the advice of Fulbright & Jaworski L.L.P.
[4] Isn't this the purpose of economic coercion?
[5] To date, there has been no attempt to provide any answers.
[6] Due to a change in auditors.

If CFC is proper in relying upon the fact that CFC and RTFC (even though RTFC is a patron of CFC) are two separate legal entities in refusing to provide answers to "accounting or auditing matters", they can not be treated as one entity for purposes of representation. I suggest it is inappropriate to represent all three of the parties above. This is not an inchoate conflict but a live conflict since ICC has raised both propriety of CFC's allocation of patronage income from CFC to RTFC and further, the incestuous relationship (where CFC's officers fill all material positions of RTFC) appears to be used as a means to systematically subsidize CFC with profits provided by RTFC loans.

You may want to run this letter and my earlier letter to Mr. Stratton through your firm's conflict committee. Note that you do not have ICC's consent to represent both RTFC and CFC.

4.   **Disparage?**   The Seventh Edition of Black's Law Dictionary defines "disparage" as "To *unjustly* discredit or detract from reputation of another's business". (Emphasis Added). While expressed in my own words, the facts and conclusions in the letter represent my opinion as well as the opinion of experts. There is nothing stated in the letter that is not supported by facts set forth in the letter, the majority of which are supported by publicly filed documents and RTFC's financial statements. Additionally, CFC has to this day never offered even a shred of information to refute any of the issues raised in my letter to Mr. Stratton.

To reiterate my position, simply provide answers to the questions raised. No one needs to litigate this matter further, simply provide the answers.

5.   **Public Policy?**   The Sarbanes-Oxley Act's stated purpose includes "To improve quality and transparency in financial reporting". The Act specifically strengthens the function and independence of the audit committee and requires independence in investigating "questioning accounting or auditing matters". The Act also protects parties against retaliation. See Title 18 Crimes and Criminal Procedure, Subchapter 73 Obstruction of Justice, § 1514A and § 1513(e) & (f) added by the Sarbanes-Oxley Act. The Sarbanes-Oxley Act contemplates that the Financial Expert and the Audit Committee provides the first internal control over public reporting. My letter was in keeping with the public policy adopted by the Sarbanes-Oxley Act.

I trust that the audit committee is going to respond to my letter and that the last word on this matter is not your letter trying to suppress the "questioning accounting or auditing matters". I look forward to their response and if I am wrong will promptly cease and desist raising such issues.

Regards,

John Raynor

**Exhibit "B-3"**
**Other Communications**



# COUNSEL FOR DISCIPLINE OF THE
## NEBRASKA SUPREME COURT

Counsel for Discipline
**DENNIS G. CARLSON**

Assistant Counsel
For Discipline
**JOHN W. STEELE**
**KENT L. FROBISH**

3808 Normal Blvd.
Lincoln, NE 68506
**(402) 471-1040**
**FAX (402) 471-1014**

October 30, 2007

Toby L. Gerber
Attorney at Law
2200 Ross Ave. – Ste. 2800
Dallas, TX 75201-2784

Dear Mr. Gerber:

Please find enclosed a copy of the response submitted by Attorney John P. Raynor, Sr.

Please file a written reply to Attorney Raynor's response within ten days. Feel free to include any additional evidence or information that you would like me to consider.

Thank you for your cooperation on this matter.

Sincerely,



Kent L. Frobish
Assistant Counsel for Discipline

KLF: ck
Enc.
Cc: John P. Raynor, Sr.

COPY

Printed with soy ink on recycled paper

# COUNSEL FOR DISCIPLINE OF THE
## NEBRASKA SUPREME COURT

Counsel for Discipline
**DENNIS G. CARLSON**

Assistant Counsel
For Discipline
**JOHN W. STEELE**
**KENT L. FROBISH**

3808 Normal Blvd.
Lincoln, NE 68506
**(402) 471-1040**
**FAX (402) 471-1014**

February 15, 2008

Toby L. Gerber
Attorney at Law
2200 Ross Ave., Suite 2800
Dallas, TX 75201-2784



Dear Mr. Gerber:

Dennis Carlson asked me to review your grievance filed against Attorney John P. Raynor. To do so I will need some additional information from you.

On April 30, 2007, Mr. Raynor sent his letter to Mr. R. Wayne Stratton, a CPA and board member of CFC. Mr. Raynor asserts that Mr. Stratton joined the CFC board on March 31, 2007, and appointed as the Financial Expert of the CFC Audit Committee.

1. Please state when Mr. Stratton joined the CFC board.

2. Please state whether Mr. Stratton served on the CFC Audit Committee on April 30, 2007.

3. Please state whether Mr. Stratton was acknowledged by CFC to be the Financial Expert of the Audit Committee.

4. Please state whether Mr. Stratton served as a board member, officer, or employee of CFC at any time prior to April 30, 2007, and if so, state the positions held and the respective dates.

5. Please state whether Mr. Stratton or his accounting firm, ever provided professional services to CFC. If so, please provide the dates of service.

6. Please state what involvement, if any, Mr. Stratton had in any of the litigation involving CFC and RTFC against Mr. Prosser.

