# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Jeffrey J. Prosser, pro se, and John P. Raynor, pro se, | ) |
| | ) |
| | )   Civil No.: 1:08-cv-00687 |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Federal Agricultural Mortgage Corporation and the United States Department of Agriculture; | ) |
| | ) |
| | ) |
| Defendants | ) |
| | ) |

## JEFFREY J. PROSSER AND JOHN P. RAYNOR OPPOSITION
## TO THE FEDERAL AGRICULTURAL MORTGAGE CORPORATION'S MOTION TO DISMISS
_____

For the reasons set forth in the Memorandum of Law filed concurrently, Plaintiffs, Jeffrey J. Prosser and John P. Raynor respectfully requests the Court deny Federal Agricultural Mortgage Corporation's Motion to dismiss the complaint and direct them to answer the complaint.

Dated:  June 9, 2008.

Respectfully Submitted,


/s/John P. Raynor_____
John P. Raynor, Pro Se
Raynor, Rensch & Pfeiffer
10110 Nicholas Street, Suite 102
Omaha, Nebraska 68114
Telephone No.: (402) 498-4400
jraynor@rrplawyers.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Jeffrey J. Prosser, pro se, and John P. Raynor, pro se, | ) | |
| | ) | |
| | ) | Civil No.: 1:08-cv-00687 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **MOL** |
| | ) | |
| Federal Agricultural Mortgage Corporation and the United States Department of Agriculture; | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## MEMORANDUM OF LAW

## IN RE: PLAINTIFF'S OPPOSITION TO THE MOTION TO DISMISS

## THE FEDERAL AGRICULTURAL MORTGAGE CORPORATION

John P. Raynor ("Raynor"), the Pro Se Plaintiff, respectfully submits this brief on behalf of Respondent and Jeffrey J. Prosser ("Prosser") (Raynor and Prosser shall be collectively referred to as "Respondent") in Opposition to the Motion of the Federal Agricultural Mortgage Corporation ("Farmer Mac") to Dismiss the complaint.

## I. <u>THE ACTORS</u>

The National Rural Utilities Cooperative Finance Corporation ("CFC") is a tax-exempt (not-for-profit) financing cooperative association (coop) formed pursuant to the laws of the District of Columbia and operates out of its offices at 2201 Cooperative Way, Herndon, VA 20171. CFC is not regulated by any governmental agency and is NOT a Government Sponsored

Enterprise ("GSE").  CFC lends funds directly to rural electric utilities and indirectly lends to rural telephone companies through Rural Telephone Finance Corporation ("RTFC"), a taxable cooperative, which is under the dominion and control of CFC.

The Rural Telephone Finance Corporation ("RTFC") is a taxable coop presently domiciled in the District of Columbia, created by CFC in 1987 as a South Dakota coop purportedly to serve the financial needs of the rural telecommunications industry.  RTFC's Headquarters is co-located with CFC at 2201 Cooperative Way, Herndon, Virginia 20171. RTFC is under the dominion and control of CFC as more fully described hereinafter.

The Federal Agricultural Mortgage Corporation, commonly known as "Farmer Mac", is a stockholder-owned, federally chartered instrumentality of the United States and is designated as an instrumentality of the United States by 12 U.S.C.A. § 2279aa-1(a)(1).  Farmer Mac was created by Congress in 1988 by the Agricultural Credit Act of 1987, which added a new Title VIII to the Farm Credit Act of 1971 (12 U.S.C. 2279aa et seq.) to establish a secondary market for agricultural real estate and rural housing mortgage loans and to increase the availability of long-term credit at stable interest rates to American farmers, ranchers and rural homeowners. Farmer Mac is a GSE.

The United States Department of Agriculture (the "USDA") is an executive branch of the United States Government.  The USDA is a Department of the United State Government.  The USDA administers the Rural Economic Development Loan and Grant ("REDLG") program - a program that provides funding to rural projects through local utility organizations.

The Farm Credit Administration (the "FCA") is an independent Federal agency responsible for examining and regulating the Farm Credit System (FCS).  The FCS is a nationwide network of borrower-owned lending institutions and specialized service

organizations that provide credit and related services to farmers, ranchers, agricultural cooperatives, and other eligible borrowers. The FCA is charged with the regulation of Farmer Mac.

Prosser, a Plaintiff herein, is the former beneficial owner and former board member of Innovative Communication Corporation ("ICC"), a former member and patron of RTFC.

Raynor, a plaintiff herein, is a former member of the Board of ICC.

## II.  <u>PRELIMINARY STATEMENTS</u>

Respondents are characterized as misguided antagonists. In fact, Respondents are whistleblowers coupled with interest. Respondents seek no personal gain in this action other than an end to the unlawful financial bailout of CFC by Farmer Mac.

Respondents would be remised if they did not draw the Court's attention to the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), two GSEs that assumed a dismissive attitude towards the report of the Office Of Federal Housing Enterprise Oversight until the Securities and Exchange Commission ordered each to restate their financial statements in December of 2004. Now, Fannie Mae and Freddie Mac cozening is an accepted fact. The Street.com, in a December 16, 2004 stated "But in some ways the Fannie mess is much worse than any of the big recent corporate scandals. Fannie betrayed public trust on a massive scale". The same betrayal of public trust is operative in this factual situation.

The issue raised in Farmer Mac's Motion to Dismiss is standing. If that issue is to be decided by innuendo and personal attacks then Respondents will lose. If it is to be decided by law and facts, than Respondents believe that they should prevail.

Raynor, the author of this brief, though an attorney, readily admits that he has little experience as a litigator. The inexperience coupled with being unaware that an opposition had to be filed within ten (10) days resulted in the dismissal of National Rural Utilities Cooperative Finance Corporation ("CFC") from this action. CFC is not a necessary party. Respondents seek to halt Farmer Mac's financial bailout of CFC. Removed at their request, if CFC seeks to intervene, Respondent has filed a motion, brief and exhibits to 'disqualify' the law firm of *Fulbright & Jaworski L.L.P.* ("Fulbright"). How can one firm simultaneously represent (i) CFC, (ii) RTFC which is not owned by CFC but is under the dominion and control of CFC, (iii) CFC's management which serves as RTFC's management, and (iv) CFC's Audit Committee, the bulwark against corporate security and accounting fraud? The fact that RTFC has no independent professionals epitomizes the gravamen of this complaint - CFC financial trouble result from CFC's gambled on the continuation of CFC's long-term and systematic defalcation of RTFC. Farmer Mac is engaged in the unlawful financial bailout of CFC, a private enterprise. Should a GSE be able to use the Government fisc to shield a private entity from the consequences of their fraud? I think not.

### III.  FARMER MAC'S UNLAWFUL BAILOUT

Farmer Mac has made the investments set forth in the following table with the respect to CFC.

| Date: | Corporate Notes | CFC Loans | Total |
|---|---|---|---|
| July 29, 2005 | $ 500,000,000 | | $ 500,000,000 |
| May 15, 2007 | | $365,600,000 | 365,600,000 |
| August 1, 2007 | | 40,000,000 | 40,000,000 |
| January 2, 2008 | | 34,000,000 | 34,000,000 |
| March 28, 2008 | 400,000,000 | | 400,000,000 |
| **Totals** | $ 900,000,000 | $ 439,600,000 | $1,339,600,000 |

The column titled "Corporate Notes" represents Farmer Mac's purchase of corporate notes issued by CFC. The column "CFC Loans" represents Farmer Mac's purchase of loans from CFC to provide CFC with liquidity. The CFC loans were purchased in a private sale of mortgage-backed securities (backed by the CFC loans to electric members) issued by CFC to Farmer Mac. The above table should not be subject to contest since the source of the date is SEC filings by Farmer Mac or CFC as well as press releases issue by them.

*The Nature of the Investments When Made!*

    Farmer Mac's investments in CFC are non-program investments. Farmer Mac's 2006 10K on page 42 describes the $365.6 Million purchase of mortgage-backed securities from CFC as a "mission-related non-program" investment. The $500 Million invested in CFC corporate notes is the largest investment disclosed in a table set forth in Farmer Mac's 2006[1] and 2007[2] 10Ks setting forth Farmer Mac's five largest non-program investments. 12 C.F.R. § 652.5 defines non-program investments as investments other than those in "Qualified loans" as defined in section 8.0(9) of the Farm Credit Act of 1971, as amended; or Securities collateralized by "qualified loans".

*The Purpose of Non-Program Investments!*

    12 C.F.R. § 652.25(a) states the purpose of non-program investments is for the purpose "of complying with the interest rate risk requirements of § 652.15, complying with the liquidity reserve requirements of § 652.20, and managing surplus short-term funds". Non-program investments serve to support or provide creditability to Farmer Mac's guarantee.

