# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Jeffrey J. Prosser, pro se, and John P. Raynor, pro se, | ) ) ) | |
| | | Civil No.: 1:08-cv-00687 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Federal Agricultural Mortgage Corporation and the United States Department of Agriculture; | ) ) ) | |
| Defendants | ) ) ) | |

# JEFFREY J. PROSSER AND JOHN P. RAYNOR
# OPPOSITION
# TO THE U. S. DEPARTMENT OF ARGRICULTURE
# MOTION TO DISMISS
_____

For the reasons set forth in the Memorandum of Law filed concurrently, Plaintiffs, Jeffrey J. Prosser and John P. Raynor respectfully requests the Court deny the United States Department of Agriculture's Motion to dismiss the complaint and direct them to answer the complaint.

Dated:  July 7, 2008.

Respectfully Submitted,


/s/John P. Raynor_____
John P. Raynor, Pro Se
Raynor, Rensch & Pfeiffer
10110 Nicholas Street, Suite 102
Omaha, Nebraska 68114
Telephone No.: (402) 498-4400
jraynor@rrplawyers.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 7th day of July, 2008, I electronically filed Plaintiff's Opposition to U.S. Department of Agriculture's Motion to Dismiss, the foregoing memorandum of law, and the appendix with the Clerk of the Court by using the CM/ECF system which sent notification of such filing upon all parties who filed an appearance or motion by electronic filing in this case as follows:

/s/John P. Raynor

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Jeffrey J. Prosser, pro se, and John P. Raynor, pro )
se, )
           )   Civil No.: 1:08-cv-00687
      Plaintiffs, )
           )
  v.           )     **MOL**
           )
Federal Agricultural Mortgage Corporation and )
the United States Department of Agriculture; )
           )
      Defendants )
           )

**MEMORANDUM OF LAW**

**IN RE: PLAINTIFF'S OPPOSITION TO THE MOTION TO DISMISS**

**THE UNITED STATES DEPARTMENT OF AGRICULTURE**

---

    John P. Raynor ("Raynor"), the Pro Se Plaintiff, respectfully submits this brief on behalf of Respondent and Jeffrey J. Prosser ("Prosser") (Raynor and Prosser shall be collectively referred to as "Respondent") in Opposition to the Motion of the Federal Agricultural Mortgage Corporation ("Farmer Mac") to Dismiss the complaint.

**I. THE OPPOSITION TO THE FEDERAL AGRICULTURAL MORTGAGE CORPORATION MOTION TO DISMISS.**

    The United States Department of Agriculture (the "USDA") has filed a Motion to Dismiss that builds upon the Federal Agricultural Mortgage Corporation's ("Farmer Mac") Motion to Dismiss and Plaintiff's Opposition thereto. Plaintiffs hereby incorporate their

Opposition to the Farmer Mac's Motion to Dismiss and files this brief which builds upon the Memorandum of Law presented in Opposition to the Farmer Mac's Motion to Dismiss.

II.    **GENERAL STATEMENT.**

The following is table sets forth the joint investment of the USDA and Farmer Mac in the National Rural Utilities Cooperative Finance Corporation ("CFC"), a financing cooperative, which is completely unregulated.

|  | Farmer Mac | REDLG Program | Total |
|---|---|---|---|
| 29-Jul-05 | $    500,000 | - | $    500,000 |
| 22-Nov-05 | - | $    500,000 | 500,000 |
| 22-Feb-06 | - | 500,000 | 500,000 |
| 9-May-06 | - | 1,000,000 | 1,000,000 |
| 15-May-07 | 365,600 | - | 365,600 |
| 1-Aug-07 | 40,000 | - | 40,000 |
| 7-Aug-07 | - | 500,000 | 500,000 |
| 2-Jan-08 | 34,000 | - | 34,000 |
| 28-Mar-08 | 400,000 | - | 400,000 |
| **Total** | $   1,339,600 | $   2,500,000 | $   3,839,600 |

The above represents an extraordinary sum invested by the Government in an unregulated, financing entity. The funds were invested by the Government at a time when CFC was constricting: member loans were $20.5 Billion as of May 31, 2004 and were slightly over $18.1 Billion as of May 31, 2007. Thus, the loan proceeds were used by CFC to replace indebtedness and not passed through to members in the form of loans.

Farmer Mac's investment of over $1.3 Billion, a figure nearly 6 times Farmer Mac's regulatory capital, is patently illegal. The same can not be said about the USDA's investment made through the guarantee of the loans funded by the Federal Financing Bank. 7 U.S.C.A. § 940c-1 permits the USDA through the REDLG program "to refinance bonds or notes issued"

"for any electrification or telephone purpose eligible for assistance under this chapter".

The Conference Report accompanying the Farm Bill of 2002 stated as follows about the

REDLG program:

> "This section provides for a new source of private funding for the Rural Economic Development Loan and Grant (REDLG) program. Since enactment in 1987, the REDLG program has provided approximately $185 million in economic development assistance to rural communities in the form of grants and zero-interest loans for rural development projects such as water and waste, business incubator, schools, hospitals, emergency services, and general economic and community development.
> …
> The provision **provides for safety and soundness** and permits the Administrator to deny the request of a lender for a guarantee if the lender does not have expertise and experience in rural utility lending, or issues bonds that, without the guarantee, **would not be of investment grade quality**. In addition, a lender should provide documentation that the proceeds of a guaranteed bond or note are used for eligible REAct purposes.
> This provision further requires that a private lender make payments on the bonds or notes even if a loan made using the proceeds of such bond or note is not repaid to the lender. This effectively places the lender between the RUS and the borrower **minimizing the risk to the government**."  H.R. CONF. REP. 107-424, 2002 U.S.C.C.A.N. 141, at 588. (Emphasis Added)

The REDLG program is a loan program not a Federal grant program.  One merely needs to

examine the USDA Regulations set forth in Title 7, Subtitle B, Chapter XVII, Part 1720 that the

program is designed to fund credit-worthy parties and not to serve as a bailout.

Respondent contend in the Complaint that the USDA loans were a product of cronyism.

Attached as **Exhibit "A"** is a Wall Street Journal article discussing when the foregoing provision

of the law was actually funded.  Out of $3 Billion in funding CFC landed $2.5 Billion.  How

does $2.5 Billion of a $3 Billion program end up in the one borrower: CFC?  7 U.S.C.A. § 940c-

1(d)(2) restricted the Secretary's review of applications to 5 a year.  That provision makes no

sense if Congress anticipated that funding was designate for the benefit of one borrower.

Nevertheless, before the Plaintiffs can contest the legality issue they must first over come

the issue of standing.

III.    **RICO.**

The USDA brief correctly cites that Innovative Communication Corporation ("ICC") and Jeffrey J. Prosser ("Prosser"), a Plaintiff herein, are subject to bankruptcy proceedings. The USDA argued that any claim belongs to ICC and the Prosser estate; thus, no standing exists.

First, not all claims escheat to the respective estates. Mr. Prosser and Raynor were both employed by ICC from the acquisition of the Virgin Islands Telephone Corporation ("Vitelco") on June 24, 1987 until October of 2007. The Plaintiff's and others have a RICO cause of action that is personal and has not escheated to the estate based upon their termination of employment. Prosser was terminated in October of 2007, long after the related bankruptcy was converted to a Chapter 7 proceeding. The following is relevant:

➢ The loss of a job is an injury to property. Hunt v. Weatherbee, 626 F. Supp. 1097; 35927, R.I.C.O. Bus. Disp. Guide (CCH) ¶; 6212 (D. Mass. 1986); Nichols v. Spencer Intern. Press, Inc., 371 F.2d 332, 2 A.L.R. Fed. 829 (7th Cir. 1967).

➢ Plaintiffs' injury, discharged from employment, must flowed from the RICO violations. Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 105 S. Ct. 3275, (1985).

➢ A foreclosure was commence in violation of 18 U.S.C. § 1513 (e)—to wit, multiple retaliatory acts which actions were harmful to the Prosser, and Raynor, including interference with the lawful employment or livelihood of the Plaintiffs to suppress[1] truthful information relating to the commission or possible commission of any Federal offense. This Predicate Act subsection was added by Sarbanes-Oxley Act of 2002,

---

[1] It has been held in the case of a companion statute, 18 USC §1512(b)(3), prohibiting and hindering communications does **not** require an official proceeding to be pending or imminent at the time of the offense, but, rather, a reasonable belief that a named witness will communicate information to a law enforcement officer is enough to create liability under the statute. SEE U.S. v. Davis, 183 F.3d 231, 52 Fed. R. Evid. Serv. 732 (3d Cir. 1999)

Section 1107 and titled "Retaliation against informants".

➢ The Rural Telephone Finance Corporation ("RTFC") commence the foreclosure and numerous other actions against ICC and Mr. Prosser premised upon a False 2001 Loan Agreement in violation of 18 U.S.C. § 1512(c) – another Predicate Act.

➢ Loss of employment after conversion of the bankruptcies to Chapter 7 cases is not property of the Estate pursuant to 11 U.S.C. § 547(a)(6) and 11 U.S.C. § 1115(a)(2). **Exhibit "B"** sets forth the date as October 7, 2007.

Evidence supporting the above will be discussed after the second point.

Secondly, as to the damages incurred to ICC and the other entities as a result of RICO actions, Mr. Prosser needs only to two prerequisites to pursue the action for damages: (i) the Trustee's refusal to pursue the action and (ii) the Bankruptcy Court's authorization to pursue the action.  A demand has already been made upon the Trustee (see Raynor Affidavit) and the second condition is merely perfunctory: normally approved if not funded by the estate.

Plaintiffs were subject to retaliatory actions because the Plaintiffs discover the systematic misappropriation of patronage income by CFC which belonged to the RTFC and therefore, belonged to RTFC members including ICC.   The misappropriation scheme requires an understanding of the relationship by and between CFC and RTFC coupled with a simple analysis of audited financial statements: CFC's SEC filings compared to RTFC Audited Financial Statements.

The object of CFC's/RTFC's retaliatory actions (CFC exercises dominion and control over RTFC) was to remove the Plaintiffs and other from management of the ICC.   The evidence supporting the Plaintiffs' cause of action for civil violations of RICO because of the discharge of the Respondent includes, but is not limited to:

1.      An CFC internal document acknowledging that the purpose of the foreclosure was to change management.  The document set forth discussions of employee of CFC (currently the Controller) with Ernst regarding the ICC foreclosure and loan loss reserve including the following:

> "I think that I satisfied them [Ernst] with the following
> - ICC is a **viable business** that can be operated in a manner **to pay the debt service**
> - **existing management continually is pushing the edge and we have finally decide we have had enough and want to replace management**.
> - while we [CFC] believe that **the company has the ability to pay debt service**, the green light litigation and the company's issuance of preferred stock - one of issues in our litigation - has increased the uncertainty related to the credit.
> - that while we [CFC] initially moved the reserve up to $99 million, we subsequently reduced it **to $92 million based on the analysis** and adding the pat cap to that analysis as an offset."  (Emphasis Added)  SEE: **Exhibit "C"**

CFC made the business decision[2] to incur a $92 Million loan loss on a viable business loan for the purpose of changing management.  Reasonable inferences from the above memo coupled with the fact, that all allege loan violations were contrived and unsupportable, lends credence to Plaintiffs' proposition – CFC sought to remove management because of the discovery of the misappropriation of patronage capital.  The repayment of the misappropriate sums would bankrupt CFC: Plaintiffs calculations support a figure of $262 Million for the period 2000 through 2004. These sums are material.  This is a fraud not only upon RTFC and its members but also the investing public and the Government.

2.      CFC altered the Authentic 2001 Loan Agreement and destroy the authenticate 2001 Loan Agreement.  This statement is supported by the deposition of Frank Vaughan, associate General Counsel of CFC serving as RTFC's internal counsel in which after a lot of dancing this question and answer was given under oath:

---

[2] Upon information and belief, CFC is aware that the loss is approaching $250 Million (based upon current bids) and after the resolution of pending matters made exceed $400 Million on an otherwise viable operation.

00224

13    Q.    Can you sit here today and tell me that

14    each and every word on the physical loan document

15    that Mr. Prosser signed is identical to the words in

16    the loan documents, the four versions of the loan

17    documents that Mr. Siegfried asked you about?  That's

18    a yes or no question, sir.

19    **A.    No.**

Mr. Vaughan testified that he took the signature page to the original loan agreement and attached

it to a revised version of the 2001 Loan Agreement.  Mr. Vaughan claims ICC counsel approval

but only produce evidence that further incriminated him.  There were 7 different copies of the

document. Eight of the original twenty-six pages of the 2001 Loan Document were changed.

Based upon the foregoing augmented by other evidence the Federal District Court in the

Virgin Islands denied RTFC's Motion for Summary Judgment stating: "The Court finds that

there are genuine issues of material facts in this matter and that RTFC has failed to meet its

burden."  That statement was linked to footnote in which the Court cited to the fact that RTFC

could not authenticate its loan document. SEE: **Exhibit "D"**

3.    RTFC's foreclosure action even using the altered document was commenced

without a legitimate default.  There were only 10 of the original 31 default claims left at the time

of the ICC bankruptcy filing.  All of such defaults were premised upon Vitelco's sale of

preferred stock.  The provisions of the 2001 False Loan Agreement upon which the defaults are

predicated upon void *ab initio* because PSC approval was required before an ICC loan could

restrict Vitelco's access to the market pursuant to Section 7(a)(8) of the Public Services

Commission ("PSC") Settlement Agreement with New ICC and RTFC.  ICC loans could not be used by RTFC to restrict Vitelco's access to the markets without pre-approval of the PSC.  SEE: **Exhibit "E"**

RTFC, anticipating the above, entered into an agreement with Greenlight agreeing to pay Greenlight $27.5 Million to do what RTFC could not do, place ICC and Mr. Prosser into bankruptcy.  SEE: **Exhibit "F".**  The $27.5 Million RTFC obligation is not dependent upon the recovery and RTFC's obligation to make the payment is not disclosed in any of CFC's SEC filings.

Respondent seeks not prove the viability of the RICO action against CFC but to make a good faith showing that grounds exists for a RICO.  Respondent can and will submit more information of the RICO cause of action should the Court desire.

**IV.    Cronyism or Victim?**

The gravamen of the Respondent's position is that the USDA and Farmer Mac are engaged in a bailout of CFC which is unlawful: patently unlawful in the case of Farmer Mac and less obvious but still unlawful in the case of the USDA.  The USDA and Farmer Mac acted with a disregard for their obligations for care and welfare of the Government fisc in providing CFC, an insolvent entity on a Fair Value basis.  USDA and Farmer Mac are not conspirators under RICO but clearly, by lending financial support at unprecedented levels to an unregulated entity, USDA and Farmer Mac aided and abetted CFC's retaliatory and extortionistic actions against the Plaintiffs – even if unwontedly so.

Here is the support for this position.

- Among the many requirement for the REDLG program is a requirement pursuant to 7 C.F.R. § 1720.7(b)(3) that "The applicant's demonstrated performance of **financially sound business practices"**. (Emphasis added)

There are many reasons that an examination of CFC's SEC filings would give a prudent investor pause if they engaged in their own study of CFC's financial statements. They include the following information. This information is derived by a very simple analysis of CFC's financial information.

*Gross Margin Trend.*

**Exhibit "G"** is the Gross Margin trend of CFC derived from the financial statements contained in SEC filings. The Exhibit has two trends: one as reported in the 2006 10K and other as reported in the 2007 10K. The loans from the USDA and Farmer Mac commenced in calendar year 2005 but in fiscal year 2006. The last investment made by the USDA was in fiscal year 2008 (calendar year 2007) and the last investment made by Farmer Mac was March of 2008.