Toby L. Gerber
February 15, 2008
Page Two

7. Please state whether Mr. Stratton supervised, directed or regularly consulted with you or members of your firm concerning the Prosser litigation. If so, please state the dates when Mr. Stratton did so.

8. Please state whether on April 30, 2007, Mr. Stratton had authority to obligate CFC in regard to any matter relating to Mr. Prosser and his companies. If so, please explain.

9. Please state the date the CFC Audit Committee was formed.

10. Please state when, if ever, you or members of your firm specifically represented the CFC Audit Committee.

11. Please state when, if ever, you or members of your firm specifically represented the CFC Audit Committee on matters related the Prosser litigation and/or Raynor's claims of misconduct by CFC, its officers or directors.

Thank you for your cooperation in this matter. If you have any questions, please contact me. Our toll-free number is 877-504-0967.

Sincerely yours,

Kent L. Frobish
Assistant Counsel for Discipline

C: John P. Raynor

**Exhibit "C"**

**Key Officers of CFC & RTFC**

## Summary Compensation Table

The summary compensation table below sets forth the aggregate compensation for the year ended May 31, 2007 earned by the named executive officers and two additional executive officers of the Company that meet the definition of related persons pursuant to SEC disclosure requirements.

| Name and Principal Position | Year | Salary | Non-Equity Incentive Plan Compensation (1) | Change in Pension Value and Non-qualified Deferred Compensation Earnings (2) | All Other Compensation (3) | Total |
|---|---|---|---|---|---|---|
| Sheldon C. Petersen<br>Governor & CEO | 2007 | $ 643,125 | $ 204,212 | $ 428,799 | $ 132,577 | $ 1,408,713 |
| Steven L. Lilly<br>Senior Vice President &<br>Chief Financial Officer | 2007 | 364,000 | 117,513 | 266,788 | 50,938 | 799,239 |
| John J. List<br>Senior Vice President of<br>Member Services and General<br>Counsel | 2007 | 364,000 | 113,233 | 477,364 | 51,830 | 1,006,427 |
| John T. Evans<br>Senior Vice President of<br>Operations | 2007 | 364,000 | 113,233 | 146,285 | 16,833 | 640,351 |
| Lawrence Zawalick<br>Senior Vice President of<br>RTFC | 2007 | 265,500 | 85,507 | 147,479 | 46,494 | 544,980 |
| Richard E. Larochelle (4)<br>Senior Vice President of<br>Corporate Relations | 2007 | 265,500 | 85,507 | 161,864 | 18,582 | 531,452 |
| John. M. Borak (4)<br>Senior Vice President of<br>Credit Risk Management | 2007 | 233,500 | 75,927 | - | 10,860 | 320,287 |

(1) Includes amounts earned during fiscal year 2007 under the long-term and short-term incentive plans. Payments under the short-term incentive plan are subject to approval by the Board of Directors at a date subsequent to the filing of this Form 10-K.
(2) Represents the change in the net present value of the accumulated pension benefit under the Company's multi-employer defined benefit pension plan during the year. For Mr. Borak, change in pension value was a reduction of $122,189 as a result of a distribution of $228,679 during fiscal year 2007.
(3) For Mr. Petersen, includes $18,595 of perquisites comprised of $9,674 for personal use of vehicle and $8,921 for spousal travel. Both amounts are calculated based on a combination of incremental aggregate costs to the Company incurred prior to January 1, 2007, after which Mr. Petersen starting receiving an annual perquisite allowance for these costs. Additionally, for Mr. Petersen, includes $60,415 related to RTFC contributions to the RTFC deferred compensation plan. All other compensation also includes $38,055, $37,163, $38,055, $3,058, $34,657, and $6,745 related to the termination of a retirement benefit plan for Mr. Petersen, Mr. Lilly, Mr. List, Mr. Evans, Mr. Zawalick and Mr. Larochelle, respectively. The remaining amounts included in this column represent sick leave incentive bonuses and Company contributions to its 401(k) defined contribution plan.
(4) These executives are "related persons" as defined by the SEC's disclosure requirements and are included in the summary compensation table as we generally treat all of our executive officers equally.

## Grants of Plan-Based Awards

The Company has a long-term and a short-term incentive plan for all employees under which executive officers may receive a bonus of up to 37.5% and 25% of salary, respectively. The incentive payouts are based on the executive officer's salary at the date the program becomes effective. See the "Compensation Discussion and Analysis" above for further information on these incentive plans.



2004 Annual Report

# Enhancing the Value Proposition

**Who We Are**

**2004 Spotlight**

**Message from the President and CEO**

**Board of Directors**

**Lender Advisory Council**

**Key Staff**

**Financial Highlights**

**Report of Independent Auditors**

**Complete Financials**

## Key Staff

RTFC's day-to-day activities are directed by an executive team that includes:



**Sheldon C. Petersen**
Chief Executive Officer



**John Borak**
Senior Vice President
Credit Risk Management



**John T. Evans**
Senior Vice President
Operations



**Richard Larochelle**
Senior Vice President
Corporate Relations



**Steven L. Lilly**
Senior Vice President &
Chief Financial Officer



**John J. List**
Senior Vice President
& General Counsel



**Lawrence Zawalick**
Senior Vice President
& Administrative
Coordinator