*The Purpose of the Regulation Governing Farmer Mac's Non-Program Investments!*

---

[1] The Farmer Mac investment in CFC Corporate Notes exceeds the next largest investment by $395 Million in 2006.
[2] Ignoring the investment in CFC issued mortgage-backed securities, in the 2007 10K, the Farmer Mac investment in CFC Corporate Notes exceeds the next largest investment by $411 Million.

12 C.F.R. § 652.1, 'Purpose', sets forth the reason for Subpart A, Investment Management, of Part 652 Title 12 of the Code of Federal Regulations. That regulation states the purpose "is to ensure **safety and soundness**, continuity of funding, and **appropriate use of non-program investments** considering Farmer Mac's special status as a Government-sponsored enterprise (GSE)". (Emphasis added).

*Why Farmer Mac Investments In CFC Are Unlawful!*

12 C.F.R. § 652.35(d)(1) states that Farmer Mac "not invest more than 25 percent of your regulatory capital in eligible investments issued by **any single entity, issuer or obligor**". (Emphasis added) That provision restricts Farmer Mac's investment in "any single entity, issuer or obligor" to:

(i)    As of December 31, 2005 Farmer Mac reported regulatory capital of $239.4 Million (2006 10K, p. 121). Twenty-five percent (25%) of Farmer Mac's regulatory capital means that as of December 31, 2005, restricts Farmer Mac's investment to less than $60 Million "in eligible investments issued by any single entity, issuer or obligor**".** Farmer Mac's investment of $500 Million as of December 31, 2006 in securities and notes issued by CFC breaches this limitation by $440 Million.

(ii)    As of December 31, 2006 Farmer Mac reported regulatory capital of $248.1 Million (2006 10K, p. 121). Twenty-five percent (25%) of Farmer Mac's regulatory capital means that as of December 31, 2006, restricts Farmer Mac's investment to less than $63 Million "in eligible investments issued by any single entity, issuer or obligor**".** Farmer Mac's investment of $500 Million as of December 31, 2006 in securities and notes issued by CFC breaches this limitation by $437 Million.

(iii)    As of December 31, 2007 Farmer Mac reported regulatory capital of $230.3 Million (2007 10K, p. 25).  Twenty-five percent (25%) of Farmer Mac's regulatory capital means that as of December 31, 2007, restricts Farmer Mac's investment to less than $58 Million "in eligible investments issued by any single entity, issuer or obligor".  Farmer Mac's investment of $939.6 Million as of December 31, 2007 in securities and notes issued by CFC breaches this limitation by $881.6 Million.

Investments of sums that constitute multiples of Farmer Mac's regulatory capital are unlawful: regulations restrict Farmer Mac's investments to a fraction (one-fourth) of its regulatory capital.

There are other provisions 12 CFR §§ 652.1 thru 652.45 that are also violated such as the requirement that all investments be readily marketable in an active secondary market.

*The FCA Has NO Authority To Approve Such Investments By Farmer Mac!*

Farmer Mac relies upon FCA approval of the investments.  That reliance is misplaced and is not in good faith.  Reliance on FCA's approval of the CFC investments is akin to concluding that subversion of the Federal agency makes the subversion of a GSE, Farmer Mac, an a non-issue: two wrongs make a right.

12 C.F.R. § 652.35(e)(1) states that Farmer Mac "may also purchase non-program investments other than those listed in the Non-Program Investment Eligibility Criteria Table at paragraph (a) of this section only with our written prior approval".  This provision, on its face, cannot support the Farmer Mac's investments in CFC.  The language expressly provides the FCA with authority to approve investments other than those listed in the table set forth in 12 C.F.R. § 652.35(a).  The language does NOT give the FCA authority to waive the requirements of paragraphs (c) and (d)(1) of  12 C.F.R. § 652.35.  Those requirements are separate and distinct

requirements that apply to all investments set forth in the table set forth in paragraph (a) of that regulation. Note that each page of the Table has the following footnote:

> "Note: You must also comply with requirements of paragraphs (b), (c), and (d) of this section, and § 651.40 when applicable. "NA" means not applicable."

'This section' as set forth in the above notation refers to 12 C.F.R. § 652.35. The FCA has NO authority by explicit language relied upon to waive the twenty-five percent (25%) restriction on the amount of the investment in any single issuer which is set forth in 12 C.F.R. § 652.35(d)(1) and the requirement that all investments be readily marketable set forth in 12 C.F.R. § 652.35(c).

Obviously, an investment of over $1.3 Billion in investments "issued by any single entity, issuer or obligor", CFC, can not be reconciled with the purpose of Subpart A of Part 652 as set forth in 12 C.F.R. § 652.1 "to ensure safety and soundness" of Farmer Mac and to ensure "appropriate use of non-program investments considering Farmer Mac's special status as a Government-sponsored enterprise (GSE)". Further, investments of $1.3 Billion in unmarketable securities and notes issued by CFC do not comport with "the liquidity reserve requirements of § 652.20" as required by non-program investments by 12 C.F.R. § 652.25(a).

The Farmer Mac investment in CFC is unjustifiable. The FCA approval stands as a testament that CFC and its sister coop, the National Rural Electric Cooperative Association power co-opt the farm programs for its own purposes.

### IV.    Plaintiff's Standing To Contest Farmer Mac's Unlawful Investments.

*Standing: Generally.*

Standing requires a personal stake in the outcome -

> "the gist of the question of standing" is whether petitioners have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." Massachusetts v. E.P.A., 127 S. Ct. 1438, at 1453, 2007 (Citations Omitted)

The elements of standing are (i) injury, (ii) the injury is fairly traceable to the defendant, and (iii) a favorable decision will redress that injury.

*The RICO Action.*

Appendix A to this memorandum, in summary form, sets forth the essence of a cause of action for civil violations of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. §§ 1961 in seq.   The cause of action will frame:

1.      RTFC as the legitimate enterprise;

2.      CFC as 'associated with' RTFC and CFC's management 'as employed by' RTFC;

3.      CFC and CFC's management have an interest in RTFC and exercise control over RTFC through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(b);

4.      CFC and CFC's management participation in numerous racketeering acts that have been committed including (i) retaliatory acts, (ii) extortionistic acts, and (ii) the destruction and altering of evidence for the purpose of intending to quash and overpower the Plaintiffs (Respondents).   Plaintiffs (Respondents) did suffer harm to their business and/or property (whistleblowers' racketeering injury) in violation of 18 U.S.C. § 1962(c); and

5.      The action will name several other defendants under conspiracy provisions of 18 U.S.C. § 1962(d).

Appendix A is supported for the most part with objective evidence relying heavily upon the audited financial statements of CFC and RTFC and other information provided in CFC's SEC Filings.

Farmer Mac will not be named as a defendant in the actions under provisions of subsection (b) or (c) of 18 U.S.C. § 1962 because Farmer Mac is not engaged in the 'conduct' of

the business affairs of the enterprise: RTFC.  Farmer Mac will not be named as a Defendant

pursuant to 18 U.S.C. § 1962(d) because Farmer Mac is not a 'conspirator'.

*Farmer Mac's Status In re CFC*.

The unlawful bailout of CFC by Farmer Mac makes Farmer Mac an aider and abettor of

CFC's fraudulent conduct.   In an article entitled *CIVIL LIABILITY FOR AIDING AND

ABETTING* a party is regarded as an aider and abettor if the following conditions are satisfied:

(1)  the existence of an underlying fraud;

(2)  knowledge of this fraud on the part of the aider and abettor, and;

(3)  substantial assistance by the aider and abettor in perpetration of the fraud.

(61  BUSLAW 1135, at 1146 –Citations Omitted)    Farmer Mac meets all of the foregoing

conditions for the reasons stated hereinafter.

*Farmer Mac is Required as a Matter of Law to Perform Due Diligence*.

Farmer Mac investments in CFC consist of two types: (i) the purchase of unmarketable

Corporate Notes in private transactions and (ii) the purchase of mortgage-backed securities

secured by CFC loans collateralized by electric distribution systems.  The first purchase of notes

took place in July of 2005.

A purchase from a private, unregulated entity of an unmarketable note is no different than

a 'loan'.  Farmer Mac, when investing the Government fisc, must act prudently.  Farmer Mac is

charged with knowledge of CFC's business.  12 C.F.R. § 614.4150 provide guidance of the

requirements for FCA institutions loans which include, but are not limited to: prudent lending

with verification of minimum supporting credit and financial information in relation to loan size,

complexity and risk exposure.  The regulation requires measurable standards for determining that

an applicant has the operational, financial, and management resources necessary to repay the

debt from cash flow.  The regulation could be summed up with the phrase "know your client and your client's business".