CFC was experiencing substantial and serious decline in CFC's Gross Margin: a decline from $301 Million in 2002 to $82 Million in 2004. Fiscal year 2005 appears to experience a bump up from $82 Million to $104 Million. That bump in CFC's Gross Margin is illusory. The Financial Statement footnote state: "The increase in fees recognized during fiscal year 2005 compared to 2004 was due to make-whole fees and exit fees totaling $36 Million related to the prepayment of RTFC loans during fiscal year 2005". The Telecommunication Systems loans had decreased by nearly $1.7 Billion from 2004 to 2005 and the $36 Million of CFC's income represented one-time, make-whole fees. Remove the make-whole fees and CFC's decline in Gross Margin was continuing with a decrease from $82 Million in 2004 to less than $68 Million

in 2005.  Further, notwithstanding a one-year bump in earnings, a decline in Telecommunication

Systems loans did not bold well for CFC's financial future if one understood where CFC derived

its income.

*Where CFC Derives Its Income.*

A simple review of CFC's Financial Statements would reveal CFC's dependency upon

Telecommunication Systems loans.  **Exhibit "H"** sets forth information disclosed in Footnote 2

to the CFC Financial Statements.  Footnote 2 is CFC's disclosure regarding the members' loans.

By comparing Electric Systems loans to Telecommunication Systems loans in various categories

it is clear (i) Telecommunication Systems loans generated more gross income and (ii) the spreads

between Electric Systems loans and Telecommunication Systems loans were increasing:

increasing dependence upon Telecommunication Systems loans.

For example, in 2001 the long-term loans for Electric members paid a weighted average

rate of interest of 6.85% while the long-term loans for Telecommunications members paid a

weighted average rate of interest of 8.17%.  The differential in rates, the incremental amount

Telecommunications members paid was 1.32% or 132 basis points.  By 2004, the incremental

amount paid by Telecommunication members was 2.06% or 206 basis points.  Long-term loans

to Telecommunication members were 15 years in contrast to Electric members where long-term

loans were 35 years.  Clearly, the Telecommunication Systems loans were making a more

substantial contribution to CFC's Gross Margin on a basis of each dollar invested.

CFC ceased reporting separately Electric Systems loans and Telecommunication Systems

loans in the 2005 10K.  This corresponds to period when Telecommunication Systems loans

decreased by $1.7 Billion from 2004 to 2005 and $2 Billion from 2003 to 2005.

**Exhibit "I"** compares information from Footnote 2 to the CFC Financial Statements to information derived from Footnote 4or 5 (the footnote on Long-term Debt) to the CFC Financial Statements. This simply compares the rates CFC is paying on long-term debt to the rate CFC is earning on long-term loans: CFC's interest spread (the "Spread"). The first differential shows a declining trend in the Spread comparing the cost of long-term debt to the earnings from long-term loans to Electric Members. This was a decreasing trend until, once again, a reporting change occurred.

The second differential in Exhibit "I" subtracts the cost of long-term debt from the earnings from 'all' long-term loans (Telecommunications and Electric combined). Again, this Spread has a decreasing trend that goes **negative** in 2005 (May 31st which 10K is filed 8/2005) – the report immediately preceding the first REDLG Loan in November of 2005. When the differential is negative, CFC is paying more to borrow on a long-term basis than CFC is earning on long-term loans.

The final differential set forth at the bottom of **Exhibit "I"** demonstrates that the long-term cost of funds exceeded the earnings from long-term loans in 2006 if the Government loans were remove: 5.90% cost of funds in contrast 5.76% earnings from long-term loans. Again, this comparison can not be made for 2007 because of a reporting change: Footnote 2 no longer discloses the average rate of interest on the year-end loan portfolio.

The conclusions drawn from the above superficial examinations are supported by further analysis. An examination of the Segment Information would have disclosed two items: (i) as reported in the 2004 10K (FN 15, p. 134) the Electric Systems loans produced $19.8 Million Gross Margin on a $15.5 Billion investment; (ii) General and Administrative Expenses in 2004 standing alone exceeded Electric Systems Gross Margin by over $15 Million; and (iii) a

reporting change occurred in the Segment Information reported in 2005. With respect to 2004 performance of the Electric Systems loans, there was a $100 Million positive adjustment in loan losses appears to offset the loss from lending. This is misleading. For as reported in the 2005 10K, CFC "has agreed to indemnify RTFC and NCSC for loan losses, …. Therefore, there is no loan loss allowance required at RTFC and only a small loan loss allowance is required at NCSC to cover the exposure to consumer loans". (2005 10K, p. 37.) This has been the arrangement since CFC's illegal voting control was eliminated. A proper charge the Electric Systems results with a deduction of over $50 Million for loan losses rather than positive adjustment of $100 Million. CFC loss from loans to Electric systems was over $115 Million. Simply, CFC was not making money from its Electric Systems loans. Further, reliance on the Electric Systems loans was increasing because of the decrease in the Telecommunication Systems loans.

In the foregoing paragraph it was noted that a reporting change was made in CFC's reporting of Segment Information. The change in Segment Information reporting violates FAS 131 and FAS 57: the first FAS controls segment reporting and latter FAS deals with disclosures on related party transactions. Ernst endeavored to explain the differences between its reporting of Segment Information and Arthur Andersen reporting of Segment Information by stating: "**The amount reported for the electric systems represented the total earned on loans from CFC to its electric members and RTFC**. The amount reported for the telecommunications systems represented the **incremental amount** earned on its CFC loans that it re-lent to the telecommunications systems…. The telecommunications system income statement now represents the total earned on telecommunications loans at both the CFC and RTFC levels. **The electric system income statement is now only the amount earned on loans to electric member systems**." (2002 10K, FN 13, p. 97) (Emphasis added) Simplified, CFC reported as

Electric Systems income the income captured within CFC from Telecommunication System loans. RTFC is a member and patron of CFC and is entitled to patronage dividends for such income.

Deloitte in 2005 reintroduced AA's methodology and thereby used (buried) profit made from Telecommunication Systems loans to offset Electric Systems loans cost of capital without disclosing such to the investing public at large. Paragraph 27 of FAS 131 requires that "Revenues [reported by CFC] from transactions with other operating segments [RTFC] of the same enterprise" must be disclosed. CFC does not disclose the profit (which is required to be return as patronage allocation) made from Telecommunications Systems loans that is used to offset Electric Systems cost of funds. This resulted in a decrease of the Electric Systems cost of funds by $51 Million in 2003 and $54 Million in 2004 – a material sum. As a departure from GAAP, 17 C.F.R. § 210.4-01(a)(1) establishes a presumption that the Financial Statements are "misleading or inaccurate". This material misleading information affects the investing public as well as RTFC.

*Fair Value Insolvency.*

Exhibit "J" sets forth the calculations if CFC's reflected its Balance Sheet on a Fair Value basis. This is done by merely taking the disclosures in the Fair Value disclosure and substituting the Fair Value for value reflected in the Balance Sheet. Each year on a Fair value basis CFC had negative net worth: $700 Million in 2005 (before USDA & Farmer Mac investment); $1,965 Million in 2006; and $1,276 Million in 2007. The Fair Value deficiency (negative equity) is understated because the largest category is calculated by using the CFC lending rates (a below market lender) rather than value that assets would sell between a willing buyer and seller in a non-distressed situation. This is another departure from GAAP, FAS 107, which pursuant to 17

13

C.F.R. § 210.4-01(a)(1) establishes a presumption that the Financial Statements are "misleading or inaccurate".  This material misleading information affects the investing public as well as RTFC.

*Cronyism.*

The USDA points to Moody's investment grade rating.  However, Moody's gave fantastic ratings until the last minute to Enron, WorldCom, Global Crossing, the current subprime debacle, etc.  Egan Jones Ratings Co., just recently granted NRSRO status, assigns CFC a junk bond rating.  It really doesn't take much analysis to understand CFC's precarious financial position especially since CFC is insolvent on a Fair Value basis throughout the whole of the period of USDA and Farmer Mac funding.  In the case of the USDA, the RUS administrator approving the REDLG USDA guarantees stated proudly:  "I served 16 years on the NRECA board. Six of those years I served as an officer, including two as the president. As president of NRECA, I served on the board of the National Rural Electric Cooperative Finance Corporation (CFC), a supplemental finance cooperative owned by the members [of NRECA]." SEE: Mr. James M. Andrew Speech before the Senate Agriculture Committee in 2005.

If anyone of the parties making the investment were making an investment in CFC of either (i) 6 times their own net worth or (ii) 5/6 of their available funds for investment, I don't believe CFC would remotely be the beneficiary of said investment.  The result should not be different because the Government fisc is involved.

## SUMMATION

The Plaintiffs believe that if the Government bailout ended and CFC had to repay the indebtedness to the Farmer Mac and USDA CFC would fail.  Thereafter, Government investigations would result and ultimately, the whistleblowers would be vindicated.

Alternatively, without Government support CFC would be force to reach a compromise Plaintiffs before all is loss.

The Plaintiffs roots are in rural America: Raynor from Omaha, an economy dependent upon farm economy, and Prosser from Falls City, Nebraska, a town of 5,000. Just as I do not believe Islamic terrorists should get a pass by other Muslims (because they are Muslim); I do not believe CFC should get a pass on fraud merely because annunciates or proclaims the rural cause. CFC operations do not reflect rural values.

The last 10Q filed by CFC stated that the sum of the ICC loan at $498 Million. (Qtr. ending 2/29/2008, FN 13(e), page 25) CFC started the foreclosure to change management with a $92 Million Loan Loss Provision which otherwise would have been not necessary because ICC by CFC's own admission was viable. In August of 2007, RTFC (CFC) rejected a fully financed transaction which would have yielded RTFC and Greenlight $402 Million. Recently, RTFC (CFC) rebuffed an offer from Mr. Prosser that would have yielded RTFC and Greenlight $250 Million. Upon information and belief, Mr. Prosser's offer exceeded the sum total existing offers by $100 Million. For reasons beyond the scope of this memorandum of law, soon the net enterprise value of ICC to RTFC will be reduced to far less than $150 Million.

How can an entity with more than $13 Billion in public indebtedness justify acting with such disdain for the economic consequences? How can an entity with more than $3.8 Billion in indebtedness to the USDA and Farmer Mac act with such disdain for the economic consequences? It can only be explained because of CFC's past access to the Federal fisc and CFC's anticipated future access to the Federal fisc. The USDA and Farmer Mac are aiders and abettors. When a powerful organization like the National Rural Electric Cooperative Association headed since March of 1994 by the former 20-year member of the House of Representatives (on

the House Committee of Agriculture) can so penetrate and manipulate the mechanism for funding farm programs that the built-in safe guards are meaningless, Plaintiffs, which are being harmed by such malfeasance, must be able to through the Courts enforce the law.

For all the foregoing reasons, the Defendant's Motion for Dismissal should be denied.

Respectfully submitted this 9th of June, 2008.

>Jeffrey J. Prosser, pro se, &
>John P. Raynor, pro se,
>  The Plaintiffs


>By ____/s/JOHN P. RAYNOR_____




## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 7th day of July, 2008, I electronically filed the Memorandum of Law in support of Plaintiff's Opposition to U.S. Department of Agriculture's Motion to Dismiss with the Clerk of the Court by using the CM/ECF system which sent notification of such filing upon all parties who filed an appearance or motion by electronic filing in this case as follows:


>_____/s/John P. Raynor____


16

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Jeffrey J. Prosser, pro se, and John P. Raynor, pro se,                                          )
                                                        )
                                                         )   Civil No.: 1:08-cv-00687
                          Plaintiffs,          )
                                                       )
       v.                                           )   **INDEX OF EVIDENCE**
                                                         )   **IN SUPPORT OF**
Federal Agricultural Mortgage Corporation and       )   **PLAINTIFF'S OPPOSITION**
the United States Department of Agriculture;         )   **TO USDA'S MOTION TO**
                                           )   **DISMISS**
                          Defendants       )
                                                       )

Plaintiffs offer the following evidence in support of their Opposition to the USDA's

Motion to Dismiss:

1.      Exhibit "A" – December 27, 2004 Wall Street Journal Article in re REDLG Loan

          Funding.

2.      Exhibit "B" – October 7, 2007 Employment Termination Letter.

3.      Exhibit "C" – RTFC August 18, 2004 Memo in re ICC Loan: Termination of

          Management.

4.      Exhibit "D" –  Federal District Court Order Denying RTFC's Summary Judgment

          Motion.

5.      Exhibit "E" – Tri-Party Agreement: RTFC & ICC 1989 settlement with the V.I.

          Public Services Commission.

6.      Exhibit "F" –   The Inter-Creditor Agreement: RTFC's agreement to pay

          Greenlight to place ICC into bankruptcy.

7.      Exhibit "G" – CFC's Gross Margin Trend

8.      Exhibit "H" – CFC's Loan Pricing: Dependency upon Telecommunication

        Systems loans.

9.      Exhibit "I" –  CFC's Loan Pricing: Cost of Long-Term Debt (funding) v. Earning

        on Long-Term Members' loans.

10.     Exhibit "J" – CFC's Fair Value Deficiency (Insolvency)

11.     Exhibit "K" – Plaintiff Raynor's Affidavit.

Dated:  July 7, 2008.



                                    Jeffrey J. Prosser, pro se, &
                                    John P. Raynor, pro se,
                                        The Plaintiffs


                                    By ____/s/JOHN P. RAYNOR_____



                        **CERTIFICATE OF SERVICE**

        The undersigned hereby certifies that on this 7th day of July, 2008, I electronically filed the Index of Evidence and the Exhibits in support of Plaintiff's Opposition to U.S. Department of Agriculture's Motion to Dismiss, the foregoing memorandum of law, and the appendix with the Clerk of the Court by using the CM/ECF system which sent notification of such filing upon all parties who filed an appearance or motion by electronic filing in this case as follows:


                            _____/s/John P. Raynor_____

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Jeffrey J. Prosser, pro se, and John P. Raynor, pro se, | ) | |
| | ) | |
| | ) | Civil No.: 1:08-cv-00687 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Federal Agricultural Mortgage Corporation and the United States Department of Agriculture; | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

---

**EXHIBIT "A"**

**OPPOSITION TO U.S. DEPARTMENT OF AGRICULTURE'S MOTION TO DISMISS**

Wall Street Journal December 27, 2004 Article

# Co-op Pleased With Loan Program

**Rural Electric Association**
**Is a Big Winner in Pact**
**From Bush Administration**
**By JOHN J. FIALKA**
Staff Reporter of THE WALL STREET JOURNAL
December 27, 2004

*(See Corrections & Amplifications item below.)*

WASHINGTON -- Glenn English is a former congressman who heads the National Rural Electric Cooperative Association. The Oklahoma Republican wasn't running for office this year, but he was still a big winner in the election.

Nobody was more pleased when, amid intense competition with John Kerry for Farm Belt votes, the Bush administration announced $3 billion in government-backed loans for rural development three days before the election.

The move got scant attention from the national media, but was widely trumpeted in the agricultural trade media and in the rural communities that stood to gain. A Minnesota business leader issued a statement thanking "President Bush for this important announcement that means millions of dollars ... throughout Minnesota." Iowa's Democratic Sen. Tom Harkin fumed that the decision was made "for political points on the eve of the election."

The last-minute announcement illustrates the Bush administration's willingness to bend its free-market principles for powerful farm groups. The White House move came despite longstanding criticism of the subsidized loans by the Government Accountability Office and other government watchdogs.

The decision also shows the clout of the group Mr. English leads, an obscure but effective lobbying organization in Washington whose scope long ago extended to issues far beyond electrifying the countryside.