As noted above, as of December 31, 2005 Farmer Mac had regulatory capital of $239.4 Million (2006 10K, p. 121).  A loan, structured as a purchase of an unmarketable note, for a sum in excess of two times the Farmer Mac's regulatory capital mandates detailed knowledge of the fiscal and management affairs of CFC.  Here is what Farmer Mac knew or should be charged with knowing as of July 2005.

1.    Information Available:    CFC's year-end is May 31st.  CFC filed the 10K for fiscal year 2004 on August 20, 2004.  The 10K for the fiscal year ended May 31, 2005 was not filed until August 24, 2005.  At the time Farmer Mac invested the latest SEC Filings available were for the year ended May 31, 2004.  The 2005 information was unaudited information. Below is some information easily deduced from CFC's 2004 SEC Filings as well as RTFC's 2004 Annual Report.

2.    Overall Income In 2004:    CFC reported a Net Loss of $178 Million which was clutter with the results of derivative and foreign currency transactions.  A summary of CFC's Income Statement for 2004 through its reported Operating Margin which was a loss of $198 Million is as follows:

|  | Amounts (Thousands) |
|---|---|
| Gross margin | $ 91,292 |
| Total operating expenses | (94,462) |
| Total loss of foreclosed assets | (7,059) |
| Total gain (loss) on derivative & foreign currency adjustments | (184,355) |
| Operating (loss) margin | ($ 194,584) |

The foregoing financial statement should give a prudent investor pause. With a financial picture muddled by derivative and foreign currency contracts, it is reasonable to concentrate on 'core earnings': that is, the money CFC makes from its lending activities.

Ignoring results of foreclosed assets, CFC produced a **loss** of over $3 Million in 2004 on from its lending business. This is calculated by subtracting from CFC's Gross margin of $91 Million CFC's Operating expenses of $94 Million. Operating expenses consist of (i) general and administrative expenses and (ii) adjustments to the provision for loan losses. With a loss of $3 Million in it core business Prudent lenders would require more analysis.

3.     Electric Loan Portfolio:     The dismal results for 2004 would require further analysis of CFC's financial condition with special emphasis on the financial viability of CFC's member loan portfolio which then constituted 93% of CFC's total consolidated assets. CFC had to major business segments: Electric loans and Telephone loans made through RTFC. The relative contribution of the telephone loan portfolio versus the electric loan portfolio should be examined. Footnote 13 to the 2004 Financial Statements set forth on pages 133-36 of the 2004 10K for CFC sets out the segment information which is summarized as follows for the 2004 fiscal year:

|  | (in thousands) | | |
|---|---|---|---|
|  | Electric | Telephone | Other |
| Gross Margin | $19,813 | $ 62,053 | $, 9,426 |
| General & administrative expenses | (35,168) | (4,267) | (957) |
| Loan loss adjustments | 99,690 | (145,861) | (7,899) |
| Net lending margin | $ 84,355 | ($ 88,075) | $ 570 |

On first glance Electric looks good while the Telephone and Other segments appear to be liabilities rather than assets. However, Electric's income is derived entirely from a loan loss

adjustment.  In fact the electric loan portfolio produced a loss of $15,355 before the loan loss adjustment.  The Electric loan portfolio is suspect.

Further examination should be required.  Footnote 1(b) of CFC's 2004 10K states: "Under a guarantee agreement, CFC has agreed to reimburse RTFC for loan losses".  The same statement is made regarding the Other segment, NCSC, except expressing excluding consumer loans from the guarantee.  Adjust the foregoing table to reflect the guarantee agreement for RTFC by charging RTFC's loan loss adjustment to the Electric loan portfolio (an adjustment to 'Other' is ignored because the amount allocated to consumer loans is not disclosed) and the financial picture would be properly reflected as follows:

|  | (in thousands) | | |
| --- | --- | --- | --- |
|  | Electric | Telephone | Other |
| Gross Margin | $19,813 | $ 62,053 | $, 9,426 |
| General & administrative expenses | (35,168) | (4,267) | (957) |
| Loan loss adjustments | (46,171) | 0,000 | (7,899) |
| Net lending margin | ($ 61,526) | $ 57,786 | $ 570 |

 The foregoing calculations need only one further adjustment to reflect the true economic results of each loan portfolio: the guaranty fee should be charged to Telephone and credited to Electric. The 2004 RTFC Annual Report states on page 8 in the notes to the RTFC Financial Statements that: "RTFC pays CFC an annual guaranty fee equal to fifty (50) basis points times the portion of CFC's loan loss reserve allocated to RTFC loans. This fee is calculated and paid at the beginning of each fiscal quarter".  If the year-end loan loss reserve for RTFC was used to calculate the fee the guarantee fee would be less than $1.6 Million.  Thus, results would not change significantly: Electric would have a loss of nearly $60 Million on a $15.5 Billion loan portfolio and Telephone would earn over $56 Million on a $4.6 Million loan portfolio.

The 2004 Segment Information shows that the Electric portfolio was producing a loss after the allocation of general and administrative expenses.  Loan loss adjustments made to reflect the guaranty agreement just exacerbate an already financial dismal situation.

4.    The Fair Value Disclosures:    Footnote 13 to the CFC Financial Statements set forth the Fair Value of CFC's assets and liabilities.  An examination of this footnote would help to verify the foregoing analysis and the reasonable conclusion therefrom: the Electric loan portfolio is not financially viable.  Ignoring CFC's departure from GAAP in valuing members' loans, member loans are under water by over $1.6 Billion (the "Fair Value Deficiency") and if CFC's Consolidated Balance Statement was restated on a Fair Value basis, CFC's Total Equity would have be nearly a $1.4 Billion deficient.  CFC is insolvent of a Fair Value basis.

Examination of the Fair Value calculations in RTFC's 2004 Annual Report demonstrates that RTFC loans constitute 23.31% of CFC's total loan portfolio but only $54 Million, or 3.34%, of the Fair Value Deficiency in the value of the members' loan portfolio.

This footnote analysis verifies or confirms the income analysis – the Electric loan portfolio of $15.5 Billion is a liability.

5.    The 2003 Operating Results Per Segment Information:    The 2004 CFC 10K includes the Balance Sheet for 2003 and 2004 as well as the Income Statements for fiscal years 2004, 2003, and 2002.  The 2003 Electric loan portfolio of $15.8 Billion seems to fair better producing a contribution of nearly $14 Million after deducting loan loss adjustments and allocated general and administrative expenses.  However, adjust the Electric loan portfolio results for the guarantee agreement and once again, the Electric loan portfolio is under water producing a loss of over $23 Million before any offset for the guaranty fee –a loss in excess of $20 million if adjusted for the guarantee fee.

6.      RTFC's 2004 Annual Report:      While the investing public does not have access to the RTFC annual report a lender in a private transaction generally needs to just ask.  The examination into the CFC-RTFC would require an investor using reasonable diligence to request RTFC's 2004 Annual Report.  This examination would scare away any lender that understands the operating principles of coops.  In 2003 and 2004 Telephone loans portfolio contributed profits to the CFC-RTFC results of operations while Electric loan portfolio operated at a deficient.  CFC made distributions of $70.6 Million in patronage capital for fiscal year 2003 to all patrons of CFC.  In 2003 RTFC was reporting a net margin (income) of $27.9 Million.  CFC made distributions of $77.8 Million in patronage capital for fiscal year 2004.  In 2004 RTFC reported as a Net Margin (income) for 2004 after CFC allocations of $26.2 Million.  Farmer Mac and the FCA should have discovered the misappropriation of patronage capital by CFC.

7.      2005 Unaudited Financial Statements:      The Financial Statements for 2005 do not offer any comfort for numerous reasons including:

a.      The Telephone loan portfolio dropped by over $1.6 Billion to $3.0 Billion in 2005.  The drop in the Telephone loan portfolio from 2003 to 2005 was nearly $2.0 Billion.  As discussed above, the telephone loan portfolio was providing the bulk of CFC-RTFC profit from the lending business.  The Electric loan portfolio was unprofitable in 2003 and 2004.

b.      Deloitte restated Segment Information departing from FAS 131, *Disclosures about Segments of an Enterprise and Related Information*.  This is another (the second – not using market values to calculate Fair Value of loans was the first) clear departure from GAAP and a material one intending to mask or hide the failure of the Electric loan portfolio to contribute to profit.

       c.     CFC, in Footnote 2, reports long-term fixed rate loans to members of $14.5 Billion with a weighted-average interest rate of 5.76% while, in Footnote 5, reports a weighted-average cost of long-term debt of 5.73% with $10.6 Billion of L-T Debt outstanding.  This is a spread of less than 3 basis points.