As a lawmaker from 1975 to 1994, Mr. English led a campaign inside Congress for more rural loans during the 1990s, and has since maintained access to pivotal players on agriculture and appropriations committees that write farm legislation. Mr. English sets up lobbying trips by leaders of the association's members: 900 cooperatives that are nonprofit, consumer-owned organizations originally formed to bring electricity to rural areas.

The cooperatives' 37 million customers vote in almost every rural House district. Since 1989, the association's political action committee has pumped out almost $8 million in donations, according to the Center for Responsive Politics, putting it on a par with **Exxon Mobil** Corp.'s PAC.

Mr. English sees the association's recent victory in getting subsidized loans for rural electric and telecommunications projects as the first step in an ambitious political agenda. He hopes to

expand the PAC's fund raising -- currently limited to co-ops -- to include individual donations from co-op members, as it refers to customers of the rural utilities.

He views the looming debate over the energy bill as an opportunity to exert more political sway, particularly in decisions about overhauling the nation's electricity grid where co-ops will likely battle another muscular stakeholder: privately owned utilities. "We want to take it to a level where we've never been before," Mr. English says.

The rural-loan subsidy was originally authorized in the 2002 farm bill, but it took two years for the Bush administration to agree to create it. "While this has been a difficult experience," Mr. English said, "it has created a new level of trust among some key people in the Bush administration."

Trust among Republican administration officials is indeed a new development for co-op lobbying projects. The Agriculture Department's Rural Electrification Administration was created by Franklin D. Roosevelt by executive order in 1935 to make low-cost loans to groups bringing power lines and power plants to rural America, then still largely in the dark. Budget cutters in the Nixon, Reagan and first Bush administrations tried repeatedly to abolish the agency.

By 1990, rural America had been wired, and President Bush's father led the charge against the co-ops, asserting in a speech that congressional proposals to expand the loan programs "represented unwarranted increases in federal subsidies and risk," and created a portfolio of loans that was increasingly hard to manage. A report issued by his Agriculture Department noted that "nearly 100% of all farms and rural areas" had reliable electricity and telephone systems. It said that government-subsidized loans should be cut back and reserved for a few hardship cases.

Consequently, the co-ops decided to organize their own private bank, the National Rural Utilities Cooperative Finance Corp., or CFC, located in Herndon, Va. The Agriculture Department agency, which Congress ultimately retained and renamed the Rural Utilities Service, helped the CFC get started by giving co-ops even sweeter government-backed loans if they would promise to wean themselves from federal assistance and get future loans at the private bank.

The loans recently announced by the Bush administration would blur the distinction between private lenders, such as the CFC, and government ones, such as the Agriculture Department's Rural Utilities Service. It would for the first time allow the co-ops' private bank to issue government-backed loans. In return for the lower interest rates, the CFC will pay a fee into a new fund that is expected to generate $270 million. Local cooperatives could use the fund to help their communities raise money for projects, such as pitching in on buying a new fire engine.

Both the CFC and the Rural Utilities Service have drawn criticism for going beyond their official missions. A GAO report issued in June said that the lenders are having problems targeting their money in the rural areas they are supposed to serve. Because it has a "once a borrower, always a borrower" standard, the Agriculture Department's bank currently provides 29% of its loans to co-ops in counties now classified as being in metropolitan areas. Three co-ops provide electricity to

suburban Atlanta and another offers satellite-television service to viewers in Washington, D.C., according to the GAO and the Agriculture Department's inspector general.

Examiners also have suggested that both banks have wandered into overly risky areas. According to the GAO, the government bank had to write off more than $3.2 billion in losses to three borrowers from 1999 through 2003. Meanwhile the co-ops' private bank also got into trouble, lending more than $1 billion to a member in suburban Fort Worth, Texas. The Denton County Electric Cooperative formed a company called CoServ, which sprouted more than 30 subsidiaries selling telecommunications, real-estate developments, natural gas, home-security systems and cable television. Most of these businesses went bankrupt in 2002, leaving the co-ops' bank holding a suburban hotel and a golf course, among other properties.

Sheldon C. Peterson, chief executive of the CFC, said that his $20 billion company is in sound financial condition, and that the CoServ loan was "an experiment" -- a failed attempt to develop business opportunities for co-ops. He said he can't talk about two other pending bad loans because they're in negotiation.

Hilda Gay Legge, the administrator of the government lending program, said that while some of the loans go to areas that are partly urban, the agency's "focus continues to be on the rural." Only 3.6% of the borrowers in the agency's $50 billion loan portfolio missed payments last year, she said, adding that "they may be behind, but they're not bad loans."

**Write to** John J. Fialka at john.fialka@wsj.com

**Corrections & Amplifications:**

Glenn English, director of the National Rural Electric Cooperative Association, is a former Democratic congressman from Oklahoma. This article incorrectly identified him as a Republican

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Jeffrey J. Prosser, pro se, and John P. Raynor, pro se, | ) |
| | ) |
| | )    Civil No.: 1:08-cv-00687 |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Federal Agricultural Mortgage Corporation and the United States Department of Agriculture; | ) |
| | ) |
| | ) |
| Defendants | ) |
| | ) |

---

**EXHIBIT "B"**

**OPPOSITION TO U.S. DEPARTMENT OF AGRICULTURE'S
MOTION TO DISMISS**

Mr. Prosser's Termination Letter

# Vinson&Elkins

Daniel C. Stewart  dstewart@velaw.com
Tel 214.220.7761  Fax 214.999.7761

October 8, 2007

***VIA EMAIL, FACSIMILE, AND CERTIFIED MAIL***

Jeffrey J. Prosser
4A & 10AA Estate Shoys
St. Croix, Virgin Islands  00820
Facsimile: (301) 230-2891
E-mail: jjprosser@aol.com

Jeffrey J. Prosser
c/o Shulman, Rogers, Gandal, Pordy, Ecker, P.A.
Attn: Michael J. Lichtenstein
11921 Rockville Pike
Rockville, Maryland 20852
Facsimile: (301) 230-2891
E-mail: mjl@srgpe.com

Jeffrey Prosser
c/o Robert F. Craig, P.C.
Attn: Robert F. Craig
1321 Jones Street
Omaha, Nebraska 68102
Facsimile: (340) 773-4491
E-mail: robert@craiglaw.org

Re:    Termination of Employment By and Removal From the Board of Directors of Innovative Communication Corporation and All of its Direct and Indirect Subsidiaries by Which You Are Employed or Upon Whose Board of Directors You Currently Serve (individually, a "Company" and collectively, the "Companies")

Dear Mr. Prosser:

As you are aware, Vinson & Elkins L.L.P. represents Stan Springel in his capacity as chapter 11 trustee (the "Trustee") of Innovative Communication Corporation.  In such capacity, the Trustee has determined that the Companies are no longer in need of your services.  Therefore, my client has directed me to notify you that, effective immediately, your employment by the Companies in any capacity is hereby terminated and you are removed

**Vinson & Elkins LLP  Attorneys at Law**
Austin  Beijing  Dallas  Dubai  Hong Kong  Houston
London  Moscow  New York  Shanghai  Tokyo  Washington

Trammell Crow Center, 2001 Ross Avenue, Suite 3700
Dallas, TX 75201-2975
Tel 214.220.7700  Fax 214.220.7716  www.velaw.com

Dallas 1317249v.1



October 8, 2007   Page 2

from the Board of Directors of each Company to the extent you serve in such capacity. A complete list of the Companies, as provided by you to the bankruptcy court under oath, and a copy of the Trustee's appointment order are enclosed for your convenience.

Please call me should you have any questions or comments regarding the content of this letter.

Sincerely,

Daniel C. Stewart

Enclosure

cc:     Stan Springel, Trustee
        Toby Gerber
        Greg Galardi
        William Greendyke
        Guy Gebhardt
        Craig Rasile

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


| | | |
|---|---|---|
| Jeffrey J. Prosser, pro se, and John P. Raynor, pro se, | ) | |
| | ) | |
| | ) | Civil No.: 1:08-cv-00687 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Federal Agricultural Mortgage Corporation and the United States Department of Agriculture; | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |


**EXHIBIT "C"**


**OPPOSITION TO U.S. DEPARTMENT OF AGRICULTURE'S**
**MOTION TO DISMISS**


Mr. Grier's Memo in re change of ICC's Management

 **Bob Geier**
08/18/2004 11:31 AM

To: Steve Slepian/CFC@CFC, Steven Lilly/CFC@CFC
cc:
Subject: Timing for 10K filing

EY is pushing for us to file on Friday. If we go past Friday, we will need new rep letters and they will need to update procedures through the new date. Think that we run into issues with staff not being at the office as we move into next week due to vacations that were put off until after our planned 10K filing.

They informed me that the staff will have been through the MDA by end of day on Thursday, but all items will not have been reviewed by manager or partner yet.
They have also asked us to provide them with an edgar version of the report on Thursday morning, so that they can perform their final review. Don said this review will take at least a day - based on past performance, probably a little longer, but hopefully two days will be enough.

We can provide them with the edgar version. We are just working on formatting at this point and will send all changes in later tonight.

My only concern is that we would like to have the MDA tie out completed for a couple of reasons, (1) to have double check on our work, (2) any changes found after we file the 10K will have to be discussed and explained in the comfort letter and (3) to get full value for the amount we are paying for the work

So far they have only found one minor change, but I do not know how much of the MDA has been reviewed. In one of the charts we have a reference related to LT Debt and included the full amount of the foreign currency valuation account. It should only include a portion of the valuation, as some of the valuation is related to MTNs maturing within one year and reclassified to short-term debt. In all other places where we have the total for MTNs outstanding, the footnote is correct with the total foreign currency valuation account.

Don also mentioned that it is very common in their comfort work to have minor changes referenced and that it is not that big a deal (My guess is that is because they can't get their act together at other clients either in order to get all the work done on time). In the past this was never an issue for us because AA was always completed with the 10K tie down before we filed and in the past two years, there has not been anything that they found when they did the tie down and circle up work as part of prep for a comfort letter

At this point, I would be happy to get it filed and get them out of the building. As we have seen in the past, they will not accept the signature of an employee who has been designated as acting CEO, CFO or controller. So we will run into issue trying to provide them a new rep letter on Monday or Tuesday

Please let me know if you are in agreement that it is best to get the document filed on Friday regardless of whether they have completed the full tie down.

Today they are doing some more work on ICC. I sat down with Don and Katie and explained why we felt that the two credits were different and to support ICC as high risk and VarTec as impaired. And that the analysis performed on ICC, while similar to the valuation we did for VarTec, was done as additional support for the level of the reserve. We do expect ICC to continue to pay us during the litigation.
I think that I satisfied them with the following
- ICC is a viable business that can be operated in a manner to pay the debt service
- existing management continually is pushing the edge and we have finally decide we have had enough and want to replace management
- while we believe that the company has the ability to pay debt service, the green light litigation and the company's issuance of preferred stock - one of issues in our litigation - has increased the uncertainty related to the credit.
- that while we initially moved the reserve up to $99 million, we subsequently reduced it to $92 million based on the analysis and adding the pat cap to that analysis as an offset

RTFC 108598

Cian has asked us to provide him with what ICC would have been at the minimum- we gave them the calculation - $87 million.
So i think that they should be ok with the slight increase due to the increase in uncertainty related to green light and RTFC litigation.


Bob Geier
NRUCFC
Assistant Controller
Phone: 703-709-6716
Fax: 703-707-5026 or 703-709-6779
email: bob.geier@nrucfc.coop

RTFC 106599

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Jeffrey J. Prosser, pro se, and John P. Raynor, pro se,     )
)
)          Civil No.: 1:08-cv-00687
               Plaintiffs,     )
)
   v.     )
)
Federal Agricultural Mortgage Corporation and the United States Department of Agriculture;     )
)
)
          Defendants     )
)

---

# EXHIBIT "D"

# OPPOSITION TO U.S. DEPARTMENT OF AGRICULTURE'S MOTION TO DISMISS

V.I. Federal District Court Order denying RTFC's Motion for Summary Judgment

NOT FOR PUBLICATION

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| RURAL TELEPHONE FINANCE COOPERATIVE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) Civil No. 2004-154 |
| | ) |
| INNOVATIVE COMMUNICATION CORPORATION, | ) |
| | ) |
| Defendant. | ) |

### ORDER

Before the Court is plaintiff Rural Telephone Finance Cooperative's ("RTFC") Motion for Partial Summary Judgment.

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir. 1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

RTFC v. ICC
Civil No. 2004-154
Order
Page 2

The movant has the initial burden of showing there are no
"genuine issues of material fact," but once this burden is met it
shifts to the non-moving party to establish specific facts
showing there is a genuine issue for trial. *Gans v. Mundy*, 762
F.2d 338, 342 (3rd Cir. 1985). "[T]here is no issue for trial
unless there is sufficient evidence favoring the non-moving party
for a jury to return a verdict for that party." *Anderson*, 477
U.S. at 249. In making this determination, this Court draws all
reasonable inferences in favor of the non-moving party. *See Bd.
of Educ. v. Earls*, 536 U.S. 822, 850 (2002).[1]

The Court finds that there are genuine issues of material
facts in this matter and that RTFC has failed to meet its
burden.[2]  Accordingly, the premises considered, it is hereby

_____

[1] In addition to the requirements set forth in Federal Rule
of Civil Procedure 56 and the relevant case law, movants must
also comply with Local Rule 56.1:

> Each dispositive motion shall be accompanied by a notice of
> motion, brief, affidavits and/or other supporting
> documentation, including a statement of the material facts
> about which the movant contends there is no genuine issue,
> with specific references to parts of the record relied on to
> support the motion and each paragraph of the statement of
> material facts.

[2] For example, each of RTFC's claims is dependant on the
existence of a specific loan document, which outlines the
obligations of ICC as a borrower and what constitutes a default.
While the loan transaction is not in dispute, the parties dispute
the very document that RTFC claims reduced the loan transaction
and ICC's obligation to a writing.

RTFC v. ICC
Civil No. 2004-154
Order
Page 3

**ORDERED** that RTFC's motion for partial summary judgment is

**DENIED.**

Dated: December 29, 2005

                                CURTIS V. GÓMEZ
                                District Judge

ATTEST:

WILFREDO F. MORALES
Clerk of the Court

By: *Carol C. Jackson*
Chief  Deputy Clerk

Copy:  ✓ Hon. Geoffrey W. Barnard
       ✓ Daryl Dodson, Esq. — Via Fax: 777-5498
       ✓ Joel Holt, Esq. , Via Fax:773-8677
       ✓ Lydia Trotman
       ✓ Carol C. Jackson
       ✓ Olga Schneider
       ✓ Kendra Nielsam

12/29/2005
el/jackson

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Jeffrey J. Prosser, pro se, and John P. Raynor, pro se, | ) | |
| | ) | |
| | ) | Civil No.: 1:08-cv-00687 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Federal Agricultural Mortgage Corporation and the United States Department of Agriculture; | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

# EXHIBIT "E"

# OPPOSITION TO U.S. DEPARTMENT OF AGRICULTURE'S MOTION TO DISMISS

V.I. Public Services Commission 1989 Settlement
with ICC's predecessor and RTFC

<u>SETTLEMENT AGREEMENT</u>

The undersigned parties, VITELCO, ATN, RTFC, VITELCOM and the Virgin Islands Public Services Commission, desiring to resolve and settle various pending civil actions, administrative proceedings and appeals, stipulate and agree as follows:

1.    <u>RATES</u>

    a.    VITELCO agrees to reduce rates for regulated local service, retroactive to January 1, 1988, and consequently to return to ratepayers as prescribed below, $800,000.00 associated with the calendar year 1988. This $800,000.00 will be booked by VITELCO in 1988 into the appropriate liability account and will be amortized to income over a three year period. A negative surcharge associated with the three year amortization of $800,000.00 will be implemented as of January 1, 1989. This negative surcharge will have an annual value of $267,000.00 and will be priced out based upon average 1988 access lines, but a one time credit will be given for the period of January 1, 1989, to the date rates are implemented through this agreement.

    b.    VITELCO will implement a permanent base reduction of $1.1 million dollars effective January 1, 1989. A one time credit will be given for



EXHIBIT

H

RTFC 109281

VITELCO's convenience, to begin discussions relating to the appropriate unbundling of the inside wire tariff.