After examination of the 2004 CFC SEC Filings, the 2005 statements would not make a lending decision any easier.  A prudent lender would not make an investment.

Even a superficial analysis as the one above shows that CFC is (i) financially distressed, (ii) insolvent on a Fair Value basis, and (iii) that CFC is misappropriating funds from RTFC to a person knowledgeable about coops,.

*Coop Principles*.

Coops are conduits and coop profits from doing business with a patron belong to patron that generated the coop's profit.  The IRS states:

> "We believe the Service's characterization of patronage dividends as price rebates in the case of a purchasing cooperative and as part payment for produce furnished in the case of a marketing cooperative is merely an alternative means of stating that a nonexempt cooperative **must function as a conduit**."  GCM 38061, 1979 WL 52855 (IRS General Counsel Memorandum), page 6.  (Emphasis added)

> "To conclude, as some representatives of the cooperative industry have concluded, that a multi-activity, exempt cooperative may divert earnings produced by one patronage activity to the patrons of another distinct activity, **we believe is plainly inconsistent with the characterization of the cooperative as an agent or conduit**."  Id. at page 5.  (Emphasis added)

CFC's bylaws support the IRS's interpretation stating in Section 4 of Article XI of CFC's bylaws that:

> "(a) The books and records of the Association shall be set-up and kept in such a manner that at the end of each fiscal year the amount of patronage capital, if any, **in the form of net savings so furnished *by each patron* is clearly reflected and credited in an appropriate record to the capital account *of each patron*.** … All such amounts credited to the capital account of any patron shall have the **same status as though they had been paid to the patron in cash in pursuance of a**

**legal obligation to do so and the patron had then furnished the Association corresponding amounts for capital**." (Emphasis added)

The other provisions of Article XI of CFC's bylaws clarify and illuminate the statement in Article XI, Section 1 that: "The Association shall at all times be operated on a cooperative nonprofit basis for the **primary and mutual benefit of its patrons**". (Emphasis added) Section 1 incorporates the provisions of DC ST § 29-903 - Purposes for incorporation. These sections are emboldened by subsection (e) of Section 4 which provides "… the Articles of Incorporation and Bylaws [of CFC] shall constitute and be a contract between the Association and each patron…".

Basically diverting earnings "from produced by one patronage activity", telephone loans, to "to the patrons of another distinct activity" is not consistent with coop principles. Further it is inconsistent with CFC's bylaws. Without any investigation of the dispute between ICC and RTFC, a knowledgeable agricultural lender even in a superficial examination of CFC's financial information would deduce that CFC is misappropriating funds from its patron, RTFC.

*The Aider and Abettor Elements in Context.*

These are the basic facts:

❖ Farmer Mac was investing a sum excess of two times the sum of Farmer Mac's regulatory capital.

❖ Farmer Mac investment of $500 Million in July of 2005 exceeded the 25% limitation of 12 C.F.R. § 652.35(d)(1) by over $400 Million.

❖ A superficial examination of the Consolidate Financial Statements would (i) deduce that CFC was not making any money from members' loan portfolio (producing a loss of $3 Million) and (ii) mandate further examination.

❖ Further examination would have revealed (i) the lack of contribution to earnings by the Electric loan portfolio and the (ii) Fair Value insolvency.

❖ A simple analysis of allocation of patronage income would leave a financial person prudent in operations of coops with the conclusion that CFC was taking income that belong to RTFC (earnings from telephone loans) and distributing it to electric members of CFC.

❖ Electric members were already enjoying loans price at uneconomical margins; hence, the Fair Value deficiency in the Electric loan portfolio.

❖ At the time of the Farmer Mac investment, CFC was financially distress by the recent substantial reduction in the Telephone loan portfolio.

Farmer Mac knows or should have known the above facts. Farmer Mac can not spend the Federal fisc without such a simple investigation.

Contrary to Farmer Mac's brief, Plaintiffs' position is supportable by numbers – CFC's published numbers. It is Farmer Mac's investment endangering its financial viability that should be questioned. It does not take a Certified Financial Analysts to make such simple financial analysis.

Thus, the Farmer Mac investment was made with an underlying fraud and knowledge of the fraud by Farmer Mac.

_The Last Element of the Aider and Abettor Status_.

The 1987 taxpayer bailout of the Farm Credit System required the issuance of taxpayer guaranteed bonds of $1.261 billion. SEE: "The Farm Credit System, Lending Anywhere But on the Farm" by Bert Ely (November 2006) at page 7. Farmer Mac, one institution in the Farm

Credit System, invests in corporate notes $1.339 Billion in CFC notes and mortgage-backed securities in a private transaction: that is substantial assistance.

CFC for the first time in its coop history sold loans to Farmer Mac in May of 2007. CFC basis for reporting loans at carrying value is a statement contained in the fair Value footnote to the Financial Statements which state: "the Company has held and intends to hold all financial instruments to maturity". In CFC's 2007 10K the sale was reported as follows:

> On February 15, 2007, the Company sold CFC distribution loans with outstanding principal balances totaling $366 million in a loan securitization transaction. The transaction qualified for sale treatment under SFAS 140. The Company received $366 million of cash in exchange for the loans, **which represents the full principal amount of the loans sold**. The Company incurred $0.7 million of costs associated with the transaction and had $0.9 million of unamortized deferred loan origination costs for the loans sold and accordingly, the Company recorded a loss on sale of loans totaling $1.6 million. (2007 10K, FN 3, p. 98) (Emphasis Added).

Farmer Mac purchased the mortgage-backed securities at the full face value of the loans. CFC did not disclosed (i) that Farmer Mac is the purchaser and (i) that the market value of loans if sold at market would have resulted in the recognition of a substantial loss by CFC.

At that time, CFC's disclosure was misleading to public investors. A sale of loans to any other buyer would have in all probability resulted in a loss of $40 Million or more. Farmer Mac shelter CFC from such disclosure by acquiring loans at a value other than Fair Value. This is substantial assistance and may itself constitute move Farmer Mac's status from an aider and abettor to a conspirator if CFC is ever the object of a security fraud case.

Farmer Mac is likened to a parent sheltering a child from the consequences of their misdeeds no matter haw egregious the misdeeds. Farmer Mac facilitates CFC's retaliatory and extortionistic actions directed against ICC to suppress knowledge of and accountability of the misappropriation of patronage capital. The misappropriation of patronage capital is an ongoing

scheme.    Farmer Mac renders substantial assistance in CFC's perpetration of the fraud by

sheltering CFC from the economic consequences of its behavior and financial condition.

*Aider and Abettor Status Relationship to RICO*.

On page 5 of the article titled *CIVIL LIABILITY FOR AIDING AND ABETTING* it was

noted that:

> The D.C. Circuit Court of Appeals has distinguished conspiracy from aiding and abetting
> by observing that a conspiracy consists of "concerted action by agreement" while aiding
> and abetting is "concerted action by substantial assistance."  (61 BUSLAW 1135, at 1139
> –Citations Omitted)

*Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).  Aiders and abettors are not subject to

civil liability under a RICO action under the principles adopted by the Supreme Court.    *Central

Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, (1994).  Thus,

Farmer Mac can not be a defendant under the section applicable to conspirators.  However, that

does not translate into the lack of standing in this action.

*The Standing Issue*.

Standing is premised on the following:

1.    On June 1, 2004, RTFC commenced a retaliatory foreclosure against ICC in

response to threats of a derivative suit regarding the misappropriation of the patronage capital

due RTFC.  ICC's interest in RTFC's patronage capital varied from 12% to 17%.

2.    RTFC premised its foreclosure upon the altered or false 2001 Loan Agreement.

3.    RTFC foreclosure action was checkmated when in the May 20, 2005 deposition

of a CFC counsel, the attorney that admitted to swapping out pages of the authentic loan

document after Mr. Prosser sign the document and further, admitted that the document submitted

to Court was not the document signed by Mr. Prosser.

4.     In 2005 ICC burden with the expense of litigation and other RTFC retaliatory acts (such as cutting off RUS funding), ICC stopped making payments on its loan to RTFC.

5.     RTFC should have sought at this time to make an accommodation ICC because RTFC was and is financially distressed and the damaged inflicted on ICC had impacted RTFC's cash flow.

6.     However, Farmer Mac stepped in with its first unlawful investment of $500 Million enabling CFC through RTF to continue its retaliatory action.

7.     In October of 2005, RTFC by guarantying Greenlight a minimum payment of $27.5 Million from ICC plus first access to the first $30 Million of Prosser's personal assets, incentivize Greenlight to reduce a claim in existence since May of 2004 to judgment and force ICC's parent into involuntary bankruptcy.  Greenlight was on record[3] stating bankruptcy would destroy the value of ICC.