7. ITEMS RELATED TO DOCKET 301

a. The Commission agrees to approve the sale of VITELCO stock from ITT to ATN upon appropriate satisfaction of the following conditions which the parties agree to undertake as part of this agreement within thirty (30) days:

1. VITELCO's guarantee of $44.4 million of debt from RTFC by ATN shall be removed.

2. The mortgages and UCC liens on VITELCO's property shall be used as collateral only for VITELCO's direct debt and shall not guarantee $44.4 million of debt taken on by ATN. The underlying documents shall be amended accordingly. It is agreed that nothing contained herein shall preclude ATN, VITELCOM, or any other ATN subsidiaries or affiliates other than VITELCO, from granting mortgages or UCC liens to RTFC to further secure the ATN loan so long as the assets to be mortgaged are the bona fide separate property of ATN, VITELCOM, or such other ATN subsidiaries or affiliates, and do not represent assets of VITELCO transferred to VITELCOM, ATN or such

RTFC 109293

other ATN subsidiaries or affiliates, without
the Commission's specific approval.

3. The loan agreements and financing documents
between RTFC, VITELCO and ATN shall be amended
to reflect that earnings and performance tests
such as the Times Interest Earned Ratio (TIER)
and Debt Service Coverage Test (DSC) with
regard to loans made to VITELCO will be based
upon VITELCO's earnings and VITELCO's debt
alone and will not incorporate the debt
service related to the $44.4 million borrowed
by ATN. The Commission recognizes VITELCO's
RTFC debt and related mortgage and loan
agreement obligations as valid and binding
obligations of VITELCO and will recognize the
debt in future rate making proceedings as a
valid element of capital.

4. ATN, VITELCO and RTFC represent that presently
all VITELCO's issued and outstanding stock is
pledged to RTFC as collateral for ATN's loan.
RTFC agrees that should default in that loan
occur resulting in seizure of or foreclosure
upon that VITELCO stock, any proposed sale of
such stock shall first be submitted to the
Commission for approval before consummation
which approval shall not be unreasonably

RTFC 109294

withheld if the proposed sale will not adversely affect VITELCO's operations or rates. Provided this condition is met, it is understood and agreed that in the event of an ATN loan default RTFC may foreclose its lien or pledge upon VITELCO stock. ATN and VITELCO agree that if in the future any VITELCO stock is to be used as collateral or security for any debt or obligation, the same undertaking hereinabove given by RTFC will be required from the prospective creditor prior to creating or imposing any lien or pledge of VITELCO stock.

5. VITELCO's investment in the Subordinated Capital Certificates (SCC) shall be reduced from $10.4 million to $6.0 million.

6. VITELCO must demonstrate to the satisfaction of the Commission that it has attained an equity ratio of fifteen percent (15%) by December 31, 1988 and twenty five (25%) by December 31, 1989. The measurement of the equity ratio will be determined by the proportion of equity in VITELCO's capital structure after reflecting the appropriate dividends payment, if any, for VITELCO's operations for the year 1988 and 1989. In

RTFC 109295

addition, VITELCO's books must reflect the appropriate treatment for such items as the "regulatory asset" as agreed to in this stipulation as well as the reduction in the SCC.

7.  VITELCO and ATN agree that transfer of ownership of a cumulative 51% or greater share of ATN stock from the current owners will not take place without the Commission's prior approval. For purposes of this paragraph, a series of transfers of shares to the same or directly affiliated persons or entities shall be considered on a cumulative basis, and if the total interest so transferred equals or exceeds 51%, Commission approval shall be required.

8.  VITELCO and ATN agree that any additional financing (i.e. any financing not now in place and disclosed to the Commission) undertaken by ATN shall in no way require VITELCO to guarantee or collateralize such financing or any part thereof, and shall in no way impact on VITELCO's access to financial markets, without the Commission's prior approval. Any such purported guarantee or collateralization shall be void.

RTFC 109296

SETTLEMENT AGREEMENT
Page 17 of 20

9.  VITELCO and ATN agree that VITELCO shall employ for at least two (2) years, as Executive Vice President for Regulatory Affairs, an individual with at least five (5) years experience as vice president, president or chief executive of a regulated telephone utility not smaller than VITELCO. Such individual should be provided the normal latitude of an officer responsible for the day to day affairs of managing the telephone utility's regulatory rights and responsibilities.

b.  Providing that VITELCO, ATN, RTFC and VITELCOM are in compliance with the terms of this stipulation, the Commission agrees that dividends from VITELCO to ATN will be permitted in amounts required to satisfy ATN's debt service requirement to RTFC. This is not a guarantee that rates will be fixed to assure coverage; only that such payments can be made if funds are available after satisfaction of VITELCO's responsibilities as a public utility, and as prescribed herein.

8.  **SETTLEMENT OF OUTSTANDING PROCEEDINGS**

This settlement supercedes and would dispose of Dockets 301, 314, and 316, and all related civil actions, including all outstanding orders related to those

RTFC 109297

shall be returned to ATN and shall not become a part of the public record. If the matters do affect VITELCO they shall be referred to the Commission.

4. A copy of VITELCO's annual audit report, no less than promptly after it is formally received by VITELCO's management.

5. A copy of VITELCO annual report information presented to the extent available in the format that was previously compiled for the company's form M. This information should be provided together with the company's annual audit report.

6. A monthly summary of all payments made by VITELCO to any affiliated company, individual or interest. In addition, all income and receipts from affiliated interests should be listed.

Virgin Islands Telephone Corporation "VITELCO"

DATED: 4/19 , 1989    By: _____

Atlantic Tele-Network, Inc. "ATN"

DATED: 4/19 , 1989    By: _____

Rural Telephone Finance Cooperative "RTFC"

DATED: April 19 , 1989    By: _____

RTFC 109299

SETTLEMENT AGREEMENT
Page 20 of 20

DATED: __4/19__, 1989

"VITELCOM"

By: _____

Public Services Commission
"Commission"

DATED: __4/19__, 1989

By: _____

RTFC 109300

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Jeffrey J. Prosser, pro se, and John P. Raynor, pro se, | ) |
| | ) |
| | )   Civil No.: 1:08-cv-00687 |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Federal Agricultural Mortgage Corporation and the United States Department of Agriculture; | ) |
| | ) |
| | ) |
| Defendants | ) |
| | ) |

---

**EXHIBIT "F"**

**OPPOSITION TO U.S. DEPARTMENT OF AGRICULTURE'S
MOTION TO DISMISS**

RTFC & Greenlight Agreement to pursue ICC Bankruptcy: the Inter-Creditor Agreement

## INTERCREDITOR AGREEMENT

This Intercreditor Agreement ("Agreement"), dated as of October 24, 2005, is made and entered into by and among (1) **Rural Telephone Finance Cooperative**, a cooperative organized under the laws of the District of Columbia ("**RTFC**"), (2) **Greenlight Capital, L.P.**, a Delaware limited partnership, (3) **Greenlight Capital Offshore, Ltd.**, a Delaware limited partnership, and (4) **Greenlight Capital Qualified, L.P.**, a Delaware limited partnership.

### RECITALS:

A.    **WHEREAS,** pursuant to that certain Loan Agreement, made as of August 27, 2001, as amended, Innovative Corp. is indebted to RTFC in the aggregate principal amount of approximately $507,000,000[1]; which indebtedness is secured by a pledge of certain Collateral;

B.    **WHEREAS,** pursuant to the Delaware Ruling, (i) Innovative Corp is liable to the Greenlight Entities for damages in the aggregate amount of approximately $28,548,915, plus interest, and (ii) Innovative Corp., ECI, ICC, and Prosser are jointly and severally liable to the Greenlight Entities for damages in the aggregate amount of approximately $77,200,183, plus interest; and

C.    **WHEREAS,** RTFC and the Greenlight Entities believe that it is in their respective best interests to cooperate with each other in their efforts to collect on their respective claims against the Emerging Entities and certain other parties; and

D.    **WHEREAS,** RTFC desires to purchase from the Greenlight Entities, and the Greenlight Entities desire to sell, transfer and assign to RTFC, their respective claims against Innovative Corp., upon the occurrence of certain events, all upon the terms and subject to the conditions set forth herein; and

E.    **WHEREAS,** RTFC and the Greenlight Entities have reached additional agreement as to the enforcement and collection of the Parties' respective claims against the Prosser Assets and the Belize Assets; and

F.    **WHEREAS,** the Greenlight Entities represent to RTFC that they have resolved among themselves that, if each of the Emerging Entities has not voluntarily filed a Bankruptcy Proceeding upon the execution date of this Agreement, and if the statutory requisites set forth in section 303 of the Bankruptcy Code for the commencement of an involuntary Bankruptcy Proceeding are met, then the Greenlight Entities will jointly undertake the filing of involuntary Bankruptcy Proceedings under the Bankruptcy Code with respect to each of such Emerging Entities that has not voluntarily filed such a Bankruptcy Proceeding. The Greenlight Entities have further resolved among themselves, and hereby represent to RTFC, that any such involuntary Bankruptcy Proceeding(s) will be filed no later than 45 days following the entry of a

---

[1]    Further detail of RTFC Claim is attached to this Agreement as Schedule 1.

Page 1

INTERCREDITOR AGREEMENT



judgment on the Delaware Ruling

G.    **WHEREAS**, RTFC and the Greenlight Entities wish to cooperate with each other in connection with their efforts to collect on their respective claims against Innovative Corp. and certain other parties, which collection efforts may include, among other things, involvement in any bankruptcy proceedings with respect to the Emerging Entities and their respective subsidiaries, and proposing and soliciting acceptances of one or more plans of reorganization in any such cases commenced under the Bankruptcy Code or, in the case of RTFC, seeking to foreclose or exercising other rights as a secured creditor with respect to the Collateral securing the RTFC Claim. In connection therewith, RTFC and the Greenlight Entities wish to enter into this Agreement to set forth the terms and conditions applicable to such cooperation and certain related matters.

## AGREEMENT:

**Now, Therefore**, in consideration of the premises and for other good, fair and valuable consideration, the receipt, adequacy and reasonable equivalency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

1.    **Definitions.**

The following terms shall have the meanings assigned to them below:

| | |
|---|---|
| **Bankruptcy Code:** | Title 11 U.S.C. § 101, et seq. |
| **Bankruptcy Proceeding:** | A judicial proceeding commenced by the filing of a bankruptcy petition by or against Innovative Corp. and, if applicable, other Persons, seeking entry of an order for relief under the Bankruptcy Code. |
| **Belize:** | Belize Telcom Ltd., a Belizean limited liability company. |
| **Belize Assets:** | All assets of any kind or nature owned of record or beneficially by Belize or any direct or indirect subsidiary of Belize (whether or not wholly owned), including all property, plant and equipment and other assets listed as owned by Belize or such subsidiary in the books and records of Belize or such subsidiary, all cash, marketable securities and similar assets held by any such entity, all real property owned by such entity, all intellectual property and other intangible assets of such entity and all claims, causes of action, contract rights and other contingent assets of such entity; all equity interests in Belize or any direct or indirect subsidiary thereof (whether or not wholly owned); and all proceeds, income, earnings or amounts distributed in respect of any of the foregoing; provided, |

Page 2

however, that the Belize Assets shall in no event include any Innovative Assets or Prosser Assets. For the avoidance of doubt, the Belize Assets shall include any assets so described in the immediately preceding sentence which are determined by a court of competent jurisdiction to have been transferred, sold, conveyed or assigned to another Person under circumstances constituting a fraudulent conveyance or other voidable transfer under the Bankruptcy Code or other applicable transfer avoidance law.

**Business Day:**  Any day other than a Saturday, Sunday or other legal holiday for federal government employees in the continental United States.

**Collateral:**  All tangible and intangible property, both legal and equitable, that is encumbered, mortgaged and/or pledged to, or otherwise held by, RTFC to secure the repayment of the RTFC Claim.

**Creditor:**  A party holding a claim (as defined in the Bankruptcy Code) against one or more of the Emerging Entities, including RTFC and each of the three Greenlight Entities.

**Delaware Ruling:**  The opinion of the Court of Chancery of the State of Delaware in and for New Castle County, dated June 4, 2004, in the Shareholders Litigation (including the related Stipulation of Settlement entered into by the parties to the Shareholders Litigation in connection therewith and any Order of the Court of Chancery entered in connection therewith) in which the Court of Chancery determined that: (i) Innovative Corp. is liable to the Greenlight Entities for damages in the aggregate amount of $28,548,915, plus interest at the rate of 6.27%, compounded monthly, accruing from October 19, 1998 to the date of judgment; and (ii) the Emerging Entities and Prosser are jointly and severally liable to the Greenlight Entities for damages in the aggregate amount of $77,200,183, plus interest, such that, as of the date hereof, the Emerging Entities and Prosser are indebted to the Greenlight Entities in an aggregate amount in excess of $130,000,000.

**ECI:**  Emerging Communications, Inc., a Delaware corporation.

**Emerging Entities:**  Comprising the following entities:  **ECI**, **ICC** and **Innovative Corp.**

**Filing Entity:**  An entity against which an order for relief under either section 301 or section 303 of the Bankruptcy Code has been entered.

Page 3

| | |
|---|---|
| **Finality / Final Order:** | Finality is the procedural condition in which an order entered by a court may no longer be appealed to a higher court, nor be made the subject of a writ of certiorari, pursuant to applicable rules of court. Such an order is termed a "Final Order." |
| **Foreclosure Action** | An action, suit or proceeding, or series of related actions, suits or proceedings, commenced by, or on behalf of, RTFC seeking to exercise foreclosure remedies with respect to all or a substantial portion of the Collateral securing the RTFC Claim. |
| **Fractional Share:** | A sum of money calculated by multiplying a given distribution amount by a certain fraction which is specifically established and stated in this Agreement. |
| **Greenlight Capital:** | Greenlight Capital, L.P., a Delaware limited partnership. |
| **Greenlight Claim:** | Those claims of the Greenlight Entities against Innovative Corp. and its direct and indirect subsidiaries (whether or not wholly owned) described and established in the Delaware Ruling in an aggregate amount currently in excess of $130,000,000 and all rights associated therewith.  For the avoidance of doubt, the Greenlight Claim shall in no event be deemed to include any claims of the Greenlight Entities, whether arising under the Delaware Ruling or otherwise, against Prosser, ECI or ICC or any of their respective direct or indirect subsidiaries (whether or not wholly owned) other than Innovative Corp. and its direct or indirect subsidiaries (whether or not wholly owned). |
| **Greenlight Entities:** | Comprising the following three entities: **Greenlight Capital, Greenlight Offshore** and **Greenlight Qualified**. |
| **Greenlight Offshore:** | Greenlight Capital Offshore, Ltd., a British Virgin Islands limited liability company. |
| **Greenlight Qualified:** | Greenlight Capital Qualified, L.P., a Delaware limited partnership. |
| **ICC:** | Innovative Communications Company, LLC, a Delaware limited liability company. |
| **Including:** | Means "including, without limitation." |
| **Innovative Assets:** | All equity interests in Innovative Corp. and all assets of any kind or nature owned of record or beneficially by Innovative Corp. or any direct or indirect subsidiary of Innovative Corp. (whether or |

Page 4

not wholly owned), including all property, plant and equipment and other assets listed as owned by Innovative Corp. or such subsidiary in the books and records of Innovative Corp. or such subsidiary, all cash, marketable securities and similar assets held by Innovative Corp. or such subsidiary, all real property owned by Innovative Corp. or such subsidiary, all intellectual property and other intangible assets of Innovative Corp. or such subsidiary and all claims, causes of action, contract rights and other contingent assets of Innovative Corp. or such subsidiary; all equity interests in Innovative Corp. or any direct or indirect subsidiary thereof (whether or not wholly owned); and all proceeds, income, earnings or amounts distributed in respect of any of the foregoing; provided, however, that the Innovative Assets shall in no event include any Prosser Assets or Belize Assets. For the avoidance of doubt, the Innovative Assets shall include any assets so described in the immediately preceding sentence which are determined by a court of competent jurisdiction to have been transferred, sold, conveyed or assigned to another Person under circumstances constituting a fraudulent conveyance or other voidable transfer under the Bankruptcy Code or other applicable transfer avoidance law.