8.     In February of 2006, ICC's parents were forced into involuntary bankruptcy by Greenlight.

9.      In July of 2007, RTFC in open court rejected a settlement with ICC that would have paid RTFC $402 Million stating that RTFC has a right to reject a settlement and sell the assets for less.

10.     In October of 2007, ICC was forced into bankruptcy.

11.     Plaintiffs, both objects of RTFC's predicated acts, were dismissed from employment with ICC.

12.     Based upon preliminary bids, upon information and belief, RTFC will recover less than $150 Million from the sale of the assets.  RTFC last valuation of ICC in 2003 pegged

---

[3] Greenlight by letter threaten a breach of fiduciary duty suit if ICC filed bankruptcy.

ICC's value from a high of $930 Million to a low of $607 Million before consideration of RTFC's indebtedness.

CFC, acting through RTFC, has placed CFC's drive to retaliate against Plaintiffs before CFC's fiduciary duty to investors and other members of CFC and RTFC.  CFC even adds its legal expenses to ICC's indebtedness knowing that said indebtedness is uncollectible.

Plaintiffs' have suffered an injury.  The injury is a direct result of CFC's bellicose and openly hostile attitude; an attitude which CFC would lack the means to act upon but for financial support provided by Farmer Mac buying loans materially above their market value and making unlawful investments by purchasing in private transactions, notes issued by CFC at rates below market value.  But for Farmer Mac, an aider or abettor, CFC would have no economic choice but to resolve its dispute with ICC.  The Plaintiff's injuries after July 29, 2005, are **fairly** traceable to Farmer Mac's investment of $1.3 Billion and CFC receipt of another $2.5 Billion under the REDLG program with $500 Million received November of 2005, $500 Million received in February of 2006, $1 Billion received in May of 2006, and another $500 Million received in August of 2007.  Here is a table of the support CFC has received from the Federal Government:

**Government Investment in re: CFC**
(in Thousands)

|            | Farmer Mac  | REDLG Program | Total       |
|------------|-------------|---------------|-------------|
| 29-Jul-05  | $   500,000 | -             | $   500,000 |
| 22-Nov-05  | -           | $   500,000   | 500,000     |
| 22-Feb-06  | -           | 500,000       | 500,000     |
| 9-May-06   | -           | 1,000,000     | 1,000,000   |
| 15-May-07  | 365,600     | -             | 365,600     |
| 1-Aug-07   | 40,000      | -             | 40,000      |
| 7-Aug-07   | -           | 500,000       | 500,000     |
| 2-Jan-08   | 34,000      | -             | 34,000      |
| 28-Mar-08  | 400,000     | -             | 400,000     |

| **Total** | $  1,339,600 | $  2,500,000 | $  3,839,600 |
|-----------|-------------|-------------|-------------|

One look at the timing and it appears that the USDA and Farmer Mac investments and it is easy to conclude Farmer Mac steps in whenever the USDA funds dry up.  This level of access to the Federal fisc at a time when CFC is shrinking by an unregulated entity is unprecedented.  How could Farmer Mac invest such funds in an obvious scheme to bailout CFC.

As to the last element of standing deals with whether declaratory relief will redress Plaintiffs' injury?  The short answer is not fully.  However, if CFC is cut off from the Federal fisc, CFC will either be force to deal with Plaintiffs or face bankruptcy.  CFC could not adopt a cavalier attitude towards the consequences of its actions towards Plaintiffs.  For instance, RTFC refuse to consider an offer to purchase the ICC assets from Mr. Prosser that upon information and belief is at least $100 Million more than closest offer.  Because of the Farmer Mac's fisc is available to CFC, CFC can flout its fiduciary duty to investors and pursue its retaliatory course of conduct.  Relief in this action would force reason upon CFC and end Farmer Mac's unlawful investments.

## V.     The False Claims Act.

Standing allowed to question the use of Federal fisc is not unprecedented.  For instance, the Senate Judiciary Committee with respect to the False Claims Reform Act stated:

> "… each and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or **other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim**."   S. REP. 99-345, 1986 U.S.C.C.A.N. 5266, at p. 5274. (Emphasis added)

The False Claims Act, 31 U.S.C.A. § 3730, confers standing upon every citizen with out any of the traditional requirements of standing for a case and controversy.  In this situation, as set forth

above, Farmer Mac's funding of CFC is "in violation of … [an] applicable regulation".  The

public policy encapsulated in the False Claims Act augments the grant of standing to the

Plaintiffs in the present case.

## VI.     THE 2007 FARM BILL

The 2007 Farm Bill added Title V, "Credit", Subtitle E, "Farm Credit", Section 5406,

"Rural utility loans" which states:

> "(C) that is a loan, or an interest in a loan, for an electric or telephone facility by a
> cooperative lender to a borrower that has received, or is eligible to receive, a loan under
> the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.)."

Farmer Mac seeks to give this provision retroactive effect.  In essence, Farmer Mac seeks to say

a law in 2008 makes an unlawful transaction 2005 lawful.  However, there is no evidence in the

law that it was intended to be given retroactive effect.

Note that in there is only one provision in which Congress specifically stated was to

given retroactive effect.   SEC. 13105(k) which amends 7 U.S.C. 18(d) in which Congress

specified "This paragraph shall operate retroactively from the effective date of its enactment, and

shall apply to all reparation awards for which a proceeding described in paragraph (1) is

commenced within 3 years of the date of the Commission's order.''   This section applies to

reparation awards.

The very nature of the Farm Bill is that the law is enacted for a set period and must be

readopted.  The 2007 Farm Bill was intended to replace the 2002 Farm Bill.  In fact the 2002

Farm Bill was extended because of the slow progress of the 2007 Farm Bill progress was so

slow.  Farmer Mac's to treat the 2007 Farm Bill as if it overwrote provisions of the 2002 Farm

Bill.

Giving the 2007 Farm Bill retroactive effect would effectively permit Farmer Mac to purchase CFC's total loan portfolio of $18 Billion – a wholesale bailout of CFC. Barney Frank's legislation to deal with the subprime foreclosures estimated to costs $2.7 Billion is considered by most pundits doomed because of the tag bailout. However, Farmer Mac would have the Court adopt an interpretation that fosters an $18 Million bailout of CFC without a mention of the word bailout in any of the legislative history of the 2007 Farm Bill. The provisions of 2007 Farm Bill, if law, must be interpreted to apply new loans made by CFC after the effective date of the law that meet the qualifications of 12 U.S.C. 2279aa(9).

For all the foregoing reasons, the Defendant's Motion for Dismissal should be denied.

Respectfully submitted this 9th of June, 2008.


Jeffrey J. Prosser, pro se, &
John P. Raynor, pro se,
   The Plaintiffs


By ____/s/JOHN P. RAYNOR_____


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 9th day of June, 2008, I electronically filed the Motion in opposition to Farmer Mac's Motion to Dismiss, the foregoing memorandum of law, and the appendix with the Clerk of the Court by using the CM/ECF system which sent notification of such filing upon all parties who filed an appearance or motion by electronic filing in this case as follows:


_____/s/John P. Raynor_____

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Jeffrey J. Prosser, pro se, and John P. Raynor, pro se, | ) ) ) | |
| | ) | Civil No.: 1:08-cv-00687 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Federal Agricultural Mortgage Corporation and the United States Department of Agriculture; | ) ) ) | |
| Defendants | ) ) ) | |

## APPENDIX "A"
## TO OPPOSITION TO FARMER MAC'S
## MOTION TO DISMISS COMPLAINT

_____

## CFC's TRANSGRESSIONS

1.      **Structural Transgressions: CFC-RTFC Relationship.**
**PREMISE:**    The International Co-operative Alliance describes coops as "an autonomous association of persons united voluntarily to meet their common economic, social, and cultural needs and aspirations through a jointly-owned and democratically-controlled enterprise". Coops are communal enterprises. CFC, a coop, avail itself of this form of entity, by forming RTFC. However, CFC sought an end inconsistent with coop form of business – to make money from loans to rural telephone companies. RTFC functions as an entity only insofar as to deprive telephone companies from the coop principle of 'democratically-controlled enterprise' (telephone companies have no vote in CFC or right to knowledge of CFC's business) and to accomplish CFC's end, predatory lending to telephone companies.

a.      **Illegal voting control over RTFC.**

1.      Facts.

A.      For $1,000 investment CFC elected a majority of RTFC's Directors. (2002 10K, FN 1(b), p. 72)

B.      This patently illegal arrangement persisted from the creation of RTFC until October of 2001: a period of more than 14 years. (SDCL § 47-16-10)

C.      The illegal voting arrangement change at the time there was a change in auditors from Arthur Andersen ("AA") to Ernst & Young ("Ernst").