**Innovative Corp:**      Innovative Communication Corporation, a U.S. Virgin Islands corporation.

**Obligor:**      Any of the Emerging Entities and/or Prosser.

**Parties:**      RTFC and each of the Greenlight Entities.

**Person:**      Means any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated organization or government (or any agency, instrumentality or political subdivision thereof).

**Plan of Reorganization**      Any plan of reorganization for Innovative Corp. under the Bankruptcy Code which may or may not include other Persons as debtors.

**Pro Rata Share:**      A sum of money calculated by multiplying a distribution amount by a fraction, the numerator of which is the specified amount then owing to a given Creditor and the denominator of which is the aggregate amount owed to all Creditors.

**Prosser:**      Jeffrey Prosser, a defendant in the Shareholders Litigation.

     INTERCREDITOR AGREEMENT

| | |
|---|---|
| **Prosser Assets:** | All assets of any kind or nature owned of record or beneficially (whether or not wholly owned) by (1) ECI, or (2) ICC or (3) any of their respective direct or indirect subsidiaries, or by (4) Prosser, or (5) any entity owned or controlled by Prosser or in which Prosser has an equity interest, or (6) any direct or indirect subsidiary of any such entity, including all property, plant and equipment and other assets listed as owned by such entity in the books and records of such entity, all cash, marketable securities and similar assets held by any such entity, all real property owned by any such entity, all intellectual property and other intangible assets of such entity and all claims, causes of action, contract rights and other contingent assets of such entity; all equity interests in such entity or any direct or indirect subsidiary thereof (whether or not wholly owned); and all proceeds, income, earnings or amounts distributed in respect of any of the foregoing; provided, however, that the Prosser Assets shall in no event include any Innovative Assets or Belize Assets.  For the avoidance of doubt, the Prosser Assets shall include any assets so described in the immediately preceding sentence which are determined by a court of competent jurisdiction to have been transferred, sold, conveyed or assigned to another Person under circumstances constituting a fraudulent conveyance or other voidable transfer under the Bankruptcy Code or other applicable transfer avoidance law. |
| **Prosser Parties:** | Means Prosser and the Emerging Entities. |
| **RTFC Claim:** | The consolidated secured and unsecured claims held by RTFC against Innovative Corp. and based upon loan transactions totaling approximately $507,000,000, and all rights associated therewith. |
| **RTFC Liens:** | All security interests held by RTFC in the Collateral securing the repayment by any of the Emerging Entities of the RTFC Claim. |
| **Sale Transaction** | Any (i) sale of any or all of the assets of Innovative Corp. and/or its subsidiaries or any of the other Emerging Entities and/or their respective subsidiaries (other than pursuant to section 363 of the Bankruptcy Code); or (ii) any merger, consolidation, recapitalization, reclassification or similar transaction (including any sale or exchange of common stock or other equity securities) involving Innovative Corp. and/or its subsidiaries or any of the other Emerging Entities and/or their respective subsidiaries in which the common stock or other equity securities of Innovative |

INTERCREDITOR AGREEMENT

Corp. or any such other Emerging Entity or any of their respective subsidiaries is converted into or exchanged for cash, securities or other property and, as a result of which, any person or group (other than the equity holders of such entity or entities as of immediately prior to such transaction) (x) owns or controls more than 50% of the common stock or other equity securities of such entity or entities or (y) has the ability to elect a majority of the board of directors, board of managers or other governing body of such entity or entities, in each case, other in connection with a Bankruptcy Proceeding.

**Shareholders Litigation:** The action before the Court of Chancery of the State of Delaware in and for New Castle County captioned *In re Emerging Communications, Inc. Shareholders Litigation*, C.A. No. 16415.

**Vitelco:** Virgin Islands Telephone Corporation, a U.S. Virgin Islands corporation.

2.  **Judicial Procedures.**

2.1  **Bankruptcy Proceedings.** In view of the determination of the Greenlight Parties to initiate involuntary bankruptcy proceedings (as represented in paragraph F above) against any of the Emerging Entities that have not filed voluntary bankruptcy petitions within 45 days following the entry of a judgment on the Delaware Ruling, the timing of certain provisions of this Agreement specifically relate to the timing of events which would normally be anticipated in any such voluntary or involuntary bankruptcy proceedings.

2.2  **Provisions for Fees and Costs.** The professional fees and other incidental costs of preparing, filing and prosecuting the involuntary Bankruptcy Proceeding referenced above shall be borne by the Party incurring same.

3.  **Consideration**

Upon the terms and subject to the conditions of this Agreement, in consideration of the purchase, sale, assignment and transfer to RTFC of the Greenlight Claim as provided herein, and the representations, covenants and agreements of the Greenlight Entities contained herein, RTFC shall pay to the Greenlight Entities, by wire transfer of immediately available funds to an account or accounts designated in writing by the Greenlight Entities, the following amounts as of the dates and upon the occurrence of the events set forth below:

3.1  **First Claim Purchase.** On the first Business Day following either (i) the entry of an order for relief under the Bankruptcy Code against Innovative Corp. as a result of Innovative Corp. and/or the other Emerging Entities or their respective subsidiaries voluntarily commencing a Bankruptcy Proceeding in accordance with section 301 of the Bankruptcy Code; or (ii) the

Page 7

Bankruptcy Court entering an order for relief under section 303 of the Bankruptcy Code against Innovative Corp. as a result of (x) an involuntary petition not being controverted by Innovative Corp. and/or the other Emerging Entities or their respective subsidiaries, or (y) the Bankruptcy Court entering an order for relief after trial, which order for relief shall have become a Final Order, RTFC shall pay the Greenlight Entities the aggregate sum of **$15,000,000** and, upon such payment, the Greenlight Entities shall be deemed to have sold and assigned to RTFC **$60,000,000** of the Greenlight Claim; provided, however, that RTFC shall be entitled to deduct from the payment to the Greenlight Entities contemplated by this Section 3.1 any payments made by RTFC to the Greenlight Entities pursuant to Section 3.4 of this Agreement prior to the date on which such order for relief is entered.  The Parties agree to cooperate reasonably with each other in the execution and filing of any notices or other papers documenting such transaction to the extent reasonably deemed necessary or appropriate by RTFC.

3.2     **Second Claim Purchase.**  On the first Business Day following either (a) the entry of a Final Order confirming a Plan of Reorganization or (b) the consummation of a court-approved transaction pursuant to section 363 of the Bankruptcy Code for the sale of all or substantially all of the assets of the bankruptcy estate of Innovative Corp. and, if applicable, the assets of Innovative Corp. subsidiaries (such court approval being in the form of a Final Order approved as to form by RTFC), RTFC shall pay the Greenlight Entities the aggregate sum of **$12,500,000,** and, upon such payment, the Greenlight Entities shall be deemed to have sold and assigned to RTFC the balance of the Greenlight Claim; provided, however, that RTFC shall be entitled to deduct from the payment to the Greenlight Entities contemplated by this Section 3.2 any payments made by RTFC to the Greenlight Entities pursuant to Section 3.4 of this Agreement prior to the date on which such Final Order is entered or such sale transactions are consummated (provided such amounts have not previously been deducted from any amounts otherwise payable pursuant to Section 3.1 hereof).  The Parties agree to cooperate reasonably in the execution and filing of any notices or other papers documenting such transaction to the extent reasonably deemed necessary or appropriate by RTFC.

3.3     **Additional Consideration.**  As additional consideration for the sale of the Greenlight Claim to RTFC pursuant to Sections 3.1 and 3.2 above, from and after the date on which RTFC shall have received from the bankruptcy estate(s) of any of the Emerging Entities, including any of their respective subsidiaries, payments or distributions (other than any payments or distributions arising from, or relating to, Prosser Assets or Belize Assets, which are addressed in Sections 3.5 and 3.6 hereof, respectively), whether consisting of money, property or securities, in an amount equal to or in excess of the sum of (i) **$327,500,000,** plus (ii)(A) the amount of any debtor in possession financing provided by RTFC; plus (B) the amount of any post-confirmation loans provided by RTFC and any unpaid or forgone interest with respect thereto; plus (C) the amount of any capital contributions made by RTFC (such capital contributions to be treated for the purposes of this Section 3.3 as loans and to be repaid with interest calculated at the same rate and in the same manner as post-confirmation loans hereunder) (the amounts specified in clauses (A), (B) and (C) above being referred to herein as **"Financing Transactions"**), RTFC shall deliver to the Greenlight Entities, in the form received by RTFC (including, if appropriate, the granting of an undivided interest therein), 10% of the value of any such additional payment or

Page 8

distribution (*i.e.*, payments or distributions over and above the first $327,500,000 received plus the amount of all Financing Transactions effected by RTFC), whether consisting of money, property or securities, received by RTFC from the bankruptcy estate(s) of Innovative Corp. and/or any of the other Emerging Entities, including any of their respective subsidiaries, in respect of the RTFC Claim and/or the Greenlight Claim purchased by RTFC from the Greenlight Entities hereunder (other than any payments or distributions arising from, or relating to, Prosser Assets or Belize Assets, which are addressed in Section 3.5 and 3.6 hereof, respectively), such payments to the Greenlight Entities pursuant to this Section 3.3 being calculated after first deducting from the amounts received by RTFC the professional fees and other costs of collection incurred by RTFC after the date hereof in connection with its efforts to collect the payment or distribution RTFC receives, in an aggregate amount not to exceed $3,000,000, unless otherwise agreed to by the Parties.

     3.4   **Non Bankruptcy Recoveries.**  In the event that RTFC receives any payment or distribution, whether consisting of money, property or securities, from any of the Emerging Entities, including any of their respective subsidiaries, in respect of the RTFC Claim and/or the Greenlight Claim purchased by RTFC from the Greenlight Entities hereunder, or receives from any other party upon the sale or other disposition of property of the Emerging Entities, including the Collateral securing the RTFC Claim (and/or the value of the assets of entities to which RTFC acquires ownership through enforcement of the RTFC Liens against the Collateral), or in connection with a Sale Transaction (other than, in each case, (A) from the bankruptcy estates of the Emerging Entities, including any of their respective subsidiaries, which payments and distributions are addressed in Sections 3.1 through 3.3 hereof, or (B) arising from, or relating to, Prosser Assets or Belize Assets, which payments and distributions are addressed in Sections 3.5 and 3.6 hereof, respectively), then RTFC shall deliver to the Greenlight Entities, in the form received by RTFC (including, if appropriate, the granting of an undivided interest therein), (x) 10% of the value of any such payment or distribution until the aggregate amount of all such payments and distributions is equal to or exceeds $300,000,000; and (y) from and after the date on which the aggregate amount of all such payments and distributions is equal to or exceeds $327,500,000, 10% of the value of any such additional payments or distributions (*i.e.*, payments or distributions over and above the first $327,500,000 received) (clauses (x) and (y) being collectively referred to herein as the **"Greenlight Share"**); provided that the Greenlight Share shall be calculated after first deducting (i) any payments made by RTFC to the Greenlight Entities pursuant to Sections 3.1 and 3.2 of this Agreement and (ii) the professional fees and other costs of collection incurred by RTFC after the date hereof in connection with its efforts to collect the payment or distribution RTFC receives, in an aggregate amount not to exceed $3,000,000, unless otherwise agreed to by the Parties. Upon payment by RTFC to the Greenlight Entities pursuant to this Section 3.4 of the aggregate sum of $15,000,000, the Greenlight Entities shall be deemed to have sold and assigned to RTFC $60,000,000 of the Greenlight Claim (to the extent not previously sold to RTFC pursuant to Section 3.1 hereof) and upon payment by RTFC to the Greenlight Entities pursuant to this Section 3.4 of the aggregate sum of $30,000,000, the Greenlight Entities shall be deemed to have sold and assigned to RTFC the balance of the Greenlight Claim (to the extent not previously sold to RTFC pursuant to Sections 3.1 and 3.2 hereof). The Parties agree to cooperate reasonably with each other in the execution and filing of

Page 9

any notices or other papers documenting such transaction to the extent reasonably deemed necessary or appropriate by RTFC.

      3.5    **Prosser Collections.** The Parties shall mutually cooperate in the pursuit of their respective claims against the Prosser Assets, and RTFC agrees to subordinate its claims against the Prosser Assets to the first $35,000,000 of the Greenlight Entities' claims against the Prosser Assets. After collection by the Greenlight Entities of a sum equal to $35,000,000 with respect to the Prosser Assets, all additional collections by the Parties with respect to the Prosser Assets shall be divided by Fractional Shares of one-third to RTFC and two-thirds to the Greenlight Entities. In furtherance of the foregoing, (x) until such time as the Greenlight Entities shall have received payments or other distributions arising out of, or relating to, the Prosser Assets (including any such payments received from RTFC) in an aggregate amount equal to or in excess of $35,000,000, RTFC shall deliver to the Greenlight Entities, in the form received by RTFC, 100% of the value of any payment or distribution received by RTFC in respect of the Prosser Assets until the aggregate amount of all payments and distributions received by the Greenlight Entities in respect of the Prosser Assets is equal to or exceeds $35,000,000; and (y) from and after such time as the Greenlight Entities shall have received payments or other distributions arising out of, or relating to, the Prosser Assets (including any such payments received from RTFC) in an aggregate amount equal to or in excess of $35,000,000, (1) RTFC shall deliver to the Greenlight Entities, in the form received by RTFC, a Fractional Share equal to two-thirds of the value of any payment or distribution received by RTFC in respect of the Prosser Assets and (2) the Greenlight Entities shall deliver to RTFC, in the form received by the Greenlight Entities, a Fractional Share equal to one-third of the value of any payment or distribution received by the Greenlight Entities in respect of the Prosser Assets. If and when the claims of the Greenlight Entities against the Prosser Assets are fully satisfied, all other and further collections with respect to the Prosser Assets shall be applied to RTFC's claims against the Prosser Assets. For purposes of this Section 3.5, any amounts collected by the Parties in respect of the Prosser Assets shall be calculated after first deducting the professional fees and other costs of collection incurred by either Party after the date hereof in connection therewith, in an aggregate amount not to exceed $3,000,000 for RTFC or $3,000,000 for the Greenlight Entities, unless otherwise agreed to by the Parties.