      D.     When illegal voting arrangement ended CFC no longer had ownership interest in RTFC but RTFC was a Class "E" Member of CFC.

    b.    **Interlocking Management Arrangement.**

        1.     CFC's occupies all the key management positions of CFC including having CFC's CEO serve as RTFC's CEO, CFC's CFO serve as RTFC's CFO, and CFC's General Counsel serve as RTFC's General Counsel. (RTFC 2004 Annual Report)

        2.     RTFC has one employee.

    c.    **Long-term management contract.**

        1.     CFC is the sole lender to RTFC. (2004 10K, FN 1(b), p. 101)

        2.     CFC manages the affairs of RTFC. (all 10Ks, FN 1 to Fin. Stat.)

        3.     All amounts borrowed from CFC may be accelerated if RTFC obtains financing from another source. (2002 10K, FN 1(b), p. 72)

        4.     RTFC has no authority to make loans without the approval of the CFC loan advisory committee.

    d.    **Professionals.**

        1.     CFC's accountants serve as RTFC's accountants.

        2.     CFC's attorneys serve as RTFC's attorneys.

2.    **The Façade Proposition.**

**PREMISE:** RTFC functions as a bookkeeping entity.

    a.    **Facts:**

        1.     RTFC has no independent ability to loan money: its purported purpose.

        2.     RTFC does not have independent management.

        3.     RTFC has no ability to borrow from any entity other than CFC.

        4.     RTFC has no independent professionals.

        5.     All of RTFC's money is and always has been controlled by CFC except $30,000 maintained for years in an RTFC bank account.

        6.     RTFC has no voting authority regarding the affairs of CFC.

    b.    **The RTFC Board.**

    Telephone companies vote to elect a board that has no power and authority. All facets of RTFC's business are controlled by CFC's management.

    c.    **Conclusion:**

    RTFC is a CFC façade for CFC to book telephone loans. A separate entity is essential to CFC's predatory lending to telephone companies.

3.    **Monetary Transgressions: CFC-RTFC Relationship.**

**PREMSIE:** CFC through the pricing of inter-coop loans traps the majority of RTFC's profits (80% or more) within CFC and then allocates patronage income legally due RTFC to electric companies: members of CFC.

    a.    **RTFC ownership of CFC.**

        1.     RTFC is a class "E" owner (non-voting) of CFC. (2004 10K, FN 1(b), p. 101)

        2.     CFC is not an owner of RTFC. (2004 10K, FN 1(b), p. 101)

        3.     RTFC is a 'patron' of CFC because RTFC borrows money from CFC.

       4.     As a patron of CFC, RTFC is entitled to the patronage allocation of RTFC's contribution to CFC's earnings.  (Section 4 of Article XI of CFC's bylaws)

b.    **CFC uses loans to RTFC to transfer RTFC earnings into CFC.**

       1.    **Proof.**

          A.    A legal admission: CFC's 10K for f/y 2002: "The amount reported [pursuant to AA's methodology] for the electric systems represented the total earned on loans from CFC to its electric members and RTFC. The amount reported [pursuant to AA's methodology] for the tele-communications systems represented the **incremental amount** earned on its CFC loans that it re-lent to the telecommunications systems. … The electric system income statement **is now** only the amount earned on loans to electric member systems." (FN 13, p. 97) (Emphasis added)

          B.    The Ernst restatement of the 2000 segment information resulted in $48 Million **decrease** in Electric income and a corresponding $48 Million **increase** in Telephone with the predominating factor a $63 Million change in the cost of capital.

          C.    The Ernst restatement of the 2001 segment information resulted in $63 Million **decrease** in Electric income and a corresponding $63 Million **increase** in Telephone with the predominating factor a $102 Million change in the cost of capital.

          D.    The Deloitte restatement of the 2004 segment information resulted in $60 Million **decrease** in Telephone's Gross Margin and a $52 Million **increase** in Electric's Gross Margin.  Telephone's gross margin was decrease from $67 Million to $7 Million.

          E.    The Deloitte restatement of the 2005 segment information resulted in $56 Million **decrease** in Telephone's Gross Margin and a $45 Million **increase** in Electric's Gross Margin.  Telephone's gross margin was decrease from $65 Million to $6 Million.

c.    **CFC's BYLAWS Support RTFC's Entitlement.**

Section 4 of Article XI, "Patronage Capital Certificates", of CFC's bylaws supports the IRS position that a coop must operate as a conduit: each patron is entitled to be allocated the patron's contribution to the coop earnings.  It states:

       "(a) The books and records of the Association shall be set-up and kept in such a manner that at the end of each fiscal year the amount of patronage capital, if any, **in the form of net savings so furnished by each patron is clearly reflected and credited in an appropriate record to the capital account of each patron**. … All such amounts credited to the capital account of any patron shall have the **same status as though they had been paid to the patron in cash in pursuance of a legal obligation to do so and the patron had then furnished the Association corresponding amounts for capital**." (Emphasis added)

d.    **Misappropriated Sums.**

       There is only five years of transparent segment information: all from the Ernst's audits.  The segment information must be adjusted fiscal years commencing in 2002 to give effect to CFC's guaranty agreement of RTFC's loans

by substituting the guaranty fee for the loan loss adjustment. The statement made in 2007 10K, page 38 is:

> "CFC has agreed to indemnify RTFC and NCSC for loan losses, with the exception of the NCSC consumer loans that are covered by the NCSC loan loss allowance. Therefore, there is no loan loss allowance required at RTFC and only a small loan loss allowance is required at NCSC to cover the exposure to consumer loans."

This guaranty agreement went into effect for fiscal year 2002, the same year the CFC-RTFC voting arrangement changed.

The sums misappropriated for 2000 thru 2004 are as follows:

|              |       | (000)      |
| ------------ | ----- | ---------- |
| May 31, 2000 |       | $ 23,236   |
| May 31, 2001 |       | 28,475     |
| May 31, 2002 |       | 89,396     |
| May 31, 2003 |       | 65,051     |
| May 31, 2004 |       | 56,680     |
|              | Total | $ 262,928  |

There is no reason to believe that this defalcation has not been effective for years before fiscal year 2000 and for years for fiscal years after 2004.

4.    **Illegality of CFC-RTFC Relationship.**

**PREMISE:**  The CFC-RTFC relationship goes far beyond the contractual relationship of two private entities. The CFC-RTFC relationship involves a long establish pattern of behavior with RTFC operated in complete disregard to numerous laws governing coops and discharge of fiduciary duties. In essence, CFC acts as if it is not bound to follow any law.

a.    **Unlawful Control of RTFC.**

CFC's altered its relationship with RTFC from a patently unlawful exercise of control to a subtle unlawful relationship.

1.    The relationship from inception until altered by Ernst in October of 2001 violated the SDCL § 47-16-10, which requires one-member, one-vote.

2.    The relationship after the change still violated SDCL § 47-16-10 in substance for the reasons set forth in 3 below.

3.    In February of 2005, RTFC was moved to D.C. RTFC is an artifice or device for CFC to make loans telephone companies while denying the telephone voting rights and the democratic voting rights and control normally associated with coops violating numerous provisions of District of Columbia Cooperative Association Act. For instance, DC ST § 29-913(b) implements the one-member, one-vote principle by declaring illegal any arrangement to avoid the principle.

4.    CFC unlawful control of RTFC is accomplished with scienter: CFC advertises and has always advertised coop values. Petersen in fact lectures on coop values.

b.    **Defalcation: the violation of Sate laws.**

The *systematic defalcation of RTFC's patronage income* by CFC violates a number of laws.

1.    During RTFC's operation as a South Dakota coop -

A.    Provisions of Chapter 47-30 of the South Dakota laws addressing Corporate Fraud and Mismanagement.

B.    Provisions of Chapters 47-15, 47-16, and 47-17 of the South Dakota laws addressing operation of coops.

C.    Provisions of Title 22 of the South Dakota laws to the extent that the misappropriation of RTFC's patronage capital involves criminal -

(i) violations of the theft statutes;

(ii) violations of the fraud statutes;

(iii) violations of statutes involving false reports; and

(iv) violations of statutes addressing defalcation by fiduciaries (CFC's management stand in a fiduciary position to telephone companies).

2.    RTFC's operation as a District of Columbia Dakota coop violates similar laws codified in the District of Columbia.

3.    To the extent that RTFC loans in 42 states and the Virgin Islands, CFC's misappropriation of RTFC's patronage capital which effectively is a misappropriation of patronage capital belonging to each telephone company, CFC and its management have violated numerous laws of each of those jurisdictions.

c.    **The violation of Federal Income Tax laws.**

The *systematic defalcation of RTFC's patronage income* by CFC violates Federal income tax laws.