      3.6    **Belize Collections.** The Parties shall mutually cooperate in the pursuit of their respective claims against the Belize Assets, and to divide any collections with respect thereto by the Fractional Shares of 50% to RTFC and 50% to the Greenlight Entities. In furtherance of the foregoing, from and after the date hereof, in the event that RTFC or any of the Greenlight Entities receives any payment or distribution, whether consisting of money, property or securities, in respect of the Belize Assets (1) RTFC shall deliver to the Greenlight Entities, in the form received by RTFC, a Fractional Share equal to 50% of the value of any such payment or distribution received by RTFC in respect of the Belize Assets and (2) the Greenlight Entities shall deliver to RTFC, in the form received by the Greenlight Entities, a Fractional Share equal to 50% of the value of any such payment or distribution received by the Greenlight Entities in respect of the Belize Assets. For purposes of this Section 3.6, any amounts collected by the Parties in respect of the Belize Assets shall be calculated after first deducting the professional

                                                           INTERCREDITOR AGREEMENT

fees and other costs of collection incurred by either Party after the date hereof in connection therewith, in an aggregate amount not to exceed $3,000,000 for RTFC or $3,000,000 for the Greenlight Entities, unless otherwise agreed to by the Parties.

3.7    **Certain Matters Regarding Payments.**

3.7.1    Prompt Payment. Any amounts payable pursuant to Sections 3.3 through 3.6 hereof shall be paid by RTFC to the Greenlight Entities, or by the Greenlight Entities to RTFC, as the case may be, as promptly as practicable after receipt of such amounts by RTFC or the Greenlight Entities, as applicable, but in no event later than thirty (30) days thereafter.

3.7.2    Payments Non-refundable. The Parties hereto acknowledge and agree that any amounts paid to the Greenlight Entities by RTFC, or by the Greenlight Entities to RTFC, in each case, pursuant to Sections 3.1 through 3.6 hereof shall be non-refundable notwithstanding any subsequent termination of this Agreement and irrespective of whether any involuntary Bankruptcy Proceeding filed by RTFC and the Greenlight Entities with respect to Innovative Corp. or any of the other Emerging Entities and/or their respective subsidiaries is dismissed, or whether a Plan of Reorganization is confirmed or consummated.

3.7.3    No Setoff. The Parties hereto further acknowledge and agree that any amounts payable by RTFC to the Greenlight Entities, or by the Greenlight Entities to RTFC, in each case, pursuant to Sections 3.5 and 3.6 hereof shall be in addition to the amounts payable pursuant to Sections 3.1 through 3.4 hereof and, for the avoidance of doubt, in the event that any bankruptcy case of Prosser or ECI, ICC, Belize or any of their respective subsidiaries shall be consolidated with the Bankruptcy Proceeding of Innovative Corp. and/or its subsidiaries and results in a recovery by RTFC or the Greenlight Entities with respect to the Prosser Assets or the Belize Assets, then the provisions of Sections 3.5 and 3.6 shall apply with respect to such any recovery with respect to such Prosser Assets or Belize Assets, in addition to any amounts payable pursuant to Sections 3.1 through 3.4 hereof.

3.7.4    Notice of Distributions Received. Each Party agrees that it shall notify the other Party or Parties in writing within five (5) Business Day after the receipt, or deemed receipt, of a distribution of proceeds (i) from Innovative Corp., ECI, ICC, Belize, or any of their respective subsidiaries, or from Prosser, (ii) from the bankruptcy estate of any of the foregoing persons or entities; or (iii) under any other circumstances requiring payment by such Party under Sections 3.1 through 3.6 hereof.

3.7.5    Application of Proceeds. The Parties hereto acknowledge and agree that any amounts collected by RTFC from Innovative Corp. or any of the other Emerging Entities, or any of their respective direct or indirect subsidiaries (whether or not wholly owned), or from Prosser or any other Person shall, to the extent applicable, be applied: *first*, to the satisfaction of the RTFC Claim and *second*, to the satisfaction of the Greenlight Claim purchased by RTFC from the Greenlight Entities hereunder. In no event shall any payments made by RTFC to the Greenlight Entities pursuant to Sections 3.1 through 3.6 be deemed to reduce the amount of the

Greenlight Claim or otherwise be in satisfaction of all or any portion thereof. The Parties hereto further acknowledge and agree that any distributions, collections or other payments received by the Parties from Prosser or the Emerging Entities, or their respective bankruptcy estates, if applicable, shall be, as between the Parties hereto, shared and distributed according to the governing terms of this Agreement.

       3.7.6   <u>Methods of Payment.</u>  Any payments required to be made by RTFC to the Greenlight Entities pursuant to this Agreement shall be made by wire transfer of immediately available funds to an account or accounts designated in writing by an agent designated by the Greenlight Entities (the "<u>Greenlight Agent</u>") prior to such payment (it being understood that the Greenlight Agent may provide standing wire transfer instructions to be used by RTFC for purposes of all future payments hereunder, or the Greenlight Agent may choose to specify different wire transfer instructions from time to time as payments are required to be made under this Agreement). RTFC shall be fully protected in relying on the most current wire transfer instructions provided by the Greenlight Agent and any payment made by RTFC of an amount required to be paid pursuant to this Agreement shall, if paid pursuant to such current wire transfer instructions, be deemed to satisfy RTFC's obligations with respect thereto for all purposes under this Agreement. Any payments required to be made by the Greenlight Entities to RTFC pursuant to this Agreement shall be made by wire transfer of immediately available funds to an account or accounts designated in writing by RTFC prior to such payment (it being understood that RTFC may provide standing wire transfer instructions to be used by the Greenlight Entities for purposes of all future payments hereunder, or RTFC may choose to specify different wire transfer instructions from time to time as payments are required to be made under this Agreement). The Greenlight Entities shall be fully protected in relying on the most current wire transfer instructions provided by RTFC and any payment made by the Greenlight Entities of an amount required to be paid pursuant to this Agreement shall, if paid pursuant to such current wire transfer instructions, be deemed to satisfy the Greenlight Entities' obligations with respect thereto for all purposes under this Agreement.

4.      **Further Agreements Among The Parties.**

      4.1    **Validity of Claims and Liens.**  From and after the date of this Agreement, RTFC agrees that it will not challenge the amount or validity of the Greenlight Claim, and the Greenlight Entities agree that they will not challenge (1) the amount or validity of the RTFC Claim, (2) the validity, effectiveness, perfection, priority and non-avoidability of the RTFC Liens, or (3) the value of any Collateral securing the RTFC Claim.

      4.2    **Greenlight Covenants.**

      4.2.1   <u>Entry of Judgment.</u>  The Greenlight Entities shall each use their respective commercially reasonable efforts to cause the Court of Chancery of the State of Delaware to enter, as soon as practicable after the date hereof, a judgment on the Delaware Ruling. In the event the Greenlight Entities fail to achieve such entry of judgment on the Delaware Ruling, or fail to initiate, and use commercially reasonable efforts to pursue, involuntary Bankruptcy Proceedings

with respect to any Emerging Entity that has not voluntarily filed a Bankruptcy Proceeding, as represented in Recital F above, then RTFC shall have the option, at its discretion, to rescind this Agreement, upon written notice to the Greenlight Entities, whereupon all future obligations of the Parties hereunder shall terminate.

       4.2.2   Waiver of Certain Claims. During the term of this Agreement and subject to the terms set forth herein, the Greenlight Entities hereby waive any and all rights and claims arising out of, or with respect to, RTFC's enforcement of the RTFC Claim or enforcement of the Greenlight Claim purchased by RTFC from the Greenlight Entities hereunder including, without limitation, (i) the exercise by RTFC of any remedies, whether in bankruptcy or otherwise, in connection therewith, (ii) the foreclosure by RTFC of any liens, (iii) the credit bidding by RTFC of the RTFC Claim and/or the Greenlight Claim acquired from the Greenlight Entities hereunder, (iv) RTFC's reorganization of, investment in, or management and sale of the Emerging Entities, their assets and their businesses, (v) any Financing Transactions, or (vi) the incurrence of professional, fees in connection with the foregoing, with respect to all of which RTFC shall be entitled to exercise its sole discretion, including incurring such costs as it deems necessary.

       4.2.3   Support of the Plan of Reorganization and Disclosure Statement. If a Plan of Reorganization is filed or supported by RTFC and this Agreement has not been terminated, the Greenlight Entities agree that they will (i) not object to the Plan of Reorganization or otherwise commence any proceeding to oppose or alter any of the terms of the Plan of Reorganization or any other document filed by RTFC in connection with the confirmation of the Plan; (ii) not agree to, consent to, provide any support to, participate in the formulation of or any discussions or negotiations regarding, or vote for, any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring involving Innovative Corp. or any of its subsidiaries, other than the Plan of Reorganization and the transactions contemplated thereby; (iii) take all reasonable actions necessary or reasonably requested by RTFC to support the Plan of Reorganization and the transactions contemplated thereby, including voting the Greenlight Claim in favor of such Plan of Reorganization; and (iv) not take any actions inconsistent with, or that would prevent, delay or impede approval or confirmation of, the Plan of Reorganization, the Disclosure Statement to be prepared, filed and disseminated in connection therewith or any related documents. In furtherance of the foregoing, subject to the terms and conditions hereof, the Greenlight Entities agree to execute and deliver, within seven (7) business days after solicitation materials are delivered to the Greenlight Entities, a ballot in a form reasonably acceptable to the Greenlight Entities and RTFC showing the Greenlight Entities' acceptance of the Plan of Reorganization. If the Greenlight Entities have received the payment required pursuant to Section 3.1 above, and this Agreement has not otherwise been terminated, the Greenlight Entities shall take all actions reasonably requested by RTFC in furtherance of the Plan of Reorganization, or as RTFC may otherwise reasonably determine are necessary, desirable or appropriate in connection with the preparation, filing, prosecution, confirmation and/or consummation of the Plan of Reorganization, including, without limitation, using all commercially reasonable efforts to: prosecute, or assist in the prosecution of, the Plan of Reorganization; secure the appointment of a trustee or receiver with respect to Innovative Corp. or any of the other Emerging Entities and/or their respective subsidiaries; terminate any period of

exclusivity during which the Plan or Reorganization may not be filed by RTFC; assist in securing all consents and approvals necessary for the confirmation of the Plan of Reorganization, including the consent of any creditor or class of creditors of Innovative Corp. or any of the other Emerging Entities or their respective subsidiaries, and any similar matters.

4.2.4    Agreement to Forebear.  During the term of this Agreement and other than as contemplated by this Agreement or agreed to in writing by the Parties, the Greenlight Entities shall not: (i) exercise or seek to exercise any rights or exercise or seek to exercise any remedies with respect to the Greenlight Claim against Innovative Corp. or any of its subsidiaries or the assets thereof; (ii) institute any action or proceeding with respect to such rights or remedies, including without limitation, any action of foreclosure against Innovative Corp. or any of its subsidiaries or the assets thereof; or (iii) contest, protest or object to any Foreclosure Action brought by RTFC against Innovative Corp. or any of its subsidiaries or any other exercise by RTFC of any rights and remedies against one or more of the Emerging Entities and/or their respective subsidiaries in connection with the RTFC Claim; provided that nothing in this Agreement shall prevent the Greenlight Entities from seeking satisfaction of the Greenlight Claim through action against the Prosser Assets or the Belize Assets. Notwithstanding anything in this Agreement to the contrary, except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner, waive, limit, impair, or restrict the ability of the Greenlight Entities to (A) protect and preserve their rights, remedies, and interests, including, without limitation, those rights, remedies and interests associated with the Greenlight Claim or any other claim against the Innovative Assets, the Prosser Assets or the Belize Assets, nor (B) to support or pursue fraudulent conveyance or other transfer avoidance actions under the Bankruptcy Code or other applicable transfer avoidance law.

4.2.5    Capacity.  Each of the individuals executing this Agreement on behalf of the Greenlight Entities represents and warrants by his or her signature that he or she is authorized and empowered by all requisite consents to execute this Agreement on behalf of the Greenlight Entity indicated, duly acting on behalf of such limited partnership as its general partner or duly acting on behalf of the entity which serves as its general partner, and that such execution is duly authorized by the respective limited partnership agreements and is done in accordance with applicable state law governing actions by the respective limited partnerships. Each Greenlight Entity executing this Agreement further represents and warrants that it is one of the entities that filed the February 10, 1999, appraisal action which lead to the Delaware Ruling, and is one of the parties referenced and identified collectively as "Greenlight" in the Delaware Ruling.

### 4.3    Certain Covenants of RTFC.

4.3.1    Commercially Reasonable Efforts.  From and after the date of this Agreement, unless this Agreement is earlier terminated, RTFC shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws to cause the Parties to receive the maximum recovery reasonably attainable with respect to the Innovative Assets, the Prosser Assets and the Belize Assets.

Page 14

4.3.2  <u>Agreement to Forebear.</u>  During the term of this Agreement and other than as contemplated by this Agreement or agreed to in writing by the Parties, RTFC agrees that until the Greenlight Entities' claims against Prosser have been repaid in full, RTFC shall not (i) exercise or seek to exercise any rights or exercise or seek to exercise any remedies, in each case, against Prosser, with respect to the RTFC Claim or the Greenlight Claim purchased by RTFC from the Greenlight Entities hereunder; or (ii) institute any action or proceeding with respect to such rights or remedies, including without limitation, any action of foreclosure against any Prosser Assets held by Prosser.  Notwithstanding the foregoing or anything else in this Agreement to the contrary, except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner, waive, limit, impair, or restrict the ability of RTFC (A) to protect and preserve its rights, remedies, and interests, including, without limitation, those rights, remedies and interests associated with the RTFC Claim or any other claim against the Innovative Assets, the Prosser Assets or the Belize Assets, nor (B) to support or pursue fraudulent conveyance or other transfer avoidance actions under the Bankruptcy Code or other applicable transfer avoidance law.

4.3.3  <u>Exercise of RTFC Remedies.</u>  RTFC may at any time, in its sole discretion, enforce any rights, and exercise any remedies, in connection with the RTFC Claim and the Greenlight Claim purchased by RTFC from the Greenlight Entities hereunder, all in such order and in such manner as it may determine in the exercise of its sole business judgment; <u>provided</u> that the enforcement of such rights and exercise of such remedies is consistent with the terms of this Agreement.  Such exercise and enforcement may include, without limitation, the rights to foreclose on, and sell or otherwise dispose of, Collateral securing the RTFC Claim, to release guarantors, to incur expenses in connection with such sale or disposition and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code or any other applicable law of any applicable jurisdiction and the right to refrain from taking any action otherwise permitted in connection with the RTFC Claim, in each case, except as provided in section 4.3.2 hereof.

4.4    **Independent Actions by Parties**.  Nothing contained in this Agreement shall prohibit a Party from taking independent action not inconsistent with this Agreement to pursue enforcement and collection of its claims against an Obligor, including accelerating the maturity of obligations, demanding payment which it has a right to demand, or instituting legal action against an Obligor to obtain a judgment or other legal process in respect of such claim, or prohibit or limit RTFC from extending post-bankruptcy financing to any of the Obligors.  In addition to the foregoing, RTFC and the Greenlight Entities shall cooperate to seek a mutually satisfactory restructuring of (1) the obligations of Vitelco to its creditors and (2) the terms and conditions of Vitelco's outstanding preferred shares.

4.5    **Relation of Parties**.  This Agreement is entered into solely for the purposes set forth herein, and, except as otherwise provided herein, neither RTFC nor any of the Greenlight Entities assumes any responsibility to any other Party hereto to advise such other Party of information known to such Party regarding the financial condition of any Obligor or of any other circumstances bearing upon the risk of nonpayment of any portion of claims against an Obligor.

Page 15

5.    **Miscellaneous Provisions**

5.1    **Benefits of Agreement.**  Each Party specifically acknowledges and agrees that nothing contained in this Agreement is, or is intended to be, for the benefit of any Obligor or any other person, and no Person other than the Parties is responsible or liable for, entitled to rely upon, or entitled to raise as a defense -- in any manner whatsoever -- any of these Sections of this Agreement.  Except as otherwise specifically provided, nothing contained herein shall limit or in any way modify any of the obligations of the Obligors to the Parties.