1.    CFC is a tax exempt entity pursuant to IRC 501(c)(4).  (2007 10K, p. 1)

2.    RTFC is a taxable coop subject to Subchapter T of the IRC. (2007 10K, p. 1)

3.    An IRS General Counsel Memorandum on "COOPERATIVE NETTING" makes is clear that coops must function as a conduit and that diversion of earnings produced by one patronage activity (telephone loans) to the patrons of another distinct activity (electric loans) "is plainly inconsistent with the characterization of the cooperative as an agent or conduit." GCM 38061, 1979 WL 52855 (IRS General Counsel Memorandum)

4.    In essence, income due a taxable entity, RTFC, is misappropriated by CFC, a tax exempt entity.  This is a tax fraud.

d.    **The Violation of Federal security laws.**

This issue is addressed and discussed below.


5.    **Accounting Fraud.**

**PREMISE:**    Relying upon an evergreen scheme to misappropriate funds from telephone companies, CFC (i) priced loans to electric companies with little or no margin and (ii) distributed patronage income that belonged to rural telephone companies to electric companies.    To accomplish the foregoing, CFC had to commit numerous acts of accounting fraud.

a.    **Accounting Firms: Complicity.**

It is impossible to accomplish CFC's accounting without firms that are not independent.

1.    The Firms:

A. Fiscal year 1987 through fiscal year 2001, inclusive – Arthur Andersen, LLP ("AA").

B. Fiscal year 2002 thru fiscal year 2004, inclusive – Ernst & Young LLP ("Ernst").

C. From year 2005 thru the present - Deloitte & Touche LLP ("Deloitte")

2. Independence.

A. AA from an examination of accounting policies AA appears not to be independent of CFC.   AA was not independent regarding RTFC because it answered to CFC.

B. Ernst was independent of CFC but was not independent of RTFC.

C. Deloitte's audit manager, Randall B. Johnston, is the former auditor of CFC while at AA.  Mr. Johnston's involvement as the CFC-RTFC auditor in violates of Sarbanes-Oxley Act of 2002 (SOX) § 203 as implemented by 17 C.F.R. § 210.2-01 making the Deloitte audits of CFC unlawful.  The 8K filed April 22, 2002 relating to the change in accounting firms was signed by Mr. Johnston while at AA.  Deloitte is not independent with respect to CFC and RTFC.

b.   **GAAP:  FAS 131, *Disclosures about Segments of an Enterprise and Related Information*, and FAS 57, *Related Party Disclosures*.**

1. Both statements require disclosures about CFC's relationship to RTFC f/b/o investors and other parties that may rely upon the CFC financial statements.

A. FAS 131, ¶ 27(b), requires disclosure of "Revenues from transactions with other operating segments of the same enterprise".

B. FAS 131, ¶ 31(a), requires disclosure of "The basis of accounting for any transactions between reportable segments".

C. FAS 57 require detailed disclosure about transactions between related parties.  *GAAP 2008, Handbook of policies and Procedures,* states: "Related-party transactions take place when a transacting party has the ability to influence or exercise control of another transacting business due to … familial relationship with that party". With CFC's management serving as RTFC's management such a relationship exists.

2. The AA/Deloitte methodology reports CFC's profit from RTFC loans (the sums misappropriated) primarily as an offset (decrease) to the Electric loan portfolio's cost of funds and increases RTFC's cost of funds by a like amount.  This approach -

A. Hides that fact that the Electric companies loans has not produced a profit since May 31, 2003.

B. Hides CFC's dependency on rural telephone loans.

C. Hides CFC's defalcation of rural telephone companies from public investors and RTFC's members sophisticated enough to examine CFC's 10K.

3. There are many accounting irregularities which impeach Deloitte's purported independence but none more egregious than Deloitte's disregard FAS 131.

    A. Deloitte re-implemented[1] AA's methodology for reporting segment information after RTFC accelerated Innovative Communication Corporation's ("ICC") loans without a payment default for raising the issue misappropriated patronage capital.

    B. In the 10Ks after the emergence of Deloitte in the MD&A section a "Volume Rate Variance Table" was added that is based upon the segment information.

c.   **FAS 107, *Disclosures about Fair Value of Financial Instruments*.**

This is about the reporting surrounding the fair value of CFC's single largest asset: member loans.

1.   Materiality. CFC is insolvent on a fair value basis and CFC's largest deficiency in fair value is attributable to member loans. Therefore, how fair value is reported is crucial.

    A. CFC's financial statements are a hybrid: part Fair Value and part historical costs. CFC reports its second largest asset on a Fair Value basis. This has generally resulted in substantial increases to CFC's 'Total Equity'.

    B. CFC's Total Equity is reported on a Fair Value basis with have a ***deficient*** of $699,694,000 for the year ended May 31, 2005.

    C. CFC's Total Equity is reported on a Fair value basis with have a ***deficient*** of $1,965,382,000 for the year ended May 31, 2006.

    D. CFC's Total Equity is reported on a Fair value basis with have a ***deficient*** of $1,276,288,000 for the year ended May 31, 2007.

2.   FAS 107 require disclosures regarding the "market value" of assets and liabilities. FASB 107, ¶ 5 states:

> "For purposes of this Statement, the fair value of a financial instrument is the amount at which the instrument could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale".

Clearly, FAS requires a market value approach.

3.   Ignoring FAS directive, CFC uses its own rates as of May 31st as the measuring basis for member loans and not market value. The 2007 10K, FN 14, page 110, entitled 'Loans to Members" states:

> "Fair values are estimated by discounting the future cash flows using the current rates at which similar loans would be made to borrowers [by CFC] with similar credit ratings and for the same remaining maturities."

CFC uses its rates. CFC is an acknowledged below marker lender.

4.   The effect is that the Fair Value deficiency is understated and subject to manipulation since by adjusting rates every May 31st CFC adjusts Fair Value disclosures of loans.

5.   Only member loans are single out for this treatment.

d.   **FAS 114, Accounting by Creditors for Impairment of a Loan.**

---

[1] After a trend for more transparency because of Enron, a coop adopts an accounting methodology that is less transparent.

1.    Facts.  ICC defaulted on their loans in June of 2001 and entered into a new loan agreement with RTFC in August of 2001, days before issuance of the 10K for 2001.  New loan terms put ICC on interest only basis for two years.

2.    FAS 114, paragraph 8 states:

> "A loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement. As used in this Statement and in Statement 5, as amended, *all amounts due according to the contractual terms* means that both the contractual interest payments and the contractual principal payments of a loan will be collected as scheduled in the loan agreement."

FAS 118, paragraph 6, issued October 1994, states:

> "For a loan that has been restructured in a troubled debt restructuring, *the contractual terms of the loan agreement* refers to the contractual terms specified by the original loan agreement, not the contractual terms specified by the restructuring agreement."

Clearly, the ICC loan was impaired.

3.    Intentional Misrepresentation.  CFC's impaired loans increased from $572 Million in 2000 to $1,465 Million in 2001.  Inclusion of the ICC loans would have resulted in a jump from $572 Million in 2000 to over $2 Billion in 2001.

4.    AA auditor Johnston was aware that ICC had defaulted in 2001.


e.    **Combination and Consolidation of CFC and RTFC.**

1.    CFC reported the results of CFC and RTFC on a combined basis through fiscal year 2003 and thereafter, on a consolidated basis.  Combining or consolidating financial statements are generally premised upon common ownership of 50% or more.

2.    AA justified the combination of CFC and RTFC because "RTFC is a controlled affiliate of CFC".  Thus, AA based the combination upon the illegal voting arrangement.

3.    Without the illegal voting arrangement, there was no basis to combine the CFC and RTFC financial statements.  The loan guaranty came into existence at the same time the voting arrangement disappeared.  Upon information and belief, CFC's financial stake in the outcome of RTFC's business due to the loan guaranty was the accounting foundation for combining CFC and RTFC.

4.    In 2004, the consolidation of the financial statements was premised upon FIN 46(R), an official interpretation of GAAP.  By the express terms of the statement, FIN 46(R) does not apply to non-profit entities.  CFC is a non-profit and a tax-exempt entity pursuant to IRC § 501(c)(4).

5.    Combining and consolidating CFC with RTFC serves one and only one purpose, it lessens the reporting requirements of the CFC-RTFC

relationship: the inter-coop relationship is less material.  Thus combining or consolidating CFC and RTFC operations serves the defalcation (misappropriation) scheme.

f.    **Summary of other liberties taken with accounting and disclosure.**
Accounting disclosure is not an exact science, depends upon materiality, and is subjective.  While the forgoing (b thru e) are objective, the following are more subjective.