5.2    **Entire Agreement.**  This Agreement represents the entire Agreement between and among the Parties with respect to the subject matter hereof and, except as otherwise provided, this Agreement may not be altered, amended, modified or terminated except in a writing executed by all the Parties to this Agreement.

5.3    **Notices.**  Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed or sent by facsimile to the Parties hereto at the respective addresses or facsimile numbers, as applicable, set forth on the **Notices Addendum** hereof.  All notices and other communications given to any Party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service, or on the Business Day following receipt of good transmission notification to the sender's facsimile machine if sent by facsimile, or on the date three Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in the Notices Addendum hereof.

5.4    **Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective successors, transferees and assigns.

5.5    **Consents, Waivers.**  All waivers or consents with respect to any provision of this Agreement shall be effective only if the same shall be in writing and signed by all of the Parties.

5.6    **Governing Law.**  This Agreement shall be governed as to all matters by, and construed in accordance with, the substantive laws of the State of Delaware, excluding (to the greatest extent permissible by law) any rule of law that would cause the application of the laws of any jurisdiction other than the State of Delaware.  To the greatest extent possible, all undefined terms used in this Agreement shall be construed to have the meaning ascribed to them under the laws of the State of Delaware.  Subject to any applicable United States bankruptcy law and rules, the Parties hereto submit to the non-exclusive jurisdiction and venue of the federal and state courts of the Commonwealth of Virginia and hereby waive any right to trial by jury for the resolution of disputes which may arise hereunder.

5.7    **Counterparts.**  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one Agreement and any of the Parties hereto may execute this Agreement by signing any such counterpart.

Page 16

5.8    **Sale of Interest.** No Party will sell, transfer or otherwise dispose of any interest in this Agreement unless the purchaser or transferee agrees, in writing, to be bound by the terms of this Agreement pursuant to an appropriate Joinder Agreement executed and delivered to each other Party hereto.

5.9    **Severability.** In case any one or more of the provisions contained in this Agreement shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

5.10    **Effectiveness.** This Agreement shall not be effective until it shall have been executed and delivered by each Party.

5.11    **Headings.** The headings of the sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

5.12    **Effect of Bankruptcy or Insolvency.** This Agreement shall continue in effect notwithstanding the bankruptcy or insolvency of any party hereto or any Obligor.

5.13    **Expenses.** Whether or not this Agreement becomes effective or the transactions contemplated hereby are consummated, each of the parties agrees to pay all of its own out-of-pocket expenses incurred in connection with the preparation, execution and delivery of this Agreement and any other documentation contemplated hereby.

5.14    **Further Assurances.** Each of the Parties, at its own expense and at any time from time to time, upon the written request of the other Party or Parties hereto, will promptly and duly execute and deliver such further instruments and documents and take such further actions as the other Party or Parties reasonably may request for the purposes of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted.

5.15    **Confidentiality.** The Parties recognize that, in connection with the performance of this Agreement, each party or their respective affiliates (in such capacity, the **"Disclosing Party"**) may disclose Confidential Information (as defined below) to the other party or parties or such party's or parties' affiliates (the **"Receiving Party"**). For purposes of this Agreement **"Confidential Information"** means (i) proprietary information (whether owned by the Disclosing Party or a third party to whom the Disclosing Party owes a non-disclosure obligation) regarding the Disclosing Party's business, (ii) information which is marked as confidential at the time of disclosure to the Receiving Party, or if in oral form, is identified as confidential at the time of oral disclosure and reduced in writing or other tangible (including electronic) form including a prominent confidentiality notice and delivered to the Receiving Party within thirty (30) days of disclosure; or (iii) information regarding this Agreement, the terms thereof or the terms of the relationship among the parties created thereby. **"Confidential Information"** shall not include information which: (A) was known to the Receiving Party prior to the disclosure by the Disclosing Party; (B) becomes publicly known through no wrongful act of the Receiving

Party; (C) has rightfully been received by the Receiving Party from a third party; or (D) has been independently developed by the Receiving Party. The Receiving Party agrees (x) not to use any such Confidential Information for any purpose other than in the performance of its obligations under this Agreement and (y) not to disclose any such Confidential Information, except (1) to its employees who are reasonably required to have the Confidential Information in connection herewith, (2) to its agents, representatives, lawyers and other advisers that have a need to know such Confidential Information and (3) pursuant to, and to the extent of, a request or order by a governmental authority. The Receiving Party agrees to take all reasonable measures to protect the secrecy and confidentiality of, and avoid disclosure or unauthorized use of, the Disclosing Party's Confidential Information.

5.16    **Survival**.  The provisions of Sections 5.6, 5.13 and 5.15 and this Section 5.16 shall survive the termination of this Agreement.

5.17    **Termination**.  In the event that any Party shall materially breach its covenants or agreements set forth in this Agreement, which breach shall remain uncured for a period of thirty (30) days from and after the date on which written notice thereof is given by the non-breaching Party, this Agreement shall be terminable at any time thereafter at the election of the non-breaching Party and, except as provided in Section 5.16 hereof, the obligations of the parties hereunder shall terminate.

**In Witness Whereof,** the Parties hereto have caused this Agreement to be duly executed by their duly authorized officers, all as of the day and year first above written.

**Rural Telephone Finance Cooperative**

By_____

Title and name:_____

**Greenlight Capital Offshore, Ltd.**

By_____

Title and name:_____

**Greenlight Capital, L.P.**

By_____

Title and name:_____

**Greenlight Capital Qualified, L.P.**

By_____

Title and name:_____

**NOTICES ADDENDUM**

**Rural Telephone Finance Cooperative**

2201 Cooperative Way
Herndon, VA 20171-3025
Attn: Steven L. Lilly
Attn.: John J. List
Fax No.: 703-709-6780

**Greenlight Capital, L.P.**

**Greenlight Capital Offshore, Ltd.**

**Greenlight Capital Qualified, L.P.**

140 East 45th Street
New York, New York 10017
Attn: David Einhorn
Fax No.: 212-973-9219

**Attorneys:**

LeBoeuf, Lamb, Greene & MacRae, LLP
125 West 55th Street
New York, NY 10019-5389
Attn.: Eric W. Cowan
Attn.: Jonathan D. Siegfried
Fax No.: 212-424-8500

**Attorneys:**

Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square, Seventh Floor
Wilmington, Delaware 19801
Attn: Thomas J. Allingham, II
Attn: Gregg M. Galardi
Fax No.: 302-651-3001

- and –

Fulbright & Jaworski L.L.P.
2200 Ross Ave., Suite 2800
Dallas, Texas 75201
Attn.: Toby L. Gerber
Attn.: Michael Anglin
Fax No.: 214-855-8200

Note: Any change of address or other contact
information must be served by certified mail
upon each other Party listed above.

31019072v1

INTERCREDITOR AGREEMENT

# SCHEDULE 1

### RTFC Claim for ICC as of October 21, 2005

| | |
|---|---|
| Principal Outstanding | 481,962,421.43 |
| Interest due through October 21st [1] | 15,924,284.30 |
| Legal Fees[2] | 8,972,216.70 |
| Travel Expenses | 18,642.06 |
| | |
| Total Claim as of 10/21/05[3] | 506,877,564.49 |

[1]Interest due does not include default interest, but does include interest for line of credit 3/20/05-10/21/05.
    Line of credit interest has not been included on invoices.
[2]Legal fees include $1,813,656.36 in fees billed by LeBoeuf, but not yet paid (or recorded)
[3]Total claim does not include late fees

Page 21

INTERCREDITOR AGREEMENT

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Jeffrey J. Prosser, pro se, and John P. Raynor, pro se, | ) | |
| | ) | |
| | ) | Civil No.: 1:08-cv-00687 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Federal Agricultural Mortgage Corporation and the United States Department of Agriculture; | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**EXHIBIT "G"**

**OPPOSITION TO U.S. DEPARTMENT OF AGRICULTURE'S
MOTION TO DISMISS**

CFC's Gross Margin Trend

**Exhibit "G"**

**National Rural Utilities Cooperative Finance Corporation**
**Business Practices: Loan Pricing**
**Gross Margin Trend**

AS REPORTED 5/31/2006 (2006 10K, p. 16)

| For the year ended May 31: | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| Operating income | 1,193,597 | 1,075,310 | 1,009,856 | 1,030,853 | 1,007,912 |
| Cost of Funds | 892,902 | 943,767 | 928,215 | 926,790 | 962,656 |
| **Gross margin** | **300,695** | **131,543** | **81,641** | **104,063** | **45,256** |
| | | | | | |
| As % with 2002 Base Year | | | | | |
| Operating Income | 100.00% | 90.09% | 84.61% | 86.37% | 84.44% |
| Cost of Funds | 100.00% | 105.70% | 103.95% | 103.80% | 107.81% |
| **Gross Margin** | **100.00%** | **43.75%** | **27.15%** | **34.61%** | **15.05%** |

AS REPORTED 5/31/2007 (2007 10K, p. 16)

| | 2002* | 2003 (As restated) | 2004 (As restated) | 2005 (As restated) | 2006 (As restated) | 2007 |
|---|---|---|---|---|---|---|
| Interest inc./Gross Income | 1,193,597 | 1,075,310 | 1,009,856 | 1,030,853 | 1,007,912 | 1,054,224 |
| Interest Exp./COF | 892,902 | 951,628 | 941,491 | 942,033 | 975,936 | 996,730 |
| **Net interest inc./Gross Margin** | **300,695** | **123,682** | **68,365** | **88,820** | **31,976** | **57,494** |
| | | | | | | |
| As % with 2002 Base Year | | | | | | |
| Operating Income | 100.00% | 90.09% | 84.61% | 86.37% | 84.44% | 88.32% |
| Cost of Funds | 100.00% | 106.58% | 105.44% | 105.50% | 109.30% | 111.63% |
| **Net interest inc./Gross Margin** | **100.00%** | **41.13%** | **22.74%** | **29.54%** | **10.63%** | **19.12%** |

* From 2006 10K, page 16

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Jeffrey J. Prosser, pro se, and John P. Raynor, pro se, | ) ) | |
| | ) | Civil No.: 1:08-cv-00687 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Federal Agricultural Mortgage Corporation and the United States Department of Agriculture; | ) ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

---

## EXHIBIT "H"

## OPPOSITION TO U.S. DEPARTMENT OF AGRICULTURE'S MOTION TO DISMISS

CFC's Loan Pricing: Telecom Dependency

**Exhibit "H"**

**National Rural Utilities Cooperative Finance Corporation**
**Business Practices: Loan Pricing**
**Electric Systems v. Telecommunications Systems**

| | | 2001 | 2002 | 2003 | Fiscal Year: 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|
| Loans: | | | | | | | | |
| Electric systems | | 18,535,081 | 14,972,033 | 14,541,701 | 15,523,129 | 15,505,166 | 15,794,372 | 15,805,290 |
| Telecommunication systems | | 1,148,869 | 5,075,076 | 4,942,640 | 4,643,008 | 2,992,192 | 2,162,464 | 1,860,379 |
| Other/NCSC | | - | - | - | 322,386 | 474,710 | 404,069 | 462,538 |
| | TOTAL | 19,683,950 | 20,047,109 | 19,484,341 | 20,488,523 | 18,972,068 | 18,360,905 | 18,128,207 |
| Loans: | | | | | | | | |
| Electric systems | | 94.16% | 74.68% | 74.63% | 75.76% | 81.73% | 86.02% | 87.19% |
| Telecommunication systems | | 5.84% | 25.32% | 25.37% | 22.66% | 15.77% | 11.78% | 10.26% |
| Other/NCSC | | 0.00% | 0.00% | 0.00% | 1.57% | 2.50% | 2.20% | 2.55% |
| | TOTAL | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Long-term fixed rate secured loans: | | | | | | | | |
| Electric systems | | 6.85% | 6.32% | 5.64% | 5.27% | **Reporting Change** | | |
| Telecommunication systems | | 8.17% | 7.90% | 7.77% | 7.33% | **Reporting Change** | | |
| | Differential | 1.32% | 1.58% | 2.13% | 2.06% | | | |
| Long-term variable rate secured loans: | | | | | | | | |
| Electric systems | | 7.05% | 4.21% | 3.35% | 2.63% | **Reporting Change** | | |
| Telecommunication systems | | 7.69% | 5.71% | 5.30% | 4.52% | **Reporting Change** | | |
| | Differential | 0.64% | 1.50% | 1.95% | 1.89% | | | |
| Intermediate-term unsecured loans: | | | | | | | | |
| Electric systems | | 7.24% | 5.19% | 3.65% | 2.56% | **Reporting Change** | | |
| Telecommunication systems | | 7.50% | 5.75% | 5.45% | 4.75% | **Reporting Change** | | |
| | Differential | 0.26% | 0.56% | 1.80% | 2.19% | | | |
| Line of credit loans: | | | | | | | | |
| Electric systems | | 7.35% | 4.57% | 3.57% | 2.50% | **Reporting Change** | | |
| Telecommunication systems | | 8.12% | 6.32% | 5.60% | 5.05% | **Reporting Change** | | |
| | Differential | 0.77% | 1.75% | 2.03% | 2.55% | | | |

Source: 10K, Financial Statements, FN 2  2002, p. 77   2004, p. 108   2006, p. 83   2007, p. 94

"Reporting Change" or "R.C." represents change in information provided when Deloitte replaced Ernst.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Jeffrey J. Prosser, pro se, and John P. Raynor, pro se, ) | |
| ) | |
| ) | Civil No.: 1:08-cv-00687 |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| Federal Agricultural Mortgage Corporation and ) | |
| the United States Department of Agriculture; ) | |
| ) | |
| Defendants ) | |
| ) | |

---

# EXHIBIT "I"

# OPPOSITION TO U.S. DEPARTMENT OF AGRICULTURE'S MOTION TO DISMISS

CFC's Loan Pricing: Long-term Debt Cost v. Earnings from long-term loans

**Exhibit "I"**

**National Rural Utilities Cooperative Finance Corporation**
**Business Practices: Loan Pricing**
**Long-term Loans v Long-term Debt**

|  | 2001 | 2002 | 2003 | Fiscal Year:<br>2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| Long-term fixed rate secured loans:<br>   Electric systems | 6.85% | 6.32% | 5.64% | 5.27% | **Reporting Change** | | |
| CFC: Costs of Total long-term debt | 5.28% | 4.94% | 4.83% | 4.66% | 6.00% | 5.73% | 5.82% |
| *Differential* | *1.57%* | *1.38%* | *0.81%* | *0.61%* | **?** | **?** | **?** |
| All long-term fixed rate secured loans | 7.23% | 6.72% | 6.12% | 5.69% | 5.52% | 5.76% | **R.C.** |
| CFC: Total long-term debt cost | 5.28% | 4.94% | 4.83% | 4.66% | 6.00% | 5.73% | 5.82% |
| *Differential* | *1.95%* | *1.78%* | *1.29%* | *1.03%* | ***(0.48%)*** | *0.03%* | **?** |
| Source of long-term debt cost:<br>   10K, Financial Statements - | | FN 4, 2002, p. 82 | | FN 5, 2004, p. 115 | | FN 5, 2006, p. 89 | 2007, p. 101 |
| All long-term fixed rate secured loans | | | | | | 5.76% | **R.C.** |
| CFC: Total long-term debt cost excluding Government loans | | | | | | 5.90% | 6.01% |
| *Differential* | | | | | | ***(0.14%)*** | **?** |