1.    **CFC's deteriorating Operating Margin**: CFC's Operating margin (loss) before derivative and foreign currency adjustments for fiscal years 2004, 2005, and 2006 was a loss of $11.5 Million, a profit of $60.6 Million, and a loss of $10.2 Million, respectively.

   A.   The $60.6 Million included extra-ordinary income from make-whole fees of $36.4 Million of make-whole fees related to the repayment of $1.6 Billion in RTFC loans.

   B.   Gain of foreclosed assets was $2.6 Million, $13 Million, and $15.5 Million for fiscal years 2004, 2005, and 2006, respectively.

   C.   Remove the total gain of foreclosed assets and as well as the extra-ordinary gain from make whole fees and CFC's lending income for fiscal years 2004, 2005, and 2006 was a loss of $12.8 Million, income of $11.1 Million, and a loss of $27 Million, respectively.

Clearly, CFC was not making money from its lending activities.  This mandates extra-ordinary disclosure to investors if not notation in the Audit opinion.  There was none.

2.    **Unprofitability of the Electric Loan Portfolio**:  The Segment Information in the 2004 10K, FN 15, p. 134, disclosed that Electric company loans of $15.5 Billion produced a Gross Margin of $19.8 Million with allocated general and administrative expenses of $35.2 Million for a **loss** of $15.4 Million.

   A.   The segment information shows loan loss adjustment favorable to Electric companies of $100 Million.

   B.   The 2004 10K, FN 1(b) states: "Under a guarantee agreement, CFC has agreed to reimburse RTFC for loan losses".

   C.   The 2004 10K, FN 1(b) states: "Under a guarantee agreement effective June 1, 2003, CFC has agreed to reimburse NCSC for losses on loans, excluding the consumer loan program".

   D.   Electric systems bear nearly 100% of RTFC and NCSC loan losses.

   E.   Loan losses for CFC, RTFC, and NCSC produced a loss of $54 Million.

   F.   The Electric systems after allocation of (i) general and administrative expenses, (ii) all loan loss adjustments, and (iii) offset by the guaranty fees, would produce **a loss in excess of $65 Million**.

   G.   The net loans to Electric systems constituted over 70% of the consolidated assets.

The dire economics of the lack of profitability of the Electric systems loans was material: constituting over 70% of Consolidated Assets and a figure over 21 times total equity.  This situation merited additional

disclosure, a note in the Auditor's opinion, and possibly, a going concern qualification.

3.    There are numerous things CFC does to manage earnings and mislead investors including, but not limited, to:

❖ After the 2006 10K showed CFC's weighted average interest rate on long-term member loans of $14.5 Billion of 5.76% (FN 2) and weighted average interest rate on long-term debt of $10.6 Billion of 5.73% (FN 5), a 3 basis point spread, in the 2007 10K (FN 2) CFC dropped the disclosure on the weighted average interest rate on long-term member loans.

❖ For first time CFC reported a recovery of a loan loss as income (rather than adjustment to loan loss reserve) at a time when the loan loss reserve was charged with a $45 Million VarTec write-off settlement with an additional write-off of $17 Million deferred to 1st quarter of 2008. (2007 10K, FN 1(d), p. 87).

❖ In the case of ICC for the first time that I am aware, CFC has been adding attorney fees to the amount owed to the ICC indebtedness rather than charging attorney fees through the income statement. The ICC loan has increased from $475 Million (2005 10K, FN 14, p. 103) in 2005 to $498 Million (10Q for 2/29/2008, FN 13, p. 25) as of February 29, 2008, a $23 Million increase.

❖ CFC ends the discussion on the ICC loan in 3rd quarter 10Q with the statement: "Based on its analysis, the Company believes that it is adequately reserved for its exposure to ICC at February 29, 2008." There is mounting evidence that CFC will not recover more than $150 Million or stated differently, experience a loss of over $300 Million.

❖ For the first time, in the 3rd qtr, 2008 10Q, CFC recognized income of $47.9 Million for "due to the recovery of loan losses resulting from the decrease in calculated impairments due to lower variable rates and payments received on impaired loans". This is just entry decreasing loan loss reserve and increasing income. This was done notwithstanding CFC's Fair Value insolvency. As of May 31, 2003, CFC had a loan loss reserve of $ 511 Million, non-performing loans of $ 0,000 Million, and restructure loans of $ 629 Million of which $628 Million was on non-accrual status. As of February 29, 2008, CFC had a loan loss reserve of $497 Million, non-performing loans of $ 504 Million, and restructure loans of $ 584 Million of which $545 Million was on non-accrual status.

The foregoing is not an exhaustive list.

6.    **Predicate Acts.**

**PREMISE**:  RTFC is a litigate business organization under the dominion and control of CFC. CFC uses RTFC as a vehicle to defraud rural telephone companies. ICC discovered the scheme to misappropriate patronage income belonging to RTFC. Twice ICC raised the scheme and twice ICC had its loans from RTFC accelerated without a payment default. Further, to this date CFC nor RTFC have never offered any explanation for the discrepancy between the RTFC's contribution to CFC's income and CFC's allocation of patronage income to RTFC. Besides the traditional mail and wire fraud predicate acts, CFC has committed the following predicate acts.

x

RTFC, under CFC's control, committed the predicate acts in order to suppress ICC's knowledge of, and rights to seek redress for, the underlying fraud, the Patronage Capital Misappropriation Scheme, itself an illegal scheme.

     a.     **Tampering with a Witness, Victim, or an Informant 18 U.S.C. § 1512(c).**

     1.     The following is a recital of the facts related to destruction of the Authentic 2001 Loan Agreement between RTFC and ICC and the use of the False 2001 Agreement in legal proceedings against ICC in Federal District Court.

     A.  ICC defaulted on its loans in 2001.

     B.  RTFC in August of 2001 agreed to restructure the loan – ICC went on an interest only basis.

     D.  RTFC accelerated the ICC loans on June 1, 2004 after ICC threatened a derivative action.

     E.  In 2005 counsel for ICC noticed that the footers at the bottom of the page did not match.

     F.  After comparing versions of the 2001 Loan Agreement it was deduced that:

        (i)     Prosser signed the 2001 Loan Agreement on August 24, 2001.

        (ii)     Prosser mail the signature pages and cause the corporate seals to mail to RTFC headquarters in Virginia.

        (iii)     RTFC executed the documents so that it could issue the 2001 10K on August 27th.

        (iv)     CFC associate counsel working as RTFC's counsel altered the original 2001 Loan Agreement.

        (v)     (CFC's) RTFC's counsel sent down a redline version of the altered document where he purported to make minor grammatical changes.  He omitted redlines on the major changes made to the document executed by Mr. Prosser and included redlines on minor changes.

        (vi)     The original 2001 Loan Agreement was destroyed.

        (vii)     RTFC used the False 2001 Loan Agreement in numerous actions against ICC and Mr. Prosser.

     G.  In a deposition taken on May 20, 2005, CFC's-RTFC's counsel acknowledge swapping out pages AFTER Mr. Prosser's signature but claimed ICC's counsel's consent.

     H.  In the same deposition the CFC-RTFC counsel acknowledge that 2001 Loan Document was not the Loan Document signed by Mr. Prosser.

     I.  The Federal District Court in the Virgin Island denied RTFC's Motion for Summary Judgment.

     2.     RTFC used a False 2001 Loan Document in numerous actions in the Virgin Islands Federal District Court presenting the False 2001 Loan Document as the Authentic 2001 Loan Document.  Each instance is a violation of 18 U.S.C. § 1512(c).

     3.     The destruction of the Authentic 2001 Loan Document is a violation of 18 U.S.C. § 1512(c).

b.    **Violations of 18 U.S.C. § 1513(e) which protects Whistleblowers & Hobbs Act (Extortion), 18 U.S.C. § 1951(a).**

    1.    With the commencement of the foreclosure action through the present day RTFC has committed numerous acts retaliatory in nature and with the intent to have Prosser consent to the surrender of his property rights.  For instance, in October of 2005, when RTFC could not authenticate the 2001 Loan Agreement (the agreement which govern the relationship between RTFC and ICC), RTFC entered into a "Intercreditor Agreement" to economically entice Greenlight Capital (agreed to pay a minimum of $27.5 Million plus surrender claim to Prosser's personal assets) to obtain a judgment against Emerging Communications, Inc. and commence involuntary bankruptcy proceedings against Emerging Communications (ICC's Parent), and Jeff Prosser.

    2.    RTFC has been misreporting the gravamen of the dispute and facts such as its inability to authenticate the 2001 Loan Agreement and RTFC's obligations under the Intercreditor Agreement in CFC's SEC filings.

## 7.    **The SEC Implications.**

The foregoing set forth a pattern of illegality and cozening that shows contempt of the law and the documents filed by CFC are materially misleading due to material misstatements and material omissions.