"Reporting Change" or "R.C." represents change in information provided when Deloitte replaced Ernst.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Jeffrey J. Prosser, pro se, and John P. Raynor, pro se, | ) |
| | ) |
| | )    Civil No.: 1:08-cv-00687 |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Federal Agricultural Mortgage Corporation and the United States Department of Agriculture; | ) |
| | ) |
| | ) |
| Defendants | ) |
| | ) |

---

**EXHIBIT "J"**

**OPPOSITION TO U.S. DEPARTMENT OF AGRICULTURE'S
MOTION TO DISMISS**

CFC's Fair Value Deficiency

Exhibit "J"

**National Rural Utilities Cooperative Finance Corporation  (CFC)**
**Total Equity: Carrying Value to Fair Value**
(fiscal years 2005, 2006 & 2007)

| (in thousands) | 31-May-07 | | | 31-May-06 | | | 31-May-05 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Carrying Value | Fair Value | | Carrying Value | Fair Value | | Carrying Value | Fair Value | |
| *Total Equity as reported in Balance Sheet* | | | **710,041** | | | **784,408** | | | **768,761** |
| *Assets:* | | | | | | | | | |
| Cash and cash equivalents | 304,107 | 304,107 | - | 260,338 | 260,338 | - | 418,514 | 418,514 | - |
| Loans to members, net | 17,566,544 | 15,743,632 | (1,822,912) | 17,749,462 | 15,055,729 | (2,693,733) | 18,382,319 | 17,681,520 | (700,799) |
| Debt service reserve funds | 54,993 | 54,993 | - | 80,159 | 80,159 | - | 93,182 | 93,182 | - |
| | | | | | | | | | |
| Cash flow interest rate exchange agrs. | 212,143 | 212,143 | - | 320,201 | 320,201 | - | 61,671 | 61,671 | - |
| Cash flow cross-curr. int. rate exch. agrs. | - | - | - | 22,226 | 22,226 | - | 64,797 | 64,797 | - |
| Fair value interest rate exch. agrs. | 10,631 | 10,631 | - | - | - | - | 224,992 | 224,992 | - |
| cross currency int. rate exch. agrs. | - | - | - | 233,242 | 233,242 | - | 233,403 | 233,403 | - |
| | | | | | | | | | |
| *Liabilities:* | | | | | | | | | |
| Short-term debt | 4,427,123 | 4,404,590 | 22,533 | 5,343,824 | 5,339,759 | 4,065 | 7,952,579 | 7,977,991 | (25,412) |
| Long-term debt | 11,295,219 | 11,492,645 | (197,426) | 10,642,028 | 10,725,849 | (83,821) | 8,701,955 | 9,439,911 | (737,956) |
| Guarantee liability | 18,929 | 18,929 | - | 16,750 | 16,750 | - | 16,094 | 16,094 | - |
| | | | | | | | | | |
| Cash flow interest rate exch. agrs. | 12,869 | 12,869 | - | 6,844 | 6,844 | - | 67,154 | 67,154 | - |
| Interest rate exch. agrs. | 59,065 | 59,065 | - | 78,354 | 78,354 | - | 11,317 | 11,317 | - |
| Subordinated deferrable debt | 311,440 | 299,964 | 11,476 | 486,440 | 462,741 | 23,699 | 685,000 | 689,288 | (4,288) |
| | | | | | | | | | |
| Off-balance sheet instr.: Commitments | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | |
| *Total Equity on a Fair Value Basis* | | | **(1,276,288)** | | | **(1,965,382)** | | | **(699,694)** |
| | | | | | | | | | |
| Source: (10K) (Footnote #) (page #) | 2007 10K | FN 14 | Page 111 | 2007 10K | FN 14 | Page 111 | 2006 10K | FN 13 | Page 100 |

| | CFC's Asset Growth | | | | | Government Investment in re: CFC | | |
|---|---|---|---|---|---|---|---|---|
| | (in Thousands) | | | | | (in Thousands) | | |
| | Carrying Value Loans, Net | Other Assets | Total Assets | | | Farmer Mac | REDLG Program | Total |
| As of **May 31,2004** per 2005 10k, page 72 | 19,914,584 | 1,526,654 | 21,441,238 | | 29-Jul-05 | $ 500,000 | - | $ 500,000 |
| As of **May 31, 2005** per 2005 10k, page 72 | 18,382,319 | 1,663,769 | 20,046,088 | | 22-Nov-05 | - | $ 500,000 | 500,000 |
| As of **May 31, 2006** per 2007 10k, page 80 | 17,749,462 | 1,430,159 | 19,179,621 | | 22-Feb-06 | - | 500,000 | 500,000 |
| As of **May 31, 2007** per 2007 10k, page 80 | 17,566,544 | 1,008,637 | 18,575,181 | | 9-May-06 | - | 1,000,000 | 1,000,000 |
| | | | | | 15-May-07 | 365,600 | - | 365,600 |
| | % of Curr. Year Total Assets | % of Curr. Year Total Assets | % of 2004 Total Assets | | 1-Aug-07 | 40,000 | - | 40,000 |
| As of **May 31,2004** | 92.88% | 7.12% | 100.00% | | 7-Aug-07 | - | 500,000 | 500,000 |
| As of **May 31, 2005** | 91.70% | 8.30% | 93.49% | | 2-Jan-08 | 34,000 | - | 34,000 |
| | | | | | 28-Mar-08 | 400,000 | - | 400,000 |
| As of **May 31, 2006** | 92.54% | 7.46% | 89.45% | | | | | |
| As of **May 31, 2007** | 94.57% | 5.43% | 86.63% | | **Total** | $ 1,339,600 | $ 2,500,000 | $ 3,839,600 |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Jeffrey J. Prosser, pro se, and John P. Raynor, pro se, | ) ) | |
| | ) | Civil No.: 1:08-cv-00687 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Federal Agricultural Mortgage Corporation and the United States Department of Agriculture; | ) ) ) | |
| Defendants | ) ) ) | |

### AFFIDAVIT OF JOHN P. RAYNOR, PLAINTIFF, IN OPPOSITION TO

### THE MOTION TO DISMISS COMPLAINT

Exhibit "K"

### AFFIDAVIT OF JOHN P. RAYNOR

| | |
|---|---|
| STATE OF NEBRASKA | ) |
| | )ss. |
| COUNTY OF DOUGLAS | ) |

John P. Raynor, being duly sworn, deposes and says:

1.     That I am an attorney, admitted in the State of Nebraska and the Federal District Court for the District of Nebraska.  My office address is 10110 Nicholas Street, Suite 102, Omaha, Nebraska 68114.

2.    Affiant is a certified public accountant with an inactive permit to practice issued by the Board of Public Accountancy by the State of Nebraska.

3.    Affiant submits this Affidavit in support of Plaintiff's OPPOSITION TO THE U.S. DEPARTMENT OF ARGRICUTURE MOTION TO DISMISS.  All facts set forth in this Affidavit are based upon Affiant's personal knowledge or Affiant's review of relevant documents.  If Affiant were called upon to testify, Affiant could and would testify competently to the facts set forth herein.

4.    Affiant formed or cause to be formed the original companies that were the predecessors of the Innovative Communication Corporation ("ICC") and Emerging Communication Inc. ("EmCom").

5.    Affiant participated in the leverage buy-out of the Virgin Islands Telephone Corporation ("Vitelco") representing Mr. Prosser in the acquisition.

6.    Affiant from June 1987 through September of 2007 served as an attorney for and a board member of ICC and served as an officer, in many cases, the President, of ICC's French subsidiaries.

7.    The Rural Telephone Finance Corporation ("RTFC") loaned ICC's predecessor and Vitelco over $100 Million in January of 1988 to refinance the funds borrowed from E.F. Hutton to close the Vitelco acquisition.

8.    In March of 1998 , the Third Circuit issued the opinion in *Atlantic Tele-Network Co. v. Public Services Com.*, 841 F.2d 70 (C.A. 3rd, 1988) which threw the closed acquisition into tailspin with the Virgin Islands Public Services Commission (the "PSC") seeking to set aside the sale of Vitelco by ITT to Atlantic Tele-Network Co., ICC predecessor.

9.    The litigation was settled in April of 1989 in an agreement (the "Tri-Party Agreement") executed by Atlantic Tele-Network, Inc. (EmCom's predecessor), Vitelco, Vitelcom (a deregulated subsidiary), **RTFC**, and the PSC.

10.    The Tri-Party Agreement required the following:

(i)    Paragraph 7 (a) provides that – "The Commission agrees to approve the sale of VITELCO stock from ITT to ATN" provided:

(ii)    Paragraph 7(a)(1) provided: "VITELCO's guarantee of the $44.4 million of debt from RTFC by [to] ATN shall be removed." This was the only indebtedness of ATN, Vitelco's parent, guaranteed by Vitelco. The effect was to decouple ATN finances from Vitelco's finances.

(iii)    Paragraph 7(a)(2) provided: "The mortgages … on VITELCO's property shall be used as collateral *only* for VITELCO's direct debt…"." (Emphasis added). There was an admonishment that clearly that there shall be (in the future) no further mortgages or liens on VITELCO property for other activities of ATN by RTFC without "the Commission's specific approval".

(iv)    Paragraph 7(a)(3) required that the earnings tests of any RTFC indebtedness directly to Vitelco only be based upon Vitelco's earnings and further, that those tests would not be incorporated into the ATN Indebtedness. Thus, RTFC agreed that a default of ATN could not be based upon the earnings performance of Vitelco.

(v)   Paragraph 7(a)(4) requires for all indebtedness (including future indebtedness of ATN) that any proposed sale of Vitelco stock due to any seizure by RTFC be submitted to PSC for approval.

(vi)   Paragraph 7(a)(5) required a reduction in Vitelco's investment in RTFC's SCCs (subordinated capital certificates).

(vii)   Paragraph 7(a)(6) dealt with Vitelco's equity ratio.

(viii)   Paragraph 7(a)(7) insured that a series of transfers resulting tin a change of control will be submitted to PSC for approval.

(ix)   Paragraph 7(a)(8) provided: "... any additional financing ... undertaken by ATN shall in no way require VITELCO to guarantee or collateralize ..., and **shall in no way impact on VITELCO's access to financial markets**, *without the Commission's prior approval. Any such ... shall be void*." (Emphasis Added).

(x)   Paragraph 7(a)(9) dealt with how Vitelco would deal with the PSC.

In exchange for the above agreements, the PSC agreed to allow Vitelco to pay dividends sufficient for then ATN Co. to make the RTFC loan payments.

11.   Affiant singularly negotiated the high-level terms of what became the 2001 Loan Agreement. There was no agreement to change the traditional relationship between RTFC loans to Vitelco and RTFC loans to ICC which were decoupled as a result of the Tri-Party Agreement.

12.   In 2003 Affiant was asked to review CFC's public documents because for the first time in the history of ICC's relationship with RTFC, patronage distributions were decreasing. Mr. Prosser questioned whether a $1 Billion non-performing Electric loan was affecting the patronage dividend to Vitelco and ICC.

4

13.    Affiant and ICC's CFO each independently concluded after examining Ernst and Young LLP ("Ernst") restatement of Segment Information for 2000 and 2001 that CFC was misappropriating funds that belonged to RTFC and its members which includes ICC.

14.    Because ICC represented from 12% to 17% of RTFC's earnings making $100 Million defalcation material, ICC raised the issued with RTFC.  RTFC is managed by CFC.

15.    RTFC did not then, and to this day has not offered, an explanation for why patronage allocations have not tracked RTFC contribution to CFC/RTFC earnings.

16.    When pressed, RTFC accelerated all of ICC loans in March or April of 2003.

17.    Faced with ruination, Mr. Prosser capitulated; entered into revised loan repayment schedule agreement with RTFC; executed a release having never received an explanation for differences between RTFC's audited information and CFC's reported Segment Information.

18.    In 2004 the Delaware Court rendered a devastating decision in the case of *In re Emerging Communications, Inc. Shareholders Litigation*, 2004 WL 1305745 (Del. Ch., May 2004) finding EmCom, ICC's parent liable on over $230 Million.  Mr. Prosser and Affiant were held personally liable.

19.    Mr. Prosser called Affiant from meetings with RTFC in May of 2004 asking whether he could raise (given the 2003 release) the misappropriation of RTFC's income by CFC. Affiant responded that the release did not protect CFC from a derivative suit and further, that CFC continued the practice after the 2003 settlement.  Since 2003 Affiant has come to opinion that release designed to allow the perpetrator to continue with unlawful activity is void as a matter of public policy.

20.     Mr. Prosser stated that he raised the prospect of a derivative suit and the RTFC meeting came to an abrupt end.

21.     Within a week, RTFC commenced the suit for foreclosure of the ICC loans.

22.     In 2005, ICC's counsel noticed two discrepancies in the 2001 Loan Agreement: (i) 8 pages of the 2001 Loan Agreement had the footer "4" at the bottom of the page while the balance of the pages had the "2" footer; and (ii) the "In Witness Whereof ..." language is the same on pages 25 and 26 of the 2001 Loan Agreement.

23.     A deposition was taken of Frank Vaughan, a CFC associate general counsel, in which he under oath answered the following question as follows:

00224

13     Q.   Can you sit here today and tell me that

14  each and every word on the physical loan document

15  that Mr. Prosser signed is identical to the words in

16  the loan documents, the four versions of the loan

17  documents that Mr. Siegfried asked you about?  That's

18  a yes or no question, sir.

19     **A.   No.**

24.     Of the 31 defaults in the RTFC foreclosure action only 10 had survived to the date when ICC filed bankruptcy.  All ten defaults required setting aside the Tri-party Agreement executed in April of 1989.  Without Vitelco coupled to the ICC loan there was no default. Additionally, the defaults were also dependent upon the authentication of the 2001 Loan Agreement.

25.    Before Orrick was disqualified by a conflict, Orrick engaged the Washington D.C. office of LECG Corporation to review the facts of the CFC-RTFC relationship.

26.    LECG Corporation reached three conclusions: (i) verified that CFC had misappropriated funds from RTFC (LECG's figures were higher than Affiant's figures); (ii) that the misappropriation scheme constituted security fraud; and (iii) the misappropriation scheme constituted tax fraud.

27.    Upon information and belief, Affiant's reasoned opinion is that CFC has no interest in settlement because CFC has been able to access the Government fisc that allows CFC to act detached and indifferent to the economic consequences of the actions with regard to ICC.

28.    Upon information and belief, Affiant's reasoned opinion is that CFC would be forced to settle with ICC but for access to the Government fisc.

29.    Upon information and belief, Affiant's reasoned opinion is that CFC would have financially collapsed but for the access to the Government fisc. Selling loans in 2007 to Farmer Mac in 2007 as well as innovative accounting adjustments to loan loss reserve all are indicative of CFC's cash flow problems.

30.    CFC's stated in the February 29, 2008 10Q that: "Based on its analysis, the Company believes that it is adequately reserved for its exposure to ICC at February 29, 2008". This in Affiant's opinion is an intentional misrepresentation.

31.    Affiant personally caused the creation of an internet site on this matter which is http://cooperativefinancecorporation.com/. Point 7 entitled "CFC misappropriation of funds belonging to rural telephone members of RTFC" was prepared with link to extracts to either or both CFC's audited Financial Statements or RTFC's audited Financial Statements.

32.     On March 21, 2008, Affiant made a demand upon the Trustees to pursue a civil

RICO action.  To date, neither Trustee has responded.

I declare under penalty of perjury that the foregoing is true and correct.  This affidavit

was executed this 7th day of July 2008, at Omaha, Nebraska.

_____
John P. Raynor

Subscribed and sworn to before me this 2nd day of June 2008.

_____
Notary Public

My Commission Expires:



GENERAL NOTARY - State of Nebraska
WILLIAM E. PFEIFFER
My Comm. Exp. March 8, 2011